## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**RONALD JEFFREY PRIBLE,**                          '
                              **Petitioner,**       '
                                                    '     **NO. _____**
**VS**                                              '
                                                    '
**NATHANIAL QUARTERMAN, DIRECTOR,** '
**TEXAS DEPARTMENT OF CRIMINAL**         '
**JUSTICE, INSTITUTIONAL DIVISION**      '
                              **Respondent**        '

### ORIGINAL PETITION FOR WRIT OF HABEAS CORPUS
### OF A PERSON IN STATE CUSTODY

TO THE HONORABLE KEITH ELLISON, U.S. DISTRICT JUDGE:

Petitioner, Ronald Jeffrey Prible, Texas Department of Criminal Justice Inmate No. 999433, is currently confined on death row in the Texas Department of Criminal Justice – Institutional Division's Polunsky Unit located in Livingston, Texas.  Mr. Prible petitions this Court, pursuant to Title 28 U.S.C. §2254, to issue a Writ of Habeas Corpus and to order his release from confinement on grounds that his custody violates the Constitution and laws of the United States.  This is an original federal petition in a death penalty case.

### JURISDICTION

This court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Mr. Prible was convicted in a Harris County, Texas, court.  Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Mr. Prible is restrained pursuant to the judgment and sentence entered in *The State of Texas vs. Ronald Jeffrey Prible, Jr.*, Cause No. 921126, in the 351st Judicial District Court, Harris County, Texas.  Mr. Prible was charged with capital murder alleged to have occurred on April 24, 1999.  (CR. Vol. 1, p. 2.)  Mr. Prible was convicted of capital murder and sentenced to death on October 25, 2002.  (CR. Vol. 1, p. 212.)  A motion for new trial was filed on November 25, 2002, and overruled on January 7, 2003.  (CR. Vol. 1, pp. 233, 239.)

On January 5, 2004, Mr. Prible filed his direct appeal raising eight points of error. The Texas Court of Criminal Appeals denied relief in *Prible v. State*, 175 S.W.3d 724 (Tex. Crim. App. 2005)  On or about November 18, 2004, Mr. Prible's counsel, Roland Moore, filed an application for writ of habeas corpus containing four claims for relief in the TCCA pursuant to Article 11.071 of the Texas Code of Criminal Procedure.  On June 18, 2008, the TCCA denied relief.

## *PRO SE* PLEADINGS

During state habeas proceedings, Mr. Prible filed numerous pleadings *pro se*. These pleadings included two applications for habeas relief.  Mr. Prible explicitly raised a claim that the State violated *Massiah v. United States*, 377 U.S. 201 (1964), "when it recruited a prisoner [Michael Beckcom] to act as the government agent in deliberately elicit[ing] incriminating information from [Mr.] Prible".  *Pro Se Petition*, at 4 (citing *Creel v. Johnson*, 163 F.3d 385, 393 (5th Cir. 1988).  Mr. Prible also raised a claim based on *Brady v. Maryland*, 373 U.S. 83 (1963), in which he alleged that the State suppressed

2

the nature and extent of its relationship to Beckcom, its key witness, and to Nathan Foreman, who supplied Beckcom to the State to act as its agent. *Id.* at 3-4.  Mr. Prible also set forth the scheme that the State used to establish probable cause using misleading and inaccurate representations about ballistics evidence, and he alleged that the State schemed to transfer Mr. Prible to the federal prison unit in which Beckcom and Foremen were housed.  *Id.,* at 6-7.  He expanded on the evidence supporting these allegations in a pro se motion for discovery.  Mr. Prible attempted to raise ineffectiveness of counsel allegations, in which he complained that his defense counsel failed to protect his Sixth Amendment and Due Process rights.

Mr. Prible repeatedly brought to the convicting court's and the TCCA's attention that the attorney appointed to represent him in state post-conviction proceedings was not investigating his case, and was not raising the important prosecutorial misconduct claims that Mr. Prible had clearly identified.  Mr. Prible attempted to recuse Judge Mark Kent Ellis, who presided over trial and was presiding over state post conviction proceedings, on the ground that he had assigned his state writ attorney because of campaign contributions.  At a hearing conducted by videoconference on the recusal motion, Mr. Prible expressly informed Judge Ellis that his attorney was not investigating his case and had not raised the meritorious issues that Mr. Prible had asked him to raise.

The convicting court did not assign Mr. Prible new counsel despite the clear conflict between Mr. Prible and his appointed attorney.  His appointed attorney failed to file a motion to withdraw even though Mr. Prible's communications to the courts and with him demonstrated that a complete breakdown in the attorney-client relationship had

occurred before the state writ was due.  The Texas Court of Criminal Appeals reached the merits of the application filed by state habeas counsel, but treated Mr. Prible's *pro se* pleadings as subsequent applications under TEX. CODE CRIM. P., ART. 11.071 § 5, and disposed of them as an abuse of the writ.

## CLAIMS FOR RELIEF

Mr. Prible presents claims raised on direct appeal and in *Prible v. State*, 175 S.W.3d 724 (Tex. Crim. App. 2005), collateral proceedings in *Ex parte Ronald J. Prible, Jr.*, 2008 Tex. Crim. App. Unpub. LEXIS 449 (Tex. Crim. App. 6/18/2008).  The argument and exhibit evidence referred to in these claims is incorporated by reference as if fully set forth herein.

Mr. Prible also presents several claims that he did not file in a state forum.  Should the Court find that it does not have jurisdiction over these claims, or should the Court find that they are unexhausted, he hereby moves for the Court to stay and abbey his petition so that he may exhaust them in State court.  In the alternative, he asks that he be given leave to file an amended petition without the claims, or that they be stricken, so as to avoid having his petition dismissed as a mixed petition.

## CLAIM #1

**Mr. Prible was deprived of his Fourteenth Amendment right to Due Process by the admission of evidence documenting the deaths of the Complainants' children.**

As the State recognized, Mr. Prible alleged on direct appeal that the introduction of testimony and exhibit evidence describing and depicting the deaths of Steve and Nilda Herrera's children due to smoke inhalation "deprived him of due process under the

4

United States Constitution." *State's Appellate Brief,* at 19; CR, at 35.  The Texas Court of Criminal Appeals addressed Mr. Prible's constitutional claim, stating that it was denying it for the "same reasons expressed" in the TCCA's determination that the admission of the evidence did not violate Texas Rules of Evidence 402 and 403.

### A.    FACTS

Mr. Prible was charged with capital murder in a one-paragraph indictment that alleged he caused the deaths of Steve and Nilda Herrera by shooting them with a firearm during the same criminal transaction.  (CR, vol. 1, at 2).  Steve was found in the garage face down.  Nilda's burnt body was found in the adjacent room on the couch.  Both had been executed by gunshots to the head.  The bodies of their three children were found upstairs.  Each had died of smoke inhalation from the smoldering fire that Steve and Nilda's assailant(s) had started below.  There was no evidence that the children had been sequestered, injured or traumatized.

At trial, Defense counsel made the following objection to the introduction of evidence of the children's deaths.

> DEFENSE COUNSEL:    "Concerning the children… I want the Court to understand that our grounds [for objecting to evidence of the children's death] are premised in the Rules of Evidence, Rule 403 and Rule 404 and the Fourteenth Amendment to the Constitution of the United States. The Defendant's right to a fair trial unencumbered by evidence that he's a criminal generally, has committed other offenses.  And [we] would ask the Court to extend its ruling to a point where we are not required to

make objections every time evidence of the deaths of the three children comes up through any witness."

> THE COURT:      "Absolutely. The Court will grant a running objection to any evidence related to the death of the children introduced at the guilt/innocence phase of the trial with all the objections the Defense has just stated and will not require them to make the objection in the presence of the jury…."

RR. Vol. 21, at 16.  Citing this objection and ruling on direct appeal, Mr. Prible argued that the introduction of evidence related to the deaths of the girls violated his due process rights.

In Texas, a homicide is a capital crime if there are two or more victims in the same transaction, if a victim is under 12 years old, or if the cause of death is arson.  TEX. PENAL CODE § 19.03.  During opening remarks the prosecutor stated that what the firemen who arrived at the scene saw was "horror because they're going to tell you what they found there that day in that house was a whole family dead.  Not just Esteban Herrera, Jr., Steve; not just Nilda Tirado, but three little girls."  *Id.,* at 73.  According to the prosecutor, "walked out of a house with it smoking and burning, knowing three little babies were asleep in their beds.  That is the kind of man [he is] and he's guilty of capital murder."  *Id.* at 83.  During closing argument, the prosecutor insisted that this case was "a capital murder where three little girls were executed." RR. Vol. 28, at 83.

B.    ARGUMENT

The Fifth Circuit applies a two-pronged test to determine whether extraneous offense evidence violates due process.  First, the government must make a "strong showing that the defendant committed the offense' and second the government must demonstrate that the extraneous offense is 'rationally connected with the offense charged." *Enriquez v. Procunier*, 752 F.2d 111, 115 (5th Cir.1984), *cert. denied*, 471 U.S. 1126 (1985).

