UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **RONALD JEFFREY PRIBLE,** | ' | |
| **Petitioner,** | ' | |
| | ' | |
| **VS.** | ' | **4:09-cv-01896** |
| | ' | |
| **RICK THALER, DIRECTOR,** | ' | |
| **TEXAS DEPARTMENT OF CRIMINAL** | ' | |
| **JUSTICE, CORRECTIONAL INSTITUTIONS** | ' | |
| **DIVISION,** | ' | |
| **Respondent.** | ' | |

---

**SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
OF A PERSON IN STATE CUSTODY**

---

TO THE HONORABLE KEITH ELLISON, UNITED STATES DISTRICT JUDGE:

Petitioner Ronald Jeffrey Prible files this second amended petition for a writ of habeas corpus as follows:

**<u>JURISDICTION</u>**

This court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Mr. Prible was convicted in a Harris County, Texas, court.  Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

**<u>INTRODUCTION</u>**

Mr. Prible stands convicted and sentenced to death for the capital murder of Steven Herrera and Nilda Tirado.  He is an innocent man whose guilty verdict is the product of the false testimony of Michael Beckcom, a jailhouse informant who served time with Mr. Prible in FCI Beaumont.  Beckcom was incarcerated for forcing a man at gunpoint into a large metal toolbox, then holding the lid down while carbon monoxide pumped from Beckcom's running Ford

1

Explorer through a hose into the container, poisoning and asphyxiating the victim.  In another case where Beckcom turned State's witness in return for a deal, a federal judge found that Beckcom lied under oath. 26 RR 91.  Beckcom offered to testify against Mr. Prible only upon assurance that Mr. Prible's lead prosecutor, Kelly Siegler, would use her influence to secure a Rule 35 reduction of Beckcom's sentence. *Id.* at 14.

Critical to Mr. Prible's claim for relief is the fact that Beckcom's testimony was concocted in league with Nathan Foreman.  At trial, Beckcom testified that Prible confided in and finally confessed not just to him, but to Foreman. *Id.* at 31, 35, 38 *et passim*.  Foreman helped stage the Thanksgiving Day photographs at the prison in 2001 with Prible's, Beckcom's and Foreman's parents, which the State introduced to convey the impression that Mr. Prible had become bosom friends with his confessors. *Id.* at 55-56, 82-83 and State's Exh. 187.  It was Foreman, too, who supplied Beckcom with the lead prosecutor's name and phone number, *id.* at 23, so their scheme of supplying testimony in return for state favors could be set into motion. Bureau of Prison ("BOP") records, recently disclosed pursuant to a March 10, 2011, order of this Court,[1] show that Foreman, Beckcom, and other FCI Beaumont prisoners listed the lead prosecutor as a contact on their phone logs and called her numerous times leading up to Mr. Prible's trial.[2]

Foreman and Beckcom headed a ring of informants that the lead prosecutor was relying on to secure convictions not only against Mr. Prible for the deaths of Nilda and Steve, but also against Hermilo Herrero (who was incarcerated at FCI Beaumont contemporaneously with Mr. Prible) in yet another cold case murder involving the death of a man named Alberto Guajardo. In fact, the lead prosecutor learned of Foreman's presence at Beaumont FCI from Jessie Moreno,

---

[1] *Prible v. Thaler,* 4:08-mc-00316 (S.D. Tex.), Dkt. Entry #18 (Order).

[2] *See Group Exhibit 'F' below.*

who would be the lead prosecutor's primary witness at Herrero's trial.  Moreno was serving a lengthy term for federal drug offenses and contacted the lead prosecutor in April of 2001 to arrange a *quid pro quo* for testimony.  In an interview taped on July 3, 2001, Moreno told the prosecutor that Herrero had confessed to killing Guajardo.[3]  The motive and circumstances Moreno gave for the confession were similar in several respects to the motive and circumstances under which Prible supposedly confessed.  However, the striking equivalence is this: on tape, Moreno tells the prosecutor that Herrero confessed not only to himself but simultaneously to Nathan Foreman.

From that point, the State knew it had in place at FCI Beaumont snitches to run at Mr. Prible.  In 1999, the lead prosecutor had relied on Moreno to give quid pro quo testimony to secure a conviction against Jason Morales in a cold case murder.  The lead prosecutor had also used Nathan Foreman to supply informants in other cases. 26 RR 82.  Indeed, the Foreman family was involved in providing the lead prosecutor with jailhouse confessions in return for State favors.  In 1993-1994, Nathan Foreman and his brother Bobby Ray Foreman were witness against Carl Henry Evans in a drug case.[4]  In 2001-2002, Bobby Ray Foreman was a jailhouse informant in a murder case against Porter Lee Bush that resulted in an acquittal.  The lead prosecutor in Mr. Prible's case prosecuted Bush and therefore handled this informant.[5]

---

[3] The tape and transcript of the July 3, 2001, Moreno interview is attached to Mr. Prible's Second Supplemental Briefing filed in the 351st District Court on June 22, 2011.  The transcript is attached here as Exhibit 'Q' below.

[4] See Harris County JIMs records for case No. 668356 in the 177th District Court, Harris County, Texas.  The JIMs criminal prescriber data base now allows a search for "Persons Connected (QCOC)".  JIMs records show that Bobby Ray Foreman and Nathan Ray Foreman are each connected to this case as a "witness for the prosecutions."  Available as of August 15, 2012, at  http://apps.jims.hctx.net/subcrim/PersonsConnectedResults.do

[5] *See* Harris County JIMs, Persons Connected to Cause No. 865395, in the 176th District Court, Harris County, Texas.  Harris County JIMS records also show that the complaint was reviewed by Kelly Renee Jalufka (the lead prosecutor's maiden name) on August 1, 2001.  On January 24, 2002 (four months before Herrero's trial and ten months before Mr. Prible's) a Harris County jury acquitted Bush.

After Mr. Prible was convicted, he began to suspect that the lead prosecutor had utilized a ring of informants to supply false testimony against him and he suspected that Foreman was a central player.  Confinement to death row limited his ability to corroborate his theories, and it was not after he filed his original state application that he identified, by sheer luck, the full name of an important witness, "Carl Walker, Jr."  During initial federal proceedings that began in 2008, Mr. Prible, through federally appointed counsel, was able to contact an individual named "Carl Walker, Jr.," who was a former member of the FCI Beaumont informants ring.[6]  Carl Walker, Jr. granted a telephonic interview to Mr. Prible's federally appointed investigator and provided a taped statement (dated August 26, 2010) to during a face to face visit with undersigned counsel at FCI Oakdale, in Louisiana, where he is currently located.[7]  Both interviews resulted in detailed fact specific statements regarding, *inter alia*, the following: (i) the existence of the informants ring, its approximate size and mode of operation; (ii) how and when Carl Walker, Jr., was recruited to be part of the ring of informants; (iii) the frequent contact, means of communication and close working relationship between the prosecutor and leading members of the ring, whom Carl Walker, Jr., identified as Beckcom, Foreman and a man nick-named "Cat" who turned out to be Raphael Dominguez; and the fact that members of the ring were angling for favors from the lead prosecutor by providing false testimony against Mr. Prible and against Herrero.

Carl Walker, Jr., also referred in the August 26, 2010, interview, to letters from members of the ring to the lead prosecutor that he said were written as part of the conspiracy to obtain state favors for falsely testifying that Herrero and Prible had confessed to murder.  The

---

[6] Attached here as Exhibit 'A' (Transcript of August 26, 2010, interview with Carl Walker, Jr.).  A CD recording of the August 26, 2010 tape is attached to Mr. Prible's Successor Application for Writ of Habeas Corpus Pursuant to Article 11.071 as Exhibit 'C', which was filed September 8, 2010.

[7] Exh. 'B' (Affidavit of JJ Gradoni regarding Carl Walker, Jr.).

documents corroborating Carl Walker, Jr. have surfaced.   In 2011 state proceedings, held subsequent to this Court's dismissal of Mr. Prible's causes of action pursuant to *Rhines v. Weber*, 544 U.S. 269 (1995), the State produced letters from FCI Beaumont inmates that named Beckcom, Foreman, and other informants used by the lead prosecutor.[8]   The letters also conveyed the inmates' offers to provide testimony against Mr. Prible. *Id.*   Review of Herrero's file showed, further, that the prosecutor wrote Assistant United State's Attorneys urging reductions in the sentence of up to five of these FCI Beaumont informants in exchange for their assistance in securing Herrero's conviction.[9]   Among the known beneficiaries of the prosecutor's influence were Moreno, Beckcom's confederate, Nathan Foreman, and Raphael Dominguez and Eddie Gomez.

Neither the defense team nor state habeas counsel was told of the identities of members of the ring of informants, Beckcom's and Foreman's involvement in the ring, the frequent contacts between members of the ring and the State, or, in particular, Foreman's similar operational role in the State's efforts to convict Herrero.   The State also suppressed inmate letters to the prosecutor documenting the existence of the ring, identifying witnesses for the defense to interview, and containing information impeaching the pillars of the State's argument for their key witness' credibility, namely, that Beckcom learned details about the crime only through Prible, and that Prible confessed to Beckcom and Foreman because of a special confidential relationship.   Finally, the State suppressed evidence that the State was rewarding FCI Beaumont informants even when they provided concocted, inconsistent statements.

Hiding the State's use of informants, and hiding Beckcom's and Foreman's involvement in the FCI Beaumont ring especially, was vital.   Unless the jury believed Beckcom's testimony

---

[8] Group Exhibit 'C' (Inmate letters to ADA, Kelly Siegler).

[9] Group Exhibit 'D' (Letters from Siegler to AUSAs on behalf of FCI Beaumont inmates).

that Prible confessed to Foreman and him, the State could not convict.  In fact, the non-confessional evidence was insufficient to take to the Grand Jury.  Within days of Steve and Nilda's deaths, investigators developed all the non-confessional evidence later used at trial, including DNA evidence, statements of family members, and the statements of Mr. Prible, in which he admitted to being with Steve, at Steve and Nilda's home during the night and early morning hours before the murder. 21 RR 176-178.  All the witnesses voluntarily, including Mr. Prible, appeared at the homicide division at 601 Lockwood, Houston, Texas for interview. 22 RR 27.  The State's DNA expert received biological material for testing on May 3, 1999, ten days after the crime. 24 RR 35.  However, the State also found a solid, independent alibi witness, a neighbor of Mr. Prible's, who informed the State that a few hours before the murders she saw Steve drop Mr. Prible off at Mr. Prible's parents' home.[10]  Mr. Prible, according to the witness, had gone inside his parent's home after a non-acrimonious conversation with Steve on the streets and Steve had driven away. 27 RR 3-10.

With a weak case punctured, too, by a solid alibi, Mr. Prible was not even arrested, let alone indicted, in connection with Steve and Nilda's death until **July 5, 2001**, two days after the State learned (from interviewing Moreno) that Mr. Prible could be targeted by FCI Beaumont informants led by Foreman.  At that point, the State supplemented the probable cause affidavit that had languished unused for two years with bogus ballistic information,[11] and charged Mr.

---

[10] The witness, Christina Garrusquita, lived right next door to Mr. Prible and was interviewed by two police detectives, Brown and Hernandez, within one or two weeks of the murder. 27 RR 10.  However, Brown and Hernandez allegedly told the lead prosecutor they could not recall where this person lived or even if this person was male or female. 20 RR 5.  Of course, neither detective asked *this witness* to come down to 601 Lockwood (homicide) to give a statement.  The two highly experienced officers also gave "keystone cop" explanations for their inaction and fault memory.  Brown supposedly said he could not find his notes. *Id*.  Hernandez told the prosecutor that he "didn't make any supplements or notes," because "he felt Detective Brown was going to be making all of the notes for both them." *Id*. at 6.  On October 11, 2002, the Friday before the Monday, October 14, 2002, trial the lead prosecutor, therefore, claimed she still did not have identifying information regarding this alibi witness. *Id*. at 7.

[11] The complaint was filed July 5, 2001.  Ballistics apparently remained incomplete long after that date.  As late as October 11, 2002, two days before trial, the State did not know if its fire-arms examiner had finished his work. 20

Prible with capital murder.  Mr. Prible was not transferred to Harris County Jail for an appearance, arraignment and pre-trial detention.  He was held in federal prison, instead, on these state charges, and was released to Harris County only after the informants – Beckcom and Foreman – finished their work.

The due process violations are therefore unspeakably grotesque.  Because of them, Mr. Prible has been falsely convicted and cruelly confined in administrative segregation on death row for more than decade.  In that time, Mr. Prible has suffered bouts of mental illness.  He intermittently hears voices, he is labile and agitated, but he has persisted throughout in investigating and litigating his case because of his desire to see justice done and because of his insight into the environmental causes of his mental turmoil.  The State courts have refused to hear the merits of his constitutional claims.  Federal habeas corpus now stands between the inhumane incarceration and execution of an innocent human being.  From this Court he therefore seeks relief from his unconstitutional conviction and sentence.

## HISTORY

Mr. Prible is restrained pursuant to the judgment and sentence entered in State of Texas vs. Ronald  Jeffrey Prible Jr., Cause No. 921126, in the 351st Judicial District Court, Harris County, Texas.  Mr. Prible was charged with a capital murder alleged to have occurred on April 24, 1999. (CR. Vol. 1 p. 2).  On October 25, 2002, Mr. Prible was convicted of capital murder and sentenced to death. (CR. Vol. 1 p. 212).  A motion for new trial was filed on November 25, 2002, and overruled on January 7, 2003. (CR. Vol. 1 pp. 233, 239).  On January 5, 2004, Mr.

---

RR 7.  By this point, though, the State revealed that when the actual comparison was made by an examiner, the conclusion was that the magazine found at the scene was used in a "nine millimeter" weapon.  *Id.* at 7.  The probable cause affidavit's representation that ballistic evidence tied ordinance recovered at the scene to a .38 revolver that Prible owned was, therefore, a fiction.

Prible filed his direct appeal raising eight points of error. The Texas Court of Criminal Appeals denied relief on all claims in *Prible v. State*, 175 S.W.3d 724 (Tex. Crim. App. 2005).

### 1.    Appointed counsel's litigation of post-conviction claims

In 2002, the convicting court appointed Roland Moore, III (alternatively referred to herein as "state habeas counsel") to prepare and file an initial application for writ of habeas corpus under Article 11.071 of the Texas Code of Criminal Procedure. Moore asked the firm of Vinson & Elkins to serve as co-counsel. Vinson & Elkins agreed, but only for the limited purpose of investigating and drafting allegations that Harris County's methods of empanelling jurors discriminated against Hispanics.

In addition to arranging for Vincent & Elkins to prepare a racial discrimination claim, Moore sought funding for and retained an investigator to review documents, investigate witnesses and extensively interview Mr. Prible. Moore also filed motions for discovery, including motions for evidence that the State is required to disclose pursuant to *Brady v. Maryland*, 73 U.S. 83 (1963), and he was active in the pre-petition investigation himself. Moore bench warranted federal prisoner Nathan Foreman for interview, sought permission from key witness Michal Beckcom's attorney to speak with his client, and conferred with Mr. Prible's family members.

On November 19, 2004, Moore filed Mr. Prible's original application for writ of habeas corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure, raising the following issues in Mr. Prible's initial state writ:

> (1)    The applicant received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel offered additional evidence of an extraneous offense.

> (2)    The  applicant received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel failed to effectively

address and rebut the testimony of William Watson, that  the semen found in the complainant Nilda Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion.

   (3)    Applicant was denied his constitutional right to an impartial jury because the venire did not reflect a fair cross-section of the community.

   (4)    Applicant was denied effective assistance of counsel on appeal, in violation of the sixth amendment, where appellate counsel failed to urge on direct appeal the trial court's pre-trial ruling denying applicant's motion to declare the Texas capital sentencing scheme unconstitutional and motion to preclude imposition of the death penalty.

   (5)    Applicant was denied effective assistance of counsel on appeal, in violation of the Sixth Amendment, where appellate counsel failed to urge on direct appeal the trial court's pre-trial ruling denying Applicant's Motion to Hold Unconstitutional V.A.C.C.P. Article 37.071, sec. 2(e) and (f)-Burden of Proof.

After Moore filed the original state application, Mr. Prible filed several hundred pages of miscellaneous papers, letters and motions in the 351st District Court. *Exh. 'E'* (Excerpt of *Clerk's Record*).  Among the papers were two pleadings in which Mr. Prible attempted to raise claims based expressly on *Brady, supra, Giglio v. United States,* 405 U.S. 150 (1972), *Massiah v. United States*, 377 U.S. 201 (1964) and *Strickland v. Washington,* 466 U.S. 668 (1984).  On June 27, 2007, Mr. Prible filed *pro se* pleadings in the 351st District Court entitled a "Subsequent Application for a Writ of Habeas Corpus" in which he asked the TCCA to consider a *Brady* claim. *Exh. 'E'* at 00382-00390.  In the pleading, Mr. Prible alleged that "the prosecution (Kelly Siegler) hid her true ties to Mike Beckom (*sic.*) and her jailhouse informants in Beaumont Federal Prison."  *Id.* at 00384.  According to Mr. Prible, Siegler was "using Beckom and his group of friends from Federal Prison to aid her in making cases." *Id.* at 00385.  Prible identified the members of the group as "Nathan Foreman, Mike Beckom and Rafael Dominguez as well as others not named here."  *Id.*  Mr. Prible further alleged that had he "been made aware of the ties [Siegler] had to Beckcom and his group of friends who aided Siegler in other cases, I could have

showed this as it truly [was a case of] a prosecutor who had Foreman recruit his friends to enlist in Siegler army of deceit [t]o carry out what ever mission she task them in hopes of a time cut." *Id.* at 00386.  Mr. Prible also alleged in the June 27, 2007, pleading that the state used Beckcom to gather evidence in violation of *Massiah v. United States*, 377 U.S. 201 (1964). *Id.* at 00384.

On August 17, 2007, Mr. Prible filed another document, entitled "Subsequent Application for a Writ of Habeas Corpus (Pro Se). Ineffectiveness of Counsel," in which he contended his trial counsel was ineffective for not investigating a witness named Hermilo Herrero.  In the August 17, 2007, pleading, Mr. Prible alleges that Herrero was prosecuted by Siegler, went to trial "a month before" Mr. Prible was tried and was convicted of murder.  *Id.* 00411-00415.  According to Mr. Prible, Herrero "realized from media source (newspaper or television) the same Prosecutor (Kelly Siegler) did the same thing to him as she did to me," and instructed his wife to call Prible's trial attorney, which, Mr. Prible maintains Mrs. Herrero did, but, Mr. Prible maintained, his trial attorney failed to "make this known to the court or myself." *Id.* at 00413.

Neither the trial court nor the Harris County Clerk treated Mr. Prible's 2007 pleading as a successor application.  Under Art. 11.071 § 5(b)(3) the Clerk must immediately forward second or successor state applications to the TCCA.  In Harris County, successor pleadings are distinguished from original proceedings, which are called "A-writs," by appending in sequence another alphabetical identifier to the cause number.  However, the Clerk did not label Mr. Prible's pleadings as "B" or "C" writs, and the Clerk transmitted Mr. Prible's *pro se* submissions to the TCCA, not immediately, but five months later, in January of 2005, as part of the file accompanying the original state application that Moore filed on November 19, 2004.

On June 18, 2008, the TCCA denied relief on claims contained in the November 2004 petition, deemed documents filed *pro se* by Mr. Prible on June 27, 2007 and August 17, 2004, subsequent applications for habeas relief governed by 11.071 § 5(a), and summarily dismissed both filings. *Ex parte Prible*, WR-69,328-01, WR-69,328-02, WR-69,328-03 (Tex Crim. App. 2008) (Order). In explaining its decision, the TCCA clarified that it did not consider the merits of claims raised in Mr. Prible's June 27 and August 17, 2007, *pro se* pleadings because, in the TCCA's view, neither contained "sufficient specific facts establishing that the application meets one of the exception set out in Art. 11.071, § 5." *Id.* Therefore, the TCCA "dismiss[ed] those applications as abuses of the writ" instead. *Id.*

On June 18, 2009, Mr. Prible filed his original federal writ in the Southern District of Texas. On August 17, 2009, Mr. Prible filed his fist amended federal petition. On December 10, 2009, Respondent filed his Answer and Motion for Summary Judgment. On April 30, 2010, this court denied Respondent's motion upon finding that several of Mr. Prible's claims, although unexhausted, nonetheless met standards in *Rhynes v. Weber*, 544 U.S. 269, 275 (2005). The Court thereupon dismissed Mr. Prible's federal writ without prejudice so that he might present claims that satisfied *Rhynes* to the Texas courts for consideration.

On September 8, 2010, Mr. Prible filed a successor application for habeas relief in the 351st District Court of Harris County raising the following claims:

1.     Whether "[t]he State violated Mr. Prible's rights guaranteed by the Sixth Amendment" and *Massiah v. United States,* 377 U.S. 201, 206 (1964);

2.     Whether "[t]he State intentionally sponsored false and misleading testimony in violation of Mr. Prible's due process rights" as established in *Giglio v. United States,* 405 U.S. 150 (1972);

3.     Whether "[t]he State violated due process by concealing the nature of the arrangement between Beckcom, Foreman and the lead prosecutor." *Brady v. Maryland*, 73 U.S. 83 (1963);

4.      Whether "[i]n violation of due process, the State permitted its key witness to mislead the jury about the existence and extent of the benefits he expected to receive for testifying against Mr. Prible," contrary to *Giglio v. United States,* 405 U.S. 105 (1972); and

5.      Whether "Mr. Prible is actually innocent of capital murder."   *U.S. Const., Amends.* XIV and VIII.

On December 15, 2010, the TCCA ruled that Mr. Prible's September 8, 2010, successor pleadings did not contain sufficient facts to allow the TCCA to make a determination whether Mr. Prible's successor claims satisfied Article 11.071, Section 5's threshold bar.   The TCCA therefore,

> "remanded [this cause] to the trial court so that the habeas corpus record can be supplemented with evidence relating to the Section 5 bar. Specifically, applicant shall have the opportunity to show when and how he obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity. Following receipt of this additional information, the trial court shall determine whether any of the claims satisfy the requirements of Article 11.071, § 5."

*Ex parte Prible*, WR-69,328-04 (Tex. Crim. App., Dec. 15, 2010), Order at 3.

The TCCA's December 15, 2010, order was a source of some confusion, starting with the fact that the TCCA appeared to be delegating Section 5 determinations to the lower court.   The December 15, 2010, order, furthermore, did not dictate how Mr. Prible should make the showing of "when and how he obtained the evidence at issue and whether he exercised due diligence." Instead, the TCCA apparently left it up to the trial court to decide this issue based on submissions of the parties, by conducting a hearing, or by a combination of pleadings and testimony.

However, the December 15, 2010, order contemplated that the trial court would make 11.071 § 5 threshold findings before turning to the merits, if at all.   The order "specifically" stated that "applicant shall have the opportunity to show when and how he obtained the evidence

at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity." *Id.* at 2. "Following the receipt of this additional information," the TCCA continued, "the trial court shall determine whether any of the claims satisfy the requirements of Article 11.071, § 5." *Id.* The trial court was authorized to reach the merits only upon a positive finding that claims met threshold 5(a) standards. *Id.*

Untangling arguments and evidence going to the merits from as opposed to making a threshold Section 5 showing was not easy, nor appropriate. Mr. Prible not only sought consideration of successive claims pursuant to subsection 5(a)(1), **he also contended that his pleadings satisfied "gateway" actual innocence standards incorporated in subsection 5(a)(2).** Under subsection 5(a)(2), the Court must make a determination of whether Mr. Prible pleadings and attachments showed by a preponderance of the evidence that but for a violation of his constitutional rights no reasonable jury would have convicted him. Due diligence, moreover, is not an element of subsection 5(a)(2), nor is it clearly a requirement of the Supreme Court jurisprudence from which subsection 5(a)(2) is derived.

**2.    Development of additional evidence in support of Mr. Prible's due process rights to a fair trial.**

Upon remand to the 351st District Court, Mr. Prible therefore sought *in camera* review of the State's file. The State did not oppose the motion and voluntarily provided the file for review. The State also disclosed three letters that prosecutors had sealed in a letter sized envelope that was labeled on its face attorney work product material. Mr. Prible also sought disclosure of Bureau of Prison ("BOP") records via state court subpoena. BOP asserted sovereign immunity and refused to respond to the state process. Mr. Prible filed an ancillary motion seeking discovery pursuant to the miscellaneous number associated with his federal habeas litigation, which this Court granted.

Based on documents produced by the State and BOP, disclosure of the inmate letters to the lead prosecutor in Mr. Prible's file and evidence obtained from the Herrero file, Mr. Prible filed a series of supplemental pleadings with the convicting court alleging prosecutorial misconduct.  In his first supplemental briefing, filed June 6, 2011,[12] Mr. Prible briefed the following issues:  First, Mr. Prible contended that three letters purportedly from inmates that the state disclosed in response to Mr. Prible's motion for in camera review confirmed that Beckcom was actively involved in a ring of informants that the State was utilizing to obtain incriminating evidence from Mr. Prible in violation of *Massiah v. United States,* 377 U.S. 201 (1964). *Id.* Second, Mr. Prible contended that BOP records, which documented frequent phone calls between the prosecutor's office, Beckcom and other inmates seeking to inform on Mr. Prible, falsified testimony sponsored by the state at trial that minimized the contacts between the State and its key informant and supported a due process claim of prosecutorial misconduct pursuant to *Giglio v. United States,* 405 U.S. 150 (1972).  Third, Mr. Prible contended that the inmate letters and evidence of numerous phone contacts between Beckcom and his confederates constituted *Brady* material in themselves, and certainly were favorable and material to the defense when considered in conjunction with the audiotaped statements Mr. Prible had obtained in 2009 and 2010 from Carl Walker.  Fourth, Mr. Prible argued that letters dated May 1, 2002 (five months before Mr. Prible's trial), to Assistant United States Attorneys from Mr. Prible's lead prosecutor advocating sentence reductions under Federal Rule of Criminal Procedure 35 for inmates for demonstrably false testimony against Herrero were *Brady* material, particularly the letter sent on behalf of Nathan Foreman, since Foreman was Beckcom's roommate, Foreman introduced

---

[12] SUPPLEMENTAL BRIEFING TO APPLICANT'S SUCCESSOR APPLICATION FOR A WRIT OF HABEAS CORPUS (filed June 6, 2011).

Beckcom to the lead prosecutor and Foreman schemed closely with Beckcom to incriminate Mr. Prible.

On June 8-9, 2011, the trial court convened a hearing in accordance with the TCCA's December 15, 2010, instructions.  Mr. Prible called the following witnesses: Mollie Steinlie, his investigator at trial; Kurt Wentz, his trial co-counsel; Roland Moore, his state habeas counsel; and Rudy Garza, the investigator for Mr. Herrero.  Mr. Prible also introduced into evidence a taped statement of Walker,[13] and the three letters disclosed pursuant to his request for *in camera* review.[14]  Mr. Prible attempted to introduce BOP records and evidence from the States file in *State v. Herrero*, No. 903122, in the 179th District Court, Harris County, Texas, but the trial court upheld the State's objections and refused to consider the material on the ground that the information was irrelevant. *June 8-9, 2011, Hearing, Vol. 2, p.* 33, 50.

Nonetheless, at the end of the June 8-9, 2011, hearing, the convicting court invited both parties to submit further evidence and argument for his review with the promise that the court would consider it as follows:

> THE COURT: I'm sorry. One more thing. I'm certainly -- in the next two weeks, if anybody wants to give me anything else to read, I'll be happy to read it, just as I've read everything that's already been filed. If anybody has anything else they want to throw it, I will definitely read it and look at it. So, there you go.

*Id., Vol. 3*, p. 67.

