# No. 4:09-cv-1896

———————————————

## IN THE UNITED STATES DISTRICT COURT
## FOR SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

———————————————

### RONALD JEFFERY PRIBLE, JR.
Petitioner,

v.

### RICK THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division,
Respondent.

———————————————

Death penalty case
U.S. Dist. Judge Keith P. Ellison

———————————————

## RESPONDENT THALER'S MOTION FOR SUMMARY JUDGMENT AND AMENDED ANSWER, RESPONDING TO SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS, WITH BRIEF IN SUPPORT

———————————————

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

*Counsel of Record

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division

*THOMAS M.  JONES
Assistant Attorney General
Postconviction Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400

———————————————

ATTORNEYS FOR RESPONDENT

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

RESPONDENT THALER'S MOTION FOR SUMMARY JUDGMENT AND AMENDED ANSWER, RESPONDING TO SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS, WITH BRIEF IN SUPPORT . . . . . . . . 1

PRIBLE'S ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

EXHAUSTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    Facts of the Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    Facts at Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    Appeal and First Three State Habeas Applications . . . . . . . . . 11

        A.    Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.    First state application . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.    Second state application . . . . . . . . . . . . . . . . . . . . . . . 12

        D.    Third state application . . . . . . . . . . . . . . . . . . . . . . . . 13

        E.    State court resolution . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.    First Two Federal Petitions . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    III.    Prible's Fourth State Application . . . . . . . . . . . . . . . . . . . . . 16

    IV.    Second Amended Federal Petition . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF CONTENTS, con't.

INDEPENDENCE AND ADEQUACY OF STATE-LAW DEFAULT ...... 23

I.   A State-Court Dismissal under Article 11.071, section 5(a)(2), of the Code of Criminal Procedure Is Independent of Federal Law. ............................................. 23

II.  Prible's Second and Third State Habeas Applications Were Dismissed Because They Failed to Meet the "Unavailability" Requirement. ........................................ 26

III. The State Court's Dismissal of Prible's Fourth State Application Acts as an Adequate and Independent State Bar Precluding Federal Review. ........................... 28

STANDARDS OF REVIEW .................................... 30

I.   The Record Shows That the Director Is Entitled to Judgment. ........................................... 30

II.  Where a Claim Was Adjudicated on the Merits in State Court, this Court Determines Only Whether That Decision Was Reasonable. ......................................... 30

ANSWER ................................................. 33

I.   On His claim That the Prosecution Sponsored False and Misleading Evidence, Prible Is Entitled to No Relief. ........ 33

     A.   Prible's *Giglio/Napue* claims are defaulted. ........... 34

          1.   The state court dismissed the claims on grounds adequate to support the judgment and independent of federal law. ............... 34

          2.   Because two factual predicates have never been presented to the state courts, they are defaulted. ................................. 35

# TABLE OF CONTENTS, con't.

3.     Prible cannot show cause to avoid default. . . . . . . 37

4.     Prible does not show actual innocence to
        avoid default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B.   In    the    alternative,   no   evidence supports the
      allegation that the State sponsored false or misleading
      testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

      1.     Prible does not show that Beckcom lied
              about the source of his information. . . . . . . . . . . . 42

              a.     Carl Walker, Jr., interview. . . . . . . . . . . . . . 42

              b.     Prison phone records. . . . . . . . . . . . . . . . . . 48

              c.     Inmate letters. . . . . . . . . . . . . . . . . . . . . . . 48

              d.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      2.     Prible does not show that Beckcom lied
              about the extent of Beckcom's contacts with
              the prosecutor. . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      3.     Prible does not show that Beckcom misled
              jurors    in   his    portrayal of Nathan
              Foreman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

II.   On His Claim That the State Suppressed Evidence That
      Beckcom and Foreman Were Part of a Snitch Ring, Prible Is
      Entitled to No Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

      A.   Because the state court dismissed the claim on an
            adequate and independent state-law ground, the
            claim is defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

      B.   Nothing shows the State withheld favorable
            evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## TABLE OF CONTENTS, con't.

1.  Inmate letters. . . . . . . . . . . . . . . . . . . . . . . . . . . 59

2.  Herrero files . . . . . . . . . . . . . . . . . . . . . . . . . . 62

3.  Foreman records . . . . . . . . . . . . . . . . . . . . . . . 63

4.  Carl Walker, Jr., identification . . . . . . . . . . . . . . 65

5.  *Brady* conclusion . . . . . . . . . . . . . . . . . . . . . . . 67

III.  The State Did Not Surreptitiously Use an Agent to Question Prible after the Right to Counsel Had Attached. . . . . . . . . . . . 67

A.  The claim is defaulted. . . . . . . . . . . . . . . . . . . . . . . . 67

B.  The record does not show that when Beckcom spoke with Prible, Beckcom was a state agent. . . . . . . . 68

IV.  On Certain Ineffective-Assistance Claims, Prible Is Entitled to No Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

A.  The claim is barred by the statute of limitation. . . . . . . 72

B.  Prible's *Massiah*-related ineffective-assistance claim is defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

C.  Because a *Massiah*-based claim would have been futile, counsel was not ineffective for failing to object. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

D.  Where no trial counsel error is found, a claim of appellate counsel error is groundless. . . . . . . . . . . . . . 81

E.  Prible is entitled to no relief on his complaint about the actions of state habeas counsel. . . . . . . . . . . . 82

V.  On His *Massiah*-Related *Brady* Claim, Prible Is Entitled to No Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

iv

## TABLE OF CONTENTS, con't.

A.   The claim is barred by limitation. . . . . . . . . . . . . . . . . . . . 83

B.   Prible never raised this issue in state court; the
     claim is defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

C.   Prible shows no *Brady* violation. . . . . . . . . . . . . . . . . . . . 84

VI.   Admission of Evidence That Prible Killed the Complainants'
      Three Children Did not Deprive Prible of Due Process. . . . . . . 86

A.   On appeal, the state court found no error. . . . . . . . . . . . . 86

B.   State habeas court found no constitutional
     violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

C.   The state courts applied Supreme Court
     precedent reasonably. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

VII.   As for Rebutting the Evidence from the State's DNA Expert,
       Prible Does Not Show He Received Ineffective Assistance of
       Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

A.   The State's expert testified that physical evidence
     suggested that Prible committed the murders. . . . . . . . . 93

B.   In state habeas proceedings Prible's experts
     challenged the findings and methods of the
     State's expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

     1.   Prible's evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 95

          a.   Johnson affidavit . . . . . . . . . . . . . . . . . . . . 95

          b.   Benjamin affidavit . . . . . . . . . . . . . . . . . . . 95

     2.   State's evidence–defense counsel's
          affidavit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

## TABLE OF CONTENTS, con't.

3.    Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

4.    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

C.    The state habeas court's findings and conclusions were reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

VIII.   Prible Does Not Show That He Was Deprived of an Unbiased Jury by the Systematic Exclusions of Hispanics from the Venire Panel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

A.    State habeas proceedings . . . . . . . . . . . . . . . . . . . . . . 107

1.    Prible's state habeas evidence . . . . . . . . . . . . . . . 107

a.    Hietala affidavit . . . . . . . . . . . . . . . . . . . . . . 107

b.    Stiffler affidavit . . . . . . . . . . . . . . . . . . . . . . 107

2.    State's evidence–Byers's affidavit . . . . . . . . . . . . 107

3.    Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

4.    Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

B.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

1.    Because the state court denied relief based on state-law grounds, federal merits review is precluded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

2.    The evidence does not prove that Hispanics were excluded systematically from the venire panel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

IX.    The Fifth Circuit Does Not Recognize Actual Innocence as a Ground for Federal Habeas Corpus Relief. . . . . . . . . . . . . . . 116

## TABLE OF CONTENTS, con't.

EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

## RESPONDENT THALER'S MOTION FOR SUMMARY JUDGMENT AND AMENDED ANSWER, RESPONDING TO SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS, WITH BRIEF IN SUPPORT

Prible, convicted in a state court of capital murder and sentenced to death, seeks federal habeas corpus relief. *See* 28 U.S.C. § 2254 (West 2012). He has filed his Second Amended Petition for Habeas Corpus. (ECF[1] No. 47.) The respondent, Rick Thaler, here called "the Director," files this motion and response. In this pleading, the Director incorporates all arguments and assertions he made in his previous motion and answer. (ECF No. 12.)

### PRIBLE'S ALLEGATIONS

Prible raises the following grounds for relief:

I.  He was denied due process when the State introduced false and misleading testimony (ECF No. 47 at 60–71);

II.  He was denied due process when the State failed to disclose evidence that Michael Beckcom and Nathan Foreman were part of an organized attempt to secure favors in return for fabricating false confessions (*id.* at 71–93);

III.  He was denied the assistance of counsel when the State used agent-informers to gather evidence (*id.* at 93–98);

IV.  He received ineffective assistance when

    A.  trial counsel failed to object to the testimony of Michael Beckcom on grounds that the evidence was gathered through the use of agent-informers (*id.* at 101–02);

---

[1] "ECF" refers to the documents filed in the district court's electronic case-filing system, followed by the document number and, where appropriate, the page number.

    B.     appellate counsel failed to complain about trial counsel's failure to object to Beckcom's testimony on grounds that it was gathered through the use of agent-informers (*id.* at 102–03); and

    C.     state habeas counsel failed to complain about the ineffectiveness of trial and appellate counsel (*id.* at 103);

V.    Prible was denied due process when the State withheld evidence that it was using agent-informers to gather evidence (*id.* at 103–05);

VI.    He was deprived of a fair trial when the state introduced evidence that he killed three children (*id.* at 105–15);

VII.    He received ineffective assistance when trial counsel failed to rebut the testimony of State's expert William Watson (*id.* at 116–17);

VIII.    He was deprived of an impartial jury because the venire panel was not drawn from a fair cross-section of the community (*id.* at 117–24); and

IX.    He is innocent of the crime (*id.* at 124–26).

## EXHAUSTION

Prible either has presented his claims to state court for review or is barred from now doing so. *See Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997). Because he has no additional state remedy available, Prible has exhausted his state-court remedies. *See Teague v. Lane*, 489 U.S. 288, 297–98 (1989). The Director does not move to dismiss these claims for failure to exhaust those remedies.

## STATEMENT OF THE CASE

Prible was found guilty of capital murder and sentenced to death. (CR[2] 212–13.) The conviction and sentence were affirmed on appeal, *Prible v. State*, 175 S.W.3d 724 (Tex. Crim. App. 2005), and certiorari review was denied, *Prible v. Texas*, 546 U.S. 962 (2005). His first state habeas application, *Ex parte Prible*, No. WR-69328-01, was denied on the merits; two additional pro se applications, Nos. WR-69328-02 & 03, were dismissed without a consideration of the merits, *Ex parte Prible*, 2008 WL 2487786 (Tex. Crim. App. June 18, 2008) (unpublished), and certiorari review was denied, *Prible v. Texas*, 129 S. Ct. 1307 (2009).[3] Prible then filed his first federal habeas petition. (ECF No. 7.) After the Director answered (ECF No. 12), this Court held proceedings in abeyance to allow Prible to return to state court to present previously unpresented claims. (ECF No. 23.) Prible's fourth state application also was dismissed as abusive. *Ex parte Prible*, No. WR-69,328-04, 2011 Tex. Crim. App. Unpub. LEXIS 829 (Nov. 2, 2011). He now returns to this Court with an amended petition. (ECF No. 47.)

---

[2] "CR" refers to the clerk's record of papers filed in the trial court followed by the page number.

[3] In state court Prible also sought and was refused additional DNA testing. *State v. Prible*, No. 921,126 (351st Dist. Ct., Harris County, Tex. Aug. 11, 2006). The Court of Criminal Appeals affirmed that denial, *Prible v. State*, 245 S.W.3d 466 (2008), and certiorari review was denied, *Prible v. Texas*, 555 U.S. 833 (2008).

## STATEMENT OF FACTS

### I. Facts of the Crime

The facts of the offense are taken from the opinion of the Court of Criminal

Appeals on direct review:

In March and April, 1999, [Prible] committed a series of bank robberies in Houston, Texas. He purportedly planned to use the proceeds of the robberies to go into business with his friend, Esteban ("Steve") Herrera. [Prible's] plan never came to fruition, however, because Steve Herrera and his family were murdered in their home in Houston in the early morning hours of April 24, 1999. [Prible] was the last person seen with Steve at his house prior to the murders.

Steve Herrera's brother, Edward, testified that he and Steve both sold drugs, and he often supplied Steve with drugs. A week before the murders, Edward went to the house that Steve shared with his girlfriend, Nilda Tirado, and their three children. Edward, Steve, and [Prible] played pool and drank beer in Steve's garage that night. When Steve went inside the house, [Prible] told Edward that he and Steve planned to open a bar together. Edward testified that Steve never told him that he had any plans to go into business with [Prible].

Edward saw [Prible] at Steve's house again on the evening of April 21. They played pool in the garage, and Steve went inside the house at one point. While Steve was inside, Edward saw [Prible] take a large amount of money out of his own wallet and count it.

On April 23, Steve paged Edward at 9:00 p.m. and 11:00 p.m. When Edward returned his pages, Steve asked if Edward could get him some cocaine. Steve called Edward from [Prible's] cell phone at 2:00 or 2:30 a.m. and said he was on his way home. Edward received pages again at 3:00 and 4:00 a.m. He spent the night at a friend's house that night, and he did not learn what happened to Steve and his family until the next morning.

4

Steve's brother-in-law, Victor Martinez, testified that he went to Steve's house in his white Ford Escort shortly after 10:00 p.m. on April 23. When he arrived, the garage door was raised and Steve and [Prible] were drinking beer and playing pool in the garage. Sometime around midnight, Nilda opened the door and called to Steve. He walked over to her and they exchanged a few words and a kiss, then she went back inside and the men continued playing pool. During the course of the evening, Victor Martinez heard Steve and [Prible] talk about trying to get some cocaine from Edward.

They decided to go to a nightclub, Rick's Cabaret, at 12:30 a.m., so Steve lowered the garage door, and the three men left in Martinez's car. They arrived at around 1:00 a.m. and left sometime after 2:00 a.m. It took them about fifteen or twenty minutes to drive back to Steve's house. On the way home, Steve used [Prible's] phone to page Edward. When they returned, they talked in front of the house while Steve and [Prible] smoked marijuana, then Steve and [Prible] went inside the garage, and Martinez drove home. Martinez testified that when he left, the garage door was raised and Steve and [Prible] were playing pool. Martinez arrived home at about 3:30 a.m. and went directly to bed. He testified that he never saw [Prible] enter Steve's house that evening.

Gregory Francisco, who lived across the street from Steve Herrera, testified that he saw Steve in his driveway with two of his children at 4:30 or 5:00 p.m. on April 23. At 9:00 or 9:30 p.m., he noticed that Steve's garage door was lowered to shoulder-level and that there were people inside the garage listening to music. Some vehicles were parked in front of the house, including a white car that looked like a Ford Escort. He went to bed at about 12:30 a.m. When he went outside at approximately 6:00 a.m. the next morning, Steve's garage door was lowered and he saw smoke and heard loud music coming from the house. No one answered the front door when Francisco and his wife rang the doorbell, so they tried to enter the house through the side door to the garage. The door was hot, and there was smoke coming out from under it. Francisco kicked the door open and saw Steve lying face-down in a pool of blood inside the garage, so he told his wife to call 911. Firefighters arrived shortly thereafter and found Nilda's badly burned body on a couch in the living room.  The fire was confined to the couch area and was

5

merely smoldering at the time, but the house was filled with smoke. Firefighters also discovered the bodies of Steve's seven-year-old daughter, Valerie Herrera, and Nilda's seven-year-old daughter, Rachel Elizabeth Cumpian, in one bedroom, and the body of Steve and Nilda's twenty-two-month-old daughter, Jade Herrera, in the master bedroom. The children's bodies were covered in soot, and they appeared to have died from smoke asphyxiation.

Investigator Marshall J. Kramer testified that flammable liquids were used to deliberately set the fire in the living room. A burned red plastic gasoline container, an aerosol can, and a roll of paper towels soaked in a flammable liquid were on the living room floor, and a burned one-gallon metal can was on the couch next to Nilda's body. The metal can contained Kutzit, an extremely flammable liquid that is normally used to dissolve tile glue. Other cans of Kutzit were found in lockers inside the garage and in a storage shed behind the house. Nilda was lying face-down on the couch, and there was blood around her head. Her body was "charred from the exterior." Kutzit or gasoline had been poured on her body and the couch. Police found a spent bullet under the carpet where the couch was located. There were no signs of forced entry, and Steve had a wallet in his back pocket that contained approximately $900.

The medical examiner who performed the autopsies testified that the three children died from inhaling toxic levels of soot and carbon monoxide. Steve's death was caused by a penetrating gunshot wound to the back of his neck which severed the connection between his brain and spinal cord. The stippling around the wound indicated that the gun was fired within eighteen inches of his body. There was no exit wound and the bullet was recovered from his body. Nilda died from a perforating gunshot wound to her neck that severed her spinal cord. The bullet entered her neck on the back right side and exited the front left side. She suffered severe burns along the entire back side of her body that were consistent with a flammable substance being poured on her body and set afire after she had been shot. Sperm cells were found on oral, vaginal, and anal swabs taken during a forensic exam of her body. Steve's DNA was consistent with the DNA on the vaginal and anal swabs. [Prible's] DNA was consistent with the DNA on the oral swab.

6

[Prible] gave two written statements to police. In his first written statement, he said Steve picked him up at 8:00 or 9:00 p.m. on April 23, and they went over to Steve's house to play pool and drink beer in the garage. Martinez joined them at about 11:00 p.m. They later went to Rick's Cabaret in Martinez's car and stayed until 2:00 a.m. Martinez drove them back to Steve's house, where they again played pool and drank beer, and Martinez left twenty or thirty minutes later. At some point, Nilda opened the door leading into the garage and gave Steve "a look," so [Prible] "knew it was time to leave." Steve drove him home in his black Honda Prelude at 4:00 a.m., and he went straight to bed.

[Prible] later changed his story when a detective asked him what he would do if his semen was found in or on Nilda's body. In his second written statement, he added that he had been having an affair with Nilda. He said that he went inside the house at one point during the evening while Steve remained in the garage. He and Nilda went into a bathroom, and he bent her over the sink and began having sex with her. They stopped because they mistakenly thought they heard Steve enter the house. Then Nilda began "sucking [his] dick and jacking [him] off," and he did not remember "if [he] came or not." He went back into the garage afterwards and told Steve to take him home. He claimed that he and Nilda had only "messed around" and kissed on prior occasions, and that night was the first time they had sex. He said he had never told anyone about their affair because it would ruin Nilda's reputation.

