# EXHIBIT "30(A)"

# Part 1 of 4

REPORTER'S RECORD

VOLUME 5 OF 8 VOLUMES

TRIAL COURT CAUSE NO. 903122


HERMILIO HERRERO, JR.       )    IN THE DISTRICT COURT

         Appellant      )

                       )

VS.                  )    HARRIS COUNTY, TEXAS

                       )

THE STATE OF TEXAS        )

         Appellee       )    179TH JUDICIAL DISTRICT



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL/GUILT-INNOCENCE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


On the 26th day of April, 2002, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable J. Michael Wilkinson, Judge Presiding, held in Houston, Harris County, Texas:

Proceedings reported by computer aided transcription/stenograph machine.

COPY

A P P E A R A N C E S

1

2

3

4   MS. KELLY SIEGLER

5   Assistant District Attorney

6   SBOT NO. 10533450

7   201 Fannin

8   Houston, Texas 77002

9   Phone:  713.755.5800

10   ATTORNEY FOR THE STATE OF TEXAS

11

12

13

14   MR. DAN COGDELL

15   330 T.C. Jester

16   SBOT NO. 04501500

17   Houston, Texas 77007

18   PHONE:  713.426.2244

19   ATTORNEY FOR THE DEFENDANT

20

21

22

23

24

25

CHRONOLOGICAL INDEX

VOLUME 5

TRIAL ON MERITS-GUILT/INNOCENCE

APRIL 26, 2002

PAGE/VOL.

State rests.................................. 90/5

Defense rests............................. 114/5

Lunch....................................... 114/5

Court reporter's certificate................ 115/5

State's witnesses

| | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| RAFAEL DOMINGUEZ | 8 | 23 | | 5 |
| DR. DWAYNE WOLF | 60,74 | 86 | 74 | 5 |

Defense witnesses

| | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| SANDY BIELSTEIN | 90,112 | 102,113 | | 5 |

ALPHABETICAL INDEX OF WITNESSES

| | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| BIELSTEIN, SANDY | 90,112 | 102,113 | | 5 |
| DOMINGUEZ, RAFAEL | 8 | 23 | | 5 |
| WOLF, DR. DWAYNE | 60,74 | 86 | 74 | 5 |

EXHIBIT INDEX

| NUMBER | DESCRIPTION | OFFERED/ADMITTED/VOL. |
|--------|-------------|------------------------|
| SX - 1 | Photograph | 75/76/3 |
| SX - 2 | Photograph | 76/76/3 |
| SX - 3 | Photograph | 76/76/3 |
| SX - 4 | Photograph | 76/76/3 |
| SX - 5 | Photograph | 76/76/3 |
| SX - 6 | Photograph | 76/76/3 |
| SX - 7 | Photograph | 76/76/3 |
| SX - 8 | Photograph | 76/76/3 |
| SX - 9 | Photograph | 76/76/3 |
| SX - 10 | Photograph | 76/76/3 |
| SX - 11 | Photograph | 76/76/3 |
| SX - 12 | Photograph | 76/76/3 |
| SX - 13 | Plastic | 56/56/3 |
| SX - 14 | Glove | 58/58/3 |
| SX - 15 | Rug cutting | 59/59/3 |
| SX - 16 | Rope | 57/58/3 |
| SX - 17 | Autopsy report | 85/86/5 |
| SX - 18 | Photograph | 80/81/4 |
| SX - 19 | Photograph | 80/81/4 |
| SX - 20 | Photograph | 80/81/4 |
| SX - 21 | Photograph | 80/81/4 |
| SX - 22 | Photograph | 80/81/4 |
| SX - 23 | Photograph | 80/81/4 |

| | | | |
|---|---|---|---|
| 1 | SX - 24 | Photograph | 80/81/4 |
| 2 | SX - 25 | Photograph | 80/81/4 |
| 3 | SX - 26 | Photograph | 80/81/4 |
| 4 | SX - 27 | Photograph | 80/81/4 |
| 5 | SX - 28 | Photograph | 80/81/4 |
| 6 | SX - 29 | Photograph | 80/81/4 |
| 7 | SX - 30 | Photograph | 80/81/4 |
| 8 | SX - 31 | Photograph | 80/81/4 |
| 9 | SX - 32 | Consent form | |
| 10 | SX - 33 | Photograph | 112/112/3 |
| 11 | SX - 34 | Photograph | 190/190/3 |
| 12 | SX - 35 | Autopsy diagram | 73/74/5 |
| 13 | SX - 36 | Photograph | 191/191/3 |
| 14 | SX - 37 | Pen packet | |
| 15 | SX - 38 | J & S | |
| 16 | SX - 39 | Plea papers | |
| 17 | SX - 40 | J & S | |
| 18 | SX - 41 | Photograph | 104/104/3 |
| 19 | SX - 42 | Cassette tape | 106/NA/4 |
| 20 | DX - A | Photograph | 30/30/3 |
| 21 | DX - B | Photograph | 30/30/3 |
| 22 | DX - C | Photograph | 30/30/3 |
| 23 | DX - D | Photograph | 30/30/3 |
| 24 | DX - 18 | Letter | 44/44/4 |
| 25 | DX - 19 | Letter | 44/44/4 |

1          (Jury out.)

