```
 1  J0659784 eb

 2

 3        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
 4                 HOUSTON DIVISION

 5  RONALD JEFFREY PRIBLE, JR.  *
              Plaintiff         *
 6                              *
    VS.                         * CIVIL ACTION NO.
 7                              * 4:09-cv-01896
    LORIE DAVIS, DIRECTOR,      *
 8  TEXAS DEPARTMENT OF         *
    CRIMINAL JUSTICE,           *
 9  INSTITUTIONAL DIV.          *
              Defendants        *
10

11

12

13
          VIDEOTAPED DEPOSITION OF KELLY SIEGLER
14

15

16

17

18

19
    Date                    Edith A. Boggs, CSR
20

21

22  10-17-17                HOUSTON, TEXAS

23

24

25
```



EXHIBIT A

800.211.DEPO (3376)
EsquireSolutions.com

                    DEPOSITION OF KELLY SIEGLER


     DEPOSITION AND ANSWERS of KELLY SIEGLER, taken
before Edith A. Boggs, a certified shorthand reporter in
Harris County for the State of Texas, taken at the law
offices of Hilder & Associates, 819 Lovett Boulevard,
Houston, Texas, on the 17th day of October, 2017,
between the hours of 9:05 a.m. and 6:23 p.m.



```
 1              A P P E A R A N C E S

 2

 3   ATTORNEYS FOR PLAINTIFF:

 4        Hilder & Associates, PC
          819 Lovett Boulevard
 5        Houston, Texas  77006

 6        By:  James G. Rytting, Esquire

 7        AND

 8        Reed & Scardino, LLP
          301 Congress Avenue, Suite 1250
 9        Austin, Texas  78701

10        By:  Gretchen N. Scardino, Esquire

11
     ATTORNEYS FOR DEFENDANTS:
12
          Attorney General of Texas
13        P.O. Box 12548
          Austin, Texas  78711-2548
14
          By:  Tina J. Miranda, Esquire
15        George A. d'Hemecourt, Esquire
          Kelli Weaver, Esquire
16

17   ATTORNEY FOR THE WITNESS, KELLY SIEGLER:

18        Doyle, Restrepo, Harvin & Robbins, LLP
          440 Louisiana Street, Suite 2300
19        Houston, Texas  77002

20        By:  James Eloi Doyle, Esquire

21
     ALSO PRESENT:
22
          Mr. Dwayne Smith, Videographer
23

24   REPORTED BY:

25        Ms. Edith A. Boggs
```



```
1        Q.  Okay.  What was done post 1999?
2        A.  That's when I got the case.
3        Q.  Yes.  And what did you do when you started
4   investigating the case?
5        A.  Started from the beginning all over again.
6        Q.  Did you interview witnesses?
7        A.  Yes.
8        Q.  Okay.  But you didn't make any notes of those
9   witnesses?
10       A.  If I did, they're in the file.
11       Q.  They would be in your work product file?
12       A.  No.  They would be in the file.
13       Q.  How was the Herrera/Tirado case brought to the
14  DA's attention?
15       A.  Initially?
16       Q.  Uh-huh.
17       A.  I wasn't involved initially.
18       Q.  Okay.  Well, let's look at Exhibit 154, Page
19  18.  This is the handbook again.  And it says that a
20  potential charge may be brought to the DA's attention
21  one of three ways.  First, through the intake division
22  following a law enforcement investigation, second,
23  through a citizen's complaint to the DA's office or,
24  three, through charges filed by a special division of
25  the DA's office, for example, Special Crimes, or an
```



1     A.  One more time, I don't know what they had in
2  1999.  It could have been completely sufficient in 1999
3  to move forward but I didn't have the case then.  When I
4  got the case, I wanted to be thorough, which included
5  talking to Nathan Foreman, which I thought would be a
6  waste of time and it turned out to be a waste of time.
7  Irrespective of that, I made a decision to move forward
8  on the case against Ronald Jeffrey Prible.
9     Q.  Okay.  Did you disclose to Mr. Prible's defense
10 attorney that you had spoken with Mr. Foreman on August
11 8th, 2001?
12    A.  Mr. Prible's attorney, Terry Gaiser?
13    Q.  Uh-huh.
14    A.  We talked about Nathan Foreman.  I don't know
15 exactly if I told him about that conversation but we did
16 discuss Nathan Foreman.
17    Q.  I'm asking you if you told Mr. Gaiser or
18 Mr. Wentz if you -- about the substance of your meeting
19 with Mr. Foreman on August 8th, 2001?
20    A.  I think I did.
21    Q.  And you would have -- did you show him your
22 notes from that meeting?
23    A.  They were in the file.
24    Q.  But he wasn't allowed to see your work product
25 notes, was he?



```
 1        A.  Those weren't -- that's not work product.  My
 2   notes were in the file.  Notes are notes.  They're in
 3   the file.
 4        Q.  So, should they all be -- all your notes --
 5        A.  Yes.
 6        Q.  -- be viewable --
 7        A.  Yes.
 8        Q.  -- to the defense counsel?
 9        A.  Yes.
10        Q.  Okay.  So, you're saying that all of your --
11   any -- any of your notes that were contained in the file
12   would have been disclosed to defense counsel?
13        A.  My notes would have been in the open file.
14        Q.  Okay.  So, you didn't take any notes out
15   saying -- claiming work product protection over them
16   before the defense came to review the file?
17        A.  Not that I remember, no.
18        Q.  Okay.
19            MS. SCARDINO:  Let's take a short break and
20   go off the record.
21            THE VIDEOGRAPHER:  The time is 11:23.  We
22   are off the record.
23            (Short recess.)
24            THE VIDEOGRAPHER:  This is the beginning of
25   file 3.  The time is 11:43.  We are on the record.
```



