## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **RONALD JEFFREY PRIBLE,** | ' | |
| | ' | |
| **Petitioner,** | ' | |
| | ' | |
| **V.** | ' | **4:09-cv-01896** |
| | ' | |
| **LORI DAVIS, DIRECTOR,** | ' | |
| **TEXAS DEPARTMENT OF CRIMINAL** | ' | |
| **JUSTICE, INSTITUTIONAL DIVISION,** | ' | |
| | ' | |
| **Respondent** | ' | |

---

## FOURTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## OF A PERSON IN STATE CUSTODY

---

Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
819 Lovett Boulevard
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112
E-mail: james@hilderlaw.com

Gretchen N. Scardino
State Bar No. 24037170
REED & SCARDINO LLP
P.O. Box 1567
Austin, Texas 78767
Telephone (512) 659-4470
E-mail: gscardino@reedscardino.com

ATTORNEYS FOR PETITIONER
RONALD JEFFREY PRIBLE, JR.

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................... 1

II.   JURISDICTION ........................................................................................ 3

III.  SUMMARY OF AMENDMENTS ........................................................... 3

IV.   FACTUAL BACKGROUND ...................................................................... 4

    A.    THE 1999 MURDERS AND INITIAL INVESTIGATION ............................ 4

          1.    The Relationship Between Prible, Steve Herrera, and Nilda Tirado. ................................................................................. 4

          2.    The Bank Robbery Scheme. .............................................. 5

          3.    The Night of the Murders. .................................................. 6

          4.    The Alibi Witness. ............................................................. 7

          5.    The Discovery of the Bodies. ............................................. 7

          6.    The 1999 Investigation. ..................................................... 11

          7.    Prible is not charged for 2 years. ...................................... 19

    B.    PROSECUTOR KELLY SIEGLER STARTS LOOKING AT THE CASE IN 2001. ...................................................................................... 20

          1.    FCI Beaumont inmate Jesse Moreno reaches out to Siegler in April 2001. ................................................................. 20

          2.    Siegler meets with Moreno on July 3, 2001, at the U.S. Marshal's Office in Beaumont. ............................................. 20

          3.    Siegler accepts charges against Hermilo Herrero and Prible on July 5, 2001, and has Prible moved to the same FCI Beaumont unit as Nathan Foreman. ...................................... 21

          4.    Siegler and Bonds meet with Nathan Foreman on August 8, 2001, to discuss the Prible and Herrero cases. ...................................... 22

          5.    Prible is indicted for capital murder on August 29, 2001. ..................... 24

          6.    Foreman's attorney sends Siegler a letter on November 12, 2001, indicating that Foreman has information that will lead her to the murder weapon. She immediately contacts FCI Beaumont to arrange to meet with Foreman on December 10, 2001. On

November 26, 2001, Siegler and Bonds send another letter to FCI Beaumont, this time asking to meet with inmate Michael Beckcom "after we talk with Foreman.".................................................. 25

7. Siegler and Bonds meet with Foreman and Beckcom back-to-back at FCI Beaumont on December 10, 2001, and Beckcom gives them a handwritten statement describing Prible's alleged "confession." ........................................................................................... 26

8. Confident that the informants had extracted a "confession" from Prible, the State files paperwork to have Prible transferred from FCI Beaumont to the Harris County Jail.................................................. 27

9. Siegler reaches out to Beckcom's federal prosecutor to talk about a time cut in March 2002, months before Prible goes to trial. Meanwhile, other FCI Beaumont inmates – including Carl Walker, Oscar and Felix Gonzalez, and Mark Martinez – reach out to Siegler, "trying to jump on the bandwagon" to testify against Prible ........................................................................................ 27

10. In April 2002, Siegler secures a murder conviction against Hermilo Herrero by putting inmates Jesse Moreno and Rafael Dominguez on the stand to testify against him. Afterwards, she writes Rule 35 reduction letters for Moreno, Dominguez, Eddie Gomez, and Foreman. .......................................................................... 29

11. On August 22, 2002, Siegler testifies at a Rule 35 sentence reduction hearing for Moreno in Lafayette, Louisiana. ......................... 30

C. PRIBLE IS TRIED FOR CAPITAL MURDER IN OCTOBER 2002............. 30

1. The State's "Coincidental Contact" Theory .......................................... 31

2. The State's DNA Theory .................................................................... 47

D. SIEGLER'S POST-TRIAL EFFORTS ON BECKCOM'S BEHALF .............. 50

V. PROCEDURAL HISTORY ...................................................................... 52

A. PRIBLE'S COURT-APPOINTED COUNSEL FILES AN INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS UNDER ARTICLE 11.071............................................................................................ 53

B. IN JUNE AND AUGUST 2007, PRIBLE FILES TWO *PRO SE* PLEADINGS IN THE TRIAL COURT ALLEGING A JAILHOUSE CONSPIRACY TO FRAME HIM FOR THE MURDERS. ............................ 54

C.      ON JUNE 18, 2008, THE TCCA DENIES RELIEF AND DISMISSES PRIBLE'S JUNE AND AUGUST 2007 *PRO SE* PLEADINGS AS "ABUSES OF THE WRIT." ........................................................................... 55

D.      IN JUNE 2009, PRIBLE FILES HIS ORIGINAL FEDERAL WRIT, AND IS SENT BACK TO STATE COURT TO EXHAUST CLAIMS PURSUANT TO *RHINES V. WEBER*. .............................................................. 56

E.      PRIBLE'S ATTORNEY, JAMES RYTTING, INTERVIEWS CARL WALKER ON AUGUST 26, 2010, AND WALKER DESCRIBES A CONSPIRACY BY VARIOUS FCI BEAUMONT INFORMANTS WORKING WITH SIEGLER TO FRAME PRIBLE AND HERMILO HERRERO FOR MURDER IN EXCHANGE FOR TIME CUTS. ................. 56

F.      ON SEPTEMBER 8, 2010, PRIBLE FILES A SUCCESSOR APPLICATION FOR HABEAS RELIEF IN THE 351ST DISTRICT COURT OF HARRIS COUNTY ...................................................................... 66

G.      ON DECEMBER 15, 2010, THE TCCA REMANDS TO THE TRIAL COURT. ............................................................................................................. 66

H.      IN FEBRUARY 2011, THE STATE DISCLOSES, FOR THE FIRST TIME, THE THREE INFORMANT LETTERS FROM MARK MARTINEZ, CARL WALKER, AND JESSE GONZALEZ, WHICH HAD BEEN CONCEALED IN A SEALED ENVELOPE DESIGNATED "ATTORNEY WORK PRODUCT." ..................................... 68

I.      IN JUNE 2011, THE TRIAL COURT CONVENES A HEARING. ................ 69

J.      THE TCCA DISMISSES PRIBLE'S 2010 SUCCESSOR APPLICATION AS AN ABUSE OF THE WRIT. ........................................... 72

VI.      **RESULTS OF COURT-ORDERED DISCOVERY** ................................................. 73

A.      THE HCDA PRODUCES EVEN MORE NEW EVIDENCE FROM PRIBLE'S CASEFILE IN OCTOBER 2015 ...................................................... 73

B.      IN JANUARY 2016, NATHAN FOREMAN SIGNS TWO AFFIDAVITS DESCRIBING HOW PRIBLE AND HERRERO WERE "SET UP" BY FCI BEAUMONT INFORMANTS WORKING FOR SIEGLER. ON JULY 8, 2016, THE HCDA PRODUCES ADDITIONAL EVIDENCE FROM PRIBLE'S CASEFILE. .......................... 74

C.      PRIBLE'S ATTORNEYS FILE A MOTION TO UNSEAL THE TRANSCRIPT OF THE AUGUST 22, 2002, SENTENCE REDUCTION HEARING FOR JESSE MORENO, AT WHICH SIEGLER TESTIFIED. ...................................................................................... 74

D.     INFORMATION PRODUCED PURSUANT TO *IN CAMERA* REVIEW. ................................................................................... 75

E.     THROUGHOUT 2017, PRIBLE'S COUNSEL CONDUCT VARIOUS WITNESS INTERVIEWS AND DEPOSITIONS. ........................... 75

F.     PRIBLE'S COUNSEL DEPOSE SIEGLER'S INVESTIGATOR, JOHNNY BONDS, ON SEPTEMBER 19, 2017. ............................. 77

G.     PRIBLE'S ATTORNEYS DEPOSE SIEGLER'S CO-COUNSEL, VICTOR WISNER, ON SEPTEMBER 20, 2017. ............................ 79

H.     PRIBLE'S ATTORNEYS DEPOSE BECKCOM ON OCTOBER 10, 2017.................................................................................................... 79

I.     PRIBLE'S ATTORNEYS DEPOSE SIEGLER ON OCTOBER 17, 2017.................................................................................................... 81

VII.   **THE STATE COURT'S RELIANCE ON ABUSE OF THE WRIT DOCTRINE DOES NOT SATISFY FEDERAL DEFAULT STANDARDS** ........ 83

A.     THE TCCA'S JUNE 18, 2008, DISMISSAL OF PRIBLE'S JUNE AND AUGUST 2007 *PRO SE* PLEADINGS DID NOT REST ON INDEPENDENT OR ADEQUATE GROUNDS. ............................ 83

     1.     The June 18, 2008, decision does not "clearly and expressly" rely on state law grounds ............................................................ 84

     2.     Alternatively, whether one is talking about the June 18, 2008, opinion or the November 2, 2011, opinion, the TCCA's application of Section 5(a)(1) to Prible's June and August 2007 pleadings would not be an independent and adequate state law ground triggering federal default, because the TCCA does not strictly or regularly apply the abuse of the writ doctrine to *pro se* pleadings. ............................................................................ 86

B.     THE TCCA'S NOVEMBER 2, 2011, DECISION DOES NOT WARRANT DEFAULT UNDER FEDERAL LAW EITHER. ................ 90

VIII.  **CAUSE AND PREJUDICE** ........................................................ 91

A.     CAUSE ................................................................................ 93

     1.     Trial counsel diligently sought discovery of the State's relationship to Beckcom and had no reason to suspect that Foreman and Beckcom were part of a ring of informants whom the State was utilizing to investigate and assemble its case .................. 96

2.      State habeas counsel Roland Moore diligently attempted to pursue the insubstantial leads he had to witnesses who might support Prible's prosecutorial misconduct claims. ............................... 104

      a.      The lead prosecutor's active suppression of Carl Walker's identity prevented trial counsel and state habeas counsel from investigating him. .............................................. 109

      b.      The convicting court's finding that Walker's statements were unpersuasive hearsay is neither independent nor adequate, nor otherwise legally grounded. ................................ 110

3.      Prible acted diligently in his *pro se* attempts to present evidence that the State violated his due process rights under *Brady, Giglio*, and *Massiah*. ........................................................................... 113

4.      The June 2011 *Findings* do not address the supporting and corroborating evidence that Prible presented to the Texas courts in his June 6, June 22, and June 23, 2011, supplemental briefs, which confirm that the State suppressed important evidence impeaching its key witness, Michael Beckcom; impeaching its method of assembling its case; and supporting Prible's prosecutorial misconduct claims. ........................................... 117

      a.      The State withheld inmate letters to Siegler bearing the names and identifying information of Walker, Martinez, and the Gonzalezes. ................................................... 117

      b.      BOP phone and housing records were inaccessible and Prible's attorneys had no reason to seek them. ......................... 118

      c.      The State withheld the identities of, and information possessed by, Walker, Martinez, Delgado, and other inmates about the operation of the informants' ring, and state habeas counsel had no reason to suspect the existence or importance of this information. ............................ 121

      d.      The State withheld letters from Siegler seeking Rule 35 sentence reductions for Foreman, Moreno, Dominguez, and Gomez which, along with recently disclosed BOP records, indicate that the State was rewarding Foreman and other members of the informants ring for false testimony. ................................................................ 122

      e.      Highly confidential BOP memoranda that were not disclosed until 2014 were clearly unavailable to trial counsel and state habeas counsel, and therefore cause for not discovering this evidence is clearly established. ................ 125

i.      Confidential BOP Memoranda impeach Beckcom's testimony that Prible was his sole source of information about the crime against Steve Herrera and Nilda Tirado. ................................... 126

ii.     Confidential BOP documents indicate that the State was aware that Beckcom lied about Foreman's and therefore Beckcom's own "credible evidence" used to incriminate Prible............. 128

iii.    BOP documents indicate the lead prosecutor had a system for contacting and managing informants, which if disclosed would have discredited the manner in which the State investigated and assembled its case. ....................................... 129

5.     Evidence of the State's involvement in the conspiracy was admissible in Prible's case, but the State suppressed the evidence. .............................................................. 131

B.    PREJUDICE ................................................................ 133

IX.   **GATEWAY INNOCENCE EXCEPTION TO DEFAULT**................................... 133

A.    STANDARDS................................................................ 133

B.    ARGUMENT ................................................................ 135

1.     The sources of Prible's evidence of innocence satisfy *Schlup's* qualitative criteria for evidence that directly exculpates a defendant by falsifying, not just impeaching, the pillars of the State's case for conviction. .................................................. 136

2.     This Court is entitled to re-assess the credibility of witnesses in light of evidence of innocence that contradicts their incriminating trial testimony, including the testimony of expert witnesses. ............... 143

a.    Beckcom's testimony is thoroughly discredited by Walker, Foreman, and Gonzalez; by BOP documents; by his co-conspirator Foreman's role in the *Herrero* case; by Siegler and Bonds' deposition testimony and work product notes confirming they knew Foreman was a liar; and by demonstrable fabrications contained in Beckcom's December 10, 2001, written statement and trial testimony.................................................................. 143

b.    This Court can reassess William Watson's credibility, taking into account Siegler's undisclosed consultation

with DNA analyst Pam McInnis, who told her that semen could live in the oral cavity for up to 72 hours. The Court can also reassess Watson's credibility in light of the fact that that he did not have a doctorate, was not qualified to estimate a PMI, had not reviewed the existing literature, and stands refuted by subsequent studies on the detection of haploid DNA by oral swab. ................................................... 152

    c.    This Court may also discredit the false and misleading expert testimony that the State introduced through Dr. Joye Carter and Cleva West. ....................................................... 153

    d.    New evidence exculpates Prible and demonstrates that the State sponsored false testimony through Victor Martinez and Edward Herrera. ................................................. 158

  C.    EQUITABLE TOLLING. ...................................................... 161

**X.**    **CLAIMS FOR RELIEF** ............................................................. 162

**CLAIM #1** - THE STATE VIOLATED DUE PROCESS BY SPONSORING FALSE AND MISLEADING TESTIMONY THAT MINIMIZED THE STATE'S CONTACT WITH KEY WITNESSES AND COMMUNICATIONS WITH, AND USE OF, OTHER INFORMANTS, AS STATE AGENTS, TO DEVELOP EVIDENCE INCRIMINATING PRIBLE. .................................................. 162

  A.    STANDARDS. ....................................................................... 162

  B.    ARGUMENT ......................................................................... 163

    1.    Statements given by Walker to Prible's federally-appointed investigator and counsel show that Beckcom's testimony – *i.e.,* that he and Foreman had learned about the facts of the crime from Prible alone – was false and misleading. ............................................................... 163

    a.    Walker's statement to the investigator ........................... 164

    b.    Walker's August 26, 2010, Interview ........................... 165

    c.    Walker's taped statement demonstrates that Beckcom's testimony was false and misleading. .......... 166

    d.    Foreman's 2016 affidavit confirms that the State provided information through non-testifying informants. ................................................................. 167

2.    BOP records establish that the prosecution was in frequent contact with Beckcom, Foreman, and the other informants in the ring, who were seeking, and receiving, promises from the State to assist them in obtaining Rule 35 sentence reductions, contrary to Beckcom's testimony. ....... 168

3.    Letters show that inmates belonging to a ring of informants that included Beckcom and Foreman had similar information about the crime, thereby contradicting Beckcom's testimony that he got information only from Prible. ................................................................................. 171

4.    BOP documents and the Herrero file show that Beckcom's portrayal of Foreman as a disinterested corroborating witness was false and misleading. ...................... 173

5.    Discovery ordered in present federal habeas proceedings shows that the State, through Beckcom, left the false and misleading impression on the jury that Foreman and Beckcom were not actively soliciting information from Prible. .................................................................................. 174

6.    False and misleading testimony sponsored by the State was material under *Giglio* and prejudicial under *Carrier*. .......... 176

**CLAIM #2** - IN VIOLATION OF DUE PROCESS GUARANTEED UNDER *BRADY V. MARYLAND*, THE STATE SUPPRESSED MATERIAL EVIDENCE THAT BECKCOM AND FOREMAN WERE PART OF AN ORGANIZED ATTEMPT TO SECURE FAVORS IN RETURN FOR FABRICATING A FALSE CONFESSION. ............................................................................. 177

A.    STANDARDS .................................................................................. 178

B.    ARGUMENT ................................................................................... 179

1.    The suppressed inmate letters to Siegler demonstrate that the State was aware of, but failed to disclose, favorable evidence showing that Beckcom was part of an organized ring of informants manufacturing evidence against Prible. ....... 179

2.    In violation of *Brady*, the State withheld favorable evidence that Foreman had been rewarded for helping secure the conviction of Hermilio Herrero using false confessions. ............................................................................ 183

a.    The evidence from the *Herrero* file was suppressed. ................................................................. 184

b. Information in the *Herrero* file was favorable to Prible's defense. ........................................................... 185

c. Foreman's involvement in the scheme to suborn perjury and manufacture evidence in the *Herrero* case should have been disclosed to Prible's counsel. ...................................................................... 190

3. The cumulative effect of the false and misleading testimony and suppressed evidence was material under *Giglio* and *Brady*, and was therefore prejudicial under *Carrier*. .................................................................. 192

a. Inmate letters to the prosecutor documenting Beckcom's and Foreman's association with a ring of informants would have undermined the State's case. ............................................................................. 192

b. By suppressing Walker's identity, the State prevented defense counsel from impeaching the State's key witness and its method of assembling its case. ............................................................................ 193

c. Competent counsel could have placed the State's case in a completely different light so as to shake confidence in the verdict if the State had fulfilled its duty to disclose the July 3, 2001, taped interview of Moreno and the letters from Siegler seeking Rule 35 sentence reductions for FCI Beaumont informants. .................................................... 194

**CLAIM #3** - IN VIOLATION OF *BRADY* AND DUE PROCESS GUARANTEED BY THE FOURTEENTH AMENDMENT, THE PROSECUTION SUPPRESSED EVIDENCE THAT FOREMAN, WHOM BECKCOM REPRESENTED COULD CORROBORATE HIS STORY, GAVE A DIFFERENT ACCOUNT, AND WAS, IN FACT, FABRICATING EVIDENCE AGAINST PRIBLE .............................................................. 196

A. THE STATE SUPPRESSED FOREMAN'S HISTORY OF FABRICATING EVIDENCE AGAINST PRIBLE ............................. 196

B. THE UNDISCLOSED INTERVIEWS OF FOREMAN WERE MATERIAL. ...................................................................... 198

**CLAIM #4** - IN VIOLATION OF *BRADY*, THE STATE SUPPRESSED EVIDENCE IMPEACHING ITS KEY WITNESS'S TESTIMONY REGARDING THE CIRCUMSTANCES OF THE ALLEGED "CONFESSION" AND HIS MOTIVES FOR QUESTIONING PRIBLE. ................... 199

    A.      FACTS ................................................................................. 199

    B.      THE STATE SUPPRESSED IMPEACHMENT EVIDENCE.............. 201

    C.      THE SUPPRESSED EVIDENCE WAS FAVORABLE, AND MATERIAL.......................................................................... 202

**CLAIM # 5** - THE STATE WITHHELD EVIDENCE THE TRIAL COURT ORDERED PRODUCED PURSUANT TO *BRADY* .................................... 203

**CLAIM #6** - THE STATE VIOLATED PRIBLE'S RIGHTS GUARANTEED BY THE SIXTH AMENDMENT AND *MASSIAH V. UNITED STATES*, 377 U.S. 201, 206 (1964)...................................................................... 209

    A.      STANDARDS.................................................................... 209

    B.      ARGUMENT..................................................................... 211

          1.      Prible was in custody and charged with capital murder, and Beckcom was ostensibly no more than a fellow inmate. ...................................................................... 211

          2.      In return for assistance in obtaining a sentence reduction, Beckcom, acting as a State agent, circumvented Prible's right to counsel. ........................................................ 212

**CLAIM # 7** - PRIBLE WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. ...................................... 215

    A.      DEFAULT ........................................................................ 215

    B.      SUBSTANTIVE STANDARDS ........................................... 216

    C.      ARGUMENT..................................................................... 218

          1.      Failure of trial counsel to object to Beckcom's testimony under *Massiah* and progeny was ineffective.............................. 218

          2.      State habeas counsel's failure to raise IAC claims based on *Massiah* was ineffective......................................... 219

**CLAIM #8** - IN VIOLATION OF *MASSIAH*, THE STATE SUPPRESSED EVIDENCE THAT INDEPENDENTLY ESTABLISHED THE STATE HAD DEPLOYED BECKCOM AND FOREMAN AS AGENTS TO PRY INCRIMINATING INFORMATION FROM PRIBLE ALTHOUGH THE STATE WAS AWARE PRIBLE WAS REPRESENTED BY COUNSEL. ................. 220

**CLAIM #9** - PRIBLE WAS DEPRIVED OF HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS BY THE ADMISSION OF

EVIDENCE DOCUMENTING THE DEATHS OF THE COMPLAINANTS' CHILDREN. ..................................................................................... 222

    A.    FACTS ............................................................................... 222

    B.    ARGUMENT ...................................................................... 224

        1.    The State did not make the type of strong showing required to justify the introduction of evidence of the extraneous capital murders of three children. ........................... 224

        2.    The State did not demonstrate a rational connection to the offense charged. ....................................................................... 225

        3.    The argument that admission was justified because it bolstered the jailhouse snitch's credibility was false and misleading. ............................................................................... 227

        4.    The TCCA's determination that there was no due process violation was "contrary to" and involved an "unreasonable application" of federal constitutional law, per 28 U.S.C. § 2254(d)(1). ........................................................ 229

        5.    The extraneous offense evidence was clearly harmful when measured against the scant evidence supporting the jury's verdict. ............................................................................ 230

        6.    The TCCA's harmless error analysis violated the "contrary to" and "unreasonable application" prongs of 28 U.S.C. § 2254(d)(1). .............................................................. 232

**CLAIM #10** – IN VIOLATION OF DUE PROCESS UNDER BRADY, THE STATE SUPPRESSED MATERIAL EVIDENCE THAT SIEGLER HAD CONSULTED THE HEAD OF THE HARRIS COUNTY CRIME LAB TO ASK HOW LONG SEMEN COULD REMAIN IN THE ORAL CAVITY, AND WAS TOLD IT LIVES UP TO 72 HOURS. ....................................... 223

    A.    FACTS ............................................................................... 223

    B.    ARGUMENT ...................................................................... 223

**CLAIM #11** - THE STATE VIOLATED DUE PROCESS BY SPONSORING FALSE AND MISLEADING TESTIMONY, AND ENGAGING IN FALSE AND MISLEADING ARGUMENT, CONCERNING THE AMOUNT OF TIME THAT SEMEN COULD PERSIST IN THE ORAL CAVITY, AFTER BEING ADVISED BY THE HEAD OF THE HARRIS COUNTY CRIME LAB THAT IT COULD LIVE UP TO 72 HOURS. ..................................... 234

**CLAIM #12** - PRIBLE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, AS A MATTER OF FEDERAL CONSTITUTIONAL LAW, WHERE TRIAL COUNSEL FAILED TO EFFECTIVELY ADDRESS AND REBUT THE TESTIMONY OF WILLIAM WATSON THAT THE SEMEN FOUND IN TIRADO MUST HAVE BEEN DEPOSITED IN HER MOUTH NEAR OR AT THE TIME OF HER DEATH, WHERE THERE WAS NO SCIENTIFIC BASIS FOR THIS EXPERT CONCLUSION. ...................................... 236

    A.     PRIBLE'S ATTORNEYS WERE INEFFECTIVE IN FAILING TO OBJECT TO WATSON'S CONCLUSION THAT TIRADO PERFORMED ORAL SEX ON PRIBLE WITHIN MINUTES IF NOT SECONDS OF BEING SHOT, WITHOUT THE TRIAL COURT FIRST CONDUCTING A HEARING TO DETERMINE WHETHER WATSON'S METHODS WERE RELIABLE. ......................................................................... 238

          1.     In violation of *Kelly's* first factor, Watson's estimate of a precise PMI was not based on a theory or technique generally acceptable in the scientific community...................... 239

          2.     In violation of *Kelly's* second factor, Watson was not qualified to estimate the PMI..................................................... 240

          3.     Watson's testimony was not supported by any scientific literature, as required by *Kelly's* third factor. ............................. 241

          4.     Watson's estimate of the PMI did not satisfy *Kelly*'s fourth or sixth factors................................................................ 241

          5.     Kelly's fifth factor was not appropriately satisfied................... 242

    B.     TRIAL COUNSEL WERE ALSO INEFFECTIVE IN THAT THEY FAILED TO MOVE FOR A CONTINUANCE SO THAT EXPERT TESTIMONY CONTRADICTING WATSON'S TESTIMONY COULD BE OBTAINED. ........................ 242

    C.     TRIAL COUNSEL'S FAILURES TO OBJECT AND DEMAND A HEARING PREJUDICED PRIBLE'S DEFENSE. ........ 244

    D.     TRIAL COUNSEL'S FAILURE TO DEMAND A CONTINUANCE PREJUDICED PRIBLE'S DEFENSE.................... 247

**CLAIM #13** - PRIBLE WAS DENIED HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY BECAUSE THE VENIRE DID NOT REFLECT A FAIR CROSS-SECTION OF THE COMMUNITY..................................................... 247

    A.     PRIBLE HAS AN ABSOLUTE RIGHT TO A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY. ............ 248

B. HISPANICS ARE A DISTINCTIVE GROUP UNDER THE *DUREN* TEST................................................................................. 250

C. THE UNDER-REPRESENTATION OF HISPANICS ON HARRIS COUNTY VENIRES IS BOTH UNFAIR AND UNREASONABLE. ............................................................................. 250

D. THE UNDER-REPRESENTATION OF HISPANICS ON VENIRES IN HARRIS COUNTY IS SYSTEMATIC. ...................... 252

    1. Juror Pay Excludes Hispanics Disproportionately.................... 252

    2. Hispanics are disproportionately affected by Harris County's failure to update addresses. ........................................ 253

**CLAIM #14** - PRIBLE IS ACTUALLY INNOCENT OF CAPITAL MURDER; THIS COURT SHOULD ORDER RELIEF AND MAY REACH ALL CLAIMS HEREIN THROUGH *SCHLUP'S* ACTUAL INNOCENCE GATEWAY. ............................................................................................. 254

A. STANDARDS.......................................................................... 254

B. FACTS ................................................................................... 255

    1. Prible was wrongfully convicted on the basis of jailhouse snitch testimony that Prible's post-conviction evidence shows was fabricated. ................................................. 255

    2. Post-conviction evidence demonstrates that forensic testimony relied upon by the State to place Prible at the murder scene was unsupportable "junk science."...................... 256

**CLAIM #15** - IN VIOLATION OF DUE PROCESS, THE STATE SPONSORED FALSE TESTIMONY TO BOLSTER ITS RAPE/MURDER THEORY AND TO PREVENT CORROBORATION OF PRIBLE'S ALIBI WITNESS. ................................................................................................... 257

A. THE STATE SOLICITED FALSE AND MISLEADING EVIDENCE FROM WILLIAM WATSON. ......................................... 257

B. THE STATE INTRODUCED AND ARGUED FALSE AND MISLEADING EXPERT TESTIMONY REGARDING BURN PATTERNS, AND FALSELY AND MISLEADINGLY ARGUED THAT TESTING ON CRIME SCENE EVIDENCE SHOWED THAT ACCELERANTS HAD BEEN USED TO COVER UP SEXUAL ACTIVITY. ...................................................... 259

C.   THE STATE KNOWINGLY SPONSORED FALSE TESTIMONY AND ARGUMENT THAT HERRERA WOULD NOT HAVE ALLOWED PRIBLE IN HIS HOME. ............................ 259

D.   IN ORDER TO SUPPORT AN IMPROPER, INFLAMMATORY CLOSING ARGUMENT THAT PRIBLE WAS TOO UGLY FOR NILDA TO HAVE CONSENSUAL SEX WITH HIM, THE STATE KNOWINGLY SPONSORED FALSE TESTIMONY THAT NILDA TOLD CYNTHIA FLORES SHE THOUGHT PRIBLE WAS "CREEPY.". .................... 260

E.   THE STATE SOLICITED MISLEADING TESTIMONY ABOUT PHONE CALLS FROM STEVE KNOWING THAT THEY WERE MADE BY PRIBLE. ..................................................... 264

F.   VIOLATIONS OF *GIGLIO*, INDIVIDUALLY AND COLLECTIVELY, DEPRIVED PRIBLE OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL. .............................................. 266

**CLAIM #16** - TRIAL COUNSEL'S FAILURE TO UTILIZE PRIBLE'S PHONE RECORDS AND FAILURE TO EXCLUDE OR REFUTE THE FOUNDATION OF THE STATE'S RAPE THEORY VIOLATED PRIBLE'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. ......................................................................................................... 266

A.   COUNSEL FAILED TO REFUTE WATSON'S TESTIMONY PURPORTING TO ESTIMATE A PERIMORTEM INTERVAL BETWEEN ORAL SEX AND NILDA'S DEATH. ............................. 266

B.   COUNSEL FAILED TO REFUTE VICTOR MARTINEZ'S TESTIMONY. ................................................................... 267

C.   COUNSEL FAILED TO REFUTE TESTIMONY AND ARGUMENT THAT NILDA THOUGHT PRIBLE WAS "CREEPY" AND WOULD NOT HAVE ENGAGED IN VOLUNTARY SEX WITH HIM BECAUSE HE WAS TOO UGLY AND BECAUSE SHE WOULD HAVE NEVER CHEATED ON STEVE. ................................................ 267

D.   COUNSEL FAILED TO PRESENT PHONE RECORDS THAT TENDED TO EXONERATE PRIBLE. ................................................. 267

E.   COUNSEL FAILED TO EXCLUDE OR IMPEACH CARTER'S TESTIMONY THAT BURN PATTERNS SHOWED NILDA HAD BEEN SET ABLAZE USING ACCELERANTS. ................................................................ 267

F.      COUNSEL FAILED TO PREVENT OR OBJECT TO THE STATE'S IMPROPER CLOSING ARGUMENTS.. ............................ 268

     1.     Counsel failed to object to the misuse of arson evidence in the State's closing argument. ................................................. 268

     2.     Counsel failed to object to violations of Prible's Fifth Amendment rights..................................................................... 269

G.      COUNSEL'S FAILURES PREJUDICED PRIBLE............................. 269

H.      STATE HABEAS COUNSEL UNREASONABLY FAILED TO RAISE AN IAC CLAIM BASED ON THE ALLEGATIONS AND EVIDENCE SET FORTH IN SUBSECTIONS (A)-(D) OF THIS CLAIM, SO THIS COURT CAN REACH THE FOREGOING CLAIMS SET FORTH IN SECTIONS (A)-(F) UNDER *TREVINO V. THALER*; THE MERITS CAN ALSO BE CONSIDERED BY VIRTUE OF *SCHLUP* (SEE SECTION IX ABOVE).. ............................................................................................ 269

XI.    CONCLUSION ........................................................................................... 270

PRAYER FOR RELIEF............................................................................................ 271

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                    **Page(s)**

*Amos v. Scott*,
   61 F.3d 333 (5th Cir. 1995) ........................................................................87

*Barr v. City of Columbia*,
   378 U.S. 146 (1964).................................................................................84

*Barrientes v. Johnson*,
   221 F.3d 741 (5th Cir. 2000) ...............................................................91, 92

*Blankenship v. Estelle*,
   545 F.2d 510 (5th Cir. 1977) ...............................................................162

*Brady v. Maryland*,
   373 U.S. 83 (1963)........................................................................ *passim*

*Brecht v. Abrahamson*,
   507 U.S. 619 (1993).............................................176, 214, 222, 234

*Busby v. Dretke*,
   359 F.3d 708 (5th Cir. 2004) ...............................................................84

*Castaneda v. Partida*,
   430 U.S. 493 (1977)...............................................................................252

*Chambers v. Mississippi*,
   410 U.S. 284 (1973)...............................................................................134

*Chapman v. California*,
   386 U.S. 18 (1967).........................................................................162, 165

*Daubert v. Merrell Dow Pharmaceuticals*,
   509 U.S. 579 (1993)........................................................................ *passim*

*Dawson v. Delaware*,
   503 U.S. 159 (1992)...............................................................................231

*Dowthitt v. Johnson*,
   230 F.3d 742 (5th Cir. 2000) ...............................................................110

*Duncan v. Louisiana*,
   391 U.S. 145 (1968)........................................................................248, 249

*Duren v. Missouri*,
   439 U.S. 357 (1979)...........................................249, 252, 253, 256

*Enriquez v. Procunier*,
   752 F.2d 111 (5th Cir. 1984), *cert. denied*, 471 U.S. 1126 (1985) ...............................226, 231

*Estelle v. McGuire*,
   502 U.S. 62 (1991) ...........................................................................................................234

*Evitts v. Lucey*,
   469 U.S. 387 (1985) ...........................................................................................................217

*Faretta v. California*,
   422 U.S. 806 (1975) ...........................................................................................................236

*Ford v. Georgia*,
   498 U.S. 411 (1991) .............................................................................................................84

*Giglio v. U.S.*,
   405 U.S. 150 (1972) ....................................................................................................*passim*

*Goodwin v. Johnson*,
   132 F.3d 162 (5th Cir. 1997) .............................................................................................110

*Graves v. Cockrell*,
   351 F.3d 143 (5th Cir. 2003) .............................................................................................256

*Henry v. Mississippi*,
   379 U.S. 443 (1965) .....................................................................................................84, 212

*Hernandez v. Texas*,
   347 U.S. 475 (1954) ...........................................................................................................252

*Herrera v. Collins*,
   506 U.S. 39 (1993) .............................................................................................................256

*House v. Bell*,
   547 U.S. 518 (2006) ....................................................................................................*passim*

*Ibarra v. Thaler*,
   687 F.3d 222 (5th Cir. 2012) .............................................................................................217

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ...........................................................................................................134

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ...................................................................................113, 134, 184, 185

*Lindsey v. King*,
   769 F.2d 1034 (5th Cir. 1985) ...........................................................................................185

*Lockhart v. McCree*,
   476 U.S. 162 (1986)..............................................................249, 252

*Maine v. Moulton*,
   474 U.S. 159 (1985)....................................................................212

*Martinez v. Ryan*,
   132 S.Ct. 1309 (2012)..................................................................217

*Massiah v. United States*,
   377 U.S. 201 (1964).............................................................. *passim*

*Matchett v. Dretke*,
   380 F.3d 844 (5th Cir. 2004) ..........................................................87

*McNeely v. Olivarez*,
   104 F.3d 365 (9th Cir. 1996) ........................................................227

*McQuiggins v. Perkins*,
   133 S.Ct. 1924 (2013)............................................................134, 161

*Mullen v. Blackburn*,
   808 F.2d 1143 (5th Cir. 1987) ......................................................231

*Murray v. Carrier*,
   477 U.S. 478 (1986)............................................................... *passim*

*Payne v. Tennessee*,
   501 U.S. 808 (1991)....................................................................231

*Porter v. Estelle*,
   709 F.2d 944 (5th Cir. 1983) ........................................................231

*Powers v. Ohio*,
   499 U.S. 400 (1991)....................................................................248

*Prible v. Thaler*,
   4:08-mc-00316 (S.D. Tex)...............................................68, 116, 120

*Rhines v. Weber*,
   544 U.S. 269 (2005).................................................................56, 90

*Roberts v. Thaler*,
   681 F.3d 597 (5th Cir. 2012) ..........................................................84

*Schlup v. Delo*,
   513 U.S. 298 (1995)............................................................. *passim*

*Smith v. Robbins*,
    528 U.S. 259 (2000)..............................................................217

*Spears v. Mullin*,
    343 F.3d 1215 (10th Cir. 2003), *cert. denied sub nom. Powell v. Mullin*, 541
    U.S. 909 (2004)..............................................................227, 228

*Spencer v. Texas*,
    385 U.S. 554 (1967)..............................................................231

*Story v. Collins*,
    920 F.2d 1247 (5th Cir. 1991) ..............................................................226

*Strickland v. Washington*,
    466 U.S. 668 (1984).............................................................. *passim*

*Strickler v. Greene*,
    119 S.Ct. 1936 (1999)..............................................................179

*Strickler v. Greene*,
    527 U.S. 263 (1999).............................................................. *passim*

*Swain v. Alabama*,
    380 U.S. 202 (1965)..............................................................252

*In re Swearingen*,
    556 F.3d 344 (5th Cir. 2009) ..............................................................256

*Taylor v. Louisiana*,
    419 U.S. 522 (1975).............................................................. *passim*

*Thiel v. Southern Pacific Co.*,
    328 U.S. 217 (1946)..............................................................249

*Thompson v. Sheppard*,
    490 F.2d 830 (5th Cir. 1974) ..............................................................137, 138, 252

*United States ex rel. Touhy v. Ragen*,
    340 U.S. 462 (1951)..............................................................116, 126, 162

*U.S. v. Agurs*,
    427 U.S. 97 (1975)..............................................................179

*U.S. v. Barham*,
    595 F.2d 231 (5th Cir. 1979) ..............................................................162, 165

*U.S. v. Blair*,
    493 F. Supp. 398 (D. Md. 1980), *aff'd*, 665 F.2d 500 (4th Cir. 1981) ..............................252

*U.S. v. Brummitt*,
665 F.2d 521 (5th Cir. 1981) ........................................................................252

*U.S. v. Butler*,
611 F.2d 1066 (5th Cir. 1980) ......................................................................252

*U.S. v. Cross*,
308 F.3d 308 (3rd Cir. 2002) ........................................................................217

*U.S. v. Gil*,
297 F.3d 93 (2d Cir. 2002).............................................................................113

*U.S. v. Haley*,
521 F. Supp. 290 (N.D. Ga. 1981) .................................................................252

*U.S. v. Maskeny*,
609 F.2d 183 (5th Cir. 1980), *cert. denied*, 447 U.S. 921 (1980)..................249, 252

*U.S. v. Stevens*,
935 F.2d 1380 (3rd Cir. 1991) ......................................................................131

*U.S. v. Williams*,
264 F.3d 561 (5th Cir. 2001) ........................................................................252

*United States v. Bagley*,
473 U.S. 667 (1985)........................................................................162, 179, 203

*United States v. Henry*,
447 U.S. 264 (1980)........................................................................................212

*Wiggins v. Smith*,
539 U.S. 510 (2003)........................................................................................217

*Williams v. Taylor*,
529 U.S. 420 (2000)..........................................................................................92

*Wood v. Quarterman*,
503 F.3d 408 (5th Cir. 2007) ........................................................................226

**State Cases**

*Aldrich v. State*,
928 S.W.2d 558 (Tex. Crim. App. 1996)......................................................249, 252

*Ex parte Davis*,
818 S.W.2d 64 (Tex. Crim. App. 1991)..............................................................87

*Kelly v. State*,
824 S.W.2d 568 (Tex. Crim. App. 1992).............................................152, 240, 241, 270

*Ex Parte Medina*,
   361 S.W.3d 633 (Tex. Crim. App. 2011)..............................................................89

*Pondexter v. State*,
   942 S.W.2d 577 (Tex. Crim. App. 1996), *cert denied,* 522 U.S. 825 (1997).......................252

*Prible v. State*,
   175 S.W.3d 724 (Tex. Crim. App. 2005)....................................................52, 231

*Ex parte Reed*,
   271 S.W.3d 698 (Tex. Crim. App. 2008)..............................................................87

*Robinson v. State*,
   240 S.W.3d 919 (Tex. Crim. App. 2007)..............................................................87

*Ex parte Rousseau*,
   No. WR-61389-02, 2010 WL 3430765 (Tex. Crim. App. 2010) (unpublished) ...................87

*Ex parte Taylor*,
   36 S.W.3d 883 (Tex. Crim. App. 2001)..............................................................87

*Ex Parte Temple*,
   No. WR-78,545-02, 2016 WL 6903758 (Tex. Crim. App. Nov. 23, 2016)
   (unpublished) ...........................................................................................262

*Weaver v. State*,
   823 S.W.2d 371 (Tex. App.—Dallas 1992, pet. ref'd).......................................252

TO THE HONORABLE KEITH ELLISON, UNITED STATES DISTRICT JUDGE:

Petitioner Ronald Jeffrey Prible ("Prible" or "Petitioner") files this Fourth Amended Petition for Writ of Habeas Corpus as follows:

## I.
## INTRODUCTION

For over 15 years, the State has denied any conspiracy to frame Prible for the murders of the Herrera/Tirado family through the use of false jailhouse informant testimony. Now, lead prosecutor Kelly Siegler's own handwritten notes, which she admits writing *before* Prible was ever charged in the murders, confirm that this was in fact the case:



It is now crystal clear that before Siegler ever accepted charges against Prible, she was contemplating setting him up with a "federal prison roommate." Had the jury known this, they would have been able to see right through the State's theory at trial that Prible had *coincidentally* come into contact with informants Michael Beckcom and Nathan Foreman while imprisoned at FCI Beaumont and had confessed to the two of them after they had become as close as "brothers."[1]

Prible's trial was a master class in obfuscation by omission. We now know, after seeing Siegler's work product notes, that she and her investigator, Johnny Bonds, met with Nathan Foreman before Prible was indicted at the suggestion of inmate Jesse Moreno, a long-time informant of Siegler's who was imprisoned with Foreman in FCI Beaumont; determined

---

[1] *See* Testimony of Michael Beckcom, 26 RR 49, 54-55.

immediately that Foreman had never laid eyes on Prible, let alone heard a confession from him; nevertheless continued to speak with Foreman and his lawyer about Prible's case; arranged another face-to-face meeting with Foreman at FCI Beaumont followed by a meeting with his cellmate, Michael Beckcom, to discuss Prible's case; eventually decided to use Beckcom to testify against Prible; wrote a Rule 35 sentence reduction letter for Foreman five months before Prible's trial; and personally testified at a Rule 35 hearing for Moreno two months before Prible's trial. None of this was ever disclosed to Prible's trial attorneys. The extent of Foreman's involvement in this case was summed up as follows in a pre-trial hearing on October 11, 2002:

> MS. SIEGLER: The first time he [Beckcom] contacted me it was by telephone. He called me. He got my name from Nathan Foreman. And the best I can recall, Judge, is he called me around October of 2001. And I know when he called we were at 201 because we had just gotten there because of the temporary flood move and I remember getting the phone call being on the 9th floor over there and we didn't move in there until the end of August. And I think that's going to be around October. We didn't go see him until December.

> THE COURT: Who's Nathan Foreman?

> MS. SIEGLER: Nathan Foreman is another inmate at FCI Medium. What else did you ask me?[2]

In addition to concealing Foreman's role in Prible's prosecution, Siegler never disclosed that she had communicated with several other inmates at FCI Beaumont (Carl Walker, Oscar Gonzalez, Felix Gonzalez, and Mark Martinez) about possibly informing against Prible; that she found each of them to lack credibility; that some of these same informants were also helping her at the same time with her prosecution of a man named Hermilo Herrero for a separate murder; and that the informants involved in the Herrero and Prible prosecutions were speaking with each other about the two cases. Had the jury known this, they would have rejected the State's story at

_____
[2] **Exhibit 72,** at 10-12.

2

Prible's trial that everything informant Michael Beckcom knew about the case, he learned from Prible.[3]  In short, the jury would have figured out that the whole thing was a set-up.

These are just some of the *Brady, Giglio,* and *Massiah* violations in this case that are outlined herein.  Prible respectfully requests that this Court issue a writ of habeas corpus and grant him relief from his unconstitutional conviction and death sentence.

## II.
## JURISDICTION

This Court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Prible was convicted in a Harris County, Texas, court.  Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

## III.
## SUMMARY OF AMENDMENTS

The Fourth Amended Petition incorporates the evidence obtained since the filing of the Third Amended Petition in 2015 and since this Court's July 2016 Order granting Prible's request for discovery.  In addition to newly-obtained documentary evidence, it incorporates affidavits from non-testifying informants Nathan Foreman and Oscar Gonzalez; a declaration from Gordon Harpe, a former Bureau of Prisons employee at FCI Beaumont; a transcript of a Rule 35 hearing for non-testifying informant Jesse Moreno, at which Siegler testified two months before Prible's trial; and transcripts of the 2017 depositions of witnesses Siegler (the lead prosecutor), Vic Wisner (her co-counsel), Johnny Bonds (the Harris County District Attorney's Office investigator), Michael Beckcom (the testifying informant), and Rafael Dominguez (a non-testifying informant).

---

[3] *See* Siegler's closing argument, Vol. 28, at 75:11-21.

**IV.**
**FACTUAL BACKGROUND**

**A.    THE 1999 MURDERS AND INITIAL INVESTIGATION.**

**1.    The Relationship Between Prible, Steve Herrera, and Nilda Tirado.**

Steve Herrera and Prible had been friends since meeting in junior high.  They grew up in the same Houston neighborhood.  After Prible was honorably discharged from the Marines in the late 1990s, he moved back home with his young son to live with his parents.  He and Steve re-connected and began hanging out together regularly at the house that Steve shared with his girlfriend, Nilda Tirado, drinking, using cocaine, and shooting pool.  They also went clubbing together, often to topless bars.  Steve and his brother, Edward Herrera, were both cocaine dealers, and Edward often supplied Steve with drugs.[4]

By the time of their murders in April 1999, Steve and Nilda had been living together for about five years.[5]  Between them, they had three little girls:  Nilda's daughter, Rachel Elizabeth Cumpian (whose father was later murdered in a separate drug-related incident), age 7; Steve's daughter, Valerie Herrera, age 7; and Steve and Nilda's daughter together, Jade Herrera, age 22 months.  Testimony at trial showed that Nilda did not approve of Steve staying out late with his friends, using drugs, and selling drugs (although it is now known that she, too, sold drugs on occasion).[6]  Nor did she approve of Steve going to topless bars.[7]  Nilda kicked Steve out of their house at least a couple of times, the last time a week before the murders.[8]  Unbeknownst to Nilda, Steve had been seeing another woman, Jaime Lyons, for several months before he died.[9]

---

[4] Testimony of Edward Herrera, 25 RR 61, 100.
[5] *Id.* at 59.
[6] Testimony of Angela Alvarez, 25 RR 134.
[7] *Id.*
[8] *Id.*
[9] Testimony of Jaime Lyons, 26 RR 195.

4

Unbeknownst to Steve, Nilda had recently become involved with Prible. Nilda's sister-in-law, Marybell Tirado, testified that prior to the murders, Prible had gifted Nilda a bathrobe.[10]

### 2. The Bank Robbery Scheme.

Steve and Prible wanted to open a club together.[11] In the spring of 1999, they concocted a scheme whereby Prible would rob banks and give the proceeds to Steve, who would grow the money by buying and re-selling drugs, allowing them to make enough money to open a club. Between March 30 and April 22, 1999, Prible robbed five banks in Houston, for a total of $45,989.00.[12] Various witnesses testified that they saw Prible and Steve handling large sums of cash at Steve's house during this time period, made up of noticeably old bills like those that banks use as bait money.[13] Edward Herrera described one of these incidents in detail at trial. Edward testified that he went over to Steve and Nilda's house the evening of April 21, 1999, and Prible was there shooting pool.[14] He saw Prible take a large amount of money out of his pocket and sit down on the couch to count it.[15] The next morning, Edward picked Steve up from his house and took him to a Texaco.[16] Steve pulled out a lot of money when they got there.[17] Edward didn't know where Steve had gotten the money.[18] Nor did he know whether Steve was buying money orders with it, changing it, or doing something else, and he didn't ask, "because

---

[10] Testimony of Marybell Tirado, 26 RR 235.
[11] Testimony of Edward Herrera, 25 RR 101.
[12] No weapon was used in the robberies, and no one was physically injured.
[13] *See, e.g.,* Testimony of Edward Herrera, 25 RR 59. Other witnesses testified that they, too, had seen Steve handling large amounts of cash during this time, which they presumed to have come from the robberies. Nilda's friend Cynthia Garcia Flores told lead detective Curtis Brown that she suspected Prible and Steve were involved in bank robberies, and that she had seen the money. *See* 25 RR 140. Cynthia's husband, Vincent Flores, testified that Steve bought cocaine from him 6-7 times a week, and that Steve had paid him for some cocaine in April 1999 using "old bills." *See* 26 RR 211. Jaime Lyons, Steve's mistress, testified that in March 1999, she saw Prible give Steve a gift bag full of money. *See* 26 RR 198.
[14] Testimony of Edward Herrera, 25 RR 63.
[15] *Id.* at 64.
[16] *Id.* at 66.
[17] *Id.* at 67.
[18] *Id.*

[Steve] didn't really want me in his business."[19]  Edward conceded at trial, however, that Prible might have given the stack of money that he was counting the night before to Steve, and that that might have been the money that Steve pulled out at the Texaco.[20]

> ### 3. The Night of the Murders.

On April 23, 1999, Steve's brother-in-law, Victor Martinez, went over to Steve and Nilda's house around 10:00 p.m. with some beer.[21]  Prible was there also, shooting pool and drinking with Steve in the garage.[22]  This was the first time Victor had met Prible.  Steve had been trying to score an 8-ball of cocaine and had been paging his brother Edward from Prible's phone over and over, asking him if he could get him any.[23]  Around 11:00 p.m., Steve paged his brother again and told him that he would pay him double if he could get him the drugs.[24]  Steve, Prible, and Victor played pool until around midnight, when Nilda stuck her head in the garage and called for Steve.[25]  Steve, Prible, and Victor then went to Rick's Cabaret.[26]  Sometime after 2:00 a.m., the three men left Rick's Cabaret and headed back to Steve's house in Victor's car.[27]  When they got back to Steve's house, they talked for a little while by the car.  Then Victor drove off and Steve and Prible went back into the garage to play some more pool.[28]  During the entire time the three men were together that night, Victor never saw any reason to think that Steve and Prible were angry with each other.[29]  Nor did he recall any harsh words between them.[30]

---

[19] *Id.*

[20] *Id.* at 105.

[21] Testimony of Victor Martinez, 25 RR 4, 9.

[22] *Id.* at 14.

[23] Testimony of Edward Herrera, 25 RR 74-75.  Edward said Steve repeatedly paged him from Prible's phone that night looking for cocaine, at 9:00 p.m., 11:00 p.m., 2:30 a.m., 3:00 a.m., and 4:00 a.m.  He knew the pages were from Steve because Steve used his special code that he always used when paging Edward ("021").  *See id.* at 74.

[24] Testimony of Victor Martinez, 25 RR 21.

[25] *Id.*

[26] *Id.* at 24.

[27] *Id.* at 28.

[28] *Id.* at 32-33.

[29] *Id.* at 53 *("No reason to think they were mad at one another?"  "Not at all.").*

[30] *Id.*

Likewise, Edward Herrera testified that he had been over to his brother's house to play pool while Prible was there "at least 25 times," and he never saw Prible and Steve arguing or fighting.[31]

### 4. The Alibi Witness.

In the early morning hours, after Victor had left Steve's house, Steve drove Prible to Prible's parents' house in Nilda's black Honda Prelude.[32] Christina Gurrusquieta was the Pribles' 12-year-old next-door neighbor.[33] She knew Prible and she also knew Steve, because Steve had once cussed her out when he was over at Prible's and she had accidentally kicked a ball into his car.[34] Her parents owned a restaurant and didn't get home from work until around 1:00 a.m. on the weekends.[35] Christina and her sister had a habit of waiting up for them.[36] Once her parents got home, Christina would go to sleep.[37] Christina testified that the night she saw Steve drop off Prible, it had to have been after 1:00 a.m., because she had been asleep.[38] She woke up and heard Prible's voice, looked out the window, and saw him and Steve talking by Prible's dad's truck.[39] She saw Steve drive away and Prible walk into his house. Up until the day of trial, the State attempted to conceal the identity of this alibi witness.[40]

### 5. The Discovery of the Bodies.

At around 6:00 a.m., Steve and Nilda's neighbor, Gregory Francisco, opened his front door.[41] He saw smoke coming out of the Herreras' house across the street and heard music

---

[31] Testimony of Edward Herrera, 25 RR 104.
[32] Testimony of Christina Gurrusquieta, 27 RR 17.
[33] *Id.* at 7.
[34] *Id.* at 6-7.
[35] *Id.* at 8.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.* at 8-9.
[40] *Id.* at 10; 20 RR 5-6.
[41] Testimony of Gregory Francisco, 21 RR 104.

blaring from the home.[42]   He and his wife went to the house and rang the doorbell.[43]   No one answered.   The garage door was closed, so he kicked the side door of the house open and saw Steve face-down on the ground in a pool of blood.[44]   He also saw blood on the washing machine.[45]   They called 9-1-1.   Firemen arrived about 10 minutes later.   "There was hardly no fire," testified James Cone, one of the responding firemen.[46]   There was only "light smoke" coming out of the roof, and no smoke coming out of the doors or windows.[47]   There was only a small fire smoldering on the couch.[48]

The Harris County deputies arrived at the house around 6:53 a.m.[49]   They found Steve prone in the garage, his feet close to the door leading into the home.[50]   This room, which the State described as a den, was, like the garage, an entertainment space.   On one wall opposite the garage, Steve had created an entertainment center with several large speakers for his stereo and a large (approximate 60-inch) plasma TV.   The furniture, judging from crime scene photographs, included a medium-sized sofa or love seat set against the wall.[51]

Nilda was found face-down on one of the two loveseats in the room adjacent to the garage.[52]   She was nude except for remnants of a t-shirt found beneath her body, clinging to the anterior surface of her torso, which had shielded the shirt fabric from open flames.   Her right knee was on the ground; her left knee remained on the end of the sofa.[53]   Her knees were bent and her body, in crime scene photographs, appears taut and rigid.   Her arms were underneath her

---

[42] *Id.* at 104-105.
[43] *Id.* at 105.
[44] *Id.* at 109, 142-43.
[45] *Id.* at 142-43.
[46] 21 RR 165.
[47] *Id.* at 165-66.
[48] *Id.* at 174.
[49] Testimony of Dennis Tones, 21 RR 203.
[50] Testimony of Marshall Kramer, 21 RR 224.
[51] *See* crime scene photographs contained in the Clerk's Record.
[52] Testimony of Marshall Kramer, 21 RR 219.
[53] *Id.* at 220.

and bent at the elbow and her hands were positioned by her face.[54]  The skin on her back, buttocks, and legs appeared taut, marbled, and burned.[55]  Her right side, which was exposed to open flames, was burned more than her left, which was positioned against the couch and shielded from the fire.[56]  Autopsy reports conducted the next day state that Nilda's body presented in full rigor mortis and with fixed livor mortis.[57]

Near Nilda's body, firefighters found a scorched metal Kutzit container.[58]  On the floor, in the middle of the entertainment room, firefighters found the melted remains of a small red plastic container that could be used to hold gasoline.

Marshall Kramer, a 17-year veteran of the Harris County Fire and Emergency Services Department, testified that the assailants had set a flashfire – "a very hot rapid fire."[59]  Kramer compared flashfires to the phenomena seen when lighter fluid is poured on charcoal and a match is dropped on the soaked heap.[60]  "You get a whoosh, a rush of flames," Kramer said, as the fire immediately consumes all of the liquid fuel.[61]  At the same time, when a house is closed up tight, like Steve and Nilda's was,[62] the flashfire consumes "all of the oxygen in the room that is available at that time."[63]  With that, Kramer said, the flashfire "self-extinguished.  It went out. The fire went out literally," leaving behind "very heavy, very thick smoke."[64]  This smoke, according to Kramer, then permeated the house and suffocated Steve and Nilda's three children. Crime scene reports and photos show that the sofa was burned down to the frame in places, the

---

[54] *Id.*
[55] *See* crime scene photographs contained in the Clerk's Record.
[56] Testimony of Marshall Kramer, 21 RR 221.
[57] All bodies from the crime scene were taken to the morgue the day they were discovered, refrigerated overnight, and autopsied the next day.
[58] *Id.* at 216.
[59] *Id.*
[60] *Id.* at 217.
[61] *Id.*
[62] The den/living room was "a well built, tightly constructed area."  *Id.* at 223.
[63] *Id.* at 222.
[64] *Id.* at 223.

appliances had melted from the heat, other furniture in the room was charred, and the entire room was "well-burnt." The garage also sustained extensive fire damage. Extinguishment was not immediate.

The cause of Steve and Nilda's deaths was "an obvious gunshot wound," not smoke or fire.[65] Steve and Nilda had both been executed at close range. Steve had been hit point-blank in the neck.[66] The bullet severed his spinal cord.[67] Blood had splattered on the garage wall and pooled around his body. The flashfire had leapt through the door into the garage, where Steve's body lay.[68] However, he displayed only scattered burn marks, notably on his feet and the bottom of his shorts.[69] Fire personnel could tell that "there was no question" that Steve was "already dead before the fire" reached him.[70] The medical examiner, Dr. Joye M. Carter, testified that Steve was "definitely killed by a firearm" and that she did not see "anything that would constitute fatal burning."[71]

Nilda's body had third- and fourth-degree burns.[72] Like Steve, she had been executed by a single "obvious" gunshot to the neck,[73] which "severed the spinal cord at the level of the second cervical vertebra," resulting in a "nearly instantaneous" death.[74] Autopsy photos of Steve and Nilda's airways showed pink tissue, unmarred by soot, and unclogged mucus exudations.[75] Blood tests on both were negative for carboxyhemoglobin, which is produced when carbon

---

[65] Testimony of Dr. Joye Carter, 23 RR 36.
[66] *Id.*
[67] *Id.* at 37.
[68] Testimony of Marshall Kramer, 21 RR 225.
[69] *Id.*
[70] *Id.*
[71] Testimony of Dr. Joye Carter, 23 RR 48.
[72] *Id.*
[73] *Id.* at 58.
[74] *Id.* at 60.
[75] *Id.* at 54, 62.

monoxide from a fire is inhaled.[76]  Death by fire therefore could be categorically ruled out from the adult autopsy evidence.[77]

But the smoke did kill the couple's three small girls, who were located in other parts of the house.[78]  The bodies of the two older girls were found in their bedroom.[79]  Rachel was face-down on the floor; Valerie was face-down in bed.  Jade's body was found in the master bedroom face-down on the floor.[80]  Investigators arriving at the scene at 8:30 a.m., two hours after neighbors had discovered that Steve and Nilda had been killed, described stiffness of the neck occurring in the body of only one child.

### 6.    The 1999 Investigation.

Word of the fire and the deaths spread quickly, and neighbors and relatives gathered at the scene.  That morning police were able to interview neighborhood witnesses, as well as every family member who eventually testified at trial.  Cynthia Flores, Nilda's friend, told Detective Brown that Prible had pulled a series of bank robberies in order to provide start-up money for a bar that he and Steve had spoken of opening, and told the police where they could find Prible.[81]  Edward Herrera also gave Prible's name to Detective Brown that morning.[82]  Edward showed Detective Brown to Prible's house and then drove off.[83]

Detective Brown and two other police officers visited Prible at his parents' house the day of the murders.  Prible's mother answered his knock and called for her son.  Prible came to the

---

[76] *Id.* at 42, 61.
[77] *Id.* at 33-34.
[78] Testimony of Marshall Kramer, 21 RR 226.
[79] *Id.*
[80] At trial, over the defense's objections, the State displayed gruesome photos of the children and their dissected respiratory organs, mouths, tracheas, and lungs to the jury, even though Prible was not charged with their deaths. *See* 23 RR 8-15 (overruling objections to State's exhibits).
[81] Testimony of Cynthia Flores, 25 RR 140.
[82] Testimony of Curtis Brown, 23 RR 176-77.
[83] *Id.* at 178.

door, and Detective Brown "advised him that he would need to be talked to at my office."[84] Prible accompanied the officers in the squad car to the police station. When they arrived, Detective Brown escorted Prible to the clinic at the jail.[85] A nurse took blood, saliva, and hair samples from him.[86]

Prible was also made to strip completely naked so his body could be extensively photographed.[87] The photos showed no wounds, burns, or suspicious marks of any kind. At trial, Detective Brown at first denied that Prible had been stripped and photographed:

> *Q (by Ms. Siegler): And we've heard some talk of him being stripped completely naked and photos taken of his poor naked body. Did y'all take any pictures of him?*
>
> *A. Not to my knowledge.[88]*

During cross-examination by defense counsel, Detective Brown continued to deny any knowledge of the photographs:

> *Q (by the defense): When you took Prible to the jail to have these samples taken from him, was he photographed at that point in time?*
>
> *A. I don't recall.*
>
> *. . .*
>
> *Q. Detective Brown, let me show you what's been marked as Defendant's Exhibits No. 19, 20, 21, 22, and 23 and see if those might refresh your recollection as to when Prible was photographed and where.*
>
> *A. I don't remember these pictures.*
>
> *Q. Okay. You didn't – you weren't present when those pictures were taken?*
>
> *A. No.*

---

[84] *Id.* at 189.
[85] *Id.* at 188-89.
[86] *Id.* at 189-90.
[87] *Id.* at 191.
[88] *Id.*

. . .

*Q. Were you aware that Prible was photographed while he was a voluntary guest of the sheriff's department?*

*A. No, I wasn't aware of those pictures.*[89]

It was not until the next day that Detective Brown acknowledged that Prible was photographed nude at the jail, and that the photos showed no suspicious marks whatsoever:

*Q. [D]oes that fairly and accurately depict the way Prible looked --*

*A. That's correct.*

*Q. -- when he was at the Lockwood location, the jail location?*

*A. Yes.*

*Q. So – and these photographs all appear to have been taken in the same location?*

*A. Yes.*

*Q. Does that refresh your recollection as to these photographs?*

*A. I don't remember the photographs. But it's nothing unusual to be taking photographs like this.*

. . .

*Q. Do these fairly and accurately depict the way Prible looked when he was there at the –*

*A. Yes.*

. . .

*Q. So, those would indicate that Prible at some point was photographed while he was nude while he was in custody or at that location, correct?*

*A. Yes.*

*Q. And he showed his hands in front and back and they were photographed?*

---

[89] 23 RR 230-31.

*A. Yes.*

*Q. And if any kind of wounds or singing or – had appeared on his body you would have noted that in your report, wouldn't you?*

*A. That's correct.*

*Q. And that's not noted in your report, is it?*

*A. No.[90]*

According to Detective Brown, Prible was cooperative throughout his time at the station.[91] He signed a voluntary consent to search his room in his parents' house and his vehicle.[92] Detective Brown asked him for his tennis shoes so they could be tested for trace evidence, and he handed them over.[93] They were tested and nothing was found on them – "no blood, no hair, no nothing."[94] Prible was wearing blue shorts and a gray shirt when he came to the door; Detective Brown asked for those also and Prible consented.[95] Detective Brown sent the clothes to the lab for trace evidence testing and blood analysis, but they too came back negative.[96]

Detective Brown ordered all recovered evidence from the Herrera/Tirado house to be sent for fingerprint testing.[97] Buddy Wood, the crime lab supervisor for the Houston Fire and Arson Investigation Division, testified that several items from the crime scene were submitted to him for fingerprint analysis: a 1-gallon burned metal can, a red plastic burned gas container, a paper

---

[90] 24 RR 12.
[91] Testimony of Curtis Brown, 23 RR 195.
[92] *Id.* at 185.
[93] *Id.* at 193.
[94] *Id.* at 193.
[95] *Id.* at 194.
[96] *Id.* at 194-95 *("Q. Did anything at all come back? A. No. Q. Nothing connecting the clothes with any sort of blood – A. No. Q. – or any sort of hair or fiber or anything like that? A. No.")*.
[97] *Id.* at 214.

towel holder with paper towels, and a burned aerosol can.[98]  None of the prints turned out to be Prible's.[99]

In addition to testing Prible's clothes and shoes and extensively photographing his entire body, Detective Brown requested that "all evidence possible" from the scene – "cans, bottles, whatever they felt that could be useful" – be examined for trace evidence.[100]  Detective Brown and Kramer both testified that there was blood splattered and smeared about the crime scene.[101]  Detective Brown testified that he also requested testing on all blood samples from the scene, but then conceded that he did not know if the blood samples were ever submitted for testing, and that he did not remember directing anyone to test them.[102]  The following day, when testimony resumed, Detective Brown conceded that none of the blood found at the scene was taken to be tested[103] – not even the blood smear that Detective Brown noticed next to Steve's body while he was examining the scene.[104]  Prible's shoes were examined for bloodstains; that test came back negative.[105]

At trial, Kramer, the Harris County fire investigator, described how a flash fire such as the one in this case is set, and the incriminating evidence that such a fire could leave on the perpetrator:

> *Q (by the defense):  With regards to the different fire accelerants that you've described, the gasoline and the Kutzit, all of these items were taken from a container and placed on a floor, on a sofa, on a person, whatever.  In doing this,*

---

[98] Testimony of Buddy Wood, 24 RR 235.
[99] Testimony of Curtis Brown, 23 RR 203 *("Q.  When all that evidence was sent to the fingerprint examiner for purposes of developing prints, were any prints ever obtained that led to the Defendant, Jeffrey Prible?  A.  No.  Q. None?  A.  None.").*
[100] *Id.* at 232.
[101] Testimony of Curtis Brown, 24 RR 18-19; Testimony of Marshall Kramer, 26 RR 108.
[102] Testimony of Curtis Brown, 23 RR 232-34.
[103] 24 RR 4-5 *("Q.  I believe when we left off yesterday you were going to review the report to see what trace evidence and blood was taken from the scene to the laboratory to be analyzed.  A.  That's correct, sir.  I did review the report.  Q.  And can you tell me what that evidence was?  A.  There was no documentation where blood was removed – taken from the scene.  Q.  No blood taken from the scene?  A.  That's correct.").*
[104] *Id.* at 18-19.
[105] Testimony of Bill Watson, 24 RR 42-43.

*is there not apt to be splashing as the accelerant is taken from the can and poured onto the surface?*

*A. Yes.*

*Q. And I think you've indicated that when you submitted some of these items to a laboratory that was one of the - - of the questions that might have been asked of the laboratory, were certain accelerants found on certain items; is that correct?*

*A. Yes, sir, that's correct.*

*Q. And certainly you might expect not only to have the accelerant found on the person whose body is left at the scene in the course of splashing, pouring, whatever, the accelerants onto the body where those accelerants might get onto the person who was there causing the fire, correct?*

*A. Yes.*

*Q. What other types of evidence might a perpetrator come to have on him as a result of starting a fire like this one?*

*A. Soot, smoke.*

*Q. The same type of soot that we've described as being on the wall?*

*A. Yes.*

*Q. And this stuff called Kutzit, is it possible that it might be on shoes?*

*A. Yes.*

*Q. And on clothes?*

*A. Yes.*

*Q. Does it have any burning effect if it gets on the skin, if you know?*

*A. I think it's listed as an irritant indicative of the fact that it would cause some irritation to the skin.[106]*

Buddy Wood, the crime lab supervisor, also testified about the irritant properties of Kutzit. He said that Kutzit would leave a mark if it touched the skin of someone who was using

---

[106] 22 RR 145-47.

it, and could even singe the skin if a fire was lit while Kutzit was on it.[107] He also testified that

Kutzit could remain on clothes and shoes for possible future testing, and would make the clothes

that it is splashed on smell bad.[108]

Cleva West, a Houston Police Department Crime Lab employee, tested Prible's shoes and

clothing for fire accelerants.[109] West testified that she found accelerants – namely, gasoline – on

only four crime scene items: foam from the sofa on which Nilda's body lay, a piece of Nilda's t-

shirt, a partly burned roll of paper towels, and a partly burned roll of toilet paper.[110] West also

testified that a sample of Nilda's hair, while not testing positive for gasoline, tested positive for a

"heavy component" of gasoline. West did not detect Kutzit on any item except the content of the

Kutzit can found next to Nilda,[111] which crime scene photos show was capped.[112] **No Kutzit,**

**gasoline, singe marks, skin irritations, soot, or smoke were found on Prible's body, clothes,**

**or shoes, all of which law enforcement examined and photographed, with Prible's consent,**

**within hours of the murders.** The following trial exchange summed up the extent of the

forensic evidence connecting Prible to the killings:

> *Q (by Ms. Siegler):  When you came away from your investigation, did you, in what you saw, what you observed and what you handled, did you develop any evidence that linked this crime scene to Jeff Prible?*
>
> *A (by Kramer):  No.[113]*

After providing the police with blood, hair, and saliva samples and allowing them to

photograph his body, Prible submitted to an interview with Detectives Taber and Brown.  Prible

gave an initial statement advising that he had been at Steve and Nilda's home the night before

---

[107] 24 RR 228.
[108] *Id.* at 229.
[109] Testimony of Cleva West, 24 RR 214-15.
[110] *Id.* at 212.
[111] *Id.*
[112] *See* crime scene photographs contained in the Clerk's Record.
[113] 22 RR 163.

and that Steve had dropped him off at the Prible residence early that morning.[114]   The officers

continued to question him about whether any of his DNA would be found on Nilda.  Prible then

made an additional statement, informing the officers that he had engaged in consensual oral sex

with Nilda that evening and that he had not volunteered this information initially because he did

not want to ruin Nilda's reputation.[115]

A Harris County Medical Examiner DNA analyst, Brandt Moore, testified that the

Medical Examiner's Office made slides from vaginal, anal, and oral swabs taken from Nilda.

According to laboratory notes, one sperm cell was observed on the vaginal and anal slides.[116]  No

more than fifteen or so sperm cells were observed on the oral slide.[117]  The Chief Harris County

Medical Examiner, Dr. Joye Carter, testified that she could not tell, just by looking at Nilda's

mouth, whether there was semen in it.[118]  She also stated that sperm cells could be found in a

person's mouth at least several hours after ejaculation, and maybe longer.[119]  She testified that

there was "no indication" that Nilda had been sexually assaulted.[120]

William Watson, who, at the time of trial, held a master's degree in biology from the

University of North Texas, performed the DNA testing.  Watson testified that he obtained a

DNA profile from Nilda's fingernail scrapings, but that those scrapings contained only Nilda's

DNA.[121]  Watson also testified that he obtained DNA profiles from the swabs taken from Nilda's

mouth, vagina, and anus.   Steve's DNA was found on the vaginal and anal swabs.   A

---

[114] Testimony of Curtis Brown, 23 RR 205; *see also* **Exhibit 1** (Statement of Ronald Jeffrey Prible dated April 24, 1999, at 5:46 p.m.).
[115] *See* **Exhibit 2** (Statement of Ronald Jeffrey Prible dated April 25, 1999, at 12:09 a.m.).
[116] Testimony of Brandt Moore, 23 RR 152.
[117] *Id.* at 153.
[118] *Id.* at 128.
[119] *Id.* at 128-29.
[120] *Id.* at 128.
[121] 24 RR 44, 96.

"microscopic" amount of DNA was collected on the swabs taken from Nilda's mouth; this DNA was linked to Prible.[122]

In his June 4, 1999 report, Watson did not try to estimate a perimortem interval ("PMI") between oral sex and death based on the quantity or testability of sperm found on the oral swab.[123]  At trial, Watson testified that he had never before developed a DNA profile from an oral swab and had not seen it reported in the literature.[124]  Watson testified that the fact that he could develop a profile from the oral swab was "consistent with there being a great deal of sperm present."[125]  Watson testified that the fact that he was able to generate a full and complete male profile from the oral swab was inconsistent with the semen being deposited into Nilda's mouth as long as an hour before she was killed.[126]  He said the fact that he was able to obtain the pure male profile "certainly would be consistent with" Prible depositing the semen in Nilda's mouth "moments, if not seconds, before she was killed."[127]

### 7.  Prible is not charged for 2 years.

Within six weeks of Steve's and Nilda's deaths, the State had developed all of the evidence that it would introduce at trial – except for the testimony of jailhouse informant Michael Beckcom.  But more than two years passed before Prible was charged with capital murder, on July 5, 2001, after lead prosecutor Kelly Siegler had taken up the case.  In the meantime, Prible pleaded guilty to bank robbery soon after the murders and was sent to FCI Beaumont to serve his sentence.

---

[122] 24 RR 118; *see* **Exhibit 3** (June 4, 1999, report of William Watson).
[123] *See* **Exhibit 3.**
[124] 24 RR 100, 112.
[125] *Id.* at 94.
[126] *Id.* at 101.
[127] *Id.* at 103.

**B.  PROSECUTOR KELLY SIEGLER STARTS LOOKING AT THE CASE IN 2001.**

**1.  FCI Beaumont inmate Jesse Moreno reaches out to Siegler in April 2001.**

Siegler was not involved in the Herrera/Tirado murder case initially.[128]  But the documents in her file show that she and her HCDA investigator, Johnny Bonds, were working on the case by March 2001, if not earlier.[129]  On April 4, 2001, a jailhouse snitch that Siegler had used in a murder case years before wrote to her and said he had information about a different murder case that he wanted to share.[130]  This snitch, Jesse Moreno, was serving time in FCI Beaumont's Special Housing Unit (the "SHU" or the "hole").[131]  A few days later, Moreno's mother wrote a letter to Siegler, asking her to help her son.[132]  Siegler arranged to meet with Moreno.

**2.  Siegler meets with Moreno on July 3, 2001, at the U.S. Marshal's Office in Beaumont.**

On July 3, 2001, Siegler met with Moreno face-to-face (the "July 3 Meeting") at the U.S. Marshal's Office in Beaumont.[133]  Some of this meeting was recorded.[134]  Moreno told Siegler that a prisoner named Hermilo Herrero had confessed to the murder of a man named Albert Guajardo in the presence of Moreno and his fellow inmate Nathan Foreman.[135]  Moreno and

---

[128] *See* the October 17, 2017, deposition of Kelly Siegler, **Exhibit 4-A,** at 55.  Siegler's deposition is attached hereto in two parts.  The first part, attached as **Exhibit 4-A,** is unsealed.  The second part, attached as **Exhibit 4-B,** concerns her testimony in Jesse Moreno's Rule 35 hearing and is being filed under seal in accordance with the protective order mentioned *infra.*

[129] *See* **Exhibit 3**; *see also* **Exhibit 4-A** at 65-66; *see also* Deposition of Johnny Bonds, excerpts of which are attached hereto as **Exhibit 5,** at 65-66.

[130] *See* **Exhibit 6** (April 4, 2001, handwritten letter from Jesse Moreno to Siegler).

[131] *See* **Exhibit 7** (BOP housing and transfer records for Moreno).  Siegler had used Moreno in 1998 to convict Jason Morales of a cold case murder.  *See* **Exhibit 8** (Writ of Habeas Corpus Ad Testificandum for Jesse Moreno in *State v. Morales*, No. 752171, in the 228th Criminal District Court of Harris County, Texas).  Siegler had also arranged a deal for Moreno's testimony in another murder case in which Moreno himself was a suspect.  *See* **Exhibit 9** (HCDA Capital Murder Report identifying Moreno, Frankie Vasquez III, Gene Arthur Taylor, and Jose Cuellar as suspects).  Moreno would later turn State's witness against Vasquez.

[132] *See* **Exhibit 10** (April 10, 2001, handwritten letter of Celia Moreno to Siegler).

[133] *See* **Exhibit 11** (Transcript of the July 3, 2001, Moreno/Siegler interview).

[134] *See id.*

[135] *See id.* at 13, 17.

Foreman were from the same neighborhood and knew each other outside prison.[136]

At the July 3 Meeting, Moreno and Siegler also spoke about Prible's case.[137] Siegler stated at her deposition that she could not remember "the details" of what Moreno told her about Foreman that day.[138] At the meeting, Moreno referred to Foreman as "the one I was asking you about":[139]

> *KELLY SIEGLER: Okay. How do you spell Foreman's last, last name?*
>
> *JESSE MORENO: Foreman.*
>
> *KS: F o r e m a n?*
>
> *JM: Yeah.*
>
> *KS: White guy?*
>
> *JM: Black guy.*
>
> *KS: Black guy. How old is he?*
>
> *JM: 35.[140]*

Shortly after the July 3 Meeting, Siegler spoke with Foreman and arranged to meet with him in person.[141]

### 3. Siegler accepts charges against Hermilo Herrero and Prible on July 5, 2001, and has Prible moved to the same FCI Beaumont unit as Nathan Foreman.

Siegler returned to Houston after her meeting with Moreno and accepted charges against Hermilo Herrero two days later, on July 5, 2001, having no evidence against him other than

---

[136] Moreno had been transferred out of FCI Beaumont on or about May 15, 2001, to an intransit facility, where he stayed until approximately September 12, 2001. This facility was the Liberty County Jail, which was also used by the Feds. On or about September 12, 2001, he was admitted to another intransit facility, where he stayed until approximately March 29, 2002. He was admitted on or about that day back into FCI Beaumont's SHU, ahead of Hermilo Herrero's April 2002 trial. *See* **Exhibit 7.**

[137] *See* **Exhibit 4-A,** at 130-131 *("Q. . . . Jesse Moreno talked with you about Mr. Prible's case and Mr. Herrero's case, correct? A. He did.").*

[138] *See id.* at 100-101.

[139] *See* **Exhibit 11** at 13.

[140] *Id.* at 19.

[141] *See* **Exhibit 4-A** at 102.

Moreno's confession story.[142]   She also accepted charges against Prible on that day.[143]   The probable cause affidavit was signed by Detective Curtis Brown, and it represented that ballistics tied the bullets recovered at the scene to a .38 Taurus revolver that Prible owned.[144]

In accordance with HCDA policy, Siegler prepared and signed detainer paperwork to have Herrero transferred from FCI Beaumont to the Harris County Jail to await trial.[145]   She did not do the same for Prible until months later.   Therefore, instead of going to the Harris County Jail after being charged with murder on July 5, 2001, Prible was moved from FCI Beaumont Low to FCI Beaumont Medium on July 25, 2001.[146]   On that same day, Foreman was also moved from the FCI Beaumont Medium's SHU back into the Medium's general population.[147]

**4.      Siegler and Bonds meet with Nathan Foreman on August 8, 2001, to discuss the Prible and Herrero cases.**

On August 8, 2001, Siegler and Bonds met with Foreman at the Federal Detention Center in Houston (the "August 8 Meeting").[148]   At this point, Prible had not yet been indicted for the murders.   Foreman told Siegler and Bonds that Prible had confessed to him, but Siegler and Bonds believed that Foreman's account was not credible, and that he had not even met Prible. At his 2017 deposition, Bonds testified:

> . . . *[Nathan Foreman] starts telling us basically [Prible] did it, you know, and he couldn't give us any details. . . . And two minutes into his conversation, I'm like this guy is lying.   He doesn't know anything about this case.   Then I asked him to describe Prible.   He's like what?   I said what does he look like?   And he couldn't*

---

[142] *See* **Exhibit 12** (July 5, 2001, HCSO supplemental report); *see also* **Exhibit 13** (May 1, 2002, letter from Siegler to AUSA Todd Clemons regarding Moreno's cooperation in Herrero case).

[143] *See* **Exhibit 14** (July 5, 2001, Indictment).

[144] *See* **Exhibit 15** (July 5, 2001, Probable Cause Affidavit).   Later, the State's ballistics examiner would determine that the bullets recovered from the crime scene came from a .9mm weapon, and the number of lands and grooves on the bullets meant that a .38 could not have fired them.

[145] *See* **Exhibit 16** (September 4, 2001, letter from HCDA regarding interstate detainer paperwork for Herrero).

[146] *See* **Exhibit 17** (BOP housing and transfer records for Prible).

[147] *See* **Exhibit 18** (BOP housing and transfer records for Foreman).

[148] *See* Siegler's handwritten notes, true and correct copies of which are attached hereto as **Exhibits 19** and **20.** Prible's defense team did not learn about the August 8 Meeting until May 2017, when this Court ordered the State to produce these work product notes from its file.

*give me a physical description. And at that point, I don't think he – at the time we talked to Nathan Foreman, I don't think he had ever met Prible.*[149]

Siegler admitted at her deposition that she, too, knew Foreman was lying:

> *Q. And what was your take on Mr. Foreman when you met with him?*
>
> *A. I didn't believe him.*
>
> *Q. Why didn't you believe him?*
>
> *A. I didn't believe him.*
>
> *Q. Okay.*
>
> *A. Neither one of us did. We walked out of there saying we didn't believe a word he had to say.*[150]

Nevertheless, Siegler continued to cultivate Foreman as an informant after the August 8 Meeting:

> *Q (by Ms. Scardino): [At the August 8, 2001 meeting,] Mr. Bonds actually asked [Foreman] what Prible looked like, right, and he couldn't describe him?*
>
> *A. I don't remember that part. I'm not arguing with you but I don't remember that part.*
>
> *Q. Okay. But you didn't remember anything that he said as far as Prible or Herrero were concerned, you thought he was a liar?*
>
> *A. I – I remember some of the things that Nathan Foreman said. I also thought he was lying.*

---

[149] *See* Deposition of Johnny Bonds, **Exhibit 5** at 44-45, 48 (*"[] It was real obvious after talking to Foreman for a few minutes, he was just lying. And basically, we confronted him with it."); id.* at 49-50 (*"A. You know, and his – his reaction, I remember he kind of smirked. Well, didn't work. Q. What lie did you catch Nathan Foreman in? A. Well, he couldn't just give any details. He was kind of vague in information. It was real obvious that he had not talked to Prible. And, in fact, I was under the impression he hadn't even met him because he couldn't give me – or if he'd met him, he couldn't describe him, you know."); id.* at 50 (*"A. . . . [A]nything [Foreman] could have gotten, it wasn't anything that he couldn't have gotten from the newspaper or talking to somebody else that knew something. . . . But I got the impression that he didn't actually have any information that he got directly from Prible."); id.* at 170 (*"Q. Now, when you and Kelly interviewed Foreman back in August 8, '01, and you immediately found the guy to be just a liar, did Kelly agree with you? A. Uh-huh. Absolutely.").*

[150] *See* Deposition of Kelly Siegler, **Exhibit 4-A,** at 107, 134 (*"Q. And you also found [Foreman] to be a liar, right? A. I did not believe him to be credible, no.").*

*Q.  So, after you left that meeting or as you were leaving, did you tell Foreman, "Look, I don't believe anything you're saying.  Get out of here.  Get lost"?*

*A.  I didn't tell him what I thought.*

*Q.  You didn't?  Did you tell him to contact you if he had further information?*

*A.  I don't remember saying that.*

*Q.  Okay.  Would you have wanted him to contact you again with more information if you knew he was a liar?*

*A.  No.*

*Q.  That would have been improper to use a witness that you knew was lying, right?*

*A.  I never used him as a witness, contrary to what your petition says.[151]*

Siegler continued to communicate with Foreman after the August 8 Meeting.[152] Foreman's BOP phone records show that on October 3, 2001, Foreman added Siegler's name and number to the list of people he was authorized to telephone.[153]  Foreman's attorney, Alan Percely, also called Siegler and sent her a letter stating that Foreman had information on Prible.[154]  Siegler also met with Foreman at least one more time in person to discuss Prible's case.[155]

**5.      Prible is indicted for capital murder on August 29, 2001.**

In August 2001, Siegler presented Prible's and Herrero's cases to the grand jury.  She presented both cases on the same day.[156]  She did not present any witnesses to the grand jury and did not have the proceedings recorded.[157]  Consequently, there is no record of what she told the

---

[151] Siegler **Exhibit 4-A** at 107-108.
[152] *See id.*
[153] *See* **Exhibit 21** (Foreman's TruFone records and phone list).
[154] *See* **Exhibit 22** (August 13, 2001 telephone memo from Percely to Siegler "re Nathan Foreman to testify in federal trial"); **Exhibit 23** (November 12, 2001, letter from Percely to Siegler).
[155] *See* **Exhibit 20** (work product notes memorializing December 10, 2001, meeting with Foreman).
[156] *See* **Exhibit 4-A** at 120.
[157] *See id.* at 118-24.

grand jury about Prible's and Herrero's cases.[158]   The grand jury indicted Prible for capital

murder on August 29, 2001.[159]   They also indicted Herrero for capital murder on the same day.[160]

**6.      Foreman's attorney sends Siegler a letter on November 12, 2001, indicating that Foreman has information that will lead her to the murder weapon.  She immediately contacts FCI Beaumont to arrange to meet with Foreman on December 10, 2001.  On November 26, 2001, Siegler and Bonds send another letter to FCI Beaumont, this time asking to meet with inmate Michael Beckcom "after we talk with Foreman."**

On November 12, 2001, Foreman's attorney, Alan Percely, sent a letter to Siegler.[161]

Percely told Siegler that Foreman "has information that will lead you to the weapon that was

used in the murder case that you are preparing to go to trial on in the near future," and that

Foreman "wants the U.S. Attorney's office in Beaumont to aid him in getting out of prison

soon." [162]   Siegler immediately sent a letter to FCI Beaumont asking to meet with Foreman again

on December 10, 2001.[163]

On November 26, 2001, Siegler and Bonds sent another letter to FCI Beaumont, asking

to meet with inmate Michael Beckcom "after we talk with Foreman."[164]   Beckcom was serving

time at FCI Beaumont for murder, and he was Foreman's cellmate.[165]   They had moved in

together sometime near the beginning of October 2001, and Foreman had given Beckcom

Siegler's number that same month.[166]   Beckcom called Siegler and told her he had information

on Prible, and that's how, according to Beckcom, "[t]he wheels got set in motion."[167]

---

[158] **Exhibit 24** (December 5, 2016, affidavit of Brian Rose regarding lack of grand jury records).
[159] **Exhibit 25** (August 29, 2001, Prible indictment).
[160] **Exhibit 26** (August 29, 2001, Herrero indictment).
[161] *See* **Exhibit 23** ("As you are already aware, I am Mr. Foreman's attorney on federal and state criminal matters.").
[162] *Id.*
[163] *See* **Exhibit 27** (November 20, 2001, fax from Bonds to Lt. Robert Clark at FCI Medium requesting Foreman visit); *See also* **Exhibit 4-A** at 216-20.
[164] *See* **Exhibit 28** (November 26, 2001, fax from Bonds to Lt. Clark); *see also* **Exhibit 4-A** at 220-21.
[165] Trial Testimony of Michael Beckcom, 26 RR 23.
[166] *See* Beckcom's Deposition, excerpts of which are attached as **Exhibit 29,** at 32, 42-43.
[167] *See* **Exhibit 29** at 65-67; *see also* Trial Testimony of Michael Beckcom, 26 RR 21-24.

7.  **Siegler and Bonds meet with Foreman and Beckcom back-to-back at FCI Beaumont on December 10, 2001, and Beckcom gives them a handwritten statement describing Prible's alleged "confession."**

On December 10, 2001, Siegler and Bonds met with Foreman and Beckcom at the lieutenant's office in FCI Beaumont to discuss Prible's case (the "December 10 Meetings").[168] Bonds' notes from the Beckcom meeting show that Foreman's name came up during that meeting:



Beckcom gave Siegler and Bonds a 10-page handwritten letter laying out his supposed conversations with Prible.[170] In it, Beckcom describes how he allegedly first came into contact with Prible ("through my exercise partner, Bobby Williams"), and claims that *Prible* approached *Beckcom and Foreman* to talk about his murder case, rather than the other way around.[171] Beckcom wrote that he, Prible, and Foreman became very close in a very short period of time, and that after a few weeks, on November 24, 2001, Prible finally confessed to him *and*

---

[168] *See* **Exhibit 4-A** at 224-30; **Exhibit 20** (work product notes). Prible's defense team did not learn of these meetings until May 2017, when this Court ordered the State to produce these work product notes from its file. Bonds insisted at his deposition that he only met with Foreman once, on August 8, 2001, and said he was "at a loss of why we would want to talk to him again." *See* **Exhibit 5** at 131-36, 151, 155, 176-77. Bonds was also adamant that he had never met nor spoken with Beckcom. *See id.* at 45. Also on December 10, 2001, Bonds and Siegler met with inmate Jonathan Wayne Jefferson, who had been imprisoned with Prible in a Montgomery County holding cell right after Prible was charged in the Herrera/Tirado murders. *See* **Exhibit 20.**

[169] **Exhibit 20;** *see also* **Exhibit 4-A** at 228-30; **Exhibit 5** at 136-37.

[170] *See* **Exhibit 30** (handwritten statement of Beckcom). Bonds wrote "12-10-01" on the letter, but he and Siegler testified they were not certain that the letter was actually given to them on that date. Siegler said she thought Beckcom gave her the letter just before Prible's trial. *See* **Exhibit 4-A** at 231. But at trial, the State's story was that Beckcom gave the statement to Siegler and Bonds at the end of their December 10, 2001, meeting. *See* Trial Testimony of Michael Beckcom, 26 RR 25-26.

[171] *See* **Exhibit 30** at 1. Bonds conceded at his deposition that this story of *Prible* coincidentally approaching *Beckcom* sounds suspicious, given that Bonds and Siegler had already been speaking with Beckcom's cellmate, Foreman, about Prible's case for several months at this point. *See* **Exhibit 5** at 158.

*Foreman.*[172]  According to Beckcom's handwritten statement, his trial testimony, his affidavit, and his deposition testimony, Foreman was present on <u>each and every occasion</u> that Prible talked about his case with Beckcom, including when he supposedly confessed to the killings on November 24, 2001.[173]

At trial, the State presented a photograph of Prible, Beckcom, Foreman, and their respective parents taken on November 24, 2001.[174]  Beckcom testified at trial that he and Foreman took this photo in order to have a piece of evidence corroborating Prible's "confession."[175]  But visiting hours at FCI Beaumont ended at 4 p.m., and Beckcom testified that the "confession" happened as the sun was coming down on the yard.[176]  So Beckcom and Foreman took the photo in order to corroborate a "confession" that they didn't yet have.[177]

      **8.**      **Confident that the informants had extracted a "confession" from Prible, the State files paperwork to have Prible transferred from FCI Beaumont to the Harris County Jail.**

On November 29, 2001, the State filed an interstate detainer to have Prible transferred out of FCI Beaumont.[178]  BOP acted immediately, transferring Prible to another BOP facility that same day and eventually to the Harris County Jail.[179]

      **9.**      **Siegler reaches out to Beckcom's federal prosecutor to talk about a time cut in March 2002, months before Prible goes to trial.  Meanwhile, other FCI Beaumont inmates – including Carl Walker, Oscar and Felix Gonzalez, and Mark Martinez – reach out to Siegler, "trying to jump on the bandwagon"[180] to testify against Prible.**

---

[172] *See* **Exhibit 30.**
[173] *See* **Exhibit 30; Exhibit 31** (April 19, 2017, Affidavit of Michael Beckcom); **Exhibit 29** at 117-18; Trial Testimony of Michael Beckcom, 26 RR 31, 35, 38, 49, 54.
[174] *See* **Exhibit 32** (informant photographs with Prible).
[175] Trial Testimony of Michael Beckcom, 26 RR 83.
[176] *See* **Exhibit 29** at 43; Trial Testimony of Michael Beckcom, 26 RR 53.
[177] *See* **Exhibit 29** at 124-26.
[178] *See* **Exhibit 17.**
[179] *Id.*
[180] **Exhibit 4-A** at 157.

Siegler began communicating with Beckcom's federal prosecutor, AUSA Mark Cullers, as early as March 2002.[181] Beckcom knew that she was in communication with Cullers months before Prible's trial.[182] Beckcom testified at his deposition that Siegler led him to believe that he would be released from prison for testifying against Prible.[183]

Beckcom and Foreman were not the only FCI Beaumont inmates vying to testify against Prible in exchange for a time cut. Inmates Mark Martinez, Carl Walker, and Jesse[184] and Felix Gonzalez (a father/son duo incarcerated together) also were talking to Siegler in the spring of 2002 – though these names weren't known to Prible's attorneys until years after his trial.[185] In Siegler's file is a telephone memo dated March 7, 2002, asking her to call inmate Martinez.[186] A couple weeks later, Martinez wrote Siegler a letter in which he claimed to have been at the Herrera/Tirado residence the night of the murders and to have seen Prible and Steve Herrera arguing.[187] Siegler testified at her deposition that she did not find Martinez credible.[188]

Inmate Carl Walker also wrote to Siegler, claiming to have heard Prible confess to the murders. Walker told her that he was hanging around with her other informants and that they had all been privy to Prible's "confession."[189] Siegler testified at her deposition that she did not believe Walker either.[190]

---

[181] *See* **Exhibit 33** (March 4, 2002, letter from Cullers to Siegler enclosing Beckcom's federal trial testimony); **Exhibit 34** (March 5, 2002, letter from Cullers to Siegler enclosing Texas Rangers report regarding Beckcom's state murder case); **Exhibit 4-A** at 234-35.

[182] *See* **Exhibit 4-A** at 235 *("Q. And Mr. Beckcom knew that you were in talks with Cullers leading up to Mr. Prible's trial, right? A. Yes.").*

[183] *See* **Exhibit 29** at 19-20, 87 *("Q. [Y]ou thought you would be walking out the door after? A. For a house full of bodies, yeah. Children. Sure.").*

[184] Jesse Gonzalez's middle name is Oscar, and he is sometimes referred to in the documents and in the transcripts as "Oscar Gonzalez."

[185] At her deposition, Siegler initially testified that she couldn't remember if she had spoken with any inmates other than Foreman and Beckcom about Prible's case. *See* **Exhibit 4-A** at 149.

[186] *See* **Exhibit 22.**

[187] *See* **Exhibit 35** (March 20, 2002, letter from Martinez to Siegler).

[188] *See* **Exhibit 4-A** at 157.

[189] *See* **Exhibit 36** (undated letter from Walker to Siegler).

[190] *See* **Exhibit 4-A** at 155.

On May 22, 2002, Jesse and Felix Gonzalez wrote Siegler a letter, referencing two earlier phone calls they had had with her.[191] They said they had known about Prible and his case before Prible had even arrived at the Medium.[192] Siegler testified at her deposition that she did not believe their story.[193]

      **10.    In April 2002, Siegler secures a murder conviction against Hermilo Herrero by putting inmates Jesse Moreno and Rafael Dominguez on the stand to testify against him. Afterwards, she writes Rule 35 reduction letters for Moreno, Dominguez, Eddie Gomez,** *and Foreman.*

Hermilo Herrero was convicted of murder in April 2002 and was sentenced to life in prison.[194] Moreno and another inmate named Rafael Dominguez testified against Herrero at trial.[195] Moreno's prison phone records show that he made at least three phone calls to his federal prosecutor, Todd Clemons, after Herrero was convicted.[196] Moreno also sent Siegler a handwritten letter telling her what to say to AUSA Clemons to get Moreno transferred to another prison and to get his sentence reduced, preferably to time served.[197]

On May 1, 2002, Siegler wrote a letter to FCI Beaumont asking that Moreno, Dominguez, Foreman, and Gomez be separated from Herrero.[198] On that day, she also sent Rule

---

[191] *See* **Exhibit 37** (May 22, 2002, letter from Jesse Gonzalez to Siegler).

[192] *See id.*

[193] *See* **Exhibit 4-A** at 152-53. The Martinez, Walker, and Gonzalez letters all appear to have been typed on the same typewriter, using the same formatting, indentions, and spacing. *See* **Exhibit 4-A** at 160. In each, the word "Prible" is misspelled as "Pribble." At his deposition, Beckcom testified that there was an "old school" typewriter in the law library at FCI Beaumont. *See* **Exhibit 29** at 60-61. He testified that all three inmate letters look like they had been typed on that law library typewriter. *Id.* at 96. He said he didn't know if he had typed up the letters for the Gonzalezes, Martinez, and Walker. *Id.* at 97. However, the letters are identical in font and formatting to a letter found in Beckcom's state murder prosecution file, *see* **Exhibit 38,** and Beckcom indicated at his deposition that he thought Prible's name was spelled "Pribble." *See* **Exhibit 29** at 97. At her deposition, Siegler testified that when she received the three letters, she thought they all looked the same, signaling to her that the inmates were talking about Prible's case with one another. *See* **Exhibit 4-A** at 161.

[194] *See* **Exhibit 4-A** at 138-39.

[195] Dominguez was an old friend of Jesse Moreno's from the neighborhood. *See* Deposition of Dominguez, excerpts of which are attached hereto as **Exhibit 39,** at 22.

[196] **Exhibit 40** (Moreno's TruFone records and phone list showing calls made to AUSA Clemons on May 9, May 20, and June 3, 2002).

[197] **Exhibit 41** (handwritten letter from Moreno to Siegler, instructing her on what to say to AUSA Clemons). At her deposition, Siegler testified that she did not remember ever seeing this letter. *See* **Exhibit 4-A** at 139-40.

[198] *See* **Exhibit 42.**

35 letters to the federal prosecutors for Moreno, Dominguez, Foreman, and Gomez for their cooperation in the Herrero case.[199]  She wrote the Rule 35 letter for Foreman even though she found him not credible.[200]

As a result of the letter she wrote for Jesse Moreno, AUSA Clemons did file a Rule 35 motion to reduce his sentence.[201]  And unbeknownst to Prible's and Herrero's counsel until recently, Siegler traveled to Lafayette, Louisiana, in August 2002 to testify in person at Moreno's Rule 35 hearing.

### 11. On August 22, 2002, Siegler testifies at a Rule 35 sentence reduction hearing for Moreno in Lafayette, Louisiana.

On August 22, 2002, Siegler traveled to Lafayette, Louisiana, to testify in Moreno's Rule 35 hearing.[202]  She was the only witness called.  She testified about her July 3, 2001, meeting with Moreno, and told the Court that Moreno's testimony, and that of another inmate, was the *only* evidence she had against Herrero.  She did not reveal to the court that Moreno had lied to her at the July 3 Meeting about Nathan Foreman being present for Herrero's supposed confession.  Moved by her testimony on Moreno's behalf, the court shaved 77 months off of Moreno's remaining 78-month sentence.[203]

## C. PRIBLE IS TRIED FOR CAPITAL MURDER IN OCTOBER 2002.

Prible was tried for capital murder in October 2002, with Beckcom as the State's star witness.  The prosecution's theory at trial was that Beckcom had coincidentally come into

---

[199] *See* **Exhibits 43-46.**
[200] *See* **Exhibit 4-A** at 135-38.
[201] *See* **Exhibit 47.**
[202] *See* **Exhibit 48** (fact witness voucher for Kelly Siegler in *U.S. v. Jesse Moreno,* Cause No. 96-20037-005, in the U.S. District Court for the Western District of Louisiana, Lafayette Division).  The hearing transcript was obtained by Prible's counsel in December 2016 pursuant to a protective order; it is attached hereto as **Sealed Exhibit 49.**
[203] *See id.*  In March 2016, Siegler filed an affidavit in the state habeas proceeding for Hermilo Herrero in which she omitted the fact that she had testified on his behalf at the Rule 35 hearing.  *See* **Exhibit 125.**  She also maintained, in the March 2016 affidavit, that Foreman did not lie to her about Herrero's "confession," and that Foreman's January 2016 affidavit saying so was false.  *See id.*; **Exhibit 123.**

contact with Prible, who confessed to him and another inmate named Nathan Foreman after the three of them had become close; and that everything Beckcom knew about the murders, he had learned from Prible and Prible alone. The prosecution further argued that the oral sex between Prible and Tirado could not have been consensual, because a microscopic amount of Prible's DNA was found in Tirado's mouth. According to the State, semen that has been deposited in the mouth disappears in "moments, if not seconds,"[204] and therefore, whoever deposited the semen must have murdered Tirado right after ejaculating.[205]

## 1. The State's "Coincidental Contact" Theory

In her opening statement, Siegler told the jury this regarding her informant, Beckcom:

> You're also going to hear testimony from a man named Michael Glen Beckcom. Michael Beckcom is a Federal inmate at the Beaumont Medium Federal Pentitentiary. He's going to tell you about how he came to meet and know Jeff Prible. . . . He's going to make you sick to your stomach and that's how you should feel but you're going to believe what he has to tell you about Jeff Prible for this reason. He'll tell you he's coming to court and testifying because he stands to gain or hopes to gain something from that testimony. He'll tell you that. He's right up front with you about that. And this is the deal that we have cut with Michael Beckcom.

> The deal is this: **if** Michael Beckcom **and only if** Michael Beckcom comes in this courtroom later this week and testifies completely and truthfully about what he knows about what came out of the mouth of Jeff Prible, **then** I contact his Federal prosecutor from the State of California and lethis prosecutor know this: Mr. Prosecutor, Michael Beckcom testified in a capital murder down here in Houston where three little girls and two grownups were killed. He testified truthfully and testified completely, if that happens.

> At that point his Federal prosecutor makes the decision whether or not he wants to file what's called a time-cut motion. It's called a Federal Time-Cut. They have that in Federal court. We don't have it in state court.

> If his Federal prosecutor – if he decides to file that motion based on what I tell him about what Michael Beckcom did, then that motion gets filed before Michael Beckcom's Federal Judge in California. Then, when and if that Federal

[204] 24 RR 103.
[205] 21 RR 82-83.

*Judge rules on the motion, the Federal Judge all by himself decides whether or not and if so how much of a time cut to give Mike Beckcom.*

*So, Mike Beckcom will tell you, "I might not get anything for this. I hope to get a lot. That's the truth. I might not get one day cut off my time for that testimony," but the things he has to tell you you'll be able to know and he'll tell you that only come from the man who did it.*

*Michael Beckcom will testify to you that over the course of several months during many, many conversations **this Defendant approached him** and asked him, Hey, you're in here on a murder case yourself. What's the State got? What's going to happen next? What do you think about this or what do you think about that?*

*And Beckcom began to play the role of sort of an advisor, someone kind of in the know about how murder cases work. And during the course of those many conversations, Beckcom elicited a lot of details about what happened that night out of the mouth of Jeff Prible.*[206]

Siegler did the direct examination of Beckcom at trial. He explained the agreement he had with the State as follows:

*Q (by Siegler): Now, let's talk about the deal that you have with me today. Do you and I have a deal or understanding?*

*A. We have an understanding that if I testify truthfully to this Court that you will reciprocate by calling my Federal prosecutor. At that point it's out of the your hands, but just to let him know what I've done.*

*Q. Okay. Let's break that down. First of all, tell the jury what your part of this deal is?*

*A. My testimony here today.*

*Q. Has to be what?*

*A. Truthful.*

*Q. And if in my opinion it's not truthful, what happens?*

*A. Nothing.*

*Q. You get nothing?*

---
[206] 21 RR 78-81.

*A.  Correct.  Well, there's no guarantee I get anything anyway.*

*Q.  We'll talk about that in a minute.  So, if you do testify truthfully, what am I supposed to do?*

*A.  I'm not sure if you're going to write a letter or make a call to my Federal prosecutor in California.*

*Q.  Why do you call him your Federal prosecutor, who is he?*

*A.  Mark Cullers, he's the gentleman that prosecuted my Federal case.*

*Q.  And also the one that handled the case that you testified on in California?*

*A.  That's correct.*

*Q.  So, he's familiar with your fact situation?*

*A.  Yes.*

*Q.  And it's your understanding that I'm going to tell him what, if you testify truthfully?*

*A.  That I assisted you with this particular case and the severity of the case and the extent of my testimony.*

*Q.  And once that is done it's your hope that what might happen?*

*A.  Consideration for sentence reduction.*

*Q.  And he'll have to do what, Mark Cullers?*

*A.  He'll have to file a motion which is called a Rule 35 to my Judge.  Then it's still up to my Judge.*

*Q.  And what is your Federal Judge's name?*

*A.  Oliver Wanger.*

*Q.  If Mark Cullers decides to file the motion, first of all, does he have to do that just because I ask him to?*

*A.  No he doesn't.*

*Q.  Does he have to do that just because you ask him to?*

*A. No, he doesn't.*

*Q,  And if Mark Cullers does that, files that Federal time cut request motion then it's before whom?*

*A. The sentencing judge.*

*Q. And your sentencing judge could do what with that motion?*

*A. Anything he wants.*

*Q. He could give you absolutely no credit?*

*A. Correct.*

*Q. He could give you some amount of months credit?*

*A. Right.*

*Q. Or some amount of years credit?*

*A. That's correct.*

*Q. Or if he wanted to he could cut your whole sentence?*

*A. That's correct.*

*Q. It's completely up to him?*

*A. Entirely up to him.*

*Q.  Obviously, Mr. Beckcom, what are you hoping the Federal Judge does assuming you testify truthfully and I call Mark Culler and Mark Culler files a motion for a time request?  It's your hope that the Judge will do what?*

*A. Let me out.*

*Q. Have I ever made you any guarantees or promises in that regard?*

*A. None whatsoever.[207]*

Regarding how he came into contact with Siegler, Beckcom testified as follows:

*Q (by Siegler):  Who was the person who gave you my name?*

---

[207] 26 RR 14-17.

*A.  Nathan Foreman.*

*Q.  And how did you know Nathan Foreman?*

*A.   He was – he lived in my unit at the prison and then ultimately became my cellmate.[208]*

The jury did not hear that Siegler had met with Foreman way back in August 2001, and that she had determined he had never even met Prible, let alone heard him confess to the murders. Regarding his December 10, 2001, meeting with Siegler and Bonds, Beckcom testified:

*Q (by Siegler):  And eventually did I come see you?*

*A.  Yes, you did.*

*Q.  When was that?*

*A.  I believe it was either late November or early December.*

*Q.  Of what year?*

*A.  2001.*

*Q.  Did I come with anybody?*

*A.  Yes.  I can't remember the gentleman's name.*

*Q.  Johnny Bonds?*

*A.  Johnny Bonds, yes.*

*Q.  An investigator who works at our office?*

*A.  Yes, ma'am.*

*Q.  Where did we meet, you, me and Mr. Bonds.*

*A.  In the lieutenant's office.*

*. . .*

*Q.  . . . December 10, 2001, does that sound like the day we came to see you?*

---

[208] 26 RR 23.

*A.  That sounds about right.*[209]

The jury did not hear that on that same day, before Siegler and Bonds met with Beckcom, they

met with his cellmate, Nathan Foreman.

Regarding how he first met Prible, Beckcom testified as follows:

*Q (by Ms. Siegler):  Now, tell the jury who it was that first introduced you to Jeff Prible.*

*A.  Well, I don't know if it was what you could call an introduction.  I exercise with a gentleman named Bobby Williams.  And a couple of occasions Prible used to walk up and speak to Bobby on different days.*

*. . .*

*Q.  What is the relationship between Bobby Williams and Jeff Prible?*

*. . .*

*A.  As it came out later through conversations with Mr. Prible, he told me that the girl Bobby had ultimately married named Melanie, I believe Garrison, he had previously been married to and had a child with.*[210]

The jury was led to believe that Beckcom was introduced to Prible by Bobby Williams, rather

than by his cellmate, Nathan Foreman, who had been talking to Siegler about Prible's case for

months.

Concerning the lead-up to Prible's eventual "confession" to Beckcom, Beckcom told the

jury:

*Q (by Ms. Siegler):  **When you first through Bobby Williams started talking to Jeff Prible initially,** did he ever talk to you about the facts of his capital murder?*

*A.  No, **he approached me** later on the rec yard.*

*. . .*

*Q.  The first time that you can recall who approached whom?*

_____
[209] 26 RR 24-26.
[210] 26 RR 28-30.

*A. I was sitting on the bleachers in the rec yard just catching some sun, listening to my radio and **Prible approached myself and Nathan Foreman.***

*Q. How did it start out, what did the Defendant say to you first?*

*A. Just general conversation, really. I wasn't too much paying attention to him because I really didn't know who he was. Then it seemed – he sat down near me and it seemed he wanted to talk so he was striking up conversation with me. And it eventually came out that we both worked in the fitness industry in Houston at competing businesses. We talked about people we knew in that industry. And then it came on – he just kind of came out and said, I heard you had a – that you fought a case like I have. And so that kind of caught my attention. And I said, "Well, you have a capital – you have a capital case?" And he said, "Well, I thought you knew." And I really didn't. I had heard bits and pieces of information when this guy got there, accused of killing some people. And I still really didn't know who he was.[211]*

In a meticulously crafted and well-rehearsed direct examination, Siegler went on to guide Beckcom through all of the problematic aspects of the State's case – Prible's story of consensual sex, lack of motive, money never found, murder weapon never found, Prible's alibi witness – so Beckcom could explain them away, and so he would appear more credible because of his knowledge of seemingly innocuous facts.[212] Concerning the DNA evidence and Prible's story of consensual sex:

*Q (by Ms. Siegler): What did you say to him when the Defendant told you they had DNA on the girl?*

*A. I said, "Well, that's pretty serious, you know, you're pretty – you're through right there."*

*Q. And what did he say back to you?*

*A. He said, "Well, everybody knew I was having an affair with her." So he made it – he painted a picture to me like it was common knowledge that he was having an affair with this girl. So, you know, like I said, this didn't happen*

---

[211] 26 RR 30-32.

[212] This exercise of having Beckcom fill in the holes in the State's case was important enough for Siegler to re-visit it in her closing argument. *See* 28 RR 81-84 ("[S]ome of the things that Mike Beckcom testified to that might otherwise have been innocuous and not so important become very telling when you try to say he's lying;" "I have a witness who can say she saw me. Mike Beckcom turned out to be right, didn't he, when that little girl came in here and testified. . . . Mike Beckcom told you that witness is a 12 or 13-year old neighbor girl. Right all down the line. How would he know that unless Jeff Prible told it to him?").

*chronologically. So, in bits and pieces of conversations on the same subject it came out that the guy, Steve, was apparently his best friend but yet he was having an affair with Steve's wife. . . .*[213]

*. . .*

*Q. I want to direct your attention now to talking about the DNA. Did you ever make any – did you ever make any comment to Mr. Prible about your opinion of the DNA evidence?*

*A. Yeah.*

*Q. What did you say?*

*A. I pretty much told him you're through if they've got DNA on the body.*

*Q. And what was his comment back to you in regard to that?*

*A. Everybody knew they were messing around. So, that was his justification, that was going to solve it.*

*Q. And did he ever tell you how the sex happened with Nilda that night?*

*A. No we never got into detail. . . .*

*Q. Did he ever tell you when and where that day he had sex with Nilda?*

*A. He gave me the impression in the bathroom.*

*Q. Now, what did he tell you?*

*A. What did he tell me that day? He said they were screwing around that day at the house but to me it didn't make any sense once I started adding up the facts he was giving me.*

*Q. Did you ask during the time the Defendant was talking to you about having sex with Nilda, did you ask Prible where Steve was?*

*A. Not during the sex. In another conversation I basically took a stance of not playing into this third party innocence thing. So, I quit acting like, okay, who did what. I basically came right out and insinuated I knew he did it.*[214]

---

[213] 26 RR 34.
[214] 26 RR 43-45. In her closing argument, Siegler emphasized Beckcom's testimony: "Even Mike Beckcom told the Defendant, the DNA in her mouth or DNA on the girl pretty much sinks you. An ex-convict can know how telling it is that his semen ends up in her mouth."

Concerning the missing murder weapon:

*Q. Did there come a conversation toward the beginning when he told you something about what kind of weapon the police were looking for?*

*A. Yes, he – besides the DNA he said that they were looking for a .38 caliber pistol that they knew he had had, but he had sold it, I believe he said to some girl but his father had already gotten it back from the girl and, you know, it was clean. That wasn't the weapon.*

*Q. Okay. Prible told you what about the weapon, again?*

*A. That it was clean. That wasn't the weapon.*

*Q. Did he ever make a conversation to you also in regard to the weapon about asphalt?*

*A. Well, we talked about asphalt extensively.*

*Q. Okay. Tell the jury why y'all were talking about asphalt.*

*A. Well, before we got real heavy into talking about the actual crime and the murders, you've got to understand we went back and forth because he's not trusting anybody at this point, anyway. So, we began talking about an industry he knew about, which is the asphalt and the paving business. So, this is before – I'm kind of getting out of sequence. This is before I knew who you were or even that I would even consider doing this. I was actually seriously interested in the asphalt business.*

*Q. Tell the jury why and how y'all talked about that.*

*A. Well, because of the money involved. He was explaining all the facets of the business, of the equipment you would need. Foreman was interested. Foreman was interested in investing in the business so we were actually making plans on something to do when we got out. We went on back and forth some time with this asphalt situation.*

*Q. So, you had a lot of conversations talking about going into business together in the asphalt business, also?*

*A. Correct.*[215]

*Q. I want to direct your attention right now to a conversation you had with this Defendant when he talked about in regards to the weapon, the asphalt business.*

---

[215] How Foreman expected to go into business with Prible, when he was working with Siegler to try to get him sent to death row, was never explained to the jury.

*A. Well, it actually came out later just in passing. It was something that you almost didn't catch because at one point when I actually became interested in this and decided what I was going to do, I began prodding him into conversations at times. So, I would ask him, "Well, tell me about the evidence. What did you do here? What did they have here?" And, so, the only thing I told him, "Well, they don't have the murder weapon. That's good. You sure it can't be found?" And in passing he said something about, Well, that's – asphalt's good some times for hiding things.[216]*

Concerning Prible's alibi witness:

*Q (by Ms. Siegler): Did the Defendant ever tell you something about a witness that he said he had about that night?*

*A. Yes, he did. Initially one of the first conversations when I was asking him what you guys had on him, he said DNA and when we got through the discussion on that he said but I've got a witness that saw Steve take me home that night. So, he said he admitted to authorities that he was there that day but that Steve had taken him home. The information he gave me later – it may have been that conversation or a subsequent conversation – that it was a child of maybe 12 or 13 years. From what he said the person – the child had gotten up in the middle of the night to use the restroom and saw him through the window with Steve out in front of his parents' home.[217]*

Concerning how Prible would have been able to return to the house after the victim had dropped

him off at home, kill the family, and then escape unnoticed:

*Q. What else did you say to him in that conversation to get him to tell you more about what happened?*

*A. I asked him point blank, "How did you get in and out without being seen?" And he said – his response was, "It's a typical high intensity low drag maneuver."[218]*

*. . .*

*Q. Did he ever make a comment to you along the lines of how he was a bad mother fucker?*

*A. Yeah. Again, I asked him, How the hell did you get in and out of this house without being seen? And he said, "Anybody that can go in a house and take out a*

---

[216] 26 RR 33-36.
[217] 26 RR 40; 28 RR 82-83.
[218] 26 RR 46-47.

*whole family and get out without being seen is a bad mother fucker and I'm that mother fucker.*[219]

Concerning the fact that many people knew that Steve Herrera was in possession of a large amount of money from bank robberies and would have had a motive to rob the Herrera/Tirado house and kill the family:

> *Q (by Ms. Siegler): Now, back to what you were getting into, this conversation where you were talking about perception of the crime. Tell the jury, first of all, what you said is the introduction to this conversation we're just going to talk about.*
>
> *A. Well, he was still in the early stage, he was still asking me, you know, what to expect. I said, "Well, it depends on what they found at the crime scene." So, he asked me what do you mean. I said, Well it depends on where the bodies were. If the police officers walk into a home and there's several bodies who have been killed in the same room, then it looks like maybe it was a robbery or some type of organized hit. But if the people are in different rooms then it gives the impression that they knew who the attacker was because they were comfortable with them to let them in the home. They weren't guarding themselves.*
>
> *Q. Did you say anything – did you say anything to Prible about forced entry?*
>
> *A. Yes, I did.*
>
> *Q. What did you say?*
>
> *A. I said, well if they're all in separate rooms and there is no forced entry, then it's obvious that they knew who the person was.*[220]

Concerning Prible's lack of motive to kill the family:

> *Q (by Ms. Siegler): Did he ever give you anymore detail about why he shot Steve, what his motivation was for doing this?*
>
> *A. Yeah, it was over money.*
>
> *Q. What – out of the mouth of Jeff Prible, what did he tell you was the reason why?*

---

[219] 26 RR 52-53.
[220] 26 RR 45-46.

*A. He said, quote, "He took $250,000 of my hard-earned money." He said, That was my money. We were going to buy some jacked drugs – which was basically stolen drugs – and we were going to try to double the money on it.*

*. . .*

*Q. And did he tell you about immediately before he shot Steve what was going on there in the garage that night?*

*A. Well, leading up to that he got pretty agitated, the last conversation we had, and he said, "He took $250,000 of my hard-earned money and he came up with some lame story that things didn't go down the way they were supposed to. But don't worry, we can make it up tomorrow. That was my money. He fucked me out of my money and then he was going to kill me, so I handled my business."[221]*

Concerning the fact that the money, the supposed motive for the murders, was never found, Beckcom testified:

*I even asked him – I even asked him, "Well, did you at least get the money back?" And he said, "No." I said, "Well, did you look in the house?" And he said, "Yeah, but it wasn't there."[222]*

Beckcom painted a picture for the jury that he, Foreman, and Prible had bonded in prison, and that their close relationship ennobled Prible to confess to them. "He became close to Foreman and I," Beckcom testified. "He called us his brothers and said he loved us."[223] Beckcom testified that his and Foreman's weeks of conversation with Prible finally culminated in a confession that Prible "poured out" the night of November 24, 2001.[224] Beckcom described that night to the jury as follows:

*We were sitting out in the rec yard that particular evening. It was getting dark, we were sitting under – we had these little pavilions out on the rec yard with tables underneath where you can play cards and dominoes. And he was just sitting there and he got pretty quiet for a while and I could tell he was thinking about some things. So, he pulled Foreman and I aside and that's when he gave*

---

[221] 26 RR 49-51.
[222] 26 RR 52.
[223] 26 RR 49.
[224] 26 RR 53 ("Q (by Ms. Siegler): Did you make note of a specific day in regard to these conversations you had with Jeff Prible? A. Only the last one. Q. That date being what? A. November 24th. Q. And why did you remember that date? A. Because it was most of the conversation I just gave you. It's where he really poured it all out.").

*me the information I just told you. . . . He said, "You know, Steve screwed me.
He screwed me out of $250,000.00. That was my money." And then he gave me
the story about, you know, they were planning to buy some drugs.*

*. . .*

*Q (by Ms. Siegler): Did he make any comments to you in this conversation about
the fact that **you and Nathan** knew what he was saying?*

*A. Yeah. He said we were the only ones – he said, "You know, I trust you guys.
You're my brothers. You're the only ones that could convict me . . . ."*

*. . .*

*Q. Let me show you what's been marked for identification purposes as State's
Exhibit 87 and ask you if you recognize this?*

*A. Yes.*

*Q. What is it.*

*A. It's a picture of Mr. Prible and his mother, myself and my mother, Foreman
and his mother and his stepfather.*

*Q. And it was taken where?*

*A. The visiting room at Beaumont Medium.*

*Q. And about when was it taken?*

*A. There's the date, November 24th, 2001. [] So, it was actually the evening of
that date that he told us the additional information.*[225]

The prosecution went to great lengths to paint a picture to the jury that Prible was

charged with the murders *before* he ever came into contact with Beckcom. This was critical to

the State's "coincidental contact" narrative. If the jury had known that Moreno had given Siegler

Foreman's name while Prible was still in the Low, and that she had charged Prible in the belief

that she would have an informant – namely, Foreman – to testify against him, the testimony of

---

[225] 26 RR 53-56. The referenced photo is attached hereto as **Exhibit 32.** At his deposition in October 2017,
Beckcom admitted that the purpose of the photo was to have evidence for the criminal case against Prible, but that it
was actually taken ***before*** he and Foreman had any "confession" to corroborate. *See* **Exhibit 29** at 124-126.

Foreman's cellmate, Michael Beckcom, would have been much less credible to a jury. So she made sure to impress upon the jury the following order of events:

> *Q (by Ms. Siegler): In the conversation you had with Prible, did he recount for you when it was – where was he when he first found out about the fact that he was charged with capital murder out of this case in Harris County?*
>
> *A. I believe he was at the Low in Beaumont.*
>
> *Q. And then they transferred him to the Medium?*
>
> *A. Correct.*
>
> *Q. Which is when you got to know him?*
>
> *A. Yes. Eventually, yes.*[226]

Siegler would have had no reason to ask Beckcom these questions unless she wanted to persuade the jury that Prible's acquaintance with Beckcom was entirely coincidental and not nefarious.[227] This timeline was so crucial to the State's theory of the case that Siegler and Bonds evidently went over it with Beckcom at their December 10, 2001 meeting. Bonds' notes from that meeting say:



[228]

---

[226] 26 RR 57.

[227] This narrative was so important to the State that prosecutor Victor Wisner addressed it again in his closing argument. *See* 28 RR 16 *("I told you before that I proved to you that Mike Beckcom was telling the truth and let me tell you why. Let's think this through, if we could. The first thing that goes on in this case that gets this Defendant and Beckcom together is that charges are filed. . . . When charges are filed, an affidavit accompanies those charges. . . . That's the first thing that gets Beckcom and Prible into motion to meet each other. Then and only then is this Defendant taken from one of those two lower prison units at Beaumont to Medium when he meets Beckcom.")*

[228] **Exhibit 20; Exhibit 5** at 136-38; **Exhibit 4-A** at 228-30.

When it came time for Prible's attorney to cross-examine Beckcom, he asked him about Foreman, and all Beckcom offered was this:

> Q (by Mr. Gaiser):  Now, Nathan Foreman was your cellmate, right?
>
> A.  Eventually, yes.
>
> Q.  How long was he your cellmate?
>
> A.  A couple of months.
>
> Q.  And what time period were those couple of months?
>
> A.   I believe my cell mate left first part of October on a transfer and I think Nathan moved in probably the first week or two of October.
>
> Q.  And he was there for how long, two months?
>
> A.  Yeah, two months, maybe a little more or less.
>
> Q.  So, he was there through the end of November, right?
>
> A.  Yes.
>
> . . .
>
> Q.  Now, you got Kelly Siegler's name from Nathan Foreman?
>
> A.  Yes, I did.
>
> Q.  And he's supplied other informants to Ms. Siegler, correct?
>
> A.  I believe so, yes.[229]

Beckcom did not reveal that Foreman had been in touch with Siegler since July or August 2001, and that Foreman was her first informant in Prible's case.  The prosecution and Beckcom also emphasized that everything Beckcom knew about Prible's case, he had learned from Prible.[230]

In her closing argument, Siegler revisited the same themes that she had impressed upon the jury during Beckcom's direct examination – namely, that Beckcom and Prible met by

---

[229] 26 RR 80, 82.
[230] 26 RR 85, 91-95.

coincidence only *after* murder charges were filed against Prible, and that everything Beckcom knew about the murders came from Prible's mouth. She never mentioned Foreman, Moreno, or any of the other FCI Beaumont informants that she had communicated with and that she knew were talking about the case among themselves. She argued:

> *Is there any evidence in this trial that Michael Beckcom got any facts about what happened anywhere except out of the mouth of this Defendant? All of Mr. Gaiser and Mr. Wentz' questions and hypotheticals and hopes and desires in the whole wide world do not amount to a hill of beans because* **there ain't no evidence that Michael Beckcom ever had anybody, anywhere, any paper, any newspaper, any cop, any T.V. show tell him anything about the facts of this case except for Jeff Prible.**
>
> . . .
>
> *Mr. Wentz made an argument about the State had all this evidence back in 1999 but the charges didn't get filed until later. Curtis Brown told you he brought that notebook, that offense report over to the D.A.'s office and after all of the questions were answered that I posed to him and he did all of the to-do's and requests that we had for him, charges were filed.*
>
> . . .
>
> *Remember what Vic [Wisner] told you, it wasn't until charges were already filed on Jeff Prible that caused Jeff Prible to be moved from Beaumont Low to Beaumont Medium, that he ever even met Mike Beckcom.*
>
> . . .
>
> *And do you really think it's that great of a deal that Mike Beckcom is getting? Because if you think about it, what's going to happen is a Federal Judge in California is going to decide whether or not, if at all, Mike Beckcom gets any kind of time cut based on the fact – and that Judge knows all about the crime Mike did – based on the fact that in this capital murder in Harris County, Texas, three little girls were killed as well as their mother, who was also raped and their father. A Federal Judge is going to decide how much Mike Beckcom stands to gain from telling the truth.*[231]

---

[231] 28 RR 75-76, 78-79 .

Siegler vouched for Beckcom's credibility and never told the jury how his cellmate, Foreman, was her original informant in Prible's case, and that she had determined that he lied about having heard Prible confess:

> *One more thing before we move off this deal thing. If you believe that this deal [with Beckcom] was a horrible deal to have been made by Vic and me or by me, that's your opinion. When the trial is over feel free to write a letter to our boss and tell him you're disgusted by it. That's your opnion and your right and I hope you do that. But when you do that you consider this: Those families, all three of them, have a right to have a jury know all of the evidence that there is. And if there is a witness who knows the very details of exactly how a crime happened and the State is too lazy or too stupid or too insensitive to talk to that witness and do their utmost to bring all of the evidence to a jury for a jury to decide one day, whether or not they believe it, then that would be a tragedy. You try telling those people, oh, I just blew off Mike Beckcom. That's crazy. Now, Mike Beckcom, what's the best the Defense can do to call him a liar? Did they bring in any formal Federal prosecutors to say he's a liar or a State prosecutor to call him a liar or a defense lawyer to call him a liar or a Judge to call him a liar? No.[232]*

### 2. The State's DNA Theory

The State's theory at trial was that unless Prible had "magic semen, magic sperm that somehow lives longer than any of y'all's or any other man's in this whole universe,"[233] it would have disappeared moments after ejaculation; thus, the presence of *any* of his semen in Tirado's mouth, no matter how microscopic the amount, meant that he must have executed her immediately after ejaculating. This theory was used to counter Prible's story that he and Tirado had had consensual oral sex earlier on the night of her murder.

In her opening statement, Siegler told the jury:

> *[T]he DNA expert will tell you what the odds are, what that means exactly statistically the fact that his DNA is found in her mouth. But the most compelling thing he's going to tell you is that you know what, when semen is in somebody's mouth, in a lady's mouth, it goes away in minutes. It goes away with a small swallow. That's what the evidence is about in this case. And you're going to know from the testimony all about what kind of a man could ejaculate in a*

---

[232] 28 RR 79-81.
[233] 28 RR 55.

*woman's mouth after he executed her husband minutes before he executed her. . .*
*.*[234]

Prosecutor Victor Wisner conducted the direct examination of the State's DNA expert, William Watson. Watson testified that he had tested hundreds of oral swabs for the presence of sperm, and had never been able to generate even a partial DNA profile before this case.[235] Consequently, he said, the semen must have been deposited proximate to the time Tirado was killed:

> *Q (by Mr. Wisner): . . . Could we say that based on your experience and training because we have a full and complete male profile that would be inconsistent – let me repeat – inconsistent with the semen in this case being deposited into Nilda's mouth as long as an hour before she was killed?*
>
> *. . .*
>
> *A (by Mr. Watson): I would say that it is. I would say that it's inconsistent.*
>
> *. . .*
>
> *Q. Would the profile, the pure male profile that you were able to obtain that matches to the Defendant be consistent with the male depositing the semen in Nilda's mouth moments, if not seconds, before she was killed?*
>
> *A. It certainly would be consistent with that.*[236]

In their closing arguments, prosecutors Siegler and Wisner hammered home their theory that the presence of *any* of Prible's DNA in Tirado's mouth – no matter how small – could only mean that ejaculation occurred virtually simultaneously with Tirado's murder; otherwise, they argued, the semen would have disappeared immediately.[237] Wisner told to the jury:

> *I would suggest to you what Bill Watson, a credible witness from an independent research lab, tells you is absolutely totally, credible. There is no way in the world that that semen wasn't deposited either moments before or seconds after Nilda died. There is no way that semen is not the semen of somebody who sexually*

---

[234] 21 RR 82-83.
[235] 24 RR 100.
[236] 24 RR 101-103.
[237] *See* Wisner Closing Argument, 28 RR 10 ("[I]t had to come right before she was killed or after she was killed").

*assaulted her just moments before or moments after she died.  I would suggest to you what the evidence indicates is that the Defendant after killing Steve forced Nilda to orally copulate him at gunpoint and executed her as soon as he finished.  As horrific as that sounds, that is the only logical conclusion that you can draw from that evidence.*[238]

Likewise, Siegler told the jury:

*If I could be crude for a minute, unless you think I guess that he had some kind of magic semen, magic sperm that somehow lives longer than any of y'all's or any other man's in this whole universe or unless you think that – I mean, you've heard how he said the sex happened, right?  They got back from the bar at 2:30 in the morning.  That's when he found this time to have this sex in this house filled with people, including three children.  If you believe that story I guess you've also got to believe that his semen is so tasty that she walked around savoring the flavor of it in her mouth for a couple hours.  That's the only way it's going to end up still in her mouth after she's dead. . . . [H]ave you ever thought about yet what the last minutes and the last seconds of Nilda's life was really like?  Have you thought about it?  Have you thought about what she went through right before she left this world?*

*You know, this picture right here, Defendant's Exhibit No. 22, what's it a picture of?  Nude, naked Jeff Prible.  Just thank God that Mr. Wentz didn't put it up on that wall for y'all to look at because, oh, that's embarrassing.  And we don't want to embarrass poor Jeff by letting the jury see him in all his glory, naked on a picture on a wall in a courtroom.  Let's not embarrass or humiliate Jeff Prible, please.  Do you think he was worred about how he looked in all his glory when he pulled his penis out and stuck it in the mouth of Nilda?  Do you really?  Have you thought about the last minutes of her life?  Have you thought about the fact that as she laid there knowing her husband had just been executed by this man, did you think it was going to happen if Steve was still alive to stop it?  She knew as she sat there or knelt down on that living room that this man had just executed the man she loved.  She knew what he was capable of.  She'd just heard the shot.  She just saw it happen.  She just tried to run and call the police.*

*And then what is Jeff Prible doing?  What did Nilda have to endure before she lost her life?  He puts her down on her knees – it's the only way to make it happen – with the gun to her head and it had to be and he forces her to open her mouth and he sticks his penis inside her mouth and she sits there and takes it and does it and holds it there because why?  Why do you think?  Because she knew she might die.  She probably thought she was going to be killed because he had already killed her husband.  And why did she do it?  You know why?*

---

[238] 28 RR 11-12.

> *Most of y'all have kids. She knew her babies were in the next room and she left this world with his penis in her mouth, knowing her husband was dead, hoping to God that her babies would survive the nightmare that is Jeff Prible.*
>
> . . .
>
> *Why was his semen left in her mouth? Because she didn't have a chance to spit it out or swallow it or take a drink of water or let any time pass whatsoever because as soon as he ejaculated, he executed her.*[239]

But Siegler never revealed that she had reached out to Pam McInnis, a DNA analyst who was head of the Harris County crime lab, to ask her how long semen could live in the oral cavity, and Ms. McInnis told her it could live up to 72 hours:



[240]

Prible's counsel did not learn of Siegler's conversation with Ms. McInnis until May 2017, when this Court ordered the HCDA to produce some of Siegler's work product.[241]

On October 25, 2002, Prible was convicted and sentenced to death.[242]

## D.    SIEGLER'S POST-TRIAL EFFORTS ON BECKCOM'S BEHALF

On October 29, 2002, Siegler wrote a letter to Beckcom's AUSA, Mark Cullers, informing him of Beckcom's cooperation in Prible's trial.[243]  Regarding how Beckcom came to be involved in Prible's case, Siegler wrote that "Michael Beckcom first came to my attention when he made me aware that he had information that would be helpful to my case.  At that time

---

50

Beckcom was incarcerated in Beaumont Medium FCI with my trial defendant, Prible and that is where and how Prible came into contact with Beckcom and confided details of his capital murder offense to Beckcom."

The following day, Beckcom wrote a thank-you note to Siegler, stating that he would "appreciate any further contact you may have with Mark Cullers that might urge him to expediently file his motion on my behalf."[244] Several days later, AUSA Cullers wrote back to Siegler, informing her that the United States did not have jurisdiction to confer any benefit on Beckcom for his cooperation in her State case.[245]

At this point, Siegler had already done for Beckcom what she told the jury she would do: *i.e.,* write a letter to his federal prosecutor. But rather than leaving it at that, Siegler went beyond her and Beckcom's professed agreement. First, she personally called Cullers on November 12, 2002, and left him a voicemail. While no recording of this message still exists, the contents of her voicemail can be gleaned from Cullers' return voicemail later that day, a recording of which does exist.[246] In his voicemail, Cullers expressed concern that there had been a misunderstanding between him and Siegler vis-à-vis any expectation of a deal in Beckcom's federal case, telling Siegler: "If Mike testified in your case with the expectation of some deal

---

[244] **Exhibit 126.**

[245] **Exhibit 98; Exhibit 4-A** at 248-50 (*"A (by Ms. Siegler): There was, obviously, some confusion because Mr. Cullers never told me this part that's – that's addressed in the letter dated November 4[th] of '02. He never told me that before, and I don't know that Michael Beckcom knew that either. Q (by Ms. Scardino): And so, you were under the assumption or under the understanding going into that trial that he had jurisdiction to do this Rule 35 agreement, right? A. "He" being? Q. Mr. Cullers. A. I was. Q. Okay. And you had conveyed that to Mr. Beckcom as well, right? A. I think Mr. Beckcom thought the same thing, right. Q. And he would – only would have heard that from you, right? He didn't have – A. Oh, no. Mr. Beckcom knew what the law was. He was well aware of all this. Q. . . . But Mr. Beckcom would nto have had independent communications with Mr. Cullers now, would he have? A. He could have. Q. You think that Mr. Beckcom might have been communicating with his federal prosecutor while he was in prison? A. He can write letters. Q. So, it's your testimony that all information that Mr. Beckcom was getting regarding the sentence – the possible sentence reduction, he didn't get it all from you? A. You should ask Mr. Beckcom that.").*

[246] **Exhibit 127**

from us, that would probably have to be disclosed to the defense in your case."[247]  That same

day, Siegler reached out to the U.S. Attorney's Office in Lafayette and asked for a copy of their

motion to modify Jesse Moreno's sentence.[248]  She then wrote Cullers another letter, urging him

to reconsider based on the "vital role" that Beckcom played in convicting Prible.[249]  Siegler's

notes show that Cullers called her on November 15, 2002 to say that they had "reconsidered and

would seek some sort of reduction for Beckcom."[250]  That same day, Siegler sent Cullers the

contact information for Beckcom's attorney so the two could negotiate a time cut.[251]

For testifying against Prible, Beckcom was rewarded with a year reduction of the already

lenient 8-year sentence imposed on him for murdering a federal witness.

## V.
## PROCEDURAL HISTORY

Prible is restrained pursuant to the judgment and sentence entered in *State of Texas v.*

*Ronald Jeffrey Prible Jr.,* Cause No. 921126, in the 351st Judicial District Court, Harris County,

Texas.  Prible was charged with a capital murder alleged to have occurred on April 24, 1999.[252]

On October 25, 2002, Prible was convicted of capital murder and sentenced to death.[253]  A

motion for new trial was filed on November 25, 2002, and overruled on January 7, 2003.[254]  On

January 5, 2004,  Prible filed his direct appeal raising eight points of error.  The Texas Court of

Criminal Appeals ("TCCA") denied relief on all claims in *Prible v. State*, 175 S.W.3d 724 (Tex.

Crim. App. 2005).

---

[247] *Id.*; **Exhibit 4-A** at 252-53.
[248] **Exhibit 47.**
[249] **Exhibit 100;** During her deposition, Siegler denied that Beckcom played a vital role in Prible's prosecution, this letter notwithstanding.  *See* **Exhibit 4-A** at 254.
[250] **Exhibit 101.**
[251] **Exhibit 102.**
[252] 1 CR 2.
[253] 1 CR 212.
[254] 1 CR 233, 239.

## A. Prible's court-appointed counsel files an initial application for writ of habeas corpus under Article 11.071.

In 2002, the convicting court appointed Roland Moore III (alternatively referred to herein as "state habeas counsel") to prepare and file an initial application for writ of habeas corpus under Article 11.071 of the Texas Code of Criminal Procedure. Moore sought funding for and retained an investigator to review documents, investigate witnesses, and extensively interview Prible. Moore also filed motions for discovery, including motions for evidence that the State is required to disclose pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and he was active in the pre-petition investigation himself. Moore bench-warranted Foreman for an interview, sought permission from Beckcom's attorney to speak with Beckcom, and conferred with Prible's family members.[255] Foreman went "stone silent" on Moore when he tried to interview him and refused to talk.[256] Beckcom's attorney would not make his client available for interview.[257]

On November 19, 2004, Moore filed Prible's original application for writ of habeas corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure, raising the following issues:

> (1) Prible received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel offered additional evidence of an extraneous offense;

> (2) Prible received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel failed to effectively address and rebut the testimony of William Watson, that the semen found in Nilda Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion;

> (3) Prible was denied his constitutional right to an impartial jury because the venire did not reflect a fair cross-section of the community;

---

[255] *See* **Exhibit 50** (excerpts from Roland Moore's testimony at June 8, 2011 state writ hearing) at 2 RR 39-40.
[256] *Id.*
[257] *Id.*

(4) Prible was denied effective assistance of counsel on appeal, in violation of the Sixth Amendment, where appellate counsel failed to urge on direct appeal the trial court's pre-trial ruling denying Prible's motion to declare the Texas capital sentencing scheme unconstitutional and motion to preclude imposition of the death penalty; and

(5) Prible was denied effective assistance of counsel on appeal, in violation of the Sixth Amendment, where appellate counsel failed to urge on direct appeal the trial court's pre-trial ruling denying Prible's Motion to Hold Unconstitutional V.A.C.C.P. Article 37.071, sec. 2(e) and (f)-Burden of Proof.[258]

**B.    In June and August 2007, Prible files two *pro se* pleadings in the trial court alleging a jailhouse conspiracy to frame him for the murders.**

After Moore filed the original state application, Prible filed several hundred pages of miscellaneous papers, letters, and motions in the 351st District Court. Among the papers were two documents in which Prible attempted to raise claims based expressly on *Brady, Giglio, Massiah,* and *Strickland.* In June 2007, Prible filed a *pro se* pleading in the 351st District Court entitled "Subsequent Application for a Writ of Habeas Corpus," in which he asked the TCCA to consider a *Brady* claim.[259] In the pleading, Prible alleged that "the prosecution (Kelly Siegler) hid her true ties to Mike Beckom (*sic.*) and her jailhouse informants in Beaumont Federal Prison."[260] According to Prible, Siegler was "using Beckom and his group of friends from Federal Prison to aid her in making cases."[261] Prible identified the members of the group as "Nathan Foreman, Mike Beckom and Rafael Dominguez as well as others not named here."[262] Prible further alleged that had he "been made aware of the ties [Siegler] had to Beckcom and his group of friends who aided Siegler in other cases, I could have showed this as it truly [was a case of] a prosecutor who had Foreman recruit his friends to enlist in Siegler army of deceit [t]o carry

---

[258] *See* **Exhibit 51.**
[259] *See* **Exhibit 52** at 00382-390.
[260] *Id.* at 00384.
[261] *Id.* at 00385.
[262] *Id.*

out what ever mission she task them in hopes of a time cut."[263]  Prible also alleged that the State

used Beccom to gather evidence in violation of *Massiah*.[264]

In August 2007, Prible filed another document, entitled "Subsequent Application for a

Writ of Habeas Corpus (Pro Se).  Ineffective Assistance of Counsel," in which he contended his

trial counsel was ineffective for not investigating a witness named Hermilo Herrero.[265]  In the

pleading, Prible alleged that Herrero was prosecuted by Siegler, went to trial "a month before"

Prible was tried, and was convicted of murder.[266]  According to Prible, Herrero "realized from

media source (newspaper or television) the same Prosecutor (Kelly Siegler) did the same thing to

him as she did to me," and instructed his wife to call Prible's trial attorney.  Prible maintained

Mrs. Herrero did this, but that his trial attorney failed to "make this known to the court or

myself."[267]

Neither the trial court nor the Harris County Clerk treated Prible's 2007 *pro se* pleadings

as a successor application.  Under Art. 11.071 § 5(b)(3), the Clerk must immediately forward

second or successor state applications to the TCCA.  In Harris County, successor pleadings are

distinguished from original proceedings, which are called "A-writs," by appending in sequence

another alphabetical identifier to the cause number.  However, the Clerk did not label Prible's

pleadings as "B" or "C" writs, and the Clerk transmitted Prible's *pro se* submissions to the

TCCA, not immediately, but five months later, in January 2008, as part of the file accompanying

the original state application that Moore filed on November 19, 2004.

**C.    On June 18, 2008, the TCCA denies relief and dismisses Prible's June and August 2007 *pro se* pleadings as "abuses of the writ."**

---

[263] *Id.* at 00386.
[264] *Id.* at 00384.
[265] *See* **Exhibit 53.**
[266] *Id.* at 00411-415.
[267] *Id.* at 00413.

On June 18, 2008, the TCCA denied relief on claims contained in the November 2004 petition. It deemed the documents filed *pro se* by Prible in June and August 2007 to be subsequent applications for habeas relief governed by Article 11.071 § 5(a), and summarily dismissed both filings.[268] In explaining its decision, the TCCA clarified that it did not consider the merits of the claims raised in Prible's June and August 2007 *pro se* pleadings because, in the TCCA's view, neither contained "sufficient specific facts establishing that the application meets one of the exceptions set out in Art. 11.071, § 5."[269] Therefore, the TCCA "dismiss[ed] those applications as abuses of the writ" instead.[270]

**D.     In June 2009, Prible files his original federal writ, and is sent back to state court to exhaust claims pursuant to *Rhines v. Weber*.**

On June 18, 2009, Prible filed his original federal writ in the Southern District of Texas. On August 17, 2009, Prible filed his First Amended Petition. On December 10, 2009, Respondent filed his Answer and Motion for Summary Judgment. On April 30, 2010, this Court denied Respondent's motion upon finding that several of Prible's claims, although unexhausted, nonetheless met standards in *Rhines v. Weber*, 544 U.S. 269, 275 (2005). The Court thereupon dismissed Prible's federal writ without prejudice so that he might present claims that satisfied *Rhines* to the Texas courts for consideration.

**E.     Prible's attorney, James Rytting, interviews Carl Walker on August 26, 2010, and Walker describes a conspiracy by various FCI Beaumont informants working with Siegler to frame Prible and Hermilo Herrero for murder in exchange for time cuts.**

After Prible was convicted in 2002, he began to suspect that Siegler had conspired with a web of informants in FCI Beaumont to supply false testimony against him, and he suspected that Foreman was a central player. Confinement to death row prevented him from supporting his

---

[268] *See Ex parte Prible*, WR-69,328-01, WR-69,328-02, WR-69,328-03 (Tex Crim. App. 2008) (Order).
[269] *Id.*
[270] *Id.*

theories, and it was not until after he filed his original state application that he was able to locate, by sheer luck,[271] key witness Carl Walker.  During initial federal proceedings that began in 2008, Prible, through federally-appointed counsel, was finally able to contact Walker.

In February of 2009, after the BOP refused to allow anyone but an attorney to meet with Walker, court-appointed investigator J.J. Gradoni arranged a telephonic interview with him. During the interview, Walker described a circle of informants headed by Nathan Foreman who were being recruited to provide information to the State.[272]  During a consensually recorded interview with James Rytting on August 26, 2010, Walker explained that the plan to frame Prible for the Herrera/Tirado murders was already in place even before Prible arrived at the Medium:[273]

> [Beckcom] already knew who Prible was before he got there.  And he was expecting him, and Prible didn't befriend him, he befriended Prible. . . . Prible was dead the day he hit the yard.  He just didn't know.  He got the news at the end of the day, what, the day he arrived.  They had already baked a cake for the man. He, he just didn't know it was his birthday.[274]

Walker explained that inmates in the Medium were "recruited" to take part in particular murder cases.  He himself was recruited by Beckcom and Foreman to fabricate evidence against Prible even before Prible arrived at the Medium:

> CARL WALKER ("CW"):  [O]ne day we were all in the unit, when I saw all, there was, ah, Michael Beckom (sic), and a guy, his last name was Forman (sic), I forget his first name, they called him "Green Eyes" as well, and he also had a nickname like "Bones" or something like that, "Bone" or "Bones".  But, ah, nevertheless, us three were in the same unit together.
>
> JAMES RYTTING ("JGR"):  Right.
>
> CW:  And, ah, they were talking about, you know, trying to get out, [unintelligible], and it came up to the fact that Beckom (sic) had told on some

---

[271] How habeas counsel was able to identify Walker is explained in Section VIII(A)(2), *infra*.
[272] Gradoni's statement is attached as **Exhibit 54**.  It was also attached as Exh. 'A' to the First Amended Petition, and it was presented in 2010-2011 proceedings in state court.
[273] *See* **Exhibit 55** (transcript of August 26, 2010, interview with Carl Walker) at 54; **Exhibit 124** (Affidavit of Carl Walker).
[274] *Id.*

*people in the Mob or somebody because it was on A&E or something, it was on television, so he had had a history of telling. But if I'm not mistaken, the prosecutor was working directly with Forman (sic), I want to assume. It was either Forman (sic) and him was the lead man or him and Forman (sic) were the two, which one of them had more control or direct communication with the prosecutor, I'm not sure. They may have been on equal terms.*

*JGR: Uh huh*

*CW: But, ah, it was like, ah, man you got all this time, and they went to talking about how they got to get out of here, you want to help his mother, you know, you know you got to recognize a blessing when it comes, blasé, blasé, because like I say we attended church together.*

*JGR: Uh huh*

*CW: And, ah, they start talking about Jeff. Now at this time I don't, I'm not sure Jeff had even been sent to the Medium, cuz he was originally at the Low.*

*JGR: Right.*

*CW: And they knew before he got to the Medium that he was coming.*

*JGR: Yeah.*

*CW: They knew - -*

*JGR: How, how could they possibly have known that? Was that anything you were aware of?*

*CW: Well, from what I understand, they were all in cahoots with the, ah, prosecutor.*

*JGR: Well you don't think they, you don't recall seeing it in the paper, is there anything like that?*

*CW: Well, that's not something that would be in the papers because peoples get transferred from prisons for various reasons.*

*JGR: Right.*

*CW: Whether if you do a disciplinary act or something to get transferred, or whether you fell you if you are a high security risk, or you are going into investigation for a, there are various reasons to get transferred but that's not a notified thing, because that is a security risk. If people know when or where or where you are going too far ahead of time, if you have somebody that want to try*

*to bust you out, then they could do that, so, ah, for them to even know that he was at the Low and was coming to the Medium, it's obvious that they had some type of inside track on his whereabouts or where he would be.*[275]

According to Walker, Beckcom and Foreman referred to Prible as a "blessing" – that is, someone they could rat on to get their own sentences reduced:

*JGR: And this blessing that they were talking about was Prible coming, Jeffrey Prible, coming over.*

*CW: Yeah, he was, he was, he was the blessing. He was the blessing. And he, the reason he was the blessing was because they made it like he is a scumbag, he killed his family, he killed the wife, the husband, the kids . . . . So what, what we did is they tried to paint this good versus evil picture. Like, he is bad, he did this, dada dada, dada da, you know, blasé, blasé, so, the hell with him.*

*JGR: Okay.*

*CW: So that helped justify the mindset to go ahead and nail him to the cross, so to speak.*[276]

Weeks later, after Prible had arrived at the Medium, Beckcom and Foreman, who were cellmates at this point, sat Walker down in their cell and asked him if he was "in or out" on the scheme to inform on Prible for Siegler. They told Walker specific details about the crime and gave him step-by-step instructions on how to contact Siegler and offer himself as a snitch:

*CW: Maybe been weeks later or a month or so later, Jeff Prible actually is on the scene. And that's when the actual, you know, are you in or you out type conversation came about.*

*JGR: "Are you in or you out" conversations are with you?*

*CW: Right. With me. And the in or out conversation is the one where they sit me down, they tell me all these various events and supposedly details of the case and whose who, and what's what.. . . But needless to say, I was in their cell. Prible was there, and the plot was put out on what they wanted to do or how they wanted to do it and what their intentions was and what I needed to do to be a part of it. And –*

*JGR: What did they say you needed to do to be a part of it?*

---

[275] **Exhibit 55** at 9-10.
[276] *Id.* at 10-11.

> CW: One of the things was to contact this prosecutor, ah, it starts with an "S", [unintelligible], ah, I forget her name but I got her name and number in my phone book in, in the, in the unit. I've had it all these years. Surprisingly enough I was looking through my [unintelligible], wow, look at that. I had her name and number. Ah, so,
>
> JGR: Was it Kelly Siegler?
>
> CW: Siegler. Siegler. Siegler. I knew it was "S". I don't remember the Kelly part. But Kelly Siegler was definitely her. Okay, because
>
> JGR: Among, among your papers you have Kelly Siegler's phone number?
>
> CW: Yes.
>
> JGR: And how did you get that?
>
> CW: I got it from those guys. It's in my actual phone book. Ah, ten year old phone book.[277]

According to Beccom and Foreman, Walker needed to call Siegler so she could judge whether he would be a good "candidate" to testify against Prible, and then write her a letter containing details about the case:

> CW: The prison has a record of all the [unintelligible] phone numbers that ever been on my phone list, and you can get the exact time and date when they was put on my phone list. Ah, you can see how many times the number was called, and so forth and so on.
>
> JGR: Have you ever called Kelly Siegler?
>
> CW: I was, ah, prompted to call her at one time, yes. Once or twice, I don't recall. Ah, during the recruiting process, they like look, this is what you need to do. Put this number on your list. Call Kelly, blasé this, blasé, blasé, blasé. Initially, ah, I
>
> JGR: Was that so she could check you out?
>
> CW: Right. Right. To see if I was ah, what do you call, a candidate, or was I, you know,
>
> JGR: Were you going to be articulate on the stand.

---

[277] *Id.* at 12-13.

*CW: Yeah, was I going to be reliable or useful or whatever the case may be.*

*JGR: Or just do what she wanted you to do.*

*CW: Basically. So then, that was one part of it. And the second part was to write a letter which they had given me details. And ah, I don't know if the letter was sent or not. But I remember something in regards to a letter needed to be in the written or sent to her in regards to what I supposedly had known or details about the case. Which I had never been known anything because all the details were told by them, by Beckcom and, and, ah, Foreman . . . .*

*[]*

*CW: When I knew the details of the case about what this man [Prible] supposedly testified before I even knew the man, I instinctively knew that this is wrong. On a, on a more than just telling wrong, this is like, I don't know, re, godly wrong. You know.*

*JGR: Yeah.*

*CW: Judas told on Jesus, look what he got. So, I mean, it just, it just, it just feels all the way wrong because you are telling me the body is here in the front door, this body is over here. I mean, I know too many details that I would never know and it was in no paper and nowhere and - -*

*JGR: They were telling you that?*

*CW: Yes.*

*JGR: They were telling,*

*CW: **I know that before I even met the man.** So how could they, how could he have told them before I even met him, and they . . . ?*

*JGR: They were telling, they were telling you this where the bodies were found?*

*CW: Yeah, in the doorway. In the doorway of the house, the husband was shot first, the woman was either in the garage or somewhere, den, I don't remember offhand right now. She had semen in, in, in her, was maybe, I remember something about a pool table. Um, I remember, what else they were telling me? Ah, one of the neighbors or something said they seen him leave but he had supposed, one of the neighbors of the house that burned. Somebody in the surrounding area seen him leave but he supposedly had came back . . .*

*JGR: **All this was discussed before you even laid eyes on Prible.***

61

*CW:  Before I even seen the man.*[278]

According to Walker, whether Prible actually confessed was not critical to the snitching operation, because Beckcom and the other snitches already knew the facts of the case:

> [T]he thing was with me then and even now, my whole funny feeling about getting too involved is that the details these gentlemen knew, only two people could know. And that's the killer or the police who was there on the scene of the crime.  Ah, I don't know if Jeff is innocent.  I don't know if he did it or not.  I, I can't, I can't even fathom.  I don't know him well enough to even make an assumption on that. But, I do know that someone high on the food chain was feeding these guys the information because he [Prible] wasn't telling me that, because they were telling me that before they even set up the stings to make up like he got drunk on the yard, they was getting him high.  **See the whole plot was made out before it was actually executed.  So, I knew the execution and the plot before they did it, and I knew what he supposed to tell them before, before the time he was supposed to have told them.  So, common sense tells me that someone was feeding them the information.  And I was told this lady [Siegler] was the person. . . . Did they go through the motions?  Yes.  But did he [Prible] ever actually confess?  No. What he was supposed to confess, they already knew***.[279]

Walker explained to Rytting that if the informants could have gotten Prible to confess, "that would have been like icing on the cake," but whether he actually confessed was irrelevant; their main role was to "paint a picture" for the jury that they had formed such a close prison bond with Prible that he would have felt comfortable confiding in them.[280]  As an example, Walker referenced the November 24, 2001, photograph that Beckcom and Foreman staged with their mothers, Prible, and Prible's mother:

> *CW:  But, ah, did they go through the motions to prepare the bonds, taking him out onto the break yard, getting him drunk, drinking?  Yes.  Did they ever get him high?  Yes.  Did they take group pictures with him, try to make connection with their people and his people?  They played it all the way up.  But do I believe or to my knowledge, did he ever actually confess?  No.  Because –*

---

[278] *Id.* at 13, 58-59 (emphasis added).
[279] *Id.* (emphasis added).  Walker's statements are corroborated by phone records produced by the BOP, *see* **Exhibits 21** and **56,** and by the letter from Walker to Siegler, discussed *supra*, which was not produced by the State until 2011.  *See* **Exhibit 36.**
[280] *See* **Exhibit 55** at 15.

*JGR:  Not while you were in his presence*

*CW:  Not while I was in his presence or out of his presence because what he was supposed to confess, they already knew.  That's the thing.  If I know your favorite color is blue, and I go through all this trouble to make you tell me blue, whether you tell me blue or not it still don't change the fact that I know what your color is.*[281]

According to Walker, Siegler had told the informants that "the evidence on Prible was little to none," so if they could not get a confession out of him, "the chances of him walking was good because he was like a few months away from getting out on his [] federal bid."[282]

During his face-to-face interview with Rytting, Walker mentioned another "mark" that the same ring of informants was working to incriminate in a separate, unrelated cold murder case for Siegler at the same time they were working on Prible.[283]  This second "mark" was Hermilo Herrero.  According to Walker, Foreman was instrumental in setting up Herrero just as he was instrumental in setting up Prible.  In both cases, Foreman staged photos so that the State could bolster the credibility of the testifying informants:

---

[281] *Id.* at 15-16.
[282] *Id.* at 19-20.  This is true; Prible was set to be released from federal prison on the bank robbery conviction in December 2001.  *See* **Exhibit 17.**
[283] *See* **Exhibit 55** at 19-20.



**Figure 1: Staged photo used to incriminate Ronald Jeffrey Prible. From left to right: Foreman and his parents, Beckcom and his mother, and Prible and his mother.**



**Figure 2: Staged photo used to incriminate Hermilo Herrero. Herrero sits in the middle. Jesse Moreno appears at his bottom right. Directly behind Herrero stands Rafael Dominguez. Nathan Foreman stands to Dominguez's right.[284]**

According to Walker,

> *this is how you have [the] miraculous coincidence that the same group of guys that been confessed, have been confessed to by two different people on two different murders, totally different murders. . . . All the murderers on the compound coming and confessing to you? Not likely.*[285]

Walker "was aware of Kelly Siegler's involvement in relaying information that was needed to solidify [] the supposed[] confession that [Prible] had given them."[286] Walker eventually decided not to participate in the conspiracy to frame Prible. And he never reached out to Prible to assist him in his case because Walker was still in prison and feared for his safety if he

---

[284] Herrero is placed front and center. This photo enabled the State to create the false impression, at Herrero's trial, that Herrero was the leader of a prison gang called the "All Houston" group. *See also* **Exhibit 57** (photo of so-called "All Houston Group" used in *State v. Herrero).*
[285] **Exhibit 55** at 21-22.
[286] *Id.* at 42.

was found out to have helped free someone convicted of such a heinous crime.[287]   As Walker explained:

> *I don't know if this guy is guilty or not. . . . I just know these guys is guilty of conspiring against him and working together to recruit me and others or whomever that would listen to, actually, ah, get him on death row.  I know that for a fact.  I do know for a fact that Kelly Siegler was involved.*[288]

**F.     On September 8, 2010, Prible files a successor application for habeas relief in the 351st District Court of Harris County**.

On September 8, 2010, Prible filed a successor application for habeas relief in the 351st District Court of Harris County, raising the following claims:

> (1)     Whether "[t]he State violated Prible's rights guaranteed by the Sixth Amendment" and *Massiah*;

> (2)     Whether "[t]he State intentionally sponsored false and misleading testimony in violation of Prible's due process rights" as established in *Giglio*;

> (3)     Whether "[t]he State violated due process by concealing the nature of the arrangement between Beccom, Foreman and the lead prosecutor," contrary to *Brady*;

> (4)     Whether "[i]n violation of due process, the State permitted its key witness to mislead the jury about the existence and extent of the benefits he expected to receive for testifying against Prible," contrary to *Giglio;* and

> (5)     Whether "Prible is actually innocent of capital murder."   *U.S. Const., Amends.* XIV and VIII.

**G.     On December 15, 2010, the TCCA remands to the trial court.**

On December 15, 2010, the TCCA ruled that Prible's September 8, 2010, successor pleading did not contain sufficient facts to allow the TCCA to make a determination of whether Prible's successor claims satisfied Article 11.071, Section 5's threshold bar.   Therefore, the TCCA

---

[287] *Id.* at 48 *("I could only imagine the type of press this shit would get. . . .[T]he first thing I wouldn't want to see in the newspaper, ole Carl Walker, Jr., here freed a suspected baby killer.").*
[288] *Id.* at 48-49.

remanded [this cause] to the trial court so that the habeas corpus record can be supplemented with evidence relating to the Section 5 bar. Specifically, applicant shall have the opportunity to show when and how he obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity. Following receipt of this additional information, the trial court shall determine whether any of the claims satisfy the requirements of Article 11.071, § 5.[289]

The TCCA's December 15, 2010, order was a source of some confusion, starting with the fact that the TCCA appeared to be delegating Section 5 determinations to the lower court. Furthermore, the order did not dictate how Prible should make the showing of "when and how he obtained the evidence at issue and whether he exercised due diligence." Instead, the TCCA apparently left it up to the trial court to decide this issue based on submissions of the parties, by conducting a hearing, or by a combination of pleadings and testimony.

However, the December 15, 2010, order contemplated that the trial court would make 11.071 § 5 threshold findings before turning to the merits, if at all. The order "specifically" stated that "applicant shall have the opportunity to show when and how he obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity."[290] "Following the receipt of this additional information," the TCCA continued, "the trial court shall determine whether any of the claims satisfy the requirements of Article 11.071, § 5."[291] The trial court was authorized to reach the merits only upon a positive finding that claims met threshold 5(a) standards.[292]

Untangling arguments and evidence going to the merits as opposed to making a threshold Section 5 showing was not easy, nor appropriate. Prible not only sought consideration of successive claims pursuant to subsection 5(a)(1), **he also contended that his pleadings satisfied**

---

[289] *Ex parte Prible*, WR-69,328-04 (Tex. Crim. App., Dec. 15, 2010), Order at 3.
[290] *Id.* at 2.
[291] *Id.*
[292] *Id.*

**"gateway" actual innocence standards incorporated in subsection 5(a)(2).** Under subsection 5(a)(2), the Court must make a determination of whether Prible's pleadings and attachments showed, by a preponderance of the evidence, that but for a violation of his constitutional rights, no reasonable jury would have convicted him. Due diligence, moreover, is not an element of subsection 5(a)(2), nor is it clearly a requirement of the Supreme Court jurisprudence from which subsection 5(a)(2) is derived.

**H.    In February 2011, the State discloses, for the first time, the three informant letters from Mark Martinez, Carl Walker, and Jesse Gonzalez, which had been concealed in a sealed envelope designated "attorney work product."**

Upon remand to the 351st District Court, Prible sought *in camera* review of the State's file. The State did not oppose the motion and voluntarily provided the file for review. The State also disclosed three letters that prosecutors had sealed in a letter-sized envelope that was designated "attorney work product." These letters were the ones from informants Carl Walker, Mark Martinez, and Oscar Gonzalez to Siegler.[293] On February 18, 2011, Prible filed a motion in the miscellaneous docket associated with his case seeking discovery of BOP documents, which this Court granted.[294]

Based on documents produced by the State and the BOP, the disclosure of the inmate letters to Siegler in Prible's file, and evidence obtained from the Hermilo Herrero file, Prible filed a series of supplemental pleadings in the 351st District Court alleging prosecutorial misconduct. In his first supplemental briefing, filed June 6, 2011,[295] Prible asserted the following issues. First, he contended that the three inmate letters that the State disclosed in response to Prible's motion for *in camera* review confirmed that Beckcom was actively involved

---

[293] *See* **Exhibits 35-37.**
[294] *See* Dkt. [14] and Dkt. [18] in *Prible v. Thaler*, H-08-316 (S.D. Tex. 2011). Prible first sought disclosure of BOP records via state court subpoena. The BOP asserted sovereign immunity and refused to respond to the state process. *See* Dkt. [14] and exhibits thereto.
[295] *See* **Exhibit 58.**

in a ring of informants that the State was utilizing to obtain incriminating evidence against Prible in violation of *Massiah*. Second, Prible contended that the BOP records, which documented frequent phone calls between Siegler's office, Beckcom, and other inmates seeking to inform on Prible, contradicted testimony sponsored by the State at trial that minimized the contacts between the State and its key informant, and supported a due process claim of prosecutorial misconduct pursuant to *Giglio*. Third, Prible contended that the inmate letters and evidence of numerous phone contacts between Beckcom and his confederates constituted *Brady* material in and of themselves, and certainly were favorable and material to the defense when considered in conjunction with the audiotaped statements that Prible had obtained in 2009 and 2010 from Carl Walker. Fourth, Prible argued that letters dated May 1, 2002 (five months before Prible's trial), from the lead prosecutor to Assistant U.S. Attorneys advocating sentence reductions under Federal Rule of Criminal Procedure 35 for Moreno, Foreman, Dominguez, and Gomez for demonstrably false testimony against Herrero were *Brady* material – particularly the letter sent on behalf of Foreman, since Foreman was Beckcom's cellmate, Foreman introduced Beckcom to Siegler, and Foreman schemed closely with Beckcom to incriminate Prible.

I.    **In June 2011, the trial court convenes a hearing.**

On June 8-9, 2011, the trial court convened a hearing in accordance with the TCCA's December 15, 2010 instructions. Prible called the following witnesses: Mollie Steinlie, his investigator at trial; Kurt Wentz, one of his trial attorneys; Roland Moore, his state habeas counsel; and Rudy Garza, the investigator for Hermilo Herrero. Prible also introduced Walker's taped statement[296] and the three informant letters disclosed pursuant to his request for *in camera*

---

[296] The State drafted findings stating the August 26, 2010, tape of Carl Walker, Jr. was "proffered." However, at the June 8-9, 2011, hearing before the 351st District Court, undersigned counsel offered to authenticate the tape, but the trial court agreed that authentication was not necessary as the tape was "already in" and the court had taken judicial notice of it. *See* **Exhibit 50** at 2 RR 3 and 3 RR 3, 66-67.

review.  Prible attempted to introduce BOP records and evidence from the State's file in *State v. Herrero*, but the trial court upheld the State's objections and refused to consider the material on the ground that the information was irrelevant.[297]

Nonetheless, at the end of the June 8-9, 2011 hearing, the convicting court invited both parties to submit further evidence and argument for his review with the promise that the court would consider it as follows:

> THE COURT: . . . One more thing. I'm certainly -- in the next two weeks, if anybody wants to give me anything else to read, I'll be happy to read it, just as I've read everything that's already been filed.  If anybody has anything else they want to throw in, I will definitely read it and look at it. So, there you go.[298]

On June 22, 2011, Prible filed a Second Supplemental Briefing to Applicant's Successor Application for Writ of Habeas Corpus in the 351st District Court.[299]  Further analysis of the Herrero case after the June 8-9, 2011, hearing confirmed that in order to develop evidence against Herrero and secure a conviction in the "cold" murder case of Guajardo, the State had utilized a ring of informants – the membership of which overlapped membership in the ring working to incriminate Prible.[300]  Foreman was again involved with the State's testifying informants, in a joint effort to incriminate Herrero in return for assistance in obtaining Rule 35 reductions in their federal sentences.[301]  And just as Foreman and Beckcom had staged a photo with Prible to create the impression that they had formed a close prison bond with him, so had

---

[297] *See* **Exhibit 50** at 2 RR 50.  Throughout the hearing, the State repeatedly objected to Rytting's attempts to introduce any evidence related to the Herrero case, on grounds that "anything having to do with Hermilio *(sic)* Herrero's case is not relevant in this proceeding."  **The HCDA's writ attorney represented this to the court even though the HCDA's Prible casefile contained documents from Hermilo Herrero's case.**   This was not known to Prible's counsel at the time, and only became apparent during a later stage of discovery when the HCDA produced, from Prible's file, (1) an August 6, 2001 fax from the Harris County Sheriff's Office to Siegler concerning the murder of Albert Guajardo **(Exhibit 59),** (2) the jury charge from *Texas v. Herrero* **(Exhibit 60),** and (3) the Rule 35 motion to reduce Jesse Moreno's federal sentence in exchange for his testimony in the Herrero case **(Exhibit 61).**
[298] *See* **Exhibit 50** at 3 RR 67.
[299] *See* **Exhibit 62.**
[300] *See id.* at 8.
[301] *See id.* at 3-6.

the informants staged a photo with Herrero.[302]  In his June 22, 2011, second supplemental

pleading, Prible therefore claimed that in violation of *Brady,* the State had suppressed this

evidence, which he contended supported his allegation that the lead prosecutor was utilizing a

system of informants to fabricate testimony.  Citing *Kyles v. Whitley*, 514 U.S. 419 (1995), Prible

contended especially that he was entitled not only to impeach witnesses but to impeach the

methods that the State had used to gather and assemble its case against him.

In addition to pointing out the use of interrelated informant rings to convict Herrero and

himself, Prible maintained in his June 22, 2011, pleading that the State had also suppressed the

May 1, 2002, letters that Siegler had written to Assistant U.S. Attorneys advocating Rule 35

reductions not only for the testifying witnesses, Moreno and Dominguez, but for Foreman and

Gomez, who had not testified. The letters showed that the State was promising benefits to

jailhouse informants who had given inconsistent and false statements and were clearly in league.

On June 23, 2011, the convicting court entertained arguments from Prible and the State

and issued a ruling from the bench.  The State also volunteered findings of fact and conclusions

of law, although the convicting court did not request that the State or Prible prepare them.  On

June 24, 2011, the convicting court signed the State's version of the facts and law (the "June

2011 *Findings*")[303] and ordered the case forwarded to the TCCA.  Although the TCCA's

December 15, 2010, order did not limit the convicting court to considering threshold issues under

§ 5(a)(1), the trial court confined the June 8-9, 2011, hearing to § 5(a)(1) issues and made

findings and conclusions only under this section of Article 11.071.

---

[302] *See* **Exhibit 64**, *State v. Herrero,* Cause No. 903122, in the 179th District Court, Harris County, Tr. Transc. Vol. 4, at 122.

[303] The findings drafted by the District Attorney and signed by the trial court on June 24, 2011, are styled "Findings Pursuant to Tex. Code Crim. App. Art. 11.071, Sec. 5(a)(1)" and are attached hereto as **Exhibit 65.**

On June 23, 2011, Prible filed a third supplemental brief in the 351st District Court based on evidence developed that afternoon subsequent to the morning hearing.[304] In the third supplement, Prible called the convicting court's attention to Mark Martinez, another member of the group of informants operating within FCI Beaumont while Prible was incarcerated before trial.[305] Martinez refused to speak with Prible's investigator, but did briefly confer with his counselor at the federal prison in Colorado, where Martinez had been transferred. Martinez was shown the letter purportedly bearing his signature, denied that it was his handwriting, and confirmed that some FCI Beaumont prisoners were pressuring others to sign statements incriminating Prible.[306] In the same pleading, Prible pleaded for leave to subpoena and depose Martinez and Jesse Gonzalez (also a purported signatory on one of the three letters disclosed from the prosecutor's file).

**J.      The TCCA dismisses Prible's 2010 successor application as an abuse of the writ.**

On July 11, 2011, the Harris County Clerk transmitted the habeas record to the TCCA. On November 2, 2011, the TCCA issued an opinion stating that the TCCA had "reviewed the application and the trial court's recommendations" and had found that "the allegations fail to satisfy the requirements of Article 11.071, § 5(a)."[307] As a result, the TCCA dismissed the 2010 successor application "as an abuse of the writ." The TCCA did not reach the merits of the five claims it remanded on December 15, 2010.

---

[304] *See* Third Supplemental Briefing to the Successor Petition for Writ of Habeas Corpus and Request for Reconsideration of the June 23, 2011 Determination that Prible's Successor Petition Does Not Meet Section 5(a) Standards, attached hereto as **Exhibit 66**.
[305] *Id.*
[306] *See id.*
[307] *Ex parte Ronald Jeffrey Prible, J.*, WR-69,328-04 (Tex. Crim. App. 2011).

# VI.
## RESULTS OF COURT-ORDERED DISCOVERY

**A.     The HCDA produces even more new evidence from Prible's casefile in October 2015.**

On October 13, 2015, Prible's attorney, James Rytting, met with the HCDA to review the HCDA's files for information responsive to this Court's order that it produce any and all records related to Prible's and Hermilo Herrero's grand jury proceedings.  At the meeting, the HCDA's attorney produced, among other items, the following documents from the "work product" file upon determining that they were not work product:

- the November 12, 2001, letter from Nathan Foreman's attorney, Alan Percely, to Siegler, in which Percely conveys Foreman's desire to provide evidence against Prible in exchange for Siegler's assistance in getting Foreman's sentence cut.[308]

- TCIC/NCIC criminal background reports for Foreman and Rafael Dominguez, dated December 6, 2001.[309]   These reports were produced from a folder of privileged material containing TCIC/NCIC reports for potential witnesses and testifying witnesses at Prible's trial.

- A sticky note attached to would-be informant Mark Martinez's April 30, 2002, letter to Siegler, which appears to memorialize a March 7 voicemail from Martinez regarding the Prible case.[310] It directs Siegler to call Martinez's counselor at FCI Beaumont.

- An undated letter from Beckcom to Siegler referencing his upcoming testimony in Prible's trial and expressing concern that he could not count on his California AUSA to assist him, and proposing that Siegler help him secure a Rule 35 sentence reduction by arranging for him and another FCI Beaumont inmate named Anton Davi to inform on even more FCI Beaumont inmates.[311]

- A letter from the HCDA to Lt. Robert Clark at FCI Beaumont, asking for permission for Siegler and Bonds to interview Beckcom and Anton Davi, as Beckcom requested, in May 2002, five months before Prible's trial.[312]

---

[308] **Exhibit 23.**
[309] **Exhibits 93-94.**
[310] **Exhibit 35.**
[311] **Exhibit 95.**
[312] **Exhibit 96.**

- Documents showing that after Prible's trial, Siegler strenuously lobbied Beckcom's AUSA for a time cut and evidently even recruited an AUSA working out of the Houston office to weigh in on Beckcom's behalf.[313]

Prible's trial counsel had never seen any of these documents.

**B.    In January 2016, Nathan Foreman signs two affidavits describing how Prible and Herrero were "set up" by FCI Beaumont informants working for Siegler.[314]   On July 8, 2016, the HCDA produces additional evidence from Prible's casefile.**

On July 2016, this Court granted Petitioner's motion for leave to conduct discovery and to depose members of the prosecution team, the informants and would-be informants in Prible's and Herrero's cases, and FCI Beaumont employees who may have had knowledge of the informant operation.   In August and September 2016, in response to a subpoena, the HCDA produced even more new evidence from Prible's casefile, including, among other things, potential *Brady* evidence such as:

- the DOJ Fact Witness Voucher for Kelly Siegler, compensating her for her August 22, 2002, testimony in the sentence reduction hearing for Jesse Moreno;[315] and

- TCIC/NCIC criminal background reports for various individuals who may have been considered by law enforcement to be alternate suspects, including James Martin and Gilbert Trevino.[316]

The HCDA withheld approximately 500 pages of documents on grounds that they were protected work product.   Prible filed a motion to compel the work product documents, and this Court ordered Respondent to submit the material for *in camera review*.

**C.    Prible's attorneys file a motion to unseal the transcript of the August 22, 2002, sentence reduction hearing for Jesse Moreno, at which Siegler testified.**

On September 26, 2016, the HCDA produced a DOJ fact witness voucher indicating that, unbeknownst to Prible's trial attorneys, Siegler had testified in a Rule 35 hearing for Jesse

---

[313] **Exhibits 97-102.**
[314] *See* **Exhibits 87, 123.**
[315] **Exhibit 48.**
[316] *See* **Exhibits 103-104.**

Moreno in a Louisiana federal court just two months before Prible's trial.[317]  The transcript of the Rule 35 hearing was sealed, so Prible's counsel had to file a motion with that court to unseal it. That motion was granted pursuant to a protective order.  The transcript is attached to this Fourth Amended Petition as **Exhibit 49,** but is being filed under seal as required by the protective order.

## D.      Information produced pursuant to *in camera* review.

On May 12, 2017, the Court ordered Respondent to produce approximately 19 pages of handwritten notes from the HCDA's Prible casefile, including:

- notes memorializing meetings with informants Foreman, Beckcom, Jonathan Wayne Jefferson, and Eddie Gomez concerning Prible's and Herrero's cases, dated as far back as August 2001;

- notes indicating that Siegler contemplated setting Prible up with a "potential federal prison roommate"; and

- notes indicating that Siegler had consulted Pam McGinnis, the head of the Harris County Crime Lab, who told her that semen could live up to 72 hours in the mouth.[318]

## E.      Throughout 2017, Prible's counsel conduct various witness interviews and depositions.

In June 2017, Prible's counsel obtained an affidavit from former FCI Beaumont unit manager Gordon Harpe.  Harpe described how FCI Beaumont staff could arrange for unmonitored calls to a prosecutor if inmates wanted to share information about a case.[319]  He stated that he had reached out to Siegler on behalf of an FCI Beaumont inmate to pass along information the inmate had about Prible's case.[320]  He remembered that Siegler called him later, thanking him "for not discounting the informant's claim."[321]

---

[317] **Exhibit 123.**
[318] *See* **Exhibits 19-20.**
[319] **Exhibit 73.**
[320] *Id.*
[321] *Id.*

Prible's counsel also obtained an affidavit from would-be informant Oscar Gonzalez.[322]

Gonzalez explained that

> *Before Jeff got to the Medium people in the Medium knew he was coming over there and they knew what had happened in his case. . . . There was talk on the Medium about checking Jeff in as soon as he got on the yard because people believed he killed the three little girls. Guys were talking about Jeff's case on the yard all the time. They guys were trying to put together information so they could give it to the prosecutor and get a time cut. They were saying that Jeff would be their ticket out of prison. . . . I remember the prosecutor on Jeff's case was named Kelly Siegler. I remember seeing her on television later because she was a big-time prosecutor. Siegler was well-known on the compound. The word was that if you helped Siegler, she would help you. My dad Felix was doing 25 years in FCI Beaumont. I wanted to help him get his sentence lowered. One of the guys told me that I should contact Siegler. I remember going into the counselor's office with my dad once and talking with Siegler on the phone . . . .*[323]

Prible's counsel deposed Rafael Dominguez on April 17, 2017. He was shown a copy of the letter that Oscar Gonzalez had written to Siegler, in which Gonzalez said that "[Prible] was worried that inmates Martinez and Dominguez might want to retaliate for Steve and Nilda."[324] Dominguez said this was a lie, and that he did not even know who "Steven and Nilda" were.[325] Dominguez also said he didn't know why his name would have been mentioned in Carl Walker's letter to Siegler.[326] He went on to say that "[e]verybody knew" that Prible had been accused of murder.[327] Dominguez also said that he had been childhood friends with Jesse Moreno, and that they were still in touch.[328]

Prible's counsel have made numerous attempts to locate and serve Jesse Moreno with a subpoena for his deposition, without success.

---

[322] **Exhibit 88.**
[323] **Exhibit 88.**
[324] **Exhibit 37.**
[325] **Exhibit 39** at 13.
[326] *Id.* at 18-20.
[327] *Id.* at 13-14 *(Q (by Mr. Rytting): You said that you recognized Jeff. Do you understand what he was accused of when he was – when he was – do you know that he was accused of murder? A. Yeah, I know that. Q. Okay. A. Everybody knew that.").*
[328] *Id.* at 20, 79.

**F.** **Prible's counsel depose Siegler's investigator, Johnny Bonds, on September 19, 2017.**[329]

Johnny Bonds testified that he was an HCDA investigator from 1989 through 2008, and worked lots of cold cases with Siegler during that time. He was assigned to Special Crimes-Major Offenders, which was different from other divisions in that "we were more proactive than reactive, whereas most of the investigators don't get involved till the charges are filed, we actually work with the agencies on helping get to that point where they can file charges."[330]

Bonds testified that he never received any training while at the HCDA on dealing with informants, and that the HCDA didn't have any policies concerning informants.[331] He worked informants based on his "gut instinct."[332] It was evident to Bonds, when they met on August 8, 2001, that Foreman knew about Prible and his case; Bonds just wasn't sure where Foreman had gotten that information. Bonds explained:

> *You know, apparently, **Foreman had some information from somebody that Prible was the suspect and that, you know, that he possibly could get some leverage by saying he confessed to me.** [] So he knew about Prible. I don't know how he knew about Prible. I don't know if he got it from Foreman or from – I mean, from Beckcom or somebody. I don't know where he got the information. But he did know about Prible.*[333]

Bonds insisted at his deposition that he only met with Foreman once, on August 8, 2001, and said he was "at a loss of why we would want to talk to him again."[334] Bonds testified that until the day of his deposition, he had never known that Foreman and Beckcom were cellmates.[335] He said "it sounds like there might have – they [Beckcom and Foreman] might have colluded to get more information. Yes, it does sound like they probably said, hey, let's see if we can milk him

---

[329] *See* **Exhibit 5.**
[330] **Exhibit 5** at 19.
[331] *Id.* at 23.
[332] *Id.* at 31-32.
[333] *Id.* at 120-21 (emphasis added).
[334] *Id.* at 131-36, 151, 155, 176-77; *but see* **Exhibit 20** (Bonds' handwritten notes).
[335] **Exhibit 5** at 211.

for some more information."[336]  He acknowledged that as cellmates, they each would have probably known that they both were meeting with Prible's prosecutor on December 10, 2001.[337]

Bonds testified that he had never seen the letters to Siegler from would-be informants Mark Martinez, Carl Walker, and Oscar Gonzalez,[338] and that it was apparent from reading those letters that inmates in FCI Beaumont were talking about Prible's case with each other pretty freely.[339]  When asked whether Prible's defense attorneys could have made use of this evidence of a web of informants auditioning to testify against their client, he said he couldn't say, but that "doing away with federal parole just opened up a whole bag of worms in the federal prisons. . . . I mean, they were all looking for an out.  So I don't know, you know, that defense attorneys were aware of this in 2001.  We were becoming aware of it, you know, the prosecution.  It was somewhat of a new phenomenon for us because normally, you don't get that many convicted felons coming forward from a unit from a prison."[340]

Bonds was also questioned about his understanding of the *Brady* rule.  When asked who at the HCDA had the responsibility of disclosing discovery to defense counsel, Bonds stated: "Well, I mean, if – if they file discovery motions and, you know, the court rules in their favor, if they filed the motions, we have to comply.  So it would be the prosecutor that handles that case. It would be the prosecutor's responsibility, not the investigator."[341]  When asked about Siegler's practices with respect to disclosing witness statements to the defense, he said that Siegler "didn't give up anything she didn't have to give up. . . . [S]he never gave anything away. . . . [S]he made the defense earn what they got."[342]

---

[336] *Id.* at 158.
[337] *Id.* at 176-77.
[338] *Id.* at 114-15.
[339] *Id.* at 184-85.
[340] *Id.* at 116.
[341] *Id.* at 205.
[342] *Id.* at 97.

Bonds described Siegler as being very meticulous in her organization of a case.[343]  Bonds

testified that he did not know if the HCDA had an open file policy back in 2001-2002, and said

"I'm sure that there were some things in the files that weren't turned over."[344]

**G.     Prible's attorneys depose Siegler's co-counsel, Victor Wisner, on September 20, 2017.[345]**

Wisner testified that he worked as an HCDA prosecutor from 1984 to 2008.  He said that

the HCDA "always had an open file policy unless there was some extraordinary need not to, but

it would not include our personal notes in preparation for trial."[346]  He testified that defense

attorneys would not be allowed to make copies of any documents in the HCDA file, "unless it

was their client's statement or something extraordinary."[347]  He testified that he had never seen

anything in the file related to Nathan Foreman or any of the other would-be informants.[348]  The

only informant he was aware of was Michael Beckcom.

**H.     Prible's attorneys depose Beckcom on October 10, 2017.[349]**

Beckcom appeared for his deposition on October 10, 2017.  He testified that he had heard

about Siegler's connection to Prible's case from Foreman, his cellmate.[350]  He was surprised to

see Siegler's name on his prisoner phone list because, he said, he didn't need to use the inmate

---

[343] *Id.* at 21.
[344] *Id.* at 24.  *See also id.* at 30-31 *("And I can't be specific on this case or any other case, but I do recall now that there were times that there were some disagreement on what [defense counsel] were allowed to see. . . . So I'm not real sure exactly what it was, but there were some – some things they were not allowed to see or take copies of.").*
[345] Wisner's deposition is attached hereto as **Exhibit 105.**
[346] *Id.* at 9-10.
[347] *Id.* at 18.
[348] *Id.* at 32, 35-39, 48.
[349] Prible's investigator, JJ Gradoni, had traveled to Florida to serve Beckcom with a deposition subpoena in April 2017.  Beckcom became very angry, agitated, and threatening, and told Mr. Gradoni, "If I have to I'll kill the son of a bitch lawyer and go back to prison, but I'm not going to get involved in this case anymore."  *See* **Exhibit 106.** Beckcom failed to appear for his deposition on April 25, necessitating a contempt proceeding in the U.S. District Court for the Southern District of Florida.  *See* Motion to Enforce Deposition Subpoena from Another District and Request That Service of Process Be Made by the United States Marshal Service, filed in *Prible v. Beckcom,* Case No. 0:17-cv-61695-WPD, in the U.S. District Court for the Southern District of Florida (Dkt. 1).  On August 30, 2017, the court entered an order to show cause or else appear for his deposition by October 11, 2017.  *See id.* at Dkt. 11.  Beckcom appeared for his deposition on October 10, 2017.  That deposition is attached hereto as **Exhibit 29.**
[350] **Exhibit 29** at 32.

phones to call her; he could talk with her from a unit manager's phone.[351] He remembered calling Siegler from Gordon Harpe's office phone.[352]

He admitted that he knew other FCI Beaumont inmates were trying to set up Prible, because "everybody was kind of hanging around all the time."[353] He also said he knew what those inmates intended to tell Siegler and the jury.[354] When asked whether he and his cellmate, Foreman, talked about Prible's case together, he said: "I'm sure we talked about it plenty."[355] He agreed it seemed probable that he and Foreman both knew that they were meeting with Siegler on December 10, 2001.[356]

Beckcom admitted that he and the other inmates knew that Prible was going to be transferred to the Medium before he arrived, and that they were all talking about Prible's murder case before he got there.[357] Beckcom said that at FCI Beaumont, the inmates were allowed to watch the news and read newspapers, and that "it's possible" that he read newspaper articles about Prible's case. He also acknowledged that Prible may have shown him his probable cause affidavit, but said he could not remember for sure.[358] He was aware that some of the same snitches, including Foreman, were involved in the case against Hermilo Herrero.[359]

Beckcom testified that his sole motivation for providing testimony for Siegler against Prible was that he might be given a Rule 35.[360] Beckcom said he was sure he probably asked

---

[351] *Id.* at 37.
[352] *Id.* at 23-24.
[353] *See id.* at 47, 131 (*"Q (by Mr. Rytting): And so it can't just be a coincidence, can it, that one, two, three, four, five, six, seven people who were angling to testify against Mr. Prible all took a picture together? A. No.");* *id.* at 140.
[354] *Id.* at 132.
[355] *Id.* at 48, 64.
[356] *Id.* at 56-57, 78-79.
[357] *Id.* at 57, 155.
[358] *Id.* at 70-71.
[359] *Id.* at 84, 129.
[360] *Id.* at 114.

Siegler for some sort of assurance, before Prible's trial, that it would be worth the risk he was taking by testifying as an informant.[361]  And he testified that Siegler gave him this assurance:

> *Q (by Ms. Scardino):   [S]o you're wanting reassurance from her that the Feds were actually going to give you a time cut for the Prible case?*
>
> *A.  Yeah.*
>
> *Q.  Okay, and did she give you any reassurance on that end?*
>
> *A.  I never got anything in writing.  I mean --*
>
> *Q.  Not in writing but just in –*
>
> *A.  I think the best – as I shared earlier I think the best she did was they're going to play ball might have been her words.  I've talked to them and they're in, something to that effect.[362]*

Beckcom said that his "head was swimming with information back then" about other inmate's cases, and described how he became something of a guru in FCI Beaumont for inmates wanting advice on how to become informants.[363]  He remembered Carl Walker, and recalled Walker visiting his cell.[364]

## I.    Prible's attorneys depose Siegler on October 17, 2017.

Siegler testified that she began working for the HCDA as a prosecutor in 1987.  She eventually became division chief of major crimes in Special Crimes, and then bureau chief of Special Crimes.[365]  She said she got the Prible case sometime in 2001 or 2000.[366]

She confirmed that Nathan Foreman called her after her July 3, 2001 prison visit with Jesse Moreno.[367]  She admitted that when she and Bonds met with Foreman on August 8, 2001,

---

[361] *Id.* at 87.
[362] *Id.* at 92.
[363] *Id.* at 94 (*"I guess once I had all this from Prible it's like suddenly people came out of the woodwork, were trying to get out, people I didn't – I'm like how the fuck do you know what – that I talked to somebody?"*)
[364] *Id.* at 95-96.
[365] **Exhibit 4-A** at 18-19.
[366] *Id.* at 55.
[367] *Id.* at 102.

they spoke about Prible's and Herrero's cases, and also discussed Jesse Moreno and other would-be informants.[368]  She admitted that she did not believe Foreman's story about Prible "confessing."[369]  Yet, she "disagree[d] with the assertion that [] Nathan Foreman tried to set [Prible] up."[370]  Siegler denied ever meeting with Foreman in person again after the August 8, 2001, meeting,[371] at least until she was shown evidence – including her own notes – to the contrary.[372]

After meeting with Foreman on August 8, 2001, she presented the Prible and Herrero cases to the grand jury.  She admitted that she presented those cases on the same day.[373]  She presented no witnesses in Prible's case,[374] and claims she did not tell the grand jury that there was a jailhouse informant that would testify that he heard Prible confess.[375]  She testified that she did tell the grand jury that there was a jailhouse informant in Herrero's case.[376]  She admitted that she did not request that a court reporter be present for either grand jury proceeding.  Consequently, there is no record whatsoever of what she told the Prible or Herrero grand juries.[377]

Siegler denied that how Beckcom and Prible first came into contact was important to the State's case.[378]  She said she never told the jury about her August 8, 2001, meeting with Foreman because "[t]hat was out of the mouth of Nathan Foreman, who wasn't credible."[379]  She also

---

[368] *Id.* at 106.
[369] *Id.* at 107.
[370] *Id.* at 125.
[371] *See id.* at 191-92, 210-11.
[372] *Id.* at 219-21.
[373] *Id.* at 119-20.
[374] *Id.*
[375] *Id.* at 121.
[376] *Id.*
[377] **Exhibit 24**; **Exhibit 4-A** at 123-24.
[378] *Id.* at 274-75.
[379] *Id.* at 277.

admitted that she never told Prible's trial attorneys about her August 8, 2001, interview with Foreman.[380]

When asked whether she ever revealed to Prible's counsel that she had spoken with Pam McInnis, the forensic scientist, and had been told that semen could live up to 72 hours in the mouth, Siegler said, "I think that was part of the trial. 72 hours is in the trial."[381] Then she admitted that she could not remember whether she had told defense counsel about her conversation with Ms. McInnis.[382]

Siegler conceded that it was not her usual practice to indict a defendant but not have him moved to Harris County until later, as she had done in Prible's case.[383] Siegler denied even knowing that Prible was moved from FCI Beaumont Low to the Medium after she had him charged in the Tirado/Herrera murders.[384] "I don't know anything about that," she claimed. "I didn't keep up with that. I don't remember when he was moved or why he was moved."[385]

Siegler claimed that she adhered to an "open file" policy, that she did not maintain a separate "work product" file, and that her entire file, including all of her notes, was available to defense counsel any time they wanted to look at it.[386]

## VII.
## THE STATE COURT'S RELIANCE ON ABUSE OF THE WRIT DOCTRINE DOES NOT SATISFY FEDERAL DEFAULT STANDARDS

A.    **The TCCA's June 18, 2008, dismissal of Prible's June and August 2007 *pro se* pleadings did not rest on independent or adequate grounds.**

The Supreme Court has consistently held that "the question of when and how defaults in compliance with state procedural rules can preclude . . . consideration of a federal question is

---

[380] *Id.* at 291.
[381] *Id.* at 286.
[382] *Id.*
[383] *Id.* at 129.
[384] *Id.* at 128.
[385] *Id.*
[386] *Id.* at 111-12.

itself a federal question."[387]  A state procedural default is an "independent and adequate state ground" barring subsequent federal review only if the state rule was "firmly established and regularly followed."[388]  A state procedural ground is regularly followed when it is strictly followed.[389]

In *Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012), the Fifth Circuit analyzed "[]the twin requirements of independence and adequacy."  Under this federal doctrine, the state court's dismissal must "'clearly and expressly' indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims."[390]  Importantly, in order "[t]o produce a federally cognizable default, the state procedural rule must have been 'firmly established and regularly followed' by the time as of which it is to be applied."[391]

1. **The June 18, 2008, decision does not "clearly and expressly" rely on state law grounds.**

The TCCA's June 18, 2008, dismissal of Prible's June and August 2007 *pro se* pleadings as an abuse of the writ does not satisfy the requirements for a federally cognizable default. Although the TCCA clearly and expressly stated that Prible abused the writ, the reason for the abuse, according to the TCCA, was that Prible's 2007 applications did not "contain sufficient specific facts establishing that the application meets one of the exceptions set out in Art. 11.071 § 5."[392]  But Section 5 of Article 11.071 has three subsections, 5(a)(1), 5(a)(2), and 5(a)(3), the first two of which apply to guilt phase habeas claims.  The relevant subsections state as follows:

---

[387] *Henry v. Mississippi*, 379 U.S. 443, 447 (1965).
[388] *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).
[389] *See Barr v. City of Columbia*, 378 U.S. 146, 149 (1964).
[390] *Id.* (internal quotations omitted).
[391] *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (quoting *Ford*, 498 U.S. at 424).
[392] *See* June 18, 2008, Order, attached hereto as **Exhibit 67,** at 2.

Sec. 5(a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

Ordinarily, § 5(a)(1) is an independent and adequate ground, provided other prerequisites needed to satisfy this federal default doctrine are met.[393]  Subsection 5(a)(2), on the other hand, depends on federal constitutional law.  In *Ex parte Reed*, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008), the TCCA noted that "[b]ecause Article 11.071 Section 5(a)(2) was enacted in response to the Supreme Court's decision in *Schlup [v. Delo*, 298 U.S. 195 (1995)], we conclude that the standards set forth for evaluating a gateway-actual-innocence claim announced by the Supreme Court should guide our consideration of such claims under Section 5(a)(2)."  As a result, reliance on § 5(a)(2) obviously cannot satisfy federal default doctrines as it is derived from federal constitutional law.

However, the TCCA's June 18, 2008, opinion does not identify what subsection it relied upon when it found that Prible's June and August 2007 *pro se* pleadings did not satisfy Article 11.071, § 5(a).  One cannot determine, therefore, whether the TCCA disposed of Prible's writ because, in the TCCA's view, it did not satisfy federally-derived standards for "gateway" innocence under 5(a)(2).  The statement that Prible's applications are abuses of the writ,

---

[393] *See Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004).

therefore, does not satisfy the federal requirement that the state must "'clearly and expressly' indicate that it rests on state grounds which bar relief."[394]

    **2.    Alternatively, whether one is talking about the June 18, 2008, opinion or the November 2, 2011, opinion, the TCCA's application of Section 5(a)(1) to Prible's June and August 2007 pleadings would not be an independent and adequate state law ground triggering federal default, because the TCCA does not strictly or regularly apply the abuse of the writ doctrine to *pro se* pleadings.**

The TCCA does not discuss actual innocence in its June 18, 2008, opinion, nor did Prible squarely raise actual innocence in his June and August 2007 filings, so it is readily arguable that the TCCA relied only on § 5(a)(1) to dismiss those *pro se* pleadings. Nonetheless, even if the TCCA's June 18, 2008, opinion is deemed to have "clearly and expressly ruled" that Prible did not meet Section 5(a)(1) provisions for a subsequent writ, dismissal of Prible's June and August 2007 pleadings as an abuse of the writ should not trigger federal default. Default is justified only if the state courts strictly follow and regularly apply state procedural rules. However, the TCCA's decision to recognize Prible's June and August 2007 pleadings is an aberration for the following reasons.

First, the TCCA has repeatedly held that defendants are not entitled to hybrid representation, whether at trial or in post-conviction proceedings.[395] The rule against hybrid representation "is basic and important."[396] Hybrid representation threatens orderly review and adjudication of the defendant's request for relief by creating fertile grounds for conflict, waiver, and abandonment of claims. Sophistication of the applicant, in this regard, is irrelevant, and so too, whether they present claims supported by authority or not. In *Ex parte Taylor*, the Court applied the no hybrid rule to preclude attempts by a sophisticated litigant to engage in hybrid

---

[394] *See Amos v. Scott,* 61 F.3d 333, 338-39 (5th Cir. 1995).
[395] *See Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007).
[396] *See Ex parte Taylor*, 36 S.W.3d 883, 887 (Tex. Crim. App. 2001).

representation. A district attorney sought to file pleadings in an appeal in which the State was being represented by the Texas Attorney General's Office. The TCCA flatly stated that "[a]ppellants are not allowed to have 'hybrid representation' on appeal, in which an appellant and an attorney can present independent points to an appellate court."[397]

Importantly, the rule against hybrid representation is not itself an independent and adequate state law ground for disposing of state habeas actions that might justify the application of the federal default doctrine to Prible's June and August 2007 pleadings. Hybrid pleadings are simply not cognizable.[398] In *Ex parte Rousseau*, the TCCA rejected a *pro se* applicant's successor claims because the "applicant [did] not have a right to hybrid representation."[399] Rather than finding an abuse of the writ, "the Court declined to consider these grounds as they present nothing for review, and we reject any findings or conclusions pertaining to them."[400] Clearly, as long as an applicant is still represented by counsel in 11.071 proceedings, he does not have authority to file a successor writ, and the applicant's *pro se* efforts are nullities with no more bearing on substantive claims, or the procedural posture of a case, than an application for habeas relief filed by a third party with no standing.

TCCA precedents show that the potential for conflict is sufficient to reject hybrid pleadings.[401] In this case, the conflict between Prible and his state habeas counsel was bitter and explicit. The record clearly reflects that Prible's state habeas counsel refused to authorize Prible to file *pro se* pleadings. Prible sent his state habeas counsel, Roland Moore, his June 2007 *pro se* application. In a curt letter, Moore wrote back: "I have received your successor Writ. None of

---

[397] *Id.*
[398] *See Ex parte Davis,* 818 S.W.2d 64, 68 (Tex. Crim. App. 1991) (Onion, J., concurring).
[399] *See Ex parte Rousseau,* No. WR-61389-02, 2010 WL 3430765, *5 (Tex. Crim. App. 2010) (unpublished opinion).
[400] *Id.*
[401] *See Ex parte Rousseau, supra.*

it is useful.  I will not be adopting it."[402]  Prible brought this letter, and the conflict over post-conviction representation, to the Texas courts' attention by filing it in protest over Moore's continuing representation.

The trial court did not authorize Prible to proceed *pro se*, and instead ignored all the numerous requests for discovery, new counsel, and hearings that Prible made so that he could prove the allegations in his June and August 2007 pleadings.  The only judicial action taken was on Prible's January 22, 2007, motion to disqualify the trial judge, Hon. Mark Kent Ellis.[403]  Prible moved for disqualification because the judge had not taken action on the numerous papers Prible had filed in which he had complained about state habeas counsel and requested the appointment of a different attorney.[404]  The recusal motion was forwarded to the Second Administrative Judicial District.  A hearing took place by video hookup, during which Prible furiously, but unsuccessfully, demanded new counsel.

And there is a second reason why the TCCA's June 18, 2008, decision disposing of Prible's June and August 2007 pleadings cannot justify application of federal default doctrines.  The TCCA found that Prible's June and August 2007 pleadings abused the writ for one reason, and the reason was **not** because Prible's claims could have been presented in his 2004 writ.  Instead, according to the TCCA,

> [t]he merits of claims raised in a subsequent application may not be considered by this Court unless the application contains sufficient specific facts establishing that the application meets one of the exceptions set out in Art. 11.071, § 5.

---

[402] *See* **Exhibit 68.**
[403] *See* **Exhibit 69** (Prible's *Pro se* Motion to Disqualify Judge of the 351st District Court).
[404] The 351st District Court took no action on any of Prible's numerous motions, including discovery motions, and neither the district clerk nor the trial court treated Prible's July and August 17, 2007, filings as successor writs. Harris County courts identify separate writs alphabetically.  The original writ is the 'A' writ; subsequent writs are labeled 'B' and 'C' writs, etc.  However, the clerk filed Prible's *pro se* pleadings in the original habeas case, the 'A' writ.  Furthermore, by statute, the convicting court must *immediately* send subsequent 11.071 applications to the TCCA.  The trial court and district clerk did not transmit Prible's file to the TCCA until February 4, 2008.

Applicant's two subsequent applications do not satisfy this requirement, and we therefore dismiss those applications as abuses of the writ.[405]

However, the TCCA does **not** regularly apply an abuse of the writ standard to pleadings that fail to allege "sufficient specific facts." In *Ex Parte Medina*, 361 S.W.3d 633 (Tex. Crim. App. 2011), the TCCA explained why:

> Texas law has **long required** all post-conviction applicants for writs of habeas corpus to plead specific facts which, if proven to be true, might call for relief. Counsel has not cited a single case in which this Court has granted a writ application that contained only conclusory allegations or even remanded such an application for further consideration by the convicting court. A Texas writ application must be complete on its face. It must allege specific facts so that anyone reading the writ application would understand precisely the factual basis for the legal claim.[406]

If specific facts are not alleged, the result is not a deficient Texas writ. One does not have a Texas writ at all. For this reason, the *Medina* court indicated the proper procedure is to dismiss the pleading "**without prejudice**" rather than to apply the abuse of the writ doctrine.[407]

The TCCA's June 18, 2008, decision to consider Prible's June and August 2007 *pro se* pleadings as successor applications under 11.071 § 5, and to dismiss them as abuses of a writ, was therefore highly irregular. In fact, the decision violated the TCCA's precedents prohibiting hybrid representation, was contrary to the preferred practice of dismissing without prejudice those applications that do not meet minimal pleading requirements, and conflicted with the trial court's treatment of Prible's *pro se* efforts as part of his original application.

Had the TCCA followed its own precedents, Prible would not have been allowed to seek relief *pro se* while still represented by state habeas counsel Roland Moore. Prible's June and August 2007 pleadings would have been stricken rather than ruled upon. Consequently, the TCCA's June 18, 2008, determination that the June and August 2007 *pro se* pleadings were

---

[405] *Ex Parte Prible*, WR-69,328-01, WR-69,328-02, WR-69,328-03 (Tex. Crim. App.) at 2.
[406] *Medina,* 361 S.W.3d at 640 (emphasis added).
[407] *Id.* at 641 (emphasis added).

subsequent writs subject to an abuse of the writ standard does not constitute the application of independent and adequate state law grounds, but is instead a departure from the TCCA's established jurisprudence.

Indeed, developments since the 2008 opinion in Prible's own case show that the TCCA is not strict when it comes to dismissing as abusive those subsequent applications that fail to plead sufficient facts showing the applicant can satisfy § 5(a)(1), (2), or (3). According to the TCCA's 2010 opinion, pleadings prepared by Prible's federally-appointed counsel pursuant to this Court's determination that he should exhaust pursuant to *Rhines v. Weber* also did **not** permit the TCCA to find that there were sufficient facts to satisfy § 5(a)(1), (2), or (3) standards; however, instead of dismissing the 2010 successor as an abuse of the writ, the Court remanded the case to the trial court with instructions to allow Prible to present evidence that he met these standards. In any event, the TCCA's 2008 disposition of Prible's *pro se* pleadings on state law grounds has no bearing on this Court's consideration of whether Prible meets federal "cause" and "prejudice" standards of *Murray v. Carrier* or the gateway innocence standard in *Schlup*.[408]

**B.    The TCCA's November 2, 2011, decision does not warrant default under federal law either.**

The TCCA does not specify in its November 2, 2011, opinion whether it found that claims in Prible's September 8, 2010, application failed to satisfy § 5(a) because Prible (i) failed to discover the factual allegations contained therein at trial, (ii) failed to present them in his November 19, 2004, application, or (iii) failed to present them in his June and August 2007 pleadings. On the other hand, the June 2011 *Findings*, which were drafted by the State, signed

---

[408] The TCCA's 2008 opinion does not contain findings of fact tending to show that Prible should have discovered the factual basis of the constitutional claims he attempted to articulate in his *pro se* pleadings, which might bear on the question of cause under *Carrier*. Instead, in finding an abuse of the writ, the Court found that Prible's *pro se* filings did not meet a pleading requirement according to which subsequent applicants bear the burden of demonstrating, by a preponderance of the evidence, that they satisfy 11.071 § 5(a)(1), (2) or (3).

verbatim by the convicting court, and apparently adopted by the TCCA, touch on each possibility.[409]  The June 2011 *Findings* suggest that a factual basis for claims brought in connection with successor proceedings initiated by Prible's September 8, 2010, successor application **may have** been available to Prible's trial counsel.[410]  The June 2011 *Findings* also assert that the factual basis for Prible's 2010 successor allegations was available for inclusion in Prible's original application in 2004 and in the *pro se* pleadings he filed in 2007.[411]

However, if the TCCA's decision that successor claims filed by Prible in his September 8, 2010, successor application abused the writ because the factual allegations could have been presented in his June and August 2007 pleadings, then federal default doctrines are inapplicable for reasons set forth above, namely:  (a) the TCCA does not strictly or regularly apply abuse of the writ doctrines to the *pro se* pleadings of represented defendants, and (b) the TCCA does not strictly or regularly apply abuse of the writ doctrines to pleadings that do not meet the heightened pleading requirements for applications filed pursuant to Article 11.071 for habeas relief. Furthermore, defaulting Prible's claims would be a manifest injustice because he can show cause and prejudice for not raising present federal claims based on *Giglio, Brady,* and *Massiah* in his previous state proceedings, and he can show gateway innocence under *Schlup.*

## VIII.
## CAUSE AND PREJUDICE

Prible seeks an evidentiary hearing on prosecutorial misconduct claims brought under *Massiah, Brady,* and *Giglio,* for which he has discovered evidence that he diligently tried to develop in state habeas proceedings antedating his original federal petition, but was unable to develop.  In *Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000), the Fifth Circuit explained the

---

[409] **Exhibit 65** at 7.
[410] *Id.* at 6-7.
[411] *Id.*

relationship between standards for cause and prejudice under *Murray v. Carrier*, 477 U.S. 478

(1986), and the AEDPA's prescription against claims that rely on evidence that a petitioner

failed to develop in state habeas proceedings, as follows:

> The Supreme Court in [*Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000)] also linked the "failure to develop" inquiry with the cause inquiry for procedural default. *See id.* at [444] ("Our analysis [of § 2254(e)(2)] should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the Virginia courts in the first instance."). In this case, if Barrientes establishes cause for overcoming his procedural default, he has certainly shown that he did not "fail to develop" the record under § 2254(e)(2). Accordingly, if the district court determines that Barrientes has established cause and prejudice for his procedural default, it should proceed to conduct an evidentiary hearing on any claim for which cause and prejudice exists. It should then revisit the merits of any such claim anew.[412]

In determining whether Prible can show cause, or alternatively, whether he "failed to

develop the factual basis of a claim in state court," the standard set forth in *Williams v. Taylor*,

529 U.S. 420 (2000), applies. A failure to develop the factual basis of a claim is not established

unless there is "a lack of diligence, or some greater fault, attributable to the prisoner or the

prisoner's counsel."[413] This Court, therefore, must focus on Prible's efforts to discover the

relevant facts, and not on whether he actually could have discovered these facts. "Diligence …

depends upon whether the prisoner made a reasonable attempt, in light of the information

available at the time, to investigate and pursue claims in state court; it does not depend . . . upon

whether those efforts could have been successful."[414] In determining prejudice under *Carrier,*

the standards are identical to those for the concept of materiality that governs substantive claims

under *Brady*.[415] A petitioner establishes prejudice if the evidence that he shows cause for not

introducing at trial, or which he could have prevented from being introduced at trial if the

---

[412] *Barrientes*, 221 F.3d at 771.
[413] *Williams,* 529 U.S. at 432.
[414] *Id.* at 435.
[415] *See Strickler v. Greene*, 527 U.S. 263, 282 (1999).

petitioner had the evidence he or she has now, would have made a different outcome at trial reasonably probable.[416]

A.      **Cause.**

In its June 2011 *Findings*, the convicting court characterized the successor application filed by Prible in 2010 as "rais[ing] five claims alleging a conspiracy among the lead prosecutor in his case and several federal prison inmates who were housed with the applicant at FCI Beaumont."[417]   The convicting court next described the conspiracy theory as an allegation that "the lead prosecutor provided federal inmate Nathan Foreman with otherwise-unknown details about the applicant's case, that inmate Foreman shared the provided information with a ring of snitches he recruited to assist the lead prosecutor in obtaining a false confession from the applicant," and that "witness Michael Beckcom's testimony at the applicant's trial regarding the applicant's confession was perjured and rendered him a state agent, as a false confession based on information he received from the lead prosecutor, by way of Foreman."[418]   In *Finding No. 14*, the convicting court asserted that "applicant's [2010] claims are based largely on the statements of witness Carl Walker, Jr., a former Beaumont federal prison inmate."[419]   According to the convicting court, however, statements from Walker attached to the 2010 state application "consist almost entirely of hearsay and speculation and contain no direct evidence of applicant's conspiracy theories."[420]

The convicting court then turned to the question of whether the information Walker provided in 2010 in statements to Prible's federal investigator and federal counsel were available at the time Prible filed his previous state application in 2004 and his *pro se* pleadings in 2007.  In

---

[416] *Id.* at 281.
[417] *See* **Exhibit 65** at 2, *Finding No. 12*.
[418] *Id.* at 3, *Finding No. 13*.
[419] *Id.* at 3, *Finding No. 14*.
[420] *Id.* at 4.

*Finding No. 20*, the convicting court found that "during the preparation of the initial habeas petition" in 2004, state habeas counsel "investigated the applicant's conspiracy theory," but "applicant provided counsel with very limited information and, that counsel did not urge the applicant's conspiracy theory alleg[ing] Walker as a potential witness to the conspiracy in the applicant's initial habeas petition."[421]    Nonetheless, "based on the applicant's proffered statements of witness Walker upon which the applicant relied to support the merits of his instant claims," the convicting court found "that the factual basis for the instant claims were available when the applicant's initial habeas petition was filed in November, 2004."[422]

Having found that a factual basis for claims raised by Prible in 2010 was "available" under Article 11.071 § 5(a)(1) six years earlier for inclusion in his original November 2004 application, the convicting court also found that the information was available when Prible filed his June and August 2007 *pro se* pleadings.  According to the convicting court, the June 2007 pleading "identified Walker by name and federal inmate number" and indicated that "Walker had come forth with information regarding the conspiracy theory."[423]   The August 2007 pleading, according to the convicting court, "explicitly raised the conspiracy theory" and indicated that "a witness had contacted his trial counsel, Terry Gaiser, with information about the alleged conspiracy."[424]   The convicting court, therefore, determined that "applicant's conspiracy theory and the identity of witness Walker were available at the time of the filing of the applicant's second subsequent application for writ of habeas corpus" and that "a factual basis for the applicant's conspiracy theory may have been available at the time of applicant's trial."[425]   In conclusion, the convicting court found "that applicant fails to establish that the factual basis for

---

[421] *Id.* at 4-5.
[422] *Id.* at 5, *Finding No. 22*.
[423] *Id.* at 5-6, *Finding Nos. 24-25*.
[424] *Id.* at 6, *Finding Nos. 29-30*.
[425] *Id.* at 6-7, *Finding Nos. 31-32*.

his claims was unavailable on the dates that applicant filed his three previous applications, as required by Tex. Code Crim. Proc. Art 11071, sec. 5(a)(1)."[426]

However, the state courts' findings that evidence underlying Prible's "conspiracy theory" were available to Prible's previous counsel are (1) legally irrelevant and (2) factually erroneous. First, with regard to the relevancy, the convicting court's findings speak generally about a conspiracy theory and fail to address whether evidence was or was not available to support Prible's specific constitutional claims that the State sponsored false testimony and suppressed exculpatory evidence. Second, the State courts' determination that evidence underlying Prible's federal claims was available to previous counsel (trial counsel and state habeas counsel) turns on an unacceptably broad definition of "available," in which evidence was "available" if it simply existed before or during the time that previous counsel represented Prible. However, by definition, evidence that is the subject of a *Brady* claim predates, or arises at, the time of trial. The State cannot suppress or misrepresent evidence of facts that do not exist.

When "available" and "unavailable" are properly interpreted to mean "discoverable through the exercise of due diligence" or "not discovered despite due diligence," it is clear that the evidence that underlies Prible's *Brady*, *Giglio,* and *Massiah* claims was not available (or was unavailable). As shown below in subsections (1) (addressing whether evidence was available to trial counsel) and (2) (addressing whether evidence was available to state habeas counsel), the record confirms that trial counsel, state habeas counsel, and Prible (acting *pro se*) took all measures that could reasonably be expected in order to investigate the State's relationship to any FCI Beaumont informants that they had reason to believe were used to supply information incriminating Prible.

---

[426] *Id.* at 7, *Finding No. 34*.

1. **Trial counsel diligently sought discovery of the State's relationship to Beckcom and had no reason to suspect that Foreman and Beckcom were part of a ring of informants whom the State was utilizing to investigate and assemble its case.**

As an initial matter, the state court did not find that any of the specific facts that Prible alleged in support of the five claims for relief that he filed in 2010 were available to trial counsel. The June 2011 *Findings* speak nondescriptly of "a factual basis" being available.[427] The June 2011 *Findings* also do not express any level of certainty about whether trial counsel should have known about "a factual basis" and, instead, speculate that such "a factual basis for applicant's conspiracy theory may have been available at the time of the applicant's trial."[428]

The record shows, moreover, that trial counsel attempted to discover "a factual basis" for impeaching Beckcom about his relationship to the lead prosecutor. Trial counsel sought to determine how Beckcom and Siegler had first come into contact. But at a pre-trial hearing on Friday, October 11, 2002, only three days before trial started on Monday, October 14, 2002, the following misleading exchange took place:

> MR. GAISER: Finally, Judge, just so the record is clear on this. When we initially had a hearing concerning discovery with reference to Michael Beckcom, one of the orders the Court issued was that the State furnish us with – and I believe the Court said that that report could be oral, an indication of when and how contact was first initiated by – with regard to Mr. Beckcom and the dates of any contacts with him. And I'm somewhat confused – and that may be my own fault and my old age and having a lot of senior moments – as to those dates and how contact was initiated. And I reurge that we – we've been told on I believe two different dates but I may be wrong on that. If Ms. Siegler could re-inform me on that regard I would appreciate it.
>
> MS. SIEGLER: Judge, on the record, I don't have my notes in front of me. So, I'm trying to remember this as best I can. I know that I told Mr. Gaiser inconsistent at one point because I went back and looked up the notes.
>
> . . .

---

[427] *Id.* at 7, *Finding No. 32.*
[428] *Id.*

*The first time he [Beckcom] contacted me it was by telephone. He called me. He got my name from Nathan Foreman. And the best I can recall, Judge, is he called me around October of 2001. And I know when he called we were at 201 because we had just gotten there because of the temporary flood move and I remember getting the phone call being on the 9th floor over there and we didn't move in there until the end of August. And I think that's going to be around October. We didn't go see him until December.*

*THE COURT: **Who's Nathan Foreman?***

*MS. SIEGLER: **Nathan Foreman is another inmate at FCI Medium.** What else did you ask me?*[429]

But Nathan Foreman was not just "another inmate at FCI Medium." He was Siegler's original informant on Prible's case, who had come to Siegler with a story of a supposed "confession" before he had even met Prible. Siegler knew this, but kept her mouth shut when the trial court asked her who Nathan Foreman was.

Trial counsel also sought to determine, at this October 11, 2002, pre-trial hearing, how many contacts Siegler had had with Beckcom. Again, she misled the trial court and Prible's counsel:

*MS. SIEGLER: . . . And all together there has been about **maybe four, five phone calls** where he's called me from Beaumont.*

*THE COURT: When were they?*

*MS. SIEGLER: When were the phone calls?*

*THE COURT: Yes.*

*MS. SIEGLER: I have no idea because the phone calls were mainly consisting of when am I going to be coming to Houston, is it going to trial, how long will it take and that kind of stuff. None of the phone calls were anything about details of the offense.*

*MR. GAISER: **He initiated all those phone calls?***

*MS. SIEGLER: **He has to because I can't call an inmate, obviously.***[430]

---

[429] **Exhibit 72** at 10-12.
[430] **Exhibit 72** at 13-14.

In fact, Siegler *was* able to initiate phone calls to her FCI Beaumont informants, and regularly did so.  She confirmed this at her deposition:

> *Q (by Ms. Scardino):  Did you ever contact FCI Beaumont to ask to speak to an inmate?*
>
> *A.  You mean like generically or by name?*
>
> *Q.  By name.*
>
> *A.  Yes.*
>
> *Q.  Okay.  You – you could call FCI Beaumont and speak with a unit manager, I believe, and –*
>
> *A.  I would have Johnny Bonds do it –*
>
> *Q.  Okay.*
>
> *A.  – because it was a pain and it took a lot of time.  It was very inefficient.*
>
> *Q.  Okay.  So, he could – he could call FCI Beaumont and get an inmate that you needed to speak with on the telephone, right?*
>
> *A.  No, it was never that easy.  Johnny would call and call and call and leave messages to try and get the case manager or whatever they're called, and they only have certain hours of any day that they're allowed to talk to their case manager, and the case manager has lots of inmates.  So, you had to get the case manager to call you back, to have a time slot on a certain day where the inmate would be there and we could be there at that time to ever hook up on the phone.*
>
> *Q.  Okay.  And when you did finally hook up on the phone, the inmate would be in the unit manager's office speaking with you on the phone; is that right?*
>
> *A.  Yes.  Yes.*[431]

Siegler represented to the trial court that she had "maybe four, five phone calls" with Beckcom, all of which were initiated by him.  In fact, Beckcom's TruFone records show that he called Siegler at least 10 times between January 1, 2002, and September 26, 2002, just before he was

---

[431] **Exhibit 4-A** at 196-97.

moved to Harris County for Prible's trial.[432] Each of these 10 calls was very short, indicating

that Siegler likely called him back on a unit manager or case manager's phone.[433]

Trial counsel also sought disclosure of deals with the prosecutor and vigorously cross-

examined Beckcom about the benefits the State had promised him. Before trial, Prible's

attorneys filed a motion to require the State to reveal any agreements it had made with any

witnesses, whether or not the witness testified.[434] At a September 10, 2002, pre-trial hearing, the

State agreed to the motion, and Siegler stated the agreement on the record as follows:

> MS. SIEGLER: The agreement right now, Judge, that I have with witness,
> Michael Beckcom, is that in exchange for his cooperation and truthful testimony,
> when this trial is completely over with and resolved I will notify his Assistant
> United States Attorney who's (sic) name is Mark Cullers, in Fresno, California,
> that he cooperated in this case, what the level of his cooperation was, the extent
> of his cooperation, and whether or not I believe that it was truthful. At that time it
> will be Mark Cullers' decision as to whether or not to file a Rule 35 reduction.
> Even if he files that Rule 35 reduction, it will be his superior's decision whether
> or not to proceed with it. And even if they decide to proceed with it, it will be his
> Federal Judge in California's decision whether or not to give him any kind of
> reduction in his sentence. That's the agreement that we have.[435]

Again, Siegler misrepresented facts to the court, both expressly and by omission. And she

concealed agreements she had made with Moreno and Foreman. Siegler never mentioned that

Moreno had given Foreman her name, and that Foreman had in turn given her contact

information to his cellmate, Beckcom. She never mentioned that in exchange for their assistance

in her cases, she personally testified in a Rule 35 hearing in Lafayette for Moreno, and wrote a

---

[432] *See* **Exhibit 56.** BOP did not install the TruFone system until 2002. Therefore, inmate phone records from before 2002 are not available.

[433] *See* **Exhibit 4-A** at 201-09. There is no log showing how many times Siegler spoke with Beckcom on the unit manager/case manager phones. Moreover, phone calls on the case manager/unit manager phones were not recorded, as the Trufone calls were. *See* Declaration of Gordon Harpe, BOP unit manager, attached hereto as **Exhibit 73.** At her deposition, Siegler claimed that she did not know whether calls on a unit manager/case manager's line would have been recorded or not. *See* **Exhibit 4-A** at 197 (*"Q (by Ms. Scardino): And that phone call would not be recorded, would it? A. I don't know. That's a federal prison rule. I don't know what they're recording when they're calling from the case manager's office. Q. Okay. A. I don't know the rules. Q. You do know that phone calls with inmates from the usual inmate phones, those would have been recorded, right? A. I would assume so."*).

[434] *See* **Exhibit 74** (seeking agreements between the State and "any witness or potential witness").

[435] **Exhibit 70** at 28-29.

Rule 35 letter to Foreman's federal prosecutor. And Prible's attorneys would never have known to ask her specifically what she had done for Foreman and Moreno, because they did not even know that these federal prison inmates had been communicating with Siegler about Prible's case. Siegler was careful to conceal Foreman's and Moreno's involvement from the trial court also, as the rest of the exchange shows:

> THE COURT: And for purposes of the record, what's a Rule 35?
>
> MS. SIEGLER: It's a Federal time cut. And from what I understand a Federal Judge can cut a federal inmate's sentence however much he wants to, for whatever reason he wants to. The prosecutors in Federal Court sometimes make a recommendation and those Federal Judges can do whatever they want.
>
> THE COURT: Is it the State's intention to be a part of that process in recommending a Rule 35 reduction?
>
> MS. SIEGLER: Yeah – they tell me that the mere fact that I write the letter means that I'm recommending it. **I've done one before and I went to Louisiana and testified.** Mark Cullers says he doesn't know if I'll have to come there or not. They usually just do it in a hearing.[436]

Siegler neglected to tell the court that the one she had done in Louisiana was for Jesse Moreno.

> THE COURT: All right. Is Mr. Beckcom aware of this?
>
> MS. SIEGLER: Yes.
>
> THE COURT: If there be – if any future date the agreement changes or is modified you'll notify the Defense as soon as possible. And that also, obviously, extends to any other witnesses involved in the case as far as – <u>at this point in time, are there any other agreements with any other witnesses involved in the case</u>?
>
> MS SIEGLER: One of the defendant's ex-wives' name is Melanie Garrison. She's bench warranted by Karen and she'll be here this week. She just got moved to Gatesville by Waco and I – I haven't even talked to her but I've told her family that I will try to get her sent back to Gatesville when this is over because she likes it there. She's getting a degree there or something. If you call that a promise, I've – I talked to her family about that. That's all I can think of.
>
> THE COURT: Okay. And if and when you meet with her, you'll inform her of that; is that correct?

---

[436] **Exhibit 70** at 29-30.

> MS. SIEGLER:  Yes, sir.
>
> THE COURT:  And anybody else or any other agreements that you're aware of?
>
> MS. SIEGLER:  No, sir, that's it.
>
> THE COURT:  Same thing, if anything comes about notify the Defense as soon as possible.[437]

Again, Siegler made no mention of her Rule 35 efforts on behalf of Foreman or Moreno.  Nor did she tell the court that she had asked FCI Beaumont to move Foreman and Moreno to a different unit of the prison for their safety,[438] even though she evidently knew that that was the type of benefit that she would have had to reveal, as she revealed a similar promise she had made to Melanie Garrison.  She did not tell the court that she had arranged a meeting with Beckcom and another inmate named Anton Davi to discuss other informant opportunities, as Beckcom had asked her to.[439]  But most importantly, she never told the court that she had led Beckcom to believe that he was going to walk out of prison a free man if he testified against Prible.[440]  So despite Prible's trial attorneys' best efforts to discover a "factual basis" for impeaching Beckcom about his relationship, communications, and agreements with the lead prosecutor, they were stymied by the lead prosecutor herself.

The notion that Prible's August 2007 pleading shows that trial counsel unreasonably failed to follow leads to evidence now adduced in support of federal due process claims is untenable.  The only hint in Prible's August 2007 pleading regarding what might be considered "a factual basis for applicant's conspiracy theory" is Prible's garbled reference to lead trial counsel's "failure to make information of [a] potential witness," namely, Hermilo Herrero,

---

[437] **Exhibit 70** at 31.
[438] *See* **Exhibit 42.**
[439] *See* **Exhibits 95-96.**
[440] *See* **Exhibit 29** at 19-20, 87.

"[known] to court or defendant."[441]   According to the August 2007 pleading, this witness had

noticed from "watching TV or other sources" that the lead prosecutor had "done the same thing"

when she prosecuted him for murder as she had done to Prible.[442]   The August 2007 pleading

also alleges that Herrero instructed his wife to contact Prible's lead counsel at trial.   However,

Prible's trial counsel, Kurt Wentz, testified at the June 8-9, 2011, hearing that the name "Hermilo

Herrero" never surfaced.   Molli Steinli, the investigator appointed to assist trial counsel,

confirmed that Prible did not provide her with information about such "potential witnesses"

during or after trial.   Herrero's habeas investigator also testified that he interviewed Herrero, and

that Herrero did not mention a Walker, let alone the name of Carl Walker, Jr.

Importantly, in the December 15, 2010, order remanding five claims to the convicting

court for a hearing on 11.071 § 5(a)(1) procedural issues first, and on the merits later (depending

on findings regarding procedural issues), the TCCA instructed the trial court to make credibility

findings if appropriate.   The trial court did not make adverse findings regarding the credibility of

Wentz, Steinli, Moore, or Garza.   Based on these witnesses' unimpeached testimony, "the

statements of Carl Walker, Jr." that the convicting court found "applicant's [2010-2011] claims

are based largely on" clearly were **not available** to trial counsel in any meaningful or reasonable

construction of the phrase.

Finally, the June 24, 2011, *Finding* that the factual basis of Prible's claim "**may have**

**been available**" to trial counsel because of a phone call in the middle of a capital murder trial

from the spouse of a recently convicted inmate named Herrero is belied by the position taken by

the State and trial court during the June 8-9, 2011, hearing held two weeks earlier.   At that

hearing, the State repeatedly insisted that facts about the prosecution of Herrero, far from being

---

[441] *See* **Exhibit 53** at 2.
[442] *Id.*

facts that Prible should have pursued at any stage of proceedings, were instead irrelevant even now:

> MS. HAMPTON: Your Honor, I would object to the relevance of this witness' testimony. If he's an investigator for Norm Silverman on the Hermilo Herrero case, it doesn't have anything to do with Prible's case **and it doesn't have anything to do with whether this claim was available to be raised at a prior writ proceeding**. I'm just confused generally.
>
> THE COURT: I agree.[443]

Foreman's role in both the Herrero and Prible prosecutions was also deemed irrelevant despite Prible's 2011 supplementary briefing which documented Foreman's efforts to incriminate Herrero and Prible in their respective cases.[444] Turning to the documents from the Herrero file that Prible submitted, the State objected again on relevancy:

> MS HAMPTON: Judge, if I may. I understand that Mr. Rytting has attached this document to his supplement in his exhibits, but I would object to their admission. I don't think they're relevant there, nor do I think they're relevant here. These are documents that he obtained from the Hermilio (sic) Herrero file. And, again, anything having to do with Hermilio (sic) Herrero's case is not relevant in this proceeding, particularly as to whether he meets the criteria for Section 5 –
>
> THE COURT: I agree.[445]

If the Herrero file appears irrelevant to the State even now, the State certainly cannot take the position that years earlier, whether at trial or during initial state habeas proceedings, Prible's attorneys should have sought information from that file. Prible's previous attorneys did not have the benefit of BOP records and letters to the prosecutor from other informants, which together link Foreman and Beckcom in an organized effort to incriminate Prible. Without this evidence,

---

[443] **Exhibit 50** at 2 RR 29-30.
[444] *Id.* at 3 RR 62.
[445] *Id.* at 2 RR 50. *See also id.* at 29-30, 62. In August 2016, the HCDA produced, for the first time, certain documents from the Herrero case *that were contained in the Prible casefile. See* **Exhibits 59-61.** Thus, there is no question that the Prible and Herrero cases were related. The HCDA writ attorney either did not review the Prible file carefully or else expressly misrepresented to the trial court that the two cases had nothing to do with each other.

Prible's previous attorneys had no reason to investigate the Herrero case, whether in the midst of Prible's own capital trial or during initial state habeas proceedings.

> **2.    State habeas counsel Roland Moore diligently attempted to pursue the insubstantial leads he had to witnesses who might support Prible's prosecutorial misconduct claims.**

State habeas counsel Roland Moore tried to identify the person named "Walker" who, Prible maintained, could prove that Beckcom, in league with Foreman and the lead prosecutor, were fabricating evidence against him. Moore employed an experienced investigator, John Greenfield, and inquired about how he could possibly locate the individual that Prible believed could expose the operations of the informant's ring in FCI Beaumont. Greenfield, however, pointed out that because "Walker" was a very common name, additional identifying information would be needed in order for him to identify and arrange an interview with an inmate in the BOP system. At the June 8-9, 2011, hearing, Moore explained his predicament and his attempt to solve it:

> *A.  I -- all I had was the name -- was that there was a man named Walker and that he was black. And I had talked about this with my investigator and there was simply no way to proceed on that small amount of personal identifying information.*
>
> *Q.  Okay. And so, you had to find, perhaps, someone who had some information – knew Walker, had more identifying information; is that correct?*
>
> *A.  Yes.*[446]

Moore also tried to contact and interview all witnesses that he thought might be able to identify a relevant witness with the last name "Walker." He took the extraordinary step of issuing a subpoena for Foreman and attaching him to another Harris County case.[447] He then attempted to interview Foreman but was stonewalled:

---

[446] *See* **Exhibit 50** at 2 RR 39-40.
[447] *Id.* at 2 RR 40-41.

*Well, I -- I subpoenaed Nathan Foreman back to the courthouse. I had him attached to another – an unrelated felony case and Greenfield, my investigator, and I interviewed him alone, just the two of us, in one of the holdover cells. And as soon as he discovered that Greenfield and I were not working for the State of Texas, but, in fact, were working for Prible, he went stone silent, wouldn't answer any questions, wouldn't cooperate. I don't even have any notes because he would say nothing that I could have written down. He absolutely would not talk to us.[448]*

Moore also sought permission to interview Beckcom, but Beckcom was represented by counsel who refused to make him available:

*Q. And you were aware that the key witness at trial was Michael Beckom; is that correct?*

*A. Yes.*

*Q. And did you try to talk with Michael Beckom?*

*A. I was about to. And I spoke with another lawyer in the courthouse here who represents him who told me that, A, that he represented Beckom, and, B, that Beckom wouldn't talk to me. So, I didn't pursue Beckom since his lawyer told me he wouldn't talk to me.*

*Q. And who was his lawyer, if you can recall?*

*A. I'll have to think. Give me a minute. I'll think of his name in just a minute. Well known to all of us. Logan Dietz.[449]*

Moore also wrote to FCI Beaumont prisoner Brett Liedtke seeking information about a potential witness named "Walker" and the ring of snitches that Prible believed had set him up.[450] Liedtke was a defense witness at trial. When Liedtke testified, however, he did not identify or describe Walker. Prible's defense team interviewed Liedtke before he testified, as well, but Liedtke did not provide the defense any information about a person named Walker or names of other inmates who were aware of a ring of informants in FCI Beaumont.[451] Nonetheless, Moore

---

[448] *Id.* 41.
[449] *Id.*
[450] *Id.* at 2 RR 49.
[451] *Id.* at 3 RR 55.

reached out to Liedtke, but without success.[452]

Despite testimony documenting state habeas counsel's efforts before 2004 to find a witness when he only had the last name of "Walker" to go by, and despite state habeas counsel's additional efforts to contact Carl Walker, Jr. after adequate identifying information became available for the first time in 2005 (a year after state habeas counsel filed Prible's original 2004 application), the convicting court nonetheless signed off on findings stating that Prible's 2010 successor application abused the writ precisely because of statements that Carl Walker, Jr. gave when interviewed by Prible's federally-appointed team.[453]   In *Finding No. 15*, the court refers to Carl Walker, Jr.'s "statements" that were attached as an exhibit to his successor petition[454] and finds that Walker was present when Foreman and Beckcom were putting into motion the conspiracy to convict Prible with false testimony.[455]   However, the convicting court recommended dismissing Prible's due process claims under § 5(a)(1) without reaching the merits upon determining that "the factual basis for [Prible's] instant claims were available when the applicant's initial habeas petition was filed in November, 2004."[456]   The court based this conclusion squarely on "**the applicant's proffered statements of witness Walker upon which the applicant relies to support the merits of his instant claims.**"[457]

However, any finding that Carl Walker, Jr.'s statements prove state habeas counsel was not diligent are so mystifyingly erroneous that it cannot possibly satisfy 28 U.S.C. § 2254(d) or §2254(e).   The August 26, 2010, taped interview of Walker shows that he was first located by complete chance.   As he explains, because there was nothing to go by except for a very common

---

[452] *Id.*
[453] *See* **Exhibit 65** at 3, *Finding No. 15*.
[454] The exhibit cited in *Finding No. 15* is "exhibit 'g.'"   However, exhibit 'g' to the successor petition has nothing to do with Carl Walker, Jr.  The State, when it drafted the *Findings*, must have meant "exhibit 'c'."
[455] *See* **Exhibit 65** at 3, *Finding No. 15*.
[456] *Id.*
[457] *Id.* at 5.

last name, Prible, through his *pro bono* assistant, Ward Larkin, wrote to someone who shared the

last name "Walker":

> CW: *And I think that is how or that's why he reached out to me. I don't know if he found out about me. Well, that's what I. I mean, if I'm not mistaken, it's been a long time ago, but this is, [UI], what's happening was at one point in time, **the lawyer's office was writing the wrong Walker, it wasn't writing me. It was trying to get in contact with a Walker.***

> JGR: *Uh huh.*

> CW: *on his behalf. They thought it was me, but it happened to be a friend of mine, Selly, and that person was in here for either hijacking an 18-wheeler or something, or something with some pizzas, or, I forgot what he did. But anyway, that particular Walker knew me, and his roommate was actually a friend of mine that grew up in the same neighborhood I grew up in.*

> JGR: *Okay.*

> CW: *And he was getting letters and he knew didn't know nothing about the letters so my friend come to me and he's telling me about these letters about Jeff Prible, and da da da, and I knew what was going on so I revealed to my friend, man, I know what that is. I know, who blah, blah, blah. This is while we were still in Beaumont. And, I think I even told Herrera about that. Was it before Herrera left, I'm not sure. I get kinda confused on that time line. But anyway, I get the letters and I reach out and say, hey, this, I'm the Carl Walker I think you are looking for, you didn't blah, blah, blah, and I think Herrera's attorney even tried to reach out to me. I forget his name. Because, I think either Herrera's attorney sent me something or Jeff's attorney sent me something, showing me something about both cases. And when they showed me something like, it was like, okay, these guys and these guys all know the same thing about, you know what I mean?*

> JGR: *Right, right.*[458]

Carl Walker recalls that Larry Wayne Walker figured Larkin's letter might be intended

for Carl. The cellmate brought the letter to Carl's attention, and Carl said he tried to reach out to

Herrero's or Prible's attorney, although he was not sure of the time frame. The record, however,

and state habeas counsel's June 8-9, 2011, testimony, prove that Carl did not reach out until

years after the original application was filed on November 19, 2004.

---

[458] **Exhibit 55** at 32-33.

Prible's November 16, 2005, letters to the 351st District Court also show that at this late date, Prible still believed that "Larry Wayne Walker" was the name of the witness he needed to establish that he had been convicted by false testimony.[459]  At the June 8-9, 2011, hearing, state habeas counsel Moore explained that although Larkin did not approach him until a year after he had already filed Prible's writ, he nevertheless attempted at that point to contact Carl Walker. Moore's only duty was to litigate issues in Prible's original Article 11.071 application.  Texas law does not make provisions for the appointment of counsel on a successor application, and Moore could not seek funding for an investigator nor for expenses incurred in investigating successor issues.  Nonetheless, Moore wrote to Carl Walker once Carl surfaced, by sheer luck, in order to substantiate Prible's contention that he had been convicted by false testimony:

> Q.  Okay. But you still tried to find Carl – Carl Walker, Jr. even after you filed [Prible's original petition]; is that –
>
> A.  Yeah, I did.
>
> Q.  And how did you learn of his name?
>
> A.  There's an individual whose name is Ward, Ward Larkin.  And Larkin took an interest in Prible's case and continued to write letters to inmates in various federal prisons. And as I understand it from Larkin, quite by accident, they unearthed the identity of Carl Walker, having talked to some other people whose name was Walker, but not Carl.  And by accident the Carl Walker we were interested in was in the same unit with another Walker who had gotten one of Larkin's letters, and just by coincidence, then took that letter and contacted -- took the initiative and contacted Larkin himself, but this is long after -- a year or so after I filed the writ.
>
> Q.  A year after you filed the writ?
>
> A.  Yes, sir.
>
> Q.  And did -- but did you send a letter to Carl Walker?

---

[459] *See* **Exhibit 75.**

*A. Yes, I did. I sent two to him. One came back because I think I had the wrong PO Box for the FCI. The other I sent, he did not respond.*[460]

Moore also apparently secured assistance from the Alabama Innocence Project, but this organization did not follow through on a promise to try to interview Carl Walker.[461]

The only conceivable explanation for why the Texas courts would rely on Carl Walker's statement (which affirms the happenstance through which his existence and whereabouts were eventually discovered) to find that Prible supposedly did <u>not</u> meet Section 5(a)(1) standards is if the pre-existence of information is sufficient to show that such information was previously available for purposes of Texas' abuse of the writ statute. However, when it comes to federal default standards, pre-existence is not the touchstone. The critical factors are whether counsel took reasonable actions, successful or not, to pursue the evidence, and whether the State took steps to thwart discovery.

> **a.** **The lead prosecutor's active suppression of Carl Walker's identity prevented trial counsel and state habeas counsel from investigating him.**

Any allegation that state habeas counsel failed to act diligently to identify and interview Carl Walker is undermined by the fact that the State withheld key evidence that would have made this possible. **The three informant letters to Siegler, contained in Prible's casefile, identify Carl Walker by name and federal inmate number, but they were concealed from Prible's lawyers as attorney work product.** Had the prosecutor disclosed the three informant letters, Prible's trial counsel or state habeas counsel could have easily located Walker, rather than having to undertake a fishing expedition on BOP databases that will not allow searches using the

---

[460] *See* **Exhibit 50** at 2 RR 48.
[461] *Id.*

inmate locator program unless the full **first** name of the defendant is entered.[462]

        **b.**      **The convicting court's finding that Walker's statements were unpersuasive hearsay is neither independent nor adequate, nor otherwise legally grounded.**

In *Finding No. 16*, the convicting court adopted the State's contention that "Walker's statements, proffered in support of the applicant's instant subsequent habeas claims, consist almost entirely of hearsay and speculation and contain no direct evidence of the applicant's conspiracy theory; accordingly, such statements are unpersuasive and have little evidentiary value with respect to the validity of the applicant's habeas claims regarding any alleged conspiracy involving the lead prosecutor and federal inmates."[463]  However, the legal basis for this ruling is federal law, namely, Fifth Circuit authority.  The convicting court cited *Dowthitt v. Johnson*, 230 F.3d 742 (5th Cir. 2000), and *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997), and no other authority.  The convicting court's legal conclusion that Carl Walker's statements must be discounted as hearsay is dependent on federal law and, consequently, undeserving of deference.  To the extent that it is a comment on the merits, the legal assessment fails 28 U.S.C. § 2254(d) standards.  There is no telling just what the convicting court meant by "unpersuasive."   However, such a subjective basis for the decision is contrary to, or an unreasonable application of, the "prejudice" or "materiality" tests required by *Giglio* and *Brady*.  Neither case requires the habeas petitioner to "persuade" the reviewing court.  Under *Giglio*, "a new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"[464]  Under *Brady's* similar standard, the error need only "undermine[]

---

[462] *See* **Exhibit 76** (http://www.bop.gov/iloc2/LocateInmate.jsp), BOP Inmate Locator, stating in its instructions that "[w]hen searching by name, an inmate's first and last name are required and must be an exact match (i.e., John Doe will not find Jon Doe)").

[463] **Exhibit 65** at 3-4.

[464] *Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).

confidence in the verdict."[465]

Furthermore, the State should be estopped from contending that Walker's statements are inadmissible, or of diminished probative value, because they are hearsay. **First**, throughout the June 8-9, 2011, hearing, the State objected to, and the convicting court excluded, evidence that Prible tried to sponsor on the ground that the evidence delved into the merits. Having limited the scope of the hearing, the court should not be able to then rule on the merits, particularly when the evidence it excluded corroborates the statements it finds unpersuasive and speculative. **Second**, Prible offered to authenticate the taped conversation that contains Walker's description of the informants' ring and Beckcom's, Foreman's, and Siegler's roles in running it. However, the State interjected that this tape was already in evidence, and the convicting court agreed:

> *MR. RYTTING: Your Honor, I think that – I don't have any more witnesses.*
>
> *THE COURT: Okay. State.*
>
> *MS. HAMPTON: No witnesses, Your Honor.*
>
> *THE COURT: Okay.*
>
> *RYTTING: Except I do -- well, we may have one depending on evidentiary foundation that has to be laid for the tapes that I made of my August 26th, 2010 conversation with Walker. I would like to move that into evidence. If the State wants me to take the stand and say that I personally interviewed Walker and that's my voice, et cetera, I will be glad to do it.*
>
> *MS. HAMPTON: The truth of the matter, Judge, is we've already got -- we have a CD that's already been attached as an exhibit to the successor writ, so ...*
>
> *THE COURT: I've already taken judicial notice of it.*
>
> *MS. HAMPTON: This is a new one. This is a new conversation that happened, I guess, two weeks ago or so.*
>
> *MR. RYTTING: No, no. It's the August -- the tape is the CD that you have.*
>
> *MS. HAMPTON: So, it's already in.*

---

[465] *Kyles,* 514 U.S. at 435.

*MR. RYTTING: That's in.*

*MS. HAMPTON: He's taken judicial notice of the whole file. So, everything that is in the file is –*

*THE COURT: Yeah. It's attached to the subsequent, right?*

*MS. HAMPTON: You're wanting –*

*THE COURT: I'm trying to remember. I know it's in here somewhere, but –*

*MR. RYTTING: Yes. Yes, it is. It's in there.*

*THE COURT: Right.*[466]

*Finding No. 16's* assertion that Walker's statements in his taped interview were speculative is unreasonable. The finding does not identify what statements were speculative. Furthermore, the conclusory allegation that Walker was speculating conflicts with the court's specific determinations in *Finding No. 15*. Before declaring that Walker's statements were speculative, the convicting court determined that Walker "knew Nathan Foreman and Michael Beckcom," "was present during the planning of the alleged conspiracy" to fabricate Prible's confession, and "observed the applicant's interaction with the co-conspirators."[467] These findings show that Walker was not speculating but instead was a first-hand witness to Beckcom's and Foreman's efforts to manufacture evidence for use by the prosecutor at trial. Walker did not report what others saw, heard, and did. Walker described what he witnessed *as a participant* in the FCI Beaumont informants' ring.

Further undermining the convicting court's assertion of "speculation" is the fact that Walker's allegations are also corroborated by evidence withheld by the State until the 2011 proceedings. A critical aspect of Walker's August 26, 2010, interview is that he was initially

---

[466] *See* **Exhibit 50** at 3 RR 66-67.
[467] *See* **Exhibit 65** at 3, *Finding No. 15*.

part of the conspiracy to incriminate Prible. Walker provided an extensive and detailed explanation of how and why he was recruited by Beckcom and Foreman. Walker also stated that part of the FCI Beaumont informants' scheme was to draft letters to the prosecutor supplying some evidence and offering to inform. Walker admitted that he did not know if the letter he signed had been sent, but thought that it had. Disclosure in 2011 of inmate mail sent to the lead prosecutor before Prible's 2002 trial confirmed Walker's recollection of the letter-writing scheme. The letters themselves corroborated Walker's identification of the members of the informants' ring and his statements about its mode of operation.

Finally, when a *Brady* claim is the constitutional claim that the alleged hearsay underlies, federal law does not support the State's position. Items may still be material and favorable under *Brady* if not admissible themselves as long as they "could lead to admissible evidence" or "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise."[468] Walker's statements to Prible's federally-appointed investigator and attorney are an exception to the rule against hearsay for precisely the reasons identified in *U.S. v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).

> **3.** **Prible acted diligently in his *pro se* attempts to present evidence that the State violated his due process rights under *Brady*, *Giglio*, and *Massiah*.**

Prible made prodigious efforts to discover the facts that underlie his present federal petition. After the original application, Prible continually prodded his state habeas attorney to provide *pro bono* efforts to investigate and draft due process claims based on *Massiah, Brady,* and *Giglio*. Despite state habeas counsel's efforts, a raging conflict arose between counsel and client. The conflict was openly displayed in Prible's frequent, voluminous writings to the trial court in which he severely and adamantly criticized Moore for not doing enough to investigate

---

[468] *U.S. v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (citing, *inter alia, Spence v. Johnson*, 80 F.3d 989, 1005 n.14 (5th Cir. 1996) ("[I]nadmissible evidence may be material under Brady.")).

and present **subsequent** claims.  Prible demanded that the trial court appoint counsel who would conduct the investigation into the prosecutorial misconduct he believed lay at the heart of his wrongful conviction.  Prible also filed pleadings and letters begging the trial court to grant him discovery, subpoena power, and a hearing so that he could present Walker as a witness.[469]

The trial court refused to grant Prible's requests for discovery and subpoena power, refused to convene a hearing to explore the conflict between Moore and Prible, and refused to appoint different or additional counsel to assist Prible with the development of facts to support the due process and prosecutorial misconduct claims he alleged in his June and August 2007 pleadings.  Frustrated by representation that he thought was not sufficiently zealous, Prible sought to disqualify the trial judge based on his suspicion that the judge's refusal to replace Moore was the result of Moore's contributions to his judicial campaign.[470]

Because of the conflict with counsel, and the trial court's refusal to remedy the situation, Prible turned to Larkin, the anti-death penalty activist, to help him locate inmate "Walker." Prible also attempted to contact "Walker" through the mail.  However, the Polunsky Unit intercepted his letters, even those sent to Larkin urging him to contact a man named "Walker," on the ground that the attempts at communication violated a rule prohibiting death row prisoners from contacting other inmates.[471]  Prible, nonetheless, strove to clear this obstacle from practically the sole means he had for contacting any witnesses and obtaining any information regarding his case, *i.e.,* the monitored, highly regulated use of the U.S. Mail.  On June 20, 2006, exactly one year before he filed the first pleading that the TCCA deemed a subsequent writ, Prible filed a complaint protesting the interception of his correspondence.  In the section of the form asking him to describe the action he would like to see taken in order to resolve the issue,

---

[469] *See* **Exhibit 77**.
[470] *Id.* at 00343.
[471] *Id.* at 00293.

Prible wrote: "Mainly to not stop me from my appeal process by stopping me from corresponding with a person who [is] assisting me when I did nothing wrong as [the] letter clearly shows."[472]   On August 3, 2006, TDCJ ruled that "the issue presented is not grievable" and refused to return his correspondence.

A year before he filed his June and August 2007 applications, Prible mailed his June 20, 2006, complaint about interference with his mail, and the Polunsky Unit's response, to the convicting court, in order to illustrate how his desperate efforts to investigate his capital case were being thwarted by the prison bureaucracy.[473]   In his letter to the court, Prible pleads with Judge Ellis to understand that when he "uses the words inmate in federal prison some person in the mailroom uses this rule to stop my mail,' and that judicial intervention is therefore necessary. "So please," Prible wrote, "at the very least, let the mail room know they cannot do these things that deter a person from their appeal process without being liable to someone."[474]   He also expressly moved the convicting court as follows:

> *If you subpoena the supervisor and that letter he gonna feel like a idiot and I guarantee it will stop what some person in that mail room doing in the way of abusing it power to deter people in regards to their legal process.  This is my prayer you will grant this motion.*

However, neither the trial court nor the HCDA ever treated Prible's writings as if they were actual pleadings calling for a response and a ruling.

Prible did everything he could from death row to uncover the facts supporting his claims before the federal court.  Undersigned counsel succeeded in developing evidence because he received funding through the federal courts to hire a professional investigator to locate and interview Carl Walker.  The private investigator was also able to contact and interview Beckcom,

---

[472] *Id.* at 00292.
[473] *Id.* at 00289.
[474] *Id.* at 00290.

who was on probation but no longer represented by counsel. The private investigator was also able to conduct background checks on Foreman, and review records of cases to which he was attached.

Undersigned counsel also filed motions in this Court, under the Freedom of Information Act, after exhausting administrative steps required by Title 5 U.S.C. § 301 and *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951), in order to obtain BOP records, including phone and housing and transfer records, which document the interconnection between the lead prosecutor and the jailhouse informants she used to investigate and testify against Prible and Herrero.[475] Filing in federal court was necessary because the BOP invokes sovereign immunity to state process. Undersigned counsel was able to invoke this Court's continuing jurisdiction over Prible's stayed federal habeas proceedings.[476] In contrast, Prible, in 2007, would have had to file and litigate a separate lawsuit under the Administrative Procedure Act in order to obtain BOP records.[477]

In 2011, undersigned counsel was also able to utilize legal processes, including subpoenas and motions for discovery, in order to force the production of heretofore undisclosed documents in the State's file. This required working with the assistant district attorney and physical access to the HCDA's Office in order to review and retrieve the three informant letters to Siegler – from Carl Walker, Mark Martinez, and Jesse Gonzalez – from the State's file. And in 2016 and 2017, undersigned counsel was able to force the production of even more previously undisclosed documents from the State's file, as well as to depose key witnesses – but this was only possible because of this Court's granting of leave to conduct discovery.

---

[475] *See Prible v. Thaler,* 4:08-mc-00316 (S.D. Tex.), Dkt. 14 (filed February 18, 2011).
[476] *See id.,* at Dkt. 18.
[477] *See Touhy,* 340 U.S. at 468, as codified at 5 U.S.C. § 301.

**4.**     **The June 2011** *Findings* **do not address the supporting and corroborating evidence that Prible presented to the Texas courts in his June 6, June 22, and June 23, 2011, supplemental briefs, which confirm that the State suppressed important evidence impeaching its key witness, Michael Beckcom; impeaching its method of assembling its case; and supporting Prible's prosecutorial misconduct claims.**

      **a.**     **The State withheld inmate letters to Siegler bearing the names and identifying information of Walker, Martinez, and the Gonzalezes.**

The inmate letters that Walker referenced in his August 26, 2010, interview were not disclosed by the HCDA until February 24, 2011, in response to a motion for disclosure of exculpatory evidence and *in camera* review of the State's file.   Each of the three letters are addressed to Kelly Siegler and each are ostensibly signed by an FCI Beaumont inmate:  Mark Martinez, Felix and Jesse Gonzalez, and Carl Walker.   Their federal inmate numbers are listed next to their names.   Right before Prible's trial, his attorneys filed a *Brady* motion that would have specifically encompassed these letters.   At a pre-trial hearing on September 10, 2002, the court took up the *Brady* motion and ordered the prosecution to produce "<u>all witness statements, whether oral or written, by any witness.</u>"[478]   But the three letters were never disclosed to Prible's trial attorneys.

State habeas counsel Moore never saw the letters either.   Moore sought production of the State's trial file and thoroughly reviewed, several times, twice with his investigator, former Houston Police Department Officer John Greenfield, the material the State provided.[479]   But the three informant letters were not present in the material that the HCDA allowed Moore to review.[480]   Nor were they disclosed to federally-appointed counsel during initial federal proceedings.   Although the letters were not privileged material, the prosecutors had filed them in a sealed manila folder designated "attorney work product," thereby ensuring that they would not

---

[478] **Exhibit 70** at 16 (emphasis added).
[479] *See* **Exhibit 50** at 2 RR 37.
[480] *Id.*

be disclosed at trial or pursuant to the HCDA's open-file policy. In light of the HCDA's open-file policy in post-conviction capital cases, the concealment of the letters constitutes an active misrepresentation that this evidence did not exist.[481]

The letters signed by Walker and purportedly signed by Martinez and Jesse Gonzalez, stating that all three spoke with Siegler by telephone, on several occasions, about a *quid pro quo* for incriminating Prible, indicate that Siegler and her main informants, Beckcom and Foreman, were at the hub of joint efforts by FCI Beaumont informants to set Prible up with fabricated evidence of a confession. At the June 8-9, 2011, state habeas hearing, Prible's trial and post-conviction counsel explained the significance of these letters. Using the identifying information contained therein, counsel would have investigated and summoned Carl Walker and other witnesses. Because the letters referenced Beckcom and Foreman, Prible's trial attorneys could have undermined the integrity of the State's case by impeaching Beckcom's testimony that he and Foreman were largely passive recipients of Prible's confession with evidence that Beckcom and Foreman were part of an aggressive ring of informants intent on reducing their sentences in return for providing incriminating evidence against Prible. The letters, as defense counsel pointed out, confirmed Prible's assertion that he was set up by a ring of informants led by Beckcom and Foreman. The letters were therefore material evidence that the State suppressed to shield its key witness and the methods the State deployed to gather evidence and assemble its case.

> **b.** **BOP phone and housing records were inaccessible and Prible's attorneys had no reason to seek them.**

Prible's previous counsel had neither a reason nor an effective mechanism for obtaining the BOP records that Prible submitted for the State court's consideration in his 2011

---

[481] *See Strickler v. Greene,* 527 U.S. 263, 284 (1999).

supplemental briefing and at the June 8-9, 2011, evidentiary hearing. To corroborate Prible's allegation that the State concealed evidence of Beckcom operating as its agent, Prible sought BOP phone records for individuals that he had identified as members of the informant ring – namely, Carl Walker (BOP # 04770-0170), Jesse Moreno (BOP # 72731-079), Rafael Dominguez (BOP #79233-079), Michael Beckcom (BOP # 49349-079), Thomas Delgado (BOP # 80261-079), Eddie Gomez (BOP # 79236-079), and Nathan Foreman (BOP # 07831-078) – from April 1, 2001, until November 1, 2002.[482] Except for Foreman, the identities of these individuals were not known to trial counsel or to state habeas counsel before November 19, 2004, when Prible's original state application was filed.

Although it is generally known that phone calls from federal inmates may be recorded, the recordings are not retained for a significant time. It was not until undersigned counsel interviewed Walker in 2010 that he learned that the BOP retained a paper record of the individuals and numbers that each federal inmate called. The computerized TruFone telephone call tracking system used by the BOP to track prisoner phone calls was put in place after Prible was transferred in December of 2001 to the Harris County Jail, and from there went to death row. January 1, 2002, is the furthest back in time the TruFone records go. Prible never went back to federal prison and therefore did not use or know about the TruFone system.

Even if previous counsel had known of the TruFone system or the identities of the inmates whose records Prible eventually obtained in 2011, they could not reasonably have expected production. Undersigned counsel served FCI Beaumont with a subpoena issued from the state court. However, the BOP refused to comply, claiming that it enjoyed sovereign

---

[482] **Exhibits 56** (BOP TruFone records for Beckcom) and **78** (BOP TruFone records for Dominguez). The HCDA sought the same records. The BOP responded to the HCDA's request without requiring the HCDA to litigate under the Administrative Procedure Act. The HCDA received a more complete set of records. Hence, the production to the HCDA is used as an exhibit here.

immunity and would respond only to an order from a court "of competent jurisdiction" (*i.e.,* a federal district court).[483] The BOP also took the position that third-party information was protected under the Privacy Act as another reason for not disclosing anyone's records except Prible's.[484] In order to secure production of BOP records, Prible was forced to file a motion in the miscellaneous proceedings ancillary to his abated federal habeas cause of action, which was then contested by the Texas Attorney General's office.[485] Only after the federal district court ordered them to do so did BOP disclose the phone records of the informants being utilized by Siegler. These phone records included a list of names of people with whom the prisoners intended to communicate, as well as TruFone logs listing the date, time, and numbers called by the inmates.

BOP housing records obtained by Prible in 2011 were just as inaccessible. Like the phone records of third parties, trial and state habeas counsel would have had to file a federal lawsuit under the Administrative Procedure Act to obtain them. They would also have had to seek funding for filing fees in order to litigate the matter. The June 8-9, 2011, hearing demonstrates that even if Prible's attorneys had an idea that the BOP records would be valuable, the trial court would not have agreed with their assessment nor authorized funding for a federal lawsuit. Prible attempted to introduce the BOP records into evidence at the June 8-9, 2011, hearing. He also submitted briefing explaining the BOP records' significance. However, the trial court sustained the State's objections that the BOP records were irrelevant. The BOP records had even less relevance to Prible's previous attorneys, who did not have the benefit before November 19, 2004, of information (such as Walker's August 2010 statement or the three

---

[483] *See* **Exhibit 79**, which is also attached as Exh. 'E' to Prible's June 6, 2011, supplement filed in state court.
[484] *Id.*
[485] *See Prible v. Thaler,* 4:08-mc-00316 (S.D. Tex), Dkt. [14].

inmate letters to Siegler) identifying informants in FCI Beaumont and establishing their connections to the lead prosecutor.

> ### c. The State withheld the identities of, and information possessed by, Walker, Martinez, Delgado, and other inmates about the operation of the informants' ring, and state habeas counsel had no reason to suspect the existence or importance of this information.

Mark Martinez was identified as a potential witness in the wake of the motion for *in camera* review of the State's file that resulted in the production of the three previously-undisclosed inmate letters to Siegler. By the time the State produced the letters, Martinez had been transferred to a high security federal facility in Colorado. Prible's federally-appointed investigator attempted to contact Martinez after the inmate letters came to light, but Martinez would not communicate.[486] Prible's investigator sent Martinez's FCI counselor a copy of the three letters, and she agreed to show them to Martinez to see if he recognized them, particularly the one bearing his name and inmate number.[487] On June 23, 2011, the FCI counselor reported that Martinez recognized the letters but denied signing the one bearing his signature.[488] The counselor told Prible's investigator that she had compared known exemplars of Martinez's signature to the signature on the letter and was certain that Martinez had not signed it.[489] She also reported that Martinez told her that "some dudes" were pressuring others to sign the letters sent to the lead prosecutor.[490]

By suppressing the inmate letters to Siegler, the State prevented Prible's previous counsel from discovering Martinez and developing evidence of how the ring of informants operating at FCI Beaumont was manufacturing evidence against him in order to procure favors from the

---

[486] *See* **Exhibit 80** (statement of investigator J.J. Gradoni).
[487] *Id.*
[488] *Id.*
[489] *Id.*
[490] *Id.*

prosecutor.  Under *Murray v. Carrier* standards, Prible can therefore show cause for why he was unable to present evidence related to Martinez at trial or in his pre-2010 state habeas proceedings.

> **d.    The State withheld letters from Siegler seeking Rule 35 sentence reductions for Foreman, Moreno, Dominguez, and Gomez which, along with recently disclosed BOP records, indicate that the State was rewarding Foreman and other members of the informants ring for false testimony.**

After discovering the correspondence from Walker, Martinez, and the Gonzalezes in Prible's file, undersigned counsel sought discovery of the HCDA file in *Herrero v. State* in the belief that similar correspondence from FCI inmates might have been suppressed in that case. The *Herrero* file did not contain the same sorts of letters from inmates, but it did contain the Rule 35 letters from Siegler on behalf of the informants that she had employed to gather evidence and testify against Herrero.[491]

On May 26, 2011, the HCDA provided, from its Herrero file, the July 3, 2001, taped interview between Siegler and Moreno.  The tape shows that Moreno, who was the State's key witness against Herrero, fabricated the confession used against Herrero.  Moreno states on tape that Herrero confessed to him and Nathan Foreman in November or December of 1999.[492] Moreno specifically described Foreman and named other inmates who were supposedly present in November or December 1999 for the alleged confession, including Rafael Dominguez.[493] However, the State eventually found out that Foreman was not even at FCI Beaumont at the time Moreno said Herrero confessed.  The lead prosecutor knew that Moreno and Dominguez had entirely fabricated the substance of Herrero's "confession."  Indeed, the State was involved in the fabrication, as follows.

---

[491] *See* **Exhibits 43-46.**
[492] *See* **Exhibit 11** at 13.
[493] *Id.*

In opening and closing arguments at Herrero's trial, Siegler told the jury that BOP was compelled to place Moreno and Dominguez in protective custody, and to transfer Moreno from FCI Beaumont, because Herrero was a leader of a prison outfit called the "All Houston" gang or group and had ordered a hit on Moreno and Dominguez.[494]  Siegler also told the jury that these two witnesses had contacted her to testify against Herrero in order to save themselves from Herrero's violent reach.[495]  Siegler then solicited testimony supporting her jury arguments from Moreno and Dominguez.  However, BOP's files on Moreno and Dominguez, which Siegler would have accessed or inquired into, show that Moreno was placed in the SHU and transferred from FCI Beaumont **not** because of threats from Herrero, but because he had gotten into a physical confrontation with another inmate over drugs on July 25, 2000.[496]  Moreno told investigators, when he was interviewed on July 25, 2000, that members of the Texas Syndicate gang in FCI Beaumont had gotten hold of transcripts of his testimony against another inmate named Frankie V___ in a murder case, and were using the transcript to blackmail Moreno into smuggling drugs into FCI Beaumont.[497]  According to Moreno's BOP files, members of the Texas Syndicate, not Herrero, had placed a hit on Moreno.  That is why Moreno said he could not make it at the unit, and that is why Moreno was placed in the SHU on July 26, 2000, the day after he was interviewed.  It is also one reason why Moreno was placed back into protective custody and eventually transferred out of FCI Beaumont to Liberty County.  The other reason was because Moreno was assisting with BOP's investigation of drug smuggling into FCI Beaumont.[498]

---

[494] *See* **Exhibit 81** (table comparing Siegler's opening and closing remarks in *State v. Herrero* to BOP Memoranda, with excerpts of opening and closing arguments attached).
[495] *Id.*
[496] *See* **Exhibit 82**.
[497] *Id.*
[498] *Id.*

Moreno's protected status had nothing to do with Herrero. A BOP "CIM Clearance and Separatee Data" sheet for Moreno dated July 27, 2001 – **three weeks after the lead prosecutor interviewed Moreno on July 3, 2001** – shows that Moreno was being separated from 12 inmates, none of whom were Hermilo Herrero.[499]

Forensic evidence also demonstrates that the lead prosecutor sponsored thoroughly false testimony against Herrero and then tried to bolster it. The recently obtained affidavit of Dr. Tommy Brown, who performed the autopsy on Herrero but did not testify at trial, shows that Moreno and Dominguez made up the entire story. Moreno and Dominguez testified Herrero told them that he began choking Guajardo, who was supposedly in the passenger seat of a van, and then reached into his pocket, took out a knife, and slit Guajardo's throat. Moreno and Dominguez testified further that Herrero said he dragged Guajardo to the back of the van, laid him out on the van's floor, discovered Guajardo was still breathing, and then beat him to death on the head with a hammer before wrapping him in a rug and discarding his body by a dumpster. All of this testimony was obviously false, for the reasons stated in Dr. Brown's affidavit.[500]

Siegler had to have known that Moreno and Dominguez were lying in Herrero's case, and by the same token, she knew well before Prible's trial that Foreman was closely involved in the wholesale fabrication of evidence against him. In fact, she confirmed at her October 2017 deposition that she "didn't believe a word [Foreman] had to say."[501] Yet she failed to disclose this to Prible. The letter that Siegler sent to AUSA Tracy Batson right after Herrero's conviction, seeking a Rule 35 sentence reduction for Foreman even though he did not testify in Herrero's case, itself provides substantial evidence that Siegler knew Foreman was fabricating confessions. In the letter, the lead prosecutor commends Foreman for cooperating, and states

---

[499] *See* **Exhibit 83**.
[500] *See* **Exhibit 84**.
[501] *See* **Exhibit 4-A** at 107.

"she chose not to use him as a witness because his knowledge was repetitious of another witness who did testify."[502] The letter to Batson indicates that Siegler interviewed Foreman and compared his account with Moreno's and Dominguez's. Siegler was therefore on notice that Foreman had prepared to tell the same fabricated story.[503] Nevertheless, Siegler tried to reward Foreman by using her influence and reputation to secure a Rule 35 reduction of his sentence.

In order to secure Rule 35 rewards for Foreman, Siegler stated that the AUSA should also take into account that Herrero "made threats against Foreman's life" that had "escalated to the point where it was necessary to put Foreman in administrative segregation while he was imprisoned in Beaumont and the Harris County Jail."[504] However, BOP documents indicate that Siegler was the sole source of evidence for these so-called threats, and that Foreman had **not** asked for protection from Herrero. Nor had Dominguez or Gomez, on whose behalf Siegler made the same representations to their respective AUSAs.[505] The fact that misrepresentations were made to AUSAs to help get sentence reductions for informants who were fabricating evidence was not disclosed to Prible. This evidence was certainly material under *Brady,* since it thoroughly impeached the State's method of assembling and investigating cold cases, including Prible's, using the ring of FCI Beaumont informants revolving around Foreman.

> e. **Highly confidential BOP memoranda that were not disclosed until 2014 were clearly unavailable to trial counsel and state habeas counsel, and therefore cause for not discovering this evidence is clearly established.**

In 2014, through *Touhy* litigation, Prible obtained BOP memoranda related to Beckcom and other FCI Beaumont informants that Siegler utilized to obtain convictions against Prible and

---

[502] *See* **Exhibit 44**.
[503] If Foreman's account of the alleged confession was materially different, then she would have had to disclose this under *Brady*.
[504] *See* **Exhibit 44**.
[505] *See* **Exhibits 45-46**.

Herrero.  Prible's trial counsel had no reason to suspect that this information existed.  Neither did

Prible's state habeas counsel.  The memoranda are labelled "FOIA exempt."  State courts could

not issue process that would have compelled the BOP to disclose the information even if trial

counsel or state habeas counsel were to have suspected its existence, and federal habeas counsel

had to take extraordinary measures, such as initiating *Touhy* litigation and securing a protective

order issued by this Court (Dkt. [79]), to obtain the information.

> ### i. Confidential BOP Memoranda impeach Beckcom's testimony that Prible was his sole source of information about the crime against Steve Herrera and Nilda Tirado.

On cross-examination at trial, Beckcom testified that when Prible was transferred to FCI

Medium "from the Low," Beckcom learned from unidentified sources that Prible was "charged

with killing a bunch of people."[506]  Beckcom said he later learned that members of one or more

white supremacist organizations had asked Prible if he had "killed those kids," and Beckcom

opined that Prible had denied having anything to do with their deaths in order to avoid jailhouse

retribution.[507]  Beckcom denied that he had heard anyone else talking about the crime, and

insisted that Prible was his only source of facts about Steve and Nilda's murder, as follows:

> *Q.  Had you seen anything about this case on T.V. before you gave that statement?*
>
> *A.  No.*
>
> *Q.  Read any newspaper articles about it?*
>
> *A.  No, the only article I saw was last week.*
>
> *Q.  Heard people talking about it?*
>
> *A.  No.*
>
> *Q.  You didn't know -- Prible came up to talk about this case –*

---

[506] 26 RR 85.
[507] 26 RR 86.

*A. Yeah.*

*Q.  -- throughout your conversations with him, nobody talked to you about the case, you didn't know anything about it, it was just everything -- all the knowledge you acquired, you acquired from Jeff Prible?*

*A.  Yes. Like I said, when he came from the Low I had heard there was a guy that had been charged with killing a bunch of people.  That it was just loose talk. I didn't know any facts.[508]*

However, Beckcom knew that several other inmates were vying to testify against Prible, and he was aware of the testimony that these inmates would give.  He admitted this at his deposition.[509]  According to BOP memoranda, BOP officials interviewed Beckcom regarding his role in Prible's upcoming trial because of threats against Beckcom's life from white supremacist groups.[510]  BOP officials also interviewed Felix Gonzalez, Jesse Gonzalez, and Mark Martinez, all of whom were under the impression that they would be called to testify against Prible.[511]  Beckcom told BOP officials that he would be the prosecution's star witness.[512]  In a follow-up interview on September 13, 2002, Beckcom told BOP officials that the two Gonzalezes, Martinez, and Foreman were on a list of State's witnesses that he had seen, but he maintained that only he, Michael Beckcom, had "enough credible information to testify."[513]  Beckcom therefore had to have discussed the Prible case with these potential witnesses and compared what they had planned to testify to at Prible's trial.

The State therefore knew that Beckcom had other sources of information about the murders, but suppressed this evidence and misled the jury.[514]

---

[508] 26 RR 85-86.
[509] *See* **Exhibit 29** at 131-32, 140.
[510] *See* **Exhibit 85** (September 15, 2002, BOP memorandum).
[511] *See id.*
[512] *See id.*
[513] *See id.*
[514] *See* Siegler's closing argument, 28 RR 75.

ii.    **Confidential BOP documents indicate that the State was aware that Beckcom lied about Foreman's and therefore Beckcom's own "credible evidence" used to incriminate Prible.**

Beckcom testified at trial that Foreman was privy to all of the information Beckcom had that incriminated Prible.  Beckcom testified that Prible came to trust and confide in *Foreman* to the same extent that he trusted and confided in Beckcom.  Beckcom did not report a single communication between himself and Prible that did not also involve Foreman, and to this day insists that Foreman was present at all times when Prible supposedly "confessed."[515]  However, when BOP investigators asked Beckcom what his role in Prible's case was going to be, Beckcom stated that he alone was the State's "star witness."[516]  He also told BOP that Foreman would not be testifying because Foreman, like Martinez and the Gonzalezes, did not have enough credible evidence.[517]

Foreman certainly did not have worse general problems with credibility than Beckcom.  Beckcom's criminal record and history of perjury were just as bad as Foreman's, if not worse.  The explanation, therefore, for Beckcom's appraisal of Foreman is that Foreman could not keep the story the two were fabricating against Prible straight, and would be subject to impeachment that would, at the same time, undermine Beckcom's own testimony, since the two supposedly received exactly the same information from Prible.

Records from the HCDA's files indicate that the State was aware of this problem with its case.  A November 26, 2001, fax from investigator Johnny Bonds to FCI Beaumont shows that as soon as Beckcom or Foreman notified the State that they had arranged the staged photograph with Prible's mother and their respective parents and had gotten the story the State recruited them to come up with, Siegler and Bonds contacted BOP to set up the December 10, 2001, back-

---

[515] *See* **Exhibit 29** at 160; *see also id.* at 138 (testifying that Foreman's affidavit is totally false).
[516] *See* **Exhibit 85.**
[517] *See id.*

to-back interviews.[518]  Siegler and Bonds interviewed Foreman ahead of interviewing Beckcom. Siegler and Bonds evidently again determined, as they had back in August 2001, that Foreman was still going to be a liability and not a credible second witness that could back up Beckcom's story.  And Beckcom must have relayed the State's assessment of Foreman to BOP.[519]

The fact that Siegler and Bonds knew that Foreman was a liar, and nevertheless continued to communicate with him and eventually used him as a non-testifying corroborating witness to Beckcom's "confession" story, impeaches Beckcom's testimony that Foreman had the same close relationship with Prible and was privy to all of the same information as he was.  But the State suppressed this highly material information impeaching Beckcom from Prible's trial and state habeas counsel.  This Court should therefore consider the information in making a determination on cause and prejudice under *Carrier,* and also on whether the State violated due process guaranteed by *Brady*.

> ### iii. BOP documents indicate the lead prosecutor had a system for contacting and managing informants, which if disclosed would have discredited the manner in which the State investigated and assembled its case.

BOP documents, BOP phone records, and suppressed evidence in the State's files confirm that Siegler maintained undisclosed backchannels of communication with the informants and informant families in Prible's and Herrero's cases.  In Prible's case, BOP documents show that Siegler was contacted by the Gonzalezes' family.[520]  Siegler's notes show that Foreman's wife had contacted Siegler on his behalf.[521]  Beckcom's phone records show that Beckcom called Foreman's mother, Lillian Thorn, numerous times after Foreman was transferred from FCI

---

[518] *See* **Exhibit 28.**
[519] *See* **Exhibit 85.**
[520] *See* **Exhibit 85.**
[521] *See* **Exhibit 19.**

Beaumont, raising a substantial question of whether Beckcom was communicating with the State through Thorn during the lead-up to Prible's trial.[522]

In Herrero's case, letters in the State's file show that Moreno's mother wrote to Siegler to promote her son's efforts to get a sentence reduction in return for State favors.[523]  Siegler also cultivated and preserved lines of communications with her informants post-conviction, a fact that is illustrated by an incident that occurred during the state habeas proceedings for Hermilo Herrero.  Herrero's investigator, Rudy Vargas, knocked on Jesse Moreno's door hoping to interview him about Herrero's case.  Moreno's wife answered and told Vargas that Moreno was not home but that she would give him the message.  Evidently, Moreno's wife immediately called Siegler, because Siegler then called Vargas and told him:

> *KELLY SIEGLER:  . . . [I]f I hear one more time that you or [Herrero's writ attorney] or anybody else said that I fabricated evidence or suborned perjury I'm going to report you to the Board of Private Investigators, if you are a certified investigator, I'll file a slander suit on both of you.  Because it is not true.  Nothing inappropriate happened in that trial.  You're slandering my reputation and I'm not going to stand for it.  You understand that?*

> *RUDY VARGAS:  Well, what makes you think that I said that?*

> *KS:  Because I was told you said that. . . . The person who gave me your phone number.  How did you think I got your phone number?[524]*

Rather than informing Mrs. Moreno that Vargas was just doing his job, Siegler reacted by calling Vargas to threaten litigation and thereby discourage his investigation.

The BOP documents also confirm that the BOP and Siegler communicated with each other about the activities of the jailhouse informants who were vying to testify against Prible on a *quid pro quo* basis.  BOP employee Gordon Harpe, who worked at FCI Beaumont as a unit manager, says that Beckcom approached him and asked for his help in contacting Siegler so he

---

[522] **Exhibit 56;** *see also* **Exhibit 29** at 36-37.
[523] *See* **Exhibit 10.**
[524] *See* **Exhibit 86** (transcript of phone recording of call from Siegler to Vargas).

could pass along information he had concerning the Herrera/Tirado murders, and Harpe obliged.[525]  Siegler and BOP investigators even discussed the merits of the testimony that the various informants proposed to give against Prible and Herrero, and discussed the custodial status of the informants and defendants.  The close communications and the responsiveness of the BOP to the lead prosecutor's assessment of the danger within FCI Beaumont to her witnesses indicate that the lead prosecutor had some influence over the movement of informants in the federal system.  However, none of this information impeaching the State's methods of investigating and assembling its case was disclosed to trial counsel or state habeas counsel.  This Court should therefore first find that Prible has established cause and prejudice under *Carrier* and then proceed to consider the *Brady* and *Giglio* violations that are supported by this evidence.

> **5.      Evidence of the State's involvement in the conspiracy was admissible in Prible's case, but the State suppressed the evidence.**

"It is well established that a defendant may use similar 'other crimes' evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt of the crime charged against him."[526]  "Recasting this standard in terms of the Federal Rules of Evidence," the Third Circuit "conclude[d] that a defendant may introduce 'reverse 404(b)' evidence so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations."[527]  The Texas Rules of Evidence in relevant part are identical to the Federal Rules.[528]

---

[525] *See* **Exhibit 73.**  Harpe could not remember the name of the inmate or the names of the murder victims involved.  But Beckcom confirmed at his deposition that he was the inmate who reached out to Harpe about Prible's case.  *See* **Exhibit 29** at 22-23.

[526] *See U.S. v. Stevens,* 935 F.2d 1380, 1404 (3rd Cir. 1991) (quoting *State v. Williams,* 518 A.2d 234, 238 (1986)).

[527] *Id.* at 1404-05.

[528] *See* Tex. R. Evid. 401, 403, and 404(b).

Prible could also invoke due process rights to sponsor a defense in order to compel admission of evidence over any objections based on rules of evidence.[529]   In *Chambers v. Mississippi,*[530] state court evidentiary rules prohibited hearsay testimony that a third person had confessed to the murder of a police office for which Mississippi was trying to convict Leon Chambers.  The U.S. Supreme Court held that a state may not enforce its rules of evidence, such as rules excluding hearsay, in a fashion that disallows a criminal defendant from presenting reliable exculpatory evidence and thus denies the defendant a fair trial.  At Chambers' jury trial, the defense called Gable McDonald as a witness and put his confession into evidence.  On cross-examination, the prosecution presented evidence that McDonald had withdrawn and disavowed the confession.  The defense then asked for permission to examine McDonald as an adverse witness.  The trial court denied permission, basing its ruling upon Mississippi's common-law "voucher" rule, which prohibits the party that called a witness to the stand from impeaching his own witness.  The defense then sought to present testimony from three other witnesses, all of whom would have testified that McDonald told them soon after the shooting that he, not Chambers, had shot the police officer.  The trial judge found that this testimony would constitute inadmissible hearsay and excluded it.  The Supreme Court concluded that Chambers had been unconstitutionally deprived of a fair trial.  Likewise, here, the exclusion by the trial court of evidence tending to prove that Siegler was prosecuting cold cases using a ring of snitches with whom she had cultivated ties inside and outside the legal system, and who she knew had manufactured false confessions, would have deprived Prible of a fair trial, just as surely as the suppression of this evidence did render his trial unconstitutionally unfair.

---

[529] *See Chambers v. Mississippi*, 410 U.S. 284 (1973).
[530] *Id.*

## B.    PREJUDICE.

The showing that a constitutional error was "material" as that term is defined in *Brady* and its progeny is ordinarily all that is needed to cure a procedural default.[531]   Generally, this requires a habeas petitioner to demonstrate "that 'there is a reasonable probability' that the result of the trial would have been different" absent the error.[532]   The question is not whether the petitioner would more likely have received a different verdict had the error not occurred, but whether he received a fair trial, understood as a trial worthy of confidence.[533]   Because of the overlap in standards between prejudice under *Carrier,* and materiality under *Brady* and *Giglio*, prejudice is demonstrated below through proof that the constitutional errors raised by Prible "portend such an effect on a trial's outcome as to destroy confidence in its result."[534]

## IX.
## GATEWAY INNOCENCE EXCEPTION TO DEFAULT

This Court may reach each of Prible's constitutional claims through *Schlup's* innocence "gateway," which also provides a passage, via *McQuiggins v. Perkins,* 133 S.Ct. 1924 (2013), through AEDPA's time limitation barrier.

## A.    STANDARDS

In *Schlup v. Delo,* 513 U.S. 298 (1995), the Supreme Court recognized that otherwise procedurally-defaulted claims may be cognizable upon showing that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."[535]   This formulation "ensures that petitioner's case is truly 'extraordinary,'

---

[531] *See Strickler v. Greene*, 527 U.S. 263, 289 (1999).
[532] *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).
[533] *See Kyles*, 514 U.S. at 434.
[534] *See id.* at 439.
[535] *See also House v. Bell*, 547 U.S. 518 (2006) (citing *Schlup,* 513 U.S. at 327).

while still providing petitioner a meaningful avenue by which to avoid a manifest injustice."[536] A petition supported by a convincing *Schlup* gateway showing "raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error"; hence, "a review of the merits of the constitutional claims" is justified.[537]

In determining whether a petitioner has passed through *Schlup's* gateway, the court may consider "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."[538] However, the habeas court's analysis is not limited to such evidence. *Schlup* makes plain that the habeas court must consider "all the evidence," old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial."[539] Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do."[540]

While "the court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors,"[541] the gateway actual-innocence standard is not equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), which governs claims of insufficient evidence.[542] When confronted with a challenge based on trial evidence, courts presume that the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict. Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the

---

[536] *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).
[537] *Id.* (quoting *Schlup*, 513 U.S. at 317).
[538] *Id.* at 324.
[539] *See id.* at 327-28 (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U. Chi. L. Rev. 142, 160 (1970)).
[540] 513 U.S. at 329.
[541] *Id.*
[542] *House,* 547 U.S. at 519.

federal court to assess how reasonable jurors would react to the overall, newly-supplemented record.[543]  If new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial."[544]

## B.  ARGUMENT

The arguments and evidence set forth (and incorporated by reference) above, and in Claims #1-5, 8, 11, and 14-15 below, are incorporated by reference as if fully set forth herein.

No reasonable juror would have convicted Prible if he had been able to exclude Beckcom's testimony based on *Massiah* using evidence that the State had conspired to violate his Sixth Amendment rights.  Evidence suppressed by the State independently establishes that the State had targeted Prible with two agents, Beckcom and Foreman, to extract information from Prible.  That same evidence exonerates Prible by demonstrating that the Government relied on witnesses who were fabricating confessions, including Prible's, in order to secure favors from the State.  No reasonable jury would have convicted Prible if competent trial counsel had been able to present this evidence at trial.

The evidence supporting innocence, furthermore, consists of a first-hand account of members of the informants' ring who witnessed the interactions between the State's key witness and Prible.  Hence, it is the type of reliable evidence that *Schlup* speaks to.  Furthermore, the insider accounts are supported by deposition testimony and substantial documentary evidence, including Government records (BOP phone, housing, and transfer records) and documents created by the prosecution (work product notes and sentence reduction letters written on behalf of FCI Beaumont informants), all of which corroborate Carl Walker's taped statements and

---

[543] *See id.*
[544] *Id.; see also ibid.* (noting that "[i]n such a case, the habeas court may have to make some credibility assessments").

constitute independent evidence showing Prible is an innocent victim of false jailhouse testimony.

### 1. The sources of Prible's evidence of innocence satisfy *Schlup's* qualitative criteria for evidence that directly exculpates a defendant by falsifying, not just impeaching, the pillars of the State's case for conviction.

In *Calderon v. Thompson,* Thomas Thompson was convicted of rape and murder. He challenged his death sentence by attacking the felony rape conviction. He moved to reopen judgment based on evidence that he maintained disproved the rape conviction. This evidence "[fell] into two categories," as follows:

> Thompson presented additional evidence to impeach the credibility of Fink and Del Frate, the jailhouse informants who testified Thompson confessed the rape and murder to them. In the case of Fink, Thompson presented additional evidence of Fink's history as an informant and of law enforcement favors for Fink. Thompson also presented statements by law enforcement officials to the effect that Fink was an unreliable witness. In the case of Del Frate, Thompson presented evidence that law enforcement officials and certain members of Del Frate's family regarded Del Frate as dishonest, that Del Frate shared a jail cell with David Leitch prior to meeting Thompson, that Del Frate's statements to police tracked newspaper accounts of the crime, and that Del Frate neglected to mention at trial his prior convictions for grand theft and distribution of hallucinogens without a license.[545]

The Supreme Court ruled that "this impeachment evidence provides no basis for finding a miscarriage of justice," because "the evidence is a step removed from evidence pertaining to the crime itself," and because "it tends only to impeach the credibility of Fink and Del Frate."[546] The Supreme Court therefore implied that testimony that is not a step removed from the crime, and which demonstrates that the facts alleged by the informant are false, not just that the informant is unreliable, could satisfy *Schlup.* Indeed, the Court described circumstances in which this type of evidence, although removed from the crime and tending only to impeach, may

---

[545] *Id.* at 562-63.
[546] *Id.* at 563.

nonetheless demonstrate a miscarriage of justice. To find that the matters in all probability would have altered the outcome of Thompson's trial, the Supreme Court said:

> [W]e should have to assume, first that there was little evidence of rape apart from the informants' testimony, and second, that the jury accepted the informants' testimony without reservation. The former assumption is belied by the evidence recited above. The latter one is belied by the substantial impeachment evidence Thompson's attorney did introduce.[547]

The evidence that Prible advances in order to demonstrate a miscarriage of justice is many times stronger than Thompson's, and the case against Prible that the State presented at trial is many times weaker than the State's case against Thompson. Furthermore, the evidence that undermines the crucial testimony of Beckcom, although not an alternative eyewitness account of a crime, is exactly on par with Beckcom's – Foreman and Walker were no more removed than the pillar of the State's case was. Moreover, Foreman's affidavit not only impeaches Beckcom's credibility, it contradicts the events central to conviction that Beckcom claimed to have heard and seen, namely, Prible's conduct and statements supposedly admitting culpability for Tirado and Herrera's deaths. Finally, the evidence of innocence includes a scientific opinion and studies that refute the State's expert's (William Watson's) opinion.

In *Thompson,* the defendant challenged his rape conviction with evidence that pales in comparison to the evidence Prible advances to show his innocence. Besides attacking Fink's and Del Frate's reputation for truthfulness, Thompson introduced evidence of Fink's history as an informant, of Del Frate's prior convictions, of Del Frate's testimony tracking newspaper accounts, and of Del Frate's history as a cellmate of Thompson's co-defendant. Prible's evidence also undermined Beckcom's reputation for veracity, emphasized his history as an informant, showed that his testimony tracked information in newspaper accounts and probable cause affidavits, and established that he was a cellmate of an informant who supplied the lead

---

[547] *Id.*

prosecutor with snitches in other cases, but Prible's evidence goes far beyond facts comparable to the ones in *Thompson.*

Unlike Thompson's evidence which impeached Fink's and Del Frate's characters and histories, Prible's evidence demonstrates that Beckcom fabricated the "confession" that he testified Prible gave. Foreman, according to Beckcom's pretrial statements and his testimony at trial, was a witness to each and every event on which Beckcom based his statement and trial testimony. Beckcom's testimony was based, he said, on a series of encounters with Prible. Foreman, according to Beckcom, was present during each meeting Beckcom and Prible had. Prible, according to Beckcom's own testimony, considered Foreman to be a confidant with the very same standing, in this regard, as Beckcom.

Prible, by Beckcom's own account, had the same reason to be forthcoming to Foreman, and no reason to be any less. According to Beckcom, Prible formed a bond with him and Foreman, not just Beckcom alone. The bond Prible felt between the three of them, according to Beckcom, was what led Prible to supposedly confess.

Furthermore, it is clear from Beckcom's testimony that Foreman was not a disinterested, let alone distracted, bystander who could have missed or ignored something as dramatic as the confession Beckcom maintained Prible gave the two of them. Beckcom's testimony, instead, has Foreman initiating and participating in the conversations with Prible on which Beckcom supposedly based his pretrial statement and his testimony at trial. Foreman, in fact, facilitated Beckcom's efforts to become a witness against Prible. Foreman provided Beckcom the prosecutor's contact information, and facilitated the photo opportunity with Beckcom's, Foreman's, and Prible's family that the prosecutor used to support Beckcom's claim to have formed a close, confidential relationship with Prible. Documents disclosed in discovery ordered

by this Court show that Foreman's interest in obtaining information from Prible preceded his contact with Beckcom and persisted throughout the time Prible was present in the FCI Medium.

Foreman's sworn testimony, however, is that Prible did not confess, as Beckcom testified. According to Foreman, Prible did not confess at all. Foreman's sworn account of Prible's verbal conduct and behavior, moreover, is far more than a blanket or conclusory denial. Instead, Foreman confirmed that he and Beckcom met with Prible, and that he (Foreman) was interested in providing testimony in return for the prosecutor's efforts to help him secure a reduction of his federal sentence. Foreman, though, gave a different account of how Prible behaved and what Prible said, which exonerates Prible. According to Foreman, Prible resisted every effort to get him to incriminate himself. Rather than displaying animosity and resentment toward the victims for supposedly taking his money, Foreman stated, under oath, that Prible was distraught over his friends', Steve Herrera and Nilda Tirado's, deaths, and spoke fondly of the couple.

Foreman's account of the day and moments that form the critical basis for Beckcom incriminating Prible completely exonerate Prible. Beckcom testified that on November 24, 2001, after the staged multi-family photograph Foreman helped arrange, Prible met Foreman and him on the FCI Beaumant yard, took them aside, expressed the camaraderie he felt for both of them, and said he was entrusting the two with information on which his life might depend. According to Beckcom, Prible then confessed to shooting Tirado and Herrera and setting their house, with chidren asleep inside, on fire. Beckcom testified further that Prible was in an impassioned state, nearly spitting, his tone furious, as he gave an expletive-laden account of the crime and reasons for committing it – because, according to Beckcom, Prible believed that Herrera had stolen a quarter million dollars that Prible considered his own. Although present with Beckcom on

November 24, 2001, during the entire period on which Beckcom based his testimony, Foreman swears none of what Beckcom described took place that day.[548]  Foreman confirms that Prible was with him and Beckcom on the yard, but Foreman says that Prible was so inebriated on contraband wine that he was unable to walk back to his cell.  Foreman had to assist him.  Prible not only did not confess, he was not in a condition to make a coherent statement.

Foreman's account of Prible's behavior and speech, moreover, is corroborated by other witnesses.  Two other FCI Beaumont inmates who had hoped for a *quid pro quo* for testimony against Prible support Foreman's assertion that Prible never confessed.  Not only that, they independently described attempts to get Prible inebriated so that he would confess.  According to Carl Walker, Prible steadfastly maintained he did not kill Tirado or Herrera despite dogged efforts by numerous inmates to extract incriminating information from him.  Walker's statement, as well as that of Oscar Gonzalez, confirm that Beckcom and Foreman had a preconceived plan to incriminate Prible.[549]  Walker and Gonzalez described the steps in the operation that Beckcom and Foreman carried out in order to set Prible up; this included the use of alcohol and marijuana, and efforts to befriend Prible and induce him to talk about his case.[550]  Walker and Gonzalez also both state that Prible never confessed to the murders during the drinking and dope-smoking sessions that had been designed to loosen him up.[551]  Finally, Walker in particular details how Beckcom and Foreman led a ring of informants working to incriminate Prible and Herrero in exchange for *quid pro quo* benefits from Siegler.

Beckcom not only stands thoroughly refuted by Foreman, the very witness he says was privy to the same conduct and speeches that he was, Beckcom has admitted that a critical part of

---

[548] **Exhibit 87.**
[549] **Exhibit 55** at 13-14; **Exhibit 88.**
[550] *Id.* at 38, 39.
[551] **Exhibit 55** at 15; **Exhibit 88.**

his testimony about those events and statements was perjured. Beckcom testified that Prible did not confess immediately. Instead, he, Prible, and Foreman engaged in natural or normal conversations, bantering during their first encounters about Prible's asphalt business. Beckcom testified that he and Foreman discussed going into business with Prible after finishing their federal sentences. Beckcom said at trial that Foreman seriously considered this opportunity. However, at Beckcom's 2017 deposition, Beckcom admitted that all the conversation about Prible's business was "a pretense" to get Prible to eventually talk about the murders:

> Q. Okay, so you and Nathan Foreman were going to go into this asphalt business with Mr. Prible? That was your belief, correct?
>
> A. That was the pretense.
>
> Q. Okay, it was a pretense for what?
>
> A. Information.
>
> Q. Okay, a pretense to get Mr. Prible to come forth with information about his case, correct?
>
> A. Correct.[552]

Neither had any experience in the asphalt business. From the start the two of them were interested in one thing: incriminating Prible in hopes of reducing their sentence via Rule 35.

In addition to discrediting and disproving Beckcom's testimony that Prible confessed, Prible provides scientific proof, in the form of a declaration by Dr. Elizabeth Johnson, a forensic scientist and the former director of the DNA laboratory within the Harris County Medical Examiners Office, discrediting and disproving Watson's forensic testimony about the PMI between oral sex and Nilda's death, which placed Prible at the murder scene at the time of death.[553] Thompson, in contrast, did not contest the fact that he was at the murder scene.

---

[552] **Exhibit 29** at 138.
[553] **Exhibit 114.**

Indeed, Thompson testified, implausibly, that he woke up next to the dead victim, having slept through the knife attack that killed her. The forensic scientific evidence that Prible advances, on the other hand, discredits the forensic evidence placing Prible at the murder scene, and reestablishes the validity and credibility of Prible's alibi witness.

Finally, Prible presents BOP documents that demonstrate he was a victim of a program contrived by the lead prosecutor to convict defendants – Herrero as well as Prible – in cold cases through the testimony of informants whom she knew were fabricating evidence. BOP housing and transfer records raise a strong inference that Siegler, working with BOP through unrecorded channels (*i.e.,* not leaving a record of their communications or her visits), had Prible and Foreman moved into housing arrangements so that Foreman and other inmates could get to know Prible and craft a usable "confession." These BOP documents, along with documents from the Herrero file, all of which were disclosed after the August 26, 2010 Carl Walker interview, also corroborate Walker's story. BOP documents confirm multiple communications that Walker said took place between Siegler and the ring of FCI Beaumont informants. BOP employee Gordon Harpe confirms, in his affidavit, that he arranged for Beckcom to phone Siegler to discuss Prible's case on his own office phone.[554] The Herrero file confirms specifics, such as the letters and phone calls to Siegler, to whom Walker said he and other informants wrote, as an initial step to becoming state witnesses; confirms the opportunity that the informants had to hatch their plan while housed in the FCI Beaumont SHU; and confirms that the prosecutor had a system of using and rewarding non-testifying witnesses for setting defendants up that was used to bolster the stories of testifying informants and, in Prible's case, to mask violations of *Massiah*.

This Court is faced with a far different and far stronger case than Thompson's, and a stronger case than the type that the Supreme Court contemplated would satisfy *Schlup*. A

---

[554] **Exhibit 73.**

hearing should therefore be convened so that Prible can fully develop the already ample evidence

of innocence that he presents with this Fourth Amended Petition, or else this Court should find

*Schlup* satisfied and order a hearing on the merits of all claims that Respondent maintains are

defaulted.

       **2.**       **This Court is entitled to re-assess the credibility of witnesses in light of evidence of innocence that contradicts their incriminating trial testimony, including the testimony of expert witnesses.**

In making a determination of "gateway" innocence, this Court is not confined to

considering evidence of innocence that simultaneously underlies a constitutional violation.[555] A

reviewing habeas court must instead "consider[] all the evidence, old and new, incriminating and

exculpatory, admissible at trial or not."[556] Under *Schlup*, a district court is also allowed to "make

some credibility assessments" when assessing the reliability of a petitioner's "newly presented

evidence [that] may indeed call into question the credibility of the witnesses presented at

trial."[557] Similarly, the district court may make determinations about "the probative force of

relevant evidence that was either excluded or unavailable at trial,"[558] and "assess how reasonable

jurors would react to the overall, newly supplemented record."[559]

       **a.**       **Beccom's testimony is thoroughly discredited by Walker, Foreman, and Gonzalez; by BOP documents; by his co-conspirator Foreman's role in the *Herrero* case; by Siegler and Bonds' deposition testimony and work product notes confirming they knew Foreman was a liar; and by demonstrable fabrications contained in Beccom's December 10, 2001, written statement and trial testimony.**

In light of Prible's new evidence, which includes Walker's taped statement, Foreman and

Gonzalez's affidavits, prosecutor work product notes, deposition testimony, and Government

---

[555] *See House v. Bell*, 547 U.S. 518, 538 (2006).
[556] *Id.*
[557] *Schlup*, 513 U.S. at 330.
[558] *Id.* at 327-28.
[559] *House*, 547 U.S. at 538.

records proving that Beckcom and Foreman, with whom Beckcom's testimony is inextricably linked, were members of a ring of informants fabricating confessions in return for State favors, the testimony of Beckcom on which the State's case depends can be rejected as a self-serving fabrication. Furthermore, the timing, composition, and content of Beckcom's December 10, 2001, account proves that the letter and Beckcom's testimony against Prible were fabricated.

The December 10, 2001, date on Beckcom's statement shows that he composed his final version of Prible's alleged confession in anticipation of the meeting that Bonds arranged for that very same date. However, Beckcom's written statement was not a first draft or a memorialization near the time of an event. The "confession" that Beckcom describes was not spontaneous; Beckcom had been planning to contrive a confession all along. Indeed, he had been making notes and he may have passed these notes on to the prosecution. On cross-examination, trial counsel asked Beckcom if he had created any other written records related to his December 10, 2001, composition. Beckcom's reply shows he assumed that Prible's trial counsel had managed to lay his hands on them:

> *A (by Beckcom):  At one point I started taking some notes, yes.*
>
> *Q (by the defense):  Do you have those notes?*
>
> *A.  Do I have them?*
>
> *Q.  Yes.*
>
> *A.  I think you're holding them.*
>
> *Q.  No, I'm not.  I'm holding my notes.*
>
> *A.  Oh, okay.*[560]

Trial counsel inexplicably failed to follow up with basic questions such as, "Where are your notes now, Mr. Beckcom?" or "To whom did you turn over your notes?"  It is apparent, from the

---

[560] 26 RR 75-76.

fact that Beckcom thought trial counsel had them, that Beckcom had given his notes to the State. However, the State has never disclosed his notes to Prible's attorneys.

Although Beckcom crafted a "confession" replete with specifics intended to lend credibility to his testimony, that testimony, when compared to his December 10, 2001, statement, shows that he repeatedly fabricated information at trial. For example, at trial, Beckcom changed the timeframe he wrote down in his December 10, 2001, statement. The statement says that he had "learned of Prible through [his] exercise partner, Bobby Williams" at FCI Beaumont.[561] The letter does not say that Williams had discussed Prible's case; it says only that Prible approached Williams and Beckcom occasionally while they were working out and would "pull Bobby off to the side" to talk to him alone. "**Some months later around late Oct. or early Nov.**" of 2001, Beckcom writes, "Prible said that he had a state case and that he had heard that I fought the same charge at one time. I asked him if he had a capital charge and he said, 'I thought you knew.'"[562] Beckcom writes that "I had heard something to the effect, but didn't really know who it was."[563] However, this timeframe laid out in Beckcom's December 10, 2001, statement has several monumental implications:

(1) It shows that before Prible said a word about his case to Beckcom, Beckcom and Foreman had arranged to incriminate him. Beckcom testified at trial that Foreman gave him Siegler's name in *September 2001* and that Beckcom had telephoned Siegler sometime in "**the first half of October**" of 2001 offering to incriminate Prible.[564] In that phone call, Siegler accepted Beckcom's offer and instructed him to get "specifics" if he wanted a *quid pro quo* for

---

[561] **Exhibit 30.**
[562] *Id.*
[563] *Id.*
[564] 26 RR 24.

informing on Prible.[565]  Hence, Beckcom and Foreman were working as State agents from the start.  Beckcom did not approach the State voluntarily, with information derived from Prible, without inducement, as the State and Respondent have contended all along.  Instead, the timeframe confirms Prible's original allegation – supported by Walker's August 26, 2010, taped statement and Foreman and Gonzalez's affidavits – that Beckcom and Foreman planned to incriminate him before they even met him.[566]

(2)      It confirms that he lied on the stand continuously about the genesis of Prible's "confession."  Beckcom told the jury that when he first spoke to Prible, he "wasn't too much paying attention to him because I really did not know who he was."[567]  But his December 10, 2001, written timeframe shows that his trial testimony was false down to the details he added to try to give it credibility.  Beckcom testified that when he and Foreman first began conversing with Prible, the two of them were actually interested in Prible's asphalt paving business:

> *A.  Well, before we got real heavy into talking about the actual crime and the murders, you've got to understand we went back and forth because he's not trusting anybody at this point, anyway.  So, we began talking about an industry he knew about, which is the asphalt and the paving business.  So, this is before – I'm kind of getting out of sequence.  This is before I knew who you were or even that I would even consider doing this.  I was actually seriously interested in the asphalt business.*

> *Q (by Siegler):  Tell the jury why and how y'all talked about that.*

> *A.  Well, because of the money involved.  He was explaining all the facets of the business, of the equipment you would need.  Foreman was interested.  Foreman was interested in investing in the business so we were actually making plans on something to do when we got out.  We went on back and forth some time with this asphalt situation.[568]*

---

[565] 26 RR 37.
[566] Inexplicably, Siegler disagrees with the assertion that Foreman tried to set Prible up, even though she admits that Foreman came to her with an alleged "confession" from Prible before he had even met Prible.  *See* **Exhibit 4-A** at 125.
[567] 26 RR 32.
[568] 26 RR 37.

However, the December 10, 2001, statement's timeframe documenting that Prible "did not approach myself and Nathan Foreman" until "some months later around late Oct[ober] or early Nov[ember]" proves that the sole interest Beckcom and Foreman had was in contriving a story about the murder containing enough specifics to satisfy the lead prosecutor, because this alleged "late Oct[ober] or early Nov[ember]" came *after* Beckcom contacted Siegler in "the first half of October" and offered to snitch *quid pro quo*.

(3)    It proves that Siegler solicited false testimony to cover up the fact that Beckcom was operating as a State agent from the first time Prible and Beckcom spoke. Beckcom's written statement has Prible first broaching the subject of his case in late October or early November (*i.e.,* after Beckcom had already contacted Siegler), but at trial, Beckcom testified that he "became interested in [Prible's case] and decided what I was going to do" – *i.e.,* testify against Prible – "before I knew who you [Siegler] were."[569]  Beckcom further testified that "weeks, if not a month" before he contacted Siegler to "see if we could make some kind of deal," he "began prodding [Prible] into conversations" and would ask him questions about the evidence that the State had against him:

> A.  So, I would ask him, "Well, tell me about the evidence. What did you do here? What did they have here?" And, so, the only thing I told him, "Well, they don't have the murder weapon. That's good. You sure it can't be found?"  And in passing he said something about, Well, that's -- asphalt's good sometimes for hiding things.
>
> Q (by Siegler):  These conversations, when was it after how many conversations or how long a time period that you made up your mind you were going to contact me and in regards to contacting me get more details out of this Defendant about the case?
>
> A.  It was several conversations. I mean, it was weeks if not a month.
>
> Q.  And eventually you made up your mind you were going to do what, sir?

---

[569] 26 RR 35-37.

*A. Contact you and see if we could make some kind of deal.*

*Q. Because you were hoping for what, again?*

*A. Sentence reduction.*

*Q. And the only way for me to be interested is if you know what?*

*A. Specifics about the case, facts.*

*Q. So in that regard what did you do?*

*A. I sought to find out as much as I could.*

*Q. From who?*

*A. From Prible.* [570]

(4) <u>It contradicts Beckcom's testimony at trial with respect to the crucial moments on November 24, 2001, when Prible allegedly decided finally to "confess."</u>  For the jury, Beckcom described a situation where Prible sat quietly, thinking, as though torn between proving his loyalty and confidence to Beckcom and Foreman and jeopardizing his chances at trial, and then allegedly revealed his motive and his criminal conduct. [571]  There is no prefatory discussion of other matter.  According to Beckcom's trial testimony, after sitting quietly for some time, Prible got "pretty agitated" and then suddenly poured out to Beckcom and Foreman how Herrera had screwed him out of $250,000 dollars and how he had taken care of business by murdering Herrera and Tirado and setting their home with sleeping children ablaze.  However, this is not what Beckcom said happened in his December 10, 2001, written statement.

Beckcom begins his written account of the alleged "confession" with this self-serving note to the file:  "Nov. 24th.  I've made note of this date because this is when he finally came out

---

[570] 26 RR 36-37.
[571] 26 RR 53-54.

with the rest of the story."[572]  Beckcom then drafts a completely different conversational context than the one he testified to at trial.  He writes that on November 24, 2001, Prible was gabbing about a number of topics, including two law enforcement officers named Todd Depolis and Efram Gonzalez.[573]  Beckcom writes that he, Prible, and Foreman were sitting outside, and Prible next asked him if he "knew what Black Ops were."[574]  Then, Beckcom writes, Prible started talking about the "many secret missions" he had done "for the government" in distant lands (which Prible never did), before turning back to Depolis and relating yet another tale about an alleged drug transaction which earned Prible $20,000 in cash.[575]  Beckcom writes that Prible returned again to talk about his military exploits.  Only after this extended conversation about drug deals and military adventures did Prible, according to Beckcom's written story, spontaneously profess his love for Beckcom and Foreman and confess to killing Herrera, Tirado, and their three small children.[576]

Even more striking are the differences between the fabrications in Beckcom's written statement and those in Beckcom's trial testimony concerning the physical setting of the alleged November 24, 2001, "confession."  On each occasion, Beckcom strove to supply the "specifics" the prosecutor demanded in order for him to receive *quid pro quo* benefits.  According to Beckcom's written statement:



---

[572] **Exhibit 30.**
[573] *Id.*
[574] *Id.*
[575] *Id.*
[576] *Id.*

\*
\*
\*

> *He said that he loves us, and would do anything for us, anything! He then pulled us very close and looked around to be sure no one was within earshot and* [577]

Sitting apart from others at night on the turf of the football field, while receiving a confession, is the type of "specifics" which, if actually experienced, would not be forgotten. However, that is not the setting for the alleged confession that Beckcom painted at trial. Nor did Beckcom testify at trial that he could no longer recall the particular setting. Instead, he strove to appear credible by laying on different details.

According to Beckcom's trial testimony, when Prible allegedly "poured it all out" to him and Foreman on November 24, 2001, the three of them were **not** sitting on the ground, in the open field, apart from other inmates. Instead, Beckcom testified that

> [w]e were sitting out in the rec yard that particular evening. It was getting dark, we were sitting under -- we had these little pavilions out on the rec yard with tables underneath where you can play cards and dominoes. And he was just sitting there and he got pretty quiet for a while and I could tell he was thinking about some things. So, he pulled Foreman and I aside and that's when he gave me the information I just told you.[578]

Finally, Beckcom's trial testimony is contradicted by crime scene evidence. The lead prosecutor, bent on inflaming the jury with the deaths of the three small girls, tried to solicit testimony from Beckcom suggesting that Prible knew the girls were in the house. Beckcom obliged, but did so with fabrications that photographic evidence and trial testimony of fire

---

[577] *Id.*

[578] 26 RR 53-54. At his deposition in October 2017, when confronted with the discrepancies between his written statement and his trial testimony, Beckcom said: "I don't know if that's of grave importance exactly where my butt was when somebody confessed to killing a family. No, I don't." *See* **Exhibit 29** at 122.

marshals and police who made the scene disprove.  The motive for Herrera's murder, according

to Beckcom, was money.  Beckcom testified that Prible complained that Herrera "stole [his]

money," $250,000 of it.[579]  The State also put on evidence that the night he died, Herrera was

seen at the house with wads of cash that Prible had given him.  However, if stolen money were

the motive, then it would make no sense for Prible to burn down the house without searching it

first.  So the State solicited the following testimony from Beckcom:

> . . . I even asked him, "Well, did you at least get the money back?"  And he said,
> "No."  I said.  "Well, did you look in the house?"  And he said, "Yeah, but it
> wasn't there."[580]

Crime scene photos taken throughout the house, however, do not show that anything was

disturbed for any reason other than the fire.[581]  Apart from soot and some water damage, none of

the bedrooms, bathrooms, halls, or kitchen were in disarray.  Dresser drawers were not pulled

open and dumped, mattresses were not pulled off beds, furniture was not overturned, and

Herrera's and Tirado's closets and lockers were not rummaged through.  None of the firefighters

or police who searched the home or preserved the crime scene testified that there was a single

drawer, cabinet, cushion, or rug out of place anywhere in the neatly kempt home.

The jury did not get to hear Beckcom impeached by his own fabrications.  Trial counsel

did not question Beckcom about a single one of the contradictions set forth above.  Trial counsel

did not even stress how unbelievable it would have been for Prible, whose bedroom wall was

festooned with a confederate flag (as seen in HPD photos taken during the search of his home),

to have professed his love for Nathan Foreman, an African-American whom Prible had just met

in prison, and then to have confessed to Foreman after he was indicted for capital murder.

---

[579] 26 RR 51-52.
[580] 26 RR 52.
[581] *See* Volume 34 of the Reporter's Record (containing black and white reproductions of State's Crime Scene Exhibits).  The crime scene photos in the reporter's record are virtually useless reproductions, although dressers and beds can be seen shut and made.

This Court can and should reassess the credibility of Beckcom's testimony based on new evidence and old evidence that the jury did not get to hear. This evidence shows that Prible was convicted by false testimony. Not just the confession fabricated by Beckcom, but also the false testimony of witnesses that the State used to mislead the jury into finding that Prible forced himself into the Herrera/Tirado home and forced himself sexually on Tirado "moments, if not seconds," before allegedly executing her and setting her home with her children inside ablaze.

> **b.** **This Court can reassess William Watson's credibility, taking into account Siegler's undisclosed consultation with DNA analyst Pam McInnis, who told her that semen could live in the oral cavity for up to 72 hours. The Court can also reassess Watson's credibility in light of the fact that that he did not have a doctorate, was not qualified to estimate a PMI, had not reviewed the existing literature, and stands refuted by subsequent studies on the detection of haploid DNA by oral swab.**

The State's closing argument shows that it relied heavily on Watson's testimony that spermatozoa cannot remain in the oral cavity of a living person in testable quantities for more than a very short interval after oral sex.[582] The State used this testimony to place Prible at the scene of the crime within moments or seconds of the victims' deaths. However, Siegler never disclosed to Prible's attorneys that she had posed the question of how long semen can remain in the mouth to the head of the Harris County Crime Lab, and was told that it could remain for 72 hours.[583] Moreover, Watson's testimony was impeached by actual studies published before trial. And recent controlled studies disprove Watson's incriminating testimony outright,[584] rendering it inadmissible under *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992) and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

---

[582] 28 RR 10-11.
[583] *See* **Exhibit 20.**
[584] *See* **Exhibit 89,** Roberts, K.A., *A Comparison of the Effectiveness of Swabbing and Flossing as a Means of Recovering Spermatozoa from the Oral Cavity,* J. Forensic Sci., Vol. 59, no. 4 (July 2014), available online at: onlinelibrary.wiley.com.

In fact, that only a microscopic amount of male haploid DNA was able to be collected by swabbing Tirado's mouth is itself evidence that the oral sex did not occur "moments" or "seconds" before she died. As Prible's forensic science expert Dr. Johnson explained in state habeas proceedings, "if the victim dies immediately after oral sex, the processes that tend to remove substances from the oral cavity – expectoration, swallowing, drinking and eating – would, of course, cease. Assuming a normal ejaculation, one would therefore anticipate collecting more than 70 nanograms of male haploid DNA from a victim whose bodily functions had been stopped by a violent death right after performing oral sex." Thus, besides discrediting the State's inculpatory evidence, the new scientific evidence amplifies the value of Christina Gurrusquieta's alibi testimony, which proves Prible innocent of Herrera's and Tirado's murders. In conducting the "gateway" analysis, this Court can take into account the fact that the incriminating implication of the State's expert testimony about the principal physical evidence – the spermatozoa found by swab in Tirado's mouth – has been disproven by scientific analysis showing that the testimony was false and foundationless.

> **c.** **This Court may also discredit the false and misleading expert testimony that the State introduced through Dr. Joye Carter and Cleva West.**

The State argued that Prible poured Kutzit, a highly volatile paint and varnish remover, on Tirado's body in order to destroy evidence that he had sexually assaulted her (even though it was Prible himself who told the police, within hours of the murders and before any DNA testing, that he had had oral sex with Tirado on the night she died). Tirado's body was found on the burned frame of a couch.[585] Fire had completely burned away the back of the couch and the cushions.[586] A canister of Kutzit was found close to Tirado's body. Other canisters of Kutzit

---

[585] 22 RR 78.
[586] 22 RR 79.

were found in the garage where Herrera's body was found. There was no evidence that the Kutzit canister found on the couch in the den next to Tirado's body had been opened by anyone other than State investigators after the crime. The canister was surely not brought into the home by an arsonist, as Herrera used Kutzit in his tile business and had a stock of it at home. The canister no doubt came from this source.[587] No one testified how much, if any, of the Kutzit had been emptied from the canister found near Tirado. But a Houston Fire Marshal investigator testified that he transferred some of it to another receptacle in order to exhibit the substance at trial.[588] This can only mean that the canister was sealed when the investigators found it, because if it had been left open, it would have spontaneously combusted during the fire, which was big enough to consume the sofa, melt the ceiling fan, and burn the entire room.[589] It seems unlikely, however, that a person bent on arson would have recorked the Kutzit container after pouring it on his victim and then left the canister upright on the sofa. If the perpetrator had "poured" Tirado, as the State claimed, the Kutzit canister would more likely have been tossed aside with the top still off of it.

In order to shore up the theory that Tirado had been "poured," the State submitted items from the crime scene to the crime lab. The analysis was not performed by a chemist, but by Cleva West, who testified that she had a Bachelor of Science degree from Texas Southern University and had taken courses in arson and other areas from the FBI Academy.[590] West's description of what she did to isolate or extract material for analysis is cryptic and imprecise. She apparently put strips in cans containing items supplied by the fire marshal detectives, heated the cans and then ran the strips on a "GC" machine, which likely means "gas

---

[587] 22 RR 235.
[588] 22 RR 75.
[589] 22 RR 238-239.
[590] 24 RR 208.

chromatography."[591]  West said she detected gasoline on foam from the couch, on a remnant of Tirado's shirt, and on toilet paper and paper towels found at the scene.[592]

In the State's closing argument, Siegler represented that a forensic scientific analysis of samples from the crime scene definitively demonstrated that Prible had doused Tirado and the sofa on which she was found with Kutzit:

> *[You] know what doesn't make sense, what doesn't make sense is why anybody in the whole wide world would have the motive to execute Tirado in the back of the head and set her on fire.  Nobody in the world had any reason to desecrate her body and pour gasoline and Kutzit on her hair and on her face and on her clothes and all around her, except Ronald Jeffery Prible, Jr.  Nobody else.*[593]

However, this is a false and misleading exaggeration and distortion of the evidence, for the following reasons.

First, Toluene is an ingredient in Kutzit, and Toluene is derived from gasoline, but Kutzit does not contain gasoline, which is what West claimed to have detected.[594]  Moreover, if West meant "Toluene," inferences of a pour based on her results would be confounded by the burnt foam,[595] which, like Kutzit, contains Toluene, and also confounded by the fact that Steve worked with Kutzit all the time in his tile business, so the house and household items would have been thoroughly contaminated with Kutzit ingredients; hence, West's positive identification of gasoline on toilet paper and paper towel samples.  Furthermore, West did not detect gasoline on hair samples from Tirado, only what West called "the heavy product," which she did not

---

[591] 24 RR 209-210.

[592] 24 RR 210-211.

[593] 28 RR 54.

[594] The ingredients in Kutzit are Methanol 000067-56-1 <25; Acetone 000067-64-1 >24; Methylene chloride 000075-09-2 >24; Toluene 000108-88-3 >25; Paraffin 008002-74-2 <2.  *See* Household Data Base, U.S. Department of Health and Human Services, at http://hpd.nlm.nih.gov/cgi-bin/household/brands?tbl=brands&id=19014002.  The expression ">24", for example, means "more than 24%" of the ingredients are methylene chloride, so Toluene is the most prevalent ingredient in Kutzit.

[595] Toluene diisocyanate (TDI) is the most common isocyanate employed in polyurethane manufacturing, and is considered the 'workhorse' of flexible foam production. *See* https://oecotextiles.wordpress.com/2010/01/20/foam-for-upholstery-cushions/ (last visited May 9, 2015).

describe any further.[596]  Other items near the body, including the pillow under Tirado's head, tested negative.[597]

Second, the conclusion that an accelerant had been poured on Tirado was drawn not by West, but by the former Harris County Medical Examiner, Dr. Joye Carter.  And Dr. Carter drew that conclusion from what she thought were burn patterns on Tirado's body.[598]  But although "pour patterns were once believed to be caused by the burning of accelerants in arson fires, [they] are now known to be caused by everything from fallen objects to the combustion of synthetic components in carpets and flooring adhesives."[599]  Tirado's body was found clad in the remnants of a t-shirt that had been consumed by flames.  Flames from the burning couch could just as well account for the burn pattern Carter saw whether or not the body was poured.  Hair is extremely flammable and would burn or melt in any event by a fire that consumed the cushions and covering of a couch.   A couch fire quickly reaches high temperatures and releases tremendous energy.[600]  The description firefighters gave of the crime scene shows that this is what likely happened:

> *A.  The ceiling fan had drooped. We describe it as drooping. The heat of the fire itself caused the 21 blades of the ceiling fan and the fixture itself to melt and droop down towards the fire, which is another indicator for us usually where the fire started.*
>
> *Q.  And where was Tirado's body compared to this melted light or fan?*
>
> *A.  You could almost say directly under it, but it was a little bit to the right of the actual ceiling fan itself.*

---

[596] 24 RR 211.

[597] *Id.*

[598] *See* 23 RR 62-63 *("Q:  And, Doctor, do you believe the body was poured?  A.  Yes.  Q.  What makes you say that?  A.  The pattern of burn on the body is consistent with a substance being poured on the body.").*

[599] *She Blinded Me with Science,* 14 Tex. Wesleyan L. Rev. 481, 489 (2011).

[600] *See Heat Release Rates of Burning Items in Fires*, 38th Aerospace Sciences Meeting and Exhibit (Jan. 2000), p. 2, and Fig. A31.  Available at http://ncfs.ucf.edu/burn_db/Thermal_Properties/docs/Kim_HRR_of_Burning_Items_in_Fires.pdf (last accessed on May 7, 2015).

*Q. And how would you characterize the condition of the den itself?*

*A. It was well burned.*

*Q. What was the state of the appliances and things like that in the den?*

*A. They were -- they showed significant signs of heat damage, which was conducive to the amount of fire we found inside that room.*

*Q. The area around Tirado's body, the carpet and the loveseat and that area right there, how would you characterize or describe that?*

*A. Heavily charred, but not totally consumed.*

*Q. What's the difference?*

*A. When you have a heated fire that's got oxygen feeding to it and it burns up, it's like a log in a fireplace. It'll keep burning until it burns down and there's almost nothing left. In this particular case, because the fire had consumed the majority of the oxygen in that area, the fire itself self-extinguished and all we had left was smoldering material. We have charring of the wood frame of the sofas and the loveseats, but we don't have total consumption.*[601]

The State's contention that a pattern of intense burns and charring seen during autopsy of Tirado's body and captured in photographs was caused by Kutzit is readily explained by the intensity of a sofa fire, and by exposure to turbulent flames from the burning furniture. According to the arson literature, "naked flames cause the most injury to unclothed areas, as do flash fires, e.g., barbecue accidents."[602] A flash or barbecue flare up is exactly the type of fire that the State's firefighter witness said occurred in this case.[603] Also, at five foot, three inches and 157 pounds, Tirado's body mass index was 27.8. Photographs indicate significant subcutaneous fat, as did the autopsy, which acts as a natural fuel.[604]

---

[601] 22 RR 238-39.
[602] R. Dettmeyer, *et al.*, Thermal Injury (2013), p. 192.
[603] *See* 22 RR 217.
[604] *See* Munster, Joe H., *Investigation of Fires* (1953), p. 9 (stating that "the human body is remarkably easily burned... This relative ease of destruction has been credited to the layer of subcutaneous fat present in the human body.").

Watson's testimony that the sperm found in Tirado's oral cavity must have been disposited "moments, if not seconds, before she was killed"[605] was false, misleading, and contradicted by the forensic literature. Dr. Carter's testimony that Tirado's body "certain[ly]" was poured was false, misleading, and contradicted by forensic studies on the effects of fire on human subjects. Like Watson and Dr. Carter, West gave *Daubert*-disqualified testimony that the lead prosecutor used in closing to create the false and misleading impression that the State had definitive proof that Tirado's body and the couch had been soaked in fuel and set on fire to cover up a sexual assault. Prible's showing that the State's case rested on unsubstantiated, discredited, and false scientific testimony, from witnesses who were not qualified to testify in the first place, enhances the probative power of Prible's other evidence of "gateway" innocence. This Court should therefore order an evidentiary hearing so that Prible can fully develop his already substantial showing that he meets *Schlup* standards excusing procedural default.

> **d.** **New evidence exculpates Prible and demonstrates that the State sponsored false testimony through Victor Martinez and Edward Herrera.**

Evidence kept from the jury shows that the State prevailed, through the use of other false testimony, in creating the impression that Prible forced himself into the Herrera/Tirado home and forced himself upon Tirado. Through Herrera's brother-in-law, Victor Martinez, and Herrera's brother, Edward, the State sponsored false testimony that the Herrera/Tirado home was off-limits to family and friends alike.[606] The lead prosecutor went so far as to solicit testimony from Martinez that Herrera made his guests urinate outside in the yard rather than let them in to use his bathroom.[607] But the lead prosecutor unquestionably knew that HCSO had interviewed several non-testifying witnesses, who told Deputies that Steve had invited his brother to live in

---

[605] 24 RR 103.

[606] 25 RR 32, 90.

[607] *Id.*

the family home.[608]   One of those non-testifying witnesses was the live-in brother, Jaime

Herrera.[609]  Nilda Tirado's brother, Rafael Tirado, also gave a statement in which he said the last

time he was over at the Herrera/Tirado house was for a family barbeque a week before the

murders.  The idea that Herrera would invite people over, entertain, drink volumes of beer, and

not even let family members use the bathroom is preposterous.  But Siegler stressed Martinez's

testimony to that effect in closing argument, when she said:

> And [Prible] went inside to use the bathroom.  Gee, now why would Steve
> Herrera let Jeff Prible go in the house where his babies and his wife are asleep at
> 2:00 or 3:00 in the morning and use the bathroom that he don't let his own
> brother use, in the middle of the night.  It's a lie.[610]

But Prible was not lying, the State was.

Finally, phone records showing that Prible called Edward Herrera and left him messages

of considerable length, right around the time that Prible was supposedly murdering the victims,

exculpate Prible and support the testimony of Prible's alibi witness, Christina Gurrusquieta.

Gurrusquieta testified that she saw Herrera drop Prible off at Prible's home and drive away in the

early morning hours of April 24, 1999, just before the murders.  Her testimony impeaches the

false case put on by the State.  The State called Edward Herrera, who testified that his brother

Steve had paged him numerous times late on April 23, 1999, and early on April 24, 1999.  The

purpose of the calls was to purchase cocaine from Edward.[611]  Edward testified that the drug

transaction was not consummated.  The number Steve called from was Prible's, but that created

an awkward fact for the State – namely, that on the night of the murders, Prible was trying to

reach the victim's brother.  So the State had Edward testify that the calls he received that night,

---

[608] *See* **Exhibit 90** (Harris County Sherriff's Office reports of interviews of Jaime Herrera, L. Detmore and T. Burroughs).
[609] *Id.*
[610] 28 RR 62.
[611] 25 RR 76.

except for the last couple, were followed by a numerical suffix, "021," and that Steve used this suffix to notify Edward he was calling or paging him.[612]  The calls purportedly from Steve using Prible's phone, of course, placed Steve and Prible together in the early morning hours of April 24, 1999.  Edward, in fact, testified that is why he "locked in" the phone number and showed it to police.[613]

However, the State did not introduce phone records from Edward or Prible, even though the HCSO had subpoenaed Prible's.  This is because Prible's records show (and Edward's would have shown) that a numerical suffix was entered on April 23-24, 1999 from Prible's phone *only once*. And that suffix was not "021," but a mistake repeat dial around 2:00 a.m. of Edward's number.[614]  Edward testified that the last page he got from Steve from Prible's phone came in at around 4:00 a.m.[615]  He said there was no suffix, just a line, and he speculated that wrong numbers had been punched in.  Edward also testified he checked his pager when he woke up the morning of April 24, 1999, and had voicemails, but implied that they were all from his sister.[616] That was not true either.  Prible's phone records show that Prible, not Steve, called Edward at 4:04 a.m., leaving a message nine seconds long; called Edward again at 5:08 a.m., leaving a message over a minute and a half in length; and called Edward one last time at 6:13 a.m., leaving a message 32 seconds long.  This does not seem like the behavior of a defendant who was about to kill, or had just killed, someone's brother.  Instead, it is more like what someone would do if dropped off late night at his home with unfinished drug business or business he wanted to cancel.

With Beckcom's, Watson's, Martinez's, and Edward Herrera's testimony rejected by proof that the State solicited false jailhouse informant testimony, false expert testimony, and

---

[612] 25 RR 73.
[613] 25 RR 85.
[614] **Exibit 91** (Prible's cell phone records from April 22, 1999, to April 28, 1999).
[615] 25 RR 81.
[616] 25 RR 84-85.

false testimony from the victim's family members, no reasonable jury would have convicted Prible. This Court should therefore find that Prible's evidence of innocence satisfies *Schlup* and, thereafter, reach Prible's constitutional claims, including those asserted under *Giglio, Brady, Massiah,* and *Strickland,* through the *Schlup* gateway innocence exception to procedural default.

## C.    EQUITABLE TOLLING.

In *McQuiggins v. Perkins*, 133 S.Ct. 1924, 1928 (2013), the Supreme Court held "that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations." *Perkins* "clarifie[d] that a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown."[617] The illustration given of when unjustified delay would be a factor involved the abuse of the actual innocence gateway. The State envisioned a case in which a petitioner laid in wait in order to "use stale evidence to collaterally attack his conviction ... when an elderly witness has died and cannot appear at a hearing to rebut new evidence."[618] The Court instructed that under these circumstances, "the timing of such a petition … should seriously undermine the credibility of the actual-innocence claim."[619]

The timing and circumstances under which Prible raises actual innocence do not detract in the least from the merits of his argument. Prible has always maintained his innocence. He raised actual innocence and "gateway" innocence in his original federal petition and in each subsequent petition. Whether raised now or at an earlier opportunity, the substance of the actual argument would be exactly the same. Furthermore, Prible's undersigned counsel has gone to

---

[617] *Perkins,* 133 S. Ct. at 1928.
[618] *Id.* at 1936.
[619] *Id.*

extraordinary lengths to develop evidence post-dating his original federal petition, including undertaking *Touhy* litigation to discover confidential BOP documents; conducting extensive written discovery, witness interviews, and depositions; and undertaking the *pro bono* representation of Hermilo Herrero in order to more effectively develop evidence material to both Herrero and Prible in these closely-related cases. The State's opportunity to counter Prible's actual innocence claim is unaffected as well. There is no reason to believe that arguments, evidence, or witnesses that Respondent may call upon to counter Prible's gateway innocence claims have vanished or deteriorated since Prible filed his original federal petition.

## X.
## CLAIMS FOR RELIEF

### CLAIM #1

**THE STATE VIOLATED DUE PROCESS BY SPONSORING FALSE AND MISLEADING TESTIMONY THAT MINIMIZED THE STATE'S CONTACT WITH KEY WITNESSES AND COMMUNICATIONS WITH, AND USE OF, OTHER INFORMANTS, AS STATE AGENTS, TO DEVELOP EVIDENCE INCRIMINATING PRIBLE.**

**A. STANDARDS**

False evidence is "material" if there is "'any reasonable likelihood [that it could] have affected the judgment of the jury.'"[620] Under *Giglio,* courts "will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony" either.[621]

In *United States v. Bagley*, 473 U.S. 667, 679 n. 9 (1985), the Supreme Court explained that this materiality standard "is equivalent to the harmless-error standard" in *Chapman v. California,* 386 U.S. 18 (1967).[622] Under the *Chapman* standard, "the beneficiary of a

---

[620] *See Giglio v. U.S.,* 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois,* 360 U.S. 264, 269 (1959)).
[621] *See Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir. 1977).
[622] *See also U.S. v. Barham,* 595 F.2d 231, 242 (5th Cir. 1979) ("[The false-evidence materiality standard] is the brother, if not a twin, of the standard 'harmless beyond a reasonable doubt' for determining whether constitutional error can be held harmless.").

constitutional error [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[623]   This "strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only 'prosecutorial misconduct,' but also 'a corruption of the truth-seeking function of the trial process.'"[624]

## B.   ARGUMENT

At trial, the State had a key witness with serious credibility problems.  Beckcom was a murderer, admitted to lying in federal court, and conceded he was testifying in hopes of obtaining a reduction in his federal sentence.  The reeds on which his credibility depended were the theories, vigorously promoted by the State on direct examination and during closing argument, that Beckcom, along with Foreman, had established a special, confidential relationship with Prible, and that Beckcom could have learned the facts of the murder only from Prible and no other source.  It was vital, therefore, for the State to suppress evidence that it was supplying Beckcom with the facts about Prible's case, and to suppress evidence that other inmates with whom Beckcom was associated had similar information about the deaths of Herrera, Tirado, and their three children.  The State (i) failed to disclose documents identifying members of its informants' ring, (ii) failed to disclose the widespread deals that it was making with FCI Beaumont informants (including non-testifying witnesses), (iii) allowed Beckcom to testify falsely and misleadingly about the extent of the contact that he had with the State, and (iv) allowed Beckcom to falsely and misleadingly portray himself and Foreman as disinterested witnesses to Prible's alleged "confession."

> **1.    Statements given by Walker to Prible's federally-appointed investigator and counsel show that Beckcom's testimony – *i.e.,* that he and Foreman had learned about the facts of the crime from Prible alone – was false and misleading.**

[623] *Chapman*, 386 U.S. at 24.
[624] *Barham*, 595 F.2d at 242 (quoting *U.S. v. Agurs*, 427 U.S. 97 (1975)).

According to Walker, who was housed with Beckcom and Foreman at the time Beckcom was investigating Prible, Foreman had access to the lead prosecutor's cell, home, and office numbers. Foreman was the lead prosecutor's point person at the Beaumont unit; he was constantly on the phone with her. Through these phone conversations, Foreman, the State, and Beckcom contrived a scheme to secure jailhouse informant testimony against Prible.

Walker was present during several conversations between Foreman and the lead prosecutor. In fact, Walker was part of what he described as a tight, neat circle of informants headed by Foreman who were recruited to provide information to the State. Walker said Foreman had recruited him to be a snitch, and that at first he intended to testify against Prible.

Walker stated that Foreman's crew was "schooled" about the specifics of the offense that the State was trying to prove against Prible by Foreman, who received his information from the lead prosecutor. Walker specifically stated that the lead prosecutor told Foreman that the problem with the Prible case was the neighbor who put Prible at his home a few hours before the murders took place. According to Walker, the lead prosecutor told Foreman that Herrera had dropped Prible off at his house hours before the murder, and that one of the neighbors had substantiated this.

Walker described how Foreman, Beckcom, and their circle worked to get Prible's trust. The process included supplying Prible with wine and "weed." Foreman and his group would take photos with Prible to show him that they were all buddies and made promises to Prible to hook him up with a female while he was in prison. According to Walker, on many occasions

---

[625] *See* **Exhibit 54.**

they would get Prible high on weed.  On each occasion they would try to swing the conversation to Prible's supposed involvement in the multiple murders.

Walker stated that Prible would never admit that he was involved in the murders.  At one point Walker remembered asking Foreman, "If we're all so stoned, how are we going to remember when [Prible] supposedly tells us he did it?"  Foreman's comment, according to Walker, was that Prible would be the only one stoned.  According to Walker, Foreman's and Beckcom's objective in plying Prible for information was to get a reduction in time.

### b.    Walker's August 26, 2010, Interview[626]

Walker's August 26, 2010, statement is consistent with the statements he made in 2009. The additional facts he provides are responsive to the different set of questions asked of him. Three pieces of evidence, in particular, demonstrate that Beckcom testified falsely.  First, Walker describes in detail the circumstances under which he was recruited by Foreman and Beckcom to assist in developing incriminating evidence against Prible.[627]  The initial contact took place in the prison chapel, which allowed for private conversations about turning State's witness under the cover of mutual interest in religion.[628]  It was in chapel that Foreman and Beckcom approached Walker with plans for incriminating Prible.[629]

Second, Walker explains that Beckcom and Foreman were aware that Prible was being transferred from FCI Beaumont's Low to its Medium facility.  They also were aware of the murder charges against Prible and they were aware of basic facts about the crime he was accused of committing, including the identities of the victims and specific facts about how they had died and how they were found.  Third, Walker describes how Beckcom and Foreman rationalized the

---

[626] **Exhibit 55.**
[627] **Exhibit 55** at 46.
[628] *Id.*
[629] An example of a specific detail, and proof that Walker is not making sweeping or speculative statements, is his recollection that "Cat" (*i.e.,* Raphael Dominguez) did not attend chapel and that Prible did not either.  *Id.*

decision to testify against Prible. According to Walker, part of Foreman's and Beckcom's recruitment pitch was that informing on Prible did not violate jailhouse codes of conduct, because the crime Foreman and Beckcom claimed he committed resulted in the deaths of three children.[630] The other part of their pitch was that informing on Prible would get them a time cut.[631] Importantly, Walker's recollections on this point are not general or ambiguous. Instead, he provides a firsthand account of how Foreman and Beckcom described Prible's arrival to their unit as a "blessing."[632] Finally, Walker recalled that he had signed a letter that he believed had been mailed to the lead prosecutor as part of the informants' plans to set Prible up in return for State favors.[633] That recollection was corroborated perfectly in 2011 with the disclosure of heretofore-suppressed correspondence from FCI Beaumont prisoners to the lead prosecutor.[634]

### c. Walker's taped statement demonstrates that Beckcom's testimony was false and misleading.

Walker's inside account contradicts and belies the most critical components of the State's key witness's testimony. Statements provided to Prible's federally-appointed investigator and counsel establish that Beckcom lied when he testified that Prible was the source of his information about the case, and when he testified that Prible confessed to him. Walker's statements further establish that Beckcom lied about his and Foreman's motives for initially speaking with Prible, lied when he claimed to have been unaware of other FCI informants with information about Prible's case,[635] and lied about the methods he and Foreman used to extract information from Prible. Walker's statements support Prible's claim of innocence and

---

[630] *Id.* at 10.

[631] *Id.* at 16.

[632] *Id.* 9-10, 16, *et passim.*

[633] *Id.* at 13.

[634] *See* **Exhibits 35-37.**

[635] In 2011, Beckcom was asked about the letters and admitted to Prible's investigator that he knew about them, but denied drafting them or sending them. *See* **Exhibit 58.**

undermine the State's case by revealing that the State sponsored false and misleading testimony in violation of Prible's Fourteenth Amendment rights to due process.

> ### d. Foreman's 2016 affidavit confirms that the State provided information through non-testifying informants.

According to Foreman,

> *Kelly Siegler knew that FCI inmates wanted to testify against Prible in return for help getting their federal sentence reduced for cooperating. She contacted prisoners who wanted to testify through case managers and the unit manager. I remembered my unit manager's name sounded like "heart" or "harp." I have been shown a document that shows my unit manager's name was Gordon Harpe. That is the person that let us talk to Siegler on his office phone at FCI Beaumont. I was called to Harpe's office several times to talk to Siegler. That is how I learned that Prible's semen was found in Nilda's mouth. It was through one of these phone calls on Harpe's office phone.[636]*

From her June 3, 2001, interview with Moreno, Siegler heard that Foreman wanted to provide testimony against Prible. Her August 8, 2001, interview of Foreman confirmed that Foreman was intent on becoming a State's witness against Prible. No later than December 10, 2001, Siegler learned from Beckcom's written statement that Foreman was Beckcom's roommate and was working, with Foreman, to provide incriminating information against Prible.

However, Siegler allowed Beckcom to impress upon the jury that "nobody talked to [him] about the case, [he] didn't know anything about it, . . . all the knowledge [he] acquired, [he] acquired from Jeff Prible."[637] In her closing argument, Siegler revisited the same themes that she had impressed upon the jury during Beckcom's direct examination – namely, that Beckcom and Prible met by coincidence only *after* murder charges were filed against Prible, and that everything Beckcom knew about the murders came from Prible's mouth. She never mentioned Foreman, Moreno, or any of the other FCI Beaumont informants that she had

---

[636] Exh. **, January 11, 2016, Affidavit of Nathan Foreman.
[637] 26 RR 85-86.

communicated with and that she knew were talking about the case among themselves. She argued:

> Is there any evidence in this trial that Michael Beckcom got any facts about what happened anywhere except out of the mouth of this Defendant? All of Mr. Gaiser and Mr. Wentz' questions and hypotheticals and hopes and desires in the whole wide world do not amount to a hill of beans because **there ain't no evidence that Michael Beckcom ever had anybody, anywhere, any paper, any newspaper, any cop, any T.V. show tell him anything about the facts of this case except for Jeff Prible.**[638]

> **2. BOP records establish that the prosecution was in frequent contact with Beckcom, Foreman, and the other informants in the ring, who were seeking, and receiving, promises from the State to assist them in obtaining Rule 35 sentence reductions, contrary to Beckcom's testimony.**

At trial the State allowed Beckcom to testify falsely and misleadingly about the extent of the contact he had with the prosecution. To this end, the lead prosecutor elicited the following testimony:

> Q. Who was the person who gave you my name?
>
> A. Nathan Foreman.
>
> Q. And how did you know Nathan Foreman?
>
> A. He was -- he lived in my unit at the prison and then ultimately became my cellmate.
>
> Q. When you got my name from -- and you can't tell the jury what Nathan Foreman told you because that's hearsay. But when you got my name from Nathan Foreman what did you do?
>
> A. Nothing immediately.
>
> Q. Eventually what did you do?
>
> A. I called you.
>
> Q. And tell the jury how you were able to call me, another prosecutor, from a Federal institution?

---

[638] 28 RR 75.

*A.  Each unit has a secretary case manager and a unit manager.  I went to my unit manager and asked him if he would place a call to her from me.*

*Q.  And when we eventually talked, generally speaking, what did you tell me --tell the jury what you told me as to why I needed to come see you?*

*A.  Because I had information regarding this case involving a murder.*

*Q.  Did we go into any great detail about what information you had the first time on the telephone?*

*A.  No, not really.*

*Q.  When was the first telephone call that you made to me?*

*A.  I would say the first half of October, 2001.*

*Q.  And eventually did I come see you?*

*A.  Yes, you did.*

*Q.  When was that?*

*A.  I believe it was either late November or early December.*

*Q.  Of what year?*

*A.  2001.*

*. . .*

*Q.  And all together on the telephone how many times have you and I spoken?*

*A. Two or three times.*

*Q. And during those phone conversations had they been about the details of what you know about this case?*

*A.  No, I didn't.*

*Q.  Usually they were more about what?*

*A.  You contacting California.*

*Q.  And when's the trial going to happen and questions like that?*

*A. Yes, ma'am, just questions in general.*[639]

The State knowingly allowed Beckcom to testify falsely at trial that he spoke by phone with the lead prosecutor maybe "two or three times."[640]  But a review of the BOP's "TruFone" records for 2002 alone showed that Beckcom placed nine calls to the lead prosecutor's phone number.[641]  And the TruFone records actually underestimate the contacts between Beckcom and the lead prosecutor, because they do not include phone calls placed in 2001, and they do not include phone calls made by Beckcom's unit manager (who, Beckcom testified, dialed the lead prosecutor on his behalf those "two or three times").[642]  Calls such as those would not have been recorded or logged.  For example, there is no record of a call that Beckcom or someone on his behalf placed to the lead prosecutor right after the alleged November 24, 2001, confession.  However, a letter from HCDA to FCI Beaumont officials dated November 26, 2001, states that Beckcom had information about the murders and requested that the prison arrange for Siegler to interview him on December 10, 2001.  Beckcom or someone on his behalf had to have telephoned the State to tell prosecutors that.  Adding the "two or three" calls that Beckcom admitted to placing to the nine he falsely omitted means that Beckcom placed at least 11-12 phone calls to Siegler. And other members of the informant's ring also placed multiple, direct phone calls to Siegler using the TruFone system that BOP installed in 2002.[643]

Finally, Beckcom's, Foreman's, Moreno's, and Dominguez's lists of phone contacts all contain Siegler's name.[644]  She is also listed in Walker's personal phone book.[645]  Another FCI Beaumont inmate, Thomas Delgado, in a taped conversation with Prible's investigator,

---

[639] 26 RR 25-26.
[640] *Id.* at 26.
[641] *See* **Exhibit 56.**
[642] 26 RR 23.
[643] *See* **Exhibits 21, 40, 56,** and **78.**
[644] *See* **Exhibits 21, 40, 56,** and **78.**
[645] *See* **Exhibit 107** (Personal phone book of Carl Walker, Jr. listing Siegler's name and number).

confirmed that either Foreman or Beckcom had given him Siegler's number.[646]   Beckcom,

therefore, had opportunities to be privy to, or receive information or instructions through, phone

calls placed by any one of these other informants.  Walker, moreover, maintains that this is what

happened, with Foreman being the main conduit between the State and its key witness,

Beckcom.  The BOP records, along with Walker's statements and Foreman's affidavit, therefore

prove that the State sponsored false and misleading testimony about the crucial issue of the

extent of its communications with Beckcom.

    **3.**    **Letters show that inmates belonging to a ring of informants that included Beckcom and Foreman had similar information about the crime, thereby contradicting Beckcom's testimony that he got information only from Prible.**

The three letters from Martinez, the Gonzalezes, and Walker also show that members of

the FCI Beaumont informants' ring contacted the lead prosecutor about Prible's case on multiple

occasions offering to provide similar information about the crime in exchange for her influence

in securing them Rule 35 sentence reductions.[647]   The BOP letters therefore discredit the two

pillars that the State relied upon to bolster Beckcom's credibility.  First, the letters show that

Prible had been approached by other informants besides Foreman and Beckcom and had talked

about his case.  The letters therefore impeach Beckcom's testimony that Prible talked about his

case only to Beckcom and Foreman because Prible came to "love" them as "brothers."[648]   The

letters also refute Beckcom's testimony that Prible was the only source of information he had

about the crime, a claim that Beckcom repeated numerous times as in this exchange on cross-

examination:

> *Q.   Had you seen anything about this case on T.V. before you gave that statement?*

---

[646] *See* **Exhibit 54** (Affidavits of J.J. Gradoni, federally appointed private investigator; *attached also to* September 8, 2010,  Successor Application Pursuant to Article 11.071, as Group Exh. 'A'; *see also* Dkt. 17 at 16-17).
[647] *See* **Exhibits 35-37.**
[648] 26 RR 49.

*A. No.*

*Q. Read any newspaper articles about it?*

*A. No, the only article I saw was last week.*

***Q. Heard people talking about it?***

***A. No.***

*Q. You didn't know -- Prible came up to talk about this case*

*A. Yeah.*

*Q. -- throughout your conversations with him, nobody talked to you about the case, you didn't know anything about it, it was just everything -- all the knowledge you acquired, you acquired from Jeff Prible?*

*A. Yeah.*[649]

The letters show instead that Beckcom was part of a ring of informants who discussed the facts of the murder in order to put together a package of incriminating testimony in return for State favors.

The lead prosecutor knew Beckcom was involved with multiple FCI informants in schemes to incriminate Prible. Letters from Walker, the Gonzalez's and Martinez all refer to Beckcom and show these prospective informants' awareness of his connection with the prosecutor. A group photograph taken approximately 10 days before Prible's alleged November 24, 2001, "confession" show Prible surrounded by at least eight informants or would-be informants, all of whom were known to the prosecutor. Beckcom is prominently positioned right of back of Prible. Walker, Martinez, the Gonzalezes, Dominguez, and Gomez are also in the photograph.

---

[649] 26 RR 85.

Due process also prohibits the State from making false and misleading closing arguments. The State emphasized throughout its closing remarks that Prible was the only source of information for Beckcom's testimony.[650] The State also argued that Prible had confided in Beckcom and Foreman because Beckom had become an advisor to Prible.[651] However, the inmate letters, along with Walker's inside account of how the State fed information to its informants, show that the State knew that Beckcom and Foreman, rather than striking a singular friendship or unique advisory relationship with Prible, were part of a larger group who had targeted Prible in order to bolster the incriminating testimony they hoped would result in *quid pro quo* deals with the State.

### 4. BOP documents and the *Herrero* file show that Beckcom's portrayal of Foreman as a disinterested corroborating witness was false and misleading.

Moreno, in his July 3, 2001, interview with the lead prosecutor, revealed that Foreman, in league with Moreno, had hatched a scheme to provide testimony against Hermilo Herrero in exchange for State favors before Prible was ever charged. Siegler testified at her deposition that during this July 3, 2001, meeting, she and Moreno also discussed Prible's case.[652] Harris County records show that Siegler, using her maiden name, reviewed and accepted charges against Prible two days later.[653] BOP records show that Foreman was moved from FCI Beaumont to an "unassigned" facility in Harris County for a period coinciding with the session of the Grand Jury of the 177th District Court that indicted Herrero and Prible.[654] Two days after indictments were returned against Prible, Foreman was transferred back to FCI Beaumont.[655] Right after he got

---

[650] 28 RR 80-84.
[651] 21 RR 81.
[652] *See* **Exhibit 4-A** at 130-31.
[653] *See* **Exhibit 108.**
[654] *See* **Exhibits 18, 25-26.**
[655] *See* **Exhibit 18.**

back to FCI Beaumont, he gave his new cellmate, Beckcom, Seigler's name and number.[656] Together, the records are significant proof that Foreman was operating as an informant for the State even before Prible was transferred to FCI Beaumont Medium's general population.

At trial, however, the State allowed Beckcom to portray Foreman as a passive witness to Prible's conversations rather than a state agent intent on supplying incriminating information for state favors. Although the State realized Foreman was involved from the beginning in a plot to inform on Prible, the State allowed Beckcom to falsely and misleadingly portray "Foreman [as] interested in investing in the [asphalt] business" that Prible supposedly said he ran.[657] The State also allowed Beckcom to tell the jury, falsely and misleadingly, that Foreman and Beckcom initially "were actually making plans" for a joint business venture with Prible "for when we got out" – when the State knew that Foreman and Beckcom had been probing Prible from the start for information to support testimony, which they planned in advance to give, about a jailhouse confession, and knew that Foreman was a career criminal without any inclination towards honest toil.

> **5.** **Discovery ordered in present federal habeas proceedings shows that the State, through Beckcom, left the false and misleading impression on the jury that Foreman and Beckcom were not actively soliciting information from Prible.**

On July 3, 2001, two days before Prible was charged, Siegler interviewed Moreno about the Herrero cold case. Moreno informed her that Foreman either had information on Prible or was willing to assist the State in obtaining information to incriminate him. When deposed in 2017, Siegler confirmed that Foreman's name came up during her interview of Moreno in connection with Prible.

---

[656] *See* 26 RR 23.
[657] 26 RR 35.

Notes disclosed pursuant to this Court's *in camera* review of the State's trial file show that on August 8, 2001, the lead prosecutor and her investigator, Johnny Bonds, met with Foreman in the Federal Detention Center in Houston.[658]  The two met with Foreman to find out what he knew about Prible.[659]  Siegler and Bonds learned from this meeting that Foreman wanted a deal for providing information he said he had against Prible.  However, both Siegler and Bonds determined that Foreman was not credible, and believed he was not only willing to, but in fact was, fabricating evidence against Prible.[660]

Prible was not transferred to Beaumont Medium, where Foreman was incarcerated, until after the State charged him with capital murder on July 5, 2001.  The State was therefore aware that Foreman was never a disinterested bystander, but was intent on providing information against Prible from the moment Prible stepped onto Beaumont Medium's yard.  However, the State permitted Beckcom to misleadingly represent that he and Foreman did not target Prible from the outset, but rather, that Prible engaged them in conversation while they disinterestedly listened or took interest, not in his case, but in his asphalt business:

A. *Well, we talked about asphalt extensively.*

Q *(by Ms. Siegler):  Okay.  Tell the jury why y'all were talking about asphalt.*

A.  *Well, before we got real heavy into talking about the actual crime and the murders, you've got to understand we went back and forth because he's not trusting anybody at this point, anyway.  So, we began talking about an industry he knew about, which is the asphalt and the paving business.  So, this is before – I'm kind of getting out of sequence.  This is before I knew who you were or even that I would even consider doing this.  I was actually seriously interested in the asphalt business.*

Q. *Tell the jury why and how y'all talked about that.*

---

[658] *See* **Exhibits 19-20.**
[659] *See id.*
[660] *See* **Exhibit 4-A** at 107, 133-134, 192, 230, 287; **Exhibit 5** at 48-49.

*A. Well, because of the money involved. He was explaining all the facets of the business, of the equipment you would need. Foreman was interested. Foreman was interested in investing in the business so we were actually making plans on something to do when we got out. We went on back and forth some time with this asphalt situation.*

*Q. So, you had a lot of conversations talking about going into business together in the asphalt business, also?*

*A. Correct.*[661]

Beckcom admitted at his 2017 deposition that the conversations that he and Foreman had with Prible about his asphalt business were merely "a pretense" for extracting information from Prible about his case.[662] Beckcom's deposition therefore clarified that like Foreman, Beckcom had no other intention than to probe Prible, as instructed by the lead prosecutor, for "details" about the Tirado/Herrera murders.

6. **False and misleading testimony sponsored by the State was material under *Giglio* and prejudicial under *Carrier*.**

Under *Giglio,* relief is required if testimony that a defendant demonstrates was false and misleading had "any effect" on the jury's decision. If *Brecht* standards apply at the habeas stage to *Giglio* claims, the petitioner must demonstrate that the false and misleading testimony had a substantial and injurious effect on the outcome.[663] The very idea that Prible would confess was *prima facie* implausible. Prible was indicted on capital murder charges *before* he supposedly confessed. As investigator Bonds candidly stated, during his 2017 deposition, he would find it hard to believe that Prible, as voluble as he was, would have admitted to murdering the victims post-indictment.[664] Not only that, the State had to convince the jury that Prible would confess to two people he had no prior relationship to within weeks after meeting them.

---

Overcoming these implausible circumstances required the State to sponsor false and misleading testimony about Beckcom's and Foreman's initial motivations for engaging Prible in conversation, and to keep them unblemished by association with other FCI Beaumont informants. The State therefore allowed Beckcom to present a false and misleading narrative, according to which Foreman met Prible by coincidence, had no interest initially in incriminating him, but then developed a camaraderie that gave Prible confidence ultimately to confide in them apart from all others. These are the types of impressions that affect juries faced with otherwise completely implausible circumstances for a confession. Relief under *Giglio's* harm standard is therefore justified.

Furthermore, given these circumstances, the true picture – *i.e.,* that Foreman and Beckcom targeted Prible from the start, and did so in conjunction with other FCI inmates whom the State knew were communicating with each other about Prible's case – would make a different outcome reasonably probable. It is reasonably probable that the jury would find that Beckcom, along with Foreman, had to have fabricated Prible's confession. Because of the importance of Beckcom's testimony, it is therefore reasonably probable that the outcome in this case would have been different. Hence, relief under *Brecht's* standards for harm is also warranted.

## CLAIM #2

**IN VIOLATION OF DUE PROCESS GUARANTEED UNDER *BRADY V. MARYLAND,* THE STATE SUPPRESSED MATERIAL EVIDENCE THAT BECKCOM AND FOREMAN WERE PART OF AN ORGANIZED ATTEMPT TO SECURE FAVORS IN RETURN FOR FABRICATING A FALSE CONFESSION.**

Because the evidence underlying Prible's *Giglio* allegation in Claim #1 above was suppressed, Prible's due process rights under *Brady* were violated as well. Furthermore, even if the suppressed evidence does not directly demonstrate the falsity of the State's testimonial

evidence and argument, it impeaches the State's key witness as well as the State's method of gathering evidence and assembling its case. Relief from Prible's sentence and conviction is necessary because but for the suppression of this evidence, it is reasonably probable that the jury's decision would have been different.

## A. STANDARDS

Prosecutors are obligated to disclose evidence favorable to the defense under *Brady v. Maryland,* 373 U.S. 83 (1963). Whether prosecutors were ever aware of the existence or value of evidence to the defense is irrelevant. In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the Supreme Court clarified that prosecutors are liable even if other government agencies retained custody of *Brady* material. In *Strickler v. Greene*, 119 S.Ct. 1936, 1949 (1999), the Supreme Court distilled the essence of what petitioners must show to overcome procedural bars to litigating *Brady* claims. A petitioner must first make some showing that a *Brady* violation actually occurred – that is, he must make some showing that the State suppressed favorable, material evidence.[665] Second, a petitioner must show that the State's conduct was what caused his or her failure to discover the evidence.[666] This inquiry into cause is itself tripartite: (1) whether the prosecution withheld exculpatory evidence; (2) whether the petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (3) whether the State confirmed the petitioner's reliance on that policy by asserting during the state habeas proceedings that the petitioner had already received everything known to the Government.

The prosecution has an affirmative obligation to determine if evidence that comes into its possession could be put to favorable use by a competent defendant during the course of trial.

---

[665] *See Strickler,* 119 S.Ct. at 1948.
[666] *See id.* at 1949-50.

The Supreme Court extended *Brady* to include a duty to disclose evidence even if the defendant has not requested it, and to include both impeachment and exculpatory evidence.[667] Prible's defense counsel, moreover, filed motions for disclosure of exculpatory, or *Brady*, material.[668] However, the State suppressed evidence (i) that it was gathering and assembling its case against Prible using a ring of informants that included its key witness, Beckcom; (ii) that prosecutors had transmitted information about the case to Beckcom through Foreman and to other members of the ring of informants; (iii) that it was rewarding FCI Beaumont informants working in concert with Beckcom to secure confessions even though the State knew that those informants had given false and conflicting testimony in another case; and (iv) that Foreman was used to provide information to the Grand Jury that indicted Prible even though the Grand Jury convened before Prible allegedly confessed to Beckcom and Foreman.

## B.    ARGUMENT

**1.    The suppressed inmate letters[669] to Siegler demonstrate that the State was aware of, but failed to disclose, favorable evidence showing that Beckcom was part of an organized ring of informants manufacturing evidence against Prible.**

During state habeas proceedings, the State allowed Prible's state habeas counsel to review the State's files pursuant to its open file policy. State habeas counsel's billing records (on file in this case with the appellate clerk) show that he reviewed the file on two occasions, first with his investigator and a second time alone. However, because the prosecutors had placed the three inmate letters in a folder designated "attorney work product," they were not produced. Whether failure to disclose the letters was inadvertent or purposeful is irrelevant.[670]

---

[667] *U.S. v. Agurs*, 427 U.S. 97, 107 (1976); *U.S. v. Bagley*, 473 U.S. 667, 676 (1985).
[668] *See* **Exhibits 74** and **109.**
[669] *See* **Exhibits 35-37.**
[670] *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

In federal habeas proceedings, the State, pursuant to its open file policy, again allowed Prible's attorneys to review its file, except for material that the State deemed attorney work product. Federal habeas counsel ordered and paid for a copy of all documents disclosed by the State; however, the letters were not included in this production.

Despite *purporting* to incriminate Prible, the letters constitute *Brady* material. The three letters reveal that the State was utilizing a ring of informants who were engaging in a collective, coordinated effort to secure sentence reductions in return for providing the State with incriminating evidence in the form of manufactured confessions. Furthermore, the letters contain striking evidence that Beckcom was involved with a ring of informants who were striving to curry favors from the lead prosecutor in Prible's case in return for manufacturing incriminating evidence against Prible. Since the letters were addressed to the lead prosecutor and marked received, they show that the State was aware of a relationship between Beckcom and the ring of informants. And the fact that the letters were placed in a special file designated "attorney work product" shows that the State understood that the letters implicated its key witness in a scheme to fabricate evidence against Prible.

At the June 8-9, 2011, hearing, Prible's state habeas counsel explained why the three letters were material:

> *Q. And you mentioned that you thought that the letter from Walker contained at least leads to other information; is that correct?*
>
> *A. Yes.*
>
> *Q. And is this -- would this letter, too, be something that you would have investigated if you would have had it?*
>
> *A. Oh, yes, absolutely.*

*Q.  As a defense attorney what you -- was one of the things that you try to do is to impeach the integrity of the investigation of the methods by which the State is gathering this evidence; is that right?*

*A.  Yes.*

*Q.  Do these -- I'd like to show you, also, Defense Exhibit 4.  Do you recognize that (indicating)?*

*A.  Again, this is something that you showed me that was divulged during your investigation per the Court's order.*

*Q.  And taking those letters as a group, would they -- would you have investigated the individuals that are involved?*

*A.  Yes, absolutely.  I would have sent Greenfield to talk to every one of them, probably given the -- what I can only describe as the crucial nature of these identities, I would have gone with him and I would have tried to talk to them.*

*Q.  Again, why do you consider those things to be crucial identities?*

*A.  Well, because they -- not only do they buttress what the defense -- what  Prible was saying and what the defense -- the trial defense advocated, that  Prible was being framed by these guys, it also raises an issue of whether these -- these prison informants or potential prison informants were being used in an improper way by the Harris County District Attorney's Office. In other words, sending agents in to talk to Prible without revealing who or what they were at a time when he was already represented by counsel.[671]*

Prible's trial counsel also maintained that the letters were *Brady* material, not only because of the potential leads to defense witnesses that they may have contained, but because the letters confirmed that the State was involved with a ring of informants angling to testify in return for favors.  In particular, the letters showed that the State's key witness and the individual he claimed had also heard Prible's confession (Foreman) were known to and involved in this ring.  According to Prible's trial attorney,

*A.  Yes, what you -- the two letters that you just showed me are, in my opinion, Brady material.  They are impeachment type of evidence.  They show that there are all these people.  They obviously know one another.  They know Ms. Siegler.*

---

[671] *See* **Exhibit 50,** at 2 RR 43-44.

*They are seeking out deals. The fact is that there are other letters from the Herrero trial wherein Foreman's name also surfaces –*

*MS. HAMPTON: Judge, I would object to any testimony about the Herrero trial.*

*THE COURT: Sustained.*

*A. There would be –*

*THE COURT: Wentz, please wait for the next question.*

*Q (by Mr. Rytting): And why -- if you would, why do you consider this to be important impeachment evidence?*

*A. Well, one, it would show where Beckom is coming from. I refer to it as a culture of complicity of, you know, trying to gain favor so you can re-write your sentence at some future date. So, he's coming from this general mindset. You have these individuals who all know one another. You have these individuals who are writing to Ms. Siegler.*[672]

The story each letter tells about how the confession came about follows a pattern similar to the one followed by Beckcom's trial testimony, and corroborates Walker's contention that the informants named in the letters, including Beckcom and Foreman, coordinated their manufactured testimony. According to the common narrative in the letters, Prible is at first cautious and guarded, but gradually becomes more and more comfortable with the informants as camaraderie between them builds; finally, he allegedly confesses. Beckcom could have been devastatingly examined about his knowledge of this fabricated "evidence."[673]

Walker's letter, in particular, demonstrates that the lead prosecutor was the contact person for at least half a dozen inmates who were bargaining for shorter sentences in exchange for incriminating Prible. Walker's letter specifically identifies Beckcom, Beckcom's cellmate Foreman, and three others, as follows:

---

[672] *See id.* at 3 RR 61-62.
[673] An effective defense attorney would call one or more of the three signatories on these letters in order to introduce the content of the letters into evidence. Hearsay objections, moreover, would be useless since counsel would not be using the letters to establish the truth of the matters they assert, but rather to impeach the State's investigation and its key witness, Beckcom.

> *As you may, or may not, know from previous conversations with Nathan Foreman, myself, Mark Martinez, Jesse Gonzalez, his father Felix Gonzalez and Beckcom were all close friends of Pribble. We all hung around each other because we all are from Houston, and because some of us knew one another from home.*[674]

Walker's letter shows that he realized that Foreman and Beckcom were in contact with the lead prosecutor and were supplying her with incriminating information. Given the well-known repercussions that jailhouse informants face, Walker's letter is evidence that the participants he mentions, including Foreman and Beckcom, formed a tight-knit group of prisoners[675] who were drawn together by the common purpose of falsely incriminating Prible in return for the State using its influence to secure reductions in their sentences.

**2.     In violation of *Brady,* the State withheld favorable evidence that Foreman had been rewarded for helping secure the conviction of Hermilio Herrero using false confessions.**

Undersigned counsel asked to review the *Herrero* file after the State disclosed the three inmate letters to the lead prosecutor on the suspicion that the *Herrero* file might contain similar letters – particularly, letters from Beckcom or Foreman. On May 26, 2011, the HCDA provided copies of the *Herrero* file. The file did not contain correspondence from Foreman or Beckcom. However, it did contain a tape of the July 3, 2001, interview between Siegler and Moreno, the key witness against Herrero.[676] The file also contained letters from Siegler to AUSAs advocating Rule 35 sentence reductions for four witnesses: Foreman, Moreno, Dominguez, and

---

[674] *See* **Exhibit 36.**

[675] Letters in the *Herrero* file from the lead prosecutor to the BOP on behalf of her informants acknowledge the violent repercussions that informants may face if their role is known in the general population. In a May 1, 2002, letter to Michael Greene, the case manager at FCI Beaumont for Moreno, Gomez, Dominguez, and Foreman, Siegler states that "now that the defendant [Herrero] has sat through an entire trial and knows everything that these four witnesses had to say against him, the situation has only worsened. They are now known informants, not only to Herrero, but to the entire prison population. Please take whatever measures you feel necessary to protect these four witnesses…" *See* **Exhibit 42.**

[676] *See* **Exhibit 11.** A CD of the July 3, 2001, interview between Siegler and Moreno was attached as Exh. 'E' to Prible's June 22, 2011, *2nd Supp.*

Gomez.[677]  These four informants against Herrero were closely connected to the FCI Beaumont inmates that the State used to gather and assemble evidence against Prible.  The testimony of the informant central to the State's case, Michael Beckom, demonstrates that Foreman, in particular, was instrumental in developing the jailhouse snitch testimony that the State used against Herrero and Prible.[678]  These witnesses were also identified by Walker as informants in the letter he wrote to the lead prosecutor.

<strong>a.      The evidence from the <em>Herrero</em> file was suppressed.</strong>

At the June 8, 2011, hearing, the State argued that the *Herrero* case was irrelevant to Prible's proceedings[679] – despite the fact that, unknown to Prible's attorneys at the time, certain *Herrero* case documents were actually contained in Prible's casefile.[680]  The State stressed that even though Foreman may have been involved in both cases, he was not called as a witness in either.[681]  However, the Supreme Court has made it clear that *Brady* is not limited to evidence that can be used to impeach specific testifying witnesses.  Instead, a defendant is entitled to attack the integrity of the State's investigation.[682]  In *Kyles v. Whitley,* police withheld information that another person named Beanie had incriminated himself in the crime.[683]  The State argued that Beanie would have testified unfavorably to Kyles, so the defense would not have even called him.[684]  The Supreme Court corrected the State, explaining that:

> the defense could have examined the police to good effect on their knowledge of Beanie's statements and so have attacked the reliability of the investigation in failing even to consider Beanie's possible guilt and in tolerating (if not

---

[677] *See* **Exhibits 43-46.**
[678] 26 RR 23, 31, 35, 38, 49, 54, 56.
[679] **Exhibit 50** at 2 RR 29-30, 50.
[680] *See* **Exhibits 47, 59-60.**
[681] *See* **Exhibit 50** at 3 RR 9-10.
[682] *Kyles v. Whitley,* 514 U.S. 419 (1995).
[683] *Id.* at 446.
[684] *Id.*

countenancing) serious possibilities that incriminating evidence had been planted.[685]

Neither Prible's trial counsel nor his state habeas counsel received documents or tapes from the *Herrero* file. They had no reason to seek this material while they were representing Prible. The State's contention that the *Herrero* file is irrelevant even now should estop them from arguing that Prible's previous attorneys failed to exercise due diligence. Neither set of attorneys was aware, before November 19, 2004, of the information contained in Walker's August 26, 2010, statement or in the letters sent to the lead prosecutor bearing Martinez's, Walker's, and the Gonzalezes' names, in which Beckcom and Foreman are specifically identified as leading actors in a ring of informants that the State was using to secure the convictions of Herrero and Prible.

### b. Information in the *Herrero* file was favorable to Prible's defense.

The Rule 35 reduction letters and the July 3, 2001, Moreno interview demonstrate that the State was gathering and assembling its cases against Herrero and Prible using an overlapping ring of informants. The July 3, 2001, interview with Moreno, in particular, shows that by the time of Prible's trial, the State was aware that Foreman, in particular, was engaged in operations to incriminate defendants in cold case murders, using the same *modus operandi* in each case. In the July 3, 2001, tape, Moreno sets a context for the Herrero confession that is identical in vital respects to the context that Beckcom later testifies about in Prible's trial. First, Herrero does not just confess to Moreno, he supposedly confesses to Moreno *and Foreman:*

> KS:    *Who was there that day when [Herrero] said that to you.*
>
> JM:    *Dominguez and Nathan Foreman.*

---

[685] *See id.* (citing *Bowen v. Maynard,* 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation"); *Lindsey v. King,* 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial of prisoner convicted in Louisiana state court because withheld Brady evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case").

. . .

*KS:    You tell me Dominguez is Rafael Dominguez.*

*JM:    Yeah, Rafael Dominguez*

*KS:    About how old is he*

*JM:    Thirty ... he's about 27, 26*

*KS:    And he heard all this stuff you were telling me just now?*

*JM:    Yeah.*

*KS:    And who was the other guy there, Nathan Foreman.*

*JM:    Nathan Foreman.*

*KS:    Is he from Houston.*

*JM:    Yeah, we're all from Houston.*

. . .

*KS:    White guy or black guy.*

*JM:    Black guy*

*KS:    How old is he.*

*JM:    34 years old.*

*KS:    And he [Foreman] heard all this **the same time you did?***

*JM:    Yeah.*[686]

Moreno not only identifies Foreman, he explains why Herrero would confess to Foreman in particular. According to Moreno, Dominguez and Foreman were expecting a riot or disturbance at FCI Beaumont, and they wanted assurance that Herrero would help out if any one of them got caught in the violence:

---

[686] *See* **Exhibit 11.**

186

> *When he was telling me I was like, you want to tell me by yourself?  Why do you want to talk to me by these guys.  But the thing was we, everybody thought he wasn't going to back them.*[687]

Moreno goes on to explain that the tale of murder Herrero gave was to assure the others that he was a man of action and would not stand by if he saw members of their group in trouble.  He also assures the lead prosecutor that Dominguez and Foreman heard everything Herrero supposedly said.  Furthermore, Moreno refers only to one confessional occasion, namely, in late November or early December.

The July 3, 2001, tape, along with the Rule 35 reduction letters, further show that the lead prosecutor was prepared to use and reward members of the FCI Beaumont informants' ring even though they had given her false and conflicting information.  Moreno's tale about Herrero's confession to himself, Dominguez, and Foreman was impossibly false.  Contrary to Moreno's taped statement, Herrero could not have confessed to Moreno in November or December of 1999.  **BOP records list <u>February 28, 2000</u> as the date of Foreman's "admission and orientation" at FCI Beaumont.**[688]

Transcripts of Herrero's April 2002 trial provide ample evidence that informants that the State was sponsoring were fabricating evidence against Herrero, and that Foreman was involved in their efforts.  At trial, when asked who was present when Herrero allegedly described how he killed Guajardo, Moreno contradicted his July 3, 2001, statement and testified that Herrero confessed to Moreno, Rafael Dominguez, and Eddie Gomez.[689]  Gomez, however, is Hispanic, not a 34-year-old African-American, which is how Moreno confidently and correctly described Foreman in the July 3, 2001, interview.  Furthermore, instead of confessing to three individuals,

---

[687] *Id.*
[688] *See* **Exhibit 18** (BOP housing and transfer records for Foreman, which were also attached as Exh. 'G' to the June 22, 2011, *2ⁿᵈ Supp.*).
[689] *See* **Exhibit 63** at 3 RR 183.

Moreno maintained at trial that Herrero's November or December confession was heard by about four people who were milling about talking.[690]

Dominguez, however, contradicts Moreno's testimony and his taped statement:

*Q.   Do you remember a riot, Mr. Dominguez, that was supposedly going to happen in December of '99?*

*A.   Yes.*

*Q.   Do you remember kind of a pre-riot meeting?*

*A.   Yes.*

*Q.   Where you, Cevellos, Eddie Gomez, Moreno, and Herrero were supposedly there?*

*A.   Yes.*

*Q.   Did you hear Mr. Herrero talk about killing Albert then?*

*A.   At that time, I didn't.*

*Q.   Sir?*

*A.   At that time I didn't .*

*Q.   Not a word?*

*A.   No, at that time I didn't.*[691]

Dominguez also maintains that Herrero confessed in March of 2000 and that Moreno, Gomez, and another man named Cevallos were there.[692]   Furthermore, Dominguez brings Foreman into the equation.  Foreman, in fact, is the person who, according to Moreno, inquires

---

[690] *See id.*  Moreno's trial testimony also contradicts his July 3, 2001, statement on other fundamental points.  In the July 3, 2001, statement, Siegler asks why Moreno waited a year and a half, until April 4, 2001, to come forward. Moreno explains that up until July of 2000, he and Herrero were on good terms, but that in July of 2000 Herrero discovered Moreno had informed on another inmate and was going to kill Moreno for it.  This still left open the question of why Moreno waited eight months to come forth with Herrero's confession.  At trial, Moreno testified that he contacted the prosecutor in September of 2000, half a year before he sent his initial letter.  *See* **Exhibit 64** at 4 RR 5.

[691] *See* **Exhibit 128** at 5 RR 47.

[692] *See id.*

about Herrero's supposed assassination of Guajardo:

*Q: I want to direct your attention now and talk about a conversation you had with the defendant one day in the Year 2000. Do you know which conversation I'm talking about?*

*A: In March, 2000?*

*Q. Yes, sir, in March. Where were you and what was going on that day in the prison this conversation we're fixing to talk about.*

*A. We were in the rec yard.*

*Q. Who is we?*

*A. Me, Herrero, Foreman, and Moreno.*

*Q. What were you doing in the rec yard?*

*A. We were just hanging out.*

*Q. Remember what time of the day it was?*

*A. It had to be in the evening.*

*Q. Just hanging out?*

*A. Yeah.*

*Q. What happened to start this conversation? What led up to it?*

*A. We were in the rec yard.*

*Q. Who is we?*

*A. Me, Herrero , Foreman, and Moreno.*

*Q. What were you doing in the rec yard?*

*A. We were just hanging out.*

*Q. Remember what time of the day it was?*

*A. It had to be in the evening.*

*Q. Just hanging out?*

*A. Yeah.*

*Q. What happened to start this conversation? What led up to it?*

*A. We were talking about our war stories and stuff, our past crimes we've done. And Foreman, he had just finished telling a story how he had been kidnapped and tortured. And when he finished, Herrero made the comment of saying, You guys haven't put in no real work. And Foreman is like, What do you mean by real work? And he goes, Do you know Albert from the neighborhood? And Foreman's like, No, I don't know him. He's like, Well, I killed him. And Foreman is like, Oh, for real? And he's like, Cat and Jay know.*[693]

The fact that the lead prosecutor attempted to secure a Rule 35 sentence reduction for Moreno,[694] Dominguez, Gomez, and Foreman, although she had reason to believe they had given her false statements and knew that her trial witnesses had contradicted each other, should have been disclosed to Prible. Defense counsel should have been allowed to question Beckcom about whether he knew of Foreman's involvement in manufacturing evidence against Herrero and whether he was aware that the lead prosecutor had advocated on Foreman's behalf for a Rule 35 reduction. Even if Beckcom had denied knowledge, the jury would have had to judge how likely it was that Foreman would have kept this information from his cellmate, with whom he had worked hand in glove to gather evidence against Prible. This would have impeached whatever motive to be truthful the jury may have imputed to Beckcom.

      c.      **Foreman's involvement in the scheme to suborn perjury and manufacture evidence in the Herrero case should have been disclosed to Prible's counsel.**

To convict Herrero, the State needed to explain why Moreno didn't contact the prosecutor until long after he claimed Herrero confessed. In opening arguments the State explained that Moreno did not intend to inform against Herrero until Herrero discovered that Moreno had been in a witness for the State in another case. According to the State, Herrero

---

[693] *Id.* at 10-11.
[694] She was successful in the case of Moreno. *See* **Sealed Exhibit 49.**

threatened Moreno's life and the lives of his family members, and BOP had to protect him from Herrero by putting him in the SHU and transferring him. According to the State, Moreno decided that despite these measures, he could not survive Herrero while in the federal prison system. That is why, according to the State, Moreno contacted the prosecutor in the hope that testimony he gave against Herrero would get him out of jail soon. However, BOP documents show that this argument, and the testimony in support that the lead prosecutor solicited from Moreno and Dominguez, was all a lie. Confidential memoranda show that Moreno was place in the SHU and then transferred out of FCI Beaumont due to his involvement in a scheme to smuggle drugs into FCI Beaumont for the Texas Syndicate.[695] The Texas Syndicate obtained transcripts of Moreno's testimony against one of their members to blackmail Moreno into smuggling drugs, and according to Moreno, the Texas Syndicate, not Herrero, put a hit on him.[696]

In the event that Foreman testified, the State manufactured a similar motive for Foreman to come forth and testify against Herrero. Two month before Herrero's trial, the lead prosecutor drafted a letter to BOP asking them to segregate Foreman from the general population, allegedly to keep him safe from Herrero.[697] BOP did the prosecutor's bidding even though it did not have any information that Foreman was in danger other than the prosecutor's representations.[698] Foreman, himself, did not ask to be put in the SHU. The prosecutor also wrote similar letters on behalf of Moreno, Dominguez, and Gomez (who did not testify) seeking protective status in FCI Beaumont.[699]

---

[695] *See* **Sealed Exhibit 82.**
[696] *Id. See also* **Exhibit 81** (table setting out text of BOP memo next to excerpts of State's Opening and Closing arguments).
[697] *See* **Exhibit 110** (BOP memo dated February 14, 2002, referencing letter from Siegler).
[698] *See* **Exhibit 111** (BOP memo dated May 7, 2002).
[699] *See* **Exhibit 42.**

The State's role in manufacturing evidence in the related case of Herrero, if disclosed, would have allowed Prible to severely impeach the State's case. In particular, Prible would have had grounds for questioning Beckcom about his knowledge of Foreman's involvement in this scheme to manufacture evidence.

3. **The cumulative effect of the false and misleading testimony and suppressed evidence was material under *Giglio* and *Brady,* and was therefore prejudicial under *Carrier*.**

a. **Inmate letters to the prosecutor documenting Beckcom's and Foreman's association with a ring of informants would have undermined the State's case.**

BOP documents indicate that trial counsel may have obtained some sort of list naming F. Gonzalez, J. Gonzalez, M. Martinez, and Foreman as potential trial subpoena targets.[700] However, only Beckcom was listed as a witness, and the State failed to disclose critical information showing that Beckcom and these potential subpoena targets were in league. Information demonstrating that the Gonzalezes, Martinez, and Beckcom were aware of their mutual activities developing evidence against Prible in hopes of a *quid pro quo* from the State was contained in the letters that the Gonzalezes, M. Martinez, and Walker (whose name is not mentioned in the September 2002 BOP Memorandum) signed and transmitted to the lead prosecutor four months earlier.

Without disclosure of information showing that the State's key witness was part of a common effort to incriminate Prible, defense counsel did not have the opportunity or a reason to investigate the Gonzalezes or Martinez. The subpoena list appears to have been disclosed within weeks of trial, and trial counsel had every reason to believe that the reference to the Gonzalezes, Martinez, and Foreman were diversionary. The lead prosecutor had a reputation of disclosing numerous diversionary leads near the time of trial. Selective disclosure, however, does not

---

[700] *See* **Exhibit 85.**

discharge the State's duty to disclose information that would lead competent counsel to exculpatory information. Instead, selective disclosure functions as a false representation that the State has discharged its discovery and *Brady* obligations when, in fact, the State is withholding information that is favorable and material to the defense. Furthermore, the State failed to disclose, even as a diversionary tactic, Walker's identity or information showing that Walker was aware of the scheme to incriminate Prible, in which Beckcom was involved.

> **b.** **By suppressing Walker's identity, the State prevented defense counsel from impeaching the State's key witness and its method of assembling its case.**

If they had been able to call Walker, competent counsel would have been able to undermine Beckcom's entire testimony as well as impeach the State's method of assembling and gathering its case. Walker's statements recounting that Beckcom and Foreman were familiar with the details of the case seriously undermine Beckcom's recurrent claim that he learned everything he knew about the murders from Prible. Similarly, competent counsel would have been able to establish that Beckcom and Foreman were operating as agents of the State from the beginning, thereby undermining testimony critical to Beckcom's credibility. In this regard, striking use could have been made of the fact that Walker was present when Beckcom and Foreman supplied Prible with intoxicating substances in order to encourage him to talk. Finally, a competent attorney would have used Walker's testimony to demonstrate that the State had played an active role supplying Beckcom with information about the case so that he could fashion a suitable "confession."

Walker's status as a former member of the informants' ring could not have been ignored by the jury. The Texas courts, in fact, determined that Walker was a witness to the nascence of

the conspiracy and to the interactions between Prible, Foreman, and Beckcom.[701] Finally, documents produced by the BOP, as well as documents disclosed by the State pursuant to Prible's 2011 motion for *in camera* review of the State's file in his case, corroborate Walker's recollection of the extent and nature of the communications between Beckcom and the informants' ring and between Beckcom and the prosecution. By suppressing the inmate letters, the State prevented Prible from discovering a witness with first-hand information who could have thoroughly impeached the State's key witness and the State's method of gathering and assembling evidence against Prible. The evidence, therefore, is material and prejudicial under *Brady* and *Carrier*. This Court should therefore reach the merits of Prible's prosecutorial misconduct claim and grant relief.

        **c.**       **Competent counsel could have placed the State's case in a completely different light so as to shake confidence in the verdict if the State had fulfilled its duty to disclose the July 3, 2001, taped interview of Moreno and the letters from Siegler seeking Rule 35 sentence reductions for FCI Beaumont informants.**

Preserving the integrity of the State's investigation and the credibility of the State's key witness against Prible, namely, Michael Beckcom, depended critically on suppressing evidence found in the *Herrero* file that would have enabled the defense to argue that the State had arranged for Prible to be targeted by FCI Beaumont informants. Evidence that the State had filed charges against Prible in order to place him in contact with known informants already working for the State would have impeached the State's key witness and its method of assembling its case, and it would have highlighted the weakness of the State's non-informant evidence.

The State's opening and closing arguments reflect the importance, for the rest of the State's case, of being able to convince the jury that Beckcom and Foreman were initially disinterested witnesses who passively received a confession from Prible, rather than State agents

---

[701] *See* **Exhibit 65** at 3, *Finding No.* 15.

angling to incriminate Prible for State favors. In the State's opening remarks, the lead prosecutor told the jury that "you will also learn from the evidence that before this State, me, ever knew of the existence of Michael Glen Beckcom, these capital murder charges were already filed on Prible."[702] In closing, the lead prosecutor's co-counsel emphasized that the charges against Prible were based on non-informant evidence, and that Beckcom's testimony was not developed until later.[703] The allegation that Prible coincidentally, not through the State's manipulations, was housed with an informant was, in fact, the first premise of the prosecutor's promise to "prove[] to [the jury] that Mike Beckcom was telling the truth."[704] The lead prosecutor also instructed the jury "to remember what Vic told you, it wasn't until charges were already filed on Jeff Prible that caused Jeff Prible to be moved from Beaumont Low to Beaumont Medium, that he ever even met Mike Beckcom."[705]

Evidence in the *Herrero* case showing the State knew on July 3, 2001, that Beckcom's confederate, Foreman, was at FCI Beaumont and was already working to supply the State with incriminating information against another inmate, if it had been disclosed, would have allowed trial counsel to document for the jury that the State charged Prible two days later, on July 5, 2001, not because it had different non-informant evidence, but in order to ensure that Prible was in reach of veteran jailhouse agents whom the State had used as informants in the past. With a tape recording and documentation that the State knew Foreman was working together with Moreno to incriminate Herrero, Foreman's status as Beckcom's cellmate would no longer appear to be a natural explanation for why Prible's alleged confession might be heard by Beckcom and Foreman in tandem. Instead, it would be additional evidence that Beckcom and Foreman, from

---

[702] 21 RR 82.
[703] 28 RR 15-16.
[704] *Id.* at 15.
[705] *Id.* at 77-78.

the beginning, intended to incriminate Prible for favors that they realized the State was dispensing no matter how confabulated an informant's testimony might be.

In light of proof that the State charged Prible in order to expose him to the FCI Beaumont informants, the State's insistence that even without Beckcom's contribution the State had strong physical and testimonial evidence of guilt would be undermined, and a completely different picture of the case would emerge. Specifically, competent defense counsel could forcefully point out that the State developed the DNA evidence and obtained all witness statements more than two years before the charging decision, but did not charge Prible even though it only needed probable cause to do so. With the suppressed evidence in hand, the defense could devastatingly argue that the reason the State charged Prible was because it realized that the only way to secure a conviction was by making sure that Prible remained at FCI Beaumont where he could be targeted by informants who had successfully provided the State with jailhouse confessions before. The suppression of the Moreno interview and the letters showing the widespread dispensation of State favors to multiple informants closely associated with the State's key witness clearly was material under *Brady* and prejudicial under *Carrier.*

**CLAIM #3**

**IN VIOLATION OF *BRADY* AND DUE PROCESS GUARANTEED BY
THE FOURTEENTH AMENDMENT, THE PROSECUTION
SUPPRESSED EVIDENCE THAT FOREMAN, WHOM BECKCOM
REPRESENTED COULD CORROBORATE HIS STORY, GAVE A
DIFFERENT ACCOUNT, AND WAS, IN FACT,
FABRICATING EVIDENCE AGAINST PRIBLE.**

**A.      The State Suppressed Foreman's History of Fabricating Evidence Against Prible.**

The prosecution suppressed from Prible's defense counsel the fact that Siegler and Bonds met with Foreman on August 8, 2001, before Prible was indicted, at the suggestion of inmate Moreno, a long-time informant of Siegler's who was imprisoned with Foreman in FCI

Beaumont.  The prosecution suppressed the fact that they had immediately determined, at that August 2001 meeting, that Prible had neither confessed to Foreman nor discussed his case with him.  According to Bonds, Foreman's inability to describe Prible led him to conclude that Foreman had not ever seen Prible and that the information Foreman was offering was fabricated.

Furthermore, Siegler and Bonds met with Foreman on December 10, 2001, at FCI Beaumont, but found him no more credible than when they had interviewed him three months earlier.  The lead prosecutor denied that race or appearance had anything to do with the decision not to use Foreman.[706]  According to the prosecutor, Foreman's story did not hang together or fit with the facts:

> Q.   And on December 10th of 2001, you interviewed Nathan Foreman, along with Johnny Bonds, at least that's what the record indicates based on Johnny Bonds' notes?
>
> MS. MIRANDA:· Objection, form.
>
> A.  I don't remember that specifically but I'm not going to argue with that.
>
> Q (by Mr. Rytting):  All right.  Did you determine Nathan Foreman was not credible because – did that have – did that have anything to do with his race?
>
> A.  No.
>
> Q.  Did it have anything to do with his appearance?
>
> A.  With his what?
>
> Q.  With his appearance.
>
> A.  No.
>
> Q.  Was it because his story just didn't hang together or didn't fit the facts?
>
> A.  That was a lot of it.[707]

---

[706] *See* **Exhibit 4-A** at 287-88.
[707] **Exhibit 4-A** at 287-88.

However, the prosecutor failed to disclose her December 10, 2001, meeting with Foreman; failed to disclose that Foreman's account conflicted with Beckcom's, whose description of a "confession" the prosecution insisted was true; and failed to disclose that the State had bargained with Foreman for his cooperation against another FCI Beaumont inmate, Hermilo Herrero, in another cold case murder.

**B.     The undisclosed interviews of Foreman were material.**

Beckcom, the State's key witness, directly implied, in his pretrial statements and in his testimony, that Foreman could corroborate everything Beckcom said he heard and saw Prible say and do, because Foreman heard and saw everything that Beckcom did.   The two inmates, Beckcom and Foreman, at all times coordinated efforts to extract information from Prible.   Not only was Foreman present; according to Beckcom, Foreman actively participated in efforts to extract the details about the crime that the prosecutor wanted from Prible.   However, when the prosecutor and her investigator interviewed Foreman, they both realized that Beckcom's corroborating witness could not back him up, and in fact, was fabricating evidence against Prible.

So the question of materiality is this:  when a key witness, on whom the State's case critically relies, represents that there is another person who can corroborate every relevant event on which his testimony depends, would proof that this other person could not corroborate the key witness (and was in fact trying to fabricate evidence against the defendant since before he had even met the defendant) make a different outcome reasonably probable?  Clearly, a reasonable juror would react just like a reasonable prosecutor or detective would and reject, wholesale, the testimony of the key witness.

Without Beckcom's testimony, though, the State's case hinged on DNA analyst William Waton's testimony, which implied that Tirado died within an hour of having oral sex with Prible. This testimony was not the kind of overwhelming, or even substantial, evidence of guilt that makes testimony such as Beckcom's immaterial. The State's other witness, Dr. Joye M. Carter, disputed Watson's testimony, as did the defense's expert, who was Watson's mentor. In addition, Prible had an alibi witness, a neighbor who knew Prible and Herrera by sight and by voice and confidently testified that she saw Herrera drop Prible off at Prible's home. Prible's home was a mile away from the scene of the murders that took place shortly after Herrera left Prible and returned to his own house.

Given (i) the exculpatory value of an alibi witness, (ii) the weakness of the State's forensic DNA evidence, and (iii) the fact that Foreman could not corroborate Beckcom, as Beckcom represented he could, but instead fabricated evidence, a reasonable juror would have voted to acquit. The withheld evidence therefore easily satisfies the lesser "reasonable probability of a different outcome" standard required for relief under *Brady*.

**CLAIM #4**

**IN VIOLATION OF *BRADY*, THE STATE SUPPRESSED EVIDENCE IMPEACHING ITS KEY WITNESS'S TESTIMONY REGARDING THE CIRCUMSTANCES OF THE ALLEGED "CONFESSION" AND HIS MOTIVES FOR QUESTIONING PRIBLE.**

**A.      FACTS**

At Prible's trial, the State's key witness, Beckcom, testified that Prible eventually confessed to him and Foreman after a long and involved series of encounters at which Foreman was invariably present. According to Beckcom's trial testimony, Beckcom did not speak with Prible for several days after Prible arrived at FCI Beaumont Medium. Beckcom testified that he

met Prible incidentally through Bobby Williams, that Prible initiated the conversation, and that

he (Beckcom) and his confederate Foreman were initially disinterested in what Prible had to say:

> *Q (by Ms. Siegler): Now tell the jury, who was it that first introduced you [to Prible].*
>
> *A. Well, I don't know if it was what you could call an introduction. I exercise with a gentleman named Bobby Williams. And a couple of occasions Prible used to walk up and speak to Bobby on different days.*
>
> . . .
>
> *A. I was sitting on the bleachers in the rec yard just catching some sun, listening to my radio and Prible approached myself and Nathan Foreman.*
>
> *Q. How did it start out, what did the Defendant say to you first?*
>
> *A. Just general conversation, really. I wasn't too much paying attention to him because I really didn't know who he was. Then it seemed he sat down near me and it seemed he wanted to talk so he was striking up conversation with me.[708]*

According to Beckcom, he and Foreman spoke about the asphalt business with Prible, as their

concern was not in helping the State make a case against Prible but in going into business with

Prible after prison:

> *A. Well, before we got real heavy into talking about the actual crime and the murders, you've got to understand we went back and forth because he's not trusting anybody at this point, anyway. So, we began talking about an industry he knew about, which is the asphalt and the paving business. So, this is before – I'm kind of getting out of sequence. This is before I knew who you [Siegler] were or even that I would even consider doing this. I was actually seriously interested in the asphalt business.*
>
> *Q. Tell the jury why and how y'all talked about that.*
>
> *A. Well, because of the money involved. He was explaining all the facets of the business, of the equipment you would need. Foreman was interested. Foreman was interested in investing in the business so we were actually making plans on something to do when we got out.[709]*

---

[708] 26 RR 28, 31-32.

[709] *Id.* at 31-32.

Beckcom stated that Prible gradually revealed more and more details of the crime as he grew to trust Beckcom and Foreman. Finally, Beckcom said, Prible, overcome with a sense of camaraderie, confessed to the two of them on November 24, 2001:

> *Q. Did you make note of a specific day in these conversations you had with Jeff?*
>
> *A. Only the last one.*
>
> *Q. That date being what?*
>
> *A. November 24th.*
>
> *Q. And why did you remember that date?*
>
> *A. Because it was most of the conversation I just gave you. It's where he really poured it all out.*
>
> *Q. What led up to the Defendant finally telling you all these details on November 24th?*
>
> *A. I guess it was a culmination of a lot of things. He'd finally gotten used to us [i.e., Foreman and Beckcom] and relaxed.[710]*

## B.      THE STATE SUPPRESSED IMPEACHMENT EVIDENCE

The State failed to disclose that on August 8, 2001, Siegler and Bonds had met with Foreman at the Federal Detention Center in Houston. The State did not disclose that Foreman's purpose, in requesting the August 8, 2001, meeting, was to bargain for State favors in return for incriminating information. The State did not disclose that Foreman was attempting to bargain with fabricated evidence. Nor did the State disclose the fact that Foreman, long before Prible's trial, had become a cooperating witness against Hermilo Herrero, under an arrangement whereby the State was assisting Foreman in his efforts to secure a Rule 35 sentence reduction in return for

---

[710] 26 RR 53.

incriminating information.[711]

## C. THE SUPPRESSED EVIDENCE WAS FAVORABLE, AND MATERIAL

In *Bagley,* the Supreme Court clearly instructed that evidence impeaching the State's case, as well as positively exculpatory evidence, is material and must be disclosed.[712]  Because Beckcom did not come into contact with Prible until several months after Prible was indicted for capital murder, and since Beckcom and Foreman remained in contact with Prible for only a short period before Prible was transferred from FCI Beaumont to the Harris County Jail, the jury had to have an explanation for why Prible would risk his life and confess to Beckcom and to Foreman.  The jury also needed assurance that Beckcom was not fabricating a confession in the hopes that by securing a conviction, the lead prosecutor would use her influence to obtain a reduction of his federal sentence.  Beckcom's testimony that he and Foreman were disinterested listeners, who met Prible coincidentally and engaged in normal, natural conversation about matters besides Prible's case that eventually led to a friendly and confidential relationship, provided the jury with these necessary assurances.

The fact that Foreman was fabricating evidence against Prible for state favors *before he ever met Prible* completely undermines Beckcom's testimony about his and Foreman's neutral motives and the circumstances that made it plausible for the jury to think that Prible would have chosen Beckcom and Foreman as his confidants.   Reasonable jurors would conclude that Foreman and Beckcom were instead intent on setting Prible up from the start.  Indeed, Beckcom admitted during deposition that he engaged Prible in talk about Prible's asphalt business as a "pretense" for extracting information about Prible's case.[713]

---

[711] *See* **Exhibit 44** (May 1, 2002, letter from Siegler to Foreman's AUSA informing her of Foreman's cooperation in Herrero trial).
[712] *See Bagley,* 105 S. Ct. 3380.
[713] **Exhibit 29** at 138-39.

It is also reasonably probable that jurors – who knew from trial testimony that Foreman was Beckcom's roommate, and knew from trial testimony that Foreman had put Beckcom in contact with the lead prosecutor – would have concluded that Beckcom and Foreman were conspiring to fabricate evidence against Prible just as Foreman had done in August 2001.  The likelihood that jurors would draw such a conclusion would only increase had the State not suppressed evidence that Foreman was being awarded in another cold murder case, despite the fact that the lead prosecutor had determined that he was fabricating evidence.

With Beckcom's story about his and Foreman's motives impeached, and with evidence impeaching the circumstances under which Prible came to trust Foreman and Beckcom undermined, it is reasonably probable that jurors would find it incredible that Prible would have confessed to Beckcom.  Given Foreman's relationship with Beckcom and the lead prosecutor, and evidence that the State was rewarding Foreman in another case despite realizing he had fabricated evidence and was not a credible witness, it is reasonably probable that jurors would find that Foreman was conspiring with Beckcom to falsely incriminate Prible.

Because Beckcom was a key witness, and the other evidence against Prible was **under**whelming, it is reasonably probable that the final judgment of the jurors would have been different.  Consequently, this Court should grant relief.

## <u>CLAIM # 5</u>

### THE STATE WITHHELD EVIDENCE THAT THE TRIAL COURT ORDERED PRODUCED PURSUANT TO *BRADY*

The prosecution concealed from Prible's defense counsel the fact that Siegler and Bonds had met with Foreman on August 8, 2001, before Prible was indicted, at the suggestion of Jesse Moreno, Siegler's long-time informant who was imprisoned with Foreman in FCI Beaumont. They concealed the fact that they immediately determined, at that August 2001 meeting, that

Foreman had never laid eyes on Prible, let alone heard a confession from him. They concealed the fact that they continued to speak with Foreman and his lawyer about Prible's case anyway, and even arranged another face-to-face meeting with him at FCI Beaumont on December 10, 2001. They concealed the fact that they met with Beckcom, Foreman's cellmate, immediately after meeting with Foreman, and decided to use him as their informant instead. They concealed the fact that Siegler had written a Rule 35 sentence reduction letter for Foreman five months before Prible's trial. And they concealed the fact that Siegler personally testified at a Rule 35 hearing for Moreno two months before Prible's trial, resulting in 77 months being taken off of Moreno's sentence. Not only did she fail to disclose this material evidence to the defense, she took steps to actively conceal it from Prible's attorneys and the trial court.

Before Prible's trial, his defense team filed various discovery motions, including a *Motion and Request for Production of Evidence Favorable to the Accused* (the *"Brady"* Motion).[714] The motion included a general request for all *Brady* evidence and asked for specific information related to the State's dealings with Michael Beckcom, who was the only informant that Prible's attorneys knew about. The court took up the *Brady* motion at a September 10, 2002, pre-trial hearing,[715] at which time Siegler misled the trial court, made numerous misrepresentations, and also concealed evidence that the court ordered her to disclose. What follows are troubling excerpts from those hearings.

(i)     The defense asked for <u>the date, time, place, and manner of the State's contacts with Beckcom, "[i]ncluding a statement of how contact was first initiated, and with whom it was made."</u>[716]     The following exchange took place at the hearing:

---

[714] **Exhibit 109.**
[715] **Exhibit 70.**
[716] *See* **Exhibit 109**.

*MR. GAISER: No. B [of the defense's Brady motion] has to do with the date, time, place and manner of the State's contacts with this witness, including a statement of how the contact was first issued and with whom it was made.*

*MS. SIEGLER: Judge, and I don't think I'm required to provide that to him. If they want to ask him on cross examination how many times I've met with him, how we first came to come in contact with each other, I think they get to do that. But I don't think I have to sit down and write out a statement to the Defense as to how I came in contact with Mr. Beckcom.*

*MR. GAISER: Well, Judge, that assumes that Mr. Beckcom is going to be completely truthful and honest on cross examination and that we would not have to call Ms. Siegler to – the only way we have of knowing how the contact was initiated, for instance, whether he initiated it or they initiated it, are certainly relevant to his motive for testifying in this case. And I fail to see how this could be work product as to dates and times and places as opposed to the contents.*

*MS. SIEGLER: Judge, I'll agree to tell Mr. Gaiser how we came into contact and the times that we've met. I don't remember the dates. I didn't take any notes. And the best that I can remember, I'll let him know what they are, but I'm not going to write it all down. He can come to my office and I'll sit down and tell him what I can remember.*

*MR. GAISER: I don't need it in writing, Judge.*

*THE COURT: Okay. I'll grant it as to – what Ms. Siegler said is okay with me as far as No. B is concerned. That will be granted as to Ms. Siegler's oral transmission of the information to Mr. Gaiser as described on the record.[717]*

But Siegler never told the defense that her long-time informant, Jesse Moreno, had put her in contact with Nathan Foreman back in July 2001; that Foreman had come to her in August 2001 with a false confession story before he had even met Prible; and that Foreman ultimately put her in contact with his cellmate, Beckcom. And contrary to her representations at the hearing, Siegler and Bonds *had* taken notes at their December 10, 2001, meeting with Beckcom.[718] They had also taken notes at their meetings with Foreman, but Siegler did not even reveal her meetings with Foreman, let alone hand over her notes of them.[719]

---

[717] **Exhibit 70**, at 4-5 (emphasis added).
[718] *See* **Exhibit 20.**
[719] *See* **Exhibits 19-20.**

(ii)     The defense asked for <u>Beckcom's entire criminal record, including any sentence</u> <u>reduction requests.</u>[720]  The following exchange took place at the hearing:

> MR. GAISER:  We're asking that we be allowed to have his [Beckcom's] entire criminal record, including arrests and detentions, probations, deferred adjudications, sentence reductions or sentence reduction requests, anything in the possession of the State or which the State can have access to by request.  And we believe that all of those will ultimately be relevant to his cross examination.
>
> THE COURT:  For clarification, the sentence reductions and sentence reduction requests, would these be referring to Federal cases he may have?
>
> MS. SIEGLER:  Yes.
>
> MR. GAISER:  Yes, Your Honor.
>
> THE COURT:  That's fine with me.  Okay.  That's granted.[721]

But Siegler did not disclose to Prible's trial attorneys that she had been talking with Beckcom's California AUSA for months leading up to Prible's trial about a possible sentence reduction.[722]

(iii)     The defense asked for <u>a complete list of all cases in which Beckcom had appeared</u> <u>as a witness, been listed as a witness, or volunteered to appear as a witness.</u>  The trial court granted this request.[723]  Beckcom had been bench-warranted by Siegler as a witness for the prosecution in *Texas v. Danny Bible*,[724] another capital murder case that she was handling at the same time as the Prible case.  Siegler never disclosed this to Prible's trial team.  At her deposition, Siegler testified that Beckcom was never a witness in Bible's case, but that she purposefully misrepresented that he was so he would be attached to Bible's case and "Jeffrey Prible wouldn't know that he was brought back for Jeffrey Prible's case."[725]  By doing so, she

---

[720] *See* **Exhibit 109.**
[721] **Exhibit 70** at 4.
[722] *See* **Exhibits 33-34.**
[723] **Exhibit 70** at 6.
[724] *See* Harris County District Clerk's record listing "Michael Beckmon" as a prosecution witness, attached as **Exhibit 112,** at 3.
[725] **Exhibit 4-A** at 267-68; 288-91.

would have also been able to conceal any face-to-face meetings she might have had in the Harris County jail with Beckcom concerning Prible's case.

(iv)     The defense asked for "[a] copy of all statements made by Beckcom and communicated to the State, including notes of any conversations had with Beckcom by any agent of the State."[726]  The following exchange took place at the hearing:

> MR. GAISER:   We've been supplied with a written statement that [Beckcom] made and been told by Ms. Siegler that that's the only written statement they have.
>
> MS. SIEGLER:  That's correct, Judge.  And, again, like we've talked about once before, I've given Mr. Gaiser the statement Beckcom wrote up for me as to his communications with Prible and how they came into contact.  I've already provided that to him and it's still our position that any notes that either myself or Johnny Bonds made when we went to visit Michael Beckcom is work product.
>
> THE COURT:  I agree.  So, I will grant it as to the witness statement that's been described in the record, not as to notes made by Ms. Siegler or Mr. Bonds.[727]

In fact, Siegler had another written statement in her file from Beckcom, which she never disclosed to the defense.  This was the letter from Beckcom seeking assurance that he was going to get a time cut and asking Siegler to arrange a meeting with him and another inmate, Anton Davi, to discuss another informant opportunity – a request that Siegler granted.[728]

(iv)     The defense asked for "a copy of any agreements made with Beckcom concerning any benefits or treatment he will receive in exchange for his testimony in this case, including any oral agreements."[729]  This request was also granted.[730]  But Siegler did not disclose that she had already been in touch with Beckcom's AUSA; that she expected a time cut to be forthcoming;

---

[726] **Exhibit 109.**
[727] **Exhibit 70** at 7.
[728] See **Exhibits 95-96.**
[729] **Exhibit 109.**
[730] See **Exhibit 70** at 8.

and that she had intimated this to Beckcom.[731]  Nor did she disclose that she arranged the meeting with Beckcom and Davi, as Beckcom had asked her to.[732]

(v)    The defense asked for "[a]ll promises, agreements, offers or leniency, consideration or understandings extended to any State witnesses, their relatives or friends for testimony against the defendant."[733]  The trial court granted this request.[734]  But Siegler never disclosed that she had written a Rule 35 letter to Foreman's prosecutor[735] a few months before, nor did she disclose that she had traveled to Lafayette, Louisiana, to testify as the sole witness in Jesse Moreno's Rule 35 hearing, which resulted in 77 months being taken off of his remaining 78-month sentence.[736]

(vi)    The defense asked for "[a]ll witness statements whether written or oral which conflict internally or with the statements of other witnesses."[737]  At the pre-trial hearing, the court ordered the prosecution to produce "all witness statements, whether oral or written, by any witness."[738]  The following exchange took place at the hearing:

> MS. SIEGLER:  Judge, [how] about just written because oral statements is a lot of people that end up not saying anything worth – worth our time and I didn't take notes on and I don't plan on using.
>
> THE COURT:  Okay.  I guess with the exception of any oral statement by any witness turns out to be Brady –
>
> MS. SIEGLER:  Okay.
>
> THE COURT:  -- or exculpatory or impacts on punishment, then that –
>
> MS. SIEGLER:  Yes, sir.

---

[731] *See* **Exhibit 29** at 20, 92.
[732] *See* **Exhibit 4-A** at 240-42.
[733] **Exhibit 109.**
[734] **Exhibit 70** at 8.
[735] *See* **Exhibit 44.**
[736] *See* **Sealed Exhibit 49.**
[737] *See* **Exhibit 109.**
[738] **Exhibit 70** at 16.

*THE COURT: -- needs to be turned over.  So I'm going to say any written statements and then I'm going to change the language to any oral statements which are Brady or mitigate punishment.*[739]

When Siegler represented to the court that she did not want to produce oral statements because a lot of them were from "people that end up not saying anything worth [] our time," she was no doubt referring to Foreman and the other would-be informants.  It is no wonder she did not want to disclose those, because they would have dealt a fatal blow to Beckcom's credibility.  Consequently, she did not disclose the audio of her July 3, 2001 meeting with Moreno, in which he gave her Foreman's name.  She did not disclose her notes from her conversations with Beckcom, Foreman, and Moreno, which would have revealed that the conspiracy to frame Prible was set in motion before Foreman had even met Prible.  And she did not disclose any of the letters from would-be informants Carl Walker, Mark Martinez, and Felix and Oscar Gonzalez.  All of this evidence would have revealed to Prible's defense team that a vast web of informants in FCI Beaumont was simultaneously assisting Siegler in two unrelated murder prosecutions, and that the informants were willing to say anything for a time cut.

For the same reasons expressed in Claim #3 and Claim #4 above, the suppressed evidence was favorable and material.

## CLAIM #6

### THE STATE VIOLATED PRIBLE'S RIGHTS GUARANTEED BY THE SIXTH AMENDMENT AND *MASSIAH V. UNITED STATES*, 377 U.S. 201, 206 (1964).

A.    STANDARDS

Once a defendant's Sixth Amendment right to counsel has attached, the government is forbidden from "deliberately eliciting" incriminating statements from the defendant.[740]    This

---

[739] **Exhibit 70** at 16-17.
[740] *Massiah*, 377 U.S. at 206.

prohibition has been extended to the use of jailhouse informants who relay incriminating statements from a prisoner to the government. In *United States v. Henry*, 447 U.S. 264 (1980), the government used a paid informant, who was serving time for forgery, to obtain information about Henry. The government admonished him to "be alert to any statements made by federal prisoners [including Henry, with whom the informant was housed in the same cellblock], but not to initiate any conversation with or question Henry regarding the bank robbery [for which he had been previously indicted]."[741] As a result of conversations the informant had with Henry, the government obtained incriminating evidence, which was used at trial to convict him.

The central question in *Henry* was "whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah*."[742] In concluding that a government agent had elicited such statements, the Court relied on three factors. First, Henry was in custody and under indictment at the time the informant conversed with him. Second, the informant "was ostensibly no more than a fellow inmate of Henry," which caused Henry to trust him and thus be more likely to make incriminating statements.[743] Finally, the informant was acting under instructions from the government and was paid for his services. The Court found it irrelevant that government officials had cautioned the informant not to ask Henry any questions: "Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result."[744] In these circumstances, the Supreme Court held that the government agent's conversation with Henry amounted to "deliberate elicitation" under *Massiah*.

---

[741] *Id.* at 266.
[742] *Id.* at 270.
[743] *Id.*
[744] *Id.* at 271.

In *Maine v. Moulton,* 474 U.S. 159, 176 (1985), the Supreme Court clarified that the Sixth Amendment and due process protections enunciated in *Henry* apply "to the accused, at least after the initiation of formal charges."  At that point, the accused enjoys

> the right to rely on counsel as a "medium" between him and the State. . . . [T]his guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever – by luck or happenstance – the State obtains incriminating statements from the accused after the right to counsel has attached. **However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.** Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.[745]

**B.    ARGUMENT**

> **2.    Prible was in custody and charged with capital murder, and Beccom was ostensibly no more than a fellow inmate.**

Beccom contacted Prible while he was in FCI Beaumont.  The first encounter took place after Prible had returned to the Medium Unit from the Low, where he was being housed in anticipation of his release to a half-way house.  This transfer was due to the fact that Prible had just been charged with the capital murders of Herrera and Tirado.  Prible was, at all relevant times, represented by counsel appointed by the trial court to defend him against capital murder charges.[746]

Beccom was already on the Medium Unit to which the Government returned Prible.  He was serving time on federal charges for conspiracy to commit murder.  Beccom was, and presented himself as, a fellow inmate.

---

[745] *Id.* (internal citations omitted) (emphasis added).
[746] Harris County District Clerk Records show that lead trial counsel, Terry Gaiser, was appointed on September 28, 2001.  *See* **Exhibit 113.**

## 2.	In return for assistance in obtaining a sentence reduction, Beckcom, acting as a State agent, circumvented Prible's right to counsel.

Beckcom's testimony shows that he began developing evidence to incriminate Prible *after* he contacted the lead prosecutor. Beckcom testified that he got Siegler's name from his cellmate, Foreman, sometime at the end of September or early October of 2001.[747] Beckcom testified that all he knew in October 2001 was "something about a guy coming from the Low [security] charged with murder," but he "really did not get too much information on it."[748] Beckcom said he did not phone Siegler immediately; he waited until "the first half of October of 2001" to call her.[749] Beckcom said that during that phone call he claimed that he had information on a murder, but that he did not go into great detail. Indeed, Beckcom's testimony indicates that he actually had *no* information at the time of this initial phone conversation. According to Beckcom, he and Prible exercised together *after* he learned in September or October that someone charged with murder was returning to the Medium.[750] It was not for "weeks or maybe a month later" that Prible approached him for the first time to talk to talk about anything.[751]

At other points in Beckcom's testimony, he indicated that he had several conversations with Prible, over the course of a month, *prior* to calling Siegler in October of 2001. However, these early conversations appear to have been about "the asphalt and the paving business" and about "going into business together."[752] On the other hand, Beckcom could not put a timeframe on when Prible discussed aspects of his case. Referring to what he supposedly learned from Prible, Beckcom stated, "you know, … this didn't happen chronologically. So, in bits and pieces

---

[747] 26 RR at 22.
[748] *Id.*
[749] 26 RR 24.
[750] *Id.* at 31.
[751] *Id.*
[752] *Id.* at 35.

of conversations on the same subject it came out," including information that Steve Herrera "was apparently his best friend, but yet he was having an affair with Steve's wife."[753] However, Beckcom said that Prible did not start talking "real heavy . . . about the actual crime and the murders . . . because he was not trusting anybody" at first.[754]

In either event, Beckcom's testimony leaves little doubt that (1) his initial phone call to Siegler in early October 2001 was for the purpose of reaching an agreement for him to serve as an agent to investigate Prible, and (2) Beckcom had learned very little about the case from Prible until after he and Siegler had worked out a deal that would reward him for informing on Prible. Siegler questioned Beckcom at trial concerning their first contact as follows:

> Q.    *And eventually you made up your mind you were going to do what, sir?*
>
> A.    *Contact you and see if we could make some kind of deal.*
>
> Q.    *Because you were hoping for what, again?*
>
> A.    *Sentence reduction.*
>
> Q.    *And the only way for me to be interested was for me to know what?*
>
> A.    *Specifics about the case.*
>
> Q.    *So, in that regard you did what?*
>
> A.    *I sought to find out as much as I could.*
>
> Q.    *From who?*
>
> A.    *From Prible.*[755]

After the initial phone conference in October 2001, Beckcom went to work, for the State, on Prible. Beckcom claims that on November 24, 2001, Prible "really poured it all out."[756]

---

[753] *Id.* at 34.
[754] *Id.* at 35.
[755] 26 RR 37.

According to Beckcom, Prible confessed to killing Herrera and Tirado, confessed to setting the house on fire to cover his tracks, described himself as a "bad motherfucker" that would take out a whole family, described himself as "a ghost" who could move in and out of the crime scene unseen in a "high intensity, low drag maneuver," described the crime scene and the position of the bodies, and explained the motives for the killing, which allegedly were (a) that Herrera had bilked him out of $250,000.00, and (b) that Prible felt he had to kill Herrera before Herrera took his money and killed him first.[757]  Foreman and Beckcom then contrived a photo op to prove that Beckcom knew Prible and had met with him on November 24, 2001.[758]

Beckcom did not obtain information by happenstance.  Instead, he was referred to Siegler by another State agent, Foreman.  Siegler and Bonds knew Foreman was lying about Prible "confessing," but they kept meeting with him anyway and eventually decided to use Beckcom, his cellmate, as their testifying informant.  Furthermore, the timeframe that Beckcom wrote down supposedly at the same time Prible "poured out" his "confession" shows that Beckcom was a State agent before he ever approached Prible for "specifics" about his case.[759]  The State and Beckcom thereafter conspired to violate Prible's constitutional rights by eliciting statements about the crime in the absence of defense counsel.  Beckcom's testimony was critical to the State's case; without question, it was harmful.[760]  Beckcom supplied the motive for the crime. Beckcom supplied the evidence without which the State would not have tried the case.

---

[756] *Id.* at 53.  Beckcom maintained that Prible had come to look at Foreman and Beckcom as brothers.  *Id.* at 54. According to Beckcom, Prible said, "I trust you guys, …, you're the only ones that could convict me."  *Id.* at 54-55. At the same time, Beckcom said that Prible had "made his peace," and was "prepared to die" if his "brothers" proved not to be so trustworthy and turned State's witness.  *Id.* at 55.  Furthermore, despite Prible's supposed feelings of peace and kinship, he apparently did not confide in Beckcom or Foreman or communicate with them ever again.

[757] *Id.* at 45-55.  This all supposedly occurred on the same day that Prible and his mother and Beckcom and his mother got together for a photograph during visitation at the prison.  *Id.*

[758] *Id.* at 83.

[759] *See* Section IX(B)(2)(a), *supra.*

[760] *See Brecht, supra.*

## CLAIM # 7

## PRIBLE WAS DENIED HIS SIXTH AMENDMENT RIGHT TO
## EFFECTIVE ASSISTANCE OF COUNSEL.

### A.    DEFAULT

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012), excuses otherwise defaulted ineffectiveness of trial counsel claims if state habeas counsel should have litigated the claim but failed to do so. A recent Fifth Circuit decision has limited *Martinez* to cases that by law could only be brought in the first instance in a writ of habeas corpus.[761]   A majority of the three-judge panel reasoned that because the TCCA did not prohibit, as a matter of law, the inclusion of IAC claims on direct appeal, *Martinez* did not apply.[762]   Prible's claim is different. In addition to alleging trial counsel IAC, Prible alleges that appellate counsel failed to raise trial IAC.

The Supreme Court has firmly held that where, as in Texas, criminal defendants are entitled to an appeal as a matter of law, as opposed to judicial discretion, the right to competent appellate counsel is indistinguishable in importance, for the purpose of due process, from the right to a competent trial attorney. In *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court stated:

> A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney. This result is hardly novel. The petitioners in both *Anders v. California*, 386 U.S. 738 (1967), and *Entsminger v. Iowa*, 386 U.S. 748 (1967), claimed that, although represented in name by counsel, they had not received the type of assistance constitutionally required to render the appellate proceedings fair. In both cases, we agreed with the petitioners, holding that counsel's failure in Anders to submit a brief on appeal and counsel's waiver in Entsminger of the petitioner's right to a full transcript rendered the subsequent judgments against the petitioners unconstitutional. In short, the promise of Douglas that a criminal defendant has a right to counsel on appeal – like the promise of Gideon that a criminal defendant

---

[761] *Ibarra v. Thaler,* 687 F.3d 222, 227 (5th Cir. 2012).
[762] *Id.*

has a right to counsel at trial – would be a futile gesture unless it comprehended the right to the effective assistance of counsel.[763]

It is a claim analyzed under *Strickland* and therefore requires a harm analysis that includes an inquiry into whether the appeal would have been set aside if appellate counsel had raised a different claim.[764] Hence, appellate IAC obviously cannot be brought until the direct appeal is over and the appellate decision has been rendered. Appellate IAC, therefore, by logic and law, can only be brought for the first time in state habeas. Unsurprisingly, district courts in other federal jurisdictions have interpreted *Martinez* to allow appellate IAC claims alleging that the direct appeal should have raised trial IAC.[765]

The exception to procedural default that *Martinez* created is an equitable remedy motivated by the vital importance of competent representation in criminal proceedings. The force of those equitable concerns is amplified by Prible's situation. He has been deprived of his Sixth Amendment right to a competent trial counsel and his Sixth Amendment right to a competent appellate attorney. He has spent nearly 16 years on death row in the equivalent of solitary confinement (as a result of which he is now hallucinating) because of incompetent state habeas counsel. Under these circumstances, equitable principles of *Martinez* militate in favor of excusing default rather than enforcing it.

## B.    SUBSTANTIVE STANDARDS

*Strickland v. Washington*, 466 U.S. 668 (1984), laid out the legal principles that govern IAC claims. There are two components: a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.[766] To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of

---

[763] *Evitts,* 469 U.S. at at 396-97.
[764] *See, e.g., U.S. v. Cross,* 308 F.3d 308, 315 (3rd Cir. 2002).
[765] *See Williams v. Alabama*, Slip Copy, 2012 WL 1339905 (N.D. Ala. 2012).
[766] *See Strickland,* 466 U.S. at 687.

reasonableness."[767]    The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct."[768]  Instead, the Court has "emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"[769]

In order for counsel's inadequate performance to constitute a Sixth Amendment violation, a petitioner must show that counsel's failures prejudiced his defense.[770]  To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  That does not mean that a petitioner must show that counsel's deficient conduct more likely than not altered the outcome of the case."[771]  "The result of a proceeding," the Court added, "can be rendered unreliable, and the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."[772]  Instead, "reasonable probability" is simply "a probability sufficient to undermine confidence in the outcome."[773]

In *Smith v. Robbins*, 528 U.S. 259, 285 (2000), the Supreme Court noted that in addition to demonstrating that counsel's performance was "objectively unreasonable," a petitioner must show a "reasonable probability" that, but for his counsel's objectively unreasonable performance, he would have "prevailed on his appeal."  To prevail on an ineffective assistance of appellate counsel claim, Prible must therefore demonstrate that the omission of a *Massiah* claim from the direct appeal was objectively unreasonable, and show it is reasonably probable that the TCCA would have granted relief at the appellate stage.

---

[767] *Id.* at 688.
[768] *Wiggins v. Smith,* 539 U.S. 510, 521 (2003).
[769] *Id.* (quoting *Strickland*, 466 U.S. at 688).
[770] *Strickland*, 466 U.S. at 692.
[771] *Id.* at 694.
[772] *Id.*
[773] *Id.*

## C.     ARGUMENT

**1.     Failure of trial counsel to object to Beckcom's testimony under *Massiah* and progeny was ineffective.**

Whenever possible, trial counsel has a duty to prevent the State from introducing incriminating testimony.  In this case, trial counsel knew that Beckcom was the key witness. Before trial, counsel was put on notice that Beckcom would testify against his client.  Although counsel was not allowed to see Beckcom's written statement until right before he cross-examined the witness, reasonably competent trial counsel would have realized immediately from the answers to the State's preliminary questions on direct examination that he should have lodged an objection based on *Massiah*.  In fact, reasonable trial counsel, once he heard on direct exam that Beckcom had called the State the first week in October 2001, would have demanded a hearing, pursuant to *Massiah*, in order to ascertain Beckcom's relationship with the State.  After obtaining Beckcom's December 10, 2001, written statement for purposes of cross-examination, reasonable counsel should have objected to Beckcom's testimony and requested that the court order it stricken, admonish the jury to disregard, or declare a mistrial.  As shown in Claim #6 and in Section IX, *supra,* Beckcom's December 10, 2001, statement shows that Beckcom was a State agent working *quid pro quo* to pry information from Prible from the time he first conversed with Prible in late October or early November 2001, which was after the Court had appointed counsel on September 28, 2001.  However, Prible's trial counsel failed to object or request a *Massiah* hearing.

For reasons set forth in Claim #6, *supra,* which are incorporated by reference as if fully set forth herein, had counsel objected, the trial court would have been required to exclude Beckcom's entire testimony.  Under *Strickland v. Washington,* a petitioner prevails if he or she shows by a preponderance of the evidence that but for errors of trial counsel, it is reasonably

probable the outcome of trial would have been different.[774] Without Beckcom's testimony, there would have been far more than a reasonable probability that the jury would not have convicted Prible. Beckcom was central to the State's case. Beckcom supplied the motive for the murder and the State leaned heavily on Beckcom's testimony at closing argument through a hackneyed (but persuasive) argument that Beckcom had learned facts that only Prible could have told him, such as where the bodies of the girls were found,[775] and that the .38 Taurus that Detective Brown referred to in his July 5, 2001, probable cause affidavit was "clean." Trial counsel's inexcusable failure to object under *Massiah* was therefore deficient and prejudicial under *Strickland*.

## 2. State habeas counsel's failure to raise IAC claims based on *Massiah* was ineffective.

Competent habeas attorneys familiarize themselves with the record. This basic post-conviction duty requires reading trial transcripts. State habeas counsel was ineffective for not spotting the *Massiah* violation and trial counsel's failure to object. For reasons set forth in Claim #4, *supra,* the failure prejudiced Prible. But for the collective failure of previous counsel to raise a basic constitutional issue regarding the misuse of informants where the State's case depended on introducing jailhouse snitch testimony, Prible would have been acquitted at his original trial or would have received a new trial at which the State could not call on Beckcom. Relief from his continued unconstitutional confinement and sentence of death should, therefore, finally be granted.

---

[774] 466 U.S. at 692-94.

[775] This was another false statement by the State since police, firefighters, family members, and neighbors who discovered the blaze, to name a few, undoubtedly knew where the bodies of the three children were found right after the murder. Furthermore, Beckcom got it wrong. He testified that Prible told him all the girls were found in bed, 26 RR 48-49, but that was not a fact at all, let alone one known only to Prible. Only the middle child was found in bed. The older child was found on the floor. The youngest child was not in bed or in her bedroom. She was found in the master bedroom and on a sheet which Nilda had arranged for her to sleep, next to the master bed. *See* State Trial Exhibits 69(A) (diagram of home showing location of bodies).

## CLAIM #8

**IN VIOLATION OF *MASSIAH*, THE STATE SUPPRESSED EVIDENCE THAT INDEPENDENTLY ESTABLISHED THAT IT HAD DEPLOYED BECKCOM AND FOREMAN AS AGENTS TO PRY INCRIMINATING INFORMATION FROM PRIBLE ALTHOUGH THE STATE WAS AWARE PRIBLE WAS REPRESENTED BY COUNSEL.**

As set forth in Sections VIII-IX and in Claims #1-5, *supra,* the State suppressed evidence of multiple contacts with informants inside FCI Beaumont who were angling to provide incriminating testimony in return for State favors, and suppressed inmate letters to Siegler, identifying such witnesses as Walker, who had information showing that the State was using a ring of informants headed by Foreman and Beckcom to investigate Prible.

The State also suppressed evidence showing that Beckcom's cellmate, Nathan Foreman, was a State agent, before and during the time that he and Beckcom were investigating Prible. Foreman had a *quid pro quo* arrangement with the State already in place for supplying testifying witnesses against Herrero. He tried to act as a State agent against Prible *before he even met Prible,* by meeting with Siegler and Bonds and describing a "confession" that had never happened. Foreman and Beckcom staged the photo shoots used by the State to explain why Prible (and Herrero) would confess after indictment to strangers such as Beckcom and Foreman. Foreman reported to the State when he and Beckcom had the results of the photo shoot that they had arranged for November 24, 2001 (ahead of Prible's pre-ordained "confession"), which the State used to convince the jury that Prible had taken Foreman and Beckcom into his confidence and confessed. However, the State did not disclose this information ahead of trial.

Recently-produced work product notes show that Foreman was the first person that Siegler and Bonds sought to interview, right after Siegler learned, from Jesse Moreno, that

Foreman was in a position to incriminate Prible effectively.[776]   However, the State suppressed

evidence that Foreman was assisting Beckcom in prying information from Prible, while he was

represented by counsel, in return for *quid pro quo* benefits from the State.   Instead, the State

misled the court and trial counsel.   At an October 11, 2001, pretrial conference held on the

Friday before the October 14, 2001, start of trial on the merits, trial counsel specifically asked

Siegler, again, to inform him of the State's contacts with Beckcom because she had given him

inconsistent responses, a point that she admitted.[777]   Siegler identified face-to-face meetings, but

not phone contacts, with Beckcom, and she only told of her communications with *Beckcom,* not

any other informants.   Indeed, she quickly changed the subject after she let Foreman's name slip

out for the first time:

> MS. SIEGLER:   *The first time Beckcom contacted me was by telephone.   He*
> *called me.   He got my name from Nathan Foreman.   And the best I can recall,*
> *Judge, is he called me around October of 2000...*
>
> THE COURT:   *Who's Nathan Foreman?*
>
> MS. SIEGLER:   *Nathan Foreman is another inmate at FCI Medium. What else*
> *did you ask me?*
>
> MR. GAISER:   *About any other contact.*
>
> MS. SIEGLER:   *About any other contact with Beckcom?*
>
> MR. GAISER:   *Yes.*[778]

Prible would have been able to exclude Beckcom's testimony based on *Massiah* if the

State had not suppressed this evidence, which, independent of the information in trial transcripts,

shows that Beckcom and Foreman were working together as State agents to investigate Prible's

case while he was represented by counsel.   Exclusion of Beckcom's testimony would have

---

[776] **Exhibit 19.**
[777] 7 RR 11.
[778] 20 RR 12-13.

resulted in an acquittal, for in the State's own words, the jury's decision to convict or acquit depended on whether they believed that Beckcom had provided credible evidence of a confession. This Court can, therefore, reach this otherwise defaulted claim based on suppressed evidence of a *Massiah* violation. And for the same reasons that it finds cause and prejudice under *Carrier*, the Court can grant relief under *Massiah* and the even more lenient harm standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The suppression of *Massiah* evidence that permitted the State to unconstitutionally introduce Beckcom's testimony undoubtedly had a substantial effect on the verdict.

**CLAIM #9**

**PRIBLE WAS DEPRIVED OF HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS BY THE ADMISSION OF EVIDENCE DOCUMENTING THE DEATHS OF THE COMPLAINANTS' CHILDREN.**

As the State recognized, Prible alleged on direct appeal that the introduction of testimony and exhibit evidence describing and depicting the deaths of the children due to smoke inhalation "deprived him of due process under the United States Constitution."[779] The TCCA addressed Prible's constitutional claim, stating that it was denying it for the "same reasons expressed" in the TCCA's determination that the admission of the evidence did not violate Texas Rules of Evidence 402 and 403.

**A.     FACTS**

Prible was charged with capital murder in a one-paragraph indictment that alleged he caused the deaths of Herrera and Tirado by shooting them with a firearm during the same criminal transaction.[780] Both had been executed by gunshots to the head. The bodies of their three children were found in the children's and master bedrooms. Each had died of smoke

---

[779] *State's Appellate Brief* at 19; CR at 35.
[780] 1 CR 2.

inhalation from the smoldering fire that Herrera and Tirado's assailant(s) had started.  There was no evidence that the children had been sequestered, injured, or traumatized prior to their deaths from smoke inhalation.

At trial, defense counsel made the following objection to the introduction of evidence of the children's deaths:

> DEFENSE COUNSEL:   Concerning the children . . . I want the Court to understand that our grounds [for objecting to evidence of the children's deaths] are premised in the Rules of Evidence, Rule 403 and Rule 404 and the Fourteenth Amendment to the Constitution of the United States.  The Defendant's right to a fair trial unencumbered by evidence that he's a criminal generally, has committed other offenses.  And [we] would ask the Court to extend its ruling to a point where we are not required to make objections every time evidence of the deaths of the three children comes up through any witness.
>
> THE COURT:  Absolutely.   The Court will grant a running objection to any evidence related to the death of the children introduced at the guilt/innocence phase of the trial with all the objections the Defense has just stated and will not require them to make the objection in the presence of the jury. . . ."[781]

Citing this objection and ruling, Prible, on direct appeal, argued that the introduction of evidence related to the deaths of the girls violated his due process rights.

In Texas, a homicide is a capital crime if there are two or more victims in the same transaction, if a victim is under 12 years old, or if the cause of death is arson.[782]  During opening remarks, Siegler stated that what the firemen who arrived at the scene saw was "horror because they're going to tell you what they found there that day in that house was a whole family dead.  Not just Esteban Herrera, Jr., Steve; not just Nilda Tirado, but three little girls."[783]  According to Siegler, Prible "walked out of a house with it smoking and burning, knowing three little babies were asleep in their beds.  That is the kind of man [he is] and he's guilty of capital murder."[784]

---

[781] 21 RR 16.
[782] TEX. PENAL CODE § 19.03.
[783] 21RR 73.
[784] Id. at 83.

During closing argument, the prosecutor insisted that this case was "a capital murder where three little girls were executed."[785]

## B.     ARGUMENT

The Fifth Circuit applies a two-pronged test to determine whether extraneous offense evidence violates due process.  First, the Government must make a "strong showing that the defendant committed the offense."[786]   Second, the Government must demonstrate that the extraneous offense is "rationally connected with the offense charged."[787]

### 1.     The State did not make the type of strong showing required to justify the introduction of evidence of the extraneous capital murders of three children.

The evidence that Prible intended to kill Herrera's and Tirado's children hinged on Beckcom's testimony.   Beckcom testified that Prible told him that he knew the girls were in the house.  According to Beckcom, when he inquired about the deaths of the three girls, Prible stated that anyone who could "take out an entire family was a bad motherfucker, and I'm that bad motherfucker."[788]   However, Beckcom's testimony about the deaths of the girls is inherently unreliable jailhouse snitch testimony that is not supported by any evidence corroborating an intention to kill the three little girls.  In fact,  Beckcom testified that Prible's alleged purpose was "basically to cover his tracks."[789]

There was no testimony indicating that Prible saw or heard the children while he was at the Herrera/Tirado house during the evening before Steve and Nilda were killed.  There was no evidence that Herrera and Tirado's killer(s) went back to where the girls were found.  According to the State, before Herrera died, Prible, Herrera, and Herrera's brother-in-law played pool out in

---

[785] 28 RR 83.
[786] *Enriquez v. Procunier*, 752 F.2d 111, 115 (5th Cir. 1984), *cert. denied*, 471 U.S. 1126 (1985).
[787] *Id.*
[788] 26 RR 52.
[789] 26 RR 51.

the garage, then went to a cabaret before returning to the Herrera/Tirado home. These events transpired late at night. Children were not part of these scenes. Although Prible and Herrera were childhood friends, the State maintained that Herrera allowed no one in the house. The girls had numerous relatives nearby – uncles, aunts, and grandparents – at whose homes the girls could spend the night. In sum, the State argued that killing the girls was **not** part of Prible's alleged scheme and the State failed to show that Prible knew the girls were at home, asleep in their beds.

### 2. The State did not demonstrate a rational connection to the offense charged.

The Fifth Circuit's case law makes clear that it is not enough to show that the *actus reus* of the extraneous offense – in this case, the deaths of the three girls – was a causal consequence of the conduct that constituted the charged offense. Instead, the extraneous offense evidence has to be probative of the actions or the mental states that the State contends satisfy the elements of the charged crimes. For example, in *Wood v. Quarterman*, 503 F.3d 408 (5th Cir. 2007), the State sponsored testimony from a prostitute who had escaped the fate of one of Wood's murder victims, a woman named Kelly. The prostitute described being restrained and raped in a manner that bore a "striking similarity" to the crime scene evidence developed in six murders, including Kelly's.[790] The Fifth Circuit held that because the extraneous offense was rationally connected to the offense charged, the admission of Kelly's testimony did not violate the petitioner's due process rights.[791]

Likewise, in *Story v. Collins*, 920 F.2d 1247 (5th Cir. 1991), the State charged Story with indecency with a child named Crystal. He objected to evidence that he had masturbated in front of two other girls. After finding that that satisfied the first prong of the test enunciated in

---

[790] *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007).
[791] *Id.* at 415.

*Enriquez v. Procunier,*[792] the Court ruled that the extraneous offense was "rationally connected with the charged offense, because it indicated that Story had a desire to engage in sexual conduct in Crystal's presence."[793]

In sharp contrast, the deaths of the three little girls at the Herrera/Tirado house had nothing at all to do with the motive, intent, manner, or means of death that the State alleged were involved in the execution of their parents. The girls were not witnesses, so the assailant(s) did not need to kill them for that reason. The State did not need to show that Herrera or Tirado died of asphyxiation; rather, it alleged that the parents died from gunshot wounds to the head fired at close range. The State did not need to display crime scene and autopsy evidence in order to support the theory that a fire had been set in order to conceal and destroy evidence. The evidence of a fire, where it started, what caused it, and where it spread, was absolutely clear without reference to the deaths of the children.[794] The accelerant was found downstairs near Tirado, the firefighters arrived to find smoke coming out from under the eaves of the home, and they described the smoky conditions they found throughout the house when they entered to search.

Introduction of evidence of the three extraneous capital offenses was entirely gratuitous, rather than rationally connected to the State's case for convicting Prible of Herrera's and Tirado's deaths. Indeed, the State admitted that the evidence of the extraneous capital murders that it intended to introduce at guilt/innocence were **not** rationally connected to Herrera's and

---

[792] 752 F.2d 111, 115 (5th Cir. 1984), *cert. denied*, 471 U.S. 1126 (1985).

[793] *See Story v. Collins,* 920 F.2d 1247, at 1254.

[794] The State's recitation of the evidence shows that the firefighters found Steve's and Nilda's bodies immediately and realized right off that the crime scene involved homicide and arson. The firefighters retreated from the house, ventilated it and searched other rooms. Finding nothing they regrouped outside again. They reentered and went upstairs in order to find the three girls. *See* State's Appellate Brief at 6; CR 000022. That is, firefighters conducted three searches, and what they found on the third go-around was absolutely unnecessary to "provide a context" to Steve's or Nilda's murder.

Tirado's assailant(s)' intentions or actions. In trying to justify the introduction of the extraneous offense evidence on the morning of the first day of trial, the State argued:

> And the way that this crime took place, Judge, the way the Defendant set the house on fire, the kids may have lived. The kids in theory could have escaped through the door. The kids in theory could have found a way to pry the burglary bars off. The kids, in theory, who were still alive when the fire was set, had somebody seen the fire early enough, could have been saved because the Defendant really didn't care that much about the kids. This isn't some sociopath who decided to wipe out a whole family. This is a Defendant who killed two people and then set the house on fire in an attempt to cover up the family (sic.). And had those children survived there probably would have been no moment to the Defendant because neither (sic.) of the three children had seen him or could identify him as the person who killed both their parents because they were upstairs . . . .[795]

That the purpose of introducing evidence regarding the children's deaths was to inflame the jury, rather than provide a context for the crime, is clear, too, from the extensive visual evidence that the State introduced. The State was not satisfied with sponsoring verbal descriptions from the firefighters who found the girls. It also introduced crime scene photos of each child followed by autopsy photos showing the dissected bodies and organs of every single little victim. As the Ninth Circuit recognized in *McNeely v. Olivarez*, 104 F.3d 365, *5 (9th Cir. 1996),[796] a federal due process claim exists if the introduction of graphic, gruesome photographs of the victim renders the trial fundamentally unfair. At sentencing, where evidentiary rules are more relaxed, particularly gruesome photos of a victim may still warrant habeas relief.[797]

### 3. The argument that admission was justified because it bolstered the jailhouse snitch's credibility was false and misleading.

According to the State, the evidence of three extraneous capital murders was admissible because the evidence corroborated Beckcom's testimony. However, if anything, the evidence

---

[795] 21 RR 7-8.
[796] Unpublished opinion.
[797] *See Spears v. Mullin*, 343 F.3d 1215, 1229 (10th Cir. 2003), *cert. denied sub nom. Powell v. Mullin*, 541 U.S. 909 (2004) (photos of victims so inflammatory as to "fatally infect[] the trial and deprive [the defendants] of their constitutional rights to a fundamentally fair sentencing proceeding").

detracted from Beckcom's credibility. The key to the State's attempt to establish Beckcom's credibility were statements allegedly made to him by Prible describing details of the crime scene that only a person who had been at the scene would know. However, Beckcom's testimony about where the girls were was neither detailed nor accurate, nor did it indicate in the least that the source of the testimony had to have been someone who had been at the crime scene. Beckcom testified Prible told him that the girls "were in bed."[798] Beckcom claimed to have asked how they died, and he said Prible said "smoke inhalation."[799] However, no one would have learned that the girls died of smoke inhalation from being at the crime scene when the crime occurred. This is the type of fact that could only be learned afterwards from other sources, such as the newspaper, where it was reported; from police reports; or from any number of people who talked later to the family members and neighbors who had arrived in numbers at the crime scene. The culprit would have fled the scene before the girls asphyxiated. Even though the fire was a flash fire that quickly spread through the room adjacent to the garage, it took time for the smoke to permeate the entire home and choke the girls.

Beckcom's testimony that Prible told him that the "girls were in bed" is equally useless as far as establishing credibility. Prible was Herrera's close friend. He had been to Herrera's home many times and knew that the crime took place very late at night or early morning. He certainly did not have to be at the scene when the crime happened to be able to make the representation that the girls were in bed when their parents were shot downstairs. Furthermore, Beckcom's testimony that Prible told him that the girls were "in bed" when their parents were shot does **not** accurately describe how or where the girls were found.[800] One of the children,

---

[798] 26 RR 49.
[799] *Id.*
[800] It is absolutely mindboggling that at trial, on appeal, and in post-conviction proceedings, the State gets away with this ruse about "facts that only the killer would know." Prible knew Steve's and Nilda's family; he was from the

Jade, was in the master bedroom. Two, including Jade, were found on the floor.

### 4. The TCCA's determination that there was no due process violation was "contrary to" and involved an "unreasonable application" of federal constitutional law, per 28 U.S.C. § 2254(d)(1).

Evidentiary rulings, though they may be justified on common law statutory grounds, are subject to constitutional review when they are "so unduly prejudicial that [they] render[ed] the trial fundamentally unfair."[801] Specifically, when a state court admits evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."[802] The established standard for fundamental fairness requires that habeas relief be granted by a federal court when the state trial error relates to evidence that is material in the sense that it is crucial, critical, and highly significant.[803] The Fifth Circuit has recognized, in a long line of habeas cases, that if extraneous offenses are highly significant factors, their introduction at guilt-innocence infringes the defendant's due process rights unless there is a rational connection between the extraneous offenses and the charged offenses.[804]

In Prible's case, the TCCA justified the introduction of the evidence of three extraneous capital offenses on grounds that explicitly *violate* due process. Indeed, the TCCA upheld the decision to admit the extraneous murders of the three girls because it found that these offenses were **not** rationally connected to the crimes with which Prible was charged. The TCCA expressly ruled that "there was little likelihood" that evidence of the tragic deaths of the three girls "would encourage the jury to reach an irrational verdict or act on the basis of emotion,"

---

neighborhood. Facts about the crime, such as where the girls were found dead, where the parents were found dead, how they were killed, etc., were known by a wide circle of people with which Prible was connected.

[801] *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *and see Spencer v. Texas*, 385 U.S. 554, 561 (1967) (The Due Process Clause guarantees the fundamental elements of fairness in a criminal trial.).

[802] *Dawson v. Delaware*, 503 U.S. 159, 179 (1992) (quoting *Tennessee v. Bane*, 510 U.S. 808 (1993)).

[803] *Mullen v. Blackburn*, 808 F.2d 1143, 1145 (5th Cir. 1987).

[804] *Procunier, supra; Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983).

because "**evidence of their deaths did <u>nothing</u> to prove that appellant was responsible for the murders of Steve and Nilda.**"[805]    Clearly, the TCCA's decision was contrary to bedrock principles of due process and fundamental fairness that the Supreme Court has long insisted must govern criminal trials.    In the alternative, it is an unreasonable application of these basic principles.

5.    **The extraneous offense evidence was clearly harmful when measured against the scant evidence supporting the jury's verdict.**

The presentation of the evidence in Prible's case focused extensively on the deaths of the three girls.  Testimony regarding the condition in which their bodies were found came in through firefighters, police officers, and the Medical Examiner.  The State displayed gruesome autopsy photos showing the effects of smoke inhalation.  The prosecution emphasized the deaths by suffocation in its case-in-chief and in closing.  The State realized the evidence was shocking.  Speaking to the jury, the lead prosecutor stated:

> *You probably thought, wait a minute, Kelly, you just said whole family.  All I've heard about from the Judge and you and Vic and them is Steve and Nilda.  What's this business about a whole family?  You were probably shocked and should have been.*[806]

On the other hand, the evidence that Prible killed Herrera and Tirado was far from overwhelming.  The State's case depended on the testimony of its jailhouse informant –  who had killed a man by carbon dioxide poisoning, admitted that he had previously lied under oath, and was testifying to get his sentence reduced.  Prible's attorneys also impeached the crime scene investigation.  Detective Brown failed to collect blood samples from the splatters on the wall, and was compelled to admit that his performance was just sloppy.  The State's DNA expert's inference that DNA from Prible found in Tirado's oral cavity was deposited near the time of her

---

[805] *Prible*, 175 S.W.3d at 733 (emphasis added).
[806] 28 RR 86.

death was discounted at trial by the Harris County Medical Examiner[807] and Prible's expert,[808] and during state habeas proceedings by the scientific report and authority provided by Dr. Libby Johnson.[809]

On the other hand, Prible put on a substantial defense. He disproved the motive that the State advanced for the murder, which was that Herrera stole $250,000.00 in bank robbery loot from him.[810] The total from the robberies – approximately $46,000.00 – did not come close to that amount, and that figure includes dyed and useless bait money, so the actual proceeds were even less. The State's theory that Herrera and Prible "had to have been pretty volatile" and had "not been close friends for very long"[811] was utter speculation and contrary to testimony that Herrera's and Prible's families socialized,[812] that the two had known each other since junior high school,[813] and that Herrera and Prible had never even been seen in an argument. The defense also sponsored a credible alibi witness, a neighbor, who testified that she knew Herrera and Prible by sight and by voice, and that she saw and heard both of them sometime after 1:00 a.m. outside her home. The State's arson expert also provided exculpatory information when he testified that the accelerants used by the perpetrator(s) would produce a "flashfire" which he described as a "very rapid hot fire."[814] According to the arson expert, "the easiest way . . . to describe a flashfire to most people is take a charcoal barbecue, pour lighter fluid and drop a match or torch and you get a whoosh or rush of flames. That's a typical flashfire. We're talking about a roomful of consequences."[815] With the rapidity that characterizes an explosion of lighter

---

[807] 23 RR 82.
[808] 27 RR 119.
[809] *See* **Exhibit 51** at Exhibit 'C'.
[810] 21 RR 81 (State's opening remarks); 26 RR 50 (testimony of Beckcom).
[811] 28 RR 69.
[812] 26 RR 248-49.
[813] 25 RR 17.
[814] 21 RR 217.
[815] *Id.*

fluid, the flashfire quickly burned up what he referred to as the "majority of the consumables" in the room where Tirado was found.[816]  Surely, such a fire would have burned and singed Prible's clothing, exposed body hair, and exposed skin.  However, Prible did not display any such effects when detectives interviewed him and police examined him within hours of the murder.

6.     **The TCCA's harmless error analysis violated the "contrary to" and "unreasonable application" prongs of 28 U.S.C. § 2254(d)(1).**

For purposes of 28 U.S.C. § 2254(d)(1), the TCCA's prejudice analysis is contrary to, or involves an unreasonable application of, federal constitutional law.  The TCCA did not conduct the harmless error analysis delineated by the Supreme Court in *Brecht v. Abraham*, 507 U.S. 619, 637 (1993).  Instead, the TCCA analyzed "potential prejudice" in terms of what it called "the relatively strong probative value of the evidence" incriminating Prible in the deaths of Herrera and Tirado, and determined whether it was  "substantially outweighed" by "the mere possibility of unfair prejudice."[817]  However, this is the standard for determining whether the admission of the evidence resulted in a substantive violation of evidentiary rules.[818]  Such a standard is not appropriate for evaluating prejudice under Texas or federal constitutional law.[819]

In conducting the analysis of whether admitting the children's deaths violated due process, it is irrelevant whether the evidence was correctly admitted or not pursuant to State law.[820]  The sole inquiry is whether the admission violated the Constitution.[821]  State law analysis means that the state court failed to reach the merits of the Constitutional claim.

---

[816] *Id.* at 222.
[817] *Id.*
[818] *See* TEX. R. EVID. 403; FRE 403.
[819] *See* TEX. R. APP. P. 44.2(a-b); *Brecht, supra.*
[820] *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).
[821] *Id.* at 68.

<u>CLAIM #10</u>

**IN VIOLATION OF DUE PROCESS UNDER *BRADY,* THE STATE SUPPRESSED MATERIAL EVIDENCE THAT SIEGLER HAD CONSULTED THE HEAD OF THE HARRIS COUNTY CRIME LAB TO ASK HOW LONG SEMEN COULD REMAIN IN THE ORAL CAVITY, AND WAS TOLD IT LIVES UP TO 72 HOURS.**

**A.     FACTS**

At the beginning of her investigation into the Herrera/Tirado murders, Siegler reached out to Pam McInnis, a DNA analyst who was head of the Harris County crime lab, to ask her how long semen can survive in a victim's mouth.  Siegler's own notes show that McInnis told her it lives "up to 72 hours."[822]  Prible's counsel did not learn of Siegler's conversation with McInnis until May 2017, when this Court ordered the HCDA to produce some of Siegler's work product notes.[823]

**B.     ARGUMENT**

This piece of evidence is favorable to Prible because it supports his defense that he had consensual sexual contact with Nilda earlier in the night before she was murdered, rather than immediately prior to her execution.  This piece of evidence is material because it impeaches the State's argument that semen deposited in the mouth disappears in "moments, if not seconds,"[824] such that whoever deposited the semen must have murdered Tirado right after ejaculating.[825] This argument vitiated the defense theory, supported by an alibi witness, that Prible left Tirado's house after having consensual oral sex with her and that someone else killed the victims.

During their recent depositions, both Wisner and Siegler emphasized the importance of the DNA evidence, and they emphasized Watson's opinion about the PMI between death and

---

[822] **Exhibit 20.**
[823] *See* **Exhibit 4-A** at 286-87 *("Q (by Ms. Scardino):  My question to you is did you ever reveal to Mr. Prible's counsel that you had spoken with Pam McInnis and she had told you that semen lives up to 72 hours?  A.  I don't remember.").*
[824] 24 RR 101-103.
[825] *Id.*

oral sex.  According to Wisner, this testimony was the single most important piece of evidence in the case; relative to this testimony, he said, Beckcom's testimony was insubstantial.  According to Wisner, the DNA evidence was so important that "I don't think we would try the case without physical evidence linking Prible to the scene . . . ."[826]

**CLAIM #11**

**THE STATE VIOLATED DUE PROCESS BY SPONSORING FALSE AND
MISLEADING TESTIMONY, AND ENGAGING IN FALSE AND
MISLEADING ARGUMENT, CONCERNING THE AMOUNT OF TIME
THAT SEMEN COULD PERSIST IN THE ORAL CAVITY, AFTER
BEING ADVISED BY THE HEAD OF THE HARRIS COUNTY CRIME
LAB THAT IT COULD LIVE UP TO 72 HOURS.**

The State's theory at trial was that unless Prible had "magic semen, magic sperm that somehow lives longer than any of y'all's or any other man's in this whole universe,"[827] it would have disappeared moments after ejaculation; thus, the presence of *any* of his semen in Tirado's mouth, no matter how microscopic the amount, meant that he must have executed her immediately after ejaculating.  This theory was emphasized by both prosecutors during opening and closing argument.  In her opening statement, nothwithstanding that Pam McInnis, the head of the Harris County crime lab, had previously told her that semen could persist up to 72 hours in a person's mouth, Siegler told the jury:

> [T]he DNA expert will tell you what the odds are, what that means exactly statistically the fact that his DNA is found in her mouth.  But the most compelling thing he's going to tell you is that you know what, when semen is in somebody's mouth, in a lady's mouth, it goes away in minutes.  It goes away with a small swallow.[828]

Wisner, who conducted DNA expert William Watson's direct examination, solicited testimony to the effect that the fact that Watson was able to obtain a pure male profile was

---

[826] **Exhibit 105** at 74.
[827] 28 RR 55.
[828] 21 RR 82-83.

consistent with the semen being deposited "moments, if not seconds, before she was killed."[829] In their closing arguments, Siegler and Wisner hammered home their theory that the presence of *any* of Prible's DNA in Tirado's mouth – no matter how small – could only mean that ejaculation occurred virtually simultaneously with Tirado's murder; otherwise, they argued, the semen would have disappeared immediately.[830] Wisner told the jury:

> *I would suggest to you what Bill Watson, a credible witness from an independent research lab, tells you is absolutely totally, credible. There is no way in the world that that semen wasn't deposited either moments before or seconds after Nilda died. There is no way that semen is not the semen of somebody who sexually assaulted her just moments before or moments after she died. I would suggest to you what the evidence indicates is that the Defendant after killing Steve forced Nilda to orally copulate him at gunpoint and executed her as soon as he finished. As horrific as that sounds, that is the only logical conclusion that you can draw from that evidence.[831]*

Likewise, Siegler told the jury:

> *If I could be crude for a minute, unless you think I guess that he had some kind of magic semen, magic sperm that somehow lives longer than any of y'all's or any other man's in this whole universe or unless you think that – I mean, you've heard how he said the sex happened, right? They got back from the bar at 2:30 in the morning. That's when he found this time to have this sex in this house filled with people, including three children. If you believe that story I guess you've also got to believe that his semen is so tasty that she walked around savoring the flavor of it in her mouth for a couple hours. That's the only way it's going to end up still in her mouth after she's dead. . . . [H]ave you ever thought about yet what the last minutes and the last seconds of Nilda's life was really like? Have you thought about it? Have you thought about what she went through right before she left this world?*

> *You know, this picture right here, Defendant's Exhibit No. 22, what's it a picture of? Nude, naked Jeff Prible. Just thank God that Mr. Wentz didn't put it up on that wall for y'all to look at because, oh, that's embarrassing. And we don't want to embarrass poor Jeff by letting the jury see him in all his glory, naked on a picture on a wall in a courtroom. Let's not embarrass or humiliate Jeff Prible, please. Do you think he was worred about how he looked in all his glory when he pulled his penis out and stuck it in the mouth of Nilda? Do you really? Have you thought about the last minutes of her life? Have you thought*

---

[829] 24 RR 101-103.
[830] *See* Wisner Closing Argument, 28 RR 10 ("[I]t had to come right before she was killed or after she was killed").
[831] *See* Wisner Closing Argument, 28 RR 11-12.

*about the fact that as she laid there knowing her husband had just been executed by this man, did you think it was going to happen if Steve was still alive to stop it? She knew as she sat there or knelt down on that living room that this man had just executed the man she loved. She knew what he was capable of. She'd just heard the shot. She just saw it happen. She just tried to run and call the police.*

*And then what is Jeff Prible doing? What did Nilda have to endure before she lost her life? He puts her down on her knees – it's the only way to make it happen – with the gun to her head and it had to be and he forces her to open her mouth and he sticks his penis inside her mouth and she sits there and takes it and does it and holds it there because why? Why do you think? Because she knew she might die. She probably thought she was going to be killed because he had already killed her husband. And why did she do it? You know why?*

*Most of y'all have kids. She knew her babies were in the next room and she left this world with his penis in her mouth, knowing her husband was dead, hoping to God that her babies would survive the nightmare that is Jeff Prible.*

*. . .*

*Why was his semen left in her mouth? Because she didn't have a chance to spit it out or swallow it or take a drink of water or let any time pass whatsoever because as soon as he ejaculated, he executed her.[832]*

The prosecutors' arguments, and the misleading testimony that they solicited from William Watson with respect to a very short PMI, run counter to the 72-hour window of time told to Siegler by McInnis.

## CLAIM #12

**PRIBLE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, AS A MATTER OF FEDERAL CONSTITUTIONAL LAW, WHERE TRIAL COUNSEL FAILED TO EFFECTIVELY ADDRESS AND REBUT THE TESTIMONY OF WILLIAM WATSON THAT THE SEMEN FOUND IN TIRADO MUST HAVE BEEN DEPOSITED IN HER MOUTH NEAR OR AT THE TIME OF HER DEATH, WHERE THERE WAS NO SCIENTIFIC BASIS FOR THIS EXPERT CONCLUSION.**

Prible was entitled to counsel skilled in the rules of evidence and procedure.[833] He received ineffective assistance of counsel, as a matter of federal constitutional law, where his

---

[832] Siegler Closing Argument, at 28 RR 55-58.
[833] U.S. Const. Amends. 6 & 14; *Faretta v. California*, 422 U.S. 806 (1975).

trial attorney failed to effectively address and rebut William Watson's testimony that the semen found in Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion. Watson was a DNA expert hired by the State.[834] He analyzed the semen swabs taken from Tirado during the autopsy.[835] Watson testified that he was able to detect Prible's DNA from the sperm found on a swab taken from Tirado's mouth.[836] The amount of testable DNA was microscopic, no more than 70 nanograms in weight. By Watson's own account, it would occupy considerably less space than the pointed end of a pin.[837] Watson told the jury that in his experience, he had never been able to recover a sufficient amount of sperm from a swab taken from a person's mouth to make a reliable DNA determination, where the victim had been alive at the time sperm had been deposited.[838] The expert opinion Watson then gave was that Prible's sperm had been deposited in Tirado's mouth at or almost simultaneously with the time of her death. This testimony about a precise PMI between oral sex and death placed Prible at the murder scene at the time of death. However, it was not only inadmissible, it was false. Inexcusably, the defense was caught by surprise and the State seized upon Watson's expert opinion to justify a lurid, incriminating closing argument in which the prosecutor grotesquely fantasized that Prible forced Tirado at gunpoint to "suck[] [his] dick," then, after ejaculating, shot her in the back of the head before burning down a house full of children.[839]

---

[834] 24 RR 31.
[835] 24 RR 64.
[836] 24 RR 104.
[837] 24 RR 116-18.
[838] 24 RR 100-06.
[839] 28 RR 63, 83.

**A.** **Prible's attorneys were ineffective in failing to object to Watson's conclusion that Tirado performed oral sex on Prible within minutes if not seconds of being shot, without the trial court first conducting a hearing to determine whether Watson's methods were reliable.[840]**

Under *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992)*, the Court may exclude technical or scientific testimony that is unreliable. The factors affecting the trial court's determination of reliability include: (1) general acceptance of the theory and technique by the relevant scientific community; (2) the expert's qualifications; (3) the existence of literature supporting or rejecting the theory; (4) the technique's potential rate of error; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the theory or technique can be explained to the trial court; and (7) the experience and skill of the person who applied the technique on the occasion in question.[841] Under Rule 705(b) of the Texas Rules of Evidence, [b]efore an expert states an opinion or discloses the underlying facts or data, an adverse party in a civil case may – or in a criminal case **must** – be permitted to examine the expert about the underlying facts or data. Furthermore, "[t]his examination **must** take place outside the jury's hearing."[842]

Watson gave a precise estimate of the PMI. He testified that the evidence supported the conclusion that Tirado died within moments, if not seconds, of performing oral sex on Prible,[843] and he testified that the DNA evidence excluded PMIs between oral sex and death longer than an hour.[844] Estimates of the PMI based on rates of decay, whether of gross structures or at the microscopic level, are notoriously difficult. Any technique adequate for making the precise estimate of the PMI that Watson gave would have to be supported by the data collected under

---

[840] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).
[841] *Id.* (citing 3 WEINSTEIN & BERGER, WEINSTEIN'S EVIDENCE ¶ 702[03] (1991)).
[842] TEX. R. EVID. 705(b).
[843] 24 RR 103.
[844] 24 RR 101-02.

controlled or at least known conditions. An explanation for conclusions from data phenomena being measured – namely, the rate and thoroughness at which testable haploid DNA is destroyed in or removed from the oral cavity by biological and chemical processes – would have to be forthcoming. Given that biological and chemical processes underlie the phenomena of sperm decay or removal in the oral cavity, Watson should have been able to explain why his conclusions were testable.

Watson had neither data, nor a tested method, nor support in the scientific literature for his precise estimation of the interval between oral sex and death in this case. His testimony did not satisfy a single relevant element of Texas or Federal law governing the admission of expert testimony. Yet in violation of Prible's Sixth Amendment right to effective assistance of counsel, Prible's attorneys failed to object to Watson's opinion; failed to demand a hearing to which Prible was entitled under *Daubert, Kelly,* and Rule 705(b), at which they could have readily demonstrated that Watson's testimony – by far the most incriminating testimony from a non-informant – was baseless, untrustworthy, false, and inadmissible; and failed to effectively rebut Watson's incriminating testimony.

1.      **In violation of *Kelly's* first factor, Watson's estimate of a precise PMI was not based on a theory or technique generally acceptable in the scientific community.**

Watson did not address such obvious factors as the chemical environment of an oral cavity and why it would or would not cause a rapid deterioration in testable haploid DNA. Nor did Watson address the chemical properties of semen, the most prevalent component of which is fructose, but which is also composed of lipids, coagulating proteins and enzymes, or why or why not this compound of organic substances would degrade or disappear from the oral cavity completely over a short interval. Watson also did not address the rate of production and turnover

239

of saliva or the efficiency with which saliva production in the mechanical actions of swallowing invariably results in removal of sperm bearing fluids well within an hour's time.[845]

Indeed, Watson did not have a recognizable method at all, let alone a method backed by sound scientific evidence, testing, and peer review. Watson just asserted that he himself had never developed a DNA profile off an oral swab and that he had not read that anyone else had. Watson then simply assumed that developing a profile meant the deposit of sperm in this case had to be close to death, without taking into account any other variables, conditions, or facts that could explain the presence of spermatozoa. Take one variable obvious to anyone who has been to a dentist and has had impressed upon them the fact that sticky, sugary substances persist in the oral cavity long after consumption; that is why you must brush your teeth before bed. Seminal fluid is a sticky sugary substance, composed mainly of fructose, and mixed with lipids and coagulating enzymes that make it more likely to persist, particularly in the irregular folds and pockets of the oral cavity that DNA collection via swab targets.

## 2. In violation of *Kelly's* second factor, Watson was not qualified to estimate the PMI.[846]

Watson's testimony did not establish that he was qualified to give estimations of PMIs based on the presence or absence of testable DNA under any circumstances. Watson had no experience in giving such estimates, nor was he trained to do so. Watson's dissertation director, Dr. Robert Benjamin, in fact, testified that Watson was making dangerous assumptions.[847] This went some way toward impeaching Watson at trial. However, the clear implication is that Watson had neither the training, nor experience, nor scientific knowledge needed to reliably

---

[845] Since on slides made from the vaginal and anal swabs, the Harris County Medical Examiner's DNA analyst counted only a single sperm cell on each, yet Watson was able to develop profiles from each of these swabs containing so little genetic material, Watson would have to address how chemical and mechanical processes in the mouth result in virtually the total removal of testable haploid DNA (from sperm) within an hour's time.

[846] *See* Affidavit of Dr. Elizabeth A. Johnson, with scientific publications, Exh. C to the State Application for Writ of Habeas Corpus, and attached here as **Exhibit 114.**

[847] 27 RR 115.

estimate a PMI with the precision he pretended to. Rather than allowing damaging testimony in and then trying to impeach it on the fly, trial counsel should have demanded a hearing under Rule 705(b) and *Kelly* in order to prevent the jury from ever hearing Watson's unsubstantiated, unreliable, and false opinion about the PMI between oral sex and death.

### 3. Watson's testimony was not supported by any scientific literature, as required by *Kelly's* third factor.

There was ample scientific evidence that the testimony of the State's DNA expert was without foundation in scientific fact. Indeed, the existing literature on the subject falsified Watson's conclusion and his insinuations that his experience and the experience of the DNA investigators supported his assertion that Tirado was killed immediately after performing oral sex. The expert report that Dr. Johnson prepared for state habeas counsel shows that long before trial, forensic investigators had published scientific papers documenting the collection of spermatozoa via oral swabs hours after oral sex took place.[848]

### 4. Watson's estimate of the PMI did not satisfy *Kelly's* fourth or sixth factors.

The fourth *Kelly* factor advocates for exclusion of expert testimony based on techniques that are afflicted with high rates of error. Rates of error are dependent on ability to account for important variables. Watson's estimate of the PMI does not have a control for numerous relevant variables. The human oral cavity displays great variability from person to person. Whether a viscous substance, such as seminal fluid, remains detectable by oral swab over time depends on the oral activities engaged in after intake of the fluid. Notoriously, sugars may remain in the oral cavity over time, as anyone who has ever received advice from a dentist about basic oral hygiene can attest. Development of caries in some persons rather than others is in part a function of the variable rates at which saliva turns over in different subjects. The number of

---

[848] **Exhibit 114.**

sperm deposited by ejaculation is also highly variable in the same subject and is dependent on such things as the proximity of the latest sexual activity and the health of the male subject. However, none of these variables were controlled nor appear to have even been considered by Watson or the State.

No attempt was made to explain Watson's technique, nor could a clear and simple explanation be given, because Watson did not rely on a discernable technique, methodology, or study in which such techniques or methodologies were developed or utilized to estimate PMIs based on the presence of spermatozoa or quantity in nanograms of haploid DNA from sperm cells.

     **5.**     **Kelly's fifth factor was not appropriately satisfied**.

Although experts critical of Watson's conclusions were available, including the director of his dissertation and Dr. Johnson, testing Watson's technique was mooted by the fact that he did not utilize a discernable technique, but relied on his experience and incompetent review of the literature to leave the misimpression that his estimate of a precise, limited PMI from quantities of DNA detected on the oral swab was valid. As Dr. Johnson stated, if Tirado had been killed immediately after being forced to engage in oral sex, the biological processes in a living person's oral cavity that may degrade and remove semen would have ceased. Assuming a relatively normal ejaculation, there should have been far more male DNA and semen than the microscopic 70 nanogram amount Watson said was present on the oral swab in this case if death occurred "moments if not seconds" before oral sex, as the State argued.

**B.**     **Trial counsel were also ineffective in that they failed to move for a continuance so that expert testimony contradicting Watson's testimony could be obtained.**

Watson did not estimate the PMI between oral sex and death in a pretrial report. The State did not ask Watson to provide a written opinion about the PMI pretrial, which might have

been ordered disclosed to the defense.  However, Watson's performance on direct examination bears all the marks of a witness whom the State had prepared beforehand to provide and support an opinion regarding the PMI.  Prosecutors systematically elicited Watson's opinion about the PMI (catching defense counsel off guard), then elicited testimony to create the impression that Watson's estimation of the PMI was scientifically valid and was supported by (i) Watson's experience handling hundreds of cases in which profiles had not been developed from DNA collected via oral swab, (ii) Watson's canvassing of the scientific literature, and (iii) quantitative analysis of the amount of DNA and the development of a "pure male profile," all of which misled the jury to conclude that an allegedly vast amount of semen was present in the oral cavity at autopsy in this case and that Prible must have forced Tirado to perform oral sex right before she died.

Without question, prosecutors knew before trial what Watson would say about the PMI between oral sex and Nilda's death.  Indeed, there is little likelihood that Watson volunteered an opinion, because he would not and should not have known the facts of the case and because he had no reason for (or business) estimating a PMI.  Instead, the prosecutors undoubtedly asked Watson to formulate an opinion about the PMI and rehearsed justifications supporting the opinion preparing for trial.

Trial counsel required a continuance in order to exclude and impeach Watson's testimony.  Watson's opinion about the PMI was the focus of his testimony.  Watson purported to have a scientific basis for that testimony, which, though spurious, was complex and appeared to be grounded in highly reliable and exact science of DNA analysis.  Trial counsel therefore needed, and should have sought, time to retain and prepare an expert and research the forensic scientific literature.  Continuances may be granted after the trial has begun based on (1) unfair

surprise that (2) renders a trial unfair without a continuance,[849] both of which trial counsel could have easily demonstrated for the following reasons.

**First**, the State sponsored a novel scientific opinion, which trial counsel could not reasonably have been expected to anticipate. Watson does not appear to have ever given testimony about a PMI based on the quantity of DNA in a particular orifice, nor did the forensic literature put trial counsel on notice that the State might rest its case on such an opinion. Instead, as state habeas counsel's expert confirmed, the forensic literature indicates that spermatozoa are regularly recovered by oral swab hours after oral sex.[850] Finally, trial counsel is entitled to expect the State, in seeking justice, to sponsor reasonably valid expert testimony rather than pseudoscientific opinions that misrepresent the forensic scientific literature.

**Second**, only with a continuance could trial counsel have given a witness, once retained, time to review the literature, review Watson's findings and testimony, and get prepared to answer questions on direct and cross-examination. Without a continuance, the State, through an invalid, readily refutable opinion about the PMI, was able to incriminate Prible in the most fundamental way, by placing him in intimate, compromising sexual contact with the victim at the murder scene right before she died.

## C. Trial counsel's failures to object and demand a hearing prejudiced Prible's defense.

Whether trial counsel's failure to object to Watson's PMI testimony resulted in prejudice under *Strickland v. Washington* depends on whether it is reasonably probable that the results of trial would have been different if the trial Court had excluded this testimony.[851] The damage

---

[849] TEX. CODE CRIM. P. § 29.13 ("A continuance or postponement may be granted on the motion of the State or defendant after the trial has begun, when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had.").

[850] *See* **Exhibit 114.**

[851] 466 U.S. at 694.

caused by Watson's testimony was severe. Prible was the last person seen by Herrera's and Tirado's relatives at the couple's home the night the two were murdered. With purported scientific precision, Watson's testimony placed Prible at the crime scene moments, if not seconds, before Tirado was shot dead.

The highly prejudicial nature of Watson's testimony is reflected in the State's closing argument, which luridly highlighted the pseudoscientific conclusion that Tirado had to have performed oral sex on Prible only moments or seconds before she died, as follows:

> *I would suggest to you what the evidence indicates is that the Defendant after killing Steve forced Nilda to orally copulate him at gunpoint and executed her as soon as he finished. As horrific as that sounds, that is the only logical conclusion that you can draw from that evidence. But, again, let's give the Defendant the benefit of the doubt because we're thinking of a way to find him not guilty. Assume consensual sex and let's assume that Nilda's mouth is kind of like fly paper for semen – and it may have happened two or three or four or five hours before. This would be a first case of this kind for Bill Watson. Who is the real killer? Why does the real killer kill the whole family? Why does the real killer make so much more of an effort to destroy Nilda's body than the other four people in that house?*[852]

A comparison of Watson's testimony to the remainder of the State's non-informant testimony underscores Watson's importance. The State maintained that Prible forced Tirado at gunpoint to perform oral sex on him before killing her. The only support for this lurid rape-murder fantasy, apart from Watson's testimony, came from a girlfriend of Nilda's, who testified that Nilda, on some unidentified occasion, said she thought Prible was "creepy." Needless to say, where there is no basis for inferring from the physical evidence that sex was non-consensual, this alone could not support a rape charge. Watson's testimony, on the other hand, firmly impressed upon the jury that oral sex occurred just before Nilda and Steve were violently killed. This creates an inference that the sex was the product of violence, which in turn provided

---

[852] 28 RR 12.

the State with a motive for the arson (*i.e.,* to obliterate DNA evidence by burning Tirado's corpse), which in turn supported the State's case against Prible for killing Herrera and Tirado.

Watson's testimony about the PMI was also used to corroborate the State's claim that Beckcom had learned details of the crime that only the perpetrator could have told him. Watson finished his DNA analysis approximately six weeks after the murder. However, the report did not express an opinion about the PMI, nor did any other known source. Beckcom's testimony implied that he learned from Prible that oral sex occurred proximate to death, and even insinuated that Prible's demeanor, when he allegedly described this aspect of the crime, indicated that he may have had sex with Tirado after killing her. Everything else in the alleged "confession" was already known to the State, including the fact that the .38 caliber gun referred to in Detective Brown's July 5, 2001, probable cause affidavit was **not** the murder weapon. The State's ballistic examiner determined that the bullets recovered from the crime scene came from a .9mm weapon, and that the number of lands and grooves on the bullets meant that a .38 could not have fired the bullet.

Finally, Watson's pseudoscientific testimony undermined an otherwise believable alibi provided by Prible's neighbor, Christina Gurrusquieta, who testified that she saw Herrera drop Prible off at his house in the early morning hours before Herrera and Tirado were killed. Without Watson, it is reasonably probable that the jury would have acquitted because of testimony from Gurrusquieta alone, who stood up so firmly to cross-examination that the State was reduced to insinuating that Prible must have sneaked back to Herrera's home and slaughtered his two friends without Gurrusquieta seeing him.

**D.      Trial counsel's failure to demand a continuance prejudiced Prible's defense.**

With a continuance, trial counsel could have retained an expert with time to review the scientific literature and prepare the type of testimony that state habeas counsel presented to the state courts in conjunction with this claim. The studies reported in this literature antedated trial and, as state habeas counsel's expert explained, clearly falsified Watson's assertions about the PMI between oral sex and death in this case. For the reasons stated above in subsection C, trial counsel's failure to request a continuance so he could prepare and sponsor testimony refuting Watson prejudiced Prible's defense.

## CLAIM #13

### PRIBLE WAS DENIED HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY BECAUSE THE VENIRE DID NOT REFLECT A FAIR CROSS-SECTION OF THE COMMUNITY.

In 1975, in *Taylor v. Louisiana,* the United States Supreme Court held:

> [T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.[853]

Because Harris County systematically excludes Hispanics from jury service, Prible was denied his right to a jury drawn from a fair cross-section of the community as guaranteed by the Sixth and Fourteenth Amendments. As explained in further detail in this section, each of the elements required to establish a *prima facie* violation of the fair cross-section requirement is satisfied. In particular:

(a)      Hispanics qualify as a distinctive group.

(b)      Hispanics are under-represented on the venire as a matter of law. Based on his analysis of the data, Prof. Harold Hietala, Ph.D., Professor of Statistics, determined that Hispanics were in fact significantly under-represented. Hispanics make up 30% of persons in the county eligible for jury service, but Prible's venire

---

[853] *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975).

panel included only 37 Hispanics out of 300, or about 12%.[854]  Prible's 12-person jury contained zero Hispanics.

(c)     The exclusion of Hispanics from venire panels is systematic in that it is the direct result of procedures adopted by Harris County.  As shown below, Hispanics are being excluded primarily because the pay for jury service ($6/day) is the lowest in the nation, among other reasons.

## A.     Prible Has an Absolute Right to a Jury Drawn From a Fair Cross-Section of the Community.

The right to a fair and impartial jury in criminal cases is one of the most fundamental aspects of the government and society of the United States.[855]  "Jury service preserves the democratic element of the law … [because it] affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for the law."[856]  Jury service also "guard[s] against the exercise of arbitrary power … [by making] available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge."[857]  Accordingly, the right to an impartial jury, which traces its roots all the way back to the signing of Magna Carta in the 13th century,[858] is preserved by the Sixth Amendment to the Constitution.[859]

"The very idea of a jury is a body of men composed of the peers or equals of the persons whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status as that which he holds."[860]  Thus, "[t]he American tradition of trial by jury … necessarily contemplates an impartial jury drawn from a

---

[854] *See* **Exhibit 115.**
[855] *Powers v. Ohio*, 499 U.S. 400, 407 (1991).
[856] *Id.*
[857] *Taylor,* 419 U.S. at 530.
[858] *Duncan v. Louisiana*, 391 U.S. 145, 151 (1968).
[859] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed."  U.S. Const., Amend. 6.
[860] *Taylor*, 419 U.S. at 536 n.19 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)).

cross-section of the community," and requires that "prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of [the economic, social, religious, racial, political and geographical groups of the community]."[861]

The tool provided to ensure this requirement is met is the fair cross-section claim, articulated by the Supreme Court in *Duren v. Missouri*.[862]  In order to prove a violation of a defendant's right to a jury drawn from a fair-cross section of the community, the defendant must show:  (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.[863]  Once the defendant makes a *prima facie* showing of a fair cross-section violation, the burden shifts to the State to show "that the disproportionate exclusion manifestly and primarily advances a significant governmental interest."[864]

Fair cross-section claims are not limited to federal courts.[865]  Rather, the requirement applies to state court criminal proceedings by virtue of the Fourteenth Amendment.[866]  Nor is membership in the excluded class a requisite for raising a claim.[867]  Finally, the requirement is not a guarantee of "a jury of any particular composition."[868]  Instead, the right to bring a fair

---

[861] *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220 (1946).
[862] *Duren v. Missouri*, 439 U.S. 357, 364 (1979).
[863] *Id.*
[864] *Aldrich v. State*, 928 S.W.2d 558 (Tex. Crim. App. 1996) (quoting *Duren*, 439 U.S. at 367-68); *U.S. v. Maskeny*, 609 F.2d 183, 189 (5th Cir. 1980), *cert. denied*, 447 U.S. 921 (1980) ("unless the state shows that the aspects of the process that result in the disproportion manifestly and primarily advance a significant state interest").
[865] *Duncan v. Louisiana*, 391 U.S. 145 (1968).
[866] *Id.*
[867] *Duren*, 439 U.S. at 359, n.1 (citing *Taylor*, 419 U.S. at 526-31, 538).
[868] *Taylor*, 419 U.S. at 538; *Lockhart v. McCree*, 476 U.S. 162, 173 (1986) ("We have never invoked the fair cross-section principle … to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.").

cross-section claim only ensures that venires from which juries are drawn do not systematically exclude distinctive groups in the community.[869]

## B.    Hispanics Are a Distinctive Group Under the *Duren* Test.

Hispanics have repeatedly been held to be a distinctive group.[870]   The Supreme Court has never defined "distinctiveness," but has held that "the concept … must be linked to the purposes of the fair-cross section requirement."[871]   The "purposes" identified by the Court are:   (1) guarding against the exercise of arbitrary power and ensuring that the commonsense judgment of the community will act as a hedge against the overzealous or mistaken prosecutor, (2) preserving public confidence in the fairness of the criminal justice system, and (3) implementing our belief that sharing in the administration of justice is a phase of civic responsibility.[872]   In *Weaver v. State*, the Dallas Court of Appeals held that "distinctiveness" is found where a "common thread of shared experience or a political, social, or religious viewpoint binds all persons [of the particular group]."[873]

## C.    The Under-Representation of Hispanics on Harris County Venires is Both Unfair and Unreasonable.

The second element of the *Duren* test requires that a defendant show "that the representation of [Hispanics] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community."[874]   To meet this requirement, a defendant should present evidence to show an absolute disparity[875] of more than 10%.[876]   The

---

[869] *Taylor*, 419 U.S. at 538.
[870] *See, e.g., Hernandez v. Texas*, 347 U.S. 475 (1954); *Castaneda v. Partida*, 430 U.S. 493, 495 (1977); *Aldrich v. State*, 928 S.W.2d 558, 560 (Tex. Crim. App. 1996) ("We accept that Hispanics are a distinctive group in any community …").
[871] *Lockhart*, 476 U.S. at 174.
[872] *Lockhart*, 476 U.S. at 174-75 (quoting *Taylor*, 419 U.S. at 530-31).
[873] *Weaver v. State*, 823 S.W.2d 371, 373 (Tex. App.—Dallas 1992, pet. ref'd), citing *U.S. ex rel. Silagy v. Peters*, 713 F. Supp. 1246, 1251 (C.D. Ill. 1989); *U.S. v. Blair*, 493 F. Supp. 398, 406 (D. Md. 1980), *aff'd*, 665 F.2d 500 (4th Cir. 1981).
[874] *Duren*, 439 U.S. at 364.
[875] *Maskeny*, 609 F.2d at 190.

representation of the distinct group is measured against the community of eligible jurors, rather than the whole community.[877]  An absolute disparity is calculated by subtracting the percentage of the jury venire that is composed of members of the distinct group from the percentage of the community of eligible jurors made up of members of the distinct group.[878]  The Supreme Court has not determined precisely the point at which the representation of a distinctive group is so low as to be unfair and unreasonable.[879]  However, a showing of an absolute disparity greater than 10% should be sufficient to satisfy the second element of the *Duren* test.[880]

Here, the absolute disparity is at least 17%.  Based on the analysis of Dr. Hietala, the absolute disparity in Harris County – making all assumptions in favor of the State – is approximately 17.3%.[881]  As explained in his affidavit, Hispanics make up approximately 29.64% of persons eligible for jury service.[882]  Because this number is drawn from year-2000 figures, Hietala suggests that this number could be somewhat higher due to dramatic Hispanic growth in Houston since then.[883]  In comparison, based on Hietala's analysis of Prible's 300-person panel, only 37 panel members could possibly have been considered Hispanic (12.3%).[884]  Also, Prible's petit jury contained no Hispanics.  Thus, based on the evidence, Hietala concluded

---

[876] *U.S. v. Haley*, 521 F. Supp. 290, 292 (N.D. Ga. 1981) ("[C]ourts have clearly arrived at the conclusion that more than 10% absolute disparity is necessary to implicate a violation of the fair cross-section rule."), citing *Swain v. Alabama*, 380 U.S. 202, 208-09 (1965); *U.S. v. Butler*, 611 F.2d 1066, 1070 (5th Cir. 1980); *U.S. v. Maskeny*, 609 F.2d 183 (1980); *Thompson v. Sheppard*, 490 F.2d 830 (5th Cir. 1974); *see also* Ted M. Eades, *Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County,* 54 SMU Law Rev. 1813, 1823 (2001) (most courts use the 10% floor from *Swain v. Alabama*, 380 U.S. 202, 208-09 (1965)).

[877] *U.S. v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001); *U.S. v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981) ("the disparity … must be based not on *total* population but, instead, on those of the identifiable class who are *eligible* to serve as jurors."); *Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996), *cert denied,* 522 U.S. 825 (1997).

[878] *Maskeny*, 609 F.3d at 190.

[879] The Supreme Court has never articulated precise standards for determining what constitutes a significant underrepresentation.  *U.S. v. Haley*, 521 F. Supp. 290, 292 (N.D. Ga. 1981), citing *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972).

[880] *Maskeny*, 609 F.2d at 190.

[881] *See* **Exhibit 115.**

[882] *Id.*

[883] *Id.*

[884] *Id.*

that Hispanics were under-represented on Prible's venire panel, that the absolute disparity was in excess of 17%, and that the possibility that mere random chance created the disparity was less than 1 in 10,000,000.[885]

**D.    The Under-Representation of Hispanics on Venires in Harris County is Systematic.**

The third element of the *Duren* test requires that the disparity be the result of systematic exclusion.[886]    In Harris County, all of the evidence, the analysis contained in related studies and other jurisdictions, and any reasonable interpretation of the facts all point to the same explanation for the systematic exclusion of Hispanics:   $6/day is so low – the lowest in the nation – that the working poor cannot afford to attend jury duty.   This falls disproportionately on Hispanics who make up a large part of the working poor in this county.   Because this and other procedures inherent to Harris County's venire selection are employed daily against every defendant in Harris County courts, the disparity is systematic under *Duren's* requirements.

**1.    Juror Pay Excludes Hispanics Disproportionately.**

In Texas, employers do not have to pay their employees for time spent serving as a juror.[887]   Thus, jury duty often means losing a daily wage for day laborers and hourly workers summoned for jury duty.   In Dallas, where $6/day is also the prevailing rate, studies have shown that the poor, especially day laborers, and Hispanics fail to show up for jury duty.[888]   $6 barely pays for parking at the court building and will not satisfy both lunch at the courthouse plus parking.   Thus, the poorest citizens – to whom jury duty is a secondary concern to providing food and shelter for their families – are forced to choose between a day's wage, perhaps $45, or attending the courthouse at a loss.    The evidence suggests that these people are

---

[885] *Id.*, *see* Sub Exhibit E 8b.
[886] *Duren*, 439 U.S. at 364.
[887] *See also* TEX. CIV. PRAC. & REM. CODE. § 122.001 (2004).
[888] Ted Eades, *Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County,* 54 SMU L. Rev. 1813 (2001); *Number of Minority, Lower-income Jurors Doesn't Mirror Community,* Dallas Morning News, October 22, 2000.

disproportionately Hispanic and that financial hardship is the primary factor in their non-participation.[889]  Experience in other jurisdictions also suggests that raising the daily pay from $6 to $40 would greatly increase participation by low wage earners and Hispanics.[890]

The problem is compounded because Harris County systematically fails to enforce juror summonses – allowing many poor Hispanics to simply opt out of the system.  As explained in *Duren* and in *Taylor v. Louisiana*, such an arrangement is unconstitutional and unacceptable.  As the Supreme Court reasoned in those cases, procedures allowing most women to opt out of jury service violated defendants' rights to a jury from a fair cross-section of the community.

### 2. Hispanics are disproportionately affected by Harris County's failure to update addresses.

Hispanics are also disproportionately affected by the County's failure to update its address lists.  Harris County gets its addresses from voter registration lists, driver's licenses, and ID cards.  However, because addresses are often not updated until a person renews his or her driver's license, many of the addresses become bad addresses when a person changes residences.  Studies reflect that huge numbers of jury summonses are returned because of bad addresses.[891]  The evidence also shows that this disproportionately affects Hispanics because Hispanics move more frequently than other groups.[892]  New York – where driver's licenses are updated every eight years (Texas licenses usually expire in six) – resolved this very problem by subscribing to a national change of address service.[893]

---

[889] *Id.*
[890] *See* Mark Curriden, *Extra Money Helps El Paso Lure More Prospective Jurors*, Dallas Morning News, October 24, 2000; Mark Curriden, *No Excuses: New Yorkers Who Try to Avoid Jury Duty Find That System Has Gotten Serious About Service*, Dallas Morning News, October 24, 2000.
[891] *Number of Minority, Lower-income Jurors Doesn't Mirror Community,* Dallas Morning News, October 22, 2000.
[892] *Id.*
[893] Mark Curriden, *No Excuses: New Yorkers Who Try To Avoid Jury Duty Find That System Has Gotten Serious About Service*, Dallas Morning News, October 24, 2000.

In sum, all of the essential elements of *Duren* are met. Hispanics are distinctive. They are being dramatically under-represented on the venire panels. And the cause of the under-representation is systematic. Therefore, Prible has made a *prima facie* case that his Sixth Amendment right to a jury drawn from a fair cross-section of the community has been violated.

## CLAIM #14

### PRIBLE IS ACTUALLY INNOCENT OF CAPITAL MURDER; THIS COURT SHOULD ORDER RELIEF AND MAY REACH ALL CLAIMS HEREIN THROUGH *SCHLUP'S* ACTUAL INNOCENCE GATEWAY.

## A. STANDARDS

Close review of the decision in *Herrera v. Collins*, 506 U.S. 39 (1993), demonstrates that a majority of the Court found that the execution of an innocent man violates the Constitution.[894] Even Chief Justice Rehnquist left open the question of whether, in a capital case, a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and would warrant federal habeas relief if there were no state avenue open to process such a claim,[895] although "the threshold showing for such an assumed right would necessarily be extraordinarily high."[896]

The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review.[897] However, in a recent case, Judge Wiener stated that actual innocence is the "elephant in the room."[898] Judge Wiener stressed that the Supreme Court has indicated that those

---

[894] *Id.* at 419 (O'Connor, J., joined by Kennedy, J., concurring) ("executing the innocent is inconsistent with the Constitution" and "the execution of a legally and factually innocent person would be a constitutionally intolerable event"); *see also id.* at 429 (White, J., concurring) ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case."); *see also id.* at 430 (Blackmun, J., joined by Stevens and Souter, JJ., dissenting) ("Nothing could be more contrary to contemporary standards of decency … than to execute a person who is actually innocent.").
[895] 506 U.S. at 417.
[896] *Id.*
[897] *See Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003).
[898] *In re Swearingen*, 556 F.3d 344 (5th Cir. 2009) (concurring opinion).

who prove their actual innocence will be added to the list of defendants upon whom the State is forbidden to impose capital punishment:

> Consistently repeating the mantra that, to date, the Supreme Court of the United States has never expressly recognized actual innocence as a basis for habeas corpus relief in a death penalty case, this court has uniformly rejected standalone claims of actual innocence as a constitutional ground for prohibiting imposition of the death penalty. The Supreme Court has, however, made statements in dicta which at least strongly signal that, under the right circumstances, it might add those capital defendants who are actually innocent to the list of persons who – like the insane, the mentally retarded, and the very young – are constitutionally ineligible for the death penalty.[899]

In conclusion, Judge Wiener admonished that "this question is a brooding omnipresence in capital habeas jurisprudence that has been left unanswered for too long."[900]

## B.    FACTS

The factual basis of the innocence claim includes the facts outlined above in Sections IV, VI, and VIII, which are the same facts that underlie Prible's prosecutorial misconduct claims (Claims #1-6, 8, 10-11, and 15 above). The facts and argument on which Prible's prosecutorial misconduct claims rest are therefore incorporated herein by reference as if fully set forth under this actual innocence claim.

### 1.    Prible was wrongfully convicted on the basis of jailhouse snitch testimony that his post-conviction evidence shows was fabricated.

This is a case of a wrongful conviction stemming from the testimony of a notorious jailhouse informant. At trial, Beckcom informed the jury that Prible had confessed to the murders of Herrera, Tirado, and their three children. That fabricated testimony was borne out of a conspiracy, involving the State, to convict people through jailhouse informant testimony. Without Beckcom's false testimony, no reasonable juror would have convicted Prible. The

---

[899] *Id.* at 349.
[900] *Id.*

evidence that Beckcom fabricated the confession is strikingly powerful in light of the State's weak case and in light of the substantial defense, including significant alibi testimony, that Prible presented at trial.

Prible's jury should have been shown evidence demonstrating that Foreman and Beckcom were involved with a ring of FCI Beaumont informants who were manufacturing false confessions, that Foreman actually went to Siegler and Bonds with a false confession story before he had even met Prible, and that Siegler and Bonds did not consider him credible although he supposedly was privy to everything Prible ever said to Beckcom later. The jury should also have been confronted with evidence that Siegler wrote a Rule 35 sentence reduction letter for Foreman five months before Prible's trial, and personally testified at a Rule 35 hearing for Jesse Moreno – the informant who had introduced her to Foreman so that he could assist her in Prible's prosecution – two months before Prible's trial. If the jury would have known this, Beckcom's testimony would have been rejected.

2. **Post-conviction evidence demonstrates that forensic testimony relied upon by the State to place Prible at the murder scene was unsupportable "junk science."**

If the jury had been presented with the foregoing evidence, the State's case would have hinged on the unscientific testimony of Watson that Prible had oral sex with Tirado moments, if not seconds, before she died. However, Prible's expert, Dr. Johnson, and the forensic literature disprove this evidence outright. Dr. Johnson's affidavit refutes Watson's testimony that testable spermatozoa are not recoverable by oral swab more than an hour after they are deposited, and refutes Watson's suggestion that his ability to develop a full DNA profile for Prible from the swab of Tirado's mouth meant she was killed within moments or even seconds of oral sex.

Along with the scientific literature, Dr. Johnson's report supports an alibi defense that proves Prible's innocence. According to Dr. Johnson,

> Whereas Mr. Watson testified that there was a great deal of sperm present on the oral swab, he could not reliably make that statement without having microscopically evaluated the number of spermatozoa present. In fact, if one accepts Mr. Watson's stated yield of DNA as 70 nanograms (ng) on the half swab that he tested (p. 116 lines 20-21) and multiply by two, that gives approximately 140 ng male DNA on the entire oral swab. Since one sperm cell contains about .0035 ng of DNA, there were an estimated 40,000 spermatozoa on the entire oral swab. Normal seminal fluid contains 20-1000 million spermatozoa per milliliter (ml), and a typical ejaculat[ion] which consists of 3-5 mls of seminal fluid can contain 400 million spermatozoa. If one assumes a figure of 40 million spermatozoa per ml of fluid, then the amount of seminal fluid represented on the entire oral swab would be about 0.0001 milliliter (or 1 microliter, ul). This volume is approximately 1/50 of a typical drop of liquid that is dispensed from an eye dropper. It is far less than the volume of seminal fluid that would be found in someone's mouth if ejaculation had occurred moments if not seconds before the victim was killed as Mr. Watson testified upon direct examination (p. 103, lines 9-15). And although any given oral swab would not necessarily contain the total amount of semen found in the oral cavity, a given swab should be representative and indicative of the amount of material present. [901]

Recent, controlled, and statistically analyzed studies resoundingly disprove Watson's testimony and support Dr. Johnson's conclusions.[902] Moreover, the jury should have been told that Siegler was informed, by Pam McInnis, that semen can persist in the oral cavity up to 72 hours. If the jury would have known this, Watson's testimony would have been rejected.

Hence, Prible's evidence establishes clearly and convincingly that no reasonable jury would have convicted him of capital murder.

## CLAIM #15

**IN VIOLATION OF DUE PROCESS, THE STATE SPONSORED FALSE TESTIMONY TO BOLSTER ITS RAPE/MURDER THEORY AND TO PREVENT CORROBORATION OF PRIBLE'S ALIBI WITNESS.**

**A.      The State solicited false and misleading evidence from William Watson.**

---

[901] **Exhibit 54** at ¶ 16 (Affidavit of Elizabeth Johnson, Ph.D.).
[902] **Exhibit 55**.

Through Watson, the State presented a theory regarding the calculation of a PMI that could not begin to meet *Daubert* standards. The State knew that Watson's pretense to estimate a time of death based on the longevity of sperm in an oral cavity was not supported by scientific literature, did not command consensus among authorities in the field of DNA testing, and had not been confirmed through testing in conformity with the scientific method. The State also knew that Watson was unqualified to provide a forensic opinion about the PMI between oral sex and death in this case, and knew that Watson had never presented a similar opinion in any other case. The State also knew that Watson had not provided a PMI in his 1999 report and had not supplemented that report. Nevertheless, the State drummed up the theory of estimating a PMI based on the perdurance of testable haploid DNA in an oral cavity, and contrived to present this invalid forensic opinion through Watson without notice to the defense.

The State's purpose in presenting Watson's false and unqualified testimony was to mislead the jury to rely on invalid scientific testimony. This purpose is reflected in the lurid closing argument.[903] The prosecutors touted Watson's testimony that the PMI was short, and maybe no more than seconds, as "the only logical conclusion that you can draw," and then mocked the idea that semen and spermatozoa could be present in testable amounts more than an hour after death in grotesque language. According to co-counsel for the State, the defense would have the jury believe that Tirado's mouth was "fly paper for semen."[904] Siegler made even more vile, intentionally fictional comments, such as the following:

> *If you believe that story I guess you've also got to believe that his semen is so tasty that she walked around savoring the flavor of it in her mouth for a couple hours. That's the only way it's going to end up still in her mouth after she's dead.*[905]

---

[903] 28 RR 22.
[904] *Id.*
[905] 28 RR 55-56.

Through inflammatory emphasis upon testimony that the State knew could not pass muster under *Daubert*, the State aimed to convince the jury that Prible was not only present at the crime scene moments, if not seconds, before the death of the victims, but compelled Tirado to perform fellatio on him moments, if not seconds, before she died. The reckless solicitation of scientific testimony that the State knew was invalid, and the emphasis and exaggeration of the invalid testimony during closing argument, violated Prible's due process rights guaranteed under *Giglio v. United States.* The testimony was highly prejudicial because it placed Prible at the crime scene, at the time of death, engaged in criminal sexual conduct.

**B.    The State introduced and argued false and misleading expert testimony regarding burn patterns, and falsely and misleadingly argued that testing on crime scene evidence showed that accelerants had been used to cover up sexual activity.**

Argument and evidence outlined in Sections IV and IX, *supra,* regarding Carter's and West's expert testimony, is incorporated by reference.

**C.    The State knowingly sponsored false testimony and argument that Herrera would not have allowed Prible in his home.**

At trial, Herrera's brother-in-law, Victor Martinez, testified that Herrera's house was off-limits to guests. Martinez intimated that even family members like himself were not welcome inside. Martinez said that when he was at Herrera's playing pool in the garage and had to urinate, he would urinate outside.[906] In closing remarks, the State used Martinez's testimony to attack Prible's statement to the police, in which Prible said that he had consensual sex with Tirado in the bathroom of her home on the night of the murders, as follows:

> *And [Prible] went inside to use the bathroom. Gee, now why would Steve Herrera let Jeff Prible go in the house where his babies and his wife are asleep at 2:00 or 3:00 in the morning and use the bathroom that he don't let his own brother use, in the middle of the night. It's a lie.*[907]

---

[906] 25 RR 32.
[907] 28 RR 62.

However, it was the State that was lying, not Prible. Steve did not close his home to his relatives, including his brother. He actually had let his brother *live* with him. Deputies interviewed the live-in brother, Jaime Herrera, who explained in a sworn statement that "Steve used to live with me in an apartment. When my lease ran out Steven and Nilda rented a house and I moved in with them."[908] Jaime Herrera said he decided to move out to give the couple room, because Herrera and Tirado were bringing over children that they had had with other partners. Nilda's co-workers, Lisa Detmore and Tiffany Burroughs, also spoke to deputies "about Nilda's brother or brother in law living with them in the past." According to Burroughs, Nilda made the relative or relatives leave after finding drugs in their room.

Crime scene photos of the den next to the garage, which the State argued was forbidden territory to friends and family alike, show that this area was used for entertainment. Steve had installed an expensive looking sound system and wide screen TV. Nilda's brother, Rafael Tirado, told police that he had been at Steve and Nilda's house for a family barbeque a week before the murders.[909] The idea that Steve and Nilda would invite people over for meals and entertainment, but would be so secretive and protective as to refuse to let guests go to the bathroom inside, is preposterous. However, the State recklessly sponsored Martinez's testimony knowing it was fabricated, and emphasized the fabrications in closing arguments, proclaiming that this fabrication showed Prible was lying about consensual sex.

**D.    In order to support an improper, inflammatory closing argument that Prible was too ugly for Nilda to have consensual sex with him, the State knowingly sponsored false testimony that Nilda told Cynthia Flores she thought Prible was "creepy."**

The State tied the murder conviction to purported evidence that Prible forced himself sexually on Nilda. The "proof" consisted of Watson's testimony concerning the persistence of

---

[908] **Exhibit 90.**
[909] **Exhibit 118** (Statements in HCSO files of Rafael Tirado, Jr.).

sperm in the oral cavity, and, importantly, on testimony and argument that Nilda would not have engaged in voluntary sex with Prible because Prible was too ugly, and because she would not have cheated on Steve.[910]  To justify this inflammatory theory, the lead prosecutor elicited the following testimony from Nilda's friend, Cynthia Flores:

> Q (by Siegler):  Was there ever a conversation that you had with Nilda where she told you how she felt or thought about this Defendant?
>
> A.  Yes.
>
> Q.  What did she tell you?
>
> A.  She told me that she was tired of him being there and he gave her the creeps.[911]

But in her April 26, 1999, written statement, Flores stated that Prible gave *her* the creeps, not Nilda:

> I have known Jeff Prible since we were in middle school. . . . I never spoke with him but I knew who he was and **he gave me the creeps** because of the way he looks.[912]

Siegler emphasized Flores's false and misleading testimony in closing, when she argued:

> What's [Prible's] explanation about how his DNA ended up in her mouth?  Oh, we were having an affair.  Please.  You know, you heard a lot of talk about don't let appearances give you first impressions.  That's all well and good, but appearance is what leads to affairs.  And thinking sometone to you is creepy and gives you the creeps and looks the way he does ain't going to make you have a hot passionate affair.  You heard what Cynthia and Angie said about what Nilda thought about Jeff Prible.  Do you really think she wanted to have an affair with someone that she thought was creepy?[913]

Moreover, the State depicted Nilda as a responsible parent and homemaker who would never cheat on her husband.  But certain witness statements, given shortly after the murders, paint a different picture, one which would have corroborated Prible's defense that he and Nilda

---

[910] *See* Testimony of Cynthia Flores, 25 RR 143.
[911] 25 RR 143.
[912] *See* **Exhibit 116.**
[913] 28 RR 55.

261

were having a consensual sexual affair, and would have shown Nilda to be a heavy partier who knew of Steve's criminal activity and was herself also involved in criminal activity. These statements were either altogether withheld from the defense, or else not disclosed until trial, at which point it was too late for the defense to make use of them:[914]

- Statement of Steven Cumpian, Nilda's ex-husband.[915] Cumpian says that Nilda sold him drugs on occasion.

- Statement of Rafael Tirado.[916] Rafael says that his sister Nilda confided in his wife, Maribel, and had recently told Maribel something that she did not want Rafael to hear. Rafael also said that Nilda had never expressed any fears or concerns about anyone that he knew of, which impeaches the testimony of Nilda's friends who testified that Nilda thought Jeff was "creepy."

- Statement of Maribel Tirado.[917] Maribel says that Nilda wanted to kick Steve out because he partied too much, and was just using him so she could get plastic surgery.

- Statement of Cynthia Flores.[918] Cynthia's written statement indicates that she and Nilda did not confide in each other as much as she would have the jury believe. Cynthia, for example, knew a lot about the bank robberies, things she said Nilda did not know. **Cynthia even admits, in her written statement, to spending some of the bills taken in the bank robberies.** She therefore had a motive to implicate Prible, because she and her husband could have been suspects in the murders. Nilda

---

[914] In the David Temple murder case, in which Siegler was found by the Texas Court of Criminal Appeals to have committed 36 separate *Brady* violations, Siegler testified that her practice was to withhold witness statements from the defense until after the witness testified. The defense would then have to read them during a break in trial. The court found that there were many witness statements that were never turned over, or else turned over far too late for the defense to make use of them. *See* **Exhibit 92** (Temple Findings of Fact and Conclusions of Law dated July 6, 2015); *Ex Parte Temple,* No. WR-78,545-02, 2016 WL 6903758 (Tex. Crim. App. Nov. 23, 2016) (unpublished).
[915] **Exhibit 117.**
[916] **Exhibit 118.**
[917] **Exhibit 119.**
[918] **Exhibit 116.**

was supposed to be Cynthia's best friend, yet Cynthia kept important information from her regarding Steve's criminal activities. Likewise, it is evident from Cynthia's statement that Nilda kept certain things from Cynthia. For instance, Nilda told Cynthia that Steve had gotten a large sum of money playing pool, but then admitted to her real estate co-workers that it was drug money.[919] Nilda told Cynthia that she and Steve were very happy and planning on getting married, but told her co-workers that they went to the International Festival instead of getting married.

- Statement of Angela Serna.[920] Angela states that Nilda had kicked Steve out of the house two weeks before the murders for staying out too late.

The State also withheld certain supplemental offense reports from the defense, either not disclosing them at all or disclosing them too late for the defense to make use of them:

- Supplemental report by P.S. Klim.[921] This report says that Cynthia and her husband actually spent some of the bills that were allegedly stolen in the bank robberies. Money was the supposed motive for the Herrera/Tirado murders, yet Cynthia and her husband were pointing the finger at *Prible*. This report could have been used to impeach Cynthia's testimony at trial.

- Supplemental Report by Det. Reynolds.[922] This report says Nilda told her co-workers that she had recently called the cops on Steve and had had him removed from the house, and also that she knew Steve was involved in drug activity. The report also states that Steve hid money under the carpet in their closet because he didn't trust the relative who was living with them.

---

[919] **Exhibit 90.**
[920] **Exhibit 120.**
[921] **Exhibit 121.**
[922] **Exhibit 90.**

- <u>HPD Report regarding the murder of Steven Cumpian on July 2, 2000.</u>[923] Cumpian was the father of one of the girls murdered in the Herrera/Tirado household. This report shows that he led a very risky drug lifestyle that ultimately got him killed. It could have been used by the defense to show that other individuals may have had a motive to murder the Herrera/Tirado family.

**E.      The State solicited misleading testimony about phone calls from Steve knowing that they were made by Prible.**

Victor Martinez also testified that during the night of April 23, and into the early morning of April 24, 1999, Herrera called and paged his brother, Edward. Edward testified that he knew Herrera was paging him from a number that was not Herrera's own. Edward saved the sending cell phone number – 281-684-3400 – on his pager and showed it to police. The number was Prible's cell phone number. Edward said he did not recognize this number, but he said the number was followed by a three digit code, "021," that Herrera used to identify himself as the caller. Edward said he receive a page with the 021 code at 11:00 p.m. on April 23, and again around 2:00 or 2:30 a.m. on April 24. Edward said he returned the 2:00 or 2:30 a.m. call and received another call around 3:00 a.m. on April 24 that he also returned. Edward said that at about 4:00 a.m. another call came in, but this time without the "021" suffix. Edward said he did not return this call because he did not have a phone.

Edward said that the 4:00 a.m. page was the last time he dealt with his pager until daylight on April 24. Edward explained that he stayed the night with his girlfriend and did not have his phone with him to return pages. Edward did say that when he woke up he checked his pages and locked in Jeff's number (saved it). Edward said he checked voice mails from his

---

[923] **Exhibit 122.**

family and listened to one more that was "just like went into record and you just hear like a couple of buttons being pressed."[924]

However, phone records subpoenaed by the HCSO show that Prible called Edward's 713-210-4887 number on several occasions on the morning of the April 23 and on April 24 as follows: April 23, 11:03:47 a.m. (26 seconds); April 24, 12:05:38 a.m.; April 24, 2:28:38 a.m. (20 seconds); April 24, 3:14:16 a.m. (19 seconds); April 24, 4:04:15 a.m. (9 seconds); April 24, 4:06:06 a.m. (33 seconds); April 24, 5:08:30 a.m. (1 minute, 39 seconds); April 24, 6:13:58 a.m. (32 seconds).[925]  None of the calls are followed by any suffix, including the "021" suffix Steve used.  Only the April 24 call placed at 2:28:38 a.m. is followed by other numbers, and that appears to be a case of the caller dialing the same number twice in a row.

Misrepresenting the phone calls was essential to the State's case.  A jury could understand that one brother might use a friend's phone to call his brother.  Calls from Herrera to Edward on Prible's phone also place Prible and Herrera together late in the morning hours of April 24, 1999, near the time Herrera and Tirado were killed.  However, the fact that no "021" suffix was added to the phone calls meant that *Prible* was calling Edward, not Steve. Furthermore, the calls show that Prible rang Edward twice and left messages 9- and 33-seconds long around 4:00 a.m., which would have been at the very moment the State insists Prible got home,[926] and, on the State's theory, immediately after the murders.  Then Prible kept calling Edward, calling him next at 5:00 a.m. and again around 6:00 a.m., and left messages of some considerable length.  The 5:08 a.m. call lasted over a minute and a half; the 6:13 a.m. call lasted a little more than a half a minute.  But calling the brother of the victims is not what killers do, let alone do they call relatives to leave extended messages.  The explanation for the calls, which a

---

[924] 25 RR 86.
[925] **Exhibit 52** (Prible's cell phone records for April 22, 1999, to April 28, 1999).
[926] 28 RR 75.

reasonable jury would have been forced to consider, was that Prible had called Edward Herrera from Prible's home after being seen by the alibi witness, Gurrusquieta, which is what actually happened.

**F.      Violations of *Giglio,* individually and collectively, deprived Prible of his due process rights to a fair trial.**

Proof that Prible forcibly entered the home and forced Tirado to engage in oral sex moments, if not seconds, before killing her was crucial to the State's ability to secure a conviction.  Based on this fabricated evidence, the State launched into an inflammatory jury argument, according to which Prible killed Herrera and then put a gun to Tirado's head, forcing her to engage in fellatio before putting a bullet through the back of her head.  Had this false testimony been excluded, it is reasonably probable that the jury would not have convicted. Instead, the jury would be faced with an uncontradicted alibi placing Prible at home making the phone calls to Herrera's brother, calls that are documented in his phone records.  Indeed, the evidence demonstrates Prible's actual innocence and justifies this Court in reaching the claims set forth above, and Prible's other constitutional claims, pursuant to *Schlup.*

## CLAIM #16

### TRIAL COUNSEL'S FAILURE TO UTILIZE PRIBLE'S PHONE RECORDS AND FAILURE TO EXCLUDE OR REFUTE THE FOUNDATION OF THE STATE'S RAPE THEORY VIOLATED PRIBLE'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

**A.      Counsel failed to refute Watson's testimony purporting to estimate a perimortem interval between oral sex and Nilda's death.**

The evidence and argument in Claims #10-12 and 14-15 are hereby incorporated by reference.

**B.      Counsel failed to refute Victor Martinez's testimony.**

Counsel made no discernable effort to impeach Martinez's false testimony that the Herrera home was closed to friends and family alike. Counsel could have called any number of family members to refute this false testimony, including Jaime Herrera or Tirado's coworkers.

**C.      Counsel failed to refute testimony and argument that Nilda thought Prible was "creepy" and would not have engaged in voluntary sex with him because he was too ugly and because she would have never cheated on Steve.**

The evidence and argument in Claim #15, *supra,* is hereby incorporated by reference.

**D.      Counsel failed to present phone records that tended to exonerate Prible.**

Counsel should have obtained Prible's phone records or else used those phone records if counsel did obtain them. Instead, the State presented a false history of phone contact between Steve and Edward Herrera, based on Edward's recollection of pages he received on the night of the murder that placed Prible with Steve until late in the morning (past 4:00 a.m.).

Trial counsel should have suspected that the State was sponsoring false and inaccurate testimony. Edward Herrera was testifying about pages and phone calls made two years before trial; however, the State did not introduce Edward Herrera's pager and phone records and did not introduce Prible's phone records. Trial counsel failed to ask Herrera if he had reviewed his pager record's request that the State produce any documents, including phone records that Edward Herrera may have reviewed.

**E.      Counsel failed to exclude or impeach Carter's testimony that burn patterns showed Nilda had been set ablaze using accelerants.**

Texas Rules of Evidence require a court to hold a hearing outside the presence of the jury at which defense counsel is entitled to have the State's expert disclose the opinions he or she expects to give in testimony.[927]  Under 705(b), the defense "must be … permitted to examine the

---

[927] Tex. R. Evid. 705(b).

expert about the underlying facts or data" and move to exclude the testimony under *Daubert* or *Kelly* without exposing the jury to the opinion or the attempt to exclude it. Prible's trial counsel did not move to have any of the State's witnesses disclose their opinions. Nor did they object that the State had intentionally ambushed the defense by filing reports – autopsy, DNA and arson – which expressed conclusions but not the prejudicial ones that the State solicited at trial without notice, including Watson's on PMI between sex and death, and Carter's on the significance of burn patterns seen on Nilda.

Had trial counsel taken steps he was entitled to take under Texas Rule of Evidence 705(b), Carter's false testimony would have been excluded. Trial counsel could have also prevented the State's misuse of her invalid testimony in closing remarks.

## F.     Counsel failed to prevent or object to the State's improper closing arguments.

### 1.     Counsel failed to object to the misuse of arson evidence in the State's closing argument.

Siegler argued at closing that Kutzit was the perfect accelerant to start a flash fire and destroy everything, and asked and answered the following question for the jury:

> *Did Jeff Prible know that Kutzit was such an excellent choice for a weapon, for arson? You're never going to know that. We're never going to know that.*[928]

However, lab employee Cleva West did not find a single item that tested positive for Kutzit except the Kutzit itself, and the canister found on the couch appears unopened in crime scene photos. Furthermore, firefighters testified that Kutzit tends to create a flash fire that quickly uses all the oxygen in the room, thereby extinguishing itself. The lead prosecutor intentionally misrepresented this testimony.

---

[928] 28 RR 73.

2.      **Counsel failed to object to violations of Prible's Fifth Amendment rights.**

The rhetorical question and answer referred to in subsection (F)(1), above, violated Prible's Fifth Amendment rights not to testify by implying that only Prible could say whether he knew Kutzit was "such an excellent choice . . . for arson." This improperly drew the jury's attention to the fact that he did not take the stand.

The lead prosecutor also made foundationless arguments designed to encourage jurors to convict Prible because of his facial appearance.

**G.      Counsel's failures prejudiced Prible.**

Counsel's failure to refute and prevent the introduction of critical testimony used by the State to place Prible at the crime scene, raping Tirado moments before death, obviously prejudiced Prible. Had counsel taken steps to refute and disprove Martinez's, Watson's, and Edward Herrera's testimony, the State would not have been able to damage the alibi defense provided by Prible's neighbor. Under *Strickland,* Prible only has to show by a preponderance of the evidence that the outcome of trial would have been different but for counsel's errors.[929] Had trial counsel taken reasonable steps to refute and impeach the false testimony of the State's witnesses – Martinez, Watson, Herrera, and Flores – no reasonable jury would have convicted Prible. The State would have been caught fabricating evidence of guilt, making it even less reasonable for a jury to rely on the State's compromised informant. This Court should therefore order relief.

**H.      State habeas counsel unreasonably failed to raise an IAC claim based on the allegations and evidence set forth in Subsections (A)-(D) of this claim, so this Court can reach the foregoing claims set forth in Sections (A)-(F) under *Trevino v. Thaler;* the merits can also be considered by virtue of *Schlup* (*see* Section IX above).**

---

[929] 466 U.S. 688 (1984).

State habeas counsel had access to, or could have sought, the same evidence as that presented herein, which refutes Martinez, Watson, Herrera, and Flores. There is no conceivable strategic reason for state habeas counsel not to have raised claims complaining that trial counsel was ineffective for not refuting Martinez, Herrera, and Flores. State habeas counsel did raise an IAC claim showing how trial counsel should have prevented or refuted the testimony of Watson. If the state habeas IAC claim is found to be distinguishable from Claim #12, then to that extent, state habeas counsel should be considered ineffective with respect to Watson.

## XI.
## CONCLUSION

The due process violations in this case are astonishing. The State used multiple informants working on a *quid pro quo* basis against Prible after he was represented by counsel. The State knew that their non-testifying corroborating witness to Prible's supposed "confession" to Beckcom – *i.e.,* Nathan Foreman – was a liar who had tried to set Prible up before he had ever laid eyes on Prible, yet they hid their dealings with Foreman from Prible's attorneys. The State obtained a conviction and death sentence based on fabricated, illegally obtained jailhouse informant evidence and false "scientific" testimony. Prible has been cruelly confined on death row in solitary confinement for almost 16 years. During that time, he has suffered bouts of mental illness. He intermittently hears voices and he is labile and agitated, but he has persisted throughout in investigating and litigating his case because of his desire to see justice done and because of his insight into the environmental causes of his mental turmoil. State courts have refused to hear the merits of Prible's constitutional claims. Federal habeas corpus is the only thing standing in the way of the inhumane incarceration and execution of an innocent human being. From this Court he seeks relief from his unconstitutional conviction and sentence.

## PRAYER FOR RELIEF

WHEREFORE, Ronald Jeffrey Prible, Jr. requests that this Court:

(1)     Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

(2)     Permit additional briefing on procedural questions concerning procedural default, "gateway" innocence, or issues arising under 28 U.S.C §§ 2241-2254 before issuing any opinion disposing of claims for relief on such grounds.

(3)     Grant him an evidentiary hearing, as requested in his motion for an evidentiary hearing, at which he may present evidence in support of the claims presented in this Fourth Amended Petition, and allow him a reasonable period of time, before any hearing this Court orders, to brief the issues of fact and of law raised by this petition.

(4)     Grant him an evidentiary hearing, as requested in his motion for an evidentiary hearing, at which he may present evidence in support of his arguments against procedural default and other procedural defenses Respondent has raised and may raise.

(5)     Issue a scheduling order governing discovery necessary to properly litigate the merits of Prible's constitutional claims and contest Respondent's procedural defenses.

(6)     Grant such other relief as law and justice require.

Respectfully submitted,
HILDER & ASSOCIATES, P.C.

By:     */s/* Gretchen N. Scardino
        Philip H. Hilder
        State Bar No. 19620050
        James Rytting
        State Bar No. 24002883
        819 Lovett Boulevard
        Houston, Texas 77006-3905
        Telephone (713) 655-9111
        Facsimile (713) 655-9112

        Gretchen N. Scardino
        State Bar No. 24037170
        REED & SCARDINO LLP
        P.O. Box 1567
        Austin, Texas  78767
        Telephone (512) 659-4470

        ATTORNEYS FOR PETITIONER
        RONALD JEFFREY PRIBLE, JR.

## VERIFICATION

I, Gretchen N. Scardino, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Ronald Jeffrey Prible.

*/s/ Gretchen N. Scardino*
Gretchen N. Scardino

## CERTIFICATE OF SERVICE

On March 26, 2018, a copy of Petitioner's Fourth Amended Petition for Writ of Habeas Corpus was served upon Respondent by ECF filing, via email, or U.S. Mail, return receipt requested, addressed to the Texas Attorney General, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

*/s/ Gretchen N. Scardino*
Gretchen N. Scardino

# EXHIBIT LIST TO FOURTH AMENDED COMPLAINT

| Exhibit No. | Description |
|---|---|
| Exhibit 1 | First Statement of Jeff Prible, April 24, 1999 at 5:46 pm |
| Exhibit 2 | Second Statement of Jeff Prible, April 25, 1999 at 12:09 am |
| Exhibit 3 | March 1, 2001 Fax from William Watson to Johnny Bonds enclosing lab report dated June 4, 1999, making DNA link to Jeff Prible |
| Exhibit 4A | Deposition of Kelly Siegler (Unsealed) |
| Exhibit 4-B | Deposition of Kelly Siegler **(Filed Under Seal)** |
| Exhibit 5 | Deposition of Johnny Bonds |
| Exhibit 6 | April 4, 2001 handwritten letter from Jesse Moreno to Kelly Siegler |
| Exhibit 7 | Housing/Transfer Records for Jesse Moreno **(Filed Under Seal)** |
| Exhibit 8 | Writ of Habeas Corpus Ad Testificandum for Jesse Moreno in *State v. Morales,* Nos. 752171 and 752172, in the 228th Criminal District Court of Harris County, Texas |
| Exhibit 9 | HCDA Capital Murder Report identifying Jesse Moreno, Frankie Vasquez III, Gene Arthur Taylor, and Jose Cuellar as suspects |
| Exhibit 10 | April 10, 2001 handwritten letter from Celia Moreno to Kelly Siegler |
| Exhibit 11 | Transcript of July 3, 2001 Kelly Siegler/Jesse Moreno interview |
| Exhibit 12 | July 5, 2001 HCSO supplemental report discussing Kelly Siegler's July 3, 2001 meeting with Jesse Moreno |
| Exhibit 13 | May 2, 2002 letter from Kelly Siegler to AUSA Todd Clemons regarding Jesse Moreno's cooperation in Hermilio Herrero case |
| Exhibit 14 | July 5, 2001 Prible Information and Indictment paperwork |
| Exhibit 15 | July 5, 2001 Probable Cause Affidavits by Curtis Brown |
| Exhibit 16 | September 4, 2001 letter from HCDA regarding Interstate Agreement on Hermilio Herrero |
| Exhibit 17 | Housing/Transfer Records for Jeff Prible **(Filed Under Seal)** |
| Exhibit 18 | Housing/Transfer Records for Nathan Foreman **(Filed Under Seal)** |
| Exhibit 19 | Tab 9 Work Product, produced on May 12, 2017 |
| Exhibit 20 | Tab 65 Work Product, produced on May 12, 2017 |
| Exhibit 21 | Trufone Records and phone lists – Nathan Foreman **(Filed Under Seal)** |

| Exhibit No. | Description |
|---|---|
| Exhibit 22 | Telephone memos to Kelly Siegler from informants, Jesse Moreno, and Alan Percely |
| Exhibit 23 | November 12, 2001 Letter from Alan Percely to Kelly Siegler regarding Nathan Foreman |
| Exhibit 24 | December 5, 2016 Brian Rose affidavit regarding grand jury records |
| Exhibit 25 | August 29, 2001, Indictment against Jeff Prible |
| Exhibit 26 | August 29, 2001, Indictment against Hermilio Herrero |
| Exhibit 27 | November 20, 2001 Fax from Johnny Bonds to Lt. Robert Clark at FCI Medium requesting Foreman visit |
| Exhibit 28 | November 26, 2001 Fax from Bonds to Lt. Clark requesting Michael Beckcom visit right after Nathan Foreman |
| Exhibit 29 | Deposition of Michael Beckcom |
| Exhibit 30 | December 10, 2001 handwritten statement by Michael Beckcom |
| Exhibit 31 | Michael Beckcom Deposition Subpoena Return with Michael Beckcom Affidavit dated April 19, 2017 |
| Exhibit 32 | Informant photos with Jeff Prible |
| Exhibit 33 | March 4, 2002 letter from AUSA Mark Cullers to Kelly Siegler |
| Exhibit 34 | March 5, 2002 letter from AUSA Mark Cullers to Kelly Siegler enclosing Texas Rangers report on Nick Brueggen murder |
| Exhibit 35 | April 30, 2002 letter from Mark Martinez to Kelly Siegler plus telephone memo from Mark Martinez to Kelly Siegler dated 3/7/[02]? |
| Exhibit 36 | Undated letter from Carl Walker to Kelly Siegler |
| Exhibit 37 | May 22, 2002 letter from Jesse Gonzalez to Kelly Siegler |
| Exhibit 38 | Typed letter from Michael Beckcom found in his *Texas v. Beckcom* case file |
| Exhibit 39 | Deposition of Rafael Dominguez |
| Exhibit 40 | Trufone records and phone list – Jesse Moreno (**Filed Under Seal**) |
| Exhibit 41 | Undated handwritten letter from Jesse Moreno to Kelly Siegler telling her exactly what to say to AUSA Todd Clemons |
| Exhibit 42 | May 1, 2002 letter from Kelly Siegler to Michael Greene at FCI Bmt, asking that Jesse Moreno, Rafael Dominguez, Nathan Foreman, and Eddie Gomez be separated from Hermilio Herrero |

| Exhibit No. | Description |
|---|---|
| Exhibit 43 | May 1, 2002 letter from Kelly Siegler to AUSA Todd Clemons regarding Jesse Moreno's cooperation in Hermilio Herrero case |
| Exhibit 44 | May 1, 2002 letter from Kelly Siegler to AUSA Tracy Batson regarding Foreman's cooperation in Hermilio Herrero case |
| Exhibit 45 | May 1, 2002 letter from Kelly Siegler to AUSA Sam Lewis regarding Rafael Dominguez's cooperation in Hermilio Herrero case |
| Exhibit 46 | May 1, 2002 letter from Kelly Siegler to AUSA Sam Lewis regarding Eddie Gomez's cooperation in Hermilio Herrero case |
| Exhibit 47 | Rule 35 Motion to reduce Jesse Moreno's sentence **(Filed Under Seal)** |
| Exhibit 48 | Fact Witness Voucher for Kelly Siegler in *U.S. v. Jesse Moreno,* dated August 22, 2002 |
| Exhibit 49 | Transcript of August 22, 2002 Rule 35 Hearing in *U.S. v. Jesse Moreno* **(Filed Under Seal)** |
| Exhibit 50 | Excerpts from June 2011 state writ hearing, Volumes 2-3 |
| Exhibit 51 | November 19, 2004 original application for writ of habeas corpus filed by Roland Moore |
| Exhibit 52 | June 25, 2007 *Subsequent Application for a Writ of Habeas Corpus* filed by Prible *pro se,* file-stamped by the TCCA |
| Exhibit 53 | August 21, 2007 *Subsequent Application for Writ of Habeas Corpus, Ineffectiveness of Counsel* filed by Prible *pro se,* file-stamped by the TCCA |
| Exhibit 54 | Statements of JJ Gradoni memorializing 2010 telephone interviews of Carl Walker, Jr. and Thomas Delgado, and face-to-face interviews of Michael Beckcom |
| Exhibit 55 | August 26, 2010 James Rytting interview with Carl Walker |
| Exhibit 56 | Trufone records and phone list – Michael Beckcom **(Filed Under Seal)** |
| Exhibit 57 | Informant photos with Hermilio Herrero |
| Exhibit 58 | June 6, 2011 *Supplemental Briefing to Applicant's Successor Application for a Writ of Habeas Corpus* |
| Exhibit 59 | August 6, 2001 Fax from HCSO to Kelly Siegler regarding Albert Guajardo |
| Exhibit 60 | Jury charge from *Texas v. Herrero* |
| Exhibit 61 | Rule 35 Motion to reduce Jesse Moreno's sentence **(Filed Under Seal)** |
| Exhibit 62 | *Second Supplemental Briefing Applicant's Successor Application for a Writ* |

| Exhibit No. | Description |
|---|---|
| | *of Habeas Corpus* filed in the 351st District Court on June 22, 2011 |
| Exhibit 63 | Trial Transcript, Vol. 3, *Herrero v. State,* Cause No. 903122, in the 179th District Court, Harris County, Texas (excerpts) |
| Exhibit 64 | Trial Transcript, Vol. 4, *Herrero v. State,* Cause No. 903122, in the 179th District Court, Harris County, Texas (excerpts) |
| Exhibit 65 | June 24, 2011 *Findings Pursuant to Tex. Code Crim. App. Art. 11.071, Sec. 5(a)(1)* |
| Exhibit 66 | June 23, 2011 *Third Supplemental Briefing to the Successor Petition for Writ of Habeas Corpus and Request for Reconsideration of the June 23, 2011 Determination that Prible's Successor Petition Does Not Meet Section 5(a) Standards* |
| Exhibit 67 | June 18, 2008 Opinion of the Texas Court of Criminal Appeals |
| Exhibit 68 | Letter from Roland Moore to Jeff Prible |
| Exhibit 69 | Prible's *pro se* motion to disqualify judge of the 351st District Court |
| Exhibit 70 | September 10, 2002 Pretrial hearing transcript (Vol. 2 of 34) |
| Exhibit 71 | September 13, 2002 Pretrial hearing transcript (Vol. 3 of 34) |
| Exhibit 72 | October 11, 2002 Pretrial hearing transcript (Vol. 20 of 34) |
| Exhibit 73 | Declaration of Gordon Harpe, BOP unit manager |
| Exhibit 74 | *Motion to Require the State to Reveal Agreements* |
| Exhibit 75 | November 16, 2005 "Supplemental Writ" |
| Exhibit 76 | http://www.bop.gov/iloc2/LocateInmate.jsp, Inmate Locator |
| Exhibit 77 | June 27, 2007 *Petitioner Prible Motion for Discovery and Memorandum of Law in Support (Pro-Se)* |
| Exhibit 78 | Trufone records and phone list – Rafael Dominguez **(Filed Under Seal)** |
| Exhibit 79 | Letter from BOP refusing to comply with subpoena |
| Exhibit 80 | Statement of JJ Gradoni regarding Mark Martinez |
| Exhibit 81 | Table comparing Kelly Siegler's opening and closing remarks in *State v. Herrero* to BOP Memoranda, with excerpts of opening and closing arguments attached |
| Exhibit 82 | Two BOP Memoranda, dated March 28, 2001 and July 30, 2001, which prove the State made false jury arguments and utilized perjured testimony of members of the ring of FCI informants in *State v. Herrero* **(Filed Under** |

| Exhibit No. | Description |
|---|---|
|  | Seal) |
| Exhibit 83 | BOP CIM Clearance and Separatee Data sheet for Jesse Moreno dated July 27, 2001 **(Filed Under Seal)** |
| Exhibit 84 | July 6, 2015 Affidavit of Tommy Brown |
| Exhibit 85 | September 15, 2002 memo from Dee Roberts to Warden at FCI Medium re Aryan threats on Michael Beckcom for testifying against Jeff Prible **(Filed Under Seal)** |
| Exhibit 86 | Transcript of phone message in which Kelly Siegler threatens Hermilio Herrero's investigator, Rudy Vargas, and his attorney, Norm Silverman, with legal action due to their investigation of *Brady* violations |
| Exhibit 87 | Affidavit of Nathan Foreman regarding Jeff Prible, dated January 11, 2016 |
| Exhibit 88 | Affidavit of Jesse Oscar Gonzalez, dated January 30, 2017 |
| Exhibit 89 | Roberts, et al., *A Comparison of the Effectiveness of Swabbing and Flossing as a Means of Recovering Spermatazoa from the Oral Cavity,* J. Forensic Sci., Vol. 59, No. 4 (July 2014) |
| Exhibit 90 | Harris County Sherriff's Office reports of interviews of Jaime Herrera, L. Detmore and T. Burroughs |
| Exhibit 91 | Jeff Prible's cell phone records from April 22, 1999 to April 28, 1999 |
| Exhibit 92 | *Ex Parte Temple* Findings of Fact and Conclusions of Law dated July 6, 2015 |
| Exhibit 93 | NCIC for Nathan Foreman, printed by Johnny Bonds on December 6, 2001 **(Filed Under Seal)** |
| Exhibit 94 | NCIC for Rafael Dominguez, printed by Johnny Bonds on December 6, 2001 **(Filed Under Seal)** |
| Exhibit 95 | Undated letter from Michael Beckcom to Kelly Siegler regarding Anton Davi |
| Exhibit 96 | May 1, 2002 letter from HCDA to Lt. Clark requesting visit between Kelly Siegler/Johnny Bonds and Michael Beckcom/Anton Davi |
| Exhibit 97 | October 29, 2002 Letter from Kelly Siegler to Mark Cullers regarding Michael Beckcom's cooperation |
| Exhibit 98 | November 4, 2002 letter from Mark Cullers to Kelly Siegler saying they could not confer a benefit on Michael Beckcom |
| Exhibit 99 | November 7, 2002 Fax from AUSA Mark McIntyre (USAO Houston) to Kelly Siegler enclosing sample Rule 35 motion |

| Exhibit No. | Description |
|---|---|
| Exhibit 100 | 11-?-02 letter from Kelly Siegler to Mark Cullers asking him to reconsider |
| Exhibit 101 | Kelly Siegler notes: "11/15/02 – Mark Cullers called to say they reconsidered and would seek some sort of reduction for Beckcom" |
| Exhibit 102 | November 15, 2002 fax from Kelly Siegler to Mark Cullers enclosing email with Michael Beckcom's attorney contact information |
| Exhibit 103 | JIMS and NCIC for James Martin, printed by P. Klim on April 30, 1999 **(Filed Under Seal)** |
| Exhibit 104 | NCIC for Gilbert Trevino, printed by Johnny Bonds on September 13, 2002 **(Filed Under Seal)** |
| Exhibit 105 | Deposition of Victor Wisner |
| Exhibit 106 | Affidavit of JJ Gradoni regarding death threats by Michael Beckcom |
| Exhibit 107 | Carl Walker's personal phone book listing "Kelly Siegler" **(Redacted)** |
| Exhibit 108 | Harris County District Clerk docket sheet for *Texas v. Prible,* showing review of case by "Kelly Renee Jalufka (Siegler)" on July 5, 2001 |
| Exhibit 109 | *Motion and Request for Production of Evidence Favorable to the Accused* |
| Exhibit 110 | BOP memo dated February 14, 2002, referencing letter from Kelly Siegler **(Filed Under Seal)** |
| Exhibit 111 | BOP memo dated May 7, 2002 **(Filed Under Seal)** |
| Exhibit 112 | *Texas v. Bible* documents (Indictment dated 3/29/01; Harris County District Clerk's summary of case; Harris County District Clerk's Parties List, identifying "Michael Beckmon" as a "Previous Bench Warrant for the Prosecution") |
| Exhibit 113 | Harris County District Clerk record showing appointment of counsel for Prible on September 28, 2001 |
| Exhibit 114 | Affidavit of Dr. Elizabeth A. Johnson, with scientific publications |
| Exhibit 115 | Affidavit of Harold J. Hietala, Ph.D. |
| Exhibit 116 | Cynthia Garcia (Flores) statement dated April 26, 1999 **(Redacted)** |
| Exhibit 117 | Steven Cumpian statement dated August 10, 1999 **(Redacted)** |
| Exhibit 118 | Rafael Tirado, Jr. statement dated July 15, 1999 **(Redacted)** |
| Exhibit 119 | Maribel Tirado statement dated July 15, 1999 **(Redacted)** |
| Exhibit 120 | Angela Serna statement (page(s) missing) **(Redacted)** |

| Exhibit No. | Description |
|---|---|
| Exhibit 121 | May 3, 1999 Supplemental Report by P.S. Klim |
| Exhibit 122 | HPD Current Information Report regarding murder of Steven Cumpian **(Filed Under Seal)** |
| Exhibit 123 | Affidavit of Nathan Foreman regarding Hermilio Herrero, dated January 11, 2016 |
| Exhibit 124 | March 7, 2016 Affidavit of Carl Walker |
| Exhibit 125 | March 22, 2016 Affidavit of Kelly Siegler in Hermilio Herrero writ case |
| Exhibit 126 | October 30, 2002 handwritten thankyou note from Michael Beckcom to Kelly Siegler |
| Exhibit 127 | Transcript of voicemail left by AUSA Mark Cullers to Kelly Siegler on November 12, 2002 |
| Exhibit 128 | Trial Transcript, Vol. 5, *Herrero v. State*, Cause No. 903122, in the 179th District Court, Harris County, Texas (excerpts) |