# EXHIBIT 4-A

**In the Matter Of:**

RONALD JEFFREY PRIBLE vs LORIE DAVIS

4:09-cv-01896

# KELLY SIEGLER

*October 17, 2017*



800.211.DEPO (3376)
EsquireSolutions.com

1    J0659784 eb

2

3              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
4                       HOUSTON DIVISION

5    RONALD JEFFREY PRIBLE, JR.  *
                    Plaintiff    *
6                                *
     VS.                         *  CIVIL ACTION NO.
7                                *  4:09-cv-01896
     LORIE DAVIS, DIRECTOR,      *
8    TEXAS DEPARTMENT OF         *
     CRIMINAL JUSTICE,           *
9    INSTITUTIONAL DIV.          *
                    Defendants   *

10

11

12

13          VIDEOTAPED DEPOSITION OF KELLY SIEGLER

14

15

16

17

18

19
     Date                     Edith A. Boggs, CSR
20

21

22   10-17-17                  HOUSTON, TEXAS

23

24

25



1

2

3

4

5

6

7

8                    DEPOSITION OF KELLY SIEGLER

9

10

11       DEPOSITION AND ANSWERS of KELLY SIEGLER, taken

12   before Edith A. Boggs, a certified shorthand reporter in

13   Harris County for the State of Texas, taken at the law

14   offices of Hilder & Associates, 819 Lovett Boulevard,

15   Houston, Texas, on the 17th day of October, 2017,

16   between the hours of 9:05 a.m. and 6:23 p.m.

17

18

19

20

21

22

23

24

25



```
 1        A P P E A R A N C E S

 2

 3   ATTORNEYS FOR PLAINTIFF:

 4        Hilder & Associates, PC
          819 Lovett Boulevard
 5        Houston, Texas  77006

 6        By:  James G. Rytting, Esquire

 7        AND

 8        Reed & Scardino, LLP
          301 Congress Avenue, Suite 1250
 9        Austin, Texas  78701

10        By:  Gretchen N. Scardino, Esquire

11

12   ATTORNEYS FOR DEFENDANTS:

13        Attorney General of Texas
          P.O. Box 12548
14        Austin, Texas  78711-2548

15        By:  Tina J. Miranda, Esquire
          George A. d'Hemecourt, Esquire
16        Kelli Weaver, Esquire

17   ATTORNEY FOR THE WITNESS, KELLY SIEGLER:

18        Doyle, Restrepo, Harvin & Robbins, LLP
          440 Louisiana Street, Suite 2300
19        Houston, Texas  77002

20        By:  James Eloi Doyle, Esquire

21

22   ALSO PRESENT:

23        Mr. Dwayne Smith, Videographer

24   REPORTED BY:

25        Ms. Edith A. Boggs
```



```
1                    EXAMINATION INDEX

2
        QUESTIONS BY                      PAGE
3
        Ms. Scardino                      10
4
        Mr. Rytting                       287
5
        Ms. Scardino                      335
6
        Ms. Miranda                       337
7
        Ms. Scardino                      337
8

9                  INDEX OF EXHIBITS

10
   NO.  FIRST      DESCRIPTION
11      REFERENCED

12  9    56        Harris County Sheriff's Department News
    Release
13
    28   55        Harris County Sheriff's Department
14  Supplement Report, Supplement #3

15  43   167       Voluntary Statement of Jamie Diane Lyons

16  46   65        Fax dated 3-1-01 from Johnny Bonds to
    William Watson
17
    47   84        Fax dated 5-15-01 from John Bonds to FCI
18  Low

19  49   75        Jesse Moreno Inmate History

20  50   75        Nathan Foreman Inmate History

21  52   67        Letter from Jesse Moreno to Kelly
    Siegler dated 4-4-01
22
    53   78        Letter from Celia Moreno to Kelly
23  Siegler dated 4-10-01

24  54   93        Transcript of interview between Kelly
    Siegler and Jesse Moreno, July 3, 2001
25
```



KELLY SIEGLER                                        October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                             5

```
1   55    97          Harris County Sheriff's Department
    Supplement Report, Supplement #1
2
    56    101         Probable cause affidavit dated 7-5-01
3   for the arrest of Mr. Prible, and the affiant is Curtis
    Brown
4
    57    99          Felony charge capital murder against
5   Mr. Prible dated 7-5-01

6   60    110         Felony charge capital murder against
    Mr. Prible prepared 8-17-01
7
    66    132         Letter dated 9-4-01 from Bert Graham to
8   M.B. Thaler, Administrator

9   70    71          Excerpt from the testimony of Mr. Moreno

10  71    133         Letter dated 5-1-02 from Kelly Siegler
    to Michael Greene
11
    72    134         Letter dated 5-1-02 from Kelly Siegler
12  to Todd Clemons

13  73    136         Letter dated 5-1-02 from Kelly Siegler
    to Tracy Batson
14
    77    218         Fax dated 11-20-01 from Johnny Bonds to
15  FCI medium

16  78    220         Fax dated 11-26-01 from Johnny Bonds to
    FCI medium
17
    81    240         Letter dated 10-7-02 from Ted Wilson to
18  Lt. Robert Clark

19  86    165         Criminal history report on James Martin

20  87    165         Criminal history report on Jonathan
    Jefferson
21
    88    103         Criminal history report on Nathan
22  Foreman

23  106   166         Criminal history report on James Martin,
    with handwritten notes
24
    108   104         Tab 9 - Kelly Siegler's handwritten
25  notes
```



KELLY SIEGLER                                    October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                          6

```
 1   109   197          Kelly Siegler's handwritten notes

 2   110   271          Privilege log dated 9-21-16

 3   111   215          Letter dated 11-12-01 from Alan Percely
     to Kelly Siegler
 4
     112   149          Letter from Jesse Gonzalez to Kelly
 5   Siegler

 6   113   154          Letter from Carl Walker to Kelly Siegler

 7   114   156          Letter from Mark Martinez to Kelly
     Siegler
 8
     116   264          Motion and Request for Production of
 9   Evidence Favorable to the Accused

10   123   141          Fact Witness Voucher

11   125   139          Handwritten letter from Jesse Moreno to
     Kelly Siegler
12
     126   235          Letter dated 3-5-02 from John Vincent to
13   Kelly Siegler

14   127   159          Letter from Michael Beckcom to Kelly
     Siegler
15
     129   244          Letter dated 10-29-02 from Kelly Siegler
16   to Mark Cullers

17   130   246          Handwritten letter dated 10-30-02 from
     Michael Beckcom to Kelly Siegler
18
     131   248          Letter dated 11-4-02 from Mark Cullers
19   to Kelly Siegler

20   132   250          Fax from Mark McIntyre to Kelly Siegler

21   133   251          Letter from Kelly Siegler to Mark
     Cullers
22
     135   254          Fax dated 11-15-02 from Kelly Siegler to
23   Mark Cullers

24   136   256          The State of Texas vs. Michael G.
     Beckcom case summary
25
```



KELLY SIEGLER
RONALD JEFFREY PRIBLE vs LORIE DAVIS

October 17, 2017
7

```
 1  137   259        Michael Beckcom's application for parole

 2  140   12         Excerpt of Kelly Siegler's testimony
    from the Temple trial
 3
    141   12         Excerpt of Kelly Siegler's testimony
 4  from the Temple trial

 5  142   12         Excerpt of Kelly Siegler's testimony
    from the Temple trial
 6
    143   12         Excerpt of Kelly Siegler's testimony
 7  from the Temple trial

 8  144   12         Excerpt of Kelly Siegler's testimony
    from the Temple trial
 9
    145   266        Probable cause affidavit in the case of
10  Danny Bible

11  152   108        Telephone memos

12  154   44         Excerpt of Operations Manual

13  156   26         Rule 3.09, Special Responsibilities of a
    Prosecutor
14
    161   79         HOUSTON CHRONICLE article
15
    162   181        Informant agreement dated 7-23-96
16
17  164   308        Photographs

    170   200        Inmate phone list for Michael Beckcom
18
    171   209        Inmate phone list for Nathan Foreman
19
    172   82         Inmate phone list for Jesse Moreno
20
    174   230        Handwritten statement dated 12-10-01,
21  JLB

22  176   162        Affidavit of Kelly Siegler

23  180   160        Letter from Michael Beckcom to Clerk of
    Court
24
    181   234        Letter dated 3-4-02 from Mark Cullers to
25  Kelly Siegler
```



1  184  23        Cold Justice Prosecutor Kelly Siegler on
   How She Picks Cases: 'There's a Deluge of Requests'
2
   185  24        Photograph
3
   195  274       Trial transcript dated October 14, 2002
4
   300  294       Opening Statement of the State
5
   301  318       HPD report
6
   302  319       Statement of Dr. Tommy Brown
7
   303  324       Exhibit "29" autopsy photographs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    PROCEEDINGS

2                    THE VIDEOGRAPHER:  Going on the record.

3    Today's date is October 17th, 2017.  The time is 9:05

4    a.m.

5                    This marks the beginning of file number 1

6    in the deposition of Kelly Siegler in the case of Ronald

7    Prible versus Lorie Davis, Case No. 4:09-cv-01896 in the

8    United States District Court for the Southern District

9    of Texas, Houston Division.

10                   The deposition is taking place at Hilder &

11   Associates, 819 Lovett, Houston, Texas.

12                   The videographer today is Dwayne Smith of

13   Esquire Deposition Solutions.  The court reporter is

14   Edie Boggs.

15                   Would all present counsel please voice

16   identify yourselves and say who you represent.

17                   MS. SCARDINO:  Gretchen Scardino for

18   petitioner, Ronald Jeffrey Prible.

19                   MR. DOYLE:  James Doyle for Kelly Siegler.

20                   MR. RYTTING:  James Rytting for petitioner,

21   Ronald Jeffrey Prible.

22                   MS. MIRANDA:  Tina Miranda for the

23   director.

24                   MR. D'HEMECOURT:  George d'Hemecourt for

25   the director.



```
 1              MS. WEAVER:  Kelli Weaver for the director.

 2              THE VIDEOGRAPHER:  Would the court reporter

 3   please swear in the witness.

 4                      KELLY SIEGLER

 5   was called as a witness and, being first duly sworn by

 6   the notary, testified as follows:

 7                      EXAMINATION

 8       Q.  (BY MS. SCARDINO)  Ms. Siegler, my name is

 9   Gretchen Scardino.  We haven't met before.  I represent

10   Mr. Prible in this matter.  You've testified in a

11   deposition previously, have you not?

12       A.  I have not.

13       Q.  You have not?  Okay.  Just in court, you've

14   testified as a witness?

15       A.  Yes.

16       Q.  And most recently in Wisconsin, I believe?

17       A.  Oh.

18       Q.  Last week?

19       A.  That was a deposition.  Well, it was a hearing.

20       Q.  A hearing.  Okay.  What was the name of that

21   case?

22       A.  I don't know the style of the case.

23       Q.  Okay.  What was the defendant's name?

24       A.  It wasn't a defendant.

25       Q.  Was it a civil matter?
```



1        A.  It was a dispute between an employee and his

2   boss, whatever you want to call that.

3        Q.  And in what capacity were you testifying?

4        A.  On behalf of the employee.

5        Q.  Okay.  Who -- what -- you don't recall the name

6   of any of the parties to that matter?

7        A.  The name of the employee is Steve Bowers,

8   B O W E R S.

9        Q.  Is that the only time you've testified as a

10  witness in court?

11       A.  No.

12       Q.  What other cases have you testified in, if we

13  could just list them?

14       A.  In my capacity as a prosecutor.

15       Q.  Uh-huh.  Yes.

16       A.  A long time ago in a competency hearing, on

17  little matters having to do with various cases and in

18  the David Temple case.

19       Q.  And the David Temple, case you testified in

20  2015, correct, in the state habeas hearing?

21       A.  '15 and '16, I think.

22       Q.  Okay.  And you testified truthfully in that

23  case?

24       A.  Yes.

25       Q.  And the murder of Linda Temple occurred in



1  1999, correct?

2        A.  Yes.

3        Q.  And that was the same year as the murders that

4  we are here about today, the Tirado/Herrera murders?

5        A.  Yes.

6        Q.  Okay.  And Mr. Prible -- you tried Mr. Prible

7  in 2002, and you indicted Mr. Temple in 2005, correct?

8        A.  Yes.

9        Q.  Okay.

10             MS. SCARDINO:  I'm going to attach as an

11  exhibit to Ms. Siegler's deposition certain excerpts

12  from her testimony in the David Temple matter.  Those

13  will be Exhibits 140 through 144.

14             MR. DOYLE:  Do you have a copy for me?

15             MS. SCARDINO:  I do.  I have copies for

16  everyone.  Here you go.

17             MR. DOYLE:  As I understand, the parameters

18  of this inquiry have to do with the Prible case,

19  correct?

20             MR. RYTTING:  Sir --

21             MS. SCARDINO:  The -- the inquiry -- or the

22  parameters of the deposition have to do with anything

23  related to Prible, Herrero, the Hermilio Herrero case,

24  and this goes -- the David Temple case goes to her

25  credibility.  So, for that reason, we're putting in --



1           MR. DOYLE:  I'm -- my question is this has

2  to do -- I think the judge indicated that it had to do

3  with a ring of snitches, is that the point?

4           MS. SCARDINO:  Yes, it is --

5           MR. DOYLE:  Okay.

6           MS. SCARDINO:  -- both of which were used

7  in those two cases.

8           MR. DOYLE:  What's that?

9           MS. SCARDINO:  They were both used in the

10  Prible and the Herrero cases.

11           MR. DOYLE:  And then what does it have to

12  do with the --

13           MR. RYTTING:  Sir --

14           MR. DOYLE:  -- Temple case?

15           MR. RYTTING:  We need to call the Court.

16           MS. SCARDINO:  It has everything.  You'll

17  see -- you'll see every --

18           MR. DOYLE:  Well, if you could just tell me

19  what the rel -- what the --

20           MS. SCARDINO:  What the relevance is?

21           MR. DOYLE:  Yeah.

22           MS. SCARDINO:  Well, Ms. Siegler testified

23  in the Temple case as to her understanding --

24           MR. RYTTING:  You do not need to explain to

25  him the relevance of that case.



KELLY SIEGLER                                              October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                                    14

1                   And your position here is not to ask

2     questions like that.  If the --

3                   MR. DOYLE:  Ms. Scardino -- Ms. Scardino,

4     if you --

5                   MR. RYTTING:  Off the record.

6                   MR. DOYLE:  -- if you could lead the case.

7                   MR. RYTTING:  Please go off the record.

8                   MR. DOYLE:  No, we're going to stay on the

9     record.

10                  MR. RYTTING:  That is not your call.

11                  MR. DOYLE:  You cannot --

12                  MS. SCARDINO:  Wait.  Wait one second.  I

13    want to stay -- I want to stay on the record, and I want

14    to say I am deposing Ms. Siegler --

15                  MR. DOYLE:  And I --

16                  MS. SCARDINO:  -- that your questioning is

17    improper.

18                  MR. DOYLE:  No, I --

19                  MS. SCARDINO:  If you need to go and look

20    at the pleadings that we've pled in this case and you

21    can see what exactly the parameters of this deposition

22    are but we have a lot of latitude here.  This is a

23    discovery deposition.

24                  MR. DOYLE:  I understand.  And what I asked

25    you was what the relationship was and --



1              MS. SCARDINO:  And I don't need to tell you

2    what the relationship is but I will say that her

3    credibility is always going to be at issue.

4              MR. DOYLE:  So, you think that opens it up

5    to any case that she's been involved with, is that the

6    point?

7              MS. SCARDINO:  James, do we need to call

8    Judge Ellison?

9              MR. DOYLE:  No, I'm just asking you.

10             MR. RYTTING:  You're not allowed to ask

11   her.

12             MS. SCARDINO:  I'm going to continue with

13   my --

14             MR. RYTTING:  That's why we're -- that's

15   why we're objecting.  Do you understand?  You are not

16   allowed to ask.  You are to sit there and make only

17   objections based on --

18             MR. DOYLE:  Ms. Scardino, would you please

19   ask your co-counsel to restrain himself?

20             MR. RYTTING:  Sir, you need to restrain

21   yourself.

22             MS. SCARDINO:  I'm going to continue.

23       Q.  (BY MS. SCARDINO)  Ms. Siegler, what did you do

24   to prepare for your deposition today?  Did you review

25   the trial transcript in this case?



1     A.  No.

2     Q.  Did you review your work product notes?

3     A.  No.

4     Q.  You didn't look at your file at all?

5     A.  No.

6     Q.  Okay.  You met with the Attorney General's

7  office yesterday, correct?

8     A.  Yes.

9     Q.  How long was that meeting?

10    A.  About two hours.

11    Q.  And what was discussed at that meeting with the

12 AG's office?

13    A.  They told me what their function is in this

14 proceeding and explained that to me.

15    Q.  Over two hours, did you speak with them about

16 the specifics of any of the prior depositions in this

17 matter?

18    A.  No.

19    Q.  Have you looked at the deposition transcripts

20 of Mr. Wisner?

21    A.  No.

22    Q.  Have you looked at the deposition transcript of

23 Mr. Bonds?

24    A.  I have not.

25    Q.  Did you speak with the Attorney General's



1  office about the substance of the deposition of

2  Mr. Bonds, Mr. Wisner or Michael Beckcom?

3       A.  I have not.

4       Q.  Okay.  You were a prosecutor for the DA's

5  office from 1989, is that when you began there?

6       A.  I began as an intern in 1986.

7       Q.  When you were still in law school?

8       A.  Yes.

9       Q.  And when did you begin working there as an

10 attorney?

11      A.  1987.

12      Q.  And when you began to work there as an

13 attorney, I -- I suppose you were just an assistant

14 district attorney at that time?  Was that your title?

15      A.  Yes.

16      Q.  And through the years, you progressed until you

17 eventually became head of Special Crimes; is that

18 correct?

19      A.  Yes.

20      Q.  Okay.  What was your role at the district

21 attorney's office in 1999, your title?

22      A.  It changed in '99.  Which part of '99?

23      Q.  April, 1999.

24      A.  At that time, I think I was still assigned as

25 the chief prosecutor in Ted Poe's court.



1    Q.  And by the time you tried Mr. Prible in 2002,

2    what was your title at the DA's office?

3    A.  From '99 until 2002, it changed a couple of

4    times.  I'm not sure when you're talking about.

5    Q.  Okay.  Well, why don't you take me through the

6    various changes.  You started out in '99, you were the

7    chief prosecutor in Ted Poe's court.  From there, how

8    did your title change?

9    A.  After I was the chief prosecutor in Ted Poe's

10   court, I then got transferred to major crimes in Special

11   Crimes in -- toward the end of '99, I think.

12           And then at some point, I got made the

13   division chief of major crimes in Special Crimes.

14           And then at some point, I got made the

15   bureau chief of Special Crimes.

16   Q.  And that was all between 1999 and 2002?

17   A.  I don't remember.

18   Q.  Okay.  By 2002, were you, at that point, the

19   division chief of major crimes in Special Crimes?

20   A.  I was also a bureau chief of the misdemeanor

21   division, I just remembered, too.  I don't know where I

22   was.  I don't remember the timing of those.

23   Q.  Okay.  But at some point, you became the

24   division chief of Special Crimes and those were the --

25   that was the division where you handled a lot of cold



 1  cases; is that correct?

 2      A.  I was the division chief of major crimes in

 3  Special Crimes and then the bureau chief of Special

 4  Crimes.

 5      Q.  Okay.  So, when you prosecuted Mr. Prible in

 6  2002, you had been on the job for approximately 25

 7  years; is that correct?

 8      A.  No.

 9      Q.  15 years?

10      A.  Yeah.

11      Q.  I can't do my math.  15 years.

12              Okay.  You met Mr. Bonds -- Mr. Johnny

13  Bonds in 1989 when you were a new prosecutor, right?

14      A.  He was new to the office.  I wasn't new then.

15      Q.  Okay.  He came to the office in 199 -- '89?

16      A.  Yes.

17      Q.  Okay.  And you -- you all worked closely

18  together in Special Crimes, correct?

19      A.  Correct.

20      Q.  He was your primary investigator, right?

21      A.  There were two, but yes.

22      Q.  He was the main -- he was your main right-hand

23  man?

24      A.  There were two.

25      Q.  Okay.  Who was the other one?



1        A.   Woody.

2        Q.   Okay.   What was Woody's last name?

3        A.   Woodruff.

4        Q.   Okay.   And you all -- you and Mr. Bonds worked

5   together at the DA's office until you left in 2008, or

6   had he previously left?

7        A.   I think I left first.

8        Q.   You left first, he was still there?

9        A.   I think so.

10        Q.   Okay.   So, from approximately 1989 to 2008, you

11   worked very closely with Mr. Bonds on a lot of your

12   cases?

13        A.   It was off and on.   He would be transferred

14   around, and I would be transferred around.   So, it

15   wasn't consistently the whole time, no.

16        Q.   Okay.   When you did work on a case together,

17   you would oftentimes accompany each other to witness

18   interviews, correct?

19        A.   Define often.

20        Q.   Well, more often than not?

21        A.   No.

22        Q.   No?   How often would he accompany you to a

23   witness interview?

24        A.   I did most of my witness interviews by myself.

25        Q.   You did?



```
 1        A.  Yeah.
 2        Q.  And would you take notes when you did those
 3   witness interviews?
 4        A.  No.  I didn't have time.  I was talking.
 5        Q.  You didn't take any notes after you left the
 6   interview to remember what you had spoken with the
 7   witness about?
 8        A.  Maybe sometimes.
 9        Q.  But most of all -- most of the time, you just
10   kept it up in your head?
11        A.  I tried.
12        Q.  And you took Mr. Bonds out of retirement a few
13   years ago to work on your reality television show; is
14   that right?
15        A.  Yes.
16        Q.  Okay.  And what's his role on that show?
17        A.  He's an investigator.
18        Q.  Okay.  Just like he was with you back in the
19   DA's office, similar working relationship?
20        A.  Correct.
21        Q.  Okay.  And you've described your work on that
22   show as working miracles.  What -- what is -- what do
23   you mean by that?
24        A.  We look at the hardest unsolved murder cases
25   there are all across the country and try our best to
```



 1 | solve them.

 2 |     Q.  And almost always these cold cases that you

 3 | work on are based on circumstantial evidence, right?

 4 |     A.  Yes.

 5 |     Q.  And you like cold cases.  I've seen it written

 6 | that you like working on cold cases.  Why is that?

 7 |     A.  They're difficult.  They're a challenge.

 8 |     Q.  What about your skill set makes you well suited

 9 | to working on cold cases?

10 |     A.  I don't think there's anything special about

11 | me.  I just think that cold cases are a challenge and

12 | cases that ought to be worked on.

13 |     Q.  Well, you're very detailed oriented, right?

14 |     A.  I hope most lawyers are.

15 |     Q.  And details matter in circumstantial cases a

16 | lot, right?

17 |     A.  Yes.

18 |     Q.  You have to be meticulous, thorough, organized

19 | to solve these cold cases, right?

20 |     A.  I think any case you handle as a prosecutor

21 | requires the same things.

22 |     Q.  So, is that a yes?

23 |     A.  As I said, I think all cases we work on require

24 | the same things.

25 |     Q.  Okay.  Require you to be meticulous, thorough



1  and organized, right?

2       A.  On any case.

3       Q.  Okay.  And in the Temple case, you testified

4  that you won circumstantial -- circumstantial cases by

5  paying attention to detail.  That's a true statement,

6  right?

7       A.  Yes.

8       Q.  Okay.  I'm going to show you Exhibit 184.

9  Exhibit 184 --

10                MR. DOYLE:  Can I --

11      Q.  (BY MS. SCARDINO)  I'll give you an opportunity

12  to read it.  Yeah, Exhibit 184 is an article from Parade

13  Magazine about your television show.

14      A.  I'm going to have a hard time reading this or

15  anything today.  I just had eye surgery.  I don't have

16  my new glasses.  It's going to take me a while --

17      Q.  Okay.

18      A.  -- because I can't see it.

19      Q.  Okay.  Well, we can go off the record and give

20  you a chance to read it and then go back on.

21      A.  Well, I'll try to read it but it's going to

22  take longer than normal.

23      Q.  Okay.

24                Okay.  Have you finished reading it?

25      A.  Yes.



1     Q.   Okay.  And so, in that case -- or in that

2  article, the reader asked how does Cold Justice pick

3  cases, and you say in there, "Living in the real world,

4  we don't have those instruments and equipment and

5  machines.  It does not exist in most cases, especially

6  local ones.  You have to combat that, and it's very

7  frustrating.  It makes me crazy when people say, 'Oh,

8  you've got a circumstantial case.'  I'm like, 'What?

9  Circumstantial evidence is a good thing because the

10 thing that solves cases isn't fancy technology.  It

11 isn't forensics or DNA coming back that shows who the

12 killer is.  Please.  That doesn't happen.  It's old

13 fashioned hard work done one piece at a time,

14 reinterviewing every witness one statement at a time and

15 one question at a time, putting it all back together

16 again like a good little anal-retentive,

17 obsessive-compulsive, perfectionist nerd.  That's what

18 solves cold cases.'"  And so, you made that statement?

19     A.   I did.

20     Q.   Okay.  Now, Exhibit 185 is a photograph.  It's

21 a still shot from your television show, correct?

22               MS. MIRANDA:  Do you have another copy?

23 Thanks.

24     A.   Yes.

25     Q.   (BY MS. SCARDINO)  Okay.  And that shows you



 1  looking through your files in one of your cold cases?

 2      A.  No.

 3      Q.  What case -- what are you looking at in that

 4  picture?

 5      A.  Are you -- what are you pointing to?  All

 6  these?

 7      Q.  All those files.

 8      A.  Those are props.

 9      Q.  So, that wasn't actually your file in a cold

10  case, it's just a prop?

11      A.  These right here?

12      Q.  Uh-huh.

13      A.  Those are props.  I don't know what they are.

14  I never look at them.

15      Q.  Okay.  Now, as a prosecutor, your duty was to

16  seek justice, not just to get a conviction, right?

17      A.  Yes, ma'am.

18      Q.  And there are multiple duties or sources for

19  the duty to seek justice, correct?

20      A.  I'm sorry, ask that again.

21      Q.  There are multiple sources for the duty to seek

22  justice, one of those is the due process clause of the

23  constitution, correct?

24      A.  I don't understand the question.

25              MR. DOYLE:  Objection.



 1      Q.   (BY MS. SCARDINO)  Are there multiple sources

 2   for your duty to seek justice under the law?

 3      A.   I really still don't understand the question.

 4   My duty was to seek justice.

 5      Q.   Okay.  And your duty is to follow the due

 6   process clause of the constitution, correct?

 7      A.   Yes.

 8      Q.   Okay.  And you're also bound by the ethical

 9   rules set forth in the Texas Disciplinary Rules of

10   Special -- of Conduct, correct?

11      A.   Yes.

12      Q.   Okay.  Specifically, Rule 3.09D, which lays out

13   the special responsibilities of a prosecutor?

14      A.   Do you want to read it to me?

15      Q.   Sure.  Are you familiar with that rule?

16      A.   By number, no, ma'am.

17      Q.   And if you would like to read this, that's fine

18   but I'm going to go off the record so we don't use our

19   time up.

20           MR. DOYLE:  She's going to read whatever

21   documents you give to her.

22           MS. SCARDINO:  That's fine.

23      Q.   (BY MS. SCARDINO)  So, I'll give you Exhibit

24   156, which is a copy of Rule 3.9 -- 09, but we're going

25   to go off the record so you can take your time reading



 1  it.

 2       A.  No, I don't want to go off the record --

 3             MR. DOYLE:  I'm not going to --

 4       A.  -- every time you give me something to read.

 5  You had a whole year to do this.  You could have given

 6  me all these things to read ahead of time.

 7       Q.  (BY MS. SCARDINO)  All of the -- Rule 3.09

 8  isn't -- isn't something that you shouldn't be

 9  unfamiliar with.

10       A.  I'm not saying it's not.

11       Q.  Okay.

12       A.  I just don't know which rule it is by number.

13       Q.  Okay.  Well, if we run out of time today, we're

14  going to stay --

15       A.  Why don't you just read it to me.

16       Q.  Oh, I'm happy to.  I thought you wanted to read

17  it.  I was giving you an opportunity to read it.

18             Exhibit 156 is Rule 3.09, the Special

19  Responsibilities of a Prosecutor.  "The prosecutor in a

20  criminal case shall remain from prosecuting or

21  threatening to prosecute a charge that the prosecutor

22  knows is not supported by probable cause; should refrain

23  from conducting or assisting in a custodial

24  interrogation of an accused unless the prosecutor has

25  made reasonable efforts to be assured that the accused



1  has been advised of any right to, and the procedure for

2  obtaining, counsel and has been given reasonable

3  opportunity to obtain counsel; shall not initiate or

4  encourage efforts to obtain from an unrepresented

5  accused a waiver of important pretrial, trial or post

6  trial rights; shall make timely disclosure to the

7  defense of all evidence or information known to the

8  prosecutor that tends to negate the guilt of the accused

9  or mitigates the offense and, in connection with

10  sentencing, disclose to the defense and to the tribunal

11  all unprivileged mitigating information known to the

12  prosecutor, except when the prosecutor is relieved of

13  this responsibility by a protective order of the

14  tribunal and, finally, shall exercise reasonable care to

15  prevent persons employed or controlled by the prosecutor

16  in a criminal case from making an extrajudicial

17  statement that the prosecutor would be prohibited from

18  making under Rule 3.07."

19            Are you familiar with this rule?

20            MR. DOYLE:  You put it in the -- can I have

21  a copy, please?

22            MS. SCARDINO:  Uh-huh.

23      Q.  (BY MS. SCARDINO)  Are you familiar with this

24  rule?

25      A.  Yes.



1      Q.  You also have duties to the people you

2  prosecuted; isn't that correct?

3      A.  Yes.

4      Q.  You had a duty to comply with the Brady rule?

5      A.  Yes.

6      Q.  You had the duty not to use false testimony to

7  obtain a conviction?

8      A.  Yes.

9      Q.  Even if you personally believed that that was

10  the correct result, right?

11      A.  I don't understand that question.

12      Q.  In other words, the ends didn't justify the

13  means in a criminal prosecution, correct?

14      A.  I don't understand that question.

15      Q.  I'll restate it.

16          If you felt that a defendant was guilty,

17  you still could not use false testimony to obtain a

18  conviction against that defendant, right?

19      A.  Right.

20      Q.  Did you take any Brady training while you were

21  at the district attorney's office?

22      A.  Yes.

23      Q.  And who gave that training?

24      A.  It would have either been through the office --

25  interoffice -- intraoffice or from TDCAA.



1     Q.  And who gave the training intraoffice?

2     A.  It would have been different every year.

3     Q.  Was it a formal workshop that the district

4 attorneys had to sit through or was it just speaking

5 with a supervisor on a case-to-case basis?

6     A.  That changed over time.

7     Q.  In 1999 through 2002, what was the policy

8 then -- or the training then?

9     A.  I don't remember.  In the beginning when Johnny

10 Holmes was the DA, we had official training once a year

11 for a certain number of weeks, certain nights of the

12 week, and that would include the ethics and Brady

13 training, and then we quit doing that, and then it was

14 different.  It was more random but it was still, you

15 know, every year but I don't remember when it changed or

16 exactly how it changed.

17     Q.  When did Mr. Holmes leave the DA's office?  Was

18 that prior to 1999?

19     A.  It was right around then.

20     Q.  Okay.  And then Mr. Rosenthal became the DA,

21 right?

22     A.  Yes.

23     Q.  Okay.  Did you ever give Brady training at the

24 DA's office?

25     A.  Not that I remember.



1      Q.   Okay.  Mr. Wisner, at his deposition, mentioned
2  the district attorney's operations manual that every
3  prosecutor had a copy of.  Do you recall this manual?
4      A.   Yes.
5      Q.   Okay.  And that manual was hundreds of pages
6  long, correct, and it addressed all kinds of issues that
7  might arise in your practice as a prosecutor?
8      A.   It did.
9      Q.   And did you have any role in writing that
10  manual?
11      A.   No.
12      Q.   Who wrote that manual?
13      A.   I don't know.
14      Q.   You don't know?  Okay.  And every prosecutor
15  was required to follow the guidelines laid out in that
16  manual, correct?
17      A.   Yes.
18      Q.   And would they be subject to termination if
19  they didn't, if they willfully violated any of those
20  guidelines?
21      A.   I think that would depend on the circumstances.
22      Q.   Okay.  Did the DA's office have a policy -- and
23  I'm going back to this time period 1999-2002 --
24  regarding the disclosure of offense reports?
25      A.   Yes.



1     Q.   Okay.  And in the Temple case, you testified

2  that inconsistent statements of material witnesses fell

3  under Brady and a witness is material if he gets called

4  to testify at trial.  Do you recall that?

5     A.   No.

6     Q.   You don't recall making that statement?

7     A.   No.

8     Q.   Okay.  We can come back to it then in a moment.

9          Okay.  Going on to the offense reports,

10  what was the policy about disclosing offense reports to

11  the defense back in 1999-2002?

12     A.   The office had an open file policy.

13     Q.   And what does that mean?

14     A.   For the most part, offense reports were open

15  for the defense to read.

16     Q.   Okay.  So, let's break that down.  For the most

17  part, when were they not available for the offense to

18  read -- the defense to read?

19     A.   What does that have to do with the issue we're

20  here for today having to do with the ring of snitches

21  that you claim I manipulated?

22          MS. SCARDINO:  Objection, nonresponsive.

23     Q.   (BY MS. SCARDINO)  I'd like to talk -- ask you

24  again what did you mean for the most part these offense

25  reports were available for the defense to read?



1      A.   I'm not going to answer questions about every
2   case I ever handled.
3      Q.   Okay.
4      A.   That's not what this deposition is about.
5      Q.   So, are you refusing to answer my question?
6      A.   Yes.
7              MR. DOYLE:   What she wants to know is what
8   the relationship is with the --
9              MS. SCARDINO:   And --
10             MR. DOYLE:   -- ring of snitches.
11             MS. SCARDINO:   And I don't -- and I
12  understand that but I'm not required --
13             MR. RYTTING:   Let me --
14             MS. SCARDINO:   James, I've got this.
15             I'm not required to -- to explain the
16  reasoning.
17             MR. DOYLE:   Well, I understand, Gretchen,
18  and I know you want to get through the deposition.
19  What -- what she's asked you is what is the
20  relationship -- which I think is a fair question -- of
21  that question to this issue that you're inquiring about.
22             MS. SCARDINO:   And --
23             MR. DOYLE:   Because it has to do with a
24  different case.
25             MR. RYTTING:   We've got to stop the



1    deposition right now.

2                   MS. SCARDINO:  And I --

3                   MR. RYTTING:  We need to go off the record

4    right now and call the Court.

5                   MS. SCARDINO:  Well, let's -- let's

6    actually stay on the record.  Let's stay on the record

7    right now.

8                   MR. RYTTING:  Okay.  Let's stay on the

9    record.  Let me --

10                  MS. SCARDINO:  James --

11                  MR. RYTTING:  Let me lay out my position

12   here.

13                  MS. SCARDINO:  James, hold on.  I'll --

14                  MR. RYTTING:  No.  I'm going to say it on

15   the record right now.

16                  MR. DOYLE:  I object.

17                  MR. RYTTING:  I'm -- no.  I'm sorry, I'm

18   going to put it on the record right now.

19                  We have before us -- your name again is

20   Dale what?

21                  MR. DOYLE:  What?

22                  MR. RYTTING:  What's your last name?

23                  MR. DOYLE:  Doyle.

24                  MR. RYTTING:  -- Dale Doyle is

25   representing --



1              MR. DOYLE:  That -- that -- that --

2  Mr. Rytting, that is not my name.

3              MR. RYTTING:  James Doyle.  James Doyle.

4              I'm just going to put it on the record,

5  Gretchen, and then you can continue.

6              -- James Doyle, who has come here to

7  represent the witness, Kelly Siegler.  He has informed

8  us before this deposition started that he was going to

9  enforce the rule that under the Federal Rules of Civil

10  Procedure that the deposition must be conducted as in a

11  trial.

12              Mr. Doyle does not represent -- represents

13  a nonparty witness.  Mr. Doyle knows very well that in

14  any trial a representative of a nonparty witness does

15  not get to ask questions of the prosecutor, of the

16  defense attorney or of the Court except on a very

17  limited basis that has to do with his client's privilege

18  to testimony -- testify if they need to insert a Fifth

19  Amendment right.

20              But he has repeatedly asked questions in

21  this deposition that have nothing to do with privileges,

22  that have nothing to do with anything that an attorney

23  who represents a nonparty would be allowed to do in a

24  deposition.

25              He is obstructing this deposition, and he's



1  doing it purposefully, and we will be seeking sanctions

2  if it continues.  Period.

3              MS. SCARDINO:  I'd like to --

4              MR. DOYLE:  Gretchen, if I could --

5              MS. SCARDINO:  Continue on with my

6  questioning.

7              MR. DOYLE:  Gretchen, if I could, my

8  purpose in -- in asking those questions is to determine

9  whether or not this is within the parameters, as I

10  understand, that Judge Ellison set up.  He did set some

11  parameters.

12              MR. RYTTING:  Tell him it's not his

13  business.

14              MS. SCARDINO:  We --

15              James.

16              This is a -- this is a -- no, he did not --

17  he did not set specific parameters on the deposition.

18  This is a discovery deposition that he's allowed us to

19  take.  Now, if we need to call the Court and discuss it

20  with him so we can continue --

21              MR. DOYLE:  Am I wrong?

22              MS. SCARDINO:  -- let's go ahead and do

23  that but --

24              MS. MIRANDA:  I mean, I'll respond.

25  Gretchen and I --



 1              MS. SCARDINO:  Okay.

 2              MS. MIRANDA:  -- discussed prior to the

 3  depositions about the scope and -- and we did agree that

 4  we would keep it within the scope of the claims, and I

 5  mean, there are Brady claims that have been raised in

 6  the allegations.

 7              And so, I mean, I can't -- I mean, you're

 8  her client but as far as the director is concerned,

 9  questions regarding the Brady -- her Brady practices are

10  within the scope.

11              MR. DOYLE:  Okay.  That's all I wanted to

12  know.

13              THE WITNESS:  But the question was about

14  open policy offense report rules at the DA's office,

15  which is not within the scope.

16              MS. SCARDINO:  Okay.  What I think would be

17  best is to pause the deposition right now, let's call

18  Judge Ellison so everyone is on the same -- same page --

19              MR. DOYLE:  I mean, I'm --

20              MS. SCARDINO:  -- as exactly what this is

21  because this is -- there are no limits on this

22  deposition but if we're going to continue to have to

23  stop it every few minutes --

24              MR. DOYLE:  I just asked a question and I

25  got an answer, and I said go.



1          MS. SCARDINO:  Okay.

2          MR. DOYLE:  Do you understand all I'm

3  trying to do is find out -- there are some parameters,

4  you would have to agree with me.  I just heard --

5          MS. SCARDINO:  Parameters under the Federal

6  Rules but there's no specific -- Judge Ellison did not

7  put any specific parameters on this deposition such as

8  you can't go into other cases, you can't go into the

9  Herrero case.

10          THE WITNESS:  That's not what I was told.

11          MS. MIRANDA:  I --

12          MS. SCARDINO:  Okay.

13          MS. MIRANDA:  I think that -- our

14  understanding is that there are parameters and this

15  incident is limited to the case and to the allegations

16  that have been raised.

17          I have not had -- personally had concerns,

18  based on the questions that have been asked to date,

19  that we have gone beyond those.  I feel like if we go

20  beyond those, then I probably will say something but to

21  this point, I have not had any concerns.

22          MR. DOYLE:  That's fine.

23          MS. SCARDINO:  Well, in the interest of

24  continuing and trying to get this over with, I want to

25  keep going but if there's any more -- if any other



 1  objection comes up, then at that point, we'll stop,

 2  we'll call the Court and figure it out.

 3              MR. DOYLE:  I want to -- I want to make

 4  sure that we stay within the parameters, as I understood

 5  them to be, that's all, and that's why I asked the

 6  question, Gretchen.

 7              MS. SCARDINO:  Okay.

 8      Q.  (BY MS. SCARDINO)  Now, I'm going to ask this

 9  question about the offense reports, going back to it,

10  you said, quote, "For the most part, the defense was

11  able to see the offense reports."  What did you mean

12  "for the most part"?

13      A.  It was an open file policy.

14      Q.  Okay.  But you said "for the most part," so,

15  that means not all offense reports were given to them,

16  correct?

17      A.  Correct.

18      Q.  Okay.  If the witness -- if the investigator

19  did not testify in the trial, were you obligated to turn

20  those offense reports over to the defense?

21      A.  I don't understand what that has to do with the

22  Jeffrey Prible case and the ring of snitches that you

23  all have alleged that I orchestrated.

24              MS. SCARDINO:  Okay.  Objection, non --

25      A.  I'm not going to ask -- I'm not going to answer



 1  questions about every case --

 2              MR. DOYLE:  Go ahead and just answer that

 3  question.

 4              MS. SCARDINO:  Objection, nonresponsive.  I

 5  do think at this point it would be best to call the

 6  Court and just get everything --

 7              MR. DOYLE:  I just told her to go ahead and

 8  answer it.  Go ahead.  Ask the question.

 9      Q.  (BY MS. SCARDINO)  I asked the question.  Are

10  you going to answer it or not?

11      A.  What was the question?

12      Q.  "For the most part" -- you said, "For the most

13  part, the defense was able to see the offense reports."

14  What did you mean "for the most part"?  When were they

15  not able to see the offense reports?

16      A.  Well, the most obvious exception to seeing the

17  offense report was if an examining trial was requested.

18      Q.  Okay.  And was an examining trial requested in

19  this case?

20      A.  In the Jeffrey Prible case?

21      Q.  Right.  Yes.

22      A.  I don't think so.

23      Q.  Okay.  Were the offense reports in this matter

24  of those investigators that did not testify at

25  Mr. Prible's trial, were those offense reports given to



 1  Mr. Prible's defense attorneys?

 2        A.   Yes.

 3        Q.   When?

 4        A.   Whenever they came to look at the file.

 5        Q.   And when an attorney did come and look at the

 6  file, were you in the room with them when they looked at

 7  the file?

 8        A.   Sometimes I was.  Sometimes I wasn't.

 9        Q.   Okay.  And you'll agree with me that when you

10  say "open file," ultimately, the prosecutor is the only

11  person that knows what is in the entire file, correct?

12        A.   Correct.

13        Q.   Okay.  And if you had removed certain things

14  from the file, there would be no way for the defense to

15  know that unless you told them that, correct?

16        A.   Correct.

17        Q.   What was your policy regarding the production

18  of -- or the disclosure of written witness statements to

19  the defense?

20        A.   In the Prible case?

21        Q.   Yes, in the Prible case.

22        A.   The defense got to see it.

23        Q.   When did they see it?

24        A.   Whenever they came to look at the file.

25        Q.   So, this was a different situation than in the



1  Temple case where you didn't present the -- or offer --

2  or disclose the written witness statements until after

3  the witness had testified; is that correct?

4        A.  Yes.

5        Q.  And it was different because the Temple case

6  was an examining trial?

7        A.  Yes.

8        Q.  And so, you -- you had different rules that you

9  went by if it was an examining trial versus just a

10  normal trial?

11       A.  According to the office policy, yes.

12       Q.  And that's contained somewhere within the

13  office policy manual?

14       A.  Yes.

15       Q.  What was the DA's policy regarding the

16  disclosure of Brady evidence that came to light after a

17  trial was over?

18       A.  The same as it was before.  If you heard about

19  Brady information, you disclosed it.

20       Q.  Even after the trial was over, you needed to

21  make that disclosure to defense counsel?

22       A.  Yes.

23       Q.  And were you ever involved in the state habeas

24  proceeding for Mr. Temple -- I mean for Mr. Prible?

25       A.  Can you be more specific?



1      Q.  Were you at the DA's office during the state

2   habeas proceeding for Mr. Temple?

3      A.  What years?

4           MR. DOYLE:  Prible.

5      Q.  (BY MS. SCARDINO)  I'm sorry.  Mr. Prible.

6      A.  What were the years of that proceeding?

7      Q.  I believe 2004, 2005.

8      A.  I was still at the office.  Was I involved in

9   it, I was not in appellate.

10      Q.  Okay.  But you would have been consulted by the

11   appellate group prior to them appearing at the state

12   habeas hearing?

13      A.  I never appeared at any state habeas hearing.

14      Q.  I'm sorry.  Let me -- that might have been

15   confusing.

16           The people in the appellate group at the

17   DA's office that were prepping for the state habeas

18   hearing, they would have consulted you, as the trial

19   attorney on that case, prior to that hearing, correct?

20      A.  I would hope so.

21      Q.  Right.  I mean, that -- that would make sense

22   that they would come to you since you had --

23      A.  They didn't always.

24      Q.  -- been the person that tried the case?

25      A.  They didn't always.



1    Q.  Did they in this case?

2    A.  I don't remember.

3    Q.  So, they might have, you just don't remember?

4    A.  Correct.

5    Q.  Exhibit 154 is excerpts from that policy

6  manual.  And I'll represent to you that this policy

7  manual was produced by Brian Rose in response to a

8  Public Information Act request to me as the manual that

9  would have been in place in 2001 and 2002.

10           And if you go to Page 1 -- or Page 25, so,

11  it's Exhibit 154-25 --

12    A.  Not all of 2001 because the date is August,

13  2001.  So, there could have been something different at

14  some part -- point in 2001.

15    Q.  So, do you disagree with Mr. Rose's

16  representation that this is the policy manual that was

17  in effect in 2001 and 2002?

18    A.  Well, from the bottom of the page, it says this

19  is effective August 16 of 2001.  So, more than half of

20  2001, some of these things could have been different.

21    Q.  Okay.  And you tried Mr. Prible's case in 2002?

22    A.  Yes.

23    Q.  Okay.  So, if you go to Page -- Exhibit

24  154-25 -- and I know that your eyesight is -- is

25  recovering, so, I can read this to you.  It says, quote,



 1   "A prosecuting attorney should not impede defense

 2   counsel's access to witness but may accompany and assist

 3   witnesses in any interview with defense counsel."  Now,

 4   if a prosecutor does not reveal the existence of a

 5   witness, that would be an impediment, right?

 6        A.  Not necessarily.

 7        Q.  Well, how would the defense attorney know about

 8   a witness if the prosecutor didn't disclose the identity

 9   of that witness?

10        A.  I don't know who the witness is.

11        Q.  Okay.  How about a jailhouse informant that

12   came to you to talk with you about a case, there's no

13   way a defense attorney could have known that unless you

14   had disclosed that, correct?

15        A.  I think that answer is going to always depend

16   on the circumstances of a given case.

17        Q.  Okay.  I just gave you the circumstances.

18   What's your answer with those circumstances?

19        A.  The same.

20        Q.  So, you can't answer yes or no?

21             MR. DOYLE:  I'm not sure I understood.

22             MR. RYTTING:  That is not your -- please

23   tell him to -- we're just going to have to stop if he

24   does that again.

25        Q.  (BY MS. SCARDINO)  If a prosecutor --



1               MR. RYTTING:  I'm really not going to put

2    up with it.

3         Q.  (BY MS. SCARDINO)  If a prosecutor does not

4    reveal the existence of a witness, that would be an

5    impediment, that's my -- my premise that I'm asking you

6    the question, and the -- the circumstances are if a

7    jailhouse informant reached out to you, Kelly Siegler,

8    to talk with you about a case, the defense attorney

9    would have no way of knowing about that witness unless

10   you disclosed the identity of that witness to them;

11   isn't that correct?

12        A.  What's your question?

13        Q.  That was my question.  Can you answer that

14   question?

15        A.  I cannot.

16        Q.  You can't answer that?

17        A.  I don't think that's necessarily always going

18   to be an impediment.

19        Q.  Okay.

20             MS. SCARDINO:  Objection, nonresponsive.

21        Q.  (BY MS. SCARDINO)  If a -- if a jailhouse

22   informant -- in this case, Nathan Foreman is one -- came

23   to you and said he had information about Prible's case,

24   the defense attorney would have no way of knowing that

25   that witness came to you with that information unless



 1  you disclosed that to the defense attorney, wouldn't you

 2  agree?

 3      A.  No, I don't agree with that statement.

 4      Q.  Okay.  Moving on, also on Exhibit 154-25, it

 5  says, "A prosecuting attorney shall provide information

 6  known to the prosecuting attorney which is subject to a

 7  voluntary discovery agreement or Court order throughout

 8  the case."  Now, this doesn't look like an open file

 9  policy to me.

10      A.  What doesn't?

11      Q.  This -- this statement saying that the

12  prosecuting attorney shall provide information which is

13  subject to a voluntary discovery agreement or a Court

14  order.  Is that different from an open file policy?

15  Right?

16      A.  I didn't write the office manual.  I have no

17  idea what they meant when they wrote it.

18      Q.  Okay.  But you'll agree that this statement

19  does not describe an open file policy, right?

20      A.  I don't agree with that.  I don't know what

21  they meant when they wrote this.

22      Q.  Did you ever enter into a voluntary discovery

23  agreement with defense counsel?

24      A.  Orally voluntarily all the time.

25      Q.  Okay.  But nothing in writing?



1        A.   I might have had a few.

2        Q.   Okay.  When a defense attorney would come and

3   look at the file, would you take notes of what was shown

4   to that defense attorney?

5        A.   Sometimes.

6        Q.   Did you in this case?

7        A.   In the Prible case?

8        Q.   Uh-huh.

9        A.   No.

10        Q.   Okay.  Going back on Exhibit 154-25, it also

11   says, "A prosecuting attorney shall participate in good

12   faith in pretrial discovery.  Absent voluntary

13   discovery, the prosecuting attorney shall diligently and

14   timely divulge matters as may be ordered by the Court,"

15   end quote.  Now, again, there's no mention of an open

16   file policy in that paragraph, right?

17        A.   Not in this paragraph, no.

18        Q.   What is a timely divulging of information, in

19   your mind?

20        A.   I don't know.  I didn't write that paragraph.

21        Q.   Okay.  You -- let's -- let's talk about your

22   understanding of the requirement that you timely

23   disclose Brady -- Brady information.  What is your

24   understanding of the timely disclosure requirement?

25        A.   To make good faith reasonable efforts to



 1 | disclose.

 2 |     Q.  And at what point are you required to disclose

 3 | Brady information?

 4 |     A.  That depends on the circumstances.

 5 |     Q.  Okay.  If you look at Exhibit 140, Page 147,

 6 | this is your testimony in the Temple habeas proceeding,

 7 | Page 147, line 3, and the question is, "Okay.  What is

 8 | your understanding -- or I should say" --

 9 |             MR. DOYLE:  Excuse me.  She doesn't have --

10 |             MS. SCARDINO:  Sorry.  I was reading it to

11 | her because of her eyesight.

12 |     Q.  (BY MS. SCARDINO)  Here, I can give you a copy.

13 | Page 147.

14 |             MR. DOYLE:  Again that reference?

15 |             MS. SCARDINO:  Okay.  147, line 3.

16 |             MR. DOYLE:  Do you have the page that

17 | precedes it?

18 |             MS. SCARDINO:  Well, it's -- these are

19 | excerpts.  Oh, yeah.  Do I have the page that precedes

20 | it?

21 |             MR. DOYLE:  Right.

22 |             MS. SCARDINO:  Yes.  We can go off the

23 | record and I can get it for you if you'd like to read it

24 | right now.

25 |             MR. DOYLE:  Yeah, let her read this first.



1              MS. SCARDINO:  Okay.

2        A.  Okay.

3        Q.  (BY MS. SCARDINO)  Okay.  So, Page 147, line 3

4    of the Temple case, the question is, "What is your

5    understanding -- or I should say what was your

6    understanding when you were at the district attorney's

7    office about a prosecution's obligation to turn Brady

8    evidence over to the defense?  And when I say 'your

9    obligation,' the timeliness of it.  When -- at what

10   point is a prosecutor obligated to turn Brady evidence

11   over to the defense?"

12              And you answered, "As soon as you can."

13              And the question, "And when you say 'as

14   soon as you can,' can you elaborate on that?  I mean, do

15   you have -- as soon as you can, as soon as you discover

16   it?  What?"

17              And you responded, "As soon as you discover

18   it.  As soon as possible."

19              And that was a truthful testimony on your

20   part?

21        A.  Yes.

22        Q.  Going back to Exhibit 154, Page 25, it says, "A

23   prosecuting attorney shall timely disclose to the

24   defense the existence of evidence which tends to negate

25   the guilt of the accused as to the offense charged."



1          Now, does this comport with your

2   understanding of the Brady rule back in 2001 and 2002?

3       A.  Yes.

4       Q.  Okay.  You only had to disclose evidence which

5   tended to negate the guilt of the accused?

6       A.  You put the word "only" in there.

7       Q.  I'm asking you if that's your understanding?

8       A.  No.

9       Q.  What other evidence did you need to disclose?

10      A.  Ask me the question again.

11      Q.  What other evidence did you need to disclose

12  under the Brady rule?

13      A.  Under Brady?

14      Q.  Uh-huh.

15      A.  Evidence that is exculpatory, evidence that

16  might mitigate punishment, evidence that would affect

17  the credibility of a witness for impeachment purposes.

18      Q.  And let's talk about the Prible -- or the

19  Tirado/Herrera murders.  The murder of that family

20  occurred on April 23rd, 1999, correct?

21      A.  I don't remember.

22      Q.  Okay.  I'll represent to you that was the date

23  of the murder.  And Detectives Curtis Brown and Ramon

24  Hernandez interviewed Prible that very day.  Do you

25  remember that?



 1      A.  I do not.

 2      Q.  Okay.  Do you remember Ramon Hernandez is the

 3 same detective that worked on the David Temple case?

 4      A.  I don't remember.

 5      Q.  You don't remember his name?

 6      A.  I don't think I ever met him.

 7      Q.  Okay.  And at all times Mr. Prible was

 8 cooperative, according to Detective Brown.  Do you

 9 recall that?

10      A.  I don't remember the specific facts, no.

11      Q.  Okay.  And Mr. Prible gave two statements --

12 voluntary statements within hours of the murder.  Do you

13 recall those?

14      A.  I do not.

15      Q.  Okay.  And he admitted in those statements that

16 he had had consensual oral sex with Ms. Tirado, the

17 victim.  Do you recall that?

18      A.  I don't.  The trial was 17 years ago.  I do

19 not.

20      Q.  Okay.

21      A.  The trial was 17 years ago.

22      Q.  Yes.  Yes.  I understand.  Okay.  And the

23 detectives photographed every inch of Mr. Prible's body

24 that day.  Do you remember that?

25      A.  I do not.



1      Q.   Okay.   They found no blood.   Do you remember

2  that?

3      A.   I don't remember the facts.

4      Q.   Okay.

5      A.   The details of the facts.

6      Q.   Okay.   No -- no burns from -- caused by the

7  accelerant that was used to start the fire.   You don't

8  remember that?   And I understand, you can say you don't

9  remember.   I just need to go through it all.

10     A.   The trial was in 2002.

11     Q.   Uh-huh.

12     A.   This is 2017.   I have looked at, investigated,

13 worked on, worked questions up for, tried, given advice

14 on, talked about and gone over maybe 500 murder cases

15 since this one.

16     Q.   Okay.

17     A.   That's a lot.

18     Q.   And so, you didn't review any of your materials

19 from this case in order to prepare yourself for this

20 deposition today?

21     A.   No.   I don't have them.

22     Q.   Okay.   Well, was there anything preventing you

23 from getting the work product file and the other -- the

24 rest of the file from the DA's office prior to your

25 deposition?



```
 1      A.  I don't have them.  I don't work there any
 2 more.
 3      Q.  I'm asking -- I understand that.  I'm asking
 4 you was there anything preventing you from asking the
 5 district attorney's office to allow you to see the file
 6 prior to your deposition today?
 7      A.  No one told me to do that.
 8      Q.  And --
 9           MS. SCARDINO:  Objection, nonresponsive.
10      Q.  (BY MS. SCARDINO)  My question was was there
11 anything preventing you from making a phone call to the
12 DA's office to ask if you could see this file prior to
13 your deposition today?
14      A.  No.
15      Q.  Mr. Prible, I'll represent to you, he gave his
16 clothes to the detectives that day so they could test
17 for trace evidence, and there was no blood, no Kutzit --
18 that's the accelerant used to start the fire -- no hair,
19 no burns, no soot, no fibers of any kind connecting him
20 to the murder scene.  You don't recall that?
21      A.  Anything that you would represent to me, I
22 can't agree to.  I've read your petition.  It's full of
23 lies.  So, whatever you might tell me you represent to
24 me, I really need to see for myself.  And I don't
25 remember all the details of the case.
```



1      Q.   Okay.  As early -- as early as April 26th,

2  1999, the DA's office was involved in this case.  I'll

3  show you Exhibit 28.  Exhibit 28 -- Exhibit 28 is an

4  offense report -- or a supplemental report, and it

5  states that Detectives Brown and Schmidt went to the

6  Special Crimes division of the DA's office and got a

7  search warrant for Prible's house, and it also states

8  that the affiant spoke with Investigator Johnny Bonds of

9  the Harris County district attorney's office.  And this

10 is dated April 26th, 1999.  And my question to you is

11 were you involved in this case at this time?

12     A.   As I stated earlier, I didn't even go to

13 Special Crimes until the end of 1999.

14     Q.   Okay.  So, does that mean you were not involved

15 in this case at this time?

16     A.   I was not.

17     Q.   Okay.  When did you get involved in this case?

18     A.   2001, maybe 2000.  I don't remember.

19     Q.   Okay.  Do you remember the circumstances of

20 you're getting -- or hearing about the case for the

21 first time?

22     A.   Yes.

23     Q.   And what were those circumstances?

24     A.   I was in major offenders, and Curtis Brown came

25 by to talk about the case to present it to me to give it



 1 | to me to read.

 2 |    Q.   And what was your thought on the case after you

 3 | read it?

 4 |    A.   That we needed to proceed with working the

 5 | case.

 6 |    Q.   Okay.  And this -- you think this might have

 7 | been in 2000 or 2001?

 8 |    A.   It wasn't '99 because I didn't go to Special

 9 | Crimes until the end of '99.

10 |          MR. DOYLE:  I'm going to ask her not to

11 | speculate but if she's got a date for you --

12 |    A.   2000, 2001.  I don't know any better than that.

13 |    Q.   (BY MS. SCARDINO)  You'll agree that right

14 | away, Mr. Prible was listed as a suspect, right?

15 |    A.   Are you looking at something in particular on

16 | Exhibit 28?

17 |    Q.   Well, I can show you -- no.  I can show you

18 | Exhibit 9.  Exhibit 9 is a news release from the Harris

19 | County sheriff's department, and it lists Mr. Prible as

20 | the suspect?

21 |    A.   It lists Mr. Prible as the suspect on the top

22 | paragraph of this document.  That doesn't necessarily

23 | mean that it had to do with the news release itself.

24 |    Q.   Okay.  Do you disagree that Mr. Prible was the

25 | only -- or the -- the suspect in this case from the very



 1  beginning?

 2       A.  I do not.

 3       Q.  You do not disagree to that?  Sorry, I -- I

 4  said a double negative.  Do you agree -- let me restate

 5  it so it's clear.

 6            Do you agree that Mr. Prible was the only

 7  suspect in this case since the murders were committed in

 8  1999?

 9       A.  The only suspect I disagree with.  The primary

10  suspect I agree with.

11       Q.  Okay.  So, there were other suspects in this

12  case?

13       A.  I don't remember.  There could have been.  I

14  don't remember.  I wasn't involved initially.

15       Q.  Okay.

16       A.  I don't want to speak for what happened before

17  I came on the case.

18       Q.  So, the Harris County sheriff's office had

19  interviewed all witnesses and submitted all of their

20  reports in 1999 and the investigation was completed by

21  1999.  Do you remember that?

22       A.  I wasn't involved in 1999, and I disagree with

23  that.

24       Q.  You disagree with that?

25       A.  Yes.



1     Q.   Okay.   What was done post 1999?

2     A.   That's when I got the case.

3     Q.   Yes.   And what did you do when you started

4  investigating the case?

5     A.   Started from the beginning all over again.

6     Q.   Did you interview witnesses?

7     A.   Yes.

8     Q.   Okay.   But you didn't make any notes of those

9  witnesses?

10    A.   If I did, they're in the file.

11    Q.   They would be in your work product file?

12    A.   No.   They would be in the file.

13    Q.   How was the Herrera/Tirado case brought to the

14  DA's attention?

15    A.   Initially?

16    Q.   Uh-huh.

17    A.   I wasn't involved initially.

18    Q.   Okay.   Well, let's look at Exhibit 154, Page

19  18.   This is the handbook again.   And it says that a

20  potential charge may be brought to the DA's attention

21  one of three ways.   First, through the intake division

22  following a law enforcement investigation, second,

23  through a citizen's complaint to the DA's office or,

24  three, through charges filed by a special division of

25  the DA's office, for example, Special Crimes, or an



1  information or felony complaint is filed directly or a

2  matter is presented to the Grand Jury for indictment.

3  Do you recall that?  Those are the three ways that the

4  charge could be brought to a DA's attention?

5       A.  Yes.

6       Q.  Okay.  So, this is -- tell me if I'm correct,

7  this is the order of events, the DA decides to accept

8  charges and then you present the case to the Grand Jury

9  for indictment, is that the correct order of events?

10      A.  Say it again.

11      Q.  The district attorney decides to accept charges

12 and then the district attorney presents the case to the

13 Grand Jury for indictment?

14      A.  That's one way that it could happen, yes.

15      Q.  Okay.  What's another way that it could happen?

16      A.  You take a case direct to the Grand Jury.

17      Q.  Okay.  Before you accept charges?

18      A.  Correct.

19      Q.  Okay.  Okay.  And the DA's office had

20 guidelines about the acceptance of charges, and those

21 are outlined also on 154-18.  It says, "General

22 guidelines for the acceptance of a criminal charge

23 should include the following considerations."

24      A.  Where you reading?  This what paragraph?

25      Q.  154-18.



 1        A.  Halfway down?

 2        Q.  Yes.

 3        A.  Okay.

 4        Q.  "General guidelines for the acceptance of a

 5   criminal charge should include the following

 6   considerations:  One, the mandatory considerations are:

 7   One, has the law been violated and, two, is there

 8   probable cause to believe the accused is guilty of that

 9   violation.  If both do not exist, no charge should be

10   accepted."  Do you see that?

11        A.  Yes.

12        Q.  Okay.  And you'll agree with that statement, I

13   presume?

14        A.  Yes.

15        Q.  Okay.  And if you go to 154-26, it says --

16   sorry.  Tell me when you're ready.

17        A.  Okay.

18        Q.  Prosecutors have broad discretionary authority

19   in pursuing criminal charges but this discretion is

20   tempered.  A prosecuting attorney shall initiate only

21   those charges for which the prosecuting attorney

22   reasonably -- reasonably believes probable cause exists.

23   Do you see that?

24        A.  No.  I'm on Page 26.  What did you say again?

25        Q.  Let me see.  Sorry.  It says in paragraph 3.2,



1   "A prosecuting attorney:  B, shall initiate only those

2   charges for which the prosecuting attorney reasonably

3   believes probable cause exists."

4       A.  Okay.

5       Q.  Do you see that?

6       A.  Yes.

7       Q.  And you'll agree with that statement?

8       A.  Yes.

9       Q.  Okay.  What is your understanding of probable

10  cause?

11      A.  A good faith belief -- a good faith belief

12  based on articulable facts that a crime has been

13  committed.

14      Q.  Okay.  And you'll agree that the standard for

15  probable cause is a much lower standard than beyond a

16  reasonable doubt?

17      A.  Yes.

18      Q.  Okay.  Now, charges were not accepted against

19  Prible in 1999.  You remember that, right?

20      A.  I do not.

21      Q.  Well --

22      A.  That is not a correct statement.

23      Q.  Were they -- were they accepted against Prible

24  in 1999?  I'm asking you.  I -- I didn't see anything in

25  the file.



1      A.  I -- I was not involved.  As far as I know, no

2  one ever requested for charges to be accepted.

3      Q.  Okay.

4      A.  The investigation was just ongoing.

5      Q.  Okay.  So, someone in the DA's office was

6  working on the case from the very beginning in April,

7  1999 but, for whatever reason, they did not ask to

8  accept the charges at that time?

9      A.  I don't know.  I don't know who was working on

10  it before me.

11      Q.  You don't?  Okay.

12      A.  Johnny Bonds would have known maybe, if he

13  remembered.

14      Q.  Okay.  And presumably, it's because the

15  evidence didn't -- at that time didn't rise to the level

16  of probable cause, otherwise, they would have accepted

17  charges on a five-person murder, right?

18              MS. MIRANDA:  Objection, form.

19      A.  I disagree with that.

20      Q.  (BY MS. SCARDINO)  You do disagree with that?

21      A.  I do.

22      Q.  Okay.  Was this case presented to the Grand

23  Jury for indictment in 1999?

24      A.  I didn't have the case in 1999.

25      Q.  And -- and I understand that, although you did



 1  have the file.  And so, I'm asking you if you recall

 2  from your review of the file whether the case was

 3  presented to the Grand Jury for indictment in '99?

 4       A.  Not that I recall, no.

 5       Q.  Okay.  Exhibit 154-11, it addresses cases that

 6  are declined for prosecution.

 7       A.  Okay.

 8       Q.  Okay.

 9            MS. MIRANDA:  I'm sorry, tell me again what

10  page you're on.

11            MS. SCARDINO:  Sorry.  154-11.

12       Q.  (BY MS. SCARDINO)  And it says, "Whenever a

13  case is submitted through DIMS to the district attorney

14  police intake section and is declined for prosecution, a

15  record of that transaction must be made.  After

16  receiving an offense report, the prosecutor will

17  complete the appropriate case decline form describing

18  precisely why the charge was declined -- declined."  Do

19  you see that?

20       A.  I do.

21       Q.  Okay.  So, what does decline the case for

22  prosecution mean?

23       A.  You need to go back to the second line where it

24  says "through the intake section."  To -- to now, you

25  and I have been talking about through the Special Crimes



1  section.  So, this is actually irrelevant to anything

2  we've been talking about.

3      Q.  Okay.  Well, explain that to me.  How -- what

4  does this paragraph mean?

5      A.  This paragraph has to do with when you're

6  working intake, the more routine charges, if an officer

7  comes in to present a case to you and you're the

8  prosecutor behind the desk and you say, "I'm not going

9  to take those charges," the cop can, if he wishes at

10  that point, ask you for a declination, which is what

11  this talks about.

12      Q.  Okay.  And the DA didn't decline this case, the

13  Prible case, for prosecution back in 1999, right?

14      A.  Well, as far as I know, no one ever went

15  through intake, which is what Page 11 talks about.

16      Q.  Right.  So, it didn't even get that far to go

17  through intake?

18      A.  It's not that far, it's two different avenues.

19      Q.  Okay.

20      A.  Most murder cases -- capital murder cases, a

21  lot of them didn't go through intake, they went through

22  Special Crimes.

23      Q.  Okay.  And that was your division, Special

24  Crimes?

25      A.  Yes.



 1      Q.   Okay.  So, the case went cold in -- in 1999 and

 2  there's nothing new in the file, I'll represent to you,

 3  until 2001, although you've seen the file.  Do you --

 4  would you agree with that statement?

 5              MR. DOYLE:  I don't -- I don't think she

 6  has seen --

 7      A.   That the case went cold, no.

 8              MR. DOYLE:  I'll object, the

 9  characterization that she had seen the file.

10      Q.   (BY MS. SCARDINO)  Okay.  Let -- let me restate

11  since it's been 17 years.

12              All of the investigate -- all of the

13  investigative reports and the evidence in the file is

14  dated through 1999 but then nothing else is new in the

15  file until 2001.  Do you recall that?

16      A.   I don't recall that.

17      Q.   Okay.  I'm going to show you Exhibit 46.

18  Exhibit 46 is a March 1st, 2001 fax from William Watson

19  to Bonds -- to Johnny Bonds.  Do you see that?

20      A.   I do.

21      Q.   Okay.  And Dr. Watson was the state's DNA

22  expert in this case.  Do you recall?

23      A.   He's the witness who testified, yes.

24      Q.   Okay.  So, it appears from the date of this fax

25  that this case, the Prible case, is back on your and



 1  Mr. Bonds' radar at least by March 1st, 2001, correct?

 2      A.  Yes.

 3              MS. MIRANDA:  Objection, form.

 4      Q.  (BY MS. SCARDINO)  Okay.  Now, why did you

 5  choose to pick the case back up at this time?

 6      A.  As I stated earlier, because Curtis Brown

 7  brought the case to me in major offenders to look over

 8  and read to see what I thought about it.

 9      Q.  Okay.  So, it's on your radar in the spring of

10  2001, and on April 4th, 2001 --

11              MR. DOYLE:  I'm a little confused,

12  Gretchen --

13              MS. SCARDINO:  Yes.

14              MR. DOYLE:  -- as to whether she was in

15  Special Crimes, as testified earlier, at this point.

16              MR. RYTTING:  Object.  This is -- that is

17  not a proper objection.  If you have an objection to the

18  question, please state it.  Do not --

19              MS. SCARDINO:  My --

20              MR. RYTTING:  -- engage in a dialogue,

21  Mr. Doyle.

22              MS. SCARDINO:  My understanding -- yes, I

23  would agree with that.  Please state the objection, and

24  I'll re -- I'll rephrase if I need to.

25              MR. DOYLE:  Well, I think it



 1 | mischaracterizes her earlier testimony.

 2 |                MS. SCARDINO:  Okay.  Okay.  And I --

 3 |                MR. DOYLE:  And I just wanted to bring it

 4 | to your attention so you can get it right.

 5 |                MS. SCARDINO:  Okay.  And I'd also --

 6 |                MR. DOYLE:  If I'm wrong --

 7 |                MS. SCARDINO:  And I'd also --

 8 |                MR. DOYLE:  If I'm wrong, you'll get it --

 9 | she'll tell you.

10 |                MS. SCARDINO:  Okay.  And I'd also ask,

11 | James, if you could please stick with form objections so

12 | that the witness doesn't --

13 |                MR. DOYLE:  I'm going to do what I need to

14 | do but go ahead.  I haven't interrupted you.

15 |     Q.  (BY MS. SCARDINO)  Okay.  So, Exhibit 52 --

16 |                MS. SCARDINO:  I'm sorry, you'll have to

17 | share the exhibit.

18 |                Do you have a copy of Exhibit 52?

19 |                MS. MIRANDA:  Yes, I do.

20 |                MS. SCARDINO:  Okay.

21 |                MR. DOYLE:  You don't have another one for

22 | me?

23 |                MS. SCARDINO:  Huh?

24 |                MR. DOYLE:  Do you have one for me?

25 |                MS. SCARDINO:  Can you take a look at that



1  one?  Sorry about that.  I didn't have as many of that

2  one.

3     Q.  (BY MS. SCARDINO)  Exhibit 52 is an April 4th,

4  2001 letter from an inmate at FCI Beaumont named Jesse

5  Moreno to you.  Now, if you need some time to read this,

6  we can go off the record.

7              MR. DOYLE:  No, if she -- if she needs --

8     Q.  (BY MS. SCARDINO)  Or if you're ready to --

9              MR. DOYLE:  I think if you're going to ask

10  her about it, let her read it.

11              MS. SCARDINO:  No, I absolutely will let

12  her read it but I know -- because of her eye problem, I

13  don't want to take up more time than usual on our --

14              MR. DOYLE:  Well, she -- she's entitled to

15  look at whatever you're going to ask her about, I think.

16              MS. SCARDINO:  Absolutely, I agree.  So,

17  let's --

18              MR. DOYLE:  But not -- and it's on the

19  time -- it's your time, not hers.

20     Q.  (BY MS. SCARDINO)  Would you like to go off the

21  record to review this?

22     A.  No.  I can look at it real quick.

23     Q.  Okay.

24              MR. RYTTING:  And I'm going to state one

25  more time, James Doyle apparently does not know the



 1  rules.  You are not to make objections, especially not

 2  speaking objections or instructing the witness like

 3  this.  That is not allowed in a trial.  You know you'd

 4  never be able to do this in a trial and you continue to

 5  do it.  You know that nonparty witnesses do not get to

 6  make these types of interjections.

 7              MR. DOYLE:  I object --

 8              MR. RYTTING:  So, it's purposefully.

 9              MR. DOYLE:  -- as to the double teaming,

10  that it's inappropriate.

11              Gretchen, after this, do you want to take a

12  quick break?  We've been going about an hour and 15.

13              MS. SCARDINO:  Uh-huh.

14      A.  Okay.

15              MS. SCARDINO:  After I finish this line of

16  questioning, then I'll stop and break.

17              MR. DOYLE:  That's fine.

18      Q.  (BY MS. SCARDINO)  Okay.  So, on April 4th,

19  2001, you received this letter, Exhibit 52, from Jesse

20  Moreno, and Mr. Moreno was --

21      A.  Well, that's the date he wrote the letter.

22      Q.  Okay.  The date he wrote the letter.  So,

23  sometime after April 4th, 2001, probably within a couple

24  of days, you received this letter from Mr. Moreno,

25  correct?



1      A.   Within a week, I would say, yes.

2      Q.   Okay.   And Mr. Moreno was a federal prison

3  inmate that had testified for you in the murder trial of

4  Jason Morales a few years prior.   Do you remember that?

5      A.   Yes.

6      Q.   Okay.   In exchange, you dismissed a charge of

7  aggravated robbery against him in a home invasion case

8  in which the victims were beaten with a hammer.   Do you

9  recall that?

10      A.   I don't remember what happened with Jesse

11  Moreno's case having to do with Jason Morales.   I don't

12  remember.

13      Q.   With Jason Morales?   You don't recall

14  dismissing a charge of aggravated -- of aggravated

15  robbery against him?

16      A.   I do not.

17      Q.   Okay.

18      A.   I don't know what happened to his case.   I

19  can't remember.

20      Q.   Okay.   So, you might have done it but you just

21  can't recall?

22      A.   I do not remember.

23      Q.   Okay.   Do you recall that you also did not

24  charge him in a capital murder case in which he was a

25  suspect?



1      A.  I don't remember that at all.

2      Q.  You don't recall that at all?

3      A.  No.

4      Q.  Okay.  I'm going to show you Exhibit 70.  This

5   is an excerpt of Dan Cogdell, Hermilio Herrero's

6   attorney, questioning Mr. Moreno.

7              MS. MIRANDA:  Do you have an extra copy?

8              MS. SCARDINO:  I'm sorry.

9      Q.  (BY MS. SCARDINO)  And if you look at Page 57,

10   line 23, the question is, "Let's talk about that crime

11   you claim you didn't commit.  That crime occurred back

12   in October of 1996, right?"

13              Mr. Moreno answers, "I guess."

14              Question, "That crime involved a home

15   invasion committed here in Houston?"

16              Answer, "I don't know.  I had nothing to do

17   with that.  I know nothing about that case."

18              Question, "That crime involved a case where

19   victims were beaten with a hammer."

20              And then there's some objections by you,

21   and the Court rules, sustains the objection.

22              And Mr. Cogdell asks, question, "Isn't it a

23   fact, Mr. Moreno, that in addition to the crime that you

24   were charged with, which was later dismissed after you

25   testified, you were a suspect in a capital murder case"?



 1            Answer, "Yes."

 2            Question, "So, in addition to the dismissal

 3   of the aggravated robbery that was filed, you were never

 4   charged with a capital murder case?"

 5            Answer, "No."

 6            Now, does this refresh your memory as to

 7   whether you dismissed a charge of aggravated robbery

 8   against Mr. Moreno and also did not charge him in a

 9   capital murder case in which he was a suspect --

10            MS. MIRANDA:  Objection, form.

11       Q.  (BY MS. SCARDINO)  -- in exchange for his

12   testimony in the Jason Morales trial?

13       A.  Contrary to what your petition states, I did

14   not handle that capital murder case.  It was never mine.

15   It was Mark Vincent's.  I had nothing to do with that.

16            MS. SCARDINO:  Okay.  Objection,

17   nonresponsive.

18       Q.  (BY MS. SCARDINO)  So, the answer is no, you

19   did not dismiss a charge of aggravated robbery against

20   Mr. Moreno?

21       A.  That's not my answer.

22       Q.  Okay.  Then I don't understand your answer.

23       A.  I don't remember what happened in the cases

24   arising out of Jason Morales.  I had nothing to do with

25   the capital murder case.  That was not my case, contrary



1  to what you've stated in your petition.

2       Q.  Okay.  Well, I'm -- I'm' not talking about the

3  petition right now.  I'm just asking you a question.

4  So, you're saying that you had nothing to do with that

5  capital murder case?

6       A.  Correct.

7       Q.  Okay.  But you might have dismissed the charge

8  of aggravated robbery but you don't recall?

9       A.  I don't remember if he pled or it was

10  dismissed.  I cannot remember.

11      Q.  Okay.  So, if you look at Exhibit 52, which is

12  Mr. Moreno's handwritten letter to you, he says he

13  helped you back in '97 and you told him if he ever

14  needed help to call you, right?

15      A.  I don't think that's exactly the words I used.

16  That's what he said.

17      Q.  And that's what I'm asking you, is -- is that

18  an accurate reflection of this letter, what I just

19  stated?

20      A.  That's the -- those are Jesse Moreno's words --

21      Q.  Yes.

22      A.  -- not mine.

23      Q.  I understand that.  And he says he has

24  information on an unsolved murder and could help you if

25  you helped him, and he asked you to call up there and



1  ask to speak with him because he's in the hole and can't

2  make a phone call.  That's what he's asking you in this

3  letter, right?

4      A.  That's what the letter says, yes.

5      Q.  Okay.  And so, when Moreno contacted you in

6  this letter April 4th, 2001, he was being housed in the

7  medium SHU in Beaumont, FCI Beaumont; isn't that right?

8      A.  Medium or low, I don't remember.

9      Q.  Okay.  Somewhere in FCI Beaumont in the SHU?

10     A.  What is the SHU?

11     Q.  The SHU -- the special housing unit.

12     A.  I didn't know that.

13     Q.  Okay.  That's just the segregation --

14     A.  I didn't know that.

15     Q.  The segregation unit.  Okay.  I'll refer to it

16  as the SHU, S H U.

17          Okay.  And when he contacted you, he was in

18  the SHU with an old friend of his from the neighborhood

19  named Jesse Foreman, wasn't he?

20     A.  I don't know that.

21          MR. RYTTING:  Nathan Foreman.

22     Q.  (BY MS. SCARDINO)  I'm sorry.  Nathan Foreman.

23     A.  I don't know who he was with.

24     Q.  You don't recall that he told you he was in

25  there with Nathan Foreman?



1      A.  From this letter, no.

2      Q.  No.  I'm asking you aside from this letter,

3  when he contacted you, at that time, he was in the SHU

4  with Nathan Foreman, right?

5      A.  I don't know who he was with.

6      Q.  Okay.  I'm going to show you Exhibit 49.

7              MR. DOYLE:  Are we going to another?

8              MS. SCARDINO:  I'm sorry.  The same line of

9  questioning and then I promise we'll go to the break.  I

10  forgot.

11      Q.  (BY MS. SCARDINO)  Now, Exhibit 49 is the

12  inmate housing history for Jesse Moreno in FCI Beaumont.

13  And if you look down at the bottom -- let's see, it's

14  six lines from the bottom, it tells you where he was

15  housed --

16      A.  On the first page?

17      Q.  On the first page.  Sorry.  It tells you where

18  he was housed from 12-22-2000 through 5-3-01.  Do you

19  see that?

20      A.  Where it says BMM and then --

21      Q.  A-DES.

22      A.  Yes.

23      Q.  Yes.  Do you see that?

24      A.  Yes.

25      Q.  Okay.  Now, if you look at Exhibit 50, which



1  I'll show you, these are the housing -- BOP housing

2  records -- and by that I mean Bureau of Prisons --

3  BOP --

4             MS. MIRANDA:  I'm sorry, Gretchen, do you

5  have one?

6             MS. SCARDINO:  Yeah.

7             MS. MIRANDA:  Thank you.

8      Q.  (BY MS. SCARDINO)  These are the BOP housing

9  records for Nathan Foreman.  And if you look on the

10  second page, nine lines from the bottom, it says that

11  between February 28th, 2000 and April 18th, 2001 that

12  Foreman was housed in BMM A-DES, just like we saw with

13  Mr. Moreno, correct?

14     A.  They're not in the same place.

15     Q.  Why are they not in the same -- why do you make

16  that statement?

17     A.  Because Jesse Moreno says in his letter he's in

18  isolation.  So, wherever they're housed, it doesn't

19  matter, Jesse is in isolation.

20     Q.  In the SHU, right?

21     A.  I don't know what the SHU is.  That's your

22  word.  I've never heard that before.

23     Q.  Okay.  Would you agree that the documents say

24  what they say?

25     A.  I would agree that Jesse says he's in



 1  isolation, which means he's not living with anybody.

 2       Q.  Okay.

 3       A.  That's what the letter says.  These documents

 4  are from the prison, which you must understand better

 5  than I can but that's not what Jesse says.

 6       Q.  Okay.

 7       A.  He's not with Nathan Foreman, according to his

 8  letter.

 9       Q.  Okay.

10            MS. SCARDINO:  I'm going to take a break

11  right here and we'll come back in -- how long do you

12  need?

13            MR. DOYLE:  Five minutes.

14            MS. SCARDINO:  Five minutes.

15            THE VIDEOGRAPHER:  The time is 10:24.  We

16  are off the record.

17            (Short recess.)

18            THE VIDEOGRAPHER:  This is the beginning of

19  file 2.  The time is 10:37.  We are on the record.

20       Q.  (BY MS. SCARDINO)  Ms. Siegler, did you respond

21  to Jesse Moreno's 4-4-01 letter?

22       A.  In writing?

23       Q.  In any -- in any way.

24       A.  Eventually, I talked to him.

25       Q.  Okay.  Well, you didn't respond in writing



 1  then?

 2       A.  I don't think so, no.

 3       Q.  Okay.  Eventually, you spoke with him

 4  approximately how long after you got that letter?

 5       A.  I don't remember.

 6       Q.  And did you contact him?

 7       A.  At some point, we talked, yes.

 8       Q.  So, you contacted him?  Because he says in his

 9  letter you would have to contact -- call him, he's in

10  the SHU, right?

11       A.  I don't remember how we got in touch the next

12  time but we did get in touch eventually.

13       Q.  Okay.  I'm going to show you Exhibit 53, and

14  this is a handwritten letter from Jesse Moreno's mom,

15  and this letter is dated April 10th, 2001.  Do you see

16  that?

17       A.  Yes.

18       Q.  And in this letter, she asks you to help her

19  son, right?

20       A.  Okay.  What's your question?

21       Q.  She asked you to help her -- help her son,

22  Jesse, right?

23       A.  Yes.

24       Q.  And did you respond to this letter?

25       A.  I don't think so, no.



1       Q.   Okay.  You don't recall ever speaking with
2    Ms. Moreno on the telephone?
3       A.   No.
4       Q.   Okay.  Did you ever have any other written
5    correspondence with her?
6       A.   I don't think so, no.
7       Q.   Okay.  Exhibit 161 is an April 15th, 2001
8    article in the HOUSTON CHRONICLE about the
9    Tirado/Herrera murders.  Detective Curtis Brown is
10   quoted in that article.  And he says what they need is
11   someone with knowledge of these killings to step
12   forward, someone who may have been told about them by
13   someone involved.  Now, at the time of this article, you
14   were already working on the murder case again with
15   Detective Brown, right?
16      A.   Are we not talking about these letters any
17   more?
18      Q.   No.  I've moved on.
19      A.   So, we're off the letters?
20      Q.   We're off the letters.  I'm asking you about
21   the article.
22      A.   Okay.
23      Q.   So, April 15th, 2001, that article appears.
24   And by this time, you're already speaking with Detective
25   Brown about this case, right?



1      A.  It could have been after this article appeared

2   that I first started talking to Curtis about the case.

3   I don't remember this article coming up while I worked

4   on the case.

5      Q.  And you recall earlier I showed you that March

6   1st, 2001 fax about this case, and so, we discussed that

7   you were already working on the case at that time with

8   Mr. Bonds?

9             MS. MIRANDA:  Objection, form.

10     Q.  (BY MS. SCARDINO)  Was that not your testimony?

11     A.  I don't think you ever asked me that specific

12  question.

13     Q.  Okay.  I'll ask you now.  Were you working on

14  this case -- was the case on your radar again on

15  April -- on March -- in March of '01 --

16            MS. MIRANDA:  Objection, form.

17     Q.  (BY MS. SCARDINO)  -- when -- when --

18            MS. SCARDINO:  Let me just finish it real

19  quick.

20            MS. MIRANDA:  Yeah.  Sorry.

21     Q.  (BY MS. SCARDINO)  -- when that fax was sent to

22  Mr. Bonds from Mr. -- from Dr. Watson?

23     A.  I don't know for sure.  I don't remember when I

24  got on the case.

25     Q.  Would Johnny Bonds have gotten in on it before



KELLY SIEGLER                                    October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                        81

1  you got on it?

2       A.  Yes.

3       Q.  Okay.  So, he -- he might have been --

4       A.  He was in Special Crimes before me.

5       Q.  No, but I mean, if you all were working on a

6  case together, would the two of you approach it together

7  or would he be working on a case separately from you

8  working on it?

9       A.  He could have been working separately.

10      Q.  Okay.  So, you don't -- you can't say whether

11 or not this case, this Tirado/Herrera case was on your

12 radar in March, 2001 at the date of that fax?

13      A.  The date of this fax, the William Watson fax?

14      Q.  Uh-huh.

15      A.  I don't remember for sure when I started

16 working on the Prible case.

17      Q.  Okay.  And so, you don't know for sure if you

18 were already working with Detective Brown on this case

19 at the time of this April 15th, 2001 HOUSTON CHRONICLE

20 article?

21      A.  I do not remember.

22      Q.  Okay.  You might have been, you just can't

23 recall --

24      A.  Yes.

25      Q.  -- the date?



```
 1              Okay.  Now, on April 26, 2001, Moreno --
 2   Jesse Moreno put your name on his phone list.  I'll show
 3   you an exhibit --
 4       A.   What date did you say again?
 5       Q.   April 26, 2001.  And I'll show you Exhibit 172,
 6   which is Mr. Moreno's phone list produced by --
 7              MS. MIRANDA:  May I have a copy?
 8       Q.   (BY MS. SCARDINO)  -- the Board of Prisons.
 9              MS. SCARDINO:  I'm sorry.
10       Q.   (BY MS. SCARDINO)  Do you see on Page 1 right
11   there it's dated April 26, 2001 and he writes your name
12   down?
13       A.   I see that.
14       Q.   Okay.  So, presumably, you talked to him before
15   that date, you spoke with him about his April 4th
16   letter, right, otherwise, he wouldn't have put your name
17   on the phone list?
18              MS. MIRANDA:  Objection, form.
19       A.   Not necessarily.
20       Q.   (BY MS. SCARDINO)  Okay.  Do you recall if you
21   spoke with him between April 4th and April 26th, 2001?
22       A.   I do not.
23       Q.   Okay.  You might have but you can't recall?
24       A.   It's the wrong phone number to call me at if he
25   put my number down.
```



 1      Q.   Okay.  What is that phone number that he's

 2   listed?

 3      A.   That's the general number.

 4      Q.   Okay.

 5      A.   So, if he -- if he had my correct number, it

 6   wouldn't have been this one.

 7      Q.   Okay.  What was your correct number?

 8      A.   5845, 8339, 5865, not 5800.

 9      Q.   Okay.  So, you don't recall if you spoke with

10   Mr. Moreno before he put your phone number down on his

11   phone list?

12      A.   I do not.

13      Q.   Okay.  He also put his U.S. attorney that

14   prosecuted him in a Louisiana criminal case, U.S.

15   Attorney Todd Clemons.  Do you see that?

16      A.   I see that.

17      Q.   Okay.  Are you familiar with Mr. Clemons?

18      A.   I remember his name.

19      Q.   Okay.  What do you remember -- do you -- did

20   you ever meet with him?

21      A.   I don't remember.

22      Q.   You might have but you don't recall?

23      A.   Correct.

24      Q.   Okay.  Do you ever recall going to Louisiana

25   and speaking with him about Mr. Moreno's case?



1     A.   I don't remember who I talked to.

2     Q.   Okay.  But you did do that, you just don't

3  recall if you spoke with Mr. Clemons?

4     A.   Correct.

5     Q.   Okay.  So, at this point, it looks like by

6  April 26, 2001 that Mr. Moreno is already contemplating

7  a sentence reduction, wouldn't you -- wouldn't you say?

8  He put your name down and his U.S. attorney's number

9  down.

10          MS. MIRANDA:  Objection, form.

11    A.   No.

12    Q.   (BY MS. SCARDINO)  You disagree with that?

13    A.   Yes.

14    Q.   Okay.  You don't think it's on his mind --

15  Jesse Moreno's mind at this point, he's hoping to get

16  some kind of sentence deduction for the information that

17  he has to give you?

18          MS. MIRANDA:  Objection, form.

19          MR. DOYLE:  Asked and answered.

20    A.   I think that's on every federal inmate's mind.

21    Q.   (BY MS. SCARDINO)  Okay.  I would agree with

22  you on that.

23    A.   Uh-huh.

24    Q.   Exhibit 47.  Exhibit 47 is a fax dated May

25  15th, 2001, and it's from the Harris County district



1  attorney's office to FCC (sic) Beaumont low, requesting

2  permission for you and Mr. Bonds to meet with Ronald

3  Prible on May 17th, 2001.  Do you see that?

4      A.  I do.

5      Q.  Okay.  And you initiated this contact with

6  Mr. Prible, right, he didn't initiate it with you?

7      A.  Correct.

8      Q.  Did you tell Mr. Prible in advance that you

9  were coming?

10      A.  Did I tell?

11      Q.  Mr. Prible.

12      A.  No.

13      Q.  Okay.  You just showed up?

14      A.  Correct.

15      Q.  Okay.  Was he surprised to see you?

16      A.  I don't know.

17      Q.  And he was in custody at this time, right?

18      A.  Correct.

19      Q.  Okay.  Did you advise him when you met with him

20  that he was a suspect in the Tirado/Herrera case?

21      A.  I don't remember.

22      Q.  You don't recall if you --

23      A.  I don't remember exactly how we started the

24  conversation.

25      Q.  Did you inform him that he had a right to



 1  counsel?

 2      A.  No.

 3      Q.  And did you encourage him to speak with you

 4  about the Tirado and Herrera case?

 5      A.  That's not exactly how it went.

 6      Q.  Okay.  How did it go?

 7      A.  It was a very short conversation.

 8      Q.  And what did the conversation consist of?

 9      A.  It was mostly Johnny talking.  I don't think I

10  talked much at all.

11      Q.  Okay.  So, Johnny was asking questions about

12  the case?

13      A.  No, not -- not a lot of questions.

14      Q.  No?  Well, you went over there -- you made the

15  whole trip to Beaumont for a reason, right?  So, there

16  must have been some question that you all asked him?

17      A.  Correct.

18      Q.  Okay.  But it was a short conversation?

19      A.  It was.

20      Q.  I'm going to go back to Exhibit 156.  That's

21  the Rule 3.09 of the Texas Disciplinary Rules of

22  Professional Conduct.  Do you have one?

23      A.  That's the thick one?

24      Q.  No, it's that one.

25      A.  Oh.



1       Q.   Rule 3.09B states, "A prosecutor shall refrain
2    from conducting or assisting in a custodial
3    interrogation of an accused unless the prosecutor has
4    made reasonable efforts to be assured that the accused
5    has been advised of any right to, and the procedure for
6    obtaining, counsel and has been given reasonable
7    opportunity to obtain counsel."  Do you see that?
8       A.   I do.
9       Q.   That was not done for Mr. Prible at that May
10   15th, 2001 meeting, as you just testified, correct?
11              MR. DOYLE:   Objection.
12      A.   What was not done?
13      Q.   (BY MS. SCARDINO)  He was not informed that he
14   had a right to counsel?
15      A.   He was not.
16      Q.   Now, a suspect's right to counsel is one of the
17   most important rights afforded a criminal defendant
18   under the constitution, would you agree?
19      A.   Yes.
20      Q.   Okay.  If you look at Rule 3.09C, it says, "A
21   prosecutor shall not initiate or encourage efforts to
22   obtain from an unrepresented counsel -- or an
23   unrepresented accused a waiver of important pretrial,
24   trial or post trial rights."  Do you see that?
25      A.   I do.



1    Q.  Okay.  But on that day that you met with

2  Mr. Prible on May 17th, 2001, you initiated that contact

3  and you encouraged him to answer your questions, did you

4  not?

5    A.  That's not exactly how it went, no.

6    Q.  That's not how it went?

7    A.  No.

8    Q.  Okay.  On July 3rd, 2001, you met with Jesse

9  Moreno at the Federal Detention Center in Beaumont.  Do

10  you recall that meeting?

11    A.  Not by date specifically, no.

12    Q.  Okay.  Well, do you remember meeting with him

13  there?

14    A.  Beaumont medium or low, which one did you say?

15    Q.  At FDC Beaumont, the Federal Detention Center

16  in Beaumont.

17    A.  In that medium or low?  I don't know the

18  difference.

19    Q.  Well, where did you have this meeting with

20  Mr. Moreno?

21    A.  I don't remember.  I don't remember which

22  location it was.

23    Q.  Was it somewhere in Beaumont?

24    A.  Yes.

25    Q.  Or was it in Liberty County at a federal



 1 | holding --

 2 |      A.  It was in Beaumont.  I think it was in

 3 | Beaumont.

 4 |      Q.  You believe the first meeting that you had with

 5 | him was in Beaumont?

 6 |      A.  I think so.

 7 |      Q.  Okay.  Did you meet with Mr. Moreno more than

 8 | once?

 9 |      A.  No.  I mean, I remember meeting him in the

10 | Harris County jail and in Beaumont in person one time.

11 |      Q.  Now, in the Harris County jail, when was that

12 | meeting?

13 |      A.  When he testified.

14 |      Q.  At the Jason Morales case?

15 |      A.  Hermilio Herrero.

16 |      Q.  At Hermilio Herrero.  So, you recall meeting

17 | with him in the Harris County jail just before that

18 | trial, the Herrero trial?

19 |      A.  Correct.

20 |      Q.  Okay.  Do you ever recall meeting with him in

21 | Liberty County?

22 |      A.  Not specifically.

23 |      Q.  Okay.  So, if you're meeting with a federal

24 | prison inmate, you can't just show up and ask to see

25 | them, right?



 1        A.   Correct.

 2        Q.   You have to give the prison advance notice,

 3   right?

 4        A.   Yes.

 5        Q.   You have to request to be able to see the --

 6   the inmate?

 7        A.   It's a process.

 8        Q.   Right.  And how long does that process usually

 9   take?

10        A.   Weeks, minimum.

11        Q.   Okay.  Because they have to arrange for the

12   prisoner to be available on that day?

13        A.   Among a lot of other things.

14        Q.   What else do they have to arrange for?

15        A.   They had to have my Bar card.  They had to have

16   driver's licenses.  They had to have a letter.  They had

17   to agree to when we wanted to come.  It all had to be

18   organized.  You couldn't just show up.

19        Q.   And did you organize these meetings via the SIS

20   division at BOP Beaumont?

21        A.   Johnny was in charge of that.  I didn't really

22   organize them.  He did.

23        Q.   Okay.  When I say the word SIS, do you -- do

24   you recall -- do you know what that means?

25        A.   No.



1      Q.   Okay.   The special investigative services unit

2   at the prison, does that ring a bell?

3      A.   No.   I know that there's a lady in charge of

4   helping them take care of their end but I don't remember

5   what the name was, the acronym.

6      Q.   Okay.   There was a lady in charge at FCI

7   Beaumont?

8      A.   Yes.

9      Q.   Okay.   Does her -- was her name Dee Roberts?

10      A.   You would ask Johnny that.   He would know

11   better than I would.

12      Q.   Okay.   Do you recall any BOP employees over in

13   FCI Beaumont?

14      A.   Do I recall names?

15      Q.   Do you recall the names of them?

16      A.   No.

17      Q.   Does the name Lieutenant Clark ring a bell?

18      A.   No.

19      Q.   What about Gordon Harp?

20      A.   No.

21      Q.   Okay.   So, it takes -- it takes several weeks

22   to -- to meet with an inmate.   How did you request this

23   meeting with -- with Jesse Moreno?   Would that have been

24   through Johnny Bonds?

25      A.   I would have told Johnny to try and set it up.



1     Q.  Okay.  Sometime after this April 4th letter, I
2  guess?
3     A.  Yes.
4     Q.  Okay.  And you don't recall the location of the
5  meeting with him on July 3rd, 2001?
6     A.  If it was July the 3rd.
7     Q.  Okay.
8     A.  I don't know what day it was.
9     Q.  Okay.  You don't recall where you were when you
10  met with him --
11     A.  With Jesse?
12     Q.  -- at that first meeting?  Right.
13     A.  I remember we went to the Beaumont federal
14  prison.  I don't remember which one or where exactly we
15  met but I remember meeting with Jesse Moreno at least
16  one time in Beaumont.
17     Q.  Okay.  Possibly more?
18     A.  I think it's just one.
19     Q.  Okay.  Was anyone else in the room with you
20  during this meeting?
21     A.  With Jesse Moreno?
22     Q.  Yes.
23     A.  I don't think so.
24     Q.  And you recorded part of that meeting, right?
25     A.  I don't remember that.



1      Q.   Okay.  I have a transcript of your interview.

2  It's Exhibit 54.  Was it your practice to record

3  interviews with witnesses?

4      A.   It was not.

5      Q.   This was an unusual situation?

6      A.   I didn't record very many.

7      Q.   Do you recall the BOP guidelines for recording

8  visits?

9      A.   No.

10     Q.   Did you ever encounter any -- do you recall

11 ever encountering any pushback from a prison official if

12 you wanted to record an interview with an inmate?

13     A.   No.

14     Q.   Okay.  Now, the transcript goes straight into

15 the interview here.  There's not much small talk.

16 You'll see it says, "It's July 3rd.  We're at the

17 Marshal's office in Beaumont."

18            Now, at this meeting, Mr. Moreno told you

19 about his friend, Nathan Foreman, right?

20     A.   Who transcribed this?

21            MS. SCARDINO:   Object --

22     A.   You all or you all?

23            MS. SCARDINO:   Objection, form.

24     Q.   (BY MS. SCARDINO)  This was produced in the

25 discovery.



1      A.   From whom?

2      Q.   I believe from the DA's office.  Okay.  I'm

3  not -- I'm not -- did --

4           MS. SCARDINO:  Okay.  So, you have the --

5  the recording?

6           MR. RYTTING:  That's right.

7      Q.   (BY MS. SCARDINO)  Okay.  So, Mr. Rytting

8  informed me that the recording was produced and that

9  Mr. Rytting's secretary or assistant at the time

10  recorded this.

11      A.   Okay.

12      Q.   I mean, transcribed it.

13      A.   Okay.

14      Q.   Okay.  So, the DA's office produced the --

15      A.   Tape.

16      Q.   -- recording, yes.  Okay.  So, did you know

17  Nathan Foreman before you had this interview with Jesse

18  Moreno?

19      A.   Did I know his name, yes.

20      Q.   Okay.  And -- because Jesse had told you -- had

21  mentioned him previously?

22      A.   I don't remember how I first heard Nathan

23  Foreman's name.

24      Q.   Okay.  Let's look at Page -- Exhibit 54, Page

25  18.  On the bottom part of the page, it says "KS,"



1   that's you.  It says, "And who was the other guy there?

2   Nathan Foreman?"

3                Jesse Moreno:  "Nathan Foreman.  He" --

4                Kelly Siegler:  "Is he from Houston?"

5                Moreno says, "Yeah, we're all from

6   Houston."

7                And you say, "Beaumont medium, too?"

8                Okay.  So, it looks like from this

9   transcript that you didn't know Mr. Foreman previously,

10  right?

11       A.  Not necessarily.

12       Q.  You might have known him before this?

13       A.  I might have known him by name.  I can't

14  remember.

15       Q.  Because Jesse might have told you his name

16  previously?

17       A.  No.  I don't know how I found Nathan Foreman,

18  how I got his name first.

19       Q.  If you look at Page 12 -- I'm sorry, Page 13,

20  the very top of the page, the second line, Jesse is

21  talking to you.  He says, "There was me, him, Dominguez,

22  Ralph Dominguez and Nathan Foreman, the one I was asking

23  you about."  Do you see that?

24       A.  Uh-huh.  Yes, ma'am.

25       Q.  Does that refresh your memory as to whether



 1  Moreno made you aware of Nathan Foreman?

 2      A.  It does not.

 3      Q.  You still think you knew him previously for

 4  some reason beyond Jesse Moreno?

 5      A.  Yes.

 6      Q.  But you can't tell me why?

 7      A.  The Jason Morales trial.

 8      Q.  You think Foreman was involved in the Jason

 9  Morales trial?

10      A.  I don't -- I don't know if he -- he didn't

11  testify.  I don't know if he was involved.  I can't

12  remember.

13      Q.  Okay.  Now, at this meeting, Jesse Moreno spoke

14  with you about a murder confession he had heard from

15  Hermilio Herrero.  Do you remember that?

16      A.  Yes.

17      Q.  Okay.  And he said that Herrero confessed to

18  himself, Moreno, to Dominguez and to Nathan Foreman in

19  1999 when they were all incarcerated together in

20  Beaumont.  Do you remember that?

21      A.  Yes.

22      Q.  And two days after this meeting with Moreno on

23  July 3rd, you asked Detectives Davis and Holtke to

24  review the audiotape of that meeting.  Do you remember

25  that?



KELLY SIEGLER                                     October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                           97

1       A.   To review the audiotape that I took?

2       Q.   Yes.

3       A.   So --

4       Q.   The audiotape that we just referenced, Exhibit

5    54.

6       A.   Okay.

7       Q.   And to refresh your memory, I have Exhibit 55,

8    which is a supplemental report from the Harris County

9    sheriff's department, and it mentions how you had asked

10   Detectives Davis and Holtke to review the audiotape.  Do

11   you see that?

12      A.   Okay.

13      Q.   Okay.  And you accepted charges against Herrero

14   that day, right?

15      A.   This day?

16      Q.   Yes.  I'm sorry.  Yeah, you -- you accepted

17   charges against Hermilio Herrero on this day, on July

18   5th, 2001, right?  That's what it says here in this

19   report?

20      A.   Where does it say that?

21      Q.   Let's see.  At the very last line, "Assistant

22   District Attorney Siegler then stated she would accept

23   charges of the murder on Hermilio Herrero, Jr., date of

24   birth 10-7-1969," right?

25      A.   It says that I would accept the charges.  It



1  doesn't say on what date.

2      Q.  Okay.  Well, it's talking about a conversation

3  that you had with these detectives on July 5th, 2001.

4  Do you see that on the very first line?

5      A.  I do.

6      Q.  And at the end of talking about that

7  conversation you had with them, Detective Davis states,

8  "I informed Siegler that the information the witness had

9  provided was information that matched the details of

10  what we knew them to be.  Assistant District Attorney

11  Siegler then stated she would accept charges of murder

12  on Hermilio Herrero, Jr., date of birth 10-7-1969."  Do

13  you see that?

14     A.  I do.

15     Q.  Does that refresh your memory as to whether you

16  accepted charges against Mr. Herrero on July 5th, 2001?

17     A.  It doesn't mean that I accepted the charges on

18  July 5th.  It could have been the following day.  It

19  could have been the following week.

20     Q.  Okay.

21     A.  I did accept the charges.

22     Q.  Okay.  You also accepted charges against

23  Mr. Prible that day, right?

24     A.  What day?

25              MS. MIRANDA:  Objection, form.



 1      Q.  (BY MS. SCARDINO)  July 5th, 2001.

 2      A.  I don't remember.

 3      Q.  You don't recall when charges were accepted

 4  against Mr. Prible?

 5      A.  I do not.

 6      Q.  Now, before you charge -- accepted charges

 7  against Herrero, Hermilio Herrero, did you check to see

 8  if he was even incarcerated with Moreno, Dominguez and

 9  Foreman on the date he supposedly confessed to them?

10      A.  I would have had Johnny Bonds check on that.

11      Q.  And what did he find out?

12      A.  I'm assuming that it was consistent with the

13  information we got from Jesse Moreno.

14      Q.  Because if it was inconsistent, it would have

15  been improper to accept charges against Mr. Herrero

16  based entirely on Jesse Moreno's conversation with you,

17  right?

18      A.  We would have needed to look into it further.

19      Q.  And when you accepted charges -- I will -- I

20  will represent to you that charges were accepted against

21  Prible the same day they were accepted against Hermilio

22  Herrero.

23      A.  You need to show me something.

24      Q.  Okay.  Okay.  Exhibit 57, the first page, at

25  the top, it says date prepared July 5th, 2001, felony



 1  charge capital murder against Mr. Prible.  Do you see

 2  that?

 3      A.  Okay.  Yes, I see that.

 4      Q.  Okay.  So, you agree that charges were accepted

 5  against Mr. Prible on July 5th, 2001, this -- do you

 6  agree with that?

 7      A.  Yes.

 8      Q.  And at that July 3rd, 2001 meeting, you and

 9  Mr. Moreno discussed Nathan Foreman, you saw?  Do you

10  remember the testimony -- or the recording I just showed

11  you where you discussed Nathan Foreman?

12      A.  His name was mentioned.

13      Q.  Yes.

14      A.  Nathan Foreman's name was mentioned, yes.

15      Q.  Okay.  And at that July 3rd, '01 meeting, did

16  Moreno tell you that Nathan Foreman had heard a

17  confession by Ronald Prible?

18      A.  Ask me that again.

19      Q.  At that meeting that you had with Mr. Moreno,

20  at some point during that meeting, did Mr. Moreno inform

21  you that Mr. Foreman, Nathan Foreman had heard a

22  confession by Mr. Prible?

23      A.  I don't remember what the details were, what

24  Jesse Moreno told me that day.

25      Q.  So, he might have told you that but just can't



1  recall?

2       A.  I cannot.

3       Q.  Now, if you look at Exhibit 56, Exhibit 56 is a

4  probable cause affidavit dated July 5th, 2001 for the

5  arrest of Mr. Prible, and the affiant is Curtis Brown.

6  And you testified in the Temple case that you would

7  often type up the probable cause affidavit for the

8  detectives to sign; is that right?

9       A.  Correct.

10      Q.  Is that -- was that the case here, did you type

11 up this probable cause affidavit?

12      A.  I don't know because it's signed by Marcy.

13      Q.  Okay.  So, you -- who is Marcy?

14      A.  A fellow prosecutor that worked in Special

15 Crimes the same time I did.

16      Q.  Okay.  So, you don't know if you typed up this

17 probable cause affidavit?

18      A.  I don't know for sure.

19      Q.  Okay.  Do you see anything new in that probable

20 cause affidavit that you all didn't have against

21 Mr. Prible in 1999?

22      A.  I didn't know what they had in 1999.  It wasn't

23 my case then.

24      Q.  Okay.  So, you're not denying that there's

25 nothing new in that probable cause affidavit?



 1      A.  I don't know what they had in '99.  It wasn't

 2  my case then.

 3      Q.  Okay.  Did you reach out to Mr. Foreman after

 4  your July 3rd, 2001 visit with Mr. Moreno?

 5      A.  Ask me again.

 6      Q.  Did you reach out to Mr. Foreman after your

 7  July 3rd, 2001 visit with Jesse Moreno?

 8      A.  No.

 9      Q.  You didn't?

10      A.  I didn't reach out to him, no.

11      Q.  Did he reach out to you?

12      A.  Yes.

13      Q.  Okay.  In what form?  How did he reach out to

14  you?  Did he call you?

15      A.  He called.  He might have written.  I don't

16  remember.

17      Q.  If he had written to you, that would have been

18  kept in your file, right?

19      A.  Yes.  We're talking about the Herrero file

20  because you keep talking about all these letters like

21  they belong to Prible, and they do not.

22      Q.  Well, some of them were found in the Prible

23  file, which we'll get to that in a little bit.

24          But -- okay.  So, Foreman reached out to

25  you, contacted you, you believe?



 1      A.  Yes.

 2      Q.  Okay.  Might have written.  Might have made a

 3 phone call.

 4           Exhibit 88 is a criminal history report for

 5 Nathan Foreman printed out by Johnny Bonds.  And all I'm

 6 interested in is -- is the date.

 7           MS. SCARDINO:  Do you have one?

 8           MS. MIRANDA:  I don't.  I'm sorry.

 9      Q.  (BY MS. SCARDINO)  The date you'll see at the

10 top is August 7th, 2001, and if you go down a little

11 more, it says that Johnny Bonds had printed it out.  Do

12 you see that?

13      A.  I do.

14      Q.  Okay.  Now, this criminal history report, was

15 this something that you all would typically run before

16 you met with a potential witness or -- with a potential

17 witness?

18      A.  Or a potential suspect?

19      Q.  Or a potential suspect.

20      A.  Yes.

21      Q.  That was my next question.

22      A.  Yes.

23      Q.  Okay.  And so, this was typed -- this was

24 searched on August 7th.  And then on August 8th, the

25 following day, you and Mr. Bonds and Foreman met in



 1  person; isn't that right?

 2       A.  I don't remember the date.

 3       Q.  Okay.  Do you recall this meeting?  Do you

 4  recall meeting with Mr. Foreman at FCI Beaumont?

 5       A.  In Beaumont?

 6       Q.  Uh-huh, or just ever.

 7       A.  I remember meeting with Nathan Foreman at the

 8  Federal Detention Center in downtown Houston.

 9       Q.  Okay.  I'm going to show you Exhibit 108-2,

10  beginning at 108-2.

11             MR. DOYLE:  Thanks.

12             MS. SCARDINO:  Do you have that?

13             MS. MIRANDA:  I don't.  I feel like I

14  should but I don't.

15       Q.  (BY MS. SCARDINO)  In this meeting -- and you

16  see it's dated -- these are your notes, correct?

17       A.  They are.

18       Q.  Okay.  And up at the top, it's dated August

19  8th, 2001?

20       A.  Yes.

21       Q.  So, you took the notes on this day, right?

22       A.  Yes.

23       Q.  Okay.  And I'd like to have you first just read

24  these notes into the record so we can have a correct

25  interpretation of them since it's your handwriting.



1        A.   Exhibit 108-2, "Nathan Foreman, August 8th, '01

2   at the Federal Detention Center.  Been here two days?

3   Why.  On deferred adjudication for dope and thought CC

4   with the 5 year fed, plus 3 years supervised" -- I don't

5   know if that's "after" or "often."  "Out 2004.  Wife

6   called me.  Jesse and me at B" -- that's Beaumont --

7   "medium together.  Prible" -- I think that's dis -- or

8   "disciplinary seg at medium, also known as the hole.  I

9   was a trustee about six and a half months.  Prible was

10  an inmate.  Got assigned for marijuana.  Disciplinary

11  years.  Around August of 2000.  Medium" -- I think that

12  says "range" up at the top right-hand side.  "Prible put

13  in seg for dirty urine.  Contact around January of '01.

14  Prible on 300 to 400 range disciplinary seg.  Prible

15  with Bear and Chuy on seg.  Prible talked about dope.

16  Major connection with dope because owed money.  Prible's

17  family killed.  No remorse.  Prible weird.

18  Schizophrenic."

19              Over to the right, squared off, it says,

20  "Beaumont medium 2001.  Talked about two times.  Also

21  present A. J., a white male, Bubba, a white male, Bear,

22  a white male, Chuy, a white male.  Dirty" something

23  "boys.  Two times?  Later.  Last saw Prible months ago

24  in medium.  Regarding Herrero, we were high, me,

25  Dominguez, defendant, Jesse, who was down and who was



1  snitches.  Regarding battle wounds.  I got shot in the

2  hand.  I thought BS.  Defendant guy owed me money.  Ran

3  into the club."  "Woods" or "words."  "Drove off.

4  Carpet in a van.  Dude who owed him money was talking

5  BS.  Somebody else left.  I cut dude's throat, still

6  alive and a hammer."

7              Fourth page, "Grabbed from behind.

8  Complaining witness Alfred or Albert.  Rolled dude up in

9  the carpet, ditch.  Dumpster?  I thought BSing.  Jesse

10 and I talked regarding it.  Afraid to get stuck in

11 Beaumont."

12      Q.  Okay.  And this Jesse that Mr. Foreman is

13 referencing in this interview with you is Jesse Moreno,

14 right?

15      A.  Yes.

16      Q.  And during this August 8th, 2001 interview with

17 you, Mr. Foreman discusses both the Prible and the

18 Herrero cases, right?

19      A.  He does.

20      Q.  Okay.  And he discusses various informants --

21 or various other inmates, himself, Rafael Dominguez,

22 right, you saw that name?

23      A.  I did.

24      Q.  Okay.  And Jesse Moreno, right?

25      A.  Among others.



1      Q.   Now, Mr. Bonds was at this meeting with you,

2   right?

3      A.   Yes.

4      Q.   Okay.   And what was your take on Mr. Foreman

5   when you met with him?

6      A.   I didn't believe him.

7      Q.   Why didn't you believe him?

8      A.   I didn't believe him.

9      Q.   Okay.

10      A.   Neither one of us did.   We walked out there

11   saying we didn't believe a word he had to say.

12      Q.   And Mr. -- Mr. Bonds actually asked him what

13   Prible looked like, right, and he couldn't describe him?

14      A.   I don't remember that part.   I'm not arguing

15   with you but I don't remember that part.

16      Q.   Okay.   But you didn't remember anything that he

17   said as far as Prible or Herrero were concerned, you

18   thought he was a liar?

19      A.   I -- I remember some of the things that Nathan

20   Foreman said.   I also thought he was lying.

21      Q.   Okay.   So, after you left that meeting or as

22   you were leaving, did you tell Foreman, "Look, I don't

23   believe anything you're saying.   Get out of here.   Get

24   lost"?

25      A.   I didn't tell him what I thought.



1      Q.  You didn't?  Did you tell him to contact you if

2  he had further information?

3      A.  I don't remember saying that.

4      Q.  Okay.  Would you have wanted him to contact you

5  again with more information if you knew he was a liar?

6      A.  No.

7      Q.  That would have been improper to use a witness

8  that you knew was lying, right?

9      A.  I never used him as a witness, contrary to what

10  your petition says.

11      Q.  Now, Exhibit 152, this is a difficult exhibit

12  to read.  It was produced this way but these are

13  different telephone memos from your file.  One of them

14  is dated August 13th.  I mean, they're really difficult

15  to read.

16      A.  Yeah.  You want to just point it to me?

17      Q.  Yeah.  I'd give you a better one if I had one

18  but this is how they were produced.  Let's see.  We

19  might -- actually, at a break, we might have to show you

20  on the computer.  It might be easier to read.

21           I'll -- I'll represent to you what -- the

22  question that I'm going to ask about, and I'll show

23  you -- I'm happy to show it to you --

24      A.  Okay.

25      Q.  -- on the screen.  This was produced from your



1  file by the DA's office in August of 2016.  And it's

2  a -- there's a phone message on there showing Alan

3  Percely -- Percely, who was Nathan Foreman's attorney.

4  Do you -- do you recall Mr. Percely?

5        A.  Now that you mentioned it, yes.

6        Q.  I might be saying his name wrong.  Okay.

7        A.  He was as credible as Nathan.

8        Q.  He was as credible as Nathan?

9        A.  Uh-huh.

10       Q.  Okay.  And what do you mean by that?

11       A.  Just what I said.

12       Q.  Just a liar?

13       A.  Yep.

14       Q.  Okay.  And he called you on August 13th, 2001

15  about testifying -- about having Nathan testify on the

16  federal trial, right?

17       A.  He might have.  I don't remember.

18       Q.  Okay.  If -- if, in fact, this -- this phone

19  message shows that, you wouldn't disagree with that,

20  right?

21       A.  No.

22       Q.  Okay.  Did you call Percely back and speak with

23  him?

24       A.  I don't remember.

25       Q.  Okay.  At some point, you must have spoken with



1   him if you knew that he was lying, right?

2       A.  Which one?

3       Q.  Percely.

4       A.  To be nice maybe.

5       Q.  How did you determine that he was a liar?

6       A.  From years of working with him.

7       Q.  So, you knew him before this case?

8       A.  Alan Percely, yes.

9       Q.  Yeah.  Okay.  Okay.  Nine days after you speak

10  with Mr. Foreman, the Prible indictments were prepared.

11  That's Exhibit 60.

12              MS. SCARDINO:  We'll take a break right

13  after this.

14      Q.  (BY MS. SCARDINO)  You see the first page of

15  this Exhibit 60, it says date prepared August 17th,

16  2001.  So, after speaking with Foreman, did you believe

17  you had probable cause to present the case to the grand

18  jury for indictment?

19      A.  My decision to decide what to do with the

20  Prible case had no bearing and nothing to do with the

21  conversation I had with Nathan Foreman.

22      Q.  Okay.  Why did you suddenly decide to charge

23  Mr. Prible and indict him for capital murder if there

24  was no new evidence since 1999 other than this

25  conversation that you had had with Mr. Foreman?



1      A.  One more time, I don't know what they had in

2  1999.  It could have been completely sufficient in 1999

3  to move forward but I didn't have the case then.  When I

4  got the case, I wanted to be thorough, which included

5  talking to Nathan Foreman, which I thought would be a

6  waste of time and it turned out to be a waste of time.

7  Irrespective of that, I made a decision to move forward

8  on the case against Ronald Jeffrey Prible.

9      Q.  Okay.  Did you disclose to Mr. Prible's defense

10 attorney that you had spoken with Mr. Foreman on August

11 8th, 2001?

12     A.  Mr. Prible's attorney, Terry Gaiser?

13     Q.  Uh-huh.

14     A.  We talked about Nathan Foreman.  I don't know

15 exactly if I told him about that conversation but we did

16 discuss Nathan Foreman.

17     Q.  I'm asking you if you told Mr. Gaiser or

18 Mr. Wentz if you -- about the substance of your meeting

19 with Mr. Foreman on August 8th, 2001?

20     A.  I think I did.

21     Q.  And you would have -- did you show him your

22 notes from that meeting?

23     A.  They were in the file.

24     Q.  But he wasn't allowed to see your work product

25 notes, was he?



1        A.   Those weren't -- that's not work product.   My

2   notes were in the file.   Notes are notes.   They're in

3   the file.

4        Q.   So, should they all be -- all your notes --

5        A.   Yes.

6        Q.   -- be viewable --

7        A.   Yes.

8        Q.   -- to the defense counsel?

9        A.   Yes.

10       Q.   Okay.   So, you're saying that all of your --

11   any -- any of your notes that were contained in the file

12   would have been disclosed to defense counsel?

13       A.   My notes would have been in the open file.

14       Q.   Okay.   So, you didn't take any notes out

15   saying -- claiming work product protection over them

16   before the defense came to review the file?

17       A.   Not that I remember, no.

18       Q.   Okay.

19            MS. SCARDINO:   Let's take a short break and

20   go off the record.

21            THE VIDEOGRAPHER:   The time is 11:23.   We

22   are off the record.

23            (Short recess.)

24            THE VIDEOGRAPHER:   This is the beginning of

25   file 3.   The time is 11:43.   We are on the record.

1     Q.   (BY MS. SCARDINO)   Ms. Siegler, if you'll take

2  a look at Exhibit 154-7 again, the policy manual.   The

3  basic function of a Grand Jury is to determine whether

4  there's sufficient evidence to warrant an indictment,

5  right?

6     A.   Yes.

7     Q.   Would you agree?   Okay.   And if you look at

8  Page 7 of Exhibit 154, it says on there, "More

9  specifically, the Grand Jury should believe that there

10 is probable cause that a particular individual is guilty

11 of a particular crime from evidence that will be

12 admissible in a court," right?   And we talked a little

13 while ago about probable cause.

14    A.   Correct.

15    Q.   Okay.   Exhibit 154-7 also says that, "Although

16 Texas law does not so require, the evidence should be of

17 such a nature that there is a reasonable likelihood a

18 jury would convict.   It will be the policy of our office

19 to recommend a true bill only if there is such a

20 reasonable likelihood of conviction."   Do you see that?

21    A.   I do.

22    Q.   Okay.   So, we can presume, because this case

23 wasn't presented to the Grand Jury in '99, that the DA's

24 office did not believe, based on the evidence they had

25 at that time, that there would have been a reasonable



 1  likelihood of conviction, right?

 2             MS. MIRANDA:  Objection, form.

 3      A.  We cannot presume that.

 4      Q.  (BY MS. SCARDINO)  You disagree with that

 5  statement?

 6      A.  I absolutely disagreement with that statement.

 7      Q.  Okay.

 8             (Off the record.)

 9      Q.  (BY MS. SCARDINO)  And continuing on Exhibit

10  154, Page 7, it says -- I'm sorry -- yeah, if the

11  prosecution believes that the defendant is probably

12  guilty, that there is sufficient legally admissible

13  evidence to convict and there is a likelihood of

14  conviction, the prosecutor should recommend a true bill.

15  If those circumstances do not exist, the prosecutor

16  should recommend a no bill.

17             And my question for you is why would a

18  prosecutor present a case to the Grand Jury and

19  recommend a no bill as opposed to presenting the case

20  to -- or as opposed to not presenting the case to the

21  Grand Jury at all?

22             MR. DOYLE:  Objection.

23      A.  Where did you read that?  I couldn't find it

24  fast enough.

25      Q.  (BY MS. SCARDINO)  Let me find it on the page



 1  for you.  Okay.  The third paragraph, second half.  Are
 2  you on -- yeah.  Right there.
 3      A.  Okay.
 4      Q.  "If the prosecution believes," do you see that?
 5      A.  I do.
 6      Q.  "If the prosecution believes the defendant is
 7  probably guilty, that there is sufficient legally
 8  admissible evidence to convict and there is a likelihood
 9  of conviction, the prosecution should recommend a true
10  bill.  If those circumstances do not exist, the
11  prosecutor should recommend a no bill."  Do you see
12  that?
13      A.  I do.
14      Q.  And my question to you is why would a
15  prosecutor present a case to the Grand Jury and
16  recommend a no bill as opposed to not presenting the
17  case to the Grand Jury at all?
18      A.  Because there were some cases, under office
19  policy, that you always took them to a Grand Jury for a
20  Grand Jury to decide, for example, cop shootings.
21      Q.  Okay.
22      A.  And at the end of that presentation, it would
23  be the prosecutor's duty and obligation to make that
24  recommendation.
25      Q.  Okay.  And where -- is that the general rule



 1  for capital murders or just for cop shootings?

 2      A.  I know that you -- you had to take all cop

 3  shootings into the Grand Jury.  You didn't have to take

 4  all murders.

 5      Q.  Okay.  Looking at Page 154-12, the second to

 6  last paragraph, it says, "It's better to build a strong

 7  case or to dispose of a weak case by no bill than to be

 8  embarrassed at trial time."

 9      A.  Okay.  Wait.  Second to the last paragraph?

10      Q.  Second to the last paragraph.

11      A.  That starts with "discuss" here?

12      Q.  Yes.  The next sentence.

13      A.  Okay.  Go ahead.

14      Q.  "It is better to build a strong case or to

15  dispose of a weak case by a no bill than to be

16  embarrassed at trial time.  The Grand Jury is the proper

17  forum to determine whether or not there is a reasonable

18  possibility of success at trial."  Do you see that?

19      A.  I do.

20      Q.  Okay.  So, if there's not sufficient legally

21  admissible evidence to convict and there's not a

22  likelihood of conviction, even if the prosecutor herself

23  believes that the defendant is guilty, the prosecutor

24  should either recommend a no bill or not present the

25  case to the Grand Jury in the first place, do you agree



 1  with that statement?

 2       A.   That's a long question.

 3       Q.   Okay.  Let's -- let's break it up.

 4            If there's not sufficiently legal --

 5  sufficient legally admissible evidence to convict and

 6  there is not a likelihood of conviction, I take this to

 7  read that even if the prosecutor herself believes that

 8  the defendant is guilty, the prosecutor should either

 9  recommend a no bill or not present the case to the Grand

10  Jury in the first place.  Do you agree?

11       A.   I do.

12       Q.   Now, in this case, with all of the evidence

13  that law enforcement had in 1999, which you claim you

14  don't recall what -- what evidence that was, but with

15  all that evidence that they had in 1999, the DA must not

16  have believed that there was sufficient legally

17  admissible evidence to convict Prible of the five

18  murders at that time, right?

19            MS. MIRANDA:  Objection, form.

20       A.   I do not agree with that statement.

21       Q.   (BY MS. SCARDINO)  You don't agree with that

22  statement?

23       A.   No, ma'am.

24       Q.   Even though this was a case of an entire family

25  being murdered, three young children, don't you think



KELLY SIEGLER                                      October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                        118

 1  the DA's office would have prosecuted that as soon as

 2  they had -- they had the evidence needed to do so?

 3      A.  Not --

 4              MS. MIRANDA:  Objection, form.

 5              THE WITNESS:  Sorry.

 6      A.  Not necessarily.

 7      Q.  (BY MS. SCARDINO)  In fact, back in 1999, the

 8  DA's office didn't even present the case to the Grand

 9  Jury, did they?

10      A.  I don't think they did, no.

11      Q.  Okay.

12              THE WITNESS:  Is that the same phone?  Can

13  you unplug it?

14              MS. SCARDINO:  Let's go off the record real

15  briefly to fix that.

16              THE VIDEOGRAPHER:  The time is 11:50.

17  We're off the record.

18              (Off the record.)

19              THE VIDEOGRAPHER:  This is the beginning of

20  file 4.  The time is 11:52.  We are on the record.

21      Q.  (BY MS. SCARDINO)  Okay.  So, you just

22  testified that you do not believe they presented it to

23  the Grand Jury in 1999; is that right?

24      A.  I don't think they did.  That's correct.

25      Q.  Okay.  When did the DA's office finally present



1  this case to the Grand Jury?

2      A.  When I did.

3      Q.  You were the one that presented it?

4      A.  Yes.

5      Q.  And do you recall the date that you did so?

6      A.  August, 2001.

7      Q.  Okay.  Do you recall the -- was it after you

8  had met with Mr. Foreman August 8th?

9      A.  Yes.

10     Q.  It was after you met with him.  Okay.  And was

11 there only one Grand Jury that heard this case?

12     A.  Yes.

13     Q.  Was that the only one?

14     A.  Yes.

15     Q.  All right.  Did you prepare any sort of a

16 witness list for the Grand Jury?

17     A.  No.

18     Q.  Did you present any witnesses to the Grand

19 Jury?

20     A.  No.

21     Q.  And is that a common practice of yours to go

22 into a Grand Jury without any witnesses?

23     A.  Yes.

24     Q.  Did you testify at the Grand Jury about your

25 conversations with Foreman and Moreno?



```
 1        A.   I know I didn't about Foreman.

 2        Q.   But you spoke with the Grand Jury about your

 3   conversation with Moreno?

 4        A.   Having to do with the Prible case?

 5        Q.   Yes.

 6        A.   No.

 7        Q.   Did you present these two cases, Herrero and

 8   Prible, on the same day?

 9        A.   Yes.

10        Q.   In the same -- I mean, was it like back to

11   back?  How does -- how does it work when you go into the

12   Grand Jury?

13        A.   You go in on your scheduled morning with all

14   the cases that you have and present them, go outside

15   while they vote, see if they have any questions and then

16   do the next one.

17        Q.   Okay.  So, your -- your testimony is that you

18   spoke with the Grandy Jury about Moreno --

19        A.   No.

20        Q.   -- with respect to the Herrero case?

21        A.   I presented the Herrero case and I presented

22   the Prible case.

23        Q.   Okay.

24        A.   And maybe others.  I don't remember.

25        Q.   Okay.  And when you presented those two cases
```



1  to the Grand Jury, did you tell the Grand Jury that

2  there were jailhouse informants in those cases that

3  would testify as to a confession?

4       A.  Can we divide up the cases and ask the question

5  specifically?

6       Q.  Sure.  With respect to Prible.

7       A.  Okay.

8       Q.  Yes.  Did you tell the Grand Jury that there

9  was a jailhouse informant that would testify that Prible

10  confessed to the crime?

11      A.  No.

12      Q.  With respect to Mr. Herrero, did you tell the

13  Grand Jury that there was a jailhouse informant who

14  would testify that Mr. Herrero confessed to the crime?

15      A.  Yes.

16      Q.  Was there a court reporter present at that

17  Grand Jury meeting?

18      A.  No.  Sorry.  No.

19      Q.  You did not request that --

20      A.  I don't think so, no.

21      Q.  -- a court reporter be present?

22      A.  I don't think so, no.

23      Q.  Was that common practice in the DA's office

24  to -- to not have a court reporter present to transcribe

25  those proceedings?



 1      A.  Correct.  You only had a court reporter present

 2   if you had a witness you were presenting.

 3      Q.  Okay.  Now, you could have a court reporter

 4   present if you weren't having -- presenting a witness

 5   but you just didn't in this case?

 6      A.  I don't think we ever had a court reporter

 7   present if we weren't presenting a witness.

 8      Q.  Okay.  Let -- sorry.  Let me ask you a question

 9   so it's easier to follow.

10           Was there anything preventing you from

11   asking a court reporter to be present in a Grand Jury

12   proceeding in which you were not presenting any

13   witnesses?

14      A.  Yes.

15      Q.  What was preventing you from doing that?

16      A.  Grand Jury proceedings are secret, so, you

17   don't want a record of what's going on when they vote,

18   when they talk about things.  You only have a court

19   reporter present when there's a witness.

20      Q.  Okay.  But -- and I understand the Grand Jury

21   proceedings are secret.  There would never be a court

22   reporter present to take down what you were telling the

23   Grand Jury before they went into their secret

24   deliberations?

25      A.  I don't want to say never but not that I



 1  remember.

 2      Q.  Okay.  Was there anything preventing you from

 3  having a court reporter take down the testimony, for

 4  lack of a better word, the -- the statements that you

 5  were making to the Grand Jury about these cases before

 6  they went into their private deliberations?

 7      A.  Well, you would have to find the court

 8  reporter.  They weren't there.  They don't stay in the

 9  Grand Jury room.

10      Q.  You would have to arrange for a court reporter

11  to be present?

12      A.  Correct.

13      Q.  And those court reporters are -- that

14  transcribe the -- the Grand Jury proceedings, those

15  worked at the DA's office, right?

16      A.  They worked in the Grand Jury division, yes.

17      Q.  Right.  Like Javier Leal, I believe was one?

18      A.  Yes.

19      Q.  Okay.  So, what you would need to do is make

20  arrangements for one of them to be present when you

21  presented the case if you wanted the testimony

22  transcribed?

23      A.  Yes.

24      Q.  Okay.  But you did not do that in this case?

25      A.  Which case?



1      Q.   In the Prible case.

2      A.   I did not.

3      Q.   And you did not do that in the Herrero case?

4      A.   I did not.

5      Q.   So, there is no record whatsoever as to what

6   you told the Grand Jury when you presented the Prible

7   matter to that Grand Jury?

8      A.   There is not.

9      Q.   And there is no record whatsoever regarding

10   what you told the Herrero Grand Jury about Herrero's

11   case in that Grand Jury proceeding?

12      A.   There is not.

13      Q.   Now, a prosecutor has a duty to disclose all

14   material defensive facts to the Grand Jury, correct?

15      A.   Yes.

16      Q.   Okay.  Did you tell the Grand Jury in the

17   Prible matter that you had spoken to Nathan Foreman

18   about Mr. Prible's case?

19      A.   No.

20      Q.   Did you tell the Grand Jury that a jailhouse

21   informant tried to come -- or came to you to try to set

22   up Mr. Prible for this murder before Mr. -- before he

23   had even met Mr. Prible?

24           MS. MIRANDA:  Objection, form.

25      A.   I don't understand that question.



1      Q.   (BY MS. SCARDINO)  Did you tell the Grand Jury

2   that an inmate, Nathan Foreman, had come to you and

3   tried to set up Mr. Prible, saying that he -- Mr. Prible

4   had confessed to him but that you had determined that

5   Mr. Foreman was lying about that?

6      A.   I disagree with the assertion that Nathan --

7   Nathan Foreman tried to set him up.  I agree with the

8   statement I made earlier that I did not believe Nathan

9   Foreman was being credible, and I agree with the

10  statement I said earlier that Nathan Foreman's interview

11  had nothing to do with the evidence that existed against

12  Jeffrey Prible.

13            MS. SCARDINO:  Okay.  Objection,

14  nonresponsive.

15      Q.   (BY MS. SCARDINO)  My question -- I'll restate

16  it.

17            Did you -- when you were presenting the

18  case against Mr. Prible to the Grand Jury, did you tell

19  the Grand Jury about your meeting and the substance of

20  that meeting with Nathan Foreman?

21      A.   No.

22      Q.   Now, if you had a defendant that you were going

23  to charge in a Harris County case who was already

24  serving a sentence in a federal institution, how would

25  you go about getting custody of that person so you could



1 | try them in your state case?

2 |     A.  You have to follow the federal procedures.

3 |     Q.  And that's the federal detainer rule?

4 |     A.  Yes.

5 |     Q.  Okay.  Do you have to wait until their federal

6 | sentence is up to try them in the state case?

7 |     A.  That depends.

8 |     Q.  Okay.  And what does it depends on?

9 |     A.  All kinds of things.  I never did understand

10 | when it didn't and when it did.

11 |     Q.  Okay.  In the Hermilio Herrero case, you didn't

12 | need to wait for his federal sentence to be up before

13 | you tried him in the state case, right?

14 |     A.  I did not.

15 |     Q.  And the same with Mr. Prible's case, you didn't

16 | have to wait until his federal sentence was up to try

17 | him in the state case, right?

18 |     A.  Correct.

19 |     Q.  Okay.  If you look at Exhibit 154-2, it

20 | addresses how to obtain persons from other

21 | jurisdictions.  Section -- actually, it's the next page,

22 | 154-3.  Section C says, "If a prisoner in federal

23 | custody has been sentenced by the federal court, we may

24 | secure the custody of the prisoner by virtue of the

25 | interstate agreement on detainers, Article 51.14 of the



1  Texas Code of Criminal Procedure."  And that's the

2  detainer agreement that you were just mentioning?

3       A.  Yes.

4       Q.  Okay.  And down at the bottom, Section D, it

5  says, "An individual who has been indicted in Texas but

6  is in custody and has been sentenced in a foreign state

7  or under federal law has a detainer placed on him in the

8  foreign state by virtue of the warrant issued by the

9  State of Texas.  It acts as notice to the custodial

10 official of such pending warrant and when the prisoner

11 has satisfied his time in the foreign state, the

12 custodial official will notify the law enforcement

13 agency which requested the detainer.  In Harris County,

14 that is the Harris County sheriff's office.  The effect

15 of the interstate agreement on detainers allows the

16 custodial official to temporarily seek custody of the

17 prisoner to allow prosecution of the offense giving rise

18 to the detainer prior to the satisfaction of the

19 prisoner's present sentence.  The proceedings may be

20 initiated by either the prisoner or by the prosecutor of

21 the jurisdiction which requested the detainer on the

22 prisoner."

23           Now, did you request that a detainer be

24 placed on Mr. Prible so he could be returned to Harris

25 County to face capital murder charges?



1    A.  Yes.

2    Q.  And when did you do that?

3    A.  I don't remember.

4    Q.  You don't?  You didn't do it immediately,

5    though, right?

6    A.  Immediately meaning when?

7    Q.  After he was charged in the capital murder.

8    A.  No.

9    Q.  Because first he was charged in -- July 5th,

10   2001, as we established, right?

11   A.  Right.

12   Q.  And after that, he was moved from the FCI

13   Beaumont low to FCI Beaumont medium because his points

14   went up, right?

15   A.  I don't know anything about that.

16   Q.  You don't know that he was moved from the low

17   to the medium?

18   A.  I didn't keep up with that.  I don't remember

19   when he was moved or why he was moved.

20   Q.  Okay.  But you don't disagree that he was moved

21   from the low to the medium after he was charged in this

22   case?

23   A.  I don't know.

24   Q.  Okay.  Now, where in the operations manual did

25   it say -- or does it say that it's -- the interstate



 1  agreement on detainers is optional or that it can be

 2  done at a later time rather than immediately after the

 3  defendant is charged?  Is there any -- is there any

 4  rule?

 5       A.  It says indicted, not charged.

 6       Q.  And -- after the person is indicted?

 7       A.  There's a big difference.

 8       Q.  Okay.  Well, in this case --

 9       A.  And you know that.

10       Q.  In this case, the indictment was August --

11       A.  29th.

12       Q.  -- 2001?

13       A.  Right.

14       Q.  Okay.  So, was it your practice to indict and

15  then not have the defendant moved to Harris County until

16  later?

17       A.  No.

18       Q.  That was unusual?

19       A.  That was not my practice.

20       Q.  Okay.  With Mr. Herrero, did you have him moved

21  immediately to Harris County after he was indicted?

22       A.  I don't remember.  I'd have to see the

23  paperwork.

24       Q.  Okay.  Now, Curtis Brown was involved in the

25  Hermilio Herrero case as well, right?



 1      A.  Yes.

 2      Q.  And the same informants were involved in the

 3  Herrero case as were involved in the Prible case, right?

 4      A.  No.

 5      Q.  Well, Nathan Foreman was involved in both

 6  cases, right?

 7      A.  No.

 8      Q.  Well --

 9      A.  You all say Nathan Foreman was involved in the

10  Prible case.  He was not.

11      Q.  He spoke with you about the Prible case, right?

12      A.  And he lied.  He wasn't involved.

13      Q.  And he spoke --

14      A.  You want to make him involved.  He wasn't

15  involved.

16      Q.  And he spoke also with you about the Herrero

17  case, right?

18      A.  Yes.

19      Q.  And he ended up not testifying again -- with

20  you -- or for you in that case, right?

21      A.  That's right.

22      Q.  Okay.  But you, nevertheless, wrote him a Rule

23  35 letter to his prosecutor, right?

24      A.  I did.

25      Q.  Okay.  Jesse Moreno talked with you about



 1 | Mr. Prible's case and Mr. Herrero's case, correct?

 2 |     A.  He did.

 3 |     Q.  Rafael Dominguez spoke with you about

 4 | Mr. Herrero's case and his name was also listed -- he --

 5 | he -- his name came up in that conversation that you had

 6 | in August 8th, 2011 with Mr. Foreman, right?

 7 |     A.  With Nathan Foreman.  Ralph Dominguez was not

 8 | involved in the Prible case.

 9 |     Q.  Okay.  But he was mentioned in that

10 | conversation that you were having with Mr. Foreman on

11 | August 8th, 2001?

12 |     A.  By Nathan Foreman, who was lying.

13 |     Q.  Okay.

14 |     A.  So, that doesn't make him involved.

15 |     Q.  I understand.

16 |         MS. SCARDINO:  I'm going to -- objection,

17 | nonresponsive.

18 |     Q.  (BY MS. SCARDINO)  My question is Rafael

19 | Dominguez was mentioned by Nathan Foreman during that

20 | conversation you had with him on August 8th, 2001,

21 | right?

22 |     A.  That does not make him involved.

23 |     Q.  Are you going to refuse to answer the question?

24 |     A.  No.

25 |     Q.  Okay.  One more time.  Mr. Dominguez's name was



 1  mentioned by Nathan Foreman when he met with you on

 2  August 8th, 2001, correct?

 3       A.  It was.

 4       Q.  Now, Exhibit 66, if you look at Exhibit 66,

 5  it's dated September 4th, 2001, and it's a letter from

 6  Bert Graham at the Harris County DA's office

 7  including -- enclosing the forms for the interstate

 8  agreement on detainers for Hermilio Herrero.  Do you see

 9  that?

10       A.  I do.

11       Q.  And your signature appears on those documents?

12       A.  It does.

13       Q.  Okay.  And this was five days after the

14  indictment of Mr. Herrero on August 29th?  Five or six?

15       A.  Yes.

16       Q.  Okay.  So, you immediately filled out the

17  paperwork for Mr. Herrero after he was indicted, the

18  interstate agreement to have him transferred to Houston?

19       A.  I didn't fill out this paperwork.

20       Q.  I'm sorry.  You signed it?

21       A.  Kim Bryant was in charge of filling out the

22  paperwork.  That's the initial KB after Bert Graham.

23  She was a lady at our office that completely was in

24  charge of all of the paperwork for all of the detainers

25  for all of the defendants for all the years I was there.



1      Q.  Okay.  On Page 2 of this exhibit, you'll see

2   where you signed this detainer paperwork?

3      A.  I did.

4      Q.  Okay.  Now, why did you not end up using

5   Mr. Foreman at Herrero's trial?

6      A.  I didn't need him.  I didn't believe him.

7      Q.  Exhibit 71, that's a letter dated May 5th, 2002

8   from you to FCI medium, and you're asking the prison to

9   keep Jesse Moreno, Rafael Dominguez, Nathan Foreman and

10  Eddie Gomez safe from Herrero because he's put a hit on

11  all them for testifying in his case, right?

12     A.  What's your question?

13     Q.  Is that -- that's what it reflects, right?

14     A.  Not exactly.

15     Q.  Okay.  Well, will you agree that the letter

16  says what it -- says what it says?

17     A.  The letter is a request to try and keep them

18  safe.

19     Q.  Right.  And you refer to four witnesses, one of

20  whom is Herrero, right?

21     A.  Yes.

22     Q.  I mean -- I'm sorry.  One of whom is Foreman,

23  right?

24     A.  Yes.

25     Q.  Okay.  But you just said that he lied and you



 1  didn't believe -- you didn't believe him?

 2       A.  He didn't testify.

 3       Q.  That's not my question.  You just said that he

 4  lied and you didn't believe him, right?

 5       A.  I just said that Nathan Foreman did not testify

 6  in the Hermilio Herrero trial.

 7       Q.  And you also found him to be a liar, right?

 8       A.  I did not believe him to be credible, no.

 9       Q.  And nevertheless, you gave him favors for his

10  assistance in the Herrero case, didn't you?

11       A.  I did not.  I wrote him a letter.

12       Q.  Well, you also asked for the prison to keep him

13  safe based on his testimony in that case when he didn't

14  testify, right?

15       A.  I think I still have an obligation to keep a

16  man from being killed, don't you?  Even if I think he's

17  a liar, I can't let him get killed.

18       Q.  Let's look at Exhibit 72.  Exhibit 72 is a May

19  1st, 2002 letter from you to U.S. Attorney Todd Clemons.

20  We -- we mentioned his name earlier.  And it says,

21  quote, "Moreno told me initially of the possibility of

22  other witnesses to admissions made by Herrero about his

23  committing this murder in 1995."  And those other

24  witnesses we saw in that --

25       A.  Okay.  You just read -- which paragraph is



 1  that?

 2      Q.  Let me see.

 3      A.  Oh, I see it.

 4      Q.  You see it?

 5      A.  Yes.

 6      Q.  Because I don't.

 7      A.  Yes.

 8      Q.  Where is it?

 9      A.  Bottom of the first page.

10      Q.  Okay.  Here we go.  Okay.  "Moreno told me

11  initially of the possibility of other witnesses to

12  admissions made by Herrero about his committing this

13  murder in 1995.  Moreno and the other three witnesses

14  have all been cooperative.  It was, however, Moreno who

15  I presented to the jury as being the crux of the case,

16  and it was almost entirely because of his testimony that

17  the jury found Herrero guilty of murder," right?  Right?

18      A.  Yes.

19      Q.  Okay.  Now, the other three witnesses that you

20  were referring to there were Foremen, Ralph Dominguez

21  and Eddie Gomez, right?

22      A.  I think so.  I don't remember the last one.

23      Q.  Okay.  And by the time that you wrote this

24  letter, you had determined that foreman was not with

25  Moreno at the time Moreno claims he heard this testimony



 1  from Mr. -- or this confession from Mr. Herrero, right?

 2       A.  I don't remember when I figured that out.

 3       Q.  Okay.  At some point before Mr. Herrero's

 4  trial, you figured that out, right?

 5       A.  At some point before Mr. Herrero's trial, I did

 6  not believe that Nathan Foreman was being completely

 7  truthful.

 8       Q.  But regardless, you wrote this letter to the

 9  U.S. attorney for Mr. Moreno, saying that all three

10  witnesses, including Foreman, had been cooperative?

11       A.  That's correct.

12       Q.  And Exhibit 73, even though by the time

13  Mr. Herrero's trial you had found out that Moreno had

14  been lying to you about Foreman being present, and you

15  Mr. Foreman had also lied to you on August 8th, 2001,

16  you, nevertheless, wrote a letter to Foreman's U.S.

17  attorney asking for a sentence reduction for his

18  assistance in the Herrero case; is that correct?

19            MS. MIRANDA:  Do you have another copy of

20  those last two letters?

21       A.  Okay.  What was your question?

22       Q.  (BY MS. SCARDINO)  By May 1st, 2002, Herrero's

23  trial was over, right?

24       A.  Yes.

25       Q.  Prior to his trial, you had determined that --



1  not only that -- well, first, I'll break it down.

2              You had determined that Moreno's initial

3  story to you about hearing the confession of Herrero in

4  the presence of Nathan Foreman was false, correct?

5      A.  I don't remember that -- making that

6  determination, no.

7      Q.  I thought you just were saying that at some

8  point prior to trial, you determined that Mr. Foreman

9  was not present during that confession?

10     A.  No.  I determined that Mr. Foreman was not

11 being completely credible -- truthful.

12     Q.  Did you not -- did you ever determine that

13 Mr. Foreman was not present for the -- for Herrero's

14 supposed confession to Moreno as Moreno had told you he

15 was back in July of 2001?

16     A.  I don't remember.  I didn't going into a break

17 it down determination of all the reasons why I thought

18 Nathan Norman was lying.  I just didn't believe him, so,

19 I didn't use him.

20     Q.  Okay.  But you, nevertheless, wrote this letter

21 to his U.S. attorney asking for a sentence reduction,

22 right?

23     A.  Not exactly.  That's a lot different letter

24 than the one I wrote for Jesse Moreno.

25     Q.  Are you disagreeing that this Exhibit 73 is a



1  letter to Nathan Foreman's U.S. attorney asking her to

2  consider his cooperation in the Herrero case?

3      A.  I agree that I wrote this letter saying that

4  Nathan Foreman was cooperative.  I don't say nearly the

5  parts about how truthful he was like I do with Jesse

6  Moreno, and I do not specifically make a request for a

7  downward departure like I do for Jesse Moreno.  It's a

8  different letter.

9      Q.  Okay.  And nowhere in this letter do you say,

10  "Ms. Batson, I met with -- with Mr. Foreman.  I think

11  he's a complete liar"?

12      A.  I do not say that.

13      Q.  You do not say that?

14      A.  No.

15      Q.  And nothing was requiring you to write this

16  letter, right?  You didn't have to right this letter to

17  Ms. Batson, right?

18      A.  I did not.

19      Q.  You chose to do that on Mr. Foreman's behalf?

20      A.  I chose to write the letter.

21      Q.  Now, Hermilio Herrero was convicted of murder

22  in April, 2002, and he was sentenced to life in prison,

23  right?

24      A.  Yes.

25      Q.  And Moreno and Dominguez testified him --



 1  against him at that trial, correct?

 2       A.  Yes.

 3       Q.  Okay.  And immediately after Herrero was

 4  convicted, you started working -- discussing with

 5  Moreno's U.S. attorney about getting his sentence

 6  reduced, right?

 7       A.  That's not how I would put it.

 8       Q.  Okay.  How would you put it?

 9       A.  When I finish a trial -- when I finish a trial,

10  I want to complete all of my to-dos and all of my

11  paperwork to be done with the whole case to give the box

12  to appellate.

13            I write the jury their thank you notes.  I

14  call all my witnesses to tell them what happened.  I

15  call all the cops to tell them what happened.  And in

16  this case, I needed to write the fed prosecutor letters,

17  and I did that so I could be done with the case.

18       Q.  Okay.  I'm going to show you Exhibit 125.  Now,

19  Exhibit 125 is an undated letter from Jesse Moreno to

20  you telling you exactly what to say to U.S. Attorney

21  Clemons to get him transferred to another prison and to

22  have his sentence reduced, right?

23       A.  I don't know what this is.

24       Q.  Okay.  Have you never seen it before?  It was

25  found in your file.



1      A.  I'm trying to recognize it.  I don't remember

2  seeing this.

3      Q.  You've never seen that?

4      A.  I'm not denying that it was in the file that

5  you got from Brian Rose but I don't remember seeing

6  this.

7      Q.  Were you, in fact, able to persuade the unit

8  team to transfer Moreno to the prison to keep him safe

9  like we discussed earlier?

10      A.  I don't know -- when are we talking about?

11      Q.  Well, did you -- did you contact BOP in

12  Beaumont and inform them that Moreno and these other

13  witnesses -- these other three witnesses had

14  testified -- or had cooperated in your case against

15  Herrero and he needed to keep him safe?

16      A.  I don't know what this says.  I didn't read the

17  whole thing.  Is that what this is?

18      Q.  No, I'm asking you after you got -- after you

19  received this --

20      A.  Are we done with this?  I don't know if I

21  received this.  I do not recognize this.

22      Q.  Okay.  Were you able to persuade the unit team

23  in BOP, the FCI Beaumont team to move Moreno and these

24  other three witnesses to another area of the prison

25  where they would be kept safe?



 1      A.  I don't remember.  I hope so.

 2      Q.  Okay.  So, that's something that you might have

 3  been able to do is all I'm -- is all I'm asking?

 4      A.  All I can do is make the request.

 5      Q.  Okay.

 6      A.  The federal prisons do what the federal prisons

 7  do.

 8      Q.  Okay.  Now, Exhibit 123 -- Exhibit -- Exhibit

 9  123 was also produced from your file by the DA's office,

10  and it is a witness voucher for your testimony in an

11  August 22nd, 2002 sentence reduction hearing for Jesse

12  Moreno.  Do you recognize this document?

13      A.  I do.

14      Q.  Okay.  You filled it out, correct?

15      A.  I didn't fill this out.

16      Q.  You didn't fill it out?

17      A.  No.

18      Q.  Okay.  Well, you -- you must have told someone

19  how to fill it out so you could sign it and get

20  reimbursed?

21      A.  I don't know how it got filled out.  It says

22  signed by the assistant U.S. attorney.

23      Q.  Okay.  But you recall seeing this document, you

24  recall making this -- submitting this fact witness

25  voucher?



```
 1        A.  I remember seeing this.

 2        Q.  Okay.  Now, this was never produced to

 3   Mr. Prible's defense team, was it?

 4              MS. MIRANDA:  Okay.  I'm going to object at

 5   this point, and I know we're going to continue --

 6              MS. SCARDINO:  Well, hold on.  Let me

 7   finish --

 8              MS. MIRANDA:  Okay.

 9              MS. SCARDINO:  -- my sentence.

10              MS. MIRANDA:  Okay.

11        Q.  (BY MS. SCARDINO)  This was never produced to

12   Mr. Prible's defense team, was it?

13              MR. DOYLE:  Objection.

14        A.  Why would it be?

15        Q.  (BY MS. SCARDINO)  I'm just asking you if it

16   was ever produced to Mr. Prible's defense team?

17        A.  This piece of paper having to do with Jesse

18   Moreno, you're asking me why I didn't produce this to

19   Jeffrey Prible's defense team?

20        Q.  I'm asking if you did produce it to their

21   defense team?

22        A.  No.

23        Q.  Okay.  Now, the hearing for Mr. Moreno that

24   this references was in Lafayette, Louisiana, right?

25        A.  I was instructed that that hearing was
```



 1  confidential and that I was never to talk about it or of

 2  it to anyone, by a federal judge.

 3       Q.  Okay.

 4               MS. SCARDINO:  Objection, nonresponsive.

 5               MR. DOYLE:  Wait a second.  If -- if it's

 6  something that's under -- under the Court -- federal

 7  judge's order, what are we going to do?

 8               MS. SCARDINO:  Yes.  Actually, I can take

 9  care of that.  We have a protective order in this case.

10  We were able to get that file from the Court in

11  Lafayette.  We have a protective order.  It's under

12  seal.  It's not to be used outside of this.

13               MR. DOYLE:  So, you have the information on

14  that?

15               MS. SCARDINO:  I do.  I do.

16               MR. DOYLE:  Okay.

17               MS. SCARDINO:  Yeah.

18               MR. DOYLE:  And so, would this portion of

19  this record be sealed?

20               MS. SCARDINO:  Yes.

21               MR. DOYLE:  Okay.

22               MS. SCARDINO:  I'm going to ask that it be

23  sealed, and I'm going to ask that the document itself,

24  the --

25               MR. DOYLE:  That's fine.



1          MS. SCARDINO:  -- hearing transcript be

2    sealed.  Now, this was in her file.  This is not under

3    the protective order.

4          MR. DOYLE:  Okay.

5          MS. SCARDINO:  123.  Okay?  And when we go

6    on break for lunch, I'll show you that protective order.

7          MR. DOYLE:  Okay.

8          MS. MIRANDA:  Can we take just a really

9    super quick break?  I just need to consult with them

10   really quickly about something?  Are we almost --

11         MS. SCARDINO:  Okay.

12         MS. MIRANDA:  -- done with this line of

13   questions?

14         MS. SCARDINO:  Yeah, we're almost done with

15   this line of -- I mean --

16         MR. DOYLE:  Well, she needs to get an

17   answer to this, though, right?  That's what your caucus

18   is about?

19         MS. MIRANDA:  Well, I'm a little concerned

20   about --

21         MS. SCARDINO:  Oh, about the protective

22   order?

23         MS. MIRANDA:  -- about the line of

24   questioning, and so --

25         MS. SCARDINO:  Well, we can -- okay.  Well,



 1 | why don't you make your --
 2 |           MR. RYTTING:  Make your objection.
 3 |           MS. SCARDINO:  -- question to me on --
 4 | yeah, go ahead and make it on the record.
 5 |           MR. RYTTING:  Just object.
 6 |           MS. MIRANDA:  I'll just make my objection
 7 | on the record.
 8 |           MS. SCARDINO:  Yeah.  Yeah.
 9 |           MS. MIRANDA:  And then we'll just keeping
10 | going.  All right.  But I'm going to object at this
11 | point with the depth and detail into which we are going
12 | into the Herrero case because the Herrero case is only
13 | relevant to this proceeding to the extent that it
14 | informed her knowledge of the informants in the -- in
15 | the penitentiary.
16 |           And so, I'm going to object that we might
17 | be using this deposition as discovery in another case
18 | for a defendant that he's representing.
19 |           MS. SCARDINO:  Okay.  Tina, that's an
20 | improper objection under the Rules and it's coaching of
21 | the witness, and you know as well I do that there is no
22 | restriction on this deposition --
23 |           MR. DOYLE:  You just --
24 |           MS. SCARDINO:  -- to the matters between
25 | Prible versus matters regarding Herrero.



 1              MS. MIRANDA:  Okay.  We are in a litigation

 2   about a client.  The fact that you can depose this

 3   person with respect to Mr. Prible does not -- that --

 4   there are restrictions.  There's restrictions to the

 5   scope of this case.  You can't depose her for discovery

 6   for every other case that he represents her in.

 7              And I understand that the judge was upset

 8   about us coming to him but I -- that is something that I

 9   will go back to the judge on.  You -- you don't get

10   permission to depose a witness in a case about a thing

11   and then you get to go into all that.

12              Now, I understand -- I'm saying that I

13   understand there's some leeway with the Herrero case but

14   I'm objecting because it appears that we're going into

15   discovery matters for that case and not this case.

16              MR. RYTTING:  Look --

17              MS. SCARDINO:  Okay.  Let's go ahead and go

18   off the record and we're going to have call the judge

19   again because this is related to Mr. Prible's matter --

20   case.

21              MS. MIRANDA:  Okay.

22              MS. SCARDINO:  The Herrero and Prible cases

23   are interrelated.  This is what our motion for the

24   depositions and motion for discovery was about, which

25   was granted by the Court.



1            MS. MIRANDA:   Okay.   And if you -- before

2    we do that, if you could just give me a few minutes to

3    consult with them, then maybe we can come to -- I can

4    figure that out.

5            MS. SCARDINO:   That's fine.

6            MS. MIRANDA:   Okay.

7            THE VIDEOGRAPHER:   The time is 12:25.

8    We're off the record.

9            (Lunch recess.)

10           THE VIDEOGRAPHER:   This is the beginning of

11   file 5.   The time is 1:20.   We are on the record.

12      Q.   (BY MS. SCARDINO)   Okay.   Ms. Siegler, earlier

13   we were talking about the open file policy that you said

14   the DA's office had during this time period that

15   Mr. Prible was prosecuted, and in that -- when a defense

16   attorney came in to view the file, would they be able to

17   take notes of what they were reading?

18      A.   Yes.

19      Q.   But they would not be able to make copies of

20   the documents in the file; is that right?

21      A.   Correct.

22      Q.   And you testified that you had no work product

23   file that you kept as such, correct?

24      A.   Not per se, not necessarily, no.

25      Q.   Okay.   And that is because all of your work



1  product would have been reviewable by the defense,

2  right?

3      A.  I'm trying to think of what work product might

4  have come up in Prible early on.  I can't think of what

5  it would have been.

6      Q.  Okay.

7      A.  But my notes I wouldn't have considered work

8  product.

9      Q.  Okay.  All notes -- any notes that you took

10  working on this case would have been available to

11  defense attorneys to see; is that right?

12      A.  Yes.

13      Q.  Okay.  And how do you define work product?

14  What's your understanding of that definition?  The legal

15  definition of work product.

16      A.  We tried to keep most things not work product

17  just because it was simpler.

18      Q.  Okay.  Do you -- do you know what the term

19  "work product" -- how it's defined under the law?

20      A.  Tell me.

21      Q.  No, I'm asking you if you -- if you know?

22      A.  No, I don't know the criminal definition of it.

23          THE VIDEOGRAPHER:  I'm sorry, Ms. Scardino,

24  can you put on the microphone.

25          MS. SCARDINO:  I'm sorry.



1    Q.  (BY MS. SCARDINO)  Okay.  There were other

2  nontestifying informants that were involved in the

3  Prible case; isn't that right?

4    A.  I remember Michael Beckcom but Michael Beckcom

5  testified.

6    Q.  Okay.  Do you remember discussing Mr. Prible's

7  case with other inmates other than Mr. Foreman and

8  Mr. Beckcom in FCI Beaumont?

9    A.  I don't remember.  I could have but I'm not

10  sure if I did there or where or who it would have been.

11    Q.  Okay.  I'm going to show you Exhibit 112.  And

12  you see on the last page of this Exhibit 112 it says the

13  letter was received by you on May 22nd, 2002?  Do you

14  see that?

15    A.  Just a second.

16    Q.  Okay.

17    A.  Okay.

18    Q.  Okay.  And this letter to you is from Jesse

19  Gonzalez and Felix Gonzalez.  Do you see that at the

20  top?

21    A.  I do.

22    Q.  Okay.  Do you remember Mr. and Ms. -- or

23  Mr. Jesse Gonzalez and Felix Gonzalez?

24    A.  I never met them.

25    Q.  Okay.  Do you recall that they were -- I'm just



 1  asking you if you -- if you remember them.  Do you

 2  remember them?

 3      A.  I never met them.  I remember getting this

 4  letter.

 5      Q.  Okay.  Do you remember that they're a

 6  father/son duo that's incarcerated together in FCI

 7  Beaumont?

 8      A.  Only from this letter.

 9      Q.  Okay.  But you did -- you remember receiving

10  this letter in May of 2002?

11      A.  Yes.

12      Q.  Okay.  And in this letter, Mr. Gonzalez said

13  that he and his father have spoken to you twice on the

14  phone about the Prible case, right?

15      A.  That's what he says.

16      Q.  Okay.  And he -- do you recall speaking to him

17  on the phone about the Prible case?

18      A.  I do not.

19      Q.  Do you -- do you just not remember or did you

20  not -- let me ask that question more clearly.

21          Did you ever speak on the telephone with

22  the Gonzalezes about Mr. Prible's case?

23      A.  Not that I remember, no.

24      Q.  Not that you recall, no?

25      A.  (Witness indicated by shaking her head



 1 | negatively.)

 2 |     Q.  Okay.  And you notice in this letter that the

 3 | word "Prible" is misspelled, do you see that?

 4 |     A.  I do.

 5 |     Q.  With two Bs instead of one?

 6 |     A.  Correct.

 7 |     Q.  Okay.  And Mr. Gonzalez, in this letter, also

 8 | mentions a newspaper article that he had recently seen

 9 | about the case while he was in prison, right?

10 |     A.  He does.

11 |     Q.  Okay.  Now, was it your practice with

12 | informants if someone reached out to you with

13 | information about a case and you spoke with them on the

14 | phone to ask them to write you a letter detailing what

15 | they knew about the case?

16 |     A.  No.

17 |     Q.  That wasn't a practice that you had?

18 |     A.  No.

19 |     Q.  Did you ever ask any informant to put down what

20 | they knew in writing and send it to you?

21 |     A.  I did not.

22 |     Q.  Did you ever tell potential informants to take

23 | a prison photograph with the defendant that they were

24 | working to testify against?

25 |     A.  I saw that in your petition where you said I



 1 | did that.  That is a lie.

 2 |     Q.  I'm just asking you.  So, you deny that you

 3 | ever did that?

 4 |     A.  I did not.

 5 |     Q.  Okay.  But you are aware of such informant

 6 | photos, correct?

 7 |     A.  I saw the picture.

 8 |     Q.  Okay.  When was the first time you saw that

 9 | informant photo?

10 |     A.  I don't know if I first saw it at Beaumont or

11 | when -- when Beckcom got back to Harris County right

12 | before the trial.

13 |     Q.  But you saw the photos prior to the trial of

14 | this case?

15 |     A.  Yes.

16 |     Q.  Okay.  And they were shown to you by Beckcom?

17 |     A.  I think it was Beckcom.

18 |     Q.  Okay.

19 |     A.  But I'm not sure about that either.

20 |     Q.  Okay.  Now, parts of this letter from

21 | Mr. Gonzalez don't make sense, right?

22 |     A.  They do not.

23 |     Q.  Okay.  And what was your take on this letter

24 | when you received it?

25 |     A.  Mr. Gonzalez was trying to glom on and put



1  himself in the middle of a case to try and get himself a

2  deal, like every other inmate in federal prison.

3      Q.   Okay.  And did you believe his story from this

4  letter that he had heard Mr. Prible confess?

5      A.   I did not believe his story for lots of

6  reasons.

7      Q.   Also, if you notice in this photo -- in this

8  Exhibit 112, Mr. Gonzalez says that he knew about Jeff

9  and Jeff's case before Jeff even got to the medium from

10  the low.  Did you see that?

11      A.   I did see that.

12      Q.   Okay.  How might an inmate know that another

13  inmate is going to be transferred to their unit of the

14  prison?

15          MS. MIRANDA:  Objection, form.

16      A.   I have no idea.  I didn't believe what this

17  letter had to say.

18      Q.   (BY MS. SCARDINO)  And is that why you decided

19  not to have Mr. Gonzalez testify against Prible in his

20  case, because you determined that he was not credible?

21      A.   Correct.

22      Q.   Okay.  Did you ever show Mr. Gaiser or

23  Mr. Wentz this letter from Mr. Gonzalez?

24      A.   It would have been in the file.

25      Q.   Okay.  So, your -- your testimony is yes, you



1  did show it to them?

2      A.  I don't know if they looked at it or not.  It

3  would have been in the file.

4      Q.  It would have been in the file that you gave

5  them to review when they came into your office to review

6  the file?

7      A.  Correct.

8      Q.  And do you have any written record of what was

9  in that file that you gave them to review?

10     A.  No.

11     Q.  Okay.  You never made any notes about

12  specifics?

13     A.  The file was an open file.  I've known Terry

14  Gaiser for years.  Any time he wanted to read the file,

15  he could come.  I would even bring it to court for him

16  to read during docket call.  "Here it is, Terry.

17  Knock -- knock yourself out."

18     Q.  Now, Exhibit 113 -- Exhibit 113 is a letter

19  from Carl Walker, another inmate in FCI Beaumont, to you

20  about Mr. Prible's case.  Do you recognize this letter?

21     A.  I do, but this is the only letter I noticed you

22  all talk about in your petition where you don't have the

23  envelope attached with the date.  I'd like to see the

24  date, please.

25     Q.  Well, I'd like to see it also but it wasn't



1  produced to us from your file.

2       A.  That's odd.

3       Q.  Do you think it should be in your file

4  somewhere?

5       A.  You should ask him that.

6       Q.  Well, I'm asking you because you know what's in

7  the file.  Would you have kept that --

8       A.  Yes.

9       Q.  -- in your file?

10      A.  Yes.

11      Q.  Okay.  So -- and it would be -- and in your

12 mind, we should be able to review the entire file,

13 right, that you had in this case?

14      A.  No, I just want to know where the envelope is

15 because you've attached the rest of the envelopes.

16      Q.  Right.  I've attached everything that was

17 given -- I'll represent to you that was produced to us

18 by the DA's office.

19           So, you've seen this letter before.  Do you

20 recognize it?

21      A.  Okay.

22      Q.  Okay.  Now, why did you not use Carl Walker to

23 testify against Mr. Prible?

24      A.  I didn't believe him.

25      Q.  Okay.  Did you ever speak with him on the



 1  phone?

 2      A.  I don't even remember the name of Carl Walker.

 3  Unlike the other inmates whose names I do recognize, I

 4  don't remember Carl Walker's name.

 5            And I also notice in this letter that he

 6  talks as if Prible had already been indicted, unlike the

 7  others, which, again, makes me wonder where is the

 8  envelope that went with this letter.

 9            MS. SCARDINO:  Objection, nonresponsive.

10      Q.  (BY MS. SCARDINO)  And I would very much like

11  to see that envelope also, I would represent to you.

12  So --

13            Okay.  So, you chose -- you decided not to

14  use Mr. Walker because you thought he was not credible?

15      A.  Based on what he's saying here --

16      Q.  What he's saying here?

17      A.  -- it doesn't make sense.

18      Q.  Okay.  But you're saying that you showed this

19  letter to Mr. Prible's defense team?

20      A.  I'm saying it was in the file.

21      Q.  So, you can't say for certain that you showed

22  this letter to Mr. Prible's defense team?

23      A.  I don't know what they read.  The file was open

24  for them to read whatever they wanted.

25      Q.  Let's look at Exhibit 114.



1              MR. DOYLE:  Thank you.

2         Q.  (BY MS. SCARDINO)  Exhibit 114 is a letter from

3    Mark Martinez, another inmate at FCI Beaumont, to you.

4    And if you look on the third page, there's an envelope

5    that's dated April 30th, 2002.  Do you see that?

6         A.  Just one second.

7         Q.  Okay.

8         A.  Okay.

9         Q.  Okay.  Now, why didn't you use Mr. Martinez in

10   your case against Mr. Prible?

11        A.  Because it's pretty obvious that he's just

12   trying to jump on the bandwagon of what all they're all

13   saying to each other out there.  He's trying to say

14   whatever he can to act like he knows something he

15   doesn't know for a time cut, like every other inmate in

16   federal prison.  I didn't believe him either.

17        Q.  And -- and when you say talking about things --

18              MS. SCARDINO:  I'm sorry, if you could read

19   back her statement on that just so I get right.

20              MR. DOYLE:  Something about time cut.

21              MS. SCARDINO:  Something about all the --

22   all the other inmates that were talking about the case.

23        A.  That's what he said.

24        Q.  (BY MS. SCARDINO)  Right.

25        A.  They were all talking about it.



1    Q.  Okay.  Okay.  So, he said that all -- and you

2   got this -- you received this letter from him about four

3   months before Mr. Prible's trial -- six months -- about

4   six months before Mr. Prible's trial?

5    A.  Yes.

6    Q.  Okay.  So, it looks like you had several

7   inmates in FCI Beaumont auditioning for this role of

8   informant against Mr. Prible, right?

9    A.  Federal inmates audition for any role they have

10   on any case they can think of with any information they

11   might hear to try and get a time cut.  That's what

12   federal inmates do all day long 24 hours a day every day

13   of the year.

14    Q.  Yeah.  So, you knew that they were doing this

15   before Mr. Prible's trial, right?

16    A.  I'm not stupid.

17    Q.  Okay.  But your testimony is that you gave each

18   of these informant letters to Mr. Defense -- or

19   Mr. Prible's defense counsel prior to his trial, right?

20    A.  My testimony is these letters were in the file.

21    Q.  Okay.  So, you can't say for sure whether you

22   gave these to Mr. Gaiser and Mr. Wentz?

23    A.  I don't know what he read.  I didn't babysit

24   his note taking and what he pulled out of the file to

25   read.



1      Q.  Now, if you look at these letters, if you line

2  them up side by side, do they look to you like they

3  might have been typed up by the same person?

4      A.  They --

5              MS. MIRANDA:  Objection, form.

6      A.  They have similarities.

7      Q.  (BY MS. SCARDINO)  I'm going to show you

8  Exhibit 127.  And, again, we don't have the envelope for

9  this letter that would show the date that it was mailed

10  to you but it's from Michael Beckcom, another inmate at

11  FCI Beaumont who eventually testified against

12  Mr. Prible, correct?

13      A.  Okay.  What was your question?

14      Q.  You remember receiving this letter?

15      A.  Not this one.

16      Q.  Okay.  Well, I'll represent to you that it was

17  produced by the DA's office from your file.

18              Okay.  Now, does this letter have

19  similarities to the other inmate letters?  The

20  similarities you just mentioned, aren't they --

21      A.  The language in the body are nothing alike.  I

22  would think that they all had to use the same typewriter

23  in whatever office they were allowed to use for their

24  allotted time of day.  So, the typewriter is probably

25  going to be the same.



1      Q.   Okay.  And the formatting of all of these is

2   the same, the indentions, the spacing, et cetera?

3      A.   That is the same.

4      Q.   Okay.  Now let me show you Exhibit 180.  This

5   is a letter typed up by Michael Beckcom found in his

6   Port Aransas -- or his Aransas County capital murder

7   case, from that file.  Do you see the same similarities

8   in this -- the formatting of this letter as in these

9   other informant letters?

10     A.   I see that they look like they could be the

11  same typewriter.

12     Q.   Okay.  Did it ever occur to you that these

13  Exhibits 112 through 114, those informant letters could

14  have been typed up by the same person?

15     A.   They might have been.  I don't know.  I think

16  the similarity is the typewriter.

17     Q.   Did it raise a red flag to you when you

18  received these letters that they all looked the same?

19     A.   Yes.

20     Q.   And did -- and that red flag to you was that

21  they could have been typed up by the same person?

22     A.   I don't know if I thought that.

23     Q.   Okay.  What was the red flag that you were

24  referring to?

25     A.   Well, the main red flag was between -- or in --



 1  in comparing the two letters written by -- the Jesse and

 2  Felix Gonzalez letter compared to the Carl Walker

 3  letter.  To me, those are the ones that raise -- and

 4  Mark Martinez, those raise the red flags.

 5      Q.  Okay.  And it was obvious that these guys were

 6  talking about this case on the yard together?

 7      A.  Jesse Gonzalez, Felix Gonzalez, Carl Walker and

 8  Mark Martinez, yes.

 9      Q.  Okay.  But it wasn't obvious to you that they

10  were speaking about this case with Mr. Beckcom even

11  though he had --

12      A.  Not based on this letter.  It has nothing to do

13  with Prible.

14      Q.  And not -- and not looking at the substance of

15  the letter --

16      A.  But that's what we're talking about.

17      Q.  -- the for -- excuse me -- the formatting of

18  the letter, did it appear to you that they were all

19  typed up by the same person?

20      A.  No.

21      Q.  Okay.  In looking at it still, you disagree

22  that Mr. Beckcom had typed up all of those letters?

23      A.  I would have no way of knowing that.

24      Q.  Okay.  And it didn't even cross your mind at

25  the time that he could have been typing up those



 1  letters?

 2        A.  No, ma'am.

 3             MS. SCARDINO:  I'm going to backtrack just

 4  a minute to -- James, to put on the record that

 5  agreement that we --

 6             MR. DOYLE:  Okay.

 7             MS. SCARDINO:  -- made earlier because I

 8  forgot to do that when we started.

 9             (WHEREUPON, SEALED PROCEEDINGS HAVE BEEN

10  REMOVED AND BOUND SEPARATELY.)

11        Q.  (BY MS. SCARDINO)  I'll show you Exhibit 176.

12  It's an affidavit you filed in the state habeas hearing,

13  Hermilio Herrero's habeas proceeding.  I'm sorry.  And

14  you signed that affidavit on March 22nd, 2016; is that

15  correct?

16        A.  Okay.

17        Q.  Okay.  Nowhere in that affidavit do you say

18  that you traveled to Louisiana and testified in

19  Mr. Moreno's Rule 35 hearing, does it?

20        A.  Why would it?

21        Q.  I'm just asking you if it does.  Does that

22  appear anywhere in there?

23        A.  It does not.

24        Q.  Now, moving on, there was a criminal history

25  report for Nathan Foreman that we talked about earlier.



1  Does the defense -- they don't have equal access to

2  those reports, correct?

3      A.  They do.

4      Q.  They do?

5      A.  Yes.

6      Q.  How does a defense attorney go about running a

7  criminal history report?

8      A.  He opens the DA's file and looks at the

9  criminal history.

10     Q.  Okay.  I understand that.  Is there any way

11 that the defense attorney would be able to see that

12 criminal history report if he wasn't looking at it in a

13 file at the DA's office?

14     A.  Hire a private investigator and they get the

15 criminal history for them.

16     Q.  Okay.  What was your policy regarding giving

17 criminal history printouts that you had printed for

18 witnesses and for alternate suspects, what was your

19 policy about giving those over to the defense?

20     A.  We gave them over to the defense.

21     Q.  You gave all of the ones that you had run for

22 all witnesses, you gave them to the defense?

23     A.  What do you mean "all"?  We're talking about

24 which case?

25     Q.  In -- in Mr. Prible's case.



1      A.  Can you rephrase the question?

2      Q.  Sure.  Let's see.  You -- let's see.  I can

3  show you each of these, if you'd like, if you feel like

4  you need to see them, or I can just tell you the names.

5      A.  I gave the defense the criminal histories of

6  every witness that testified in the Prible case.

7      Q.  Okay.  If a witness did not testify, you didn't

8  give them that criminal history, right?

9      A.  Who are we calling a witness?  I don't call

10  Nathan Foreman a witness.

11      Q.  You don't call him a witness?

12      A.  Not in the Prible case.

13      Q.  Okay.  Was he a witness for you in the Herrero

14  case?

15      A.  He tried to be.

16      Q.  Okay.  Now, he had knowledge about Prible's

17  case, right?

18      A.  He was lying.

19      Q.  Okay.  But he was connected to Prible's case

20  because he came to speak with you about it, correct?

21      A.  He's still lying.

22      Q.  Okay.  So, you did not -- okay.  So, you didn't

23  give a criminal history report for Nathan Foreman to the

24  defense to Prible's case?

25      A.  He wasn't a witness.



1      Q.  Okay.  Did you give Exhibit 87 -- this is a

2    criminal history report for a Beaumont -- FCI Beaumont

3    inmate named Jonathan Jefferson that was found in your

4    file.  Mr. Jefferson did not testify in Mr. Prible's

5    case.  Did you give this Exhibit 87 to defense counsel?

6      A.  I don't know who Jonathan Jefferson is, and I

7    don't know what Terry Gaiser chose to take notes from in

8    the file.

9      Q.  Okay.  But you just said that you only gave the

10   criminal history reports for testifying witnesses,

11   right?

12     A.  I said that I know for sure I gave them

13   criminal history reports for testifying witnesses.

14   There could have been other ones in the file that Terry

15   might have looked at.  I don't know what he took notes

16   from.

17     Q.  You don't have -- you don't have any

18   independent recollection of giving him this criminal

19   history report of Jonathan Jefferson, do you?

20     A.  I do not.

21     Q.  Exhibit 86 is a criminal history report for a

22   man named James Martin.  Again, he did not testify in

23   Mr. Prible's case, so, you would not have given this

24   exhibit to Mr. Prible's defense counsel, correct?

25     A.  I don't know who James Martin is.



1      Q.  Was he an alternate suspect in this case?

2      A.  I have no idea who he is.

3      Q.  I'm going to show you Exhibit 106.  It's part

4  of that criminal history report with Mr. Martin with

5  some notes down at the bottom.

6           MS. MIRANDA:  I don't have a copy of that

7  one.

8           MS. SCARDINO:  I'm sorry.

9           MS. MIRANDA:  Thanks.

10     Q.  (BY MS. SCARDINO)  Is that your handwriting?

11     A.  It is.

12     Q.  Okay.

13     A.  This is Johnny Bonds' handwriting.  The bottom

14  is my handwriting.

15     Q.  Yes, the bottom is your handwriting.  Okay.

16  And if you could read that handwriting into the record,

17  your handwriting.

18     A.  "Nothing has ever happened between this witness

19  and defendant per Martin 9-10-02."

20     Q.  And the next --

21     A.  "Knew" --

22     Q.  Sorry.

23     A.  "Knew nothing regarding complainant and

24  defendant's activities and no recall day of money in the

25  bag."



1    Q.  So, from these notes, it looks like you reached

2  out to this James -- James Martin to follow up on a

3  statement that someone had given you in this case?

4    A.  I wouldn't say reached out.  I would say I

5  talked to him, whether it was on the phone or in person.

6  These are my notes talking about that conversation.

7    Q.  Okay.  I'm going to show you Exhibit 43.  This

8  is a statement of Jamie Diane Lyons given on April 29th,

9  1999.  And if you go to the second page, the first

10  paragraph, it says, "I don't know of any enemies that

11  Steve might have.  The only friends of his that I met

12  were James Martin, lives in Woodgate subdivision on

13  Lemonwood, and a white guy who I've since learned to be

14  Jeff Prible.  About seven months ago, Steve, Crystal and

15  I were at James' house on Lemonwood when Jeff came over

16  with a baby shower bag full of money.  The whole bag was

17  full of cash."  Do you see that?

18    A.  I do.

19    Q.  Okay.  Did you contact Mr. Martin in order to

20  check out whether Jamie Lyons' story was correct?

21    A.  I don't remember but that would make sense.

22    Q.  Okay.  And he -- and from looking at your

23  notes, it looked like he gave you a different story than

24  Ms. Lyons gave in her statement; is that right?

25    A.  It looks like he told me he didn't remember



 1 anything about this baby bag full of money.

 2      Q.  That's right.  And these notes of yours were

 3 never presented -- or disclosed to Mr. Prible's attorney

 4 before his trial, were they?

 5      A.  About Jamie Lyons and the baby bag full of

 6 money?

 7      Q.  No.  Your notes on Exhibit 106 about your

 8 conversation with this witness, James Martin.

 9      A.  I don't know if they were or not.  This

10 statement was in the file of Jamie Lyons.  The name of

11 James Martin was in her statement for Terry Gaiser to

12 follow through with himself.  I don't know if Terry

13 Gaiser took notes from this or not, No. 106.

14      Q.  Do you think it was sufficient to give the

15 defense attorneys the name of a witness to disclose --

16 or to -- let me -- let me restate that.

17           In order to fulfill your Brady obligations

18 as a prosecutor, do you believe it was sufficient to

19 simply give the name of a witness to defense counsel

20 without giving the context of what that particular

21 witness had spoken to you about?

22      A.  That's not what I said.

23      Q.  I'm asking you --

24      A.  I do not.

25      Q.  -- if that's your belief?  You do not?



1      A.  Not if I have exculpatory information, no.

2      Q.  Okay.  You're required to give --

3      A.  The exculpatory information.

4      Q.  -- the substance of that exculpatory

5   information?  Okay.  But I believe you said that you

6   gave the name of James Martin to Terry Gaiser and it was

7   up to him to follow through on this?

8      A.  I didn't say that.

9      Q.  That's not your -- your testimony?

10      A.  No.  That's not what I said.  I said this

11   statement was in the file.  The name of James Martin was

12   in the statement, and these notes specifically were also

13   in the file.  Whether Terry Gaiser read it or not, I

14   don't know.  I don't know what Terry Gaiser read.

15      Q.  Exhibit 154, if we can find that.

16              MR. DOYLE:  What does it look like?

17              MS. SCARDINO:  That's the --

18              THE WITNESS:  Office manual.

19              MS. SCARDINO:  -- office manual.  Here's a

20   copy if you need one.

21              MR. DOYLE:  Thank you.  I've got it,

22   thanks.

23      Q.  (BY MS. SCARDINO)  And the office manual had --

24              MR. DOYLE:  I'm going to give it back to

25   you, Gretchen.



 1              MS. SCARDINO:  Okay.

 2       Q.  (BY MS. SCARDINO)  The office manual had

 3  guidelines regarding the use of informants, correct?

 4       A.  I don't remember what all it had.  It was -- it

 5  was this thick.

 6       Q.  Right.  It was very thorough --

 7       A.  Yes.

 8       Q.  -- would you say?

 9       A.  Yes.

10       Q.  And the reason it would have had guidelines

11  about the use of informants is because as -- as we've

12  just discussed, prison inmates are notoriously

13  unreliable, right?

14       A.  They lie.

15       Q.  They lie.  Everyone in jail wants a time cut?

16       A.  Yes.

17       Q.  Everyone wants out?

18       A.  Yes.

19       Q.  And so, the office needed to have guidelines

20  regarding the vetting and the usage of informants and

21  the benefits that were exchanged with informants for the

22  purpose of transparency, right?

23       A.  I didn't write the guideline.  I don't know

24  what their thinking was.  This -- the -- the Harris

25  County DA's office guidelines were written way before I



 1 | got there.

 2 |     Q.  Okay.  But you were familiar with these

 3 | guidelines as a prosecutor, right?

 4 |     A.  Yes.

 5 |     Q.  Okay.  So, if you look at Page 15 of this

 6 | exhibit, it contemplates two situations when informants

 7 | might be used, right?  And one such circumstance was

 8 | where the defendant had a case pending and he and his

 9 | attorney decided -- or sought to have him become an

10 | informant to work off the case.  Do you see that?

11 |     A.  I do.

12 |     Q.  And if the trial bureau prosecutor had no

13 | objections to that arrangement, it would be referred to

14 | the Special Crimes Bureau for approval.  The Special

15 | Crimes prosecutor enters into a contract with the

16 | defendant and his attorney and notifies the trial

17 | prosecutor when the contract is completed or not

18 | completed.  Do you see that?

19 |     A.  I do.

20 |     Q.  Okay.  And the second situation in -- in which

21 | informants might be used was where the defendant had a

22 | case pending, again, and a police officer who has used

23 | the defendant as an informant in the past requests

24 | special consideration in the form of a lenient sentence,

25 | and in that case, the trial bureau prosecutor would make



1  the determination of whether such consideration ought to

2  be given and then must follow and it lists a procedure.

3  Do you see that --

4       A.  I do.

5       Q.  -- that must be followed?

6       A.  I do.

7       Q.  Now -- so, the DA manual contemplates two

8  situations when informants might be used, right?

9       A.  No.

10      Q.  And --

11      A.  These are two specific unique situations,

12 working off a contract and when a cop wants to work his

13 own informant, completely separate than what we've been

14 talking about all day.

15      Q.  And -- and that -- that was my next question.

16 Neither of these situations applied to this case, right?

17      A.  Correct.

18      Q.  Okay.  If the second situation would have

19 applied, the guidelines required several people to sign

20 off on the use of an informant, right?

21      A.  It's a whole different situation.

22      Q.  Okay.

23      A.  It's not anything like using an informant as a

24 witness in another case.

25      Q.  Okay.



 1           MS. SCARDINO:  Objection, nonresponsive.

 2      Q.  (BY MS. SCARDINO)  Let's look at the section --

 3  Section 2.  It said if that section would have applied,

 4  "The requesting officer must produce his request in

 5  writing with approval of a supervisor of the grade of

 6  lieutenant or above attached thereto.  The chief of

 7  Special Crimes or one of the members of the organized

 8  crime division must be notified to determine if the

 9  informant has good, bad or no past history with regards

10  to information furnished.  Both the chief prosecutor in

11  the trial court and the first ADA must approve such

12  special consideration in writing, which shall become

13  part of the file.  Additionally, Special Crimes shall

14  log the special consideration information in a

15  well-bound book kept for such purposes.  It is the trial

16  bureau prosecutor's responsibility to ensure that such

17  information is communicated to Special Crimes."  Do you

18  see that?

19      A.  I do.

20      Q.  So, in these two -- in these two situations in

21  which the use of informants might be contemplated, no

22  fewer than, I believe, six people had to sign off -- or

23  five people had to sign off on the use of that

24  informant; is that right?

25      A.  No.  Do you want me to explain?



1    Q.  No.  I'm asking you in -- in what I just read,

2    if the second situation would have applied, the

3    guidelines required several people to sign off on the

4    use of that informant, right?

5    A.  It's the working off of contracts that's the

6    issue here, not the use of the informant.  We didn't

7    want cops taking -- taking it upon themselves to work

8    off dope cases or to work their informants and a cop's

9    unilateral decision, a narc on the street making that

10   call without going through us.  It's the working off of

11   the contract that's at issue here, not the use of the

12   informant necessarily.

13   Q.  Okay.  So, if you were dealing with an -- an

14   informant who was just trying to work off a drug case,

15   like a narc case, then this would have applied?

16   A.  This is -- this is -- this is to put an

17   informant on the streets to work off a case the cop has

18   on him by trying to sell more dope by hooking him up

19   with the bigger guy up the chain.  The goal was to get

20   the bigger guy up the chain.

21       And our reason for this rule was to stop

22   the cops from doing it out there willy-nilly without us

23   knowing what was going on and making those deals.

24   Q.  Okay.

25   A.  Nothing to do with simply testifying as a



 1 | snitch in a case.

 2 |     Q.  Okay.  And if -- and my question to you is if

 3 | you did have a narc case like you just described, no

 4 | less than five people would have had to sign off on

 5 | that, right, according to this?

 6 |     A.  There were -- there were a lot.  I was the boss

 7 | of Special Crimes.  There were a lot.

 8 |     Q.  Okay.  And that was my next question.  Were you

 9 | Special Crimes -- you -- at this point, you were in

10 | Special Crimes.  So, you would have had to have been one

11 | of the people that signed off on the use of the

12 | informant for that working off a contract type case?

13 |     A.  The contract.

14 |     Q.  Is that correct?

15 |     A.  We didn't want -- we didn't want a cop working

16 | off 20 kilos of cocaine by having some street guy going

17 | and buying some marijuana and saying, "Oh, we're all

18 | good.  Special Crimes, let his case go."  It's the

19 | contract that was the problem.  We wanted to know every

20 | deal going on with drug cases with contracts.  We wanted

21 | to be aware of it.

22 |     Q.  And the reason it was so important in that case

23 | to have so many people sign off on the use of an

24 | informant was so they could vet that informant's

25 | credibility, right?



1     A.  It was really to watch the cops, to be honest

2  with you.

3     Q.  Okay.

4     A.  We didn't want cops deciding all by themselves

5  who they were going to work off.  We wanted to decide.

6     Q.  Okay.  So, the reason it was important was

7  transparency, you didn't want the cop to be able to do

8  something that you all were unaware of, right?

9     A.  We -- we didn't like the whole concept of

10  working off dope cases -- of working off dope cases that

11  way anyway but this was to watch the cops.

12     Q.  Okay.  Now, it refers -- the passage I read

13  earlier refers to a well-bound book.  What is that book

14  and where can I find it?

15     A.  It wasn't really a well-bound book.  When I was

16  involved with this, it was like a folder passed down

17  forever with contracts in it.  And the whole time I was

18  in Special Crimes, I don't know if I ever even saw a

19  contract.  That's how rare they were because we didn't

20  like them.

21     Q.  Why didn't you like them?

22     A.  We didn't want the cops doing it.  If you had a

23  dope case, you had a dope case.  Take it to court.  Take

24  it to trial.  Don't work it off on the streets because

25  they never got the bigger guy.



1        Q.  So, now when you --

2        A.  They would just get more dope.  It didn't solve

3   any problems.

4        Q.  So, when used an informant in another context

5   to testify in a case against you, you wouldn't enter

6   into a contract with that informant?

7        A.  Like this?

8        Q.  No, just -- I'm just asking would you enter

9   into a written contract with that informant?

10       A.  Not under circumstances like the Herrero or

11  Prible case, no.

12       Q.  What about other circumstances, would you ever

13  enter into a contract with an informant?

14       A.  On immunity agreements, which were as rare as

15  contracts, it was written down.

16       Q.  Okay.  Nothing was stopping you from putting

17  the agreement that you had with an informant into the

18  form of a written contract, right?

19       A.  It was pretty transparent because I told the

20  jury what the deal was.

21            MS. SCARDINO:  Objection, nonresponsive.

22       Q.  (BY MS. SCARDINO)  There was no one at the DA's

23  office that said, "You can't put your deal with an

24  informant in writing," right?

25       A.  We didn't need to.  We told the jury.



1           MS. SCARDINO:  Objection, nonresponsive.

2      Q.  (BY MS. SCARDINO)  There was no one at the DA's

3  office that said, "You can't put a deal with an

4  informant in writing," was there?

5      A.  There was no rule that said I couldn't do that.

6  There was also no defense lawyer who ever required me to

7  do that.

8           MS. SCARDINO:  Objection, nonresponsive.

9      Q.  (BY MS. SCARDINO)  Okay.  So, you -- at least

10 with these smaller cases, these smaller drug cases that

11 were contemplated in this section that I just read to

12 you, you were the person that would have had to approve

13 the use of those informants in writing, right?

14     A.  Well, it depends on where I was in Special

15 Crimes at the time and where I was in the chain.  The

16 whole time I was in Special Crimes, I wasn't the

17 ultimate signer off.  It would have been my supervisor

18 or boss, wherever I was in that time.

19           And you said smaller drug cases, these were

20 the big drug cases.  That's why they were rare.

21     Q.  I'm sorry, I'm comparing them to a capital

22 murder case.  You have a drug case versus a capital

23 murder case, right?

24     A.  People get killed in those drug cases.  That's

25 why we didn't like the street deals.



1      Q.   Okay.  Okay.  But in a -- in a drug case in

2   which a defendant was trying to, quote, work off the

3   contract, you required -- the DA's office required that

4   informant deal to be in writing, right?

5      A.   Yes.

6      Q.   But in the case of if you're using an already

7   convicted capital murderer in a federal prison to

8   testify against another one of your capital murder

9   defendants in a state case, there needed to be no

10  writing memorializing that at all?

11     A.   It essentially was in writing.

12          MS. SCARDINO:  Object --

13     A.   The defense lawyer understood what was

14  happening who represented that inmate/witness.  It was

15  told to the jury.  It was told in opening statement.  It

16  was told on direct examination.  It was told on cross

17  examination.  And it was told in final argument.  It was

18  all out there.

19          MS. SCARDINO:  Objection --

20     A.   This was no secret.

21          MS. SCARDINO:  Objection, nonresponsive.

22     Q.   (BY MS. SCARDINO)  Did you have a written

23  contract with Mr. Beckcom in Mr. Prible's case?

24     A.   I did not.

25     Q.   Did you have a written contract with



```
 1  Mr. Foreman in Mr. Prible's case?
 2      A.  One more time, Mr. Foreman was not involved in
 3  Jeffrey Prible's case.  I know you want him to be but he
 4  was not.
 5            MS. SCARDINO:  Objection, nonresponsive.
 6      Q.  (BY MS. SCARDINO)  Did you have a written
 7  contract with Mr. Foreman for Mr. Prible's case?
 8            MR. DOYLE:  Objection, asked and answered.
 9      A.  Mr. Foreman was not involved in Mr. Prible's
10  case.
11      Q.  (BY MS. SCARDINO)  Did you enter into a written
12  contract with Mr. Moreno in the Herrero case?
13      A.  No.
14      Q.  Did you enter into a written contract with
15  Mr. Foreman in the Herrero case?
16      A.  No.
17      Q.  Did you enter into a written contract with
18  Mr. Dominguez in the Herrero case?
19      A.  No.
20      Q.  Did you enter into a written contract with
21  Mr. Eddie Gomez in the Herrero case?
22      A.  He did not testify, and I don't remember him
23  for that reason, but the answer is there was no written
24  contract for any of them.
25      Q.  Okay.  And you say that these informant
```



1  contracts were pretty rare, right?  They didn't --

2      A.  No, that's not what I said.

3      Q.  Okay.

4      A.  I said these contracts that you've talked about

5  on Page 14 and tried to make appear to be the same kinds

6  of testimony we've been discussing all day be relevant

7  are very rare.  That's what I said.

8      Q.  I'm going to show you Exhibit 162.  Exhibit 162

9  is an informant agreement made between the Harris County

10  DA's office and Vincent Flores on July 23rd, 1996.  Do

11  you see that?

12      A.  I do.

13      Q.  And this document was produced by the DA's

14  office in this case from your file.  And this is an

15  example of a contract that would be entered into by the

16  DA's office with another -- with an informant, right?

17      A.  I don't understand the relevance.  Whatever

18  this is, 162 has nothing to do with Prible or Herrero.

19      Q.  And I'm not asking you if it has anything to do

20  with --

21      A.  Your question made it sound like -- you said it

22  was produced as part of this file, as if it had

23  something to do with Prible or Herrero, and that is not

24  true.

25      Q.  Okay.  Do you know that Mr. Flores was -- was a



1  witness in Prible's case?

2      A.   I don't remember him.

3      Q.   Okay.  This -- and I'm representing to you that

4  this agreement was found in your Prible file and was

5  produced to us by the DA's office.  Do you deny that?

6      A.   I don't remember him.

7      Q.   Okay.  You don't remember him?

8      A.   I do not.

9      Q.   Okay.  Now, earlier when I was reading from

10  Exhibit 154-5 and those two informant -- the

11  contemplation of the use of an informant that we already

12  discussed did not apply in this case but in those two

13  situations, deviations from that policy could only be

14  made in writing by the DA for good cause shown by the

15  prosecutor urging such deviation, right?

16     A.   If we're talking about Page 154-5 in the

17  context of working off dope deals, contracts through

18  Special Crimes, I don't know what the deviation might

19  have been.  I never dealt with the deviation where that

20  would have arisen but if that's what the manual says,

21  that's what the manual says.

22     Q.   Okay.  Is it your testimony that nothing in the

23  policy manual addressed the situation when informants

24  would be used in the matter that -- in the manner that

25  you used them in the Prible case?



```
 1        A.  I have no idea what's in that manual.  Like I
 2   said, it's this thick.
 3        Q.  Go back to Exhibit 154.
 4               MR. DOYLE:  You gave me an extra one.
 5               MS. SCARDINO:  Oh, I did.
 6               MR. DOYLE:  Yeah, a while ago.
 7               MS. SCARDINO:  Oh, yeah.  I have it here.
 8        Q.  (BY MS. SCARDINO)  If you go to Page 16, and it
 9   addresses agreements with cooperating individuals.  Are
10   you familiar with this paragraph of the manual?
11        A.  Let me read it.
12        Q.  Okay.
13        A.  I haven't read the manual since about 1987.
14        Q.  Okay.  And I'll read it out loud --
15        A.  Okay.
16        Q.  -- along with you.  So, Exhibit 154-16 says,
17   "Agreements with cooperating individuals," and it says,
18   "Approval of such requests" --
19        A.  Where did you jump?
20        Q.  I'm sorry.  Oh, sorry.  Six lines down.
21        A.  Do you want to just read the whole thing?
22        Q.  Sure.  "It is the policy of the district
23   attorney's office that officers who wish to use persons
24   who are presently charged with an offense as informants
25   or cooperating individuals shall contact an assistant
```



1   district attorney from the organized crime division, the

2   major offender division or one of the other Special

3   Crimes divisions with such request.  Approval of such

4   request must be obtained from the Special Crimes bureau

5   chief or, in his absence, a Special Crimes division

6   chief.  The assistant shall review the circumstances of

7   the case pending against the individual, his criminal

8   record and what benefit is to be gained from using the

9   individual and make a decision as to whether such

10  agreement will be made.  The -- the assistant will

11  ensure that investigating officers from the pending case

12  are contacted to allow their input in this decision

13  making process.  If the assistant agrees to offer some

14  consideration on the pending case in exchange for the

15  cooperating individual's assistance, this agreement will

16  be reduced to writing and signed by the assistant, the

17  requesting officer and his supervisor, the cooperating

18  individual and his attorney.  Any such writing shall

19  contain the signature of the Special Crimes bureau chief

20  or a division chief of the bureau signifying his or her

21  approval of the agreement."  Do you see that?

22       A.  I heard what you just read, yes.

23       Q.  Okay.  And, again, you were the Special Crimes

24  bureau chief, correct?

25       A.  Yes.



1    Q.  And you -- this is saying that in order for the

2  district attorney's office to cut a deal with an

3  informant, no less than six people had to sign off in

4  writing; isn't that correct?

5    A.  That's not what it says.

6    Q.  That's not what it says?  You disagree that

7  that's what it says?

8    A.  Read the first line again.  "It is the policy

9  of the DA's office that officers" -- police officers --

10 "who wish to use people presently charged."  This is the

11 same thing we were talking about earlier.  This is to

12 watch over cops wanting to make deals.

13   Q.  Okay.

14   A.  It's not what we've been talking about on the

15 Herrero case or the Prible case.

16   Q.  And I'm not asking about the Herrero case and

17 the Prible case.  I'm talking about the -- the Harris

18 County DA's policy with respect to having informant

19 agreements in writing.

20   A.  These are cops working off cases with their

21 informants, they need to be in writing.

22   Q.  Okay.  So, your understanding of the Harris

23 County district attorney's policies was that no one

24 needed to sign off on your use of informants in the

25 Prible case; is that correct?



1      A.   That's correct.

2      Q.   Okay.   You had the ultimate discretion whether

3  to use an informant in Mr. Prible's case, right?

4      A.   I did.

5      Q.   And no one else needed to know about your use

6  of that informant or your conversations leading up to

7  your use of that informant in the case?

8      A.   Well, it wasn't a secret.   You made it sound

9  like I was trying to keep a secret.

10     Q.   Well, did you tell it -- did you tell -- did

11 you share with Mr. Wisner and Mr. Bonds your

12 communications with these various informants?

13     A.   They knew what was going on.   Vic didn't come

14 to the Beaumont meeting with Johnny Bonds and me.   Vic

15 didn't go with me to talk to Michael Beckcom the day

16 before he testified because Beckcom was my witness.   We

17 divided up the witnesses.   He did his.   I did mine.

18     Q.   Looking at Page 154-16, talking about the use

19 of informants in this paragraph 10 -- or D, agreements

20 with cooperating individuals, and I understand you said

21 it's a different situation than in the Prible case but

22 in this case that they're referring to in this policy

23 manual, no person who is on parole or probation would be

24 used as an informant, correct, without the written

25 approval of the parole board through its representative,



1  if on parole, right?

2      A.  That's what it says, yes.

3      Q.  Okay.  But when you used informants in the

4  Prible and Herrero case, it didn't matter that they were

5  not only on parole but they -- not on parole but they

6  were actually in prison, convicted for crimes at that

7  time, right?

8      A.  One more time, this was written for the

9  situations where a cop, a narc wanted to work an

10  informant on the streets and have him sell more dope or

11  try to catch another bad guy, therefore, the requirement

12  that that defendant who is on parole or probation at the

13  time have to have his patrol officer or probation

14  officer involved in the process of him working on the

15  streets selling more dope was important.  That is not

16  what we're talking about in the Herrero case or the

17  Prible case.

18      Q.  Right.

19          MR. DOYLE:  It might help if -- if you --

20  if you let her read what she pointed out to you, the

21  first two -- two lines where it speaks of officers.

22          MS. SCARDINO:  Okay.  Well, let's keep --

23  let's keep our objections to -- to form.

24          MR. DOYLE:  Okay.  But you didn't -- you --

25  you -- okay.



1              MS. SCARDINO:  Well, I already read -- I

2   read that into the record but we'll move on to Exhibit

3   154 --

4              MR. DOYLE:  Well, that was not read into

5   the record, the first two lines.

6      Q.  (BY MS. SCARDINO)  Okay.  Which lines are you

7   referring to, Ms. Siegler?

8      A.  "It is the policy of the DA's office that

9   officers who use -- who wish to use persons who are

10  presently charged with an offense," and it goes on,

11  because this specifically deals with cops who want to

12  work their informants for dope deals or higher-ups in

13  the chain on the street, especially when those

14  informants at that time on the streets might be on

15  parole and might be on probation.

16     Q.  Okay.

17     A.  That is not the same as a testifying inmate.

18     Q.  And that's -- that's my next question.  So, is

19  your testimony that it was the policy -- it was not the

20  policy of the DA's office that prosecutors who needed --

21  who wished to use people that were incarcerated as

22  informants needed to contact an assistant DA from the

23  organized crime division, the major offender division or

24  one of the Special Crimes divisions with such a request?

25     A.  Are you reading from Page 154-16?



1    Q.  Yes, I am.  And I -- I just -- what I'm --

2  and -- and maybe we can make this easier if you just

3  answer this question.

4    A.  Okay.

5    Q.  It looks like you go through a lot of hoops to

6  use an informant in a case where you're trying to work

7  off a charge?

8    A.  It was to watch over the cops.

9    Q.  Okay.  And so, I think you'll agree that when

10  you -- it sounds like when you used an informant that

11  was already imprisoned in federal prison to testify

12  against -- against Mr. Prible in his capital murder

13  trial, that these requirements listed in the policy

14  manual flew out the window, they didn't apply to that

15  situation, correct?

16    A.  Two different scenarios.

17    Q.  Okay.  So, the answer is yes, these guidelines

18  did not apply to the situation in Mr. Prible's case?

19    A.  Correct.

20    Q.  Okay.  And, likewise, moving on down that Page

21  154-16, it says, "No agreement for consideration on a

22  pending case will be considered where the pending case

23  involved any use of a deadly weapon, involved any act of

24  violence to other persons, cooperating individual is a

25  habitual criminal, cooperating individual has been



1   adjudged guilty on pending case, involves one person

2   working off a case for another, vicarious contract, or

3   the agency arresting the cooperating individual is not

4   the agency seeking the contract, unless the arresting

5   agency is aware of the contract and agrees to the terms

6   in writing prior to any agreement with the cooperating

7   individual."

8              So, is it your testimony that the passage I

9   just read would not have applied to any of the

10  informants that you used in the Prible or Herrero cases?

11      A.  The passage that you just read applies to those

12  defendants in the free world who a cop is asking to work

13  off a dope case through a contract by selling more dope

14  on the streets, and the passage here applies because if

15  the pending case involved violence, weapons, serious

16  victims and all that, those were the cases we were going

17  to let a cop willy-nilly decide to work off a case

18  through.  To us, it was more important that the pending

19  case matter than a copy deciding unilaterally to work

20  off my case because he thought he had a good snitch that

21  could get him more dope off the streets.

22      Q.  Okay.  So, let's go through these 1 through 6,

23  and I'm going to take each informant from the Prible and

24  Herrero cases and ask you a question.

25              First, Mr. Beckcom, Mr. Beckcom had already



1  been adjudged guilty on his pending case, right, he was

2  in prison?

3       A.  Well, it was -- it wasn't pending.  It was

4  resolved.

5       Q.  I'm sorry.  His resolved -- his case was

6  resolved.  He was in prison --

7       A.  Yes.

8       Q.  -- correct?  He had been convicted of capital

9  murder, correct?

10      A.  Yes.

11      Q.  He -- his deadly weapon of choice in that case

12  was a metal toolbox that he had put his victim in and

13  then threaded a garden hose from the exhaust pipe of his

14  car and turned the car on, right?

15      A.  Yes.

16      Q.  Okay.  So, it definitely involved an act of

17  violence to another person?

18      A.  It did.

19      Q.  And he was a habitual criminal, correct?

20      A.  I don't remember.

21      Q.  You don't recall that he had been --

22      A.  I don't want to argue with that but I don't

23  remember.

24      Q.  Okay.  Okay.  And then Foreman -- Nathan

25  Foreman, his crime was assault causing bodily injury, do



 1  you remember that?

 2        A.  Nathan Foreman never testified.

 3        Q.  That's not my question.

 4        A.  Well, which case are we talking about?

 5        Q.  I'm asking you if you recall that Nathan

 6  Foreman was convicted of assault causing bodily injury?

 7        A.  I don't remember what his conviction was for

 8  because I never used him.

 9        Q.  Okay.  Do you remember that he was a violent

10  criminal?

11        A.  I never used him.

12        Q.  Well, you spoke with him --

13        A.  I don't know what --

14        Q.  -- on August 8th, 2001, right?

15        A.  I'm sorry?

16        Q.  You spoke with him on August 8th, 2001, right?

17        A.  I did.

18        Q.  And did you ever speak with him again after

19  that?

20        A.  He probably tried to call me but I don't know

21  what we talked about for very long because I knew he was

22  a liar.

23        Q.  Okay.  But you never met with him in person

24  again?

25        A.  After the Beaumont -- after the --



1    Q.  After the August the 8th, 2001.

2    A.  -- downtown Houston day, no.

3    Q.  Okay.  Nathan Foreman was a habitual criminal,

4    do you remember that?

5    A.  I don't remember.

6    Q.  Okay.  Well, my question to you is these six

7    requirements for an informant -- or for an agreement for

8    consideration to be given to an informant in the type of

9    case that we discussed earlier, the drug case on the

10   street, if you had a different situation like the Prible

11   case, it didn't matter if the informant was involved in

12   a crime that had -- or committed a crime that involved

13   the use of a deadly weapon, right, you could still use

14   him?

15   A.  Of course, it mattered.

16   Q.  Well, you could still use him as an informant,

17   it wouldn't preclude you from using him as an informant,

18   right?

19   A.  Not that alone, no.

20   Q.  Okay.  You could also use him if his crime

21   involved an act of violence to another person?

22   A.  I could.

23   Q.  Okay.  You could also use him if he was a

24   habitual criminal?

25   A.  I could.



1    Q.  Okay.  And you could also use him if he had
2  been adjudged guilty on another case?
3    A.  I could.
4    Q.  Okay.  So, these 1 through 6 requirements, they
5  only applied if you were working with informants who
6  were trying to work off a drug case on the street,
7  right?
8    A.  That's incorrect.  These rules applied in
9  writing because we were trying to watch over the cops,
10  too, on Page 154-16, on those specific types of cases.
11         The factors that you've listed that you
12  think are important, I agree they are important, and in
13  any case, whether it's a murder or a DWI case, before
14  I'm going to use a snitch or an inmate as a witness, I
15  care about everything that's listed here.  Of course,
16  it's important.  We don't just blow it off and use every
17  inmate that comes walking around wanting to give
18  information.  That ought to be pretty obvious to you
19  that I didn't use them all.
20    Q.  Well, Mr. Beckcom, who testified in
21  Mr. Prible's case --
22    A.  Yes, ma'am.
23    Q.  -- Mr. Moreno, who testified in Mr. Herrero's
24  case, and Mr. Dominguez, who testified in Herrero's
25  case, all of them were involved in crimes involving the



1  use a deadly weapon, an act of violence, they were all

2  habitual criminals and they had all been adjudged

3  guilty, right?

4       A.  Those are typically the people that end up in

5  federal prison that can be witnesses.

6               MS. SCARDINO:  Object --

7       A.  So, yes.

8       Q.  (BY MS. SCARDINO)  Thank you.

9               Now, the DA didn't have different

10  guidelines for working -- for working with informants

11  that were incarcerated in the federal system versus the

12  state system, right?

13       A.  No.

14       Q.  Okay.  Now, I mentioned earlier Jonathan Wayne

15  Jefferson, and you said you didn't recall that name; is

16  that right?

17       A.  I do not.

18       Q.  Okay.  Do you remember that he was a trusted

19  informant for the SIS and FCI Beaumont and he had been

20  in the low unit of FCI Beaumont with Prible?

21       A.  I don't remember his name.

22       Q.  Okay.  Do you remember if he reached out to

23  you?

24       A.  I don't remember him by name.

25       Q.  Did you reach out to him?



1      A.  I don't remember him.  I mean, a lot of these

2  names I do remember but I don't remember that one.

3      Q.  Did you reach out to anyone in FCI Beaumont low

4  about Mr. Prible's case?

5      A.  The names we've talked about today I remember.

6  If there are additional names, you can throw them at me

7  but I can't come up with them off the top of my head.

8      Q.  Do you recall -- and take the names aside.

9      A.  Okay.

10     Q.  Did you ever contact FCI Beaumont to ask to

11  speak to an inmate?

12     A.  You mean like generically or by name?

13     Q.  By name.

14     A.  Yes.

15     Q.  Okay.  You -- you could call FCI Beaumont and

16  speak with a unit manager, I believe, and --

17     A.  I would have Johnny Bonds do it --

18     Q.  Okay.

19     A.  -- because it was a pain and it took a lot of

20  time.  It was very inefficient.

21     Q.  Okay.  So, he could -- he could call FCI

22  Beaumont and get an inmate that you needed to speak with

23  on the telephone, right?

24     A.  No, it was never that easy.  Johnny would call

25  and call and call and leave messages to try and get the



1  case manager or whatever they're called, and they only

2  have certain hours of any day that they're allowed to

3  talk to their case manager, and the case manager has

4  lots of inmates.  So, you had to get the case manager to

5  call you back, to have a time slot on a certain day

6  where the inmate would be there and we could be there at

7  that time to ever hook up on the phone.

8      Q.  Okay.  And when you did finally hook up on the

9  phone, the inmate would be in the unit manager's office

10  speaking with you on the phone; is that right?

11     A.  Yes.  Yes.

12     Q.  Okay.  And that phone call would not be

13  recorded, would it?

14     A.  I don't know.  That's a federal prison rule.  I

15  don't know what they're recording when they're calling

16  from the case manager's office.

17     Q.  Okay.

18     A.  I don't know the rules.

19     Q.  You do know that phone calls with inmates from

20  the usual inmate phones, those would have been recorded,

21  right?

22     A.  I would assume so.

23     Q.  Okay.  I'm going to show you Exhibit 109.

24         MS. SCARDINO:  How long have we been going

25  since the beginning?



```
 1              THE VIDEOGRAPHER:  Total time?

 2              MS. SCARDINO:  Uh-huh.

 3              THE VIDEOGRAPHER:  3 hours, 53 minutes.

 4              MS. SCARDINO:  Okay.

 5              MS. MIRANDA:  Did you say 109?

 6              MS. SCARDINO:  Uh-huh.  Do you all have

 7   that?  I don't know if I passed it out.

 8              THE WITNESS:  What is it?

 9              MS. SCARDINO:  One second.

10       Q.  (BY MS. SCARDINO)  Actually, let's start with

11   109, Page 5.

12              MS. MIRANDA:  Do you have another one?

13              MS. SCARDINO:  Yes.

14       Q.  (BY MS. SCARDINO)  See 109-5, do you recognize

15   that handwriting as that of Johnny Bonds'?

16       A.  I do.

17       Q.  Okay.  Turn to the next page.  If you could

18   just go to the next page for me, please.

19       A.  Okay.

20       Q.  109-6, it's dated December 10th, 2001 and --

21   and that's Johnny Bonds' handwriting again, right?

22       A.  Yes.

23       Q.  Okay.  Were you at this meeting with

24   Mr. Jefferson with Mr. Bonds?

25              MS. MIRANDA:  Objection, form.
```



```
 1        A.   I don't know that this was a meeting.

 2        Q.   (BY MS. SCARDINO)  You don't recall any sort of

 3   meeting on December 10th, 2001 with Mr. Jefferson at the

 4   low unit in Beaumont?

 5        A.   I don't remember Jefferson at all.

 6        Q.   Okay.  So, I guess nothing came of this

 7   meeting, right?

 8             MS. MIRANDA:   Objection, form.

 9        A.   I don't know if it was a meeting.

10        Q.   (BY MS. SCARDINO)  If it was -- if it was a

11   meeting.

12        A.   Yeah, I really don't remember that name.

13        Q.   Okay.  And so, you wouldn't have disclosed

14   this -- this -- any sort of information that you and Mr.

15   Bonds had with Jefferson on December 10th, 2001 to

16   defense counsel, right?

17             MR. DOYLE:   Objection, mischaracterizes

18   what she said.  She didn't say she had testimony with --

19   met with him.  She didn't know.

20             MS. SCARDINO:   And that's fine.

21        Q.   (BY MS. SCARDINO)  And so, I -- I suppose it

22   wouldn't have been disclosed to defense counsel if you

23   didn't know that it happened, right?

24        A.   I don't know.

25        Q.   Okay.
```



1              MS. SCARDINO:  You know what, why don't we

2    take a short break.  Go off the record.

3              THE VIDEOGRAPHER:  The time is 2:29.  We're

4    off the record.

5              (Short recess.)

6              THE VIDEOGRAPHER:  This is the beginning of

7    file 6.  The time is 2:44.  We are on the record.

8       Q.  (BY MS. SCARDINO)  I'm going to show you

9    Exhibit 170, Ms. Siegler.  This is the inmate phone list

10   for Michael Beckcom dated December 19th, 2001.  And you

11   see that he added your name to his phone list on that

12   day?

13      A.  I see that.

14      Q.  Okay.  That was your direct line at the DA's

15   office?

16      A.  It wasn't my direct line but it was to major

17   offenders.

18      Q.  Okay.  And if you go to Page 4 of that Exhibit

19   170, you see your name is written down there as well?

20   It's about seven up from the bottom.

21      A.  This is the printout, yes, I see that.

22      Q.  Yes.  Saying that he added you on February 5th,

23   2002?

24              MR. DOYLE:  The one that says Page 30?

25      A.  Yes.



 1                MS. SCARDINO:  Yes.  I'm sorry.

 2        Q.  (BY MS. SCARDINO)  Okay.  And then if you go up

 3   a few more from that, it says, "Lilian Thorn, friend."

 4   Do you see that?

 5        A.  I see her name, yes.

 6        Q.  Do you know Lilian Thorn?

 7        A.  I've heard that name before but I don't know

 8   why.

 9        Q.  Do you remember that she's Foreman's mom?

10        A.  No, I wasn't thinking of that.  I was thinking

11   of a white lady, so, no.

12        Q.  Okay.  Did you ever speak with Ms. Thorn?

13        A.  No.

14        Q.  So, you'll agree that every time you're -- oh,

15   if you go to the follow -- the next page, this is his

16   printout of his phone calls in 2002 from the inmate

17   phones.

18        A.  Okay.

19        Q.  And we understand those are different from the

20   unit managers' phones.

21        A.  Okay.

22        Q.  Okay.  And so, every time that number 6178

23   appears, that phone call was made to you, right?

24        A.  No.  As I said, 6178 went to major offenders.

25   You have Special Crimes.  It has four divisions, each



 1  with their own number.  One of those was major

 2  offenders.  It wasn't my direct line.

 3       Q.  Okay.  Would he have been speaking with anyone

 4  else at the DA's office?

 5       A.  There were five -- five or six other

 6  prosecutors, two or three investigators.

 7       Q.  Do you know if he was speaking to any other

 8  investigators or prosecutors during the time that you

 9  were working with him on the Prible case?

10       A.  You said this is the inmate phone.

11       Q.  Right.  This is Mr. Beckcom's phone records

12  from 2002 --

13       A.  So, he had his own phone?

14       Q.  -- of phone calls he made from the inmate

15  phones.

16       A.  He had his own phone?

17       Q.  No.  This is from the inmate phones at FCI

18  Beaumont.

19       A.  Well, how do you know they're from Michael

20  Beckcom?

21       Q.  Because if you go to the top, it says, "Inmate

22  name Michael Beckcom," and these were produced to us by

23  the Board of Prisons.  And so, my question to you is

24  when that number -- the 6178 number appears on his phone

25  list, that phone call was going to the Harris County



1 DA's office, right?

2      A.  That is correct.

3      Q.  Okay.  But you're saying he might have been

4 talking to other people in the office at the same time

5 as he was talking with you, so, you didn't necessarily

6 speak with him at those -- on those phone calls?

7      A.  I'm saying that if he called 6178, the -- the

8 major offenders number, depending on how long the call

9 went or if he was placed on hold, he might not have ever

10 connected with me.  He could have called just to try and

11 talk with me.  I might not have been there.  I might not

12 have taken the call.  So, just because there's a call

13 made to 6178 doesn't mean he necessarily ever even

14 connected with we.

15     Q.  Okay.  It was an attempt by him to call you at

16 least?

17     A.  Yes.

18     Q.  Okay.  And you'll see on Exhibit 170 that he

19 called that 6178 number that he had put on his phone

20 list as belonging to you, he called it on April 4th,

21 2002?

22     A.  Can you show me?  Otherwise, it will take us a

23 while.

24     Q.  I'll tell you what, they're highlighted.

25     A.  They are?



KELLY SIEGLER                                          October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                              204

```
 1       Q.  Yep.  So, if you go to -- they go in descending
 2  order.
 3       A.  Okay.
 4       Q.  So, if you go to Page 64 down there, at the
 5  Bates label 64.
 6       A.  Where is the page?
 7            MR. DOYLE:  Right here, the Bates.
 8       Q.  (BY MS. SCARDINO)  Bates label 64 down there.
 9  Do you see highlighted at the top?
10            MR. DOYLE:  Do you see down here 64?
11       A.  I can't read it, though.  Tell me which one.
12            MR. DOYLE:  But I don't see the
13  highlighting.
14       Q.  (BY MS. SCARDINO)  Okay.  So, it's that -- it's
15  that -- maybe yours didn't -- it didn't show up.  Sorry.
16  So, let's -- let's look at April 4th, 2002.  Can you see
17  the dates of this -- of these calls?
18       A.  So, I go to April 4th, 2002?
19       Q.  Uh-huh.  And there's a phone call to that 6178
20  number for 6 minutes.  Do you see that?
21       A.  Not yet.
22            MR. DOYLE:  This is on 64?
23            MS. SCARDINO:  Yes.
24            THE WITNESS:  Do you see it?
25            MR. DOYLE:  What time was it?  Do you know?
```



```
 1                    MS. SCARDINO:  11:08 a.m.

 2                    MR. DOYLE:  April 4th.  Okay.

 3         Q.  (BY MS. SCARDINO)  Would it be quicker if I

 4    check it for you?

 5         A.  Yes, it would.

 6                    MR. DOYLE:  This one right here, Kelly.

 7         Q.  (BY MS. SCARDINO)  Here.

 8         A.  Okay.

 9         Q.  Look at this.  Look at this.  This one is

10    highlighted.  Okay.

11         A.  Is this the first one?

12         Q.  Well, go to Page 64.  Is that 64?  Yeah.  Okay.

13    So, the one that's highlighted, he called you on April

14    4th, 2002, right?

15         A.  I see that.

16         Q.  Okay.  He called you again on --

17         A.  Wait.  Wait.  Wait.  It's for only how many

18    minutes?

19         Q.  6 minutes.

20         A.  And what time is the call?

21                    MR. DOYLE:  11:08.  Is that right?

22         A.  6 minutes doesn't mean he got in touch with me.

23    He could have been put on hold and I never picked up the

24    call.

25         Q.  (BY MS. SCARDINO)  Do you recall 16 years -- or
```



1  15 years ago that that happened?

2      A.  Oh, I recall that I was so busy, they would be

3  calling, "Kelly Siegler, line whatever," and I could

4  never get all the calls.  Yes, it happened all the time.

5      Q.  Okay.  So, you deny speaking with him on April

6  4th, 2002?

7      A.  No.  I don't remember, but just because it says

8  he called 6178 and the call lasted 6 minutes doesn't

9  mean that we actually spoke.  That's what I'll say.

10     Q.  Okay.  Now, going to April 17th, 2002 --

11     A.  The next page?

12     Q.  So, it's the next page back.

13     A.  Back?

14     Q.  Well, yeah, we're going in reverse order here.

15     A.  Okay.

16             MR. DOYLE:  Page 63.

17     Q.  (BY MS. SCARDINO)  4-17-02.

18     A.  Okay.

19     Q.  He called your line for 2 minutes.  Do you see

20 that?

21     A.  Yes.

22     Q.  And on April 24th, 2002 --

23     A.  I'm pretty sure that wasn't a connected call to

24 me for only 2 minutes.  The next one?

25             MS. SCARDINO:  Objection, nonresponsive.



1    Q.  (BY MS. SCARDINO)  Do you have any evidence

2  that that wasn't a connected -- connected call or are

3  you just speculating?

4    A.  I don't believe that I talked to him on a phone

5  call that lasted only 2 minutes.

6    Q.  So, you're denying that you spoke with him on

7  that date?

8    A.  I don't remember that call, no.

9    Q.  You're denying that you spoke with him on that

10  date or you just don't remember?

11    A.  I don't remember.  I don't remember.

12    Q.  You don't remember?

13    A.  It doesn't make any sense that the call would

14  last 2 minutes.

15    Q.  If you look at -- going up to April 24th, 2002,

16  another phone call to your office?

17    A.  Again for 2 minutes.

18    Q.  Okay.  And on May 15th, 2002.

19    A.  I see May 14th.  Is that right?

20    Q.  I'm sorry.  May 14th, 2002.

21          MR. DOYLE:  What page?

22          MS. SCARDINO:  62.  Sorry.

23          MR. DOYLE:  62.

24    Q.  (BY MS. SCARDINO)  Another phone call to your

25  number?



```
 1        A.  For 3 minutes.

 2        Q.  Uh-huh.  And July 12th, 2002, at the top there,

 3   it's a phone call for 1 minute?

 4        A.  For 1 minute, I see that.

 5        Q.  And on July 16th, 2002, there's a couple of

 6   phone numbers -- phone calls?

 7        A.  I see those.

 8        Q.  Do you see that?

 9        A.  For 2 minutes and for 1 minute.

10        Q.  Uh-huh.  And then there's 3 times -- 3 phone

11   calls on October -- I mean, on August 2nd, 2002.  Do you

12   see that?

13        A.  So, 3 calls on the same date, which means that

14   he, obviously, didn't get ahold of me for the 1 minute

15   call or the 3 minute call because there's a 9 minute

16   call, too.

17        Q.  Okay.  So, whenever he would call you and leave

18   a -- he would leave a message, I suppose, with your

19   office?

20        A.  He would call 755-6178 and get the main

21   receptionist, who would then put him through to my

22   secretary, Esmeralda, and then she would try to find me

23   or take a message, which is probably why were there's so

24   2 minute, 1 minute and 3 minute calls, and they never

25   did get ahold of me.
```



1    Q.  And you would then return his phone call by

2   calling his unit manager to have the conversation on

3   that phone?

4    A.  No.  I got a lot of calls that I didn't return.

5    Q.  So, you're saying that he kept calling you over

6   and over, he was your witness in -- in Prible's case and

7   you never returned his phone call, is that your

8   testimony?

9    A.  I did return some of the phone calls.  I said

10   that I don't remember returning all of these individual

11   phone calls.

12    Q.  Okay.  But some of those phone calls that you

13   returned, you would have called the unit manager, would

14   have put Mr. Beckcom on the telephone, right --

15    A.  Yes.

16    Q.  -- like we discussed earlier?

17    A.  Yes.

18    Q.  On Exhibit 171 --

19    A.  This is a different color, so, that goes back

20   to you, right?

21    Q.  Yeah.  Thanks.

22        Exhibit 171 is telephone records for Nathan

23   Foreman produced by the Board of Prisons.  And you see

24   on the first page of that that Mr. Foreman added you to

25   his phone record -- or his phone list on October 3rd,



KELLY SIEGLER                                    October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                          210

1  2001, right?

2      A.  I see that.  I also notice that now he has the

3  right number.

4      Q.  Right, he has the correct number.  And this is

5  almost two months after you spoke with him in August

6  8th, 2001 and determined he was lying about Mr. Prible's

7  case, right?

8      A.  That's what the date says, yes.

9      Q.  Okay.  And there are no phone calls to you, if

10  you look at Mr. Foreman's list, in 2002.  Do you see

11  that?

12      A.  Does this cover the whole year?

13      Q.  Yeah.  Well, yeah.  I'm just asking you -- it

14  looks like it covers from January to October, 2002.  And

15  no where -- I'll represent to you that no where in that

16  list is a phone call to that 6178 number.

17      A.  Okay.

18      Q.  But you were speaking with Mr. Foreman during

19  this time, correct?

20      A.  No.

21      Q.  You weren't speaking with him?

22      A.  Not that I remember.

23      Q.  Is it your testimony that you never spoke with

24  him again after August 8th, 2001?

25      A.  That was the day of the downtown fed facility?



1    Q.  Uh-huh.

2    A.  I never talked to him again.

3    Q.  You never talked to him again?

4    A.  Not that I remember.

5    Q.  Now, if you -- looking at Exhibit 172, these

6  are the phone records for Jesse Moreno.  This is dated

7  April 26, 2001.  You see that he puts your name down on

8  his phone list.  And this is the one we had discussed

9  earlier, right?  It was a different number, the 5800

10 number?

11   A.  Yes.

12   Q.  Okay.  And, again -- and you were speaking --

13 you did speak with Mr. Moreno on the phone leading up to

14 Mr. Herrero's trial, right?

15   A.  I know I got the letter, the letter that we

16 talked about.  I know that I went to see him at some

17 point.  Whether or not there was a phone call in between

18 before I went to see him, I don't remember.

19   Q.  Okay.

20   A.  I would think there was but I don't remember

21 for sure.

22   Q.  Right.  You would think there would be some

23 communication before the testimony at trial, before --

24   A.  Well, no, I went to see him.

25   Q.  Uh-huh.



KELLY SIEGLER                                          October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                           212

1       A.  Your question was was there a phone call.

2       Q.  Okay.  You think there might have been a phone

3  call in between that initial visit and when you went to

4  see him before trial?

5       A.  No.

6       Q.  I'm sorry.

7       A.  He writes me -- he writes me a letter.  He

8  writes me a letter.  His mom writes the letter.

9       Q.  Uh-huh.

10      A.  There might have been a phone call.

11      Q.  Okay.

12      A.  I don't remember.  I did go see him.

13      Q.  Okay.  And that phone call that there might

14  have been, would that have been on the unit manager's

15  telephone?

16      A.  It had to be.

17      Q.  Okay.

18              MR. DOYLE:  Don't keep me guessing.  Is his

19  number in here?

20              MS. SCARDINO:  I'm sorry?

21              MR. DOYLE:  Is there -- are there any calls

22  in here?

23              MS. SCARDINO:  No.

24              MR. DOYLE:  Okay.

25              MS. SCARDINO:  No.  No.



1            MR. DOYLE:  I just didn't want --

2            MS. SCARDINO:  No.  Sorry.

3        Q.  (BY MS. SCARDINO)  Okay.  And sometimes BOP

4   employees would call you about cases that you were

5   working on with these inmates, would they not?

6        A.  No.

7        Q.  Never?

8        A.  Not that I remember.  They were too busy.

9        Q.  Did you know anyone that worked at FCI Beaumont

10  before you worked on Mr. Prible and Mr. Herrero's case?

11       A.  An employee?

12       Q.  Yes.

13       A.  I don't think so.

14       Q.  Had you ever dealt with informants in FCI

15  Beaumont before?

16       A.  Had I ever been there ever before, maybe, but I

17  don't remember for sure.

18       Q.  You don't remember having a preexisting

19  relationship --

20       A.  No.

21       Q.  -- with any BOP employees at FCI Beaumont?

22       A.  No.

23       Q.  Okay.  And, again, here we're going to Exhibit

24  152, and I was supposed to show you all that legible

25  copy on -- and I promise I'll do that when we get on a



 1  break.

 2      A.  These are the pink slips, right?  That's why

 3  they're so dark?

 4      Q.  These are the pink slips, yeah.  And I don't

 5  have the originals but you might be able to see them on

 6  the screen at a break.

 7              But I'll -- I'll represent to you that one

 8  of these pink slips in Exhibit 152 that was produced by

 9  the DA's office in this case, it shows Lieutenant Robert

10  Clark from FCI Beaumont called Kelly re Herrero.  So,

11  does that refresh your memory as to whether any BOP

12  employees ever called you to discuss the Herrero case?

13      A.  No.

14              MR. DOYLE:  Do you know what date?

15              MS. SCARDINO:  I do believe it's dated.

16              MR. DOYLE:  I thought you might have it in

17  your notes.

18              MS. SCARDINO:  Let's see.  I know I did,

19  too.  I don't see it dated on here.  I think there is a

20  date.  I'm happy to -- I'll put it out so I remember to

21  look at it at the break.

22              MS. MIRANDA:  Which one is it?

23              MS. SCARDINO:  I'll have to do that, too.

24              MS. MIRANDA:  Okay.

25              MS. SCARDINO:  I mean, these are really bad



 1  copies.  Sorry.

 2      Q.  (BY MS. SCARDINO)  Okay.  Now, you said a

 3  moment ago, I believe, that you did not speak with

 4  Mr. Foreman again after that August 8th, 2001 meeting

 5  with him in --

 6      A.  Not that I remember.

 7      Q.  Okay.  Let me show you Exhibit 111.  Actually,

 8  we're going to come back to 111 because I don't see it

 9  right here.

10          Oh, here it is.

11          Okay.  Exhibit 111 is a letter from Alan

12  Percely, Mr. Foreman's attorney, to you on November

13  12th, 2001, if you want to take a moment to read it.

14      A.  Okay.

15      Q.  And he says, "As you are already aware, I am

16  Mr. Foreman's attorney on federal and state criminal

17  matters," right?

18      A.  That's what he said.

19      Q.  So, had you already been talking with

20  Mr. Percely about Mr. Foreman?

21      A.  Actually, I think what happened was he came up

22  to me one day in court and said that he represented

23  Nathan Foreman, and I thought to myself, "Of course, you

24  do," and that was it.

25      Q.  Okay.  And then he reaches out to you on this



1  November 12th, 2001 letter, right?

2       A.  Yes.

3       Q.  Okay.  But you didn't speak with him another

4  time previously to this on the telephone or anything

5  else?

6       A.  No.

7       Q.  Okay.  And in his letter, he said that Nathan

8  Foreman told him that he has information that will lead

9  you to the weapon that was used in the murder case that

10 you are preparing to go to trial on in the near future.

11 Do you see that?

12      A.  I see that.

13      Q.  Okay.  How did Mr. Foreman know that the murder

14 weapon in Mr. Prible's case had never been found?

15      A.  I don't evening think they're talking about

16 Prible.  I think it's Alan Percely talking bull with

17 Nathan Foreman, who is talking bull, and I don't know

18 what they're talking about, which proves the point.

19      Q.  So, you don't --

20      A.  They were both full of it.

21      Q.  Okay.  So, you don't know what case he's

22 referring to in this letter, whether it's the Prible

23 case or the Herrero case?

24      A.  I tried a lot of cases in '02.  It could have

25 been one of the other ones that I tried.  It doesn't



 1 | mean it's Prible --

 2 |     Q.  Okay.

 3 |     A.  -- or Herrero.

 4 |     Q.  And Mr. Percely proposes a deal in exchange for

 5 | whatever information Mr. Foreman has, right?

 6 |     A.  He tries to, yes.

 7 |     Q.  Okay.  And instead of telling Percely -- or

 8 | ignoring this letter or telling him to get lost or

 9 | telling Foreman to get lost, instead, you set up a

10 | face-to-face visit with Mr. Foreman to discuss this new

11 | information he had, didn't you?

12 |     A.  The letter is dated November 12th of '01 and

13 | the meeting with Foreman was August of '02?

14 |     Q.  August 8th, 2001 was the initial meeting with

15 | Foreman.

16 |     A.  Okay.  So, ask me the question again.  So, the

17 | letter came after the meeting?

18 |     Q.  Yes, the letter came after the meeting.  And

19 | I'm asking you after you got this letter of November

20 | 12th, 2001, you could have told Percely to get lost,

21 | right?

22 |     A.  I could have.

23 |     Q.  You could have told Foreman, "I never want to

24 | talk to you again.  You're a liar," right?

25 |     A.  I could have.



1       Q.   Okay.  You could have ignored them, right?

2       A.   I did.

3       Q.   But, instead, after you received this letter,

4  you arrange for another face-to-face meeting with

5  Mr. Foreman at FCI Beaumont, didn't you?

6       A.   Not that I remember.

7       Q.   I'm going to show you Exhibit 77.

8            MS. SCARDINO:  Do you have it?

9            MS. MIRANDA:  I'm looking.

10            MS. SCARDINO:  Okay.

11            MS. MIRANDA:  I'm looking.

12            Yes, I have it.

13       Q.   (BY MS. SCARDINO)  Now, Exhibit 77 is a letter

14  dated November 20th, 2001 from Johnny Bonds to

15  Lieutenant Clark, requesting that he -- you and he be

16  allowed to visit with Nathan Foreman on December 10th,

17  2001.  Do you see this?

18       A.   I see that.

19       Q.   And this letter was written eight days after

20  Mr. Percely's letter to you was written, right, on

21  November 12th, 2001?

22       A.   Yes.

23       Q.   And earlier you said the letters might have

24  been -- taken about a week to get to you.  So, that

25  would make your receipt of that letter about November



 1  12th -- 19th, 2001?

 2              MS. MIRANDA:  Objection, form.

 3      A.  Let's see.  You've got me confused.

 4      Q.  (BY MS. SCARDINO)  Okay.

 5      A.  Say that again.

 6      Q.  Earlier, I forget which letter we were

 7  referring to but you said it might have taken a week for

 8  the letter to -- it was one of the informant letters --

 9  to get to --

10      A.  From the inmates, not from Alan Percely.

11      Q.  Okay.  So, when do you think you would have

12  received this November 12th, 2001 letter from Alan

13  Percely?

14      A.  Well, I would hope the next day.

15      Q.  Within a couple of days?

16      A.  (Witness indicated by nodding her head

17  affirmatively.)

18      Q.  Okay.  And so, pretty soon after receiving this

19  letter, you have Johnny Bonds request another meeting

20  with Mr. Foreman at FCI Beaumont, right?

21      A.  This is Ted requesting it for Johnny and me.

22      Q.  I'm sorry.

23      A.  But yes.

24      Q.  Yes.  So, you, obviously, asked Mr. Wilson to

25  request this meeting, right?



 1      A.  Right.

 2      Q.  Okay.  So, even though he lied to you back in

 3  November -- or in August, a few months earlier, maybe

 4  now he's got some good information for you, right?

 5      A.  I don't remember why we would have asked to go

 6  see him again because Johnny and I both believed when we

 7  walked away from the meeting with Nathan Foreman at the

 8  downtown Houston facility that he was not being

 9  truthful.

10      Q.  I'm going to show you Exhibit 78.  Exhibit 78

11  is a November 26, 2001 letter from Ted Wilson to

12  Lieutenant Robert Clark again at FCI Beaumont medium.

13  And he says, "I'm respectfully requesting that you

14  permit Assistant District Attorney Kelly Siegler and

15  Harris County District Attorney's Investigator Johnny

16  Bonds in your facility to interview an inmate by the

17  name of Michael Beckcom on December 10th, 2001."  Do you

18  see that?

19      A.  I do.

20      Q.  Okay.  And that's the same date that you were

21  going to interview Mr. Foreman, right?

22      A.  Well, the letter is the same date.  Did we ask

23  for the same date?  Oh, yes.  December 10th, yes.

24      Q.  Yeah.  The letters are different dates --

25      A.  December 10th.



1    Q.  -- but the date of the meeting requested is the

2    same?

3    A.  Yes.

4    Q.  So, you requested to meet with both of those

5    inmates back to back on that date, right?

6    A.  Yes.

7    Q.  And on that date, December 10th, 2001, did you

8    also meet with Jonathan Jefferson at FCI Beaumont?

9    A.  I still don't remember that name.

10                MS. MIRANDA:  Objection, form.

11    Q.  (BY MS. SCARDINO)  When you went to Beaumont to

12    interview these inmates on December 10th, 2001, was

13    Mr. Bonds with you?

14    A.  I remember for sure that the time we went to

15    Beaumont to interview Michael Beckcom -- I don't even

16    know if Johnny was there for that.  I went to see

17    Michael Beckcom one time in person in Beaumont.  I don't

18    remember the date.

19    Q.  Would you have driven to Beaumont to meet with

20    these inmates with Mr. Bonds but once you got there

21    split up from Mr. Bonds for any reason?

22    A.  He didn't have to babysit me.  I could

23    interview by myself.  It wasn't like I was scared.  And

24    I might have gone by myself, too.

25    Q.  Okay.  But -- and I know that you're -- he's



1  not babysitting you but it doesn't seem to make sense if

2  both of you were going and asking for these meetings

3  that you would have been -- wouldn't have attended all

4  of those meetings on October 10th, 2001 together --

5      A.  Agreed.

6      Q.  -- if you were both in Beaumont?

7      A.  Agreed.

8      Q.  Okay.  Exhibit 87 is a criminal history report

9  for Mr. Jefferson.  It's printed out by Mr. Bonds on

10  December 6th, 2001, just prior to that December 10th

11  requested meeting.  Do you see that?

12     A.  I do.

13     Q.  Okay.  And, again, that was standard procedure

14  whenever you and Mr. Bonds were going to interview a

15  witness or a potential suspect, you would run a criminal

16  history report on them?

17     A.  Yes.

18     Q.  I'm going to show you Exhibit 109-6.  If you

19  can turn, it's on the second page of that.  Exhibit

20  109-6 is Johnny Bonds' handwriting, correct?

21     A.  It is.

22     Q.  Okay.  And it looks as if he had a -- a

23  conversation with Jonathan Wayne Jefferson on December

24  10th, 2001?

25             MS. MIRANDA:  Objection, form.



1    Q.  (BY MS. SCARDINO)  And I'm asking you if you

2    were present at any such meeting between Mr. Bonds and

3    Mr. Jefferson on that date?

4              MS. MIRANDA:  Objection.

5    A.  I just don't remember Jonathan Jefferson, the

6    name or a face.  I don't remember that name.

7    Q.  (BY MS. SCARDINO)  Okay.  So, you wouldn't have

8    told defense counsel about this meeting that you had

9    with him --

10             MS. MIRANDA:  Objection, form.

11   Q.  (BY MS. SCARDINO)  -- if he wasn't important to

12   the case?

13   A.  It was 15 years ago.  I might have met him.  I

14   don't know.  I just don't remember today.

15   Q.  You can't recall?  Okay.  Now, if you -- if --

16   if you had been at this meeting, would you have taken

17   notes like you did in that August 8th, 2001 meeting with

18   Foreman?

19   A.  Not necessarily.

20   Q.  Not necessarily?

21   A.  (Witness indicated by shaking her head

22   negatively.)

23   Q.  If you turn to Page 109-7 -- Exhibit 109-7, and

24   these, again, are notes in Johnny Bonds' handwriting,

25   right?



1      A.  Yes.

2      Q.  And you see it looks like there he's

3   memorializing a meeting with Nathan Foreman on December

4   10th, 2001, which would have -- which corresponds to the

5   letter that I showed you earlier requesting a meeting

6   with Mr. Foreman on that date?

7           MS. MIRANDA:  Objection, form.

8      A.  It does.

9      Q.  (BY MS. SCARDINO)  Do you see that?  Were you

10  present at this meeting with Mr. Bonds and Mr. Foreman?

11     A.  If -- if Johnny would have been interviewing

12  Nathan Foreman, I would have been there.

13     Q.  Okay.  Would you have taken notes on that

14  meeting?

15     A.  Not necessarily.

16     Q.  If you had taken notes, where would they be?

17     A.  They would be in the file but I probably didn't

18  take any.

19     Q.  You wouldn't have destroyed notes about that

20  meeting or any other meeting, would you?

21     A.  No.  I didn't take a lot of notes.

22     Q.  Let's look at Exhibit 78.  Exhibit 78.  Okay.

23  Exhibit 78 I showed you earlier, so, you should have a

24  copy of it, and it's that November 26th, 2001 fax from

25  Johnny Bonds to Lieutenant Clark.



1     A.  Okay.

2     Q.  And on the fax, if you look at the front cover

3  sheet, it says, "Another visitation request letter.  We

4  are supposed to be at your unit around 11:00 a.m. on

5  December 10th, 2001 to see Inmate Foreman.  We also need

6  to see Inmate Beckcom after we talk to Foreman.  See

7  attached letter.  If there's a problem, please call me.

8  Thanks."  Do you see that?

9     A.  I do.

10    Q.  Okay.  And on that day when you met with

11 Mr. Beckcom -- you recall meeting with Mr. Beckcom that

12 day, right?

13    A.  Yes.

14    Q.  And did you meet with him in the lieutenant's

15 office?

16    A.  I don't remember where we met.

17    Q.  I'll -- I'll represent to you that was his

18 testimony at trial that you met in a lieutenant's

19 office.

20    A.  That's what Beckcom said at trial?

21    Q.  Yes.

22    A.  It's in the transcript?

23    Q.  That -- that you met at a lieutenant's office,

24 yes.

25    A.  Okay.



1       Q.   Okay.   Do you recall the name of that

2   lieutenant?

3       A.   I do not.

4       Q.   Okay.   Do you -- and you knew at this time that

5   Mr. Foreman and Mr. Beckcom were cellmates at FCI

6   Beaumont, right?

7       A.   I don't know if I knew that back then.

8       Q.   When did you learn that?

9       A.   I don't know that I've ever learned that.   I've

10  seen that in your petition.

11      Q.   You never knew at any time during your

12  prosecution of Mr. Prible's case that Foreman and

13  Beckcom were cellmates at FCI medium?

14      A.   I don't remember if I knew that.   I knew that

15  they all -- they all hung out together on the yard

16  working out outside.   I knew that but who was whose

17  cellmate, I don't know if I ever knew that.

18      Q.   And you don't -- you remember meeting with

19  Beckcom on December 10th, 2001 but not with Foreman; is

20  that correct?

21      A.   I remember the Beckcom meeting.   We -- it looks

22  like from your paperwork we met with Beckcom that same

23  day, too.   If Johnny told you that we met with Foreman

24  the same day, then we did, and I just don't remember it.

25  If Johnny remembers it, then that's what happened.



1    Q.  And that meeting would have been in the same

2  office presumably if you're --

3    A.  You would think so.

4    Q.  You would think so.  So, one would be coming in

5  and one would be leaving?

6    A.  Unless they were in separate areas and it was

7  easier for them to move us than them.

8    Q.  Do you have any recollection of that being the

9  case?

10    A.  We moved around a lot there.  We went wherever

11  they told us.

12    Q.  Okay.  I'm asking you specifically on December

13  10th, 2001 when you asked to meet with Beckcom

14  immediately after Foreman, do you have a specific

15  recollection of them moving you to a different part of

16  the prison to meet with these two individuals?

17    A.  I don't -- no, I don't remember where in the

18  prison we met with either one of them.

19    Q.  Do you know if Beckcom and Foreman passed each

20  other coming and going that day to the meeting?

21    A.  I have no idea.

22    Q.  Presumably they're cellmates, so, they're

23  talking about this case together, right?

24        MS. MIRANDA:  Objection, form.

25    A.  I didn't know they were cellmates.



1    Q.  (BY MS. SCARDINO)  Let me show you Exhibit

2  109-8.  Do you have it, 109-8?  Sorry, I thought I

3  already gave it to you.

4    A.  109-8?

5    Q.  8.

6              MR. DOYLE:  Yes.

7    A.  I have your yellow one, too, so --

8    Q.  (BY MS. SCARDINO)  That's the other one

9  actually.  That's the -- oh, it is on there.  Here, let

10  me --

11    A.  Trade?

12    Q.  No.  That's fine.  I didn't know that you had

13  the complete -- the complete thing.

14              Okay.  109-8, again, this is Mr. Bonds'

15  handwriting, right?

16    A.  Yes.

17    Q.  And it looks to be a conversation or a

18  memorialization of the meeting that he had with

19  Mr. Beckcom on December 10th, 2001 in which you were

20  also present, right?

21              MS. MIRANDA:  Objection, form.

22    A.  I see the name Michael Beckcom on the first

23  line.  I can't read the rest of it, if you want to read

24  it to me.

25    Q.  (BY MS. SCARDINO)  Okay.  It says, "12-10-01,



1   Michael Beckcom.  Nathan never told Mike about Kelly and

2   Bonds."  And Nathan there is referring to Nathan

3   Foreman, right?

4        A.  It would be Nathan Foreman.

5        Q.  So, at this conversation -- or this meeting

6   that you and Mr. Bonds had with Beckcom, you all were

7   discussing Nathan Foreman and his role in this case,

8   right?

9        A.  Not necessarily.

10       Q.  Well, why else would Nathan Foreman's name

11  appear on these notes?

12       A.  We would ask Michael Beckcom where all he had

13  information about Prible, and Johnny could have just

14  made a note, "It wasn't from Nathan."  Johnny could have

15  just made that note.

16       Q.  He could have just made a note, "It wasn't from

17  Nathan," just out of the blue, "It wasn't from Nathan"?

18       A.  If we had just interviewed Nathan Foreman right

19  before Beckcom like you're saying the paperwork shows.

20  I mean, you should ask Johnny Bonds that question, not

21  me.

22       Q.  I have asked Johnny Bonds that question but you

23  were also at the -- that meeting, right?

24       A.  Yes, but these aren't my notes.

25       Q.  Okay.  But if you had asked Mr. Beckcom where



1  he got information, would he have said to you in

2  response to that, "Well, I didn't get it from Nathan

3  Foreman"?

4      A.  No, but you need to keep in mind that Johnny

5  and I already didn't have a very good view of Nathan

6  Foreman's credibility, so, we wanted to make sure

7  Michael Beckcom wasn't getting it from Nathan Foreman --

8      Q.  So, did --

9      A.  -- since we already thought he was a liar.

10     Q.  And so, did you tell Michael Beckcom, "Don't

11  talk to Nathan Foreman.  He's a liar"?

12     A.  I doubt it.

13     Q.  Did you bring Nathan Foreman's name up in this

14  conversation with Michael Beckcom?

15     A.  Well, his -- his name is mentioned in Johnny

16  Bonds' notes, so, his name might have come up.

17     Q.  I'm going to show you Exhibit 174.  Exhibit

18  174, do you recognize this as the 10-page handwritten

19  statement that Mr. Beckcom gave to you and Mr. Bonds at

20  that December 10th, 2001 meeting?

21     A.  I don't remember that he gave this to us that

22  day.  Johnny wrote down "12-10-01" and his initials on

23  that day.

24     Q.  And had you met with Mr. Beckcom previously?

25     A.  In person, no.



1       Q.  Had you spoken with him on the phone?

2       A.  Yes.

3       Q.  Okay.  Is it -- and you say you didn't know if

4   he had given it to you on these day -- on this day of

5   December 10th, 2001.  When else might have -- he have

6   given it to you?

7       A.  I thought he gave me this 10-page letter when

8   he came to the Harris County jail right before the

9   trial.  That was what my memory was until just now.

10      Q.  Okay.  Had you asked Mr. Beckcom to take notes

11  of his communication -- his conversations with

12  Mr. Prible?

13      A.  I did not.

14      Q.  You did not?

15      A.  No.

16      Q.  Did you ask him to present you with a written

17  statement --

18      A.  No.

19      Q.  -- about Mr. Prible's -- what he had learned

20  about Mr. Prible's case?

21      A.  No.

22      Q.  Okay.  Did you use this statement that

23  Mr. Beckcom gave to you at that December 10th, 2001

24  meeting as a script for Mr. Beckcom's testimony at

25  trial?



1      A.  As a script, no.  I'm sure I -- I referred to

2  it, I used it, I looked it over to make sure I had it

3  all right in my head, but as a script, no.

4      Q.  Did you give -- or did Mr. Beckcom keep a copy

5  or make a copy of this statement for himself?  In other

6  words, did he give you his only copy or do you recall if

7  he made a copy of the statement himself?

8      A.  I'm sure he would keep a copy for himself but

9  I'm just assuming.

10      Q.  Did you ever --

11              MR. DOYLE:  Don't assume.

12              THE WITNESS:  I know.

13      Q.  (BY MS. SCARDINO)  Did you -- did you ever --

14              MS. SCARDINO:  Objection to the coaching.

15              MR. DOYLE:  Well, I just don't want her

16  speculating.

17              MR. RYTTING:  You can't instruct the

18  witness.

19      Q.  (BY MS. SCARDINO)  Did you -- did you disclose

20  to Mr. Gaiser or Mr. Wentz that you met with

21  Mr. Jefferson, Mr. Foreman and Mr. Beckcom back to back

22  at FCI Beaumont on December 10th, 2001 to discuss

23  Mr. Prible's case?

24      A.  I don't --

25              MS. MIRANDA:  Objection, form.



1        A.  I don't remember.

2        Q.  (BY MS. SCARDINO)  Now, you were talking -- you

3    began talking with the assistant U.S. attorney for

4    Michael Beckcom's case in California months before

5    Prible's trial, right?

6        A.  Months before Prible's trial?

7        Q.  Uh-huh.  You were already in talks with the

8    U.S. attorney about a possible sentence reduction for

9    Beckcom in this case?

10       A.  I think I might have called to introduce myself

11   to make sure I had the right prosecutor.  I don't think

12   we could talk much beyond that because nothing had

13   happened yet.

14       Q.  Why would you have called him to introduce

15   yourself as the prosecutor?

16       A.  To find out if he's the right prosecutor.

17       Q.  Okay.  But why would you have done that before

18   the trial -- before Mr. Prible's trial?

19       A.  Just to find out if he's the right prosecutor,

20   to find out about Michael Beckcom, to find out about the

21   situation.

22       Q.  The situation meaning what?  Mr. Beckcom's

23   sentence?

24       A.  Mr. Beckcom's sentence, Mr. Beckcom's crime,

25   what his fed -- fed prosecutor thought about him and the



 1 | whole process.

 2 |     Q.  I'm going to show you Exhibit 181.  Exhibit 181

 3 | is a March 4th, 2002 letter from Mark Cullers to you and

 4 | it says, "Enclosed please find the federal trial

 5 | testimony of Mike Beckcom."  And he -- he goes on to

 6 | say, "I will forward a printout of his docket sheet so

 7 | you can see exactly his sentence in federal court,"

 8 | right?

 9 |     A.  That's what the letter says, yes.

10 |     Q.  Okay.  And so, when you called -- you reached

11 | out to Mr. Cullers, and you told him that Mr. Beckcom

12 | was a potential informant for you in this Prible case

13 | and that you were interested in seeing what his sentence

14 | was, correct?

15 |     A.  Among other things, yes.

16 |     Q.  What else did you talk with him about?

17 |     A.  The crime Beckcom was in jail for and what this

18 | fed prosecutor thought about Beckcom.

19 |     Q.  Okay.  Did you discuss the possibility of a

20 | Rule 35 reduction for Mr. Beckcom if he testified in

21 | your case?

22 |     A.  If he testified truthfully and completely in my

23 | case, yes.

24 |     Q.  But you did discuss that --

25 |     A.  Yes.



```
 1        Q.  -- with Mr. Cullers?

 2             And I'm going to show you Exhibit 126.

 3   Exhibit 126 is a March 5th, 2002 letter from Mr. Cullers

 4   to you enclosing the initial Texas Rangers report

 5   regarding the murder of Nick Brueggen, who was

 6   Mr. Beckcom's victim, right?

 7        A.  I don't remember the name but I remember this.

 8        Q.  Okay.  It says, "Thought you might find it

 9   helpful.  Mike Beckcom was sentenced to 135 months,"

10   right?

11        A.  That's what this says, yes.

12        Q.  Yes.  And so, this shows that you all had

13   discussed Mr. Beckcom's sentence, correct?

14        A.  Yes.

15        Q.  And there would have been no reason for you to

16   discuss Mr. Beckcom's sentence with Mr. Cullers if not

17   in the context of a potential Rule 35 motion down the

18   road, right?

19        A.  Well, most likely that was the reason but I

20   would still want to know what his sentence was and what

21   he did.

22        Q.  And Mr. Beckcom knew that you were in talks

23   with Cullers leading up to Mr. Prible's trial, right?

24        A.  Yes.

25        Q.  Okay.  And he knew about these conversations
```



 1  because you wanted to reassure him that if he testified

 2  truthfully in Mr. Prible's case that a Rule 35 motion

 3  might be had, right?

 4      A.  Who is "he"?

 5      Q.  Mr. Beckcom.

 6      A.  Say the question again.

 7      Q.  You said that Mr. Beckcom was aware that you

 8  were speaking with Mr. Cullers leading up to

 9  Mr. Prible's case, and I'm asking you if the reason you

10  told Mr. Beckcom that you were communicating with

11  Mr. Cullers was so Mr. Beckcom would be reassured that a

12  Rule 35 motion would be forthcoming in his case if he

13  testified truthfully; is that correct?

14      A.  Yes.

15      Q.  And if you look at Exhibit 127 --

16          MS. SCARDINO:  I have one copy.  So, let me

17  let her read it and then I'll --

18          MR. DOYLE:  Read it and then I'll look at

19  it.

20      A.  Isn't this the one you already showed me?

21      Q.  (BY MS. SCARDINO)  Maybe I have.

22          MS. MIRANDA:  What number is that?

23          MS. SCARDINO:  127.  Maybe that's why I

24  don't have another copy.

25          MS. MIRANDA:  I have it right here.



1      A.   I think you showed me this already.

2      Q.   (BY MS. SCARDINO)   Okay.

3      A.   Yes.

4      Q.   Okay.  Now, this is undated, right, this

5  letter?  There's no date on this?

6      A.   Correct.

7      Q.   Okay.  And Mr. Beckcom is asking you for

8  reassurance and -- and you mentioned that you did give

9  him reassurance at some point by --

10     A.   This letter is different.  It's not really

11 reassurance.  He's asking for other things, different

12 things.

13     Q.   And in addition, he's also asking you, first of

14 all, if you could -- if there was anything you could do

15 to help him correct some of the mistakes the feds made

16 in his case?

17     A.   He wants me to help him file nunc pro tunc and

18 do all kinds of things, which have nothing to do with

19 the Prible case.

20     Q.   Okay.  Did you help him prepare a nunc pro tunc

21 in his state case?

22     A.   No.

23     Q.   Do you know if he prepared a nunc pro tunc in

24 that case?

25     A.   You showed me something earlier where it looked



1  like he had --

2       Q.   Uh-huh.

3       A.   -- because the clerk answered him back that the

4  judgment spoke for itself and he couldn't get a nunc pro

5  tunc but that was between him and the clerk in that

6  county.

7       Q.   So, you had nothing to do with him filing a

8  motion for nunc pro tunc?

9       A.   Not that I remember, no.

10      Q.   Did you have any communications at any time

11  with the prosecutor in the state case about his

12  conviction or sentence in that case?

13      A.   No.

14      Q.   He also says in this Exhibit 127, "I've

15  currently filed for a name change to the name that I was

16  supposed to keep while in the fed's custody but I keep

17  meeting resistance with the clerk in Beaumont.  Can you

18  give me any advice on this?"

19      A.   Yeah, I don't remember anything about that.

20      Q.   You don't remember giving -- you didn't give

21  him any advice on the name change?

22      A.   No.

23      Q.   Okay.  He also says, "Can you give me any

24  reassurance that the feds are going to do the right

25  thing on this case?"



 1      A.   Well, they all ask that.

 2      Q.   And you gave him some reassurance, right?

 3      A.   I'm sure I told him the same thing I tell all

 4 of them.

 5      Q.   Which is what?

 6      A.   "Testify truthfully and completely about the

 7 facts of the case, and if you do, when you do, I'll tell

 8 your fed prosecutor, and they take it from there."

 9      Q.   And you also reassured him by telling him that

10 you were already in communication with that prosecutor?

11      A.   Yes.

12      Q.   He also says in that letter, Exhibit 127, "I

13 may have a solution to these problems if you can assist

14 me in making contact with the DEA and an FBI agent.

15 Another inmate, Anthony Davi, and I have come onto a

16 couple of situations that would interest both of these

17 agencies."

18           Now, did you contact -- or -- or -- contact

19 Mr. Beckcom to discuss with him this information that he

20 claimed he and Anthony Davi had?

21      A.   No.

22      Q.   You never --

23      A.   I don't remember.

24      Q.   -- spoke with him about that?

25      A.   I don't remember that.  I don't know what that



 1  is.

 2      Q.  Okay.  It does not ring a bell, you never

 3  reached out to him about that?

 4      A.  I don't remember any of that.

 5             MR. DOYLE:  How are we doing, Gretchen?

 6             MS. SCARDINO:  We can -- let's see.  Let me

 7  get through this line of questioning and we can take a

 8  quick break.  How long have we been going?

 9             MR. DOYLE:  About 45 minutes.

10             MS. SCARDINO:  Okay.  Is that okay?

11             MR. DOYLE:  I just need to make a call

12  shortly.

13             MS. SCARDINO:  Okay.  We can --

14             MR. DOYLE:  If you give me five minutes,

15  that's all.

16             MS. SCARDINO:  Yeah, that's fine.  We

17  can -- we can do that.  I'd just ask that you didn't --

18  wouldn't talk to the witness because we have a question

19  pending, that's all.

20             MR. DOYLE:  I'm sorry.  Go ahead with your

21  question.

22             MS. SCARDINO:  No, it's all right if you --

23             MR. DOYLE:  Go ahead.  Go ahead.

24             MS. SCARDINO:  Okay.

25      Q.  (BY MS. SCARDINO)  So, Exhibit 81 is a letter



1  from Ted Wilson from the DA's office to Lieutenant Clark

2  at FCI medium, and it's asking -- he's respectfully

3  requesting permission for you and Mr. Bonds to interview

4  two inmates by the name of Michael Beckcom and Antone

5  Davi on May 6, 2002.  Do you see that?

6       A.  I see that.

7       Q.  Okay.  So, you did reach out to Mr. Beckcom and

8  take him up on this offer to discuss this other case

9  with him?

10      A.  I -- I don't remember Antone Davi at all.

11      Q.  Okay.  Do you deny that you sent -- that this

12  letter was sent from your office to arrange a meeting to

13  discuss --

14      A.  No.  I see that.

15      Q.  -- this with Mr. Beckcom and Mr. Davi?

16      A.  I see that.

17      Q.  Did you ever disclose to Mr. Prible's defense

18  counsel that you had set up this meeting with Mr. --

19  Mr. Beckcom to discuss this information that he claimed

20  to have with Mr. Davi?

21      A.  I don't remember anything about Antone Davi or

22  any information, if there was any.

23      Q.  Do you know if you only met with Mr. Beckcom

24  and Mr. Davi once on this May 6th, 2002 date?

25              MS. MIRANDA:  Objection, form.



1      A.   I don't remember ever meeting with Antone Davi.

2   I don't remember that name at all.

3           MS. SCARDINO:  Okay.  Let's go ahead and

4   stop right here.

5           MR. DOYLE:  Take about five minutes.

6           THE VIDEOGRAPHER:  The time is 3:33.  We're

7   off the record.

8           (Short recess.)

9           THE VIDEOGRAPHER:  This is the beginning of

10  file 7.  The time is 3:50.  We are on the record.

11     Q.   (BY MS. SCARDINO)  Ms. Siegler, Beckcom

12  testified at Mr. Prible's trial that he had gotten your

13  name from Mr. Foreman.  Do you remember that testimony?

14     A.   I don't remember that part, no.

15     Q.   Okay.  Do you deny that that was the testimony?

16     A.   You can show me the transcript.

17     Q.   Okay.  On Page 23 of Mr. Beckcom's testimony,

18  which is Volume 26, I believe, of the trial transcript,

19  you say -- you say, question, "Who was the person who

20  gave you my name?"

21           And he answers, "Nathan Foreman."

22           Next question, "And how did you know Nathan

23  Foreman?"

24           Answer, "He was -- he lived in my unit at

25  the prison and then ultimately became my cellmate.'



 1      A.  Can I see that?

 2      Q.  Let me get you a different copy because this

 3  one has my notes on it.

 4      A.  Okay.

 5      Q.  Do you -- are you disagreeing that that's what

 6  I'm reading you?  I understand I've been trying to give

 7  you copies of everything but --

 8      A.  Well, I just would like to read --

 9      Q.  -- I do also want to keep --

10      A.  -- the page before and the page after and be

11  real careful.

12      Q.  Okay.

13          MS. SCARDINO:  Let's go off the record.

14  I'll print you a clean copy real quick of the pages.

15          THE VIDEOGRAPHER:  The time is 3:53.  We're

16  off the record.

17          (Off the record.)

18          THE VIDEOGRAPHER:  This is the beginning of

19  file 8.  The time is 3:55.  We are on the record.

20      Q.  (BY MS. SCARDINO)  Ms. Siegler, at the -- on

21  the break, we were -- let you read the pages previous to

22  this testimony by Mr. Beckcom on Page 23 of the Prible

23  trial transcript, right?  You've read that?

24      A.  Correct.

25      Q.  And does that refresh your recollection that it



 1  was Nathan Foreman who gave Mr. Beckcom your name to

 2  call you about Mr. Prible's case?

 3      A.  Yes.

 4      Q.  Okay.  Exhibit 129 is a letter from you to Mark

 5  Cullers, Beckcom's U.S. attorney out in California,

 6  dated October 29th, 2002.  And this was right after

 7  Mr. Prible's trial, and you were informing him of

 8  Mr. Beckcom's cooperation in that trial.  Do you see

 9  that?

10      A.  Okay.

11      Q.  Okay.  And in that letter, Exhibit 129, you

12  tell Mr. Cullers that, "Michael Beckcom first came to my

13  attention when he made me aware that he had information

14  that would be helpful to my case."  Do you see that?

15      A.  I do.

16      Q.  Okay.  And there's nothing in this letter to

17  Mr. Cullers about how Mr. Foreman had given Mr. Beckcom

18  your name to call you about this case, right?

19      A.  No.

20      Q.  Mr. Foreman's name is not mentioned in this

21  letter at all?

22      A.  It is not.

23      Q.  Okay.  And in the letter, you also state,

24  quote, "At that time, Beckcom was incarcerated at

25  Beaumont medium FCI with my trial defendant, Prible, and



 1 | that is where and how Prible came into contact with

 2 | Beckcom and confided details of his capital murder

 3 | offense to Beckcom."  Do you see that?

 4 |      A.  Where?  Which paragraph?

 5 |      Q.  The second paragraph, second line.

 6 |      A.  Okay.

 7 |      Q.  In here, there's still no mention of

 8 | Mr. Foreman or this larger informant network, is there,

 9 | in this letter?

10 |      A.  To Beckcom's fed prosecutor, no.

11 |      Q.  That's right?

12 |      A.  There is not.

13 |      Q.  So, you never revealed to Mr. Cullers that

14 | actually Beckcom's cellmate had come to you on August

15 | 8th, 2001, before he had even met Mr. Prible, to try to

16 | set Mr. Prible up in this case and you determined that

17 | he was a liar, right?

18 |           MS. MIRANDA:  Objection, form.

19 |           MR. DOYLE:  Objection.

20 |      A.  That's incorrect.

21 |      Q.  (BY MS. SCARDINO)  You revealed all of that to

22 | Mr. Cullers?

23 |      A.  Mr. Cullers is Michael Beckcom's fed

24 | prosecutor.

25 |      Q.  I understand that.



 1            MS. SCARDINO:  Objection, nonresponsive.

 2       Q.  (BY MS. SCARDINO)  Did you reveal to

 3  Mr. Cullers that you had met with Nathan Foreman about

 4  Mr. Prible's case on August 8th, 2001 and determined

 5  that he was lying?

 6       A.  No.

 7       Q.  Okay.  You never mentioned Mr. Foreman at all

 8  to Mr. Cullers, right?

 9       A.  I did not.

10       Q.  Also in this letter to Mr. Cullers you write,

11  "I am not too familiar with how this process works.  So,

12  please forgive me if I have omitted some information you

13  need."  And by "process" here, you're referring to this

14  Rule 35 sentence reduction process, right?

15       A.  Yes.

16       Q.  But, in fact, you were very familiar with that

17  process by this time, right, because two months earlier,

18  you had testified in Moreno's hearing?

19       A.  Yes.

20       Q.  I'm going to show you Exhibit 130.  Exhibit 130

21  is a handwritten thank you note from Michael Beckcom to

22  you dated October 30th, 2002.  Do you see that?

23       A.  I see it.

24       Q.  Okay.  Do you recall receiving this note from

25  Mr. Beckcom?



1      A.  Now that I've read it, I remember getting it.

2      Q.  And he says in that letter, "I also appreciate

3  any further contact you may have with Mark Cullers that

4  might urge him to expediently file his motion on my

5  behalf."  Do you see that?

6      A.  I do.

7      Q.  Okay.  So, by "further contact," he knows that

8  you've already been in discussions with Mr. Cullers, as

9  we discussed previously, right?

10     A.  Yes.

11     Q.  Okay.  And it sounds here like this motion is a

12  foregone conclusion, wouldn't you agree?

13          MS. MIRANDA:  Objection, form.

14     Q.  (BY MS. SCARDINO)  He's -- he's not asking

15  Mr. Cullers -- or not appreciating any further contact

16  you have -- may have with Mr. Cullers that might

17  convince him to file a motion on my behalf, right?

18     A.  That's not what the letter says, no.

19     Q.  That's not what the letter says, right.  What

20  it says was, "I appreciate any further contact you may

21  have with Mark Cullers that might urge him to

22  expediently file his motion on my behalf," right?

23     A.  That's what it says.

24     Q.  So, Mr. Beckcom knows as of October 30th,

25  2002 -- or believed as of October 30th, 2002 that



 1  Mr. Cullers was going to write that motion, right?

 2              MS. MIRANDA:  Objection, form.

 3      A.  Mr. Beckcom knew that I had told him after he

 4  testified truthfully and completely that I would let

 5  Mark Cullers, his AUSA, know that he had testified

 6  truthfully and completely.  Mr. Beckcom understood, just

 7  like the jury was told, none of us had any control over

 8  what his AUSA, Mark Cullers, or his federal judge would

 9  do, if anything.

10      Q.  (BY MS. SCARDINO)  I'm going to show you

11  Exhibit 131.  Exhibit 131 is a November 4th, 2002

12  letters -- letter from AUSA Cullers to you saying that

13  the U.S. did not have jurisdiction to confer any benefit

14  on Beckcom for his cooperation with the State of Texas.

15  Do you see that?

16      A.  Let me read it.

17              I see it.

18      Q.  Okay.  Now, you could have left it at that,

19  right?  You could have left it at that, your dealings

20  with Mr. Cullers concerning Mr. Beckcom's sentence?

21      A.  Right.

22      Q.  Because at this point, you've done what you

23  told the jury that you would do, right, you would write

24  a letter to Mr. Cullers, which you did, right?

25      A.  There was, obviously, some confusion because



1  Mr. Cullers never told me this part that's -- that's

2  addressed in the letter dated November 4th of '02.  He

3  never told me that before, and I don't know that Michael

4  Beckcom knew that either.

5       Q.  And so, you were under the assumption or under

6  the understanding going into that trial that he had

7  jurisdiction to do this Rule 35 agreement, right?

8       A.  "He" being?

9       Q.  Mr. Cullers.

10      A.  I was.

11      Q.  Okay.  And you had conveyed that to Mr. Beckcom

12  as well, right?

13      A.  I think Mr. Beckcom thought the same thing,

14  right.

15      Q.  And he would -- only would have heard that from

16  you, right?  He didn't have --

17      A.  Oh, no.  Mr. Beckcom knew what the law was.  He

18  was well aware of all this.

19      Q.  If you could just let me finish my -- my

20  question so we're not talking over each other.

21           But Mr. Beckcom would not have had

22  independent communications with Mr. Cullers now, would

23  he have?

24      A.  He could have.

25      Q.  You think that Mr. Beckcom might have been



 1 | communicating with his federal prosecutor while he was

 2 | in prison?

 3 |      A.  He can write letters.

 4 |      Q.  So, it's your testimony that all the

 5 | information that Mr. Beckcom was getting regarding the

 6 | sentence -- the possible sentence reduction, he didn't

 7 | get it all from you?

 8 |      A.  You should ask Mr. Beckcom that.

 9 |      Q.  Let me show you Exhibit 132.  Exhibit 132 is a

10 | November 7th, 2002 fax from U.S. Attorney Mark McIntyre,

11 | who was at the U.S. attorney's office here in the

12 | Southern District of Texas.  Do you see that?

13 |      A.  I do.

14 |      Q.  Do you know Mr. Mark McIntyre?

15 |      A.  I do.

16 |      Q.  And he was forwarding a Rule 35 motion that he

17 | had filed in another case, right?

18 |      A.  Yes.

19 |      Q.  Okay.  And he says, "Call me if you want me to

20 | talk to the AUSA in Fresno."  Do you see that?

21 |      A.  I do.

22 |      Q.  And by the AUSA in Fresno, he's referring to

23 | Mark Cullers, right?

24 |      A.  Is that where Cullers is?  Yes.

25 |      Q.  Yes.  Okay.  Did he reach out to Mr. Cullers



 1 | for you?

 2 |     A.  I don't think so.

 3 |     Q.  He might have but you don't recall?

 4 |     A.  I don't think he did.  This -- I just needed a

 5 | go-by, and Mark McIntyre used to work at the Harris

 6 | County DA's office and now he's with the feds still, and

 7 | I just needed a go-by, and that's why I asked him.

 8 |     Q.  And so, you consulted him to give you -- to

 9 | send you a go-by so you could help Mr. Cullers prepare

10 | this Rule 35 motion?

11 |     A.  Not Mr. Cullers, no.  Mr. Cullers knows what

12 | he's doing.  I just didn't know the process.

13 |     Q.  Well, why would you have needed a go-by if you

14 | weren't preparing the Rule 35 motion?

15 |     A.  I wanted to read the -- the rule on the

16 | considerations and guidelines that a federal judge looks

17 | into and his AUSA looks into before they ever move

18 | forward to see if I'm answering their questions.

19 |     Q.  And on November 12th, 2002, you left

20 | Mr. Cullers a phone message, Exhibit 133.  Do you see

21 | it -- it -- you reference a phone call that you made to

22 | him on November 12th?

23 |     A.  I see that.

24 |     Q.  Okay.  And what did you tell Mr. Cullers in

25 | that phone call?



1      A.  Well, can I read the letter first?

2      Q.  Sure.

3      A.  Okay.

4      Q.  Okay.  Do you recall what you said to Mr. --

5  Mr. Cullers in that phone message on November 12th,

6  2002?

7      A.  No.

8      Q.  Mr. Cullers called you back and left a message

9  for you on November 12th, 2002.  Do you recall that

10 message?  Probably not.  It's been 15 years.

11     A.  I thought it was the other way around.

12     Q.  It was.  You called -- it looks like you called

13 him from that letter and now he called you and left you

14 a message, which was produced by the DA's office.

15     A.  Okay.

16     Q.  Okay.  And I'll play that message for you now.

17 This is just an audio recording.

18              (Audio recording played.)

19     Q.  (BY MS. SCARDINO)  Do you recall receiving that

20 message from Mr. Cullers?

21     A.  Vaguely.

22     Q.  Okay.  It sounded like there was a

23 misunderstanding between the two of you.  Do you agree?

24     A.  Yes.

25     Q.  And he says in that -- in that message -- and



1  he was responding to your message on November 12th,

2  2002, right?

3       A.  Yes.

4       Q.  And he says in the beginning of that message,

5  "If Mike testified in your case with the expectation of

6  some deal from us, that would probably have to be

7  disclosed -- disclosed to the defense in your case," end

8  quote.  You heard that?

9       A.  I heard that.

10      Q.  Okay.  Did you tell Mr. Cullers in that

11 November 12th, 2002 message that you left for him that

12 Mike had testified in this case with the expectation of

13 some deal?

14      A.  No.

15      Q.  Okay.  I'm going to show you Exhibit 133.

16           MS. MIRANDA:  I think you have that one

17 right in front of us.

18           MS. SCARDINO:  Oh, we do?

19           MS. MIRANDA:  Yeah.  That's the one we were

20 just looking at, right?

21           MS. SCARDINO:  Yes.  Oh, sorry.

22      Q.  (BY MS. SCARDINO)  Okay.  And in that letter,

23 Exhibit 133, you beg Mr. Cullers to reconsider based on

24 the, quote, vital role that Beckcom played in obtaining

25 a conviction of Prible, right?



 1        A.   I disagree with the word "beg," and the letter
 2   speaks for itself.
 3        Q.   Okay.  Do you agree that Mr. Beckcom was the
 4   star witness in your case against Mr. Prible?
 5        A.   No.
 6        Q.   But he did play a vital role?
 7        A.   No.  He played a role.
 8        Q.   So, you disagree with the statement "a vital
 9   role" that you said in this -- in this letter that you
10   wrote to Mr. Cullers?
11        A.   Michael Beckcom played a role.
12        Q.   I'm going to show you Exhibit 135.  This is a
13   November 15th, 2002 E-mail from you to Mr. Cullers
14   regarding Beckcom's attorney.  Do you see that?
15        A.   I do.
16        Q.   And you're giving -- you're providing
17   Mr. Cullers with Beckcom's attorney's name and contact
18   information, right?
19        A.   Yes.
20        Q.   Okay.  And eventually, Mr. Cullers did decide
21   to -- to write that Rule 35 motion for Mr. Beckcom,
22   right?
23        A.   I don't remember.
24        Q.   You don't recall if Mr. Beckcom got any time
25   off --



1     A.  I do not.  What is the end of the story?  I

2  don't know.

3     Q.  Well, I'm ask --

4     A.  I don't know.

5     Q.  I mean, I'm asking you because you were at the

6  story.

7     A.  And I don't remember.

8     Q.  So, you -- you're saying after you -- this last

9  correspondence that I showed you with Mr. Cullers, you

10  didn't have any follow up with him about what the

11  sentence reduction would be?

12     A.  I don't remember if I did because I don't know

13  if there was a sentence reduction.

14     Q.  Other than this correspondence that you had

15  with Mr. Cullers regarding that Rule 35 motion for

16  Mr. Beckcom, did you do any other favors for

17  Mr. Beckcom?

18          MR. DOYLE:  Objection.

19     A.  Well, I wouldn't characterize that as a favor

20  either.

21     Q.  (BY MS. SCARDINO)  Did you give Mr. Beckcom any

22  benefits other than corresponding with Mr. Cullers about

23  his testimony in Mr. Prible's case?

24          MR. DOYLE:  Objection.

25     A.  I don't understand the word "benefits."



1   Q.  (BY MS. SCARDINO)  Okay.  Well, I'll show you

2   Exhibit 128 -- oh, Exhibit 136.  Exhibit 136 is a

3   printout from the case summary of Beckcom's state case,

4   the capital murder case.

5              MS. MIRANDA:  Do you have another copy?

6              MS. SCARDINO:  Yeah.

7              MS. MIRANDA:  Thanks.

8   Q.  (BY MS. SCARDINO)  And if you look on Page 2,

9   it says July 20th, 2000, the third entry?

10   A.  July 20th, 2000?

11   Q.  2000.  The third entry.

12   A.  Okay.

13   Q.  And it says that he's being sentenced for

14   murder, intentionally causing death and that that

15   sentence was to run consecutive with his prior sentence.

16   Do you see that?

17   A.  I see that.

18   Q.  Okay.  And then if you look at Mr. Beckcom's

19   trial testimony on Page 9 --

20              MS. SCARDINO:  Tina, do you have a copy of

21   Mr. Beckcom's trial testimony?

22              MS. MIRANDA:  Oh, I'm sorry.

23              MS. SCARDINO:  No, that's okay.

24   Q.  (BY MS. SCARDINO)  If you start on Page 9, line

25   2, you're questioning Mr. Beckcom in Mr. Prible's trial,



1 and your question is, "What did you receive as part of

2 your plea bargain agreement on the state case, the state

3 murder case out of Aransas County?"

4                  Answer, "Five years."

5                  Question, "And a thousand dollar fine?"

6                  Answer, "Correct."

7                  Question, "And how about out of the federal

8 case?"

9                  Answer, "135 months."

10                  Question, "Which is the equivalent of about

11 how many years?"

12                  Answer, "11 years, 3 months."

13                  Question, "And is that what you're

14 currently incarcerated for?"

15                  Answer, "Yes, it is."

16                  Question, "So, tell the jury how long

17 you've been in prison for that federal offense now."

18                  Answer, "Going on five years now."

19                  Question, "And when is your expected

20 release date?"

21                  Answer, "The earliest is around the end of

22 2006."

23                  Question, "So, you have about how many

24 years left?"

25                  Answer, "Four."



1              Question, "As it stands right now?"

2              Answer, "Correct."

3              Question, "How did your sentence run?  Did

4   they run concurrently or consecutively, your state 5

5   years and your federal 135 months?"

6              The answer, "State is running concurrent

7   with the federal."

8              And -- do you see that?

9        A.  I do.

10        Q.  And so, my question to you is do you know how

11   Mr. Beckcom's sentence went from running consecutively

12   with his federal case to running concurrently with his

13   federal case?

14        A.  I would need to see his judgment and sentence

15   from federal court.

16        Q.  Well, I'm just asking you if you had any

17   role --

18        A.  Oh, no.

19        Q.  -- in having that sentence changed to run

20   concurrently?

21        A.  No.

22        Q.  Okay.  I'm going to show you Exhibit 170, which

23   we've looked at before.  It's Michael Beckcom's phone

24   records, and I'll tell you exactly where to go.  If you

25   go to Bates label number 63 down at the bottom.



1          THE WITNESS:  Which one is that?

2     Q.  (BY MS. SCARDINO)  Are you on 63?

3     A.  Okay.

4     Q.  Okay.  If you go to date April 17th, 2002 --

5     A.  Okay.

6     Q.  -- you'll see that Beckcom called the DA's

7  office Special Crimes phone number on that date?

8     A.  I see that.

9     Q.  Okay.  So, that was April 17th, 2002 he's

10  trying to reach out to you?

11     A.  Not necessarily.

12     Q.  Not necessarily?  Might he have been reaching

13  out to someone else in the DA's office for some reason?

14     A.  You should ask him that.

15     Q.  Well, I'll ask you did you -- were you aware of

16  any other prosecutor that he was working on cases with

17  at this time in the DA's office?

18     A.  I wasn't.

19     Q.  You weren't.  Okay.  Exhibit 137.  Exhibit 137

20  is Beckcom's parole application, and it's dated April

21  19th, 2002.  Do you see that?

22     A.  Should I have seen this before?

23     Q.  I'm asking you -- well, I'm asking you if you

24  see this -- obviously --

25     A.  I've never seen this before.



1      Q.  You've never seen this before?

2      A.  I don't think so.

3      Q.  So, you didn't fill this out for Mr. Beckcom?

4      A.  What?

5      Q.  I'm asking you did you fill it out for

6  Mr. Beckcom?

7      A.  What is it?

8      Q.  It's his application for parole in the state

9  case.

10     A.  You're asking me if I filled this out?

11     Q.  I am.  I'm just asking if you filled it out for

12 him?

13     A.  No.

14     Q.  Okay.  Did you have any role in assisting him

15 in applying for parole in his state case in April of

16 2002?

17     A.  No.

18     Q.  If you go back to Page 170 -- or Exhibit 170,

19 the same page we were looking at, 63.

20     A.  Same page?

21     Q.  Uh-huh.  On April 24th, 2002, Beckcom again

22 reaches -- or calls the Special Crimes unit.  Do you see

23 that?

24     A.  Not yet.  What day?

25     Q.  April 24th, 2002.



1    A.  Okay.

2    Q.  And then Exhibit 186 --

3    A.  That was a 2 minute call.

4    Q.  Yes, I see that.  And my question to you --

5    A.  That doesn't mean he talked to anybody.

6    Q.  My question to you was he called the phone

7  number at the DA's Special Crimes unit on that date,

8  right?

9    A.  He did.

10   Q.  Okay.  So, on April 17th, 2002, he called that

11 number, correct?

12   A.  That's the one we did a while ago?

13   Q.  Yes.

14   A.  Yes.

15   Q.  And on April 19th, he signed -- or filled out a

16 parole application or someone filled out a parole

17 application and dated it April 19th, 2002, right?

18   A.  I have no idea who did that.

19   Q.  Well, you'll agree that that Exhibit 137 is

20 dated 2000 -- April --

21   A.  I don't know where --

22   Q.  -- 19th, 2002?

23   A.  I don't know where you got that from.  I've

24 never seen that before.  You can ask someone who has

25 information about that to verify it.  I can't.



1       Q.   Okay.   I'm just asking if the date on that is

2   April 19th, 2002.   Do you see that at the bottom?

3       A.   I don't know anything about that.   I'm not

4   going to answer anything about it.

5       Q.   Okay.   And in Exhibit 170, we see that Beckcom

6   again called that number at Special Crimes a few days

7   later on April 24th, 2002, right?

8       A.   And it looks like he again didn't speak to

9   anybody.   It's a 2 minute call.

10      Q.   You have no recollection, sitting here 15 years

11  later, as to whether or not he spoke with anyone on that

12  date, do you?

13      A.   I have enough sense to know that not much could

14  get done in a 2 minute phone call after he went through

15  2 receptions, if not 3.

16      Q.   Right.   So, if he had spoken with you, it would

17  have been because you had called him on a unit manager's

18  phone to return his call, right?

19      A.   No.   No, not at all.

20      Q.   I'm going to show you Exhibit 186.   It's not

21  186.   One second.

22              MR. RYTTING:   Ask how much time we've got

23  left.

24              MS. SCARDINO:   Yeah.   How much time have we

25  been going?



KELLY SIEGLER                                    October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                         263

1              THE VIDEOGRAPHER:  We've been going for 5

2    hours and 19 minutes.

3              MS. SCARDINO:  Okay.

4       Q.  (BY MS. SCARDINO)  We're going to have to go

5    back to that exhibit.

6              Do you know if Mr. Beckcom was, in fact,

7    granted parole in his state case in 2002?

8       A.  I do not know.

9       Q.  Okay.  Aside from writing that letter to

10   Mr. Foreman's prosecutor for the Herrero case --

11      A.  Mr. Foreman?

12      Q.  Mr. Foreman's prosecutor, right.  We discussed

13   that earlier.

14      A.  Okay.

15      Q.  The letter to Ms. Batson.  Did you do anything

16   else in the way of a benefit for Mr. Foreman as a result

17   of his assistance in either the Prible or the Herrero

18   cases?

19      A.  The letter having to do with getting them all

20   separated.

21      Q.  Okay.  Did you have any charges against him

22   dropped?

23      A.  Not that I remember.

24      Q.  That would have been -- needed to have been

25   revealed, right?



1      A.  Yes -- no, he didn't testify for anybody ever.

2      Q.  So -- so, because he didn't testify, in -- in

3   your mind, you didn't need to reveal the fact that you

4   had written a letter for him?

5      A.  Not in the Prible case, no.  He had nothing to

6   do with the Prible case, Nathan Foreman.

7      Q.  I'll show Exhibit 116.  Exhibit 116 was the

8   Brady motion filed by Prible's counsel pretrial.  Do you

9   see that?

10     A.  Yes.

11     Q.  Okay.  Now, the defense wasn't required to file

12  this motion, right?  All this information -- Brady

13  information should have been revealed by this time,

14  right?

15     A.  Correct.

16     Q.  Okay.  It's the state's burden to produce that

17  information, right?

18     A.  Correct.

19     Q.  Okay.  On Section 2, 1B, and I know it's

20  difficult to read because of your notes, but you'll see

21  it says one of the things they asked you to reveal -- to

22  disclose was the date, place and manner of the state's

23  contacts with this witness, meaning Michael Beckcom,

24  including a statement of how contact was first initiated

25  and with whom it was made.  Do you see that?



1      A.   I see that.

2      Q.   And did you tell defense counsel that contact

3  was actually first made with Nathan Foreman, Beckcom's

4  cellmate?

5      A.   I don't believe that was the case.

6      Q.   You don't believe that you spoke with

7  Mr. Foreman before you spoke with Mr. Beckcom?

8      A.   That's not what you asked me.

9      Q.   I believe it is what I asked you but I'll --

10  I'll rephrase it.

11            Did you tell the defense that contact was

12  actually first made with Nathan Foreman, Beckcom's

13  cellmate?

14      A.   I read this to be contact that Beckcom first

15  made with me.

16      Q.   That's right.  So, did you -- okay.  Did you

17  reveal to the defense that you had spoken with

18  Mr. Foreman back in August 8th, 2001, he was -- he was

19  Mr. Beckcom's cellmate?

20      A.   He wasn't his cellmate.  He wasn't his cellmate

21  then.

22      Q.   When did he become his cellmate?

23      A.   I don't know.

24      Q.   How did you --

25      A.   Because in the transcript you just showed me,



1  Beckcom told you he became his cellmate later, another

2  misstatement in your petition.  He wasn't his cellmate

3  then.

4       Q.  Okay.  I thought you said earlier you didn't

5  know that they were ever cellmates?

6       A.  I didn't.  I just read it a while ago when I

7  looked at Tina's transcript from Beckcom's testimony,

8  and that reminded me of what Beckcom said back then.

9       Q.  Okay.  But eventually, he became Beckcom's

10  cellmate prior to this trial, right?

11       A.  No, I don't know if it was prior to the trial.

12  I don't know when it happened.

13       Q.  Okay.  Number 1C in that exhibit, it asks for a

14  list of all cases in which Beckcom has appeared as a

15  witness, been listed as a witness or volunteered to

16  appear as a witness.  Did you disclose any other cases

17  in which Mr. Beckcom was a witness for you in response

18  to this motion?

19       A.  A witness for me?

20       Q.  Yes.

21       A.  There was only the one.

22       Q.  He wasn't a witness for you in any other case

23  that you prosecuted?

24       A.  No.

25       Q.  I'm going to show you Exhibit 145.  This is a



1  probable cause affidavit in the case of Danny Bible.

2  That was a case you prosecuted, right?

3       A.   It was.

4       Q.   And if you look at the next -- actually, the

5  third page of this printout, under active parties, it

6  says, "Michael Beckcom, connection, previous bench

7  warrant, witness for the prosecution."  Do you see that?

8       A.   Where is it?  No.  Show me.  I can't -- I just

9  can't read it.

10      Q.   Third -- third line down, "Beckcom, Michael,

11 connection to Mr. Bible's case" --

12      A.   Okay.

13      Q.   -- "previous bench warrant, witness for the

14 prosecution."

15      A.   What's your question?

16      Q.   So, he was a witness for you in Mr. Bible's

17 case --

18      A.   He was not.

19      Q.   -- as well?

20      A.   He was not.

21      Q.   He wasn't a testifying witness maybe but you

22 had spoken with Mr. Bible's case?

23      A.   No, ma'am.  He -- he was bench warranted and

24 connected to that case when he was brought back so

25 Jeffrey Prible wouldn't know that he was brought back



 1  for Jeffrey Prible's case.

 2      Q.  So, you put a different name on the bench

 3  warrant?

 4      A.  That could be the explanation for it.

 5      Q.  Okay.  Now, going back through that Exhibit

 6  170, I believe it was, the motion.  When E says to

 7  disclose agreements made with Beckcom concerning

 8  benefits he would receive in exchange for testimony --

 9      A.  Wait.  Are you on 170 or --

10      Q.  I'm sorry.  I believe it's 170.

11      A.  116 you mean?

12      Q.  Hold on.  I'm sorry.  Is it 1 -- yes, 116.  1E.

13      A.  1E?

14      Q.  Uh-huh.  They are asking you to disclose

15  agreements made with Beckcom concerning benefits he

16  would receive in exchange for testimony, including --

17      A.  Just a minute.  You have to show me.  I can't

18  find it fast enough.

19      Q.  Here.

20      A.  Okay.

21      Q.  Section E, "Agreements made with Beckcom

22  concerning benefits he would receive in exchange for

23  testimony, including oral agreements."  Do you see that?

24      A.  Yes.

25      Q.  Now, in response to that motion, did you reveal



 1  to defense -- the defense counsel for Mr. Prible that

 2  you had arranged a meeting with Mr. Beckcom and Mr. Davi

 3  at Mr. Beckcom's request?

 4       A.  No.  That's not what happened.

 5       Q.  That's not what happened?

 6       A.  No.  I don't remember arranging a meeting with

 7  Mr. Davi.  I don't remember Mr. Davi.

 8       Q.  Okay.  Ms. Siegler, in the Temple trial, you

 9  testified that you deleted all your E-mails while at the

10  DA's office; is that correct?

11       A.  I think I testified that when I was done

12  working on a given E-mail and the to-dos were done, I

13  deleted it.

14       Q.  And you also deleted -- did you also delete all

15  the E-mails a second time from your trash folder?

16       A.  Yes.

17       Q.  Okay.  And you also deleted all E-mails that

18  you sent from your account, right?

19       A.  Well, I don't know about that.  I just didn't

20  want them in my in box where I had to look at them.

21       Q.  I'm going to show you Exhibit 154.  Do you have

22  Exhibit 154-1 still?  That's the manual.

23       A.  154-1, back to the manual?

24       Q.  Uh-huh.

25       A.  Here's yours back.



1      Q.  Thank you.

2      A.  Okay.  Here it is.

3      Q.  Okay.  Exhibit 154-1, Section 2.61, and it

4   states, "Computer hardware and software is provided to

5   staff members to carry out the duties of the office.

6   The Attorney General of Texas has held that electronic

7   mail is public information under the Texas Open Records

8   Act."  Do you see that?

9      A.  Is that the first paragraph?

10      Q.  Paragraph 2.61.

11      A.  The first paragraph?

12      Q.  If I can see it.  Yes.  It begins with the

13   first paragraph.

14      A.  I don't see it in the first paragraph, what you

15   just read.

16      Q.  Okay.

17          MS. MIRANDA:  I think it's the first and

18   the fourth.

19      Q.  (BY MS. SCARDINO)  And the fourth.  Okay.  So,

20   "Computer hardware and software is provided to staff

21   members to carry out the duties of the office."  Do you

22   see first sentence of Section 2.61?

23      A.  I see that, yes.

24      Q.  Okay.  And then if you go down to the fourth

25   paragraph.



1          MS. MIRANDA:  Fourth paragraph.

2     Q.  (BY MS. SCARDINO)  And it says, "The Attorney

3  General of Texas has held that electronic mail is public

4  information under the Texas Open Records Act."  Do you

5  see that?

6     A.  I do.

7     Q.  So, you had a duty to preserve your E-mails on

8  your DA account, didn't you?

9     A.  I assumed the office was doing that.

10    Q.  So, you assumed even though you personally were

11 deleting them, that the office was saving them?

12    A.  Yeah.  They had everybody's E-mails.

13    Q.  And where -- and they would be somewhere at the

14 DA's office?

15    A.  On the server.

16    Q.  I'll show you Exhibit 110.  This is a privilege

17 log from the DA's office to me dated September 21st,

18 2016.  And it's, obviously, very lengthy, so, I won't

19 make you read it, but I'll represent to you that we

20 subpoenaed your E-mails and that a search for E-mails

21 related to this case, in all of the results that came

22 up, I believe there's only one from your account.

23          MS. MIRANDA:  Do you have one more copy of

24 that?

25          MS. SCARDINO:  Yeah.



1      Q.   (BY MS. SCARDINO)  So, my question to you is if

2   they do have them at the DA's office, how do we find

3   those E-mails?  Because the DA's office could not find

4   them.  So, I'm asking you where were they stored, to

5   your knowledge?

6      A.   Well, first of all, I don't know that there

7   would be any more.  I don't know why I would have

8   E-mails specifically dealing with Prible.  I'm trying to

9   think of why I would.  Because back then, we did not

10  E-mail lawyers like they do today.  We didn't.

11     Q.   In 2001?

12     A.   Yeah.

13     Q.   Well, in the Temple case, there were E-mails

14  but you testified that you deleted your E-mails, right?

15  There are other E-mails from others, right?

16     A.   Right.

17     Q.   And in this case, there are a lot of E-mails

18  from other people but none from you, right?  So, other

19  lawyers in the office were using E-mail at that time?

20     A.   I meant defense lawyers, sorry, between

21  prosecutors and defense lawyers.

22     Q.   I'm talking any E-mails that you sent or

23  received about this case --

24     A.   Okay.

25     Q.   -- where would they be located if you deleted



 1  them?  Where could we find them?

 2      A.  The DA's office would have them.  If there were

 3  any more, they would have them.  They would be here.

 4  There must not be any more.  That doesn't surprise me.

 5              MS. SCARDINO:  How much time do we have?

 6              THE VIDEOGRAPHER:  We have 5 hours and 35

 7  minutes.

 8              MS. SCARDINO:  Okay.  If we can take a

 9  5-minute break, I think I can finish -- get exactly what

10  I need to do and then hand it over to James.

11              THE VIDEOGRAPHER:  The time is 4:41.  We're

12  off the record.

13              (Short recess.)

14              THE VIDEOGRAPHER:  This is the beginning of

15  file 9.  The time is 4:51.  We are on the record.

16      Q.  (BY MS. SCARDINO)  Ms. Siegler, at Mr. Prible's

17  trial, your coincidental contact theory between

18  Mr. Beckcom and Mr. -- Mr. Prible was very important to

19  your case, would you agree?

20              MS. MIRANDA:  Objection, form.

21      A.  Say that again.

22      Q.  (BY MS. SCARDINO)  Your theory at trial was

23  that Mr. Beckcom and Mr. Prible came into contact

24  coincidentally at FCI Beaumont, right?

25              MR. DOYLE:  Objection.



 1      A.   I don't remember exactly what I said about

 2   that.

 3      Q.   (BY MS. SCARDINO)  Okay.

 4           THE VIDEOGRAPHER:  Ms. Scardino,

 5   microphone.

 6           MS. SCARDINO:  I'm sorry?

 7           THE VIDEOGRAPHER:  Microphone.

 8           MR. RYTTING:  Your mic.

 9           MS. SCARDINO:  Sorry.  Yes.

10      Q.   (BY MS. SCARDINO)  I'm going to show you your

11   opening statement.

12      A.   Okay.

13      Q.   An excerpt that's Exhibit 195.  Page 78, line

14   21, and it said -- and -- and you say, "You're also

15   going to hear testimony from a man named Michael Glen

16   Beckcom.  Michael Beckcom is a federal inmate at the

17   Beaumont medium federal penitentiary.  He's going to

18   tell you about how he came to meet and know Jeff

19   Prible."  Do you see that?

20      A.   I do.

21      Q.   Okay.  So, it was important at trial to portray

22   the meeting of Mr. Prible and Mr. Beckcom as

23   coincidental, right?

24      A.   Not really.

25      Q.   Okay.



```
 1        A.  I didn't say that anywhere.

 2        Q.  Okay.  So, you'll disagree that that was your

 3   theory at trial?

 4        A.  That's not what you just read to me that I said

 5   anything about contact.

 6        Q.  Well, in your opening statement, you tell the

 7   jury that Michael Beckcom is going to tell them how he

 8   came in contact with Mr. Prible, right?

 9        A.  Yes.

10        Q.  And so, because you put that in your opening

11   statement, that initial contact is pretty important,

12   right?

13              MR. DOYLE:  Objection.

14        A.  Not necessarily.

15        Q.  (BY MS. SCARDINO)  Okay.  And Mr. Beckcom

16   testified at trial that the confession that he

17   received -- that he heard from Mr. Prible was heard in

18   the presence of Nathan Foreman as well.  Do you remember

19   that at the trial?

20        A.  I do not remember the specifics of the trial.

21        Q.  Okay.

22        A.  It was 15 years ago.

23        Q.  Okay.  I'm going to show you your -- an excerpt

24   from your closing statement, and I'll -- I'll read it

25   and then I'll give it to you if that's okay.  Page 75,
```



 1  line 11, this is from your closing argument, "Is there

 2  any evidence in this trial that Michael Beckcom got any

 3  facts about what happened anywhere except out of the

 4  mouth of this defendant?  All of Mr. Gaiser and

 5  Mr. Wentz's questions and hypotheticals and hopes and

 6  desires in the whole wide world do not amount to a hill

 7  of beans because there ain't no evidence that Michael

 8  Beckcom ever had anybody anywhere, any paper, any

 9  newspaper, any cop, any TV show tell him anything about

10  the facts of this case for Jeff Prible."  Do you

11  remember saying that?

12       A.  I do.

13       Q.  Okay.  So, not only was the theory at trial

14  that Mr. Beckcom met Mr. Prible coincidentally at FCI

15  Beaumont but it was also --

16            MR. DOYLE:  Object -- objection,

17  mischaracterizes.

18       Q.  (BY MS. SCARDINO) -- but it was also --

19            MS. SCARDINO:  If you could just let me

20  finish the question first and then state your objection.

21            MR. DOYLE:  Okay.  But I mean, you've

22  already done it once.

23            MS. SCARDINO:  Okay.

24            MR. DOYLE:  Come on.

25       Q.  (BY MS. SCARDINO)  And then your -- your



1  theory -- you also had another theory, which was that

2  everything that Mr. Beckcom learned about Mr. Prible's

3  case, he learned from the mouth of -- mouth of

4  Mr. Prible, right?

5      A.  That was two questions.

6      Q.  Okay.  Let me restate.

7          Your theory of the case was that everything

8  Mr. Beckcom learned from Mr. -- about Mr. Prible's case,

9  he learned from the mouth of Mr. Prible, right?

10     A.  Yes.

11     Q.  Okay.  That was your theory.  Okay.  You never

12 mentioned this August 8th, 2001 initial contact that you

13 had had with Mr. Foreman about Mr. Prible's case to this

14 jury, did you?

15     A.  That was out of the mouth of Nathan Foreman,

16 who wasn't credible.

17     Q.  Okay.

18         MS. SCARDINO:  Objection, nonresponsive.

19     Q.  (BY MS. SCARDINO)  This is a yes or no

20 question.  Did you tell the jury in your argument that

21 you had initially met with Mr. Foreman on August 8th,

22 2001 to discuss Mr. Prible's case?  Did you?

23     A.  In my opening statement, I did not.

24     Q.  At any time during trial?

25     A.  No.



1      Q.   Okay.  Let me show you Exhibit 109-4.

2   Actually, I want to get you actually to read Exhibits

3   109-2, 109-3 and 109-4 into the record because they're

4   your work product notes, I believe.

5      A.   Whoa.

6             MS. MIRANDA:  Can I have a copy?

7             MS. SCARDINO:  Yeah.

8      A.   Where is the first page?

9             MR. DOYLE:  Is that an extra one or did you

10  already --

11     Q.  (BY MS. SCARDINO)  The first page of what?

12     A.   What is this?

13     Q.   This was produced by order of the Court after

14  the Court's in camera review of your work product in

15  this case.

16     A.   But this just starts with something.  What is

17  the -- what does this go to?

18     Q.   I wish I knew.  I would like to know that as

19  well but I don't.  This was what was produced.

20     A.   From the Prible file?

21     Q.   Yes.  And if you could read it into the record.

22     A.   Okay.

23     Q.   Appreciate it.

24     A.   The first line on 109-2 -- that's a 109, right?

25     Q.   Uh-huh.



1    A.  -- says, "45 semiautomatic?  Possible," and

2  then it is X'd out.  The next says a check mark in front

3  of "Live 40 caliber rounds?"  That -- that note usually

4  means "no" or "done with" when I write it like that.

5    Q.  Okay.

6    A.  The next line is a check mark in front of,

7  "Weapon at CC for repair question?"  CC?  I don't know

8  what that is.  "Not for repair.  Lie by defendant."

9         The next line has an arrow pointing to,

10  "Shorts/shorts/towel results?  Not blood, flammable?"

11  And there's a box there that I didn't answer.  "Send to

12  FBI."

13         The next line says, "Pull old files," and

14  there's a cause number "9917797."  There's a cause

15  number "811397."  And there's a cause number "9719252."

16         The next line is a question mark, "Can we

17  prove bank robberies?  (Motive)"  Underneath that it

18  says, "Out December, 2000" -- I can't tell if that's

19  "2003" or "2023."  "Defendant in fed pen for bank

20  robbery, 5 of them."  "65 months," circled.

21         The next line says, "Does Jamie Lyons ID

22  Prible?"  And underneath that, in somebody else's

23  writing, it says, "Preg girlfriend."  That's not my

24  writing.

25         The next line says question mark, either



1   "re" or "red Dodge Ram pickup, license plate number

2   SF4896?  Nilda's dad."

3        Q.  And then if -- if I can -- if I can stop you

4   right there --

5        A.  Okay.

6        Q.  -- and move on to the next page.

7        A.  Okay.

8        Q.  And I want to bring your attention to the

9   middle of that page, a little -- and it says, "Defendant

10  in Beaumont pen."  Do you see that?

11       A.  I see a defendant -- yes, "Defendant in

12  Beaumont pen."

13       Q.  And so, this -- these notes look like they were

14  taken before Mr. Prible was charged, do you agree?

15       A.  Yes, these look like some initial to-dos or

16  random thoughts I had.

17       Q.  Okay.  And if you look at the following page,

18  if you look in the middle of the paragraph, it says,

19  "Potential federal prison roommate."  Do you see that?

20       A.  I do.

21       Q.  Okay.  So, before you were -- you had accepted

22  charges against Mr. Prible, you were already

23  contemplating setting him up with a federal prison

24  roommate; is that correct?

25       A.  No.  That's not what that means.



 1      Q.  The jury wouldn't have believed that

 2   coincidental contact theory if they had known that you

 3   had thought about putting him with a federal prison

 4   roommate before you even charged him, right?

 5              MR. DOYLE:  Objection.

 6      A.  That's not what that means.  Do you want to

 7   know what it means?

 8      Q.  (BY MS. SCARDINO)  Another theory that you had

 9   at the trial was this theory that DNA disappears

10   immediately once it's in an oral cavity; is that

11   correct?  Do you remember that?

12      A.  I don't remember exactly what we said, no.

13      Q.  Okay.  Well, the reason this -- this theory was

14   important was because the most damning piece of evidence

15   against Mr. Prible was the DNA -- his DNA found in the

16   victim's mouth.  Do you remember that?

17      A.  I do.

18      Q.  Okay.  And so, it was crucial that the

19   prosecution refute Mr. Prible's story of consensual sex,

20   which is what he told -- volunteered to the detectives

21   within hours of the murders, right?

22      A.  I don't remember what he said initially.

23      Q.  Okay.  Okay.  But you agree that this theory

24   about the semen disappear -- or DNA disappearing

25   immediately was something that was important to the



 1  trial?

 2              MR. DOYLE:  Object.

 3       A.  I don't know that we ever used the word

 4  "disappear immediately."

 5       Q.  (BY MS. SCARDINO)  Okay.  I'm going to show you

 6  your opening statement again, Page (sic) 195.  Do you

 7  have it in front of you?

 8       A.  Yes.

 9       Q.  Okay.

10       A.  It's the yellow one.  Do you need it?

11       Q.  No.  I think those are all -- thank you.  Look

12  at Page 82, line 18.

13       A.  Okay.

14       Q.  Okay.  And I'll read it for you while you're

15  reading along.  "The evidence will tell you -- the

16  compelling evidence will tell you that the reason for

17  that is that found -- after the autopsies were done,

18  especially the autopsy on Nilda Tirado, found in her

19  mouth was the semen, the DNA of Ronald Prible.  And the

20  DNA expert will tell you what the odds are, what that

21  means exactly statistically the fact that his DNA is

22  found in her mouth.  But the most compelling thing he's

23  going to tell you is that you know what, when semen is

24  in somebody's mouth, in a lady's mouth, it goes away in

25  minutes.  It goes away with a small swallow.  That's



1  what the evidence is about in this case, and you're

2  going to know from the testimony all about what kind of

3  man could ejaculate in a woman's mouth after he executed

4  her husband minutes before he executed her, minutes

5  before he could find gasoline to set her on fire and

6  what kind of a man could have walked out of the house

7  with it smoking and burning knowing three little babies

8  were asleep in their bed.  That's this kind of man, and

9  he's guilty of capital murder."

10          Now, does this refresh your memory about

11 the theory of the prosecution being that DNA disappears

12 immediately once it is in a woman -- is in a victim's

13 mouth?

14     A.  I did not use the words "disappear

15 immediately."

16     Q.  Okay.  "It goes away in minutes" is the words

17 you stated, right?

18     A.  That's what I said.

19     Q.  Okay.  And that was also the testimony that you

20 elicited from the DNA expert in this case, Mr. Watson,

21 correct, that DNA -- the fact that he found any DNA in

22 Ms. -- in the victim's mouth -- or the fact that any DNA

23 was found in her mouth meant that the victim had been

24 executed immediately after the assailant had ejaculated;

25 is that correct?



1      A.   I don't think that he could testify to that

2   exactly but you'd have to show me his testimony.

3      Q.   Okay.  I'll show you Dr. Watson's testimony.

4   If you'll let me read it real quickly into the record

5   and then I'll show it to you.

6           Okay.  Page 101 of Dr. Watson's -- Watson's

7   testimony, line 9, and this is Mr. Wisner --

8      A.   Directing him.

9      Q.   -- questioning Mr. -- yes.  I believe I said it

10  was you earlier but this is Mr. Wisner.

11          He says, "And you haven't ever found one

12  partial male sperm cell on any of these swabs?"  Talking

13  about oral swabs.

14          And Mr. Watson -- Dr. Watson says, "Well,

15  you know, I don't know if there were sperm cells there.

16  There was insufficient sperm to generate a profile."

17          Question, "Not even one?"

18          Answer, "Not that I can recall, no."

19          Question, "Yet in this case, we have a full

20  and complete male profile; is that right?"

21          Answer, "That's correct."

22          Question, "Based on your testing, could we

23  say that based on your experience and training, because

24  we have a full and complete male profile, that would be

25  inconsistent -- let me repeat -- inconsistent with the



1  semen in this case being deposited in Nilda's mouth as

2  long as an hour before she was killed?"

3            Mr. Gaiser lodges an objection, which is

4  overruled.

5            Answer, "I would say that it is.  I would

6  say that it's inconsistent."

7            Does that refresh your memory as to whether

8  testimony regarding the amount of time that semen could

9  remain in the victim's mouth was elicited from

10  Dr. Watson?

11     A.  You used the phrase "disappeared immediately."

12  What I heard there was an hour.

13     Q.  Okay.  So, at the very least, you're saying

14  that the -- that it would have disappeared in an hour?

15     A.  I don't know.  Vic did the direct.  I didn't.

16     Q.  Okay.

17     A.  It's been 15 years.  The transcript speaks for

18  itself, and Vic is the one you should be asking that

19  question to.

20     Q.  Well, the -- the transcript does speak for

21  itself, I agree, and earlier in your opening statement,

22  we -- we said that -- we showed where you said -- told

23  the jury that it disappeared within minutes, right?

24     A.  I already don't remember.  I'm sorry.  Do you

25  want me to look again?



1    Q.   Okay.  If you can look at Exhibit 109-4, at the

2  very top there in your handwriting, it says, "Pam

3  McInnis, semen lives up to 72 hours."  Do you see that?

4    A.   I do.

5    Q.   Now, who is Pam McInnis?

6    A.   She is a DNA analyst and was the head of the

7  crime lab for Pasadena --

8    Q.   Okay.

9    A.   -- and Harris County.  She was connected to

10  both.

11    Q.   And so, you consulted her about this question

12  as to how long semen could live in the oral cavity,

13  right?

14    A.   I at least started with her, yes.

15    Q.   Did you reveal to the defense counsel in

16  Mr. Prible's case that you spoke with Ms. McInnis and

17  that she told you that semen could live up to 72 hours?

18    A.   I think that was part of the trial.  72 hours

19  is in the trial.

20    Q.   My question to --

21         MS. SCARDINO:  Objection, nonresponsive.

22    Q.   (BY MS. SCARDINO)  My question to you is did

23  you ever reveal to Mr. Prible's counsel that you had

24  spoken with Pam McInnis and she had told you that semen

25  lives up to 72 hours?



1        A.  I don't remember.

2        Q.  Okay.

3            MS. SCARDINO:  I think that is all I have

4    at this moment, if I could pass it on to James.

5                    EXAMINATION

6        Q.  (BY MR. RYTTING)  Ms. Siegler, you mentioned

7    that you found Nathan Foreman not to be credible, that's

8    correct?

9        A.  I did.

10       Q.  And, in fact, you called him several times

11   during this deposition a liar?

12       A.  I did.  Can you talk a little louder?

13       Q.  In fact, you called him -- several times during

14   this deposition, you referred to him as a liar?

15       A.  I did.

16       Q.  And on December 10th of 2001, you interviewed

17   Nathan Foreman, along with Johnny Bonds, at least that's

18   what the record indicates based on Johnny Bonds' notes?

19           MS. MIRANDA:  Objection, form.

20       A.  I don't remember that specifically but I'm not

21   going to argue with that.

22       Q.  (BY MR. RYTTING)  All right.  Did you determine

23   Nathan Foreman was not credible because -- did that

24   have -- did that have anything to do with his race?

25       A.  No.



1     Q.  Did it have anything to do with his appearance?

2     A.  With his what?

3     Q.  With his appearance.

4     A.  No.

5     Q.  Was it because his story just didn't hang

6  together or didn't fit the facts?

7     A.  That was a lot of it.

8     Q.  And that's why you didn't use him in -- and

9  we're talking about at any time, you can't recall at

10  least, that Nathan Foreman gave you a good account,

11  something that fit the facts?

12     A.  You asked me two questions there.

13     Q.  Yes.  Well -- and so -- and I'm talking about

14  at any point you -- well strike the question.  I don't

15  need it.

16          You mentioned you had Michael Beckcom bench

17  warranted in the Bible -- in the Danny Bible case?

18     A.  No.  I mentioned that Michael Beckcom was bench

19  warranted and attached to the Danny Paul Bible case.

20     Q.  Okay.  And how do you do that?  What type of

21  documents do you have to file to do that?

22     A.  The court -- court coordinators are in charge

23  of bench warrants.

24     Q.  But you instruct the court coordinator why

25  they're being bench warranted --



1    A.  Yes.

2    Q.  -- correct?

3    A.  Yes.

4    Q.  And then they file some sort of document with

5  the court?

6    A.  I don't really know what they do.  That's a

7  court coordinator function.

8    Q.  But it comes out as a court order to move

9  somebody from one place to the courtroom or to the -- to

10 the jail, right?

11   A.  It does.

12   Q.  Okay.  And you knew at the time that he was not

13 going to be a witness in the Danny Bible case?

14   A.  That's correct.

15   Q.  So, it was a false misrepresentation to the

16 Court and to the court coordinator?

17   A.  No.

18        MR. DOYLE:  Objection.

19   Q.  (BY MR. RYTTING)  What was true about that?

20   A.  That we needed Michael Beckcom brought to

21 Harris County, and we needed to make sure that Jeffrey

22 Prible and Michael Beckcom did not run into each other

23 for lots of reasons, to protect the integrity of the

24 case and also for the safety purposes for both of them.

25   Q.  Okay.  And isn't there other means to do that



1  without having bench warrants somebody as -- and attach
2  them as a witness to the case?
3      A.  No.  If I would have attached Michael Beckcom
4  to the Jeffrey Prible case, they would have been brought
5  together on the chain each and every time they were
6  brought up.  That would have been really a stupid thing
7  to have happen.
8      Q.  You can't have them bench warranted at
9  different times?
10     A.  I did have them bench warranted at different
11  times.  That's why it's connected to Danny Paul Bible.
12     Q.  No, but in the Prible case.
13     A.  No.  They get -- it gets all messed up.  The
14  jail can't keep it straight.
15     Q.  So, this is a necessity that you attach them to
16  cases to which they're not involved, that a witness is
17  not involved?
18          MR. DOYLE:  Objection.  I'm not sure I
19  heard what you said, James.
20     Q.  (BY MR. RYTTING)  Okay.  So -- well, strike
21  that.
22          And is this a common practice by Harris
23  County Texas district attorneys?
24     A.  Yes.
25     Q.  And so, the result is that when say someone



 1  gets a post conviction case and has to investigate it,

 2  they're -- they look at cases and find -- and they

 3  cannot be sure if a witness is attached for one reason

 4  or another to a case because of the Harris County

 5  district attorney's policy?

 6      A.  That would be a complication, yes.

 7      Q.  Let's see.  And did you tell Mr. Wentz and

 8  Mr. Gaiser about your -- the results of your interview

 9  with Nathan Foreman?

10            MR. DOYLE:  Objection, asked and answered.

11      A.  I don't believe so, no.

12      Q.  (BY MR. RYTTING)  And Nathan Foreman,

13  obviously, didn't give you the same information as

14  Michael Beckcom did?

15            MS. MIRANDA:  Objection, form.

16      A.  You told the federal judge that the division of

17  duties were you were handling Mr. Herrero.

18      Q.  (BY MR. RYTTING)  I asked you a question,

19  Ms. Siegler.

20      A.  Well, did you misrepresent that to the federal

21  judge?  Because I thought you were doing Herrero and she

22  was doing Prible, and so far you haven't had a single

23  Herrero question.

24      Q.  Look, you're not allowed to ask questions.

25  Just answer them.



 1      A.  Just making a point.  What's your question?

 2      Q.  And the question was -- well, strike that.

 3  Strike the question.  We'll move -- move on to some

 4  matters about the -- to different matters.

 5           What is your understanding of the role of

 6  a -- and these are going to be -- going to concern with

 7  the -- specifically the Herrero case.  What is your

 8  understanding -- what is your understanding of the role

 9  of a prosecutor in opening -- opening argument?  What --

10  what are the limits?

11      A.  Ask me that again.

12      Q.  What is the purpose -- what is the purpose of

13  an opening argument?

14      A.  To give the jury a picture and an idea of what

15  we hope the evidence to be.

16      Q.  And you have to have a good faith belief that

17  the evidence that you're going to present and will be

18  admitted in the case is evidence that you have based

19  your opening argument on and that you've told the jury

20  that you're going to show them; isn't that correct?

21           MR. DOYLE:  Objection.

22      A.  If you're asking me if I have to have a good

23  faith belief that the evidence will be admissible before

24  I talk about an opening statement, if that's your

25  question, then the answer is yes.



 1                MS. SCARDINO:  Do you want to take a

 2   2-minute break and run up and get --

 3                MR. RYTTING:  Yes.

 4                MS. SCARDINO:  Okay.  Let's go off the

 5   record real quickly for 2 minutes.

 6                THE VIDEOGRAPHER:  The time is 5:19.  We're

 7   off the record.

 8                (Short recess.)

 9                THE VIDEOGRAPHER:  This is the beginning of

10   file 10.  The time is 5:21.  We are on the record.

11                MR. RYTTING:  I'm not sure what exhibit

12   we're up to.  Would it be safe to start at 300?

13                MS. SCARDINO:  Yes.  That's fine.

14        Q.  (BY MR. RYTTING)  I'm handing you --

15                MR. RYTTING:  Here you go.

16                MR. DOYLE:  Thank you.

17        Q.  (BY MR. RYTTING)  -- opening argument --

18                MR. RYTTING:  Do you need a copy?

19        Q.  (BY MR. RYTTING)  -- opening argument in the --

20   in the Herrero case.

21        A.  Okay.

22        Q.  Okay.  And on Page 4, you refer to

23   Mr. Herrero --

24        A.  Page 4 but number 8?

25        Q.  I mean Page 7.  Page 7.  On Page 7 of what's



1   been marked as Exhibit 300, you refer to -- if you read

2   down, you refer to Mr. Herrero as much like a Godfather,

3   a John Ghatti type person.

4       A.  What line are you talking about?

5       Q.  The last line on Page 7, so, it would be line

6   25.

7       A.  Ask me the question again.

8       Q.  I'm just saying if you -- if you read here,

9   you -- you -- you state before the jury in your opening

10  argument that Mr. Herrero is the leader of the All

11  Houston Group, he's very proud, he wants people to look

12  up to him, he's sort of like a Godfather, a John Ghatti

13  type person, correct?

14      A.  Yes.

15              MS. MIRANDA:  Objection, scope.

16      Q.  (BY MR. RYTTING)  And you mentioned that you

17  had nothing to do with the Jason Morales case?

18      A.  Are we still on this?

19      Q.  No.  I'm just asking a question.

20      A.  Okay.  What's the question?

21      Q.  You said that you didn't prosecute Jason

22  Morales, that was someone else's case?

23      A.  That's not what I said.

24      Q.  What did you say?

25      A.  I said I didn't prosecute the Cuellar case.



1       Q.  Cuellar?

2       A.  Yes.

3       Q.  But you did prosecute Jason Morales?

4       A.  I did.

5       Q.  Okay.  And, in fact, Jesse Moreno was a witness

6    in that case?

7       A.  He was.

8       Q.  All right.  Let me see here.  All right.  Okay.

9    And, again, like you said, you're supposed to have a

10   good faith basis in what you're informing the jury that

11   the evidence is going to show when you make an opening

12   remark, correct?

13      A.  Yes.

14      Q.  And if we look at Page 8, if we read -- at

15   the -- at the second full paragraph, I'll just read it

16   for the record starting on line 14.

17              "So, Jesse Moreno showed his papers to this

18   defendant.  At first they were all in the All Houston.

19   Everything was going along fine until this defendant

20   discovered that Jesse Moreno had before, in fact,

21   testified for the authorities on two different

22   occasions.  And when that happened, Jesse Moreno is

23   going to tell you what happened was he was put in what's

24   called the hole in the Beaumont prison where they

25   protect you even in prison from other inmates."



 1              And the -- your theory and the evidence in
 2   the case showed, did it not, that -- or the testimony
 3   from Mr. Moreno, that it was threats from Mr. Herrero
 4   that drove Mr. -- that required protection for
 5   Mr. Moreno; isn't that correct?
 6              MS. MIRANDA:  Objection, scope.
 7      A.  You asked me two different questions there.
 8      Q.  (BY MR. RYTTING)  And -- and I'm just saying
 9   this indicates -- that that -- this -- this paragraph
10   indicates that it was threats from Mr. Herrero that
11   was -- that was the reason why Jesse Moreno had to be
12   put into segregation?
13      A.  And what's your question?
14      Q.  Is that -- that was the -- that was your
15   theory, correct, in this case?
16      A.  I'm still confused.
17      Q.  I understand.  Well, isn't it a coincidence
18   that -- you're not saying it's just a coincidence that
19   Jesse Moreno -- that the defendant discovered that Jesse
20   Moreno had before, in fact, testified for the
21   authorities and that what happened was that Jesse Moreno
22   was -- was -- was put in what's called the hole in the
23   Beaumont prison?
24              MS. MIRANDA:  Objection, scope.
25      A.  What's your question?



 1    Q.  (BY MR. RYTTING)  Are you saying that it's just

 2  coincidence or are you saying that there was a --

 3  that -- are -- are you telling the jury in your opening

 4  argument that Jesse Moreno was put in the -- in the hole

 5  because of threats from Mr. Herrero?

 6    A.  No.

 7    Q.  You're not?  What does this mean?

 8    A.  Just what it says.

 9    Q.  Okay.  So, it is just a -- just two random

10  unconnected events, one -- one event that Jesse --

11  that -- that Mr. Herrero learned about Mr. Moreno's

12  testimony from the authorities on two different

13  occasions, and the second is an unconnected event,

14  completely unconnected with that, is that what you're

15  telling me?

16    A.  No.

17    Q.  So, they are connected?

18    A.  Yes.

19    Q.  How?

20        MS. MIRANDA:  Objection, scope.  If I can

21  just really quickly -- no, I -- we talked about this

22  earlier --

23        MR. RYTTING:  You make your objections.

24        MS. MIRANDA:  I don't want to -- I don't

25  want to keep interrupting you, so, I just want to say



1  for the record that I'm objecting to all things outside

2  of the scope so that I don't have to constantly keep

3  saying that.

4                    MR. RYTTING:  Oh, thanks.

5                    MS. MIRANDA:  I don't want to do that.  So,

6  if I just --

7                    MR. RYTTING:  Thanks.

8                    MR. DOYLE:  Is that an agreement you all

9  have?

10                   MS. MIRANDA:  We -- we didn't make an

11 agreement but we -- we discussed what my objections

12 were, and I don't -- and --

13                   MR. RYTTING:  Nor is it any of your

14 business.

15                   MS. MIRANDA:  -- they -- they -- they asked

16 me to simply --

17                   THE WITNESS:  It's my business.

18                   MS. MIRANDA:  -- object when they asked a

19 question but --

20                   MR. DOYLE:  I think it has to do with my

21 witness, James.  That's all I'm --

22     Q.  (BY MR. RYTTING)  So, these statements are

23 connected?  What happened to Jesse Moreno is connected

24 to what the defendant discovered -- the defendants

25 discovered, that he had testified for the authorities,



1  that's what you -- that's what this argument states,

2  correct?

3       A.  It speaks for itself.

4       Q.  Okay.  And is that -- but tell me what -- is

5  that what the -- is that how it speaks for itself?  Is

6  that a correct interpretation of what it says?

7       A.  I don't know what you think it says.

8       Q.  Okay.

9       A.  I just believe it speaks for itself.

10      Q.  I told you what I think it says.  I think the

11  implication here is that the fact that Jesse Moreno --

12  that -- that Mr. Herrero discovered that Jesse Moreno

13  had, in fact, testified for the authorities resulted or

14  was the reason why Jesse Moreno was put in what's called

15  the hole.  Is that a fair inference from this paragraph?

16      A.  That's what it says.

17      Q.  Okay.  Thank you.

18           And he was put in the hole in something

19  like 2000?

20      A.  When?

21      Q.  In -- in July of 2000.

22      A.  I don't remember that.

23      Q.  You don't know?

24      A.  (Witness indicated by shaking her head

25  negatively.)



1      Q.  But he was put in the hole before he contacted

2  you about this case; isn't that correct?

3      A.  Yes.

4      Q.  And, in fact, you told -- you said that one of

5  the reasons that Jesse Moreno came forward wasn't just

6  that he wanted a reward but out of desperation because

7  of threats from Mr. Herrero, right?

8      A.  Did you say "reward"?

9      Q.  A reward or assistance from you in getting a

10  Rule 35.

11      A.  Do you want to reask the question and leave out

12  "reward"?

13      Q.  Yeah.  Sure.  Sure.  And you also tried to

14  inform -- told the jury that one of the reasons that

15  Jesse Moreno came -- came forward -- one of the reasons

16  that Jesse Moreno contacted you to offer to testify

17  against Mr. Herrero was out of fear and for protection.

18  Do you recall that?

19      A.  I do.

20      Q.  Okay.  And it was from -- and it was protection

21  from whom?

22      A.  Hermilio Herrero.

23      Q.  And, in fact, you argued to the jury at least

24  that Mr. Herrero was risking his life by coming forward?

25      A.  I did.



1      Q.  And that was one of the reasons that may make

2  him credible was he was willing to take that risk?

3      A.  Yes.

4      Q.  And risk his life, and the risk was the risk

5  that Mr. Herrero would use his power within the prison

6  system or outside to harm Mr. Moreno; isn't that

7  correct?

8      A.  And/or his family.

9      Q.  And/or his family.  And you have read the

10  pleadings in this case, haven't you --

11      A.  Say that again.

12      Q.  -- that we have filed?  Have you read the --

13  the habeas pleadings in this case and the exhibits?

14      A.  Your petition?

15      Q.  Yes, in the -- in the Herrero case.

16      A.  When I first got it from Tina.

17      Q.  Okay.  All right.

18          MS. MIRANDA:  Wait.  I -- I'm sorry.

19      Q.  (BY MR. RYTTING)  All right.  And did you ask

20  the BOP for any documents?

21      A.  Did I?

22      Q.  Yes.

23      A.  No.

24      Q.  Did you ask Mr. Moreno why he was -- when

25  you -- did you prepare Mr. Moreno for his testimony?



```
 1        A.  In?

 2        Q.  In the Herrero case.

 3        A.  I did.

 4        Q.  Okay.  And did you ask him why he was put in

 5   what's called the -- what you're referring to as the

 6   hole?

 7        A.  Yes.

 8        Q.  Okay.  And he told you that it was because of

 9   threats from Mr. Herrero; is that correct?

10        A.  Yes.

11        Q.  And do you know now that that's false?

12        A.  I do not.

13        Q.  And if the BOP record showed that Mr. Herrero

14   was put in the hole because he was -- partly because he

15   was running drugs into the prison for the Texas

16   syndicate, were you aware of that?

17        A.  I heard that at some point through the

18   appellate process.

19        Q.  Okay.  And that Mr. Herrero was transferred to

20   Liberty County to keep him safe from other inmates

21   because he was assisting BOP investigating drug running

22   into the prison?

23        A.  That's not what I understood or was told.

24        Q.  So, you were -- you were not told that?

25        A.  No.
```



1    Q.  You were never aware of that?

2    A.  No.

3    Q.  And -- and the basis for these BOP documents --

4  the source of this information from the BOP documents

5  is -- are interviews of Mr. Moreno, you're not aware of

6  that either, are you?

7    A.  No.

8    Q.  Okay.  And, in fact, you're not aware either

9  that he mentioned Mr. Herrero in one of the documents --

10   A.  Who is "he"?

11   Q.  Sorry.  Mr. Moreno mentioned Mr. Herrero in one

12 of the documents -- in one of the interviews that BOP

13 memorialized but did not say that Mr. Herrero was

14 threatening him?

15   A.  How would I know that?

16   Q.  Okay.  You did not know that, right?

17   A.  (Witness indicated by shaking her head

18 negatively.)

19   Q.  And if all that is true, you realize that your

20 attorney -- I mean, your -- your witness not only

21 provided you false information but led you to make a

22 false representation to the jury?

23           MS. MIRANDA:  Objection, form.

24           MR. DOYLE:  Objection.

25   A.  If that is true.



1      Q.  (BY MR. RYTTING)  Thank you.

2      A.  I thought we were here today on Prible.

3      Q.  You're here to answer questions.

4      A.  My subpoena says Ronald Jeffrey Prible.

5      Q.  Yeah.  You're here to answer questions in the

6  case, and I -- I mean, you realize -- you have read both

7  those petitions, correct?

8      A.  No.  What do you mean both petitions?

9      Q.  One -- the -- the application, Herrero

10 application, have you read that?

11     A.  No.

12          MR. DOYLE:  No.  As a matter of fact, I

13 understood that was not --

14          MS. MIRANDA:  And that's what I was going

15 to clear up but I didn't want to interrupt.  Sorry.

16          MR. DOYLE:  This is -- this is --

17          MR. RYTTING:  Please --

18          THE WITNESS:  My subpoena says Prible.

19          MR. RYTTING:  We have -- we have an hour to

20 go or so.  Let's get it done.

21          MR. DOYLE:  I'm sorry?

22          MR. RYTTING:  Just make simple objections.

23 You can say, "Beyond the scope of" --

24          MR. DOYLE:  Well, here -- here's -- here's

25 the problem, James, is that if it relates to the gang



1  of -- or whatever you call it -- the circle of snitches,

2  that's one thing, but you're talking about a

3  completely -- another habeas case that -- that was not

4  the subject of the subpoena.

5              MR. RYTTING:  All right.  Then you have

6  a -- then you have a relevancy objection, and that's

7  about it, but they're not permissible.  So --

8              MR. DOYLE:  Well, no.  I think that we --

9  we have an objection to, you know, going forward on this

10  stuff.

11              MR. RYTTING:  No.  No.  I mean, what is the

12  objection?

13              MR. DOYLE:  This is not the subject matter

14  in which she was subpoenaed to be here.

15              MR. RYTTING:  Okay.  Then you're not

16  saying -- then you're saying it's not relevant and we'll

17  move on.

18              MR. DOYLE:  No, it's not -- it's not

19  relevant to the subject matter of the subpoena.

20              MR. RYTTING:  You don't get to make that

21  call.

22              MR. DOYLE:  Well, I get to --

23              MR. RYTTING:  So --

24              MR. DOYLE:  I get to protect my client.

25              MR. RYTTING:  From harassing --



1                    MR. DOYLE:  So, what --

2                    MR. RYTTING:  From harassing -- from

3    harassing questions.

4                    MR. DOYLE:  That's exactly what's --

5                    MR. RYTTING:  But these aren't.

6                    MR. DOYLE:  Thank you, James.

7                    MR. RYTTING:  These aren't.

8                    MR. DOYLE:  Yeah, it is.

9                    MR. RYTTING:  They're just questions about

10   the case.

11                   MR. DOYLE:  About a different case.

12                   MR. RYTTING:  Okay.  Let me -- let me

13   explain this.  We have a theory in both cases.  Our

14   theory is that -- as you know, we've raised Giglio

15   claims in both -- in both cases.  Those are claims that

16   the prosecutors sponsored false testimony in both cases.

17   We have an allegation in the Prible matter.  Do you

18   understand this, that there is a -- that we believe

19   there is a pattern and practice of doing so that's

20   illustrated by both of these cases?  Those are the

21   allegations in the --

22                   MR. DOYLE:  We -- we've -- she's never

23   seen the -- she doesn't know what you're talking about.

24                   MR. RYTTING:  Okay.  Then -- then you --

25   and neither have you, and you shouldn't be objecting to



1  scope, and I would like to -- we can do this off the

2  record.

3         MS. SCARDINO:  If we -- we can -- we can

4  keep it on the record.  Let's decide right now if we're

5  going to allow the questioning to continue or if we need

6  to contact Judge Ellison.

7         MR. RYTTING:  We're not --

8         MS. SCARDINO:  Because this -- this

9  information has been briefed extensively in our request

10 for these depositions.

11        MR. DOYLE:  So --

12        MS. SCARDINO:  And it's entirely within the

13 scope is my understanding.

14        MS. MIRANDA:  We're objecting to that but

15 that's why we just said it straight out and then we'll

16 take that up later.  I mean, we -- we put our objection

17 on the record and then what the Court does with it -- I

18 mean, I --

19        MS. SCARDINO:  Well, are we going to be

20 allowed to continue with the questioning --

21        MR. RYTTING:  Yes, we are.

22        MS. SCARDINO:  -- or are we going to need

23 to get the Court on the -- on the phone one more time?

24        MR. DOYLE:  We're not going to get the

25 Court on the phone at 5:30 in the afternoon.  I'm sorry.



1              MR. RYTTING:  Let's finish up the

2    deposition.

3              MS. SCARDINO:  Let's continue.

4              MR. RYTTING:  There's very little time

5    left.

6              MR. DOYLE:  Let's keep it to what you say

7    the connection was.

8              MR. RYTTING:  There's very little time.

9    There's very little time.

10      Q.  (BY MR. RYTTING)  And as in the Ronald Prible

11   case, you were given a photograph in this case of -- of

12   Mr. -- for use at trial, correct, that showed

13   Mr. Herrero with Mr. Moreno and Mr. Dominguez and

14   several other -- several other prison inmates, correct?

15      A.  I remember the photograph from the Prible

16   trial.

17      Q.  Okay.  You also got the same -- a similar

18   photograph in the Moreno (sic) trial?

19      A.  I don't remember that one.

20      Q.  I'm showing you Exhibit -- and if you look

21   at -- at Exhibit 164, do you -- do you recognize the

22   person in the center of that photograph?

23      A.  The first page of 164?

24      Q.  Yes, the first page of 164.  Yes, the first

25   page of 164.



KELLY SIEGLER                                    October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                         309

1      A.  I can't really see the person in the center of

2  it, and I don't remember this photo.

3      Q.  But you can't speak that it was -- that's

4  Hermilio Herrero?

5      A.  I can't see.

6      Q.  Oh, I see.

7           MR. DOYLE:  Can we explain on the record

8  she had surgery a week ago, and so, she -- it's getting

9  worse all day.

10          MR. RYTTING:  We may have to --

11          MR. DOYLE:  She's called the doctor while

12  we had a break.

13          MR. RYTTING:  All right.  We may have to

14  continue the deposition since I can't show exhibits to

15  her.

16          THE WITNESS:  I've been reading all day,

17  sir.

18      Q.  (BY MR. RYTTING)  Now, in your closing remark,

19  you refer to these people as members of All Houston.  Do

20  you remember that?

21      A.  I don't know if I was talking about these

22  people in this picture.

23      Q.  But these -- these were part of the All Houston

24  Group?

25      A.  I don't know who these people are in this



 1  picture.  I don't remember this picture.

 2       Q.  You don't remember that it was introduced at --

 3  in the trial?

 4       A.  I don't.  If you want to show me the exhibit

 5  with my writing on it with the State's exhibit number,

 6  then --

 7       Q.  Okay.  Did you have any information that

 8  Mr. Herrero, that you can recall, was a member of any

 9  other prison organization other than what was called the

10  All Houston Group at trial?

11       A.  Yes.

12       Q.  You did have other information?

13       A.  I remember another name, yes.  I don't remember

14  what it was.

15       Q.  It was some other group.

16       A.  There was another name that they used.  I don't

17  remember the name.

18       Q.  But at trial, you didn't introduce any evidence

19  about any other organization that Mr. Herrero was a

20  member of other than All Houston Group, correct?

21       A.  I remember them talking about another name.  I

22  don't know if they meant it was the same group with a

23  different name or a different group.

24       Q.  And --

25       A.  There was another name discussed.



1    Q.  In other words -- and, in fact, you -- if you

2    read your opening argument, it was -- it indicates that

3    as a member -- as the leader -- and he was the leader

4    for a while of All Houston Group -- that that is how he

5    exercised his control and power over other inmates, is

6    that -- does that sound familiar, that he was a leader

7    of this group and could command, if necessary, use of

8    force?

9    A.  Yes.

10   Q.  Okay.  That sounds -- okay.  All right.

11            And you realize that we deposed Rafael

12   Dominguez in this case?

13   A.  I don't know who all you deposed.

14   Q.  As Tina can confirm we did.  And the testimony

15   of -- I can have you read the testimony of Rafael

16   Dominguez but if he testified that Mr. Herrero's role as

17   the -- as the leader of the All Houston Group was

18   essentially to be a mediator between conflicting groups

19   in prison, would that change your picture --

20   A.  Not necessarily.

21   Q.  -- of All Houston?

22   A.  No.

23   Q.  And if he said that Mr. -- he didn't consider

24   Mr. -- he -- he was -- actually claimed Mr. Herrero

25   threatened him and made him show him his PSI at trial.



```
 1        A.   Who is "he"?

 2        Q.   Rafael Dominguez.  Do you recall that

 3   testimony?

 4        A.   Say the question again.

 5        Q.   Do you recall that Rafael Dominguez testified

 6   at trial that he had to show Mr. Herrero his PSI?

 7        A.   I remember that.

 8        Q.   Okay.  And the reason -- and he had to do it --

 9   and he had to doctor his PSI, just like Jesse Moreno

10   claimed that the had to doctor his PSI.  Do you remember

11   that?

12        A.   Not specifically, no.

13        Q.   They had to excise evidence that they

14   cooperated with the government.  Do you remember

15   testimonies along those lines?

16        A.   I don't remember the details of the case.

17        Q.   Okay.  One of the things that you impressed

18   upon the jury, I believe, was that Mr. Moreno's and

19   Mr. Dominguez's testimony was consistent with the

20   physical evidence; isn't that correct?

21        A.   Yes.

22        Q.   And that is how they could be assured that it

23   was -- one way that they could be assured that it is

24   accurate; isn't that correct?

25        A.   Yes.
```



1    Q.  And among the -- some of the evidence that you

2  claim showed that they were testifying accurately was

3  blood evidence, for example, correct?

4    A.  I don't remember all the evidence.

5    Q.  You don't remember?  You don't remember having

6  Curtis Brown testify about the blood evidence that

7  flowed down from the gaping wound in Guajardo's neck?

8    A.  I haven't seen the transcript, and the trial

9  was 15 years ago.

10   Q.  Did you review the -- in preparation for this

11 deposition or at any time, did you review the affidavit

12 that Tommy Brown, former -- an ME -- a former ME in

13 Harris County, filed in this case?

14   A.  No.

15   Q.  You have not?  All right.  Let's see.

16        And I believe Gretchen asked you early on

17 about testimony in the Herrero case that the victim was

18 beaten by a hammer?

19   A.  I don't remember her asking me that.

20   Q.  Okay.  Do you recall that that was part of the

21 testimony?

22   A.  I do.

23   Q.  And the claim was that Herrero slit the man's

24 throat and then dragged him to the back of the van and,

25 because he was still alive, beat him in the face with a



1  hammer?

2       A.   I don't know that that's the exact order of

3  everything.  I don't remember.

4       Q.   All right.  And having prosecuted the Jason

5  Morales case, you know that Moreno was involved in a

6  robbery in which a victim was a beaten with a hammer,

7  correct?

8       A.   I don't remember how the victim was killed in

9  Jason Morales.  I don't remember the facts of that case.

10       Q.   Okay.  But in the file in that case, in your

11  file, we have police reports that indicate that

12  Mr. Moreno was part of what was called The Little Red

13  Gang.  Do you remember that?

14       A.   I do not remember that.

15       Q.   You don't remember that?  And you don't

16  remember that Mr. Moreno was actually taped en route to

17  a -- and this Little Red Gang -- Gang was conducting

18  home envisions and home robberies.  Do you remember

19  that?

20       A.   Do you want to show it to me?  Because I don't

21  remember Jason Morales and the specifics.  That was 20

22  years ago.

23       Q.   Yeah.  I think given your eyesight, this is

24  going to be a problem.

25       A.   I can read better than I can see those pictures



 1  and the pink message slips.

 2       Q.  This is not -- it will be useless to do it

 3  since it's not tabbed.

 4            But at -- at -- at trial, Dan Cogdell tried

 5  to cross examine Mr. -- Mr. Moreno on his involvement in

 6  a home invasion in which a hammer was used, and there

 7  were objections made.  Do you recall that?

 8       A.  I do not.

 9       Q.  Okay.  And one of the reasons that -- and --

10  and the Court excluded -- excluded or prevented Dan

11  Cogdell from going into the -- into the robbery in which

12  a hammer was used, the robbery that was conducted by The

13  Little Red Gang, according to the police report, based

14  on Mr. Moreno's representation he had nothing to do with

15  it.  Do you remember -- you probably don't recall that

16  either?

17       A.  There are so many questions in that and

18  assumptions in that question, I don't even know where to

19  start.

20       Q.  You don't even recall -- do you recall that at

21  all?

22       A.  What?

23       Q.  Whether Dan Cogdell attempted to introduce

24  evidence into the trial about The Little Red Gang and

25  its involvement in a home invasion in which a hammer was



 1  used to beat victims but could not?

 2      A.  I do not remember.  The trial transcript will

 3  speak for itself, and the trial was 20 years ago.

 4      Q.  Okay.  And one of the reasons why he was not

 5  then -- I can show you Page 57 and what's been marked as

 6  Exhibit 70, Page -- there you go.

 7           MS. SCARDINO:  My notes are on that one, I

 8  think.  I believe my notes are on that one.

 9           MR. DOYLE:  I don't see any notes.

10           MS. SCARDINO:  It's on the second page.

11  No.  It's just -- it's just highlights.

12           MR. DOYLE:  I'll -- I'll ignore them.

13           MS. SCARDINO:  It's just highlights.  Sure.

14      Q.  (BY MR. RYTTING)  Are you finished reading?

15      A.  Oh, yes.  I'm sorry.  I was waiting on you.

16      Q.  Okay.

17      A.  We can barely hear you, and now the chair is in

18  the way, so, you're going to need to talk louder.

19      Q.  Yes.  Sorry about that.

20           So, does that refresh your memory that he

21  was -- that there was this issue at trial about whether

22  Dan Cogdell could introduce evidence about a robbery or

23  a crime in which a hammer was -- that Mr. Moreno -- that

24  he claimed Mr. Moreno knew about in which a hammer was

25  used?



 1      A.   I've read the transcript.  It doesn't refresh
 2 my memory about the specifics of what they're talking
 3 about, no, sir.
 4      Q.   I guess the transcripts will speak for
 5 themselves, that if they say that -- that you -- the
 6 Court ruled on the basis of Mr. Moreno's allegation that
 7 he knew nothing about the robbery in which a hammer was
 8 used, that he knew nothing about it, you can't dispute
 9 that?
10           MR. DOYLE:   Objection.
11           MR. RYTTING:   Sure.
12      A.   The transcript speaks for itself.
13      Q.   (BY MR. RYTTING)  Okay.  And police did
14 discover that he was actually taped -- the evidence will
15 show, I think, that the police taped Jesse Moreno --
16      A.   Who are we talking about?
17      Q.   Police, HPD taped Jesse -- Jesse Moreno, using
18 an informant, en route to the robbery in which a hammer
19 was used to beat the victim.
20      A.   I don't know what you're talking about.
21      Q.   You don't?  You haven't heard that?
22      A.   You're confusing cases or I'm confused.
23      Q.   You didn't -- that's a case that you're not
24 familiar with?
25      A.   You said HPD.



1      Q.  So, it's investigated by Harris County?

2      A.  The ones that I know about were.

3      Q.  Let me see.  I guess we can mark this.

4           So, you didn't know that H -- that HPD was

5  investigating Jesse Moreno's activities -- I mean --

6  yeah, Jesse Moreno's activities as part of The Little

7  Red Gang?

8      A.  That's an assumption that I don't know enough

9  about to answer.

10      Q.  You don't know.  Okay.  You don't know.  All

11  right.  You don't recall if that was the case.

12           MR. RYTTING:  I'll just introduce this.  Do

13  we have a sticker here?  I'm almost finished.  We're up

14  to 300.  This will be 301.

15      Q.  (BY MR. RYTTING)  And this was produced by

16  Brian Rose, I'll represent.

17           MR. DOYLE:  If you've got a -- if you've

18  got an extra one, I'll mark it, James.  You don't have

19  to do it.

20           MR. RYTTING:  I'll do it.

21           MR. DOYLE:  Thanks.

22           MS. MIRANDA:  And I'll take one as well.

23           MR. RYTTING:  All right.

24      Q.  (BY MR. RYTTING)  That is an HPD report,

25  correct?



 1      A.  This is an HPD report, yes.

 2      Q.  And I'll represent that was produced when we --

 3  from an open records request --

 4      A.  For?

 5      Q.  -- from Harris County in the Jason Morales case

 6  for the file.

 7      A.  In the Jason Morales case?

 8      Q.  Yes, in the Jason Morales case as part of the

 9  file.

10      A.  Okay.

11      Q.  I'll mark this as 302, and this is going to be

12  the statement of Tommy Brown.  Exhibit 302 is the

13  statement of Tommy Brown.  Have you read -- you say you

14  haven't read that?

15      A.  I have not.

16      Q.  Take your time and look through it.

17          MS. MIRANDA:  James, could I have one?  And

18  while she's looking at that, can I ask where are we at

19  with time?

20          THE VIDEOGRAPHER:  20 minutes.

21          MR. RYTTING:  20 minutes.  We'll finish.

22      A.  Okay.

23      Q.  (BY MR. RYTTING)  Have you finished reading the

24  whole thing?

25      A.  No, I didn't read the whole thing.



1    Q.   Okay.  Let's get down to -- if you'll turn

2  to --

3    A.   Get down to what?

4    Q.   If you'll turn to -- let's see -- paragraph 16.

5  And you realize that Tommy Brown did the autopsy in this

6  case, that he actually did the autopsy?

7    A.   Yes, sir.

8    Q.   Okay.  And it says, "Based on review of the

9  autopsy report and autopsy photos and crime scene

10  photos, it is my forensic opinion that Guajardo received

11  numerous blunt trauma injuries before the cutting wound

12  to the neck was administered.  Testimony that Guajardo

13  was only choked before he had his throat slit and that

14  the lacerating injuries seen on his scalp were inflicted

15  after this mortal injury cannot account for the

16  significant -- significant trauma to the back and front

17  of Guajardo's torso seen in autopsy photos, nor is it

18  consistent with premortem lacerating injuries to

19  Guajardo's lip, with abrasions to his shoulder, bruising

20  to his face and neck or what appears to be a stab wound

21  to his -- to his neck.  The lack of blood evidence on

22  lower garments, including the white belt, pants and

23  white socks, is inconsistent with testimony that

24  Guajardo had his throat slashed in the confines of a

25  van."



1              And your -- you realize that your witness

2  is simply testifying that there was an argument, that

3  Herrero grabbed the victim --

4         A.  Who are you calling my witness?

5         Q.  Moreno and -- and Dominguez both testified

6  that --

7         A.  Are we still talking about this?

8         Q.  No.  I'm talking about their testimony.  This

9  is a -- this is -- I'll just ask you a question.

10             This directly conflicts with the testimony

11  of Mr. Moreno and Dominguez, does it not?

12         A.  I would refer -- I would refer you back to

13  paragraph 15 in this same document where it says, by

14  Tommy Brown, "I have been asked to comment on the trial

15  testimony as related to me by Herrero's attorney," and

16  since that -- that is you and you're the one that

17  related whatever facts you may have to Dr. Tommy Brown,

18  I don't really care what he had to say after he talked

19  to you because I know how you relate facts.

20         Q.  Okay.  Okay.  So, the facts that I related to

21  Mr. Brown was that the testimony at trial was that there

22  was an argument, that Herrero grabbed Mr. -- in a van,

23  in a moving van --

24         A.  Does it really matter what you told Tommy

25  Brown?  Because I can't comment on what he said.  I



1  wasn't there.  And I don't -- I wouldn't believe what

2  you told me you told him anyway.

3       Q.  Okay.  Well, does the -- do you recall the

4  testimony at trial?

5       A.  I do not.  The trial transcript can speak for

6  itself.

7       Q.  Okay.  So, if the trial transcript says that

8  both Dominguez and Moreno testified that the way -- the

9  manner and means in which Mr. Herrero (sic) was killed

10 was that he was first grabbed from behind and choked and

11 then Herrero took a knife out of his pocket and slit his

12 throat, then afterwards he then dragged him to the back

13 of a van and beat him over the head with a hammer to

14 make sure he was dead, that -- you don't recall that as

15 being the gist of these -- these two defendants'

16 testimony?

17      A.  That is not exactly what they said, as I

18 recall.

19      Q.  Okay.  What else do you recall?

20      A.  Well, you said he pulled a knife out after he

21 slit the throat, so, that couldn't happen.

22      Q.  No.  He pulled a knife out and then -- and then

23 slit his throat.

24      A.  Well, that's not what you just said.

25      Q.  Okay.  All right.



1      A.  You just said that they testified in such a way
2   that's impossible for it to have happened.
3      Q.  So --
4      A.  Once again, your rendition of the facts isn't
5   quite accurate.
6      Q.  Sure.  So, pulled the knife out and then slit
7   his throat, the knife out of their pocket.  So, we'll
8   make that correction.  Do you -- does that sound like
9   the gist of their testimony?
10     A.  The gist of it but not necessarily in that
11  order.
12     Q.  They didn't mention -- they didn't -- they
13  didn't tell you that Herrero was beaten -- I mean, that
14  Mr. Guajardo was beaten badly, that he was beaten all
15  over his torso?
16     A.  I don't remember what they said about a
17  beating.  I don't remember if there was a beating.
18     Q.  They didn't say any -- they didn't say anything
19  at all about it?
20     A.  I don't remember anything -- I don't remember
21  what happened with the beating.
22     Q.  But the autopsy evidence shows that there was a
23  severe beating and, according to Dr. Brown, the severe
24  beating preceded the wound --
25     A.  The trial --



 1      Q.  -- wound to the throat; isn't that correct?

 2      A.  The trial transcript will speak for itself.

 3      Q.  But -- but that would conflict with the trial

 4  transcripts in which there's no mention of any beating,

 5  there's no mention of bruises all over the torsos,

 6  there's no mention of lacerations on the shoulder, on --

 7  on the -- on ears, all over the scalp, would it -- would

 8  it -- would it not?

 9      A.  I can't argue about what the trial transcript

10  says when I don't know what it said and the trial was 15

11  years ago.

12      Q.  And you -- do you recall that Dr. Wolf was an

13  ME in this case?

14      A.  I didn't remember that.

15      Q.  And that he testified?

16      A.  I don't -- I didn't remember that either.  I'm

17  not going to argue with you.  I just didn't remember.

18      Q.  You don't?  Okay.  So, you don't recall.  And,

19  in fact, you didn't have -- did you -- did you prepare

20  Dr. Wolf for his testimony?

21      A.  I would have met with him ahead of time, yes.

22      Q.  Would you have asked him about --

23          MR. RYTTING:  Can I have this marked as

24  304, I think -- no.  303.

25      Q.  (BY MR. RYTTING)  Here's 303.  If you would,



1  just quickly go through the autopsy.  These are autopsy

2  photos from the Morales -- from the Guajardo murder.

3  Here you go.

4      A.  These are not the ones I offered into evidence.

5  They're not because my stickies would have been on the

6  front of the pictures, not the back.

7      Q.  No, they're not the ones that you offered in.

8  They're copies -- they're copies of evidence in the --

9  they're copies of evidence in the -- in the file that

10 was produced to us.  Whether they were all introduced, I

11 don't know.  These were --

12          MR. DOYLE:  Do you have an extra --

13     Q.  (BY MR. RYTTING) -- copies from your file.

14          MR. DOYLE:  James, do you have an extra?

15 Thank you.

16     Q.  (BY MR. RYTTING)  They're from your file in

17 this case.  They were produced by your former office.

18          And if you turn to the -- let's see -- to

19 some of the pictures of the -- of the chest, for

20 example, this would be -- hold on.  I don't know how

21 many pages back in this -- in this document.  1, 2, 3,

22 4, 5, 6, 7.  I think it's the 8th or 9th page.  That

23 one.

24     A.  Okay.

25     Q.  And it shows -- did you ask Dr. Brown about



1  these injuries or these insults to this -- do you

2  recall --

3      A.  I thought you said Dr. Wolf testified.

4      Q.  I mean, Dr. Wolf.  Dr. -- did you have him

5  address any of these photographs and explain their

6  significance?

7      A.  I'm -- I'm confused.

8      Q.  Do you remember -- do you remember at all

9  talking to Dr. Wolf about any of these photographs?

10     A.  You're asking me if I remember in my pretrial

11 interview with Dr. Wolf --

12     Q.  Yes.

13     A.  -- from 15 years ago --

14     Q.  I know.

15     A.  -- questions about photographs that I didn't

16 offer into evidence.

17     Q.  Okay.  Let's -- let's make this very simple.  I

18 mean, if it's no, it's no.  I don't blame you for not

19 remembering.

20     A.  I don't remember.

21     Q.  I just asked you.

22     A.  I don't remember.

23     Q.  Would you -- was it part of your practice to

24 ask the ME about the significance of autopsy photographs

25 and what they mean?



 1      A.  Yes.

 2      Q.  Okay.  And would there be any reason not to

 3  have them address our explain injuries seen elsewhere on

 4  the body besides the head and neck of this victim?

 5      A.  Ask the question again.

 6      Q.  Would there be any reason not to have him

 7  address or explain to you the significance of injuries

 8  seen on the torso, on the back, on the shoulders of this

 9  victim?

10      A.  If I don't remember what he testified to, how

11  can I answer in the negative?

12      Q.  I just wondered would you have -- would you go

13  over the entire -- all the injuries that this individual

14  received -- received?

15      A.  That would have been my practice, yes.

16      Q.  That would have been your practice.  Okay.  And

17  you see in these -- in these photographs, for example,

18  let me show you -- make it easier -- a picture of a

19  torso and a -- and his back.

20      A.  Okay.

21      Q.  And your -- your witnesses did not testify that

22  the man was beaten and stomped in the back or hit in the

23  torso or received any injury that would have bruised his

24  body.

25      A.  I don't remember the specifics of what they



1  said happened with the injuries.

2      Q.   Okay.  But you would have asked Dr. Wolf

3  perhaps something about a photograph like this, correct?

4      A.   I don't remember if I did.

5      Q.   And if you read that -- again, if you read

6  doctor -- one of the things, he didn't just testify

7  on -- didn't just make statements based -- let's make it

8  clear -- based on my representation about what the

9  testimony was at trial, he also reviews the autopsy

10 report and reviewed the photographic evidence in this

11 case.

12     A.   Was he given the trial transcript?

13     Q.   No, he wasn't given the trial transcript.

14     A.   Why not?

15     Q.   He was -- he was -- but -- I don't know why

16 not.  That's --

17     A.   Well, you're the one that interviewed him.  Why

18 didn't you give him the trial transcript, too?

19     Q.   That's a question for you when you depose me,

20 not a question for this deposition.  Okay?  Okay?

21          So -- and if you -- based on the autopsy

22 photos, if you read his -- his -- his affidavit and

23 based on his autopsy report, he came to the conclusion

24 that the man was -- died in a completely different way

25 than testified at trial.



1      A.   I don't understand the question, my conclusion.

2      Q.   Okay.  I'll -- I'll strike that one.

3           Just to end up, just because I'm curious,

4  you mentioned that there are a number of lies in the --

5  in the application -- or in the petition -- Prible's

6  petition, that there are some lies.

7      A.   I did.

8      Q.   Okay.  And that means there's -- there must be

9  some faults in that petition that you think are false,

10  correct?

11      A.   I do.

12      Q.   Okay.  And can you name one or two of them that

13  you think are false?

14      A.   There's not much truth in it.

15      Q.   Okay.  Can you name one that stands out as

16  being false?

17      A.   Well, the overarching lie is that I

18  orchestrated a ring of informants from the Beaumont

19  federal prison system.  That is a lie --

20      Q.   Okay.  All right.  I'm just --

21      A.   -- that you made up --

22      Q.   No.  No.

23      A.   -- and you theorized and you pieced together

24  and you represented to a federal judge and defamed my

25  reputation, and it's completely wrong and unethical and



 1 | false and --
 2 |     Q.  What is the basis for you thinking -- for your
 3 | belief that we've been -- we don't believe that?
 4 |     A.  You have no evidence to support that.  That is
 5 | a lie.  You have not one shred of evidence to support it
 6 | from anybody.
 7 |     Q.  Okay.
 8 |     A.  It didn't happen.
 9 |     Q.  Did you not -- did you not read the transcript
10 | of the interview with Carl Walker?
11 |     A.  I don't even know Carl Walker is, and he's a
12 | bigger liar than Nathan Foreman.
13 |     Q.  Okay.
14 |     A.  Your own investigative interview of Carl Walker
15 | was a joke --
16 |     Q.  Okay.  So --
17 |     A.  -- if you analyze the interview itself.
18 |     Q.  So --
19 |     A.  Read it carefully.
20 |     Q.  I'm just saying --
21 |     A.  He didn't even know my name.  He wasn't even
22 | sure I was a female.
23 |     Q.  Okay.
24 |     A.  And you want to pretend like Carl Walker is the
25 | crux of your conspiracy of informants that I



 1  masterminded and orchestrated --

 2       Q.  Did you --

 3       A.  -- in federal prison?

 4       Q.  Did you read -- did you read his -- the

 5  transcript of his interview?

 6       A.  I read -- it was about 6 pages long.

 7       Q.  No, it was about 30 pages long.

 8       A.  Maybe I read 30.  I don't remember.  It was the

 9  one where he was interviewed by --

10       Q.  I just asked -- Ms. Siegler, I just asked you a

11  question.

12            MR. DOYLE:  Let her -- let her finish.

13       Q.  (BY MR. RYTTING)  Did you read it?

14       A.  I think I did, yes.

15       Q.  Okay.  And you've also read the affidavit of

16  Nathan Foreman?

17       A.  I don't know if I read an affidavit.  How long

18  is that one?

19       Q.  That's about four pages in the Prible case --

20       A.  I think I read that.  I think I read that.

21       Q.  -- and three pages in the Herrero case, and you

22  commented on that in your own affidavit.

23       A.  Say that again.

24       Q.  And you commented on his affidavit in the -- in

25  the Herrero case.



1       A.  Okay.  That's the affidavit you're talking

2  about, right?

3       Q.  So, I have -- so, there is evidence.  You --

4  you disagree with the credibility of that evidence,

5  don't you?

6       A.  No, I disagree with your making a false

7  impression to a federal judge in a case this important

8  and making up lies and saying that I orchestrated a ring

9  of informants in a federal prison system and that I told

10  them what to say and caused them to lie in not just one

11  or two or three but four different cases.  That is a

12  lie.

13       Q.  No.  There was -- there was -- the claim was

14  that you did -- that you were aware of a ring of

15  informants and that --

16       A.  And I told them what to say and I told them to

17  lie --

18       Q.  That you were aware of a ring of informants.

19  Wasn't --

20       A.  -- and I fed them information.

21       Q.  Wasn't that -- wasn't that the petition?

22       A.  It was a whole lot more than that and you know

23  it.

24       Q.  And that -- that some of the key facts were

25  learned from you by -- according to our witnesses and



 1  our affidavits and our taped statements?

 2      A.  Your witnesses' affidavits were lies.

 3      Q.  Okay.  You can take that position, and it

 4  contradicts what you -- in both cases, it contradicts

 5  precisely what you claim the State's -- the real truth

 6  is and what the State's -- what the State has argued;

 7  isn't that correct?

 8      A.  You have not one shred or iota or piece of

 9  credible evidence from a credible witness that supports

10  any of these allegations.

11      Q.  And these are the type of witnesses that you

12  used to put people on death row?

13      A.  I'm calling you a liar, sir.

14      Q.  And I'm calling you one.

15      A.  I didn't go to a federal court --

16      Q.  You used -- you used Michael Beckcom to put

17  Jeffrey Prible on death row.

18      A.  That's not the only thing that put Jeffrey

19  Prible on death row, and you know it.

20      Q.  You used Moreno, who we now know lied to you.

21      A.  For Prible?

22      Q.  No.  In the -- in the Herrero case, who we now

23  know lied to you.

24      A.  He did not lie.

25      Q.  If the evidence showed that he was put in the



1   hole not because of Herrero but because he was running

2   drugs for the Texas syndicate and was transferred to

3   Liberty County not for Herrero -- because of Herrero but

4   because he was involved in an investigation for BOP and

5   needed protection because of that, then he lied to you?

6       A.  I disagree.

7       Q.  Do you know what a lie means?

8       A.  Yeah.

9       Q.  Okay.

10              MR. RYTTING:  I'll pass the witness.

11              MS. SCARDINO:  I -- I simply have two

12  housekeeping measures.  I wanted Ms. Siegler to read

13  these last work product notes that were produced in

14  camera -- or -- I'm sorry -- ordered produced by the

15  Court in camera.  So we don't put words into her mouth,

16  I just want to know what these --

17              MR. DOYLE:  If we have time.

18              MS. SCARDINO:  Okay.  What's the time?

19              THE VIDEOGRAPHER:  Two minutes.

20              MS. SCARDINO:  Okay.

21              THE WITNESS:  What does that mean, ordered

22  produced by the Court in camera?

23              MS. SCARDINO:  The -- the Court reviewed

24  them in camera, the work product and then ordered these

25  to be produced.



```
 1                   FURTHER EXAMINATION
 2       Q.  (BY MS. SCARDINO)  So, if you could start with
 3  that first page.
 4       A.  At the top it says, "Prible," circled,
 5  "Montgomery County."  I can't read that word.  "To see
 6  if Eddie" --
 7       Q.  Is that "Gomez"?
 8       A.  I think that's "Gomez."
 9            I can't read the line under it.  "Made --
10  called," underneath the line, "Charged with five bank
11  robberies and" -- or "six" -- I can't tell -- "banks."
12  I don't know what that says after it.  I don't know what
13  that says.
14            Next line, "Here comes Prible."  I can't
15  read that.  "Defendant dropped.  Murder-no evidence.
16  People" -- I don't know if that says "cut" or "out him."
17  I can't read the rest.
18       Q.  Do you recall when you took these notes?
19       A.  No.  I don't know where this is from.  I don't
20  know where this is from.
21       Q.  Okay.
22            MS. SCARDINO:  Due -- due to the witness'
23  eyesight today, perhaps it would be best if we allowed
24  you to look at these work product notes --
25       A.  It's not the eyesight.
```



1              MS. SCARDINO:  -- and write --

2        A.  It's the copy.  It's not the eyesight.  I can't

3   read my own writing.

4        Q.  (BY MS. SCARDINO)  Okay.  So, you need a more

5   legible copy than the one that --

6        A.  No.  It won't matter.  It's my scratchy

7   handwriting is the problem.

8        Q.  So, your testimony is you can't read your own

9   handwriting?

10       A.  It happens a lot because I write so fast,

11  trying to take notes, and I can't do a good job, which

12  is why I end up not taking notes, because it doesn't do

13  me any good.

14       Q.  Okay.

15              MR. DOYLE:  I think we're at the time.

16              MS. SCARDINO:  That's -- we'll pass the

17  witness.

18              MS. MIRANDA:  Can we just have 2 minutes to

19  decide if we even want to ask questions?

20              MR. DOYLE:  Uh-huh.

21              THE VIDEOGRAPHER:  The time is 6:18.  We're

22  off the record.

23              (Short recess.)

24              THE VIDEOGRAPHER:  This is the beginning of

25  file 11.  The time is 6:21.  We're on the record.



```
 1                    EXAMINATION
 2        Q.  (BY MS. MIRANDA)  Ms. Siegler, I just wanted to
 3   clear up one thing really quickly.  I believe earlier in
 4   response to a question, you testified that you reviewed
 5   the petition in the Herrero case for this deposition
 6   and -- is that correct?
 7        A.  I don't know what I reviewed.  All I've ever
 8   seen are what you sent me.  That's all I have.
 9        Q.  Okay.  And do you recall what I sent you?
10        A.  No.
11        Q.  Okay.  If I were to represent to you that I
12   sent you the petition in the Prible case, would you have
13   any reason to disagree with that?
14        A.  Isn't that what I said?
15        Q.  Yes.
16        A.  Petition in the Prible case.
17        Q.  No.  You said the petition in the Herrero case.
18        A.  Oh, no.  No.  No.  I meant Prible.  I'm sorry.
19        Q.  Okay.  That was the only thing I wanted to
20   clear up because I knew that was a misstatement.  So --
21        A.  Yes.  I said it wrong.
22            MS. SCARDINO:  Okay.  That's the only thing
23   you wanted to clear up?
24            MS. MIRANDA:  Yes.
25            FURTHER EXAMINATION
```



KELLY SIEGLER                                          October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS                          338

1      Q.  (BY MS. SCARDINO)  Okay.  And we haven't asked

2  you if you brought documents responsive to the subpoena

3  that was served on this case, which would have included

4  any correspondence that you had with Ms. Miranda.  Did

5  you bring any documents?

6      A.  I did not.

7      Q.  Okay.  Do you have any documents in your

8  possession?

9      A.  No.

10      Q.  You didn't -- well, you just said you received

11  some information from --

12      A.  It's her E-mail, whatever she E-mailed me.

13      Q.  Okay.  So, beyond that, you don't have anything

14  else that would have been responsive to that subpoena?

15      A.  I do not.

16      Q.  Okay.

17              MS. SCARDINO:  So, Tina, if I could get

18  from you a copy --

19              MS. MIRANDA:  I'll give you the E-mails

20  that I have.

21              MS. SCARDINO:  -- of that E-mail.

22              MS. MIRANDA:  Yeah.

23              MS. SCARDINO:  Thank you very much.

24              MS. MIRANDA:  Uh-huh.

25              MS. SCARDINO:  Okay.



1               MR. DOYLE:  I didn't ever get a subpoena.

2  I don't know that she did but --

3               THE WITNESS:  I got one.

4               MR. DOYLE:  Okay.

5               MS. SCARDINO:  Okay.

6               THE VIDEOGRAPHER:  The time is 6:23.  We're

7  off the record.

8               (Whereupon, at 6:23 p.m.

9               the deposition was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



KELLY SIEGLER
RONALD JEFFREY PRIBLE vs LORIE DAVIS

October 17, 2017
340

1  CHANGES AND SIGNATURE

2  WITNESS NAME:  KELLY SIEGLER

3  DATE OF DEPOSITION:  10-17-17

4  PAGE          LINE          CHANGE          REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____



1       I, KELLY SIEGLER, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5   _____

    KELLY SIEGLER
6

7   THE STATE OF _____)

8   COUNTY OF _____)

9       Before me, _____, on this day

10  personally appeared KELLY SIEGLER, known to me (or

11  proved to me under oath or through _____)

12  (description of identity card or other document) to be

13  the person whose name is subscribed to the foregoing

14  instrument and acknowledged to me that he executed the

15  same for the purposes and consideration therein

16  expressed.

17

18      Given under my hand and seal of office, this

19  _____ day of _____, _____.

20

21  _____

    NOTARY PUBLIC IN AND FOR
22  THE STATE OF _____

23

    My commission expires:  _____
24

25  _____No Changes Made _____Amendment Sheet(s)



```
1                IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3   RONALD JEFFREY PRIBLE, JR.   *
                    Plaintiff    *
4                                *
    VS.                          *  CIVIL ACTION NO.
5                                *  4:09-cv-01896
    LORIE DAVIS, DIRECTOR,       *
6   TEXAS DEPARTMENT OF          *
    CRIMINAL JUSTICE,            *
7   INSTITUTIONAL DIV.           *
                    Defendants   *
8
             REPORTER'S CERTIFICATION OF THE ORAL
9               DEPOSITION OF KELLY SIEGLER
                       10-17-17
10
            I, Edith A. Boggs, a Certified Shorthand
11  Reporter in and for the State of Texas, hereby certify
    to the following:
12
            That the witness, KELLY SIEGLER, was duly
13  sworn by the officer and that the transcript of the oral
    deposition is a true record of the testimony given by
14  the witness;

15          That the original deposition was delivered to
    James Rytting, Esquire;
16
            That a copy of this certificate was served on
17  all parties and/or the witness shown herein on
    _____.
18
            I further certify that pursuant to FRCP Rule
19  30(e)(2) that the signature of the deponent:
            __X__ was requested by the deponent or a party
20  before the completion of the deposition and that the
    signature is to be before any notary public and returned
21  within 30 days from date of receipt of the transcript.
    If returned, the attached Changes and Signature Page
22  contains any changes and the reasons therefore:
            _____ was not requested by the deponent or a
23  party before the completion of the deposition.

24          I further certify that I am neither counsel
    for, related to, nor employed by any of the parties or
25  attorneys in the action in which this proceeding was
    taken, and further that I am not financially or
```



1    otherwise interested in the outcome of the action.

2

3            Certified to by me on this, the 27th day of
     October, 2017.

4
5    *Edith A. Boggs*

     _____
6    Edith A. Boggs, CSR No. 3022
     Firm Registration No. 03
7    Expiration Date:  12-31-2017
     1001 McKinney, Suite 560
8    Houston, Texas  77002
     Ph. No.:  (713) 524-4600

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1   COUNTY OF HARRIS   )

2   STATE OF TEXAS     )

3

4           I hereby certify that the witness was notified

5   on _____ that the witness has 30 days or

6   (_____ days per agreement of counsel) after being

7   notified by the officer that the transcript is available

8   for review by the witness and if there are any changes

9   in the form or substance to be made, then the witness

10  shall sign a statement reciting such changes and the

11  reasons given by the witness for making them;

12          That the witness' signature was/was not

13  returned as of _____.

14          Subscribed and sworn to on this, the 27th day

15  of October, 2017.

16

17

18

19

    _____
20  Edith A. Boggs, CSR No. 3022
    Firm Registration No. 03
21  Expiration Date:  12-31-2017
    1001 McKinney, Suite 560
22  Houston, Texas  77002
    Ph. No.:  (713) 524-4600

23

24

25



1  Reference No.: 659784

2

3  Case:  RONALD JEFFREY PRIBLE vs LORIE DAVIS

4

       DECLARATION UNDER PENALTY OF PERJURY

5

      I declare under penalty of perjury that

6  I have read the entire transcript of my Depo-

   sition taken in the captioned matter or the

7  same has been read to me, and the same is

   true and accurate, save and except for

8  changes and/or corrections, if any, as indi-

   cated by me on the DEPOSITION ERRATA SHEET

9  hereof, with the understanding that I offer

   these changes as if still under oath.

10

11        _____

12            KELLY SIEGLER

13

14            NOTARIZATION OF CHANGES

15                (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20_____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)                    Notary Public,

24

25  in and for the State of _____



1    Reference No.: 659784

     Case:  RONALD JEFFREY PRIBLE vs LORIE DAVIS

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   KELLY SIEGLER



1   Reference No.: 659784

    Case:  RONALD JEFFREY PRIBLE vs LORIE DAVIS

2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

    SIGNATURE:_____DATE:_____

25  KELLY SIEGLER



| Exhibits | 659784 Kelly.Siegler.EXHIBIT57 | 659784 Kelly.Siegler.EXHIBIT106 | 659784 Kelly.Siegler.EXHIBIT129 | 659784 Kelly.Siegler.EXHIBIT145 |
|---|---|---|---|---|
| 659784 Kelly.Siegler.EXHIBIT9 | 659784 Kelly.Siegler.EXHIBIT60 | 659784 Kelly.Siegler.EXHIBIT108 | 659784 Kelly.Siegler.EXHIBIT130 | 659784 Kelly.Siegler.EXHIBIT152 |
| 659784 Kelly.Siegler.EXHIBIT28 | 659784 Kelly.Siegler.EXHIBIT66 | 659784 Kelly.Siegler.EXHIBIT109 | 659784 Kelly.Siegler.EXHIBIT131 | 659784 Kelly.Siegler.EXHIBIT154 |
| 659784 Kelly.Siegler.EXHIBIT43 | 659784 Kelly.Siegler.EXHIBIT70 | 659784 Kelly.Siegler.EXHIBIT110 | 659784 Kelly.Siegler.EXHIBIT132 | 659784 Kelly.Siegler.EXHIBIT156 |
| 659784 Kelly.Siegler.EXHIBIT46 | 659784 Kelly.Siegler.EXHIBIT71 | 659784 Kelly.Siegler.EXHIBIT111 | 659784 Kelly.Siegler.EXHIBIT133 | 659784 Kelly.Siegler.EXHIBIT161 |
| 659784 Kelly.Siegler.EXHIBIT47 | 659784 Kelly.Siegler.EXHIBIT72 | 659784 Kelly.Siegler.EXHIBIT112 | 659784 Kelly.Siegler.EXHIBIT135 | 659784 Kelly.Siegler.EXHIBIT162 |
| 659784 Kelly.Siegler.EXHIBIT49 | 659784 Kelly.Siegler.EXHIBIT73 | 659784 Kelly.Siegler.EXHIBIT113 | 659784 Kelly.Siegler.EXHIBIT136 | 659784 Kelly.Siegler.EXHIBIT164 |
| 659784 Kelly.Siegler.EXHIBIT50 | 659784 Kelly.Siegler.EXHIBIT77 | 659784 Kelly.Siegler.EXHIBIT114 | 659784 Kelly.Siegler.EXHIBIT137 | 659784 Kelly.Siegler.EXHIBIT170 |
| 659784 Kelly.Siegler.EXHIBIT52 | 659784 Kelly.Siegler.EXHIBIT78 | 659784 Kelly.Siegler.EXHIBIT116 | 659784 Kelly.Siegler.EXHIBIT140 | 659784 Kelly.Siegler.EXHIBIT171 |
| 659784 Kelly.Siegler.EXHIBIT53 | 659784 Kelly.Siegler.EXHIBIT81 | 659784 Kelly.Siegler.EXHIBIT123 | 659784 Kelly.Siegler.EXHIBIT141 | 659784 Kelly.Siegler.EXHIBIT172 |
| 659784 Kelly.Siegler.EXHIBIT54 | 659784 Kelly.Siegler.EXHIBIT86 | 659784 Kelly.Siegler.EXHIBIT125 | 659784 Kelly.Siegler.EXHIBIT142 | 659784 Kelly.Siegler.EXHIBIT174 |
| 659784 Kelly.Siegler.EXHIBIT55 | 659784 Kelly.Siegler.EXHIBIT87 | 659784 Kelly.Siegler.EXHIBIT126 | 659784 Kelly.Siegler.EXHIBIT143 | 659784 Kelly.Siegler.EXHIBIT176 |
| 659784 Kelly.Siegler.EXHIBIT56 | 659784 Kelly.Siegler.EXHIBIT88 | 659784 Kelly.Siegler.EXHIBIT127 | 659784 Kelly.Siegler.EXHIBIT144 | 659784 Kelly.Siegler.EXHIBIT180 |



659784 Kell
y.Siegler.
EXHIBIT181

———————
1
———————

198:14

109-6
198:20
222:18,20

149:11,12
153:8
160:13

236:15,23
238:14
239:12

659784 Kell
y.Siegler.
EXHIBIT184

1
9:5  44:10
82:10
190:22
194:4
208:3,4,
9,14,24
268:12
325:21

109-7
223:23

109-8
228:2,4,
14

10:24
77:15

10:37
77:19

113
154:18

114
156:25
157:2
160:13

116
264:7
268:11,12

128
256:2

129
244:4,11

12:25
147:7

12th
208:2
215:13
216:1
217:12,20
218:21
219:1,12
251:19,22
252:5,9
253:1,11

659784 Kell
y.Siegler.
EXHIBIT185

659784 Kell
y.Siegler.
EXHIBIT195

659784 Kell
y.Siegler.
EXHIBIT300

10
186:19
293:10

10-7-1969
97:24
98:12

10th
78:15
198:20
199:3,15
218:16
220:17,
23,25
221:7,12
222:4,10,
24  224:4
225:5
226:19
227:13
228:19
230:20
231:5,23
232:22
287:16

11:00
225:4

11:08
205:1,21

11:23
112:21

11:43
112:25

11:50
118:16

11:52
118:20

12
95:19

13
95:19

130
246:20

131
248:11

132
250:9

133
251:20
253:15,23

135
235:9
254:12
257:9
258:5

136
256:2

137
259:19
261:19

659784 Kell
y.Siegler.
EXHIBIT301

659784 Kell
y.Siegler.
EXHIBIT302

659784 Kell
y.Siegler.
EXHIBIT303

10-page
230:18
231:7

101
284:6

106
166:3
168:7,13

108-2
104:9,10
105:1

———————
0
———————

01
80:15
100:15
105:1,13
217:12

02
216:24
217:13
249:2

09
26:24

0kay
79:22
225:1,25

109
197:23
198:5,11
278:24

109-2
278:3,24

109-3
278:3

109-4
278:1,3
286:1

109-5

11
64:15
257:12
276:1
336:25

110
271:16

111
215:7,8,
11

112

12-10-01
228:25
230:22

12-22-2000
75:18

123
141:8,9
144:5

125
139:18,19

126
235:2,3

127
159:8

13th



108:14
109:14

**14**
181:5
295:16

**140**
12:13
49:5

**144**
12:13

**145**
266:25

**147**
49:5,7,
13,15
50:3

**14th**
207:19,20

**15**
11:21
19:9,11
69:12
171:5
206:1
223:13
252:10
262:10
275:22
285:17
313:9
321:13
324:10
326:13

**152**
108:11
213:24
214:8

**154**
44:5
50:22
58:18
113:8
114:10

169:15
183:3
188:3
269:21

**154-1**
269:22,23
270:3

**154-11**
63:5,11

**154-12**
116:5

**154-16**
183:16
186:18
188:25
189:21
194:10

**154-18**
59:21,25

**154-2**
126:19

**154-25**
44:11,24
47:4
48:10

**154-26**
60:15

**154-3**
126:22

**154-5**
182:10,16

**154-7**
113:2,15

**156**
26:24
27:18
86:20

**15th**
79:7,23
81:19
84:25

87:10
207:18
254:13

**16**
11:21
44:19
183:8
205:25
320:4

**161**
79:7

**162**
181:8,18

**164**
308:21,
23,24,25

**16th**
208:5

**17**
52:18,21
65:11

**170**
200:9,19
203:18
258:22
260:18
262:5
268:6,9,
10

**171**
209:18,22

**172**
82:5
211:5

**174**
230:17,18

**176**
162:11

**17th**
9:3 85:3
88:2

110:15
206:10
259:4,9
261:10

**18**
58:19
94:25
282:12

**180**
160:4

**181**
234:2

**184**
23:8,9,12

**185**
24:20

**186**
261:2
262:20,21

**18th**
76:11

**19**
263:2

**195**
274:13
282:6

**1986**
17:6

**1987**
17:11
183:13

**1989**
17:5
19:13
20:10

**199**
19:15

**1995**
134:23
135:13

**1996**
71:12
181:10

**1999**
12:1
17:21,23
18:16
30:7,18
51:20
55:2,10,
13 57:8,
20,21,22
58:1
61:19,24
62:7,23,
24 64:13
65:1,14
96:19
101:21,22
110:24
111:2
117:13,15
118:7,23
167:9

**1999-2002**
31:23
32:11

**19th**
200:10
219:1
259:21
261:15,
17,22
262:2

**1:20**
147:11

**1B**
264:19

**1C**
266:13

**1E**
268:12,13

**1st**



65:18
66:1 80:6
134:19
136:22

---

**2**

**2**
77:19
133:1
173:3
206:19,24
207:5,14,
17 208:9,
24 256:8,
25 261:3
262:9,14,
15 264:19
293:5
325:21
336:18

**2-minute**
293:2

**2.61**
270:3,10,
22

**20**
175:16
314:21
316:3
319:20,21

**2000**
55:18
56:7,12
76:11
105:11
256:9,10,
11 261:20
279:18
299:19,21

**2001**
44:9,12,
13,14,17,
19,20

51:2
55:18
56:7,12
65:3,15,
18 66:1,
10 68:4
69:19,23
74:6
76:11
78:15
79:7,23
80:6
81:12,19
82:1,5,
11,21
84:6,25
85:3
87:10
88:2,8
92:5
97:18
98:3,16
99:1,25
100:5,8
101:4
102:4,7
103:10
104:19
105:20
106:16
109:14
110:16
111:11,19
119:6
128:10
129:12
131:11,20
132:2,5
136:15
137:15
192:14,16
193:1
198:20
199:3,15
200:10
210:1,6,
24 211:7

215:4,13
216:1
217:14,20
218:14,
17,21
219:1,12
220:11,17
221:7,12
222:4,10,
24 223:17
224:4,24
225:5
226:19
227:13
228:19
230:20
231:5,23
232:22
245:15
246:4
265:18
272:11
277:12,22
287:16

**2002**
12:7
18:1,3,
16,18
19:6 30:7
44:9,17,
21 51:2
53:10
133:7
134:19
136:22
138:22
141:11
149:13
150:10
157:5
200:23
201:16
202:12
203:21
204:16,18
205:14

206:6,10,
22
207:15,
18,20
208:2,5,
11
210:10,14
234:3
235:3
241:5,24
244:6
246:22
247:25
248:11
250:10
251:19
252:6,9
253:2,11
254:13
259:4,9,
21
260:16,
21,25
261:10,
17,22
262:2,7
263:7

**2003**
279:19

**2004**
43:7
105:5

**2005**
12:7 43:7

**2006**
257:22

**2008**
20:5,10

**2011**
131:6

**2015**
11:20

**2016**

109:1
162:14
271:18

**2017**
9:3 53:12

**2023**
279:19

**20th**
218:14
256:9,10

**21**
274:14

**21st**
271:17

**22nd**
141:11
149:13
162:14

**23**
71:10
242:17
243:22

**23rd**
51:20
181:10

**24**
158:12

**24th**
206:22
207:15
260:21,25
262:7

**25**
19:6
44:10
50:22
294:6

**26**
60:24
82:1,5,11
84:6



211:7
220:11
242:18

**26th**
55:1,10
82:21
224:24

**28**
55:3
56:16

**28th**
76:11

**29th**
129:11
132:14
167:8
244:6

**2:29**
200:3

**2:44**
200:7

**2nd**
208:11

―――――

**3**

**3**
49:7,15
50:3
105:4
112:25
198:3
208:1,10,
13,15,24
257:12
262:15
325:21

**3.07**
28:18

**3.09**
27:7,18
86:21

**3.09B**
87:1

**3.09C**
87:20

**3.09D**
26:12

**3.2**
60:25

**3.9**
26:24

**30**
200:24
331:7,8

**300**
105:14
293:12
294:1
318:14

**301**
318:14

**302**
319:11,12

**303**
324:24,25

**304**
324:24

**30th**
157:5
246:22
247:24,25

**35**
130:23
162:19
234:20
235:17
236:2,12
246:14
249:7
250:16
251:10,14
254:21

255:15
273:6
300:10

**3:33**
242:6

**3:50**
242:10

**3:53**
243:15

**3:55**
243:19

**3rd**
88:8
92:5,6
93:16
96:23
100:8,15
102:4,7
209:25

―――――

**4**

**4**
118:20
200:18
293:22,24
325:22

**4-17-02**
206:17

**4-4-01**
77:21

**40**
279:3

**400**
105:14

**43**
167:7

**45**
240:9
279:1

**46**
65:17,18

**47**
84:24

**49**
75:6,11

**4:09-cv-
01896**
9:7

**4:41**
273:11

**4:51**
273:15

**4th**
66:10
68:3
69:18,23
74:6
82:15,21
92:1
132:5
203:20
204:16,18
205:2,14
206:6
234:3
248:11
249:2

―――――

**5**

**5**
105:4
147:11
198:11
258:4
263:1
273:6
279:20
325:22

**5-3-01**
75:18

**5-minute**
273:9

**50**
75:25

**500**
53:14

**51.14**
126:25

**52**
67:15,18
68:3
69:19
73:11

**53**
78:13
198:3

**54**
93:2
94:24
97:5

**55**
97:7

**56**
101:3

**57**
71:9
99:24
316:5

**5800**
83:8
211:9

**5845**
83:8

**5865**
83:8

**5:19**
293:6

**5:21**
293:10

**5:30**



307:25

**5th**
97:18
98:3,16,
18 99:1,
25 100:5
101:4
128:9
133:7
200:22
235:3

---

**6**

**6**
190:22
194:4
200:7
204:20
205:19,22
206:8
241:5
325:22
331:6

**60**
110:11,15

**6178**
201:22,24
202:24
203:7,13,
19 204:19
206:8
210:16

**62**
207:22,23

**63**
206:16
258:25
259:2
260:19

**64**
204:4,5,
8,10,22

205:12

**65**
279:20

**66**
132:4

**6:18**
336:21

**6:21**
336:25

**6:23**
339:6,8

**6th**
222:10
241:24

---

**7**

**7**
113:8
114:10
242:10
293:25
294:5
325:22

**70**
71:4
316:6

**71**
133:7

**72**
134:18
286:3,17,
18,25

**73**
136:12
137:25

**75**
275:25

**755-6178**
208:20

**77**
218:7,13

**78**
220:10
224:22,23
274:13

**7th**
103:10,24
250:10

---

**8**

**8**
228:5
243:19
293:24
295:14

**81**
240:25

**811397**
279:15

**819**
9:11

**82**
282:12

**8339**
83:8

**86**
165:21

**87**
165:1,5
222:8

**88**
103:4

**89**
19:15

**8th**
103:24
104:19
105:1

106:16
111:11,19
119:8
131:6,11,
20 132:2
136:15
192:14,16
193:1
210:6,24
215:4
217:14
223:17
245:15
246:4
265:18
277:12,21
325:22

---

**9**

**9**
56:18
208:15
256:19,24
273:15
284:7

**9-10-02**
166:19

**97**
73:13

**9719252**
279:15

**99**
17:22
18:3,6,11
56:8,9
63:3
102:1
113:23

**9917797**
279:14

**9:05**
9:3

**9th**
325:22

---

**A**

**A-DES**
75:21
76:12

**a.m.**
9:4 205:1
225:4

**abrasions**
320:19

**absence**
184:5

**Absent**
48:12

**absolutely**
68:11,16
114:6

**accelerant**
53:7
54:18

**accept**
59:7,11,
17 62:8
97:22,25
98:11,21
99:15

**acceptance**
59:20,22
60:4

**accepted**
60:10
61:18,23
62:2,16
97:13,16
98:16,17,
22 99:3,
6,19,20,
21 100:4
280:21



**access**
45:2
163:1

**accompany**
20:17,22
45:2

**account**
269:18
271:8,22
288:10
320:15

**accurate**
73:18
312:24
323:5

**accurately**
313:2

**accused**
27:24,25
28:5,8
50:25
51:5 60:8
87:3,4,23

**acronym**
91:5

**act**
44:8
157:14
189:23
191:16
193:21
195:1
270:8
271:4

**active**
267:5

**activities**
166:24
318:5,6

**acts**
127:9

**ADA**
173:11

**added**
200:11,22
209:24

**addition**
71:23
72:2
237:13

**additional**
196:6

**Additionally**
173:13

**address**
326:5
327:3,7

**addressed**
31:6
182:23
249:2

**addresses**
63:5
126:20
183:9

**adjudged**
190:1
191:1
194:2
195:2

**adjudication**
105:3

**administered**
320:12

**admissible**
113:12
114:12
115:8
116:21
117:5,17

292:23

**admissions**
134:22
135:12

**admitted**
52:15
292:18

**advance**
85:8 90:2

**advice**
53:13
238:18,21

**advise**
85:19

**advised**
28:1 87:5

**affect**
51:16

**affiant**
55:8
101:5

**affidavit**
101:4,7,
11,17,20,
25
162:12,
14,17
267:1
313:11
328:22
331:15,
17,22,24
332:1

**affidavits**
333:1,2

**affirmatively**
219:17

**afforded**
87:17

**Afraid**

106:10

**afternoon**
307:25

**AG's**
16:12

**agencies**
239:17

**agency**
127:13
190:3,4,5

**agent**
239:14

**aggravated**
70:7,14
72:3,7,19
73:8

**agree**
37:3 38:4
41:9
47:2,3,
18,20
54:22
56:13
57:4,6,10
60:12
61:7,14
65:4
66:23
68:16
76:23,25
84:21
87:18
90:17
100:4,6
113:7
116:25
117:10,
20,21
125:7,9
133:15
138:3
189:9
194:12
201:14

247:12
252:23
254:3
261:19
273:19
280:14
281:23
285:21

**Agreed**
222:5,7

**agreement**
47:7,13,
23 126:25
127:2,15
129:1
132:8,18
162:5
177:17
181:9
182:4
184:10,
15,21
189:21
190:6
193:7
249:7
257:2
298:8,11

**agreements**
177:14
183:9,17
185:19
186:19
268:7,15,
21,23

**agrees**
184:13
190:5

**ahead**
27:6
36:22
40:2,7,8
67:14
116:13



145:4
146:17
240:20,23
242:3
324:21

ahold
208:14,25

Alan
109:2
110:8
215:11
216:16
219:10,12

Albert
106:8

Alfred
106:8

alike
159:21

alive
106:6
313:25

allegation
306:17
317:6

allegations
37:6
38:15
306:21
333:10

alleged
39:23

allotted
159:24

allowed
15:10,16
35:23
36:18
69:3
111:24
159:23
197:2

218:16
291:24
307:20
335:23

alternate
163:18
166:1

Amendment
35:19

amount
276:6
285:8

anal-
retentive
24:16

analyst
286:6

analyze
330:17

And/or
301:8,9

answering
251:18

answers
71:13
242:21

Anthony
239:15,20

Antone
241:4,10,
21 242:1

apparently
68:25

appearance
288:1,3

appeared
43:13
80:1
266:14

appearing

43:11

appears
65:24
79:23
132:11
146:14
201:23
202:24
320:20

appellate
43:9,11,
16 139:12
302:18

application
259:20
260:8
261:16,17
304:9,10
329:5

applied
172:16,19
173:3
174:2,15
190:9
194:5,8

applies
190:11,14

apply
182:12
189:14,18

applying
260:15

appreciatin
g
247:15

approach
81:6

approval
171:14
173:5
183:18
184:3,21

186:25

approve
173:11
178:12

approximate
ly
19:6
20:10
78:4

April
17:23
51:20
55:1,10
62:6
66:10
68:3
69:18,23
74:6
76:11
78:15
79:7,23
80:15
81:19
82:1,5,
11,15,21
84:6 92:1
138:22
157:5
167:8
203:20
204:16,18
205:2,13
206:5,10,
22 207:15
211:7
259:4,9,
20
260:15,
21,25
261:10,
15,17,20
262:2,7

Aransas
160:6
257:3

area
140:24

areas
227:6

argue
191:22
287:21
324:9,17

argued
300:23
333:6

arguing
107:14

argument
179:17
276:1
277:20
292:9,13,
19
293:17,19
294:10
297:4
299:1
311:2
321:2,22

arise
31:7

arisen
182:20

arising
72:24

arrange
90:11,14
123:10
218:4
241:12

arranged
269:2

arrangement
171:13



arrangement
s
    123:20

arranging
    269:6

arrest
    101:5

arresting
    190:3,4

arrow
    279:9

article
    23:12
    24:2
    79:8,10,
    13,21,23
    80:1,3
    81:20
    126:25
    151:8

articulable
    61:12

asks
    71:22
    78:18
    266:13

asleep
    283:8

assailant
    283:24

assault
    191:25
    192:6

assertion
    125:6

assigned
    17:24
    105:10

assist
    45:2
    239:13

assistance
    134:10
    136:18
    184:15
    263:17
    300:9

assistant
    17:13
    94:9
    97:21
    98:10
    141:22
    183:25
    184:6,10,
    13,16
    188:22
    220:14
    233:3

assisting
    27:23
    87:2
    260:14
    302:21

Associates
    9:11

assume
    197:22
    232:11

assumed
    271:9,10

assuming
    99:12
    232:9

assumption
    249:5
    318:8

assumptions
    315:18

assured
    27:25
    87:4
    312:22,23

attach
    12:10
    290:1,15

attached
    154:23
    155:15,16
    173:6
    225:7
    288:19
    290:3
    291:3

attempt
    203:15

attempted
    315:23

attended
    222:3

attention
    23:5
    58:14,20
    59:4 67:4
    244:13
    280:8

attorney
    16:6,25
    17:10,13,
    14 35:16,
    22 41:5
    43:19
    45:1,7,13
    46:8,24
    47:1,5,6,
    12 48:2,
    4,11,13
    50:23
    59:11,12
    60:20,21
    61:1,2
    63:13
    71:6
    83:13,15
    97:22
    98:10
    109:3

111:10,12
    134:19
    136:9,17
    137:21
    138:1
    139:5,20
    141:22
    147:16
    163:6,11
    168:3
    171:9,16
    184:1,18
    215:12,16
    220:14
    233:3,8
    244:5
    250:10
    254:14
    270:6
    271:2
    303:20
    321:15

attorney's
    17:21
    29:21
    31:2 50:6
    54:5 55:9
    84:8 85:1
    183:23
    185:2,23
    220:15
    250:11
    254:17
    291:5

attorneys
    30:4 41:1
    148:11
    168:15
    290:23

audio
    252:17,18

audiotape
    96:24
    97:1,4,10

audition
    158:9

auditioning
    158:7

August
    44:12,19
    103:10,24
    104:18
    105:1,11
    106:16
    108:14
    109:1,14
    110:15
    111:10,19
    119:6,8
    129:10
    131:6,11,
    20 132:2,
    14 136:15
    141:11
    192:14,16
    193:1
    208:11
    210:5,24
    215:4
    217:13,14
    220:3
    223:17
    245:14
    246:4
    265:18
    277:12,21

AUSA
    248:5,8,
    12
    250:20,22
    251:17

authorities
    295:21
    296:21
    297:12
    298:25
    299:13

authority



60:18

**autopsies**
  282:17

**autopsy**
  282:18
  320:5,6,
  9,17
  323:22
  325:1
  326:24
  328:9,21,
  23

**avenues**
  64:18

**aware**
  96:1
  152:5
  175:21
  190:5
  215:15
  236:7
  244:13
  249:18
  259:15
  302:16
  303:1,5,8
  332:14,18

_____
        **B**
_____

**babies**
  283:7

**baby**
  167:16
  168:1,5

**babysit**
  158:23
  221:22

**babysitting**
  222:1

**back**
  21:18

23:20
24:11,15
31:23
32:8,11
39:9
48:10
50:22
51:2
63:23
64:13
65:25
66:5
71:11
73:13
77:11
86:20
109:22
118:7
120:10,11
137:15
146:9
152:11
157:19
169:24
183:3
197:5
206:12,13
209:19
215:8
220:2
221:5
226:7
232:21
238:3
252:8
260:18
263:5
265:18
266:8
267:24,25
268:5
269:23,25
272:9
313:24
320:16
321:12
322:12

325:6,21
327:8,19,
22

**backtrack**
  162:3

**bad**
  173:9
  187:11
  214:25

**badly**
  323:14

**bag**
  166:25
  167:16
  168:1,5

**bandwagon**
  157:12

**bank**
  279:17,19
  335:10

**banks**
  335:11

**Bar**
  90:15

**barely**
  316:17

**bargain**
  257:2

**based**
  15:17
  22:3
  38:18
  61:12
  99:16
  113:24
  134:13
  156:15
  161:12
  253:23
  284:22,23
  287:18
  292:18

315:13
320:8
328:7,8,
21,23

**basic**
  113:3

**basis**
  30:5
  35:17
  295:10
  303:3
  317:6
  330:2

**Bates**
  204:5,7,8
  258:25

**Batson**
  138:10,17
  263:15

**battle**
  106:1

**beans**
  276:7

**Bear**
  105:15,21

**bearing**
  110:20

**beat**
  313:25
  316:1
  317:19
  322:13

**beaten**
  70:8
  71:19
  313:18
  314:6
  323:13,14
  327:22

**beating**
  323:17,
  21,23,24

324:4

**Beaumont**
  68:4
  74:7,9
  75:12
  85:1
  86:15
  88:9,14,
  15,16,23
  89:2,3,5,
  10  90:20
  91:7,13
  92:13,16
  93:17
  95:7
  96:20
  104:4,5
  105:6,20
  106:11
  128:13
  140:12,23
  149:8
  150:7
  152:10
  154:19
  157:3
  158:7
  159:11
  165:2
  186:14
  192:25
  195:19,20
  196:3,10,
  15,22
  199:4
  202:18
  213:9,15,
  21  214:10
  218:5
  219:20
  220:12
  221:8,11,
  15,17,19
  222:6
  226:6
  232:22



238:17
244:25
273:24
274:17
276:15
280:10,12
295:24
296:23
329:18

**Beckcom**
17:2
149:4,8
152:11,
16,17
159:10
160:5
161:10,22
179:23
186:15,16
190:25
194:20
200:10
202:20,22
209:14
220:17
221:15,17
225:6,11,
20 226:5,
13,19,21,
22
227:13,19
228:19,22
229:1,6,
12,19,25
230:7,10,
14,19,24
231:10,23
232:4,21
233:9,20
234:5,11,
17,18,20
235:9,22
236:5,7,
10,11
237:7
239:19

241:4,7,
15,19,23
242:11
243:22
244:1,12,
17,24
245:2,3
246:21,25
247:24
248:3,6,
14 249:4,
11,13,17,
21,25
250:5,8
253:24
254:3,11,
21,24
255:16,
17,21
256:25
259:6
260:3,6,
21 262:5
263:6
264:23
265:7,14
266:1,8,
14,17
267:6,10
268:7,15,
21 269:2
273:18,23
274:16,22
275:7,15
276:2,8,
14 277:2,
8 288:16,
18
289:20,22
290:3
291:14
333:16

**Beckcom's**
202:11
231:24
233:4,22,

24 235:6,
13,16
242:17
244:5,8
245:10,
14,23
248:20
254:14,17
256:3,18,
21
258:11,23
259:20
265:3,12,
19 266:7,
9 269:3

**bed**
283:8

**beg**
253:23
254:1

**began**
17:5,6,12
233:3

**begin**
17:9

**beginning**
9:5 30:9
57:1 58:5
62:6
77:18
104:10
112:24
118:19
147:10
197:25
200:6
242:9
243:18
253:4
273:14
293:9
336:24

**begins**
270:12

**behalf**
11:4
138:19
247:5,17,
22

**belief**
61:11
168:25
292:16,23
330:3

**believed**
29:9
117:16
220:6
247:25
281:1

**believes**
60:22
61:3
114:11
115:4,6
116:23
117:7

**bell**
91:2,17
240:2

**belong**
102:21

**belonging**
203:20

**belt**
320:22

**bench**
267:6,13,
23 268:2
288:16,
18,23,25
290:1,8,
10

**benefit**
184:8
248:13
263:16

**benefits**
170:21
255:22,25
268:8,15,
22

**Bert**
132:6,22

**Bible**
267:1
288:17,19
289:13
290:11

**Bible's**
267:11,
16,22

**big**
129:7
178:20

**bigger**
174:19,20
176:25
330:12

**bill**
113:19
114:14,
16,19
115:10,
11,16
116:7,15,
24 117:9

**birth**
97:24
98:12

**bit**
102:23

**blame**
326:18

**blood**
53:1
54:17
279:10
313:3,6



320:21

**blow**
194:16

**blue**
229:17

**blunt**
320:11

**BMM**
75:20
76:12

**board**
82:8
186:25
202:23
209:23

**bodily**
191:25
192:6

**body**
52:23
159:21
327:4,24

**Boggs**
9:14

**Bonds**
16:23
17:2
19:12,13
20:4,11
21:12
55:8
62:12
65:19
80:8,22,
25 85:2
91:24
99:10
103:5,11,
25 107:1,
12
186:11,14
196:17
198:24

199:15
218:14
219:19
220:16
221:13,
20,21
222:9,14
223:2
224:10,25
229:2,6,
20,22
230:19
241:3
287:17

**Bonds'**
66:1
166:13
198:15,21
222:20
223:24
228:14
230:16
287:18

**book**
173:15
176:13,15

**BOP**
76:1,3,8
90:20
91:12
93:7
140:11,23
213:3,21
214:11
301:20
302:13,21
303:3,4,
12 334:4

**boss**
11:2
175:6
178:18

**bottom**
44:18

75:13,14
76:10
94:25
127:4
135:9
166:5,13,
15 200:20
258:25
262:2

**bound**
26:8
162:10

**Bowers**
11:7

**box**
139:11
269:20
279:11

**boys**
105:23

**Brady**
29:4,20
30:12,23
32:3
37:5,9
42:16,19
48:23
49:3
50:7,10
51:2,12,
13 168:17
264:8,12

**break**
32:16
69:12,16
75:9
77:10
108:19
110:12
112:19
117:3
137:1,16
144:6,9
200:2

214:1,6,
21 240:8
243:21
273:9
293:2
309:12

**Brian**
44:7
140:5
318:16

**briefed**
307:9

**briefly**
118:15

**bring**
67:3
154:15
230:13
280:8
338:5

**broad**
60:18

**brought**
58:13,20
59:4 66:7
267:24,25
289:20
290:4,6
338:2

**Brown**
51:23
52:8
55:5,24
66:6
79:9,15,
25 81:18
101:5
129:24
313:6,12
319:12,13
320:5
321:14,
17,21,25
323:23

325:25

**Brueggen**
235:5

**bruised**
327:23

**bruises**
324:5

**bruising**
320:19

**Bryant**
132:21

**Bs**
106:2,5
151:5

**BSING**
106:9

**Bubba**
105:21

**build**
116:6,14

**bull**
216:16,17

**burden**
264:16

**bureau**
18:15,20
19:3 76:2
171:12,
14,25
173:16
184:4,19,
20,24

**burning**
283:7

**burns**
53:6
54:19

**business**
36:13
298:14,17



**busy**
206:2
213:8

**buying**
175:17

———————

C

———————

**caliber**
279:3

**California**
233:4
244:5

**call**
11:2
13:15
14:10
15:7 34:4
36:19
37:17
39:2 40:5
54:11
73:14,25
74:2 78:9
82:24
102:14
103:3
109:22
139:14,15
146:18
154:16
164:9,11
174:10
192:20
196:15,
21,24,25
197:5,12
201:23
202:25
203:8,12,
15 204:19
205:20,24
206:8,23
207:2,5,

8,13,16,
24 208:3,
15,16,17,
20 209:1,
7 210:16
211:17
212:1,3,
10,13
213:4
225:7
240:11
244:2,18
250:19
251:21,25
261:3
262:9,14,
18 305:1,
21

**called**
10:5 32:3
102:15
105:6
109:14
197:1
203:7,10,
19,20
205:13,16
206:8,19
209:13
214:10,12
233:10,14
234:10
252:8,12,
13 259:6
261:6,10
262:6,17
287:10,13
295:24
296:22
299:14
302:5
309:11
310:9
314:12
335:10

**calling**
164:9
197:15
206:3
209:2,5
321:4
333:13,14

**calls**
197:19
201:16
202:14
203:6
204:17
206:4
208:6,11,
13,24
209:4,9,
11,12
210:9
212:21
260:22

**camera**
278:14
334:14,
15,22,24

**can,'**
50:14

**capacity**
11:3,14

**capital**
64:20
70:24
71:25
72:4,9,
14,25
73:5
100:1
110:23
116:1
127:25
128:7
160:6
178:21,22
179:7,8

189:12
191:8
245:2
256:4
283:9

**car**
191:14

**card**
90:15

**care**
28:14
91:4
143:9
194:15
321:18

**careful**
243:11

**carefully**
330:19

**Carl**
154:19
155:22
156:2,4
161:2,7
330:10,
11,14,24

**carpet**
106:4,9

**carry**
270:5,21

**case**
9:6,7
10:21,22
11:18,19,
23 12:18,
23,24
13:14,23,
25 14:6,
20 15:5,
25 20:16
22:20
23:2,3
24:1

25:3,10
27:20
28:16
32:1
33:2,24
38:9,15
39:22
40:1,19,
20 41:20,
21 42:1,5
43:19,24
44:1,21
45:12,16
46:8,22,
23 47:8
48:6,7
50:4 52:3
53:19
54:25
55:2,11,
15,17,20,
25 56:2,
5,25
57:7,12,
17 58:2,
4,13
59:8,12,
16 62:6,
22,24
63:2,13,
17,21
64:7,12,
13 65:1,
7,22,25
66:5,7
70:7,11,
18,24
71:17,18,
25 72:4,
9,14,25
73:5
79:14,25
80:2,4,6,
7,14,24
81:6,7,
11,16,18
83:14,25



85:20
86:4,12
89:14
101:6,10,
23 102:2
110:7,17,
20 111:3,
4,8
113:22
114:18,
19,20
115:15,17
116:7,14,
15,25
117:9,12,
24 118:8
119:1,11
120:4,20,
21,22
122:5
123:21,
24,25
124:1,3,
11,18
125:18,23
126:1,6,
11,13,15,
17 128:22
129:8,10,
25 130:3,
10,11,17,
20 131:1,
4,8
133:11
134:10,13
135:15
136:18
138:2
139:11,
16,17
140:14
143:9
145:12,17
146:5,6,
10,13,15,
20 148:10
149:3,7

150:14,
17,22
151:9,13,
15 152:14
153:1,9,
20 154:20
155:13
157:10,22
158:10
160:7
161:6,10
163:24,25
164:6,12,
14,17,19,
24 165:5,
23 166:1
167:3
171:8,10,
22,25
172:16,24
174:14,
15,17
175:1,3,
12,18,22
176:23
177:5,11
178:22,23
179:1,6,
9,23
180:1,3,
7,10,12,
15,18,21
181:14
182:1,12,
25 184:7,
11,14
185:15,
16,17,25
186:3,7,
21,22
187:4,16,
17 189:6,
18,22
190:1,2,
13,15,17,
19,20
191:1,5,

11 192:4
193:9,11
194:2,6,
13,21,24,
25 196:4
197:1,3,
4,16
202:9
209:6
210:7
213:10
214:9,12
216:9,14,
21,23
223:12
226:12
227:9,23
229:7
231:20
232:23
233:4,9
234:12,
21,23
236:2,9,
12
237:16,
19,21,24
238:11,
12,25
239:7
241:8
244:2,14,
18 245:16
246:4
250:17
253:5,7,
12 254:4
255:23
256:3,4
257:2,3,8
258:12,13
260:9,15
263:7,10
264:5,6
265:5
266:22
267:1,2,

11,17,22,
24 268:1
271:21
272:13,
17,23
273:19
276:10
277:3,7,
8,13,22
278:15
283:1,20
284:19
285:1
286:16
288:17,19
289:13,24
290:2,4,
12 291:1,
4 292:7,
18 293:20
294:17,
22,25
295:6
296:2,15
300:2
301:10,
13,15
302:2
304:6
305:3
306:10,11
308:11
311:12
312:16
313:13,17
314:5,9,
10 317:23
318:11
319:5,7,8
320:6
324:13
325:17
328:11
331:19,
21,25
332:7
333:22

337:5,12,
16,17
338:3

**case-to-
case**
30:5

**case.'**
24:8

**cases**
11:12,17
13:7,10
19:1
20:12
21:24
22:2,5,6,
9,11,12,
15,19,23
23:4
24:3,5,10
25:1 38:8
53:14
63:5
64:20
72:23
106:18
115:18
120:7,14,
25 121:2,
4 123:5
130:6
146:22
174:8
175:20
176:10
178:10,
19,20,24
185:20
190:10,
16,24
194:10
213:4
216:24
259:16
263:18
266:14,16



290:16
291:2
306:13,
15,16,20
317:22
332:11
333:4

cases.'
24:18

cash
167:17

catch
187:11

caucus
144:17

caused
53:6
332:10

causing
191:25
192:6
256:14

cavity
281:10
286:12

cell
284:12

cellmate
226:17
245:14
265:4,13,
19,20,22
266:1,2,
10

cellmate.'
242:25

cellmates
226:5,13
227:22,25
266:5

cells

284:15

center
88:9,15
104:8
105:2
308:22
309:1

cetera
160:2

chain
174:19,20
178:15
188:13
290:5

chair
316:17

challenge
22:7,11

chance
23:20

change
18:8
238:15,21
311:19

changed
17:22
18:3
30:6,15,
16 258:19

characteriz
ation
65:9

characterize
255:19

charge
27:21
58:20
59:4,22
60:5,9
63:18
70:6,14,

24 72:7,
8,19 73:7
90:21
91:3,6
99:6
100:1
110:22
125:23
132:21,24
189:7
288:22

charged
50:25
71:24
72:4
128:7,9,
21 129:3,
5 183:24
185:10
188:10
280:14
281:4
335:10

charges
58:24
59:8,11,
17,20
60:19,21
61:2,18
62:2,8,17
64:6,9
97:13,17,
23,25
98:11,16,
17,21,22
99:3,6,
15,19,20
100:4
127:25
263:21
280:22

check
99:7,10
167:20
205:4

279:2,6

chest
325:19

chief
17:25
18:7,9,
13,15,19,
20,24
19:2,3
173:6,10
184:5,6,
19,20,24

children
117:25

choice
191:11

choked
320:13
322:10

choose
66:5

chose
138:19,20
156:13
165:7

CHRONICLE
79:8
81:19

Chuy
105:15,22

circle
305:1

circled
279:20
335:4

circumstance
171:7

circumstances
31:21

45:16,17,
18 46:6
49:4
55:19,23
114:15
115:10
177:10,12
184:6

circumstant
ial
22:3,15
23:4
24:8,9

citizen's
58:23

civil
10:25
35:9

claim
32:21
71:11
117:13
313:2,23
332:13
333:5

claimed
239:20
241:19
311:24
312:10
316:24

claiming
112:15

claims
37:4,5
135:25
306:15

Clark
91:17
214:10
218:15
220:12
224:25



241:1

clause
  25:22
  26:6

clean
  243:14

clear
  57:5
  304:15
  328:8
  337:3,20,
  23

Clemons
  83:15,17
  84:3
  134:19
  139:21

clerk
  238:3,5,
  17

client
  37:8
  146:2
  305:24

client's
  35:17

closely
  19:17
  20:11

closing
  275:24
  276:1
  309:18

clothes
  54:16

club
  106:3

co-counsel
  15:19

coaching
  145:20

232:14

cocaine
  175:16

Code
  127:1

Cogdell
  71:5,22
  315:4,11,
  23  316:22

coincidence
  296:17,18
  297:2

coincidenta
l
  273:17
  274:23
  281:2

coincidenta
lly
  273:24
  276:14

cold
  18:25
  22:2,5,6,
  9,11,19
  24:2,18
  25:1,9
  65:1,7

color
  209:19

combat
  24:6

command
  311:7

comment
  321:14,25

commented
  331:22,24

commit
  71:11

committed
  57:7
  61:13
  71:15
  193:12

committing
  134:23
  135:12

common
  119:21
  121:23
  290:22

communicate
d
  173:17

communicati
ng
  236:10
  250:1

communicati
on
  211:23
  231:11
  239:10

communicati
ons
  186:12
  238:10
  249:22

compared
  161:2

comparing
  161:1
  178:21

compelling
  282:16,22

competency
  11:16

complainant
  166:23

Complaining

106:8

complaint
  58:23
  59:1

complete
  63:17
  138:11
  139:10
  228:13
  284:20,24

completed
  57:20
  171:17,18

completely
  111:2
  132:23
  136:6
  137:11
  172:13
  234:22
  239:6
  248:4,6
  297:14
  305:3
  328:24
  329:25

complicatio
n
  291:6

comply
  29:4

comport
  51:1

computer
  108:20
  270:4,20

concept
  176:9

concern
  292:6

concerned
  37:8

107:17
  144:19

concerns
  38:17,21

concluded
  339:9

conclusion
  247:12
  328:23
  329:1

concurrent
  258:6

concurrentl
y
  258:4,12,
  20

Conduct
  26:10
  86:22

conducted
  35:10
  315:12

conducting
  27:23
  87:2
  314:17

confer
  248:13

confess
  153:4

confessed
  96:17
  99:9
  121:10,14
  125:4

confession
  96:14
  100:17,22
  121:3
  136:1
  137:3,9,



14 275:16

**confided**
245:2

**confidential**
143:1

**confines**
320:24

**confirm**
311:14

**conflict**
324:3

**conflicting**
311:18

**conflicts**
321:10

**confused**
66:11
219:3
296:16
317:22
326:7

**confusing**
43:15
317:22

**confusion**
248:25

**connected**
164:19
203:10,14
206:23
207:2
267:24
286:9
290:11
297:17
298:23

**connecting**
54:19

**connection**
28:9

105:16
267:6,11
308:7

**consecutive**
256:15

**consecutively**
258:4,11

**consensual**
52:16
281:19

**consideration**
171:24
172:1
173:12,14
184:14
189:21
193:8

**considerations**
59:23
60:6
251:16

**considered**
148:7
189:22

**consist**
86:8

**consistent**
99:12
312:19
320:18

**consistently**
20:15

**conspiracy**
330:25

**constantly**
298:2

**constitution**
25:23
26:6
87:18

**consult**
144:9
147:3

**consulted**
43:10,18
251:8
286:11

**contact**
78:6,9
85:5 88:2
105:13
108:1,4
140:11
167:19
183:25
188:22
196:10
239:14,18
245:1
247:3,7,
15,20
254:17
264:24
265:2,11,
14
273:17,23
275:5,8,
11 277:12
281:2
307:6

**contacted**
74:5,17
75:3 78:8
102:25
184:12
300:1,16

**contacts**
264:23

**contained**

42:12
112:11

**contemplated**
173:21
178:11

**contemplates**
171:6
172:7

**contemplating**
84:6
280:23

**contemplation**
182:11

**context**
168:20
177:4
182:17
235:17

**continue**
15:12,22
35:5
36:5,20
37:22
69:4
142:5
307:5,20
308:3
309:14

**continues**
36:2

**continuing**
38:24
114:9

**contract**
171:15,17
172:12
174:11
175:12,
13,19

176:19
177:6,9,
13,18
179:3,23,
25 180:7,
12,14,17,
20,24
181:15
190:2,4,
5,13

**contracts**
174:5
175:20
176:17
177:15
181:1,4
182:17

**contradicts**
333:4

**contrary**
72:13,25
108:9

**control**
248:7
311:5

**controlled**
28:15

**conversation**
85:24
86:7,8,18
98:2,7
99:16
110:21,25
111:15
120:3
131:5,10,
20 167:6
168:8
209:2
222:23
228:17
229:5
230:14



conversatio
ns
   119:25
   186:6
   231:11
   235:25

conveyed
   249:11

convict
   113:18
   114:13
   115:8
   116:21
   117:5,17

convicted
   138:21
   139:4
   179:7
   187:6
   191:8
   192:6

conviction
   25:16
   29:7,18
   113:20
   114:1,14
   115:9
   116:22
   117:6
   192:7
   238:12
   253:25
   291:1

convince
   247:17

cooperated
   140:14
   312:14

cooperating
   183:9,17,
   25
   184:15,17
   186:20
   189:24,25

190:3,6

cooperation
   138:2
   244:8
   248:14

cooperative
   52:8
   135:14
   136:10
   138:4

coordinator
   288:24
   289:7,16

coordinator
s
   288:22

cop
   64:9
   115:20
   116:1,2
   172:12
   174:17
   175:15
   176:7
   187:9
   190:12,17
   276:9

cop's
   174:8

copies
   12:15
   147:19
   215:1
   243:7
   325:8,9,
   13

cops
   139:15
   174:7,22
   176:1,4,
   11,22
   185:12,20
   188:11

189:8
194:9

copy
   12:14
   24:22
   26:24
   28:21
   31:3
   49:12
   67:18
   71:7 82:7
   136:19
   166:6
   169:20
   190:19
   213:25
   224:24
   232:4,5,
   6,7,8
   236:16,24
   243:2,14
   256:5,20
   271:23
   278:6
   293:18
   336:2,5
   338:18

correct
   11:20
   12:1,7,19
   16:7
   17:18
   19:1,7,
   18,19
   20:18
   21:20
   24:21
   25:19,23
   26:6,10
   29:2,10,
   13 31:6,
   16 39:16,
   17 41:11,
   12,15,16
   42:3
   43:19

44:4
45:14
46:11
51:20
59:6,9,18
61:22
66:1
69:25
73:6
76:13
83:5,7,23
84:4
85:7,14,
18 86:17
87:10
89:19
90:1
101:9
104:16,24
113:14
118:24
122:1
123:12
124:14
126:18
131:1
132:2
136:11,18
137:4
139:1
141:14
147:21,23
151:6
152:6
153:21
154:7
159:12
162:15
163:2
164:20
165:24
167:20
170:3
172:17
175:14
184:24
185:4,25

186:1,24
189:15,19
191:8,9,
19 203:2
210:4,19
222:20
226:20
234:14
235:13
236:13
237:6,15
243:24
257:6
258:2
261:11
264:15,18
269:10
280:24
281:11
283:21,25
284:21
287:8
289:2,14
292:20
294:13
295:12
296:5,15
299:2,6
300:2
301:7
302:9
304:7
308:12,14
310:20
312:20,24
313:3
314:7
318:25
324:1
328:3
329:10
333:7
337:6

correction
   323:8



corresponde
nce
    79:5
    255:9,14
    338:4

corresponds
    224:4

counsel
    9:15
    28:2,3
    42:21
    45:3
    47:23
    86:1
    87:6,7,
    14,16,22
    112:8,12
    158:19
    165:5,24
    168:19
    199:16,22
    223:8
    241:18
    264:8
    265:2
    269:1
    286:15,23

counsel's
    45:2

country
    21:25

county
    55:9
    56:19
    57:18
    84:25
    88:25
    89:10,11,
    17,21
    97:8
    125:23
    127:13,
    14,25
    129:15,21

132:6
152:11
160:6
170:25
181:9
185:18,23
202:25
220:15
231:8
238:6
251:6
257:3
286:9
289:21
290:23
291:4
302:20
313:13
318:1
319:5
334:3
335:5

couple
    18:3
    69:23
    208:5
    219:15
    239:16

court
    9:8,13
    10:2,13
    11:10
    13:15
    17:25
    18:7,10
    34:4
    35:16
    36:19
    39:2 40:6
    47:7,13
    48:14
    71:21
    113:12
    121:16,
    21,24
    122:1,3,

6,11,18,
21 123:3,
7,10,13
126:23
143:6,10
146:25
154:15
173:11
176:23
215:22
234:7
258:15
278:13
288:22,24
289:5,7,
8,16
307:17,
23,25
315:10
317:6
333:15
334:15,
22,23

Court's
    278:14

courtroom
    289:9

cover
    210:12
    225:2

covers
    210:14

crazy
    24:7

credibility
    12:25
    15:3
    51:17
    175:25
    230:6
    332:4

credible
    109:7,8
    125:9

134:8
137:11
153:20
156:14
277:16
287:7,23
301:2
333:9

crime
    61:12
    71:10,11,
    14,18,23
    113:11
    121:10,14
    173:8
    184:1
    188:23
    191:25
    193:12,20
    233:24
    234:17
    286:7
    316:23
    320:9

crimes
    17:17
    18:10,11,
    13,15,19,
    24 19:2,
    3,4,18
    55:6,13
    56:9
    58:25
    63:25
    64:22,24
    66:15
    81:4
    101:15
    171:14,15
    173:7,13,
    17 175:7,
    9,10,18
    176:18
    178:15,16
    182:18
    184:3,4,

5,19,23
187:6
188:24
194:25
201:25
259:7
260:22
261:7
262:6

criminal
    27:20
    28:16
    29:13
    59:22
    60:5,19
    83:14
    87:17
    103:4,14
    127:1
    148:22
    162:24
    163:7,9,
    12,15,17
    164:5,8,
    23 165:2,
    10,13,18,
    21 166:4
    184:7
    189:25
    191:19
    192:10
    193:3,24
    215:16
    222:8,15

criminals
    195:2

cross
    161:24
    179:16
    315:5

crucial
    281:18

crux
    135:15



330:25

**Crystal**
167:14

**Cuellar**
294:25
295:1

**Cullers**
234:3,11
235:1,3,
16,23
236:8,11
244:5,12,
17
245:13,
22,23
246:3,8,
10  247:3,
8,15,16,
21  248:1,
5,8,12,
20,24
249:1,9,
22
250:23,
24,25
251:9,11,
20,24
252:5,8,
20
253:10,23
254:10,
13,17,20
255:9,15,
22

**curious**
329:3

**Curtis**
51:23
55:24
66:6  79:9
80:2
101:5
129:24
313:6

**custodial**
27:23
87:2
127:9,12,
16

**custody**
85:17
125:25
126:23,24
127:6,16
238:16

**cut**
106:5
157:15,20
158:11
170:15
185:2
335:16

**cutting**
320:11

———————

———————

D

———————

**d'hemecourt**
9:24

**DA**
30:10,20
59:7
64:12
117:15
172:7
182:14
188:22
195:9
271:8

**DA's**
17:4  18:2
20:5
21:19
30:17,24
31:22
37:14
42:15
43:1,17

53:24
54:12
55:2,6
58:14,20,
23,25
59:4,19
62:5
94:2,14
109:1
113:23
118:1,8,
25  121:23
123:15
132:6
141:9
147:14
155:18
159:17
163:8,13
170:25
177:22
178:2
179:3
181:10,
13,16
182:5
185:9,18
188:8,20
200:14
202:4
203:1
214:9
241:1
251:6
252:14
259:6,13,
17  261:7
269:10
271:14,17
272:2,3
273:2

**dad**
280:2

**Dale**
34:20,24

**damning**
281:14

**Dan**
71:5
315:4,10,
23  316:22

**Danny**
267:1
288:17,19
289:13
290:11

**dark**
214:3

**date**
9:3  38:18
44:12
51:22
56:11
65:24
69:21,22
81:12,13,
25  82:4,
15  88:11
97:23
98:1,12
99:9,25
103:6,9
104:2
110:15
119:5
154:23,24
159:9
207:7,10
208:13
210:8
214:14,20
220:20,
22,23
221:1,5,
7,18
223:3
224:6
237:5
241:24
257:20

259:4,7
261:7
262:1,12
264:22

**dated**
55:10
65:14
78:15
82:11
84:24
101:4
104:16,18
108:14
132:5
133:7
157:5
198:20
200:10
211:6
214:15,19
217:12
218:14
244:6
246:22
249:2
259:20
261:17,20
271:17

**dates**
204:17
220:24

**Davi**
239:15,20
241:5,10,
15,20,21,
24  242:1
269:2,7

**David**
11:18,19
12:12,24
52:3

**Davis**
9:7  96:23
97:10



98:7

**day**
51:24
52:24
54:16
88:1
90:12
92:8
97:14,15,
17 98:18,
23,24
99:21
100:24
103:25
104:21
120:8
158:12
159:24
166:24
172:14
181:6
186:15
193:2
197:2,5
200:12
210:25
215:22
219:14
225:10,12
226:23,24
227:20
230:22,23
231:4
260:24
309:9,16

**days**
69:24
96:22
105:2
110:9
132:13
218:19
219:15
262:6

**DEA**

239:14

**dead**
322:14

**deadly**
189:23
191:11
193:13
195:1

**deal**
153:2
175:20
177:20,23
178:3
179:4
185:2
217:4
253:6,13

**dealing**
174:13
272:8

**dealings**
248:19

**deals**
174:23
178:25
182:17
185:12
188:11,12

**dealt**
182:19
213:14

**death**
256:14
333:12,
17,19

**December**
198:20
199:3,15
200:10
218:16
220:17,
23,25
221:7,12

222:10,23
224:3
225:5
226:19
227:12
228:19
230:20
231:5,23
232:22
279:18
287:16

**decide**
110:19,22
115:20
176:5
190:17
254:20
307:4
336:19

**decided**
153:18
156:13
171:9

**decides**
59:7,11

**deciding**
176:4
190:19

**decision**
110:19
111:7
174:9
184:9,12

**declination**
64:10

**decline**
63:17,21
64:12

**declined**
63:6,14,
18

**deduction**
84:16

**Dee**
91:9

**defamed**
329:24

**defendant**
10:24
29:16,18
87:17
105:25
106:2
114:11
115:6
116:23
117:8
125:22
129:3,15
145:18
151:23
166:19
171:8,16,
21,23
179:2
187:12
244:25
276:4
279:8,19
280:9,11
295:18,19
296:19
298:24
335:15

**defendant's**
10:23
166:24

**defendants**
132:25
179:9
190:12
298:24

**defendants'**
322:15

**defense**
28:7,10
32:11,15,

18,25
35:16
39:10,20
40:13
41:1,14,
19,22
42:21
45:1,3,7,
13 46:8,
24 47:1,
23 48:2,4
50:8,11,
24 111:9
112:8,12,
16 142:3,
12,16,19,
21 147:15
148:1,11
156:19,22
158:18,19
163:1,6,
11,19,20,
22 164:5,
24 165:5,
24
168:15,19
178:6
179:13
199:16,22
223:8
241:17
253:7
264:11
265:2,11,
17 269:1
272:20,21
286:15

**defensive**
124:14

**deferred**
105:3

**define**
20:19
148:13



**defined**
148:19

**definition**
148:14,
15,22

**delete**
269:14

**deleted**
269:9,13,
14,17
272:14,25

**deleting**
271:11

**deliberatio
ns**
122:24
123:6

**deny**
152:2
182:5
206:5
241:11
242:15

**denying**
101:24
140:4
207:6,9

**department**
56:19
97:9

**departure**
138:7

**depend**
31:21
45:15

**depending**
203:8

**depends**
49:4
126:7,8
178:14

**depose**
146:2,5,
10 328:19

**deposed**
311:11,13

**deposing**
14:14

**deposited**
285:1

**deposition**
9:6,10,13
10:11,19
12:11,22
14:21,23
15:24
16:19,22
17:1 31:1
33:4,18
34:1
35:8,10,
21,24,25
36:17,18
37:17,22
38:7
53:20,25
54:6,13
145:17,22
287:11,14
308:2
309:14
313:11
328:20
337:5
339:9

**depositions**
16:16
37:3
146:24
307:10

**depth**
145:11

**descending**
204:1

**describe**
47:19
107:13

**describing**
63:17

**desires**
276:6

**desk**
64:8

**desperation**
300:6

**destroyed**
224:19

**detail**
23:5
145:11

**detailed**
22:13

**detailing**
151:14

**details**
22:15
53:5
54:25
98:9
100:23
245:2
312:16

**detainer**
126:3
127:2,7,
13,18,21,
23 133:2

**detainers**
126:25
127:15
129:1
132:8,24

**detective**
52:3,8
79:9,15,

24 81:18
98:7

**detectives**
51:23
52:23
54:16
55:5
96:23
97:10
98:3
101:8
281:20

**Detention**
88:9,15
104:8
105:2

**determinati
on**
137:6,17
172:1

**determine**
36:8
110:5
113:3
116:17
137:12
173:8
287:22

**determined**
125:4
135:24
136:25
137:2,8,
10 153:20
210:6
245:16
246:4

**deviation**
182:15,
18,19

**deviations**
182:13

**dialogue**

**66:20**

**Diane**
167:8

**died**
328:24

**difference**
88:18
129:7

**difficult**
22:7
108:11,14
264:20

**diligently**
48:13

**DIMS**
63:13

**direct**
59:16
179:16
200:14,16
202:2
285:15

**Directing**
284:8

**directly**
59:1
321:10

**director**
9:23,25
10:1 37:8

**dirty**
105:13,22

**dis**
105:7

**disagree**
44:15
56:24
57:3,9,
22,24
62:19,20
84:12



KELLY SIEGLER
RONALD JEFFREY PRIBLE vs LORIE DAVIS

October 17, 2017
Index: disagreeing..documents

109:19
114:4
125:6
128:20
161:21
185:6
254:1,8
275:2
332:4,6
334:6
337:13

disagreeing
137:25
243:5

disagreemen
t
114:6

disappear
281:24
282:4
283:14

disappeared
285:11,
14,23

disappearin
g
281:24

disappears
281:9
283:11

disciplinar
y
26:9
86:21
105:8,10,
14

disclose
28:10
42:2 45:8
48:23
49:1,2
50:23
51:4,9,11

111:9
124:13
168:15
232:19
241:17
264:22
266:16
268:7,14

disclosed
42:19
45:14
46:10
47:1
112:12
168:3
199:13,22
253:7

disclosing
32:10

disclosure
28:6
31:24
41:18
42:16,21
48:24

discover
50:15,17
317:14

discovered
295:20
296:19
298:24,25
299:12

discovery
14:23
36:18
47:7,13,
22 48:12,
13 93:25
145:17
146:5,15,
24

discretion
60:19

186:2

discretiona
ry
60:18

discuss
36:19
111:16
116:11
214:12
217:10
232:22
234:19,24
235:16
239:19
241:8,13,
19 277:22

discussed
16:11
37:2 80:6
100:9,11
140:9
170:12
182:12
193:9
209:16
211:8
235:13
247:9
263:12
298:11
310:25

discusses
106:17,20

discussing
139:4
149:6
181:6
229:7

discussions
247:8

dismiss
72:19

dismissal

72:2

dismissed
70:6
71:24
72:7
73:7,10

dismissing
70:14

dispose
116:7,15

dispute
11:1
317:8

district
9:8
17:14,20
29:21
30:3 31:2
50:6 54:5
55:9
59:11,12
63:13
84:25
97:22
98:10
183:22
184:1
185:2,23
220:14,15
250:12
290:23
291:5

ditch
106:9

divide
121:4

divided
186:17

division
9:9
18:13,19,
21,24,25
19:2 55:6

58:21,24
64:23
90:20
123:16
173:8
184:1,2,
5,20
188:23
291:16

divisions
184:3
188:24
201:25

divulge
48:14

divulging
48:18

DNA
24:11
65:21
281:9,15,
24
282:19,
20,21
283:11,
20,21,22
286:6

docket
154:16
234:6

doctor
309:11
312:9,10
328:6

document
56:22
141:12,23
143:23
181:13
289:4
321:13
325:21

documents



26:21
76:23
77:3
132:11
147:20
288:21
301:20
303:3,4,
9,12
338:2,5,7

Dodge
280:1

dollar
257:5

Dominguez
95:21,22
96:18
99:8
105:25
106:21
131:3,7,
19 133:9
135:20
138:25
180:18
194:24
308:13
311:12,16
312:2,5
321:5,11
322:8

Dominguez's
131:25
312:19

dope
105:3,15,
16 174:8,
18
176:10,23
177:2
182:17
187:10,15
188:12
190:13,21

double
57:4 69:9

doubt
61:16
230:12

downtown
104:8
193:2
210:25
220:8

downward
138:7

Doyle
9:19
12:14,17
13:1,5,8,
11,14,18,
21 14:3,
6,8,11,
15,18,24
15:4,9,18
23:10
25:25
26:20
27:3
28:20
33:7,10,
17,23
34:16,21,
23,24
35:1,3,6,
12,13
36:4,7,21
37:11,19,
24 38:2,
22 39:3
40:2,7
43:4
45:21
49:9,14,
16,21,25
56:10
65:5,8
66:11,14,
21,25

67:3,6,8,
13,21,24
68:7,9,
14,18,25
69:7,9,17
75:7
77:13
84:19
87:11
104:11
114:22
142:13
143:5,13,
16,18,21,
25 144:4,
7,16
145:23
157:1,20
162:6
169:16,
21,24
180:8
183:4,6
187:19,24
188:4
199:17
200:24
204:7,10,
12,22,25
205:2,6,
21 206:16
207:21,23
212:18,
21,24
213:1
214:14,16
228:6
232:11,15
236:18
240:5,9,
11,14,20,
23 242:5
245:19
255:18,24
273:25
275:13
276:16,

21,24
278:9
281:5
282:2
289:18
290:18
291:10
292:21
293:16
298:8,20
303:24
304:12,
16,21,24
305:8,13,
18,22,24
306:1,4,
6,8,11,22
307:11,24
308:6
309:7,11
316:9,12
317:10
318:17,21
325:12,14
331:12
334:17
336:15,20
339:1,4

dragged
313:24
322:12

driven
221:19

driver's
90:16

dropped
263:22
335:15

drove
106:3
296:4

drug
174:14
175:20

178:10,
19,20,22,
24 179:1
193:9
194:6
302:21

drugs
302:15
334:2

dude
106:4,8

dude's
106:5

due
25:22
26:5
335:22

duly
10:5

Dumpster
106:9

duo
150:6

duties
25:18
29:1
270:5,21
291:17

duty
25:15,19,
21 26:2,
4,5 29:4,
6 115:23
124:13
271:7

Dwayne
9:12

DWI
194:13



**E**

**E-MAIL**
254:13
269:12
272:10,19
338:12,21

**E-MAILED**
338:12

**E-MAILS**
269:9,15,
17 271:7,
12,20
272:3,8,
13,14,15,
17,22
338:19

**earlier**
55:12
66:6,15
67:1 80:5
125:8,10
134:20
140:9
147:12
162:7,25
176:13
182:9
185:11
193:9
195:14
209:16
211:9
218:23
219:6
220:3
224:5,23
237:25
246:17
263:13
266:4
284:10
285:21
297:22

337:3

**earliest**
257:21

**early**
55:1
148:4
313:16

**ears**
324:7

**easier**
108:20
122:9
189:2
227:7
327:18

**easy**
196:24

**Eddie**
133:10
135:21
180:21
335:6

**Edie**
9:14

**effect**
44:17
127:14

**effective**
44:19

**efforts**
27:25
28:4
48:25
87:4,21

**ejaculate**
283:3

**ejaculated**
283:24

**elaborate**
50:14

**electronic**
270:6
271:3

**elicited**
283:20
285:9

**Ellison**
15:8
36:10
37:18
38:6
307:6

**else's**
279:22
294:22

**embarrassed**
116:8,16

**employed**
28:15

**employee**
11:1,4,7
213:11

**employees**
91:12
213:4,21
214:12

**en**
314:16
317:18

**Enclosed**
234:4

**enclosing**
132:7
235:4

**encounter**
93:10

**encountering**
93:11

**encourage**
28:4 86:3

87:21

**encouraged**
88:3

**end**
18:11
48:15
55:13
56:9 91:4
98:6
115:22
133:4
195:4
253:7
255:1
257:21
329:3
336:12

**ended**
130:19

**ends**
29:12

**enemies**
167:10

**enforce**
35:9

**enforcement**
58:22
117:13
127:12

**engage**
66:20

**ensure**
173:16
184:11

**enter**
47:22
177:5,8,
13
180:11,
14,17,20

**entered**
181:15

**enters**
171:15

**entire**
41:11
117:24
155:12
327:13

**entitled**
68:14

**entry**
256:9,11

**envelope**
154:23
155:14
156:8,11
157:4
159:8

**envelopes**
155:15

**envisions**
314:18

**equal**
163:1

**equipment**
24:4

**equivalent**
257:10

**Esmeralda**
208:22

**Esquire**
9:13

**essentially**
179:11
311:18

**established**
128:10

**ethical**
26:8

**ethics**
30:12



evening
  216:15

event
  297:10,13

events
  59:7,9
  297:10

eventually
  17:17
  77:24
  78:3,12
  159:11
  254:20
  266:9

everybody's
  271:12

evidence
  22:3 24:9
  28:7
  42:16
  50:8,10,
  24 51:4,
  9,11,15,
  16 54:17
  62:15
  65:13
  110:24
  113:4,11,
  16,24
  114:13
  115:8
  116:21
  117:5,12,
  14,15,17
  118:2
  125:11
  207:1
  276:2,7
  281:14
  282:15,16
  283:1
  292:15,
  17,18,23
  295:11

296:1
310:18
312:13,20
313:1,3,
  4,6
315:24
316:22
317:14
320:21
323:22
325:4,8,9
326:16
328:10
330:4,5
332:3,4
333:9,25
335:15

exact
  314:2

examination
  10:7
  179:16,17
  287:5
  335:1
  337:1,25

examine
  315:5

examining
  40:17,18
  42:6,9

exception
  40:16

excerpt
  71:5
  274:13
  275:23

excerpts
  12:11
  44:5
  49:19

exchange
  70:6
  72:11

184:14
217:4
268:8,16,
  22

exchanged
  170:21

excise
  312:13

excluded
  315:10

exculpatory
  51:15
  169:1,3,4

excuse
  49:9
  161:17

executed
  283:3,4,
  24

exercise
  28:14

exercised
  311:5

exhaust
  191:13

exhibit
  12:11
  23:8,9,12
  24:20
  26:23
  27:18
  44:5,11,
  23 47:4
  48:10
  49:5
  50:22
  55:3
  56:16,18
  58:18
  63:5
  65:17,18
  67:15,17,

18 68:3
69:19
71:4
73:11
75:6,11,
  25 78:13
79:7
82:3,5
84:24
86:20
93:2
94:24
97:4,7
99:24
101:3
103:4
104:9
105:1
108:11
110:11,15
113:2,8,
  15 114:9
126:19
132:4
133:1,7
134:18
136:12
137:25
139:18,19
141:8
149:11,12
153:8
154:18
156:25
157:2
159:8
160:4
162:11
165:1,5,
  21,24
166:3
167:7
168:7
169:15
171:6
181:8
182:10

183:3,16
188:2
197:23
200:9,18
203:18
209:18,22
211:5
213:23
214:8
215:7,11
218:7,13
220:10
222:8,18,
  19 223:23
224:22,23
228:1
230:17
234:2
235:2,3
236:15
238:14
239:12
240:25
244:4,11
246:20
248:11
250:9
251:20
253:15,23
254:12
256:2
258:22
259:19
260:18
261:2,19
262:5,20
263:5
264:7
266:13,25
268:5
269:21,22
270:3
271:16
274:13
278:1
286:1
293:11



294:1
308:20,21
310:4,5
316:6
319:12

**exhibits**
12:13
160:13
278:2
301:13
309:14

**exist**
24:5 60:9
114:15
115:10

**existed**
125:11

**existence**
45:4 46:4
50:24

**exists**
60:22
61:3

**expectation**
253:5,12

**expected**
257:19

**expediently**
247:4,22

**experience**
284:23

**expert**
65:22
282:20
283:20

**explain**
13:24
33:15
64:3
173:25
306:13
309:7

326:5
327:3,7

**explained**
16:14

**explanation**
268:4

**extensively**
307:9

**extent**
145:13

**extra**
71:7
183:4
278:9
318:18
325:12,14

**extrajudici
al**
28:16

**eye**
23:15
68:12

**eyesight**
44:24
49:11
314:23
335:23,25
336:2

——————

**F**

——————

**face**
127:25
223:6
313:25
320:20

**face-to-
face**
217:10
218:4

**facility**

210:25
220:8,16

**fact**
71:23
109:18
118:7
140:7
141:24
146:2
246:16
263:6
264:3
282:21
283:21,22
287:10,13
295:5,20
296:20
299:11,13
300:4,23
303:8
304:12
311:1
324:19

**factors**
194:11

**facts**
52:10
53:3,5
61:12
124:14
239:7
276:3,10
288:6,11
314:9
321:17,
19,20
323:4
332:24

**fair**
33:20
299:15

**faith**
48:12,25
61:11

292:16,23
295:10

**false**
29:6,17
137:4
289:15
302:11
303:21,22
306:16
329:9,13,
16 330:1
332:6

**familiar**
26:15
28:19,23
83:17
171:2
183:10
246:11,16
311:6
317:24

**family**
51:19
105:17
117:24
301:8,9

**fancy**
24:10

**fashioned**
24:13

**fast**
114:24
268:18
336:10

**father**
150:13

**father/son**
150:6

**faults**
329:9

**favor**
255:19

**favors**
134:9
255:16

**fax**
65:18,24
80:6,21
81:12,13
84:24
224:24
225:2
250:10

**FBI**
239:14
279:12

**FCC**
85:1

**FCI**
68:4
74:7,9
75:12
91:6,13
104:4
128:12,13
133:8
140:23
149:8
150:6
154:19
157:3
158:7
159:11
165:2
195:19,20
196:3,10,
15,21
202:17
213:9,14,
21 214:10
218:5
219:20
220:12
221:8
226:5,13
232:22
241:2



244:25
273:24
276:14

**FDC**
88:15

**fear**
300:17

**February**
76:11
200:22

**fed**
105:4
139:16
210:25
233:25
234:18
239:8
245:10,23
279:19
332:20

**fed's**
238:16

**federal**
35:9 38:5
70:2
84:20
88:9,15,
25 89:23
92:13
104:8
105:2
109:16
125:24
126:2,3,
5,12,16,
22,23
127:7
141:6
143:2,6
153:2
157:16
158:9,12
179:7
189:11

195:5,11
197:14
215:16
234:4,7
248:8
250:1
251:16
257:7,17
258:5,7,
12,13,15
274:16,17
280:19,23
281:3
291:16,20
329:19,24
331:3
332:7,9
333:15

**feds**
237:15
238:24
251:6

**feel**
38:19
104:13
164:3

**Felix**
149:19,23
161:2,7

**fell**
32:2

**fellow**
101:14

**felony**
59:1
99:25

**felt**
29:16

**female**
330:22

**fewer**
173:22

**fibers**
54:19

**figure**
39:2
147:4

**figured**
136:2,4

**file**
9:5 16:4
25:9
32:12
39:13
41:4,6,7,
10,11,14,
24 47:8,
14,19
48:3,16
53:23,24
54:5,12
58:10,11,
12 61:25
63:1,2
65:2,3,9,
13,15
77:19
102:18,
19,23
108:13
109:1
111:23
112:2,3,
11,13,16,
25 118:20
139:25
140:4
141:9
143:10
144:2
147:11,
13,16,20,
23 153:24
154:3,4,
6,9,13,14
155:1,3,
7,9,12

156:20,23
158:20,24
159:17
160:7
163:8,13
165:4,8,
14 168:10
169:11,13
173:13
181:14,22
182:4
200:7
224:17
237:17
242:10
243:19
247:4,17,
22 264:11
273:15
278:20
288:21
289:4
293:10
314:10,11
319:6,9
325:9,13,
16 336:25

**filed**
58:24
59:1 72:3
162:12
238:15
250:17
264:8
301:12
313:13

**files**
25:1,7
279:13

**filing**
238:7

**fill**
132:19
141:15,
16,19

260:3,5

**filled**
132:16
141:14,21
260:10,11
261:15,16

**filling**
132:21

**final**
179:17

**finally**
28:14
118:25
197:8

**find**
38:3
99:11
114:23,25
123:7
169:15
176:14
208:22
233:16,
19,20
234:4
235:8
268:18
272:2,3
273:1
283:5
291:2

**fine**
26:17,22
38:22
69:17
143:25
147:5
199:20
228:12
240:16
257:5
293:13
295:19



**finish**
69:15
80:18
139:9
142:7
249:19
273:9
276:20
308:1
319:21
331:12

**finished**
23:24
316:14
318:13
319:23

**fire**
53:7
54:18
283:5

**fit**
288:6,11

**five-person**
62:17

**fix**
118:15

**flag**
160:17,
20,23,25

**flags**
161:4

**flammable**
279:10

**flew**
189:14

**Flores**
181:10,25

**flowed**
313:7

**folder**
176:16

269:15

**follow**
26:5
31:15
122:9
126:2
167:2
168:12
169:7
172:2
201:15
255:10

**force**
311:8

**foregone**
247:12

**foreign**
127:6,8,
11

**foreman**
46:22
74:19,21,
22,25
75:4
76:9,12
77:7
93:19
94:17
95:2,3,9,
17,22
96:1,8,18
99:9
100:9,11,
16,21
102:3,6,
24 103:5,
25 104:4,
7 105:1
106:12,17
107:4,20,
22
110:10,
16,21,25
111:5,10,

14,16,19
119:8,25
120:1
124:17
125:2,5,
7,9,20
130:5,9
131:6,7,
10,12,19
132:1
133:5,9,
22 134:5
135:24
136:6,10,
14,15
137:4,8,
10,13
138:4,10
149:7
162:25
164:10,23
180:1,2,
7,9,15
191:24,25
192:2,6
193:3
209:23,24
210:18
215:4,20,
23 216:8,
13,17
217:5,9,
10,13,15,
23 218:5,
16 219:20
220:7,21
223:18
224:3,6,
10,12
225:5,6
226:5,12,
19,23
227:14,19
229:3,4,
7,18
230:3,7,
11 232:21

242:13,
21,23
244:1,17
245:8
246:3,7
263:11,16
264:6
265:3,7,
12,18
275:18
277:13,
15,21
287:7,17,
23 288:10
291:9,12
330:12
331:16

**Foreman's**
94:23
100:14
109:3
125:10
136:16
138:1,19
201:9
210:10
215:12,16
229:10
230:6,13
244:20
263:10,12

**Foremen**
135:20

**forensic**
320:10

**forensics**
24:11

**forever**
176:17

**forget**
219:6

**forgive**
246:12

**forgot**
75:10
162:8

**form**
62:18
63:17
66:3
67:11
72:10
80:9,16
82:18
84:10,18
93:23
98:25
102:13
114:2
117:19
118:4
124:24
153:15
159:5
171:24
177:18
187:23
198:25
199:8
219:2
221:10
222:25
223:10
224:7
227:24
228:21
232:25
241:25
245:18
247:13
248:2
273:20
287:19
291:15
303:23

**formal**
30:3

**formatting**



160:1,8
161:17

forms
132:7

forthcoming
236:12

forum
116:17

forward
79:12
111:3,7
234:6
251:18
300:5,15,
24 305:9

forwarding
250:16

found
53:1
95:17
102:22
134:7
135:17
136:13
139:25
160:5
165:3
182:4
216:14
281:15
282:17,
18,22
283:21,23
284:11
287:7

fourth
106:7
270:18,
19,24
271:1

free
190:12

Fresno
250:20,22

friend
74:18
93:19
201:3

friends
167:11

front
225:2
253:17
279:2,6
282:7
320:16
325:6

frustrating
24:7

fulfill
168:17

full
54:22
167:16,17
168:1,5
216:20
284:19,24
295:15

function
16:13
113:3
289:7

furnished
173:10

future
216:10

―――――――
G
―――――――

gained
184:8

Gaiser
111:12,17

153:22
154:14
158:22
165:7
168:11,13
169:6,13,
14 232:20
276:4
285:3
291:8

gang
304:25
314:13,17
315:13,24
318:7

gaping
313:7

garden
191:13

garments
320:22

gasoline
283:5

gave
29:23
30:1
45:17
52:11
54:15
134:9
154:4,9
158:17,22
163:20,
21,22
164:5
165:9,12
167:23,24
169:6
183:4
228:3
230:19,21
231:7,23
239:2
242:20

244:1
288:10

general
59:21
60:4 83:3
115:25
270:6
271:3

General's
16:6,25

generate
284:16

generically
196:12

George
9:24

get all
206:4

Ghatti
294:3,12

Giglio
306:14

girlfriend
279:23

gist
322:15
323:9,10

give
23:11,19
26:21,23
27:4
30:23
49:12
55:25
84:17
90:2
108:17
139:11
147:2
164:8,23
165:1,5
168:14,19

169:2,24
194:17
232:4,6
237:8
238:18,
20,23
240:14
243:6
251:8
255:21
275:25
291:13
292:14
328:18
338:19

giving
27:17
127:17
163:16,19
165:18
168:20
238:20
254:16

glasses
23:16

Glen
274:15

glom
152:25

go-by
251:5,7,
9,13

goal
174:19

Godfather
294:2,12

Gomez
133:10
135:21
180:21
335:7,8

Gonzalez
149:19,23



KELLY SIEGLER                                    October 17, 2017
RONALD JEFFREY PRIBLE vs LORIE DAVIS    Index: Gonzalezes..handwritten

150:12
151:7
152:21,25
153:8,19,
23 161:2,
7

Gonzalezes
  150:22

good
  24:9,16
  48:11,25
  61:11
  173:9
  175:18
  182:14
  190:20
  220:4
  230:5
  288:10
  292:16,22
  295:10
  336:11,13

Gordon
  91:19

government
  312:14

grabbed
  106:7
  321:3,22
  322:10

grade
  173:5

Graham
  132:6,22

grand
  59:2,8,
  13,16
  62:22
  63:3
  110:17
  113:3,9,
  23
  114:18,21

115:15,
17,19,20
116:3,16,
25 117:9
118:8,23
119:1,11,
16,18,22,
24 120:2,
12 121:1,
8,13,17
122:11,
16,20,23
123:5,9,
14,16
124:6,7,
10,11,14,
16,20
125:1,18,
19

Grandy
  120:18

granted
  146:25
  263:7

Gretchen
  9:17 10:9
  33:17
  35:5
  36:4,7,25
  39:6
  66:12
  69:11
  76:4
  169:25
  240:5
  313:16

group
  43:11,16
  294:11
  309:24
  310:10,
  15,20,22,
  23 311:4,
  7,17

groups
  311:18

Guajardo
  320:10,
  12,24
  323:14
  325:2

Guajardo's
  313:7
  320:17,19

guess
  71:13
  92:2
  199:6
  317:4
  318:3

guessing
  212:18

guideline
  170:23

guidelines
  31:15,20
  59:20,22
  60:4 93:7
  170:3,10,
  19,25
  171:3
  172:19
  174:3
  189:17
  195:10
  251:16

guilt
  28:8
  50:25
  51:5

guilty
  29:16
  60:8
  113:10
  114:12
  115:7
  116:23

117:8
135:17
190:1
191:1
194:2
195:3
283:9

guy
  95:1
  106:2
  167:13
  174:19,20
  175:16
  176:25
  187:11

guys
  161:5

─────────

H

─────────

habeas
  11:20
  42:23
  43:2,12,
  13,17
  49:6
  162:12,13
  301:13
  305:3

habitual
  189:25
  191:19
  193:3,24
  195:2

hair
  54:18

half
  44:19
  105:9
  115:1

Halfway
  60:1

hammer
  70:8
  71:19
  106:6
  313:18
  314:1,6
  315:6,12,
  25
  316:23,24
  317:7,18
  322:13

hand
  106:2
  273:10

handbook
  58:19

handing
  293:14

handle
  22:20
  72:14

handled
  18:25
  33:2

handling
  291:17

handwriting
  104:25
  166:10,
  13,14,15,
  16,17
  198:15,21
  222:20
  223:24
  228:15
  286:2
  336:7,9

handwritten
  73:12
  78:14
  230:18
  246:21



**hang**
  288:5

**happen**
  24:12
  59:14,15
  290:7
  322:21
  330:8

**happened**
  57:16
  70:10,18
  72:23
  139:14,15
  166:18
  199:23
  206:1,4
  215:21
  226:25
  233:13
  266:12
  269:4,5
  276:3
  295:22,23
  296:21
  298:23
  323:2,21
  328:1

**happening**
  179:14

**happy**
  27:16
  108:23
  214:20

**harassing**
  305:25
  306:2,3

**hard**
  23:14
  24:13

**hardest**
  21:24

**hardware**
  270:4,20

**harm**
  301:6

**Harp**
  91:19

**Harris**
  55:9
  56:18
  57:18
  84:25
  89:10,11,
  17 97:8
  125:23
  127:13,
  14,24
  129:15,21
  132:6
  152:11
  170:24
  181:9
  185:17,22
  202:25
  220:15
  231:8
  251:5
  286:9
  289:21
  290:22
  291:4
  313:13
  318:1
  319:5

**head**
  17:17
  21:10
  150:25
  196:7
  219:16
  223:21
  232:3
  286:6
  299:24
  303:17
  322:13
  327:4

**hear**
  158:11
  274:15
  316:17

**heard**
  38:4
  42:18
  76:22
  94:22
  96:14
  100:16,21
  119:11
  135:25
  153:4
  184:22
  201:7
  249:15
  253:8,9
  275:17
  285:12
  290:19
  302:17
  317:21

**hearing**
  10:19,20
  11:16,20
  43:12,13,
  18,19
  55:20
  137:3
  141:11
  142:23,25
  144:1
  162:12,19
  246:18

**held**
  270:6
  271:3

**helped**
  73:13,25

**helpful**
  235:9
  244:14

**helping**

  91:4

**Hermilio**
  12:23
  71:5
  89:15,16
  96:15
  97:17,23
  98:12
  99:7,21
  126:11
  129:25
  132:8
  134:6
  138:21
  162:13
  300:22
  309:4

**Hernandez**
  51:24
  52:2

**Herrera**
  86:4

**Herrera/
tirado**
  58:13

**Herrero**
  12:23
  13:10
  38:9
  89:15,16,
  18 96:15,
  17 97:13,
  17,23
  98:12,16
  99:7,15,
  22 102:19
  105:24
  106:18
  107:17
  120:7,20,
  21
  121:12,14
  124:3,10
  126:11

  129:20,25
  130:3,16
  132:8,14,
  17
  133:10,20
  134:6,10,
  22
  135:12,17
  136:1,18
  137:3
  138:2,21
  139:3
  140:15
  145:12,25
  146:13,22
  164:13
  177:10
  180:12,
  15,18,21
  181:18,23
  185:15,16
  187:4,16
  190:10,24
  214:10,12
  216:23
  217:3
  263:10,17
  291:17,
  21,23
  292:7
  293:20,23
  294:2,10
  296:3,10
  297:5,11
  299:12
  300:7,17,
  22,24
  301:5,15
  302:2,9,
  13,19
  303:9,11,
  13 304:9
  308:13
  309:4
  310:8,19
  311:24
  312:6



313:17,23
321:3,22
322:9,11
323:13
331:21,25
333:22
334:1,3
337:5,17

Herrero's
71:5
124:10
131:1,4
133:5
136:3,5,
13,22
137:13
162:13
194:23,24
211:14
213:10
311:16
321:15

high
105:24

higher-ups
188:12

highlighted
203:24
204:9
205:10,13

highlighting
204:13

highlights
316:11,13

Hilder
9:10

hill
276:6

Hire
163:14

histories

164:5

history
75:12
103:4,14
162:24
163:7,9,
12,15,17
164:8,23
165:2,10,
13,19,21
166:4
173:9
222:8,16

hit
133:10
327:22

hold
34:13
142:6
203:9
205:23
268:12
325:20

holding
89:1

hole
74:1
105:8
295:24
296:22
297:4
299:15,18
300:1
302:6,14
334:1

Holmes
30:10,17

Holtke
96:23
97:10

home
70:7
71:14

314:18
315:6,25

honest
176:1

hook
197:7,8

hooking
174:18

hoops
189:5

hope
22:14
43:20
141:1
219:14
292:15

hopes
276:5

hoping
84:15

hose
191:13

hour
69:12
285:2,12,
14 304:19

hours
16:10,15
52:12
158:12
197:2
198:3
263:2
273:6
281:21
286:3,17,
18,25

house
55:7
167:15
283:6

housed
74:6
75:15,18
76:12,18

housekeeping
334:12

housing
74:11
75:12
76:1,8

Houston
9:9,11
71:15
79:8
81:19
95:4,6
104:8
132:18
193:2
220:8
294:11
295:18
309:19,23
310:10,20
311:4,17,
21

HPD
317:17,25
318:4,24
319:1

hundreds
31:5

hung
226:15

husband
283:4

hypotheticals
276:5

I

I'M'
73:2

ID
279:21

idea
47:17
153:16
166:2
183:1
227:21
261:18
292:14

identify
9:16

identity
45:8
46:10

ignore
316:12

ignoring
217:8

illustrated
306:20

immediately
128:4,6
129:2,21
132:16
139:3
227:14
281:10,25
282:4
283:12,
15,24
285:11

immunity
177:14

impeachment
51:17



impede
    45:1

impediment
    45:5
    46:5,18

implication
    299:11

important
    28:5
    87:17,23
    175:22
    176:6
    187:15
    190:18
    194:12,16
    223:11
    273:18
    274:21
    275:11
    281:14,25
    332:7

impossible
    323:2

impressed
    312:17

impression
    332:7

imprisoned
    189:11

improper
    14:17
    99:15
    108:7
    145:20

inappropria
te
    69:10

incarcerate
d
    96:19
    99:8
    150:6

188:21
195:11
244:24
257:14

inch
    52:23

incident
    38:15

include
    30:12
    59:23
    60:5

included
    111:4
    338:3

including
    132:7
    136:10
    264:24
    268:16,23
    320:22

inconsisten
t
    32:2
    99:14
    284:25
    285:6
    320:23

incorrect
    194:8
    245:20

indentions
    160:2

independent
    165:18
    249:22

indict
    110:23
    129:14

indicted
    12:7
    127:5

129:5,6,
21 132:17
156:6

indictment
    59:2,9,13
    62:23
    63:3
    110:18
    113:4
    129:10
    132:14

indictments
    110:10

individual
    113:10
    127:5
    184:7,9,
    18
    189:24,25
    190:3,7
    209:10
    327:13

individual'
s
    184:15

individuals
    183:9,17,
    25 186:20
    227:16

inefficient
    196:20

inference
    299:15

inflicted
    320:14

inform
    85:25
    100:20
    140:12
    300:14

informant
    45:11

46:7,22
121:9,13
124:21
151:19
152:5,9
158:8,18
160:9,13
171:10,23
172:13,
20,23
173:9,24
174:4,6,
12,14,17
175:12,24
177:4,6,
9,13,17,
24 178:4
179:4
180:25
181:9,16
182:10,11
185:3,18
186:3,6,
7,24
187:10
189:6,10
190:23
193:7,8,
11,16,17
195:19
219:8
234:12
245:8
317:18

informant's
    175:24

informants
    106:20
    121:2
    130:2
    145:14
    149:2
    151:12,22
    170:3,11,
    20,21
    171:6,21

172:8
173:21
174:8
178:13
182:23
183:24
185:21,24
186:12,19
187:3
188:12,
14,22
190:10
194:5
195:10
213:14
329:18
330:25
332:9,15,
18

information
    28:7,11
    42:19
    44:8
    46:23,25
    47:5,12
    48:18,23
    49:3 59:1
    73:24
    84:16
    98:8,9
    99:13
    108:2,5
    143:13
    151:13
    158:10
    169:1,3,5
    173:10,
    14,17
    194:18
    199:14
    216:8
    217:5,11
    220:4
    229:13
    230:1
    239:19



241:19,22
244:13
246:12
250:5
254:18
261:25
264:12,
13,17
270:7
271:4
291:13
303:4,21
307:9
310:7,12
332:20
338:11

informed
35:7
87:13
94:8 98:8
145:14

informing
244:7
295:10

initial
132:22
137:2
212:3
217:14
235:4
275:11
277:12
280:15

initially
57:14
58:15,17
134:21
135:11
277:21
281:22

initials
230:22

initiate
28:3

60:20
61:1 85:6
87:21

initiated
85:5 88:2
127:20
264:24

injuries
320:11,
14,18
326:1
327:3,7,
13 328:1

injury
191:25
192:6
320:15
327:23

inmate
68:4 70:3
75:12
89:24
90:6
91:22
93:12
105:10
125:2
153:2,12,
13 154:19
157:3,15
159:10,19
165:3
188:17
194:14,17
196:11,22
197:6,9,
20 200:9
201:16
202:10,
14,17,21
220:16
225:5,6
239:15
274:16

inmate's
84:20

inmate/
witness
179:14

inmates
106:21
149:7
156:3
157:22
158:7,9,
12 170:12
197:4,19
213:5
219:10
221:5,12,
20 241:4
295:25
302:20
308:14
311:5

input
184:12

inquiring
33:21

inquiry
12:18,21

insert
35:18

institution
125:24

instruct
232:17
288:24

instructed
142:25

instructing
69:2

instruments
24:4

insufficien
t
284:16

insults
326:1

intake
58:21
63:14,24
64:6,15,
17,21

integrity
289:23

intentional
ly
256:14

interest
38:23
239:16

interested
103:6
234:13

interjectio
ns
69:6

intern
17:6

interoffice
29:25

interpretat
ion
104:25
299:6

interrelate
d
146:23

interrogati
on
27:24
87:3

interrupt
304:15

interrupted
67:14

interruptin
g
297:25

interstate
126:25
127:15
128:25
132:7,18

interview
20:23
21:6 45:3
58:6
93:1,12,
15 94:17
106:13,16
125:10
220:16,21
221:12,
15,23
222:14
241:3
291:8
326:11
330:10,
14,17
331:5

interviewed
51:24
57:19
229:18
287:16
328:17
331:9

interviewing
224:11

interviews
20:18,24
21:3 93:3
303:5,12

intraoffice
29:25



30:1

introduce
  233:10,14
  310:18
  315:23
  316:22
  318:12

introduced
  310:2
  325:10

invasion
  70:7
  71:15
  315:6,25

investigate
  65:12
  291:1

investigated
  53:12
  318:1

investigating
  58:4
  184:11
  302:21
  318:5

investigation
  57:20
  58:22
  62:4
  334:4

investigative
  65:13
  91:1
  330:14

investigator
  19:20
  21:17
  39:18

55:8
163:14
220:15

investigators
  40:24
  202:6,8

involved
  15:5
  42:23
  43:8
  55:2,11,
  14,17
  57:14,22
  58:17
  62:1
  71:14,18
  79:13
  96:8,11
  129:24
  130:2,3,
  5,9,12,
  14,15
  131:8,14,
  22 149:2
  176:16
  180:2,9
  187:14
  189:23
  190:15
  191:16
  193:11,
  12,21
  194:25
  290:16,17
  314:5
  334:4

involvement
  315:5,25

involves
  190:1

involving
  194:25

iota

333:8

irrelevant
  64:1

Irrespective
  111:7

isolation
  76:18,19
  77:1

issue
  15:3
  32:19
  33:21
  174:6,11
  316:21

issued
  127:8

issues
  31:6

─────────
      J
─────────

jail
  89:10,11,
  17 170:15
  231:8
  234:17
  289:10
  290:14

jailhouse
  45:11
  46:7,21
  121:2,9,
  13 124:20

James
  9:19,20
  15:7
  33:14
  34:10,13
  35:3,6
  36:15
  67:11

68:25
162:4
165:22,25
167:2,12
168:8,11
169:6,11
273:10
287:4
290:19
298:21
304:25
306:6
318:18
319:17
325:14

James'
  167:15

Jamie
  167:8,20
  168:5,10
  279:21

January
  105:13
  210:14

Jason
  70:4,11,
  13 72:12,
  24 89:14
  96:7,8
  294:17,21
  295:3
  314:4,9,
  21 319:5,
  7,8

Javier
  123:17

Jeff
  153:8,9
  167:14,15
  274:18
  276:10

Jeff's
  153:9

Jefferson
  165:3,4,
  6,19
  195:15
  198:24
  199:3,5,
  15 221:8
  222:9,23
  223:3,5
  232:21

Jeffrey
  9:18,21
  39:22
  40:20
  111:8
  125:12
  142:19
  180:3
  267:25
  268:1
  289:21
  290:4
  304:4
  333:17,18

Jesse
  68:4
  69:19
  70:10
  73:20
  74:19
  75:12
  76:17,19,
  25 77:5,
  21 78:14,
  22 82:2
  84:15
  88:8
  91:23
  92:11,15,
  21 94:17,
  20 95:3,
  15,20
  96:4,13
  99:13,16
  100:24
  102:7



105:6,25
106:9,12,
13,24
130:25
133:9
137:24
138:5,7
139:19
141:11
142:17
149:18,23
161:1,7
211:6
295:5,17,
20,22
296:11,
19,21
297:4,10
298:23
299:11,
12,14
300:5,15,
16 312:9
317:15,17
318:5,6

**job**
19:6
336:11

**John**
294:3,12

**Johnny**
19:12
30:9 55:8
62:12
65:19
80:25
86:9,11
90:21
91:10,24,
25 99:10
103:5,11
166:13
186:14
196:17,24
198:15,21

218:14
219:19,21
220:6,15
221:16
222:20
223:24
224:11,25
226:23,25
229:13,
14,20,22
230:4,15,
22
287:17,18

**joke**
330:15

**Jonathan**
165:3,6,
19 195:14
221:8
222:23
223:5

**Jr**
97:23
98:12

**judge**
13:2 15:8
36:10
37:18
38:6
143:2
146:7,9,
18 248:8
251:16
291:16,21
307:6
329:24
332:7

**judge's**
143:7

**judgment**
238:4
258:14

**July**
88:8

92:5,6
93:16
96:23
97:17
98:3,16,
18 99:1,
25 100:5,
8,15
101:4
102:4,7
128:9
137:15
181:10
208:2,5
256:9,10
299:21

**jump**
157:12
183:19

**jurisdiction**
127:21
248:13
249:7

**jurisdictions**
126:21

**jury**
59:2,8,
13,16
62:23
63:3
110:18
113:3,9,
18,23
114:18,21
115:15,
17,19,20
116:3,16,
25 117:10
118:9,23
119:1,11,
16,19,22,
24 120:2,
12,18

121:1,8,
13,17
122:11,
16,20,23
123:5,9,
14,16
124:6,7,
10,11,14,
16,20
125:1,18,
19
135:15,17
139:13
177:20,25
179:15
248:7,23
257:16
275:7
277:14,20
281:1
285:23
292:14,19
294:9
295:10
297:3
300:14,23
303:22
312:18

**justice**
24:2
25:16,19,
22 26:2,4

**justify**
29:12

_____

**K**

_____

**KB**
132:22

**keeping**
145:9

**Kelli**
10:1

**Kelly**
9:6,19
10:4 35:7
46:7 95:4
205:6
206:3
214:10
220:14
229:1

**key**
332:24

**killed**
105:17
134:16,17
178:24
285:2
314:8
322:9

**killer**
24:12

**killings**
79:11

**kilos**
175:16

**Kim**
132:21

**kind**
54:19
84:16
283:2,6,8

**kinds**
31:6
126:9
181:5
237:18

**knew**
96:3
98:10
108:5,8
110:1,7
151:15,20
153:8
158:14



166:21,23
186:13
192:21
226:4,7,
11,14,16,
17
235:22,25
248:3
249:4,17
278:18
289:12
316:24
317:7,8
337:20

**knife**
322:11,
20,22
323:6,7

**knock**
154:17

**knowing**
46:9,24
161:23
174:23
283:7

**knowledge**
79:11
145:14
164:16
272:5

**KS**
94:25

**Kutzit**
54:17

**L**

**lab**
286:7

**label**
204:5,8
258:25

**lacerating**
320:14,18

**lacerations**
324:6

**lack**
123:4
320:21

**lady**
91:3,6
132:23
201:11

**lady's**
282:24

**Lafayette**
142:24
143:11

**laid**
31:15

**language**
159:21

**larger**
245:8

**lasted**
206:8
207:5

**latitude**
14:22

**law**
17:7 26:2
58:22
60:7
113:16
117:13
127:7,12
148:19
249:17

**lawyer**
178:6
179:13

**lawyers**
22:14

272:10,
19,20,21

**lay**
34:11

**lays**
26:12

**lead**
14:6
216:8

**leader**
294:10
311:3,6,
17

**leading**
186:6
211:13
235:23
236:8

**Leal**
123:17

**learn**
226:8

**learned**
167:13
226:9
231:19
277:2,3,
8,9
297:11
332:25

**leave**
30:17
196:25
208:17,18
300:11

**leaving**
107:22
227:5

**led**
303:21

**leeway**

146:13

**left**
20:5,6,7,
8 21:5
106:5
107:21
248:18,19
251:19
252:8,13
253:11
257:24
262:23
308:5

**legal**
117:4
148:14

**legally**
114:12
115:7
116:20
117:5,16

**legible**
213:24
336:5

**Lemonwood**
167:13,15

**lengthy**
271:18

**lenient**
171:24

**letter**
68:4
69:19,21,
22,24
73:12,18
74:3,4,6
75:1,2
76:17
77:3,8,21
78:4,9,
14,15,18,
24 82:16
90:16

92:1
130:23
132:5
133:7,15,
17
134:11,19
135:24
136:8,16
137:20,23
138:1,3,
8,9,16,20
139:19
149:13,18
150:4,8,
10,12
151:2,7,
14
152:20,23
153:4,17,
23
154:18,
20,21
155:19
156:5,8,
19,22
157:2
158:2
159:9,14,
18 160:5,
8 161:2,
3,12,15,
18 211:15
212:7,8
215:11
216:1,7,
22 217:8,
12,17,18,
19 218:3,
13,19,20,
25 219:6,
8,12,19
220:11,22
224:5
225:3,7
231:7
234:3,9
235:3



237:5,10
239:12
240:25
241:12
244:4,11,
16,21,23
245:9
246:10
247:2,18,
19
248:12,24
249:2
252:1,13
253:22
254:1,9
263:9,15,
19 264:4

**letters**
79:16,19,
20 102:20
136:20
139:16
158:18,20
159:1,19
160:9,13,
18 161:1,
22 162:1
218:23
219:8
220:24
248:12
250:3

**level**
62:15

**liar**
107:18
108:5
109:12
110:5
134:7,17
138:11
192:22
217:24
230:9,11
245:17

287:11,14
330:12
333:13

**Liberty**
88:25
89:21
302:20
334:3

**license**
280:1

**licenses**
90:16

**lie**
152:1
170:14,15
279:8
329:17,19
330:5
332:10,
12,17
333:24
334:7

**lied**
130:12
133:25
134:4
136:15
220:2
333:20,23
334:5

**lies**
54:23
329:4,6
332:8
333:2

**lieutenant**
91:17
173:6
214:9
218:15
220:12
224:25
226:2
241:1

**lieutenant'
s**
225:14,
18,23

**life**
138:22
300:24
301:4

**light**
42:16

**likelihood**
113:17,20
114:1,13
115:8
116:22
117:6

**likewise**
189:20

**Lilian**
201:3,6

**limited**
35:17
38:15

**limits**
37:21
292:10

**Linda**
11:25

**lines**
75:14
76:10
183:20
187:21
188:5,6
312:15

**lip**
320:19

**list**
11:13
82:2,6,17
83:11
119:16

200:9,11
202:25
203:20
209:25
210:10,16
211:8
266:14

**listed**
56:14
83:2
131:4
189:13
194:11,15
266:15

**lists**
56:19,21
172:2

**litigation**
146:1

**live**
279:3
286:12,17

**lived**
242:24

**lives**
167:12
286:3,25

**living**
24:3 77:1

**local**
24:6

**located**
272:25

**location**
88:22
92:4

**lodges**
285:3

**log**
173:14
271:17

**long**
11:16
16:9 31:6
77:11
78:4 90:8
117:2
158:12
192:21
197:24
203:8
240:8
257:16
285:2
286:12
331:6,7,
17

**longer**
23:22

**looked**
16:19,22
41:6
53:12
107:13
154:2
160:18
165:15
167:23
232:2
237:25
258:23
266:7

**Lorie**
9:7

**lost**
107:24
217:8,9,
20

**lot**
14:22
18:25
20:11
22:16
53:17
64:21



86:13
90:13
137:23
175:6,7
189:5
196:1,19
209:4
216:24
224:21
227:10
272:17
288:7
332:22
336:10

**lots**
153:5
197:4
289:23

**loud**
183:14

**louder**
287:12
316:18

**Louisiana**
83:14,24
142:24
162:18

**Lovett**
9:11

**low**
74:8 85:1
88:14,17
128:13,
16,21
153:10
195:20
196:3
199:4

**lower**
61:15
320:22

**lunch**
144:6

147:9

**lying**
107:20
108:8
110:1
125:5
131:12
136:14
137:18
164:18,21
210:6
246:5

**Lyons**
167:8,24
168:5,10
279:21

**Lyons'**
167:20

———————
**M**
———————

**machines**
24:5

**made**
18:12,14
24:18
27:25
63:15
86:14
87:4 96:1
103:2
111:7
125:8
134:22
135:12
154:11
162:7
181:9,21
182:14
184:10
186:8
201:23
202:14
203:13

229:14,
15,16
232:7
237:15
244:13
251:21
264:25
265:3,12,
15 268:7,
15,21
311:25
315:7
329:21
335:9

**Magazine**
23:13

**mail**
270:7
271:3

**mailed**
159:9

**main**
19:22
160:25
208:20

**major**
18:10,13,
19 19:2
55:24
66:7
105:16
184:2
188:23
200:16
201:24
202:1
203:8

**make**
15:16
28:6 39:3
42:21
43:21
48:25
58:8

69:1,6
74:2
76:15
115:23
123:19
130:14
131:14,22
138:6
141:4
145:1,2,
4,6
147:19
152:21
156:17
167:21
171:25
181:5
184:9
185:12
189:2
207:13
218:25
222:1
230:6
232:2,5
233:11
240:11
271:19
289:21
295:11
297:23
298:10
301:1
303:21
304:22
305:20
322:14
323:8
326:17
327:18
328:7

**makes**
22:8 24:7
156:7

**making**
28:16,18

32:6
54:11
123:5
137:5
141:24
174:9,23
184:13
239:14
292:1
332:6,8

**male**
105:21,22
284:12,
20,24

**man**
19:23
134:16
165:22
274:15
283:3,6,8
327:22
328:24

**man's**
313:23

**manager**
196:16
197:1,3,4
209:2,13

**manager's**
197:9,16
212:14
262:17

**managers'**
201:20

**mandatory**
60:6

**manipulated**
32:21

**manner**
182:24
264:22
322:9



**manual**
  31:2,3,5,
  10,12,16
  42:13
  44:6,7,8,
  16 47:16
  113:2
  128:24
  169:18,
  19,23
  170:2
  172:7
  182:20,
  21,23
  183:1,10,
  13 186:23
  189:14
  269:22,23

**March**
  65:18
  66:1
  80:5,15
  81:12
  162:14
  234:3
  235:3

**Marcy**
  101:12,13

**marijuana**
  105:10
  175:17

**mark**
  72:15
  157:3
  161:4,8
  234:3
  244:4
  247:3,21
  248:5,8
  250:10,
  14,23
  251:5
  279:2,6,
  16,25
  318:3,18

  319:11

**marked**
  294:1
  316:5
  324:23

**marks**
  9:5

**Marshal's**
  93:17

**Martin**
  165:22,25
  166:4,19
  167:2,12,
  19 168:8,
  11 169:6,
  11

**Martinez**
  157:3,9
  161:4,8

**masterminde**
  **d**
  331:1

**matched**
  98:9

**material**
  32:2,3
  124:14

**materials**
  53:18

**math**
  19:11

**matter**
  10:10,25
  11:6
  12:12
  16:17
  22:15
  40:23
  59:2
  76:19
  124:7,17
  146:19

  182:24
  187:4
  190:19
  193:11
  304:12
  305:13,19
  306:17
  321:24
  336:6

**mattered**
  193:15

**matters**
  11:17
  48:14
  145:24,25
  146:15
  215:17
  292:4

**Mcinnis**
  286:3,5,
  16,24

**Mcintyre**
  250:10,14
  251:5

**meaning**
  128:6
  233:22
  264:23

**means**
  29:13
  39:15
  77:1
  90:24
  208:13
  279:4
  280:25
  281:6,7
  282:21
  289:25
  322:9
  329:8
  334:7

**meant**
  47:17,21

  272:20
  283:23
  310:22
  337:18

**measures**
  334:12

**mediator**
  311:18

**medium**
  74:7,8
  88:14,17
  95:7
  105:7,8,
  11,20,24
  128:13,
  17,21
  133:8
  153:9
  220:12
  226:13
  241:2
  244:25
  274:17

**meet**
  83:20
  85:2 89:7
  91:22
  221:4,8,
  19 225:14
  227:13,16
  274:18

**meeting**
  16:9,11
  87:10
  88:10,12,
  19 89:4,
  9,12,16,
  20,23
  91:23
  92:5,12,
  15,20,24
  93:18
  96:13,22,
  24 100:8,

  15,19,20
  104:3,4,
  7,15
  107:1,21
  111:18,22
  121:17
  125:19,20
  186:14
  198:23
  199:1,3,
  7,9,11
  215:4
  217:13,
  14,17,18
  218:4
  219:19,25
  220:7
  221:1
  222:11
  223:2,8,
  16,17
  224:3,5,
  10,14,20
  225:11
  226:18,21
  227:1,20
  228:18
  229:5,23
  230:20
  231:24
  238:17
  241:12,18
  242:1
  269:2,6
  274:22

**meetings**
  90:19
  222:2,4

**member**
  310:8,20
  311:3

**members**
  173:7
  270:5,21
  309:19



**memorializa**
**tion**
  228:18

**memorialize**
**d**
  303:13

**memorializi**
**ng**
  179:10
  224:3

**memory**
  72:6
  95:25
  97:7
  98:15
  214:11
  231:9
  283:10
  285:7
  316:20
  317:2

**memos**
  108:13

**mention**
  48:15
  245:7
  323:12
  324:4,5,6

**mentioned**
  31:1
  94:21
  100:12,14
  109:5
  131:9,19
  132:1
  134:20
  159:20
  195:14
  230:15
  237:8
  244:20
  246:7
  277:12
  287:6

  288:16,18
  294:16
  303:9,11
  329:4

**mentioning**
  127:2

**mentions**
  97:9
  151:8

**message**
  109:2,19
  208:18,23
  251:20
  252:5,8,
  10,14,16,
  20,25
  253:1,4,
  11 315:1

**messages**
  196:25

**messed**
  290:13

**met**
  10:9 16:6
  19:12
  52:6
  85:19
  88:1,8
  92:10,15
  103:16,25
  107:5
  119:8,10
  124:23
  132:1
  138:10
  149:24
  150:3
  167:11
  192:23
  199:19
  223:13
  225:10,
  16,18,23
  226:22,23

  227:18
  230:24
  232:20
  241:23
  245:15
  246:3
  276:14
  277:21
  324:21

**metal**
  191:12

**meticulous**
  22:18,25

**mic**
  274:8

**Michael**
  17:2
  149:4
  159:10
  160:5
  186:15
  200:10
  202:19,22
  220:17
  221:15,17
  228:22
  229:1,12
  230:7,10,
  14 233:4,
  20 241:4
  244:12
  245:23
  246:21
  249:3
  254:11
  258:23
  264:23
  267:6,10
  274:15,16
  275:7
  276:2,7
  288:16,18
  289:20,22
  290:3
  291:14

  333:16

**microphone**
  148:24
  274:5,7

**middle**
  153:1
  280:9,18

**Mike**
  229:1
  234:5
  235:9
  253:5,12

**mind**
  48:19
  84:14,15,
  20 155:12
  161:24
  230:4
  264:3

**mine**
  72:14
  73:22
  186:17

**minimum**
  90:10

**minute**
  162:4
  208:3,4,
  9,14,15,
  24 261:3
  262:9,14
  268:17

**minutes**
  37:23
  77:13,14
  147:2
  198:3
  204:20
  205:18,
  19,22
  206:8,19,
  24 207:5,
  14,17

  208:1,9
  240:9,14
  242:5
  263:2
  273:7
  282:25
  283:4,16
  285:23
  293:5
  319:20,21
  334:19
  336:18

**miracles**
  21:22

**Miranda**
  9:22
  24:22
  36:24
  37:2
  38:11,13
  62:18
  63:9 66:3
  67:19
  71:7
  72:10
  76:4,7
  80:9,16,
  20 82:7,
  18 84:10,
  18 98:25
  103:8
  104:13
  114:2
  117:19
  118:4
  124:24
  136:19
  142:4,8,
  10 144:8,
  12,19,23
  145:6,9
  146:1,21
  147:1,6
  153:15
  159:5
  166:6,9



198:5,12,
25 199:8
214:22,24
218:9,11
219:2
221:10
222:25
223:4,10
224:7
227:24
228:21
232:25
236:22,25
241:25
245:18
247:13
248:2
253:16,19
256:5,7,
22 270:17
271:1,23
273:20
278:6
287:19
291:15
294:15
296:6,24
297:20,24
298:5,10,
15,18
301:18
303:23
304:14
307:14
318:22
319:17
336:18
337:2,24
338:4,19,
22,24

**mischaracte
rizes**
67:1
199:17
276:17

**misdemeanor**
18:20

**misrepresen
t**
291:20

**misrepresen
tation**
289:15

**misspelled**
151:3

**misstatemen
t**
266:2
337:20

**mistakes**
237:15

**misundersta
nding**
252:23

**mitigate**
51:16

**mitigates**
28:9

**mitigating**
28:11

**mom**
78:14
201:9
212:8

**moment**
32:8
215:3,13
287:4

**money**
105:16
106:2,4
166:24
167:16
168:1,6

**Montgomery**
335:5

**months**
105:9,23
158:3,4
167:14
210:5
220:3
233:4,6
235:9
246:17
257:9,12
258:5
279:20

**Morales**
70:4,11,
13 72:12,
24 89:14
96:7,9
294:17,22
295:3
314:5,9,
21 319:5,
7,8 325:2

**Moreno**
68:5
69:20,24
70:2
71:6,13,
23 72:8,
20 74:5
75:12
76:13,17
79:2
82:1,2
83:10
84:6
88:9,20
89:7
91:23
92:15,21
93:18
94:18
95:3,5
96:1,4,
13,18,22
99:8,13
100:9,16,

19,20,24
102:4,7
106:13,24
119:25
120:3,18
130:25
133:9
134:21
135:10,
13,14,25
136:9,13
137:14,24
138:6,7,
25 139:19
140:8,12,
23 141:12
142:18,23
180:12
194:23
211:6,13
295:5,17,
20,22
296:3,5,
11,19,20,
21 297:4
298:23
299:11,
12,14
300:5,15,
16 301:6,
24,25
303:5,11
308:13,18
312:9
314:5,12,
16 315:5
316:23,24
317:15,17
321:5,11
322:8
333:20

**Moreno's**
70:11
73:12,20
77:21
78:14

82:6
83:25
84:15
99:16
137:2
139:5
162:19
246:18
297:11
312:18
315:14
317:6
318:5,6

**morning**
120:13

**mortal**
320:15

**motion**
146:23,24
235:17
236:2,12
238:8
247:4,11,
17,22
248:1
250:16
251:10,14
254:21
255:15
264:8,12
266:18
268:6,25

**Motive**
279:17

**mouth**
276:4
277:3,9,
15 281:16
282:19,
22,24
283:3,13,
22,23
285:1,9
334:15



move
  111:3,7
  140:23
  188:2
  227:7
  251:17
  280:6
  289:8
  292:3
  305:17

moved
  79:18
  128:12,
  16,19,20
  129:15,20
  227:10

moving
  47:4
  162:24
  189:20
  227:15
  321:23

multiple
  25:18,21
  26:1

murder
  11:25
  21:24
  51:19,23
  52:12
  53:14
  54:20
  62:17
  64:20
  70:3,24
  71:25
  72:4,9,
  14,25
  73:5,24
  79:14
  96:14
  97:23
  98:11
  100:1
  110:23

124:22
127:25
128:7
134:23
135:13,17
138:21
160:6
178:22,23
179:8
189:12
191:9
194:13
216:9,13
235:5
245:2
256:4,14
257:3
283:9
325:2

Murder-no
  335:15

murdered
  117:25

murderer
  179:7

murders
  12:3,4
  51:19
  57:7 79:9
  116:1,4
  117:18
  281:21

_____

          N
_____

named
  68:4
  74:19
  165:3,22
  274:15

names
  91:14,15
  156:3
  164:4

196:2,5,
6,8

narc
  174:9,15
  175:3
  187:9

Nathan
  46:22
  74:21,22,
  25 75:4
  76:9 77:7
  93:19
  94:17,22
  95:2,3,
  17,22
  96:1,18
  100:9,11,
  14,16,21
  103:5
  104:7
  105:1
  107:19
  109:3,7,
  8,15
  110:21
  111:5,14,
  16 124:17
  125:2,6,
  7,8,10,20
  130:5,9
  131:7,12,
  19 132:1
  133:9
  134:5
  136:6
  137:4,18
  138:1,4
  162:25
  164:10,23
  191:24
  192:2,5
  193:3
  209:22
  215:23
  216:7,17
  218:16

220:7
224:3,12
229:1,2,
4,7,10,
14,17,18
230:2,5,
7,11,13
242:21,22
244:1
246:3
264:6
265:3,12
275:18
277:15
287:7,17,
23 288:10
291:9,12
330:12
331:16

nature
  113:17

necessarily
  45:6
  46:17
  56:22
  82:19
  95:11
  118:6
  147:24
  174:12
  203:5,13
  223:19,20
  224:15
  229:9
  259:11,12
  275:14
  311:20
  323:10

necessity
  290:15

neck
  313:7
  320:12,
  20,21
  327:4

needed
  42:20
  56:4
  73:14
  99:18
  118:2
  139:16
  140:15
  170:19
  179:9
  185:24
  186:5
  188:20,22
  196:22
  251:4,7,
  13 263:24
  289:20,21
  334:5

negate
  28:8
  50:24
  51:5

negative
  57:4
  327:11

negatively
  151:1
  223:22
  299:25
  303:18

neighborhood
  74:18

nerd
  24:17

network
  245:8

news
  56:18,23

newspaper
  151:8
  276:9



nice
  110:4

Nick
  235:5

nights
  30:11

Nilda
  282:18

Nilda's
  280:2
  285:1

nodding
  219:16

nonparty
  35:13,14,
  23 69:5

nonresponsi
ve
  32:22
  40:4
  46:20
  54:9
  72:17
  125:14
  131:17
  143:4
  156:9
  173:1
  177:21
  178:1,8
  179:21
  180:5
  206:25
  246:1
  277:18
  286:21

nontestifyi
ng
  149:2

normal
  23:22
  42:10

Norman
  137:18

notary
  10:6

note
  158:24
  229:14,
  15,16
  246:21,24
  279:3

notes
  16:2
  21:2,5
  48:3 58:8
  104:16,
  21,24
  111:22,25
  112:2,4,
  11,13,14
  139:13
  147:17
  148:7,9
  154:11
  165:7,15
  166:5
  167:1,6,
  23 168:2,
  7,13
  169:12
  214:17
  223:17,24
  224:13,
  16,19,21
  229:11,24
  230:16
  231:10
  243:3
  264:20
  278:4
  280:13
  287:18
  316:7,8,9
  334:13
  335:18,24
  336:11,12

notice
  90:2
  127:9
  151:2
  153:7
  156:5
  210:2

noticed
  154:21

notified
  173:8

notifies
  171:16

notify
  127:12

notoriously
  170:12

November
  215:12
  216:1
  217:12,19
  218:14,
  21,25
  219:12
  220:3,11
  224:24
  248:11
  249:2
  250:10
  251:19,22
  252:5,9
  253:1,11
  254:13

number
  9:5 26:16
  27:12
  30:11
  82:24,25
  83:1,3,5,
  7,10 84:8
  201:22
  202:1,24
  203:8,19
  204:20

207:25
  210:3,4,
  16 211:9,
  10 212:19
  236:22
  258:25
  259:7
  261:7,11
  262:6
  266:13
  279:14,15
  280:1
  293:24
  310:5
  329:4

numbers
  208:6

numerous
  320:11

nunc
  237:17,
  20,23
  238:4,8

──────────

O

──────────

object
  34:16
  65:8
  66:16
  69:7
  93:21
  142:4
  145:5,10,
  16 179:12
  195:6
  276:16
  282:2
  298:18

objecting
  15:15
  146:14
  298:1
  306:25

307:14

objection
  25:25
  32:22
  39:1,24
  40:4
  46:20
  54:9
  62:18
  66:3,17,
  23 71:21
  72:10,16
  80:9,16
  82:18
  84:10,18
  87:11
  93:23
  98:25
  114:2,22
  117:19
  118:4
  124:24
  125:13
  131:16
  142:13
  143:4
  145:2,6,
  20 153:15
  156:9
  159:5
  173:1
  177:21
  178:1,8
  179:19,21
  180:5,8
  198:25
  199:8,17
  206:25
  219:2
  221:10
  222:25
  223:4,10
  224:7
  227:24
  228:21
  232:14,25



241:25
245:18,19
246:1
247:13
248:2
255:18,24
273:20,25
275:13
276:16,20
277:18
281:5
285:3
286:21
287:19
289:18
290:18
291:10,15
292:21
294:15
296:6,24
297:20
303:23,24
305:6,9,
12 307:16
317:10

**objections**
15:17
67:11
69:1,2
71:20
171:13
187:23
297:23
298:11
304:22
315:7

**obligated**
39:19
50:10

**obligation**
50:7
115:23
134:15

**obligation,
'**

50:9

**obligations**
168:17

**obsessive-
compulsive**
24:17

**obstructing**
35:25

**obtain**
28:3,4
29:7,17
87:7,22
126:20

**obtained**
184:4

**obtaining**
28:2 87:6
253:24

**obvious**
40:16
157:11
161:5,9
194:18

**occasions**
295:22
297:13

**occur**
160:12

**occurred**
11:25
51:20
71:11

**October**
9:3 71:12
208:11
209:25
210:14
222:4
244:6
246:22
247:24,25

**odd**
155:2

**odds**
282:20

**offender**
184:2
188:23

**offenders**
55:24
66:7
200:17
201:24
202:2
203:8

**offense**
28:9
31:24
32:9,10,
14,17,24
37:14
39:9,11,
15,20
40:13,15,
17,23,25
50:25
55:4
63:16
127:17
183:24
188:10
245:3
257:17

**offer**
42:1
184:13
241:8
300:16
326:16

**offered**
325:4,7

**office**
16:7,12
17:1,5,21
18:2

19:14,15
20:5
21:19
29:21,24
30:17,24
31:22
32:12
37:14
42:11,13
43:1,8,17
47:16
50:7
53:24
54:5,12
55:2,6,9
57:18
58:23,25
59:19
62:5 85:1
93:17
94:2,14
109:1
113:18,24
115:18
118:1,8,
25 121:23
123:15
127:14
132:6,23
141:9
147:14
154:5
155:18
159:17,23
163:13
169:18,
19,23
170:2,19,
25 177:23
178:3
179:3
181:10,
14,16
182:5
183:23
185:2,9
188:8,20

197:9,16
200:15
202:4
203:1,4
207:16
208:19
214:9
225:15,
19,23
227:2
241:1,12
250:11
251:6
252:14
259:7,13,
17 269:10
270:5,21
271:9,11,
14,17
272:2,3,
19 273:2
325:17

**officer**
64:6
171:22
173:4
184:17
187:13,14

**officers**
183:23
184:11
185:9
187:21
188:9

**official**
30:10
93:11
127:10,
12,16

**oftentimes**
20:17

**omitted**
246:12

**ongoing**



62:4

**open**
32:12,14
37:14
39:13
41:10
47:8,14,
19 48:15
112:13
147:13
154:13
156:23
270:7
271:4
319:3

**opening**
179:15
274:11
275:6,10
277:23
282:6
285:21
292:9,13,
19,24
293:17,19
294:9
295:11
297:3
311:2

**opens**
15:4
163:8

**operations**
31:2
128:24

**opinion**
320:10

**opportunity**
23:11
27:17
28:3 87:7

**opposed**
114:19,20
115:16

**optional**
129:1

**oral**
52:16
268:23
281:10
284:13
286:12

**Orally**
47:24

**orchestrate
d**
39:23
329:18
331:1
332:8

**order**
28:13
47:7,14
53:19
59:7,9
143:7,9,
11 144:3,
6,22
167:19
168:17
185:1
204:2
206:14
278:13
289:8
314:2
323:11

**ordered**
48:14
334:14,
21,24

**organizatio
n**
310:9,19

**organize**
90:19,22

**organized**

22:18
23:1
90:18
173:7
184:1
188:23

**oriented**
22:13

**originals**
214:5

**outlined**
59:21

**overarching**
329:17

**overruled**
285:4

**owed**
105:16
106:2,4

———————

**P**

———————

**p.m.**
339:8

**pages**
31:5
243:14,21
325:21
331:6,7,
19,21

**pain**
196:19

**Pam**
286:2,5,
24

**pants**
320:22

**paper**
142:17
276:8

**papers**
295:17

**paperwork**
129:23
132:17,
19,22,24
133:2
139:11
226:22
229:19

**Parade**
23:12

**paragraph**
48:16,17,
20 56:22
59:24
60:25
64:4,5
115:1
116:6,9,
10 134:25
167:10
183:10
186:19
245:4,5
270:9,10,
11,13,14,
25 271:1
280:18
295:15
296:9
299:15
320:4
321:13

**parameters**
12:17,22
14:21
36:9,11,
17 38:3,
5,7,14
39:4

**parole**
186:23,25
187:1,5,

12 188:15
259:20
260:8,15
261:16
263:7

**part**
17:22
32:14,17,
24 39:10,
12,14
40:12,13,
14 44:14
50:20
92:24
94:25
107:14,15
166:3
173:13
181:22
227:15
242:14
249:1
257:1
286:18
309:23
313:20
314:12
318:6
319:8
326:23

**partial**
284:12

**participate**
48:11

**parties**
11:6
267:5

**partly**
302:14

**parts**
138:5
152:20

**Pasadena**
286:7



pass
    287:4
    334:10
    336:16

passage
    176:12
    190:8,11,
    14

passed
    176:16
    198:7
    227:19

past
    171:23
    173:9

patrol
    187:13

pattern
    306:19

Paul
    288:19
    290:11

pause
    37:17

paying
    23:5

pen
    279:19
    280:10,12

pending
    127:10
    171:8,22
    184:7,11,
    14 189:22
    190:1,15,
    18 191:1,
    3 240:19

penitentiary
    145:15
    274:17

people
    24:7 29:1
    43:16
    172:19
    173:22,23
    174:3
    175:4,11,
    23 178:24
    185:3,10
    188:21
    195:4
    203:4
    272:18
    294:11
    309:19,
    22,25
    333:12
    335:16

Percely
    109:3,4,
    22 110:3,
    8 215:12,
    20 216:16
    217:4,7,
    20
    219:10,13

Percely's
    218:20

perfectionist
    24:17

period
    31:23
    36:2
    147:14

permissible
    305:7

permission
    85:2
    146:10
    241:3

permit
    220:14

person
    41:11
    43:24
    89:10
    104:1
    125:25
    129:6
    146:3
    159:3
    160:14,21
    161:19
    167:5
    178:12
    186:23
    190:1
    191:17
    192:23
    193:21
    221:17
    230:25
    242:19
    294:3,13
    308:22
    309:1

personally
    29:9
    38:17
    271:10

persons
    28:15
    126:20
    183:23
    188:9
    189:24

persuade
    140:7,22

petition
    54:22
    72:13
    73:1,3
    108:10
    151:25
    154:22
    226:10
    266:2

301:14
    329:5,6,9
    332:21
    337:5,12,
    16,17

petitioner
    9:18,20

petitions
    304:7,8

phone
    54:11
    74:2
    82:2,6,
    17,24
    83:1,10,
    11 103:3
    109:2,18
    118:12
    150:14,17
    151:14
    156:1
    167:5
    197:7,9,
    10,12,19
    200:9,11
    201:16,23
    202:10,
    11,13,14,
    16,24,25
    203:6,19
    204:19
    207:4,16,
    24 208:3,
    6,10
    209:1,3,
    7,9,11,
    12,25
    210:9,16
    211:6,8,
    13,17
    212:1,2,
    10,13
    231:1
    251:20,
    21,25

252:5
    258:23
    259:7
    261:6
    262:14,18
    307:23,25

phones
    197:20
    201:17,20
    202:15,17

photo
    152:9
    153:7
    309:2

photograph
    24:20
    151:23
    308:11,
    15,18,22
    328:3

photographed
    52:23

photographic
    328:10

photographs
    326:5,9,
    15,24
    327:17

photos
    152:6,13
    320:9,10,
    17 325:2
    328:22

phrase
    285:11

physical
    312:20

pick
    24:2 66:5



picked
  205:23

pickup
  280:1

picture
  25:4
  152:7
  292:14
  309:22
  310:1
  311:19
  327:18

pictures
  314:25
  325:6,19

piece
  24:13
  142:17
  281:14
  333:8

pieced
  329:23

pink
  214:2,4,8
  315:1

pipe
  191:13

place
  9:10 44:9
  76:14
  116:25
  117:10
  264:22
  289:9

plate
  280:1

play
  252:16
  254:6

played
  252:18
  253:24

254:7,11

plea
  257:2

pleadings
  14:20
  301:10,13

pled
  14:20
  73:9

pocket
  322:11
  323:7

Poe's
  17:25
  18:7,9

point
  13:3 15:6
  18:12,14,
  18,23
  38:21
  39:1 40:5
  44:14
  49:2
  50:10
  64:10
  66:15
  78:7
  84:5,15
  100:20
  108:16
  109:25
  136:3,5
  137:8
  142:5
  145:11
  175:9
  211:17
  216:18
  237:9
  248:22
  288:14
  292:1
  302:17

pointed
  187:20

pointing
  25:5
  279:9

points
  128:13

police
  63:14
  171:22
  185:9
  314:11
  315:13
  317:13,
  15,17

policies
  185:23

policy
  30:7
  31:22
  32:10,12
  37:14
  39:13
  41:17
  42:11,13,
  15 44:5,
  6,16
  47:9,14,
  19 48:16
  113:2,18
  115:19
  147:13
  163:16,19
  182:13,23
  183:22
  185:8,18
  186:22
  188:8,19,
  20 189:13
  291:5

Port
  160:6

portion
  143:18

portray
  274:21

position
  14:1
  34:11
  333:3

possession
  338:8

possibility
  116:18
  134:21
  135:11
  234:19

Possibly
  92:17

post
  28:5 58:1
  87:24
  291:1

potential
  58:20
  103:16,
  18,19
  151:22
  222:15
  234:12
  235:17
  280:19

power
  301:5
  311:5

practice
  31:7 93:2
  119:21
  121:23
  129:14,19
  151:11,17
  290:22
  306:19
  326:23
  327:15,16

practices
  37:9

preceded
  323:24

precedes
  49:17,19

precisely
  63:18
  333:5

preclude
  193:17

preexisting
  213:18

Preg
  279:23

premise
  46:5

premortem
  320:18

preparation
  313:10

prepare
  15:24
  53:19
  119:15
  237:20
  251:9
  301:25
  324:19

prepared
  99:25
  110:10,15
  237:23

preparing
  216:10
  251:14

prepping
  43:17

presence
  137:4
  275:18

present



9:15 42:1
55:25
59:8 64:7
105:21
110:17
114:18
115:15
116:24
117:9
118:8,25
119:18
120:7,14
121:16,
21,24
122:1,4,
7,11,19,
22
123:11,20
127:19
136:14
137:9,13
223:2
224:10
228:20
231:16
292:17

**presentation**
115:22

**presented**
59:2
62:22
63:3
113:23
118:22
119:3
120:21,25
123:21
124:6
135:15
168:3

**presenting**
114:19,20
115:16
122:2,4,

7,12
125:17

**presently**
183:24
185:10
188:10

**presents**
59:12

**preserve**
271:7

**presume**
60:13
113:22
114:3

**pretend**
330:24

**pretrial**
28:5
48:12
87:23
264:8
326:10

**pretty**
157:11
177:19
181:1
194:18
206:23
219:18
275:11

**prevent**
28:15

**prevented**
315:10

**preventing**
53:22
54:4,11
122:10,15
123:2

**previous**
243:21
267:6,13

**previously**
10:11
20:6
94:21
95:9,16
96:3
216:4
230:24
247:9

**Prible**
9:7,18,21
10:10
12:6,18,
23 13:10
18:1 19:5
39:22
40:20
41:20,21
42:24
43:4,5
48:7
51:18,24
52:7,11
54:15
56:14,19,
21,24
57:6
61:19,23
64:13
65:25
81:16
85:3,6,8,
11 87:9
88:2
98:23
99:4,21
100:1,5,
17,22
101:5,21
102:21,22
105:7,9,
12,14,15,
17,23
106:17
107:13,17
110:10,

20,23
111:8
117:17
120:4,8,
22 121:6,
9 124:1,
6,17,22,
23 125:3,
12,18
127:24
130:3,10,
11 131:8
145:25
146:3,22
147:15
148:4
149:3
150:14,17
151:3
153:4,19
155:23
156:6
157:10
158:8
159:12
161:13
164:6,12
167:14
177:11
181:18,23
182:4,25
185:15,
17,25
186:21
187:4,17
189:12
190:10,23
193:10
195:20
202:9
213:10
216:16,22
217:1
229:13
231:12
234:12
237:19

243:22
244:25
245:1,15,
16 253:25
254:4
263:17
264:5,6
267:25
269:1
272:8
273:18,23
274:19,22
275:8,17
276:10,14
277:4,9
278:20
279:22
280:14,22
281:15
282:19
289:22
290:4,12
291:22
304:2,4,
18 306:17
308:10,15
331:19
333:17,
19,21
335:4,14
337:12,
16,18

**Prible's**
40:25
41:1
44:21
46:23
52:23
55:7
105:16
111:9,12
124:18
126:15
131:1
142:3,12,
16,19



146:19
149:6
150:22
154:20
156:19,22
158:3,4,
15,19
163:25
164:16,
19,24
165:4,23,
24 168:3
179:23
180:1,3,
7,9 182:1
186:3
189:18
194:21
196:4
209:6
210:6
216:14
226:12
231:19,20
232:23
233:5,6,
18 235:23
236:2,9
241:17
242:12
244:2,7
246:4
255:23
256:25
264:8
268:1
273:16
277:2,8,
13,22
281:19
286:16,23
329:5

primary
19:20
57:9

print
243:14

printed
103:5,11
163:17
222:9

printout
200:21
201:16
234:6
256:3
267:5

printouts
163:17

prior
16:16
30:18
37:2
43:11,19
53:24
54:6,12
70:4
127:18
136:25
137:8
152:13
158:19
190:6
222:10
256:15
266:10,11

prison
70:2 77:4
89:24
90:2 91:2
92:14
93:11
133:8
134:12
138:22
139:21
140:8,24
151:9,23
153:2,14

157:16
170:12
179:7
187:6
189:11
191:2,6
195:5
197:14
227:16,18
242:25
250:2
257:17
280:19,23
281:3
295:24,25
296:23
301:5
302:15,22
308:14
310:9
311:19
329:19
331:3
332:9

prisoner
90:12
126:22,24
127:10,
17,20,22

prisoner's
127:19

prisons
76:2 82:8
141:6
202:23
209:23

private
123:6
163:14

privilege
35:17
271:16

privileges
35:21

pro
237:17,
20,23
238:4,8

probable
27:22
60:8,22
61:3,9,15
62:16
101:4,7,
11,17,19,
25 110:17
113:10,13
267:1

probation
186:23
187:12,13
188:15

problem
68:12
175:19
225:7
304:25
314:24
336:7

problems
177:3
239:13

procedure
28:1
35:10
87:5
127:1
172:2
222:13

procedures
126:2

proceed
56:4

proceeding
16:14
42:24
43:2,6

49:6
122:12
124:11
145:13
162:13

proceedings
9:1
121:25
122:16,21
123:14
127:19
162:9

process
25:22
26:6
90:7,8
184:13
187:14
234:1
246:11,
13,14,17
251:12
302:18

produce
142:18,20
173:4
264:16

produced
44:7 82:6
93:24
94:8,14
108:12,
18,25
141:9
142:2,11,
16 155:1,
17 159:17
181:13,22
182:5
202:22
209:23
214:8
252:14
278:13,19
318:15



319:2
325:10,17
334:13,
14,22,25

**product**
16:2
53:23
58:11
111:24
112:1,15
147:22
148:1,3,
8,13,15,
16,19
278:4,14
334:13,24
335:24

**production**
41:17

**Professiona
l**
86:22

**profile**
284:16,
20,24

**progressed**
17:16

**prohibited**
28:17

**promise**
75:9
213:25

**prop**
25:10

**proper**
66:17
116:16

**proposes**
217:4

**props**
25:8,13

**prosecute**
27:21
294:21,25
295:3

**prosecuted**
19:5 29:2
83:14
118:1
147:15
266:23
267:2
314:4

**prosecuting**
27:20
45:1
47:5,6,12
48:11,13
50:23
60:20,21
61:1,2

**prosecution**
29:13
63:6,14,
22 64:13
114:11
115:4,6,9
127:17
226:12
267:7,14
281:19
283:11

**prosecution
's**
50:7

**prosecutor**
11:14
17:4,25
18:7,9
19:13
22:20
25:15
26:13
27:19,21,
24 28:8,

12,15,17
31:3,7,14
35:15
41:10
45:4,8,25
46:3
50:10
63:16
64:8
87:1,3,21
101:14
114:14,
15,18
115:11,15
116:22,23
117:7,8
124:13
127:20
130:23
139:16
168:18
171:3,12,
15,17,25
173:10
182:15
233:11,
15,16,19,
25 234:18
238:11
239:8,10
245:10,24
250:1
259:16
263:10,12
292:9

**prosecutor'
s**
115:23
173:16

**prosecutors**
60:18
188:20
202:6,8
272:21
306:16

**protect**
289:23
295:25
305:24

**protection**
112:15
296:4
300:17,20
334:5

**protective**
28:13
143:9,11
144:3,6,
21

**proud**
294:11

**prove**
279:17

**proves**
216:18

**provide**
47:5,12

**provided**
98:9
270:4,20
303:21

**providing**
254:16

**PSI**
311:25
312:6,9,
10

**public**
44:8
270:7
271:3

**Pull**
279:13

**pulled**
158:24
322:20,22

323:6

**punishment**
51:16

**purpose**
36:8
170:22
292:12

**purposefull
y**
36:1 69:8

**purposes**
51:17
173:15
289:24

**pursuing**
60:19

**pushback**
93:11

**put**
28:20
34:18
35:4 38:7
46:1 51:6
82:2,16,
25 83:10,
13 84:8
105:12
133:10
139:7,8
148:24
151:19
152:25
162:4
174:16
177:23
178:3
191:12
203:19
205:23
208:21
209:14
214:20
268:2
275:10



295:23
296:12,22
297:4
299:14,18
300:1
302:4,14
307:16
333:12,
16,18,25
334:15

**puts**
211:7

**putting**
12:25
24:15
177:16
281:3

───────────
**Q**
───────────

**question**
13:1
24:15
25:24
26:3
29:11,14
33:5,20,
21 37:13,
24 39:6,9
40:3,8,9,
11 46:6,
12,13,14
49:7
50:4,13
51:10
54:10
55:10
66:18
71:10,14,
18,22
72:2 73:3
78:20
80:12
86:16
103:21

108:22
114:17
115:14
117:2
121:4
122:8
124:25
125:15
131:18,23
133:12
134:3
136:21
145:3
150:20
159:13
164:1
172:15
175:2,8
181:21
188:18
189:3
190:24
192:3
193:6
202:23
212:1
217:16
229:20,22
236:6
240:18,21
242:19,22
249:20
257:1,5,
7,10,13,
16,19,23
258:1,3,
10 261:4,
6 267:15
272:1
276:20
277:20
279:7,16,
25
284:17,
19,22
285:19
286:11,

20,22
288:14
291:18,23
292:1,2,
3,25
294:7,19,
20
296:13,25
298:19
300:11
312:4
315:18
321:9
327:5
328:19,20
329:1
331:11
337:4

**questioning**
14:16
36:6
69:16
71:6 75:9
144:24
240:7
256:25
284:9
307:5,20

**questions**
14:2 33:1
35:15,20
36:8 37:9
38:18
40:1
53:13
86:11,13
88:3
120:15
144:13
251:18
276:5
277:5
288:12
291:24
296:7
304:3,5

306:3,9
315:17
326:15
336:19

**quick**
68:22
69:12
80:19
144:9
240:8
243:14

**quicker**
205:3

**quickly**
144:10
284:4
293:5
297:21
325:1
337:3

**quit**
30:13

**quote**
39:10
44:25
48:15
134:21
179:2
244:24
253:8,24

**quoted**
79:10

───────────
**R**
───────────

**race**
287:24

**radar**
66:1,9
80:14
81:12

**Rafael**

106:21
131:3,18
133:9
311:11,15
312:2,5

**raise**
160:17
161:3,4

**raised**
37:5
38:16
306:14

**Ralph**
95:22
131:7
135:20

**Ram**
280:1

**Ramon**
51:23
52:2

**Ran**
106:2

**random**
30:14
280:16
297:9

**range**
105:12,14

**Rangers**
235:4

**rare**
176:19
177:14
178:20
181:1,7

**reach**
102:3,6,
10,11,13
195:25
196:3
241:7



250:25
259:10

**reached**
46:7
102:24
151:12
167:1,4
195:22
234:10
240:3

**reaches**
215:25
260:22

**reaching**
259:12

**read**
23:12,20,
21 26:14,
17,20
27:4,6,
15,16,17
32:15,18,
25 44:25
49:23,25
54:22
56:1,3
66:8
68:5,10,
12 104:23
108:12,
15,20
114:23
117:7
134:25
140:16
154:14,16
156:23,24
157:18
158:23,25
166:16
169:13,14
174:1
176:12
178:11
183:11,

13,14,21
184:22
185:8
187:20
188:1,2,4
190:9,11
204:11
215:13
228:23
236:17,18
243:8,21,
23 247:1
248:16
251:15
252:1
264:20
265:14
266:6
267:9
270:15
271:19
275:4,24
278:2,21
282:14
284:4
294:1,8
295:14,15
301:9,12
304:6,10
311:2,15
314:25
317:1
319:13,
14,25
328:5,22
330:9,19
331:4,6,
8,13,15,
17,20
334:12
335:5,9,
15,17
336:3,8

**reader**
24:2

**reading**
23:14,24
26:25
49:10
59:24
147:17
182:9
188:25
243:6
282:15
309:16
316:14
319:23

**ready**
60:16
68:8

**real**
24:3
68:22
80:18
118:14
243:11,14
284:4
293:5
333:5

**reality**
21:13

**realize**
303:19
304:6
311:11
320:5
321:1

**reask**
300:11

**reason**
12:25
62:7
86:15
96:4
170:10
174:21
175:22
176:6

180:23
221:21
235:15,19
236:9
259:13
281:13
282:16
291:3
296:11
299:14
312:8
327:2,6
337:13

**reasonable**
27:25
28:2,14
48:25
61:16
87:4,6
113:17,
20,25
116:17

**reasoning**
33:16

**reasons**
137:17
153:6
289:23
300:5,14,
15 301:1
315:9
316:4

**reassurance**
237:8,9,
11 238:24
239:2

**reassure**
236:1

**reassured**
236:11
239:9

**recall**
11:5 31:3
32:4,6

52:9,13,
17 54:20
59:3
63:1,4
65:15,16,
22 70:9,
13,21,23
71:2 73:8
74:24
79:1 80:5
81:23
82:20,23
83:9,22,
24 84:3
85:22
88:10
89:16,20
90:24
91:12,14,
15 92:4,9
93:7,10
99:3
101:1
104:3,4
109:4
117:14
119:5,7
141:23,24
149:25
150:16,24
166:24
191:21
192:5
195:15
196:8
199:2
205:25
206:2
223:15
225:11
226:1
232:6
246:24
251:3
252:4,9,
19 254:24
284:18



288:9
300:18
310:8
312:2,5
313:20
315:7,15,
20 318:11
322:3,14,
18,19
324:12,18
326:2
335:18
337:9

receipt
218:25

receive
257:1
268:8,16,
22

received
69:19,24
140:19,21
149:13
152:24
158:2
160:18
218:3
219:12
272:23
275:17
320:10
327:14,23
338:10

receiving
63:16
150:9
159:14
219:18
246:24
252:19

recently
10:16
151:8

receptionis
t
208:21

receptions
262:15

recess
77:17
112:23
147:9
200:5
242:8
273:13
293:8
336:23

recognize
140:1,21
141:12
154:20
155:20
156:3
198:14
230:18
308:21

recollectio
n
165:18
227:8,15
243:25
262:10

recommend
113:19
114:14,
16,19
115:9,11,
16 116:24
117:9

recommendat
ion
115:24

reconsider
253:23

record
9:2 14:5,

7,9,13
23:19
26:18,25
27:2
34:3,6,9,
15,18
35:4
49:23
63:15
68:6,21
77:16,19
93:2,6,12
104:24
112:20,
22,25
114:8
118:14,
17,18,20
122:17
124:5,9
143:19
145:4,7
146:18
147:8,11
154:8
162:4
166:16
184:8
188:2,5
200:2,4,7
209:25
242:7,10
243:13,
16,17,19
273:12,15
278:3,21
284:4
287:18
293:5,7,
10 295:16
298:1
302:13
307:2,4,
17 309:7
336:22,25
339:7

recorded
92:24
94:10
197:13,20

recording
93:7
94:5,8,16
100:10
197:15
252:17,18

records
76:2,9
202:11
209:22
211:6
258:24
270:7
271:4
319:3

recovering
44:25

red
160:17,
20,23,25
161:4
280:1
314:12,17
315:13,24
318:7

reduced
139:6,22
184:16

reduction
84:7
136:17
137:21
141:11
233:8
234:20
246:14
250:6
255:11,13

refer
74:15

133:19
293:22
294:1,2
309:19
321:12

reference
49:14
251:21

referenced
97:4

references
142:24

referencing
106:13

referred
171:13
232:1
287:14

referring
135:20
160:24
186:22
188:7
216:22
219:7
229:2
246:13
250:22
302:5

refers
176:12,13

reflection
73:18

reflects
133:13

refrain
27:22
87:1

refresh
72:6
95:25
97:7



98:15
214:11
243:25
283:10
285:7
316:20
317:1

refuse
131:23

refusing
33:5

refute
281:19

reimbursed
141:20

reinterviewing
24:14

rel
13:19

relate
321:19

related
12:23
146:19
271:21
321:15,
17,20

relates
304:25

relationship
14:25
15:2
21:19
33:8,20
213:19

release
56:18,23
257:20

relevance

13:20,25
181:17

relevancy
305:6

relevant
145:13
181:6
305:16,19

relieved
28:12

remain
27:20
285:9

remark
295:12
309:18

remember
18:17,22
21:6
30:9,15,
25 44:2,3
51:21,25
52:2,4,5,
10,24
53:1,3,8,
9 54:25
55:18,19
57:13,14,
21 61:19
70:4,10,
12,19,22
71:1
72:23
73:9,10
74:8
78:5,11
80:3,23
81:15,21
83:18,19,
21 84:1
85:21,23
88:12,21
89:9 91:4
92:13,14,

15,25
94:22
95:14
96:12,15,
20,24
99:2
100:10,23
102:16
104:2,7
107:14,
15,16,19
108:3
109:17,24
112:17
120:24
123:1
128:3,18
129:22
135:22
136:2
137:5,16
140:1,5
141:1
142:1
149:4,6,
9,22
150:1,2,
3,5,9,19,
23 156:2,
4 159:14
167:21,25
170:4
180:22
182:2,6,7
191:20,23
192:1,7,9
193:4,5
195:18,
21,22,24
196:1,2,5
199:5,12
201:9
206:7
207:8,10,
11,12
209:10
210:22

211:4,18,
20 212:12
213:8,17,
18 214:20
215:6
218:6
220:5
221:9,14,
18 223:5,
6,14
225:16
226:14,
18,21,24
227:17
230:21
233:1
235:7
238:9,19,
20
239:23,25
240:4
241:10,21
242:1,2,
13,14
247:1
254:23
255:7,12
263:23
269:6,7
274:1
275:18,20
276:11
281:11,
12,16,22
285:24
287:1,20
299:22
308:15,19
309:2,20
310:1,2,
13,17,21
312:7,10,
14,16
313:4,5,
19 314:3,
8,9,13,
14,15,16,

18,21
315:15
316:2
323:16,
17,20
324:14,
16,17
326:8,10,
20,22
327:10,25
328:4
331:8

remembered
18:21
62:13

remembering
326:19

remembers
226:25

reminded
266:8

remorse
105:17

removed
41:13
162:10

rendition
323:4

repair
279:7,8

repeat
284:25

repeatedly
35:20

rephrase
66:24
164:1
265:10

report
37:14
40:17



55:4
63:16
97:8,19
103:4,14
162:25
163:7,12
164:23
165:2,19,
21 166:4
222:8,16
235:4
315:13
318:24
319:1
320:9
328:10,23

reporter
9:13 10:2
121:16,
21,24
122:1,3,
6,11,19,
22 123:3,
8,10

reporters
123:13

reports
31:24
32:9,10,
14,25
39:9,11,
15,20
40:13,15,
23,25
57:20
65:13
163:2
165:10,13
314:11

represent
9:16 10:9
35:7,12
44:6
51:22
54:15,21,

23 65:2
99:20
108:21
155:17
156:11
159:16
210:15
214:7
225:17
271:19
318:16
319:2
337:11

representat
ion
44:16
303:22
315:14
328:8

representat
ive
35:14
186:25

represented
179:14
215:22
329:24

representin
g
34:25
145:18
182:3

represents
35:12,23
146:6

reputation
329:25

request
44:8 90:5
91:2
121:19
127:23
133:17
138:6

141:4
173:4
184:3,4
188:24
219:19,25
225:3
269:3
307:9
319:3

requested
40:17,18
62:2
127:13,21
221:1,4
222:11

requesting
85:1
173:4
184:17
218:15
219:21
220:13
224:5
241:3

requests
171:23
183:18

require
22:23,25
113:16

required
31:15
33:12,15
49:2
169:2
172:19
174:3
178:6
179:3
264:11
296:4

requirement
48:22,24
187:11

requirement
s
189:13
193:7
194:4

requires
22:21

requiring
138:15

resistance
238:17

resolved
191:4,5,6

respect
120:20
121:6,12
146:3
185:18

respectfull
y
220:13
241:2

respond
36:24
77:20,25
78:24

responded
50:17

responding
253:1

response
44:7
230:2
266:17
268:25
337:4

responsibil
ities
26:13
27:19

responsibil
ity
28:13
173:16

responsive
338:2,14

rest
53:24
155:15
228:23
335:17

restate
29:15
57:4
65:10
125:15
168:16
277:6

restrain
15:19,20

restriction
145:22

restriction
s
146:4

result
29:10
263:16
290:25

resulted
299:13

results
271:21
279:10
291:8

retirement
21:12

return
209:1,4,9
262:18

returned



127:24
209:7,13

**returning**
209:10

**reveal**
45:4  46:4
246:2
264:3,21
265:17
268:25
286:15,23

**revealed**
245:13,21
263:25
264:13

**reverse**
206:14

**review**
15:24
16:2
53:18
63:2
68:21
96:24
97:1,10
112:16
154:5,9
155:12
184:6
278:14
313:10,11
320:8

**reviewable**
148:1

**reviewed**
328:10
334:23
337:4,7

**reviews**
328:9

**reward**
300:6,8,
9,12

**right-hand**
19:22
105:12

**rights**
28:6
87:17,24

**ring**
13:3
32:20
33:10
39:22
91:2,17
240:2
329:18
332:8,14,
18

**rise**
62:15
127:17

**risk**
301:2,4

**risking**
300:24

**road**
235:18

**robberies**
279:17
314:18
335:11

**robbery**
70:7,15
72:3,7,19
73:8
279:20
314:6
315:11,12
316:22
317:7,18

**Robert**
214:9
220:12

**Roberts**

91:9

**role**
17:20
21:16
31:9
158:7,9
229:7
253:24
254:6,7,
9,11
258:17
260:14
292:5,8
311:16

**Rolled**
106:8

**Ronald**
9:6,18,21
85:2
100:17
111:8
282:19
304:4
308:10

**room**
41:6
92:19
123:9

**roommate**
280:19,24
281:4

**Rose**
44:7
140:5
318:16

**Rose's**
44:15

**Rosenthal**
30:20

**rounds**
279:3

**route**

314:16
317:18

**routine**
64:6

**row**
333:12,
17,19

**rule**
26:12,15,
24  27:7,
12,18
28:18,19,
24  29:4
35:9
51:2,12
86:21
87:1,20
115:25
126:3
129:4
130:22
162:19
174:21
178:5
197:14
234:20
235:17
236:2,12
246:14
249:7
250:16
251:10,
14,15
254:21
255:15
300:10

**ruled**
317:6

**rules**
26:9  35:9
37:14
38:6  42:8
69:1
71:21

86:21
145:20
194:8
197:18

**run**
27:13
103:15
163:21
222:15
256:15
258:3,4,
19  289:22
293:2

**running**
163:6
258:6,11,
12
302:15,21
334:1

**Rytting**
9:20
12:20
13:13,15,
24  14:5,
7,10
15:10,14,
20  33:13,
25  34:3,
8,11,14,
17,22,24
35:2,3
36:12
45:22
46:1
66:16,20
68:24
69:8
74:21
94:6,7
145:2,5
146:16
232:17
262:22
274:8
287:6,22



289:19
290:20
291:12,18
293:3,11,
14,15,17,
18,19
294:16
296:8
297:1,23
298:4,7,
13,22
301:19
304:1,17,
19,22
305:5,11,
15,20,23,
25 306:2,
5,7,9,12,
24 307:7,
21 308:1,
4,8,10
309:10,
13,18
316:14
317:11,13
318:12,
15,20,23,
24
319:21,23
324:23,25
325:13,16
331:13
334:10

Rytting's
94:9

_____

S

_____

safe
133:10,18
134:13
140:8,15,
25 293:12
302:20

safety
289:24

sanctions
36:1

satisfactio
n
127:18

satisfied
127:11

saving
271:11

scalp
320:14
324:7

Scardino
9:17
10:8,9
12:10,15,
21 13:4,
6,9,16,
20,22
14:3,12,
16,19
15:1,7,
12,18,22,
23 23:11
24:25
26:1,22,
23 27:7
28:22,23
32:22,23
33:9,11,
14,22
34:2,5,
10,13
36:3,5,
14,22
37:1,16,
20 38:1,
5,12,23
39:7,8,24
40:4,9
43:5
45:25

46:3,20,
21 49:10,
12,15,18,
22 50:1,3
54:9,10
56:13
62:20
63:11,12
65:10
66:4,13,
19,22
67:2,5,7,
10,15,16,
20,23,25
68:3,8,
11,16,20
69:13,15,
18 71:8,9
72:11,16,
18 74:22
75:8,11
76:6,8
77:10,14,
20 80:10,
17,18,21
82:8,9,
10,20
84:12,21
87:13
93:21,23,
24 94:4,7
99:1
103:7,9
104:12,15
110:12,14
112:19
113:1
114:4,9,
25 117:21
118:7,14,
21 125:1,
13,15
131:16,18
136:22
142:6,9,
11,15
143:4,8,

15,17,20,
22 144:1,
5,11,14,
21,25
145:3,8,
19,24
146:17,22
147:5,12
148:23,25
149:1
153:18
156:9,10
157:2,18,
21,24
159:7
162:3,7,
11 166:8,
10
169:17,
19,23
170:1,2
173:1,2
177:21,22
178:1,2,
8,9
179:12,
19,21,22
180:5,6,
11 183:5,
7,8
187:22
188:1,6
195:6,8
197:24
198:2,4,
6,9,10,
13,14
199:2,10,
20,21
200:1,8
201:1,2
204:8,14,
23 205:1,
3,7,25
206:17,25
207:1,22,
24

212:20,
23,25
213:2,3
214:15,
18,23,25
215:2
218:8,10,
13 219:4
221:11
223:1,7,
11 224:9
228:1,8,
25
232:13,
14,19
233:2
236:16,
21,23
237:2
240:6,10,
13,16,22,
24,25
242:3,11
243:13,20
245:21
246:1,2
247:14
248:10
252:19
253:18,
21,22
255:21
256:1,6,
8,20,23,
24 259:2
262:24
263:3,4
270:19
271:2,25
272:1
273:5,8,
16,22
274:3,4,
6,9,10
275:15
276:18,
19,23,25



277:18,19
278:7,11
281:8
282:5
286:21,22
287:3
293:1,4,
13 307:3,
8,12,19,
22 308:3
316:7,10,
13
334:11,
18,20,23
335:2,22
336:1,4,
16 337:22
338:1,17,
21,23,25
339:5

scared
221:23

scenarios
189:16

scene
54:20
320:9

scheduled
120:13

Schizophren
ic
105:18

Schmidt
55:5

school
17:7

scope
37:3,4,
10,15
146:5
294:15
296:6,24
297:20

298:2
304:23
307:1,13

scratchy
336:6

screen
108:25
214:6

script
231:24
232:1,3

seal
143:12

sealed
143:19,23
144:2
162:9

search
55:7
271:20

searched
103:24

secret
122:16,
21,23
179:20
186:8,9

secretary
94:9
208:22

section
63:14,24
64:1
126:21,22
127:4
173:2,3
178:11
264:19
268:21
270:3,22

secure
126:24

seek
25:16,19,
21 26:2,4
127:16

seeking
36:1
190:4

seg
105:8,13,
14,15

segregation
74:13,15
296:12

sell
174:18
187:10

selling
187:15
190:13

semen
281:24
282:19,23
285:1,8
286:3,12,
17,24

semiautomat
ic
279:1

send
151:20
251:9
279:11

sense
43:21
152:21
156:17
167:21
207:13
222:1
262:13

sentence
84:7,16

116:12
125:24
126:6,12,
16 127:19
136:17
137:21
139:5,22
141:11
142:9
171:24
233:8,23,
24 234:7,
13
235:13,
16,20
238:12
246:14
248:20
250:6
255:11,13
256:15
258:3,11,
14,19
270:22

sentenced
126:23
127:6
138:22
235:9
256:13

sentencing
28:10

separate
172:13
227:6

separated
263:20

separately
81:7,9
162:10

September
132:5
271:17

served
338:3

server
271:15

services
91:1

serving
125:24

set
22:8 26:9
36:10,17
91:25
124:21
125:3,7
217:9
241:18
245:16
283:5

setting
280:23

severe
323:23

sex
52:16
281:19

SF4896
280:2

shaking
150:25
223:21
299:24
303:17

share
67:17
186:11

she'll
67:9

sheet
225:3
234:6

sheriff's



56:19
57:18
97:9
127:14

**shootings**
115:20
116:1,3

**short**
77:17
86:7,18
112:19,23
200:2,5
242:8
273:13
293:8
336:23

**shortly**
240:12

**Shorts/
shorts/
towel**
279:10

**shot**
24:21
106:1

**shoulder**
320:19
324:6

**shoulders**
327:8

**show**
21:13,16,
22 23:8,
13 24:21
55:3
56:17
65:17
71:4 75:6
76:1
78:13
82:2,5
89:24
90:18

99:23
104:9
108:19,
22,23
111:21
139:18
144:6
149:11
153:22
154:1
159:7,9
160:4
162:11
164:3
166:3
167:7
181:8
197:23
200:8
203:22
204:15
213:24
215:7
218:7
220:10
222:18
228:1
230:17
234:2
235:2
242:16
246:20
248:10
250:9
253:15
254:12
256:1
258:22
262:20
264:7
266:25
267:8
268:17
269:21
271:16
274:10
275:23

276:9
278:1
282:5
284:2,3,5
292:20
295:11
309:14
310:4
311:25
312:6
314:20
316:5
317:15
327:18

**showed**
80:5
85:13
100:10
156:18,21
224:5,23
236:20
237:1,25
255:9
265:25
285:22
295:17
296:2
302:13
308:12
313:2
333:25

**shower**
167:16

**showing**
109:2
308:20

**shown**
48:3
152:16
182:14

**shows**
24:11,25
109:19
214:9

229:19
235:12
323:22
325:25

**shred**
330:5
333:8

**SHU**
74:7,9,
10,11,16,
18 75:3
76:20,21
78:10

**sic**
85:1
282:6
308:18
322:9

**side**
105:12
159:2

**Siegler**
9:6,19
10:4,8
13:22
14:14
15:23
35:7 46:7
77:20
95:4
97:22
98:8,11
113:1
147:12
188:7
200:9
206:3
220:14
242:11
243:20
269:8
273:16
287:6
291:19

331:10
334:12
337:2

**Siegler's**
12:11

**sign**
101:8
141:19
172:19
173:22,23
174:3
175:4,23
185:3,24

**signature**
132:11
184:19

**signed**
101:12
132:20
133:2
141:22
162:14
175:11
184:16
261:15

**signer**
178:17

**significanc
e**
326:6,24
327:7

**significant**
320:16

**signifying**
184:20

**similar**
21:19
308:17

**similaritie
s**
159:6,19,
20 160:7



similarity
  160:16

simple
  304:22
  326:17

simpler
  148:17

simply
  168:19
  174:25
  298:16
  321:2
  334:11

single
  291:22

sir
  12:20
  13:13
  15:20
  309:17
  317:3
  320:7
  333:13

SIS
  90:19,23
  195:19

sit
  15:16
  30:4

sitting
  262:10

situation
  41:25
  93:5
  171:20
  172:18,21
  174:2
  182:23
  186:21
  189:15,18
  193:10
  233:21,22

situations
  171:6
  172:8,11,
  16 173:20
  182:13
  187:9
  239:16

skill
  22:8

slashed
  320:24

slips
  214:2,4,8
  315:1

slit
  313:23
  320:13
  322:11,
  21,23
  323:6

slot
  197:5

small
  93:15
  282:25

smaller
  178:10,19

Smith
  9:12

smoking
  283:7

snitch
  175:1
  190:20
  194:14

snitches
  13:3
  32:20
  33:10
  39:22
  106:1
  305:1

socks
  320:23

software
  270:4,20

solution
  239:13

Solutions
  9:13

solve
  22:1,19
  177:2

solves
  24:10,18

somebody's
  282:24

son
  78:19,21

soot
  54:19

sort
  119:15
  199:2,14
  289:4
  294:12

sought
  171:9

sound
  181:21
  186:8
  311:6
  323:8

sounded
  252:22

sounds
  189:10
  247:11
  311:10

source
  303:4

sources

25:18,21
  26:1

Southern
  9:8
  250:12

spacing
  160:2

speak
  16:15,25
  57:16
  74:1 86:3
  109:22
  110:9
  150:21
  155:25
  164:20
  192:18
  196:11,
  16,22
  201:12
  203:6
  211:13
  215:3
  216:3
  262:8
  285:20
  309:3
  316:3
  317:4
  322:5
  324:2

speaking
  30:4 69:2
  79:1,24
  83:25
  110:16
  150:16
  161:10
  197:10
  202:3,7
  206:5
  210:18,21
  211:12
  236:8

speaks
  187:21
  254:2
  285:17
  299:3,5,9
  317:12

special
  17:17
  18:10,13,
  15,19,24
  19:3,18
  22:10
  26:10,13
  27:18
  55:6,13
  56:8
  58:24,25
  63:25
  64:22,23
  66:15
  74:11
  81:4 91:1
  101:14
  171:14,24
  173:7,12,
  13,14,17
  175:7,9,
  10,18
  176:18
  178:14,16
  182:18
  184:2,4,
  5,19,23
  188:24
  201:25
  259:7
  260:22
  261:7
  262:6

specific
  36:17
  38:6,7
  42:25
  52:10
  80:11
  172:11



194:10
227:14

**specifically**
26:12
88:11
89:22
113:9
121:5
138:6
169:12
188:11
227:12
272:8
287:20
292:7
312:12

**specifics**
16:16
154:12
275:20
314:21
317:2
327:25

**speculate**
56:11

**speculating**
207:3
232:16

**sperm**
284:12,
15,16

**split**
221:21

**spoke**
55:8 78:3
82:15,21
83:9 84:3
96:13
120:2,18
130:11,
13,16
131:3
151:13

192:12,16
206:9
207:6,9
210:5,23
238:4
239:24
262:11
265:6,7
286:16

**spoken**
21:6
109:25
111:10
124:17
150:13
168:21
231:1
262:16
265:17
267:22
286:24

**sponsored**
306:16

**spring**
66:9

**squared**
105:19

**stab**
320:20

**staff**
270:5,20

**standard**
61:14,15
222:13

**stands**
258:1
329:15

**star**
254:4

**start**
53:7
54:18

198:10
256:24
293:12
315:19
335:2

**started**
18:6 35:8
58:3,5
80:2
81:15
85:23
139:4
162:8
286:14

**starting**
295:16

**starts**
116:11
278:16

**state**
11:20
42:23
43:1,11,
13,17
66:18,23
68:24
126:1,6,
13,17
127:6,8,
9,11
162:12
179:9
195:12
215:16
237:21
238:11
244:23
248:14
256:3
257:2
258:4,6
260:8,15
263:7
276:20
294:9

333:6

**state's**
65:21
264:16,22
310:5
333:5,6

**stated**
55:12
66:6
73:1,19
97:22
98:11
283:17

**statement**
23:5
24:14,18
28:17
32:6
47:3,11,
18 60:12
61:7,22
65:4
76:16
114:5,6
117:1,20,
22 125:8,
10 157:19
167:3,8,
24
168:10,11
169:11,12
179:15
230:19
231:17,22
232:5,7
254:8
264:24
274:11
275:6,11,
24 277:23
282:6
285:21
292:24
319:12,13

**statements**
32:2
41:18
42:2
52:11,12,
15 123:4
298:22
328:7
333:1

**states**
9:8 55:5,
7 72:13
87:1 98:7
270:4
299:1

**statistically**
282:21

**stay**
14:8,13
27:14
34:6,8
39:4
123:8

**step**
79:11

**Steve**
11:7
167:11,14

**stick**
67:11

**sticker**
318:13

**stickies**
325:5

**stomped**
327:22

**stop**
33:25
37:23
39:1
45:23



69:16
174:21
242:4
280:3

**stopping**
177:16

**stored**
272:4

**story**
137:3
153:3,5
167:20,23
255:1,6
281:19
288:5

**straight**
93:14
290:14
307:15

**street**
174:9
175:16
178:25
188:13
193:10
194:6

**streets**
174:17
176:24
187:10,15
188:14
190:14,21

**strike**
288:14
290:20
292:2,3
329:2

**strong**
116:6,14

**stuck**
106:10

**stuff**

305:10

**stupid**
158:16
290:6

**style**
10:22

**subdivision**
167:12

**subject**
31:18
47:6,13
305:4,13,
19

**submitted**
57:19
63:13

**submitting**
141:24

**subpoena**
304:4,18
305:4,19
338:2,14
339:1

**subpoenaed**
271:20
305:14

**substance**
17:1
111:18
125:19
161:14
169:4

**success**
116:18

**suddenly**
110:22

**sufficient**
111:2
113:4
114:12
115:7

116:20
117:5,16
168:14,18

**sufficientl
y**
117:4

**suited**
22:8

**summary**
256:3

**super**
144:9

**supervised**
105:4

**supervisor**
30:5
173:5
178:17
184:17

**supplementa
l**
55:4  97:8

**support**
330:4,5

**supported**
27:22

**supports**
333:9

**suppose**
17:13
199:21
208:18

**supposed**
137:14
213:24
225:4
238:16
295:9

**supposedly**
99:9

**surgery**
23:15
309:8

**surprise**
273:4

**surprised**
85:15

**suspect**
56:14,20,
21,25
57:7,9,10
70:25
71:25
72:9
85:20
103:18,19
166:1
222:15

**suspect's**
87:16

**suspects**
57:11
163:18

**sustains**
71:21

**swabs**
284:12,13

**swallow**
282:25

**swear**
10:3

**sworn**
10:5

**syndicate**
302:16
334:2

**system**
195:11,12
301:6
329:19
332:9

———————

T

———————

**tabbed**
315:3

**takes**
91:21

**taking**
9:10
158:24
174:7
336:12

**talk**
32:23
45:12
46:8
48:21
51:18
55:25
71:10
93:15
122:18
143:1
154:22
186:15
197:3
203:11
217:24
225:6
230:11
233:12
234:16
240:18
250:20
287:12
292:24
316:18

**talked**
53:14
77:24
78:7
82:14
84:1
86:10



105:15,20
106:10
111:14
113:12
130:25
162:25
167:5
181:4
192:21
196:5
207:4
211:2,3,
16 261:5
297:21
321:18

**talking**
18:4 21:4
63:25
64:2 73:2
79:16
80:2 86:9
95:21
98:2,6
102:19,20
106:4
111:5
140:10
147:13
157:17,
22,25
161:6,16
163:23
167:6
172:14
182:16
185:11,
14,17
186:18
187:16
192:4
203:4,5
215:19
216:15,
16,17,18
227:23
233:2,3

249:20
272:22
284:12
288:9,13
294:4
305:2
306:23
309:21
310:21
317:2,16,
20 321:7,
8 326:9
332:1

**talks**
64:11,15
156:6
233:7
235:22

**Tape**
94:15

**taped**
314:16
317:14,
15,17
333:1

**TDCAA**
29:25

**team**
140:8,22,
23 142:3,
12,16,19,
21
156:19,22

**teaming**
69:9

**technology**
24:10

**Ted**
17:25
18:7,9
219:21
220:11
241:1

**telephone**
79:2
108:13
150:21
196:23
209:14,22
212:15
216:4

**television**
21:13
23:13
24:21

**telling**
122:22
139:20
217:7,8,9
239:9
297:3,15

**tells**
75:14,17

**tempered**
60:20

**Temple**
11:18,19,
25 12:7,
12,24
13:14,23
23:3 32:1
42:1,5,24
43:2 49:6
50:4 52:3
101:6
269:8
272:13

**temporarily**
127:16

**tended**
51:5

**term**
148:18

**termination**
31:18

**terms**
190:5

**Terry**
111:12
154:13,16
165:7,14
168:11,12
169:6,13,
14

**test**
54:16

**testified**
10:6,10,
14 11:9,
12,19,22
13:22
23:3 32:1
42:3
65:23
66:15
70:3
71:25
87:10
89:13
101:6
118:22
138:25
140:14
147:22
149:5
159:11
162:18
164:6
186:16
192:2
194:20,
23,24
234:20,22
236:1,13
242:12
246:18
248:4,5
253:5,12
269:9,11
272:14

275:16
295:21
296:20
298:25
299:13
311:16
312:5
321:5
322:8
323:1
324:15
326:3
327:10
328:25
337:4

**testify**
32:4
35:18
39:19
40:24
96:11
109:15
119:24
121:3,9,
14 134:2,
5,14
151:24
153:19
155:23
164:7
165:4,22
177:5
179:8
180:22
189:11
239:6
264:1,2
284:1
300:16
313:6
327:21
328:6

**testifying**
11:3
109:15
130:19



133:11
165:10,13
174:25
188:17
267:21
313:2
321:2

**testimonies**
312:15

**testimony**
12:12
29:6,17
35:18
49:6
50:19
67:1
72:12
80:10
100:10
120:17
123:3,21
134:13
135:16,25
141:10
153:25
158:17,20
169:9
181:6
182:22
188:19
190:8
199:18
209:8
210:23
211:23
225:18
231:24
234:5
242:13,
15,17
243:22
250:4
255:23
256:19,21
266:7
268:8,16,

23  274:15
283:2,19
284:2,3,7
285:8
296:2
297:12
301:25
306:16
311:14,15
312:3,19
313:17,21
320:12,23
321:8,10,
15,21
322:4,16
323:9
324:20
328:9
336:8

**testing**
284:22

**Texas**
9:9,11
26:9
86:21
113:16
127:1,5,9
235:4
248:14
250:12
270:6,7
271:3,4
290:23
302:15
334:2

**theorized**
329:23

**theory**
273:17,22
275:3
276:13
277:1,7,
11  281:2,
8,9,13,23
283:11

296:1,15
306:13,14

**thereto**
173:6

**thick**
86:23
170:5
183:2

**thing**
24:9,10
140:17
146:10
183:21
185:11
228:13
238:25
239:3
249:13
282:22
290:6
305:2
319:24,25
333:18
337:3,19,
22

**things**
22:21,24
27:6
41:13
44:20
90:13
107:19
122:18
126:9
148:16
157:17
234:15
237:11,
12,18
264:21
298:1
312:17
328:6

**thinking**

170:24
201:10
330:2

**Thorn**
201:3,6,
12

**thought**
27:16
56:2  66:8
105:3
106:2,9
107:18,
20,25
111:5
137:7,17
156:14
160:22
190:20
214:16
215:23
228:2
230:9
231:7
233:25
234:18
235:8
249:13
252:11
266:4
281:3
291:21
304:2
326:3

**thoughts**
280:16

**thousand**
257:5

**threaded**
191:13

**threatened**
311:25

**threatening**
27:21
303:14

**threats**
296:3,10
297:5
300:7
302:9

**throat**
106:5
313:24
320:13,24
322:12,
21,23
323:7
324:1

**throw**
196:6

**time**
9:3  11:9,
16  17:14,
24  18:1
20:15
21:4,9
23:14
24:13,14,
15  26:19,
25  27:4,
6,13  30:6
31:23
47:24
55:11,15,
21  62:8,
15  66:5
68:5,13,
19,25
75:3
77:15,19
78:12
79:13,24
80:7
81:19
85:17
89:10
92:16
94:9
101:15
111:1,6



112:21,25
113:25
116:8,16
117:18
118:16,20
127:11
129:2
131:25
135:23,25
136:12
147:7,11,
14 152:8
154:14
157:15,20
158:11
159:24
161:25
170:15
176:17
178:15,
16,18
180:2
187:7,8,
13 188:14
196:20
197:5,7
198:1
200:3,7
201:14,22
202:8
203:4
204:25
205:20
206:4
210:19
216:4
221:14,17
226:4,11
238:10
242:6,10
243:15,19
244:24
246:17
254:24
259:17
262:22,24
264:13

269:15
272:19
273:5,11,
15 277:24
285:8
288:9
289:12
290:5
293:6,10
307:23
308:4,8,9
313:11
319:16,19
324:21
334:17,18
336:15,
21,25
339:6

**timeliness**
50:9

**timely**
28:6
48:14,18,
22,24
50:23

**times**
18:4 52:7
105:20,23
208:10
287:10,13
290:9,11

**timing**
18:22

**Tina**
9:22
145:19
256:20
301:16
311:14
338:17

**Tina's**
266:7

**Tirado**
52:16

86:4
282:18

**Tirado/
herrera**
12:4
51:19
79:9
81:11
85:20

**title**
17:14,21
18:2,8

**to-dos**
139:10
269:12
280:15

**today**
9:12 12:4
15:24
23:15
27:13
32:20
53:20
54:6,13
196:5
223:14
272:10
304:2
335:23

**Today's**
9:3

**Todd**
83:15
134:19

**told**
16:13
38:10
40:7
41:15
54:7
73:13
74:24
79:12
91:25

93:18
94:20
95:15
100:24,25
111:15,17
124:6,10
134:21
135:10
137:14
141:18
167:25
177:19,25
179:15,
16,17
216:8
217:20,23
223:8
226:23
227:11
229:1
234:11
236:10
239:3
248:3,7,
23 249:1,
3 266:1
281:20
285:22
286:17,24
291:16
292:19
299:10
300:4,14
302:8,23,
24 321:24
322:2
332:9,16

**Tommy**
313:12
319:12,13
320:5
321:14,
17,24

**toolbox**
191:12

**top**
56:21
95:20
99:25
103:10
104:18
105:12
149:20
196:7
202:21
204:9
208:2
286:2
335:4

**torso**
320:17
323:15
327:8,19,
23

**torsos**
324:5

**Total**
198:1

**touch**
78:11,12
205:22

**trace**
54:17

**Trade**
228:11

**training**
29:20,23
30:1,8,
10,13,23
284:23

**transaction**
63:15

**transcribe**
121:24
123:14

**transcribed**
93:20



94:12
123:22

**transcript**
15:25
16:22
93:1,14
95:9
144:1
225:22
242:16,18
243:23
265:25
266:7
285:17,20
313:8
316:2
317:1,12
322:5,7
324:2,9
328:12,
13,18
330:9
331:5

**transcripts**
16:19
317:4
324:4

**transfer**
140:8

**transferred**
18:10
20:13,14
132:18
139:21
153:13
302:19
334:2

**transparenc
y**
170:22
176:7

**transparent**
177:19

**trash**
269:15

**trauma**
320:11,16

**traveled**
162:18

**trial**
15:25
28:5,6
32:4
35:11,14
39:19
40:17,18,
25 42:6,
9,10,17,
20 43:18
52:18,21
53:10
69:3,4
70:3
72:12
87:24
89:18
96:7,9
109:16
116:8,16,
18 133:5
134:6
136:4,5,
13,23,25
137:8
139:1,9
152:12,13
158:3,4,
15,19
168:4
171:12,
16,25
173:11,15
176:24
189:13
211:14,23
212:4
216:10
225:18,20

231:9,25
233:5,6,
18 234:4
235:23
242:12,18
243:23
244:7,8,
25 249:6
256:19,
21,25
266:10,11
269:8
273:17,22
274:21
275:3,16,
19,20
276:2,13
277:24
281:9
282:1
286:18,19
308:12,
16,18
310:3,10,
18 311:25
312:6
313:8
315:4,24
316:2,3,
21
321:14,21
322:4,5,7
323:25
324:2,3,
9,10
328:9,12,
13,18,25

**tribunal**
28:10,14

**trip**
86:15

**true**
23:5
113:19
114:14

115:9
181:24
289:19
303:19,25

**trusted**
195:18

**trustee**
105:9

**truth**
329:14
333:5

**truthful**
50:19
136:7
137:11
138:5
220:9

**truthfully**
11:22
234:22
236:2,13
239:6
248:4,6

**tunc**
237:17,
20,23
238:5,8

**turn**
39:19
50:7,10
198:17
222:19
223:23
320:1,4
325:18

**turned**
111:6
191:14

**TV**
276:9

**type**
101:7,10

175:12
193:8
288:20
294:3,13
333:11

**typed**
101:16
103:23
159:3
160:5,14,
21
161:19,22

**types**
69:6
194:10

**typewriter**
159:22,24
160:11,16

**typically**
103:15
195:4

**typing**
161:25

———————

**U**

**U.S.**
83:13,14
84:8
134:19
136:9,16
137:21
138:1
139:5,20
141:22
233:3,8
244:5
248:13
250:10,11

**Uh-huh**
11:15
25:12
28:22



48:8
51:14
53:11
58:16
69:13
81:14
84:23
95:24
104:6
109:9
111:13
198:2,6
204:19
208:2,10
211:1,25
212:9
233:7
238:2
260:21
268:14
269:24
278:25
336:20
338:24

**ultimate**
178:17
186:2

**ultimately**
41:10
242:25

**unaware**
176:8

**unconnected**
297:10,
13,14

**undated**
139:19
237:4

**underneath**
279:17,22
335:10

**understand**
12:17
14:24

15:15
25:24
26:3
29:11,14
33:12,17
36:10
38:2
39:21
52:22
53:8 54:3
62:25
72:22
73:23
77:4
122:20
124:25
126:9
131:15
146:7,12,
13 163:10
181:17
186:20
201:19
243:6
245:25
255:25
296:17
306:18
329:1

**understandi
ng**
13:23
38:14
48:22,24
49:8
50:5,6
51:2,7
61:9
66:22
148:14
185:22
249:6
292:5,8
307:13

**understood**
39:4

45:21
179:13
248:6
302:23
304:13

**unethical**
329:25

**unfamiliar**
27:9

**unilateral**
174:9

**unilaterall
y**
190:19

**unique**
172:11

**unit**
74:11,15
91:1
140:7,22
153:13
195:20
196:16
197:9
199:4
201:20
209:2,13
212:14
225:4
242:24
260:22
261:7
262:17

**United**
9:8

**unlike**
156:3,6

**unplug**
118:13

**unprivilege
d**
28:11

**unreliable**
170:13

**unrepresent
ed**
28:4
87:22,23

**unsolved**
21:24
73:24

**unusual**
93:5
129:18

**upset**
146:7

**urge**
247:4,21

**urging**
182:15

**urine**
105:13

**usage**
170:20

**useless**
315:2

**usual**
68:13
197:20

―――――――――

**V**

―――――――――

**Vaguely**
252:21

**van**
106:4
313:24
320:25
321:22,23
322:13

**verify**
261:25

**versus**
9:7 42:9
145:25
178:22
195:11

**vet**
175:24

**vetting**
170:20

**Vic**
186:13,14
285:15,18

**vicarious**
190:2

**victim**
52:17
191:12
235:6
283:23
313:17
314:6,8
317:19
321:3
327:4,9

**victim's**
281:16
283:12,22
285:9

**victims**
70:8
71:19
190:16
316:1

**view**
147:16
230:5

**viewable**
112:6

**Vincent**
181:10

**Vincent's**
72:15



**violated**
31:19
60:7

**violation**
60:9

**violence**
189:24
190:15
191:17
193:21
195:1

**violent**
192:9

**virtue**
126:24
127:8

**visit**
102:4,7
212:3
217:10
218:16

**visitation**
225:3

**visits**
93:8

**vital**
253:24
254:6,8

**voice**
9:15

**Volume**
242:18

**voluntarily**
47:24

**voluntary**
47:7,13,
22 48:12
52:12

**volunteered**
266:15
281:20

**vote**
120:15
122:17

**voucher**
141:10,25

——————————

**W**

——————————

**wait**
14:12
116:9
126:5,12,
16 143:5
205:17
268:9
301:18

**waiting**
316:15

**waiver**
28:5
87:23

**walked**
107:10
220:7
283:6

**Walker**
154:19
155:22
156:2,14
161:2,7
330:10,
11,14,24

**Walker's**
156:4

**walking**
194:17

**wanted**
27:16
37:11
67:3
90:17
93:12

108:4
111:4
123:21
154:14
156:24
175:19,20
176:5
187:9
230:6
236:1
251:15
300:6
334:12
337:2,19,
23

**wanting**
185:12
194:17

**warrant**
55:7
113:4
127:8,10
267:7,13
268:3

**warranted**
267:23
288:17,
19,25
290:8,10

**warrants**
288:23
290:1

**waste**
111:6

**watch**
176:1,11
185:12
189:8
194:9

**Watson**
65:18,21
80:22
81:13
283:20

284:14
285:10

**Watson's**
284:3,6

**Wayne**
195:14
222:23

**ways**
58:21
59:3

**weak**
116:7,15

**weapon**
189:23
191:11
193:13
195:1
216:9,14
279:7

**weapons**
190:15

**Weaver**
10:1

**week**
10:18
30:12
70:1
98:19
218:24
219:7
309:8

**weeks**
30:11
90:10
91:21

**weird**
105:17

**well-bound**
173:15
176:13,15

**Wentz**

111:18
153:23
158:22
232:20
291:7

**Wentz's**
276:5

**whatsoever**
124:5,9

**white**
105:21,22
167:13
201:11
320:22,23

**Whoa**
278:5

**wide**
276:6

**Wife**
105:5

**willfully**
31:19

**William**
65:18
81:13

**willy-nilly**
174:22
190:17

**Wilson**
219:24
220:11
241:1

**window**
189:14

**Wisconsin**
10:16

**wished**
188:21

**wishes**
64:9



**Wisner**
16:20
17:2 31:1
186:11
284:7,10

**witness'**
335:22

**witnesses**
32:2 45:3
57:19
58:6,9
69:5 93:3
119:18,22
122:13
133:19
134:22,24
135:11,
13,19
136:10
139:14
140:13,24
163:18,22
165:10,13
186:17
195:5
327:21
332:25
333:11

**witnesses'**
333:2

**Wolf**
324:12,20
326:3,4,
9,11
328:2

**woman**
283:12

**woman's**
283:3

**won**
23:4

**wondered**
327:12

**Woodgate**
167:12

**Woodruff**
20:3

**Woods**
106:3

**Woody**
20:1

**Woody's**
20:2

**word**
51:6
76:22
90:23
107:11
123:4
151:3
254:1
255:25
282:3
335:5

**words**
29:12
73:15,20
106:3
232:6
283:14,16
311:1
334:15

**work**
16:2
17:12
20:16
21:13,21
22:3,23
24:13
53:23
54:1
58:11
111:24
112:1,15
120:11
147:22,25
148:3,7,

13,15,16,
19 171:10
172:12
174:7,8,
14,17
176:5,24
179:2
187:9
188:12
189:6
190:12,
17,19
194:6
251:5
278:4,14
334:13,24
335:24

**worked**
19:17
20:4,11
22:12
52:3
53:13
80:3
101:14
123:15,16
213:9,10

**working**
17:9
21:19,22
22:6,9
56:4
62:6,9
64:6
79:14
80:7,13
81:5,7,8,
9,16,18
110:6
139:4
148:10
151:24
172:12
174:5,10
175:12,15
176:10

182:17
185:20
187:14
190:2
194:5
195:10
202:9
213:5
226:16
259:16
269:12

**works**
246:11

**workshop**
30:3

**world**
24:3
190:12
276:6

**worse**
309:9

**wound**
313:7
320:11,20
323:24
324:1

**wounds**
106:1

**write**
47:16
48:20
138:15,20
139:13,16
151:14
170:23
246:10
248:1,23
250:3
254:21
279:4
336:1,10

**writes**
82:11

212:7,8

**writing**
31:9
47:25
77:22,25
151:20
173:5,12
177:24
178:4,13
179:4,10,
11 182:14
184:16,18
185:4,19,
21 190:6
194:9
263:9
279:23,24
310:5
336:3

**written**
22:5
41:18
42:2 79:4
102:15,17
103:2
154:8
161:1
170:25
177:9,15,
18
179:22,25
180:6,11,
14,17,20,
23 186:24
187:8
200:19
218:19,20
231:16
264:4

**wrong**
36:21
67:6,8
82:24
109:6
329:25



337:21

**wrote**
31:12
47:17,21
69:21,22
130:22
134:11
135:23
136:8,16
137:20,24
138:3
230:22
254:10

223:13
252:10
257:4,11,
12,18,24
258:5
262:10
275:22
285:17
313:9
314:22
316:3
324:11
326:13

**yellow**
228:7
282:10

**X**

**X'D**
279:2

**yesterday**
16:7

**young**
117:25

**Y**

**yard**
161:6
226:15

**year**
12:3 27:5
30:2,10,
15 105:4
158:13
210:12

**years**
17:16
19:7,9,11
21:13
43:3,6
52:18,21
65:11
70:4
105:4,11
110:6
132:25
154:14
205:25
206:1

