# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **RONALD JEFFREY PRIBLE,** | ' |
| **Petitioner,** | ' |
| | ' |
| **VS.** | '                    **4:09-cv-01896** |
| | ' |
| **LORIE DAVIS, DIRECTOR,** | ' |
| **TEXAS DEPARTMENT OF CRIMINAL** | ' |
| **JUSTICE, CORRECTIONAL INSTITUTIONS** | ' |
| **DIVISION,** | ' |
| **Respondent.** | ' |

## OPPOSED THIRD MOTION FOR AN EVIDENTIARY HEARING

TO THE HONORABLE KEITH P. ELLISON, U.S. DISTRICT JUDGE:

Petitioner files this Opposed Third Motion for an Evidentiary Hearing and respectfully

shows the Court as follows:

## I.
## INTRODUCTION

Subsequent to discovery authorized by this Court, Prible filed a Fourth Amended Petition

(Dkt. 181). Respondent filed an Answer and Motion for Summary Judgment (Dkt. 191), and

Prible filed a Reply to the Motion for Summary Judgment (Dkt. 198) ("MSJ Reply"). The issues

litigated in those pleadings include (a) procedural defenses raised by Respondent, (b) exceptions

that Prible has advocated to Respondent's procedural default, exhaustion, and statute of

limitations defenses, and (c) the merits of Prible's substantive claims.

The Rules Governing Section 2254 Cases in the United States District Courts provide for

the orderly progression of habeas corpus proceedings. Rule 3 of the Rules Governing Section

2254 Cases in the United States District Courts provides for the filing of the petition and the

payment of the filing fee. Rule 4 provides for a preliminary consideration of the petition by a

1

court.  If a petition is not dismissed at that juncture, Rule 5 then provides that an answer and state records be filed.  Subject to the judge's authorization, Rule 6 allows for discovery, Rule 7 allows for expanding the record, and Rule 8 allows for an evidentiary hearing.  This Court has found that Prible's claims justify progression through the prehearing sequence set forth in the Habeas Rules; therefore, Prible respectfully requests that this Court now proceed to an evidentiary hearing.

A petitioner may be entitled to an evidentiary hearing on procedural issues as well as substantive claims.  Respondent argued for summary judgment primarily on procedural grounds, namely, that Prible's claims are procedurally defaulted, unexhausted, and time-barred.  Prible therefore submits the following briefing, in addition to the evidence and argument in his Fourth Amended Petition and in his MSJ Reply (both of which he incorporates by reference herein), justifying an evidentiary hearing on procedural defenses and exceptions to those defenses.

Prible also seeks an evidentiary hearing on all substantive claims that he argues should not be summarily dismissed.  These substantive claims are Claims 1-8, 10-12, and 14-16 in his Fourth Amended Petition.

## II.
## PROCEDURAL ISSUES ON WHICH PRIBLE SEEKS AN EVIDENTIARY HEARING

Prible requests an evidentiary hearing on the following issues:

- Whether Prible can show cause and prejudice, under *Murray v. Carrier*, 477 U.S. 478, 495 (1986), such that this Court can reach the merits of otherwise defaulted substantive claims.

- Whether new evidence of innocence satisfies the manifest injustice exception under *Schlup v. Delo,* 513 U.S. 298 (1992).

- Whether new evidence of innocence justifies equitably tolling AEDPA's one-year statute of limitations.

- Whether this Court can reach the merits of Prible's *Massiah* IAC claim (Claim 7) through the exception to default established in *Trevino v. Thaler,* 569 U.S. 413 (2013).

## III.
## ARGUMENT AND AUTHORITIES

**A.    Prible Is Entitled to an Evidentiary Hearing to Establish Cause and Prejudice.**

**1.    Standards of review**

A habeas petitioner is entitled to an evidentiary hearing to show cause and prejudice if he proffers specific facts sufficient to support such a finding.  *See Smith v. Wainwright*, 741 F.2d 1248, 1261 (11th Cir. 1981).  "[T]he decision to grant ... a hearing rests in the discretion of the district court."  *Schriro v. Landrigan,* 550 U.S. 465, 468 (2007); *see also Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010) (reviewing for abuse of discretion the decision of a district court to deny the petitioner's request for an evidentiary hearing to establish facts to overcome procedural default); *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1333 (11th Cir. 2004) (reviewing for abuse of discretion the decision of a district court to deny an evidentiary hearing on a substantive claim).

"When a petitioner asks for an evidentiary hearing on cause and prejudice, neither section 2254(e)(2) nor the standard of cause and prejudice that it replaced apply."  *Henry v. Warden, Georgia Diagnostic Prison,* 750 F.3d 1226, 1231-32 (11th Cir. 2014); *accord, Cristin v. Brennan*, 281 F.3d 404, 413 (3d Cir. 2002) ("We conclude that the plain meaning of § 2254(e)(2)'s introductory language does not preclude federal hearings on excuses for procedural default at the state level, and therefore the District Court did not err in conducting such a hearing in Cristin's case.").  Habeas Rule 7 grants the district court discretion to expand the record, *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986), and Title 28 U.S.C. § 2254(e)(2) does not limit the "expansion of the record to overcome a procedural default."  *Buckman v. Hall*, No. CV 07-141-

3

HU, 2009 WL 204403, *1 (D. Or. 2009) (citations omitted).  While § 2254(e)(1) creates a statutory presumption of correctness for state court determinations of factual issues, the presumption of correctness applies only to findings of fact, not mixed determinations of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001) (citing *McBride v. Sharpe*, 25 F.3d 962, 971 (11th Cir. 1994)).