>   **1.    The Government did not make the type of strong showing required to justify the introduction of evidence of the extraneous capital murders of three children.**

The evidence that Mr. Prible intended to kill Steve and Nilda's children hinged on Beckcom's testimony.  Beckcom testified that Mr. Prible told him that he knew the girls were upstairs.  According to Beckcom, when he inquired about the deaths of the three girls, Mr. Prible stated that anyone who could "take out an entire family was a bad motherfucker, and I'm that bad motherfucker." RR, vol. 26, at 52.

Beckcom's testimony about the death of the girls is inherently unreliable jailhouse snitch testimony that is not supported by any evidence corroborating an intention to kill the three little girls.  The State did not provide a motive explaining why Mr. Prible would kill the girls.  None of the children witnessed the deaths of their parents.  They do not appear to have been awakened by gunshots.  Firemen found two of the girls in their bedroom: Rachel was face-down on the floor; Valerie was found face down in bed. *Prible,* 175 S.W.3d, at 727.  Jade's body was found in the master bedroom face down on the floor.  *Id.*

There was no testimony indicating that Mr. Prible saw or heard the children while he was at Steve and Nilda's during the evening before the two were killed. There was no evidence that anyone went upstairs to where the girls were found until the fire department arrived early the next morning and searched the home. According to the State, before Steve died, Mr. Prible and Steve's brother and Steve played pool out in the garage, then went to a cabaret and returned to Steve's home. These events transpired late at night. Children were not part of these scenes. Although Mr. Prible and Steve were childhood friends, the State maintained that Steve allowed no one in the house. The girls had numerous relatives nearby – uncles, aunts and grandparent – at whose homes they could be left to spend the night.

Finally, the State did not establish that the killer intended to burn the house down. Arson investigators established that the killer used an accelerant. Gasoline was used and an open can of a Kutzit was found near Nilda's body. However, there was no evidence that the assailant attempted to set the room on fire by spreading accelerant on carpets, wall or furniture. According to the State, the assailant set Nilda on fire after she was dead in order to destroy evidence that would have been left behind in the course of a sexual assault. RR. Vol. 21, at 10-11.

### 2. The Government did not demonstrate a rational connection to the offense charged.

The Fifth Circuit's case law makes clear that it is not enough to show that the *actus reus* of the extraneous offense – in this case the death of the three girls -- was a causal consequence of the conduct that constituted the charged offense. Instead, the

extraneous offense evidence has to be probative of the actions or the mental states that the State contends satisfy the elements of the charged crimes. For example, in *Wood v. Quarterman*, 503 F.3d 408 (5th Cir. 2007), the State sponsored testimony from a prostitute who had escaped the fate of one of Wood's murder victim, a woman named Kelly. The prostitute described being restrained and raped in a manner that bore a "striking similarity" to the crime scene evidence developed in six murders, including, Kelly's. *Id.,* at 414. In *Story v. Collins*, 920 F.2d 1247 (5th Cir. 1991), the State charged Story with indecency with a child named Crystal. He objected to evidence that he had masturbated in front of two other girls. After finding that that satisfied the first prong of the *Procunier* test, the Court ruled that extraneous offense was "rationally connected with the charged offense, because it indicated that Story had a desire to engage in sexual conduct in Crystal's presence." *Id.,* at __.

In sharp contrast, the deaths of Steve's and Nilda's three little girls had nothing at all to do with the motive, intent, manner or means of death that the State alleged were involved in the execution of their parents. The assailant(s) did not need to get rid of the girls because they were witnesses. The State did not need to show that Steve or Nilda died of asphyxiation. It alleged that the parents died from gunshot wounds to the head fired at close range. The State did not need to display crime scene and autopsy evidence showing how the girls died in order to show that a fire had been set in order to conceal and destroy evidence. The evidence of a fire, where it started, what caused it, and where

it spread, was absolutely clear without reference to the deaths of the children.[1]   The accelerant was found downstairs near Nilda, the firefighters arrived to find smoke coming out from under the eaves of the home, and they described the smoky conditions they found throughout the house when they entered to search.

Introduction of evidence of the three extraneous capital offenses was entirely gratuitous, rather than rationally connected to the State's case for convicting Mr. Prible of Steve's and Nilda's death.  Indeed, the State admitted that the evidence of the extraneous capital murders that it intended to introduce at guilt innocence were not rationally connected to the Steve and Nilda's assailant's intentions or actions.  In trying to justify the introduction of the extraneous offense evidence, the State argued that,

> This isn't some sociopath who decided to wipe out a whole family. This is a Defendant who killed two people and then set the house on fire in an attempt to cover up the family (*sic*).  And had those children survived there probably would have been no moment to the Defendant because neither of the three children had seen him or could identify him as the person who killed both their parents because they were upstairs….

RR. Vol. 21, at 7-8.

That the purpose of introducing evidence of regarding the children's deaths was to inflame the jury, rather than provide a context for the crime, is clear, too, from the extensive visual evidence that the State sponsored.  The State was not satisfied with sponsoring verbal descriptions from the firefighters who found the girls.  It also

---

[1] The State's recitation of the evidence shows that the firefighters found Steve and Nilda's bodies immediately and realized right off that the crime scene involved homicide and arson.  The firefighters retreated from the house, ventilated it and searched other rooms.  Finding nothing, they regrouped outside again.  They reentered and went upstairs in order to find the three girls. See, State's Appellate Brief, at 6; CR, at 000022.  That is, firefighters

introduced crime scene photos of each child followed by autopsy photos showing the dissected bodies and organs of every single little victim.  As the Ninth Circuit recognized in *McNeely v. Olivarez*, 104 F.3d 365, *5 (9th Cir. 1996),[2] federal due process claim exists if the introduction of graphic, gruesome photographs of the victim renders the trial fundamentally unfair.   At sentencing, where evidentiary rules are more relaxed, particularly gruesome photos of a victim may still warrant habeas relief.  *See, Spears v. Mullin*, 343 F.3d 1215, 1229 (10th Cir. 2003), *cert. denied sub nom.  Powell v. Mullin*, 541 U.S. 909 (2004) (photos of victims so inflammatory as to "fatally infect[ ] the trial and deprive[ the defendants] of their constitutional rights to a fundamentally fair sentencing proceeding").

### 3.  The argument that admission was justified because it bolstered the jailhouse snitches credibility was false and misleading.

According to the State, the evidence of three extraneous capital murders was admissible because the evidence corroborated Beckcom's testimony.   However, if anything the evidence detracted from Beckcom's credibility.   The key to the State's endeavor to establish Beckcom's credibility was statements to him by Mr. Prible that the State maintained described details of the crime scene that only a person who had been at the scene would know.  However, Beckcom's testimony about where the girls were was neither detailed nor accurate nor did it indicate in the least that the source of the testimony had to come from someone who had been at the crime scene.   Beckcom testified that Mr. Prible told him that the girls "were in bed". RR, vol. 26, at 49.

conducted three searches, and what they found on the third go around was absolutely unnecessary to "provide a

Beckcom asked how did they die and he said Mr. Prible said "smoke inhalation". *Id.* **However, no one would have learned that the girls died of smoke inhalation from being at the crime scene when the crime occurred**. This is the type of fact that could only be learned afterwards from other sources, such as the newspaper, where it was reported, from police reports or from any number of people who talked later to the family members and neighbors who had arrived in numbers at the crime scene. Clearly, the culprit would have fled the scene before the girls asphyxiated. Even though the fire was a flash fire spread through the room adjacent to the garage quickly, it took time for the smoke to permeate the entire home and choke the girls. Beckcom's testimony that Mr. Prible told him that the "girls were in bed" is equally useless as far as establishing credibility. Mr. Prible was Steve's close friend, he had been to their home several times, and knew that the crime took place very late at night or early morning. He clearly did not have to be at the scene when the crime happened in order to be able to make the representation that the girls were in bed when Steve and Nilda were shot downstairs. Furthermore, Beckcom testimony that Mr. Prible told him that the girls were "in bed" when Steve and Nilda were shot does **not** accurately describe how or where the girls were found.[3]   One of the children, Jade, was in the master bedroom. Two, including Jade, were found on the floor.

---

context" to Steve's or Nilda's murder.
[2] Unpublished opinion.
[3] It is absolutely mindboggling that at trial, on appeal and in post-conviction proceedings, the State gets away with this ruse about "facts that only the killer would know". Mr. Prible knew Steve and Nilda's family; he was from the

**3.     The Texas Court of Criminal Appeals' determination that there was no due process violation was "contrary to" and involved an "unreasonable application" of federal constitutional law. See, 28 U.S.C. § 2254(d)(1).**

The Due Process Clause provides relief from evidentiary rulings that are "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *and see*, *Spencer v. Texas*, 385 U.S. 554, 561 (1967) (The Due Process Clause guarantees the fundamental elements of fairness in a criminal trial.).   The established standard for fundamental fairness requires that habeas relief be granted by a federal court when the state trial error relates to evidence that is material in the sense of a crucial, critical, highly significant factor. *Mullen v. Blackburn*, 808 F.2d 1143, 1145 (5th Cir. 1987).   The Fifth Circuit has recognized in a long line of habeas cases that if extraneous offenses are highly significant factors, their introduction at guilt-innocence infringes the defendant's due process rights unless there is a rational connection between the extraneous offenses and the charged offenses.   *Procunier, supra; Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

In Mr. Prible's case, the Texas Court of Criminal Appeals justified the introduction of evidence of three extraneous capital offenses on grounds that explicitly *violate* due process.   Indeed, it upheld the decision to admit the extraneous murders of the three girls because it found that these offenses were **not** rationally connected to the crimes with which Mr. Prible was charged.   The TCCA expressly ruled that "there was

---

neighborhood.  Facts about the crime, such as where the girls were found dead, where the parents were found dead,

little likelihood" that evidence of the tragic deaths of the three girls "would encourage the jury to reach an irrational verdict or act on the basis of emotion," because "***evidence of their deaths did <u>nothing</u> to prove that appellant was responsible for the murders of Steve and Nilda.***"  *Prible*, 175 S.W.3d, at 733 (emphasis added).  Clearly, the TCCA's decision was contrary to bedrock principles of due process and fundamental fairness that the Supreme Court has long insisted must govern criminal trials.  In the alternative, it is and unreasonable application of these basic principles.