On June 22, 2011, Mr. Prible filed in the 351st District Court a Second Supplemental Briefing to Applicant's Successor Application for Writ of Habeas Corpus.  Further analysis of the *Herrero* case after the June 8-9, 2011, hearing confirmed that in order to develop evidence against

---

[13] The State drafted findings stating the August 26, 2010, tape of Carl Walker, Jr. was "proffered."  However, at the June 8-9, 2011, hearing, undersigned counsel offered to authenticate the tape, but the trial court agreed that authentication was not necessary as the tape was "already in" and that the court had taken judicial notice of it.  *Vol 2. June 8-9, 2011, Hearing* at 3; *id. vol. 3,* at 3, **66-67**.

[14] *June 8-9, 2011, Hearing, Def. Exhs.* 2-4.

Herrero and secure a conviction in the "cold" murder case of Guajardo, the State had utilized a ring of informants the membership of which overlapped membership in the ring working to incriminate Prible. *2nd Supp. to Successor App.* at 8.

In particular, Foreman was again involved with the State's testifying informants, in a joint effort to incriminate Herrero in return for assistance in obtaining a Rule 35 reduction in their federal sentences. *Id.* at 3-6.  Moreno told the prosecutor in a taped interview that Herrero had confessed in the presence of Moreno, Foreman, and another inmate named Rafael Dominguez.  Dominguez also arranged to stage photos with Herrero and other FCI Beaumont informants in order to create the impression that they had Herrero's confidence, just as Beckcom and Foreman had done to create the impression that they had formed a close relationship with Prible.[15]  In the June 22, 2011, second supplemental pleading Mr. Prible therefore claimed that in violation of *Brady v. Maryland*, 83 U.S 73 (1963), the State had suppressed this evidence, which he contended supported his allegation that the lead prosecutor was utilizing a system of informants to fabricate testimony.  Citing *Kyles v. Whitely*, 514 U.S. 419 (1995), Mr. Prible contended especially that he was entitled not only to impeach witnesses but to impeach the methods that the State had used to gather and assemble its case against him.

In addition to pointing out the use of interrelated informant rings to convict Herrero and himself, Mr. Prible maintained in his June 22, 2011, pleading that the State also suppressed letters that the prosecutor had written to Assistant United State's Attorneys advocating Rule 35 reductions not only for the testifying witnesses, Moreno and Dominguez, but for Foreman and Gomez, who had not testified.  The letters showed that the State was promising benefits to jailhouse informants who had given inconsistent and false statements and were clearly in league.

---

[15] *Herrero v. State,* cause no. *903122* in the 179th District Court, Harris County, Tr. Transc. vol. 4, p. 122.

On June 23, 2011, the convicting court entertained arguments from Mr. Prible and the State and issued a ruling from the bench. *June 23, 2011, Hearing, Vol. 4.*  The State also volunteered findings of fact and conclusions of law, although the convicting court did not request that the State or Mr. Prible prepare them.  On June 24, 2011, the convicting court signed the State's version of the facts of law and ordered the case forwarded to the Texas Court of Criminal Appeals.  However, although the TCCA's December 15, 2010, order did not limit the convicting court to considering threshold issues under § 5(a)(1), the trial court confined the June 8-9, 2011, hearing to § 5(a)(1) issues and made findings only under this section of Article 11.071.[16]

On June 23, 2011, Mr. Prible filed a third supplemental brief based on evidence developed that afternoon subsequent to the morning hearing.[17]   In the third supplement, Mr. Prible called the convicting court's attention to another member – namely, Mark Martinez - of the group of informants operating within FCI Beaumont while Mr. Prible was incarcerated before trial.  *Id.*  Martinez refused to speak with Mr. Prible's investigator, but did briefly confer with his counselor at the federal prison in Colorado, to which Martinez had been transferred. Martinez was shown the letter purportedly bearing his signature, denied that it was his handwriting and confirmed that some FCI Beaumont prisoners were pressuring others to sign statements incriminating Mr. Prible.  In the same pleading, Mr. Prible pleaded for leave to subpoena and depose Martinez and Jesse Gonzalez (also a purported signatory on one of the three letters disclosed from the prosecutor's file.). *Id.*

---

[16] The findings drafted by the District Attorney and signed by the trial court on June 24, 2011, are styled "FINDINGS PURSUANT TO TEX. CODE CRIM. APP. ART. 11.071, SEC. 5(a)(1)."

[17] THIRD SUPPLEMENTAL BRIEFING TO THE SUCCESSOR PETITION FOR WRIT OF HABEAS CORPUS; AND REQUEST FOR RECONSIDERATION OF THE JUNE 23, 2011, DETERMINATION THAT MR. PRIBLE'S SUCCESSOR PETITION DOES NOT MEET SECTION 5(a) STANDARDS.

On July 11, 2011, the Harris County Clerk transmitted the habeas record to the TCCA. On November 2, 2011, the TCCA issued an opinion stating that the TCCA had "reviewed the application and the trial court's recommendations" and had found that "the allegations fail to satisfy the requirements or Article 11.071, § 5(a)." *Ex parte Ronald Jeffrey Prible, J.*, WR-69,328-04 (Tex. Crim. App., 2011).   As a result, the TCCA dismissed the 2010 successor application "as an abuse of the writ."   The TCCA did not reach the merits of the five claims it remanded on December 15, 2010, or the constitutional claims raised in supplemental briefing that Mr. Prible filed in 2011 on remand to the convicting court.   For the following reasons, however, this Court can reach the merits of the claims raised in Mr. Prible's 2010-2011 pleadings and in this second amended federal writ:

First, whether the facts underlying Mr. Prible's June 27 and August 17, 2007, *pro se* pleadings were available does not preclude this Court from reaching the merits of Mr. Prible's 2010 successor claims.   Although it is not entirely clear, the TCCA may have decided in its November 2, 2011, order that the facts underlying Mr. Prible's current claims for relief under *Massiah, Brady, Giglio* and *Strickland* were available as of June 27 and August 17, 2007, when Mr. Prible filed *pro se* pleadings citing these Supreme Court cases.   Nonetheless, with respect to Mr. Prible's 2007 pleadings, the 2011 order, like the 2008 order before it, does not rest on an adequate or independent state law ground for purposed of federal default doctrines.   In fact, TCCA precedents militate against treating the 2007 applications even as cognizable pleadings. Second, Mr. Prible can demonstrate cause and prejudice for not raising his current claims his original state writ filed in 2004 nor in his 2007 *pro se* applications.   Furthermore, he can demonstrate that it would be manifestly unjust not to consider his *Massiah, Brady-Giglio* and *Strickland* claims.

### III.　THE STATE COURT'S RELIANCE ON ABUSE OF THE WRIT DOCTRINE DOES NOT SATISFY FEDERAL DEFAULT STANDARDS

#### A.　June 18, 2008, dismissal of the 2007 pleading did not rest on independent or adequate grounds.

The Supreme Court has consistently held that "the question of when and how defaults in compliance with state procedural rules can preclude … consideration of a federal question is itself a federal question." *Henry v. Mississippi*, 379 U.S. 443, 447 (1965).　A state procedural default is an "independent and adequate state ground" barring subsequent federal review only if the state rule was "'firmly established and regularly followed.'" *See Ford v. Georgia*, 498 U.S. 411, 423–424 (1991).　A state procedural ground is regularly followed when it is strictly followed. *See Barr v. City of Columbia*, 378 U.S. 146, 149 (1964).

In *Roberts v. Thaler*, --- F.3d ----, 2012 WL 1677031 (5th Cir. 2012), the Fifth Circuit recently analyzed "[]the twin requirements of independence and adequacy."　Under this federal doctrine, the state court's dismissal must "'clearly and expressly' indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.'" *Id.* (*quoting Finley*, 243 F.3d at 218 (quoting *Amos v. Scott*, 61 F.3d 333, 338–39 (5th Cir. 1995)).　Importantly, in order "[t]o produce a federally cognizable default, the state procedural rule 'must have been 'firmly established and regularly followed' by the time as of which it is to be applied.'" *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir.2004) (quoting *Ford*, 498 U.S. at 424.).

#### 1.　The TCCA's June 18, 2008, decision does not "clearly and expressly" rely on state law grounds.

The TCCA's June 18, 2008, dismissal of Mr. Prible's June 7 and August 17, 2007, *pro se* pleadings as an abuse of the writ does satisfy the requirements for a federally cognizable default. Although the Court clearly and expressly stated that Mr. Prible abused the writ, the reason for the

abuse, according to the TCCA, was that Mr. Prible's 2007 applications did not "contain sufficient specific facts establishing that the application meets one of the exceptions set out in Art. 11.071 § 5." *June 18, 2008, Order* at 2.  But Section 5 of Article 11.071 has three subsections, 5(a)(1), 5(a)(2) and 5(a)(3), the first two of which apply to guilt phase habeas claims.  The relevant subsections state as follows:

> Sec. 5. (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

Ordinarily, 5(a)(1) is an independent and adequate ground, provided other perquisites needed to satisfy this federal default doctrine are met.  *See Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004).  Subsection 5(a)(2), on the other hand, depends on federal constitutional law.  In *Ex parte Reed*, 271 S.W.3d 698, 733 (Tex.Crim.App. 2008), the Court of Criminal Appeals noted that "[b]ecause Article 11.071 Section 5(a)(2) was enacted in response to the Supreme Court's decision in *Schlup [v. Delo*, 298 U.S. 195 (1995)], we conclude that the standards set forth for evaluating a gateway-actual-innocence claim announced by the Supreme Court should guide our consideration of such claims under Section 5(a)(2)."  As a result, reliance on 5(a)(2) obviously cannot satisfy federal default doctrines as it is derived from federal constitutional law.

However, the TCCA's June 18, 2008, opinion does not identify what subsection it relied upon when it found that Mr. Prible's 2007 pleadings did not satisfy Article 11.071, §5(a).  One

cannot determine therefore whether the TCCA disposed of Mr. Prible's writ because, in the TCCA's view, it did not satisfy federally derived standards for "gateway" innocence under 5(a)(2). The statement that Mr. Prible's applications are abuses of the writ, therefore, does not satisfy the federal requirement that the state must "'clearly and expressly' indicate that it rests on state grounds which bar relief." *See, Amos, supra*, at 338-339.

> **2. Alternatively, whether one is talking about the June 18, 2008, opinion or the November 2, 2011, opinion, the TCCA's application of Section 5(a)(1) to Mr. Prible's June and August 2007 pleading would not be an independent and adequate state law ground triggering federal default, because the TCCA does not strictly or regularly apply the abuse of the writ doctrine to *pro se* pleadings.**

The TCCA does not discuss actual innocence in its June 18, 2008, opinion, nor did Mr. Prible squarely raise actual innocence in his 2007 filings, so it is readily arguable that the TCCA relied only on section 5(a)(1) to dismiss Mr. Prible's June and August 2007 *pro se* pleadings. Nonetheless, even if the TCCA's June 18, 2008, opinion is deemed to have "clearly and expressly ruled" that Mr. Prible did not meet Section 5(a)(1) provisions for a subsequent writ, dismissal of Mr. Prible's July and August 17, 2007, pleadings as an abuse of the writ should not trigger federal default. Default is justified only if the state courts strictly follow and regularly apply state procedural rules. However, the TCCA's decision to recognize Mr. Prible's June and August 17, 2007, pleadings is an aberration for the following reasons.

First, the TCCA has repeatedly held that defendants are not entitled to hybrid representation, whether at trial or in post conviction proceedings. *See Robinson v. State*, 240 S.W.3d 919, 922 (Tex.Crim.App. 2007). The rule against hybrid representation "is basic and important." *See Ex parte Taylor*, 36 S.W.3d 883 (Tex. Crim. App. 2001). Hybrid representation threatens orderly review and adjudication of the defendants request for relief by creating fertile grounds for conflict, waiver, and abandonment of claims. Sophistication of the applicant, in this

21

regard, is irrelevant, and so too, whether they present claims supported by authority or not.  In *Ex parte Taylor*, the Court applied the no hybrid rule to preclude attempts by a sophisticated litigant to engage in hybrid representation.  A District Attorney sought to file pleadings in an appeal in which the State was being represented by the Texas Attorney General's Office.  The TCCA flatly stated that "[a]ppellants are not allowed to have "hybrid representation" on appeal, in which an appellant and an attorney can present independent points to an appellate court." *Id.*

Importantly, the rule against hybrid representation is not itself an independent and adequate state law ground for disposing of state habeas actions that might justify the application of the federal default doctrine to Mr. Prible's June and August 17, 2007, pleadings.  Hybrid pleadings are simply not cognizable.  *See Patrick, supra; and see Ex parte Davis,* 818 S.W.2d 64, 68 (Tex.Crim.App. 1991)(Onion, J., concurring).  In *Ex parte Russeau*, 2010 WL 3430765 (Tex. Crim. App. 2010)(unpublished opinion), the TCCA rejected a *pro se* applicant's successor claims because the "applicant does not have a right to hybrid representation." *Id.* at \*5.  Rather than finding an abuse of the writ, "the Court declined to consider these grounds as they present nothing for review, and we reject any findings or conclusions pertaining to them." *Id.*  Clearly, as long as an applicant is still represented by counsel in 11.071 proceedings, he does not have authority to file a successor writ, and the applicant's *pro se* efforts are nullities with no more bearing on substantive claims, or the procedural posture of a case, than an application for habeas relief filed by a third party with no standing.

TCCA precedents show that the potential for conflict is sufficient to reject hybrid pleadings. *See Ex parte Rousseau, supra*.  In this case, the conflict between Mr. Prible and his trial counsel was bitter and explicit.  The record clearly reflects that Mr. Prible's state habeas counsel refused to authorize Mr. Prible to file *pro se* pleadings.  Mr. Prible sent Moore his June

27, 2007, application.  In a curt letter state habeas counsel wrote, "I have received your successor Writ.  None of it is useful.  I will not be adopting it."  *Exh. 'E' at 00398.*  Mr. Prible brought this letter, and the conflict over post-conviction representation, to the Texas courts' attention by filing it in protest over Moore's continuing representation.  *Id.* at 00397.

The trial court did not authorize Mr. Prible to proceed *pro se*, and instead ignored all the numerous requests for discovery, new counsel and hearings that Mr. Prible made so that he could prove the allegations in his June 27 and August 17, 2007, pleadings.  The only judicial action taken was on Mr. Prible's January 22, 2007, motion to disqualify the trial judge, Hon. Mark Kent Ellis.  *Exh. 'E'* at 343-355.  Mr. Prible moved for disqualification because the judge had not taken action on the numerous papers Mr. Prible had filed complaining about state habeas counsel and requesting the appointment of a different attorney.[18]  The recusal motion was forwarded to the Second Administrative Judicial District.  A hearing took place by video hookup during which Mr. Prible furiously, but unsuccessfully, demanded new counsel.

And there is a second reason why the Texas Court of Criminal Appeals June 18, 2008, decision disposing of Mr. Prible's July and August 17, 2007, pleadings cannot justify application of federal default doctrines.  The TCCA found that Mr. Prible's July and August 17, 2007, pleadings abused the writ for one reason and the reason was **not** because Mr. Prible's claims could have been presented in his 2004 writ.  Instead, according to the TCCA,

> The merits of claims raised in a subsequent application may not be considered by this Court unless the application contains sufficient specific facts establishing that the application meets one of the exceptions set out in Art. 11.071, § 5.

---

[18] The 351st District Court took no action on any of Mr. Prible's numerous motions, including discovery motions, and neither the district clerk nor the trial court treated Mr. Prible's July and August 17, 2007, filings as successor writs.  Harris County courts identify separate writs alphabetically.  The original writ is the 'A' writ; subsequent writs are labeled 'B' and 'C' writs, etc.  However, the clerk filed Mr. Prible's *pro se* pleadings in the original habeas case, the 'A' writ.  Furthermore, by statute, the convicting court must *immediately* send subsequent 11.071 applications to the TCCA.  The trial court and district clerk did not transmit Mr. Prible's file to the TCCA until February 4, 2008.

> Applicant's two subsequent applications do not satisfy this requirement, and we therefore dismiss those applications as abuses of the writ.

*Ex Parte Prible*, WR-69,328-01, WR-69,328-02, WR-69,328-03 (Tex. Crim. App.) at 2.

However, the TCCA does **not** regularly apply an abuse of the writ standard to pleadings that fail to allege "sufficient specific facts."  In *Ex parte Medina*, 361 S.W.3d 633 (Tex. Crim. App. 2011), the TCCA explained why:

> Texas law has **long required** all post-conviction applicants for writs of habeas corpus to plead specific facts which, if proven to be true, might call for relief. Counsel has not cited a single case in which this Court has granted a writ application that contained only conclusory allegations or even remanded such an application for further consideration by the convicting court. A Texas writ application must be complete on its face. It must allege specific facts so that anyone reading the writ application would understand precisely the factual basis for the legal claim.

*Id.* at 640 (emphasis added).

If specific facts are not alleged, the result is not a deficient Texas writ. One does not have a Texas writ at all.  For this reason, the *Ex Parte Medina* Court indicated the proper procedure is to dismiss the pleading "**without prejudice**" rather than apply the abuse of the writ doctrine. *Id.* at 641 (emphasis added).

The TCCA's June 18, 2008, decision to consider Mr. Prible's June 27 and August 17, 2007, *pro se* pleadings as successor applications under 11.071 § 5 and to dismiss them as abuses of a writ was therefore highly irregular.  In fact, the decision violated the TCCA's precedence prohibiting hybrid representation, was contrary to the preferred practice of dismissing without prejudice those applications that do not meet minimal pleading requirements, and conflicted with the trial court's treatment of Mr. Prible's *pro se* efforts as part of his original application.  Had the TCCA followed its own precedents, Mr. Prible should not have been allowed to seek relief *pro se* while still represented by state habeas counsel, Roland Moore.  Mr. Prible's June 27 and

August 17, 2007, pleadings should have been struck rather than ruled upon.  Consequently, the Texas Court of Criminal Appeals July 18, 2008, determination that the July and August 17, 2007, *pro se* pleadings were subsequent writs subject to an abuse of the writ standard does not constitute the application of independent and adequate state law grounds, but a departure from the TCCA's established jurisprudence instead.

**B.**    **The TCCA'S November 2, 2011, decision does not warrant default under federal law.**

The TCCA does not specify in its November 2, 2011, opinion whether it found claims in Mr. Prible's September 8, 2010, Application failed to satisfy section §5(a) because Mr. Prible (i) failed to discover the factual allegations contained therein at trial, (ii) failed to present them in his November 19, 2004, application, or (iii) failed to present them in his June and August 2007 pleadings.  On the other hand, the June 24, 2011, Findings drafted by the State, signed verbatim by the convicting court and apparently adopted by the TCCA touch on each possibility.  The June 2011 Findings suggest that "a factual basis for claims brought in connection with successor proceedings initiated by Mr. Prible's September 8, 2010, successor application "**may have** been available" to Mr. Prible's trial counsel. *Id.,* p. 7.  The June 2011 Findings also assert that the factual basis for Mr. Prible's 2010 successor allegations was available for inclusion in Mr. Prible's 2004 and 2007 pleadings. *Id.*

However, if the TCCA's decision that the September 8, 2010, successor claims that this Court remanded under *Rhynes* abused the writ because the factual allegations could have been presented in Mr. Prible's July and August 17, 2007, pleadings, then federal default doctrines are inapplicable for reasons set forth above, namely: (a) the TCCA does not strictly or regularly apply abuse of the writ doctrines to the *pro se* pleadings of represented defendants, and (b) the TCCA does not strictly or regularly apply abuse of the writ doctrines to pleadings that do not

meet the heightened pleadings requirements for applications filed pursuant to Article 11.071 for habeas relief.  Furthermore, defaulting Mr. Prible's claims would be a manifest injustice because he can show cause and prejudice for not raising present federal claim based on *Giglio, Brady* and *Massiah* in his previous state proceedings.

## IV.    CAUSE AND PREJUDICE.

Mr. Prible seeks an evidentiary hearing on prosecutorial misconduct claims brought under *Massiah v. United States*, (1964) *Brady v. Maryland,* 373 U.S. 83 (1963) and *Giglio v. United States,* 405 U.S. 150 (1972).  Hence, this Court must determine if Mr. Prible "failed to develop the factual basis of a claim in state court proceedings" under 28 U.S.C. § 2254(e)(2).  If Mr. Prible did fail to develop the factual basis of any claim, the Court may still consider the evidence in support of it presented at the evidentiary hearing if: (1) the claim relies on a new rule of constitutional law made retroactive to him or the factual predicate of the claim could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim establish, by clear and convincing evidence, that, but for the constitutional error, no reasonable jury would have found him guilty. *See* 28 U.S. C. § 2254(e)(2)(A) & (B).

In determining whether Mr. Prible "failed to develop the factual basis of a claim in state court" the standard set forth in (Michael) *Williams v. Taylor*, 529 U.S. 420 (2000) applies.  A failure to develop the factual basis of a claim is not established unless there is "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432.  This Court therefore must focus on Mr. Prible's efforts to discover the relevant facts, and not on whether he actually could have discovered these facts.  **"Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the**

**information available at the time, to investigate and pursue claims in state court; it does not**

**depend ... upon whether those efforts could have been successful.”** *Id.* at 435.

A.     CAUSE

In the June 24, 2011, Findings the convicting court characterized the successor

application that Mr. Prible filed in 2010 as “rais[ing] five claims alleging a conspiracy among the

lead prosecutor in his case and several federal prison inmates who were housed with the

applicant at FCI Beaumont.” *Id*., p. 2, *Finding 12*.   The convicting court next described the

conspiracy theory as an allegation that “the lead prosecutor provided federal inmate Nathan

Foreman with otherwise-unknown details about the applicant’s case, that inmate Foreman shared

the provided information with a ring of snitches he recruited to assist the lead prosecutor in

obtain a false confession for the applicant, and that “witness Michael Beckcom’s testimony at the

applicant’s trial regarding the applicant’s confession was perjured and rendered him a state

agent, as a false confession based on information he received from the lead prosecutor, by way of

Foreman.” *Id.* p. 3, *Finding 13*.   In *Finding 14*, the convicting court asserted that “applicant’s

[2010] claims are based largely on the statements of witness Carl Walker, Jr.,” a former

Beaumont federal prison inmate.” *Id.,* p. 3, *Finding 14*.   According to the convicting court,

however, statements from Walker attached to the 2010 state application “consist almost entirely

of hearsay and speculation and contain no direct evidence of applicant’s conspiracy theories.” *Id.*

p. 4.

The convicting court then turned to the question of whether the information Carl Walker,

Jr., provided in 2010 in statements to Mr. Prible’s federal investigator and federal counsel were

available at the time Mr. Prible filed his previous state application filed in 2004 and in *pro se*

pleadings filed in 2007.   In *Finding 20*, the convicting court found that “during the preparation of

the initial habeas petition" in 2004 that state habeas counsel "investigated the applicant's conspiracy theory," but that "applicant provided counsel with very limited information and, that counsel did not urge the applicant's conspiracy theory alleg[ing] Walker as a potential witness to the conspiracy in the applicant's initial habeas petition." *Id.,* p. 4-5. Nonetheless, "based on the applicant's proffered statements of witness Walker upon which the applicant relied to support the merits of his instant claims," the convicting court found "that the factual basis for the instant claims were available when the applicant's initial habeas petition was filed in November, 2004." *Id.*, p. 5, *Finding 22.*

Having found that a factual basis for claims Mr. Prible raised in 2010 was "available" under Article 11.071 §5(a)(1) six years earlier for inclusion in his original November 2004 application, the convicting court also found that the information was available when Mr. Prible filed his June and August 2007 *pro se* pleadings. According to the convicting court, the June 2007 pleading "identified Walker by name and federal inmate number" and indicated that "Walker had come forth with information regarding the conspiracy theory." *Id. Findings 24-25.* The August 2007 pleading, according to the convicting court, "explicitly raised the conspiracy theory" and indicated that "a witness had contacted his trial counsel, Terry Gaiser, with information about the alleged conspiracy." *Id.,* p. 6, *Findings 29-30.* The convicting court, therefore, determined that "applicant's conspiracy theory and the identify of witness Walker were available at the time of the filing of the applicant's second subsequent application for writ of habeas corpus" and that "a factual basis for the applicant's conspiracy theory may have been available at the time of applicant's trial." *Id.* pp. 6-7, *Findings 31-32.* In conclusion, the convicting court therefore found "that applicant fails to establish that the factual basis for his

claims was unavailable on the dates that applicant filed his three previous applications, as required by Tex. Code Crim. Proc. Art 11071, sec. 5(a)(1)." *Id.* p. 7, *Finding 34.*

However, the state courts' findings that evidence underlying Mr. Prible's "conspiracy theory" were available to Mr. Prible's previous counsel are legally irrelevant and factually erroneous. First, the state courts' findings speaks generally about a conspiracy theory and fail to address specific evidence that was or was not available to support Mr. Prible's specific constitutional claims that the state sponsored false testimony and suppressed exculpatory evidence. Second, the court's focus on "unavailability" conflicts with the emphasis on counsel's reasonable efforts at pursuing his defenses which is central to federal default of analysis. The state court did not find that counsel unreasonably failed to pursue the limited lead that it found previous counsel had to Carl Walker, Jr. In particular, it did not find that previous counsel had sufficient information before 2007 to locate and interview Carl Walker, Jr., nor did the court find that Mr. Prible had the wherewithal to contact and interview Carl Walker, Jr., from death row.

In the end the state court findings support the conclusion that the information underlying Mr. Prible's 2010 application pre-existed the pleadings he filed in 2004 and 2007. However, this is nearly always the case with the rare exception of new scientific advancements that enable counsel to develop new evidence for the first time. The record, meanwhile, confirms that previous representatives – trial counsel, state habeas counsel, and Mr. Prible acting *pro se* – took all measures that could reasonably be expected in order to investigate the State's relationship to the FCI informants they had reason to believe were used to supply information incriminating Mr. Prible .

1. **Trial counsel diligently sought discovery of the State's relationship to Beckcom and had no reason to suspect that Foreman and Beckcom were part of a ring of informants whom the State was utilizing to investigate and assemble its case.**

As an initial matter, the state court did not find that any of the specific facts that Mr. Prible alleged in support of the five claims for relief that he filed in 2010 were available to trial counsel. The findings speak nondescriptly of "a factual basis" being available. *July 24, 2011, Findings*, p. 7, *Finding 32*. The findings also do not express any level of certainty about whether trial counsel should have known about "a factual basis" and, instead, speculate that such "a factual basis for applicant's conspiracy theory may have been available at the time of the applicant's trial." *Id.* The record shows, moreover, that trial counsel attempted to discover "a factual basis" for impeaching Beckcom about his relationship to the lead prosecutor. Trial counsel sought disclosure of deals with the prosecutor and vigorously cross examined Beckcom about the benefits the State had promised him. 20 RR 5-7. Trial counsel also sought discovery of communication between Beckcom and the State, but received a misleading response on Friday, October 11, 2002, days before trial started on Monday, October 14, 2002. *Id.* at 13.

Furthermore, in the August 17, 2007, pleading the only hint towards what might be considered "a factual basis for applicant's conspiracy theory" is Mr. Prible's garbled reference to lead trial counsel's "failure to make information of [a] potential witness to court or defendant," namely Herrero. *Pro se August 17, 2007, Pleading,* p. 2. According to the August 2007 pleading, this witness had noticed from "watching TV or other sources" that the lead prosecutor had "done the same thing" when she prosecuted him for murder as she had done to Prible. *Id.* The August 2007 pleading also alleges that the inmate instructed his wife to contact Mr. Prible's lead counsel at trial. However, co-counsel at trial, Kurt Wentz, testified at the June 8-9, 2011, Hearing that the name "Hermilio Herrero" never surfaced. Molli Steinli, the investigator

appointed to assist trial counsel, confirmed that Prible did not provide her with information about such "potential witnesses" during or after trial.  Herrero's habeas investigator also testified that he interviewed Herrero, and that Herrero did not mention a Walker, let alone the name of Carl Walker, Jr. *June 8-9, 2011, Hearing, Vol. 2*, p. 31.  In a December 15, 2010, order the TCCA instructed the trial court to make credibility findings if appropriate.  The trial court did not make adverse findings regarding the credibility of Wentz, Steinli, Moore or Garza.  Based on their unimpeached testimony, "the statements of Carl Walker, Jr." that the convicting court found "applicant's [2010-2011] claims are based largely on" clearly were **not available** to trial counsel in any meaningful or reasonable construal of the phrase.