Police searched the home where [Prible] lived with his parents and found guns, boxes of ammunition, and receipts for guns and ammunition. Police also found a semiautomatic-pistol magazine that did not fit any of the weapons that were recovered. Firearms examiner Matthew Clements examined the spent bullet found in the living room and the bullet recovered from Steve's body and concluded that they were fired from the same weapon. Clements testified that the magazine recovered from appellant's home was

7

identical in design to a magazine for a nine-millimeter Ruger P85 pistol.[4]

In May 1999, shortly after the murders of Steve Herrera and Nilda Tirado, [Prible] confessed to committing March and April bank robberies, and he was convicted in federal court in September 1999. Michael Beckcom, a fellow inmate at the federal prison in Beaumont, testified against [Prible] at trial. Beckcom testified that [Prible] told him that he committed the murders. [Prible] explained to Beckcom that he killed Steve because he "took $250,000 of [his] hard-earned money."[5] He said that he and Steve argued about the money in the "pool room," and that he thought Steve was going to kill him, so he shot him in the back of the head. Nilda came into the garage during the argument and ran inside the house to call the police. He shot Nilda in the back of the head and she fell face down onto the couch. He looked for the money inside the house and could not find it. He stated that he set the fire to cover his tracks, and that the children were in bed and died from smoke inhalation. He bragged to Beckcom, "Anybody that can go into a house and take out a whole family and get out without being seen is a bad mother fucker, and I'm that mother fucker."

Beckcom testified that [Prible] told him that the police had DNA evidence, but Steve and Nilda had an open relationship, and it was common knowledge that he and Nilda were having an affair. He said police were looking for a .38 caliber pistol, but that gun was not the murder weapon, and it was "clean" because he had sold it to

---

[4] Although it is clear from the evidence presented at trial that Steve and Nilda were both killed with the same weapon, it is unclear what exact type of gun was used. The recovered bullets were consistent with several types of firearms, including a Ruger P85 and a .38 caliber pistol. The murder weapon was never recovered. [Footnote in the original.]

[5] The evidence presented at trial showed that the amount of money that appellant obtained in the bank robberies was far less than $250,000. Detective Shane McCoy testified that appellant took $9,690 in the first robbery, $12,914 in the second robbery, $9,571 in the third robbery, $3,979 in the fourth robbery, $3,175 in the fifth robbery, and $6,660 in the sixth robbery, for a total of $45,929. [Footnote in the original.]

"some girl." He also stated that police found two drops on his shoe that looked like blood but were actually catsup.

Angela Serna Alvarez and Cynthia Garcia Flores, two of Nilda's closest friends, testified that they had no knowledge of the alleged affair. Moreover, Ms. Alvarez testified that Nilda once told her that she did not like [Prible] and that he gave her "the creeps." Ms. Flores also testified that Nilda once told her that she was tired of [Prible] being at her house and that he gave her "the creeps." Vincent Flores, Cynthia's husband, testified that he did not believe that Steve and Nilda had an open relationship, and he said that Steve once got angry at him for "putting a move" on Nilda.

During the defense case-in-chief, [Prible's] mother, Sandra Prible, testified that she met Beckcom while visiting [Prible] at the federal prison, after she had sent [Prible] a copy of the probable-cause affidavit in his capital-murder case. J. Brent Liedtke, a former attorney and fellow inmate at the federal prison, testified that he saw the copy of the probable cause affidavit when he helped [Prible] with his case, and he saw [Prible] show it to other inmates as well. Brian Maurice Fuller, a former federal prison inmate, testified that, in his opinion, Beckcom was opportunistic and untruthful. Christine Bartolla, [Prible's] friend, testified that she bought a .38 Special Taurus revolver from [Prible] in November 1998 and returned the gun to his father in November 2001. [Prible's] former neighbor, Christina Gurrusquieta, testified that she looked out her window on the night of the murder and saw [Prible] and Steve talking in [Prible's] driveway sometime after 1:00 a.m., then Steve left and [Prible] went inside the house.

*Prible v. State*, 175 S.W.3d at 726–29.

## II.   Facts at Sentencing

At the sentencing phase, Prible's ex-wife, Dawn Huglett, testified about their marriage. She said he was violent. (29 RR[6] 8.) He once grabbed her by the hair and threw her to the ground. (29 RR 16). Another time, when he had been drinking, she said, he took his deer rifle out of the closet and walked around saying, "I'll kill you. I'll kill myself, you stupid bitch." (29 RR 14.) Once after she had put him on the phone with a bill collector, he said, "Don't you ever put me on the phone when those people again. You talk to those people. You're so fucking stupid." (29 RR 18.) Often, she said, he would get angry with someone and would say, "I could kill their whole fucking family and burn their house, and nobody would ever know it was me." (29 RR 19.)

Arnold D. Wolfe, a Harris County sheriff's deputy with the department's background recruiting division, said that Prible applied for a position but was rejected due to bad credit. (29 RR 38.) Wolfe said when told of his rejection, Prible "became upset, at which time I had to tell him to calm down because he was getting upset to a point where he was coming out of his chair toward me at the desk." (29 RR 38.)

---

[6] "RR" refers to the reporter's record of the trial testimony, preceded with the volume number and followed by the page number.

Ernest J. Carnie, whose brother went into the asphalt business with Prible, said that after the business failed Prible came over to Carnie's house one evening and threatened a relative with a pistol. (29 RR 43–44.)

Several bank employees testified about the robberies during which Prible threatened them, some with a bomb and some with a gun. (29 RR 62, 88, 107, 118, 127.)

## PROCEDURAL BACKGROUND

### I.   Appeal and First Three State Habeas Applications

#### A.   Appeal

On appeal, Prible's conviction and sentence were affirmed, *Prible v. State*, 175 S.W.3d 724, and certiorari review was denied, *Prible v. Texas*, 546 U.S. 962.

#### B.   First state application

In his first state habeas application, No. WR-69,328-01, with counsel representation Prible raised the following issues:

• He received ineffective assistance when trial counsel offered additional evidence of an extraneous offense (01 SHCR I: 5[7]);

• He received ineffective assistance when trial counsel failed to rebut effectively the testimony of state's expert William Watson (*id.*);

---

[7] "01 SHCR" refers to the clerk's record of the papers filed in connection with Prible's state habeas application, No. WR-69,328-01, followed by the volume number in Roman numeral and the page numbers in Arabic.

• He was deprived of an impartial jury because the venire was not drawn from a fair cross-section of the community (*id.* at 6);

• He received ineffective assistance when appellate counsel failed to raise a claim challenging the constitutionality of the Texas death-penalty system (*id.*); and

• He received ineffective assistance when appellate counsel failed to raise a claim challenging the constitutionality of Article 37.071, sec. 2(e) and (f), of the Code of Criminal Procedure regarding the burden of proof (*id.*)

After Prible filed this first state application with the aid of counsel and while the application was pending, Prible, acting pro se, file two additional applications.

## C.   Second state application

In his second state application, No. WR-69,328-02, filed pro se, Prible alleged the following:

• The prosecutor withheld evidence regarding her ties to Michael Beckcom and other jail house informers (01 SHCR II: 384); and

• The prosecutor, in violation of *Massiah v. United States*, 377 U.S. 201 (1964), used state agents as informers (*id.* at 384–85).

12

### D.    Third state application

In this third state application, No. WR-69,328-03, also filed pro se Prible alleged the following:

• Prible received ineffective assistance when trial counsel fails to bring to the attention of the trial court or  the client that the prosecutor used the same ring of informers to prosecute another defendant, Hermilio Herrero (*id.* at 412–13); and

• Prible received ineffective assistance when trial counsel failed to secure the testimony of an otherwise unidentified former FBI agent who could have told the jurors that the victim Steve Herrero owed money to drug dealers and that the drug dealers were the killers (*id.* at 413–14).

### E.    State court resolution

In connection with Prible's initial state application, *Ex parte Prible*, No. WR-69,328-01, the convicting court issued findings and conclusions (01 SHCR II: 450–72), which the Court of Criminal Appeals adopted when it denied relief. *Ex parte Prible*, 2008 Tex. Crim. App. Unpub. LEXIS 449, at *1. As for Prible's two pro se applications, Nos. WR-69,328-02 and -03, the Court of Criminal Appeals construed them as subsequent applications, found they did not meet the requirement for merits reviews, *see* Tex. Code Crim Proc. art. 11071, § 5 (West

13

2012), and dismissed them as abuses of the writ. *Ex parte Prible*, 2008 Tex. Crim. App. Unpub. LEXIS 449, at *1–*2.

## II.   First Two Federal Petitions

Prible has filed three federal petitions: a timely original petition (ECF No. 1); a first amended petition (ECF No. 7); and a second amended petition (ECF No. 47).

In his original petition, Prible alleged the following:

· He was deprived of due process by the admission of evidence regarding the deaths of the complainants' children (ECF No. 1 at 5–17);

· He received ineffective assistance when trial counsel failed to rebut effectively the testimony of State's expert William Watson (*id.* at 17–18);

· He was deprived of an impartial jury because the venire was not drawn from a fair cross-section of the community (*id.* at 18–27);

· He was deprived of the assistance of counsel when the State used agent-informers to gather evidence against him (*id.* at 27–32);

· He was deprived of due process when the State knowingly used false and misleading testimony against him (*id.* at 32–35);

· He received ineffective assistance when trial counsel failed to object to the testimony of Michael Beckcom on grounds that the evidence was gathered by agent-informers (*id.* at 37–38);

14

• He received ineffective assistance when trial counsel failed to object to the testimony of Michael Beckcom on grounds that it was false and misleading (*id.* at 38–39);

• He received ineffective assistance when appellate counsel failed to raise on direct review the two preceding claims regarding the performance of trial counsel (*id.* at 39);

• He was deprived of due process when the State withheld evidence favorable to the defense, to-wit, the nature of the arrangement among inmates Michael Beckcom and Nathan Foreman, and the prosecutor (*id.* at 39–44); and

• Prible is innocent of the charged crime (*id.* at 44–46).

In his First Amended Petition, Prible repeated those issues raised in his original petition. (ECF No. 7.)

After Prible filed his First Amended Petition (ECF No. 7), the Director sought summary judgment. (ECF No. 12.) In that motion, the Director alleged that some of Prible's claims had never been presented to the state court system and were unexhausted but nonetheless defaulted. (*Id.* at 46–48, 53–54, 64–65, 67–68, 71.)

Prible asked this Court to stay and hold in abeyance federal proceedings to allow him to return to state court and to present previously unpresented

15

claims. (ECF No. 17 at 21–23.) This Court stayed proceedings to allow Prible to return to state court. (ECF No. 23.)

## III.   Prible's Fourth State Application

In his fourth state application, Prible alleged the following:

• He was denied his right to counsel when the State used agent-informers to gather evidence against him after the right to counsel had attached (04 SHCR (before remand)[8] 32–38);

• He was deprived of due process when the State sponsored false and misleading testimony (*id.* at 39–41);

• He was deprived of due process when the State withheld evidence of the nature of the arrangement among Beckcom, Foreman and the prosecutor (*id.* at 41–48);

• He was deprived of due process when the State allowed Beckcom to mislead the jurors about the existence and extent of the benefits he expected to receive for testifying against Prible (*id.* at 48–49); and

• Prible is innocent of the charged crime (*id.* at 50–51).

The Court of Criminal Appeals remanded the application to the convicting court to determine "whether the factual basis for these claims was unavailable

---

[8]  "04 SHCR (before remand)" refers to the clerk's record of the papers filed in connection with Prible's fourth state habeas application, before the case was remanded to the convicting court, followed by the page numbers.

on the dates that applicant filed his previous applications." *Ex parte Prible*, 2010 Tex. Crim. App. Unpub. LEXIS 730, at *2. The court said that Prible "shall have the opportunity to show when and how he obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity." *Id.* The convicting court was to determine whether "any of the claims satisfy the requirements of Article 11.071, § 5" and was, if appropriate, to enter factual findings and credibility determinations. *Id.*

Only if the convicting court determined that any of the claims satisfied the requirements of Section 5 was the court to address the claims on the merits. *Id.*

The convicting court held an evidentiary hearing in which it took testimony from Mollie Steinle, an investigator who worked with Prible's trial counsel (04 SHRR II: 4–28[9]); Rudy Vargas, an investigator who worked with defense attorney Norm Silverman, who represented another defendant, Hermilio Herrero (04 SHRR II: 29–31); Roland B. Moore, III, Prible's initial state habeas counsel (04 SHRR II: 31 through 04 SHRR III: 52); and Kurt Wentz, one of Prible's trial attorneys (04 SHRR I: 52–62).

---

[9] "04 SHRR" refers to the reporter's record of the evidentiary hearing held in connection with Prible's fourth state habeas application followed by the volume number in Roman numerals and the page numbers in Arabic.

The convicting court found the following:

• Prible raised five claims alleging a conspiracy between the lead prosecutor and several federal inmates (04 SHCR (after remand) II: 798, para. 12[10]);

• Prible's theory alleged that the prosecutor provided inmate Nathan Foreman with otherwise-unknown details about Prible's case; that Foreman shared those details with a ring of snitches he recruited to assist the prosecutor in obtaining a false confession from Prible; that Michael Beckcom's trial testimony regarding Prible's confession was perjured and "rendered him a state agent" because the false confession was based upon information Beckcom received from the lead prosecutor by way of Foreman (*id.* at 799, para. 13);

• Prible's claims were based largely upon the statements of Carl Walker, Jr., a former inmate of the Beaumont federal prison and purported associate of Prible (*id.*, para. 14);

• According to Walker's statements offered with Prible's application, Walker knew and spoke with Prible a few times; Walker knew Foreman and Beckcom, who were allegedly conspiring to elicit a false confession from Prible; Walker was present during the planning of the alleged conspiracy; Walker was

_____

[10] "04 SHCR (after remand)" refers to the papers filed in connection with Prible's fourth state habeas application after remand, followed by the volume number in Roman numerals, the page numbers in Arabic, and the paragraph number.

18

present and saw Prible's interaction with the co-conspirators, including Foreman and Beckcom; Walker warned Prible to be careful about the company he kept; and Walker did not believe Prible confessed to Beckcom his involvement in the murder (*id.*, para. 15);

• Walker's statements proffered in support of Prible's claims consisted "almost entirely of hearsay and speculation and contain[ed] no direct evidence of [Prible's] conspiracy theory"; the statements were unpersuasive and had little evidentiary value with respect to the validity of Prible's claims regarding the alleged conspiracy (*id.* at 799–800, para. 16);

• Prible presented no evidence that Beckcom had recanted his testimony regarding Prible's confession (*id.* at 800, para. 17);

• Beckcom denied Prible's allegation that he, Beckcom, was supplied with information about the case from Foreman or the prosecutor (*id.*, para. 18);

• During the preparation of Prible's first state habeas application, counsel Roland Moore investigated Prible's conspiracy theory; Prible provided counsel with "very limited" information regarding the identity of Walker; counsel was unable to find Walker before filing the initial state application; and counsel in Prible's initial application, did not raise Prible's conspiracy theory or allege Walker as a witness (*id.* at 800–01, para. 20);

19

• A layperson, Ward Larkin, undertook the investigation of Prible's case and provided counsel the identity of Walker in 2005 (*id.* at 801, para. 21);

• Based upon Prible's proffered statements of Walker upon which Prible relied to support the merits of his claims, the factual basis for the claims was available when Prible filed his first state application in November 2004 (*id.*, para. 22);

• Acting pro se, Prible filed a subsequent application that was received by the Harris County District Attorney's office on July 6, 2007,[11] urging as a ground for relief his conspiracy theory and naming Walker as a potential witness (*id.*, para. 23);

• Prible raised the conspiracy theory in his first subsequent application and identified Walker by name and federal inmate register number (*id.*, para. 24);

• In his first subsequent application, Prible indicated that Walker had come forward with information about the conspiracy theory (*id.*, para. 25);

---

[11] The pleading was filed June 20, 2007, with the convicting court. The Director assumes that this pleading was construed by the state courts as writ No. 69,328-02. (01 SHCR II: 382–90.) Prible acting pro se on November 16, 2005, filed a document captioned "Supplemental Writ." (01 SHCR I: 275–78.) The Director assumes that this "Supplemental Writ" was not construed as subsequent writ application.

• Prible's conspiracy theory and the identify of Walker were available when Prible filed his first subsequent application (*id.* at 801–02, para. 26, *citing* Tex. Code Crim. Proc. art. 11.071, § 5(a)(1));

• Prible's first subsequent application was dismissed by the Court of Criminal Appeals as abusive and was, for purposes of Art. 11.071, section 5(a)(1), deemed a "previously considered writ"(04 SHCR (after remand) II: 802, para. 27);

• Acting pro se, Prible filed a second subsequent application that was received by the Harris County District Attorney's office on August 20, 2007[12] (*id.*, para. 28);

• In that second subsequent application, Prible again raised the conspiracy theory (*id.*, para. 29);

• In that application, Prible indicated that a witness had contacted trial counsel, Terry Gaiser, with information about the alleged conspiracy (*id.*, para. 30);

• Prible's conspiracy theory and the identity of Walker were available when Prible filed his second subsequent application (*id.*, para. 31);

---

[12] The pleading was filed August 17, 2007, in the convicting court. The Director assumes that the pleading was construed by the state courts as writ No. 69,328-03. (01 SHCR II: 411–15.)

• That application further indicated that a factual basis for his conspiracy theory may have been available at the time of trial (*id.*, at 803, para. 32);

• Prible's second subsequent application was dismissed by the Court of Criminal Appeals as abusive and was, for purposes of Art. 11.071, section 5(a)(1), deemed a "previously considered writ" (*id.*, para. 33);

The convicting court concluded the following:

• Prible failed to establish, as required by Art. 11.071, section 5(a)(1), that the factual basis for his claims was unavailable when he filed his three previous applications (*id.*, para. 34); and

• Prible's application was barred by Art. 11.071, section 5(a)(1) (*id.*, para. 35).

The Court of Criminal Appeals reviewed the recommendations of the convicting court, determined Prible's allegations failed to satisfy the requirements of Article 11.071, section 5(a), and dismissed the application as abusive. *Ex parte Prible*, 2011 Tex. Crim. App. Unpub. LEXIS 829, at *2 (citing Tex. Code Crim. Proc. art. 11.071, § 5(c)).

## IV.   Second Amended Federal Petition

In his Second Amended Petition, Prible raises those claims listed above in "Prible's Allegations."

## INDEPENDENCE AND ADEQUACY OF STATE-LAW DEFAULT

Prible alleges that the state court's reliance on the abuse-of-the-writ doctrine does not satisfy the federal default standard. (ECF No. 47 at 19–27.) He makes his argument in a stand-alone section of his petition without express reference to one of his enumerated claims. The Director also will address his argument in a stand-alone section not associated with a specific enumerate claim.

## I.  A State-Court Dismissal under Article 11.071, section 5(a)(2), of the Code of Criminal Procedure Is Independent of Federal Law.

Prible notes that the Court of Criminal Appeals dismissed as abusive his June 7, 2004 (01 SHCR I: 275-78) and his August 17, 2007 (*id.* at II: 382–90) pro se pleadings for failure to meet the requirements of Article 11.071, section 5(a), of the Code of Criminal Procedure. (ECF No. 47 at 19–21.) *See Ex parte Prible*, 2008 Tex. Crim. App. Unpub. LEXIS 449, at *1–*2. The Court, he argues, did not specify whether it dismissed the pleadings under section 5(a) subparagraph (1) or subparagraph (2). (ECF No. 47 at 20.) He argues that while subparagraph (1) ordinarily is an adequate and independent state-law ground, subparagraph (2) relies on federal constitutional law and is therefore not "independent" of federal law. (*Id.*)

Federal courts will not review a question of federal law where the state-court judgment relies upon a state-law ground that is independent of the federal

23

question and is adequate to support the state court judgment. *See Coleman v. Thompson*, 501 U.S. 722, 726 (1991). "A state procedural rule operates independently of the merits of the federal claim when a federal court could reverse the state court's disposition of any federal-law issues presented by the petition and, because of the state court's resolution of the state-law issues, the outcome of the case would not change." *Rocha v. Thaler*, 626 F.3d 815, 821 (5th Cir. 2010), *cert. denied*, 132 S. Ct. 397 (2011). Under Section 5 of Article 11.071 of the Code of Criminal Procedure,

> (a) [i]f a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; [or]

> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt . . . .

Where the state court dismisses a claim in a subsequent application as an abuse of the writ, that dismissal can "qualify as an independent and adequate state-law ground that functions as a procedural bar to federal-court merits review of habeas claims." *See Rocha*, 626 F.3d at 829. And section 5(a) is a

codification of the judicially created abuse-of-the-writ doctrine. *See id.* Prible argues that in this instance, section 5(a), subparagraph (1) is independent of federal law but that subparagraph (2) is not. (ECF No. 47 at 20.) He errs.

The Director agrees with Prible that in this circumstance, subparagraph (1) is independent of federal law. But subparagraph (2) also is independent.

"In the absence of a clear indication that a state court rested its decision on federal law," a federal court will not presume that the state-court decision rested upon such law. *See Balentine v. Thaler*, 626 F.3d 842, 852–53 (5th Cir. 2010) (citing *Coleman v. Thompson*, 501 U.S. 722, 739–40 (1991)), *cert. denied*, 131 S. Ct. 2992 (2011). Nothing in the decision of the Court of Criminal Appeals indicates, clearly or opaquely, that the court rested its dismissal upon federal law. A reviewing court must, therefore, presume the state court rested its decision upon state law independent of federal law. *See id.*

Citing *Ex parte Reed*, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008), Prible argues that because Texas Legislature adopted subparagraph (2) to incorporate into state law the Supreme Court's decision in *Schlup v. Delo*, 298 U.S. 195 (1995), that subparagraph is not independent of federal law. Again, he errs. "A state court does not undermine the independent state-law character of its procedural-default doctrine by using a federal standard to determine whether an otherwise defaulted successive habeas application should be permitted to

bypass a procedural bar." *Rocha*, 626 F.3d at 823–24 (interpreting Article 11.071, section 5(a)(3), applying federal innocent-of-the-death-penalty standard). The federal "innocence" claim under *Schulp* is not a constitutional claim but is, rather, a gateway through which Prible must pass to have his otherwise barred constitutional claim considered on the merits. *See id.* at 824. A court's consideration of Prible's gateway-innocence claim precedes the court's consideration of his federal constitutional claim not just temporally but analytically. *Id.* Only if Prible can show that he is actually innocent can a federal court proceed to consider the merits of the alleged underlying constitutional violation. *See id.* If he cannot establish his actual innocence, a federal court cannot, and does not, consider the merits of his habeas claim. *See id.* Thus follows the state court. Only if Prible can show that he is innocent, can the state court, under section 5(a)(2), review the merits of his otherwise barred constitutional claim. Hence, when the Court of Criminal Appeals dismissed his claims under section 5(a) had the court dismissed the claim under subparagraph (2), the dismissal would not have involved a review of his claim on the merits and would have been independent of federal law. *See Rocha*, 626 F.3d at 823–24.

## II.    Prible's Second and Third State Habeas Applications Were Dismissed Because They Failed to Meet the "Unavailability" Requirement.

Prible argues also that those claims raised in his second and third state applications, Nos. WR-69,328-02 and -03, were dismissed not because they failed

to meet the unavailability requirement of section 5(a)(1) but because the state court determined that he was not entitled to hybrid representation. (ECF No. 47 at 21–25.) He argues that because this hybrid-representation dismissal is not regularly applied by the state courts, the dismissal is not adequate to support the state court judgment. *See Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (stating that state procedural ground not adequate unless procedural rule followed strictly or regularly). Hence, he argues, the dismissal does not block federal merits review.

The record and state law do not support Prible's claim. Under state law, a habeas application is due not later than the 180th day after the date on which the convicting court appointed habeas counsel or not later than the forty-fifth day after the State filed its original brief on appeal, whichever is later. Tex. Code Crim. Proc. art. 11.071, § 4(a) (West 2012). The convicting court may grant a ninety-day extension. Art. 11.071, § 4(b). An application filed after the deadline is untimely. Art. 11.071, § 4(c). If a subsequent application is filed after an initial application has been filed, the state court may not grant relief on or review the merits of a subsequent application unless the application meets the requirement set out in Article 11.071, section 5(a), of the Code of Criminal Procedure. If an amended or supplemental application is not filed within the deadline period for

27

filing the initial application under section 4(a) or (b), the state court shall treat the application as a subsequent application. Art. 11.071, § 5(f).

After the State filed its brief on direct review on July 7, 2004, *Prible v. State*, No. 74,487 (Tex. Crim. App.) (State's Appellate Br. at cover), Prible had forty-five days, until August 21, to file his habeas application. *See* Art. 11.071, § 4(a). After he received a ninety-day extension, *see* Art. 11.071, § 4(b) (01 SHCR I: 33–35), he timely filed his application on the final date of the extension period, November 19, 2004 (01 SHCR I: 2). When Prible, acting pro se, filed his additional petitions on June 20, 2007 (01 SHCR II: 382–90), and August 17, 2007 (01 SHCR II: 411–15), after the initial application had been filed, the state court was bound to construe the pleadings as subsequent applications. *See* Art. 11.071, § 5(a), (f). Hence, when the state court dismissed the applications as abusive, *see Ex parte Prible*, 2008 Tex. Crim. App. Unpub. LEXIS 449, at *1–*2, the court did so not because Prible acted pro se but because he acted after the initial filing deadline. Even had Prible made his 2005 and 2007 filings acting through counsel, the state court would have been required to construe the pleadings as subsequent applications.

## III.   The State Court's Dismissal of Prible's Fourth State Application Acts as an Adequate and Independent State Bar Precluding Federal Review.

Prible argues that when the Court of Criminal Appeals dismissed his fourth state application as abusive, *Ex parte* Prible, 2011 Tex. Crim. App.

28

Unpub. LEXIS 829, at *3, the dismissal does not bar federal merits review. (ECF No. 47 at 25–26.) The record does not support his claim. To be entitled to merits review, a subsequent state application must show that the claim could not have been raised in a prior application "because the factual or legal basis for the claim was unavailable" at the time the applicant filed his previous writ or writs. *See Ex parte Blue*, 230 S.W.3d 151, 153 n.2 (Tex. Crim. App. 2007) (citing Tex. Code Crim. Proc. art. 11.071, § 5(a)(1)).

After Prible filed his fourth state application, the Court of Criminal Appeals remanded the application to the convicting court for an evidentiary hearing to allow Prible "to show when and how he obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity." *Ex parte Prible*, 2010 Tex. Crim. App. Unpub. LEXIS 730, at *2. Only if Prible demonstrated prior unavailability was the convicting court to address the claim on the merits. *Id.*, 2010 Tex. Crim. App. Unpub. LEXIS 730, at *3. After the evidentiary hearing, the convicting court concluded that Prible had failed to establish that when he filed his three prior applications the factual bases of his claims were not available. (04 SHCR (after remand) II: 803, para. 34, *citing* Tex. Code Crim. Proc. art. 11.071, § 5(a)(1).) After the Court of Criminal Appeals reviewed the convicting courts recommendations, it dismissed the application as abusive. *Ex parte Prible*, 2011 Tex. Crim. App. Unpub. LEXIS

829, at *3. Because the convicting court determined that Prible failed to meet the unavailability requirement and did not address the merits of his claims, one must presume the Court of Criminal Appeals also rejected the claims based upon the availability issue and not upon the merits. Hence, the dismissal of Prible's fourth application by the Court of Criminal Appeals rested upon state-law grounds independent of federal law.

## STANDARDS OF REVIEW

### I.   The Record Shows That the Director Is Entitled to Judgment.

A party moving for summary judgment bears the burden of informing the court of the basis for its motion and identifying pleadings and other record evidence that show the absence of any genuine issues of material fact. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 191 (5th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party makes the required showing, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).  Here, the record developed in the state courts shows that the Director is entitled to judgment as a matter of law.

### II.   Where a Claim Was Adjudicated on the Merits in State Court, this Court Determines Only Whether That Decision Was Reasonable.

A federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the

state court (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (citing 28 U.S.C. § 2254(d)(1)–(2)).

A state-court decision is contrary to established federal law if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent, yet reaches an opposite result. *(Terry) Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Alternatively, a state court applies clearly established federal law unreasonably if it correctly identifies the governing precedent but applies it to the facts of a particular case unreasonably. *Id.* at 407–09.

A federal court's inquiry into unreasonableness should be objective. *Williams*, 529 U.S. at 409–11. A court should not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Id.* Rather, regardless of whether the reviewing court would reach the same conclusion, relief is merited only where the state-court decision is both incorrect

31

and objectively unreasonable. *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002); *(Terry) Williams*, 529 U.S. at 411.

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The reviewing court tests "not every jot" of the state court's reasoning but the state court's ultimate decision only. *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"). Reasonableness does not require citation or even awareness of any particular Supreme Court precedent, so long as the result of the state-court decision does not contradict that precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

The state court's factual findings shall be presumed to be correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28

32

U.S.C. § 2254(e)(1). The presumption applies not only to explicit findings of fact, but also to those unarticulated findings that are necessary to the state court's conclusions of mixed law and fact. *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## ANSWER

### I. On His Claim That the Prosecution Sponsored False and Misleading Evidence, Prible Is Entitled to No Relief.

Prible alleges he was deprived of due process when the prosecutor presented testimony that was known to be false or misleading. (ECF No. 47 at 60–71.) *See Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Prible alleges that Beckcom testified falsely (1) that he received information about the charged crime from Prible only (*id*. at 61, 63–65, 68–69), (2) about the extent of the contact he had with the prosecutor (*id*. 61, 65–68), and (3) when he portrayed Nathan Foreman as a "disinterested" witness (*id*. at 70). To prove Beckcom's falsehoods, Prible offers an unsworn transcript of a recorded conversation between inmate Carl Walker, Jr., and Prible's federal habeas counsel (ECF No. 47-1); documents that purport to be letters written by inmates to the prosecutor (ECF No. 47-3 at 2–3, 6–7, and 9); and documents that Prible says prove that Foreman was not "disinterested" (ECF No. 47 at 70).

A.      Prible's *Giglio/Napue* claims are defaulted.

1.      **The state court dismissed the claims on grounds adequate to support the judgment and independent of federal law.**

When Prible raised this legal theory in state habeas proceedings, the state court dismissed the claim on state procedural grounds. Hence, federal merits review is barred.

Where the last state court to consider the claim based its denial of relief on a state procedural default expressly and unambiguously, federal review of the habeas claim is barred. *Harris v. Reed*, 489 U.S. 255, 161–62 (1989). Federal courts will not review a question of federal law where the state-court judgment relies upon a state-law ground that is independent of the federal question and is adequate to support the state court judgment. *See Coleman*, 501 U.S. at 726. Where the Court of Criminal Appeals dismisses a claim as abusive and where that decision rests upon the prior availability of the claim, that dismissal is an adequate and independent bar precluding federal review. *See Rocha*, 626 F.3d at 837.

In his state appeal, *Prible v. State*, No. 74,487 (Tex. Crim. App. Jan. 7, 2004) (Br. for Appellant at 2–4), or in his initial state habeas application (01 SHCR I: 2–24),Prible did not raise a claim based upon this legal theory or these factual predicates. He did raise the legal theory in his original and first amended federal petitions (ECF No. 1 at 33–34 and No. 7 at 34–35) and in his fourth state

34

application (04 SHCR (before remand) 38–41). For factual predicates in state court, though, he complained only that Beckcom lied when he testified that he received information about the crime from Prible only (*id.* at 40–41) and about the existence and extent of the benefits he expected to received in exchange for his testimony (*id.* at 48–49). The Court of Criminal Appeals dismissed the claims on grounds that Prible did not show that the claims were not available when he filed his three previous applications. *Ex parte Prible*, 2011 Tex. Crim. App. Unpub. LEXIS 829, at *2. Because the state court dismissed Prible's claims on procedural grounds, federal review is barred. *See Coleman*, 501 U.S. at 726; *Rocha*, 626 F.3d at 837.

### 2. Because two factual predicates have never been presented to the state courts, they are defaulted.

Prible's claims that Beckcom lied (1) about the nature of the arrangement among Beckcom, Foreman, and the prosecutor and (2) when he portrayed Foreman as a "disinterested" witness are defaulted on additional grounds. (ECF No. 47 at 61, 65–68.)

Federal habeas court may not grant relief on a state prisoner's petition unless the petitioner has exhausted his state-court remedies. 28 U.S.C. § 2254 (b)(1)(A) (West 2012). To exhaust his state-court remedies, the petitioner must have presented the substance of his claim to the state courts fairly. *Nobles*, 127 F.3d at 420 (citing *Picard v. Connor*, 404 U.S. 270, 275–76 (1971)). For a claim

to be exhausted, the state court system must have been apprised of the same facts and legal theory upon which the petitioner bases his assertions. *Picard*, 404 U.S. at 276.  Where a state prisoner seeks federal relief on a claim that has not yet been presented to state courts, the federal habeas court may find the claim barred. *Coleman*, 501 U.S. at 735 n.1. Where a petitioner has failed to exhaust his state-court remedies but where the state court to which he would be required to present his unexhausted claims would now find those claims barred procedurally, federal review is precluded by the federal procedural default doctrine. *See id.*; *Nobles*, 127 F.3d at 423 (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred).

As for Prible's allegation that he was deprived of due process when Beckcom lied about the nature of the arrangement among Foreman, the prosecutor, and himself (ECF No. 47 at 61, 65–68) and when Beckcom portrayed Foreman as a "disinterested witness (*id.* at 70), Prible has never presented these factual predicates to the state court system. (04 SHCR (before remand) 38–41.) Were he to do so now, the Court of Criminal Appeals would find the claims defaulted. *See Nobles*, 127 F.3d at 423. Hence, the claims are defaulted, and federal merits review is barred. *See Coleman*, 501 U.S. at 735 n.1.

36

In the alternative, should this Court construe the factual predicates as being encompassed by the legal theory presented to the state court (04 SHCR (before remand) 38–41), the Director would argue that the claim is nonetheless defaulted because the state court rejected the claim by relying upon an adequate and independent state-law bar. *See id.* at 726.

### 3.    Prible cannot show cause to avoid default.

Prible argues that the default should be excused because he can show cause for the default (ECF No. 47 at 27–52) and resulting prejudice (*id.* at 52). If state prisoner wishes to avoid the procedural bar in federal court, he may do so by showing cause for the default and actual prejudice that is attributable to the default. *See Coleman*, 501 U.S. at 750. The existence of cause for a procedural default ordinarily must turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner also can demonstrate cause with a showing that the legal or factual basis of the claim was not reasonably available. *Id.* Where the petitioner knows the factual basis of the claim, even where he may be unable to produce the best evidence to support the claim, the petitioner does not show cause sufficient to excuse default. *See Robison v. Johnson*, 151 F.3d 256, 263 (5th Cir. 1998); *see also Henderson v. Cockrell*, 333 F.3d 592, 607–08 (5th Cir. 2003)(finding no

37

cause where state habeas counsel was aware of factual basis for claim but did not seek to discover supporting evidence during state postconviction proceedings); *Smith v. Collins*, 977 F.2d 951, 958 (5th Cir. 1992) (finding no cause where counsel had before him all facts essential to the claim).

Prible's trial counsel had before them sufficient evidence such that if a *Giglio* or *Napue* violation occurred—and the Director asserts that no such violation occurred—the factual predicate for any such presumed claim would have been reasonably available. *See Murray*, 477 U.S. at 488. Michael Beckcom testified at trial that he and Nathan Foreman were cell mates, that he received the prosecutor's name from Foreman, and that Foreman had supplied informers to the prosecutor in the past. (26 RR 23, 53, 82.) He testified that he telephoned the prosecutor first in early October 2001, that he took Prible's confession on November 24, 2001, and that Beckcom and the prosecutor spoke in person for the first time on December 10, 2001. (26 RR 24, 25.) In that meeting Beckcom delivered to the prosecutor a handwritten letter memorializing his eventual testimony. (26 RR 25.) The defense counsel before trial knew of the contacts between the prosecutor and Beckcom. (2 RR 5–6.) The defense team had before it sufficient evidence to investigate the links among Beckcom, Foreman and the prosecutor. One must presume that the factual predicate of the *Gigilo* and *Napue* claim was reasonably available.

38

One should note, though, that Prible does not show that Beckcom's testimony was either false or misleading. *See Giglio*, 405 U.S. at 153–54; *Napue*, 360 U.S. at 269. As will be discussed below, Prible offers nothing to show that Beckcom fabricated evidence or mislead the jurors.

### 4.   Prible does not show actual innocence to avoid default.

Prible argues also that the default should be excused because he is innocent of the crime. (ECF No. 47 at 126–30.)

In an extraordinary case, even in the absence of a showing of cause for the procedural default, a federal habeas court may grant the writ where a constitutional violation has probably resulted in the conviction of one who is actually innocent. *See Murray*, 477 U.S. at 496. For such a claim to be credible, the petitioner must support his allegation with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 325. The petitioner must make a persuasive showing that he is innocent of the charges against him. *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001)). *Id.* He must show that it is more likely than not that in light of the new evidence no reasonable juror would have convicted him. *Schlup*, 513 U.S. at 327.

Prible does not show that he is innocent of the charged crime. He was the last person to see the victims alive. (25 RR 33.) Testimony suggested that he had

sex with Nilda Tirado shortly before her death. (24 RR 103–05.) While Prible said the sex was consensual, other testimony suggested that Tirado had been sexually assaulted. (23 RR 219.) Police found guns and ammunition at Prible's house and found semiautomatic-pistol magazine that did not fit any of the recovered weapons. (24 RR 124– 28, 184–85.) The magazine was consistent with the design for a Ruger P85 pistol, which could have fired the slugs that killed the victims (24 RR 179, 180, 184), and a check stub showed Prible's payment for nine millimeter ammunition consistent with that used to kill the victims (22 RR 204; 24 RR 188; SX[13] 201). Prible confessed to Beckcom that he shot the complainants and set fire to the house. (26 RR 148–53.).

Also Prible's constitutional claims—prosecutorial error, ineffective assistance of counsel, erroneous introduction of extraneous offenses, and biased jury—do not challenge his guilt. The claims, rather, challenge the fairness of his trial. To show that Prible is innocent, Prible must offer some evidence disproving his guilt or evidence, beyond that offered at trial, that Beckcom lied. Prible offers no new exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial. *See id.* at 325.

---

[13] "SX" refers to the numbered exhibits offered and admitted into evidence at trial by the State.

**B.    In the alternative, no evidence supports the allegation that the State sponsored false or misleading testimony.**

In the alternative, were this Court to review the claim on the merits, it would not find Prible entitled to relief.