2          MS. COGDELL:  The State's -- I'm still

3     objecting and maintain my objection to the

4     admissibility of any statements which purport to be

5     threats either made to this witness directly or made

6     to this witness concerning other potential witnesses

7     under the theory that they are extraneous offenses

8     which I was not provided notice of.  Ms. Siegler's

9     position yesterday afternoon was that they were not

10    extraneous offenses.  I cite the Court to, believe it

11    or not, Peoples versus --

12          THE COURT:  Remind me exactly what you

13    anticipate the testimony is going to be.

14          MS. COGDELL:  I think -- and Kelly can

15    correct me -- something to the effect of Dominguez

16    will testify that Herrero told him about Moreno, The

17    fat bitch better not talk, or words to that effect.

18          MS. SIEGLER:  That's one.

19          MS. COGDELL:  The second -- now there are

20    others.  He claims he was picked up by the cops.

21          THE COURT:  Let's do these one at a time.

22    You intend to present that; is that correct?

23          MS. SIEGLER:  That statement, yes, sir.

24          MS. COGDELL:  All right, sir.  The next

25    statement which she intends to develop is that Herrero

1  told him he was picked up by the cops.  I do not think

2  that rises to the level of an extraneous offense.  I

3  don't think I have an objection to that.  The

4  statement he makes to Dominguez about him, Herrero,

5  being the last one seen with him.  And I don't think

6  that rises to the level of extraneous offense, and I

7  don't think she was required to notify me.  The cops

8  did not have shit.  I do not believe that's an

9  extraneous offense.  I think that's admissible.  There

10  is a question I have as to exactly what she

11  anticipates the testimony of Mr. Dominguez will be

12  with respect to the statement, I've been through this

13  before.

14        MS. SIEGLER:  I've already told him this

15  morning we're not going where he said, I've been

16  through this before.  We're not talking about that.

17        MS. COGDELL:  The sole remaining statement

18  that I'm objecting to is some statement -- Miss

19  Siegler will have to clarify for the record the exact

20  substance of it -- but to the effect that the day

21  before Mr. Dominguez leaves Beaumont --

22        MS. SIEGLER:  All we're going to talk about

23  is the fact the defendant apologized to Mr. Dominguez

24  and Nathan Foreman about thinking they were snitches,

25  and he went on to say that he knew that Jesse was a

1   snitch. But I'm not going to get into the thing you
2   were most concerned about yesterday, I'm going to get
3   that pussy, Jesse, because I can reach out everywhere.
4   I'm leaving it alone.

5               MS. COGDELL: So the only one we're arguing
6   about, Kelly, is the statement, That fat bitch,
7   Freddie, better not testify?

8               MS. SIEGLER: Yes.

9               MS. COGDELL: All right. So that being the
10  sole issue, Mrs. -- I'm sorry, I'm slow this
11  morning -- Miss Siegler's position after court
12  yesterday was that it's not an extraneous offense.

13              THE COURT: And that's a statement allegedly
14  made by the defendant, referring to Moreno.

15              MS. COGDELL: Referring to Moreno, but made
16  to Dominguez.

17              MS. SIEGLER: Referring to Freddie.

18              THE COURT: I'm sorry?

19              MS. COGDELL: I'm sorry, Freddie Hernandez.

20              MS. SIEGLER: Yeah.

21              MS. COGDELL: I stand corrected. Then the
22  same objection, that that is -- A, it is an extraneous
23  offense. And I cite the Court to Peoples versus
24  State, 874 S.W.2d, 804. Stands for the proposition
25  that a defendant's statements about attempting to

1   intimidate or silence witnesses is an extraneous

2   offense.  That case, to be candid, also stands for the

3   proposition that that evidence is relevant and

4   admissible if and only if under 37.07 I receive notice

5   of it.

6           As I pointed out for the Court yesterday, my

7   notice and request for evidence pursuant to 37.07,

8   38.37, 404(b), and 609 evidence was filed on the 20th

9   day of February, 2002.  Miss Siegler and I went over

10  those, and she agreed to provide me notice of any such

11  extraneous offenses.  I was not -- I was, to her

12  credit, given a long list of extraneous offenses and

13  bad acts.  This was not among them.  That is, the

14  statement we're arguing about was not included in

15  that.  So I'm objecting to the -- I'm objecting to the

16  State's being allowed to elicit that testimony,

17  because it does not comply with 37.07, 38.37, 404, and

18  609, and the agreed order by this Court.

19          THE COURT:  Do you have anything you want to

20  put on the record?

21          MS. SIEGLER:  Judge, it's my position what

22  the defendant's saying about Freddie, That fat bitch

23  better not talk, doesn't rise to the level of

24  threatening Freddie.  First of all, Freddie's nowhere

25  around him.  He doesn't go so far as to say, like he

1 does in the one I'm agreeing not to go into today, I'm

2 going to get that pussy because I can reach out

3 everywhere. He's not saying how he can get him, if he

4 can get him, where he can get him, anything like that.