1                MS. MIRANDA:  Okay.  And if you -- before
2    we do that, if you could just give me a few minutes to
3    consult with them, then maybe we can come to -- I can
4    figure that out.
5                MS. SCARDINO:  That's fine.
6                MS. MIRANDA:  Okay.
7                THE VIDEOGRAPHER:  The time is 12:25.
8    We're off the record.
9                (Lunch recess.)
10               THE VIDEOGRAPHER:  This is the beginning of
11   file 5.  The time is 1:20.  We are on the record.
12        Q.   (BY MS. SCARDINO)  Okay.  Ms. Siegler, earlier
13   we were talking about the open file policy that you said
14   the DA's office had during this time period that
15   Mr. Prible was prosecuted, and in that -- when a defense
16   attorney came in to view the file, would they be able to
17   take notes of what they were reading?
18        A.   Yes.
19        Q.   But they would not be able to make copies of
20   the documents in the file; is that right?
21        A.   Correct.
22        Q.   And you testified that you had no work product
23   file that you kept as such, correct?
24        A.   Not per se, not necessarily, no.
25        Q.   Okay.  And that is because all of your work



1  product would have been reviewable by the defense,
2  right?
3      A.  I'm trying to think of what work product might
4  have come up in Prible early on.  I can't think of what
5  it would have been.
6      Q.  Okay.
7      A.  But my notes I wouldn't have considered work
8  product.
9      Q.  Okay.  All notes -- any notes that you took
10 working on this case would have been available to
11 defense attorneys to see; is that right?
12     A.  Yes.
13     Q.  Okay.  And how do you define work product?
14 What's your understanding of that definition?  The legal
15 definition of work product.
16     A.  We tried to keep most things not work product
17 just because it was simpler.
18     Q.  Okay.  Do you -- do you know what the term
19 "work product" -- how it's defined under the law?
20     A.  Tell me.
21     Q.  No, I'm asking you if you -- if you know?
22     A.  No, I don't know the criminal definition of it.
23          THE VIDEOGRAPHER:  I'm sorry, Ms. Scardino,
24 can you put on the microphone.
25          MS. SCARDINO:  I'm sorry.