    **2.**    **Prible is entitled to an evidentiary hearing on the issue of cause and prejudice with regard to his prosecutorial misconduct claims (Claims 1-8 of his Fourth Amended Petition).**

Respondent seeks summary dismissal of Claims 1-8, asserting that these claims are procedurally defaulted and Prible cannot establish cause and prejudice excusing procedural default.  Consequently, Respondent maintains that this Court cannot reach the merits of any of Prible's first eight claims.  In his MSJ Reply, Prible addresses Respondent's procedural default defense and her argument that Prible cannot show cause and prejudice.  While the parties disagree somewhat over the legal standards for cause and prejudice, the primary controversies are over the following general fact-intensive questions:

- Whether Prible knew of the factual basis of his prosecutorial misconduct claims (Claims 1-8) at any point before he filed his 2004, 2005, or 2007 state habeas applications pursuant to Texas Code of Criminal Procedure Article 11.071.

- Whether Prible, even if he was not aware of the factual basis of his prosecutorial misconduct claims, nevertheless rebutted by clear and convincing evidence the 2011 state court determinations, pursuant to Article 11.071 § 5(a), that he failed to discover available factual support those claims.[1]

---

[1] Respondent also argues for summary judgment on the ground that the evidence Prible maintains was withheld was not prejudicial, for purposes of establishing cause and prejudice, under *Murray v. Carrier*, 477 U.S. 478 (1986), and was not material for purposes of the merits of substantive prosecutorial misconduct claims brought under *Giglio v. United States*, 405 U.S. 150 (1972), *Brady v. Giglio*, 373 U.S. 83 (1963), and *Massiah v. United States,* 377 U.S. 201 (1964).  These questions are matters of law that would, in ordinary civil proceedings, be the subject of Rule 12(b)(6) motions to dismiss for failure to state a claim, and arguably should have been raised in a motion to dismiss filed before any responsive pleading.  *See* FED. R. CIV. P. § 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.").

In moving for summary judgment on the ground that Prible's could not show cause under *Murray*, Respondent mounted a two pronged attack on the allegations and evidence Prible argued supported prosecutorial misconduct Claims 1-8.  First, Respondent contended that Claims One through Eight in the Fourth Amended Petition could not survive summary judgement because Prible could not show cause for not presenting a theory that the State conspired with a ring-of-informants to presents false evidence in Article 11.071 Applications he filed in 2004, 2005, and 2007. Dkt. [191] at 33. Second, Respondent argued that the taped statement of Carl Walker, Jr., Prible's pro se successor 11.071 applications, and Prible's letters to the convicting court, in which Prible complained he had told his attorneys as early as 2003 about the ring and a witness named Walker,  supported state court findings that the evidence Prible submitted as proof of the ring-of-informants conspiracy theory was available at the time he file his original Article 11.071 Application in 2004, and at the time he files his 2005 and 2007 applications; hence, the state court's findings that evidence was available for inclusion in Prible's previous writs was unrebuttable. Dkt. [191] at 38.

### 3. Evidence apart from, and in addition to, Walker's August 26, 2010, taped statement raises fact issues suitable for an evidentiary hearing.

Respondent's strategy of reducing Prible's prosecutorial misconduct claims to a single complaint about a ring-of-informants conspiracy only serves to raise additional fact questions that can be resolved only through a federal evidentiary hearing.  As an initial matter, there are questions regarding whether Respondent's characterization of Prible's first eight claims as variants of a single "ring-of-informants" claim is valid, including the following:

- Whether Prible's prosecutorial misconduct claims (Claims 1-8 in his Fourth Amended Petition) were all dependent on the existence of a ring of informants, such that failure to show cause for not presenting this theory in any of his previous Article 11.071 applications (filed in 2004, 2005, and 2007) means every one of these claims is procedurally defaulted;

- Whether these claims, although arising within the time frame and from the same circumstances as the ring-of-informants theory, depended essentially on the testimony of Carl Walker, Jr., whom Respondent maintains was the primary source of information undergirding the ring-of-informants theory;

- Whether Prible, before he filed any of his 11.071 applications (the original application in 2004, and successor applications in 2005 and 2007), exercised due diligence to locate and interview Carl Walker, Jr., whose taped statements are the basis of the ring-of-informants theory to which Respondent reduces Prible's prosecutorial misconduct claims.

In his MSJ Reply, Prible contends that his prosecutorial misconduct claims (Claims 1-8), although arising from the same temporal and factual circumstances, cannot be reduced to a "ring-of-informants" conspiracy theory, because Claims 1-8 rest not just on Carl Walker's August 26, 2010, taped statement but on other specific pieces of evidence as well, including, but not limited to: photographs of groups of informants, including Michael Beckcom, who were simultaneously targeting Prible and another inmate, Hermilo Herrero, whom the lead prosecutor was aiming to convict for an unrelated murder; letters to the lead prosecutor from the informants in the photographs offering to supply information against Prible for a *quid pro quo;* letters from the lead prosecutor to Assistant United States Attorneys on behalf of multiple informants seeking Rule 35 reductions of their federal sentences; and affidavits from members of the group of informants, namely, Nathan Foreman and Oscar Gonzalez. *See* Dkt. 198, at 12-19.