           **4.**      **The extraneous offense evidence was clearly harmful when measured against the scant evidence supporting the jury's verdict.**

The presentation of the evidence in Mr. Prible's case focused extensively on the deaths of the three girls.  Testimony regarding the condition in which their bodies were found came in through firefighters, police officers and the Medical Examiner.  It displayed gruesome autopsy photos showing the effects of smoke inhalations.  The prosecution dwelt on the death by suffocation in its case in chief and in closing.  The State realized the evidence was shocking.  Speaking to the jury, the lead prosecutor stated,

> "You probable thought, wait a minute, Kelly, you just said whole family. All I've heard about from the Judge and you and Vic and them is Steve and Nilda. What's this business about a whole family?  You were probably shocked and should have been."

RR. vol. 28, at 86.

---

how they were killed, etc., were known by a wide circle of people with which Mr. Prible was connected.

On the other hand, the evidence that Mr. Prible killed Steve and Nilda was far from overwhelming.  State's evidence consisted in testimony from Steve and Nilda's family members placing Mr. Prible at Steve's residence during the late evening and early morning when the murder took place.  DNA evidence that indicated that Mr. Prible and Nilda had oral sex shortly before the murders also placed him at Steve's house near the time of the murders.  The State also obtained inconsistent statements from Mr. Prible in which at first he denied having an affair with Nilda and then admitted to one.  However, all of this evidence was developed two years before trial.  At the time, the State determined it did not have probable cause to arrest Mr. Prible.  He remained at liberty until he was apprehended for robbing several banks, and was not charged with capital murder until he had nearly completed his federal sentence.

The State's case depended on the severely impeached testimony of the State's jailhouse informant who had killed a man by carbon dioxide poisoning, admitted that he had previously lied under oath, and was testifying to get his sentence reduced.  Mr. Prible also impeached the crime scene investigation.  Detective Brown failed to collect blood samples from the splatters on the wall, and was compelled to admit that his performance was just sloppy.  The State's DNA expert fared no better.  Dr. Watson testified that spermatozoa would not live much longer than 15 minutes in an oral cavity.  The Harris County Medical Examiner and the Defense expert contradicted this testimony.

On the other hand, Mr. Prible put on a substantial defense.  He discredited the motive that the State advanced for the murder, which was that Steve took $250,000.00 from him.  He countered the State's theory of animosity toward Steve with testimony that

they were boyhood friends and knew each other's families.  The Defense also sponsored a credible alibi witness, a neighbor, who testified that she knew Steve and Prible by sight and by voice, and that she saw and heard both of them sometime after 1 PM outside her home.  The State's arson experts also provided exculpatory information when he testified that the accelerants used to set Nilda afire would produce a "flash fire" which he described as a "very rapid hot fire."  RR., Vol. 21, at 217.  According to the arson expert, "the easiest way … to describe a flash fir to most people is take a charcoal barbecue, pour light fluid and drop a match or torch and you get a whoosh or rush of lames.  That's a typical flashfire.  We're talking about a roomful of consequences." *Id.*  With the rapidity that characterizes an explosion of lighter fluid, the flashfire quickly burned up what he referred to as the "majority of the consumables" in the room where Nilda was found.  *Id.* at 222.  Clearly, such a fire would have burned and singed Mr. Prible's clothing, exposed body hair and exposed skin.  However, Mr. Prible did not display any such effects when detectives interviewed him and police examined him the just hours after the murder.

### 5. The TCCA's harmless error analysis violated 28 U.S.C. § 2254(d)(1) "contrary to" and "unreasonable application" prongs.

For purposes of 28 U.S.C. § 2254(d)(1), the TCCA's prejudice analysis is contrary to, or involves an unreasonable application of, federal constitutional law.  The TCCA did not conduct the harmless error analysis delineated by the Supreme Court in *Brecht v. Abraham*, 507 U.S. 619, 637 (1993).  Instead, the TCCA's analyzed "potential prejudice" in terms of whether what it called "the relatively strong probative value of the evidence" incriminating Mr. Prible in the deaths of Steve and Nilda, and determined whether it was

"substantially outweighed by "the mere possibility of unfair prejudice." *Id.* However, this is the standard for determining whether admission of the evidence resulted in a substantive violation of evidentiary rules. *See*, TEX. R. EVID. 403; and see, FRE 403. Such a standard is not appropriate for evaluating prejudice under Texas or federal constitutional law. *See,* TEX. R. APP. P. 44.2(a-b); *Brecht, supra.*

### CLAIM # 2

**Mr. Prible received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel failed to effectively address and rebut the testimony of William Watson, that the semen found in the complainant Nilda Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion.**

Mr. Prible was entitled to counsel skilled in the rules of evidence and procedure. U.S. Const. amends 6 & 14; *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Petitioner received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel  failed to effectively address and rebut the testimony of William Watson, that  the semen found in the complainant Nilda Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion.

William Joseph Watson testified for the State.  (RR. Vol. 24 p. 28).  Watson was a DNA expert hired by the State. (RR. Vol. 24 p. 31).  Watson analyzed the semen swabs taken from the complainant Nilda during the autopsy.  (RR. Vol. 24 p. 64).  Watson was able to detect the Petitioner's DNA from the sperm found on swab taken from the complainant's mouth.  (RR. Vol. 24 p. 104).  Watson told the jury that in his experience,

17

he had never been able to recover a sufficient amount sperm from a swab taken from a complainant's mouth, to make a reliable DNA determination, where the complainant had been alive at the time sperm had been deposited.  (RR. Vol. 24 pp. 100-106).  The conclusion to be drawn from Watson's testimony that was that Mr. Prible must have deposited his sperm in the complainant's mouth at or almost simultaneously with the time of her death.

The testimony by Watson that the sperm must have been deposited in the complainant's at or near the time of her death surprised the defense. (See Affidavit of Dr. Robert C. Benjamin, Exhibit D.)  Petitioner's attorneys were ineffective for failure to object to the expert's conclusion, without the trial court first conducting a hearing to determine whether the expert's methods were reliable. *Daubert v. Merrell Dow Pharmaceutical*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).  Trial counsel were also ineffective for failure to move for a continuance in order that expert testimony contradicting Watson's testimony could be obtained.

There was ample scientific evidence that the testimony of the State's DNA expert was without foundation in scientific fact, nor as he qualified to make the assertions that he did.  (See Affidavit of Dr. Elizabeth A. Johnson, with scientific publications, Exhibit C to the State Application for Writ of Habeas Corpus.)

## <u>CLAIM # 3</u>

**PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY BECAUSE THE VENIRE DID NOT REFLECT A FAIR CROSS-SECTION OF THE COMMUNITY**

18

In 1975, the United States Supreme Court in *Taylor v. Louisiana* held:

> [T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.[4]

Because Harris County systematically excludes Hispanics from jury service, Petitioner was denied his right to a jury drawn from a fair cross-section of the community as guaranteed by the Sixth and Fourteenth amendments.   As explained in further detail in this section, each of the elements required to establish a *prima facie* violation of the fair cross-section requirement is satisfied.   In particular:

a. Hispanics qualify as a distinctive group.

b. Hispanics are under-represented on the venire as a matter of law.   Based on his analysis of the data, Prof. Harold Hietala, Ph.D., Professor of Statistics, determined that Hispanics were in fact significantly under-represented.   Hispanics make up 30% of persons in the county eligible for jury service, but Petitioner's venire panel included only 37 Hispanics out of 300, or about 12%.   (See Exhibit E.)   Petitioner's twelve-person jury contained zero Hispanics.

c. The exclusion of Hispanics from venire panels is systematic in that it is the direct result of procedures adopted by Harris County.   As shown below, Hispanics are being excluded primarily because the pay for jury service ($6/day) is the lowest in the nation, among other reasons.

---

[4] *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975).