Finally, the June 24, 2011, finding that the factual basis of Mr. Prible's claim "**may have been available**" to trial counsel because of a phone call in the middle of a capital murder trial from the spouse of a recently convicted inmate named Herrero conflicts with the position taken by the State and convicting court throughout the June 8-9, 2011, Hearing held two weeks earlier.  At the hearing on June 8-9, 2011, the State repeatedly insisted that facts about the prosecution of Herrero, far from being facts that Mr. Prible should have pursued at any stage of proceedings, were, instead, irrelevant even now:

> MS. HAMPTON: Your Honor, I would object to the relevance of this witness' testimony. If he's an investigator for Norm Silverman on the Hermilio Herrero case, it doesn't have anything to do with Mr. Prible's case **and it doesn't have anything to do with whether this claim was available to be raised at a prior writ proceeding**.

*Vol. 2* (June 8-9, 2011, Hearing), p. 31.  Foreman's role in both the Herrero and Prible prosecutions was also deemed irrelevant despite Mr. Prible's 2011 supplementary briefing which documented Foreman's efforts to incriminate Herrero and Prible in their respective cases.  *Id.* at

62.  Turning to the documents from the Herrero file that Mr. Prible submitted, the State objected once more on relevancy:

> MS HAMPTON: And, again, anything having to do with Hermilio Herrero's case is not relevant in this proceeding, particularly as to whether he meets the criteria for Section 5 –

*Id.* at 52.

The trial court agreed with the State in every instance. *Id.* at 31, 52, 62.

If the Herrero file appears irrelevant to the state even now, the State certainly cannot take the position that years earlier, whether at trial or during initial state habeas proceedings, Mr. Prible's attorneys should have sought information in that file.  Mr. Prible's previous attorneys did not have the benefit of BOP records, letters from inmates to the prosecutor from other informants, that together link Foreman and Beckcom in an organized effort to incriminate Mr. Prible.  Without this evidence, Mr. Prible's previous attorneys had no reason to investigate the Herrero case whether in the midst of Prible's own capital trial or during initial state habeas proceedings.

> **2.      State habeas counsel diligently attempted to pursue the insubstantial leads he had to witnesses who might support Mr. Prible's prosecutorial misconduct claims.**

State habeas counsel tried to identify the person named "Walker" who, Prible maintained, could prove that Beckcom, in league with Foreman and the lead prosecutor, were fabricating evidence against him.  State habeas counsel employed an experienced investigator, John Greenfield, and inquired about how he could possibly locate the individual that Prible believed could expose the operations of the informant's ring in FCI Beaumont.  Greenfield, however, pointed out that because "Walker" was a very common name, additional identifying information would be needed in order for him to identify and arrange an interview with an inmate in the BOP

system.  At the June 8-9, 2011, Hearing, trial counsel explained his predicaments and his attempt to solve it:

> A. I -- all I had was the name -- was that there was a man named Walker and that he was black. And I had talked about this with my investigator and there was simply no way to proceed on that small amount of personal identifying information.
>
> Q. Okay. And so, you had to find, perhaps, someone who had some information -- knew Mr. Walker, had more identifying information; is that correct?
>
> A. Yes.

*Vol. 3, June 8-9, 2011, Hearing* at 39.

State habeas counsel also tried to contact and interview all witnesses that he thought might be able to identify a relevant witness with the last name "Walker".  State habeas counsel took the extraordinary step of issuing a subpoena for Nathan Foreman and attaching him to another Harris County case.  State habeas counsel then attempted to interview Foreman but was stonewalled.

> A. Well, I -- I subpoenaed Nathan Foreman back to the courthouse. I had him attached to another – an unrelated felony case and Mr. Greenfield, my investigator, and I interviewed him alone, just the two of us, in one of the holdover cells. And as soon as he discovered that Mr. Greenfield and I were not working for the State of Texas, but, in fact, were working for Mr. Prible, he went stone silent, wouldn't answer any questions, wouldn't cooperate. I don't even have any notes because he would say nothing that I could have written down. He absolutely would not talk to us.

*Vol 3, June 8-9, 2011, Hearing* at 41.

Trial counsel also sought permission to interview Beckcom, but Beckcom was represented by counsel who refused to make Beckcom available.

> Q. And you were aware that the key witness at trial was Michael Beckom; is that correct?
>
> A. Yes.

Q. And did you try to talk with Michael Beckom?

A. I was about to. And I spoke with another lawyer in the courthouse here who represents him who told me that, A, that he represented Beckom, and, B, that Beckom wouldn't talk to me. So, I didn't pursue Mr. Beckom since his lawyer told me he wouldn't talk to me.

Q. And who was his lawyer, if you can recall?

A. I'll have to think. Give me a minute. I'll think of his name in just a minute. Well known to all of us. Logan Dietz.

Q. Logan?

A. D-i-e-t-z. Logan, L-o-g-a-n.

*Id.*

State habeas counsel also wrote to the FCI Beaumont prisoner Brett Liedtke seeking information about a potential witness named "Walker" and the ring of snitches Prible believed had set him up.  June 8-9, 2011, Hearing, Vol. 2, p. 51.  Liedtke was a defense witness at trial. When Liedtke testified, however, he did not identify or describe Walker.  Prible's defense team interviewed Liedtke before he testified, as well, but Liedtke did not provide the defense any information about a person named Walker or names of other inmates who were aware of a ring of informants in FCI Beaumont. *Id., Vol. 3*, p. 55.  Nonetheless, state habeas counsel reached out to Liedtke, but without success.  *Id.*

Despite testimony documenting state habeas counsel's efforts before 2004 to find a witness when he only had last name "Walker" to go by, and despite state habeas counsel's additional efforts to contact Carl Walker, Jr., after adequate identifying information became available for the first time in 2005 (a year after state habeas counsel filed the Mr. Prible's original 2004 application) the convicting court nonetheless signed off on findings stating that Mr. Prible's 2010 successor application abused the writ precisely because of statements that Carl

Walker, Jr., gave when interviewed by Mr. Prible's federally appointed team. *June 24, 2011, Findings*, p. 3, *Finding 15*.

In *Finding 15*, the court refers to Carl Walker, Jr.'s "statements" that were attached as an exhibit to his successor petition[19] and finds that Walker was present when Foreman and Beckcom were putting into motion conspiratorial plans to convict Prible with false testimony. *Id.* However, the convicting court recommended dismissing Mr. Prible's due process claims under §5(a)(1) without reaching the merits upon determining that "the factual basis for [Mr. Prible's] the instant claims were available when the applicant's initial habeas petition was filed in November, 2004." *Id.* The court based this conclusion squarely on "**the applicant's proffered statements of witness Walker upon which the applicant relies to support the merits of his instant claims.**" *Id.* at 5.

However, any finding that Carl Walker, Jr.'s statements prove state habeas counsel was not diligent are so mystifyingly erroneous that it cannot possibly satisfy 28 U.S.C. § 2254(d) or §2254(e). The August 26, 2010, audio taped interview of Carl Walker, Jr., shows that he was first located by complete chance. As he explains, because there was nothing to go by except for a very common last name, Mr. Prible, through his pro bono assistant, Ward Larkin, wrote to someone who shared the last name "Walker":

> **CW:** And I think that is how or that's why he reached out to me. I don't know if he found out about me. Well, that's what I. I mean, if I'm not mistaken, it's been a long time ago, but this is, **[UI]**, what's happening was at one point in time, **the lawyer's office was writing the wrong Walker, it wasn't writing me. It was trying to get in contact with a Walker.**
>
> **JGR:** Uh huh.
>
> **CW:** on his behalf. They thought it was me, but it happened to be a friend of mine, Selly, and that person was in here for either hijacking an 18-wheeler or

---

[19] The exhibit cited in Finding 15 is "exhibit 'g'". However, exhibit 'g' to the successor petition has nothing to do with Carl Walker, Jr. The state, when it drafted the Findings meant "exhibit 'c'."

something, or something with some pizzas, or, I forgot what he did.  But anyway, that particular Walker knew me, and his roommate was actually a friend of mine that grew up in the same neighborhood I grew up in.

**JGR:**  Okay.

**CW:**  And he was getting letters and he knew didn't know nothing about the letters so my friend come to me and he's telling me about these letters about Jeff Prible, and da da da, and I knew what was going on so I revealed to my friend, man, I know what that is.  I know, who blah, blah, blah.  This is while we were still in Beaumont.  And, I think I even told Herrera about that.  Was it before Herrera left, I'm not sure.  I get kinda confused on that time line.  But anyway, I get the letters and I reach out and say, hey, this, I'm the Carl Walker I think you are looking for, you didn't blah, blah, blah, and I think Herrera's attorney even tried to reach out to me.  I forget his name.  Because, I think either Herrera's attorney sent me something or Jeff's attorney sent me something, showing me something about both cases.  And when they showed me something like, it was like, okay, these guys and these guys all know the same thing about, you know what I mean?

**JGR:**  Right, right.

*Exh. 'A'* (Transcript of August 26, 2010, interview of Carl Walker, Jr.).[20]

Carl Walker, Jr., recalls Larry Wayne Walker figured Larkin's letter might be intended for Carl.  The cellmate brought the letter to Carl Walker, Jr.'s attention, and Carl Walker, Jr., at the time said he tried to reach out to Herrera's [*sic., Herrero*] attorney or to Mr. Prible's although he was not sure of the time frame.  The record, however, and state habeas counsel's June 8-9, 2011, testimony, proves that Carl Walker, Jr. did not reach out until years after the original application was filed on November 19, 2004.

Letters that Mr. Prible wrote to the 351st District Court on November 16, 2005, also demonstrate that at this late date Mr. Prible still believed that **Larry Wayne Walker** was the name of the witness he needed to demonstrate that he had been convicted by false testimony.  *Group Exh.* 'E' at 000275.  At the June 8-9, 2011, hearing, state habeas counsel explained that

---

[20] *See also Exh. 'C'* (CD of August 26, 2010, taped interview of Carl Walker, Jr.) attached to the Successor Application for Writ of Habeas Corpus filed September 8, 2010.

although Larkin approached him a year after he filed Mr. Prible's writ, trial counsel attempted at this point to contact Carl Walker, Jr.   Moore's only duty was to litigate issues in Mr. Prible's original Article 11.071 application.   Texas law does not make provisions for the appointment of counsel on a successor application, and Moore could not seek funding for an investigator or for expense incurred investigating successor issues.   Nonetheless, Moore wrote Carl Walker, Jr., in order to substantiate Mr. Prible's contention that he had been convicted by false testimony.

Q. Okay. But you still tried to find Carl – Carl Walker, Jr. even after you filed [Mr. Prible's original petition]; is that –

A. Yeah, I did.

Q. And how did you learn of his name?

A. There's an individual whose name is Ward, Mr. Ward Larkin. And Mr. Larkin took an interest in Mr. Prible's case and continued to write letters to inmates in various federal prisons. And as I understand it from Mr. Larkin, quite by accident, they unearthed the identity of Carl Walker, having talked to some other people whose name was Walker, but not Carl. And by accident the Carl Walker we were interested in was in the same unit with another Walker who had gotten one of Mr. Larkin's letters, and just by coincidence, then took that letter and contacted -- took the initiative and contacted Mr. Larkin himself, but this is long after -- a year or so after I filed the writ.

Q. A year after you filed the writ?

A. Yes, sir.

Q. And did -- but did you send a letter to Carl Walker?

A. Yes, I did. I sent two to him. One came back because I think I had the wrong PO Box for the FCI. The other I sent, he did not respond.

*Vol. 3, June 8, 2011, Hearing* at 48.

Moore also apparently secured assistance from the Alabama Innocence Project, but this organization did not follow through on a promise to try to interview Carl Walker, Jr.

The only conceivable explanation for why the Texas courts would rely on Carl Walker, Jr.'s statement (which affirms the happenstance through which he was discovered) to find that Mr. Prible did not meet section 5(a)(1) standards is if the pre-existence of information is sufficient to show that it was previously available for purposes of Texas' abuse of the writ statute.  However, when it comes to federal default standards, pre-existence is not the gravamen. The critical factors are whether counsel took reasonable actions, successful or not, to pursue the evidence and whether the State took steps to thwart discovery.

### a.    Active suppression of Carl Walker Jr.'s identity prevented trial counsel's and state habeas counsel from investigating this witness.

Any allegation that state habeas counsel failed to act diligently to identify and interview Carl Walker, Jr., is undermined by the fact that the State withheld key evidence that would have made this possible.  The letters to the lead prosecutor from FCI Beaumont inmates, which the State withheld as attorney work product, identify Carl Walker, Jr., by name and federal inmate number.  Trial counsel or state habeas counsel of course could have easily found this witness with this information, as opposed to a fishing expedition on BOP data bases that will not allow a search using the inmate locator program unless the full **first** name of the defendant is entered.[21]

### b.    Convicting court's finding that Walker's statements were unpersuasive hearsay is neither independent, adequate or otherwise legally grounded.

In *Finding 16* of the June 24, 2011, Findings of Fact and Conclusions of Law the District Court adopted the State's contention that "Walker's statements, proffered in support of the applicant's instant subsequent habeas claims, consist almost entirely of hearsay and speculation and contain no direct evidence of the applicant's conspiracy theory; accordingly, such statements

---

[21] See http://www.bop.gov/iloc2/LocateInmate.jsp, Inmate Locator, stating in its instructions that "[w]hen searching by name, an inmate's first and last name are required and must be an exact match (i.e., John Doe will not find Jon Doe)."

are unpersuasive and have little evidentiary value with respect to the validity of the applicant's habeas claims regarding any alleged conspiracy involving the lead prosecutor and federal inmates." However, the legal basis for this ruling is federal law, namely, Fifth Circuit authority. The convicting court cited *Dowthitt v. Johnson*, 230 F.3d 742 (5th Cir. 2000) and *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997)(habeas petitioner's hearsay affidavits failed to provide factual basis warranting evidentiary hearing) and no other authority. The state courts' legal conclusion that Carl Walker, Jr.'s statements must be discounted as hearsay is dependent on federal law and, consequently, undeserving of deference. To the extent, that it is a comment on the merits, the legal assessment obviously fails 28 U.S.C. § 2254(d) standards. There is no telling just what the state courts mean by "unpersuasive." However, such a subjective basis for the decision is contrary to, or an unreasonable application of, the "prejudice" or "materiality" tests required by *Giglio* and *Brady*. Neither case requires the habeas petitioner to persuade the reviewing court. Under *Giglio,* the habeas petitioner "a new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury'" *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). Under *Brady's* similar standard, the error need only "undermine[] confidence in the verdict." *Kyles,* 514 U.S. at 435.

Furthermore, the State should be estopped from contending that Walker's statements are inadmissible, or of diminished probative value, because they are hearsay. **First**, throughout the June 8-9, 2011, hearing, the State objected to, and convicting court excluded, evidence Prible tried to sponsor on the ground that the evidence delved into the merits. Having limited the scope of hearing, the State cannot turn around and rule on the merits, particularly when evidence it excluded corroborates the statements it finds unpersuasive and speculative. **Second**, Prible offered to authenticate the taped conversation that contains Walker's description of the

informants ring and Beckcom's, Foreman's and the lead prosecutor's role running it.  However, the State interjected that this tape was already in evidence and the state court agreed.

MR. RYTTING: Your Honor, I think that – I don't have any more witnesses.

THE COURT: Okay. State.

MS. HAMPTON: No witnesses, Your Honor.

THE COURT: Okay.

MR. RYTTING: Except I do -- well, we may have one depending on evidentiary foundation that has to be laid for the tapes that I made of my August 26th, 2010 conversation with Mr. Walker. I would like to move that into evidence. If the State wants me to take the stand and say that I personally interviewed Mr. Walker and that's my voice, et cetera, I will be glad to do it.

MS. HAMPTON: The truth of the matter, Judge, is we've already got -- we have a CD that's already been attached as an exhibit to the successor writ, so...

THE COURT: I've already taken judicial notice of it.

MS. HAMPTON: This is a new one. This is a new conversation that happened, I guess, two weeks ago or so.

MR. RYTTING: No, no. It's the August -- the tape is the CD that you have.

MS. HAMPTON: So, it's already in.

MR. RYTTING: That's in.

MS. HAMPTON: He's taken judicial notice of the whole file. So, everything that is in the file is –

THE COURT: Yeah. It's attached to the subsequent, right?

MS. HAMPTON: You're wanting –

THE COURT: I'm trying to remember. I know it's in here somewhere, but –

MR. RYTTING: Yes. Yes, it is. It's in there.

THE COURT: Right.

*June 8-9, 2011, Hearing, Vol. 3, pp.* 67-68.

*Finding 16's* assertion that Carl Walker Jr.'s statements in his taped interview were speculative is unreasonable.  The Finding does not identify what statements were speculative.  Furthermore, the conclusory allegation that Walker was speculating conflicts with the Texas courts' specific determinations in *Finding 15*.  Before declaring that Carl Walker, Jr.'s statements were speculative, the convicting court determined that Carl Walker, Jr., "knew Nathan Foreman and Michael Beckcom," "was present during the planning of the alleged conspiracy" to fabricate Mr. Prible's confession, and "observed the applicant's interaction with the co-conspirators." *July 24, Finding 15, p. 3*.  These findings show that Carl Walker, Jr., was not speculating but instead was a first hand witness to Beckcom's and Foreman's efforts to manufacture evidence for use by the prosecutor at trial.  Carl Walker, Jr., did not report what others saw, heard and did.  Carl Walker, Jr., described what he witnessed *as a participant* in the FCI Beaumont informants' ring.

Further undermining the state court's assertion of "speculation" is the fact that Carl Walker, Jr.'s allegations are also corroborated by evidence withheld by the State until the 2011 proceedings.  A critical aspect of Carl Walker, Jr.'s August 26, 2010, interview is that he was initially part of the conspiracy to incriminate Prible.  Carl Walker, Jr., provided extensive detailed information of how as well as why he was recruited by Beckcom and Foreman.  Carl Walker, Jr., also stated that part of the FCI Beaumont informants' scheme was to draft letters to the prosecutor supplying some evidence and offering to inform.  In August of 2010, Carl Walker, Jr., admitted that he did not know if the letter he signed had been sent, but thought that it had.  Disclosure in 2011 of inmate mail sent to the lead prosecutor before Mr. Prible's 2002 trial confirmed Carl Walker, Jr.'s, recollection of the letter writing scheme.  The letters themselves

corroborated Carl Walker, Jr.'s, identification during interview of members of the informants' ring, and his statements about their mode of operation.

Finally, when a *Brady* claim is the constitutional claim that the alleged hearsay underlies, federal law does not support the State's position. Items may still be material and favorable under Brady if not admissible themselves so long if it "could lead to admissible evidence" or "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (citing, *inter alia, Spence v. Johnson*, 80 F.3d 989, 1005 n. 14 (5th Cir. 1996) ("[I]nadmissible evidence may be material under Brady."). Carl Walker, Jr.'s, statements to Mr. Prible's federally appointed investigator and attorney are exception to the rule against hearsay for precisely the reasons identified in *Gil, supra.*

> **3.     Mr. Prible acted diligently in his pro se attempts to present evidence that the State violated his due process rights under *Brady*, *Giglio* and *Massiah*.**

Mr. Prible made prodigious efforts to discover the facts that underlie his present federal petition. After the original application, Mr. Prible continually prodded his state habeas attorney to provide pro bono efforts to investigate and draft due process claims based on *Massiah, Brady and Giglio*. Despite state habeas counsel's efforts, a raging conflict arose between counsel and client. The conflict was openly displayed in Mr. Prible's frequent, voluminous writings to the trial court in which he severely and adamantly criticized Moore for not doing enough to investigate and present subsequent claims. Mr. Prible demanded that the trial court appoint counsel who would conduct the investigation into the prosecutorial misconduct he believed lay at the bottom of his wrongful conviction. Mr. Prible also filed pleadings and letters begging the trial court to grant him discovery, subpoena power and a hearing so that he could present Carl

Walker, Jr., as a witness.  *See, generally, Exh. 'E'*; *see, e.g., id.* at 00391-00397 ("*Petitioner Prible's Motion for Discovery and Memorandum of law in Support (Pro-Se)*").

The trial court refused to grant Mr. Prible's requests for discovery and subpoena power, refused to convene a hearing to explore the conflict between Moore and Prible, and refused to appoint different or additional counsel to assist Mr. Prible with the development of facts to support the due process and prosecutorial misconduct claims he alleged in his June and August 17, 2007, pleadings.  Frustrated by representation that Mr. Prible thought was not sufficiently zealous, Mr. Prible sought to disqualify the trial judge based on Mr. Prible's suspicion that his refusal to replace Moore was the result of Moore's contributions to his campaign for the bench. *Id.* at 00343.

Because of the conflict with counsel, and the trial court's refusal to remedy the situation, Mr. Prible also turned to anti-death penalty activist Ward Larkin to help him find a key witness with the last name of "Walker" who Prible hoped might assist him to prove that he had been framed by jailhouse informants working with the lead prosecutor.  Mr. Prible also attempted to make contact with this Walker through the mail.  However, the Polunsky unit intercepted his letters, even those sent to Larkin urging him to contact a man named Walker," on the ground that the attempts at communication violated a rule prohibiting death row prisoners contacting other inmates. *Exh. 'E'* at 00293.  Mr. Prible, nonetheless, strove to clear this obstacle from practically the sole means he had for contacting any witness and obtaining any information regarding his case, i.e., monitored, highly regulated use of the U.S. Mail.  On June 20, 2006, exactly one year before he filed the first pleading that the TCCA deemed a subsequent writ, Mr. Prible filed a complaint protesting the interception of his correspondence.  In the section of the form asking him to describe the action he would like to see taken in order to resolve the issue, Mr. Prible

wrote: "Mainly to not stop me from my appeal process by stopping me from corresponding with a person who [is] assisting me when I did nothing wrong as [the] letter clearly shows."  *Id.* at 292. On August 3, 2006, TDCJ ruled that "the issue presented is not grievable" and refused to return his correspondence.

A year before he filed his June 27 and August 77, 2007, applications, Mr. Prible mailed his June 20, 2006, complaint about interference with his mail, and the Polunsky Unit's response to the convicting court, in order to illustrate how his desperate efforts to investigate his capital case were being thwarted by the prison bureaucracy.  *Id.* at 00289.  In the letter to the court, Mr. Prible pleads with Judge Ellis to understand that when he "uses the words inmate in federal prison some person in the mailroom uses this rule to stop my mail.'  Hence, judicial intervention is necessary.  "So please," Mr. Prible wrote, "at the very least, let the mail room know they cannot do these things that deter a person from their appeal process without being liable to someone."  *Id.* at 290.  He also expressly moved the convicting court as follows:

> "If you subpoena the supervisor and that letter he gonna feel like a idiot and I guarantee it will stop what some person in that mail room doing in the way of abusing it power to deter people in regards to their legal process.  This is my prayer you will grant this motion."

However, neither the trial court nor the district attorney's office ever treated Mr. Prible's writings as if they were actual pleadings calling for a response and a ruling.

Mr. Prible did everything he could from death row to uncover the facts support the claims before the federal court.  Undersigned counsel succeeded in developing evidence because he received funding through the federal courts to hire a professional investigator to locate and interview Carl Walker, Jr.  The private investigator was also able to contact and interview Beckcom who was on probation, but no longer represented by counsel.  The private investigator

was also able to conduct background checks on Foreman, and review records of cases to which he was attached.

Undersigned counsel also filed motions in this Court, under the Freedom of Information Act, after exhausting administrative steps required by Title 5 U.S.C. §301 and *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951), in order to obtain Bureau of Prison records, including phone, housing and transfer records, that document the interconnection between the lead prosecutor and jailhouse informant she used to investigate and testify against Prible and Herrero.  *Prible v. Thaler,* 4:08-mc-00316 (S.D. Tex.), *Dkt. Entry* #14 (filed 2/18/2011).  Filing in federal court was necessary because BOP invokes sovereign immunity to state process.  Undersigned counsel was able to invoke this court's continuing jurisdiction over Prible's stayed federal habeas proceedings. *Id., Dkt Entry* [18].  In contrast, Mr. Prible, in 2007, would have had to file and litigate a separate lawsuit under the Administrative Procedures Act in order to obtain BOP records.  *See States ex rel. Touhy v. Ragen,* 340 U.S. 462, 468 (1951), as codified at 5 U.S.C. § 301.

In 2011, undersigned counsel was also able to utilize legal processes, including subpoena and motions for discovery in order to motivate the production of heretofore undisclosed documents in the State's file.  This required working with the assistant district attorney and physical access to the District Attorney's Office in order to review and retrieve correspondence from the State's file from Carl Walker, Jr., and purportedly from Mark Martinez and Felix and Jesse Gonzalez.

4.    The June 24, 20011, findings do not address the supporting and corroborating evidence that Mr. Prible presented to the Texas Courts in his June 6, June 22 and June 23, 2011, supplemental briefs, which confirm that the State suppressed important evidence impeaching its key witness, impeaching its method of assembling its case, and supporting Mr. Prible's prosecutorial misconduct claims.

a.    The state withheld inmate letters to the lead prosecutor bearing the names and identifying information of Carl Walker, Jr., Martinez and the Gonzalezes.

The inmate letters Carl Walker, Jr., referred to in his August 26, 2010, interview, were not disclosed until February 24, 2011. In response to motion for disclosure of exculpatory evidence and *in camera* review of the State's file, the Harris County District Attorney's Office produced three letters. *Group Exh. 'C'* (Letters to lead prosecutor). Every letter is addressed to Mr. Prible's lead prosecutor and ostensibly signed by a federal inmate: Mark Martinez, Felix and Jesse Gonzalez (a father and son), and Carl Walker, Jr. The federal inmate number of each is next to each of these prisoners names.

Mr. Prible's trial attorneys did not receive these letters pursuant to their discovery motions. State habeas counsel sought production of the State's trial file and thoroughly reviewed, several times, twice with his investigator, former Houston Police Department officer, John Greenfield, the material the State provided. *June 8-9, 2011, Hearing, Vol. 2,* p. 39. However, these letters were not present in the material the District Attorney's Office allowed state habeas counsel to review. *Id.* Nor were they disclosed to federally appointed counsel during initial federal proceedings. Although the letters clearly were not privileged material, prosecutors had filed the letters in a sealed manila folder labeled attorney-client or attorney work product thereby ensuring that they would not be disclosed at trial or pursuant to their Offices open file policy. In light of Harris County District Attorney's office open file policy in post-

conviction capital cases, the concealment of the letter constitutes an active misrepresentation that this evidence did not exist.  *See Strickler v. Greene,* 527 U.S. 263, 284 (1999).

The letters signed by Carl Walker, Jr., and purportedly signed by Martinez and Jesse Gonzalez stating that all three spoke with the lead prosecutor by telephone, on several occasions, about a *quid pro quo* for incriminating Mr. Prible indicate that the lead prosecutor and her main informants, Beccom and Foreman, were at the hub of joint efforts by FCI Beaumont informants to set Mr. Prible up with fabricated evidence of a confession.  At the June 8-9, 2011, hearing, Mr. Prible's trial and post-conviction counsel explained their significance.  Using the identifying information, counsel would have investigated and summoned Carl Walker, Jr., and other witnesses.  Based on the references to Beccom and Foreman, the trial attorneys would have undermined the integrity of the State's case by impeaching their key defendant's testimony that he and Foreman were largely passive recipients of Mr. Prible's confession with evidence that Beccom and Foreman were part of an aggressive ring of informants intent on reducing their sentence in return for providing incriminating evidence against Mr. Prible.  The letters, as defense counsel pointed out confirmed Mr. Prible's conviction that he was set up by a ring of informants led by Beccom and Foreman.  The letters were therefore material evidence that the state suppressed to shield its key witness and its methods the State deployed to gather evidence and assemble its case.