The State violates a defendant's due process right where it obtains a conviction through material evidence known by the prosecutor to be false. *Giglio*, 405 U.S. at 153–54; *Napue*, 360 U.S. at 269. It matters not that the State solicited the false testimony or merely allowed testimony known to be false to go uncorrected. *Giglio*, 405 U.S. at 153; *Napue*, 360 U.S. at 269. The rule extends to evidence going to the credibility of a witness when that witnesses's testimony is material to the case. *Giglio*, 405 U.S. at 154. The petitioner must show that the witness's testimony was (1) false, (2) known to be so by the state, and (3) material. *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005). A new trial is required if the false testimony could in any reasonable likelihood have affected the jurors' judgment. *Giglio*, 405 U.S. at 154.

False testimony, or perjury, is not established merely by contradictory testimony from witnesses, inconsistencies within a witness's testimony, and conflict between reports, written statements and the trial testimony of prosecution witnesses. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (holding that contradictory testimony from witnesses or inconsistencies in witness's testimony at trial are to be resolved by the trier of fact and do not

suffice to establish that certain testimony was perjured); *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989) (holding that omission of certain facts from reports and written statements of prosecution's witnesses, alone, not adequate to put the prosecution on notice of perjury on their part, much less establish such perjury in fact occurred); *United States v. Viera*, 819 F.2d 498, 502 (5th Cir. 1987) (holding that inconsistencies between pretrial and trial testimony do not, standing alone establish perjury or put the prosecution on notice of possible perjury).

### 1.  Prible does not show that Beckcom lied about the source of his information.

Prible alleges that while Beckcom testified that he received information about the murders from Prible only, Beckcom was in fact fed information by the prosecutor directly or through another inmate, Nathan Foreman. (ECF No. 47 at 61.)

### a.  Carl Walker, Jr., interview

To support his claim Prible offers an unsworn transcript of recorded interview between Prible's federal habeas counsel and Carl Walker, Jr., a federal inmate who knew Prible in prison. (ECF No. 47-1.) Walker, who said he was reluctant to be a prison snitch, agreed with counsel that there was a ring of informers "being run out of the Beaumont" federal prison. (*Id.* at 5–6.) He said that the ring included Michael Beckcom and "a guy, his last name was Forman

[sic], I forget his first name . . . ." (*Id.* at 10.) Walker said that the prosecutor was "working directly with Forman, *I want to assume*." (*Id.*; italics added.)

Walker suggested that the members of the ring knew about Prible's case before Prible arrived at the Beaumont prison. (*Id.*) How could the prisoners have known about Prible's arrival? Walker said, "Well, *from what I understand*, they were all in cahoots with the, ah, prosecutor." (*Id.*; italics added.)

Walker said he was asked—he does not specify by whom—to join a plot to implicate Prible in the murders. (*Id.* at 13.) Walker said, "Prible was there, and the plot was put out on what they wanted to do or how they wanted to do it and what their intentions was and what I needed to do to be a part of it." (*Id.*)

Walker said he was instructed—again, he did not say by whom—to "contact this prosecutor, ah, it starts with an "S," . . . ah, I forget her name but I got her name and number in my phone book in, in the, in the unit." (*Id.*)

Was the name Kelly Siegler? (*Id.*)

"Siegler. Siegler. Siegler. I knew it was an 'S.' I don't remember the Kelly part. But Kelly Siegler was definitely her." (*Id.*)

Where did he get the phone number? (*Id.*)

"I got it from those guys." (*Id.* at 14.)

How many times did he, Walker, call Siegler? (*Id.*)

"I was, ah, prompted to call her at one time, yes. Once or twice, I don't recall. Ah, during the recruiting process, they like look, this is what you need to do. Put this number on your list. Call Kelly, blaśe [sic] this, blaśe, blaśe, blaśe." (*Id.*)

What else was he asked to do? (*Id.*)

He said:

So then, that was one part of it. And the second part was to write a letter which they had given me details. And ah, I don't know if the letter was sent or not. But I remember something in regards to a letter needed to be in the written [sic] or sent to her in regards to what I supposedly had known or details about the case. Which I had never been known [sic] anything because all the details were told by them, by Beckcom and, and, ah, Foreman [sic], and it was another guy who got recruited I believe after me.

(*Id.*)

He was reluctant to join any plot against Prible, Walker said, because he thought that "someone high on he food chain was feeding these guys information." (*Id.* at 15.)

How did he know someone was feed them information? (*Id.* at 16.)

"So, *common sense tells me* that someone is feeding them information. And I was told this lady was the person. Did she ever tell, disclose any detailed information like that to me? Not to my recollection. *She did not personally detail anything like that to me.*" (*Id.*; italics added.)

44

Walker said that he did not believe that Prible ever confessed. (*Id.*) "Not while I was in his presence or out of his presence . . . ." (*Id.* at 17.)

Asked about some of the details of the crime supposedly related by the conspirators, Walker said, "But supposedly, according to what the prosecutor told them and this is, you know, *I didn't talk to her directly*, was that the evidence on Prible was little to none." (*Id.* at 20; italics added.)

Asked about his contact number for the prosecutor, Walker said, "These guys had her cell number, they had her home number, they had her office number. Now which number I got, I can't tell you. But I definitely got a Kelly Siegler number that can be probably verified for either her home, or cell or office, *I'm not sure*. But I know these guys could touch her [sic] at any given time or moment." (*Id.* at 23; italics added.)

Counsel asked, "And how, how did you know that? Did they tell you that?" (*Id.*)

Walker said, "They told, they told me and they was always on the phone. They, they was, it was always being coordinated in private through the duration." (*Id.* at 24.)

He said the plotters used the prison phone system, although, he said, Foreman had gotten caught with a cell phone. (*Id.*)

45

Did Foreman get caught with the cell phone "[d]uring that time that this was going down with Prible"? (*Id.*)

Walker said:

Right before Prible. So, could [Foreman] have obtained the information, you know, in that time zone, its [sic] feasible. . . .

. . . .

But supposedly, [Foreman] already had a rapport with Kelly. I don't know if he had prior cases with her, or been locked up with her or charged by her or somebody in his family. But somewhere there was a link between either Kelly and Foreman and Kelly and Beckcom.

(*Id.*)

Before Prible arrived at the Beaumont prison did the plotters mention Siegler to Walker? (*Id.*)

"I was aware of Prible's arrival, and, and I don't remember if they said Siegler [sic] name directly, but it was like a brief synopsis of, the . . . how do I put it, lesson to come." (*Id.*)

During this time period did Walker see Foreman on the phone "almost on a daily basis"? (*Id.* at 29.)

"He was on the phone a hell of a lot during this time with this case." (*Id.*)

How could you tell he was talking to Siegler? (*Id.*)

Walker said, "Because he is going back and he is reporting. They, they, they were always in. . . ." (*Id.*)

46

Walker said that he eventually was "exiled" because he would not join the plot. (*Id.*)

Walker said he was hesitant to get involved with the informers because feared Siegler's possible political connections. (*Id.* at 37.)

He said:

> [I]t was very obvious to me that the people involved were high on the food chain. And I have a belief that no good deed goes unpunished. So I was, like, you know, is, you know, do I really want to involve myself in this. Because this lady was a prosecutor, I don't know who she is friends with. Supposedly, the family is supposed to be either well off or have some type of local political ties as well as because of the high profile in this other case or the high publicity of the case.

(*Id.*)

Did Walker ever hear the phone conversations between Siegler an inmate or was he guessing? (*Id.* at 46.)

Walker said:

> No, not all because, like, its [sic] been, it was on one occasions, two occasions, you know, as they prepping me or going through it, get up and he'd go use the phone, blah, blah, blah, [sic] or maybe asked a question, he's like, no worry like I got his cell number, I can call any time. I got this, that's how I know they had various forms of ways of communicating with her.

(*Id.* at 46.)

### b.    Prison phone records

Prible also offers prison phone records to suggest that the prosecutor or another inmate was feeding information to Beckcom. (ECF No. 47 at 65–68.)

It appears that Walker did have Siegler's office phone number in his book. (ECF No. 47-20 at 2–3.) But it does not appear that from January 1 to October 31, 2002, Walker ever called the number. (ECF No. 47-7 at 10–16) And while Foreman also had Siegler's number (ECF No. 47-7 at 51), during that same period it does not appear that he used the prison phone system to call the number. (ECF No. 47-7 at 40–46.)

It does appear that during that period Beckcom called the number at least nine times: April 4, 2002, 11:08:02 a.m., six minutes (ECF No. 47-7 at 65); April 17, 2002, 3:13:50 p.m., two minutes (*id.* at 64); April 24, 2002, 3:08:19 p.m., two minutes (*id.* at 64); May 14, 2002, 2:11:56 p.m., three minutes (id. at 63); July 16, 2002, 1:28:09 p.m., two minutes (*id.* at 61); July 16, 2002, 4:32:10 p.m., one minute (*id.* at 61); August 2, 2002, 12:50:22 p.m., one minute (*id.*); August 2, 2002, 3:05:33 p.m., three minutes (*id.*); and August 2, 2002, 3:40:57 p.m.; nine minutes (*id.*).

### c.    Inmate letters

Prible alleges also that certain documents, which appear to be letters written by inmates to the prosecutor, show that the prosecutor was feeding

information to Beckcom. (ECF No. 47 at 68–69.) The letter writers were inmates Jesse Gonzales (ECF No. 47-3 at 2–3), Mark Martinez (*id.* at 6–7), and Carl Walker, Jr. (*id.* at 9).

In his letter, Gonzales, who had known Prible before prison, said that once he and Prible met again in prison, Prible "started to explain that Steve [Herrero] had screwed him out of some money so he did what he had to do but he didn't know the kids were there, that part was an accident." (*Id.* at 2.) Gonzales's letter is not dated, the date stamp indicates the letter was received by the Harris County district attorney's office on May 22, 2002. (*Id.* at 4.)

Mark Martinez in his letter said he had known the victim, Steve Herrero, and had met Prible once before at Herrero's house. (*Id.* at 6.) Martinez said that in prison he and Prible had become "somewhat friends." (*Id.*) Prible told him that he and Herrero had robbed some banks together and that Herrero owed Prible money in connection with the robberies. (*Id.*) Martinez said, "He admitted to me of Killing [sic] Steve and his wife. [Prible] even admitted to raping her, but claimed that she really liked it. As we became more familiar with one another he would sometimes joke around and say things like, 'You know what happens to people who don't pay!'" (*Id.*) Martinez's undated letter was date-stamped April 30, 2002. (*Id.* at 8.)

Walker's letter (*id.* at 9) may have been the letter he was asked by others to write. (ECF No. 47-1 at 14.) In the letter, he said that Prible would hang around in prison with other inmates. (ECF No. 47-3 at 9.) Walker said that he was present "on many occasions when [Prible] was telling his side of the story." (*Id.*) "At first [Prible] would only talk about the banks jobs he had pulled," Walker said, "but later he began to open up about the murders and how he did what he thought he had to do. It was business, not personal." (*Id.*) He said, "I am more than willing to testify to these things in court. I'm currently serving a thirty year sentence for Possession w/Intent to Distribute. I will help you in any way I can and would appreciate any help you could give me." (*Id.*)

### d.    Analysis

As for the source of his information, Beckcom testified that he learned of the crime from Prible only, not from news reports or from others. (26 RR 85, 91–92.) Beckcom also testified that he learned Siegler's name in late September or early October 2001 shortly before Prible arrived at the Beaumont unit. (26 RR 22.) He said he initially called Siegler in the first part of October 2001 (26 RR 24) and that Prible confessed to the murders during a conversation on November 24, 2001 (26 RR 53). Siegler and Beckcom met in person for the first time on December 10, 2001. (26 RR 25.) At that meeting, Beckcom apparently delivered to Siegler a letter giving the details of the crime as told to Beckcom by Prible.

(ECF No. 47-21 at 2–12.)[14] Beckcom testified that he and the prosecutor met a second time at the Beaumont unit in about May 2002. (26 RR 26.)

In the letter that Beckcom presumably tendered to the prosecutor at their first meeting, Beckcom laid out the history of relationship between Prible and Beckcom and the story of the crime as told to Beckcom by Prible. (ECF No. 47-21 at 2–12.) The story of the relationship between Beckcom and Prible and the story of the crime set out in the letter mirrors Beckcom's trial testimony.

Regarding as for Prible's claim that Beckcom learned the facts of the crime not from Prible but from the prosecutor, the recorded conversation between Walker and Prible's federal habeas counsel offers nothing to support the allegation. The conversation offers, as noted by the state court findings, only hearsay and speculation. (04 SHCR II: 799-800, para. 16.) Walker recites rumor and prison gossip but offers no first-hand knowledge that the prosecutor fed information to either Foreman or Beckcom. He acknowledge that he never saw the prosecutor pass along information to inmates.

The uncontroverted evidence shows that Beckcom may have telephoned Siegler or the prosecutor's office in the first part of October 2001. (26 RR 24.) Prible offers no evidence of the substance of the purported phone call and offers

---

[14] The letter was referenced at trial but was not admitted into evidence. (26 RR 25; DX 72.) This pleading assumes that the letter attached to Prible's amended petition (ECF No. 47-21 at 2–12) is a photocopy of that letter mentioned at trial.

no evidence that Beckcom and the prosecutor had any other contact before the December 10, 2001 meeting at the Beaumont unit. At that December 10 meeting, Beckcom in his handwritten letter had memorialized the substance of this eventual testimony. (26 RR 25; ECF No. 47-21 at 2–12.) Beckcom's testimony, uncontroverted by any evidence offered by Prible, indicates that the telephone conversations between Beckcom and Siegler involved not details of Prible's crime but the substance of Beckcom's deal. (26 RR 26.) The Court should note that the prison phone records show that Beckcom called the prosecutor's number nine times in 2002, after Beckcom on December 10, 2001, had given the prosecutor the letter memorializing his eventual testimony.

Nor do the inmate letters prove that the prosecutor fed Beckcom information. Prible argues that because other inmates had information about the crime and because Beckcom testified that he and Foreman were Prible's sole confessors, the other inmate must have gotten the information from the prosecutor not from Prible. (ECF No. 47 at 68–69.)

First, Beckcom did testify that Prible stated that he, Prible, felt close to Beckcom and Foreman and did testify that Prible had stated perhaps that he had told Beckcom and Foreman things he had told no one else. (26 RR 54–55.) But Beckcom did not testify that he and Foreman were Prible's sole confessors. Beckcom would not have been privy to all of Prible's prison conversations.

52

Indeed, the letters suggest that Prible talked with other inmates about his involvement in the crime. (ECF No. 47-3 at 2–3, 6–7, 9.) J. Brent Liedtke, a Beaumont inmate, testified that Prible talked about his case everyday to everyone. (27 RR 26.) Liedtke said, "I told [Prible] to shut up. He talked about his case so much. I told him people would come in and testify against him he if kept that suff up. And 'lo and behold—" (27 RR 26.) Another former inmate, Maurice Fuller, testified that while Prible may not have been "naive," he did not know the "in's and out's" of prison life. (37 RR 33.) Prible likely confessed to others in the presence of or out of the presence of Beckcom and Foreman. Also Beckcom delivered his letter to the prosecutor on December 10, 2001. (26 RR 25; ECF No. 47-21 at 2–12.) The letters from Gonzales and Martinez were date-stamped months after Beckcom had memorialized his proposed testimony. (ECF No. 47-3 at 4, 8.) Beckcom simply was the only inmate, or the first, to strike a deal with the prosecutors.

## 2.   Prible does not show that Beckcom lied about the extent of Beckcom's contacts with the prosecutor.

As for Prible's allegation that Beckcom lied when he testified about the extent of the contacts between Beckcom and Siegler, Beckcom testified that he called Siegler first in the early part of October 2001 but met her for the first time at the Beaumont unit on December 10, 2001. (26 RR 25.) He also testified that he and Siegler had spoken by phone two or three times. (26 RR 26 ll. 16–18.)

53

While prison records show that from January 1 to October 31, 2002, Beccom through the prison phone system called Siegler's number nine times, the records do not show how often among those nine times Beccom made contact with or spoke to Siegler. (ECF No. 47-7 at 61, 63, 64, 65.) The records also do not show the substance of any conversation. The uncontroverted testimony from Beccom was that he and Siegler during the phone conversations spoke not about the substance of his trial testimony but about the benefit Beccom hoped to receive in exchange for his testimony. (26 RR 26.) And although Prible alleges that certain of Beccom's phone calls to Siegler were not reflected in prison records (ECF No. 47 at 67), Prible offers nothing to support his allegation.

### 3. Prible does not show that Beccom misled jurors in his portrayal of Nathan Foreman.

As for Beccom's falsely portraying Foreman as a "disinterested" witnesses (ECF No. 47 at 70), Prible offers a transcript of a recorded conversation between inmate Jesse Moreno. (ECF No. 22 at 2–18.) Prible also refers to (1) prison records that purport to show that the State moved Foreman to Harris County to coincide with the session of the Grand Jury of the 177th District Court that indicted Hermilio Herrero and Prible and (2) Harris County records that purport to show that the prosecutor, using her "maiden name" reviewed and accepted

charges against Prible two days later. (ECF No. 47 at 70; DX 25.)[15] Prible alleges that Foreman also was involved in gathering evidence against Hermilio Herrero, a defendant in an unrelated case. (*Id.*) The gist of Prible's complaint seems to be that Beckcom portrayed Foreman as a passive recipient of information whereas Foreman was, rather, more active. (ECF No. 47 at 70.)

First, while the issue of Foreman's "disinterestedness" might have had bearing upon his credibility, because he did not testify at trial, his credibility was not relevant.

Second, the record does not support Prible's claim. Beckcom testified that he received Siegler's name from Foreman and that Foreman had provided other informers for Siegler. (26 RR 23, 82.) Foreman also was associated with other informers who testified in Hermilio Herrero's case. (ECF No. 47-22 at 13.) *See Herrero v. State*, 124 S.W.3d 827, 830 (Tex. Crim. App. 2003). Foreman's having funneled other informers to the prosecutor in other cases is not relevant to Prible's case. Indeed, Beckcom testified that the federal prison system "runs" on informers. (26 RR 64.) Beckcom also testified that he had previously made deals with federal prosecutors to testify against his co-defendants in other trials in exchange for sentencing consideration. (26 RR 12.)

---

[15] Prible's complaint was prepared July 5, 2001, in the 351st District Court of Harris County. (DX 25.) Hermilio Herrero was tried in the 179th District Court of Harris County. *Herrero v. State*, 124 S.W.3d 827, 827 (Tex. Crim. App. 2003).

The record does not show that Beckcom's testimony was false or misleading. *See Giglio*, 405 U.S. at 153–54; *Napue*, 360 U.S. at 269.

## II.   On His Claim That the State Suppressed Evidence That Beckcom and Foreman Were Part of a Snitch Ring, Prible Is Entitled to No Relief.

Prible alleges that he was deprived of due process under *Brady*, 373 U.S. 83, when the State suppressed evidence that Beckcom was part of a snitch ring. (ECF No. 47 at 73–93.)

### A.   Because the state court dismissed the claim on an adequate and independent state-law ground, the claim is defaulted.

Prible did not raise this claim in his state appeal, *see Prible v. State*, No. 74,487 (Br. for Appellant at 2–4), or in his initial state habeas application (01 SHCR I: 3–24). When he raised the claim in this fourth state application (04 SHCR (before remand) 41–48), the state court dismissed the claim as abusive, *Ex parte Prible*, 2011 Tex. Crim. App. Unpub. LEXIS 829, at *3. Because the state court dismissed the claim by relying upon a state-law ground that was independent of federal law and adequate to support the state-court judgment, federal merits review is barred. *See Coleman*, 501 U.S. at 726.