5 He's just making a comment.

6 THE COURT: All right. Defense's objection

7 is overruled. I'm going to allow that statement.

8 Basically my understanding is the totality of it is

9 regarding Freddie, defendant says, That bitch better

10 not talk.

11 MS. SIEGLER: Yes, sir.

12 MS. COGDELL: Now, I think we're in

13 agreement. Correct me if I'm wrong, but this witness

14 is not going to testify to any death threats made --

15 ostensibly made by Herrero to him. I think we had

16 that agreement yesterday.

17 THE COURT: I don't believe I've heard

18 anything about any of them. Were there any yesterday?

19 MS. COGDELL: We talked about it yesterday

20 and the Court -- that was when the Court said, I'm

21 inclined to go along with you.

22 MS. SIEGLER: My instructions to Mr.

23 Dominguez is, when we start today, my question is

24 going to be along the lines of, In light of your

25 current federal sentence, what is the understanding of

1  the deal you and I have?  And he's going to talk about
2  the Rule 35 reduction.  I told him not to talk about
3  any kind of threats made to him by this defendant via
4  anybody else unless I ask it or open it up, because
5  I'm not going into it.
6          MS. COGDELL:  Trust me.  I ain't asking.
7          THE COURT:  All right.  Let's bring them in.
8          (Jury in.)
9          THE COURT:  Please be seated.  If you
10 recall, ladies and gentlemen, this witness has
11 previously sworn.  When we adjourned yesterday, he was
12 on direct examination from the State.
13          Proceed, please.
14                  RAFAEL DOMINGUEZ,
15 having being first duly sworn, testified as follows:
16                  DIRECT EXAMINATION
17 BY MS. SIEGLER:
18     Q.  Mr. Dominguez, getting back to where we left
19 off yesterday, in light of the current federal
20 sentence that you're serving, describe for the jury
21 your understanding of the deal or agreement that you
22 and I have for your testimony here today.
23     A.  That if I cooperate fully with the State and
24 truthfully, you would write a letter to my prosecutor
25 and Federal Judge saying what I have done in

Do'=5

```
 1    cooperation with Herrero, and then they decide if I
 2    get a reduction of sentence or not.
 3         Q.   What does that mean, if you cooperate
 4    truthfully?
 5         A.   Yeah, that everything I say here today is
 6    the truth and I cooperate fully.
 7         Q.   And what's the difference between truthfully
 8    and fully?
 9         A.   That I not withhold any type of information.
10         Q.   And the first step in my part of the deal is
11    that I do what, sir?
12         A.   That you write a letter.
13         Q.   And if it's my opinion that you haven't been
14    completely forthcoming with all you know, what
15    happens?
16         A.   You do not write a letter.
17         Q.   And if it's my opinion you're not telling
18    the complete truth about what you're asked, what
19    happens?
20         A.   You do not write a letter.
21         Q.   And let's suppose that you do cooperate
22    truthfully and completely and I write the letter.
23    What happens once it gets to your Assistant United
24    States Attorney?
25         A.   He'll present it to my Judge, Federal Judge,
```

1   and he decides whether or not I get a reduction.   I

2   may get a reduction and I may not.

3       Q.   Is there any guarantee that once I write the

4   letter, from your understanding, that a motion will be

5   filed by your other Assistant United States Attorney?

6       A.   No, there is not.

7       Q.   And even if that other A.U.S.A. files a

8   motion, is there any guarantee, from your

9   understanding, as to what a Federal Judge might do?

10      A.   No, there is not.

11      Q.   So could this end up in a scenario where you

12  testify, I write a letter, the Feds file a motion, you

13  still don't get any reduction?

14      A.   Correct.

15      Q.   Or you could get a substantial reduction?

16      A.   Correct.

17      Q.   You don't know as you sit here today?

18      A.   No, I do not.

19      Q.   I want to direct your attention now and talk

20  about a conversation you had with the defendant one

21  day in the Year 2000.  Do you know which conversation

22  I'm talking about?

23      A.   In March, 2000?

24      Q.   Yes, sir, in March.  Where were you and what

25  was going on that day in the prison in this

1  conversation we're fixing to talk about?

2      A.   We were in the rec yard.

3      Q.   Who is we?

4      A.   Me, Herrero, Foreman, and Moreno.

5      Q.   What were you doing in the rec yard?

6      A.   We were just hanging out.

7      Q.   Remember what time of the day it was?

8      A.   It had to be in the evening.

9      Q.   Just hanging out?

10     A.   Yeah.

11     Q.   What happened to start this conversation?

12  What led up to it?

13     A.   We were talking about our war stories and

14  stuff, our past crimes we've done.  And Foreman, he

15  had just finished telling a story how he had been

16  kidnapped and tortured.  And when he finished, Herrero

17  made the comment of saying, You guys haven't put in no

18  real work.  And Foreman is like, What do you mean by

19  real work?  And he goes, Do you know Albert from the

20  neighborhood?  And Foreman's like, No, I don't know

21  him.  He's like, Well, I killed him.  And Foreman is

22  like, Oh, for real?  And he's like, Cat and Jay know.