1  himself in the middle of a case to try and get himself a
2  deal, like every other inmate in federal prison.
3      Q.  Okay.  And did you believe his story from this
4  letter that he had heard Mr. Prible confess?
5      A.  I did not believe his story for lots of
6  reasons.
7      Q.  Also, if you notice in this photo -- in this
8  Exhibit 112, Mr. Gonzalez says that he knew about Jeff
9  and Jeff's case before Jeff even got to the medium from
10 the low.  Did you see that?
11     A.  I did see that.
12     Q.  Okay.  How might an inmate know that another
13 inmate is going to be transferred to their unit of the
14 prison?
15             MS. MIRANDA:  Objection, form.
16     A.  I have no idea.  I didn't believe what this
17 letter had to say.
18     Q.  (BY MS. SCARDINO)  And is that why you decided
19 not to have Mr. Gonzalez testify against Prible in his
20 case, because you determined that he was not credible?
21     A.  Correct.
22     Q.  Okay.  Did you ever show Mr. Gaiser or
23 Mr. Wentz this letter from Mr. Gonzalez?
24     A.  It would have been in the file.
25     Q.  Okay.  So, your -- your testimony is yes, you



```
 1  did show it to them?
 2       A.  I don't know if they looked at it or not.  It
 3  would have been in the file.
 4       Q.  It would have been in the file that you gave
 5  them to review when they came into your office to review
 6  the file?
 7       A.  Correct.
 8       Q.  And do you have any written record of what was
 9  in that file that you gave them to review?
10       A.  No.
11       Q.  Okay.  You never made any notes about
12  specifics?
13       A.  The file was an open file.  I've known Terry
14  Gaiser for years.  Any time he wanted to read the file,
15  he could come.  I would even bring it to court for him
16  to read during docket call.  "Here it is, Terry.
17  Knock -- knock yourself out."
18       Q.  Now, Exhibit 113 -- Exhibit 113 is a letter
19  from Carl Walker, another inmate in FCI Beaumont, to you
20  about Mr. Prible's case.  Do you recognize this letter?
21       A.  I do, but this is the only letter I noticed you
22  all talk about in your petition where you don't have the
23  envelope attached with the date.  I'd like to see the
24  date, please.
25       Q.  Well, I'd like to see it also but it wasn't
```



```
 1  produced to us from your file.
 2       A.  That's odd.
 3       Q.  Do you think it should be in your file
 4  somewhere?
 5       A.  You should ask him that.
 6       Q.  Well, I'm asking you because you know what's in
 7  the file.  Would you have kept that --
 8       A.  Yes.
 9       Q.  -- in your file?
10       A.  Yes.
11       Q.  Okay.  So -- and it would be -- and in your
12  mind, we should be able to review the entire file,
13  right, that you had in this case?
14       A.  No, I just want to know where the envelope is
15  because you've attached the rest of the envelopes.
16       Q.  Right.  I've attached everything that was
17  given -- I'll represent to you that was produced to us
18  by the DA's office.
19               So, you've seen this letter before.  Do you
20  recognize it?
21       A.  Okay.
22       Q.  Okay.  Now, why did you not use Carl Walker to
23  testify against Mr. Prible?
24       A.  I didn't believe him.
25       Q.  Okay.  Did you ever speak with him on the
```



```
 1   phone?
 2        A.  I don't even remember the name of Carl Walker.
 3   Unlike the other inmates whose names I do recognize, I
 4   don't remember Carl Walker's name.
 5             And I also notice in this letter that he
 6   talks as if Prible had already been indicted, unlike the
 7   others, which, again, makes me wonder where is the
 8   envelope that went with this letter.
 9             MS. SCARDINO:  Objection, nonresponsive.
10        Q.  (BY MS. SCARDINO)  And I would very much like
11   to see that envelope also, I would represent to you.
12   So --
13             Okay.  So, you chose -- you decided not to
14   use Mr. Walker because you thought he was not credible?
15        A.  Based on what he's saying here --
16        Q.  What he's saying here?
17        A.  -- it doesn't make sense.
18        Q.  Okay.  But you're saying that you showed this
19   letter to Mr. Prible's defense team?
20        A.  I'm saying it was in the file.
21        Q.  So, you can't say for certain that you showed
22   this letter to Mr. Prible's defense team?
23        A.  I don't know what they read.  The file was open
24   for them to read whatever they wanted.
25        Q.  Let's look at Exhibit 114.
```



1      A.  Yes.
2      Q.  And you see it looks like there he's
3  memorializing a meeting with Nathan Foreman on December
4  10th, 2001, which would have -- which corresponds to the
5  letter that I showed you earlier requesting a meeting
6  with Mr. Foreman on that date?
7           MS. MIRANDA:  Objection, form.
8      A.  It does.
9      Q.  (BY MS. SCARDINO)  Do you see that?  Were you
10 present at this meeting with Mr. Bonds and Mr. Foreman?
11     A.  If -- if Johnny would have been interviewing
12 Nathan Foreman, I would have been there.
13     Q.  Okay.  Would you have taken notes on that
14 meeting?
15     A.  Not necessarily.
16     Q.  If you had taken notes, where would they be?
17     A.  They would be in the file but I probably didn't
18 take any.
19     Q.  You wouldn't have destroyed notes about that
20 meeting or any other meeting, would you?
21     A.  No.  I didn't take a lot of notes.
22     Q.  Let's look at Exhibit 78.  Exhibit 78.  Okay.
23 Exhibit 78 I showed you earlier, so, you should have a
24 copy of it, and it's that November 26th, 2001 fax from
25 Johnny Bonds to Lieutenant Clark.



```
 1       Q.  Okay.  Let me show you Exhibit 109-4.
 2  Actually, I want to get you actually to read Exhibits
 3  109-2, 109-3 and 109-4 into the record because they're
 4  your work product notes, I believe.
 5       A.  Whoa.
 6              MS. MIRANDA:  Can I have a copy?
 7              MS. SCARDINO:  Yeah.
 8       A.  Where is the first page?
 9              MR. DOYLE:  Is that an extra one or did you
10  already --
11       Q.  (BY MS. SCARDINO)  The first page of what?
12       A.  What is this?
13       Q.  This was produced by order of the Court after
14  the Court's in camera review of your work product in
15  this case.
16       A.  But this just starts with something.  What is
17  the -- what does this go to?
18       Q.  I wish I knew.  I would like to know that as
19  well but I don't.  This was what was produced.
20       A.  From the Prible file?
21       Q.  Yes.  And if you could read it into the record.
22       A.  Okay.
23       Q.  Appreciate it.
24       A.  The first line on 109-2 -- that's a 109, right?
25       Q.  Uh-huh.
```