Because of Respondent's singular focus on a "ring-of-informants" conspiracy theory and on Carl Walker as the primary source for that theory, Respondent did not adequately address the significance of the foregoing evidence. Prible, on the other hand, attached to his federal pleadings the transcripts of a 2011 hearing before the 351st District Court, in which his trial attorneys, his investigator at trial, and his original state habeas counsel all testified that the specific evidence supporting his prosecutorial misconduct claims was never disclosed to them. *See* Dkt. 181, at Exhibit 50 (excerpts of Volumes 3 and 4 of the 2011 hearing in the 351st District

Court).  Each witness explained that the evidence had not been disclosed at trial or in post-conviction proceedings, and Prible's trial and original state habeas counsel also explained why that evidence was favorable to Prible.[2]  Consequently, Prible has raised a fact question regarding the availability of the specific evidence attached to his Fourth Amended Petition (and to his MSJ Reply)—making summary judgment inappropriate and an evidentiary hearing necessary to resolve questions regarding the availability of the specific evidence Prible has marshaled in support of his prosecutorial misconduct claims.

### 4. The presumptions of correctness that Respondent says attach to state court findings do not preclude an evidentiary hearing.

Prible's pleadings, when juxtaposed against Respondent's, show that genuine questions of fact remain, even under AEDPA standards, regarding the focal points of Respondent's motion for summary judgment on Prible's prosecutorial misconduct claims.  That is, Prible has rebutted the presumption of correctness, pursuant to 28 U.S.C. § 2254, that Respondent says this Court must afford the Texas Court of Criminal Appeals 2011 findings:

> The Court finds, based upon the applicant's proffered statements of witness Walker upon which the applicant relies to support the merits of his instant claims, that the factual basis for the instant claims were available when the applicant's initial habeas petition was filed in November, 2004.

*See* Dkt. 191, at Exhibit 65, p. 4, Finding No. 22.

Ultimate conclusions are only as valid as the premises from which they are drawn.  The premises, in this case, were (1) that Prible had correctly identified the person referred to in the state court's findings of fact as "witness Walker,"[3] namely, Carl Walker, Jr., (2) that Prible could have contacted "witness Walker" before filing any of his Article 11.071 applications in 2004, 2005, and 2007 (*see* Dkt. 181, at Exhibit 65, Finding Nos. 21, 24, and 25), and (3) that "witness

---

[2] *See* Dkt. 181, at Exhibit 50, Vol. 3 at 43-44 (testimony of original state habeas counsel Roland Moore).
[3] *See* Dkt. 181, at Exhibit 65, p. 4, Finding Nos. 20 and 24.

Walker" would have provided, or could have been compelled to provide, using discovery, the evidence that federal habeas counsel later obtained from him in an August 26, 2010, interview. *See* Dkt. 191, at 60 (asserting original state habeas counsel could have done as Prible did [in federal proceedings] and assert those allegations in the application and then request discovery to pursue additional evidentiary support).

Every one of the foregoing premises is demonstrably false, as shown in Prible's MSJ Reply. *See* Dkt. 198, at 6-9. Through no fault of his own, Prible mistakenly thought the witness he needed was named Larry Wayne Walker. *Id.* Under this mistaken impression, Prible attempted to find Larry Wayne Walker. *Id.* Before Prible filed his 2007 Article 11.071 application, Prible correctly identify Carl Walker, Jr., and contacted him through Ward Larkin, a layperson and anti-death penalty advocate; however, Carl Walker, Jr., refused to communicate with Prible, and instructed Larkin to tell Prible not to contact him. *Id.*

Nor could Prible, at this point, use court-ordered process to compel testimony. Texas law does not authorize discovery on subsequent writs unless the TCCA finds they meet Article 11.071 § 5 requirements and remands to the district court for further proceedings. The district court waited years to transmit Prible's successor applications to the TCCA, and the TCCA found his applications did not meet Article 11.071 § 5 requirements when the convicting court finally did.

### 5. Prible's letter complaining of counsel's failures does not resolve the issues of cause and prejudice in Respondent's favor, such that a hearing is obviated.

Respondent contends that letters Prible wrote the convicting court, in which he claimed he told his attorneys, as early as 2003, all about Walker and the ring of informants, is record-based support for the state courts' determination that evidence underlying Prible's prosecutorial misconduct claims was available. *See* Dkt. 191, at 39. Therefore, according to Respondent,

Finding No. 22 cannot be rebutted.  But the TCCA did not make any findings about the veracity or credibility of Prible's letters (which are exaggerations typical of frustrated defendants about their counsel's supposed failings), so a presumption of correctness does not attach to their contents.  And even were a presumption to attach, Prible's assertions are falsified by substantial evidence in the record, such as state habeas counsel's testimony at the hearing demonstrating that Prible did not correctly identify or contact Walker until 2007, and the fact that Walker would not talk to Prible upon being contacted by Larkin on Prible's behalf.  *See* Dkt. 198, at 8-9.  Prible obviously was not privy during state court proceedings, up through 2008, to the information federal habeas counsel later obtained from Carl Walker, Jr., in 2009 and 2010.

If this Court cannot make a determination from the record developed so far whether Prible established cause for purposes of *Murray*, at the very least an evidentiary hearing is warranted in order to resolve contested, genuine issues of fact concerning (1) Prible's and his attorneys' awareness of information supporting his conspiracy theory, (2) Prible's identification of a source supporting his conspiracy theory, (3) and Prible's ability to develop evidence from this source (Carl Walker, Jr.) voluntarily or through court-ordered process.

**B.    An Evidentiary Hearing Should Be Convened to Determine Whether the "Manifest Injustice" Exception Entitles Prible to Merits Review of Defaulted Claims.**

Prible incorporates by reference the argument and evidence presented in his Fourth Amended Petition (Dkt. 181, specifically Section IX, at pp. 133-62), and in his MSJ Reply (Dkt. 198, specifically at pp. 31-36).