A.    **Petitioner Has an Absolute Right to a Jury Drawn From a Fair Cross-Section of the Community.**

The right to a fair and impartial jury in criminal cases is one of the most fundamental aspects of the government and society of the United States.[5]  "Jury service preserves the democratic element of the law … [because it] affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for the law."[6]  Jury service also "guard[s] against the exercise of arbitrary power … [by making] available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge."[7]  Accordingly, the right to an impartial jury, which traces its roots all the way back to the signing of Magna Carta in the 13th century,[8] is preserved by the Sixth Amendment to the Constitution.[9]

"The very idea of a jury is a body of men composed of the peers or equals of the persons whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status as that which he holds."[10]  Thus, "[t]he American tradition of trial by jury … necessarily contemplates an impartial jury drawn from a cross-section of the community," and requires that "prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of [the

---

[5] *Powers v. Ohio*, 499 U.S. 400, 407 (1991).
[6] *Id.*
[7] *Taylor,* 419 U.S. at 529.
[8] *Duncan v. Louisiana*, 391 U.S. 145, 151 (1968).
[9] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed."  U.S. Const., Amend. 6.
[10] *Taylor*, 419 U.S. at 536 n.19, *quoting Strauder v. West Virginia*, 100 U.S. 303, 308 (1879).

20

economic, social, religious, racial, political and geographical groups of the community]."[11]

### *Duren v. Missouri*

The tool provided to ensure this requirement is met is the fair cross-section claim, articulated by the Supreme Court in *Duren v. Missouri*.[12]  In order to prove a violation of Petitioner's right to a jury drawn from a fair-cross section of the community, an individual must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.[13]

Once the defendant makes a prima facie showing of a fair cross-section violation, the burden shifts to the state to show "'that the disproportionate exclusion manifestly and primarily advances a significant governmental interest.'"[14]

Fair cross-section claims are not limited to federal courts.[15]   Rather, the requirement applies to state court criminal proceedings by virtue of the Fourteenth Amendment.[16]  Nor is membership in the excluded class a requisite for raising a claim.[17]

---

[11] *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220 (1946).
[12] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).
[13] *Id.*
[14] *Aldrich v. State*, 928 S.W.2d 558 (Tex.Cr.App. 1996), *quoting Duren*, 439 U.S. at 367-68; *United States v. Maskeny*, 609 F.2d 183, 189 (5th Cir. 1980), *cert. denied*, 447 U.S. 921 (1980) ("unless the state shows that the aspects of the process that result in the disproportion manifestly and primarily advance a significant state interest.").
[15] *Duncan v. Louisiana*, 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968).
[16] *Id.*
[17] *Duren*, 439 U.S. at 359, n.1, citing *Taylor*, 419 U.S., at 526-531, 538.

Finally, the requirement is not a guarantee of "a jury of any particular composition."[18] Instead, the right to bring a fair cross-section claim only ensures that venires from which juries are drawn do not systematically exclude distinctive groups in the community.[19]

### B.    Hispanics Are a Distinctive Group Under the *Duren* Test.

Hispanics have repeatedly been held to be a distinctive group.[20]  The Supreme Court has never defined "distinctiveness", but has held that "the concept … must be linked to the purposes of the fair-cross section requirement."[21]  The "purposes" were identified by the court:

> (1) '[guarding] against the exercise of arbitrary power' and ensuring that the commonsense judgment of the community' will act as 'a hedge against the overzealous or mistaken prosecutor,' (2) preserving 'public confidence in the fairness of the criminal justice system,' and (3) implementing our belief that 'sharing in the administration of justice is a phase of civic responsibility.[22]

In *Weaver v. State*, the Dallas Court of Appeals held that distinctiveness is found where a "common thread of shared experience or a political, social, or religious viewpoint binds all persons [of the particular group]."[23]

---

[18] *Taylor*, 419 U.S. at 538; *Lockhart v. McCree*, 476 U.S. 162, 173 (1986) ("We have never invoked the fair cross-section principle … to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.").

[19] *Taylor*, 419 U.S. at 538.

[20] *See e.g.*, *Hernandez v. Texas*, 347 U.S. 475 (1954); *Castaneda v. Partida*, 430 U.S. 493, 495 (1977); *Aldrich v. State*, 928 S.W.2d 558, 560 (Tex.Cr.App. 1996) ("We accept that Hispanics are a distinctive group in any community …").

[21] *Lockhart*, 476 U.S. at 174.

[22] *Lockhart*, 476 U.S. at 174-75, *quoting Taylor*, 419 U.S. at 530-31.

[23] *Weaver v. State*, 823 S.W.2d 371, 373 (Tex. App.—Dallas 1992, pet. ref'd), citing *U.S. ex rel. Silagy v. Peters*, 713 F.Supp. 1246, 1251 (C.D. Ill. 1989); *United States v. Blair*, 493 F.Supp. 398, 406 (D.Md. 1980), *aff'd*, 665 F.2d 500 (4th Cir. 1981).

### C.     The Under-Representation of Hispanics on Harris County Venires is Both Unfair and Unreasonable.

The second element of the *Duren* test requires that Petitioner show "that the representation of [Hispanics] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community."[24]   To meet this requirement, a defendant should present evidence to show an absolute disparity[25] of more than 10%.[26]   The representation of the distinct group is measured against the community of eligible jurors, rather than the whole community.[27]   An absolute disparity is calculated by subtracting the percentage of the jury venire that is composed of members of the distinct group from the percentage of the community of eligible jurors made up of members of the distinct group.[28]   The Supreme Court has not determined precisely the point at which the representation of a distinctive group is so low as to be unfair and unreasonable.[29]   However, a showing of an absolute disparity greater than 10% should be sufficient to satisfy the second element of the *Duren* test.[30]

---

[24] *Duren*, 439 U.S. at 364.

[25] *Maskeny*, 609 F.2d at 190.

[26] *United States v. Haley*, 521 F. Supp. 290, 292 (N.D.Ga. 1981) ("[C]ourts have clearly arrived at the conclusion that more than 10% absolute disparity is necessary  to implicate a violation of the fair cross-section rule."), *citing Swain v. Alabama*, 380 U.S. 202, 208-9 (1965); *United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir. 1980); *United States v. Maskeny*, 609 F.2d 183 (1980); *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974); *see also* Ted M. Eades, Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County, 54 SMU Law Rev. 1813, 1823 (2001) (most courts use the 10% floor from *Swain v. Alabama*, 380 U.S. 202, 208-098 (1965)).

[27] *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981) ("the disparity … must be based not on *total* population but, instead, on those of the identifiable class who are *eligible* to serve as jurors."); *Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996), cert denied, 522 U.S. 825 (1997).

[28] *Maskeny*, 609 F.3d at 190.

[29] The Supreme Court has never articulated precise standards for determining what constitutes a significant underrepresentation,  *United States v. Haley*, 521 F. Supp. 290, 292 (N.D.Ga. 1981), *citing*, *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972)

[30] *Maskeny*, 609 F.2d at 190.

Here, the absolute disparity is at least 17%.  Based on the analysis of Professor Harold Hietala, Ph.D., an expert retained by Petitioner in this case, the absolute disparity in Harris County – making all assumptions in favor of the State – is approximately 17.3%.[31]  As explained in his Affidavit, Hispanics make up approximately 29.64% of persons eligible for jury service.[32]  Because this number is drawn from year-2000 figures, Hietala suggests that this number could be somewhat higher due to dramatic Hispanic-growth in Houston over the last four years.[33]  In comparison, based on Hietala's analysis of Petitioner's 300-person panel, only 37 panel members could possibly have been considered Hispanic (12.3%).[34]  Also, Petitioner's petit jury contained no Hispanics.  Thus, based on the evidence, Professor Hietala concluded that Hispanics were under-represented on Petitioner's venire panel, that the absolute disparity was in excess of 17%, and that the possibility that mere random chance created disparity was less than 1 in 10,000,000.[35]

### D.   The Under-Representation of Hispanics on Venires in Harris County is Systematic.

The third element of the *Duren* test requires that the disparity be the result of systematic exclusion.[36]  In Harris County, all of the evidence, the analysis contained in related studies and other jurisdictions, and any reasonable interpretation of the facts all point to the same explanation for the systematic exclusion of Hispanics: $6/day is so low

---

[31] *See* The Affidavit of Professor Harold Hietala, Ph.D., attached hereto as Exhibit ___; Professor Hietala's *Curriculum Vitae* is attached hereto as Exhibit ___.
[32] *Id*. at 6.
[33] *Id*.
[34] *Id*. at 7-8.
[35] *Id*. at 7-10.
[36] *Duren*, 439 U.S. at 364.

the lowest in the nation   that the working poor cannot afford to attend jury duty.  This falls disproportionately on Hispanics who make up a large part of the working poor in this county.   Because this and other procedures inherent to Harris County s venire selection are employed daily against every Defendant in Harris County courts, the disparity is systematic under *Duren s* requirements.

### 1.   Juror Pay Excludes Hispanics Disproportionately

In Texas, employers do not have to pay their employees for time spent serving as a juror.[37]  Thus, jury duty often means losing a daily wage for day laborers and hourly workers summoned for jury duty.  In Dallas, where $6/day is also the prevailing rate, studies have shown that the poor, especially day laborers, and Hispanics fail to show up for jury duty.[38]  $6 barely pays for parking at the court building and will not satisfy both lunch at the courthouse plus parking.  Thus, the poorest citizens   to whom jury duty is a secondary concern to providing food and shelter for their families   are forced to choose between a day s wage, perhaps $45, or attending the courthouse at a loss.  The evidence suggests that these people are disproportionately Hispanic and that financial hardship is the primary factor in their non-participation.[39]  Experience in other jurisdictions also suggests that raising the daily pay from $6 to $40 would greatly increase participation by low wage earners and Hispanics.[40]

---

[37] *See also* TEX. CIV. PRAC.& REM. CODE. § 122.001 (2004).
[38] Ted Eades, *Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County,* 54 SMU L. Rev. 1813 (2001); *Number of minority, lower-income jurors doesn t mirror community,* Dallas Morning News, October 22, 2000.
[39] *Id*.
[40] *See* Mark Curriden, *Extra money helps El Paso lure more prospective jurors*, Dallas Morning News, October 24, 2000; Mark Curriden, *No Excuses: New Yorkers who try to avoid jury duty find that system has gotten serious about service*, Dallas Morning News, October 24, 2000.