### b.    BOP phone and housing records were inaccessible and Mr. Prible's attorneys had no reason to seek them.

Mr. Prible's previous counsel had neither a reason nor an effective mechanism for obtaining the BOP records that Mr. Prible submitted for the State court's consideration in his 2011 supplemental briefing and at the June 8-9, 2011, evidentiary hearing.  To corroborate Mr. Prible's allegations that the State concealed evidence that Beccom operated as its agent, Mr.

Prible sought BOP phone records for individuals he had identified as members of the ring of informants, namely, Ronald Prible, Carl Walker, Jr. (BOP # 04770-0170), Jesse Moreno (BOP # 72731-079), Rafael Dominguez (BOP #79233-079), Michael Beckcom (BOP # 49349-079), Thomas Delgado (BOP # 80261-079), Eddie Gomez (BOP # 79236-079) and/or Nathan Foreman (BOP # 07831-078), from April 1, 2001, until November 1, 2002.  *Group Exh.* 'F' (BOP documents disclosed in response to District Attorney's subpoena).[22]  Except for Foreman, the identities of these individuals were not known to trial counsel or to state habeas counsel before November 19, 2004, when Mr. Prible's original state application was filed.

Although generally known that phone calls from federal inmates may be recorded, the recordings are not retained for a significant time.  It was not until undersigned counsel interviewed Walker in 2010, that undersigned counsel learned that BOP retained a paper record of the individuals and numbers that each federal inmate called.  The computerized TruFone telephone call tracking system used by BOP to track prisoner phone calls was put in place after Mr. Prible was transferred in December of 2001 to the Harris County Jail, and from there went to death row. January 1, 2002, is the farthest back in time the TruFone records go.  Mr. Prible never went back federal prison and therefore did not use or know about the TruFone system.

Even if previous counsel had known of the TruFone system or the identities of the inmates whose records Mr. Prible eventually obtained in 2011, they could not reasonably have expected production.  Undersigned counsel served FCI Beaumont with a subpoena issued from the State court. However, BOP refused to comply, claiming that it enjoyed sovereign immunity, and would respond only to an order form a court "of competent jurisdiction," namely, a federal

---

[22] The Harris County District Attorney's office sought the same records.  BOP responded to the District Attorney's request without requiring HCDA to litigate under the Administrative Procedures Act.  HCDA received a more complete set of records.  Hence, the production to HCDA is used as an exhibit here.

district court.  *Group Exh. 'G'* (Letters from BOP).[23]  BOP also took the position that third party information was protected under the Privacy Act as another reason for not disclosing anyone's records except Mr. Prible's. *Id.*  In order to secure production of BOP records, Mr. Prible was forced to file a motion in the miscellaneous proceedings ancillary to his abated federal habeas cause of action, which was then contested by the Attorney General's office.  *Prible v. Thaler,* 4:08-mc-00316 (S.D. Tex), Dkt. Entry [14].  Only after being ordered to by the federal district court, did BOP disclose the phone records of the informants the lead prosecutor was utilizing, which included lists of the names of persons with whom the prisoners intended to communicate, and "TruFone" logs that tabulated the date, time and numbers that the inmates telephoned.

BOP housing records that Mr. Prible obtained in 2011 were just as inaccessible.  Like the phone records of third parties, trial and state habeas counsel would have had to file a federal lawsuit under the Administrative Procedure Act to obtain them.  They would also have to seek funding for filing fees in order to litigate the matter.  The June 8-9, 2011, hearing demonstrates that even if Mr. Prible's attorneys had an idea that the BOP records would be valuable, the trial court would not have agreed with their assessment or to authorize funding for a federal law suit. Mr. Prible attempted to introduce the BOP records into at the June 8-9, 2011, hearing.  He also submitted briefing explaining the BOP records significance.  *See 2nd Supp. Briefing* (filed June 22, 2011). However, the trial court sustained the State's objections that the BOP records were irrelevant.  The BOP records had even less relevance to Mr. Prible's previous attorneys, who did not have the benefit before November 19, 2004, of information (such as Carl Walker, Jr.'s August 2010 statement or the letters signed by Walker and purportedly by Gonzalez and Martinez) identifying informants in FCI Beaumont and establishing their connection with the lead prosecutor.

---

[23] Also attached as *Exh. 'E'* to Mr. Prible's June 6, 2011, supplement filed in state court.

**c.** **The state withheld letters from lead prosecutor seeking Rule 35 sentence reductions for Foreman, Dominguez, Gomez and Moreno and Mr. Prible's state attorneys had no reason to suspect the letters existed.**

After discovering the correspondence purportedly from Walker, Martinez and the Gonzalezes in Mr. Prible's file, undersigned counsel sought discovery of the file in *Herrero v. State* in the belief that similar correspondence from FCI inmates might be suppressed in that case. The Herrero file did not contain the same sort of letters from inmates, but it did contain letters from Mr. Prible's lead prosecutor on behalf of informants she employed to gather evidence and testify against Herrero.

Herrero was convicted six months before Mr. Prible on the basis of testimony from jailhouse informants, Jesse Moreno and Rafael Dominguez. *Exh. 'H'* (May 1, 2002, letter from Assistant District Attorney, Kelly Siegler on behalf of J. Moreno)[24]; *Exh. 'I'* May 1, 2002, letter from K. Siegler on behalf of R. Dominguez).[25] Two other informants, Nathan Foreman and Eddie Gomez, offered to testify against Herrero, but the State elected not to call them. *Exh. 'J'* (May 1, 2002, letter from Siegler on behalf of N. Foreman)[26]; *Exh. 'K'* (May 1, 2002, letter from K. Siegler on behalf of E. Gomez).[27]

The four informants against Herrero were closely connected to the FCI Beaumont inmates that the State used to gather and assemble evidence against Mr. Prible. The testimony of the informant central to the State's case, Michael Beckcom, demonstrates that Foreman, in particular, was involved in gathering evidence against Mr. Prible. 26 RR, at 23, 31, 35, 38, 49, 54, 56.

---

[24] Also attached as Exh. 'A' to Mr. Prible's June 22, 2011, *2nd Supp.* filed in state court.

[25] Attached as Exh. 'B' to Mr. Prible's June 22, 2011, *2nd Sup*p. filed in state court.

[26] Attached as Exh. 'C' to Mr. Prible's June 22, 2011, *2nd Supp.* filed in state court.

[27] Attached as Exh. 'D' to Mr. Prible's June 22, 2011, *2nd Supp.* filed in state court.

On May 26, 2011, the Harris County District Attorney's Office provided a taped interview in the *Herrero* file dated July 3, 2001, between (i) the lead prosecutor in Mr. Prible's and Herrero's cases, and (ii) Jesse Moreno, the key witness against Mr. Herrero.[28]  As shown below, the July 3, 2001, Moreno tape shows that Moreno fabricated the confession used against Herrero.  The tape, along with a letter to AUSA Tracey Batson, from the lead prosecutor seeking rewards for Nathan Foreman,[29] is solid evidence that Foreman conspired with Moreno to fabricate the confession.

> **d.**    **The identities of, and information possessed by, Walker, Martinez, Delgado and other inmates about the operation of the informants ring, was withheld and state habeas counsel had no reason to suspect the existence or importance of this information.**

Mark Martinez was identified as a potential witness in the wake of the motion for *in camera* review of the State's file that resulted in the production of the three previously undisclosed letters bearing the signature of Carl Walker, Jr. and the purported signatures of Jesse Gonzalez and Mark Martinez. *See June* 8, *2011, Hearing, Def. Exhs.* 2-4.  By the time the State produced the letters, Martinez had been transferred to a high security federal facility in Colorado.  Mr. Prible's federally appointed investigator attempted to contact Martinez after the inmate letters came to light, but Martinez would not communicate. *Exh. 'M' (June 23, 2011, 3rd Supplemental Briefing).*  Mr. Prible's investigator sent Martinez's counselor in the federal prison a copy of the three letters, who agreed to show them to Martinez to see if he recognized the letters, particularly the one bearing his name and inmate number. *Id.*  On June 23, 2011, Martinez FCI counselor, Olmstad, reported that Martinez recognized the letters but denied that he had signed the letter bearing his signature. *Id.*  Counselor Olmstad told Mr. Prible's

---

[28] Also attached as Exh. 'E' to Mr. Prible's June 22, 2011 *2nd Sup*p. filed in state court.

[29] Also attached as Exh. 'K' to Mr. Prible's June 22, 2011 *1st Sup*p. filed in state court.

investigator that she had compared known exemplars of Mr. Martinez signature to the signature on the letter to the lead prosecutor and was certain that Martinez had not signed it. *Id.* Olmstad also reported that Martinez told her that "some dudes" were pressuring others to sign the letters sent to the lead prosecutor. *Id.*

By suppressing the inmate letters to the lead prosecutor, the State prevented Mr. Prible's previous counsel from discovering Martinez and developing evidence of how the ring of informants operating at FCI Beaumont were manufacturing evidence against him in order to procure favors from the prosecutor.  Under *Carrier* standards, Mr. Prible can therefore show cause for why he was unable to present evidence related to Martinez at trial or in his pre-2010 state habeas proceedings.

### B.    PREJUDICE

The showing that a constitutional error was material as that term is defined in *Brady* and progeny, is ordinarily all that is needed to cure a procedural default. *See Strickler v. Greene*, 527 U.S. 263, 289 (1999).  Generally this requires a habeas petitioner to demonstrate "that 'there is a reasonable probability' that the result of the trial would have been different" absent the error. *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).  The question is not whether the petitioner, would more likely have received a different verdict had the error not occurred, but whether he received a fair trial, understood as a trial worthy of confidence.  *See Kyles*, 514 U.S. at 434. Because of the overlap in standards between prejudice under *Murray,* and materiality under *Brady* and *Giglio*, prejudice is demonstrated below through proof that the constitutional errors Mr. Prible raises "portend such an effect on a trial's outcome as to destroy confidence in its result." *Kyles,* at 439.

IV.     FEDERAL CONSTUTIONAL CLAIMS

A.     SUMMARY OF FACTS

Steve Herrera and Nilda Tirado were murdered in their one story home in Houston in the early morning hours of April 24, 1999.  Steve was found prostrate in the garage, his feet close to the door connecting the interior of the home. 21 RR 224.  Nilda was found face down on one of two loveseats in the combination den/living room adjacent to the garage.  *Id.* at 219.  Nilda's right knee was on the ground, her left knee remained at on the end of the small couch.  *Id.* at 220.  Both hands were near her head and face. *Id.*   Nilda was clad in upper garments only. *Id.*  Remnants were all that that remained on her partially charred body – which was burnt more on the right than the left[30] -- because her assailant[s] had poured an accelerant over her dead body and had ignited the fuel.  Near Nilda's corpse firefighters found a scorched metal gas container that held the accelerant. *Id.* at 216.

Marshall Kramer, a seventeen year veteran with the Harris County Fire and Emergency Services Department testified that the assailants had set off a flashfire.  *Id.*   According to Kramer, "a flashfire is a very hot rapid fire." *Id.*   Kramer compared flashfires to the phenomena seen when lighter fluid is poured on charcoal and a match dropped on the soaked heap.  *Id.*   at 217.  "You get a woosh, a rush of flames," Kramer said, as the fire immediately consumes all the liquid fuel.  *Id.*   At the same time, when a house is closes up tight, like Steve and Nilda's was,[31] the flashfire consumes "all of the oxygen in the room that is available at that time."  *Id.* at 222. With that, Kramer said, the flashfire "self-extinguished. It went out. The fire went out literally," *id.* at 223, leaving behind "very heavy, very thick smoke." *Id.*  This smoke permeated the house.

_____

[30] *Id.* at 221.
[31] The den/living room was "a well built, tightly constructed area." *Id.* at 223.

However, the cause of Steve and Nilda's deaths was "an obvious gunshot wound" not smoke or fire. 23 RR 36. Steve had been hit point blank in the neck. *Id.* The bullet severed his spinal cord *Id.* at 37. Blood splattered on the garage wall and pooled around his body. The flash fire had leapt through the doggie door into the garage. 21 RR 225. However, Steve's body displayed only scattered burn marks, notably on the feet and bottom of his shorts. *Id.* Fire personnel could, therefore, tell that "there was no question" that Steve "already dead before the fire" reached him. *Id.* The medical examiner, Dr. Joye M. Carter, testified that Steve "definitely killed by a firearm" and that she did not see "anything that would constitute fatal burning." *Id.* at 48. Nilda's body was badly charred, showing third and fourth degree burns. *Id.* However, she also was executed by a single "obvious" gunshot to the neck, *id.* at 58, which "severed the spinal cord at the level of the second cervical vertebra" *id.* at 60, resulting in a "nearly instantaneous" death. *Id.* Autopsy photos of the adults' airways showed pink tissue, unmarred by soot and unclogged mucus exudations. *Id.* at 54 (Steve), 62 (Nilda). Blood tests on both were negative for carboxyhemoglobin, which is produced when carbon monoxide from a fire is inhaled. *Id.* at 42 (Steve), 61 (Nilda). Death by fire therefore could be categorically ruled out from the adult autopsy evidence.

On the other hand, the smoke did kill the couple's three small girls, one an infant. Firemen found two of the girls in their bedroom: Rachel was face-down on the floor; Valerie was found face down in bed. Prible, 175 S.W.3d, at 727. Jade's body was found in the master bedroom face down on the floor. *Id.* At trial, over trial counsel's objections the State displayed gruesome photos of the children and their dissected respiratory organs, mouths, tracheas and lungs to the jury although Mr. Prible was not charged with their deaths.

Word of the fire and family's death spread quickly, and neighbors and relatives gathered at the scene.  That morning police were able to interview neighborhood witnesses, as well as every family member who eventually testified at trial.  One neighbor described hearing an eerie moan, which she said sounded like woman wailing, coming from the house earlier in the morning, around 5:00 am.  The sound went on for some time.  Steve's brother told of leaving Mr. Prible with Steve in the early morning hours.  They also informed police that Mr. Prible had pulled a serious of bank robberies in order to provide start up money for a bar that Steve and Mr. Prible had spoken of opening, and told police where they could find Mr. Prible.

Based on this information, on April 24, 1999, the same day as the deaths, police contacted Mr. Prible at his parent's house where he lived.  At the officers' request, Mr. Prible went to the police station and gave a statement.  Initially, Mr. Prible claimed he only had a friendship with Nilda Tirado, but admitted in a second statement given within hours of the first that he had been sexually intimate with her that night.  Police photographed Mr. Prible front and back, completely nude and took trace evidence. The forensic investigation did not recover any materials that would indicate arson or presence near a flash fire.   Police also obtained biological samples from Mr. Prible for forensic testing against evidence from the scene, and specifically the oral, vaginal and anal swabs medical examiners later took during the autopsy of Nilda's body. DNA analysis revealed Steve donated sperm found rectally and orally, but Mr. Prible's DNA was found on the oral sample.

With the exception of testimony from jailhouse informant, within days of the murder of Steve and Nilda, the State developed all of the evidence that the State would introduce at trial. However, for more than two years, Mr. Prible was neither charged nor arrested nor indicted for these crimes.  He was prosecuted by federal authorities for the bank robberies that Steve's

relatives had informed police Mr. Prible had pulled.  Mr. Prible pled guilty and was ordered to serve his sentence at FCI Beaumont.[32]  That sentence was reduced for cooperation that led to a drug conviction of another inmate.  In 2001, Mr. Prible was therefore anticipating a move to a half way house to serve the rest of his federal time.  However, that did not happen.

On April 15, 2001, the Houston Chronicle published an article on "cold cases" out of Harris County.  The article featured the unsolved deaths of the three children and their parents, Nilda and Steve.  Soon after the article ran, assistant district attorney that would lead the prosecution, along with her investigator, Johnny Bonds, visited Mr. Prible at FCI Beaumont.  The two probed Mr. Prible for a statement about the murders, and he irately denied having anything to do with them.  The meeting ended in acrimony, with the lead prosecutor promising to convict Mr. Prible.

Mr. Prible heard nothing more from the State for months, and thought that the threat to prosecute him had been empty.  However, before his release to a halfway house, the lead prosecutor interviewed Jessie Moreno, another of her informants, who serving time on federal charges in FCI Beaumont.  In 1999, Moreno had helped the lead prosecutor secure the conviction of Jason Morales in a murder case by providing her with Morales' confession.[33]  On April 4, 2001, Moreno went to the well again, writing the lead prosecutor that he had information on yet another cold case, the murder of Albert Guajardo.  Moreno was transferred to a state facility and on July 3, 2001, the lead prosecutor conducted an audiotape interview with Moreno in the Polk County courthouse where U.S. Marshals had transferred him.  On tape, Moreno tells the lead prosecutor that in late November or early December 1999, Hermilo Herrero confessed to killing

---

[32] *See United States v. Prible*, 4:99-cr-00348 (S.D. Tex), Dkt Entry [14] (Judgment Returned Executed as to Ronald Jeffery Prible; on 10/14/99 to serve sentence at FCC Beaumont, filed. (fmremp) (Entered: 10/19/1999)).

[33] *Herrero v. State*, cause no. 903122, in the 179th District Court, Harris County, Tr. Transc., Vol. 4, p. 52-53.

Guajardo not only to Moreno, but also, at the same time, **to Nathan Foreman.**  Two days later, on July 5, 2001, Mr. Prible was charged with capital murder.

After being charged, Mr. Prible was held in isolation at FCI Beaumont Low for approximately three weeks. On July 25, 2001, though, he was moved into the general population at the FCI Beaumont's Medium facility.  That same day, July 25, 2001, Foreman was returned from isolation to the general population in the very unit or block where Prible had been assigned. According to Carl Walker, Jr., Mr. Prible was immediately targeted by Foreman and Foreman's cellmate, Michael Beckcom.

On August 3, 2001, one week after Foreman and Prible were released into the general population, Foreman was "releas[ed] on [a] federal writ" from FCI Beaumont and taken to a transit facility in Houston.  Foreman does not appear to have been involved at the time in any federal case as a defendant or a witness, so the use of the *federal* writ is inexplicable, except as a way for the prosecution to move Foreman so he could not be detected by Prible's state attorneys. Review of Foreman's criminal records indicates that he was **not** summoned to be a defendant or to be a trial witness in any state case either.  However, the Grand Jury 177th District Court had convened by the time the State moved Foreman to the Harris County Jail.  Harris County records indicate that the lead prosecutor, operating under her maiden name, "Kelly Renee Jalufka," reviewed and presented this case to this Grand Jury.  On August 29, 2001, the Grand Jury returned indictments against both Herrero and Mr. Prible.  Two days after the Grand Jury finished its work, Foreman was returned to FCI Beaumont, again using federal writs to secure his release and transfer from state to federal facilities.

After returning to FCI Beaumont Medium, Foreman gave his cellmate Beckcom the lead prosecutor's phone number. 26 RR 23.  Beckcom testified that he did not call the lead prosecutor

right away, but waited, he said, until "the first half of October" 2001 to call the number that Foreman had provided to arrange a meeting with the prosecutor to work out a *quid pro quo* for testimony against Mr. Prible. *Id.* at 24.  Beckcom maintained Mr. Prible had not told him much about his case by the time he initially called the lead prosecutor. *Id.* at 36.   According to Beckcom, the lead prosecutor replied over the phone that the only way she would be interested in a deal for testimony would be if he could supply her with detailed facts about the case. *Id.* at 37.

Beckcom testified that "[o]nce [he] made up [his] mind [he] was going to try and find out details" for the lead prosecutor, he ***and Foreman*** began meeting Mr. Prible on a daily basis. *Id.* at 37-38.   On November 24, 2001, Foreman and Beckcom staged a photo session with Mr. Prible.   The set up involved getting Beckcom's, Foreman's and Prible's parents to visit contemporaneously so that they could be included in the photograph. *Id.* at 56.   On cross examination Beckcom admitted that the purpose of the photo session was to corroborate his testimony that Prible had confessed to him. *Id.* at 83.   However, review of Beckcom's direct examination reveals that he testified that Prible confessed the evening of November 24, 2001, as it was "getting dark," *id.* at 53, so there was no confession to corroborate when the family photograph was staged.   According to Beckcom at this point on November 24, 2001, after the photographs were taken, Mr. Prible broke down in a fit of teary camaraderie, expressed his lover for and trust in Beckcom and Foreman, and confessed at length, in the middle of the prison yard (to these two inmates whom he had met only a few weeks before) to murdering Steve and Nilda and their three little girls. *Id.* at 53-56.

On November 29, 2001, Mr. Prible was transferred out of FCI Beaumont and eventually to the Harris County Jail.   Ten days later, on December 10, 2001, the lead prosecutor and her investigator Johnny Bonds met with Beckcom at the federal prison for an hour and half.   Orally

and in a multi-page hand written statement, Beckcom provided the "details" that the prosecutor told him earlier he had to supply before she would use her influence to help secure a sentence reduction. *Id.* at 25-26.

The other evidence cited by state courts as incriminating was DNA evidence demonstrating Nilda had engaged in oral sex with Mr. Prible before the murders, Mr. Prible's initial omission of intimacy from his first statement, and two witnesses who said that Nilda had told them she found Mr. Prible "creepy" and complained that he was too often at their home. *Prible v. State*, 175 S.W.3rd 724, 728-29 (Tex. Crim. App. 2005). However, no one testified that Mr. Prible ever had a falling out, fight or argument with either  In particular, witnesses with the two throughout the evening and early morning of April 23-24, 1999, testified that Mr. Prible and Steve spent the time drinking, doing drugs and playing pool without so much as exchanging a cross word or glance.[34]  The alibi witness who was the last person to see Mr. Prible and Steve together testified that she heard Steve and Mr. Prible's distinctively loud voice as they conversed before Steve drove away, but she, too, did not testify to seeing or hearing any hostile words or actions. 27 RR 3-10.

The State's chances of solving a cold case murder involving the death of three little girls depended on whether the jury believed Michael Beckcom's testimony.[35]  However, that testimony was a fabrication contrived through the joint efforts of a ring of informants spearheaded by Beckcom and Foreman and shielded from impeachment through the misleading testimony and the suppression of evidence.

---

[34] See, e.g., testimony of Victor Martinez 25 RR 15-19; testimony of Eduard Herrera, *id.* at 56-96.

[35] The lead prosecutor's letters to AUSAs urging favors for Beckcom indicate that the demise of the "three little girls," Jade, Valarie and Rachel is what fueled the prosecution and the decision to seek death. Group Exh. 'D', (October 29, 2002, letter from Siegler to AUSA Mark E. Cullers.).

### B.     LEGAL ARGUMENTS

## CLAIM # 1

**THE STATE VIOLATED DUE PROCESS SPONSORING FALSE AND MISLEADING TESTIMONY THAT MINIMIZED ITS EXTENSIVE CONTACTS WITH ITS KEY WITNESSES AND ITS COMMUNICATIONS AND USE OF OTHER INFORMANTS, AS STATE AGENTS, TO DEVELOP EVIDENCE INCRIMINATING MR. PRIBLE.**

Prosecutors are obligated to disclose evidence favorable to the defense under *Brady v. Maryland,* 373 U.S. 83 (1963).  Whether prosecutors were ever aware of the existence or value of evidence to the defense is irrelevant.  In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the Supreme Court clarified that prosecutors are liable even if other government agencies retained custody of *Brady* material.  In *Strickler v. Greene*, 119 S.Ct. 1936 (1999), the Supreme Court distilled the essence of what Petitioners must show in order to overcome procedural bars to litigating *Brady* claims.  *Id.* at 1949.  Petitioner must first make some showing that a *Brady* violation actually occurred – that is, he must make some showing that the State suppressed favorable, material evidence.  *See id.* at 1948.  Second, Petitioner must show that the State's conduct was what caused his or her failure to discover the evidence.  *See id.* at 1949-50.  This inquiry into cause is itself tripartite: (1) whether the prosecution withheld exculpatory evidence; (2) whether the petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (3) whether the State confirmed the petitioner's reliance on that policy by asserting during the state habeas proceedings that the petitioner had already received everything known to the government.

Trial counsel filed pretrial motions seeking to discover deals between Beckcom and the State and pressed this request at a hearing held two days before trial.  See 20 RR 5-7.  The State disclosed that in return for Beckcom's testimony against Mr. Prible, it promised to make recommendation that Beckcom receive a reduction in his sentence to the Assistant United States

Attorney who had prosecuted Beckcom in federal court. *Id.*  Trial counsel also discovered that Nathan Foreman had provided Beckcom with the lead prosecutor's phone number. *Id.*  Trial counsel was not informed of any other arrangements involving the State and Beckcom or Beckcom and Foreman.

At trial, the State faced trial with a key witness with serious credibility problems. Beckcom was a murderer, admitted to lying in federal court, and conceded he was testifying in hopes of a reduction in of his federal sentence.  The reeds on which his credibility depended were the theories, vigorously promoted by the state on direct examination and during closing argument, that Beckcom along with Foreman, had established a special, confidential relationship with Prible, and that Beckcom could only have learned facts of the murder from Prible and no other source.  It was vital, therefore, for the State to suppress evidence that Beckcom was getting facts about Mr. Prible's case from the State and to suppress evidence that other inmates with whom Beckcom was associated had similar information about the deaths of Steve, Nilda and their three children.  The State, therefore, failed to disclose documents identifying members of the informant's ring it was utilizing, failed to disclose the widespread deals with FCI Beaumont informants that it was making, even with non-testifying witnesses, and allowed Beckcom to testify falsely and misleadingly about the extent of the contact that he had with the state and allowed him to falsely and misleadingly portray himself and Foreman as a disinterested witnesses to Mr. Prible's alleged confession.

1.    **Statements Walker gave to Prible's federally appointed investigator and counsel show that the Beckcom's testimony that he and Foreman learned about the facts of the crime from Prible alone was false and misleading.**

a.    **Carl Walker's statement to the investigator.**

According to Carl Walker, Jr., who was housed with Beckcom and Foreman at the time Beckcom was investigating Mr. Prible, Foreman had access to the lead prosecutor's cell, home and office numbers.[36]  Foreman was the lead prosecutor's point person at the Beaumont unit; he was constantly on the phone with the lead prosecutor.  Through these phone conversations Foreman, the State and Beckcom contrived a scheme to secure jailhouse informant testimony against Mr. Prible.

Walker was present during several conversations between Foreman and the lead prosecutor.  In fact, Walker was part of what he described as a tight, neat circle of informants headed by Foreman who were recruited to provide information to the State.  Walker said Foreman had recruited him to be a snitch, and that at first he intended to testify against Mr. Prible.

Walker stated that Foreman and his crew "were schooled" about the specifics of the offense that the State was trying to prove against Mr. Prible by Foreman who received his information from the lead prosecutor.  Walker specifically stated that the lead prosecutor told Foreman that the problem with the Prible case was the neighbor who put Mr. Prible at his home a few hours before the murders took place.  According to Walker, the lead prosecutor told Foreman that Steve had dropped Mr. Prible off at his house hours before the murder, and that one of the neighbors had substantiated this.

---

[36] In February of 2009, after the Bureau of Prison refused to allow anyone but an attorney to meet Walker, Court appointed investigator JJ Gradoni arranged a telephonic interview of Walker who described the ring of informants that prosecutors were utilizing.  The affidavit is also attached as Exh. 'A' to First Amended Petition, Affidavit of JJ Gradoni, and it was presented in 2010-2011 proceedings in State court.

Walker described how Foreman, Beckcom and their circle worked to get Mr. Prible's trust. The process included supplying Mr. Prible with wine and "weed."[37] Foreman and his group would take photos with Mr. Prible to show him that they were all buddies and making promises to Prible to hook him up with a female while he was in prison. According to Walker, on many occasions they would get Mr. Prible high on weed. On each occasion they would try to swing the conversation to Mr. Prible's involvement in the multiple murders.