Nor does Prible show cause and prejudice sufficient to excuse default. Cause and prejudice to excuse default parallel two of the three components of the alleged *Brady* violation itself. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Hence, when this pleading below addresses  the *Brady* claim in the alternative,

the pleading addresses also the cause and prejudice issue. *See id.* And, as will be seen, because Prible does not show a *Brady* violation, he does not show cause and prejudice sufficient to excuse default.

And as discussed above, because Prible does not show he is innocent, this Court cannot excuse default based upon a miscarriage of justice. *See Coleman*, 501 U.S. at 750.

### B.   Nothing shows the State withheld favorable evidence.

In the alternative, were this Court to review the claim on the merits, it would not find Prible entitled to relief.

Irrespective of the good faith or bad faith of the prosecution, where evidence is material either to guilt or punishment, the suppression by the prosecution of evidence favorable to an accused after a request violates due process. *Brady*, 373 U.S. at 87. The petitioner must prove (1) the prosecutor suppressed or withheld evidence (2) that was favorable and (3) material to the defense. *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985). A probability is reasonable if it is sufficient to undermine confidence in the trial's outcome. *Id.* at 678, 684. In a habeas case, mere conclusory statements do not raise a constitutional issue in a habeas case.

57

*See Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982). Impeachment evidence as well as exculpatory evidence falls within the rule. *Bagley*, 473 U.S. at 676. The petitioner must show also that the evidence at issue could not have been discovered by the defense even if the defense had exercise due diligence. *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

Prible alleges the prosecutors withheld the following evidence: the above-mentioned inmate letters (ECF 47 at 73, 90–92); the file in connection with another defendant, Hermilio Herrero (*id*. at 78–79); records showing that when Prible was transferred to the Beaumont unit, Foreman was a state's agent (*id*. at 85–88, 92–93); and the identity of Carl Walker, Jr. (*id*. at 88–89).

First it should be noted that the Constitution does not bar the prosecutor from using informers. The questions of whether the informer was a state agent, *see Massiah*, 377 U.S. 201, whether the prosecutor withheld from the defense information that the informer was a state agent, *see Brady*, 373 U.S. 83, and whether the informer's testimony was truthful, *see Giglio*, 405 U.S. 150; *Napue*, 360 U.S. 264, are addressed elsewhere in this pleading. But whether a witness is a member of an organized snitch ring arguably could be relevant to the witness's credibility. *See Bagley*, 473 U.S. at 676. Because Michael Beckcom was the only informer testifying against Prible, only Beckcom's credibility is at stake. Hence, this *Brady* claim is relevant only to the question of Beckcom's credibility.

### 1.  Inmate letters

The letters are the above-mention letters to the prosecutor from inmates. (ECF No. 47-3 at 2–23, 6–7, 9.) In the letters, the inmates, Jesse Gonzales, Mark Martinez, and Carl Walker, Jr., offer to testify against Prible. Each inmate, more or less expressly, told the prosecutor that Prible had confessed to him his involvement in the murders.

In state habeas proceedings, the State agreed that the letters had not been provided to the defense investigator before trial but that the letters did not constitute *Brady* material because they were not exculpatory and would not have been helpful to the defense. (04 SHRR II: 20.) Prible's state habeas counsel argued, however, that the letters would have aided the defense because they revealed an organized conspiracy against his client and revealed that the State acted improperly by using agent informers. (04 SHRR II: 39, 44.) Particularly, counsel said disclosure of the Walker letter would have allowed Prible in state habeas proceedings to locate Walker, who could have given evidence about the snitch ring. (04 SHRR II: 35, 43.)

The State is not required to account to the defense all of its investigatory work. *Moore*, 408 U.S. at 795–96. The prosecutor's duty to disclose is limited to evidence a reasonable prosecutor would perceive at the time as being material

and favorable to the defense. *See Villasana v. Wilhoit*, 368 F.3d 976, 979 (8th Cir.

2004).

> The Government has no obligation to disclose possible theories of the defense to a defendant. If a statement does not contain any expressly exculpatory material, the Government need not produce that statement to the defense. To hold otherwise would impose an insuperable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning.

*United States v. Comosona*, 848 F.2d 1110, 1115 (10th Cir. 1988); *see also United*

*States v. Simpson*, 901 F.2d 1223, 1228 (5th Cir. 1990) (finding no *Brady*

violation where the evidence tended to inculpate defendant).

A reasonable prosecutor would not have viewed the inmates' letters as

exculpatory. All three inmates offered to testify against Prible, offered to tell the

jurors that Prible confessed to the murders.

As for the question of whether the letters would have helped prove that the

State was using agent-informers, Prible begs the question; he has yet to prove

that the State in fact used agents. And as will be discussed below in Section III,

in the alternative, Prible has failed to show that the State was using agents.

As for the existence of a snitch ring, as mentioned above, the use of

informers is not barred. Hence, when Prible argues that the letters could have

helped prove the existence of such a ring—and the Director does not acknowledge

the ring's existence—Prible does not plead a constitutional violation. And even

60

if the three letter writers were members of a snitch ring, and even if their supposed membership could have been used to challenge their credibility, none of the writers testified. Their credibility was not at issue. Only Beckcom's credibility was at issue, and his credibility was challenged fully.

Also, Prible conflates his allegations. At times he alleges that the State ran a ring of snitches. (ECF No. 47 at 73.) At others he alleges that State ran a ring of evidence fabricators. (*Id.*) For a defendant the danger from a snitch lies with the informer's relaying surreptitiously gained information truthfully. The danger from an evidence fabricator lies with the witness's testifying untruthfully. It is unclear whether Prible accuses the State of employing informers or liars.

To the extent that Prible argues that the letters could have proved the existence of a ring and thus could have helped Prible challenge the credibility of Beckcom at trial, Prible reaches too far. The members of the supposed ring, Foreman, Martinez, the Gonzaleses, and Gomez, did not testify at Prible's trial. Their credibility is not at issue.

The only credibility at issue is Beckcom's. And Prible offers scant evidence that Beckcom was a member of a ring. Prible at most offers indications that Foreman and Beckcom were cell mates (26 RR 23) and that Beckcom may have been acquainted with some other inmates (ECF No. 47-1 at 14–15). Such evidence does not show that Beckcom was a member of a ring. And even were one to

61

presume that Beckcom was a member, such membership, without more, does not damage Beckcom's credibility more than it already has been damaged. The jurors heard that Beckcom was testifying in exchange for a hope of sentence reduction (26 RR 15–16); he previously had lied under oath (26 RR 91); he had previously informed on fellow defendants (26 RR 12–13); he had a reputation in prison as an opportunist, someone who would collect information for his own benefit, and someone who would testify falsely (27 RR 31, 32, 34, 38, 41–42). Hence, evidence that Beckcom would associate with other like-minded inmates does nothing to challenge his credibility further and does not challenge further the truthfulness of his testimony. Beckcom was shown to be a serial snitch. Prible alleges only that the State withheld evidence that Beckcom was a member of a ring comprising other snitches. Any such evidence would not have been material. *See Moore*, 408 U.S. at 794–95.

### 2.    Herrero files

Prible alleges that the State withheld the prosecutor's files in connection with the prosecution of Hermilio Herrero, a prosecution unrelated to Prible's. (ECF No. 47 at 77–84.) Prible alleges that Foreman, Jesse Moreno, and Rafael Dominguez conspired to fabricate evidence against Herrero. (*Id.* at 81.) The petitioner seems to suggest that evidence showing that the three conspired in

Herrero's case would tend to show that Foreman also helped Beckcom, and perhaps others, fabricate evidence against Prible.(*Id.* at 78.)

Because Foreman, Moreno, or Dominguez did not testify against Prible, their credibility is not at issue. Their actions in connection with Hermilio Herrero are not relevant to Beckcom's actions in connection with Prible. As for the implication that Foreman was a "snitch master," Beckcom testified that he got the prosecutor's name from Foreman and that Foreman had previously supplied informers to the prosecutor. (26 RR 82.) The relationship between Beckcom and Foreman and Foreman and the prosecutor was before the jurors.

### 3.   Foreman records

Prible alleges also that the State withheld records showing that when Prible was transferred to the Beaumont unit, Foreman was the State's agent. (ECF No. 47 at 85–88, 92–93.) Again, as will be discussed below in Section III, Prible fails to show that either Foreman or Beckcom was a state agent. Prible seems to allege a plot involving state prosecutors, federal prison officials, and inmate informers. He appears to allege that state prosecutors brought federal prisoner Foreman to Harris County in August 2001 so he could testify before a grand jury investigating Prible's murders. (ECF No. 47 at 85–86.) A few days later, presumably after Foreman's grand jury testimony, the complaint was prepared against Prible based on non-testimonial evidence only. (ECF No. 48-6

at 2; DX[16] 25.) State prosecutors then had Prible and Foreman placed together in the Beaumont federal prison so that Foreman, a state agent, could gather evidence against Prible to strengthen the State's case. (ECF No. 47 at 86.) And while Foreman did not collect information against Prible directly, he recruited Beckcom as an informer to gather the evidence. (*Id.*)

Prible offers nothing but inference and conjecture that such a plot existed. And his logic does not withstand scrutiny. The Sixth Amendment right to counsel attaches only when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing. *See Michigan v. Jackson*, 475 U.S. 625, 629 (1986) (stating that right attached at arraignment); *United States v. Laury*, 49 F.3d 145, 150 (5th Cir. 1995) (stating that right had attached at indictment). *See also United States v. Gouveia*, 467 U.S. 180, 192 (1984) (stating that inmates in administrative segregation not constitutionally entitled to counsel before adversary judicial proceedings had been initiated). If the State wished to use agents to gather evidence against Prible, the State could have done so by postponing the complaint or the indictment against Prible until after the State had used its supposed influence to have Prible placed in federal prison alongside Foreman. With no charges

---

[16] "DX" refers to the numbered exhibits offered and admitted into evidence at trial by the defense.

pending against Prible or no complaint filed, the State could have used as many agent-informers as it wished without violating the Sixth Amendment. *See Jackson*, 475 U.S. at 629.

A more logical explanation is that, as the jurors were told, the federal prison system is filled with informers, inmates willing to gather and trade information for their own benefit. (26 RR 64.) The evidence showed that Prible was unlearned ways of federal-prison life (27 RR 33) and talked about his crime to too many people (27 RR 26). The letters from Martinez, Gonzales, and Walker, rather than showing a ring of evidence-fabricators, show rather that Prible was unwise in the ways of prison. (27 RR 33.) Rather than a labyrinthine plot involving state prosecutors, federal prison officials, and agent-informers, the more likely scenario is that Prible landed in the snitch-filled federal prison and spoke about his crime too often to too many inmates. Each inmate then tried to spin Prible's confession into sentence-reducing gold. Prible offers a conclusory statement that does not show a due process violation. *See Schlang*, 691 F.2d at 799.

### 4.   Carl Walker, Jr., identification

As for Prible's allegation that the State withheld Walker's identification, Prible seems to argue that Walker was a trove of favorable evidence, that the State knew that Walker was privy to favorable evidence, that the State by failing

65

to turn over to the defense Walker's letter to the prosecutor, in effect, concealed Walker's identity. (ECF No. 47 at 88–89.)

As in connection with the other letter writers, the prosecutor would not have known that Walker's letter was exculpatory. *See Villasana*, 368 F.3d at 979; *Comosona*, 848 F.2d at 1115. Walker offered to testify not in favor of but against Prible.

Further, Prible offers nothing to suggest that the prosecutor would have known about any defense-favorable evidence possessed by Walker.

As for any presumed evidence Prible hoped to harvest from Walker regarding the snitch ring and the State's use of agents, Prible himself, rather than the prosecutor, would have been in a better position to know the substance of Walker's presumed testimony.

Prible himself also would have known better than the State to whom he spoke in prison. The State would not have known which inmate, from the hundreds in the Beaumont prison, Prible sought. And the record shows that Prible did not mention Walker to his trial defense team. (04 SHRR II: 9–10.)

And as discussed above, Walker's testimony—presuming that it mirrored his statements to federal habeas counsel—would not have been helpful to Prible. *See Moore*, 408 U.S. at 794–95. Walker demonstrated no first-hand knowledge of any conspiracy between the prosecutors and the informers to feed the informer

66

information about the murders so that the informers could parrot the information at trial. *See Schlang*, 691 F.2d at 799.

### 5. *Brady* conclusion

Were this Court to review Prible's *Brady* claims on the merits, it would not find him entitled to relief.

## III. The State Did Not Surreptitiously Use an Agent to Question Prible after the Right to Counsel Had Attached.

Prible alleged that he was deprived of his right to counsel when the prosecutor, using a confidential informer who was a state agent, interrogated Prible secretly after the right to counsel had attached. (ECF No. 47 at 93–98, *citing Massiah*, 377 U.S. at 206)

### A. The claim is defaulted.

Prible did not raise this claim in his state appeal, *see Prible v. State*, No. 74,487 (Br. for Appellant at 2–4), or in his initial state habeas application (01 SHCR I: 3–24). When he raised the claim in this fourth state application (04 SHCR (before remand) 32–38), the state court dismissed the claim as abusive, *Ex parte Prible*, 2011 Tex. Crim. App. Unpub. LEXIS 829, at *3. Because the state court dismissed the claim by relying upon a state-law ground that was independent of federal law and adequate to support the state court judgment, federal merits review is barred. *See Coleman*, 501 U.S. at 726.

Prible does not directly address the issues of cause and prejudice or miscarriage of justice in connection with his *Massiah* claim. (ECF No. 47 at 93–98.) But he could not show cause for omitting the *Massiah* claim in his state appeal or initial habeas application. The time line for the interaction between Beckcom and the prosecutor was discussed at trial. Trial testimony showed the relationship among Beckcom, Foreman, and the prosecutor, and the record shows that the defense counsel knew of the relationship. The factual predicate of any potential claim under *Massiah*, 377 U.S. 201, would have been reasonably available to trial counsel and to appellate counsel. *See Murray*, 477 U.S. at 488. Nor does Prible show a miscarriage of justice. *See Coleman*, 501 U.S. at 750.

## B.   The record does not show that when Beckcom spoke with Prible, Beckcom was a state agent.

In the alternative, were this Court to review the claim on the merits, it would not find Prible entitled to relief. Prible alleges that he was deprived of his right to counsel when the prosecutors used an agent, Michael Beckcom, to question Prible without the presence of counsel. (ECF No. 47 at 93–98.)

A criminal defendant may not have "used against him at his trial evidence of his own incriminating words, which federal agents had deliberately [and surreptitiously] elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206. A petitioner must prove three elements: (1) The right to counsel had attached; (2) the individual seeking information from

68

the defendant was a government agent acting without the defendant's counsel being present; and (3) the agent "deliberately elicited" incriminating statements from the defendant. *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) (citing *Massiah*, 377 U.S. at 206). No violation occurs when statements are obtained by luck or happenstance. *Blackmon v. Johnson*, 145 F.3d 205, 210 (5th Cir. 1998) (citing *Maine v. Moulton*, 474 U.S. 159, 176 (1985)).

The Sixth Amendment rights of a talkative inmate are not violated when a jailmate, without having been deputized by the government to question that defendant, acts as an entrepreneur to seek information of potential value. *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997) (citing *United States v. York*, 933 F.2d 1343, 1357 (7th Cir. 1991) (discussing incentives of prisoners to seek information to better their own lot)). An informer becomes a government agent only when he has been instructed by the State to get information about the particular defendant. *Id.*; *see, e.g., United States v. D.F.*, 63 F.3d 671, 682 n.16 (7th Cir. 1995) (key inquiry is whether "the government directed the interrogator toward the defendant in order to obtain incriminating information"); *Stano v. Butterworth*, 51 F.3d 942, 977 (11th Cir. 1995) (no evidence to support prearrangement between informant and government regarding defendant); *Robinson v. Clarke*, 939 F.2d 573, 576 (8th Cir. 1991) (where government had not asked informant to solicit information while in prison, no Sixth Amendment

69

violation); *United States v. Watson*, 894 F.2d 1345, 1347–48 (D.C. Cir.1990) (government informant was not instructed to obtain information from defendant; entrepreneurial acts did not violate defendant's Sixth Amendment rights); *Brooks v. Kincheloe*, 848 F.2d 940, 945 (9th Cir. 1988) (even though informant solicited information from defendant before going to the police, informant had not been asked to obtain information from defendant). *But see United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994) ("But the record also contains evidence suggesting that Scott may have had a tacit agreement with the government.").

The record does not show that Beckcom was a State agent. The record shows, rather, that he was a freelancer, ready to barter whatever information he could find in exchange for sentencing consideration. (27 RR 31.) He had traded before and was willing to trade again. (26 RR 12–14.) Imprisoned in the federal penitentiary in Beaumont, Beckcom learned that an individual charged with murder, Prible, was arriving from a low-security unit. (26 RR 22.) Beckcom did not learn the name of the prosecutor, Kelly Siegler, until late September or early October 2001. (26 RR 22.) He learned of Siegler through his cellmate, Nathan Foreman, who had previously supplied the prosecutor with the names of other potential informers. (26 RR 23, 82.) Beckcom testified that when he first called the prosecutor in early October 2001, he told her only that he had information about a murder but that the prosecutor and he did not discuss the substance of

the information. (26 RR 23–24.) Indeed, Beckcom testified that he did not hear Prible's complete confession until November 24, 2001. (26 RR 53.) Beckcom and the prosecutor did not discuss the substance of Beckcom's information until he and the prosecutor met in person at the prison on December 10, 2001. (26 RR 25.) In an effort to gain favorable sentencing consideration, Beckcom himself had previously cooperated with authorities in an unrelated case. (26 RR 12–14.) The trial testimony showed that Prible was unwise to the ways of the federal prison informers (27 RR 26, 33) and spoke too freely to too many inmates (27 RR 26).

The record shows that Beckcom, acting on his own for his own ends, gathered information about the murder and then relayed that information to the prosecutor. The record does not show that the prosecutor contacted Beckcom or asked Beckcom to gather information.

Prible's reliance on *United States v. Henry*, 447 U.S. 264 (1980), is unavailing. There, investigators contacted an inmate, a paid informer, who was housed with Henry. *Id.* at 266. The investigators told the informer that although he was not to question Henry or initiate conversations, he was to listen to conversations that Henry might initiate. *Id.* Hence, the investigators contacted the informer before he gathered the information from the subject. The State and the informer had a preexisting relationship. When the informer gathered the information from Henry, the informer was acting as a government agent. In

71

Prible's case, the record shows that Beckcom gathered from Prible sufficient information to realize he, Beckcom, could trade information for consideration. At that point, Beckcom called the prosecutor. And later still did Beckcom and the prosecutor meet face to face and did Beckcom turn over to the prosecutor a letter detailing Prible's version of the crime. Again, the State did not contact Beckcom; Beckcom contacted the State. The record shows that when Beckcom gathered the information on his own behalf, to his own ends, and did not pass that information on to the State until later. The record does not show that Beckcom was a government agent questioning Prible in the absence of an attorney. *See Massiah*, 377 U.S. at 206.

## IV.   On Certain Ineffective-Assistance Claims, Prible Is Entitled to No Relief.

Prible alleges that he received ineffective assistance when (1) trial counsel did not object to Beckcom's testimony on *Massiah* grounds (ECF No. 47 at 101–02); (2) appellate counsel did not raise the above ineffective-assistance issue on direct review (*id.* at 102–03); and (3) state habeas counsel did not raise the trial-related ineffective-assistance issue in collateral proceedings (*id.* at 103).