23     Q.   Who's Cat?

24     A.   That's what they call me, Cat.

25     Q.   Who's Jay?

```
 1          A.    Moreno.

 2          Q.    And then what happened?

 3          A.    Okay.  And then Foreman asked him, Well,

 4    what happened?  And he said that Albert had jacked him

 5    out of some weed, and he didn't want to pay so --

 6          Q.    You need to slow down on your he's.

 7          A.    Albert jacked him out of some weed, and then

 8    one night they caught him slipping at a club.

 9          Q.    Who caught who slipping?

10          A.    Herrero and his boy.

11          Q.    Caught who?

12          A.    Caught Albert slipping at a club.

13          Q.    What does slipping mean?

14          A.    Like, off guard.

15          Q.    Keep going.

16          A.    And they ran into him there, and they

17    started talking with him and stuff, and they convinced

18    him to leave with them.  They told him, Let's go

19    somewhere and keep on partying.

20          Q.    Who convinced who?

21          A.    Herrero.

22          Q.    Convinced who?

23          A.    Convinced Albert.

24          Q.    Okay.

25          A.    And he agreed, so he left with them.  And
```

1  they all got into a van, and his boy was driving,

2  Albert sat in the front seat, and Herrero sat in the

3  back.  And as they were riding --

4        Q.    Whose boy was driving?

5        A.    Herrero's boy.

6        Q.    Okay.

7        A.    And as they were driving, Herrero and Albert

8  got into an argument about the money for the weed.

9        Q.    Did he ever say how much money it was?

10        A.    No, he did not.

11        Q.    Okay.

12        A.    Okay.  So they started arguing; so Herrero

13  grabbed him from behind, pulled out a knife, and slit

14  his throat.  And he told his driver to pull over, and

15  the driver pulled over and he freaked out and he took

16  off running.

17        Q.    Okay.  Stop.  At the point when Herrero told

18  y'all that he slit his throat, did he do anything with

19  his hands to show you how he did that?

20        A.    No, I don't recall no hand gestures.

21        Q.    Okay.  Keep going.

22        A.    Okay.  And his driver pulled over, and he

23  took off running.  And so when he went to pull Albert

24  to the back of the van --

25        Q.    When who?

```
 1        A.    When Herrero went to pull Albert to the back
 2   of the van, Albert was still alive; so he reached for
 3   a hammer and he beat him to death.
 4        Q.    Did he do anything with his hands when he
 5   talked about the hammer, the defendant?
 6        A.    No, I don't recall no hand gestures.
 7        Q.    Did he tell you where all he hit him with a
 8   hammer?
 9        A.    No.
10        Q.    He just said what again?
11        A.    He just hit him till he was dead.
12        Q.    Why did the defendant tell you he had to get
13   the hammer?
14        A.    Because he was still alive when he went to
15   pull him to the back of the van.
16        Q.    Had you ever heard any of that from this
17   defendant before?
18        A.    No.
19        Q.    Had you ever heard any of those kind of
20   details back when you were on the streets?
21        A.    No.
22        Q.    Okay.  Keep going.
23        A.    Okay.  And he said he rolled him in a carpet
24   and threw him out next to a dumpster.
25        Q.    Did he say anything else in that
```

1    conversation about all this?

2         A.    No, that was it.

3         Q.    In that conversation that you're talking

4    about right now, did the defendant mention who the

5    other person was in the van?

6         A.    No, he did not.

7         Q.    Not in that conversation?

8         A.    No.

9         Q.    I'm going to change subjects on you.   Did

10   there ever come a conversation that you had with this

11   defendant where he talked about these same

12   circumstances and named the other person involved?

13        A.    No.

14        Q.    Did he ever -- did there ever come a

15   conversation that you had with this defendant where he

16   talked about Freddie?

17        A.    Yes.

18        Q.    When did that happen?

19        A.    In September of '99.

20        Q.    Okay.   Tell us what led up to that

21   conversation.   First of all, where were y'all and what

22   were you doing?