**1.    Standards governing availability of federal evidentiary hearing on *Schlup* claims.**

In *Schlup v. Delo,* 513 U.S. 298, 327 (1995), the  Supreme Court held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new

evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." 513 U.S. at 327. Although the *Schlup* standard is demanding, it does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt. When considering a *Schlup* "gateway" innocence claim in the context of a request for an evidentiary hearing, the district court need not "test the new evidence by a standard appropriate for deciding a motion for summary judgment," but rather may "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." 513 U.S. at 331-32.

Circuits considering whether the limitation on evidentiary hearings in § 2254(e)(2) applies to *Schlup* claims have overwhelmingly found that it does not. *See Cristin v. Brennan,* 281 F.3d 404, 417 (3d Cir. 2002) (holding that Congress did not intend § 2254(e)(2) restrictions on evidentiary hearings to apply to "hearings on excuses to procedural defaults"); *accord Sibley,* 377 F.3d at 1207, n.9; *McSwain v. Davis,* 287 Fed. Appx. 450, 462 (6th Cir. 2008) (unpublished); *Vineyard v. Dretke,* 125 Fed. Appx. 551, 554 (5th Cir. 2005) (unpublished); *see also Schlup,* 513 U.S. at 315 (explaining that a *Schlup* "claim of actual innocence is not itself a constitutional claim but instead a gateway" to the review of other constitutional claims). On the other hand, a district court's ability to make factual determinations is constrained by 28 U.S.C. § 2254(e)(1), which provides that any "determination of a factual issue made by a State court shall be presumed to be correct." Thus, when a state court has made a factual determination bearing

on the resolution of a *Schlup* issue, the petitioner bears the burden of rebutting this presumption by "clear and convincing evidence." *See Sharpe,* 593 F.3d at 378.

A petitioner's satisfaction of the *Schlup* standard does not require a showing that a fundamental miscarriage of justice caused or underlies each procedurally defaulted claim. *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012).  Rather, to satisfy the *Schlup* standard, a petitioner must instead demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.  *See Schlup*, 513 U.S. at 327.  If a petitioner passes through the *Schlup* gateway by satisfying this standard, the district court then considers, and reaches the merits of, all of the petitioner's procedurally defaulted claims.   Likewise, a court does not have to determine whether a hearing on "gateway innocence" is necessary with respect to each claim.[4]

### 2. Prible's evidence raises serious questions as to his innocence that can only be resolved through an evidentiary hearing.

In *Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012), the Fourth Circuit counseled that, when a witness providing the "only direct evidence implicating [a petitioner] in the murder-for-hire scheme" recants his testimony, this recantation "strongly suggests that an evidentiary hearing may be warranted."  *Id.,* citing *Wolfe v. Johnson,* 565 F.3d 140, 170 (4th Cir. 2009).  An evidentiary hearing may be necessary, for obvious reasons, such as to assess whether recantations are credible or whether "the circumstances surrounding the recantation[s] suggest

---

[4] In *House v. Bell*, 547 U.S. 518, 533 (2006), for example, a petitioner convicted of capital murder claimed that DNA evidence proved he had not committed the crime, and that his counsel's ineffectiveness had resulted in his conviction.  The Supreme Court examined the DNA evidence and witness testimony that House offered in support of his actual innocence of the crime and held that he had met the *Schlup* gateway innocence standard without any discussion of his counsel's performance at trial.  *See id.* at 555 ("House has satisfied the gateway standard set forth in Schlup and may proceed on remand with procedurally defaulted constitutional claims.").

[that they are] the result of coercion, bribery or misdealing." *Id.* at 169 (quoting *U.S. v. Johnson,* 487 F.2d 1278, 1279 (4th Cir. 1973)).

a. **Foreman's January 11, 2016, affidavit justifies an evidentiary hearing.**

Foreman's affidavit (Dkt. 181, Exhibit 87) constitutes evidence that the jury did not hear. The affidavit is therefore new evidence for the purposes of *Schlup*. The affidavit also is the type of reliable eyewitness evidence that *Schlup* commends. Respondent cannot contest the fact that Foreman was in a position to see and hear everything that the State's testifying witness said he himself saw and heard when he communicated with Prible. The very witness who places Foreman in a position to observe and monitor how Prible acted and what Prible said is Michael Beckcom, the testifying informant at trial. *See* 26 RR 23, 31, 35, 38, 49, and 54-56 (trial testimony of Michael Beckcom).

Respondent complains, though, that Foreman is not a credible affiant because he allegedly lied on other occasions. *See* Dkt. 191, at 88. But the source of this information is the lead prosecutor, who claims Foreman lied to her about what he heard from Prible and also about what he heard from Hermilo Herrero. *See* Dkt. 181, Exhibit 4A at 134. This prosecutor nevertheless wrote Foreman's AUSA on Foreman's behalf urging a reduction of Foreman's sentence for his cooperation in the Herrero case. *See* Dkt. 181, Exhibit 44. Complaints about Foreman's credibility, moreover, only underscore the need for an evidentiary hearing.

Respondent's main thrust is that Foreman's affidavit, even if true, does not meet *Schlup's* high standards for evidence of innocence. According to Respondent, the affidavit is not sufficiently exculpatory to justify the conclusion that, more likely than not, any juror who believed it would find Prible innocent. The two reasons Respondent gives for this supposed shortfall in evidentiary power are (1) that the affidavit only incrementally impeaches Beckcom,

*see* Dkt. 191 at 58, 60-61; and (2) that Beckcom's testimony merely "bolstered" the State's case relative to the combination of incriminating evidence supposedly showing that Prible sexually assaulted the victim proximate to her violent death, coupled with ballistic evidence.  *See* Dkt. 191 at 58.