The problem is compounded because Harris County systematically fails to enforce juror summonses   this allows many poor Hispanics to simply opt out of the system.  As explained in *Taylor v. Louisiana*, and in *Duren*, such an arrangement is unconstitutional and unacceptable.  As the Supreme Court reasoned in those cases, procedures allowing most women to opt out of jury service violated defendants  rights to a jury from a fair cross-section of the community.

### 2.    Update of Addresses

Hispanics are also disproportionately affected by the County s failure to update its address lists.  Harris County gets its addresses from voter registration lists and driver license and ID cards.  However, because addresses are often not updated until a person renews their driver s license, many of the addresses become bad addresses when a person changes residences.  Studies reflect that huge numbers of jury summonses are returned because of bad addresses.[41]  The evidence also show that this disproportionately affects Hispanics because Hispanics move more frequently than other groups.[42]  New York whose Driver s Licenses are updated every eight years (Texas licenses usually expire in six)   resolved this very problem by subscribing to a national change of address service.[43]

In sum, all of the essential elements of *Duren* are met.  Hispanics are distinctive. They are being dramatically under-represented on the venire panels.  And the cause of the under-representation is systematic.  Therefore, Petitioner has made a *prima facie* case that

---

[41] *Number of minority, lower-income jurors doesn t mirror community,* Dallas Morning News, October 22, 2000.
[42] *Id.*
[43] Mark Curriden, *No Excuses: New Yorkers who try to avoid jury duty find that system has gotten serious about service*, Dallas Morning News, October 24, 2000.

his Sixth amendment right to a jury drawn from a fair-cross section of the community has been violated.

## CLAIM #4

**The State violated Mr. Prible s rights guaranteed by the Sixth Amendment,**
***Massiah v. United States*, 377 U.S. 201, 206 (1964).**

Once a defendant's Sixth Amendment right to counsel has attached, the government is forbidden from  deliberately eliciting  incriminating statements from the defendant. *Massiah*, 377 U.S., at 206.  This prohibition has been extended to the use of jailhouse informants who relay incriminating statements from a prisoner to the government. In *United States v. Henry*, 447 U.S. 264 (1980), the government used a paid informant, who was serving time for forgery, to obtain information about Henry.  The government admonished him to  be alert to any statements made by federal prisoners [including Henry, with whom the informant was housed in the same cellblock], but not to initiate any conversation with or question Henry regarding the bank robbery [for which he had been previously indicted].  Id. at 266, 100 S.Ct. 2183.  As a result of conversations the informant had with Henry, the government obtained incriminating evidence, which was used at trial to convict him.

The central question in *Henry* was  whether under the facts of this case a Government agent  deliberately elicited  incriminating statements from Henry within the meaning of Massiah.  Id. at 270, 100 S.Ct. 2183.  In concluding that a government agent had elicited such statements, the Court relied on three factors.  First, Henry was in custody and under indictment at the time the informant conversed with him.  Second, the

informant was ostensibly no more than a fellow inmate of Henry, which caused Henry to trust him and thus be more likely to make incriminating statements. *Id*. Finally, the informant was acting under instructions from the government and was paid for his services. The Court found it irrelevant that government officials had cautioned the informant not to ask Henry any questions: Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result. *Id.* at 271. In these circumstances, the Supreme Court held that the government agent's conversation with Henry amounted to deliberate elicitation under *Massiah*.

In *Maine v. Moulton,* 474 U.S. 159, 176 (1985), the Supreme Court clarified that the Sixth Amendment and due process protections enunciated in Henry apply to the accused, at least after the initiation of formal charges. At that point, the accused enjoys,

> the right to rely on counsel as a medium between him and the State.
> . [T]his guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever-by luck or happenstance-the State obtains incriminating statements from the accused after the right to counsel has attached. **However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.** Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Id.* (internal citations omitted) (emphasis added).

28

1.      **Mr. Prible was in custody and charge with capital murder; and**

2.      **Beckcom was ostensibly no more than a fellow inmate.**

Beckcom contacted Mr. Prible while he was in the federal Bureau of Prisons.  The first encounter took place after Mr. Prible returned to the Beaumont medium security unit from the low security unit where he was being housed in anticipation of his release to a halfway house.  This transfer was due to the fact that Mr. Prible had just been charged with the capital murders of Steve and Nilda.  Mr. Prible was, at all relevant times, represented by counsel appointed by the trial court to defend him against capital murder charges.

Beckcom was already on the medium security unit to which the Government returned Mr. Prible.  He was serving time on federal charges for conspiracy to commit murder.  Beckcom was, and presented himself as, a fellow inmate.

3.      **In return for a assistance in obtaining a reduction in time to be served, Beckcom, acting, as a state agent, circumvented Mr. Prible s right to counsel.**

Beckcom s testimony shows that he began developing evidence to incriminate Mr. Prible after he contacted lead prosecutor Kelly Siegler.  According to Beckcom, he got Siegler s name from his cellmate Nathan Foreman sometime at the end of September, early October of 2001.  RR at 22.  Beckcom testified that all he knew in October of 2001 was  something about a guy coming from the Low [security] charged with murder  but he  really did not get too much information on it.  *Id.*  Beckcom said he did not call immediately; however, it was very soon after learning that some guy from low was returning to medium, in  the first half of October of 2001,  that he called Siegler.

Beckcom said that during that phone call he claimed that he had information on a murder, but he said that he did not go into great detail with her.  Indeed, Beckcom s testimony, at times, indicates, that he had no information at the time of this initial phone conversation. According to Beckcom, he and Mr. Prible exercised together after he learned in September or October that someone charge with murder was returning to the medium security unit. *Id.* at 31.  It was not for  weeks or maybe a month later  that Mr. Prible approached him for the first time to talk to talk about anything. *Id.*

At other points in Beckcom s testimony, he indicates that he had several conversations with Mr. Prible, over the course of a month, **prior** to calling Siegler in October of 2001.  However, the topic of these early conversations appears to have been about  the asphalt and the paving business  and about  going into business together . *Id.,* at 35.  On the other hand, Beckcom could not put a time frame on when Mr. Prible discussed aspects of his case.  Referring to what he supposedly learned from Mr. Prible, Beckcom stated  you know,   , this didn t happen chronologically.  So, in bits and pieces of conversations on the same subject it came out,  including information that Steve  was apparently his best friend, but yet he was having an affair with Steve s wife.   *Id.* at 34. However, Beckcom said that Mr. Prible did not start taking  real heavy   about the actual crime and the murders,   , because he was not trusting anybody  at first.  *Id.,* at 35.

In either event, Beckom s testimony leaves little doubt that (1) the initial phone call to Siegler in early October 2001 was for the purpose of reaching an agreement for Beckcom serve as an agent to investigate Mr. Prible, and that (2) Beckcom knew very

little about the case until after he and Siegler worked out a deal[44] that would reward Beckcom for informing on Mr. Prible.  Addressing their first contact, Siegler inquired as follows:

Q.    And eventually you made up your mind you were going to do what, sir?

A.    Contact you and see if we could make some kind of deal.

Q.    Because you were hoping for what, again?

A.    Sentence reduction.

Q.    And the only way for me to be interested was for me to know what?

A.    Specifics about the case.

Q.    So, in that regard you did what?

A.    I sought to find out as much as I could.

Q.    From who?

A.    From Prible.

RR, vol 26, at 37.

After the initial meeting, Beckcom went to work, for the State, on Mr. Prible.  On November 24, 2001, Beckcom said Mr. Prible  really poured it all out .[45]  *Id.,* at 53.  According to Beckcom, Mr. Prible confessed to killing Steve and Nilda, confessed to setting the house on fire to cover his tracks, described himself as a  bad motherfucker

---

[44] Beckcom testified that he got Siegler s name from Nathan Foreman who had  supplied other informants to Ms. Siegler  in other cases.  *Id.* at 82.

[45] Beckcom maintained that Prible had come to look on Foreman and Beckcom as brothers.  Id. at 54.  According to Beckcom, Prible said  I trust you guys,   , you re the only ones that could convict me.   Id. at 54-55.  At the same time Beckcom said that Prible had  made his peace,  and was  prepared to die  if his  brothers  proved not to be so trustworthy and turned state s witness. *Id.* at 55.  Furthermore, despite Mr. Prible s supposed feelings of peace and kinship, he apparently did not confide in Beckcom or Forman or communicate with them ever again.

that would take out a whole family, described himself a ghost who could move in and out of the crime scene unseen in a high intensity, low drag maneuver, described the crime scene and the position of the bodies, and explained the motives for the killing, which allegedly were (a) that Steve had bilked him out of $250,000.00, and (b) that Mr. Prible felt he had to kill Steve before Steve took his money and killed him first.[46] *Id.,* at 45-55. Foreman and Beckcom then contrived a photo op to prove that Beckcom knew Prible and had met with him on November 24, 2001. *Id.* at 83.