Walker stated that Mr. Prible would never admit that he was involved in the murders. At one point Walker remembered asking Foreman, if we're all so stoned, how are we going to remember when [Mr. Prible] supposedly tells us he did it?" Foreman's comment, according to Walker, was that Mr. Prible will be the only one stoned. According to Walker, Foreman's and Beckcom's objective in plying Mr. Prible for information was to get a reduction in time.

### b.   Carl Walker's August 26, 2010, Interview.

Carl Walker, Jr.'s August 26, 2010, statement (*Exh. 'A'*, Transcript of August 26, 2010 interview) is consistent with the statements he made in 2009. The additional fact he provides are responsive to the different set of questions asked of him. Three pieces of evidence, in particular, demonstrate that Beckcom testified falsely. First, Walker describes in detail the circumstances under which he was recruited by Foreman and Beckcom to assist in developing incriminating evidence against Mr. Prible. *Id.* at 46. The initial contact took place in the prison chapel, which allowed for private conversations about turning State's witness under the cover of mutual interest

---

[37] Mr. Gradoni's affidavit is also attached to Mr. Prible's Reply, Dkt. Entry [17], filed March 6, 2010, in *Prible v. Thaler,* 4:09-cv-01896 (S.D. Tex.).

in religion. *Id.*.  It was in chapel that Foreman and Beckcom approached Carl Walker, Jr., with plans for incriminating Mr. Prible.[38]

Second, Carl Walker, Jr., explains that Beckcom and Foreman were aware that Jeff was being transferred from FCI Beaumont's Low to its Medium facility.  They also were aware of the murder charges against Mr. Prible and they were aware of basic facts about the crime he was accused of committing, including the identities of the victims and specific facts about how they had died and how they were found.  Third, Carl Walker, Jr., describes how Beckcom and Foreman rationalized the decision to testify against Mr. Prible.  According to Carl Walker, Jr., part of Foreman's and Beckcom's recruitment pitch was that informing on Prible did not violate jailhouse codes of conduct, because the crime Foreman and Beckcom claimed he committed resulted in the deaths of three children. *Id.* at 10.  The part of the pitch the two made to Carl Walker, Jr., was that informing on Mr. Prible would result in a time cut. *Id.* at 16.  Importantly, Carl Walker, Jr., recollection on this point are not general or ambiguous.  Instead, he provides a firsthand account about how Foreman and Beckcom described Mr. Prible's arrival as a "blessing." *Id.* 9-10, 16, *et passim*.  Finally, Carl Walker, Jr., recalled on August 26, 2010, that he had signed a letter that he said he believed had been mailed to the lead prosecutor as part of the FCI Beaumont plans to set Mr. Prible up in return for states favors. *Id.* at 13.  That recollection was corroborated perfectly in 2011 with the disclosure of heretofore suppressed correspondence from FCI Beaumont prisoners to the lead prosecutor.

---

[38] An example of specific detail, and proof that Carl Walker, Jr., is not making sweeping or speculative statements, is Carl Walker, Jr.'s, recollection that "Cat" (i.e., Raphael Dominguez) did not attend chapel and that Mr. Prible did not either. *Id.*

      **c.**     **Carl Walker's testimony demonstrate that Beckcom's testimony was false and misleading.**

Carl Walker, Jr.'s inside account contradicts and falsifies the most critical components of the State's key witness' testimony.  Statements provided to Mr. Prible's federally appointed investigator and counsel establish that Beckcom did not truthfully testify that Mr. Prible was the source of his information about Mr. Prible's case, and that Beckcom did not truthfully testify that Mr. Prible confessed.  Carl Walker, Jr., statements further establish that Beckcom lied about his and Foreman's motives for initially speaking with Mr. Prible, falsely testified he was **not** aware of other FCI informants with information about Mr. Prible's case,[39] and falsely testified about the methods he and Foreman used to extract information from Mr. Prible.  Carl Walker, Jr.'s statements support Mr. Prible's innocence and undermine the State's case by revealing that the State sponsored   false and misleading testimony in violation of Mr. Prible's Fourteenth Amendment rights to due process.

      **2.**     **BOP records confirm that the prosecution was in frequent contact with Beckcom, Foreman, and other members of a Ring of Informants who were seeking, and receiving, promises from the State to assist their efforts to get Rule 35 sentence reductions, contrary to Beckcom's testimony.**

At trial, the State allowed Beckcom to testify falsely and misleadingly about the extent of the contact he had with the prosecution.  To this end, the lead prosecutor elicited the following testimony:

     A.  That I'm not really sure. I don't know exactly what month he came over.

     Q.  Who was the person who gave you my name?

     A.  Nathan Foreman.

---

[39] In 2011, Beckcom was asked about the letters and admitted to Mr. Prible's investigator that he knew about them, but denied drafting them or sending them.

Q.   And how did you know Nathan Foreman?

A.   He was -- he lived in my unit at the prison and then ultimately became my cellmate.

Q.   When you got my name from -- and you can't tell the jury what Nathan Foreman told you  because that's hearsay. But when you got my name from Nathan Foreman what did you      do?

A.   Nothing immediately.

Q.   Eventually what did you do?

A.   I called you.

Q.   And tell the jury how you were able to call me, another prosecutor, from a Federal institution?

A.   Each unit has a secretary case manager and a unit manager. I went to my unit manager and asked him if he would place a call to her from me.

Q.   And when we eventually talked, generally speaking, what did you tell me tell the jury what you told me as to why I needed to come see you?

*<br>
*<br>
*

Q.   And on the telephone, how many times have you and I spoken?

A.   Two or three times.

Q.   And during those phone conversations had they been about the details of what you know  about this case?

A.   No, I didn't.

Q.   Usually they were more about what?

A.   You contacting California. And when's the trial going to happen and questions like that?

Q.   Yes, ma'am, just questions in general.

26 RR at 25-26.

Review of BOP's "TruFone" records for 2002 alone showed that Beckcom placed nine calls to the lead prosecutor's phone number. *Exh. 'L'* (TruFone log for M. Beckcom). However, the State knowingly allowed Beckcom to testify falsely at trial that he spoke by phone with the lead prosecutor maybe "two or three times." *Id.* at 26. Furthermore, the TruFone records underestimate the contacts between Beckcom and the lead prosecutor. The TruFone documents do not include phone calls placed in 2001. For another, Beckcom's testimony indicates that he placed the "two or three" phone calls, which he admitted to having with the lead prosecutor, through his "unit manager," who dialed the lead prosecutor for him. *Id.* at 23. Calls such as these would not have been recorded or logged. For example, there is no record of a call that Beckcom or someone on his behalf placed to the lead prosecutor right after the alleged November 24, 2001 confession. However, in a letter to FCI Beaumont officials dated November 26, 2010, the lead prosecutor stated that Beckcom had information about the murders and requested that the prison arrange for her to interview Beckcom on December 10, 2001, Beckcom or someone on his behalf had to have telephoned the lead prosecutor. Adding the "two or three" calls that Beckcom admitted to placing to the nine he falsely omitted about means that Beckcom placed 11-12 phone calls, at minimum, to Mr. Prible's lead prosecutor.

Finally, Moreno's, Beckcom's, and Foreman's lists of phone contacts all contain the name of the lead prosecutor.[40] *Group Exh. 'N'* (BOP prisoner phone contact lists). The lead prosecutor is also listed in Carl Walker, Jr.s,' personal phone book. *Exh. 'O'* (Excerpt of Walker's phone book). Another FCI Beaumont inmate, Thomas Delgado, in a taped conversation with Mr. Prible's investigator, confirmed that Foreman or Beckcom gave him the

---

[40] BOP also disclosed documents to the State pursuant to a request by the Assistant District Attorney.

number of the lead prosecutor.[41]   Beckcom, therefore, had opportunities to be privy to, or receive information or instructions through, phone calls placed by any one of these other informants. Carl Walker, Jr., moreover, maintains this is what happened with Foreman being the main conduit between State and its key witness.   The BOP records, along with Carl Walker, Jr.'s, statements therefore demonstrate that the State sponsored false and misleading testimony about the crucial issue of the extent of its communications with Beckcom.

> ### 3.   Letters show that numerous members belonging to a ring of informants that included Beckcom and Foreman had similar information about the crime thereby falsifying Beckcom's testimony that Prible he only got information from Prible.

The three letters from Martinez, the Gonzalez's and Carl Walker, Jr.,  also demonstrate that members of the group of informants, whom Foreman and Beckcom led, contacted the lead prosecutor about Prible's case on multiple occasions offering to provide similar information about the crime in exchange for the prosecutors influence in securing a Rule 35 reduction in the informants' federal sentence. *See Group Exhibit 'D'.*  The BOP letters therefore falsify the two pillars that the State relied upon to bolster Beckcom's credibility.   First, the letters show that Prible had been approached by other informants besides Foreman and Beckcom and had talked about his case.   The letters therefore impeach Beckcom's testimony that Prible talked about his case only to Foreman and him because Mr. Prible came to "love" them as "brothers." 26 RR 49. The letters also falsify testimony that Prible was the only source he had for information about the crime, which Beckcom repeated numerous times as in this exchange on cross examination:

Q. Had you seen anything about this case on T.V. before you gave that statement?

A.  No.

Q. Read any newspaper articles about it?

---

[41] *See September 8, 2010, Successor Application, Group Exh. 'A'* (Gradoni affidavits); *See Prible v. Thaler*, 4:09-cv-01896 (S.D. Tex.) Dkt. Entry [17], filed March 6, 2010, pp. 16-17.

A. No, the only article I saw was last week

**Q. Heard people talking about it?**

**A. No.**

Q. You didn't know -- Prible came up to talk about this case

A. Yeah.

Q.        -- throughout your conversations with him, nobody talked to you about the case, you didn't know anything about it, it was just everything -- all the knowledge you acquired, you  acquired from Jeff Prible?

A. Yeah.

26 RR 85.

The letters show instead that Beckcom was part of a ring of informants who discussed the facts of the murder in order to put together a package of incriminating testimony in return for State favors, and testimony that he had not heard others even talk about the murders with which Mr. Prible was charged was false.

Due process also prohibits the State from making false and misleading closing arguments.  The State emphasized throughout its closing remarks that Prible was the only source for Beckcom's testimony. 28 RR 80-84.  The State also argued that Mr. Prible had confided in Beckcom and Foreman because Beckom had become an advisor to Prible.  21 RR 81.  However, the inmate letters, along with Carl Walker, Jr.'s, inside account of how the State fed information to its informants, show that the State knew that Beckcom and Foreman, rather than striking a singular friendship or unique advisory relationship with Mr. Prible, were part of a larger group who had targeted Prible in order to bolster the incriminating testimony they hoped would result in a quid pro quo deal with the State.

    **4.**    **BOP documents and the Herrero file reveal that Beckcom's portrayal of Foreman as a disinterested corroborating witness was false and misleading.**

Tape recordings of the July 3, 2001, interview of Moreno show that Foreman in league with Moreno had hatched a scheme to provide testimony against Herrero in exchange for State favors before Mr. Prible was charged.  Harris County records show that the lead prosecutor (using her maiden name) reviewed and accepted charges against Mr. Prible two days later.  BOP records show that the State moved Foreman to Harris County to coincide with the session of the Grand Jury of the 177th District Court that indicted Herrero and Mr. Prible.  Together the records are significant proof the Foreman was operating as an informant for the State even before Mr. Prible was transferred to FCI Beaumont Medium's general population.

At trial, however, the state allowed Beckcom to portray Foreman as a passive witness to Mr. Prible's conversations rather than a state agent intent on supplying incriminating information for state favors.  Although the State realized Foreman was involved from the beginning in a plot to inform on Mr. Prible, the State allowed Beckcom to falsely and misleadingly portray "Foreman [as] interested in investing in the [asphalt] business" that Mr. Prible supposedly said he ran. 26 RR at 35.  The State also allowed Beckcom to tell the jury falsely and misleadingly that initially Foreman and Beckcom "were actually making plans" for a joint business venture with Mr. Prible "for when we got out" when the State knew that Foreman and Beckcom had been probing Mr. Prible from the start for information to support testimony, which they planned in advance to give, about a jailhouse confession. *Id.*

  **5.**  **False and misleading testimony argument sponsored by the State was material under *Giglio v. United States*, 405 U.S. 150 (1972), and prejudicial under *Murray v. Carrier*, 477 U.S. 478 (1986).**

Under *Giglio,* relief is required if testimony that a defendant demonstrates was false and misleading had any effect on the jury's decision. If *Brecht* standards apply at the habeas stage to *Giglio* claims the petitioner must demonstrate that false and misleading outcome had a substantial and injurious effect on the outcome. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). In the present case, the State's case rested heavily on the false testimony about minimal contacts with the state, non-involvement with, or even knowledge of, FCI Beaumont informants angling to incriminate Mr. Prible, and false statements about the circumstances and motives he had for probing Mr. Prible for information about his case. Clearly Beckcom's false testimony deeply affected the jury's deliberations and decision to convict. The false testimony was therefore harmful under *Brecht* and prejudicial under *Murray v. Carrier.*[42]

## CLAIM # 2

**IN VIOLATION OF DUE PROCESS GUARANTEED UNDER *BRADY V. MARYLAND,* 373 U.S. 83 (1963), THE STATE SUPPRESSED, MATERIAL EVIDENCE THAT BECKCOM AND FOREMAN WERE PART OF A ORGANIZED ATTEMPT TO SECURE FAVORS IN RETURN FOR FABRICATING FALSE CONFESSIONS**

Because the evidence underlying Mr. Prible's *Giglio* allegations in Claim #1 above was suppressed Mr. Prible's due process rights under *Brady* were violated as well. Furthermore, even if the suppressed evidence does not directly demonstrate the falsity of the State's testimonial evidence and argument, it clearly impeaches the State key witness as well as the State's method of gathering evidence and assembling its case. Relief from Mr. Prible's sentence

---

[42] The prejudice analysis here overlaps with the evidence and argument for *Carrier* prejudice presented below in Claim #2, which is therefore incorporate by reference.

and conviction is necessary because but for the suppression of this evidence it is reasonably probable that the jury decision would have been different.

### A. STANDARDS

The prosecution has an affirmative obligation to determine if evidence that comes into its possession could be put to favorable use by a competent defendant during the course of trial. The Supreme Court extended *Brady* to include a duty to disclose evidence even if the defendant has not requested it, and to include both impeachment and exculpatory evidence. *United States v. Agurs*, 427 U.S. 97, 107 (1976); *United States v. Bagley*, 473 U.S. 667, 676 (1985). Mr. Prible's defense counsel, moreover, filed motions for disclosure of exculpatory, or *Brady*, material. However, the State suppressed evidence that it was gathering and assembling its case against Mr. Prible using a ring of informants that include its key witness, Beckcom, suppressed evidence that prosecutors had transmitted information about the case to Beckcom through Foreman and to other members of the ring of informants, and the State suppressed evidence that it was rewarding FCI Beaumont informants working  along with Beckcom to secure confessions although the State was aware that these informants gave false and conflicting testimony in another cases, and the State suppressed evidence that Foreman was used to provide information to the Grand Jury that indicted Prible even though the Grand Jury convened before Mr. Prible allegedly confessed to Beckcom and Foreman.

B.     **ARGUMENT**

1.     **The State suppressed inmate letters (attached as *Group Exh. 'D'*) to the lead prosecutor demonstrate that that State was aware of, but failed to disclose, favorable evidence showing that Beckcom was part of an organized ring of informants manufacturing evidence against Mr. Prible.**

During State habeas proceedings, the State allowed Mr. Prible's state habeas counsel to review the State's files pursuant to its open file policy. State habeas counsel's billing records (on file in this case with the appellate clerk) reviewed the file on two occasions, first with his investigator and a second time alone. However, because the prosecutors had placed the letters in a folder labeled attorney work product, they were not produced. Whether failure to disclose the letters was inadvertent or purposeful is irrelevant. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

In federal habeas proceedings, the State, again, pursuant to its open file policy, allowed Mr. Prible's attorneys to review its file, except for material that the State deemed attorney work-product privileged. Federal habeas counsel ordered and paid for a copy of all documents disclosed by the State; however, the letters were not included in this production.

Despite *purporting* to incriminate Mr. Prible, the letters constitute *Brady* material. The three letters reveal that the State was utilizing a ring of informants who were engaging in a collective, coordinated effort to secure sentence reductions in return for providing the State with incriminating evidence in the form of manufactured confessions. Furthermore, the letters contain striking evidence that Beckcom was involved in a ring of informants who were striving to curry favors from the lead prosecutor in Mr. Prible's case in return for manufacturing incriminating evidence against Mr. Prible. Since the letters were addressed to the lead prosecutor and marked received, they show that the State was aware of a relationship between Beckcom and the ring of

informants.  The fact the letters were placed in a special file labeled work product privilege material, shows that prosecutors understood that they implicated its key witness in a scheme to fabricate evidence against Mr. Prible.

At the June 8-9, 2011, hearing, state habeas counsel, Moore, explained why the three letters were material.

Q. And you mentioned that you thought that the letter from Walker contained at least leads to other information; is that correct?

A. Yes.

Q. And is this -- would this letter, too, be something that you would have investigated if you would have had it?

A. Oh, yes, absolutely.

Q. As a defense attorney what you -- was one of the things that you try to do is to impeach the integrity of the investigation of the methods by which the State is gathering this evidence; is that right?

A. Yes.

Q. Do these -- I'd like to show you, also, Defense Exhibit 4. Do you recognize that (indicating)?

A. Again, this is something that you showed me that was divulged during your investigation per the Court's order.

Q. And taking those letters as a group, would they -- would you have investigated the individuals that are involved?

A. Yes, absolutely. I would have sent Mr. Greenfield to talk to every one of them, probably given the -- what I can only describe as the crucial mature of these identities, I would have gone with him and I would have tried to talk to them.

Q. Again, why do you consider those things to be crucial identities?

A. Well, because they -- not only do they buttress what the defense -- what Mr. Prible was saying and what the defense -- the trial defense advocated, that Mr. Prible was being framed by these guys, it also raises an issue of whether these -- these prison informants or potential prison informants were being used in an improper way by the Harris County District Attorney's Office. In other words,

sending agents in to talk to Mr. Prible without revealing who or what they were at
a time when he was already represented by counsel.

*June 8-9, 2011, Hearing, Vol. 2*, p. 45-46.

Co-counsel also  maintained that the letters were Brady material, not only because of the

potential leads to defense witnesses they may contain, but because the letters confirm that the

State was involved with a ring of informants angling to testify in return for favors. In particular,

the letter shows that the States key witness and the individual – Nathan Foreman – who he said

also received Prible's confession were known to and involved in this ring.  According to Mr.

Wentz,

> A. Yes, what you -- the two letters that you just showed me are, in my opinion,
> Brady material. They are impeachment type of evidence. They show that there are
> all these people. They obviously know one another. They know Ms. Siegler. They
> are seeking out deals. The fact is that there are other letters from the Herrero trial
> wherein Mr. Foreman's name also surfaces –
>
> MS. HAMPTON: Judge, I would object to any testimony about the Herrero trial.
>
> THE COURT: Sustained. A. There would be –
>
> THE COURT: Mr. Wentz, please wait for the next question.
>
> Q. (By Mr. Rytting) And why -- if you would, why do you consider this to be
> important impeachment evidence?
>
> A. Well, one, it would show where Mr. Beckom is coming from. I refer to it as a
> culture of complicity of, you know, trying to gain favor so you can re-write your
> sentence at some future date. So, he's coming from this general mindset. You
> have these individuals who  all know one another. You have these individuals
> who are writing to Ms. Siegler.

*June 8-9, 2011, Hearing, Vol. 3,* pp. 61-62.

The story each letter tells about how the confession came about follows a pattern similar

to the pattern Beckcom's trial testimony followed, and corroborates Walker's contention that the

informants named in the letters, including Beckcom and Foreman, coordinated their

manufactured testimony.  According to the common narrative in the letters, Mr. Prible is at first cautious and guarded, but gradually becomes more and more comfortable with the informant as camaraderie between them builds; finally, he allegedly confesses. Beckcom could have been devastatingly examined about his knowledge of this gerrymandered evidence.[43,44]  Testimony on direct, such as that which Walker's, confirming that Beckcom and Foreman came up with the letter writing scheme and crafted what was reported would have unquestionably led to an acquittal.

Carl Walker, Jr.'s, letter, in particular, demonstrates that the lead prosecutor in Mr. Prible's case was the contact person for at least half a dozen inmates who were bargaining for shorter sentences in exchange for incriminating Mr. Prible.  Walker's letter specifically identifies Beckcom and Beckcom's cell-mate, Foreman, and three others, as follows:

> As you may, or may not, know from previous conversations with Nathan Foreman, myself, Mark Martinez, Jesse Gonzalez, his father Felix Gonzalez and Beckcom were all close friends of Pribble. We all hung around each other because we all are from Houston, and because some of us knew one another from home.

*Group Exh. 'C'.*

Walker's letter shows that he realized that Foreman and Beckcom were in contact with the lead prosecutor and supplying her with incriminating information.  Given the well known repercussions that informants face, Walker's letter is, therefore, evidence that the participants he

---

[43] An effective defense attorney would call one or more of the three signatories on these letters in order to introduce the content of the letters into evidence. Hearsay objections, moreover, would be useless since counsel would not be using the letters to establish the truth of the matters they assert, but rather to impeach the State's investigation and its key witness, Beckcom.

[44] These witnesses, and others, are unavailable at the moment, or will require court ordered process or discovery in order to secure their testimony.  Jesse Oscar Gonzalez has been released on community supervision, and cannot be found, despite Mr. Prible's investigator's diligent efforts.  He apparently has not reported to his federal probation officer for months. Eddie Gomez is under community supervision in the Miami area.  Martinez is in a high security BOP facility in Colorado.  Felix Gonzalez (father of Jesse) apparently is in failing health in a federal institution in Minnesota.  The inmates have not responded for requests for telephone interviews. Mr. Prible needs this Court's help.  Specifically, he requires its power to order depositions of these witnesses.

mentions, including Foreman and Beckcom, formed a tight-knit group of prisoners,[45] who were drawn together by the common purpose of incriminating Mr. Prible with false testimony in return for the State using its influence to secure reductions in their sentences.

> **3.      In violation of *Brady,* the State withheld favorable evidence that Foreman had been rewarded for helping secure the conviction of Hermilo Herrero using false confessions.**

Undersigned counsel asked to review the Herrero file after the State disclosed three letters to the lead prosecutor bearing the names of Carl Walker, Jr., Mark Martinez and Felix and Oscar Gonzalez on the suspicion, which proved unfounded, that the Herrero file might contain similar letter and, particularly, letters from Beckcom or Foreman.  On May 26, 2011, the Harris County District Attorney's Office provided copies of the Herrero file. The file did not contain correspondence from Foreman or Beckcom.  However, it did contain a taped interview dated July 3, 2001, between the lead prosecutor and Jesse Moreno, the key witness against Mr. Herrero.  (The transcript of which is attached hereto as Exhibit 'Q'.)[46]  The file also contained letters from the lead prosecutor to Assistant United States Attorney's advocating Rule 35 sentence reductions for four witnesses. *Exh. 'J'* (Letter to U.S. Attorney on behalf of N. Foreman); *Exh. 'H'* (Letter to U.S. Attorney on behalf of J. Moreno); *Exh. 'I'* (Letter to U.S. Attorney on behalf of R. Dominguez); *Exh. 'K'* (Letter to U.S. Attorney on behalf of E. Gomez)[47]

---

[45] Letters in the Herrero file from the lead prosecutor to the Bureau of Prisons on behalf of her informants acknowledge the violent repercussions that informants may face if their role is known in the general population. In a May 1, 2002, letter to Michael Greene, the case manager at FCI Beaumont for Moreno, Gomez, Dominguez and Foreman, Siegler states that "now that the defendant [Herrero] has sat through an entire trial and knows everything that these four witnesses had to say against him, the situation has only worsened.  They are now known informants, not only to Herrero, but to the entire prison population. Please take whatever measures you feel necessary to protect these four witnesses…"

[46] Attached as Exh. 'E' to Mr. Prible's June 22, 2011, *2nd Sup*p.

[47] Attached as Exhs. 'J-M' to Mr. Prible's June 6, 2011, *1st Supp.*

The four informants against Herrero were closely connected to the FCI Beaumont inmates that the State used to gather and assemble evidence against Mr. Prible.  The testimony of the informant central to the State's case, Michael Beckcom, demonstrates that Foreman, in particular, was instrumental in developing the jailhouse snitch testimony that the State used against Mr. Prible.  26 RR, at 23, 31, 35, 38, 49, 54, 56.  The witnesses were also identified by Carl Walker, Jr., as informants in the letter he wrote to the lead prosecutor.

### a.      The evidence from the Herrero file was suppressed.

At the June 8, 2011 hearing, the State argued that that the *Herrero* case was irrelevant to Mr. Prible's proceedings.  The State stressed that even though Foreman may have been involved in both cases, he was not called as a witness in either.  However, the Supreme Court has made it clear that *Brady* is not limited to evidence that can be used to impeach specific testifying witnesses.  Instead, a defendant is entitled to attack the integrity of the State's investigation.  *Kyles v. Whitley,* 514 U.S. 419 (1995).  In Kyles, police withheld information that another person named Beanie had incriminated himself in the crime. *Id.*, at 446.  The State argued that Beanie would have testified unfavorably to Kyles, so the defense would not have even called him.  *Id.* The Supreme Court corrected the State for the following reasons:

> the defense could have examined the police to good effect on their knowledge of Beanie's statements and so have attacked the reliability of the investigation in failing even to consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted. *See, e. g., Bowen v. Maynard,* 799 F. 2d 593, 613 (CA10 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation"); Lindsey v. King, , 1042 (CA5 1985) (awarding new trial of prisoner convicted in Louisiana state court because withheld Brady evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case").

*Id.*

Mr. Prible's trial counsel and state habeas counsel did not receive documents or tapes from the Herrero file.  They had no reason to seek this material while they were representing Mr. Prible. The State's contention that the Herrero file even now is irrelevant should estop any argument that Mr. Prible's previous attorneys failed to exercise due diligence.   Neither set of attorneys was aware before November 19, 2004, of the information contained in Walker's August 26, 2010, statement or in the letters sent to the lead prosecutor bearing Martinez's, Walker's and the Gonzalez's names in which Beckcom and Foreman are specifically identified as leading actors among a ring of informants that the State was using to secure the conviction of Herrero and Mr. Prible.

### b.    Information in the Herrero file was favorable to Mr. Prible's defense.

The Rule 35 reduction letters and the July 3, 2001, taped interview of Moreno demonstrate that the State was gathering and assembling its case against Herrero and Prible using an overlapping ring of informants.  The information in the Herrero file corroborates Carl Walker, Jr.'s statement to Mr. Prible's investigator and in his August 26, 2010, interview that the State was using inmates that it realized were manufacturing evidence in return for assistance from the State in obtaining time cuts.

The June 3, 2001, interview with Moreno, in particular, shows that by the time of Mr. Prible's trial that the State was aware that Foreman, in particular, was engaged in to operations to incriminate defendants in cold case murders, using the same *modus operandi* in each case.  In the June 3, 2001 tape, Moreno sets a context for the Herrero confession that is identical in vital respects to the context that Beckcom later testifies about in Prible's trial.  First, Herrero does not just confess to Moreno, he supposedly confesses to Herrero and Foreman.

Q.    Who was there that day when [Herrero] said that to you.

A.      Dominguez and Nathan Foreman.

                        ***

Q.      You tell me Dominguez is Rafael Dominguez.

A.      Yeah, Rafael Dominguez

Q       About how old is he

A.      Thirty … he's about 27, 26

Q.      And he heard all this stuff you were telling me just now?

A.      Yeah.

Q.      And who was the other guy there, Nathan Foreman.

A.      Nathan Foreman.

Q.      Is he from Houston.

A.      Yeah, we're all from Houston.

                        ***

Q.      White guy or black guy.

A.      Black guy

Q.      How old is he.

A.       34 years old.

Q.      And he [Foreman] heard all this **the same time you did?**

A.      Yeah.

*Exh. Q (Transc. of Interview of Moreno).*

      Moreno not only identifies Foreman he explains why Herrero would confess to Foreman

in particular.  According to Moreno, Dominguez and Foreman were supposedly expecting a riot

or disturbance at FCI Beaumont, and they wanted assurance that Herrero would help out if any one of them got caught in the violence:

> [Moreno]:      When he was telling me I was like, you want to tell me by yourself?  Why do you want to talk to me by these guys. But the thing was we, everybody thought he wasn't going to back them.