### A.   The claims are barred by the statute of limitation.

These ineffective-assistance claims are barred by the statute of limitation. A federal petition for writ of habeas corpus is governed by a one-year statute of limitation. The limitation period runs from the latest of—

72

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1) (West 2012).

The period is tolled during the time in which a properly filed application for state postconviction or other collateral review is pending. *See* § 2244(d)(2). The period is not tolled, however, when the petition is before a federal court. *See Duncan v. Walker*, 533 U.S. 167, 172–73 (2001).

Prible's judgment became final by the conclusion of direct review when the Supreme Court denied certiorari review on October 17, 2005. *See* § 2244(d)(1)(A); *Prible v. Texas*, 546 U.S. 962. The period was tolled, however, while Prible's state habeas applications were before the state court. *See* § 2244(d)(2). That tolling period ended when relief was denied by the Court of Criminal Appeals on June 18, 2008. *See Ex parte Prible*, 2008 Tex. Crim. App. Unpub. LEXIS 449. Prible had one year in which to file his federal petition. He timely filed his petition on

73

the final day of that one-year period, June 18, 2009. (ECF No. 1.) But that petition did include these ineffective-assistance claims.

The Supreme Court and the Fifth Circuit have not yet determined whether the habeas corpus statute of limitation applies to the petition as a whole or claim by claim, that is, whether after the limitation period has lapsed an otherwise timely petition may be amended to include previously unpresented claims, claims that if presented in a new petition would be barred by limitation. The question is whether the limitation analysis requires a claim-by-claim review or whether one timely claim salvages the entire petition. Circuit courts have reached different conclusions. *See Fielder v. Varner*, 379 F.3d 113, 117–21 (3d Cir. 2004) (Alito, J., with Chertoff, and Becker, JJ.) (analyzing the one-year limitations period claim by claim); *see also Prendergast v. Clements*, No. 12–1166, 2012 WL 5395167, at *5 (10th Cir. 2012) (agreeing with *Felder*); *Mardesich v. Cate*, 668 F.3d 1164, 1170–71 (9th Cir. 2012) (same); *Bachman v. Bagley*, 487 F.3d 979, 984 (6th Cir. 2007) (same); *Maldonado v. Thaler*, 662 F. Supp. 2d 684, 700–01 (S.D. Tex. 2009) (Atlas, J.) (same); *but see Walker v. Crosby*, 341 F.3d 1240, 1245 (11th Cir. 2003) (finding that the entire petition is timely as long as any claim is timely).[17]

---

[17] The Eleventh Circuit may be prepared to revisit the limitation issue. *See Zack v. Tucker*, 666 F.3d 1265, 1268, *reh'g and reh'g en banc granted, opinion vacated*, 678 F.3d 1203 (2012).

The Supreme Court suggests, however, that the limitation period should be applied claim by claim. In considering a related question, the Court described the habeas statute of limitation, § 2244(d)(1)(C), as follows:

> Similarly, § 2244(d)(1) provides that a "1-year period of limitation shall apply to an application for a writ of habeas corpus." The subsection then provides one means of calculating the limitation with regard to the "application" as a whole, § 2244(d)(1)(A) (date of final judgment), but three others that require claim-by-claim consideration, § 2244(d)(1)(B) (governmental interference); § 2244(d)(1)(C) (new right made retroactive); § 2244(d)(1)(D) (new factual predicate).

*Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005). Under the interpretation suggested by *Pace*, only those claims expressly covered by 28 U.S.C. § 2244(b)(2), such as claims based upon newly discovered factual predicates or newly announced constitutional principles, are available for consideration in a successive federal habeas petition.

The policies that drive federal habeas review support such a reading of the statute. Congress wanted the limitations period to "speed up the habeas process considerably," *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir.1999), and "advance the finality of criminal convictions," *Mayle v. Felix*, 545 U.S. 644, 662 (2005). To construe the limitation statute otherwise would allow a petitioner to link claims that he should have raised years before to a claim that is newly developed. This Court does not find support in the AEDPA's statutory tolling provisions to permit the marriage of stale and fresh claims. *Cf. Felix*, 545 U.S. at 662 (barring claims

75

raised in an amended petition filed after the expiration of the limitations period because, otherwise, "AEDPA's limitation period would have slim significance"). "An interpretation that resurrects otherwise dead claims merely because they are among the living . . . hardly seems consistent with the purposes that Congress intended § 2244(d) (1), and the AEDPA generally, to serve." *Ellis v. Quarterman*, Civil Action No. H-07-2768, 2008 WL 2963467, at *6 (S.D. Tex. 2008); *see also Walker*, 533 U.S. at 179 (finding that the AEDPA "reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review.").

Because Prible raised these claims after the limitation period had lapsed, the claims are barred. *See* § 2244(d)(1)(A).

Nor can Prible cite a newly announced constitutional right. *See* § 2244(d)(1)(C). The relevant principles underlying the claims were set out before he filed his first state application. *See Coleman*, 501 U.S. at 755 (stating no right to constitutionally effective assistance of counsel in state habeas proceedings); *Strickland v. Washington,* 466 U.S. 668 (1984); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963). To the extent Prible would cite *Martinez v. Ryan* to support his ineffective-assistance claim, *Martinez* announced no constitutional right. 132 S. Ct. 1309, 1315 (2012).

Nor can Prible rely upon newly discover factual predicate. It is not enough that the factual predicate be newly discovered. It must have been undiscoverable even had the petitioner used due diligence. *See* § 2254(e)(2)(A)(ii). Prible's claims involve allegations that the state withheld evidence that Michael Beckcom and Nathan Foreman were part of a ring of snitches and that the State used agent-informers to gather evidence against Prible. The evidence showing the relationship among Beckcom, Foreman, and the prosecutor was laid out before and during trial. Prible could have raised the issues in his initial federal petition. Nor can he rely upon the State's failure to identify inmate Carl Walker, Jr. (ECF No. 47 at 62–64.) By the time Prible filed his first federal petition on June 18, 2009 (ECF No. 1), he already had identified and interviewed Walker on February 20, 2009. (ECF No. 17-1.) Had Prible used due diligence, he could have discovered the factual predicates before filing his initial federal petition. *See* § 2244(d)(1)(D).

## B.   Prible's *Massiah*-related ineffective-assistance claim is defaulted.

In the state courts, Prible raised ineffective-assistance claims about (1) the admission of evidence concerning the deaths of the children, (2) the testimony of state's expert William Watson, and the (3) the constitutionality of Article 37.071 of the Code of Criminal Procedure. (01 SHCR I: 5–6.) But he never raised this *Massiah*-related ineffective-assistance claim. *Prible v. State*, No. 77,787 (Br. for Appellant at 3–5); (01 SHCR I: 5–6, 382–97, 422–47; 04 SHCR I: 1–55.) Were he

to raise this claim now, the Court of Criminal Appeals would find the claim defaulted. *See Nobles*, 127 F.3d at 423. Hence, federal merits review is barred. *See id.*

Nor does Prible argue that he can show cause and prejudice to excuse this default. (ECF No. 47 at 98–103.) As discussed above in Section III, the factual predicate of any potential *Massiah* claim would have been reasonably available to trial, appellate, or state habeas counsel. *See Murray*, 477 U.S. at 488. Indeed, when current federal habeas counsel presented Prible's fourth state habeas application, counsel failed to raise an ineffective-assistance claim implicating a *Massiah* complaint. (04 SHCR (before remand) 1–55.) Nor does Prible meet the miscarriage-of-justice standard. *See Coleman*, 501 U.S. at 750.

Nor does *Martinez* help. There, Arizona law required a petitioner to bring a complaint about the ineffective assistance of trial counsel in his first postconviction application for relief. *Martinez*, 132 S. Ct. at 1314. Where the petitioner's postconviction attorney did not raise such a claim in the first application but in a later application, the state court could dismiss the claim on grounds that it should have been raised in the initial application. *Id.* The Supreme Court determined that in such a case, the state-law bar would not prevent the federal court from reviewing the ineffective-assistance claim on the merits. *Id.* at 1320. Here, the state court has never addressed the ineffective-

assistance claim and had issued no state-law bar. Prible's claim is defaulted not because the state court has declined to review it on the merits, but because Prible never gave the state court the opportunity to review it on the merits. *See Nobles*, 127 F.3d at 423. Extending *Martinez* to such a case would invite petitioners to bypass state courts and seek remedies in federal court alone. Furthermore, under circuit precedent, *Martinez* does not apply to Texas law. *See Ibarra v. Thaler*, 687 F.3d 222, 227 (2012).

### C.   Because a *Massiah*-based claim would have been futile, counsel was not ineffective for failing to object.

In the alternative, were this Court to review the claim on the merits, the Court would not find Prible entitled to relief.

A petitioner who wishes to show ineffective assistance of counsel must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. When a petitioner complains of the ineffectiveness of counsel's assistance, he must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687–88. In determining the merits of a claim and in considering counsel's conduct, courts must be highly deferential. *Id.* at 689. A reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 690. The petitioner must overcome the presumption that under the circumstances the challenged action might be

considered sound trial strategy. *See id.* In fact, a conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *Woodward v. Epps*, 580 F.3d 318, 329 (5th Cir. 2009).

A reviewing court need not consider the deficiency prong if it concludes that the petitioner has shown no prejudice. *Strickland*, 466 U.S. at 697. The petitioner may not simply allege, but must prove prejudice affirmatively. *Id.* at 693. He must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. A probability is reasonable where it undermines confidence in the outcome. *Id.* He must prove both prongs, and if one of the elements is determinative, the reviewing court need not consider the other. *Gochicoa v. Johnson*, 238 F.3d 278, 285 (5th Cir. 2000).

Failure to raise meritless objections is not ineffective lawyering; it is the very opposite. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

As discussed above in Section III, no evidence suggests that Beckcom gathered information acting as a state agent. *See Massiah*, 377 U.S. at 206.

The evidence shows that before trial, counsel knew of the relationships among Beckcom, Foreman, and the prosecutor. Indeed, the prosecutor met and discussed with trial counsel the prosecutor's pretrial meeting with Beckcom. (2 RR 4–6.) And trial counsel knew that Nathan Foreman, Beckcom's cellmate,

had previously supplied other informers to the prosecutor. (26 RR 80, 82.) The jurors learned that Beckcom had previously cooperated with prosecutors and actively sought ways to curry favor with prosecutors for his own ends. (26 RR 12–18, 22–28, 64, 67–68, 78, 79.)

The record shows that the defense attorneys had before them sufficient evidence to suggest the possibility of an agency relationship between the State and Beckcom. Counsel did not raise the issue at trial. The inference under *Strickland* must be that in forgoing a *Massiah* objection counsel acted reasonably. *See Strickland*, 466 U.S. at 690. Counsel would have been reasonable to forgo an objection if counsel investigated and determined that Beckcom was not a State agent. Prible offers nothing to rebut the presumption of reasonableness. *See id.* The record before this Court shows that counsel in fact knew of Beckcom's activities and the prosecutor's connection with Beckcom. (2 RR 4–6; 26 RR 80, 82.) The only permissible inference is that counsel knew that a *Massiah* objection would have been futile. *See Clark*, 19 F.3d at 966. Prible does not carry his burden of showing that the performance of counsel was deficient. *See Strickland*, 466 U.S. at 687.

### D.   Where no trial counsel error is found, a claim of appellate counsel error is groundless.

Prible alleges that he received ineffective assistance when his appellate counsel failed to raise the preceding trial-counsel complaints. (ECF No. 47 at

102–03.) Were this Court to review the claim on the merits, it would not find Prible entitled to relief.

When a petitioner complains of ineffective assistance of counsel on appeal, he must satisfy the two-pronged *Strickland* test. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). He must show that counsel was deficient and that the deficiency prejudiced his case. *Strickland*, 466 U.S. at 687. Counsel's assistance becomes ineffective when his errors are prejudicial, in that there is a reasonable probability that but for the error the ultimate result would have been different. *Id.* at 694. To prove appellate prejudice, a petitioner must show that but for counsel's deficient performance he would have prevailed on appeal. *Smith*, 528 U.S. at 285–86.

When the petitioner does not show ineffective assistance at trial, by extension, he cannot show ineffective assistance on appeal predicated upon the same issue. *See Mayabb v. Johnson*, 168 F.3d 863, 869 (5th Cir. 1999). As shown above, even if state appellate counsel had raised a complaint about the performance of trial counsel, Prible does not show that trial counsel's performance was deficient. *See id.*

### E. Prible is entitled to no relief on his complaint about the actions of state habeas counsel.

First, because a state habeas applicant has no Sixth Amendment right to counsel, the failure of state habeas counsel to raise a given issue cannot amount

82

to constitutionally ineffective assistance. *Coleman*, 501 U.S. at 752–53. Nor is relief offered by *Martinez*, 132 S. Ct. 1209. In *Martinez*, the Supreme Court announced no Sixth Amendment right to counsel in state habeas proceedings. *Id.* at 1315.

In the alternative, were this Court to review the actions of state habeas counsel, it would see that those actions met the *Strickland* standard. As with the failure of state appellate counsel to challenge the actions of trial counsel, where trial counsel's ineffectiveness is not shown, appellate counsel decision to forgo such an ineffective-assistance claim cannot constitute ineffective assistance. *See Mayabb*, 168 F.3d at 869. It follows that state habeas counsel's decision to forgo claims against trial and appellate counsel predicated on the same facts also will not fall below the *Strickland* standard.

## V.   On His *Massiah*-Related *Brady* Claim, Prible Is Entitled to No Relief.

Prible alleges that the State suppressed evidence that it was using agents, namely Beckcom and Foreman, to gather evidence against him. (ECF No. 47 at 103–04.) In other words, Prible alleges that the State in violation of *Brady* withheld evidence of a *Massiah* violation. (*Id.*)

### A.   The claim is barred by limitation.

As discussed above in Section IV, Prible filed his initial federal petition on the final day of the one-year limitation period, June 18, 2009. *See* § 2244(d)(1)(A).

83

(ECF No. 1.) That initial petition did not, however, include this *Massiah*-related *Brady* claim. (*Id.*) Nor does this claim rely upon newly discovered facts or a newly announced constitution right. *See* § 2244(d)(1)(C), (D). When Prible raised this claim for the first time in his second amended petition on August 17, 2012 (ECF No. 47), the claim was more than three years late. The claim is barred by limitation.

**B.    Prible never raised this issue in state court; the claim is defaulted.**

Further, the claim is defaulted. Prible has never presented to the state court system a *Brady* claim implicating *Massiah*. *Prible v. State*, No. 74,487 (Br. for Appellant at 2–4). (01 SHCR I: 3–24 and II: 275–78, 382–90; 04 SHCR (before remand) 1–56.) Were he to do so now, the state court  would find the claim defaulted. *See Nobles*, 127 F.3d at 423. Hence, federal merits review is barred. *See id.* Prible does not argue cause and prejudice or miscarriage of justice in connection with this claim. (ECF No. 47 at 103–05.) Also because Prible does not show something external to the defense prevented him from raising this *Massiah*-related *Brady* claim in state court and because he does not show innocence, he cannot avoid default.

**C.    Prible shows no *Brady* violation.**

In the alternative, were this Court to review this *Brady* claim on the merits, it would find that Prible is not entitled to relief.

As discussed above in Section III, Prible shows no *Massiah* violation. Because he does not show that the State was using agents, he does not show that the State withheld such evidence.

Further, were one to presume that a *Massiah* violation occurred, Prible had sufficient evidence before him such that any presumed violation could have been discovered had he used due diligence. *See Kutzner*, 303 F.3d at 336 ("To establish a *Brady v. Maryland* claim, Kutzner must prove that the prosecution suppressed favorable, material evidence that was not discoverable through due diligence."). As discussed elsewhere, the relationship among Beckcom, Foreman, and the prosecutor and Beckcom's dealings with the prosecutor were before the jurors and before defense counsel. If the State was controlling and directing the activities of Beckcom and Foreman, that evidence would have been available to Prible had he used due diligence. *See id.* The lack of evidence suggesting an agency relationship between Beckcom and the State or Foreman and the State indicates that defense counsel investigated the possibility of a such a relationship and found none. *See Strickland*, 466 U.S. at 690. Prible shows no due process violation. *See Brady*, 373 U.S. at 87.

85

## VI.   Admission of Evidence That Prible Killed the Complainants' Three Children Did Not Deprive Prible of Due Process.

Prible alleges that he was deprived of due process when the trial court allowed the jurors to hear evidence about the deaths of Herrera's and Tirado's three children. (ECF No. 47 at 105–15.)

### A.   On appeal, the state court found no error.

On appeal, Prible complained of the admission of evidence on both state-law and constitutional grounds. *Prible v. State*, No. 74,487 (Tex. Crim. App. Jan. 7, 2004) (Br. for Appellant at 30–49). The Court of Criminal Appeals found that under state law, the evidence was admissible. *Prible v. State*, 175 S.W.3d at 731–33. On Prible's due process claim, the court said that for the same reasons expressed in its state-law analysis, it held that the admission of the evidence did not deny Prible of a "fair and impartial trial." *Id.* at 733.

### B.   State habeas court found no constitutional violation.

In its findings and conclusions, the convicting court found the following:

• Prible shot and killed Herrera and Tirado in their home; in the home at the time were their three children, Jade, Tirado's twenty-two month old daughter; Rachel Compean, Tirado's seven year old daughter; and Herrera's seven year old daughter, Valerie. (01 SHCR II: 450–51, para. 5, *citing* 21 RR 87, 64; 23 RR 84, 107; 25 RR 5–6; 26 RR 102.)

• Prible set fire to the home; the complainants' neighbor, Gregory Francisco found Herrera's body in the garage; volunteer fire fighter James Cone found Tirado's body on the couch; the body of Jade was found on the floor of the master bedroom; the bodies of Rachael and Valerie were found in another bedroom; all the children's bodies were covered with soot; all three died of smoke inhalation. (01 SHCR II: 451, para. 6, *citing* 21 RR 105–14, 142, 171–78, 227–28; 22 RR 87–88; 23 RR 85–86, 95–96, 108–10.)

• Prible's trial counsel, Terrence Gaiser, moved to bar the admission at guilt-innocence of evidence regarding the children's deaths and moved to bar during voir fire the mention of their deaths. (01 SHCR II: 451, para. 7, *citing* 3 RR 23–24; 01 SHCR II: 207–08.)

• The trial court ruled that the children's deaths were admissible during guilt-innocence as "contextual evidence." (01 SHCR II: 451, para. 8, *citing* 21 RR 3–10, 16.)

• Michael Beckcom testified that Prible told him that he killed Herrera and started the fire to cover his tracks and that Prible knew that the three children were in the house at the time. (01 SHCR II: 451–52, para 9, *citing* 26 RR 29–53, 91–94.)

• On direct review, the Court of Criminal Appeals held that the trial court did not err in determining that evidence of the children's deaths was admissible

as same-transaction contextual evidence. (01 SHCR II: 453, para. 16, *citing Prible v. State*, 175 S.W.3d at 731–32.)

The Court of Criminal Appeals adopted the convicting court's findings and conclusions and denied relief. *Ex parte Prible*, 2008 Tex. Crim. App. Unpub. LEXIS 449, at *1.