23        A.    We were walking back to our units.

24        Q.    Who's we?

25        A.    Me and Herrero.

```
 1          Q.    Just the two of you?

 2          A.    Yes.

 3                THE COURT:   Tell me the date again.

 4    September when?

 5                THE WITNESS:   Sometime in September of '99.

 6          Q.    (BY MS. SIEGLER)   '99 or 2000?

 7          A.    No, '99.

 8          Q.    Okay.

 9          A.    Okay.   I had just arrived in Beaumont, and I

10    was telling him that I was locked up with Freddie.

11    And I told him everything that --

12          Q.    Okay.   Don't tell us anything that Freddie

13    said right now, okay?   But go ahead.

14          A.    That's how it leads to that conversation.

15    That's how everything started.

16          Q.    You told the defendant you ran into Freddie

17    how?

18          A.    At the Harris County Jail.

19          Q.    Okay.   Did you tell the defendant whether or

20    not you had a conversation with Freddie in the jail?

21          A.    Yes.

22          Q.    Yes or no, did you tell the defendant what

23    Freddie told you while in jail?

24          A.    Yes.

25          Q.    What was the comment the defendant made back
```

```
 1   to you?

 2        A.   I hope that fat bitch don't rat on me.

 3        Q.   The first conversation that you described

 4   for us today, the one that happened in March of 2000,

 5   when you first heard all these details out of the

 6   mouth of the defendant, how was he acting when he told

 7   you about what he had done to Albert?

 8        A.   Like he was proud of it.

 9        Q.   What did you think about it?

10        A.   Not much really.

11        Q.   Did there come another conversation that

12   took place between you and the defendant and Eddie

13   Gomez?

14        A.   Yes.

15        Q.   First tell the jury again, who is Eddie

16   Gomez?

17        A.   He's my codefendant in my federal case.

18        Q.   Who got to Beaumont first?

19        A.   Eddie.

20        Q.   How much before you?

21        A.   I'd say about two or three weeks.

22        Q.   And is he the same one that you talked about

23   yesterday, as far as his papers were the ones you used

24   to fix your papers?

25        A.   Yes, and I also had to fix his P.S.I., also.
```

```
 1          Q.    In this conversation you're fixing to talk
 2    about between you and the defendant and Eddie, when
 3    did it take place?
 4          A.    Around the summer of 2000.
 5          Q.    Was anything unusual going on in the prison
 6    then?
 7          A.    Yeah, there was a lot of tension within the
 8    gangs.
 9          Q.    Why?
10          A.    They were going to war.
11          Q.    When you say gangs, are you talking about
12    All Houston?
13          A.    No, I'm talking about the Texas Syndicate
14    and the Besurenos, an L.A. gang.
15          Q.    Spell that for Pam.
16          A.    B-E-S-U-R-E-N-O-S.
17               MS. SIEGLER:   Judge, can we approach the
18    bench?
19               THE COURT:   Yes.
20               (At the bench.)
21               MS. SIEGLER:   It's just a conversation that
22    starts off with the defendant saying, Do y'all want a
23    shake?  And I told him not to say that, but I want to
24    make sure he remembers it.
25               MS. COGDELL:   Yeah.  Just make sure -- A,
```

1    make sure he remembers it, and B, lead him.

2         (Continuing in the jury's hearing.)

3    Q.    (BY MS. SIEGLER)  Mr. Dominguez, listen to

4    my question.  In this conversation that was between

5    you and the defendant and Eddie, I want you to start

6    with the part where the defendant made a comment to

7    Eddie about what he had done to Albert.  Start with

8    that.

9    A.    He said, You should have seen when I slit

10   his throat.  I left him a smile from ear to ear.

11   Q.    How did Eddie react?

12   A.    He was like, For real, you were doing it

13   like that on the street?  And he goes, Yeah.  You

14   don't know me, Eddie.  When you fuck with my money,

15   I'm the devil.

16   Q.    Did that conversation, the one you're

17   talking about right now, happen in English or in

18   Spanish?

19   A.    In Spanish.

20   Q.    And how was the defendant acting when he

21   told Eddie about that?

22   A.    Like he was proud of it, like it was his

23   trophy.

24   Q.    Was there ever a -- changing the subject

25   again, was there ever a conversation that took place

```
 1  between you and the defendant where he talked about
 2  kind of how the investigation went in regards to this
 3  case?
 4       A.   Yes.
 5       Q.   When did that conversation happen?
 6       A.   After he got indicted.
 7       Q.   Well, that's a different conversation than
 8  the first long one, correct?
 9       A.   Yes.
10       Q.   And the one that he said to Eddie that we
11  just talked about?
12       A.   Yes.
13       Q.   And the comment he made to you back in '99?
14       A.   Yes.
15       Q.   This is one that happened again when?
16       A.   After he was indicted on this murder charge.
17       Q.   So y'all are still in Beaumont?
18       A.   Yeah.
19       Q.   That would have been about when?
20       A.   Last summer, late summer.
21       Q.   Who all was present in this conversation?
22       A.   Just me and him.
23       Q.   And what did the defendant say?
24       A.   Well, he came to me complaining about
25  Moreno.   He had snitched on him about this murder.
```

```
 1    And then he kept on bitching, saying, See, he's your
 2    home boy and look what he's doing, and stuff.  And I
 3    was like, Oh, you know, that's fucked up.  And we
 4    started talking about another friend of ours named
 5    Marty, who was over here in Harris County facing
 6    murder charges already.  And he made a comment of
 7    saying the cops had picked him up and questioned him
 8    about this murder already and stuff, because he was
 9    the last one seen with him; but he wasn't worried
10    about it, because they couldn't break him.
11         Q.   How was he saying that to you?
12         A.   Well, at that time he was kind of pissed
13    off, so --
14         Q.   Now jump to a conversation with me that took
15    place the day before the defendant left Beaumont to
16    come to Harris County.  Do you know which conversation
17    I'm talking about?
18         A.   Yes.
19         Q.   I want you to tell the jury about the part
20    of that conversation having to do with the apology and
21    tell us about that.
22         A.   Okay.  It was the day right before he left
23    to come over here to Harris County and face these
24    charges.  He came up to me and Nathan Foreman to
25    apologize for the way he had been acting lately.  He's
```

1    like, he's been under a lot of stress, and he wasn't

2    sure what he was going to do about this murder, and he

3    was sorry, and so we wished him luck.