Respondent mischaracterizes the impact of Foreman's affidavit.  At trial, defense counsel impeached Beckcom's **reputation** for truthfulness by cross-examining him about his criminal past, his history of lying under oath, and the deal he made with the State for his testimony. However, defense counsel could not otherwise contest Beckcom's account of Prible's supposed confession.  On the other hand, Foreman's affidavit does not impeach Beckcom's reputation at all, so it is not incremental to the impeachment at trial.  Instead, through specific descriptions of the communications between Beckcom, Prible, and himself, Foreman refutes: (1) Beckcom's testimony that Prible confessed, (2) Beckcom's testimony about the animus Prible supposedly displayed toward the victims, (3) Beckcom's testimony about Prible's alleged glorification of his military experience and Prible's supposed tale of how he used that experience to allegedly kill Tirado/Herrera and their children, and (4) Beckcom's account of Prible's allegedly impassioned confession, on November 24, 2001, to the murders.  *See* Dkt. 181, Exhibit 67 (Affidavit of Nathan Foreman).  Contrary to Beckcom, Foreman maintains that Prible never spoke badly about the victims, was sorrowful about their horrible fates, never bragged about using military prowess to "take out" the family, and did not confess at any time.  Foreman recalls that on the day Beckcom testified that Prible "confessed," Prible was not the frothing, impassioned confessor Beckcom testified he heard.  Instead, Prible was so inebriated that Foreman had to help him back toward his cell.  *Id.*

Respondent's argument that Beckcom's testimony was merely bolstering relative to evidence that Prible raped Tirado proximate to her murder fares worse than Respondent's "incremental impeachment" argument. To render Beckcom's testimony immaterial, the evidence of rape would have to be significant. But only William Watson's testimony in support of a short perimortem interval, were it valid, would make a solid case for non-consensual sex. And as the affidavit of Dr. Elizabeth Johnson (discussed in the next section) demonstrates, Watson's testimony was junk science, which should not have been admitted under *Daubert*.

The non-DNA evidence of sexual assault was not sufficient to support a charge. Two witnesses testified that Tirado once said Prible was "creepy" or "gave her the creeps." *See* 25 RR 116, 121-22. These hearsay reports are undermined by the fact that one of the witnesses, in a written statement given a few days after the murders, stated that Prible gave *her* the creeps, not that *Nilda* had expressed revulsion:

> *I have known Jeff Prible since we were in middle school. . . . I never spoke with him but I knew who he was and* **he gave me the creeps** *because of the way he looks.*[5]

It is also undermined by the fact that Tirado accepted a very personal gift of an expensive bathrobe from Prible shortly before her death. 26 RR 235.

Emphasizing this "creep" comment is all Respondent can do to attack Prible's statement to detectives, given right after the murders, saying that Tirado consensually performed oral sex on him in the bathroom that night. Respondent cannot show this narrative so much as conflicted with actual evidence, let alone was impossible or obviously false and therefore a cover-up. Instead, Respondent tries to show that a consensual sexual encounter was unlikely under the circumstances, because Steve was in the garage/game-room next to the den with the bathroom and there were children asleep in the house. *See* Dkt. 191 at 62. But the fact that small kids

---

[5] *See* Dkt. 181 at 261, Exhibit 116.

were asleep creates the opportunity for a tryst, rather than posing an obstacle, and Respondent neglects to mention that Herrero was inebriated from hours of heavy drinking and cocaine abuse.

Depositions have confirmed what the record shows, namely, that the case for rape was concocted for jury argument because there was no evidence to support it.  In closing, prosecutors insinuated that Prible was too unattractive for Tirado to have sex with.  *See* 28 RR 55.  This was baseless, inflammatory testimony by the State's attorneys, not evidence.  When deposed, the lead prosecutor's co-chair, Vic Wisner, admitted that the State was promoting a rape theory based on Prible's supposed unseemly appearance and personality.  *See* Dkt. 181, Exhibit 105 at 107. However, Wisner admitted that the State had no evidence about Tirado's or Herrera's sexual proclivities, preferences, or history, nor did they have any evidence about the type of relationship Herrera had with Tirado, whether an open one or not.  *Id*. at 95-96.

As for the ballistic evidence, it is irrelevant in the strict sense that it does not tend to make any fact more probable than not.  Respondent's representation that ballistics is a pillar of the State's case serves, therefore, to show how inconsequential the State's evidence, other than Beckcom's testimony, is.  When law enforcement searched Prible's **parents'** home, where Prible lived, they found guns and ammunition, none of which was confirmed to be Prible's, as opposed to his father's, and none of which was the murder weapon.  *See* Dkt. 191 at 8.  Respondent therefore has to fasten on the fact that police found a **magazine** for a Ruger P85 pistol, a type of nine millimeter gun, that could hold the **type** of ordnance used to kill Tirado and Herrera.  *See* Dkt. 191 at 8.  Respondent also stresses that investigators found a payment for nine-millimeter ammunition "consistent with the type used to kill Steve and Nilda."  *Id.*  But nine-millimeter ordnance is extraordinarily common and many a magazine can hold it, so the fact that Prible bought nine-millimeter bullets and had a magazine that could hold this ammunition is not

probative of murder.  Further undermining Respondent's argument is the fact that the State theorized, at trial, that Prible had discarded the murder weapon.  That would mean that Prible discarded the gun but kept the magazine, which makes little sense.