Beckcom clearly did not obtain information by happenstance. Instead, he was referred to Siegler by another state agent, Nathan Forman, who supplied Siegler with informants. The State and Beckcom thereafter conspired to violate Mr. Prible s constitutional rights by eliciting statements about the crime in the absence of defense counsel.

## CLAIM # 5

### THE STATE INTENTIONALLY SPONSORED FALSE AND MISLEADING TESTIMONY IN VIOLATION OF MR. PRIBLES DUE PROCESS RIGHTS

#### A.   STANDARDS

In *Napue v. Illinois*, 360 U.S. 264, 269 (1959) , the Supreme Court held that, where a witness provides false testimony, known to be so by the prosecution and the State does nothing to correct it, the defendant is denied due process. The well-settled rule is that, to succeed in a due process violation claim, petitioner must show: (1) [the witness] gave false testimony; (2) the falsity was material in that it would have affected

the jury's verdict; and (3) the prosecution used the testimony knowing it was false.  *May v. Collins*, 955 F.2d 299, 315 (5th Cir.1992).  A Fourteenth Amendment violation obtains if the State,  although not soliciting false evidence, allows it to go uncorrected when it appears.  *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir.1997) (quoting, *Napue,* 360 U.S.  at 269).  A prosecutor s ratification of misleading testimony may also provide the basis of a *Napue* claim. *See, United States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir.2007), cert. denied, 128 S.Ct. 2081 (2008); *Bragan v. Morgan*, 791 F.Supp. 704, 711, 712-15 (M.D. Tenn. 1992) (noting that prosecutor's ratification of false testimony prosecutor knowingly presented  is a clear violation of *Giglio*  )

A *Napue* violation requires that the conviction be set aside whenever there is  any reasonable likelihood that the false testimony could have affected the judgment of the jury.  *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir.2000) cert. dism'd by 531 U.S. 1134 (2001).  Some courts have gone so far as to say that     if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.   *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir.2005) (en banc) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991)).

**B.**     **ARGUMENT**

> **A.**     **The State knowingly sponsored false or misleading testimony and jury arguments.**

In closing argument at guilt innocence, the State insisted that its informant had learned information from Mr. Prible that only the person who had committed the crime

---

[46] This all supposedly occurred on the same day that Mr. Prible and his mother and Beckcom and his mother got

could know.  This was patently false.  The State was aware before Beckcom came on the scene of virtually every single fact to which Beckcom testified.  Beckcom s testimony about what Mr. Prible supposedly told him added absolutely nothing to the crime scene reports, autopsy evidence and witness statements that Mr. Prible provided nearly two years before encountering Beckcom in the federal penitentiary system.  Mr. Prible s attorneys were privy to all of this information as well, and so was Mr. Prible, who gave the statements, was aware of what had been reported in the newspapers, and of course had discussed his case with his attorneys.  This commonly known information included information about where the bodies about where the bodies of Nilda and Steve were found, where the children were found, the cause of the children s death, Mr. Prible s relationship to Nilda and Steve, and the motive for, the cause of, and the nature of and damage wrought by the fire.  Nonetheless, the State, in order to bolster Beckcom s credibility, argued to the jury that each piece of evidence was something that only Mr. Prible could have known.

The statements that Beckcom said Mr. Prible made, which are not corroborated by anything in the record, are simply blanket admissions of culpability that are sometimes guilded by peculiar rhetoric.  The alleged statements are not specific details about the crime scene or the victims that were divulged first by Mr. Prible and later confirmed by the State s investigation.  In this category falls Beckcom s testimony that Mr. Prible said he shot the victims, set Nilda on fire, that he was a bad mother fucker who could take out a whole family, and that he had killed Steve over a dispute about money.  Indeed, the

together for a photograph during visitation at the prison.  Id.

details that Beckcom tried to supply turned out to be false.  Beckcom claimed that Mr. Prible said he was robbing banks so that he and Steve could by a bar and that he killed Steve because Steve bilked him out of $250,000.00.  However, Mr. Prible s entire take for the string or robberies he pulled was in the neighborhood of $50,000.00.

### B.    The false and misleading statements were material.

The  State s  case  depended  critically  on  salvaging  Beckcom s  credibility. Beckcom admitted he had lied under oath before and that a federal judge had found that he was a liar.  Beckcom was plainly testifying in the hopes of a reward in the form of a reduced sentence.  The only way to give Beckcom a sheen of credibility was to impress upon  the  jury  that  Beckcom  had  uncovered  information  from  Mr.  Prible  that  was unknown to anyone beforehand.  Clearly, bolstering Beckcom s testimony through false and  misleading  closing  argument  had  a  substantial  impact  on  the  jury s  decision  to convict.

### CLAIM # 6

### MR. PRIBLE WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

### A.    STANDARDS

*Strickland v. Washington*, 466 U.S. 668 (1984), set forth the legal principles that govern ineffective assistance of counsel claims.  There are two components: a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Id.,* at 687.  To establish deficient performance, a petitioner must demonstrate  that  counsel's  representation  "fell  below  an  objective  standard  of

reasonableness." *Id.*, at 688.   The Supreme Court has  declined to articulate specific guidelines for appropriate attorney conduct.   *Wiggins v. Smith,* 539 U.S. 510*,* 521 (2003).   Instead, the Court has  emphasized that  [t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.   *Id.,* (quoting *Strickland*, 466 U.S., at 688).

In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel s failures prejudiced his defense.  *Strickland*, 466 U.S., at 692.   To establish prejudice, a  defendant must show that there is a reasonable probability that, but for counsel s unprofessional errors, the result of the proceeding would have been different. *Id.,* at 694.   That does not mean that a petitioner must show that counsel's deficient conduct more likely than not altered the outcome of the case.   *Id.*   The result of a proceeding,  the court added,  can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.   *Id.*  Instead, reasonable probability is simply  a probability sufficient to undermine confidence in the outcome. *Id*., at 694.   In assessing prejudice, the reviewing court reconsiders all the evidence. *Wiggins,* 539 U.S. at 534.   The totality of the evidence includes  both that adduced at trial, and the evidence adduced in the habeas proceeding[s].   *Williams*, 529 U.S., at 397-398 (emphasis added).

**B.      ARGUMENT**

**1.      Failure of trial counsel to object to Beckcom s testimony under *Massiah* and progeny was ineffective.**

**a.      Counsel s failure to invoke *Massiah* and progeny fell below reasonable professional standards.**

Beckcom was the State s key witness.  Reasonable counsel would realize that Beckcom was being called to relate an alleged jailhouse confession.  In fact, trial counsel located two witnesses who testified at trial that Beckcom was a jailhouse informant. Reasonable counsel would also realize that Beckcom had been approached by Siegler to act as an agent of the State.  Indeed, trial counsel cross-examined Beckcom about the fact that Nathan Forman, Beckcom s cellmate, had provided Beckcom with Siegler s telephone number.  Counsel demonstrated that he was aware that Siegler worked with Foreman in other cases to find prisoners willing to serve as informants for the State. Reasonable competent counsel would also be aware of major Supreme Court cases that prevented the Government from circumventing their clients Sixth Amendment rights by using snitches to gain access to them for incriminating information.   However, trial counsel failed to raise a Sixth Amendment objection to Beckcom s testimony based on *Massiah, Henry or Moulton*, *supra*.

**b.      The Failure to Assert Mr. Prible s Sixth Amendment Rights Prejudiced his Defense.**

Beckcom s testimony was material in the sense that is reasonably probable that verdict would have been different if his testimony had been excluded.  For years, the State was aware of the other evidence in the case against Mr. Prible, such as his statements the day after the murder, his relationship to Steve, and his presence at Steve s home on the night and early morning of the murders.  The State had not considered this evidence sufficient even to form the basis for bringing charges of any sort against Mr. Prible.

Clearly, without Beckcom the jury would have been compelled to acquit.  The State could not even place Mr. Prible at the scene of the crime at the time it was committed, except through spurious evidence.  All it had in this regard was Dr. Watson s testimony about sperm viability over time, which was undermined by the Harris County Medical Examiner and Defense s expert.

> ### 2. Trial counsel s failure to object to false and misleading testimony that bolstered Beckcom s credibility was ineffective.

> #### a. The failure to object was deficient.

Clearly, defense counsel would not allow the State to bolster a key witness whose credibility was so critical to the State s case.  There is no reasonable strategic justification for not moving to prevent the State from convincing the jury that the highly incriminating testimony Beckcom provided was credible.

> #### b. Trial counsel s failure to prevent false and misleading testimony and arguments of counsel that bolstered Beckcom prejudiced Mr. Prible.

For reasons explained in Claim 4, supra, the State s ability to bolster Beckcom s credibility was material.