*Id.*

Herrero goes on to explain that the tale of murder Herrero gave was to assure the others that he was a man of action and would not stand by if he saw members of their group in trouble. He also assures the prosecutor that Dominguez and Foreman heard everything Herrero supposedly. Furthermore, Moreno only refers to one confessional occasion, namely, in late November or early September.

The June 3, 2001, tape, along with the Rule 35 reduction letters, further show that that the prosecutor was prepared to utilize and reward members of the ring of FCI Beaumont informants even though they had had given her false and conflicting information.  Moreno's tale about a Herrero's confession to himself, Dominguez and Foreman was impossible false.  Contrary to Moreno's taped statement, Herrero could not have confessed to Moreno in November or December of 1999.  BOP records list **February 28, 2000**, as the date of Foreman's "admission and orientation" at FCI Beaumont. *Exh. 'R'* (BOP Housing/Tranfer records for N. Foreman).[48]

Transcripts of Herrero's April 2001 trial indicates that the lead prosecutor must have realized that her witnesses Moreno and Dominguez were fabricating evidence against Mr. Herrero, and that Foreman was involved in their efforts.  At trial, when asked who was present when Herrero allegedly described how he killed Guajardo, Moreno contradicts his June 3, 2001, statement and testifies that Herrero confessed to Moreno, Rafael Dominguez and to Eddie Gomez. *Exh. 'S', Vol. 3, Herrero v. State*, at 183.  Gomez, however, is Hispanic, not a black, 34

---

[48] Attached as Exh. 'G' to the June 22, 2011 *2nd Supp.*

year old African American, which is how Moreno confidently and correctly described Foreman

in the July 3, 2001 interview.  Furthermore, instead of confessing to three individuals, Moreno

maintains that in November or December, Herrero's confession was heard by about four people

while still were milling about talking. *Id.*[49]

Dominguez, however, contradicts Moreno's testimony and his taped statement:

Q. Do you remember a riot, Mr. Dominguez, that was supposedly going to happen in December of '99?

A. Yes.

Q. Do you remember kind of a pre-riot meeting?

A. Yes.

Q. Where you, Cevellos, Eddie Gomez, Mr. Moreno, and Mr. Herrero were supposedly there?

A. Yes .

Q. Did you hear Mr . Herrero talk about killing , Albert then?

A. At that time, I didn't.

Q. Sir?

A. At that time I didn't.

Q. Not a word?

A. No, at that time I didn't.

*Exh. 'T', Vol. 4, State v. Herrero,* at 47.

---

[49] Moreno's trial testimony also contradicts his June 3, 2001, statement on other fundamental points. In the July 3, 2001, statement the lead prosecutor asks why Moreno waited a year and a half, until April 4, 2001, to come forward, and Moreno explains that up until July of 2000 he and Herrero were on good terms, but that in July of 2000 Herrero discovered Moreno had informed on another inmate and was going to kill Moreno for it.  This still left the question why Moreno waited eight months to come forth with Herrero's confession.  At trial, Moreno testifies that he contacted the prosecutor in September or October of 2000 a half a year before he sent his initial letter.

Dominguez also maintains that Moreno confessed in March of 2000 and that Moreno, and Gomez and another man named Cevallos were there.   Furthermore, Dominguez brings Foreman into the equation. Foreman in fact is the person, who according to Moreno, inquires about Herrero's supposed assassination of Albert Guajardo.

Q. I want to direct your attention now and talk about a conversation you had with the defendant one day in the Year 2000. Do you know which conversation I'm talking about?

A. In March, 2000?

Q. Yes, sir, in March. Where were you and what was going on that day in the prison in the prison this conversation we're fixing to talk about.

A. We were in the rec yard.

Q. Who is we?

A. Me, Herrero, Foreman, and Moreno.

Q. What were you doing in the rec yard?

A. *We* were just hanging out.

Q. Remember what time of the day it was?

A. It had to be in the evening.

Q. Just hanging out?

A. Yeah.

Q. What happened to start this conversation? What led up to it?

A. We were in the rec yard.

Q. Who is we?

A. Me, Herrero, Foreman, and Moreno.

Q. What were you doing in the rec yard?

A. *We* were just hanging out.

Q. Remember what time of the day it was?

A. It had to be in the evening.

Q. Just hanging out?

A. Yeah.

Q. What happened to start this conversation? What led up to it?

A. We were talking about our war stories and stuff, our past crimes we've done. And Foreman, he had just finished telling a story how he had been kidnapped and tortured. And when he finished, Herrero made the comment of saying, You guys haven't put in no real work. And Foreman is like, What do you mean by real work?  And he goes, Do you know Albert from the neighborhood? And Foreman's like, No, I don't know him.  He's like, Well, I killed him. And Foreman is like, Oh, for real? And he's like, Cat and Jay know.

*Id.* at 10-11

The fact the lead prosecutor attempted to secure a Rule 35 reduction in sentence for Moreno, Dominguez, Gomez, and Foreman although she had reason to believe they had given her false statements and knew that her trial witnesses had contradicted each other should have been disclosed to Mr. Prible.  Defense counsel should have been allowed to question Beccom about whether he knew of Foreman's involvement in manufacturing evidence against Herrero and whether he was aware that the prosecutor had advocated on Foreman's behalf for a Rule 35 reduction.  Even if Beccom denied knowledge, the jury would have to judge how likely that Foreman would keep this from his cellmate with whom he had worked hand in glove to gather evidence against Mr. Prible.  Clearly, this would impeach whatever motive to be truthful the jury may have imputed to Beccom.

3.     **The state suppressed favorable evidence showing that from the time Mr. Prible was first transferred to FCI Beaumont Medium, Foreman was deployed as an agent to gather investigate, indict and convict Mr. Prible.**

On July 6, 2001, Mr. Prible was put into administration at the low security unit of FCI Beaumont. *Exh. 'U'.*[50]   On July 25, 2001 he was moved to medium security, and was kept in administrative segregation for five days. *Id.* On July 30, 2001, Mr. Prible was moved off administrative segregation and into general population of the FCI Beaumont medium security unit. *Id.* Up until July 25, 2001, Mr. Foreman had been in administrative segregation (in the SHU "segregated housing unit"), almost continuously, dating from August of 2000. *Id.*  The day Mr. Prible arrived at the medium security unit, July 25, 2001, Foreman was released into the general population. *Exh.* 'R'.[51]

On August 3, 2001, Foreman was transferred to an in-transit facility.  However, the State did not use the Harris County District Court process.  Instead, the State had Foreman transferred using a federal writ.[52]   Foreman was not moved for a federal hearing or federal business. Instead, on August 6, 2001, he was transferred to the Harris County Jail.[53]   Foreman's Harris County criminal records show that there was no state cases pending against Foreman.  There is no evidence, either, that Foreman was transferred to give testimony against other defendants in the state system.

The purpose of Foreman's visit, however, is evident once the BOP transfer records are compared to records of when the Grand Jury that indicted Mr. Prible was convened.  On August 29, 2001, a Grand Jury of the 177th District Court returned an indictment for capital murder

---

[50] Also attached as *Exh. 'A' to Motion for Grand Jury Testimony* (filed in the 351st District Court, June 6, 2011).
[51] *Exh. 'B' to Motion for Grand Jury Testimony* (filed in the 351st District Court, June 6, 2011).
[52] This facility likely was the federal detention center, which was dedicated October 15, 1999.
[53] *Exh. 'C' to Motion for Grand Jury Testimony* (filed in the 351st District Court, June 6, 2011).

against Mr. Prible,[54] and on that same day, it returned an indictment for murder against Hermilo Herrero.[55]  The lead prosecutor presented both cases, Prible's and Herrero's, to the jury, which had the opportunity to receive evidence directly from Foreman or through the medium of a police investigator who could interview Foreman at the Harris County Jail.

The fact that on August 31, 2001, days after the Grand Jury indicted Herrero and Mr. Prible, Forman was transferred back to FCI Beaumont, again using federal process, and returned to the general population, strongly confirms that the purpose of secretly moving Foreman to Harris County was to secure indictment against Herrero and Mr. Prible.  It also shows that the State returned Foreman to FCI Beaumont so he could manufacture evidence against both defendants before the defendants were transferred to Harris County pending trial.

By suppressing the evidence of Foreman's movements the state insulated form impeachment critical testimony.  At trial, the State's key witness, Michael Beckcom, testified that Mr. Prible eventually confessed to Foreman and himself after a long and involved series of encounters at which Foreman was invariably present.  According to Beckcom's trial testimony, Beckcom did not speak with Mr. Prible for several days after Mr. Prible arrived at FCI Beaumont Medium.  Beckcom testified that he met Prible incidentally through Bobby Williams, that Prible initiated the conversation and that, he, Beckcom and his confederate Foreman was initially disinterested.

> Q.   Now tell the jury, who was it that first introduced you [to Mr. Prible].
>
> A    Well, I don't know if it was what you could call an introduction. I exercise with a gentleman named Bobby Williams. And a couple of occasions Prible used to walk up and speak to Bobby on different days.

26 RR, at 28.

---

[54] *Exh. 'D' to Motion for Grand Jury Testimony* (file in the 351st District Court, June 6, 2011).

[55] *Exh. 'E' to Motion for Grand Jury Testimony* (file in the 351st District Court, June 6, 2011).

A       I was sitting on the bleachers in the rec yard just catching some sun, listening to my radio and Prible approached myself and Nathan Foreman.

Q       How did it start out, Defendant say to you first?

A.      Just general conversation, really. I wasn't too much paying attention to him because I really didn't know who he was. Then it seemed he sat down near me and it seemed he wanted to talk so he was striking up conversation with me.

*Id.* at 31-32.

According to Beckcom, Foreman, Beckcom and Prible talked about the asphalt business, and

Foreman's interest, and his own, was not in helping the State make a case against Prible, but

going into business with Prible after prison.

A.  Well, before we got real heavy into talking about the actual crime and the murders,  you've got to understand we went back and forth because he's not trusting anybody at this point, anyway. So, he knew about, business. So, we began talking about an industry which is the asphalt and the paving this is before  I'm kind of getting out of sequence. This is before I knew who you [i.e, the lead prosecutor] were or even that I would even consider doing this. I was actually seriously interested in the asphalt business.

Q  Tell the jury why and how y'all talked about that.

A   Well, because of the money involved. He was explaining all the facets of the business, of the equipment you would need. Foreman was interested. Foreman was interested in investing in the business so we were actually making plans on something to do when we got out.

26 RR, at 35.

Beckcom stated that Mr. Prible gradually revealed more and more details of the crime as

he grew to trust Beckcom and Foreman.  Finally, Beckcom said, Mr. Prible, overcome with

camaraderie, passionately confessed to the two of them on November 24, 2001:

Q.  Did you make note of a specific day in these conversations you had with Jeff

A.  Only the last one.

Q.  That date being what?

A.  November 24th.

Q.  And why did you remember that date? I just gave you.

A.  It's where he really poured it all out.

Q.   What led up to the Defendant finally telling you all these details on November 24th?

A.  I guess it was a culmination of a lot of things. He'd finally gotten used to us [i.e., Foreman and himself] and relaxed.

26 RR, at 53.

The BOP records show instead that State charged Prible as soon as it found Foreman could target him.  None of the foregoing testimony about Foreman's and Beckcom's motives, or the explanation of why Prible would confess to the two of them could withstand proof that Foreman and Beckcom were agents of the State from the beginning.  With such evidence, competent counsel would have cast the State's entire case in such a different light that no reviewing court could remain confident in the outcome.

**5.      The cumulative effect of the false and misleading testimony and suppressed evidence was material under *Giglio v. United States* and *Brady v. Maryland* and, therefore, prejudicial under *Murray v. Carrier***

   **a.      Inmate letters prosecutor documenting Beckcom's and Foreman's association with a ring of informants would have undermined the State's case.**

   **b.      By suppressing Carl Walker, Jr.'s, identity the State prevented defense counsel form impeaching its key witness and its method of assembling its case.**

By calling Carl Walker, Jr., competent counsel would have undermined Beckcom's entire testimony as well as impeached the states method of assembling and gathering its case.  Carl Walker, Jr., statements recounting that Beckcom and Foreman were familiar with the details of

the case clearly undermines Beckcom's recurrent claim to have learned everything he knew about the murders from Prible. Similarly, competent counsel would have been able to establish that Beckcom and Foreman were operating as agents of the State from the beginning, thereby undermining testimony critical to Beckcom's credibility that Prible confessed because he had bonded with Beckcom and Foreman.   In this regard, striking use could be made of the fact that Carl Walker, Jr. was present when Beckcom and Foreman supplied Prible with intoxicating substances in order to encourage him to talk. Finally, a competent attorney would have used Carl Walker, Jr.'s testimony to demonstrate that the State had played an active role supplying Beckcom with information about the case so that he could fashion a suitable confession.

Carl Walker, Jr., status as a former member of the informant ring could not be ignored by the jury. The Texas courts, in fact, determined that Carl Walker, Jr., was witness to the nascence of the conspiracy and to the interactions between Mr. Prible, Foreman and Beckcom.[56] Finally, documents disclose by the State pursuant to Mr. Prible's 2011 motion for in camera review of the state's file in his case, and documents produced by BOP corroborate Carl Walker, Jr.'s, recollection of the extent and nature of the communications between Beckcom and the FCI informants ring and between Beckcom and the prosecution. By suppressing the inmate letters, the State prevented Mr. Prible from discovering a witness with first hand information thoroughly impeaching the State's key witness and its method of gathering and assembling evidence against Mr. Prible. The evidence therefore is material and prejudicial under *Brady v. Maryland* and *Murray v. Carrier*. This Court should therefore reach the merits of Mr. Prible's prosecutorial misconduct claim and grant relief.

---

[56] *July 24, 2011 Findings, p. 3, Finding 15.*

> **c.     Competent counsel could have placed the State's case in a completely different light as to shake confidence in the verdict if the State had fulfilled its duty to disclose the July 3, 2001, taped interview of Moreno and the letters from the prosecutor seeking Rule 35 sentence reductions for FCI Beaumont informants.**

Preserving the integrity of the State's investigation and the credibility of the State's key witness, Beckcom, depended critically on suppressing evidence found in the Herrero file that would have permitted the defense to argue that the State had arranged for Mr. Prible to be targeted by FCI Beaumont informants.  Evidence that the State had filed charges against Mr. Prible in order to place him in contact with known informants already working for the State would have impeached the states method of assembling its case, impeached their key witness Beckcom, and it would highlight the weakness of the State's non-confessional evidence.

The State's opening and closing arguments reflect the importance for the rest of the State's case of being able to convince the jury that Beckcom and Foreman were initially disinterested witnesses, who passively received a confession from Mr. Prible, rather than State agents angling to incriminate Mr. Prible for State favors.  In the State's opening remarks the lead prosecutor tells the jury that "you will also learn from the evidence that before this State, me, ever knew of the existence of Michael Glen Beckcom, these capital murder charges were already filed on Jeff Prible. 21 RR 82.  In closing the second chair for the State emphasized that the charges against Mr. Prible based on non-confessional evidence came first and that Beckcom's testimony was developed later. 28 RR 15-16.  The allegation that Mr. Prible incidentally, not through the State's manipulations, was placed with an informant is, in fact, the first premise of the prosecutor's promise to "prove[] to [the jury] that Mike Beckcom was telling the truth."  *Id.* at 15.  The lead prosecutor also instructs the jury "to remember what Vic told you, it wasn't until

charges were already filed on Jeff Prible that caused Jeff Prible to be moved Beaumont Low to Beaumont Medium, that he ever even met Mike Beckcom." *Id.* at 77-78.

Evidence in the Herrero showing the State knew on July 3, 2001, that Beckcom's confederate, Foreman, was at FCI Beaumont and already working to supply the State with incriminating information against another inmate would have allowed trial counsel to document for the jury that the State charged Mr. Prible two days later, on July 5, 2001, not because it had different non-confessional evidence, but in order to ensure that Mr. Prible was in reach of veteran jailhouse agents whom the State had used as informants in the past.  With taped and documentation that the State knew Foreman was working together with Moreno to incriminate Herrero, Foreman status as Beckcom's cellmate would no longer appear as a natural explanation for why Mr. Prible's alleged confession might be heard by the tandem, but as additional evidence that Beckcom and Foreman, from the beginning, intended to incriminate Mr. Prible for favors that Foreman realized the State was dispensing.

In the light of proof that the State had charged Prible in order to expose him to the FCI Beaumont informants, the State's insistence that even without Beckcom's contribution the State had strong physical and testimonial evidence of guilt would be undermined, and a completely different picture of the case created.  Specifically, a competent defense counsel could forcefully point out that the State developed the DNA evidence and obtained all witness statements more than two year before the charging decision, but did not charge Mr. Prible.  Further, the lead prosecutor had reviewed the case in early 2000 and had not charged Mr. Prible.  If the State thought Mr. Prible was the murderous child killing monster that the prosecutors alleged, they would have been obligated to charge and arrest him years ago to prevent further mayhem. However, defense counsel could show that the State did not, even though it only needed probable

cause.  With the suppressed evidence in hand, the defense could devastatingly argue that the reason the State charged Mr. Prible was because it realized that the only way to secure a conviction was by making sure that Prible remained at FCI Beaumont where he could be targeted by informants who had successfully provided the State with jailhouse confessions before.  The suppression of the Moreno interview and the letters showing the widespread dispensation of State favors to multiple informants closely associated with the State's key witness clearly was material under *Brady v. Maryland* and prejudicial under *Murray v. Carrier.*

> **d.   Suppression of proof that the State secretively arranged the transfer of Foreman to coincide exactly with the convening of the Grand Jury that indicted Mr. Prible was material and prejudicial.**

A competent defense attorney, armed with evidence that Foreman had been transferred to give evidence against Mr. Prible, would have been able to undermine the State's case.  Foreman is featured throughout Beckcom's testimony as a corroborating witness.  Foreman, according to Beckcom, was present when Prible first approached him about his case and at the end when he allegedly confessed.  Evidence that the State had used Foreman to incriminate Prible in Grand Jury proceedings would have undermined the crucial pillars of Beckcom's testimony, which were, one, that he and Foreman knew virtually nothing about Prible's case at the time Prible was transferred to the Beaumont Medium, and that, instead, Prible had confessed on November 24, 2001, after a lengthy bonding period.

Even if Foreman was not brought before the Grand Jury, the BOP records documenting his secretive transfer to Harris County right after the State learned that Foreman was incarcerated at FCI Beaumont and charged Mr. Prible is substantial proof that from the very beginning, the State enlisted Foreman, as its agent, to gather evidence against Mr. Prible.  The evidence would also have impacted critical elements of Beckcom's testimony: namely, themes brought out on

direct and emphasized in argument that Foreman and Beckcom served as a kind of advisor to Prible, and were passive recipients of his confession, as opposed to agents of the State enlisted as soon as Prible was arrested to supply the State with a jailhouse confession.   The secretive transfer also corroborates and amplifies the materiality of Carl Walker, Jr., assertions that Foreman was the conduit through which the State passed information to Beckcom and other FCI Beaumont informants.   Besides permitting defense counsel to contradict and falsify Beckcom's testimony and the State's opening and closing arguments, Foreman's transfer records would have allowed a competent attorney to seriously impeach the integrity of the State's method of gathering and assembling its case.   Together with Carl Walker, Jr.'s testimony confirming the pivotal role Foreman played is an agent and conduit of information for the State, the suppressed information of the State's secretive movement of Foreman to Houston as the Grand Jury met, and placement in FCI Beaumont housing arrangements allowing access to Prible  are material evidence supporting Mr. Prible's argument that he was targeted from the beginning by jailhouse agents of the State who were vying for favors from the prosecution.   The evidence justifies this Court in reaching the merits and granting relief.

## CLAIM #3

### THE STATE VIOLATED MR. PRIBLE'S RIGHTS GUARANTEED BY THE SIXTH AMENDMENT AND *MASSIAH V. UNITED STATES*, 377 U.S. 201, 206 (1964).

Once a defendant's Sixth Amendment right to counsel has attached, the government is forbidden from "deliberately eliciting" incriminating statements from the defendant. *Massiah*, 377 U.S., at 206.   This prohibition has been extended to the use of jailhouse informants who relay incriminating statements from a prisoner to the government.   In *United States v. Henry*, 447 U.S. 264 (1980), the government used a paid informant, who was serving time for forgery, to obtain information about Henry.   The government admonished him to "be alert to any statements

made by federal prisoners [including Henry, with whom the informant was housed in the same cellblock], but not to initiate any conversation with or question Henry regarding the bank robbery [for which he had been previously indicted]." *Id.* at 266.  As a result of conversations the informant had with Henry, the government obtained incriminating evidence, which was used at trial to convict him.

The central question in *Henry* was "whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah*." *Id*. at 270. In concluding that a government agent had elicited such statements, the Court relied on three factors. First, Henry was in custody and under indictment at the time the informant conversed with him.  Second, the informant "was ostensibly no more than a fellow inmate of Henry," which caused Henry to trust him and thus be more likely to make incriminating statements. *Id.* Finally, the informant was acting under instructions from the government and was paid for his services.  The Court found it irrelevant that government officials had cautioned the informant not to ask Henry any questions: "Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id.* at 271.  In these circumstances, the Supreme Court held that the government agent's conversation with Henry amounted to "deliberate elicitation" under *Massiah*.

In *Maine v. Moulton,* 474 U.S. 159, 176 (1985), the Supreme Court clarified that the Sixth Amendment and due process protections enunciated in Henry apply "to the accused, at least after the initiation of formal charges."  At that point, the accused enjoys,

> the right to rely on counsel as a "medium" between him and the State. ….
> [T]his guarantee includes the State's affirmative obligation not to act in a
> manner that circumvents the protections accorded the accused by invoking
> this right. The determination whether particular action by state agents

94

violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever-by luck or happenstance-the State obtains incriminating statements from the accused after the right to counsel has attached. **However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.** Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Id.* (internal citations omitted) (emphasis added).

   **1.    Mr. Prible was in custody and charged with capital murder; and**

   **2.    Beckcom was ostensibly no more than a fellow inmate**

Beckcom contacted Mr. Prible while he was in the federal Bureau of Prisons. The first encounter took place after Mr. Prible returned to the Beaumont medium security unit from the low security unit where he was being housed in anticipation of his release to a half-way house. This transfer was due to the fact that Mr. Prible had just been charged with the capital murders of Steve and Nilda. Mr. Prible was, at all relevant times, represented by counsel appointed by the trial court to defend him against capital murder charges.[57]

Beckcom was already on the medium security unit to which the Government returned Mr. Prible. He was serving time on federal charges for conspiracy to commit murder. Beckcom was, and presented himself as, a fellow inmate.

   **3.    In return for assistance in obtaining a reduction in time to be served, Beckcom, acting, as a state agent, circumvented Mr. Prible's right to counsel.**

Beckcom's testimony shows that he began developing evidence to incriminate Mr. Prible after he contacted lead prosecutor Kelly Siegler. According to Beckcom, he got Siegler's name

---

[57] Harris County JIMS District and County Criminal Records show that lead trial counsel, Terry Gaiser, was appointed on September 28, 2001.

from his cellmate Nathan Foreman sometime at the end of September, early October of 2001.[58] RR at 22.   Beckcom testified that all he knew in October of 2001 was "something about a guy coming from the Low [security] charged with murder" but he "really did not get too much information on it." *Id.*   Beckcom said he did not call immediately; however, it was very soon after learning that some guy from "the Low" was returning to medium, in "the first half of October of 2001," that he called Siegler.   Beckcom said that during that phone call he claimed that he had information on a murder, but he said that he did not go into great detail with the prosecutor.   Indeed, Beckcom's testimony, at times, indicates, that he had no information at the time of this initial phone conversation.   According to Beckcom, he and Mr. Prible exercised together after he learned in September or October that someone charged with murder was returning to the medium security unit. *Id.* at 31.  It was not for "weeks or maybe a month later" that Mr. Prible approached him for the first time to talk to talk about anything. *Id.*

At other points in Beckcom's testimony, he indicates that he had several conversations with Mr. Prible, over the course of a month, **prior** to calling Siegler in October of 2001. However, the topic of these early conversations appears to have been about "the asphalt and the paving business" and about "going into business together." *Id., at 35.  On the other hand, Beckcom could not put a time frame on when Mr. Prible discussed aspects of his case.  Referring to what he supposedly learned from Mr. Prible, Beckcom stated "you know, …, this didn't happen chronologically.  So, in bits and pieces of conversations on the same subject it came out," including information that Steve "was apparently his best friend, but yet he was having an affair with Steve's wife." *Id.* at 34.  However, Beckcom said that Mr. Prible did not start talking "real heavy … about the actual crime and the murders, …, because he was not trusting anybody" at first.  *Id.* at 35.

---

[58] Beckcom testified that Nathan Foreman "supplied other informants to Ms. Siegler" in other cases.  *Id.* at 82.

In either event, Beckcom's testimony leaves little doubt that (1) the initial phone call to Siegler in early October 2001 was for the purpose of reaching an agreement for Beckcom to serve as an agent to investigate Mr. Prible, and that (2) Beckcom knew very little about the case until after he and Siegler worked out a deal that would reward Beckcom for informing on Mr. Prible.  Siegler questioned Beckcom at trial concerning their first contact as follows:

Q.     And eventually you made up your mind you were going to do what, sir?

A.     Contact you and see if we could make some kind of deal.

Q.     Because you were hoping for what, again?

A.     Sentence reduction.

Q.     And the only way for me to be interested was for me to know what?

A.     Specifics about the case.

Q.     So, in that regard you did what?

A.     I sought to find out as much as I could.

Q.     From who?

A.     From Prible.

RR, vol 26, at 37.

After the initial meeting, Beckcom went to work, for the State, on Mr. Prible.  On November 24, 2001,  Beckcom said Mr. Prible "really poured it all out."[59]  *Id.* at 53.  According to Beckcom, Mr. Prible confessed to killing Steve and Nilda, confessed to setting the house on fire to cover his tracks, described himself as a "bad motherfucker" that would take out a whole family, described himself as a ghost who could move in and out of the crime scene unseen in a

---

[59] Beckcom maintained that Prible had come to look on Foreman and Beckcom as brothers. Id. at 54.  According to Beckcom, Prible said "I trust you guys, …, you're the only ones that could convict me."  Id. at 54-55.  At the same time Beckcom said that Prible had "made his peace," and was "prepared to die" if his "brothers" proved not to be so trustworthy and turned state's witness. *Id.* at 55.  Furthermore, despite Mr. Prible's supposed feelings of peace and kinship, he apparently did not confide in Beckcom or Foreman or communicate with them ever again.

high intensity, low drag maneuver, described the crime scene and the position of the bodies, and explained the motives for the killing, which allegedly were (a) that Steve had bilked him out of $250,000.00, and (b) that Mr. Prible felt he had to kill Steve before Steve took his money and killed him first.[60]  *Id.* at 45-55.  Foreman and Beckcom then contrived a photo op to prove that Beckcom knew Prible and had met with him on November 24, 2001.  *Id.* at 83.