## C.   The state courts applied Supreme Court precedent reasonably.

The admission of evidence by a state court violates due process only when the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. *Dawson v. Delaware*, 503 U.S. 159, 179 (1992) (citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). Whether the evidence was correctly admitted under state law is not relevant. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The sole inquiry is whether the admission violated the Constitution. *Id.* at 68.

An extraneous offense may be admitted into evidence without violating the due process clause if (1) the government makes a strong showing that the defendant committed the offense and (2) the extraneous offense is rationally connected with the offense charged. *Wood v. Quarterman*, 503 F.34d 408, 414 (5th Cir. 2007). Even if the evidence is wrongly admitted at the guilt phase of a criminal trial, relief is appropriate only if the error led to fundamental unfairness. *Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir. 2001).

While the state court analyzed the admission of the evidence under state law, it also denied relief on Prible's constitutional claim. *Prible*, 175 S.W.3d at 731–33. Such a decision was reasonable. *See* § 2254(d)(1); *Dawson*, 503 U.S. at 179; *Estelle v. McGuire*, 502 U.S. at 67–68; *Payne*, 501 U.S. at 825. The State made a strong showing that Prible was responsible for the deaths of the children. *See Wood*, 503 F.3d at 414. Indeed, the evidence showing that Prible set afire the couch and Tirado's body to conceal the evidence is the same evidence showing that he killed the children.

And the deaths of the children are rationally connected to the charged offense. *See id.* Prible set the fire to destroy evidence that he murdered the children's parents. Also the children's bodies were part of the crime scene. Neighbors and fire fighters entered the house looking for survivors and found the bodies of Herrera, Tirado, and their children. (21 RR 113, 176, 179, 183.) Telling the story of the murders of Herrera and Tirado would have made little sense if the court had left out the deaths of the children.

Prible alleges that the only evidence of intent to kill the children came from Beckcom and that Beckcom's testimony regarding intent was unreliable. (ECF No. 47 at 107.) Prible argues also that the State failed to prove a motive for killing the children. (*Id.* at 107–08.) Nor did the State prove that the killer intended to burn down the house. (*Id.* at 108.)

89

Prible misconstrues the law. Prible was not charged with murdering the children. (CR 2; indictment.) The State was not required to show beyond a reasonable doubt that Prible killed the children with the required intent. *See* Tex. Pen. Code § 19.03 (West 2012). And in state proceedings, the question was not whether the prosecution at trial met the required burden. The question was, rather, whether the evidence in question rendered the trial unfair. *See Dawson*, 503 U.S. at 179; *Payne*, 501 U.S. at 825. Prible's complaint that the State failed to meet its burden of showing the required intent is no complaint at all. The State bore no such burden.

Prible also argues that the evidence was not admissible because it did not, contrary to an argument made by the respondent in its original response (ECF No. 12 at 19–20), corroborate Beckcom's trial testimony. (ECF No. 47 at 111–12.) Prible misconstrues the law. For due process purposes the State bore no burden of showing that evidence was admissible on any particular grounds. The issue was, instead, whether the State made a strong showing that Prible was responsible for their deaths and whether the deaths were "rationally related" to the charged crime. *See Wood*, 503 F.3d at 414. Indeed, even if the evidence was inadmissible under state law, so long as the evidence did not render the trial unfair—and it did not—its admission did not violate the Constitution. *See Estelle v. McGuire*, 502 U.S. at 67–68.

90

As for Prible's allegation that the evidence of the children's death was harmful when measured against the "scant evidence" supporting the verdict, again (ECF No. 47 at 113–15), Prible misses the mark. The question of harm arises only after a due process violation. *See Hafdahl*, 251 F.3d at 536. And so long as the State meets the due process requirements—that is, a strong showing that Prible committed the acts and that the acts were rationally related to the charged crime—no violation occurred and no harm analysis is needed. *See Wood*, 503 F.3d at 414.

But if this Court assumes a due process violation, Prible shows no harm. Where evidence is admitted in violation of the Constitution, a claim nonetheless fails where the petitioner does not show that evidence had a substantial and injurious effect or influence in determining the jury's verdict. *Janecka v. Cockrell*, 301 F.3d 316, 328–29 (5th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The evidence shows that Prible was the last person to see the victims. Prible had a sexual encounter—evidence suggests a nonconsensual encounter—with Tirado shortly before her death. Prible confessed to a third party, Beckcom, and described the crime and the motive, payback for a drug-deal theft. Police found at Prible's house a pistol magazine consistent with the type of pistol that may have been used to kill the victims and a check stub showing that

91

Prible purchased ammunition consistent with that used in the murders. Once the State showed that Prible killed Herrera and Tirado and set the fire to cover his tracks, the evidence of the deaths of the children would not have had a substantial and injurious effect or influence in determining the verdict. *See Brecht*, 507 U.S. at 637; *Janecka*, 301 F.3d at 328–29.

Prible also argued that the Court of Criminal Appeals determined that evidence of the children's deaths did not constitute proof that Prible killed Herrero and Tilda. (ECF No. 47 at 113–14). Hence, Prible says, the Court of Criminal Appeals determined that the children's deaths were not rationally related to the charge crime. (*Id.*) Prible again misunderstands the applicable law. The deaths of the children are related to the charged crime not because those deaths help prove the charged crime but because their deaths were a byproduct of the crime, the result of Prible's coverup. When Prible asks the trial court to require the State to offer evidence of the charged murders and the fire but then to omit mention of the three additional bodies found in the house, he asks too much.

## VII. As for Rebutting the Evidence from the State's DNA Expert, Prible Does Not Show He Received Ineffective Assistance of Counsel.

Prible alleges that he received ineffective assistance when trial counsel failed to address and rebut the testimony of the prosecution's DNA expert, William Watson. (ECF No. 47 at 116–17.) Watson testified that the semen in

Tirado's mouth must have been deposited at or near the time of her death. (*Id.*;
01 SHCR I: 10–11.) Prible had told police that he and Tirado had been having an
affair and that on the night of her death, Tirado performed consensual oral sex
upon him. (31 RR SX 102.) He says, though, that Watson's testimony allowed the
prosecutors to imply that Tirado had died almost immediately after the semen
was deposited, or perhaps before, thus suggesting that Prible was the killer. (ECF
No. 47 at 116.) Prible alleges that Watson had no scientific basis for his opinion.
(*Id.* at 117.)

### A. The State's expert testified that physical evidence suggested that Prible committed the murders.

On direct examination by the prosecutor, Watson, who analyzed the DNA
evidence for the prosecution, testified that he found in Tirado's mouth sperm cells
with DNA consistent with Prible's. (24 RR 103 ll. 9–15.) Watson said that in his
experience it was rare for a full DNA profile to be found on an oral swab after
ejaculation into the mouth of a living person due to reactions such as spitting or
swallowing. (24 RR 106.) He said that finding a full DNA profile from Prible in
Tirado's mouth was consistent with the semen's having been deposited seconds
before her death. (24 RR 102–04.)

On cross-examination, though, Watson said that he had no experience
conducting experiments with sperm found on oral swabs after consensual sex. (24
RR 110–11.) He said also that he was not familiar with any scientific literature

dealing with sperm in the mouth after consensual sex. (24 RR 112.) He said he did not know if the results from an oral swab taken after a consensual encounter would differ from those taken after an assault. (24 RR 110–11.)

But Dr. Joye Carter, the Harris County medical examiner, testified that in her experience sperm would stay in a woman's mouth for hours. (23 RR 67–71.) She said that "semen is a very sticky substance and some of it could actually adhere or stick to like placque [sic] that's on the teeth or in the recesses of the mouth [and] not fully be cleaned out." (23 RR 68.) Dr. Carter said that sperm cells could be found in the mouth hours after ejaculation. (23 RR 129.)

Dr. Robert Benjamin, a molecular biologist testifying for Prible, said that he did not agree with Watson's testimony suggesting that sperm cells found in Tirado's mouth showed that she had died soon after they were deposited. (27 RR 118–19.) He said that there were too many variables and that Watson made too many assumptions. (27 RR 119.) He said that if the semen had been deposited in a consensual act, the recipient may not take steps to remove it from the mouth. (27 RR 120–21.) He said also that there were no controlled studies to support Watson's conclusion about when the semen could have been deposited relative to Tirado's death. (27 RR 123–24.)

**B.    In state habeas proceedings Prible's experts challenged the findings and methods of the State's expert.**

**1.    Prible's evidence**

**a.    Johnson affidavit**

In state habeas proceedings, Prible offered an affidavit from Elizabeth Johnson, Ph.D., a forensic scientist with a doctorate in immunology and postdoctorate training in molecular biology and DNA analysis. (01 SHCR I: 37–41.) She said that Watson's testimony about the timing of the semen deposit in Tirado's mouth was not reliable. (01 SHCR I: 41.) She cited studies suggesting that spermatozoa could be detected in oral smears up to six hours after an assault involving ejaculation into the mouth of a living victim "despite brushing teeth, using mouthwash and drinking fluids"; in the "oral cavity up to six hours after the event and up to nine hours on lip swabs"; and "on oral samples collected 24–31 hours after the event in a live individual . . . ." (01 SHCR I: 40.)

**b.    Benjamin affidavit**

Prible also offered an affidavit from Dr. Benjamin, who had testified at trial for the defense. (01 SHCR I: 68.) Dr. Benjamin said that he was provided the documentation related to the State's DNA testing performed on the trial evidence. (01 SHCR I: 68.) When he spoke with the State's expert, William Watson, before trial, Watson told him that he, Watson, "would be unable to rule out that a time of up to 10 to 15 minutes might have passed between when Mr.

95

Prible ejaculated into the mouth of [Tirado] and the time when she was shot to death." (01 SHCR I: 68.) Dr. Benjamin then heard Watson testify that the time lapse between ejaculation and the death of Tirado was insignificant and that Tirado's death most likely followed ejaculation immediately. (01 SHCR I: 68.) Given Watson's pretrial statements, with its time estimate of 10 to 15 minutes, Dr. Benjamin said, the defense was "completely surprised" by Watson's trial testimony. (01 SHCR I: 68.) Dr. Benjamin said:

> Because defense counsel had not anticipated this testimony, they were not prepared to cross-examine [Watson] related to this point and were unable to bring in an additional expert with expertise in this area or to request from Mr. Watson the scientific evidence which would have been the basis for his conclusions.

(01 SHCR I: 68.) Dr. Benjamin said that it was still his opinion that Watson's statement about the lapse of time between ejaculation and death was not based on available current scientific literature. (01 SHCR I: 68.) Dr. Benjamin said that there are too many uncontrolled variables to make a firm and accurate estimate of the time that "profilable quantities of sperm" would remain in a person's mouth. (01 SHCR I: 68.)

## 2.   State's evidence—defense counsel's affidavit

The State offered an affidavit from Prible's trial counsel, Terrence Gaiser. (01 SHCR I: 207–10.) Gaiser said he had retained Dr. Benjamin to aid the defense. Dr. Benjamin listened to Watson's trial testimony and told Gaiser that

there was no available literature about the viability of DNA in the human mouth after ejaculation. (01 SHCR I: 209.) After Watson's testimony and before the defense presented its case, counsel and Dr. Benjamin discussed discrediting Watson's testimony. (01 SHCR I: 209.) Gaiser again questioned Dr. Benjamin about the availability of literature on the issue of the viability of DNA in the human mouth. (01 SHCR I: 209.) Counsel said that Dr. Joye Carter, the Harris County medical examiner, had testified that such literature existed and that sperm and DNA had a "lengthy viability in the human mouth." (01 SHCR I: 209.) Dr. Benjamin again told Gaiser that there was no such literature. (01 SHCR I: 209.) Giaser said there was ample time to discuss the State's evidence and the strategies to rebut it effectively. (1 SHCR 209) Gaiser said he conferred with Dr. Benjamin after Watson testified and before counsel cross-examined Watson. (1 SHCR 209.) "At no time did Dr. Benjamin express his surprise or inability to rebut Mr. Watson's testimony," Gaiser said. "In fact, he said Watson's testimony was 'bad' science." (01 SHCR I: 209.)

Gaiser said the affidavits of Drs. Benjamin and Johnson came to his attention only after he was ordered to prepare his own postconviction affidavit. (01 SHCR I: 210.) Counsel said he was "annoyed and frustrated to learn that literature existed on this crucial point and that Dr. Benjamin should have been aware of this literature." (01 SHCR I: 210.)

97

Counsel said: "Dr. Benjamin's claim that he was surprised by Watson's testimony and that Watson's testimony is 'not based upon scientific literature available to this day,' is absurd hypocrisy. He appears to be covering for a case of his own ineptitude." (01 SHCR I: 210.)

### 3. Findings

The convicting court found the following:

· At trial Watson testified that he examined fingernail scrapings and swabs taken from Tirado, the known blood sample from Herrera, and samples from Prible. (01 SHCR II: 453–54, para. 19.)

· Watson said that analysis showed mixtures of DNA in Tirado's anal and vaginal swabs were consistent with the DNA profiles of Tirado and Herrera. (01 SHCR II: 454, para. 19.)

· The full male profile obtained from Tirado's oral swab was consistent with Prible's. (01 SHCR II: 454, para. 19; 24 RR 31–45, 93–104.)

· In his statement to police, Prible said that the night of the offense, he and Tirado had a consensual sexual encounter. (01 SHCR II: 454, para. 20; 31 RR at SX 102.)

· Watson testified that it was rare for a full DNA profile to be found in an oral swab after an oral assault on a living person, due to the typical reactions such as spitting or swallowing. (01 SHCR II: 454, para. 21.)

• Watson said he had never encountered a case where an oral swab from a live victim yielded a full profile. (01 SHCR II: 454, para. 21.)

• He said that his finding a full male profile was consistent with semen being deposited in Tirado's mouth seconds before her death. (01 SHCR II: 454, para. 21; 24 RR 102–04.)

• Watson did not testify conclusively that the sperm had to be deposited in Tirado's mouth almost simultaneously with her death, and Watson did not rule out the possibility that the sperm could have been deposited a half hour before Tirado's death. (01 SHCR II: 454, para. 22.)

• Watson testified that it was difficult for him to say whether finding a full profile from an oral swab was consistent with semen being deposited in Tirado's mouth a half hour before her death. (01 SHCR II: 454, para. 22; 24 RR 99–104.)

• In cross-examination, Watson acknowledged that he had no experience in analyzing oral swabs obtained after consensual oral sex, that he did not know if results from an oral swab taken after a consensual encounter would differ from those taken after an assault, and that he knew of no literature regarding the longevity of sperm in the mouth after consensual oral sex. (01 SHCR II: 454–55, para. 23; 24 RR 109–12.)

• Watson based his testimony on his own experience; he acknowledged his lack of experience in analyzing oral swabs obtained after consensual oral sex; Prible's jurors were aware of this difference. (01 SHCR II: 455, para. 24.)

• Dr. Carter testified that based on her training and expertise, even if a woman tried to spit out or swallow semen, sperm would stay in a woman's mouth for a matter of hours after ejaculation due to its "sticky" nature; that there was not a lot of research on the subject of sperm viability in a person's mouth after ejaculation; and that it could not be determined with medical certainty when the semen was deposited in Tirado's mouth relative to her death. (01 SHCR II: 455, para. 25; 22 RR 67–70.)

• During cross-examination, Dr. Carter testified that sperm cells could be found in the mouth several hours after ejaculation, that ejaculation can contain sperms cells numbering "in the millions"; and that the ejaculation of more than two million sperm cells would not surprise her. (01 SHCR II: 455, para. 26; 22 RR 129–33.)

• Trial counsel Gaiser retained the services of Dr. Benjamin to rebut Watson's testimony; Dr. Benjamin was present for Watson's testimony; Dr. Benjamin told counsel more than once that there was no literature on the viability of DNA in a human mouth after ejaculation; Dr. Benjamin had several days after Watson's testimony to prepare his own testimony; there was ample

time to discuss the State's evidence and strategies to rebut that evidence; and Dr. Benjamin never expressed any surprise or inability to rebut Watson's testimony. (01 SHCR II: 455–56, para. 27; SX A.)

• Dr. Benjamin testified about the lack of research regarding the viability of DNA in the human mouth after ejaculation and said that too many variables existed to make a conclusion about when the sperm was deposited in Tirado's mouth; Dr. Benjamin said that Watson's time estimate was not scientifically valid and that he disagreed with Watson's testimony because Watson did not research or investigate comparative cases and because there were no studies to support Watson's conclusions regarding when the DNA was deposited in Tirado's mouth. (01 SHCR II: 456, para. 28; 27 RR 119–24, 136–37.)

• The evidence before the jurors showed that several variables could influence a person's conclusion about the time of the semen deposit in relation to the time of death. Watson, Dr. Carter, and Dr. Benjamin all acknowledged different variables and acknowledged the difficulty in determining the time of deposit in relation to the time of death. Watson, Dr. Carter, and Dr. Benjamin relied solely on their training and experience when testifying. No particular methodology was used in making their estimates. (01 SHCR II: 456, para. 29.)

• Dr. Benjamin's habeas affidavit, in which he said that trial counsel were "surprised" and unprepared to cross-examine Watson effectively about the viability of semen before death, was unpersuasive. (01 SHCR II: 456, para. 30.)

• Dr. Benjamin's after-the-fact description of his own testimony and interactions with trial counsel did not show counsel was ineffective. (01 SHCR II: 456–57, para. 20.)

• There was no dispute about the presence of semen in Tirado's mouth or the testing used to determine its presence; the dispute, rather, concerned the factors to consider in determining the time of deposit; and a *Kelly/Daubert* [18] hearing was not required for the admissibility of such evidence where experts relied upon experience and training and not particular methodology in reaching their conclusions. (01 SHCR II: 457, para. 31.)

• Counsel filed numerous pretrial motions, had a thorough command of the facts and law, cross-examined witnesses vigorously, presented defense witnesses at guilt-innocence, made relevant objections, argued passionately for Prible both at guilt-innocence and at sentencing, and presented the apparent, reasonable trial strategy challenging the credibility of the State's witnesses, attempting to

---

[18] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

show that the State did not meet its burden of proof, and attempting to show that the police investigation was lacking. (01 SHCR II: 457, para. 32.)

### 4.  Conclusions

The court concluded the following:

• Prible did not show that counsel was ineffective for failing to rebut Watson's testimony. (01 SHCR II: 464, para. 3.)

• Counsel, through cross-examination of Watson and Dr. Carter and through the testimony of Dr. Benjamin, presented evidence that Prible's sperm could have been remained in Tirado's mouth for hours before her death, rebutting the inference that the sperm conclusively was deposited in her mouth immediately before her death. (01 SHCR II: 464, para. 3, *citing Ex parte Ewing*, 570 S.W.3d941, 945 (Tex. Crim. App. 1979) (holding that trial strategy will be reviewed by appellate court only if record shows action was without any plausible basis); *Martin v. State*, 623 S.W.2d 391 (Tex. Crim. App. 1981) (holding that fact another attorney might have pursued different strategy will not support finding of ineffectiveness).)