4         Q.   And why was he apologetic to you and Nathan,

5    specifically?

6         A.   Because he thought -- well, at that time,

7    when he was apologizing to us, we told him we thought

8    you were mad at us for something because we thought

9    you were snitching on us, or we believe you thought we

10   were snitching on you.  And he's like, No, I know if

11   you guys were snitching --

12        Q.   Say that again.

13        A.   I know if you guys were snitching on me, you

14   guys be with Moreno.

15        Q.   Be with Moreno?

16        A.   Yeah.

17        Q.   Because Moreno was no longer in Beaumont?

18        A.   No.

19        Q.   Did you make any comment back to him at that

20   point after he apologized?

21        A.   Well, we just wished him luck.

22             MS. SIEGLER:  Pass the witness, Judge.

23             MS. COGDELL:  May I proceed, Your Honor?

24             THE COURT:  Please.

25

```
 1                    CROSS-EXAMINATION
 2   BY MS. COGDELL:
 3        Q.   Good morning, Mr. Dominguez.
 4        A.   Good morning.
 5        Q.   My name is Dan Cogdell.  Correct me if I'm
 6   wrong, Mr. Dominguez.  Before yesterday, you and I had
 7   never laid eyes on each other?
 8        A.   Correct.
 9        Q.   I've never cross-examined you in any other
10   courtroom or seen you in any other circumstances?
11        A.   Correct.
12        Q.   Agree with me your full name is Rafael
13   Dominguez, Jr., right?
14        A.   Correct.
15        Q.   You have made or you've testified in some
16   detail about the fact that you had to prepare a fake
17   presentence report, Mr. Dominguez, in order to prove
18   to Mr. Herrero that you are not a snitch in your case.
19   You've testified to that?
20        A.   Correct.
21        Q.   Do you know what public records are,
22   Mr. Dominguez?
23        A.   Yes.
24        Q.   Have you ever seen the public records that
25   were associated with the prosecution of you here in
```

1 | Houston?

2     A.   Meaning which ones? I take it there is

3 | quite a few.

4     Q.   Yes, sir, there are. Let me show you the

5 | first one, which I have marked as Defendant's Exhibit

6 | 30, which I represent to you is a docket sheet that

7 | prints out the history of your federal criminal case.

8 | You ever seen that before?

9     A.   No, I ain't seen this one before.

10     Q.   What is a docket sheet? What's your

11 | understanding of a docket sheet?

12     MS. SIEGLER: Objection, it's not relevant.

13     MS. COGDELL: Oh, it is relevant.

14     THE COURT: I'm going to allow it.

15     A.   The docket sheet is scheduling of my court

16 | appearances.

17     Q.   (BY MS. COGDELL) Does that appear to be the

18 | docket sheet in your case?

19     A.   Yes.

20     Q.   When does it appear from the face of that

21 | document to have been generated?

22     A.   April 25th, 2002.

23     Q.   April 25th, 2002, at 12:54 a.m. That would

24 | have been yesterday, shortly before 1:00 -- does it

25 | say a.m.?

25

```
 1        A.    Yeah, a.m.

 2        Q.    Okay.  So that may be -- I'll put a.m.

 3   Anyway, on what date?

 4        A.    25th, April 25th, 2002.

 5        Q.    That was yesterday?

 6        A.    I'm not sure of the date.

 7        Q.    In fact, do you know, Mr. Dominguez, that

 8   these documents are available on line?  If a person

 9   knows how to do it, they can click into a federal

10   website and pull down the very information that's

11   contained in this public document.

12        A.    Yeah, that's correct.

13        Q.    Let me ask you some questions and see if

14   they're consistent with your memory, Mr. Dominguez.

15   There is some things that happened in your case.

16   Was -- were you indicted on or about April 3rd, 1998?

17        A.    I believe so.

18        Q.    Were you detained?  Did a judge detain you

19   on or about May 5th?  Was a detention order signed?

20        A.    Yes.

21        Q.    Who was your first lawyer?

22              MS. SIEGLER:  Judge, I object to all of

23   this.  It's improper impeachment.  It's not relevant.

24              THE COURT:  I don't think it's impeachment

25   at all.
```

```
 1                    MS. COGDELL:   I'm getting to the impeachment
 2    part.
 3                    THE COURT:    Let's see where we're going.
 4          Q.    (BY MR. COGDELL)   Was your first lawyer a
 5    lady by the name of Asha Reddi, or a person by the
 6    name of Asha Reddi?
 7          A.    Yes.
 8          Q.    Now you entered a plea agreement on or about
 9    October 1st, 1998?
10          A.    Correct.
11          Q.    And do you know that a sealed confidential
12    sentencing recommendation regarding Rafael Dominguez
13    was filed on April 5th, 1999, or May 5th, 1999?
14          A.    Yes.
15          Q.    And you were sentenced on August 6th, 1999?
16          A.    Correct.
17          Q.    And a motion by the United States of America
18    as to Rafael Dominguez, Jr. for downward departure was
19    granted on that same day?
20          A.    Correct.
21          Q.    Now, Mr. Dominguez, does this public record,
22    in fact, show that, that this downward departure was
23    filed by the government and granted by the Judge?
24          A.    Yes.
25          Q.    It's shown in a public record, right?
```