Furthermore, the bullets that killed the victims could have come from a .38 caliber projectile.[6]  The State, when it doctored the probable cause affidavit to support charges against Prible, added a line about Prible owning a .38 and a line about the ordnance recovered at the murder scene being "consistent with a .38 caliber."  *Id.*  Then the State redid the ballistics and announced that the slugs that killed the victims were "most consistent with bullets that you would typically find in nine millimeter cartridges as opposed to .38 or .357 cartridges."  *See* 24 RR 28.  The State changed the story from .38 caliber to "most consistent" with nine millimeter likely because Christine Bartolla was going to testify at trial that she bought the .38 off Prible before the murder and returned the weapon to his father years after the murder.  *See* 27 RR 46-48.

Finally, there is the problem that Respondent footnotes:  besides not being able to definitely say what type of bullet was found, the State could not determine what "exact type of gun was used" to shoot the victims. *See* Dkt. 191 at 8, n.4; *see also* 24 RR 164-67.  In sum, the ballistics evidence is irrelevant, except to someone who does not know the meaning of "consistent" in this context.  For this context, it means merely that one cannot, based on ballistics, definitely eliminate the possibility that Herrera and Tirado were shot with nine-millimeter ordnance that Prible purchased. In other words, while the evidence was not incriminating, it was not exculpatory either.  Of course one could not eliminate the possibility,

---

[6] *See* Dkt. 181 at Exhibit 15 (probable cause affidavit stating that "according to paperwork from Carter County, the defendant purchased this .38 weapon on Apr 11, 1998.  Your affiant states that he has submitted a projectile recovered from the scene in the living room next to where Neilda Tirado was found, to the Firearms Lab for comparison and learned from Mathew Clements Harris County Firearms Examiner, that the projectile is consistent with a 38 caliber.").

based on ballistics, that Steve and Nilda were shot by countless rounds of nine-millimeter ordnance purchased by thousands and thousands of other persons, or countless rounds of .38 caliber ordnance.  In the end, the ballistics evidence is not probative of Prible's guilt.  Therefore, to stress this evidence at trial as proof of guilt is to mislead the jury.  And to propose ballistics as important evidence now is to concede that the case for guilt, apart from Beckcom's testimony, was nugatory.

> **b.     Dr. Elizabeth Johnson's affidavit is new scientific evidence supporting innocence.**

Circuits agree that *Schlup* does not impose a requirement that evidence, in order to count as new, must have been undiscoverable even with due diligence.  However, circuits are split on whether evidence that a petitioner's counsel was aware of but did not present is "new" under *Schlup*.  In *Amrine v. Bowersox*, 238 F.3d 1023, 1028 (8th Cir. 2001), the Eighth Circuit held that discovered evidence that trial counsel did not present is not "new."   All other Circuits that have decided the issue have done so differently, concluding that evidence is new under *Schlup* so long as it was not presented.  *See Gomez v. Jaimet,* 350 F.3d 673, 679-80 (7th Cir. 2003); *Griffin v. Johnson,* 350 F.3d 956, 963 (9th Cir. 2003); *Riva v. Ficco,* 803 F.3d 77, 84 (1st Cir. 2015); *Cleveland v. Bradshaw,* 693 F.3d 626, 633 (6th Cir. 2012); *Rivas v. Fischer,* 687 F.3d 514, 543, 546-47 (2d Cir. 2012).  Moreover, the Supreme Court, in *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324), affirmed that "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence **not presented** at trial."  In *Reeves v. Fayette SCI,* --- F.3d ---- (3rd Cir. 2018), the Third Circuit sided with the First, Second, Sixth, Seventh, and Ninth Circuits' determinations that evidence not presented at trial is "new."   However, the *Reeves* holding was limited to situations in which habeas petitioners allege their attorneys were ineffective because they did not present evidence they had or could have discovered.  The Court

of Appeals for the Fifth Circuit has acknowledged but not weighed in on the circuit split. *See Fratta v. Davis*, 889 F.3d 225, 232 (5th Cir. 2018). The Eleventh Circuit also stands in abeyance. *See Rozzelle v. Sec'y, Fla Dept. of Corr.*, 672 F.3d 1000, 1018, n.21 (11th Cir. 2012) (refraining from reaching the issue of whether a petitioner's evidence that was available at trial but was not presented should be considered "new" for purposes of *Schlup*).

> **i.    An evidentiary hearing is needed to resolve the factual dispute regarding whether Prible's post-conviction DNA expert's report is new evidence of innocence under *Schlup*.**

Respondent takes the position that because Prible sponsored opinion testimony on the same subject that Dr. Johnson addresses in her expert report, Dr. Johnson's expert report is not new. *See* Dkt. 191 at 61, 145. Respondent also points to the fact that two witnesses (former Harris County Medical Examiner Joye M. Carter and Dr. Robert Benjamin) at trial questioned Watson's conclusions. However, neither witness presented evidence, as Dr. Johnson does, exposing Watson's opinion as scientifically baseless,[7] nor did Carter or Benjamin refer to controlled, scientifically valid experiments that falsify Watson's opinion. Dr. Johnson's report contains an analysis of scientific literature on the persistence of spermatozoa in the oral cavity,[8] which neither Carter nor Benjamin performed. Dr. Carter was not aware of scientific literature on the subject, nor was Dr. Benjamin. *See* 23 RR 67 (Carter: "There's not much literature on that area. There's been more focus on the vaginal area."); 27 RR 122 (Benjamin: "Q. Has that research been done? A. Not that I know of."). Dr. Johnson also performed a quantitative analysis of data documenting the amount of semen and number of spermatozoa, which neither Carter nor Benjamin did.[9] Dr. Johnson then drew forensic conclusions from facts in this case against that scientific background. Unlike Carter and Benjamin, Dr. Johnson's report also

---

[7] *See* Dkt. 181 at 255-57, and at Exhibit 54 ¶ 16 (Affidavit of Elizabeth Johnson, Ph.D.).
[8] *Id.* at ¶ 19.
[9] *Id.* at ¶ 16.

contests the data and methods used by Watson to estimate the perimortem interval between oral sex and death,[10] and shows that his conclusions about the quantity of sperm and its significance were wrong.[11]   Finally, Dr. Johnson's report, unlike the experts at trial, showed why a full male profile could be developed from an oral swab hours after oral sex, and she confirmed that she herself had developed a male profile from an oral swab.[12]   In the end, whether Dr. Johnson's scientific opinion is substantially different from Carter's and Benjamin's is a question of fact that this Court may find necessary to resolve through an evidentiary hearing.