> **3.     Appellate counsel was ineffective for not raising claims in section 2 and 3 supra.  *Evitts v. Lucey*, 469 U.S. 387 (1985).**

### CLAIM # 7

### THE STATE VIOLATED DUE PROCESS RIGHTS BY CONCEALING THE NATURE OF THE ARRANGEMENT BETWEEN BECKCOM, FORMAN AND THE LEAD PROSECUTOR

**A.     Standards**

Prosecutors are obligated to disclose evidence favorable to the defense *Brady v. Maryland,* 373 U.S. 83 (1963).  Whether prosecutors were ever aware of the existence or value of evidence to the defense is irrelevant.  In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the Supreme Court clarified that prosecutors are liable even if other government agencies retained custody of *Brady* material.  In *Strickler v. Greene*, 119 S.Ct. 1936 (1999), the Supreme Court distilled the essence of what Petitioners must show in order to overcome procedural bars to litigating *Brady* claims.  *Id.* at 1949.  Petitioner must first make some showing that a *Brady* violation actually occurred   that is, he must make some showing that the State suppressed favorable, material evidence.  *See, id.,* at 1948.  Second, Petitioner must show that the State s conduct was what caused his or her failure to discover the evidence.  *See id.,* at 1949-50.  This inquiry into cause is itself tripartite: (1) whether the prosecution withheld exculpatory evidence; (2) whether the petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (3) whether the State confirmed the

petitioner's reliance on that policy by asserting during the state habeas proceedings that the petitioner had already received everything known to the government.

### B.    Facts

Trial counsel filed pretrial motions seeking to discover deals between Beckcom and the State.  The State disclosed that in return for Beckcom s testimony against Mr. Prible, it would recommend a reduction of time to the Assistant United States Attorney who had prosecuted Beckcom in federal court.  Trial counsel learned as well that the lead prosecutor had met with Beckcom on one occasion and talked with him twice by telephone.  Trial counsel also discovered that Nathan Forman had provided Beckcom with the lead prosecutor s phone number.  Trial counsel was not informed of any other arrangements involving Beckcom and Forman.

### C.    Argument

#### 1.    The State suppressed the numerous contacts between the lead prosecutor and Forman that took place while Beckcom was probing Mr. Prible for information about his case.

At trial the State made a point about how infrequently the prosecution team contacted Beckcom.  This was important in order to dispel the notion that Beckcom was getting facts about Mr. Prible s case from the State and not from Mr. Prible.  However, the State did not disclose that prosecutors had contacted Nathan Forman, Beckcom s cellmate, on numerous occasions, or that it was using a circle of informants at the prison to investigate and provide testimony against Mr. Prible.

According to C. Walker, who was housed with Beckcom and Forman at the time Beckcom was investigating Mr. Prible, Forman had access to the lead prosecutor s cell, home and office numbers.[47]   Forman was the lead prosecutor s point person at the Beaumont unit; he was constantly on the phone with the lead prosecutor.  Through these phone conversations Forman, the State and Beckcom contrived a scheme to secure jailhouse informant testimony against Mr. Prible.

Walker was present during several conversations between Forman and the lead prosecutor.  In fact, Walker was part of what he described as a tight, neat circle of informants headed by Forman who were recruited to provide information to the State. Walker said Forman had recruited him to be a snitch, and that at first he intended to testify against Mr. Prible.

Walker stated that Foreman and his crew  were schooled  about the specifics of the offense that the State was trying to prove against Mr. Prible by Forman who received his information from the lead prosecutor.   Walker specifically stated that the lead prosecutor told Foreman that the problem with the Prible case was that the neighbor who put Mr. Prible at his home a few hours before the murders took place.  According to Walker, the lead prosecutor told Forman that Steve had dropped Mr. Prible off at his house hours before the murder, and that one of the neighbors had substantiated this.

Walker describes how Forman, Beckcom and their circle worked to get Mr. Prible s trust.  The process included supplying Mr. Prible with wine and  weed .  Forman

---

[47] In February of 2009, after the Bureau of Prison refused to allow anyone but an attorney to conduct a meet with Walker, Court appointed investigator JJ Gradoni managed to arrange a telephonic interview which was recorded.

and his group would take photos with Mr. Prible to show him that they were all buddies and made promises to Prible to hook him up with a female while he was in prison. According to Walker, on many occasions they would get Mr. Prible high on weed.  On each occasion, they would try to swing the conversation to Mr. Prible s involvement in the multiple murders.

Walker stated that Mr. Prible would never admit that he was involved in the murders.  At one point Walker remembered asking Foreman, if we re all so stoned, how are we going to remember when [Mr. Prible] supposedly tells us he did it?   Forman s comment, according to Walker, was that Mr. Prible will be the only one stoned. According to Walker, Forman s and Beckcom s objective in plying Mr. Prible for information was to get a reduction in time.

**2.    The State suppressed evidence that Beckcom and Forman were part of a systematic attempt to secure convictions using jailhouse investigators and snitch testimony.**

Several other witnesses corroborate evidence from the Walker interview that indicates that prosecutors were systematically utilizing jailhouse informants to investigate defendants who were charged and represented by counsel.  On or about June 11, 2009, Mr. Prible s investigator interviewed William Irvan who is on death row at the Polunsky Unit.  Irvan was arrested and incarcerated in the Harris County Jail around the time of pretrial and trial proceedings in Mr. Prible s case.  According to Irvan, his attorney approached him with a proposal from Mr. Prible s lead prosecutor, who was also prosecuting Irvan.  The proposal was for Irvan to inform on Mr. Prible.

Other death row inmates have been subject to similar schemes.  On or about June 11, 2009, Mr. Prible s investigator interviewed Taurus Sales on death row at the Polunsky Unit.  Sales had been convicted of capital murder based largely on the testimony of a jailhouse informant named Hardnett.  The lead prosecutor in his case was the same person who prosecuted Mr. Prible.  According to Sales, Hardnett was routinely placed in the hold over tank (the pen that is part of each courtroom where incarcerated defendants and witnesses await court proceedings).  Sales said that Hardnett was placed in the tank during *voir dire* of witness in his case when Hardnett had no reason of his own for appearing in court.  Sales suspected that Hardness was present in order to provide testimony that he was scared of Sales.  Sales said he asked Hardnett each time he saw him to sign a piece of paper saying that Sales had not threatened him.  Sales said that Hardnett testified that Sales had confessed to him in the law library of the County Jail.[48]

### 3.     The suppressed evidence was favorable and material.

Establishing the credibility of Beckcom s testimony was critical.  Because of Beckcom s criminal history, including, murder for hire, and his reputation as a liar, the State had to assure the jury, based on the nature of Beckcom s testimony, that Beckcom was telling the truth in the case against Prible.  The State s ability to do so would have been completely undermined, and with it the State s case against Mr. Prible, if the State had divulged that it had used Nathan Forman as a conduit for supplying Beckcom with facts about the case.

---

[48] The State appears to have used the law library as a location where informants could talk to Defendants about their case.  On or about June 4, 2009, Mr. Prible s investigator interviewed Danny Bible on death row at the Polunsky

As Walker s statement to Mr. Prible s investigator makes clear, the very facts that the State argued were details that only Mr. Prible could have told Beckcom were conveyed by the State to Forman who then briefed Beckcom and others who were recruited to provide incriminating evidence against Mr. Prible.  Clearly, this type of information would have allowed a reasonably competent defense attorney to place the State s case in an entirely different light.  Indeed, reasonable defense counsel would have completely undermined the integrity of the State s case if he had information that would have allowed him to demonstrate that the State involved in a conspiracy to violate Mr. Prible s right to counsel and was trying to incriminate Mr. Prible with the testimony from members of this conspiracy.

## CLAIM # 8

### MR. PRIBLE IS ACTUALLY INNOCENT OF CAPITAL MURDER

### A.    STANDARDS

Close review of the decision in *Herrera v. Collins*, 506 U.S. 39 (1993), demonstrates that a majority of the Court found that the execution of an innocent man violates the constitution.  *Id.* at 419 (O Connor, J., joined by Kennedy, J., concurring) ( executing the innocent is inconsistent with the Constitution ); *Id.* (O Connor, J., joined by Kennedy, J., concurring) ( the execution of a legally and factually innocent person would be a constitutionally intolerable event. ); *Id.* at 429 (White, J., concurring) ( I assume that a persuasive showing of  actual innocence  made after trial, even though

Unit.  Bible said that he saw Beckcom in the Harris County law library virtually every time he went to research his case.  Bible said that Beckcom offered to help him but Bible was warned by others to stay clear of Beckcom.

made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case. ); *Id.* at 430 (Blackmun, J., joined by JJ. Stevens and Souter, dissenting) ( Nothing could be more contrary to contemporary standards of decency   than to execute a person who is actually innocent. ).  Even Chief Justice Rehnquist left open whether in a capital case a truly persuasive demonstration of  actual innocence  made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim,  506 U.S. at 417, although  the threshold showing for such an assumed right would necessarily be extraordinarily high . *Id.*

The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review. *See Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir.2003). However, in a recent case, Judge Wiener stated that actual innocence is the  elephant in the room .  In *re Swearingen*, 556 F.3d 344 (5th Cir. 2009) (concurring opinion).  Judge Wiener stressed that the Supreme Court has indicated that those who prove their actual innocence will be added to the list of defendants upon whom the State is forbidden to impose capital punishment.