Beckcom clearly did not obtain information by happenstance.  Instead, he was referred to Siegler by another state agent, Nathan Forman, who supplied Siegler with informants.  The State and Beckcom thereafter conspired to violate Mr. Prible's constitutional rights by eliciting statements about the crime in the absence of defense counsel.  Beckcom's testimony was critical to the State's case; it clearly was harmful.  *See, Brecht, supra.*

## CLAIM # 4

### MR. PRIBLE WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

### A.    DEFAULT

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012) excuses otherwise defaulted ineffectiveness of trial counsel claims if state habeas counsel should have litigated the claim but failed to do so.  A recent Fifth Circuit decision has limited Martinez to cases that by law could only be brought in the first instance in a writ of habeas corpus. *Ibarra v. Thaler,*--- F.3d ----, 2012 WL 2620520 (5th Cir. 2012).   A majority of the three judge panel reasoned that because the Texas Court of Appeals did not prohibit, as a matter of law, the inclusion of IAC claims on direct appeal, Martinez did not apply. *Id.*  Mr. Prible's claim is different. In addition to alleging trial counsel IAC, Mr. Prible alleges that appellate counsel failed to raise trial IAC.

---

[60] This all supposedly occurred on the same day that Mr. Prible and his mother and Beckcom and his mother got together for a photograph during visitation at the prison.  *Id.*

The Supreme Court has firmly held that where, as in Texas, criminal defendants are entitled to an appeal as a matter of law, as opposed to judicial discretion, the right to competent appellate counsel is indistinguishable in importance, for the purpose of due process, from the right to a competent trial attorney. *In Evitts v. Lucey*, 469 U.S. 387 (1985) the Supreme Court stated that,

> A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney. This result is hardly novel. The petitioners in both *Anders v. California*, 386 U.S. 738 (1967), and *Entsminger v. Iowa*, 386 U.S. 748 (1967), claimed that, although represented in name by counsel, they had not received the type of assistance constitutionally required to render the appellate proceedings fair. In both cases, we agreed with the petitioners, holding that counsel's failure in Anders to submit a brief on appeal and counsel's waiver in Entsminger of the petitioner's right to a full transcript rendered the subsequent judgments against the petitioners unconstitutional. In short, the promise of Douglas that a criminal defendant has a right to counsel on appeal-like the promise of Gideon that a criminal defendant has a right to counsel at trial-would be a futile gesture unless it comprehended the right to the effective assistance of counsel.

*Id.* at 396-97.

It is a claim analyzed under *Strickland* and therefore requires a harm analysis that includes an inquiry into whether the appeal would have been set aside if appellate counsel had raised a different claim. *See, e.g., United States v. Cross,* 308 F.3d 308, 315 (3rd Cir. 2002). Hence, Appellate IAC obviously cannot be brought until the direct appeal is over and the appellate decision has been rendered. Appellate IAC therefore by logic and law can only be brought for the first time in state habeas. Unsurprisingly, district courts in other federal jurisdictions have interpreted Martinez to allowed appellate IAC claims alleging that the direct appeal should have raised trial IAC. *See Williams v. Alabama*, Slip Copy, 2012, WL 1339905 (N.D.Ala., 2012.)

The exception to procedural default that *Martinez* created is an equitable remedy motivated by the vital importance of competent representation in criminal proceedings. The

force of those equitable concerns are amplified by Mr. Prible's situation.  He has been deprived of his sixth amendment right to a competent trial counsel and his sixth amendment right to a competent appellate attorney. He has spent 10 year on death row in administrative segregation (as a result of which he is now hallucinating) because of incompetent state habeas counsel. Under these circumstances, equitable principles of *Martinez* militate in favor of excusing default rather than enforcing it.

### B.     SUBSTANTIVE STANDARDS

*Strickland v. Washington*, 466 U.S. 668 (1984), laid out the legal principles that govern ineffective assistance of counsel claims. There are two components: a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Id.* at 687. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  *Id.* at 688.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct."  *Wiggins v. Smith,* 539 U.S. 510*,* 521 (2003).  Instead, the Court has "emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"  *Id.,* (quoting *Strickland*, 466 U.S., at 688).

In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense.  *Strickland*, 466 U.S., at 692. To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.  That does not mean that a petitioner must show that counsel's deficient conduct more likely than not altered the outcome of the case." *Id.*  "The result of a proceeding," the court added, "can be rendered unreliable, and the proceeding itself unfair, even if the errors of counsel cannot be

shown by a preponderance of the evidence to have determined the outcome." *Id.* Instead, reasonable probability is simply "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In *Smith v. Robbins*, 528 U.S. 259, 285 (2000), the Supreme Court noted that in addition to demonstrating counsel's performance was "objectively unreasonable," petitioner must show a "reasonable probability" that, but for his counsel's objectively unreasonable performance, he would have "prevailed on his appeal." To prevail on an ineffective of appellate counsel claim, Mr. Prible must demonstrate therefore that the omission of a *Massiah* claim from the direct appeal was objectively unreasonable, and show it is reasonably probable that the Texas Court of Criminal Appeals would have granted relief at the appellate stage.

**B.     ARGUMENT**

**1.     Failure of trial counsel to object to Beckcom's testimony under Massiah and progeny was ineffective.**

Trial counsel has a duty to prevent the State when possible from introducing incriminating testimony. In this case, trial counsel knew that Beckcom was the key witness. Before trial, counsel was put on notice that Beckcom would testify against his client. Although counsel was not allowed to see Beckcom's written statement until right before he cross examined the witness, reasonable competent trial counsel would have realized immediately from the answers to the State's preliminary questions on direct examination that he should have lodged an objection based on *Massiah*.

For reasons set forth in Claim #3 supra, which are incorporated by reference as if fully set forth herein, had counsel objected, the trial court would have been required to exclude Beckcom's entire testimony. Without Beckcom's testimony, there would have been far more than a reasonable probability that the jury would convict. As the lead prosecutor said, the case

came down to whether the jury believed Beckcom's testimony that Mr. Prible had confessed. Trial counsel's inexcusable failure to object under *Massiah* therefore was deficient and prejudicial under *Strickland*.

> 2. **Appellate counsel was ineffective for not urging reversal on direct appeal based on trial counsel's failure to object under Massiah.** *Evitts v. Lucey*, **469 U.S. 387 (1985).**

The *Massiah* violation in this clear is clear from the record. The lead prosecutor direct examination established that Mr. Beckcom called the prosecutor in order to arrange a deal for providing incriminating testimony against Mr. Prible. At that time, Beckcom testified he had little to know information to provide the prosecutor. The record further reflects that after the phone conversation Beckcom agreed to start probing Mr. Prible for the details of the crime that the prosecutor instructed he had to provide in order for her to use her influence to obtain a reduction in Beckcom's sentence. At 26 RR 38, Beckcom states that after learning what would be required in order for the prosecutor to be interested in testimony incriminating Mr. Prible he began meeting with Mr. Prible on a "daily basis." Beckcom's trial testimony also reflects that he obtained the type of detail the prosecutor said she had to have to justify a *quid pro quo* for testimony after she informed him of the State's requirements for a deal. *Id.* Hence, the Massiah violation was clear from the record,[61] and so was trial counsel's failure to object.

Appellate counsel faced with a cognizable appellate claim of trial IAC based on *Massiah* would have included the claim in the direct appeal. Although trial counsel raised non-frivolous claims, nothing prevented him from raising the *Massiah* issue. Trial counsel was not under prohibitive briefing constraints, and the claim could be easily and succinctly raised based on the

---

[61] The prosecutor's opening remarks announce the violation of constitutional law by stating that "during the course of those many conversations" that Beckcom testified he had daily after phoning the prosecutor in the first half of October, "Beckcom **elicited** a lot of details about what happened that night out of the mouth of Jeff Prible." 21 RR 81 (emphasis added).

transcripts of Beckcom's testimony and the clerks record showing Mr. Prible was represented by counsel to defend against capital murder charges before the State informed Beckcom that it would be interested in a deal for testimony only if he could obtain detailed incriminating information from the defendant.

### 3. State habeas counsel failure to raise IAC claims based on *Massiah* was ineffective.

Competent habeas attorneys familiarize themselves with the record.  This basic post-conviction duty requires reading trial transcripts.  For the very reasons that appellate counsel was ineffective (see section 2, supra) for not spotting the *Massiah* violation and trial counsel's failure to object, a state habeas counsel, too, was ineffective for not raising IAC.  In state habeas counsel the error is more glaring since trial counsel briefed boilerplate arguments regarding the constitutionality of Texas death penalty statute that the Texas and Federal courts have rejected time and time again.  For reasons set forth in claim #3, supra, the failure prejudiced Mr. Prible. But for the collective failure of all previous counsel to raise a basic constitutional issue regarding the misuse of informants in a case where the State's case depended on introducing jailhouse snitch testimony, Mr. Prible would have been acquitted at his original trial or would have received a new trial at which the State could not call on Beckcom.  Relief from his continued unconstitutional confinement and sentence of death should therefore finally be granted.

## CLAIM #5

**IN VIOLATION OF *MASSIAH*, THE STATE SUPPRESSED EVIDENCE THAT INDEPENDENTLY ESTABLISHED THAT THE STATE HAD DEPLOYED BECKCOM AND FOREMAN AS AGENTS TO PRY INCRIMINATING INFORMATION FROM MR. PRIBLE  ALTHOUGH THE STATE WAS AWARE HE WAS REPRESENTED BY COUNSEL.**

For reasons set forth in Claim #2, the State suppressed evidence of multiple contacts with informants inside FCI Beaumont who were angling to provide incriminating testimony in return

for State favors, suppressed inmate letters to the prosecutor that identified witnesses, such as Carl Walker, Jr., who had information showing that the State was using a ring of informants, headed by Foreman and Beckcom, to investigate Mr. Prible, and suppressed evidence showing that Beckcom's cellmate, Nathan Foreman, during the time that he and Beckcom were investigating Mr. Prible had arranged for a *quid pro quo* for providing incriminating evidence against another FCI Beaumont inmate named Herrero, and that the lead prosecutor had tried to use her influence to obtain a sentence reduction for Foreman for his ancillary, non-testifying role in the *Hererro* case.

The suppressed evidence that the State was utilizing and rewarding informants for providing jailhouse confessions constituted and independent and sufficient ground for raising a *Massiah* claim at trial and in state habeas proceedings. By suppressing this evidence, the state prevented Mr. Prible's previous defense and post-conviction attorneys from protecting his due process and sixth amendment rights.

Mr. Prible would have been able to exclude Beckcom's testimony based on *Massiah* if the state had not suppressed this evidence independently showing that Beckcom and Foreman were working as state agents to investigate Mr. Prible's case while he was represented by counsel. Exclusion of Beckcom's testimony, however, would have resulted in an acquittal, for, in the State's words jury's decision to convict or acquit depended on whether the jury believed that Beckcom had provided credible evidence of a confession. This Court can therefore reach this otherwise defaulted claim based on suppressed evidence of a *Massiah* violation, and for the same reasons that it finds cause and prejudice under *Murray v. Carrier*, the Court can grant relief under *Massiah* and the even more lenient harm standard of *Brecht v. Abrahamson*, 507 U.S. 619

(1993). The suppression of *Massiah* evidence that permitted the state to unconstitutionally introduce Beckcom's testimony clearly had a substantial effect on the verdict.

## CLAIM #6

### MR. PRIBLE WAS DEPRIVED OF HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS BY THE ADMISSION OF EVIDENCE DOCUMENTING THE DEATHS OF THE COMPLAINANTS' CHILDREN.

As the State recognized, Mr. Prible alleged on direct appeal that the introduction of testimony and exhibit evidence describing and depicting the deaths of Steve and Nilda Herrera's children due to smoke inhalation "deprived him of due process under the United States Constitution." *State's Appellate Brief,* at 19; CR, at 35.   The Texas Court of Criminal Appeals addressed Mr. Prible's constitutional claim, stating that it was denying it for the "same reasons expressed" in the TCCA's determination that the admission of the evidence did not violate Texas Rules of Evidence 402 and 403.

### A.    FACTS

Mr. Prible was charged with capital murder in a one paragraph indictment that alleged he caused the deaths of Steve and Nilda by shooting them with a firearm during the same criminal transaction.  (CR, vol. 1, at 2.)  Steve was found in the garage face down.  Nilda's burnt body was found in the adjacent room on the couch.  Both had been executed by gunshots to the head. The bodies of their three children were found in the children's and master bedroom.  Each had died of smoke inhalation from the smoldering fire that Steve's and Nilda's assailant(s) had started below. There was no evidence that the children had been sequestered, injured or traumatized.

At trial, Defense counsel made the following objection to the introduction of evidence of the children's deaths.

> DEFENSE COUNSEL:      "Concerning the children… I want the Court to understand that our grounds [for objecting to evidence of the children's death] are premised in the Rules of Evidence, Rule 403 and Rule 404 and the Fourteenth Amendment to the Constitution of the United States. The Defendant's right to a fair trial unencumbered by evidence that  he's a criminal generally, has committed other offenses.  And [we] would ask the Court to extend its ruling to a point where we are not required to make objections every time evidence of the deaths of the three children comes up through any witness."

> THE COURT: "Absolutely. The Court will grant a running objection to any evidence related to the death of the children introduced at the guilt/innocence phase of the trial with all the objections the Defense has just stated and will not require them to make the objection in the presence of the jury…."

21 RR, at 16.  Citing this objection and ruling, Mr. Prible, on direct appeal, argued that the introduction of evidence related to the deaths of the girls violated his due process rights.

In Texas, a homicide is a capital crime if there are two or more victims in the same transaction, if a victim is under 12 years old, or if the cause of death is arson.  TEX. PENAL CODE § 19.03.  During opening remarks, the prosecutor stated that what the firemen who arrived at the scene saw was "horror because they're going to tell you what they found there that day in that house was a whole family dead.  Not just Esteban Herrera, Jr., Steve; not just Nilda Tirado, but three little girls."  *Id.* at 73.  According to the prosecutor, Mr. Prible "walked out of a house with it smoking and burning, knowing three little babies were asleep in their beds.  That is the kind of man [he is] and he's guilty of capital murder."  *Id.* at 83.  During closing argument, the prosecutor insisted that this case was "a capital murder where three little girls were executed." RR. Vol. 28, at 83.

**B.     ARGUMENT**

The Fifth Circuit applies a two pronged test to determine whether extraneous offense evidence violates due process.  First, the government must make a "strong showing that the defendant committed the offense" and, second, the government must demonstrate that the extraneous offense is "rationally connected with the offense charged." *Enriquez v. Procunier*, 752 F.2d 111, 115 (5th Cir.1984), *cert. denied*, 471 U.S. 1126 (1985).

> **1.     The Government did not make the type of strong showing required to justify the introduction of evidence of the extraneous capital murders of three children.**

The evidence that Mr. Prible intended to kill Steve's and Nilda's children hinged on Beckcom's testimony.  Beckcom testified that Mr. Prible told him that he knew the girls were in the house.  According to Beckcom, when he inquired about the deaths of the three girl, Mr. Prible stated that anyone who could "take out and entire family was a bad motherfucker, and I'm that bad motherfucker." RR, vol. 26, at 52.

Beckcom's testimony about the death of the girls is inherently unreliable jailhouse snitch testimony that is not supported by any evidence corroborating an intention to kill the three little girls.  The State did not provide a motive explaining why Mr. Prible would kill the girls.  Neither of the children witnessed the deaths of their parents.  They do not appear to have been awakened by gunshots.  Firemen found two of the girls in their bedroom: Rachel was face-down on the floor; Valerie was found face down in bed.  *Prible,* 175 S.W.3d, at 727.  Jade's body was found in the master bedroom face down on the floor.  *Id.*

There was no testimony indicating that Mr. Prible saw or heard the children while he was at Steve's and Nilda's during the evening before the two were killed.  There was no evidence that anyone went back to where the girls were found until the fire department arrived early that

morning and searched the home.  According to the State, before Steve died, Mr. Prible and Steve's brother and Steve played pool out in the garage, then went to a cabaret before returning to Steve's home.  These events transpired late at night.  Children were not part of these scenes. Although Mr. Prible and Steve were childhood friends, the State maintained that Steve allowed no one in the house.  The girls had numerous relatives nearby – uncles, aunts and grandparent – at whose homes they could be left to spend the night.

Finally, the State did not establish that the killer intended to burn the house down.  Arson investigators established that the killer used accelerants.  Gasoline was used and an open can of a Kutzit was found near Nelda's body.  However, there was no evidence that the assailant attempted to set the room on fire by spreading accelerant on carpets, wall or furniture. According to the State, the assailant set Nilda on fire after she was dead in order to destroy evidence that would have been left behind in the course of a sexual assault.  RR. Vol. 21, at 10- 11. In sum, the State did not present strong evidence that Mr. Prible intended to kill the three children.  The strength of the evidence clearly fell below constitutional thresholds for admissibility.

### 2. The Government did not demonstrate a rational connection to the offense charged.

The Fifth Circuit's case law makes clear that it is not enough to show that the *actus reus* of the extraneous offense – in this case the death of the three girls -- was a causal consequence of the conduct that constituted the charged offense.  Instead, the extraneous offense evidence has to be probative of the actions or the mental states that the State contends satisfy the elements of the charged crimes. For example, in *Wood v. Quarterman*, 503 F.3d 408 (5th Cir. 2007), the State sponsored testimony from a prostitute who had escaped the fate of one of Wood's murder victim, a woman named Kelly. The prostitute described being restrained and raped in a manner that bore

a "striking similarity" to the crime scene evidence developed in six murders, including, Kelly's. *Id.,* at 414.   In *Story v. Collins*, 920 F.2d 1247 (5th Cir. 1991), the State charged Story with indecency with a child named Crystal.  He objected to evidence that he had masturbated in front of two other girls. After finding that that the satisfied the first prong of the *Procunier* test, the Court rule that extraneous offense was "rationally connected with the charged offense, because it indicated that Story had a desire to engage in sexual conduct in Crystal's presence." *Id.*

In sharp contrast, the deaths of Steve's and Nilda's three little girls had nothing at all to do with the motive, intent, manner or means of death that the State alleged were involved in the execution of their parents.  The assailant(s) did not need to get rid of the girls because they were witnesses.  The State did not need to show that Steve or Nilda died of asphyxiation.  It alleged that the parents died from gunshot wounds to the head fired at close range.  The State did not need to display crime scene and autopsy evidence in order to support the theory that a fire had been set in order to conceal and destroy evidence.  The evidence of a fire, where it started, what caused it, and where it spread, was absolutely clear without reference to the deaths of the children.[62]   The accelerant was found downstairs near Nilda, the firefighters arrived to find smoke coming out from under the eaves of the home, and they described the smoky conditions they found throughout the house when they entered to search.

Introduction of evidence of the three extraneous capital offenses was entirely gratuitous, rather than rationally connected to the State's case for convicting Mr. Prible of Steve's and Nilda's death.  Indeed, the State admitted that the evidence of the extraneous capital murders that

---

[62] The State's recitation of the evidence shows that the firefighters found Steve's and Nilda's bodies immediately and realized right off that the crime scene involved homicide and arson.  The firefighters retreated from the house, ventilated it and searched other rooms. Finding nothing they regrouped outside again.  They reentered and went upstairs in order to find the three girls.  *See,* State's Appellate Brief, at 6; CR, at 000022.  That is firefighters conducted three searches, and what they found on the third go around was absolutely unnecessary to "provide a context" to Steve's or Nilda's murder.

it intended to introduce at guilt innocence were **not** rationally connected to the Steve's and Nilda's assailant's intentions or actions.  In trying to justify the introduction of the extraneous offense evidence, the State argued that,

> This isn't some sociopath who decided to wipe out a whole family.  This is a Defendant who killed two people and then set the house on fire in an attempt to cover up the family (*sic*.).  And had those children survived there probably would have been no moment to the Defendant because neither of the three children had seen him or could identify him as the person who killed both their parents because they were upstairs….

RR. Vol. 21, at 7-8.

That the purpose of introducing evidence of regarding the children's deaths was to inflame the jury, rather than provide a context for the crime, is clear, too, from the extensive visual evidence that the State introduced.  The State was not satisfied with sponsoring verbal descriptions from the firefighters who found the girls. It also introduced crime scene photos of each child followed by autopsy photos showing the dissected bodies and organs of every single little victim.  As the Ninth Circuit recognized in *McNeely v. Olivarez*, 104 F.3d 365, *5 (9th Cir. 1996),[63] federal due process claim exists if the introduction of graphic, gruesome photographs of the victim renders the trial fundamentally unfair.   At sentencing, where evidentiary rules are more relaxed, particularly gruesome photos of a victim may still warrant habeas relief.  *See, Spears v. Mullin*, 343 F.3d 1215, 1229 (10th Cir. 2003), *cert. denied sub nom. Powell v. Mullin*, 541 U.S. 909 (2004) (photos of victims so inflammatory as to "fatally infect[ ] the trial and deprive[ the defendants] of their constitutional rights to a fundamentally fair sentencing proceeding").

---

[63] Unpublished opinion.

### 3.   The argument that admission was justified because it bolstered the jail house snitch's credibility was false and misleading.

According to the State, the evidence of three extraneous capital murders was admissible because the evidence corroborated Beckcom's testimony.   However, if anything the evidence detracted from Beckcom's credibility.   The key to the State's endeavor to establish Beckcom's credibility was statements to him by Mr. Prible that the State maintained described details of the crime scene that only a person who had been at the scene would know.   However, Beckcom's testimony about where the girls were was neither detailed nor accurate, nor did it indicate in the least that the source of the testimony had to come from someone who had been at the crime scene.   Beckcom testified that Mr. Prible told him that the girls "were in bed." RR, vol. 26, at 49. Beckcom asked how did they die and he said Mr. Prible said "smoke inhalation." *Id.*   However, no one would have learned that the girls died of smoke inhalation from being at the crime scene when the crime occurred.   This is the type of fact that could only be learned afterwards from other sources, such as the newspaper, where it was reported, from police reports or from any number of people who talked later to the family members and neighbors who had arrived in numbers at the crime scene.   Clearly, the culprit would have fled the scene before the girls asphyxiated. Even though the fire was a flash fire that spread through the room adjacent to the garage quickly, it took time for the smoke to permeate the entire home and choke the girls.

Beckcom's testimony that Mr. Prible told him that the "girls were in bed" is equally useless as far as establishing credibility.   Mr. Prible was Steve's close friend, he had been to their home several times, and knew that the crime took place very late at night or early morning.   He clearly did not have to be at the scene when the crime happened in order to be able to make the representation that the girls were in bed when Steve and Nilda were shot downstairs. Furthermore, Beckcom testimony that Mr. Prible told him that the girls were "in bed" when

Steve and Nilda were shot does **not** accurately describe how or where the girls were found.[64]
One of the children, Jade, was in the master bedroom.  Two, including Jade, were found on the
floor.

> **4.    The Texas Court of Criminal Appeals' determination that there
> was no due process violation was "contrary to" and involved an
> "unreasonable application" of federal constitutional law. *See*, 28
> U.S.C. § 2254(d)(1).**

The Due Process Clause provides relief from evidentiary rulings that are "so unduly
prejudicial that it render[ed] the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808,
825 (1991); *and see*, *Spencer v. Texas*, 385 U.S. 554, 561(1967) (The Due Process Clause
guarantees the fundamental elements of fairness in a criminal trial.).  The established standard
for fundamental fairness requires that habeas relief be granted by a federal court when the state
trial error relates to evidence that is material in the sense of a crucial, critical, highly significant
factor.  *Mullen v. Blackburn*, 808 F.2d 1143, 1145 (5th Cir. 1987).  The Fifth Circuit has
recognized in a long line of habeas cases that if extraneous offenses are highly significant
factors, their introduction at guilt-innocence infringes the defendant's due process rights unless
there is a rational connection between the extraneous offenses and the charged offenses.
*Procunier, supra; Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

In Mr. Prible's case, the Texas Court of Criminal Appeals justified the introduction of
evidence of three extraneous capital offenses on grounds that explicitly ***violate*** due process.
Indeed, it upheld the decision to admit the extraneous murders of the three girls because it found
that these offenses were **not** rationally connected to the crimes with which Mr. Prible was
charged.  The TCCA expressly ruled that "there was little likelihood" that evidence of the tragic

---

[64] It is absolutely mindboggling that at trial, on appeal and in post-conviction proceedings, the State gets away with
this ruse about "facts that only the killer would know."  Mr. Prible knew Steve's and Nilda's family; he was from
the neighborhood. Facts about the crime, such as where the girls were found dead, where the parents were found
dead, how they were killed, etc., were known by a wide circle of people with which Mr. Prible was connected.

deaths of the three girls "would encourage the jury to reach an irrational verdict or act on the basis of emotion," because "***evidence of their deaths did <u>nothing</u> to prove that appellant was responsible for the murders of Steve and Nilda.***" *Prible*, 175 S.W.3d, at 733 (emphasis added). Clearly, the TCCA's decision was contrary to bedrock principles of due process and fundamental fairness that the Supreme Court has long insisted must govern criminal trials.  In the alternative, it is and unreasonable application of these basic principles.

> ## 5.  The extraneous offense evidence was clearly harmful when measured against the scant evidence supporting the jury's verdict.

The presentation of the evidence in Mr. Prible's case focused extensively on the deaths of the three girls.  Testimony regarding the condition in which their bodies were found came in through firefighters, police officers and the Medical Examiner.  It displayed gruesome autopsy photos showing the effects of smoke inhalations.  The prosecution dwelt on the death by suffocation in its case in chief and in closing.  The State realized the evidence was shocking. Speaking to the jury, the lead prosecutor stated,

> "You probable thought, wait a minute, Kelly, you just said whole family. All I've heard about from the Judge and you and Vic and them is Steve and Nilda. What's this business about a whole family?  You were probably shocked and should have been."

RR. vol. 28, at 86.

On the other hand, the evidence that Mr. Prible killed Steve and Nilda was far from overwhelming.  State's evidence consisted in testimony from Steve's and Nilda's family members placing Mr. Prible at Steve's residence during the late evening and early morning when the murder took place.  DNA evidence that indicated that Mr. Prible and Nilda had oral sex shortly before the murders also placed him at Steve's house near time of the murders.  The State also obtained inconsistent statements from Mr. Prible in which at first he denied having an affair

with Nilda and then admitted to one.  However, all of this evidence was developed two years before trial.  At the time, the State determined it did not have probable cause to arrest Mr. Prible. He remained at liberty until he was apprehended for robbing several banks, and was not charged with capital murder until he had nearly completed his federal sentence.

The State's case depended on the severely impeached testimony of the State's jailhouse informant who had killed a man by carbon dioxide poisoning, admitted that he had previously lied under oath, and was testifying to get his sentence reduced.  Mr. Prible' attorney's also impeached the crime scene investigation.  Detective Brown failed to collect blood samples from the splatters on the wall, and was compelled to admit that his performance was just sloppy.  The State's DNA expert's inference that DNA from Mr. Prible found in Nilda's oral cavity was deposited near the time of her death was discounted by the Harris County Medical Examiner, 23 RR 82, Mr. Prible's expert, 27 RR 119, and during State habeas proceedings by the scientific report and authority provided by Dr. Libby Johnson.[65]

On the other hand, Mr. Prible put on a substantial defense.  He disproved the motive that the State advanced for the murder, which was that Steve took $250,000.00 in bank robbery loot. 21 RR 81 (State's opening remarks); 26 RR 50 (testimony of Beckcom).  The tally from the robberies was less than one fifth of that at approximately $46,000.00. *Id.* at 171.  The State's theory that Steve and Mr. Prible "had to have been pretty volatile" and had "not been close friends for very long, 28 RR 69, was utter speculation and contrary to testimony that Steve and Mr. Prible's families socialized, 26 RR 248-49, that the two who had known each other since junior high school, 25 RR 17, and had never been seen in even in an argument. *Id.* at 104.  The Defense also sponsored a credible alibi witness, a neighbor, who testified that she knew Steve and Prible by sight and by voice, and that she saw and heard both of them sometime after 1 PM

---

[65] Original Application filed November 18, 2004, Exhibit 'C'.

outside her home.  The State's arson experts also provided exculpatory information when he testified that the accelerants used to set Nilda afire would produce a "flash fire" which he described as a "very rapid hot fire."  RR., Vol. 21, at 217.  According to the arson expert, "the easiest way … to describe a flashfire to most people is take a charcoal barbecue, pour light fluid and drop a match or torch and you get a whoosh or rush of flames.  That's a typical flashfire.  We're talking about a roomful of consequences." *Id.*  With the rapidity that characterizes an explosion of lighter fluid, the flashfire quickly burned up what he referred to as the "majority of the consumables" in the room where Nilda was found.  *Id.* at 222.  Clearly, such a fire would have burned and singed Mr. Prible's clothing, exposed body hair and exposed skin.  However, Mr. Prible did not display any such effects when detectives interviewed him and police examined him hours after the murder.