• Prible failed to show that counsel were ineffective for not requesting a *Kelly/Daubert* hearing where the experts acknowledged the variables that made it difficult to determine an exact time of the semen deposit and where they, rather than relying upon a particular methodology, relied upon training and

103

experience. (01 SHCR II: 464–65, para. 4, *citing Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997) (noting *Daubert* analysis inappropriate where expert relies on his experience and training and not particular methodology to reach his conclusions); *Rachal v. State*, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996) (holding that reconciliation of conflicts in witnesses' testimony lies with jury).

· Prible did not show counsel's performance was deficient and did not show harm. (01 SHCR II: 464–65, para. 5, *citing Strickland*, 466 U.S. at 689; *Bridge v. State*, 726 S.W.2d 558, 571 (Tex. Crim. App. 1986) (holding that standard for effective assistance of counsel does not ensure errorless or perfect counsel).)

### C.   The state habeas court's findings and conclusions were reasonable.

Because the issue of the effectiveness of counsel is a mixed question of law and fact, *see Strickland*, 466 U.S. at 698, this Court reviews the state-court decision using the "unreasonable application" standard. *See* § 2254(d)(1); *Nobles*, 127 F.3d at 416.

Counsel retained and consulted with a DNA expert. The expert heard Watson's testimony and advised counsel about that testimony. (01 SHCR I: 209–10.) On cross-examination, counsel drew from Watson that the State's witness had no experience conducting experiments with sperm found on an oral swab after consensual sex (24 RR 109); that the witness did not know whether

the findings of an oral swab would be different after consensual sex versus an assault (24 RR 110); that the witness could not tell from finding sperm in an individual's mouth whether a crime had been committed (24 RR 111); that he knew of no literature regarding the finding of sperm in the mouth after consensual sex (24 RR 112).

After Dr. Carter testified on direct examination by the prosecutor that sperm "could cling together and stay in the mouth for a matter of hours" (23 RR 67), on cross-examination by the defense, Dr. Carter acknowledged that she saw no indication of sexual assault (23 RR 128). And she acknowledged that sperm could be found in the mouth after "several hours . . . maybe even longer depending on their personal habits." (23 RR 129).

The state habeas court found Dr. Benjamin's posttrial recollections unpersuasive. (01 SHCR II: 456–57, para. 30.) Regarding the testimony of Watson, Prible does not show that the performance of counsel was deficient. *See Strickland*, 466 U.S. at 687. Counsel took reasonable steps to address the oral-DNA issue and to challenge Watson's testimony on cross-examination.

Even if deficient performance were presumed, Prible does not show the required prejudice. *See id.* Dr. Benjamin testified that Watson's conclusion about the time of ejaculation in relation to the time of death was not supported by scientific research. (27 RR 123–24.) Dr. Carter testified that after oral sex semen

likely would be detected in the mouth of a live person for some time. (23 RR 129.) In his habeas application, Prible at most offered an affidavit from Dr. Johnson indicating that semen can be detected for some time in the mouth of a live individual. (01 SHCR I: 40.) Hence, Dr. Johnson's affidavit merely augments counsel's trial argument, to-wit, that because semen can be detected in the mouth hours after its deposit, the presence of Prible's semen in Tirado's mouth did not show that she had been killed immediately after ejaculation. The oral-swab testimony formed only a small portion of the evidence showing guilt, that is, Prible's confession to Beckmon, Prible's being the last person seen with the victims, and his purchasing similar ammunition and possession of a clip.

In denying relief on Prible's ineffective-assistance claim, the state court applied the *Strickland* standard reasonably. *See* § 2254(d)(1).

## VIII.   Prible Does Not Show That He Was Deprived of an Unbiased Jury by the Systematic Exclusions of Hispanics from the Venire Panel.

Prible alleges that he was deprived of an impartial jury because the venire panel was not drawn from a fair cross-section of the community. (ECF No. 47 at 117–24; 01 SHCR I: 11–20.) He alleges that Hispanics were underrepresented in Harris County venires (ECF No. 47 at 117–18; 01 SHCR I: 16–20) and that the underrepresentation was systematic because Hispanics were disproportionately excluded by low juror pay and the county's failure to update its voter registration and driver's license lists (ECF No. 47 at 123–24; 01 SHCR II: 18–20).

106

### A.   State habeas proceedings

### 1.   Prible's state habeas evidence

### a.   Hietala affidavit

In state habeas proceedings, Prible presented an affidavit from Harold J. Hietala, Ph.D., a professor emeritus in the departments of anthropology and statistical science at Southern Methodist University. (01 SHCR I: 70–83.) Hietala said that while Hispanics made up about 30 percent of individuals eligible for jury service, Prible's venire panel included 37 Hispanics out of 300, about 12 percent. (01 SHCR I: 70, 75, 76–77.)

### b.   Stiffler affidavit

Prible also offered an affidavit from Lucille A. Stiffler, a Spanish-speaking data consultant, who helped Hietala "normalize and analyze data regarding the identification of Hispanic surnames and possible Hispanic surnames . . . from the supplied database of 300 cases." (01 SHCR I: 148–49.) She described the techniques she used in interpreting the surnames and other information in the data base to determine whether the individual listed in the data base would be, for Hietala's purposes, considered Hispanic. (01 SHCR I: 149–51.)

### 2.   State's evidence—Byers's affidavit

The state offered an affidavit from Katherine Byers, the jury-room manager with the Harris County district clerk's office. (01 SHCR I: 270–71.) She said that

jurors in Harris County are selected in accordance with Chapter 62 of the state government code. (01 SHCR I: 270.)  *See* Tex Gov't Code §§ 62.001–.501 (West 2012). The secretary of state sends to the office a list of the names of eligible jurors to be included in the jury wheel. (01 SHCR I: 270.) The list comprises names received from the Harris County voter registrar and the state Department of Public Safety and includes eligible voters and residents with valid drivers' licenses or state identification cards. (01 SHCR I: 270.) When the county receives the list, it receives only the prospective jurors' names, addresses, and dates of birth. (01 SHCR I: 270.) The individual's race or ethnicity is not included. (01 SHCR I: 270.) The list makes up the jury wheel, which is reconstituted every three years or upon its exhaustion. (01 SHCR I: 270–71.) The list is randomized by computer to ensure an equal spread alphabetically and among zip codes. (01 SHCR I: 271.) She said that the names of non-citizens, felons, and the deceased are "supposed to be removed." (01 SHCR I: 271.) But, she said, "this is not always completely done." (01 SHCR I: 271.)

Each week, about 15,000 jurors are summoned. (01 SHCR I: 271.) The county has a contract with a vendor who is given the list of names and addresses of those to be summoned. (01 SHCR I: 271.) The vendor runs the addresses through a national change-of-address database, she said, to ensure that the address listed is the most current. (01 SHCR I: 271.) This process is supposed to

cull the names of the deceased and the felons. (01 SHCR I: 271.) The summons are then printed and mailed. (01 SHCR I: 271.) The process has been in place since October 1998. (01 SHCR I: 271.)

Upon receiving a summons, a prospective juror may request an exemption by mail, e-mail, fax, on line, or in person. (01 SHCR I: 271.) Normally about 40 to 45 percent of those summoned do not respond at all and do not report for duty. (01 SHCR I: 271.) "In an attempt to rectify this problem, we have instituted a system where a postcard is mailed to those who do not respond to their summons," she said. (01 SHCR I: 271.) The postcard serves as a second notice to appear and describes the penalties that may be imposed for non-compliance. (01 SHCR I: 271.) This system has been in place since March 2005. (01 SHCR I: 271.)

### 3. Findings

The convicting court  found the following:

• Prible had not objected at trial to the jury array. (01 SHCR II: 457, para. 33.)

• Prible's method of arriving at his allegation that Hispanics were underrepresented in the 300-person panel in his case—namely, counting traditionally Hispanic surnames and surnames that might possibly be Hispanic, and those individuals who classified their race as Hispanic—was unreliable and speculative. (01 SHCR II: 458, para. 35.)

109

• Prible's method for determining that Hispanics were underrepresented—namely, disregarding the possibility that non-Hispanic women may adopt the Hispanic surnames of their husbands or the possibility that non-Hispanic men and women may have "traditional" Hispanic names for various reasons, such as, adoption, the presence of a lone, paternal Hispanic among largely non-Hispanic lineage, or name change—was unreliable and speculative. (01 SHCR II: 458, para. 36.)

• Prible did not support his claim with reliable data; he relied upon bare census numbers of the Hispanic population in Harris County over the age of eighteen without consideration of facts that affect juror eligibility within that population, including the percentage of Hispanics in Harris County who are foreign-born non-citizens, the percentage of Hispanics who do not speak English well or at all, and the percentage of Hispanics who were otherwise exempt by statute. (01 SHCR II: 458, para. 37.)

• Prible's allegation of the ethnic composition of a single jury panel and his statistical assertions did not constitute a prima facie showing of discrimination and did not show exclusion, much less systematic exclusion. (01 SHCR II: 459, para. 38.)

• Prible's allegation that the low juror pay and frequent address changes excluded Hispanics systematically was unpersuasive. (01 SHCR II: 459, para. 39.)

• Prible's expert acknowledged that the procedures used by Harris County did not show bias against Hispanics and stated in his affidavit that "[w]e do not argue that the procedures for summoning individuals for jury service are in any way biased against Hispanics." (01 SHCR II: 459, para. 40, *see* 1 SHCR 75.)

• The affidavit of Harris County Jury Room Manager Katherine Byers was credible. (01 SHCR II: 459, para. 41.)

• Byers said that Prible failed to show systematic exclusion of Hispanics, that the selection of Harris County panels is done in accordance with state law, *citing* Tex. Gov't Code § 62.001; that names were selected randomly from a list compiled from registered voters and individuals with valid drivers licenses and identification cards; and that ethnicity was not listed on the jury wheel, or on the lists derived from voter registration applications, drivers' licenses or identification cards. (01 SHCR II: 459, para. 41, see 1 SHCR 270–71.)

• Harris County used a national change-of-address service to ensure that all groups, including Hispanics, received summons; addresses were run through such services before the summonses were mailed to ensure that the most current mailing address was used; and even though such efforts were used, the individual bore the burden to change his address when he moved. (01 SHCR II: 459–60, para. 42, *citing* Tex. Transp. Code § 521.054.)

111

• Under state law, a challenge to the jury array may be made "'only on the ground that the officer summoning the jury has willfully summoned jurors with a view to securing a conviction or an acquittal,'" (01 SHCR II: 460, para. 44, *quoting* Tex. Code Crim. Proc. art. 35.07), and that Prible showed no intentional or willful act on the part of the Harris County district clerk in so summoning jurors (01 SHCR II: 460, para. 44).

### 4.   Conclusions

The court concluded the following:

• Because Prible failed to object to the jury panel at trial, he was barred from asserting his claim. (01 SHCR II: 465, para.6, *citing Rhoades v. State*, 934 S.W.2d 113, 119–20 (Tex. Crim. App. 1996); *Hodge v. State*, 631 S.W.3d 754, 757 (Tex. Crim. App. 1978).)

• In the alternative, Prible did not show that the jury-selection process violated the fair-cross-section rules. (01 SHCR II: 465, para. 7, *citing Duren v. Missouri*, 439 U.S. 357, 364 (1979).)

• To show a prima facie violation of the rules, the individual must show that (1) the group alleged to be excluded is "distinctive"; (2) the group's representation in the source from which juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) the

112

underrepresentation arises from systematic exclusion of the group in the jury-selection process. (01 SHCR II: 465, para. 7.)

• Prible did not support his allegation with reliable data, such as relative percentages of Hispanics eligible to vote, with drivers' licenses or identification cards, or statistics showing the actual percentage of Harris County Hispanics eligible for jury service. (01 SHCR II: 466, para. 8, *citing Pondexter v. State*, 942 S.W.2d 577, 580–81 (Tex. Crim. App. 1996).)

• In the alternative, and assuming for the sake of argument that Prible's data were correct, Prible did not meet the second impartial-jury prong with a "mere statistical showing of more than 10% disparity." (01 SHCR II: 466, para. 9, *citing Castaneda v. Partida*, 430 U.S. 482, 493 (1977); *United States v. Lopez*, 588 F.2d 450, 451–52 (5th Cir. 1979).)

• Prible failed to show systematic exclusion of Harris County Hispanics by analyzing the single jury panel in his own case. (01 SHCR II: 466, para. 10, *citing Pondexter*, 942 S.W.2d at 581).) And Prible failed to show that the jury-selection process in Harris County was unconstitutional. (01 SHCR II: 466–67, para. 10, *citing Lopez*, 588 F.3d at 452; *United States v. Arlt*, 567 F.2d 1295, 1297 (5th Cir. 1978).)

• Prible failed to show that the officer summoning the jury had willfully summoned jurors with a view to securing a conviction or acquittal in Prible's or

113

others' cases. (01 SHCR II: 467, para. 1, *citing* Tex. Code Crim. Proc. art. 35.07;

*Pondexter*, 942 S.W.2d at 580).)

B.  **Argument**

1.  **Because the state court denied relief based on state-law grounds, federal merits review is precluded.**

The Texas contemporaneous objection rule is an adequate and independent state law ground that will bar federal review. *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999); *Amos v. Scott*, 61 F.3d 333, 345 (5th Cir. 1995).  The Court of Criminal Appeals denied relief  because Prible at trial failed to object to the jury panel. (01 SHCR II: 465, para. 6, *citing Rhoades*, 934 S.W.2d at 119–20; *Hodge*, 631 S.W.3d at 757.)  Because the state court denied relief by relying upon a state-law ground independent of federal law and adequate to support its decision, federal review is barred. *See Harris*, 489 U.S. at 161–62. Prible does not plead cause and prejudice or miscarriage of justice to excuse default. (ECF No. 47 at 117–24.)

2.  **The evidence does not prove that Hispanics were excluded systematically from the venire panel.**

In the alternative, were this Court to review Prible's claim on the merits, it would not find him entitled to relief. In state criminal trials, juries must be drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (citing U.S. Const. amend. VI). "[V]enires from which juries are

drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Duren v. Missouri*, 439 U.S. 357, 363–64 (1979). To establish a prima facie violation, a petitioner must show (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Id.* at 364.

A process systematically excludes a group if the underrepresentation of that group is inherent in the particular jury-selection process used. *Id.* at 366; *Timmel v. Phillips*, 799 F.2d 1083, 1086–87 (5th Cir. 1986).

First, the state court determined that Prible did not show that low juror-pay and the presumed frequent changes of address excluded Hispanics systematically. (01 SHCR II: 459, para. 39). Indeed, Prible's expert acknowledged that he did not think that the Harris County juror-selection process excluded Hispanics systematically. (01 SHCR II: 459, para 40; *see* 01 SHCR I: 75.) This determination alone defeats the claim. *See Duren*, 439 U.S. at 363–64. But the state court also determined that Prible's expert did not show that Hispanics were underrepresented. (01 SHCR II: 458, para. 37.) Prible did not show accurately how many Hispanics were on the venire panel or how many Hispanics in Harris

115

County were eligible for jury duty. (01 SHCR II: 458, para. 37.) Prible does not show that the state court's application of *Taylor* and *Duren* was unreasonable. *See* § 2254(d)(1).

## IX.   The Fifth Circuit Does Not Recognize Actual Innocence as a Ground for Federal Habeas Corpus Relief.

Prible alleges that is entitled to relief because he is innocent of the crime charged. (ECF No. 47 at 124–27.)

First, this circuit has never held that a claim of innocence constitutes grounds for relief. *See In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998); *Jacobs v. Scott*, 31 F.3d 1319, 1324–25 (5th Cir. 1994).

Second, even if such a claim did state grounds for relief, Prible makes no such case. Prible offers no new evidence suggesting innocence but merely asks this Court to reweigh that evidence that was before the jurors. The evidence showing guilt is legally sufficient, *see Prible*, 175 S.W.3d at 730, and Prible's innocence-related arguments do not cast doubt on that finding, *see Parr v. Quarterman*, 472 F.3d 245, 252–53 (5th Cir. 2006. He does not show himself to be actually innocence of the charged crime. *See Schlup v. Delo*, 513 U.S. 298, 328 (1995); *Wright v. Quarterman*, 470 F.3d 581, 590 (5th Cir. 2006).

116

## EVIDENTIARY HEARING

Before this Court, Prible seeks an evidentiary hearing. (ECF No. 47 at 130.) Such a hearing is barred by statute. Where a petitioner has failed to develop the factual basis of his claims in state court, he is precluded from further factual development in federal court unless he can meet the certain exceptions. *See* § 2254(e)(2); *(Michael) Williams v. Taylor*, 529 U.S. 420, 430 (2000). In such a case, to be entitled to a hearing, he must show that

> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

§ 2254(e)(2).

A lack of diligence in developing the factual basis for a claim, on the part of an applicant or his counsel, constitutes "failure" and is sufficient to trigger the restrictive requirements of this subsection. *(Michael) Williams*, 529 U.S. at 432. Diligence depends upon whether the prisoner made a reasonable  attempt, in

117

light of the information available at the time, to investigate and pursue the claim in state court. *Id.* at 435.

In connection with his initial state habeas application, Prible took evidence by affidavit. (01 SHCR I: 37–41 (Elizabeth A. Johnson), 68 (Robert C. Benjamin), 70—83 (Harold J. Hietala), 148–53 (Lucille A. Stiffler), 207–10 (Terrence Gaiser), 270–71 (Katherine Byers).) In connection with his fourth state habeas application, he took evidence by means of affidavits (04 SHCR (before remand) 61–65 (JJ Gradoni), 72 (William Irvan), 74–75 (Tarus Sales), 77–78 (Danny Bible), 04 SHCR II: 411–15 (Roland Moore III); subpoenas for federal prison records (04 SHCR II: 425–27; ECF No. 47-12); *Prible v. Thaler*, No. 4:08-mc-00316 (S.D. Tex. March 10, 2011) (Order); unsworn transcripts of recorded conversations (04 SHCR II: 145–206 (Carl Walker, Jr.); inmate letters (220–21 (Mark Martinez), 224 (Carl Walker, Jr.) 226–27 (Jess Gonzales); and through a live evidentiary hearing (01–06 SHRR). At this point, the responsibility for any failure to present evidence must lie with Prible. *(Michael) Williams*, 529 U.S. at 432. For those claims reviewed on the merits in state court, this Court is bound by the evidence before the state court. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). And those claims not presented to the state court in a manner that did not assure a merits review are defaulted, *see Coleman*, 501 U.S. at 726, as are those claims that have not been presented to state court at all, *see id.* at 735 n.1.

118

## CONCLUSION

This Court should deny with prejudice Prible's federal petition for writ of habeas corpus, should deny a certificate of appealability on all issues here raised, and should deny Prible's request for an evidentiary hearing.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


  /s/ Thomas M. Jones
THOMAS M. JONES*

\*Attorney-In-Charge     Assistant Attorney General
Postconviction Litigation Division

State Bar No. 00784357
Southern District Bar No. 29084
P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Ph.: (512) 936-1400
Fax: (512) 936-1280
E-mail:
Thomas.Jones@texasattorneygeneral.gov

ATTORNEYS FOR RESPONDENT

119

## CERTIFICATE OF SERVICE

I do hereby certify that on December 17, 2012, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Counsel for Prible:

Philip H. Hilder
James Rytting
Hilder & Assocs., P.C.
819 Lovett Blvd.
Houston TX 77006
Email: james@hilderlaw.com
        philip@hilderlaw.com

                                        /s/ Thomas M. Jones
                                      THOMAS M. JONES
                                      Assistant Attorney General