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Well, you would agree with me, |
| 3 | Mr. Dominguez, if somebody really wanted to find out |
| 4 | whether or not you were cooperating and whether or not |
| 5 | you were a snitch, all they'd have to do -- you were |
| 6 | sentenced here in Houston, right? |
| 7 | A. Yes. |
| 8 | Q. Federal Building, 515 Rusk? |
| 9 | A. Yes. |
| 10 | Q. District Clerk's Office is on the first |
| 11 | floor. All someone would have to do is walk into the |
| 12 | District Clerk's Office, punch up your name, and |
| 13 | they're going to get one of these spit out and printed |
| 14 | for them just for the asking. Are you aware of that? |
| 15 | A. In prison it don't work like that. |
| 16 | Q. If somebody has extensive contacts, family, |
| 17 | friends, people working for him, anybody could get one |
| 18 | of these by walking down to 515 Rusk, couldn't they? |
| 19 | A. Correct. |
| 20 | Q. You ever seen the judgment in your case? |
| 21 | A. Yes. |
| 22 | Q. What's a judgment, or your understanding of |
| 23 | a judgment? |
| 24 | A. It contains my sentence and information |
| 25 | about my supervised release and any fine. |

```
 1           Q.    I'm sorry, I cut your answer off.   Judgment
 2    contains what?
 3           A.    Information about my supervision release,
 4    how much time I received, and I believe it contained
 5    information about my fine.
 6           Q.    And a judgment, just like the docket sheet,
 7    is public record.   Agree with me?
 8           A.    Correct.
 9           Q.    Does the public record docket sheet --
10    showing you Defense Exhibit 31 -- show anybody who
11    looks it up that you got a downward departure, a
12    sentence reduction, based on substantial assistance?
13           A.    Correct.
14           Q.    Now substantial assistance is legalese for
15    being a snitch, right?
16           A.    Correct.
17           Q.    So once again, Mr. Dominguez, anybody that
18    really wants to find out whether or not you truly were
19    a snitch, they can go down and either have the docket
20    sheet pulled in your case --
21           A.    Correct.
22           Q.    -- or this.   Do you remember the courtroom
23    proceedings that occurred in your case, Mr. Dominguez?
24           A.    You want to be specific?
25           Q.    Sure.   Do you remember being sentenced on
```

```
1    August 6th, 1999?

2         A.    Correct.

3         Q.    You've read the transcript?

4         A.    Yes.

5         Q.    In fact, your -- the motion that the

6    government filed for substantial assistance was

7    discussed in open court in a courtroom where anybody

8    could walk into it or out of it just like this one,

9    right?

10        A.    Part of it was and part of it was discussed

11   off record.

12        Q.    Part of it was; that is, there was some

13   discussions at the bench?

14        A.    Right.

15        Q.    But anybody could come into the courtroom,

16   right?

17        A.    Right.

18        Q.    You remember what Judge Werlene (phonetic)

19   said about your downward departure?

20              MS. SIEGLER:  Objection, that's hearsay.

21              THE WITNESS:  Not specifically.

22              THE COURT:  Sustained.

23        Q.    (BY MS. COGDELL)  Well, without going into

24   specific words, he granted it, right?

25        A.    Correct.
```

```
 1          Q.    And a prosecutor stood up -- in fact, your
 2    prosecutor was Stewart Burns at that point, wasn't it?
 3          A.    Yeah, just for my sentencing.
 4          Q.    And Mr. Burns stood up in open court and
 5    discussed in an open courtroom, Mr. Dominguez, the
 6    type of assistance you had provided the government?
 7          A.    Yes.
 8          Q.    Now let's back up a bit.  If you had not
 9    cooperated in the case that landed you in custody, if
10    you had not cooperated, Mr. Dominguez, what sentence
11    would you have received?
12          A.    A life sentence.
13          Q.    Let's talk about that.  Life in the federal
14    system means just that; it means life?
15          A.    Yeah.
16          Q.    In other words, Mr. Dominguez, if you had
17    not cooperated, you would have come out of prison in a
18    pine box?
19          A.    Correct.
20          Q.    You were never ever going to leave unless
21    you cooperated; isn't that true?
22          A.    Correct.
23          Q.    And you did -- you familiar with sentencing
24    guidelines generally?
25          A.    Yes, I am.
```

1          Q.    Does this appear to be a copy of the

2     sentencing guideline table?