> ii.   **A hearing is necessary to determine whether Watson's testimony about the perimortem interval is even admissible.**

The conflicting reports and testimony of Dr. Johnson and Watson require a determination by this Court of which of the two is based on reliable, scientific facts and principles.   Based on Dr. Johnson's affidavit,[13] Prible contends that Watson's opinion testimony does not satisfy criteria for the admission of expert opinion testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).   *See* Dkt. 191 at 152.   The *Daubert* analysis requires the Court to determine whether the expert testimony is reliable.   *Id.* at 589 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").   Whether the proffered opinion is reliable is an ultimate fact question not susceptible to direct proof, so it must be inferred from certain circumstantial facts, which the Supreme Court has referred to as "factors."   *See, e.g., Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 153 (1999) (referring to the indicia of evidentiary reliability suggested in *Daubert* as "the specific factors identified in Daubert" and "Daubert's specific factors").

---

[10] *Id.* at ¶¶ 17-18.
[11] *Id.*
[12] *Id.*
[13] *Id.* at ¶ 20.

iii.    **A hearing is justified to assess the materiality of Dr. Johnson's report in relationship to the evidence that the report would have undermined and eliminated at trial.**

Respondent absolutely and correctly encapsulates the importance of Watson's expert testimony, and the strategy into which the State fit that testimony, as follows:

> "[It] strains credibility to suggest that Prible raped Nilda, but someone else came along an hour later and set fire to her body. Thus, to accept Prible's protestations of innocence, the jury would have to first find the sex consensual. But there is no credible evidence of this."

*See* Respondent's Motion for Summary Judgment, Dkt. 191, at 62. Watson's testimony, as Respondent recognizes, turned the burden of proof on Prible, so that in order to be acquitted of murder, Prible had to prove himself innocent of rape. However, Prible could not prove his innocence of rape because of the perimortem interval between sex and death that Watson's testimony supported, and the State used, to create a circular, but deadly, argument.

Watson's expert testimony was used to establish that the time frame between sex and death was short, an hour maximum, and was consistent with death immediately following "oral copulation."[14]  As Respondent argues, that testimony, if believed, made it inconceivable that anyone but Prible killed the victim and set her body on fire. It "strains credibility" to maintain that a sexual encounter that a defendant had with someone he killed and tried to immolate soon thereafter was consensual. Consequently, Watson's testimony, if believed, not only proved that the sex occurred moments before the murder, but also simultaneously showed that Prible sexually assaulted the victim.

Prible required expert testimony, such as Dr. Johnson's, not only to undermine Watson's testimony, but to eliminate it as scientifically baseless, unsupported by the literature, and controverted by actual, controlled scientific studies. The critical aspect of Watson's

---

[14] *See* Dkt. 181 at 47-48, citing, *inter alia*, 24 RR 101-103 (Watson's testimony) and 28 RR 10, 11-12 (State's closing argument).

testimony traded on his status as a DNA expert.  According to Watson, it was his ability to develop a "full male [DNA] profile" form the oral swab that supported his estimate of a short perimortem interval.  21 RR 82-83; 28 RR 12-13, 55-56, 58.  He also remarked that what he considered to be the large number of spermatozoa found in the case supported a short perimortem interval.  Dr. Johnson's report not only rejects Watson's testimony as scientifically invalid, it shows that his representations are false and misleading.  Through careful calculations that neither Watson, Carter, nor Benjamin performed, Dr. Johnson demonstrated that the quantity of seminal fluid, and corresponding number of spermatozoa, was remarkably low in this case, which one would not expect if a victim died immediately after performing oral sex.[15]

Proof of sexual assault implied by a short perimortem interval between fellatio and death was so extraordinarily incriminating, according to Respondent, that it rendered Beckcom's testimony about Prible's alleged confession insubstantial.  When deposed, both prosecutors took the same position.[16]  Dr. Johnson's report, to the very extent it demonstrates the invalidity of Watson's methods and conclusions, is correspondingly exculpatory.  In order to fully assess the impact that Dr. Johnson's expert opinion would have on any rational jury, this Court should convene a *Schlup* hearing to assess how testimony based on Dr. Johnson's report would affect a jury directly, and also how that testimony would impact a jury's reception of Watson's now controverted testimony.

**B.      An Evidentiary Hearing Should Be Convened on Equitable Tolling.**

Respondent raises AEDPA's statute of limitations as a defense to Claims 3, 4, 5, 7, 15, and 16.  *See* Dkt. 191 at 50, 164, 179.  For the reasons set forth in Prible's MSJ Reply, the "relation back" doctrine saves Claims 3, 4, 5, and 7 from dismissal based on limitations.  *See*

---

[15] *See* Dkt. 181, Exhibit 54.
[16] *See* Dkt. 181, Exhibit 105 at 74 (Wisner deposition).