> Consistently repeating the mantra that, to date, the Supreme Court of the United States has never expressly recognized actual innocence as a basis for habeas corpus relief in a death penalty case, this court has uniformly rejected standalone claims of actual innocence as a constitutional ground for prohibiting imposition of the death penalty. The Supreme Court has, however, made statements in  dicta which at least strongly signal that, under the right circumstances, it might add those  capital  defendants  who  are  actually  innocent  to  the  list  of

persons who-like the insane, the mentally retarded, and the very young-are constitutionally ineligible for the death penalty.

*Id.* at 349.  In conclusion, Judge Wiener admonished that  this question is a brooding omnipresence in capital habeas jurisprudence that has been left unanswered for too long. *Id.*

### A.     Mr. Prible was wrongfully convicted on the basis of false, contrived jailhouse snitch testimony.

The evidence and argument in Claim #7 is incorporated by reference as if fully set forth herein.

This is a case of wrongful conviction based on the testimony of a notorious jailhouse informant.  At trial, Beckcom informed the jury that Mr. Prible had confessed to the murders of Steve and Nilda and confesses to killing the couple s three children.  That testimony fabricated by a conspiracy, involving the State, to convict people through jailhouse informant testimony.  Without Beckcom s false testimony, no reasonable juror would have convicted Mr. Prible.

The evidence that Beckcom fabricated the confession is strikingly powerful in light of the State s weak case and the substantial defense, including significant alibi testimony,  that Mr. Prible presented at trial. (Evidence and argument in Claim # 1, section 4, is hereby incorporated by reference as if fully set forth herein).   Furthermore, in the case of Mr. Prible, the State did not have a motive, a weapon or a witness to the crime.  On the other hand, Steve was engaged in the inherently dangerous business of buying and selling narcotics, namely, cocaine.

46

## JUSTIFICATION FOR PRESENTING FEDERAL CLAIMS THAT THE TEXAS COURTS DID NOT CONSIDER.

**I.   ANY FAILURE TO EXHAUST CLAIMS BROUGHT PURSUANT TO *BRADY, GIGLIO*, OR *NAPUE* SHOULD BE EXCUSED.**

A rule declaring  prosecutor may hide, defendant must seek,  is not tenable in a system constitutionally bound to accord defendants due process.   Ordinarily, we presume that public officials have properly discharged their official duties.  *Bracy v. Gramley,* 520 U.S. 899, 909 (1997) (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14-15 (1926) (internal quotation marks omitted)).   The Supreme Court has several times underscored the   special role played by the American prosecutor in the search for truth in criminal trials.  *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *Strickler*, 527 U.S., at 281; accord *Kyles*, 514 U.S., at 439-440; *United States v. Bagley*, 473 U.S. 667, 675, n. 6, (1985); *Berger*, 295 U.S., at 88.   Courts, litigants, and juries properly anticipate that  obligations [to refrain from improper methods to secure a conviction] ... plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.  *Berger*, 295 U.S., at 88.  Prosecutors' dishonest conduct or unwarranted concealment should attract no

judicial approbation. *See Kyles*, 514 U.S., at 440 ( The prudence of the careful prosecutor should not ... be discouraged. ).

A.      **The State has never disclosed the bases of Mr. Prible s *Brady* claims**

The evidence and argument in Claim # 7 establishing that the State suppressed evidence are incorporated by reference as if fully set forth herein.

B.      **The concealed evidence was prejudicial.**

The evidence and argument in Claim # 7 establishing that the suppressed evidence was favorable and material are incorporated by reference as if fully set forth herein.

II.     **THE STATE COURTS PREVENTED MR. PRIBLE FROM LITIGATING HIS PROSECUTORIAL MISCONDUCT AND INEFFECTIVENESS OF COUNSEL CLAIMS.**

Interference by State officials that prevents petitioners from developing and presenting claims justifies the federal courts in reaching the merits of those claims. *See, Murray v. Carrier*, 477 U.S. 478, 487 (1986). Mr. Prible vigorously attempted to litigate viable claims under *Massiah*, *Brady* and *Strickland*. He repeatedly asked the attorney appointed by the State courts to pursue these claims, and notified these tribunals that his state habeas counsel was not pursuing those claims. Importantly, Mr. Prible took steps to notify the convicting court of his claims and of the conflict with his attorney before his state writ attorney filed the application for writ of habeas corpus that the TCCA considered to be Mr. Prible s initial writ.

Mr. Prible s communications with counsel and the Court clearly demonstrated a complete breakdown in the attorney-client relationship. However, his counsel failed to

file a motion to withdraw and the trial court failed to convene a hearing in order to determine if trial new counsel should be appointed, or, if that was not feasible, whether Mr. Prible should be allowed to proceed *pro se*.  Furthermore, neither appointed counsel nor the convicting court informed Mr. Prible that he was entitled to discharge his appointed attorney.  Neither counsel nor the convicting court informed Mr. Prible that the Courts would not consider his pro se pleadings so long as appointed counsel.

Mr. Prible diligently sought to develop evidence from the severely limited vantage of administrative segregation on death row.  He utilized the pro bono assistance of lay persons because he could not retain an investigator of his own.  Based on the evidence that he could develop from prison, Mr. Prible made vigorous attempts to protect his constitutional rights through pro se petitions and letters to the trial court.  When that failed he moved to recuse the presiding judge and pointedly informed him at the recusal hearing that his attorney had not visited him, had not investigated his case, and had filed meritless claims despite being presented with substantial evidence and substantial legal arguments for relief.

In short, the State courts prevented Mr. Prible from proceeding pro se on his meritorious claims.  Thereafter, the Texas Court of Criminal Appeals dismissed Mr. Prible s pleadings on the ground that he was a *pro se* petitioner.  Under this set of circumstances, the federal courts should consider the claims in this petition that are related to the claims that Mr. Prible attempted to raise in *pro se* pleadings he filed in the State system.

49

The prejudice that Mr. Prible must demonstrate under *Carrier, supra,* at 491, is evident from the discussions of prejudice and materiality in the substantive claims alleged in this petition under *Massiah*, *Brady*, and *Strickland*.  The evidence and argument in these respective claims is hereby re-alleged as if fully set forth herein.

III.   **THIS COURT SHOULD REACH MR. PRIBLE S CLAIMS TO PREVENT A MANIFEST INJUSTICE.**

In *Schlup v. Delo,* 513 U.S. 298 (1995), the Supreme Court recognized that otherwise procedurally defaulted claims may be cognizable upon showing that, in light of new evidence,  it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *House v. Bell*, 547 U.S. 518 (2006) (citing 513 U.S., at 327).   This formulation  ensures that petitioner's case is truly  extraordinary , while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.  *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).   A petition supported by a convincing *Schlup* gateway showing  raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error ; hence,  a review of the merits of the constitutional claims  is justified. *Id.* (quoting, *Schlup*, 513 U.S., at 317).

In determining whether a petitioner has passed through *Schlup s* gateway, the court may consider  new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at

50

trial , *id*., at 324.  However, the habeas court's analysis is not limited to such evidence. *Schlup* makes plain that the habeas court must consider     all the evidence,     old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under  rules of admissibility that would govern at trial.  *See id.*, at 327-328, 115 S.Ct. 851 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)).  Based on this total record, the court must make  a probabilistic determination about what reasonable, properly instructed jurors would do . 513 U.S., at 329.

While  the court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors , *id.,* the gateway actual-innocence standard is not equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), which governs claims of insufficient evidence. *House,* 547 U.S. at 519.  When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict.  Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record.  *See id*.  If new evidence so requires, this may include consideration of  the credibility of the witnesses presented at trial , *Id.; see also ibid*. (noting that  [i]n such a case, the habeas court may have to make some credibility assessments ).

**B.      ARGUMENT**

The argument and evidence set forth (and incorporated by reference) in Claims #1, #7 and #8 are incorporated by reference as if fully set forth herein.  No reasonable juror would have convicted Mr. Prible if he had been able to exclude Beckcom s testimony based on *Massiah* using evidence that the State had conspired to violate his Sixth Amendment rights.  Similarly, no reasonable juror would have convicted Mr. Prible if the state had disclosed the informant conspiracy and the communications between the State and its witnesses and agents.

## PRAYER FOR RELIEF

WHEREFORE, Ronald Jeffrey Prible requests that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2.      Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to conduct reasonable discovery and brief the issues of fact and of law raised by this petition or such hearing.

3.      Grant undersigned counsel a reasonable period of time, not less than sixty days, to prepare and file such amendments to this petition as may be necessary to raise all available constitutional challenges to Mr. Prible s conviction and death sentence in this proceeding

4.      Grant him leave to file a reply to Respondent s answer.

5.      Grant such other relief as law and justice require.

52

Respectfully submitted,

HILDER & ASSOCIATES, P.C.
By:   /s/ James G. Rytting
Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
819 Lovett Boulevard
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112
ATTORNEYS FOR PETITIONER

## VERIFICATION

I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Ronald Jeffrey Prible.

/s/___*James Rytting*_____
James Rytting

## CERTIFICATE OF SERVICE

On June 17, 2009, a copy of Mr. Prible s petition for writ of habeas corpus was served upon Respondent by ECF filing or U.S. Mail, return receipt requested, addressed to the Texas Attorney General, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

/s/___*James Rytting*_____
James Rytting

53