### 6. The TCCA's harmless error analysis violated 28 U.S.C. § 2254(d)(1) "contrary to" and "unreasonable application" prongs.

For purposes of 28 U.S.C. § 2254(d)(1), the TCCA's prejudice analysis is contrary to, or involves an unreasonable application of, federal constitutional law.  The TCCA did not conduct the harmless error analysis delineated by the Supreme Court in *Brecht v. Abraham*, 507 U.S. 619, 637 (1993). Instead, the TCCA's analyzed "potential prejudice" in terms of whether what it called "the relatively strong probative value of the evidence" incriminating Mr. Prible in the deaths of Steve and Nilda, and determined whether it was  "substantially outweighed by "the mere possibility of unfair prejudice." *Id.*  However, this is the standard for determining whether admission of the evidence resulted in a substantive violation of evidentiary rules.  *See*, TEX. R. EVID. 403; and *see*, FRE 403.  Such a standard is not appropriate for evaluating prejudice under Texas or federal constitutional law.  *See,* TEX. R. APP. P. 44.2(a-b); *Brecht, supra.*

## CLAIM # 6

**MR. PRIBLE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, AS A MATTER OF FEDERAL CONSTITUTIONAL LAW, WHERE TRIAL COUNSEL FAILED TO EFFECTIVELY ADDRESS AND REBUT THE TESTIMONY OF WILLIAM WATSON THAT THE SEMEN FOUND IN THE COMPLAINANT, NILDA TIRADO, MUST HAVE BEEN DEPOSITED IN HER MOUTH NEAR OR AT THE TIME OF HER DEATH, WHERE THERE WAS NO SCIENTIFIC BASIS FOR THIS EXPERT CONCLUSION.**

Mr. Prible was entitled to counsel skilled in the rules of evidence and procedure. U.S. Const. amends 6 & 14; *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The applicant received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel failed to effectively address and rebut the testimony of William Watson, that the semen found in the complainant Nilda Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion.

William Joseph Watson testified for the State. (RR. Vol. 24 p. 28.)  Watson was a DNA expert hired by the State. (RR. Vol. 24 p. 31.)  Watson analyzed the semen swabs taken from the complainant Nilda during the autopsy. (RR. Vol. 24 p. 64.)  Watson was able to detect the appellant's DNA from the sperm found on swab taken from the complainant's mouth. (RR. Vol. 24 p. 104.)  Watson told the jury that in his experience, he had never been able to recover a sufficient amount sperm from a swab taken from a complainant's mouth, to make a reliable DNA determination, where the complainant had been alive at the time sperm had been deposited. (RR. Vol. 24 pp. 100-106.)  The conclusion to be drawn from Watson's testimony that was that Mr. Prible must have deposited his sperm in the complainant's mouth at or almost simultaneously with the time of her death.

The testimony by Watson that the sperm must have been deposited in the complainant's at or near the time of her death surprised the defense. (*See* Affidavit of Dr. Robert C. Benjamin, Exhibit D to the 02/2004 State Application for Writ of Habeas Corpus.)  Applicant's attorneys were ineffective for failure to object to the expert's conclusion, without the trial court first conducting a hearing to determine whether the expert's methods were reliable. *Daubert v. Merrell Dow Pharmaceutical*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).  Trial counsel were also ineffective for failure to move for a continuance in order that expert testimony contradicting Watson's testimony could be obtained.

There was ample scientific evidence that the testimony of the State's DNA expert was without foundation in scientific fact, nor as he qualified to make the assertions that he did.  (*See* Affidavit of Dr. Elizabeth A. Johnson, with scientific publications, Exhibit C to the 02/2004 State Application for Writ of Habeas Corpus.)

**CLAIM # 7**

**MR. PRIBLE WAS DENIED HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY BECAUSE THE VENIRE DID NOT REFLECT A FAIR CROSS-SECTION OF THE COMMUNITY.**

In 1975, the United States Supreme Court in *Taylor v. Louisiana* held:

> [T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.[66]

Because Harris County systematically excludes Hispanics from jury service, Applicant was denied his right to a jury drawn from a fair cross-section of the community as guaranteed by the Sixth and Fourteenth amendments.  As explained in further detail in this section, each of the

---

[66] *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975).

elements required to establish a prima facie violation of the fair cross-section requirement is satisfied.  In particular:

a.  Hispanics qualify as a distinctive group.

b.  Hispanics are under-represented on the venire as a matter of law.  Based on his analysis of the data, Prof. Harold Hietala, Ph.D, Professor of Statistics, determined that Hispanics were in fact significantly under-represented.  Hispanics make up 30% of persons in the county eligible for jury service, but Applicant's venire panel included only 37 Hispanics out of 300, or about 12%.  (See Exhibit E.) Applicant's twelve person jury contained zero Hispanics.

c.  The exclusion of Hispanics from venire panels is systematic in that it is the direct result of procedures adopted by Harris County.  As shown below, Hispanics are being excluded primarily because the pay for jury service ($6/day) is the lowest in the nation, among other reasons.

### A.  Applicant Has an Absolute Right to a Jury Drawn From a Fair Cross-Section of the Community.

The right to a fair and impartial jury in criminal cases is one of the most fundamental aspects of the government and society of the United States.[67]  "Jury service preserves the democratic element of the law … [because it] affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for the law."[68]  Jury service also "guard[s] against the exercise of arbitrary power … [by making] available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge."[69]  Accordingly, the right to an impartial jury, which traces its roots all the

---

[67] *Powers v. Ohio*, 499 U.S. 400, 407 (1991).
[68] *Id.*
[69] *Taylor,* 419 U.S. at 529.

way back to the signing of Magna Carta in the 13th century,[70] is preserved by the Sixth Amendment to the Constitution.[71]

"The very idea of a jury is a body of men composed of the peers or equals of the persons whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status as that which he holds."[72]   Thus, "[t]he American tradition of trial by jury … necessarily contemplates an impartial jury drawn from a cross-section of the community," and requires that "prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of [the economic, social, religious, racial, political and geographical groups of the community]."[73]

### Duren v. Missouri

The tool provided to ensure this requirement is met is the fair cross-section claim, articulated by the Supreme Court in *Duren v. Missouri*.[74]   In order to prove a violation of Applicant's right to a jury drawn from a fair-cross section of the community, an individual must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.[75]

---

[70] *Duncan v. Louisiana*, 391 U.S. 145, 151 (1968).
[71] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed."  U.S. Const., Amend. 6.
[72] *Taylor*, 419 U.S. at 536 n.19, *quoting Strauder v. West Virginia*, 100 U.S. 303, 308 (1879).
[73] *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220 (1946).
[74] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).
[75] *Id.*

Once the defendant makes a prima facie showing of a fair cross-section violation, the burden shifts to the state to show "'that the disproportionate exclusion manifestly and primarily advances a significant governmental interest.'"[76]

Fair cross-section claims are not limited to federal courts.[77]  Rather, the requirement applies to state court criminal proceedings by virtue of the Fourteenth Amendment.[78]  Nor is membership in the excluded class a requisite for raising a claim.[79]  Finally, the requirement is not a guarantee of "a jury of any particular composition."[80]  Instead, the right to bring a fair cross-section claim only ensures that venires from which juries are drawn do not systematically exclude distinctive groups in the community.[81]

## B.  Hispanics Are a Distinctive Group Under the *Duren* Test.

Hispanics have repeatedly been held to be a distinctive group.[82]  The Supreme Court has never defined "distinctiveness," but has held that "the concept … must be linked to the purposes of the fair-cross section requirement."[83]  The "purposes" were identified by the court:

> (1) '[guarding] against the exercise of arbitrary power' and ensuring that the commonsense judgment of the community' will act as 'a hedge against the overzealous or mistaken prosecutor,' (2) preserving 'public confidence in the fairness of the criminal justice system,' and (3) implementing our belief that 'sharing in the administration of justice is a phase of civic responsibility.[84]

---

[76] *Aldrich v. State*, 928 S.W.2d 558 (Tex.Cr.App. 1996), *quoting Duren*, 439 U.S. at 367-68; *United States v. Maskeny*, 609 F.2d 183, 189 (5th Cir. 1980), *cert. denied*, 447 U.S. 921 (1980) ("unless the state shows that the aspects of the process that result in the disproportion manifestly and primarily advance a significant state interest.").
[77] *Duncan v. Louisiana*, 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968).
[78] *Id*.
[79] *Duren*, 439 U.S. at 359, n.1, citing *Taylor*, 419 U.S., at 526-531, 538.
[80] *Taylor*, 419 U.S. at 538; *Lockhart v. McCree*, 476 U.S. 162, 173 (1986) ("We have never invoked the fair cross-section principle … to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.").
[81] *Taylor*, 419 U.S. at 538.
[82] *See e.g., Hernandez v. Texas*, 347 U.S. 475 (1954); *Castaneda v. Partida*, 430 U.S. 493, 495 (1977); *Aldrich v. State*, 928 S.W.2d 558, 560 (Tex.Cr.App. 1996) ("We accept that Hispanics are a distinctive group in any community …").
[83] *Lockhart*, 476 U.S. at 174.
[84] *Lockhart*, 476 U.S. at 174-75, *quoting Taylor*, 419 U.S. at 530-31.

In *Weaver v. State*, the Dallas Court of Appeals held that distinctiveness is found where a "common thread of shared experience or a political, social, or religious viewpoint binds all persons [of the particular group]."[85]

### C.    The Under-Representation of Hispanics on Harris County Venires is Both Unfair and Unreasonable.

The second element of the *Duren* test requires that Applicant show "that the representation of [Hispanics] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community."[86]  To meet this requirement, a defendant should present evidence to show an absolute disparity[87] of more than 10%.[88]  The representation of the distinct group is measured against the community of eligible jurors, rather than the whole community.[89]  An absolute disparity is calculated by subtracting the percentage of the jury venire that is composed of members of the distinct group from the percentage of the community of eligible jurors made up of members of the distinct group.[90]  The Supreme Court has not determined precisely the point at which the representation of a distinctive group is so low

---

[85] *Weaver v. State*, 823 S.W.2d 371, 373 (Tex. App.—Dallas 1992, pet. ref'd), citing *U.S. ex rel. Silagy v. Peters*, 713 F.Supp. 1246, 1251 (C.D. Ill. 1989); *United States v. Blair*, 493 F.Supp. 398, 406 (D.Md. 1980), *aff'd*, 665 F.2d 500 (4th Cir. 1981).

[86] *Duren*, 439 U.S. at 364.

[87] *Maskeny*, 609 F.2d at 190.

[88] *United States v. Haley*, 521 F. Supp. 290, 292 (N.D.Ga. 1981) ("[C]ourts have clearly arrived at the conclusion that more than 10% absolute disparity is necessary  to implicate a violation of the fair cross-section rule."), *citing Swain v. Alabama*, 380 U.S. 202, 208-9 (1965); *United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir. 1980); *United States v. Maskeny*, 609 F.2d 183 (1980); *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974); *see also* Ted M. Eades, Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County, 54 SMU Law Rev. 1813, 1823 (2001) (most courts use the 10% floor from *Swain v. Alabama*, 380 U.S. 202, 208-098 (1965)).

[89] *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981) ("the disparity … must be based not on *total* population but, instead, on those of the identifiable class who are *eligible* to serve as jurors."); *Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996), cert denied, 522 U.S. 825 (1997).

[90] *Maskeny*, 609 F.3d at 190.

as to be unfair and unreasonable.[91]   However, a showing of an absolute disparity greater than

10% should be sufficient to satisfy the second element of the *Duren* test.[92]

Here, the absolute disparity is at least 17%.  Based on the analysis of Professor Harold

Hietala, Ph.D, an expert retained by Applicant in this case, the absolute disparity in Harris

County – making all assumptions in favor of the State – is approximately 17.3%.[93]  As explained

in his Affidavit, Hispanics make up approximately 29.64% of persons eligible for jury service.[94]

Because this number is drawn from year-2000 figures, Hietala suggests that this number could be

somewhat higher due to dramatic Hispanic-growth in Houston over the last four years.[95]   In

comparison, based on Hietala's analysis of Applicant's 300 person panel, only 37 panel members

could possibly have been considered Hispanic (12.3%).[96]  Also, Applicant's petit jury contained

no Hispanics.  Thus, based on the evidence, Professor Hietala concluded that Hispanics were

under-represented on Applicant's venire panel, that the absolute disparity was in excess of 17%,

and that the possibility that mere random chance created disparity was less than 1 in

10,000,000.[97]

> **D.  The Under-Representation of Hispanics on Venires in Harris County is Systematic.**

The third element of the *Duren* test requires that the disparity be the result of systematic

exclusion.[98]   In Harris County, all of the evidence, the analysis contained in related studies and

other jurisdictions, and any reasonable interpretation of the facts all point to the same

---

[91]  The Supreme Court has never articulated precise standards for determining what constitutes a significant underrepresentation,  *United States v. Haley*, 521 F. Supp. 290, 292 (N.D.Ga. 1981), *citing*, *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972)
[92]  *Maskeny*, 609 F.2d at 190.
[93]  *See* The Affidavit of Professor Harold Hietala, Ph.D, attached hereto as Exhibit ___; Professor Hietala's *Curriculam Vitae* is attached hereto as Exhibit ___.
[94]  *Id*. at 6.
[95]  *Id*.
[96]  *Id*. at 7-8.
[97]  *Id*. at 7-10.
[98]  *Duren*, 439 U.S. at 364.

explanation for the systematic exclusion of Hispanics: $6/day is so low – the lowest in the nation – that the working poor cannot afford to attend jury duty.   This falls disproportionately on Hispanics who make up a large part of the working poor in this county.   Because this and other procedures inherent to Harris County's venire selection are employed daily against every Defendant in Harris County courts, the disparity is systematic under *Duren's* requirements.

### 1.     Juror Pay Excludes Hispanics Disproportionately

In Texas, employers do not have to pay their employees for time spent serving as a juror.[99]   Thus, jury duty often means losing a daily wage for day laborers and hourly workers summoned for jury duty.   In Dallas, where $6/day is also the prevailing rate, studies have shown that the poor, especially day laborers, and Hispanics fail to show up for jury duty.[100]   $6 barely pays for parking at the court building and will not satisfy both lunch at the courthouse plus parking.   Thus, the poorest citizens – to whom jury duty is a secondary concern to providing food and shelter for their families – are forced to choose between a day's wage, perhaps $45, or attending the courthouse at a loss.   The evidence suggests that these people are disproportionately Hispanic and that financial hardship is the primary factor in their non-participation.[101]   Experience in other jurisdictions also suggests that raising the daily pay from $6 to $40 would greatly increase participation by low wage earners and Hispanics.[102]

The problem is compounded because Harris County systematically fails to enforce juror summonses – this allows many poor Hispanics to simply opt out of the system.   As explained in *Taylor v. Louisiana*, and in *Duren*, such an arrangement is unconstitutional and unacceptable.

---

[99] *See also* TEX. CIV. PRAC. & REM. CODE. § 122.001 (2004).
[100] Ted Eades, *Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County,* 54 SMU L. Rev. 1813 (2001); *Number of minority, lower-income jurors doesn't mirror community,* Dallas Morning News, October 22, 2000.
[101] *Id.*
[102] *See* Mark Curriden, *Extra money helps El Paso lure more prospective jurors*, Dallas Morning News, October 24, 2000; Mark Curriden, *No Excuses: New Yorkers who try to avoid jury duty find that system has gotten serious about service*, Dallas Morning News, October 24, 2000.

As the Supreme Court reasoned in those cases, procedures allowing most women to opt out of jury service violated defendants' rights to a jury from a fair cross-section of the community.

### 2.    Update of Addresses

Hispanics are also disproportionately affected by the County's failure to update its address lists.  Harris County gets its addresses from voter registration lists and driver license and ID cards.  However, because addresses are often not updated until a person renews their driver's license, many of the addresses become bad addresses when a person changes residences.  Studies reflect that huge numbers of jury summonses are returned because of bad addresses.[103]  The evidence also shows that this disproportionately affects Hispanics because Hispanics move more frequently than other groups.[104]  New York – whose Driver's Licenses are updated every eight years (Texas licenses usually expire in six) – resolved this very problem by subscribing to a national change of address service.[105]

In sum, all of the essential elements of *Duren* are met.  Hispanics are distinctive.  They are being dramatically under-represented on the venire panels.  And the cause of the under-representation is systematic.  Therefore, Applicant has made a prima facie case that his Sixth amendment right to a jury drawn from a fair-cross section of the community has been violated.

### CLAIM # 8

### MR. PRIBLE IS ACTUALLY INNOCENT OF CAPITAL MURDER

### A.    STANDARDS

Close review of the decision in *Herrera v. Collins*, 506 U.S. 39 (1993), demonstrates that a majority of the Court found that the execution of an innocent man violates the constitution.  *Id.*

---

[103] *Number of minority, lower-income jurors doesn't mirror community,* Dallas Morning News, October 22, 2000.
[104] *Id.*
[105] Mark Curriden, *No Excuses: New Yorkers who try to avoid jury duty find that system has gotten serious about service*, Dallas Morning News, October 24, 2000.

at 419 (O'Connor, J., joined by Kennedy, J., concurring) ("executing the innocent is inconsistent with the Constitution"); *Id.* (O'Connor, J., joined by Kennedy, J., concurring) ("the execution of a legally and factually innocent person would be a constitutionally intolerable event."); *Id.* at 429 (White, J., concurring) ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case."); *Id.* at 430 (Blackmun, J., joined by JJ. Stevens and Souter, dissenting) ("Nothing could be more contrary to contemporary standards of decency … than to execute a person who is actually innocent.").  Even Chief Justice Rehnquist left open whether in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," 506 U.S. at 417, although "the threshold showing for such an assumed right would necessarily be extraordinarily high". *Id.*

The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review. *See Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003). However, in a recent case, Judge Wiener stated that actual innocence is the "elephant in the room."  In re Swearingen, 556 F.3d 344 (5th Cir. 2009) (concurring opinion).  Judge Wiener stressed that the Supreme Court has indicated that those who prove their actual innocence will be added to the list of defendants upon whom the State is forbidden to impose capital punishment.

> Consistently repeating the mantra that, to date, the Supreme Court of the United States has never expressly recognized actual innocence as a basis for habeas corpus relief in a death penalty case, this court has uniformly rejected standalone claims of actual innocence as a constitutional ground for prohibiting imposition of the death penalty.  The Supreme Court has, however, made statements in  dicta which at least strongly signal that, under the right circumstances, it might add those capital defendants who are actually innocent to the list of persons who-like the insane, the mentally

retarded, and the very young-are constitutionally ineligible for the death penalty.

*Id.* at 349.   In conclusion, Judge Wiener admonished that "this question is a brooding omnipresence in capital habeas jurisprudence that has been left unanswered for too long."  *Id.*

## B.     FACTS

The factual basis of the innocence claim include the facts that underlie Mr. Prible's prosecutorial misconduct claims (Claims #1 - #3 above).   The facts and argument on which prosecutorial misconduct claims rest are therefore incorporated herein by reference as if full set forth under this actual innocence claim.

### 1.     Mr. Prible was wrongfully convicted on the basis of false, contrived jailhouse snitch testimony.

This is a case of wrongful conviction based on the testimony of a notorious jailhouse informant.  At trial, Beckcom informed the jury that Mr. Prible had confessed to the murders of Steve and Nilda and confessed to killing the couple's three children.   That testimony was fabricated by a conspiracy, involving the State, to convict people through jailhouse informant testimony.  Without Beckcom's false testimony no reasonable juror would have convicted Mr. Prible.

The evidence that Beckcom fabricated the confession is strikingly powerful in light of the State's weak case and in light of the substantial defense, including significant alibi testimony, that Mr. Prible presented at trial. (Evidence and argument in Claim # 1, section 4, is hereby incorporated by reference as if fully set forth herein.)

## III.    THIS COURT SHOULD REACH MR. PRIBLE'S CLAIMS THROUGH *SCHLUP'S* INNOCENCE "GATEWAY".

In *Schlup v. Delo,* 513 U.S. 298 (1995), the Supreme Court recognized that otherwise procedurally defaulted claims may be cognizable upon showing that, in light of new evidence, "it

is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *See also, House v. Bell*, 547 U.S. 518 (2006) (citing 513 U.S., at 327).  This formulation "ensures that petitioner's case is truly 'extraordinary', while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).  A petition supported by a convincing *Schlup* gateway showing "raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error"; hence, "a review of the merits of the constitutional claims" is justified. *Id.* (quoting, *Schlup*, 513 U.S., at 317).

In determining whether a petitioner has passed through *Schlup's* gateway, the court may consider "new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial", *id.*, at 324. However, the habeas court's analysis is not limited to such evidence.  *Schlup* makes plain that the habeas court must consider " 'all the evidence,' " old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See id.*, at 327-328, 115 S.Ct. 851 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)).  Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do". 513 U.S., at 329.

While "the court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors", *id.*, the gateway actual-innocence standard is not equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), which governs claims of insufficient evidence. *House*, 547 U.S. at

519.   When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict. Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record.   *See id*.   If new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial", *id.; see also ibid.* (noting that "[i]n such a case, the habeas court may have to make some credibility assessments").

## B.   ARGUMENT

The argument and evidence set forth (and incorporated by reference) in Claims #1 - #5 and # 8 are incorporated by reference as if fully set forth herein.

No reasonable juror would have convicted Mr. Prible if he had been able to exclude Beckcom's testimony based on *Massiah* using evidence that the State had conspired to violate his Sixth Amendment rights.   Evidence suppressed by the State independently establishes that the State had targeted Mr. Prible with two agents, Beckcom and Foreman, to extract information from Mr. Prible.   That same evidence exonerates Mr. Prible by demonstrating that the Government relied on witnesses who were fabricating confessions, including Mr. Prible's, in order to secure favors from the State.   No reasonable jury would have convicted Mr. Prible therefore if competent trial counsel had been able to present this evidence at trial.

The evidence supporting innocence, furthermore, consists in a first-hand account of a member the informant ring who witnessed the interactions between the State's key witness and Mr. Prible.   Hence, it is the type of reliable evidence that *Schlup* speaks to.   Furthermore, the insider account is corroborated by substantial documentary evidence, including Government records (BOP phone, housing and transfer records) and documents created by the prosecution

(letters on behalf of FCI Beaumont informants) that provide supporting and independent evidence that Mr. Prible is an innocent victim of false jailhouse testimony.

Importantly, in making gateway determinations, this Court is not confined to considering evidence of innocence that simultaneously underlies a constitutional violation. *See House v. Bell,* 547 U.S. 518, 538 (2006). A reviewing habeas court must instead "consider[s] all the evidence, old and new, incriminating and exculpatory, admissible at trial or not." *Id.* In conducting the "gateway" analysis, this Court can therefore take into account the fact that the incriminating implications of the State's expert testimony about the principal physical evidence (spermatozoa found by swab in Nilda's mouth) has been disproven by scientific analysis showing that the testimony was false and foundationless. Closing argument clearly demonstrate that the State relied heavily on testimony that sperm could not survive in a victim's oral cavity for only a very short time. 28 RR 10-11. The State used this testimony to place Mr. Prible at the scene of the crime within minutes of the victim's deaths. *Id.* However, the state's expert's testimony was contradicted by actual studies.[106]

Finally, a district court is permitted under *Schlup* to "make some credibility assessments" when assessing the reliability of a petitioner's "newly presented evidence [that] may indeed call into question the credibility of the witnesses presented at trial." *Schlup*, 513 U.S. at 330. Similarly, the district court may make determinations about "the probative force of relevant evidence that was either excluded or unavailable at trial," *id*. at 327–28, and "assess how reasonable jurors would react to the overall, newly supplemented record," House, 547 U.S. at 538. In other words, *Schlup* permits this Court to re-evaluate the credibility of witnesses in light of the evidence of innocence. The testimony of Beckcom on which the State's case depends can be rejected as a self-serving fabrication. So too the credibility of the State's expert who's

---

[106] *See* Affidavit of Dr. Libby Johnson, attached to Mr. Prible's November 19, 2004, application as Exhibit 'C'.

testimony about the biological evidence place Mr. Prible at the scene of the crime can be rejected as incredible and, for that same reason, excluded under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

In sum, the new evidence of innocence simultaneously shows that Mr. Prible was convicted due to prosecutorial misconduct in violation of due process and by his counsel's failure to object under *Massiah* to the State's jailhouse informant's testimony. This court can reach Mr. Prible's *Giglio, Brady, Massiah* and *Strickland* claims whether through the *Schlup* gateway, or under *Murray v. Carrier,* or because the State court's application of the abuse of the writ to these claims does not satisfy federal requirements for procedural default, and upon doing so, should grant relief.

## **PRAYER FOR RELIEF**

WHEREFORE Ronald Jeffrey Prible, requests that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2.      Permit additional briefing on procedural questions concerning procedural default, "gateway" innocence or issues arising under 28 U.S.C §§ 2241-2254 before issuing any opinion disposing of claims for relief on such grounds.

3.      Allow post-petition discovery including subpoena power to summon and depose witnesses and obtain additional documentation in support of his current claims.

4.      Grant him an evidentiary hearing at which he may present evidence in support of the claims presented in this second amended petition, and allow him a reasonable period of time,

before any hearing this Court orders, in which to conduct reasonable discovery and brief the issues of fact and of law raised by this petition.

5.      Grant such other relief as law and justice require.

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

By:    /s/ *James Rytting*
Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
819 Lovett Boulevard
Houston, Texas 77006
Telephone (713) 655-9111
Facsimile (713) 655-9112
ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

On August 17, 2012, a copy of Mr. Prible's *Second Amended Petition for Writ of Habeas Corpus of a Person in State Custody* was served upon Respondent by ECF filing or U.S. Mail, return receipt requested, addressed to the Texas Attorney General, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

*/s/ James G. Rytting*
James Rytting

## LIST OF EXHIBITS

*Exhibit 'A'* (Transcript of August 26, 2010 interview with Carl Walker, Jr.)

*Group Exh. 'B'* (Affidavits of JJ Gradoni regarding Carl Walker, Jr., Michael Beckcom, Thomas Delgado)

*Group Exhibit 'C'* (Inmate letters to ADA, Kelly Siegler)

*Group Exhibit 'D'* (Letters from Siegler to AUSAs on behalf of FCI Beaumont inmates)

*Exh. 'E'* (Excerpt of *Clerks Record*)

Group Exh. 'F' (BOP documents disclosed in response to District Attorney's subpoena)

*Group Exh. 'G'* (Letters from BOP)

*Exh. 'H'* (May 1, 2002 letter from Assistant District Attorney, Kelly Siegler on behalf of J. Moreno)

*Exh. 'I'* (May 1, 2002 letter from K. Siegler on behalf of R. Dominguez)

Exh. 'J' (May 1, 2002 letter from K. Siegler on behalf of N. Foreman)

Exh. 'K' (May 1, 2002 letter from K. Siegler on behalf of E. Gomez)

*Exh. 'L'* (M.Beckcom's TruFone records)

*Exh. 'M'* (June 23, 2011, 3rd Supplemental Briefing)

*Group Exh. 'N'* (BOP prisoner phone contact lists)

*Exh. 'O'* (Excerpt of Walker's phone book)

*Exh. 'P'* (Handwritten letter written by Beckcom and given to the State on December 10, 2001)

*Exh. Q* (Transc. of Interview of Moreno)

*Exh. 'R'* (BOP Housing/Tranfer records for N. Foreman)

*Exh. 'S,* (Vol. 3, *Herrero v. State*, at 183)

*Exh. 'T'* (Vol. 4, *State v. Herrero*, at 47)

*Exh. 'U'* (Prible Housing and Transfer Records)