3          A.    Yes, it is.

4          Q.    Mr. Dominguez, does it appear to be, as far

5     as you know, an accurate copy of the sentencing

6     guideline tables that are existent in federal criminal

7     cases today?

8          A.    Yes.

9                MR. COGDELL:    Offer Defense Exhibit 29, Your

10     Honor, tendering same to counsel.

11                MS. SIEGLER:    Objection.    It's not relevant.

12     It's hearsay.

13                THE COURT:    Sustained at this point.

14                MS. COGDELL:    May I have just a minute, Your

15     Honor?    Well, let me approach so I can see if I can

16     cure the Court's concern.

17                THE COURT:    I believe you can elicit all

18     this through testimony.    He seems to be very familiar

19     with it.

20                MS. COGDELL:    Okay.

21                THE COURT:    By the way, for the record, what

22     was that exhibit number?

23                MS. COGDELL:    This, Your Honor, is 29.    I

24     believe it's 29.    I can't read my own handwriting, but

25     it's either 27 or 29.    It appears to be 29.

```
 1            Q.   (BY MR. COGDELL)   In any event,

 2   Mr. Dominguez, you were at a level 43?

 3        A.   Correct.

 4        Q.   And a level 43, the offense level, the

 5   points, if you will, they go from 1 to 43, right?

 6        A.   Correct.

 7        Q.   And a 43, regardless of your criminal

 8   history category -- they have one, two, three, four,

 9   five, and six degrees of criminal history categories,

10   right?

11        A.   Correct.

12        Q.   With 1 being the least and 6 being the

13   worst?

14        A.   Correct.

15        Q.   And until you get way deep into the

16   guidelines, your criminal history category affects how

17   much time you can do, right?

18        A.   Correct.

19        Q.   But at level 43, it's life straight across

20   the board?

21        A.   Correct.

22        Q.   Now in your cooperative efforts to avoid

23   receiving a life sentence, you cooperated not a

24   little, but a lot.  You would agree with me?

25        A.   Correct.
```

1           Q.    Without going into exact names,

2    Mr. Dominguez, can you give us an idea of how many

3    people you provided information against?

4           A.    About 58 individuals.

5           Q.    You talked to the D.E.A., right?

6           A.    Correct.

7           Q.    The FBI?

8           A.    Correct.

9           Q.    The U.S. Attorney's Office?

10          A.    Correct.

11          Q.    Who else?

12          A.    FBI Agents from Chicago.

13          Q.    Houston and Chicago?

14          A.    Yeah, some type of violent task force.  I'm

15   not sure.

16          Q.    Now let's stop there.  You had a lot of

17   information about violent crimes in addition to crimes

18   involving narcotics, correct?

19          A.    No.

20          Q.    Well, isn't it a fact, Mr. Dominguez, that

21   you, yourself, were a violent individual when you were

22   caught?

23          A.    I wouldn't consider myself violent.

24          Q.    Well, you headed up a group called --

25   loosely called or loosely formed the posse, right?

1          A.    Well, federal agents gave us that name.

2          Q.    It's their fault that you got named the

3     posse?

4          A.    Yes, they picked up that in conversations

5     where I was in reference -- I would say, the posse,

6     the crew, the boys; and they picked the posse.

7          Q.    Whatever word you want to use,

8     Mr. Dominguez, whether it was the posse, the crew, or

9     the boys, y'all, in addition to selling dope, would

10    steal dope?

11         A.    Correct.

12         Q.    And you would steal dope from other dope

13    dealers, right?

14         A.    Correct.

15         Q.    And you would do that how, by gentle

16    persuasion, asking for permission, greeting cards?

17    How would you get the dope from the dope dealers you

18    were getting it from?

19         A.    Some were home invasions, and some were

20    people who gave me their dope on credit and they just

21    didn't get paid.

22         Q.    The home invasions, did you go in with

23    weapons?

24         A.    Yes.

25         Q.    You tie people up?

| | | |
|---|---|---|
| 1 | A. | Sometimes. |
| 2 | Q. | Shots fired? |
| 3 | A. | Sometimes. |
| 4 | Q. | People beat up? |
| 5 | A. | No. |
| 6 | Q. | Never beat anybody up? |
| 7 | A. | No. |

8    Q.    That's your story today. You're testifying

9  under oath, Mr. Dominguez, that you never assaulted --

10    A.    I never beat up nobody.

11    Q.    Well, were you there when the other boys,

12  members, posse, whomever, Mr. Dominguez, beat people

13  up?

14    A.    I, personally -- it's been awhile since, I

15  personally, have done it myself. That's why I have my

16  crew. I used to send them to go do it.

17    Q.    I see. You didn't want to get your hands

18  dirty. You would have your boys go beat people up in

19  a violent fashion to get the dope that you want; is

20  that right?

21    A.    Like I said, they never beat nobody up.

22    Q.    I thought you just said, I didn't want to

23  beat anybody up, so that's why I sent my boys?

24    A.    No, I didn't say I didn't want to beat

25  nobody up. I said I never beat nobody up.