Dkt. 181 at 5, 14-15, 42.  Furthermore, the Supreme Court, in *McQuiggins v. Perkins*, 569 U.S. 383 (2013), held that a demonstration of gateway innocence, as defined in *Schlup,* is grounds for equitably tolling AEDPA's one-year limitations period.  Hence, this Court may either equitably toll limitations with respect to all claims to which Respondent raises this defense, or else convene a hearing for reasons identical to those that Prible marshals in support of a hearing on manifest injustice, herein, and in his Fourth Amended Petition and MSJ Reply.

**C.    An Evidentiary Hearing is Warranted to Determine if *Trevino v. Thaler* Excuses Procedural Default of Claim 7 (the *Massiah* IAC claim).**

Prible incorporates by reference the evidence and argument presented in his Fourth Amended Petition (Dkt. 181 at 215-19) and MSJ Reply (Dkt. 198 at 50-52).

Respondent argues there was no evidence that Beckcom was an agent of the State, so trial counsel was not ineffective for failing to object to Beckcom's testimony at trial.  Likewise, Respondent argues, Prible's state habeas counsel was not ineffective for failing to raise, in state habeas proceedings, the ineffectiveness of trial counsel for failing to object to Beckcom's trial testimony.  *See* Dkt. 191 at 100-101.  However, trial counsel knew or should have known that Prible was in FCI Beaumont Medium briefly from July 25, 2001 to November 29, 2001.  *See* Dkt. 191, Exhibit 17 (Prible's BOP Housing and Transfer Records).  Trial counsel was appointed September 28, 2001.  *See* Dkt. 181, Exhibit 113.  Consequently, counsel should have realized Prible was unrepresented by counsel for only one month while in the Medium.  Counsel also knew before trial that the State was going to use an FCI Beaumont informant.  The time frame made it highly likely that any informant would have contacted Prible after he was represented.

Trial counsel also was provided with Beckcom's written statement pretrial.  *See* 2 RR 7. The lead prosecutor also agreed to tell trial counsel before trial of the circumstances under which Beckcom contacted her and the *quid pro quo* for testimony they arranged at the time.  *See* 2 RR

8-9.  The lead prosecutor stated in open court that Beckcom contacted her in early October 2001.
20 RR 10-12.  At trial Beckcom confirmed that a deal was cut in early October 2001, after trial
counsel had been appointed, for Beckcom to get specific information about the crime from
Prible.  26 RR 25-26.  Beckcom testified that he, along with Foreman, only then began to solicit
information about the crime from Prible, until Prible allegedly confessed on November 24, 2001.
*Id.*  Beckcom said that prior to the October *quid pro quo* he "had heard of the case just briefly,
something about a guy coming from the Low charged with murder," but "really did not get too
much information on it."  26 RR 37.  The foregoing sequence of events and the sources
documenting them were all available, also, to state habeas counsel.

*Massiah* is a seminal Supreme Court case that extended important Sixth Amendment
protections against the use of jailhouse informants in particular.  Eliminating the testimony of an
informant such as Beckcom would be a central objective of any reasonable trial counsel.  Trial
counsel, however, failed to request a *Massiah* hearing, and failed to object at trial even after
Beckcom's testimony clearly raised the question of whether he was induced by a *quid pro quo* to
solicit information from a represented client.  State habeas counsel, for his part, failed to raise a
related IAC claim.

The only reason not to convene an evidentiary hearing is that the record permits this
Court to grant relief, without further process, upon finding that trial counsel failed to exclude
Beckcom's testimony by invoking *Massiah*, and upon finding that state habeas counsel
ineffectively failed to raise a Massiah IAC claim.  Otherwise, Prible's factual allegations meet
the thresholds set in *Trevino v Thaler*, 569 U.S. 413 (2013), and justify an evidentiary hearing.

## IV.
## AN EVIDENTIARY HEARING SHOULD BE CONVENED ON PRIBLE'S SUBSTANTIVE CLAIMS FOR RELIEF.

For reasons set forth in Prible's Fourth Amended Petition (Dkt. 181) and MSJ Reply (Dkt. 198), the evidence and argument of which Prible incorporates by reference, Prible also requests an evidentiary hearing on substantive Claims 1-12, and 14-16, in his Fourth Amended Petition.

### PRAYER FOR RELIEF

WHEREFORE, Ronald Jeffrey Prible, Jr., respectfully requests that this Court:

(1)     grant him an evidentiary hearing at which he may present evidence in support of the claims presented in his Fourth Amended Petition;

(2)     grant him an evidentiary hearing at which he may present evidence in support of his arguments against procedural default and other procedural defenses that Respondent has raised and may raise;

(3)     issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death; and

(4)     grant such other relief as law and justice require.

Respectfully submitted,

REED & SCARDINO, L.L.P.


By:     */s/ Gretchen N. Scardino*
         Gretchen N. Scardino
         State Bar No. 24037170
         P.O. Box 1567
         Austin, Texas 78767
         Telephone:  (512) 659-4470
         gscardino@reedscardino.com

24

Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
HILDER & ASSOCIATES, P.C.
819 Lovett Boulevard
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF CONFERENCE

On August 7, 2018, I conferred with counsel for Respondent, Tina Miranda, and she indicated that Respondent opposes this motion.

*/s/ Gretchen N. Scardino*
Gretchen N. Scardino

## CERTIFICATE OF SERVICE

On August 8, 2018, a copy of Petitioner's Opposed Third Motion for an Evidentiary Hearing was served upon Respondent by ECF filing.

*/s/ Gretchen N. Scardino*
Gretchen N. Scardino