1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION

3    _____
                                            )
4    RONALD JEFFREY PRIBLE,                  )
              Petitioner,                    )
5                                            ) CIVIL ACTION NO.
     VS.                                     ) 4:09-CV-1896
6                                            )
     LORIE DAVIS,                            ) 9:02 A.M.
7             Respondent.                    )
     _____)
8

9                    EVIDENTIARY HEARING
           BEFORE THE HONORABLE KEITH P. ELLISON
10                    APRIL 30, 2019
                       VOLUME 2
11
     APPEARANCES:
12
     **FOR PETITIONER:**
13   MS. GRETCHEN N. SCARDINO
     Scardino L.L.P.
14   401 Congress Avenue, Suite 1540
     Austin, Texas  78701
15   (512)659-4470

16   MR. JAMES GREGORY RYTTING
     Hilder & Associates, P.C.
17   819 Lovett Boulevard
     Houston, Texas  77006
18   (713)655-9111

19   **FOR RESPONDENT:**
     MS. TINA DETTMER MIRANDA
20   MR. GEORGE A. D'HEMECOURT
     Office of the Attorney General
21   Criminal Appeals Division
     P.O. Box 12548
22   Capitol Station
     Austin, Texas  78711
23   (512)936-1400

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25

APPEARANCES CONTINUED:

**COURT REPORTER:**
Heather Alcaraz, CSR, FCRR, RMR
Official Court Reporter
515 Rusk, Suite 8004
Houston, Texas  77002
(713)250-5584

1

# I N D E X

2

EVIDENTIARY HEARING – VOL. 2

3

APRIL 30, 2019                                                    PAGE

4

<u>PETITIONER'S WITNESSES:</u>

5

**KELLY SIEGLER (VIA DEPOSITION)**.....................      5

6

**TERRY GAISER**
Direct Examination by Ms. Scardino.................    154

7

Cross-Examination by Ms. Miranda..................    193

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

09:02:11   1          *(Call to Order of the Court.)*

09:02:12   2                **THE COURT:**  Thank you.  Please be seated.

09:02:16   3          I was pleased to hear from the director -- the

           4   director's counsel concerning Ms. Siegler.

09:02:24   5          Do you -- have you received that -- that -- those

           6   pleadings?

09:02:28   7                **MS. SCARDINO:**  Yes, Your Honor.  I've started

           8   reviewing them.  Ms. Miranda just provided us with a copy, and

           9   she contacted me last night to tell me about her conversation.

09:02:39  10                **THE COURT:**  I'm happy we made contact.  I'm happy that

          11   you're willing to take the lead in working out the technology.

          12   Is there anything we need to discuss now, or is it -- should I

          13   assume that things will be -- will proceed as -- as -- as

          14   prognosis suggests?

09:03:00  15                **MS. MIRANDA:**  There are a couple of items, if we can

          16   take them up now, Your Honor, with respect to her testimony.

          17   And one of them -- I mean, we're going to work on the

          18   technology, but with respect to how we go from where we are now

          19   to where we get with her, I believe they anticipate finishing up

          20   their case today, potentially.

09:03:19  21          Is that correct?

09:03:20  22                **MS. SCARDINO:**  Yes, Your Honor.

09:03:21  23                **MS. MIRANDA:**  And then we have deposition designations

          24   for the same witnesses that testified, and we weren't able,

          25   unfortunately, with the timing to get them all together.

*Video Deposition of Kelly Siegler*

09:03:31  1        **THE COURT:**  That's all right.  That's okay.

09:03:32  2        **MS. MIRANDA:**  So our designations overlap

3  substantially.  So there's a lot of repeats, but what we wanted

4  to propose to the Court -- I believe they're planning to play

5  Ms. Siegler's designations today, and then they would rest their

6  case, and then in the interim between now and Thursday, we could

7  edit ours down to just the portions that don't overlap so that

8  we don't have to play those all over again for the Court.

09:03:55  9        **THE COURT:**  That sounds like a plan.

09:03:56 10        **MS. MIRANDA:**  Okay.  And so then if we could have that

11  time, then we would finish with their case, and then we would

12  reconvene on Thursday, play those, and then take

13  Ms. Siegler's --

09:04:05 14        **THE COURT:**  Works for me.

09:04:06 15        **MS. MIRANDA:**  -- live testimony.

09:04:07 16        **MS. SCARDINO:**  We do have one more witness after

17  Ms. Siegler's video this morning, and that's Mr. Gaiser, but we

18  anticipate finishing up early afternoon.

09:04:16 19        **THE COURT:**  Good.  Okay.  Good.  Good.  This is very

20  promising.

09:04:19 21        You ready to call Ms. Siegler by deposition?

09:04:22 22        **MS. SCARDINO:**  Yes, Your Honor.

09:04:22 23        *(Video deposition of Kelly Siegler played as follows.)*

09:04:32 24                              **EXAMINATION**

09:04:32 25  Q    So from approximately 1989 to 2008, you worked very closely

*Video Deposition of Kelly Siegler*

1  with Mr. Bonds on a lot of your cases?

09:04:43 2  A  It was off and on.  He would be transferred around, and I

3  would be transferred around.  So it wasn't consistently the

4  whole time, no.

09:04:49 5  Q  Okay.  When you did work on a case together, you would

6  oftentimes accompany each other to witness interviews, correct?

09:04:59 7  A  Define "often."

09:05:00 8  Q  Well, more often than not?

09:05:02 9  A  No.

09:05:03 10  Q  No?  How often would he accompany you to a witness

11  interview?

09:05:10 12  A  I did most of my witness interviews by myself.

09:05:13 13  Q  You did?

09:05:14 14  A  Yeah.

09:05:14 15  Q  And would you take notes when you did those witness

16  interviews?

09:05:18 17  A  No.  I didn't have time.  I was talking.

09:05:21 18  Q  You didn't take any notes after you left the interview to

19  remember what you had spoken with the witness about?

09:05:27 20  A  Maybe sometimes.

09:05:29 21  Q  But most of all -- most of the time, you just kept it up in

22  your head?

09:05:32 23  A  I tried.

09:05:34 24  Q  Well, you're very detail oriented, right?

09:05:37 25  A  I hope most lawyers are.

*Video Deposition of Kelly Siegler*

09:05:39 1  **Q**   And details matter in circumstantial cases a lot, right?

09:05:43 2  **A**   Yes.

09:05:45 3  **Q**   You have to be meticulous, thorough, organized to solve

4  these cold cases, right?

09:05:51 5  **A**   I think any case you handle as a prosecutor requires the

6  same things.

09:05:56 7  **Q**   So is that a yes?

09:05:58 8  **A**   As I said, I think all cases we work on require the same

9  things.

09:06:02 10  **Q**   Okay.  Require you to be meticulous, thorough and organized,

11  right?

09:06:08 12  **A**   On any case.

09:06:09 13  **Q**   Okay.  And in the Temple case, you testified that you won

14  circumstantial -- circumstantial cases by paying attention to

15  detail.  That's a true statement, right?

09:06:21 16  **A**   Yes.

09:06:22 17  **Q**   Okay.  And in the Temple case, you testified that

18  inconsistent statements of material witnesses fell under Brady,

19  and a witness is material if he gets called to testify at trial.

20  Do you recall that?

09:06:38 21  **A**   No.

09:06:39 22  **Q**   You don't recall making that statement?

09:06:40 23  **A**   No.

09:06:41 24  **Q**   Okay.  We can come back to it, then, in a moment.

09:06:43 25        Okay.  Going on to the offense reports, what was the policy

*Video Deposition of Kelly Siegler*

1  about disclosing offense reports to the defense back in

2  1999-2002?

09:07:01  3  **A**   The office had an open file policy.

09:07:04  4  **Q**   And what does that mean?

09:07:07  5  **A**   For the most part, offense reports were open for the defense

6  to read.

09:07:12  7  **Q**   Okay.  So let's break that down.  "For the most part," when

8  were they not available for the offense to read -- the defense

9  to read?

09:07:20 10  **A**   What does that have to do with the issue we're here for

11  today having to do with the ring of snitches that you claim I

12  manipulated?

09:07:28 13          **MS. SCARDINO:**  Objection, nonresponsive.

09:07:29 14  **BY MS. SCARDINO:**

09:07:31 15  **Q**   I'd like to talk -- ask you again:  What did you mean for

16  the most part these offense reports were available for the

17  defense to read?

09:07:39 18  **A**   I'm not going to answer questions about every case I ever

19  handled.

09:07:43 20  **Q**   Okay.

09:07:43 21  **A**   That's not what this deposition is about.

09:07:45 22  **Q**   So are you refusing to answer my question?

09:07:47 23  **A**   Yes.

09:07:47 24          **MR. DOYLE:**  What she wants to know --

09:07:48 25  **Q**   Now, I'm going to ask this question about the offense

*Video Deposition of Kelly Siegler*

1    reports.  Going back to it, you said, quote, for the most part,

2    the defense was able to see the offense reports.

09:07:57  3       What did you mean, "For the most part"?

09:08:00  4    A   It was an open file policy.

09:08:02  5    Q   Okay.  But you said, "For the most part."  So that means not

6    all offense reports were given to them, correct?

09:08:10  7    A   Correct.

09:08:11  8    Q   Okay.  If the witness -- if the investigator did not testify

9    in the trial, were you obligated to turn those offense reports

10   over to the defense?

09:08:24 11    A   I don't understand what that has to do with the Jeffrey

12   Prible case and the ring of snitches that you-all have alleged

13   that I orchestrated.

09:08:32 14       I'm not going to ask -- I'm not going to answer questions

15   about every case --

09:08:36 16    Q   I asked the question.  Are you going to answer it or not?

09:08:38 17    A   What was the question?

09:08:39 18    Q   "For the most part" -- you said, "For the most part, the

19   defense was able to see the offense reports."

09:08:45 20       What did you mean, "For the most part"?  When were they not

21   able to see the offense reports?

09:08:53 22    A   Well, the most obvious exception to seeing the offense

23   report was if an examining trial was requested.

09:09:00 24    Q   Okay.  And was an examining trial requested in this case?

09:09:03 25    A   In the Jeffrey Prible case?

*Video Deposition of Kelly Siegler*

09:09:05  1    Q    Right.   Yes.

09:09:06  2    A    I don't think so.

09:09:07  3    Q    Okay.   Were the offense reports in this matter of those

4    investigators [sic] that did not testify at Mr. Prible's trial,

5    were those offense reports given to Mr. Prible's defense

6    attorneys?

09:09:23  7    A    Yes.

09:09:23  8    Q    When?

09:09:26  9    A    Whenever they came to look at the file.

09:09:28  10   Q    And when an attorney did come and look at the file, were you

11   in the room with them when they looked at the file?

09:09:37  12   A    Sometimes I was.   Sometimes I wasn't.

09:09:39  13   Q    Okay.   And you'll agree with me that when you say "open

14   file," ultimately, the prosecutor is the only person that knows

15   what is in the entire file, correct?

09:09:52  16   A    Correct.

09:09:54  17   Q    Okay.   And if you had removed certain things from the file,

18   there would be no way for the defense to know that unless you

19   told them that, correct?

09:10:06  20   A    Correct.

09:10:11  21   Q    What was your policy regarding the production of -- or the

22   disclosure of written witness statements to the defense?

09:10:21  23   A    In the Prible case?

09:10:22  24   Q    Yes, in the Prible case.

09:10:24  25   A    The defense got to see it.

*Video Deposition of Kelly Siegler*

09:10:26  1    Q    When did they see it?

09:10:28  2    A    Whenever they came to look at the file.

09:10:30  3    Q    So this was a different situation than in the Temple case

4    where you didn't present the -- or offer -- or disclose the

5    written witness statements until after the witness had

6    testified; is that correct?

09:10:44  7    A    Yes.

09:10:45  8    Q    Okay.  And it was different because the Temple case was an

9    examining trial?

09:10:50 10    A    Yes.

09:10:50 11    Q    And so you -- you had different rules that you went by if it

12    was an examining trial versus just a normal trial?

09:10:58 13    A    According to the office policy, yes.

09:11:01 14    Q    What was the DA's policy regarding the disclosure of Brady

15    evidence that came to light after a trial was over?

09:11:12 16    A    The same as it was before.  If you heard about Brady

17    information, you disclosed it.

09:11:18 18    Q    Even after the trial was over, you needed to make that

19    disclosure to defense counsel?

09:11:22 20    A    Yes.

09:11:22 21    Q    Were you at the DA's office during the state habeas

22    proceeding for Mr. Temple?

09:11:27 23    A    What years?

09:11:28 24         MR. DOYLE:  Prible.

09:11:30 25    BY MS. SCARDINO:

*Video Deposition of Kelly Siegler*

09:11:31 1   Q   I'm sorry.  Mr. Prible.

09:11:35 2   A   What were the years of that proceeding?

09:11:37 3   Q   I believe 2004, 2005.

09:11:39 4   A   I was still at the office.  Was I involved in it, I was not

5   in appellate.

09:11:44 6   Q   Okay.  But you would have been consulted by the appellate

7   group prior to them appearing at the state habeas hearing?

09:11:52 8   A   I never appeared at any state habeas hearing.

09:11:54 9   Q   I'm sorry.  Let me -- that might have been confusing.

09:11:58 10       The people in the appellate group at the DA's office that

11   were prepping for the state habeas hearing, they would have

12   consulted you, as the trial attorney on that case, prior to that

13   hearing, correct?

09:12:11 14   A   I would hope so.

09:12:13 15   Q   Right.  I mean, that -- that would make sense that they

16   would come to you since you had --

09:12:17 17   A   They didn't always.

09:12:17 18   Q   -- been the person that tried the case?

09:12:19 19   A   They didn't always.

09:12:19 20   Q   Did they in this case?

09:12:21 21   A   I don't remember.

09:12:22 22   Q   Exhibit 154 is excerpts from that policy manual.  And I'll

23   represent to you that this policy manual was produced by Brian

24   Rose in response to a Public Information Act request to me as

25   the manual that would have been in place in 2001 and 2002.

*Video Deposition of Kelly Siegler*

09:12:51  1      And if you go to page 1 -- or page 25, so it's

2  Exhibit 154-25 --

09:12:59  3  **A**   Not all of 2001 because the date is August 2001.  So there

4  could have been something different at some part -- point in

5  2001.

09:13:08  6  **Q**   So do you disagree with Mr. Rose's representation that this

7  is the policy manual that was in effect in 2001 and 2002?

09:13:17  8  **A**   Well, from the bottom of the page, it says this is effective

9  August 16 of 2001.  So more than half of 2001, some of these

10  things could have been different.

09:13:26 11  **Q**   Okay.  And you tried Mr. Prible's case in 2002?

09:13:29 12  **A**   Yes.

09:13:30 13  **Q**   Okay.  So if you go to page -- Exhibit 154-25 -- and I know

14  that your eyesight is -- is recovering, so I can read this to

15  you.  It says, quote, a prosecuting attorney should not impede

16  defense counsel's access to witnesses but may accompany and

17  assist witnesses in any interview with defense counsel.

09:13:52 18      Now, if a prosecutor does not reveal the existence of a

19  witness, that would be an impediment, right?

09:13:59 20  **A**   Not necessarily.

09:14:01 21  **Q**   Well, how would the defense attorney know about a witness if

22  the prosecutor didn't disclose the identity of that witness?

09:14:08 23  **A**   I don't know who the witness is.

09:14:09 24  **Q**   Okay.  How about a jailhouse informant that came to you to

25  talk with you about a case?  There's no way a defense attorney

*Video Deposition of Kelly Siegler*

1   could have known that unless you had disclosed that, correct?

09:14:19  2   **A**   I think that answer is going to always depend on the

3   circumstances of a given case.

09:14:23  4   **Q**   Okay.  I just gave you the circumstances.  What's your

5   answer with those circumstances?

09:14:28  6   **A**   The same.

09:14:29  7   **Q**   So you can't answer yes or no?

09:14:31  8        If a prosecutor does not reveal the existence of a witness,

9   that would be an impediment.  That's my -- my premise that I'm

10   asking you the question, and the -- the cons- -- the

11   circumstances are if a jailhouse informant reached out to you,

12   Kelly Siegler, to talk with you about a case, the defense

13   attorney would have no way of knowing about that witness unless

14   you disclosed the identity of that witness to them; isn't that

15   correct?

09:14:59 16   **A**   What's your question?

09:15:01 17   **Q**   That was my question.  Can you answer that question?

09:15:04 18   **A**   I cannot.

09:15:05 19   **Q**   You can't answer that?

09:15:06 20   **A**   I don't think that's necessarily always going to be an

21   impediment.

09:15:10 22   **Q**   Okay.  If a jailhouse informant -- in this case, Nathan

23   Foreman is one -- came to you and said he had information about

24   Prible's case, the defense attorney would have no way of knowing

25   that that witness came to you with that information unless you

*Video Deposition of Kelly Siegler*

1    disclosed that to the defense attorney, wouldn't you agree?

09:15:33  2    **A**   No, I don't agree with that statement.

09:15:37  3    **Q**   Okay.  Moving on, also on Exhibit 154-25, it says, "A

4    prosecuting attorney shall provide information known to the

5    prosecuting attorney which is subject to a voluntary discovery

6    agreement or Court order throughout the case."

09:15:55  7        Now, this doesn't look like an open file policy to me.

09:15:59  8    **A**   What doesn't?

09:16:00  9    **Q**   This -- this statement saying that the prosecuting attorney

10    shall provide information, which is subject to a voluntary

11    discovery agreement or a Court order.  Is that different from an

12    open file policy?  Right?

09:16:12 13    **A**   I didn't write the office manual.  I have no idea what they

14    meant when they wrote it.

09:16:16 15    **Q**   Okay.  But you'll agree that this statement does not

16    describe an open file policy, right?

09:16:21 17    **A**   I don't agree with that.  I don't know what they meant when

18    they wrote this.

09:16:25 19    **Q**   Did you ever enter into a voluntary discovery agreement with

20    defense counsel?

09:16:29 21    **A**   Orally voluntarily all the time.

09:16:32 22    **Q**   Okay.  But nothing in writing?

09:16:34 23    **A**   I might have had a few.

09:16:37 24    **Q**   Okay.  When a defense attorney would come and look at the

25    file, would you take notes of what was shown to that defense

*Video Deposition of Kelly Siegler*

1    attorney?

09:16:46   2    **A**    Sometimes.

09:16:47   3    **Q**    Did you in this case?

09:16:48   4    **A**    In the Prible case?

09:16:49   5    **Q**    Uh-huh.

09:16:51   6    **A**    No.

09:16:51   7    **Q**    Okay.  Going back on Exhibit 154-25, it also says, "A

8    prosecuting attorney shall participate in good faith in pretrial

9    discovery.  Absent voluntary discovery, the prosecuting attorney

10   shall diligently and timely divulge matters as may be ordered by

11   the Court, end quote.

09:17:12   12        Now, again, there's no mention of an open file policy in

13   that paragraph, right?

09:17:16   14   **A**    Not in this paragraph, no.

09:17:20   15   **Q**    What is a timely divulging of information, in your mind?

09:17:26   16   **A**    I don't know.  I didn't write that paragraph.

09:17:28   17   **Q**    Okay.  You -- let's -- let's talk about your understanding

18   of the requirement that you timely disclose Brady -- Brady

19   information.  What is your understanding of the timely

20   disclosure requirement?

09:17:45   21   **A**    To make good faith reasonable efforts to disclose.

09:17:49   22   **Q**    And at what point are you required to disclose Brady

23   information?

09:17:53   24   **A**    That depends on the circumstances.

09:17:56   25        This is 2017.  I have looked at, investigated, worked on,

*Video Deposition of Kelly Siegler*

1  worked questions up for, tried, given advice on, talked about

2  and gone over maybe 500 murder cases since this one.

09:18:16  3  Q   Okay.

09:18:17  4  A   That's a lot.

09:18:18  5  Q   And so you didn't review any of your materials from this

6  case in order to prepare yourself for this deposition today?

09:18:26  7  A   No.  I don't have them.

09:18:28  8  Q   Okay.  Well, was there anything preventing you from getting

9  the work product file and the other -- the rest of the file from

10  the DA's office prior to your deposition?

09:18:38  11  A   I don't have them.  I don't work there any more.

09:18:41  12  Q   I'm asking -- I understand that.  I'm asking you:  Was there

13  anything preventing you from asking the district attorney's

14  office to allow you to see the file prior to your deposition

15  today?

09:18:50  16  A   No one told me to do that.

09:18:53  17  Q   And -- my question was:  Was there anything preventing you

18  from making a phone call to the DA's office to ask if you could

19  see this file prior to your deposition today?

09:19:03  20  A   No.

09:19:04  21  Q   Mr. Prible, I'll represent to you, he gave his clothes to

22  the detectives that day so they could test for trace evidence,

23  and there was no blood, no Kutzit -- that's the accelerant used

24  to start the fire -- no hair, no burns, no soot, no fibers of

25  any kind connecting him to the murder scene.  You don't recall

*Video Deposition of Kelly Siegler*

1    that?

09:19:31  2    **A**    Anything that you would represent to me, I can't agree to.

3    I've read your petition.  It's full of lies.  So whatever you

4    might tell me you're representing to me, I really need to see

5    for myself.  And I don't remember all the details of the case.

09:19:47  6    **Q**    Okay.  When did you get involved in this case?

09:19:58  7    **A**    2001, maybe 2000.  I don't remember.

09:20:03  8    **Q**    Okay.  So the Harris County Sheriff's Office had interviewed

9    all witnesses and submitted all of their reports in 1999, and

10    the investigation was completed by 1999.  Do you remember that?

09:20:15  11   **A**    I wasn't involved in 1999, and I disagree with that.

09:20:19  12   **Q**    You disagree with that?

09:20:20  13   **A**    Yes.

09:20:21  14   **Q**    Okay.  What was done post 1999?

09:20:23  15   **A**    That's when I got the case.

09:20:25  16   **Q**    Yes.  And what did you do when you started investigating the

17   case?

09:20:29  18   **A**    Started from the beginning all over again.

09:20:32  19   **Q**    Did you interview witnesses?

09:20:35  20   **A**    Yes.

09:20:36  21   **Q**    Okay.  But you didn't make any notes of those witnesses?

09:20:40  22   **A**    If I did, they're in the file.

09:20:42  23   **Q**    They would be in your work product file?

09:20:44  24   **A**    No.  They would be in the file.

09:20:46  25   **Q**    So someone in the DA's office was working on the case from

*Video Deposition of Kelly Siegler*

1   the very beginning in April 1999, but for whatever reason, they

2   did not ask to accept the charges at that time?

09:21:00  3   **A**   I don't know.  I don't know who was working on it before me.

09:21:03  4   **Q**   Okay.  And presumably, it's because the evidence didn't --

5   at that time didn't rise to the level of probable cause;

6   otherwise, they would have accepted charges on a five-person

7   murder, right?

09:21:13  8           **MS. MIRANDA:**  Objection, form.

09:21:14  9   **A**   I disagree with that.

09:21:15  10   **BY MS. SCARDINO:**

09:21:16  11   **Q**   You do disagree with that?

09:21:17  12   **A**   I do.

09:21:18  13   **Q**   Okay.  Was this case presented to the Grand Jury for

14   indictment in 1999?

09:21:23  15   **A**   I didn't have the case in 1999.

09:21:25  16   **Q**   And -- and I understand that, although you did have the

17   file.  And so I'm asking you if you recall, from your review of

18   the file, whether the case was presented to the Grand Jury for

19   indictment in '99?

09:21:38  20   **A**   Not that I recall, no.

09:21:39  21   **Q**   Okay.  So the case went cold in -- in 1999, and there's

22   nothing new in the file, I'll represent to you, until 2001,

23   although you've seen the file.  Do you -- would you agree with

24   that statement?

09:21:53  25           **MR. DOYLE:**  I don't -- I don't think she has seen --

*Video Deposition of Kelly Siegler*

09:21:54  1    A    That the case went cold, no.

09:21:56  2              MR. DOYLE:   I'll object, the characterization that she

          3    had seen the file.

09:21:59  4    BY MS. SCARDINO:

09:21:59  5    Q    Okay.   Let -- let me restate since it's been 17 years.

09:22:05  6         All of the investigate -- all of the investigative reports

          7    and the evidence in the file is dated through 1999, but then

          8    nothing else is new in the file until 2001.   Do you recall that?

09:22:19  9    A    I don't recall that.

09:22:20 10    Q    Okay.   I'm going to show you Exhibit 46.   Exhibit 46 is a

         11    March 1st, 2001, fax from William Watson to Bonds -- to Johnny

         12    Bonds.   Do you see that?

09:22:37 13    A    I do.

09:22:37 14    Q    Okay.   And Dr. Watson was the state's DNA expert in this

         15    case.   Do you recall?

09:22:43 16    A    He's the witness who testified, yes.

09:22:45 17    Q    Okay.   So it appears, from the date of this fax, that this

         18    case, the Prible case, is back on your and Mr. Bonds' radar at

         19    least by March 1st, 2001, correct?

09:22:59 20    A    Yes.

09:23:00 21              MS. MIRANDA:   Objection, form.

09:23:00 22    BY MS. SCARDINO:

09:23:01 23    Q    Exhibit 52 is an April 4th, 2001, letter from an inmate at

         24    FCI Beaumont named Jesse Moreno to you.   Now, if you need some

         25    time to read this, we can go off the record.

*Video Deposition of Kelly Siegler*

09:23:15  1    So on April 4th, 2001, you received this letter,

2    Exhibit 52, from Jesse Moreno, and Mr. Moreno was --

09:23:22  3  **A**  Well, that's the date he wrote the letter.

09:23:24  4  **Q**  Okay.  The date he wrote the letter.  So sometime after

5    April 4th, 2001, probably within a couple of days, you received

6    this letter from Mr. Moreno, correct?

09:23:33  7  **A**  Within a week, I would say, yes.

09:23:36  8  **Q**  Okay.  And Mr. Moreno was a federal prison inmate that had

9    testified for you in the murder trial of Jason Morales a few

10   years prior.  Do you remember that?

09:23:45 11  **A**  Yes.

09:23:45 12  **Q**  Okay.  In exchange, you dismissed a charge of aggravated

13   robbery against him in a home invasion case in which the victims

14   were beaten with a hammer.  Do you recall that?

09:23:58 15  **A**  I don't remember what happened with Jesse Moreno's case

16   having to do with Jason Morales.  I don't remember.

09:24:05 17  **Q**  With Jason Morales?  You don't recall dismissing a charge of

18   aggravated -- of aggravated robbery against him?

09:24:11 19  **A**  I do not.

09:24:12 20  **Q**  Okay.

09:24:13 21  **A**  I don't know what happened to his case.  I can't remember.

09:24:15 22  **Q**  Okay.  So you might have done it, but you just can't recall?

09:24:18 23  **A**  I do not remember.

09:24:19 24  **Q**  Okay.  Do you recall that you also did not charge him in a

25   capital murder case in which he was a suspect?

*Video Deposition of Kelly Siegler*

09:24:28  1   A   I don't remember that at all.

09:24:29  2   Q   You don't recall that at all?

09:24:30  3   A   No.

09:24:31  4   Q   Okay.  I'm going to show you Exhibit 70.  This is an excerpt

5   of Dan Cogdell, Hermilio Herrero's attorney, questioning

6   Mr. Moreno.

09:24:53  7       And Mr. Cogdell asks, question, "Isn't it a fact,

8   Mr. Moreno, that in addition to the crime that you were charged

9   with, which was later dismissed after you testified, you were a

10   suspect in a capital murder case?

09:25:04 11       Answer, "Yes."

09:25:06 12       Question, "So in addition to the dismissal of the

13   aggravated robbery that was filed, you were never charged with a

14   capital murder case?"

09:25:14 15       Answer, "No."

09:25:17 16       Now, does this refresh your memory as to whether you

17   dismissed a charge of aggravated robbery against Mr. Moreno and

18   also did not charge him in a capital murder case in which he was

19   a suspect --

09:25:31 20           MS. MIRANDA:  Objection, form.

09:25:32 21   BY MS. SCARDINO:

09:25:32 22   Q   -- in exchange for his testimony in the Jason Morales trial?

09:25:37 23   A   Contrary to what your petition states, I did not handle that

24   capital murder case.  It was never mine.  It was Mark Vincent's.

25   I had nothing to do with that.

*Video Deposition of Kelly Siegler*

09:25:50 1  Q   Okay.  So the answer is no, you did not dismiss a charge of

2  aggravated robbery against Mr. Moreno?

09:25:54 3  A   That's not my answer.

09:25:55 4  Q   Okay.  Then I don't understand your answer.

09:25:58 5  A   I don't remember what happened in the cases arising out of

6  Jason Morales.  I had nothing to do with the capital murder

7  case.  That was not my case, contrary to what you've stated in

8  your petition.

09:26:10 9  Q   Okay.  Well, I'm -- I'm not talking about the petition right

10  now.  I'm just asking you a question.  So you're saying that you

11  had nothing to do with that capital murder case?

09:26:21 12  A   Correct.

09:26:21 13  Q   Okay.  But you might have dismissed the charge of aggravated

14  robbery, but you don't recall?

09:26:26 15  A   I don't remember if he pled or it was dismissed.  I cannot

16  remember.

09:26:29 17  Q   Okay.  And so when Moreno contacted you in this letter

18  April 4th, 2001, he was being housed in the medium SHU in

19  Beaumont -- FCI Beaumont; isn't that right?

09:26:42 20  A   Medium or low.  I don't remember.

09:26:43 21  Q   Okay.  Somewhere in FCI Beaumont in the SHU?

09:26:45 22  A   What is the SHU?

09:26:46 23  Q   The SHU -- the special housing unit.

09:26:48 24  A   I didn't know that.

09:26:49 25  Q   Okay.  That's just the segregation --

*Video Deposition of Kelly Siegler*

09:26:51 1    **A**   I didn't know that.

09:26:52 2    **Q**   The segregation unit.  Okay.  I'll refer to it as the SHU,

3    S-H-U.

09:26:58 4        Okay.  And when he contacted you, he was in the SHU with an

5    old friend of his from the neighborhood named Jesse Foreman,

6    wasn't he?

09:27:05 7    **A**   I don't know who he was with.

09:27:06 8    **Q**   I'm sorry.  Nathan Foreman.

09:27:07 9    **A**   I don't know who he was.

09:27:08 10   **Q**   You don't recall that he told you he was in there with

11   Nathan Foreman?

09:27:10 12   **A**   From this letter, no.

09:27:11 13   **Q**   No.  I'm asking you, aside from this letter, when he

14   contacted you, at that time, he was in the SHU with Nathan

15   Foreman, right?

09:27:19 16   **A**   I don't know who he was with.

09:27:21 17   **Q**   Okay.  These are the BOP housing records for Nathan Foreman.

18   And if you look on the second page, nine lines from the bottom,

19   it says that between February 28th, 2000, and April 18th, 2001,

20   that Foreman was housed in BMM A-DES, just like we saw with

21   Mr. Moreno, correct?

09:28:01 22   **A**   They're not in the same place.

09:28:04 23   **Q**   Why are they not in the same -- why do you make that

24   statement?

09:28:07 25   **A**   Because Jesse Moreno says in his letter he's in isolation.

*Video Deposition of Kelly Siegler*

1  So wherever they're housed, it doesn't matter.  Jesse is in

2  isolation.

09:28:15  3  **Q**   In the SHU, right?

09:28:16  4  **A**   I don't know what the SHU is.  That's your word.  I've never

5  heard that before.

09:28:19  6  **Q**   Okay.  Would you agree that the documents say what they say?

09:28:25  7  **A**   I would agree that Jesse says he's in isolation, which means

8  he's not living with anybody.

09:28:30  9  **Q**   Okay.

09:28:31  10  **A**   That's what the letter says.  You -- these documents are

11  from the prison, which you must understand better than I can,

12  but that's not what Jesse says.

09:28:40  13  **Q**   Okay.

09:28:40  14  **A**   He's not with Nathan Foreman, according to his letter.

09:28:44  15  **Q**   Ms. Siegler, did you respond to Jesse Moreno's

16  4/4/01 letter?

09:28:49  17  **A**   In writing?

09:28:51  18  **Q**   In any -- in any way.

09:28:54  19  **A**   Eventually, I talked to him.

09:28:56  20  **Q**   Okay.  Well, you didn't respond in writing, then?

09:28:59  21  **A**   I don't think so, no.

09:29:00  22  **Q**   Okay.  Eventually, you spoke with him approximately how long

23  after you got that letter?

09:29:08  24  **A**   I don't remember.

09:29:08  25  **Q**   And did you contact him?

*Video Deposition of Kelly Siegler*

09:29:11 1 | A    At some point, we talked, yes.

09:29:14 2 | Q    So you contacted him?  Because he says in his letter you

3 | would have to contact -- call him, he's in the SHU, right?

09:29:21 4 | A    I don't remember how we got in touch the next time, but we

5 | did get in touch eventually.

09:29:26 6 | Q    Okay.  I'm going to show you Exhibit 53, and this is a

7 | handwritten letter from Jesse Moreno's mom, and this letter is

8 | dated April 10th, 2001.  Do you see that?

09:29:51 9 | A    Yes.

09:29:52 10 | Q    And in this letter, she asks you to help her son, right?

09:29:58 11 | A    Okay.  What's your question?

09:29:59 12 | Q    She asked you to help her -- help her son, Jesse, right?

09:30:03 13 | A    Yes.

09:30:05 14 | Q    So April 15th, 2001, that article appears.  And by this

15 | time, you're already speaking with Detective Brown about this

16 | case, right?

09:30:17 17 | A    It could have been after this article appeared that I first

18 | started talking to Curtis about the case.  I don't remember this

19 | article coming up while I worked on the case.

09:30:25 20 | Q    And you recall earlier I showed you that March 1st, 2001,

21 | fax about this case, and so we discussed that you were already

22 | working on the case at that time with Mr. Bonds?

09:30:36 23 | A    I don't think you ever asked me that specific question.

09:30:39 24 | Q    Okay.  I'll ask you now.  Were you working on this case --

25 | was the case on your radar again on April -- on March -- in

*Video Deposition of Kelly Siegler*

1  March of '01 when that fax was sent to Mr. Bonds from Mr. --

2  from Dr. Watson?

09:30:57 3  **A**   I don't know for sure.  I don't remember when I got on the

4  case.

09:31:00 5  **Q**   Would Johnny Bonds have gotten in on it before you got on

6  it?

09:31:04 7  **A**   Yes.

09:31:04 8  **Q**   Okay.  So he -- he might have been --

09:31:06 9  **A**   He was in Special Crimes before me.

09:31:08 10  **Q**   No, but I mean, if y'all were working on a case together,

11  would the two of you approach it together or would he be working

12  on a case separately from you working on it?

09:31:14 13  **A**   He could have been working separately.

09:31:16 14  **Q**   Okay.  So you don't -- you can't say whether or not this

15  case, this Tirado/Herrera case was on your radar in March 2001

16  at the date of that fax?

09:31:28 17  **A**   The date of this fax, the William Watson fax?

09:31:30 18  **Q**   Uh-huh.

09:31:31 19  **A**   I don't remember for sure when I started working on the

20  Prible case.

09:31:36 21  **Q**   Okay.  And so you don't know for sure if you were already

22  working with Detective Brown on this case at the time of this

23  April 15th, 2001, *Houston Chronicle* article?

09:31:46 24  **A**   I do not remember.

09:31:47 25  **Q**   Okay.  You see on page 1 right there it's dated April 26,

*Video Deposition of Kelly Siegler*

1  2001, and he writes your name down?

09:31:54  2  **A**   I see that.

09:31:55  3  **Q**   Okay.  So, presumably, you talked to him before that date.

4  You spoke with him about his April 4th letter, right; otherwise,

5  he wouldn't have put your name on the phone list?

09:32:06  6  **A**   Not necessarily.

09:32:09  7  **Q**   Okay.  Do you recall if you spoke with him between April 4th

8  and April 26th, 2001?

09:32:14  9  **A**   I do not.

09:32:15  10  **Q**   Okay.  You might have, but you can't recall?

09:32:18  11  **A**   It's the wrong phone number to call me at if he put my

12  number down.

09:32:22  13  **Q**   Okay.  What is that phone number that he's listed?

09:32:24  14  **A**   That's the general number.

09:32:26  15  **Q**   Okay.

09:32:26  16  **A**   So if he -- if he had my correct number, it wouldn't have

17  been this one.

09:32:29  18  **Q**   Okay.  What was your correct number?

09:32:31  19  **A**   5845, 8339, 5865, not 5800.

09:32:37  20  **Q**   Okay.  So you don't recall if you spoke with Mr. Moreno

21  before he put your phone number down on his phone list?

09:32:45  22  **A**   I do not.

09:32:46  23  **Q**   Okay.  He also put his U.S. attorney that prosecuted him in

24  a Louisiana criminal case, U.S. Attorney Todd Clemons.  Do you

25  see that?

*Video Deposition of Kelly Siegler*

09:32:58  1    A    I see that.

09:32:59  2    Q    Okay.  Are you familiar with Mr. Clemons?

09:33:02  3    A    I remember his name.

09:33:02  4    Q    Okay.  What do you remember -- do you -- did you ever meet

5    with him?

09:33:06  6    A    I don't remember.

09:33:07  7    Q    You might have, but you don't recall?

09:33:09  8    A    Correct.

09:33:10  9    Q    Okay.  Do you ever recall going to Louisiana and speaking

10    with him about Mr. Moreno's case?

09:33:18 11    A    I don't remember who I talked to.

09:33:19 12    Q    Okay.  But you did do that, you just don't recall if you

13    spoke with Mr. Clemons?

09:33:24 14    A    Correct.

09:33:26 15    Q    Okay.  So at this point, it looks like, by April 26, 2001,

16    that Mr. Moreno is already contemplating a sentence reduction,

17    wouldn't you say?  He put your name down and his U.S. attorney's

18    number down -- attorney's number down?

09:33:38 19             MS. MIRANDA:  Objection, form.

09:33:39 20    A    No.

09:33:39 21    BY MS. SCARDINO:

09:33:40 22    Q    You disagree with that?

09:33:41 23    A    Yes.

09:33:41 24    Q    Okay.  You don't think it's on his mind -- Jesse Moreno's

25    mind at this point, he's hoping to get some kind of sentence

*Video Deposition of Kelly Siegler*

1  reduction for the information that he has to give you?

09:33:49  2  A   I think that's on every federal inmate's mind.

09:33:52  3  Q   Okay.  On July 3rd, 2001, you met with Jesse Moreno at the

4  Federal Detention Center in Beaumont.  Do you recall that

5  meeting?

09:34:02  6  A   Not by date specifically, no.

09:34:06  7  Q   So if you're meeting with a federal prison inmate, you can't

8  just show up and ask to see them, right?

09:34:11  9  A   Correct.

09:34:11  10  Q   You have to give the prison advance notice, right?

09:34:14  11  A   Yes.

09:34:15  12  Q   You have to request to be able to see the -- the inmate?

09:34:18  13  A   It's a process.

09:34:20  14  Q   Right.  And how long does that process usually take?

09:34:28  15  A   Weeks, minimum.

09:34:29  16  Q   Okay.  You don't recall where you were when you met with

17  him --

09:34:34  18  A   With Jesse?

09:34:34  19  Q   -- at that first meeting?

09:34:35  20    Right.

09:34:37  21  A   I remember we went to the Beaumont federal prison.  I don't

22  remember which one or where exactly we met, but I remember

23  meeting with Jesse Moreno at least one time in Beaumont.

09:34:49  24  Q   And you recorded part of that meeting, right?

09:34:52  25  A   I don't remember that.

*Video Deposition of Kelly Siegler*

09:34:53  1  **Q**   Did you know Nathan Foreman before you had this interview

2  with Jesse Moreno?

09:35:00  3  **A**   Did I know his name, yes.

09:35:04  4  **Q**   Okay.  And -- because Jesse had told you -- had mentioned

5  him previously?

09:35:13  6  **A**   I don't remember how I first heard Nathan Foreman's name.

09:35:16  7  **Q**   Okay.  Let's look at pages -- Exhibit 54, page 18.  On the

8  bottom part of the page, it says "KS."  That's you.  It says,

9  "And who was the other guy there?  Nathan Foreman?"

09:35:43  10      Jesse Moreno:  "Nathan Foreman.  He" --

09:35:45  11      Kelly Siegler:  "Is he from Houston?"

09:35:48  12      Moreno says, "Yeah, we're all from Houston."

09:35:50  13      And you say, "Beaumont medium, too?"

09:35:54  14      Okay.  So it looks like from this transcript that you

15  didn't know Mr. Foreman previously, right?

09:36:04  16  **A**   Not necessarily.

09:36:05  17  **Q**   You might have known him before this?

09:36:07  18  **A**   I might have known him by name.  I can't remember.

09:36:10  19  **Q**   Because Jesse might have told you his name previously?

09:36:12  20  **A**   No.  I don't know how I found Nathan Foreman, how I got his

21  name first.

09:36:22  22  **Q**   If you look at page 12 -- I'm sorry, page 13, the very top

23  of the page, the second line, Jesse is talking to you.  He says,

24  "There was me, him, ah, Dominguez, Ralph Dominguez, and, ah,

25  Nathan Foreman, the one I was asking you about."  Do you see

*Video Deposition of Kelly Siegler*

1    that?

09:36:48  2    **A**    Uh-huh.  Yes, ma'am.

09:36:48  3    **Q**    Does that refresh your memory as to whether Moreno made you

4    aware of Nathan Foreman?

09:36:55  5    **A**    It does not.

09:36:58  6    **Q**    You still think you knew him previously for some reason

7    beyond Jesse Moreno?

09:37:03  8    **A**    Yes.

09:37:03  9    **Q**    But you can't tell me why?

09:37:05 10    **A**    The Jason Morales trial.

09:37:07 11    **Q**    You think Foreman was involved in the Jason Morales trial?

09:37:12 12    **A**    I don't -- I don't know if he -- he didn't testify.  I don't

13    know if he was involved.  I can't remember.

09:37:16 14    **Q**    Okay.  Now, at this meeting, Jesse Moreno spoke with you

15    about a murder confession he had heard from Hermelio Herrero.

16    Do you remember that?

09:37:24 17    **A**    Yes.

09:37:24 18    **Q**    Okay.  And he said that Herrero confessed to himself,

19    Moreno, to Dominguez and to Nathan Foreman in 1999 when they

20    were all incarcerated together in Beaumont.  Do you remember

21    that?

09:37:34 22    **A**    Yes.

09:37:38 23    **Q**    And two days after this meeting with Moreno on July 3rd, you

24    asked Detectives Davis and Holtke to review the audiotape of

25    that meeting.  Do you remember that?

*Video Deposition of Kelly Siegler*

09:37:51  1  A    To review the audiotape that I took?

09:37:55  2  Q    Yes.

09:37:56  3  A    So --

09:37:56  4  Q    The audiotape that we just referenced, Exhibit 54.

09:37:59  5  A    Okay.

09:38:00  6  Q    And to refresh your memory, I have Exhibit 55, which is a
7  supplemental report from the Harris County Sheriff's Department,
8  and it mentions how you had asked Detectives Davis and Holtke to
9  review the audiotape.  Do you see that?

09:38:20 10  A    Okay.

09:38:21 11  Q    Okay.  And you accepted charges against Herrero that day,
12  right?

09:38:25 13  A    This day?

09:38:26 14  Q    Yes.  I'm sorry.  Yeah.  You -- you accepted charges against
15  Hermelio Herrero on this day, on July 5th, 2001, right?  That's
16  what it says here in this report?

09:38:38 17  A    Where does it say that?

09:38:39 18  Q    Let's see.  At the very last line, "Assistant District
19  Attorney Siegler then stated she would accept charges of murder
20  on Hermelio Herrera, Jr., date of birth 10-7-1969," right?

09:38:58 21  A    It says that I would accept the charges.  It doesn't say on
22  what date.

09:39:02 23  Q    Okay.  Well, it's talking about a conversation that you had
24  with these detectives on July 5th, 2001.  Do you see that on the
25  very first line?

*Video Deposition of Kelly Siegler*

09:39:09 1   **A**   I do.

09:39:10 2   **Q**   And at the end of talking about that conversation you had

3   with them, Detective Davis states, "I informed Siegler that the

4   information the witness had provided was information that

5   matched the details of what we knew them to be.  Assistant

6   District Attorney Siegler then stated she would accept charges

7   of murder on Hermelio Herrero, Jr., date of birth 10/7/1969."

8   Do you see that?

09:39:35 9   **A**   I do.

09:39:35 10   **Q**   Does that refresh your memory as to whether you accepted

11   charges against Mr. Herrero on July 5th, 2001?

09:39:42 12   **A**   It doesn't mean that I accepted the charges on July the 5th.

13   It could have been the following day.  It could have been the

14   following week.

09:39:49 15   **Q**   Okay.

09:39:49 16   **A**   I did accept the charges.

09:39:50 17   **Q**   Okay.  You also accepted charges against Mr. Prible that

18   day, right?

09:39:55 19   **A**   What day?

09:39:57 20   **Q**   July 5th, 2001.

09:39:58 21   **A**   I don't remember.

09:39:59 22   **Q**   You don't recall when charges were accepted against

23   Mr. Prible?

09:40:03 24   **A**   I do not.

09:40:06 25   **Q**   Now, before you charge -- accepted charges against Herrero,

*Video Deposition of Kelly Siegler*

1    Hermelio Herrero, did you check to see if he was even

2    incarcerated with Moreno, Dominguez and Foreman on the date he

3    supposedly confessed to them?

09:40:19  4    **A**   I would have had Johnny Bonds check on that.

09:40:21  5    **Q**   Okay.  And what did he find out?

09:40:25  6    **A**   I'm assuming that it was consistent with the information we

7    got from Jesse Moreno.

09:40:32  8    **Q**   Because if it was inconsistent, it would have been improper

9    to accept charges against Mr. Herrero based entirely on Jesse

10    Moreno's conversation with you, right?

09:40:41  11    **A**   We would have needed to look into it further.

09:40:43  12    **Q**   And when you accepted charges -- I will -- I will represent

13    to you that charges were accepted against Prible the same day

14    they were accepted against Hermelio Herrero.

09:40:56  15    **A**   You need to show me something.

09:40:58  16    **Q**   Okay.  Exhibit 57, the first page, at the top, it says date

17    prepared, July 5th, 2001, felony charge capital murder against

18    Mr. Prible.  Do you see that?

09:41:24  19    **A**   Okay.  Yes, I see that.

09:41:25  20    **Q**   Okay.  So you agree that charges were accepted against

21    Mr. Prible on July 5th, 2001, this -- do you agree with that?

09:41:34  22    **A**   Yes.

09:41:35  23    **Q**   And at that July 3rd, 2001, meeting, you and Mr. Moreno

24    discussed Nathan Foreman, you saw?  Do you remember the

25    testimony -- or the recording I just showed you where you

*Video Deposition of Kelly Siegler*

1  discussed Nathan Foreman?

09:41:47  2  **A**   His name was mentioned.

09:41:48  3  **Q**   Yes.

09:41:49  4  **A**   Nathan Foreman's name was mentioned, yes.

09:41:51  5  **Q**   Okay.  And at that July 3rd, '01, meeting, did Moreno tell

6  you that Nathan Foreman had heard a confession by Ronald Prible?

09:41:58  7  **A**   Ask me that again.

09:41:59  8  **Q**   At that meeting that you had with Mr. Moreno, at some point

9  during that meeting, did Mr. Moreno inform you that Mr. Foreman,

10  Nathan Foreman had heard a confession by Mr. Prible?

09:42:12  11  **A**   I don't remember what the details were, what Jesse Moreno

12  told me that day.

09:42:17  13  **Q**   So he might have told you that, but you just can't recall?

09:42:19  14  **A**   I cannot.

09:42:22  15  **Q**   Exhibit 56 is a probable cause affidavit dated July 5th,

16  2001, for the arrest of Mr. Prible, and the affiant is Curtis

17  Brown.  And you testified in the Temple case that you would

18  often type up the probable cause affidavit for the detectives to

19  sign; is that right?

09:42:47  20  **A**   Correct.

09:42:48  21  **Q**   Is that -- was that the case here?  Did you type up this

22  probable cause affidavit?

09:42:52  23  **A**   I don't know because it's signed by Marcy.

09:42:54  24  **Q**   Okay.  So you -- who is Marcy?

09:42:56  25  **A**   A fellow prosecutor that worked in Special Crimes the same

*Video Deposition of Kelly Siegler*

1   time I did.

2   **Q**   Okay.  So you don't know if you typed up this probable cause

3   affidavit?

4   **A**   I don't know for sure.

5   **Q**   Okay.  Do you see anything new in that probable cause

6   affidavit that you-all didn't have against Mr. Prible in 1999?

7   **A**   I didn't know what they had in 1999.  It wasn't my case

8   then.

9   **Q**   Okay.  So you're not denying that there's nothing new in

10   that probable cause affidavit?

11   **A**   I don't know what they had in '99.  It wasn't my case then.

12   **Q**   Okay.  Did you reach out to Mr. Foreman after your July 3rd,

13   2001, visit with Mr. Moreno?

14   **A**   Ask me again.

15   **Q**   Did you reach out to Mr. Foreman after your July 3rd, 2001,

16   visit with Jesse Moreno?

17   **A**   No.

18   **Q**   You didn't?

19   **A**   I didn't reach out to him, no.

20   **Q**   Did he reach out to you?

21   **A**   Yes.

22   **Q**   Okay.  In what form?  How did he reach out to you?  Did he

23   call you?

24   **A**   He called.  He might have written.  I don't remember.

25   **Q**   If he had written to you, that would have been kept in your

*Video Deposition of Kelly Siegler*

1   file, right?

09:43:59   2   **A**   Yes.   We're talking about the Herrero file because you keep

3   talking about all these letters like they belong to Prible, and

4   they do not.

09:44:07   5   **Q**   Well, some of them were found in the Prible file, which

6   we'll get to that in a little bit.

09:44:11   7      But -- okay.   So Foreman reached out to you, contacted you,

8   you believe?

09:44:17   9   **A**   Yes.

09:44:18  10   **Q**   Okay.   Might have written.   Might have made a phone call.

09:44:24  11      Exhibit 88 is a criminal history report for Nathan Foreman

12   printed out by Johnny Bonds.   And all I'm interested in is -- is

13   the date.

09:44:36  14      The date you'll see at the top is August 7th, 2001, and if

15   you go down a little bit more, and it says that Johnny Bonds had

16   printed it out.   Do you see that?

09:44:45  17   **A**   I do.

09:44:45  18   **Q**   Okay.   Now, this criminal history report, was this something

19   that you-all would typically run before you met with a potential

20   witness or -- with a potential witness?

09:44:58  21   **A**   Or a potential suspect?

09:45:00  22   **Q**   Or a potential suspect.

09:45:01  23   **A**   Yes.

09:45:01  24   **Q**   That was my next question.

09:45:02  25   **A**   Yes.

*Video Deposition of Kelly Siegler*

09:45:03  1  **Q**   Okay.  And so this was typed -- this was searched on

2  August 7th.  And then on August 8th, the following day, you and

3  Mr. Bonds and Foreman met in the person; isn't that right?

09:45:16  4  **A**   I don't remember the date.

09:45:17  5  **Q**   Okay.  Do you recall this meeting?  Do you recall meeting

6  with Mr. Foreman at FCI Beaumont?

09:45:25  7  **A**   In Beaumont?

09:45:26  8  **Q**   Uh-huh, or just ever.

09:45:29  9  **A**   I remember meeting with Nathan Foreman at the Federal

10  Detention Center in downtown Houston.

09:45:35 11  **Q**   Okay.  I'm going to show you Exhibit 108-2, beginning at

12  108-2.

09:45:42 13      In this meeting -- and you see it's dated -- these are your

14  notes, correct?

09:45:46 15  **A**   They are.

09:45:47 16  **Q**   Okay.  And up at the top, it's dated August 8th, 2001?

09:45:50 17  **A**   Yes.

09:45:51 18  **Q**   So you took the notes on this day, right?

09:45:53 19  **A**   Yes.

09:45:54 20  **Q**   Okay.  And this Jesse that Mr. Foreman is referencing in

21  this interview with you is Jesse Moreno, right?

09:46:04 22  **A**   Yes.

09:46:04 23  **Q**   And during this August 8th, 2001, interview with you,

24  Mr. Foreman discusses both the Prible and the Herrero cases,

25  right?

*Video Deposition of Kelly Siegler*

09:46:14 1   A   He does.

09:46:14 2   Q   Okay.  And he discusses various informants -- or various

3   other inmates, himself, Rafael Dominguez, right?  You saw that

4   name?

09:46:27 5   A   I did.

09:46:27 6   Q   Okay.  And Jesse Moreno, right?

09:46:32 7   A   Among others.

09:46:36 8   Q   Now, Mr. Bonds was at this meeting with you, right?

09:46:41 9   A   Yes.

09:46:41 10   Q   Okay.  And what was your take on Mr. Foreman when you met

11   with him?

09:46:47 12   A   I didn't believe him.

09:46:48 13   Q   Why didn't you believe him?

09:46:50 14   A   I didn't believe him.

09:46:52 15   Q   Okay.

09:46:53 16   A   Neither one of us did.  We walked out of there saying we

17   didn't believe a word he had to say.

09:46:58 18   Q   Okay.  So after you left that meeting or as you were

19   leaving, did you tell Foreman, "Look, I don't believe anything

20   you're saying.  Get out of here.  Get lost"?

09:47:06 21   A   I didn't tell him what I thought.

09:47:08 22   Q   You didn't?  Did you tell him to contact you if he had

23   further information?

09:47:14 24   A   I don't remember saying that.

09:47:15 25   Q   Okay.  Would you have wanted him to contact you again with

*Video Deposition of Kelly Siegler*

1    more information if you knew he was a liar?

09:47:21  2    **A**    No.

09:47:22  3    **Q**    That would have been improper to use a witness that you knew

4    was lying, right?

09:47:25  5    **A**    I never used him as a witness, contrary to what your

6    petition says.

09:47:29  7    **Q**    But this was produced from your file by the DA's office in

8    August 2016.  And it's a -- there's a phone message on there

9    showing Alan Percely -- Percely, who was Nathan Foreman's

10   attorney.  Do you recall Mr. Percely?

09:47:44  11   **A**    Now that you mentioned it, yes.

09:47:45  12   **Q**    I might be saying his name wrong.  Okay.

09:47:47  13   **A**    He was as credible as Nathan.

09:47:49  14   **Q**    He was as credible as Nathan?

09:47:51  15   **A**    Uh-huh.

09:47:51  16   **Q**    Okay.  And what do you mean by that?

09:47:53  17   **A**    Just what I said.

09:47:54  18   **Q**    Just a liar?

09:47:54  19   **A**    Yep.

09:47:55  20   **Q**    Okay.  And he called you on August 13th, 2001, about

21   testifying -- about having Nathan testify on the federal trial,

22   right?

09:48:03  23   **A**    He might have.  I don't remember.

09:48:04  24   **Q**    Okay.  If -- if, in fact, this -- this phone message shows

25   that, you wouldn't disagree with that, right?

*Video Deposition of Kelly Siegler*

09:48:13  1   **A**   No.

09:48:13  2   **Q**   Okay.  Did you call Percely back and speak with him?

09:48:18  3   **A**   I don't remember.

09:48:18  4   **Q**   Okay.  At some point, you must have spoken with him if you

5   knew that he was lying, right?

09:48:23  6   **A**   Which one?

09:48:24  7   **Q**   Percely.

09:48:26  8   **A**   To be nice maybe.

09:48:29  9   **Q**   Nine days after you speak with Mr. Foreman, the Prible

10   indictments were prepared.  That's Exhibit 60.

09:48:39 11    You see the first page of this Exhibit 60, it says date

12   prepared, August 17th, 2001.  So after speaking with Foreman,

13   did you believe you had probable cause to present the case to

14   the grand jury for indictment?

09:48:52 15   **A**   My decision to decide what to do with the Prible case had no

16   bearing and nothing to do with the conversation I had with

17   Nathan Foreman.

09:49:01 18   **Q**   Okay.  Why did you suddenly decide to charge Mr. Prible and

19   indict him for capital murder if there was no new evidence since

20   1999 other than this conversation that you had had with

21   Mr. Foreman?

09:49:15 22   **A**   One more time, I don't know with what they had in 1999.  It

23   could have been completely sufficient in 1999 to move forward,

24   but I didn't have the case then.  When I got the case, I wanted

25   to be thorough, which included talking to Nathan Foreman, which

*Video Deposition of Kelly Siegler*

1   I thought would be a waste of time, and it turned out to be a

2   waste of time.

09:49:32  3      Irrespective of that, I made a decision to move forward on

4   the case against Ronald Jeffrey Prible.

09:49:42  5   **Q**   Okay.  Did you disclose to Mr. Prible's defense attorney

6   that you had spoken with Mr. Foreman on August 8th, 2001?

09:49:47  7   **A**   Mr. Prible's attorney, Terry Gaiser?

09:49:50  8   **Q**   Uh-huh.

09:49:55  9   **A**   We talked about Nathan Foreman.  I don't know exactly if I

10   told him about that conversation, but we did discuss Nathan

11   Foreman.

09:50:00 12   **Q**   I'm asking you if you told Mr. Gaiser or Mr. Wentz if you --

13   about the substance of your meeting with Mr. Foreman on

14   August 8th, 2001.

09:50:14 15   **A**   I think I did.

09:50:16 16   **Q**   And you would have -- did you show him your notes from that

17   meeting?

09:50:19 18   **A**   They were in the file.

09:50:21 19   **Q**   But he wasn't allowed to see your work product notes, was

20   he?

09:50:24 21   **A**   Those weren't -- that's not work product.  My notes were in

22   the file.  Notes are notes.  They're in the file.

09:50:29 23   **Q**   So should they all be -- all your notes --

09:50:31 24   **A**   Yes.

09:50:31 25   **Q**   -- be viewable?

*Video Deposition of Kelly Siegler*

09:50:32 1  A   Yes.

09:50:33 2  Q   -- to the defense counsel?

09:50:34 3  A   Yes.

09:50:35 4  Q   Okay.  So you're saying that all of your -- any -- any of

5  your notes that were contained in the file would have been

6  disclosed to defense counsel?

09:50:43 7  A   My notes would have been in the open file.

09:50:46 8  Q   Okay.  So you didn't take any notes out saying -- claiming

9  work product protection over them before the defense came to

10  review the file?

09:50:54 11  A   Not that I remember, no.

09:50:55 12  Q   Okay.  Now, in this case, with all of the evidence that law

13  enforcement had in 1999, which you came you don't recall what --

14  what evidence that was, but with all that evidence that they had

15  in 1999, the DA must not have believed that there was sufficient

16  legally admissible evidence to convict Prible of the five

17  murders at that time, right?

09:51:19 18  A   I do not agree with that statement.

09:51:21 19  Q   You don't agree with that statement?

09:51:23 20  A   No, ma'am.

09:51:23 21  Q   Even though this was a case of an entire family being

22  murdered, three young children, don't you think the DA's office

23  would have prosecuted that as soon as they had -- they had the

24  evidence needed to do so?

09:51:35 25  A   Not necessarily.

*Video Deposition of Kelly Siegler*

09:51:36 1    Q    In fact, back in 1999, the DA's office didn't even present

2    the case to the Grand Jury, did they?

09:51:47 3    A    I don't think they did, no.

09:51:49 4    Q    Okay.  When did the DA's office finally present this case to

5    the grand jury?

09:51:53 6    A    When I did.

09:51:54 7    Q    You were the one that presented it?

09:51:56 8    A    Yes.

09:51:56 9    Q    And do you recall the date that you did so?

09:52:00 10   A    August 2001.

09:52:01 11   Q    Okay.  Do you recall the -- was it after you had met with

12   Mr. Foreman August 8th?

09:52:09 13   A    Yes.

09:52:10 14   Q    It was after you met with him.  Okay.

09:52:12 15        And was there only one Grand Jury that heard this case?

09:52:17 16   A    Yes.

09:52:17 17   Q    Was that the only one?

09:52:18 18   A    Yes.

09:52:19 19   Q    Okay.  Did you prepare any sort of a witness list for the

20   Grand Jury?

09:52:24 21   A    No.

09:52:24 22   Q    Did you present any witnesses to the Grand Jury?

09:52:26 23   A    No.

09:52:28 24   Q    And is that a common practice of yours, to go into a Grand

25   Jury without any witnesses?

*Video Deposition of Kelly Siegler*

09:52:33   1    **A**    Yes.

09:52:36   2    **Q**    Did you testify at the Grand Jury about your conversations

3    with Foreman and Moreno?

09:52:42   4    **A**    I know I didn't about Foreman.

09:52:44   5    **Q**    But you spoke with the Grand Jury about your conversation

6    with Moreno?

09:52:48   7    **A**    Having to do with the Prible case?

09:52:50   8    **Q**    Yes.

09:52:51   9    **A**    No.

09:52:51  10    **Q**    Did you present these two cases, Herrero and Prible, on the

11    same day?

09:52:56  12    **A**    Yes.

09:52:57  13    **Q**    In the same -- I mean, was it like back to back?  How

14    does -- how does it work when you go into the Grand Jury?

09:53:05  15    **A**    You go in on your scheduled morning with all the cases that

16    you have and present them, go outside while they vote, see if

17    they have any questions, and then do the next one.

09:53:17  18    **Q**    Okay.  So your -- your testimony is that you spoke with the

19    Grand Jury about Moreno --

09:53:22  20    **A**    No.

09:53:22  21    **Q**    -- with respect to the Herrero case?

09:53:26  22    **A**    I presented the Herrero case, and I presented the Prible

23    case.

09:53:29  24    **Q**    Okay.

09:53:29  25    **A**    And maybe others.  I don't remember.

*Video Deposition of Kelly Siegler*

09:53:30  1   **Q**    Okay.  And when you presented those two cases to the Grand

2   Jury, did you tell the Grand Jury that there were jailhouse

3   informants in those cases that would testify as to a confession?

09:53:43  4   **A**    Can we divide up the cases and ask the question

5   specifically?

09:53:47  6   **Q**    Sure.  With respect to Prible.

09:53:49  7   **A**    Okay.

09:53:49  8   **Q**    Yes.  Did you tell the Grand Jury that there was a jailhouse

9   informant that would testify that Prible confessed to the crime?

09:53:57 10   **A**    No.

09:53:58 11   **Q**    With respect to Mr. Herrero, did you tell the Grand Jury

12   that there was a jailhouse informant who would testify that

13   Mr. Herrero confessed to the crime?

09:54:07 14   **A**    Yes.

09:54:09 15   **Q**    Was there a court reporter present at that Grand Jury

16   meeting?

09:54:21 17   **A**    No.  Sorry.  No.

09:54:23 18   **Q**    You did not request that --

09:54:24 19   **A**    I don't think so, no.

09:54:25 20   **Q**    -- a court reporter be present?

09:54:27 21   **A**    I don't think so, no.

09:54:28 22   **Q**    Was that common practice in the DA's office to -- to not

23   have a court reporter present to transcribe those proceedings?

09:54:34 24   **A**    Correct.  You only had a court reporter present if you had a

25   witness you were presenting.

*Video Deposition of Kelly Siegler*

09:54:37  1   **Q**   Okay.  Now, you could have a court reporter present if you

2   weren't having -- presenting a witness, but you just didn't in

3   this case?

09:54:44  4   **A**   I don't think we ever had a court reporter present if we

5   weren't presenting a witness.

09:54:48  6   **Q**   Okay.  Let -- sorry.  Let me ask you a question so it's

7   easier to follow.

09:54:54  8        Was there anything preventing you from asking a court

9   reporter to be present in a Grand Jury proceeding in which you

10   were not presenting any witnesses?

09:55:02 11   **A**   Yes.

09:55:02 12   **Q**   What was preventing you from doing that?

09:55:05 13   **A**   Grand Jury proceedings are secret, so you don't want a

14   record of what's going on when they vote, when they talk about

15   things.  You only have a court reporter present when there's a

16   witness.

09:55:16 17   **Q**   Okay.  But -- and I understand the Grand Jury proceedings

18   are secret.  There would never be a court reporter present to

19   take down what you were telling the Grand Jury before they went

20   into their secret deliberations?

09:55:34 21   **A**   I don't want to say never, but not that I remember.

09:55:37 22   **Q**   Okay.  Was there anything preventing you from having a court

23   reporter take down the testimony, for lack of a better word,

24   the -- the statements that you were making to the Grand Jury

25   about these cases before they went into their private

*Video Deposition of Kelly Siegler*

1    deliberations?

09:55:56  2    **A**    Well, you would have to find the court reporter.  They

3    weren't there.  They don't stay in the Grand Jury room.

09:56:02  4    **Q**    You would have to arrange for a court reporter to be

5    present?

09:56:05  6    **A**    Correct.

09:56:05  7    **Q**    And those court reporters are -- that transcribe the -- the

8    grand jury proceedings, those worked at the DA's office, right?

09:56:13  9    **A**    They worked in the Grand Jury division, yes.

09:56:15 10    **Q**    Right.  Like Javier Leal, I believe was one?

09:56:19 11    **A**    Yes.

09:56:19 12    **Q**    Okay.  So what you would need to do is make arrangements for

13    one of them to be present when you presented the case if you

14    wanted the testimony -- testimony transcribed?

09:56:28 15    **A**    Yes.

09:56:28 16    **Q**    Okay.  But you did not do that in this case?

09:56:31 17    **A**    Which case?

09:56:33 18    **Q**    In the Prible case.

09:56:34 19    **A**    I did not.

09:56:35 20    **Q**    And you did not do that in the Herrero case?

09:56:37 21    **A**    I did not.

09:56:39 22    **Q**    So there is no record whatsoever as to what you told the

23    Grand Jury when you presented the Prible matter to that Grand

24    Jury?

09:56:50 25    **A**    There is not.

*Video Deposition of Kelly Siegler*

09:56:52 1  **Q**   And there is no record whatsoever regarding what you told

2  the Herrero Grand Jury about Herrero's case in that Grand Jury

3  proceeding?

09:57:02 4  **A**   There is not.

09:57:03 5  **Q**   Now, a prosecutor has a duty to disclose all material

6  defensive facts to the grand jury, correct?

09:57:08 7  **A**   Yes.

09:57:09 8  **Q**   Okay.  Did you tell the Grand Jury in the Prible matter that

9  you had spoken to Nathan Foreman about Mr. Prible's case?

09:57:21 10  **A**   No.

09:57:22 11  **Q**   Did you tell the Grand Jury that a jailhouse informant tried

12  to come -- or came to you to try to set up Mr. Prible for this

13  murder before Mr. -- before he had even met Mr. Prible?

09:57:37 14  **A**   I don't understand that question.

09:57:38 15  **Q**   Did you tell the Grand Jury that an inmate, Nathan Foreman,

16  had come to you and tried to set up Mr. Prible, saying that

17  he -- Mr. Prible had confessed to him, but that you had

18  determined that Mr. Foreman was lying about that?

09:57:57 19  **A**   I disagree with the assertion that Nathan -- Nathan Foreman

20  tried to set him up.  I agree with the statement I made earlier

21  that I did not believe Nathan Foreman was being credible, and I

22  agree with the statement I said earlier that Nathan Foreman's

23  interview had nothing to do with the evidence that existed

24  against Jeffrey Prible.

09:58:20 25  **Q**   Okay.  My question -- I'll restate it.

*Video Deposition of Kelly Siegler*

09:58:22  1    Did you -- when you were presenting the case against

2    Mr. Prible to the Grand Jury, did you tell the Grand Jury about

3    your meeting and the substance of that meeting with Nathan

4    Foreman?

09:58:33  5   **A**   No.

09:58:34  6   **Q**   Because first he was charged in July 5th, 2001, as we

7    established, right?

09:58:40  8   **A**   Right.

09:58:40  9   **Q**   And after that, he was moved from the FCI Beaumont low to

10    FCI Beaumont medium because his points went up, right?

09:58:49 11   **A**   I don't know anything about that.

09:58:50 12   **Q**   You don't know that he was moved from the low to the medium?

09:58:54 13   **A**   I didn't keep up with that.  I don't remember when he was

14    moved or why he was moved.

09:58:57 15   **Q**   Okay.  But you don't disagree that he was moved from the low

16    to the medium after he was charged in this case?

09:59:02 17   **A**   I don't know.

09:59:04 18   **Q**   Now, Curtis Brown was involved in the Hermelio Herrero case

19    as well, right?

09:59:08 20   **A**   Yes.

09:59:09 21   **Q**   Okay.  And the same informants were involved in the Herrero

22    case as were involved in the Prible case, right?

09:59:15 23   **A**   No.

09:59:16 24   **Q**   Well, Nathan Foreman was involved in both cases, right?

09:59:19 25   **A**   No.

*Video Deposition of Kelly Siegler*

09:59:20  1    Q    Well --

09:59:21  2    A    You-all say Nathan Foreman was involved in the Prible case.

3    He was not.

09:59:25  4    Q    He spoke with you about the Prible case, right?

09:59:28  5    A    And he lied.  He wasn't involved.

09:59:29  6    Q    And he spoke --

09:59:30  7    A    You want to make him involved.  He wasn't involved.

09:59:32  8    Q    And he spoke also with you about the Herrero case, right?

09:59:35  9    A    Yes.

09:59:36 10    Q    And he ended up not testifying again -- with you -- or for

11    you in that case, right?

09:59:41 12    A    That's right.

09:59:42 13    Q    Okay.  But you, nevertheless, wrote him a Rule 35 letter to

14    his prosecutor, right?

09:59:47 15    A    I did.

09:59:47 16    Q    Okay.  Jesse Moreno talked with you about Mr. Prible's case

17    and Mr. Herrero's case, correct?

09:59:55 18    A    He did.

09:59:56 19    Q    Rafael Dominguez spoke with you about Mr. Herrero's case,

20    and his name was also listed -- he -- he -- his name came up in

21    that conversation that you had in August 8th, 2001, with

22    Mr. Foreman, right?

10:00:14 23    A    With Nathan Foreman.  Rafael Dominguez was not involved in

24    the Prible case.

10:00:17 25    Q    Okay.  But he was mentioned in that conversation that you

*Video Deposition of Kelly Siegler*

1   were having with Mr. Foreman on August 8th, 2001?

10:00:22   2   **A**   By Nathan Foreman --

10:00:23   3   **Q**   Uh-huh.

10:00:24   4   **A**   -- who was lying.

10:00:25   5   **Q**   Okay.  But --

10:00:26   6   **A**   So that doesn't make him involved.

10:00:28   7   **Q**   I understand.

10:00:28   8      My question is:  Rafael Dominguez was mentioned by Nathan

9   Foreman during that conversation you had with him on August 8th,

10   2001, right?

10:00:36   11   **A**   That does not make him involved.

10:00:38   12   **Q**   Okay.  Are you going to refuse the answer the question?

10:00:40   13   **A**   No.

10:00:40   14   **Q**   Okay.  One more time.  Mr. Dominguez's name was mentioned by

15   Nathan Foreman when he met with you on August 8th, 2001,

16   correct?

10:00:52   17   **A**   It was.

10:00:55   18   **Q**   Now, why did you not end up using Mr. Foreman at Herrero's

19   trial?

10:01:04   20   **A**   I didn't need him.  I didn't believe him.

10:01:09   21   **Q**   Exhibit 71, that's a letter dated May 5th, 2002, from you to

22   FCI medium, and you're asking the prison to keep Jesse Moreno,

23   Rafael Dominguez, Nathan Foreman and Eddie Gomez safe from

24   Herrero because he's put a hit out on them for testifying in his

25   case, right?

*Video Deposition of Kelly Siegler*

10:01:31 1 **A** What's your question?

10:01:32 2 **Q** Is that -- that's what it reflects, right?

10:01:36 3 **A** Not exactly.

10:01:38 4 **Q** Okay. Well, will you agree that the letter says what it --
5 says what it says?

10:01:43 6 **A** The letter is a request to try and keep them safe.

10:01:48 7 **Q** Right. And you refer to four witnesses, one of whom is
8 Herrero, right?

10:01:52 9 **A** Yes.

10:01:52 10 **Q** I mean -- I'm sorry. One of whom is Foreman, right?

10:01:55 11 **A** Yes.

10:01:56 12 **Q** Okay. But you just said that he lied and you didn't
13 believe -- you didn't believe him?

10:02:00 14 **A** He didn't testify.

10:02:01 15 **Q** That's not my question. You just said that he lied, and you
16 didn't believe him, right?

10:02:05 17 **A** I just said that Nathan Foreman did not testify in the
18 Hermelio Herrero trial.

10:02:10 19 **Q** And you also found him to be a liar, right?

10:02:13 20 **A** I did not believe him to be credible, no.

10:02:15 21 **Q** And nevertheless, you gave him favors for his assistance in
22 the Herrero case, didn't you?

10:02:20 23 **A** I did not. I wrote him a letter.

10:02:23 24 **Q** Well, you also asked for the prison to keep him safe based
25 on his testimony in that case when he didn't testify, right?

*Video Deposition of Kelly Siegler*

10:02:29  1    **A**    I think I still have an obligation to keep a man from being

2    killed, don't you?  Even if I think he's a liar, I can't let him

3    get killed.

10:02:38  4    **Q**    Let's look at Exhibit 72.  Exhibit 72 is a May 1st, 2002,

5    letter from you to U.S. Attorney Todd Clemons.  We -- we

6    mentioned his name earlier.  "Moreno told me initially of the

7    possibility of other witnesses to admissions made by Herrero

8    about his committing this murder in 1995.  Moreno and the other

9    three witnesses have all been cooperative.  It was, however,

10   Moreno who I presented to the jury as being the crux of the

11   case, and it was almost entirely because of his testimony that

12   the jury found Herrero guilty of murder," right?  Right?

10:03:20  13   **A**    Yes.

10:03:20  14   **Q**    Okay.  Now, the other three witnesses that you were

15   referring to there were Foreman, Rafael Dominguez, and Eddie

16   Gomez, right?

10:03:29  17   **A**    I think so.  I don't remember the last one.

10:03:31  18   **Q**    Okay.  And by the time that you wrote this letter, you had

19   determined that Foreman was not with Moreno at the time Moreno

20   claims he heard this testimony from Mr. -- or this confession

21   from Mr. Herrero, right?

10:03:51  22   **A**    I don't remember when I figured that out.

10:03:53  23   **Q**    Okay.  At some point before Mr. Herrero's trial, you figured

24   that out, right?

10:03:58  25   **A**    At some point before Mr. Herrero's trial, I did not believe

*Video Deposition of Kelly Siegler*

1    that Nathan Foreman was being completely truthful.

10:04:05  2    **Q**    But regardless, you wrote this letter to the U.S. attorney

3    for Mr. Moreno saying that all three witnesses, including

4    Foreman, had been cooperative?

10:04:15  5    **A**    That's correct.

10:04:18  6    **Q**    And Exhibit 73, even though by the time Mr. Herrero's trial

7    you had found out that Moreno had been lying to you about

8    Foreman being present, and Mr. Foreman had also lied to you on

9    August 8th, 2001, you, nevertheless, wrote a letter to Foreman's

10    U.S. attorney asking for a sentence reduction for his assistance

11    in the Herrero case; is that correct?

10:04:50 12    **A**    Okay.  What was your question?

10:04:55 13    **Q**    By May 1st, 2002, Herrero's trial was over, right?

10:04:58 14    **A**    Yes.

10:04:59 15    **Q**    Prior to his trial, you had determined that -- not only

16    that -- well, first, I'll break it down.

10:05:05 17        You had determined that Moreno's initial story to you about

18    hearing the confession of Herrero in the presence of Nathan

19    Foreman was false, correct?

10:05:14 20    **A**    I don't remember that -- making that determination, no.

10:05:17 21    **Q**    I thought you just were saying that at some point prior to

22    trial, you determined that Mr. Foreman was not present during

23    that confession?

10:05:24 24    **A**    No.  I determined that Mr. Foreman was not being completely

25    credible -- truthful.

*Video Deposition of Kelly Siegler*

10:05:28   1   **Q**   Did you not -- did you ever determine that Mr. Foreman was

2   not present for the -- for Herrero's supposed confession to

3   Moreno as Moreno had told you he was back in July of 2001?

10:05:41   4   **A**   I don't remember.  I didn't go into a break-it-down

5   determination of all the reasons why I thought Nathan Foreman

6   was lying.  I just didn't believe him, so I didn't use him.

10:05:52   7   **Q**   Okay.  But you, nevertheless, wrote this letter to his U.S.

8   attorney asking for a sentence reduction, right?

10:05:57   9   **A**   Not exactly.  That's a lot different letter than the one I

10   wrote for Jesse Moreno.

10:06:01   11   **Q**   Are you disagreeing that this Exhibit 73 is a letter to

12   Nathan Foreman's U.S. attorney asking her to consider his

13   cooperation in the Herrero case?

10:06:13   14   **A**   I agree that I wrote this letter saying that Nathan Foreman

15   was cooperative.  I don't say nearly the parts about how

16   truthful he was like I do with Jesse Moreno, and I do not

17   specifically make a request for a downward departure like I do

18   for Jesse Moreno.  It's a different letter.

10:06:31   19   **Q**   Okay.  And nowhere in this letter do you say, "Ms. Batson I

20   met with -- with Mr. Foreman.  I think he's a complete liar"?

10:06:38   21   **A**   I do not say that.

10:06:39   22   **Q**   You do not say that?

10:06:40   23   **A**   No.

10:06:40   24   **Q**   And nothing was requiring you to write this letter, right?

25   You didn't have to write this letter to Ms. Batson, right?

*Video Deposition of Kelly Siegler*

10:06:47  1    **A**    I did not.

10:06:48  2    **Q**    You chose to do that on Mr. Foreman's behalf?

10:06:50  3    **A**    I chose to write the letter.

10:07:06  4    **Q**    Now, Hermelio Herrero was convicted of murder in April 2002,

         5    and he was sentenced to life in prison, right?

10:07:12  6    **A**    Yes.

10:07:13  7    **Q**    And Moreno and Dominguez testified him -- against him at

         8    that trial, correct?

10:07:18  9    **A**    Yes.

10:07:20 10    **Q**    Okay.  Exhibit 125 is an undated letter from Jesse Moreno to

        11    you telling you exactly what to say to U.S. Attorney Clemons to

        12    get him transferred to another prison and to have his sentence

        13    reduced, right?

10:07:36 14    **A**    I don't know what this is.

10:07:37 15    **Q**    Okay.  Have you never seen it before?  It was found in your

        16    file.

10:07:40 17    **A**    I'm trying recognize it.  I don't remember seeing this.

10:07:46 18    **Q**    You've never seen it?

10:07:47 19    **A**    I'm not denying that it was in the file that you got from

        20    Brian Rose, but I don't remember seeing this.

10:07:56 21    **Q**    Were you, in fact, able to persuade the unit team to

        22    transfer Moreno to the prison to keep him safe like we discussed

        23    earlier?

10:08:08 24    **A**    I don't know -- when are we talking about?

10:08:11 25    **Q**    Well, did you -- did you contact BOP in Beaumont and inform

*Video Deposition of Kelly Siegler*

1   them that Moreno and these other witnesses -- these other three

2   witnesses had testified -- or had cooperated in your case

3   against Herrero and he needed to keep him safe?

10:08:27   4   **A**   I don't know what this says.  I didn't read the whole thing.

5   Is that what this is?

10:08:31   6   **Q**   No, I'm asking you after you got -- after you received

7   this --

10:08:34   8   **A**   Are we done with this?  I don't know if I received this.  I

9   do not recognize this.

10:08:38   10   **Q**   Okay.  Were you able to persuade the unit team in BOP, the

11   FCI Beaumont team to move Moreno and these other three witnesses

12   to another area of the prison where they would be kept safe?

10:08:55   13   **A**   I don't remember.  I hope so.

10:08:57   14   **Q**   Okay.  So that's something that you might have been able to

15   do is all I'm -- is all I'm asking?

10:09:04   16   **A**   All I can do is make the request.

10:09:07   17   **Q**   Okay.

10:09:07   18   **A**   The federal prisons do what the federal prisons do.

10:09:10   19   **Q**   Okay.  Exhibit 123 was also produced from your file by the

20   DA's office, and it is a witness voucher for your testimony in

21   an August 22nd, 2002, sentence reduction hearing for Jesse

22   Moreno.  Do you recognize this document?

10:09:29   23   **A**   I do.

10:09:30   24   **Q**   Okay.  You filled it out, correct?

10:09:34   25   **A**   I didn't fill this out.

*Video Deposition of Kelly Siegler*

10:09:35  1   Q    You didn't fill it out?

10:09:37  2   A    No.

10:09:37  3   Q    Okay.  Well, you -- you must have told someone how to fill

4   it out so you could sign it and get reimbursed?

10:09:46  5   A    I don't know how it got filled out.  It says signed by the

6   assistant U.S. attorney.

10:09:50  7   Q    Okay.  But you recall seeing this document?  You recall

8   making this -- submitting this fact witness voucher?

10:09:56  9   A    I remember seeing this.

10:09:57 10   Q    Okay.  Now, this was never produced to Mr. Prible's defense

11   team, was it?

10:10:06 12   A    Why would it be?

10:10:06 13   Q    I'm just asking you if it was ever produced to Mr. Prible's

14   defense team?

10:10:11 15   A    This piece of paper having to do with Jesse Moreno, you're

16   asking me why I didn't produce this to Jeffrey Prible's defense

17   team?

10:10:22 18   Q    I'm asking if you did produce it to their defense team.

10:10:25 19   A    No.

10:10:26 20   Q    Okay.  Now, the hearing for Mr. Moreno that this references

21   was in Lafayette, Louisiana, right?

10:10:36 22   A    I was instructed that that hearing was confidential and that

23   I was never to talk about it or of it to anyone, by a federal

24   judge.

10:10:47 25   Q    Ms. Siegler --

*Video Deposition of Kelly Siegler*

10:10:47  1     (Video paused.)

10:10:48  2     **MS. SCARDINO:**  Your Honor, at this point I want to

3  pause because we went off the record and agreed to have the

4  questions about that hearing sealed.  And I would like for you

5  to see that.  It's not on video, but I would like to -- for --

6  to read that into the record or however you would like to --

10:11:06  7     **THE COURT:**  It's still sealed?

10:11:07  8     **MS. SCARDINO:**  It's -- yes.  It's sealed by agreement.

9  We agreed to have it sealed so we could question her about it --

10  about the...

10:11:16  11     **THE COURT:**  Are you going to read it in the open

12  courtroom, then?

10:11:19  13     **MS. SCARDINO:**  Sure.

10:11:19  14     **THE COURT:**  I'm -- that will destroy the seal, I mean.

10:11:22  15     **MS. MIRANDA:**  And I understood that was -- that was

16  what was subject to the protective order.

10:11:26  17     **MS. SCARDINO:**  Well, my understanding is the

18  protective order was the actual transcript of that August 22nd,

19  2002, hearing, and that -- but the questions about it were not

20  pursuant to that protective order that was entered into with the

21  U.S. Attorney's Office.

10:11:41  22     **MS. MIRANDA:**  Our preference would be not to do it in

23  open court.  I mean, that's cutting it kind of close.

10:11:47  24     **THE COURT:**  Why don't you let me read it.

10:11:48  25     **MS. SCARDINO:**  Okay.  That's fine, Your Honor.

*Video Deposition of Kelly Siegler*

10:11:49 1      **THE COURT:**  You can give it to me.

10:11:50 2      **MS. SCARDINO:**  Okay.  So should we continue?

10:11:57 3      **THE COURT:**  Let's continue.

10:11:57 4     *(Video deposition of Kelly Siegler continued as follows.)*

10:11:58 5  **Q**   Okay.  So earlier we were talking about the open file policy

6  that you said the DA's office had during this time period that

7  Mr. Prible was prosecuted, and in that -- when a defense

8  attorney came in to view the file, would they be able to take

9  notes of what they were reading?

10:12:11 10  **A**   Yes.

10:12:12 11  **Q**   But they would not be able to make copies of the documents

12  in the file; is that right?

10:12:16 13  **A**   Correct.

10:12:19 14  **Q**   And you testified that you had no work product file that you

15  kept as such, correct?

10:12:24 16  **A**   Not per se, not necessarily, no.

10:12:26 17  **Q**   Okay.  And that is because all of your work product would

18  have been reviewable by the defense, right?

10:12:34 19  **A**   I'm trying to think of what work product might have come up

20  in Prible early on.  I can't think of what it would have been.

10:12:41 21  **Q**   Okay.

10:12:43 22  **A**   But my notes I wouldn't have considered work product.

10:12:45 23  **Q**   Okay.  All notes -- any notes that you took working on this

24  case would have been available to defense attorneys to see; is

25  that right?

*Video Deposition of Kelly Siegler*

10:12:54  1    A    Yes.

10:12:55  2    Q    Okay.  And how do you define work product?  What's your

       3    understanding of that definition?

10:13:11  4         The legal definition of work product.

10:13:17  5    A    We tried to keep most things not work product just because

       6    it was simpler.

10:13:22  7    Q    Okay.  Do you understand -- do you know what the term "work

       8    product" -- how it's defined under the law?

10:13:27  9    A    Tell me.

10:13:28 10    Q    No, I'm asking you if you -- if you know.

10:13:30 11    A    No, I don't know the criminal definition of it.

10:13:33 12    Q    Okay.  There were other nontestifying informants that were

      13    involved in the Prible case; isn't that right?

10:13:41 14    A    I remember Michael Beccom, but Michael Beccom testified.

10:13:46 15    Q    Okay.  Do you remember discussing Mr. Prible's case with

      16    other inmates other than Mr. Foreman and Mr. Beccom in FCI

      17    Beaumont?

10:13:56 18    A    I don't remember.  I could have, but I'm not sure if I did

      19    there or where or who it would have been.

10:14:01 20    Q    Okay.  I'm going to show you Exhibit 112.  And you see on

      21    the last page of this Exhibit 112 it says the letter was

      22    received by you on May 22nd, 2002?  Do you see that?

10:14:16 23    A    Just a second.

10:14:17 24    Q    Okay.  And this letter to you is from Jesse Gonzalez and

      25    Felix Gonzalez.  Do you see that at the top?

*Video Deposition of Kelly Siegler*

10:14:25  1   **A**   I do.

10:14:26  2   **Q**   Okay.  Do you remember Mr. and Mrs. -- or Mr. Jesse Gonzalez

3   and Felix Gonzalez?

10:14:30  4   **A**   I never met them.

10:14:31  5   **Q**   Okay.  Do you recall that they were -- I'm just asking you

6   if you -- if you remember them.  Do you remember them?

10:14:36  7   **A**   I never met them.  I remember getting this letter.

10:14:39  8   **Q**   Okay.  Do you remember that they're a father/son duo that's

9   incarcerated together in FCI Beaumont?

10:14:45 10   **A**   Only from this letter.

10:14:46 11   **Q**   Okay.  But you did -- you remember receiving this letter in

12   May 2002?

10:14:50 13   **A**   Yes.

10:14:50 14   **Q**   Okay.  And in this letter, Mr. Gonzalez said that he and his

15   father have spoken to you twice on the phone about the Prible

16   case, right?

10:15:00 17   **A**   That's what he says.

10:15:02 18   **Q**   Okay.  And he -- do you recall speaking to him on the phone

19   about the Prible case?

10:15:05 20   **A**   I do not.

10:15:06 21   **Q**   Do you -- do you just not remember or did you not -- let me

22   ask that question more clearly.

10:15:11 23       Did you ever speak on the telephone with the Gonzalezes

24   about Mr. Prible's case?

10:15:17 25   **A**   Not that I remember, no.

*Video Deposition of Kelly Siegler*

10:15:18  1  **Q**   Not that you recall, no?

10:15:20  2      Okay.  And you notice in this letter that the word Prible

3  is misspelled?  Do you see that?

10:15:26  4  **A**   I do.

10:15:26  5  **Q**   With two Bs instead of one?

10:15:28  6  **A**   Correct.

10:15:29  7  **Q**   Okay.  And Mr. Gonzalez, in this letter, also mentions a

8  newspaper article that he had recently seen about the case while

9  he was in prison, right?

10:15:37 10  **A**   He does.

10:15:38 11  **Q**   Okay.  Now, was it your practice with informants, if someone

12  reached out to you with information about a case and you spoke

13  with them on the phone, to ask them to write you a letter

14  detailing what they knew about the case?

10:15:56 15  **A**   No.

10:15:57 16  **Q**   That wasn't a practice that you had?

10:15:59 17  **A**   No.

10:15:59 18  **Q**   Did you ever ask any informant to put down what they knew in

19  writing and send it to you?

10:16:04 20  **A**   I did not.

10:16:05 21  **Q**   Did you ever tell potential informants to take a prison

22  photograph with the defendant that they were working to testify

23  against?

10:16:17 24  **A**   I saw that in your petition where you said I did that.  That

25  is a lie.

*Video Deposition of Kelly Siegler*

10:16:21 1   Q   I'm just asking you.  So you deny that you ever did that?

10:16:24 2   A   I did not.

10:16:25 3   Q   Okay.  But you were aware of such informant photos, correct?

10:16:29 4   A   I saw the picture.

10:16:31 5   Q   Okay.  When was the first time you saw that informant photo?

10:16:35 6   A   I don't know if I first saw it at Beaumont or when -- when

7   Beckcom got back to Harris County right before the trial.

10:16:45 8   Q   But you saw the photos prior to the trial of this case?

10:16:48 9   A   Yes.

10:16:48 10   Q   Okay.  And they were shown to you by Beckcom?

10:16:52 11   A   I think it was Beckcom.

10:16:53 12   Q   Now, parts of this letter from Mr. Gonzalez don't make

13   sense, right?

10:16:58 14   A   They do not.

10:16:59 15   Q   Okay.  And what was your take on this letter when you

16   received it?

10:17:04 17   A   Mr. Gonzalez was trying to glom on and put himself in the

18   middle of a case to try and get himself a deal, like every other

19   inmate in federal prison.

10:17:12 20   Q   Okay.  And did you believe his story from this letter, that

21   he had heard Mr. Prible confess?

10:17:17 22   A   I did not believe his story for lots of reasons.

10:17:23 23   Q   Also, if you notice in this photo -- in this Exhibit 112,

24   Mr. Gonzalez says that he knew about Jeff and Jeff's case before

25   Jeff even got to the medium from the low.  Did you see that?

*Video Deposition of Kelly Siegler*

10:17:35 1    A   I did see that.

10:17:36 2    Q   Okay.  How might an inmate know that another inmate is going

3    to be transferred to their unit of the prison?

10:17:43 4    A   I have no idea.  I didn't believe what this letter had to

5    say.

10:17:47 6    Q   And is that why you decided not to have Mr. Gonzalez testify

7    against Prible in this case, because you determined that he was

8    not credible?

10:17:55 9    A   Correct.

10:17:55 10   Q   Okay.  Did you ever show Mr. Gaiser or Mr. Wentz this letter

11   from Mr. Gonzalez?

10:18:04 12   A   It would have been in the file.

10:18:05 13   Q   Okay.  So your -- your testimony is yes, you did show it to

14   them?

10:18:07 15   A   I don't know if they looked at it or not.  It would have

16   been in the file.

10:18:10 17   Q   It would have been in the file that you gave them to review

18   when they came into your office to review the file?

10:18:15 19   A   Correct.

10:18:16 20   Q   And do you have any written record of what was in that file

21   that you gave them to review?

10:18:22 22   A   No.

10:18:23 23   Q   Okay.  You never made any notes about specifics?

10:18:26 24   A   The file was an open file.  I've known Terry Gaiser for

25   years.  Any time he wanted to read the file, he could come.  I

*Video Deposition of Kelly Siegler*

1    would even bring it to court for him to read during docket call.

2    "Here it is, Terry.  Knock -- knock yourself out."

10:18:40  3    **Q**    Now, Exhibit 113 -- Exhibit 113 is a letter from Carl

4    Walker, another inmate in FCI Beaumont, to you about

5    Mr. Prible's case.  Do you recognize this letter?

10:18:56  6    **A**    I do, but this is the only letter I noticed you-all talked

7    about in your petition where you don't have the envelope

8    attached with the date.  I'd like to see the date, please.

10:19:05  9    **Q**    Well, I'd like to see it also, but it wasn't produced to us

10    from your file.

10:19:09  11    **A**    That's odd.

10:19:09  12    **Q**    Do you think it should be in your file somewhere?

10:19:12  13    **A**    You should ask him that.

10:19:13  14    **Q**    Well, I'm asking you because you know what's in the file.

15    Would you have kept that --

10:19:19  16    **A**    Yes.

10:19:19  17    **Q**    -- in your file?

10:19:20  18    **A**    Yes.

10:19:21  19    **Q**    Okay.  So -- and it would be -- and in your mind, we should

20    be able to review the entire file, right, that you had in this

21    case?

10:19:27  22    **A**    No, I just want to know where the envelope is because you

23    attached the rest of the envelopes.

10:19:32  24    **Q**    Right.  I've attached everything that was given -- I'll

25    represent to you that was produced to us by the DA's office.

*Video Deposition of Kelly Siegler*

10:19:37  1        So you've seen this letter before.  Do you recognize it?

10:19:43  2  **A**   Okay.

10:19:44  3  **Q**   Okay.  Now, why did you not use Carl Walker to testify

          4  against Mr. Prible?

10:19:50  5  **A**   I didn't believe him.

10:19:51  6  **Q**   Okay.  Did you ever speak with him on the phone?

10:19:54  7  **A**   I don't even remember the name of Carl Walker.  Unlike the

          8  other inmates whose names I do recognize, I don't remember Carl

          9  Walker's name.

10:20:01 10        And I also notice in this letter that he talks as if Prible

         11  had already been indicted, unlike the others, which, again,

         12  makes me wonder where is the envelope that went with this

         13  letter.

10:20:10 14  **Q**   And I would very much like to see that envelope also, I

         15  would represent to you.  So --

10:20:15 16        Okay.  So you chose -- you decided not to use Mr. Walker

         17  because you thought he was not credible?

10:20:19 18  **A**   Based on what he's saying here --

10:20:20 19  **Q**   What he's saying here?

10:20:22 20  **A**   -- it doesn't make sense.

10:20:23 21  **Q**   Okay.  But you're saying that you showed this letter to

         22  Mr. Prible's defense team?

10:20:27 23  **A**   I'm saying it was in the file.

10:20:32 24  **Q**   So you can't say for certain that you showed this letter to

         25  Mr. Prible's defense team?

*Video Deposition of Kelly Siegler*

10:20:36 1   A   I don't know what they read.  The file was open for them to

2   read whatever they wanted.

10:20:40 3   Q   Okay.  Let's look at Exhibit 114.

10:20:43 4       Exhibit 114 is a letter from Mark Martinez, another inmate

5   at FCI Beaumont, to you.  And if you look on the third page,

6   there's an envelope that's dated April 30th, 2002.  Do you see

7   that?

10:21:00 8   A   Just one second.

10:21:01 9   Q   Okay.

10:21:03 10  A   Okay.

10:21:04 11  Q   Okay.  Now, why didn't you use Mr. Martinez in your case

12  against Mr. Prible?

10:21:09 13  A   Because it's pretty obvious that he's just trying to jump on

14  the bandwagon of all -- what all they're all saying to each

15  other out there.  He's trying to say whatever he can to act like

16  he knows something he doesn't know for a time cut, like every

17  other inmate in federal prison.

10:21:22 18  Q   Okay.

10:21:22 19  A   I didn't believe him, either.

10:21:24 20  Q   And you -- and when you say talking about things --

10:21:27 21  A   That's what he said.

10:21:29 22  Q   Right.

10:21:29 23  A   They were all talking about it.

10:21:31 24  Q   Okay.  So he said that all -- and you got this -- you

25  received this letter from him about four months before

*Video Deposition of Kelly Siegler*

1    Mr. Prible's trial -- six months -- about six months before

2    Mr. Prible's trial?

10:21:41 3    **A**   Yes.

10:21:41 4    **Q**   Okay.  So it looks like you had several inmates at FCI

5    Beaumont auditioning for this role of informant against

6    Mr. Prible, right?

10:21:50 7    **A**   Federal inmates audition for any role they have on any case

8    they can think of with any information they might hear to try

9    and get a time cut.  That's what federal inmates do all day

10    long, 24 hours a day, every day of the year.

10:22:02 11    **Q**   Yeah.  So you knew that they were doing this before

12    Mr. Prible's trial, right?

10:22:06 13    **A**   I'm not stupid.

10:22:08 14    **Q**   Okay.  But your testimony is that you gave each of these

15    informant letters to Mr. Defense -- or Mr. Prible's defense

16    counsel prior to his trial, right?

10:22:19 17    **A**   My testimony is these letters were in the file.

10:22:23 18    **Q**   Okay.  So you can't say for sure whether you gave these to

19    Mr. Gaiser and Mr. Wentz?

10:22:28 20    **A**   I don't know what he read.  I didn't babysit his note taking

21    and what he pulled out of the file to read.

10:22:34 22    **Q**   Did it ever occur to you that these Exhibits 112 through

23    114, those informant letters, could have been typed up by the

24    same person?

10:22:49 25    **A**   They might have been.  I don't know.  I think the similarity

*Video Deposition of Kelly Siegler*

1    is the typewriter.

10:22:54  2    **Q**   Okay.  Did it raise a red flag to you when you received

3    these letters that they all looked the same?

10:22:59  4    **A**   Yes.

10:23:00  5    **Q**   Okay.  And did -- and that red flag to you was that they

6    could have been typed up by the same person?

10:23:06  7    **A**   I don't know if I thought that.

10:23:08  8    **Q**   And it was obvious that these guys were talking about this

9    case on the yard together?

10:23:14 10    **A**   Jesse Gonzalez, Felix Gonzalez, Carl Walker and Mark

11    Martinez, yes.

10:23:18 12    **Q**   Okay.  But it wasn't obvious to you that they were speaking

13    about this case with Mr. Beckcom even though he had --

10:23:23 14    **A**   Not based on this letter.  It has nothing to do with Prible.

10:23:27 15    **Q**   I'll show you Exhibit 176.  It's an affidavit you filed in

16    the state habeas hearing, Hermelio Herrero's habeas proceeding.

17    And you signed that affidavit on March 22nd, 2016; is that

18    correct?

10:23:45 19    **A**   Okay.

10:23:47 20    **Q**   Nowhere in that affidavit do you say that you traveled to

21    Louisiana and testified in Mr. Moreno's Rule 35 hearing, does

22    it?

10:24:01 23    **A**   Why would it?

10:24:02 24    **Q**   I'm just asking you if it does.  Does that appear anywhere

25    in there?

*Video Deposition of Kelly Siegler*

10:24:06 1   **A**   It does not.

10:24:10 2   **Q**   Now, moving on, there was a criminal history report for

3   Nathan Foreman that we talked about earlier.  Does the

4   defense -- they don't have equal access to those reports,

5   correct?

10:24:22 6   **A**   They do.

10:24:22 7   **Q**   They do?

10:24:22 8   **A**   Yes.

10:24:24 9   **Q**   How does a defense attorney go about running a criminal --

10:24:26 10   **A**   An offense --

10:24:26 11   **Q**   -- or a criminal history report?

10:24:29 12   **A**   He opens the DA's file and looks at the criminal history.

10:24:31 13   **Q**   Okay.  I understand that.  Is there any way that the defense

14   attorney would be able to see that criminal history report if he

15   wasn't looking at it in a file at the DA's office?

10:24:43 16   **A**   Hire a private investigator and they get the criminal

17   history for them.

10:24:48 18   **Q**   Okay.  What was your policy regarding giving criminal

19   history printouts that you had printed for witnesses and for

20   alternate suspect?  What was your policy about giving those over

21   to the defense?

10:25:03 22   **A**   We gave them over to the defense.

10:25:05 23   **Q**   You gave all of the ones that you had run for all witnesses,

24   you gave them to the defense?

10:25:11 25   **A**   What do you mean "all"?  We're talking about which case?

*Video Deposition of Kelly Siegler*

10:25:14  1   **Q**   In -- in Mr. Prible's case.

10:25:17  2   **A**   Can you rephrase the question?

10:25:21  3   **Q**   Sure.  Let's see.  You -- let's see.  I can show you each of

4   these, if you'd like -- if you feel like you need to see them,

5   or I can just tell you the names.

10:25:34  6   **A**   I gave the defense the criminal histories of every witness

7   that testified in the Prible case.

10:25:39  8   **Q**   Okay.  If a witness did not testify, you didn't give them

9   that criminal history, right?

10:25:44 10   **A**   Who are we calling a witness?

10:25:52 11        I don't call Nathan Foreman a witness.

10:25:53 12   **Q**   You don't call him a witness?

10:25:55 13   **A**   Not in the Prible case.

10:25:56 14   **Q**   Okay.  Was he a witness for you in the Herrero case?

10:25:58 15   **A**   He tried to be.

10:25:59 16   **Q**   Okay.  Now, he had knowledge about Prible's case, right?

10:26:03 17   **A**   He was lying.

10:26:04 18   **Q**   Okay.  But he was connected to Prible's case because he came

19   to speak with you about it, correct?

10:26:08 20   **A**   He's still lying.

10:26:09 21   **Q**   Okay.  So you did not -- okay.  So you didn't give a

22   criminal history report for Nathan Foreman to the defense to

23   Prible's case?

10:26:16 24   **A**   He wasn't a witness.

10:26:17 25   **Q**   Okay.  Did you give Exhibit 87 --

*Video Deposition of Kelly Siegler*

10:26:26 1          THE COURT:  Please look for a place where we can

2    pause, okay?

10:26:29 3    BY MS. SCARDINO:

10:26:29 4    Q    This is a criminal history report --

10:26:31 5         *(Video paused.)*

10:26:32 6          MS. SCARDINO:  We can pause right there.

10:26:33 7          THE COURT:  We'll take a ten-minute break.

10:26:34 8       *(Recess taken from 10:26 a.m. to 10:45 a.m.)*

10:45:38 9          THE COURT:  Thank you.  Please be seated.  That's all

10    right.

10:45:40 11         Okay.  Why don't we resume the depo.

10:45:40 12         MS. SCARDINO:  Thank you, Your Honor.  We're about

13    half-way finished.

10:45:42 14         THE COURT:  We're half-way finished?

10:45:44 15         MS. SCARDINO:  Oh, and we wondered if we might be able

16    to break for lunch after this and have Mr. Gaiser's testimony

17    start at 1:00.

10:45:49 18         THE COURT:  That's fine.

10:45:50 19         MS. SCARDINO:  Would that be okay?

10:45:51 20         Okay.  Thank you.

10:46:01 21         Are you ready?

10:46:02 22         THE COURT:  I'm ready.

10:46:03 23      *(Video deposition of Kelly Siegler continued as follows.)*

10:46:03 24    Q    -- FCI Beaumont inmate named Jonathan Jefferson that was

25    found in your file.  Mr. Jefferson did not testify in

*Video Deposition of Kelly Siegler*

1    Mr. Prible's case.  Did you give this Exhibit 87 to defense

2    counsel?

10:46:19  3    A   I don't know who Jonathan Jefferson is, and I don't know

4    what Terry Gaiser chose to take notes from in the file.

10:46:26  5    Q   Okay.  But you just said that you only gave the criminal

6    history reports for testifying witnesses, right?

10:46:31  7    A   I said that I know for sure I gave them criminal history

8    reports for testifying witnesses.  There could have been other

9    ones in the file that Terry might have looked at.  I don't know

10    what he took notes from.

10:46:41 11    Q   You don't have -- you don't have any independent

12    recollection of giving him this criminal history report of

13    Jonathan Jefferson, do you?

10:46:50 14    A   I do not.

10:46:53 15    Q   Exhibit 86 is a criminal history report for a man named

16    James Martin.  Again, he did not testify in Mr. Prible's case,

17    so you would not have given this exhibit to Mr. Prible's defense

18    counsel, correct?

10:47:20 19    A   I don't know who James Martin is.

10:47:21 20    Q   Was he an alternate suspect in this case?

10:47:23 21    A   I have no idea who he is.

10:47:25 22    Q   I'm going to show you Exhibit 106.  It's part of that

23    criminal history report with Mr. Martin with some notes down at

24    the bottom.

10:47:37 25        Is that your handwriting?

*Video Deposition of Kelly Siegler*

10:47:38  1   **A**   It is.

10:47:39  2   **Q**   The bottom is your handwriting.  Okay.  And if you could

3   read that handwriting into the record, your handwriting.

10:47:45  4   **A**   "Nothing has ever happened between this witness and

5   defendant per Martin 9/10/02."

10:47:54  6        "Knew nothing regarding complainant and defendant's

7   activities and no recall day of money in the bag."

10:48:09  8   **Q**   So from these notes, it looks like you reached out to this

9   James -- James Martin to follow up on a statement that someone

10   had given you in this case?

10:48:20  11  **A**   I wouldn't say reached out.  I would say I talked to him,

12   whether it was on the phone or in person.  These are my notes

13   talking about that conversation.

10:48:28  14  **Q**   Okay.  I'm going to show you Exhibit 43.  This is a

15   statement of Jaime Diane Lyons given on April 29th, 1999.  And

16   if you go to the second page, the first paragraph, it says, "I

17   don't know of any enemies that Steve might have.  The only

18   friends of his that I met were James Martin, lives in Woodgate

19   Subdivision on Lemonwood, and a white guy who I've since learned

20   to be Jeff Prible.  About seven months ago, Steve, Crystal and I

21   were at James' house on Lemonwood when Jeff came over with a

22   baby shower bag full of money.  The whole bag was full of cash."

23   Do you see that?

10:49:20  24  **A**   I do.

10:49:21  25  **Q**   Okay.  Did you contact Mr. Martin in order to check out

*Video Deposition of Kelly Siegler*

1    whether Jaime Lyons' story was correct?

10:49:34  2    **A**    I don't remember, but that would make sense.

10:49:36  3    **Q**    Okay.  And he -- and from looking at your notes, it looked

4    like he gave you a different story than Ms. Lyons gave in her

5    statement; is that right?

10:49:46  6    **A**    It looks like he told me he didn't remember anything about

7    this baby bag full of money.

10:49:51  8    **Q**    That's right.  And these notes of yours were never

9    presented -- or disclosed to Mr. Prible's attorney before his

10    rile, were they?

10:50:00 11    **A**    About Jaime Lyons and the baby bag full of money?

10:50:04 12    **Q**    No.  Your notes on Exhibit 106 about your conversation with

13    this witness, James Martin.

10:50:14 14    **A**    I don't know if they were or not.  This statement was in the

15    file of Jaime Lyons.  The name of James Martin was in her

16    statement for Terry Gaiser to follow through with himself.  I

17    don't know if Terry Gaiser took notes from this or not, No. 106.

10:50:31 18    **Q**    In order to fulfill your Brady obligations as a prosecutor,

19    do you believe it was sufficient to simply give the name of a

20    witness to defense counsel without giving the context of what

21    that particular witness had spoken to you about?

10:50:48 22    **A**    That's not what I said.

10:50:49 23    **Q**    I'm asking you --

10:50:50 24    **A**    I do not.

10:50:50 25    **Q**    -- if that's your belief?  You do not?

*Video Deposition of Kelly Siegler*

10:50:53  1   A   Not if I have exculpatory information, no.

10:50:55  2   Q   Okay.  You're required to give --

10:50:57  3   A   The exculpatory information.

10:50:58  4   Q   -- the substance of that exculpatory information?  Okay.

10:51:00  5       But I believe you said that you gave the name of James

6   Martin to Terry Gaiser, and it was up to him to follow through

7   on this?

10:51:07  8   A   I didn't say that.

10:51:08  9   Q   That's not your -- your testimony?

10:51:10 10   A   No.  That's not what I said.  I said this statement was in

11   the file.  The name of James Martin was in the statement, and

12   these notes specifically were also in the file.  Whether Terry

13   Gaiser read it or not, I don't know.  I don't know what Terry

14   Gaiser read.

10:51:29 15   Q   The office manual had guidelines regarding the use of

16   informants, correct?

10:51:33 17   A   I don't remember what all it had.  It was -- it was this

18   thick (indicating).

10:51:37 19   Q   Right.  It was very thorough --

10:51:39 20   A   Yes.

10:51:39 21   Q   -- would you say?

10:51:40 22   A   Yes.

10:51:40 23   Q   And the reason it would have had guidelines about the use of

24   informants is because as -- as we've just discussed, prison

25   inmates are notoriously unreliable, right?

*Video Deposition of Kelly Siegler*

10:51:51  1    A    They lie.

10:51:52  2    Q    They lie.  Everyone in jail wants a time cut?

10:51:54  3    A    Yes.

10:51:55  4    Q    Everyone wants out?

10:51:56  5    A    Yes.

10:51:57  6    Q    Okay.  And so the office needed to have guidelines regarding

       7    the vetting and the usage of informants and the benefits that

       8    were exchanged with informants for the purpose of transparency,

       9    right?

10:52:10 10    A    I didn't write the guideline.  I don't know what their

       11    thinks was.  This -- the -- the Harris County DA's office

       12    guidelines were written way before I got there.

10:52:19 13    Q    Okay.  But you were familiar with these guidelines as a

       14    prosecutor, right?

10:52:22 15    A    Yes.

10:52:22 16    Q    Okay.  So if you look at page 15 of this exhibit, it

       17    contemplates two situations when informants might be used,

       18    right?  And one such circumstance was where the defendant had a

       19    case pending, and he and his attorney decided -- or sought to

       20    have him become an informant to work off the case.  Do you see

       21    that?

10:52:44 22    A    I do.

10:52:45 23    Q    And if the trial bureau prosecutor had no objections to that

       24    arrangement, it would be referred to the Special Crimes Bureau

       25    for approval.  The Special Crimes prosecutor enters into a

*Video Deposition of Kelly Siegler*

1   contract with the defendant and his attorney and notifies the

2   trial prosecutor when the contract is completed or not

3   completed.  Do you see that?

10:53:02  4   **A**   I do.

10:53:03  5   **Q**   Okay.  And the second situation in -- in which informants

6   might be used was where the defendant had a case pending, again,

7   and a police officer who has used the defendant as an informant

8   in the past requests special consideration in the form of a

9   lenient sentence.  And in that case, the trial bureau prosecutor

10  would make the determination of whether such consideration ought

11  to be given and then must follow -- and it lists a procedure.

12  Do you see that --

10:53:33 13  **A**   I do.

10:53:33 14  **Q**   -- that must be followed?

10:53:34 15  **A**   I do.

10:53:35 16  **Q**   Okay.  Now -- so the DA manual contemplates two situations

17  when informants might be used, right?

10:53:41 18  **A**   No.

10:53:42 19  **Q**   And --

10:53:43 20  **A**   These are two specific unique situations working off a

21  contract --

10:53:47 22  **Q**   Uh-huh.

10:53:48 23  **A**   -- and when a cop wants to work his own informant completely

24  separate than what we've been talking about all day.

10:53:54 25  **Q**   And -- and that -- that was my next question.  Neither of

*Video Deposition of Kelly Siegler*

1    these situations applied to this case, right?

10:53:58   2    **A**    Correct.

10:53:59   3    **Q**    Okay.  If the second situation would have applied, the

4    guidelines required several people to sign off on the use of an

5    informant, right?

10:54:07   6    **A**    It's a whole different situation.

10:54:09   7    **Q**    Okay.

10:54:10   8    **A**    It's not anything like using an informant as a witness in

9    another case.

10:54:15  10    **Q**    Let's look at the section -- Section 2.  It said, if that

11    section would have applied, "The requesting officer must produce

12    his request in writing with approval of a supervisor of the

13    grade of lieutenant or above attached thereto.  The chief of

14    Special Crimes or one of the members of the organized crime

15    division must be notified to determine if the informant has

16    good, bad or no past history with regards to information

17    furnished.  Both the chief prosecutor in the trial court and the

18    first ADA must approve such special consideration in writing,

19    which shall become part of the file.

10:54:49  20        "Additionally, Special Crimes shall log the special

21    consideration information in a well-bound book kept for such

22    purposes.  It is the trial bureau prosecutor's responsibility to

23    ensure that such information is communicated to Special Crimes."

24    Do you see that?

10:55:04  25    **A**    I do.

*Video Deposition of Kelly Siegler*

10:55:05  1  **Q**   So in these two -- in these two situations in which the use

2  of informants might be contemplated, no fewer than, I believe,

3  six people had to sign off -- or five people had to sign off on

4  the use of that informant; is that right?

10:55:23  5  **A**   No.  Do you want me to explain?

10:55:27  6  **Q**   No.  I'm asking you in -- if what I just read, if the second

7  situation would have applied, the guidelines required several

8  people to sign off on the use of that informant, right?

10:55:36  9  **A**   It's the working off of contracts that's the issue here, not

10  the use of the informant.  We didn't want cops taking -- taking

11  it upon themselves to work off dope cases or to work their

12  informants in a cop's unilateral decision, a narc on the street

13  making that call without going through us.  It's the working off

14  of the contract that's at issue here, not the use of the

15  informant, necessarily.

10:55:58 16  **Q**   Okay.  So if you were dealing with an -- an informant who

17  was just trying to work off a drug case, like a narc case --

10:56:07 18  **A**   This is --

10:56:07 19  **Q**   -- then this would have applied?

10:56:09 20  **A**   This is to put an informant on the streets to work off a

21  case a cop has on him by trying to sell more dope, by hooking

22  him up with a bigger guy up the chain.  The goal was to get the

23  bigger guy up the chain, and our reason for this rule was to

24  stop the cops from doing it out there willy-nilly without us

25  knowing what was going on and making these deals.

*Video Deposition of Kelly Siegler*

10:56:27 1   Q   Okay.

10:56:27 2   A   Nothing to did with simply testifying as a snitch in a case.

10:56:31 3   Q   Okay.  And if -- and my question to you is if you did have a

4   narc case like you just described, no less than five people

5   would have had to sign off on that, right, according to this?

10:56:42 6   A   There were -- there were a lot.  I was the boss of Special

7   Crimes.  There was a lot.

10:56:46 8   Q   Okay.  And that was my next question.  Were you Special

9   Crimes -- you -- at this point, you were in Special Crimes.  So

10   you would had to have been one of the people that signed off on

11   the use of the informant for that working off a contract type

12   case?

10:56:57 13   A   The contract.

10:56:58 14   Q   Is that correct?

10:56:59 15   A   We didn't want -- we didn't want a cop working off 20 kilos

16   of cocaine by having some street guy going and buying some

17   marijuana and saying, "Oh, we're all good.  Special Crimes, let

18   his case go."  It's the contract that was the problem.  We

19   wanted to know every deal going on with drug cases with

20   contracts.  We wanted to be aware of it.

10:57:15 21   Q   Uh-huh.  And the reason it was so important in that case to

22   have so many people sign off on the use of an informant was so

23   they could vet that informant's credibility, right?

10:57:24 24   A   It was really to watch the cops, to be honest with you.

10:57:27 25   Q   Okay.

*Video Deposition of Kelly Siegler*

10:57:27  1   A   We didn't want cops deciding all by themselves who they were

2   going to work off.  We wanted to decide.

10:57:32  3   Q   Okay.  So the reason it was important was transparency.  You

4   didn't want the cop to be able to do something that you-all were

5   unaware of, right?

10:57:38  6   A   Well, we -- we didn't like the whole concept of working off

7   dope cases -- of working off dope cases that way anyway, but

8   this was to watch the cops.

10:57:45  9   Q   Okay.  Now, it refers -- the passage I read earlier refers

10   to a well-bound book.  What is that book, and where can I find

11   it?

10:57:53  12   A   It wasn't really a well-bound book.  When I was involved

13   with this, it was like a folder passed down forever with

14   contracts in it.  And the whole time I was in Special Crimes, I

15   don't know if I ever even saw a contract.  That's how rare they

16   were because we didn't like them.

10:58:10  17   Q   So when you used an informant in another context to testify

18   in a case against you, you wouldn't enter into a contract with

19   that informant?

10:58:17  20   A   Like this?

10:58:18  21   Q   No, just -- I'm just asking would you enter into a written

22   contract with that informant?

10:58:24  23   A   Not under circumstances like the Herrero or Prible case, no.

10:58:28  24   Q   What about other circumstances?  Would you ever enter into a

25   contract with an informant?

*Video Deposition of Kelly Siegler*

| | | |
|---|---|---|
| 10:58:32 | 1 | **A**   On immunity agreements, which were as rare as contracts, it |
| | 2 | was written down. |
| 10:58:36 | 3 | **Q**   Okay.  Nothing was stopping you from putting the agreement |
| | 4 | that you had with an informant into the form of a written |
| | 5 | contract, right? |
| 10:58:46 | 6 | **A**   It was pretty transparent because I told the jury what the |
| | 7 | deal was. |
| 10:58:50 | 8 | **Q**   There was no one at the DA's office that said, "You can't |
| | 9 | put your deal with an informant in writing," right? |
| 10:58:59 | 10 | **A**   We didn't need to.  We told the jury. |
| 10:59:01 | 11 | **Q**   Okay.  There was no one at the DA's office that said, "You |
| | 12 | can't put a deal with an informant in writing," was there? |
| 10:59:09 | 13 | **A**   There was no rule that said I couldn't do that.  There was |
| | 14 | also no defense lawyer who ever required me to do that. |
| 10:59:15 | 15 | **Q**   So you -- at least with these smaller cases, these smaller |
| | 16 | drug cases that were contemplated in this section that I just |
| | 17 | read to you, you were the person that would have had to approve |
| | 18 | the use of those informants in writing, right? |
| 10:59:29 | 19 | **A**   Well, it depends on where I was in Special Crimes at the |
| | 20 | time and where I was in the chain.  The whole time I was in |
| | 21 | Special Crimes, I wasn't the ultimate signer off.  It would have |
| | 22 | been my supervisor or boss, wherever I was in that time. |
| 10:59:41 | 23 |     And you said "smaller drug cases."  These were the big drug |
| | 24 | cases.  That's why they were rare. |
| 10:59:46 | 25 | **Q**   I'm sorry.  I'm comparing them to a capital murder case. |

*Video Deposition of Kelly Siegler*

1  You have a drug case versus a capital murder case, right?

10:59:52  2  A   People get killed in those drug cases.  That's why we didn't

3  like the street deals.

10:59:56  4  Q   Okay.  Okay.  But in a -- in a drug case in which a

5  defendant was trying to, quote, work off a contract, you

6  required -- the DA's office required that informant deal to be

7  in writing, right?

11:00:10  8  A   Yes.

11:00:11  9  Q   But in the case of if you're using an already convicted

10  capital murderer in a federal prison to testify against another

11  one of your capital murder defendants in a state case, there

12  needed to be no writing memorializing that at all?

11:00:32  13  A   It essentially was in writing.

11:00:33  14   The defense lawyer understood what was happening who

15  represented that inmate, slash, witness.  It was told to the

16  jury.  It was told in opening statement.  It was told on direct

17  examination.  It was told on cross-examination.  And it was told

18  in final argument.  It was all out there.

11:00:50  19       MS. SCARDINO:  Objection?

11:00:50  20  A   This was no secret.

11:00:52  21       MS. SCARDINO:  Object.

11:00:53  22  BY MS. SCARDINO:

11:00:53  23  Q   Did you have a written contract with Mr. Beckcom in

24  Mr. Prible's case?

11:00:57  25  A   I did not.

*Video Deposition of Kelly Siegler*

11:00:58  1    **Q**   Did you have a written contract with Mr. Foreman in

2    Mr. Prible's case?

11:01:04  3    **A**   One more time, Mr. Foreman was not involved in Jeffrey

4    Prible's case.  I know you want him to be, but he was not.

11:01:10  5    **Q**   Did you have a written contract with Mr. Foreman for

6    Mr. Prible's case?

11:01:16  7    **A**   Mr. Foreman was not involved in Mr. Prible's case.

11:01:22  8              **SPEAKER:**   Asked and answered.

11:01:26  9    **BY MS. SCARDINO:**

11:01:26 10    **Q**   Did you enter into a written contract with Mr. Moreno in the

11    Herrero case?

11:01:32 12    **A**   No.

11:01:33 13    **Q**   Did you enter into a written contract with Mr. Foreman in

14    the Herrero case?

11:01:40 15    **A**   No.

11:01:41 16    **Q**   Did you enter into a written contract with Mr. Dominguez in

17    the Herrero case?

11:01:47 18    **A**   No.

11:01:47 19    **Q**   Did you enter into a written contract with Mr. Eddie Gomez

20    in the Herrero case?

11:01:54 21    **A**   He did not testify, and I don't remember him for that

22    reason, but the answer is there was no written contract for any

23    of them.

11:02:04 24    **Q**   Okay.  And you say that these informant contracts were

25    pretty rare, right?  They didn't --

*Video Deposition of Kelly Siegler*

11:02:09  1   A   No, that's not what I said.

11:02:10  2   Q   Okay.

11:02:10  3   A   I said these contracts that you've talked about on page 14

4   and tried to make appear to be the same kinds of testimony we've

5   been discussing all day be relevant are very rare.  That's what

6   I said.

11:02:26  7   Q   I'm going to show you Exhibit 162.  Exhibit 162 is an

8   informant agreement made between the Harris County DA's office

9   and Vincent Flores on July 23rd, 1996.  Do you see that?

11:02:43 10   A   I do.

11:02:44 11   Q   And this document was produced by the DA's office in this

12   case from your file.  And this is an example of a contract that

13   would be entered into by the DA's office with another -- with an

14   informant, right?

11:03:02 15   A   I don't understand the relevance.  Whatever this is, 162,

16   has nothing to do with Prible or Herrero.

11:03:08 17   Q   And I'm not asking you if it has anything to do with --

11:03:10 18   A   Your question made it sound like -- you said it was produced

19   as part of this file, as if it had something to do with Prible

20   or Herrero, and that is not true.

11:03:17 21   Q   Okay.  Do you know that Mr. Flores was -- was a witness in

22   Prible's case?

11:03:21 23   A   I don't remember him.

11:03:22 24   Q   Okay.  This -- and I'm representing to you that this

25   agreement was found in your Prible file and was produced to us

*Video Deposition of Kelly Siegler*

1  by the DA's office.  Do you deny that?

11:03:33  2  **A**  I don't remember him.

11:03:34  3  **Q**  Okay.  You don't remember him?

11:03:36  4  **A**  I do not.

11:03:36  5  **Q**  Okay.  Now, earlier when I was reading from Exhibit 154-5

6  and those two informant -- the contemplation of the use of an

7  informant that we already discussed did not apply in this case

8  but in those two situations, deviations from that policy could

9  only be made in writing by the DA for good cause shown by the

10  prosecutor urging such deviation, right?

11:04:09  11  **A**  If we're talking about page 154-5 in the context of working

12  off dope deals, contracts through Special Crimes, I don't know

13  what the deviation might have been.  I never dealt with the

14  deviation where that would have arisen.  But if that's what the

15  manual says, that's what the manual says.

11:04:32  16  **Q**  Okay.  Is it your testimony that nothing in the policy

17  manual addressed the situation when informants would be used in

18  the matter that -- in the manner that you used them in the

19  Prible case?

11:04:45  20  **A**  I have no idea what's in that manual.  Like I said, it's

21  this thick (indicating).

11:04:51  22  **Q**  And it addresses agreements with cooperating individuals.

23  Are you familiar with this paragraph of the manual?

11:05:01  24  **A**  Let me read it.

11:05:02  25  **Q**  Okay.

*Video Deposition of Kelly Siegler*

11:05:03 1   **A**   I haven't read the manual since about 1987.

11:05:05 2   **Q**   Okay.  So your understanding of the Harris County District

3   Attorney's policies was that no one needed to sign off on your

4   use of informants in the Prible case; is that correct?

11:05:18 5   **A**   That's correct.

11:05:19 6   **Q**   Okay.  You had the ultimate discretion whether to use an

7   informant in Mr. Prible's case, right?

11:05:24 8   **A**   I did.

11:05:25 9   **Q**   And no one else needed to know about your use of that

10   informant or your conversations leading up to your use of that

11   informant in the case?

11:05:35 12   **A**   Well, it wasn't a secret.  You made it sound like I was

13   trying to keep it a secret.

11:05:39 14   **Q**   Well, did you share with Mr. Wiser and Mr. Bonds your

15   communications with these various informants?

11:05:46 16   **A**   They knew what was going on.  Vic didn't come to the

17   Beaumont meeting with Johnny Bonds and me.  Vic didn't go with

18   me to talk to Michael Beckcom the day before he testified

19   because Beckcom was my witness.  We divided up the witnesses.

20   He did his.  I did mine.

11:06:02 21   **Q**   It looks like you go through a lot of hoops to use an

22   informant in a case where you're trying to work off a charge?

11:06:09 23   **A**   It was to watch over the cops.

11:06:11 24   **Q**   Okay.  And so I think you'll agree that when you -- it

25   sounds like when you used an informant that was already

*Video Deposition of Kelly Siegler*

1   imprisoned in federal prison to testify against -- against

2   Mr. Prible in his capital murder trial, that these requirements

3   listed in the policy manual flew out the window.  They didn't

4   apply to that situation, correct?

11:06:34   5   **A**   Two different scenarios.

11:06:37   6   **Q**   Okay.  So the answer is yes, these guidelines did not apply

7   to the situation in Mr. Prible's case?

11:06:43   8   **A**   Correct.

11:06:44   9   **Q**   Okay.  And, likewise, moving on down that page 154-16, it

10   says, "No agreement for consideration on a pending case will be

11   considered where the pending case involved any use of a deadly

12   weapon, involved any act of violence to other persons,

13   cooperating individual is a habitual criminal, cooperating

14   individual has been adjudged guilty on pending case, involves

15   one person working off a case for another, vicarious contract,

16   or the agency arresting the cooperating individual is not the

17   agency seeking the contract, unless the arresting agency is

18   aware of the contract and agrees to the terms in writing prior

19   to any agreement with the cooperating individual."

11:07:30   20      So is it your testimony that the passage I just read would

21   not have applied to any of the informants that you used in the

22   Prible or Herrero cases?

11:07:40   23   **A**   The passage that you just read applies to those defendants

24   in the free world who a cop is asking to work off a dope case

25   through a contract by selling more dope on the streets, and the

*Video Deposition of Kelly Siegler*

1    passage here applies because if the pending case involved

2    violence, weapons, serious victims and all that, those were the

3    cases we were going to let a cop willy-nilly decide to work off

4    a case through.  To us, it was more important that the pending

5    case matter than a cop deciding unilaterally to work off my case

6    because he thought he had a good snitch that could get him more

7    dope off the streets.

11:08:20   8    Q   Okay.  So let's go through these 1 through 6, and I'm going

9    to take each informant from the Prible and Herrero cases and ask

10    you a question.

11:08:29   11    First, Mr. Beckcom.  Mr. Beckcom had already been adjudged

12    guilty on his pending case, right?  He was in prison?

11:08:39   13    A   Well, it was -- it wasn't pending.  It was resolved.

11:08:45   14    Q   I'm sorry.  His resolved -- his case was resolved.  He was

15    in prison --

11:08:48   16    A   Yes.

11:08:48   17    Q   -- correct?

11:08:48   18    He had been convicted of capital murder, correct?

11:08:53   19    A   Yes.

11:08:53   20    Q   He -- his deadly weapon of choice in that case was a metal

21    toolbox that he had put his victim in and then threaded a garden

22    hose from the exhaust pipe of his car and turned the car on,

23    right?

11:09:05   24    A   Yes.

11:09:05   25    Q   Okay.  So it definitely involved an act of violence to

*Video Deposition of Kelly Siegler*

1    another person?

11:09:09  2    **A**    It did.

11:09:10  3    **Q**    Uh-huh.  And he was an habitual criminal, correct?

11:09:14  4    **A**    I don't remember.

11:09:15  5    **Q**    You don't recall?

11:09:16  6    **A**    I don't want to argue with that, but I don't remember.

11:09:18  7    **Q**    Okay.  And then Foreman -- Nathan Foreman, his crime was

8    assault causing bodily injury.  Do you remember that?

11:09:26  9    **A**    Nathan Foreman never testified.

11:09:28  10   **Q**    That's not my question.

11:09:29  11   **A**    Well, which case are we talking about?

11:09:31  12   **Q**    I'm asking you if you recall that Nathan Foreman was

13   convicted of assault causing bodily injury?

11:09:38  14   **A**    I don't remember what his conviction was for --

11:09:40  15   **Q**    Okay.

11:09:40  16   **A**    -- because I never used him.

11:09:41  17   **Q**    Do you remember that he was a violent criminal?

11:09:43  18   **A**    I never used him.

11:09:44  19   **Q**    Well, you spoke with him --

11:09:46  20   **A**    I don't know what --

11:09:46  21   **Q**    -- on August 8th, 2001, right?

11:09:48  22   **A**    I'm sorry.  I what?

11:09:50  23   **Q**    You spoke with him on August 8th, 2001, right?

11:09:52  24   **A**    I did.

11:09:52  25   **Q**    And did you ever speak with him again after that?

*Video Deposition of Kelly Siegler*

11:09:54 1   A   He probably tried to call me, but I don't know what we

2   talked about for very long because I knew he was a liar.

11:09:59 3   Q   Okay.  But you never met with him in person again?

11:10:02 4   A   After the Beaumont -- after the --

11:10:03 5   Q   August 8th, 2001?

11:10:04 6   A   -- downtown Houston day, no.

11:10:06 7   Q   Okay.  Nathan Foreman was a habitual criminal.  Do you

8   remember that?

11:10:10 9   A   I don't remember.

11:10:10 10  Q   Okay.  Well, my question to you is these six requirements

11  for an informant -- or for an agreement for consideration to be

12  given to an informant in the type of case that we discussed

13  earlier, the drug case on the street, if you had a different

14  situation like the Prible case, it didn't matter if the

15  informant was involved in a crime that had -- or committed a

16  crime that involved the use of a deadly weapon, right?  You

17  could still use him?

11:10:41 18  A   Of course, it mattered.

11:10:42 19  Q   Well, you could still use him as an informant.  It wouldn't

20  preclude you from using him as an informant, right?

11:10:48 21  A   Not that alone, no.

11:10:50 22  Q   Okay.  You could also use him if his crime involved an act

23  of violence to another person?

11:10:55 24  A   I could.

11:10:56 25  Q   Okay.  You could also use him if he was a habitual criminal?

*Video Deposition of Kelly Siegler*

11:11:00  1    A    I could.

11:11:01  2    Q    Okay.  And you could also use him if he had been adjudged

          3    guilty on another case?

11:11:05  4    A    I could.

11:11:06  5    Q    Okay.  So these 1 through 6 requirements, they only applied

          6    if you were working with informants who were trying to work off

          7    a drug case on the street, right?

11:11:18  8    A    That's incorrect.  These rules applied in writing because we

          9    were trying to watch over the cops, too, on page 154-16, on

         10    those specific types of cases.

11:11:30 11         The factors that you've listed that you think are

         12    important, I agree they are important, and in any case, whether

         13    it's a murder or a DWI case, before I'm going to use a snitch or

         14    an inmate as a witness, I care about everything that's listed

         15    here.  Of course, it's important.  We don't just blow it off and

         16    use every inmate that comes walking around wanting to give

         17    information.  That ought to be pretty obvious to you that I

         18    didn't use them all.

11:11:58 19    Q    Well, Mr. Beckcom, who testified in Mr. Prible's case --

11:12:01 20    A    Yes, ma'am.

11:12:02 21    Q    -- Mr. Moreno, who testified in Mr. Herrero's case, and

         22    Mr. Dominguez, who testified in Herrero's case, all of them were

         23    involved in crimes involving the use of a deadly weapon, an act

         24    of violence, they were all habitual criminals, and they had all

         25    been adjudged guilty, right?

*Video Deposition of Kelly Siegler*

11:12:21  1    A    Those are typically the people that end up in federal prison

2    that can be witnesses.

11:12:25  3    Q    Did you ever contact FCI Beaumont to ask to speak to an

4    inmate?

11:12:29  5    A    You mean like generically or by name?

11:12:36  6    Q    By name.

11:12:37  7    A    Yes.

11:12:38  8    Q    Okay.  And when you did finally hook up on the phone, the

9    inmate would be in the unit manager's office speaking with you

10    on the phone; is that right?

11:12:46 11    A    Yes.  Yes.

11:12:46 12    Q    Okay.  And that phone call would not be recorded, would it?

11:12:49 13    A    I don't know.  That's a federal prison rule.  I don't know

14    what they're recording when they're calling from the case

15    manager's office.

11:12:54 16    Q    Okay.

11:12:54 17    A    I don't know the rules.

11:12:56 18    Q    Okay.  You do know that phone calls with inmates from the

19    usual inmate phones, those would have been recorded, right?

11:13:02 20    A    I would assume so.

11:13:03 21    Q    Okay.  I'm going to show you Exhibit 170, Ms. Siegler.  This

22    is the inmate phone list for Michael Beckcom dated

23    December 19th, 2001.  And you see that he added your name to his

24    phone list on that day?

11:13:27 25    A    I see that.

*Video Deposition of Kelly Siegler*

11:13:29  1   Q   Okay.  That was your direct line at the DA's office?

11:13:31  2   A   It wasn't my direct line, but it was to major offenders.

11:13:34  3   Q   If you go to the next page, this is his printout of his

4   phone calls in 2002 from the inmate phones.

11:13:43  5   A   Okay.

11:13:43  6   Q   And we understand those are different from the unit

7   managers' phones.

11:13:47  8   A   Okay.

11:13:47  9   Q   Okay.  And so every time that number 6178 appears, that

10   phone call was made to you, right?

11:13:55 11   A   No.  As I said, 6178 went to major offenders.  You have

12   Special Crimes.  It has four divisions, each with their own

13   number.  One of those was major offenders.  It wasn't my direct

14   line.

11:14:06 15   Q   Okay.  Would he have been speaking with anyone else at the

16   DA's office?

11:14:09 17   A   There are five -- five or six other prosecutors, two or

18   three investigators.

11:14:16 19   Q   Do you know if he was speaking to any other investigators or

20   prosecutors during the time that you were working with him on

21   the Prible case?

11:14:22 22   A   You said this is the inmate phone.

11:14:24 23   Q   Right.  This is Mr. Beckcom's phone records from 2002 --

11:14:29 24   A   So he had his own phone?

11:14:30 25   Q   -- of phone calls he made from the inmate phones.

*Video Deposition of Kelly Siegler*

11:14:32 1    A    He had his own phone?

11:14:33 2    Q    No.  This is from the inmate phones at FCI Beaumont.

11:14:38 3    A    Well, how do you know they're from Michael Beckcom?

11:14:40 4    Q    Because if you go to the top, it says, "Inmate name Michael

5    Beckcom," and these were produced to us by the Board of Prisons.

11:14:46 6         And so my question to you is when that number -- the 6178

7    number appears on his phone list, that phone call was going to

8    the Harris County DA's office, right?

11:15:02 9    A    That is correct.

11:15:02 10   Q    Okay.  But you're saying he might have been talking to other

11   people in the office at the same time as he was talking with

12   you, so you didn't necessarily speak with him at those -- on

13   those phone calls?

11:15:12 14   A    I'm saying that if he called 6178, the -- the major

15   offenders number, depending on how long the call went or if he

16   was placed on hold, he might not have ever connected with me.

17   He could have called just to try and talk with me.  I might not

18   have been there.  I might not have taken the call.  So just

19   because there's a call made to 6178 doesn't mean he necessarily

20   ever even connected with me.

11:15:33 21   Q    Okay.  It was an attempt by him to call you at least?

11:15:36 22   A    Yes.

11:15:37 23   Q    Okay.  And you'll see on Exhibit 170 that he called that

24   6178 number that he had put on his phone list as belonging to

25   you, he called it on April 4th, 2002.

*Video Deposition of Kelly Siegler*

11:15:53 1    So the one that's highlighted, he called you on April 4th,

2    2002, right?

11:15:57 3   **A**   I see that.

11:15:58 4   **Q**   Okay.  He called you again on --

11:16:01 5   **A**   Wait.  Wait.   Wait.   It's for only how many minutes?

11:16:04 6   **Q**   Six minutes.

11:16:05 7   **A**   And what time is the call?

11:16:08 8    Six minutes doesn't mean he got in touch with me.  He could

9    have put on hold and I never picked up the call.

11:16:13 10  **Q**   Do you recall 16 years -- or 15 years ago that that

11   happened?

11:16:17 12  **A**   Oh, I recall that I was so busy, they would saying, "Kelly

13   Siegler, line whatever," and I could never get all the calls.

14   Yes, it happened all the time.

11:16:26 15  **Q**   Okay.  So you deny speaking with him on April 4th, 2002?

11:16:29 16  **A**   No.  I don't remember, but just because it says he called

17   6178 and the call lasted six minutes doesn't mean that we

18   actually spoke.  That's what I'll say.

11:16:38 19  **Q**   Okay.  He called your line for two minutes.  You see that?

11:16:40 20  **A**   Yes.

11:16:40 21  **Q**   And on April 24th, 2002 --

11:16:42 22  **A**   I'm pretty sure that wasn't a connected call to me for only

23   two minutes.  The next one.

11:16:46 24  **Q**   Do you have any evidence that that wasn't a connected --

25   connected call, or are you just speculating?

*Video Deposition of Kelly Siegler*

11:16:52 1   **A**   I don't believe that I talked to him on a phone call that

2   lasted only two minutes.

11:16:57 3   **Q**   So you're denying that you spoke with him on that day?

11:17:00 4   **A**   I don't remember that call, no.

11:17:01 5   **Q**   You're denying that you spoke with him on that day or you

6   just don't remember?

11:17:03 7   **A**   I don't remember.   I don't remember.

11:17:04 8   **Q**   You don't remember?

11:17:05 9   **A**   It doesn't make any sense that the call would last two

10   minutes.

11:17:08 11   **Q**   If you look at -- going up to April 24th, 2002, another

12   phone call to your office?

11:17:15 13   **A**   Again for two minutes.

11:17:16 14   **Q**   Okay.   And on May 15th, 2002, another phone call to your

15   number?

11:17:24 16   **A**   For three minutes.

11:17:25 17   **Q**   Uh-huh.   And July 12th, 2002, at the top there, it's a phone

18   call for one minute?

11:17:39 19   **A**   For one minute.   I see that.

11:17:41 20   **Q**   And on July 16th, 2002, there's a couple of phone numbers --

21   phone calls?

11:17:50 22   **A**   I see those.

11:17:50 23   **Q**   Do you see that?

11:17:51 24   **A**   For two minutes and for one minute.

11:17:53 25   **Q**   Uh-huh.   And then there's three times -- three phone calls

*Video Deposition of Kelly Siegler*

1    on October -- I mean, on August 2nd, 2002.  Do you see that?

11:18:01  2    A    So three calls on the same date, which means that he

3    obviously didn't get ahold of me for the one-minute call or the

4    three-minute call because there's a nine-minute call, too.

11:18:09  5    Q    Okay.  So whenever he would call you and leave -- he would

6    leave a message, I suppose, with your office?

11:18:13  7    A    He would call 755-6178 and get the main receptionist, who

8    would then put him through to my secretary, Esmeralda, and then

9    she would try to find me or take a message, which is probably

10   why there's so many two-minute, one-minute and three-minute

11   calls, and they never did get ahold of me.

11:18:31 12   Q    And you would then return his phone call by calling his unit

13   manager to have a conversation on that phone?

11:18:37 14   A    No.  I got a lot of calls that I didn't return.

11:18:39 15   Q    So you're saying that he kept calling you over and over, he

16   was your witness in -- in Prible's case, and you never returned

17   his phone call.  Is that your testimony?

11:18:45 18   A    I did return some of the phone calls.  I said that I don't

19   remember returning all of these individual phone calls.

11:18:51 20   Q    Okay.  But some of those phone calls that you returned, you

21   would have called the unit manager, who would have put

22   Mr. Beckcom on the telephone, right --

11:18:57 23   A    Yes.

11:18:57 24   Q    -- like we discussed earlier?

11:18:59 25   A    Yes.

*Video Deposition of Kelly Siegler*

11:19:00  1   **Q**   Exhibit 171 is telephone records for Nathan Foreman produced

2   by the Board of Prisons.  And you see on the first page of that,

3   that Mr. Foreman added you to his phone record -- or his phone

4   list on October 3rd, 2001, right?

11:19:25  5   **A**   I see that.  I also notice that now he has the right number.

11:19:28  6   **Q**   Right.  He has the correct number.  And this is almost two

7   months after you spoke with him in August 8th, 2001, and

8   determined he was lying about Mr. Prible's case, right?

11:19:37  9   **A**   That's what the date says, yes.

11:19:39  10  **Q**   Okay.  And there are no phone calls to you, if you look at

11  Mr. Foreman's list, in 2002.  Do you see that?

11:19:52  12  **A**   Does this cover the whole year?

11:19:54  13  **Q**   Yeah.  Well, yeah.  I'm just asking you -- it looks like it

14  covers from January to October 2002, and nowhere -- I'll

15  represent to you that nowhere in that list is a phone call to

16  that 6178 number.

11:20:09  17  **A**   Okay.

11:20:09  18  **Q**   But you were speaking with Mr. Foreman during this time,

19  correct?

11:20:12  20  **A**   No.

11:20:12  21  **Q**   You weren't speaking with him?

11:20:13  22  **A**   Not that I remember.

11:20:14  23  **Q**   Is it your testimony that you never spoke with him again

24  after August 8th, 2001?

11:20:18  25  **A**   That was the day of the downtown fed facility?

*Video Deposition of Kelly Siegler*

11:20:22  1    Q    Uh-huh.

11:20:22  2    A    I never talked to him again.

11:20:24  3    Q    And, again -- and you were speaking -- you did speak with

4    Mr. Moreno on the phone leading up to Mr. Herrero's trial,

5    right?

11:20:33  6    A    I know I got the letter, the letter that we talked about.  I

7    know that I went to see him at some point.  Whether or not there

8    was a phone call in between before I went to see him, I don't

9    remember.

11:20:44 10    Q    Okay.

11:20:45 11    A    I would think there was, but I don't remember for sure.

11:20:48 12    Q    And that phone call that there might have been, would that

13    have been on the unit manager's telephone?

11:20:54 14    A    It had to be.

11:20:55 15    Q    Okay.  And sometimes BOP employees would call you about

16    cases that you were working on with these inmates, would they

17    not?

11:21:03 18    A    No.

11:21:04 19    Q    But I'll -- I'll represent to you that one of these pink

20    slips in Exhibit 152 that was produced by the DA's office in

21    this case, it shows Lieutenant Robert Clark from FCI Beaumont

22    called Kelly re Herrero.  So does that refresh your memory as to

23    whether any BOP employees ever called you to discuss the Herrero

24    case?

11:21:28 25    A    No.

*Video Deposition of Kelly Siegler*

11:21:29  1  **Q**   Now, you said a moment ago, I believe, that you did not

2  speak with Mr. Foreman again after that August 8th, 2001,

3  meeting with him in --

11:21:37  4  **A**   Not that I remember.

11:21:38  5  **Q**   Okay.  Exhibit 111 is a letter from Alan Percely,

6  Mr. Foreman's attorney, to you on November 12th, 2001, if you

7  want to take a moment to read it.

11:21:54  8  **A**   Okay.

11:21:54  9  **Q**   And he says, "As you are already aware, I am Mr. Foreman's

10  attorney on federal and state criminal matters," right?

11:22:00 11  **A**   That's what he says.

11:22:03 12  **Q**   So had you already been talking with Mr. Percely about

13  Mr. Foreman?

11:22:07 14  **A**   Actually, I think what happened was he came up to me one day

15  in court and said that he represented Nathan Foreman, and I

16  thought to myself, "Of course, you do," and that was it.

11:22:17 17  **Q**   Okay.  And then he reaches out to you on this November 12th,

18  2001, letter, right?

11:22:24 19  **A**   Yes.

11:22:25 20  **Q**   Okay.  And in his letter, he said that Nathan Foreman told

21  him that he has information that will lead you to the weapon

22  that was used in the murder case that you are preparing to go to

23  trial on in the near future.  Do you see that?

11:22:38 24  **A**   I see that.

11:22:40 25  **Q**   Okay.  How did Mr. Foreman know that the murder weapon in

*Video Deposition of Kelly Siegler*

1   Mr. Prible's case had never been found?

11:22:45 2   **A**   I don't even think they're talking about Prible.  I think

3   it's Alan Percely talking bull with Nathan Foreman, who's

4   talking bull.  I don't know what they're talking about, which

5   proves the point.

11:22:54 6   **Q**   So you don't --

11:22:55 7   **A**   They're both full of it.

11:22:56 8   **Q**   Okay.  So you don't know what case he's referring to in this

9   letter, whether it's the Prible case or the Herrero case?

11:23:01 10   **A**   I tried a lot of cases in '02.  It could have been one of

11   the other ones that I tried.  It doesn't mean it's Prible --

11:23:07 12   **Q**   Okay.

11:23:07 13   **A**   -- or Herrero.

11:23:08 14   **Q**   And Mr. Percely proposes a deal in exchange for whatever

15   information Mr. Foreman has, right?

11:23:15 16   **A**   He tries to, yes.

11:23:16 17   **Q**   Okay.  And instead of telling Percely -- or ignoring this

18   letter or telling him to get lost or telling Foreman to get

19   lost, instead, you set up a face-to-face visit with Mr. Foreman

20   to discuss this new information he had, didn't you?

11:23:31 21   **A**   The letter is dated November 12th of '01, and the meeting

22   with Foreman was August of '02?

11:23:39 23   **Q**   August 8th, 2001, was the initially meeting with Foreman.

11:23:45 24   **A**   Okay.  So ask me the question again.  So the letter came

25   after the meeting?

*Video Deposition of Kelly Siegler*

11:23:49 1   **Q**   Yes, the letter came after the meeting, and I'm asking you,

2   after you got this letter of November 12th, 2001, you could have

3   told Percely to get lost, right?

11:23:58 4   **A**   I could have.

11:23:59 5   **Q**   You could have told Foreman, "I never want to talk to you

6   again.  You're a liar," right?

11:24:04 7   **A**   I could have.

11:24:05 8   **Q**   Okay.  You could have ignored them, right?

11:24:06 9   **A**   I did.

11:24:07 10  **Q**   But instead, after you received this letter, you arrange for

11  another face-to-face meeting with Mr. Foreman at FCI Beaumont,

12  didn't you?

11:24:16 13  **A**   Not that I remember.

11:24:19 14  **Q**   Now, Exhibit 77 is a letter dated November 20th, 2001, from

15  Johnny Bonds to Lieutenant Clark requesting that he -- you and

16  he be allowed to visit with Nathan Foreman on December 10th,

17  2001.  Do you see this?

11:24:36 18  **A**   I see that.

11:24:40 19  **Q**   And this letter was written eight days after Mr. Percely's

20  letter to you was written, right, on November 12th, 2001?

11:24:53 21  **A**   Yes.

11:24:54 22  **Q**   So when do you think you would have received this

23  November 12th, 2001, letter from Alan Percely?

11:24:59 24  **A**   Well, I would hope the next day.

11:25:00 25  **Q**   Within a couple of days?

*Video Deposition of Kelly Siegler*

11:25:02 1        Okay.  And so pretty soon after receiving this letter, you

2     have Johnny Bonds request another meeting with Mr. Foreman at

3     FCI Beaumont, right?

11:25:14 4   **A**   This is Ted requesting it for Johnny and me.

11:25:18 5   **Q**   I'm sorry.

11:25:19 6   **A**   But yes.

11:25:19 7   **Q**   Yes.  So you, obviously, asked Mr. Wilson to request this

8     meeting, right?

11:25:23 9   **A**   Right.

11:25:24 10  **Q**   Okay.  So even though he lied to you back in November -- or

11    in August, a few months earlier, maybe now he's got some good

12    information for you, right?

11:25:38 13  **A**   I don't remember why we would have asked to go see him again

14    because Johnny and I both believed, when we walked away from the

15    meeting with Nathan Foreman at the downtown Houston facility,

16    that he was not being truthful.

11:25:50 17  **Q**   I'm going to show you Exhibit 78.  Exhibit 78 is a

18    November 26, 2001, letter from Ted Wilson to Lieutenant Robert

19    Clark again at FCI Beaumont medium.  And he says, "I'm

20    respectfully requesting that you permit Assistant District

21    Attorney Kelly Siegler and Harris County District Attorney's

22    Investigator Johnny Bonds in your facility to interview an

23    inmate by the name of Michael Beckcom on December 10th, 2001."

11:26:33 24       Do you see that?

11:26:34 25  **A**   I do.

*Video Deposition of Kelly Siegler*

11:26:35 1  **Q**    Okay.  And that's the same date that you were going to

2  interview Mr. Foreman, right?

11:26:42 3  **A**    Well, the letter is the same date.  Did we ask for the same

4  date?  Oh, yes.  December 10th, yes.

11:26:48 5  **Q**    Yeah.  The letters are different dates --

11:26:51 6  **A**    December 10th.

11:26:51 7  **Q**    -- but the date of the meeting requested is the same?

11:26:54 8  **A**    Yes.

11:26:54 9  **Q**    So you requested to meet with both of those inmates back to

10  back on that date, right?

11:26:57 11  **A**    Yes.

11:27:00 12  **Q**    And on that date, December 10th, 2001, did you also meet

13  with Jonathan Jefferson at FCI Beaumont?

11:27:07 14  **A**    I still don't remember that name.

11:27:09 15  **Q**    If you turn to page 109-7 -- Exhibit 109-7, and these,

16  again, are notes in Johnny bonds handwriting, right?

11:27:24 17  **A**    Yes.

11:27:25 18  **Q**    And you see it looks like there he's memorializing a meeting

19  with Nathan Foreman on December 10th, 2001, which would have --

20  which corresponds to the letter that I showed you earlier

21  requesting a meeting with Mr. Foreman on that date?

11:27:42 22  **A**    It does.

11:27:44 23          **MS. MIRANDA:**  Objection, form.

11:27:45 24  **BY MS. SCARDINO:**

11:27:45 25  **Q**    Do you see that?

*Video Deposition of Kelly Siegler*

11:27:46  1      Were you present at this meeting with Mr. Bonds and

2   Mr. Foreman?

11:27:50  3   **A**   If -- if Johnny would have been interviewing Nathan Foreman,

4   I would have been there.

11:27:55  5   **Q**   Okay.  Would you have taken notes on that meeting?

11:27:57  6   **A**   Not necessarily.

11:27:58  7   **Q**   If you had taken notes, where would they be?

11:28:01  8   **A**   They would be in the file, but I probably didn't take any.

11:28:04  9   **Q**   You wouldn't have destroyed notes about that meeting or any

10   other meeting, would you?

11:28:07 11   **A**   No.  I didn't take a lot of notes.

11:28:11 12   **Q**   Let's look at Exhibit 78.  Okay.  Exhibit 78 I showed you

13   earlier, so you should have a copy of it, and it's that

14   November 26th, 2001, fax from Johnny Bonds to Lieutenant Clark.

11:28:30 15   **A**   Okay.

11:28:30 16   **Q**   And on the fax, if you look at the front cover sheet, it

17   says, "Another visitation request letter.  We are supposed to be

18   at your unit around 11:00 a.m. on December 10th, 2001, to see

19   Inmate Foreman.  We also need to see Inmate Beckcom after we

20   talk to Foreman.  See attached letter.  If there's a problem,

21   please call me.  Thanks."  Do you see that?

11:28:49 22   **A**   I do.

11:28:50 23   **Q**   Okay.  And on that day when you met with Mr. Beckcom -- you

24   recall meeting with Mr. Beckcom that day, right?

11:28:57 25   **A**   Yes.

*Video Deposition of Kelly Siegler*

11:28:58  1   Q   And did you meet with him in the lieutenant's office?

11:29:00  2   A   I don't remember where we met.

11:29:02  3   Q   Okay.  I'll -- I'll represent to you that was his testimony

          4   at trial, that you met in a lieutenant's office?

11:29:08  5   A   That's what Beckcom said at trial?

11:29:09  6   Q   Yes.

11:29:09  7   A   It's in the transcript?

11:29:10  8   Q   That -- that you met at a lieutenant's office, yes.

11:29:13  9   A   Okay.

11:29:13  10  Q   Okay.  Do you recall the name of that lieutenant?

11:29:15  11  A   I do not.

11:29:16  12  Q   Okay.  Do you -- and you knew at this time that Mr. Foreman

          13  and Mr. Beckcom were cellmates at FCI Beaumont, right?

11:29:25  14  A   I don't know if I knew that back then.

11:29:27  15  Q   When did you learn that?

11:29:29  16  A   I don't know that I've ever learned that.  I've seen that in

          17  your petition.

11:29:35  18  Q   You never knew at any time during your prosecution of

          19  Mr. Prible's case that Foreman and Beckcom were cellmates at FCI

          20  medium?

11:29:43  21  A   I don't remember if I knew that.  I knew that they all --

          22  they all hung out together on the yard working out outside.  I

          23  knew that.  But who was whose cellmate, I don't know if I ever

          24  knew that.

11:29:56  25  Q   And you don't -- you remember meeting with Beckcom on

*Video Deposition of Kelly Siegler*

1   December 10th, 2001, but not with Foreman; is that correct?

11:30:01 2   A   I remember the Beckcom meeting.  We -- it looks like, from

3   your paperwork, we met with Beckcom that same day, too.  If

4   Johnny told you that we met with Foreman the same day, then we

5   did, and I just don't remember it.  If Johnny remembers it, then

6   that's what happened.

11:30:16 7   Q   And that meeting would have been in the same office,

8   presumably, if you're --

11:30:21 9   A   You would think so.

11:30:22 10   Q   You would think so.  So one would be coming in, and one

11   would be leaving?

11:30:26 12   A   Unless they were in separate areas and it was easier for

13   them to move us than them.

11:30:30 14   Q   Do you have any recollection of that being the case?

11:30:32 15   A   We moved around a lot there.  We went where they told.

11:30:35 16   Q   Okay.  I'm asking you specifically on December 10th, 2001,

17   when you asked to meet with Beckcom immediately after Foreman,

18   do you have a specific recollection of them moving you to a

19   different part of the prison to meet with these two individuals?

11:30:48 20   A   I don't -- no, I don't remember where in the prison we met

21   with either one of them.

11:30:53 22   Q   Do you know if Beckcom and Foreman passed each other coming

23   and going that day to the meeting?

11:30:57 24   A   I have no idea.

11:31:00 25   Q   Presumably, they're cellmates, so they're talking about this

*Video Deposition of Kelly Siegler*

1    case together, right?

11:31:04  2    **A**    I didn't know they were cellmates.

11:31:06  3    **Q**    Okay.  109-8, again, this is Mr. Bonds' handwriting, right?

11:31:10  4    **A**    Yes.

11:31:10  5    **Q**    And it looks to be a conversation -- or a memorialization of

6    the meeting that he had with Mr. Beckcom on December 10th, 2001,

7    in which you were also present, right?

11:31:22  8    **A**    I see the name Michael Beckcom on the first line.  I can't

9    read the rest of it, if you want to read it to me.

11:31:29 10    **Q**    Okay.  It says, "12/10/01, Michael Beckcom.  Nathan never

11    told Mike about Kelly and Bonds."  And Nathan there is referring

12    to Nathan Foreman, right?

11:31:39 13    **A**    It would be Nathan Foreman.

11:31:41 14    **Q**    So at this conversation -- or this meeting that you and

15    Mr. Bonds had with Beckcom, y'all were discussing Nathan Foreman

16    and his role in this case, right?

11:31:49 17    **A**    Not necessarily.

11:31:51 18    **Q**    Well, why else would Nathan Foreman's name appear on these

19    notes?

11:31:55 20    **A**    We would ask Michael Beckcom where all he had information

21    about Prible, and Johnny could have just made a note, "It wasn't

22    from Nathan."  Johnny could have just made that note.

11:32:04 23    **Q**    He could have just made a note, "It wasn't from Nathan,"

24    just out of the blue.  "It wasn't from Nathan"?

11:32:09 25    **A**    If we had just interviewed Nathan Foreman right before

*Video Deposition of Kelly Siegler*

1    Beckcom like you're saying the paperwork shows.  I mean, you

2    should ask Johnny Bonds that question, not me.

11:32:17  3    **Q**   I have asked Johnny Bonds that question, but you were always

4    at the -- that meeting, right?

11:32:22  5    **A**   Yes, but these aren't my notes.

11:32:23  6    **Q**   Okay.  But if you had asked Mr. Beckcom where he got

7    information, would he have said to you, in response to that,

8    "Well, I didn't get it from Nathan Foreman"?

11:32:35  9    **A**   No, but you need keep in mind that Johnny and I already

10    didn't have a very good view of Nathan Foreman's credibility.

11    So we wanted to make sure Michael Beckcom wasn't getting it from

12    Nathan Foreman --

11:32:44  13    **Q**   So did --

11:32:45  14    **A**   -- since we already thought he was a liar.

11:32:46  15    **Q**   And so did you tell Michael Beckcom, "Don't talk to Nathan

16    Foreman.  He's a liar"?

11:32:50  17    **A**   I doubt it.

11:32:51  18    **Q**   Did you bring Nathan Foreman's name up in this conversation

19    with Michael Beckcom?

11:32:56  20    **A**   Well, his -- his name is mentioned in Johnny Bonds' notes,

21    so his name might have come up.

11:33:00  22    **Q**   Had you asked Mr. Beckcom to take notes of his

23    communication -- his conversations with Mr. Prible?

11:33:04  24    **A**   I did not.

11:33:05  25    **Q**   You did not?

*Video Deposition of Kelly Siegler*

11:33:06  1   A   No.

11:33:06  2   Q   Did you ask him to present you with a written statement --

11:33:10  3   A   No.

11:33:11  4   Q   -- about Mr. Prible's -- what he had learned about

5   Mr. Prible's case?

11:33:16  6   A   No.

11:33:16  7   Q   Okay.  Did you use this statement that Mr. Beckcom gave to

8   you at that December 10th, 2001, meeting as a script for

9   Mr. Beckcom's testimony at trial?

11:33:27 10   A   As a script, no.  I'm sure I -- I referred to it, I used it,

11   I looked it over to make sure I had it all right in my read.

12   But as a script, no.

11:33:36 13   Q   Did you give -- or did Mr. Beckcom keep a copy or make a

14   copy of this statement for himself?  In other words, did he give

15   you his only copy, or do you recall if he made a copy of the

16   statement himself?

11:33:50 17   A   I'm sure he would keep a copy for himself, but I'm just

18   assuming.

11:33:56 19   Q   Did you disclose to Mr. Gaiser or Mr. Wentz that you met

20   with Mr. Jefferson, Mr. Foreman, and Mr. Beckcom back to back at

21   FCI Beaumont on December 10th, 2001, to discuss Mr. Prible's

22   case?

11:34:13 23   A   I don't remember.

11:34:24 24   Q   Now, you were talking -- you began talking with the

25   assistant U.S. attorney for Michael Beckcom's case in California

*Video Deposition of Kelly Siegler*

1   months before Prible's trial, right?

11:34:43  2   A   Months before Prible's trial?

11:34:44  3   Q   Uh-huh.  You were already in talks with the U.S. attorney

4   about a possible sentence reduction for Beckcom in this case?

11:34:50  5   A   I think I might have called to introduce myself to make sure

6   I had the right prosecutor.  I don't think we could talk much

7   beyond that because nothing had happened yet.

11:35:01  8   Q   Why would you have called him to introduce yourself as the

9   prosecutor?

11:35:04 10   A   To find out if he's the right prosecutor.

11:35:06 11   Q   Okay.  But why would you have done that before the trial --

12   before Mr. Prible's trial?

11:35:11 13   A   Just to find out if he's the right prosecutor, to find out

14   about Michael Beckcom, to find out about the situation.

11:35:19 15   Q   "The situation" meaning what?  Mr. Beckcom's sentence?

11:35:23 16   A   Mr. Beckcom's sentence, Mr. Beckcom's crime, what his fed --

17   fed prosecutor thought about him and the whole process.

11:35:30 18   Q   I'm going to show you Exhibit 181.  Exhibit 181 is a

19   March 4th, 2002, letter from Mark Cullers to you, and it says,

20   "Enclosed please find the federal trial testimony of Mike

21   Beckcom."  And he -- he goes on to say, "I will forward a

22   printout of his docket sheet so you can see exactly his sentence

23   in federal court," right?

11:35:59 24   A   That's what the letter says, yes.

11:36:01 25   Q   Okay.  And so when you called -- you reached out to

*Video Deposition of Kelly Siegler*

1    Mr. Cullers, and you told him that Mr. Beckcom was a potential

2    informant for you in this Prible case and that you were

3    interested in seeing what his sentence was, correct?

11:36:19   4    **A**    Among other things, yes.

11:36:21   5    **Q**    Uh-huh.  What else did you talk with him about?

11:36:24   6    **A**    The crime Beckcom was in jail for and what this fed

7    prosecutor thought about Beckcom.

11:36:30   8    **Q**    Okay.  Did you discuss the possibility of a Rule 35

9    reduction for Mr. Beckcom if he testified in your case?

11:36:37  10    **A**    If he testified truthfully and completely in my case, yes.

11:36:42  11    **Q**    But you did discuss that --

11:36:43  12    **A**    Yes.

11:36:43  13    **Q**    -- with Mr. Cullers?

11:36:45  14         And I'm going to show you Exhibit 126.  Exhibit 126 is a

15    March 5th, 2002, letter from Mr. Cullers to you enclosing the

16    initial Texas Rangers report regarding the murder of Nick

17    Brueggen, who was Mr. Beckcom's victim, right?

11:37:04  18    **A**    I don't remember the name, but I remember this.

11:37:06  19    **Q**    Okay.  It says, "Thought you might find it helpful.  Mike

20    Beckcom was sentenced to 135 months," right?

11:37:12  21    **A**    That's what this says, yes.

11:37:13  22    **Q**    Yes.  And so this shows that you-all had discussed

23    Mr. Beckcom's sentence, correct?

11:37:18  24    **A**    Yes.

11:37:19  25    **Q**    And there would have been no reason for you to discuss

*Video Deposition of Kelly Siegler*

1    Mr. Beckcom's sentence with Mr. Cullers if not in the context of

2    a potential Rule 35 motion down the road, right?

11:37:28  3    **A**    Well, most likely that was the reason, but I would still

4    want to know what his sentence was and what he did.

11:37:38  5    **Q**    And Mr. Beckcom knew that you were in talks with Cullers

6    leading up to Mr. Prible's trial, right?

11:37:43  7    **A**    Yes.

11:37:46  8    **Q**    Okay.  And he knew about these conversations because you

9    wanted to reassure him that if he testified truthfully in

10    Mr. Prible's case, that a Rule 35 motion might be had, right?

11:37:56 11    **A**    Who is "he"?

11:37:58 12    **Q**    Mr. Beckcom.

11:38:01 13    **A**    Say the question again.

11:38:04 14    **Q**    You said that Mr. Beckcom was aware that you were speaking

15    with Mr. Cullers leading up to Mr. Prible's case, and I'm asking

16    you if the reason you told Mr. Beckcom that you were

17    communicating with Mr. Cullers was so Mr. Beckcom would be

18    reassured that a Rule 35 motion would be forthcoming in his case

19    if he testified truthfully; is that correct?

11:38:26 20    **A**    Yes.

11:38:28 21    **Q**    Now, this is undated, right, this letter?  There's no date

22    on this?

11:38:33 23    **A**    Correct.

11:38:33 24    **Q**    Okay.  And Mr. Beckcom is asking you for reassurance and --

25    and you mentioned that you did give him reassurance at some

*Video Deposition of Kelly Siegler*

1   point by --

11:38:40  2   **A**   This letter is different.  It's not really reassurance.

3   He's asking for other things, different things.

11:38:46  4   **Q**   And he also says, "Can you give me any reassurance that the

5   feds are going to do the right thing on this case?"

11:38:51  6   **A**   Well, they all ask that.

11:38:53  7   **Q**   And you gave him some reassurance, right?

11:38:57  8   **A**   I'm sure I told him the same thing I told all of them.

11:39:00  9   **Q**   Which is what?

11:39:00 10   **A**   "Testify truthfully and completely about the facts of the

11   case, and if you do, when you do, I'll tell your fed prosecutor,

12   and they take it from there."

11:39:08 13   **Q**   And you also reassured him by telling him that you were

14   already in communication with that prosecutor?

11:39:13 15   **A**   Yes.

11:39:13 16   **Q**   Yeah.  He also says in that letter, Exhibit 127, "I may have

17   a solution to these problems if you can assist me in making

18   contact with the DEA and an FBI agent.  Another inmate, Anthony

19   Davi, and I have come onto a couple of situations that would

20   interest both of these agencies."

11:39:30 21       Now, did you contact or -- or contact Mr. Beckcom to

22   discuss with him this information that he claimed he and Anthony

23   Davi had?

11:39:42 24   **A**   No.

11:39:43 25   **Q**   You never --

*Video Deposition of Kelly Siegler*

11:39:44  1    A    I don't remember.

11:39:45  2    Q    -- spoke with him about that?

11:39:46  3    A    I don't remember that.  I don't know what that is.

11:39:48  4    Q    Exhibit 81 is a letter from Ted Wilson from the DA's office

5    to Lieutenant Clark at FCI medium, and it's asking -- he's

6    respectfully requesting permission for you and Mr. Bonds to

7    interview two inmates by the name of Michael Beckcom and Antone

8    Davi on May 6, 2002.  Do you see that?

11:40:22  9    A    I see that.

11:40:23 10    Q    Okay.  So you did reach out to Mr. Beckcom and take him up

11   on this offer to discuss this other case with him?

11:40:32 12    A    I -- I don't remember Antone Davi at all.

11:40:36 13    Q    Ms. Siegler, Beckcom testified at Mr. Prible's trial that he

14   had gotten your name from Mr. Foreman.  Do you remember that

15   testimony?

11:40:43 16    A    I don't remember that part, no.

11:40:44 17    Q    And does that refresh your recollection that it was Nathan

18   Foreman who gave Mr. Beckcom your name to call you about

19   Prible's case?

11:40:51 20    A    Yes.

11:40:52 21    Q    Okay.  Exhibit 129 is a letter from you to Mark Cullers,

22   Beckcom's U.S. attorney out in California, dated October 29th,

23   2002.  And this was right after Mr. Prible's trial, and you were

24   informing him of Mr. Beckcom's cooperation in that trial.  Do

25   you see that?

*Video Deposition of Kelly Siegler*

11:41:22  1    **A**    Okay.

11:41:23  2    **Q**    Okay.  And in that letter, Exhibit 129, you tell Mr. Cullers

3    that, "Michael Beckcom first came to my attention when he made

4    me aware that he had information that would be helpful to my

5    case."  Do you see that?

11:41:35  6    **A**    I do.

11:41:36  7    **Q**    Okay.  And there's nothing in this letter to Mr. Cullers

8    about how Mr. Foreman had given Mr. Beckcom your name to call

9    you about this case, right?

11:41:47 10    **A**    No.

11:41:48 11    **Q**    Mr. Foreman's name is not mentioned in this letter at all?

11:41:51 12    **A**    It is not.

11:41:52 13    **Q**    Okay.  And in the letter, you also state, quote, at that

14    time, Beckcom was incarcerated at Beaumont medium FCI with my

15    trial defendant, Prible, and that is where and how Prible came

16    into contact with Beckcom and confided details of his capital

17    murder offense to Beckcom."  Do you see that?

11:42:08 18    **A**    Where -- which paragraph?

11:42:10 19    **Q**    That's the second paragraph, second line.

11:42:17 20    **A**    Okay.

11:42:18 21    **Q**    In here, there's still no mention of Mr. Foreman or this

22    larger informant network, is there, in this letter?

11:42:24 23    **A**    To Beckcom's fed prosecutor, no.

11:42:26 24    **Q**    That's right?

11:42:27 25    **A**    There is not.

*Video Deposition of Kelly Siegler*

11:42:28  1    **Q**    So you never revealed to Mr. Cullers that, actually,

2    Beckcom's cellmate had come to you on August 8th, 2001, before

3    he had even met Mr. Prible, to try to set Mr. Prible up in this

4    case, and you determined that he was a liar, right?

11:42:44  5    **A**    That's incorrect.

11:42:45  6    **Q**    You revealed all of that to Mr. Culler?

11:42:48  7    **A**    Mr. Cullers is Michael Beckcom's fed prosecutor.

11:42:53  8    **Q**    I understand that.

11:42:54  9    Did you reveal to Mr. Cullers that you had met with Nathan

10    Foreman about Mr. Prible's case in August 8th, 2001, and

11    determined that he was lying?

11:43:05 12    **A**    No.

11:43:05 13    **Q**    Okay.  You never mentioned Mr. Foreman at all to

14    Mr. Cullers, right?

11:43:09 15    **A**    I did not.

11:43:12 16    **Q**    Also in this letter to Mr. Cullers, you write, "I am not too

17    familiar with how this process works.  So please forgive me if I

18    have omitted some information you need."  And by "process" here,

19    you're referring to this Rule 35 sentence reduction process,

20    right?

11:43:28 21    **A**    Yes.

11:43:29 22    **Q**    But, in fact, you were very familiar with that process by

23    this time, right, because two months earlier, you had testified

24    in Moreno's hearing?

11:43:38 25    **A**    Yes.

*Video Deposition of Kelly Siegler*

11:43:40  1  **Q**   I'm going to show you Exhibit 130.  Exhibit 130 is a

2  handwritten thank you note from Michael Beckcom's to you dated

3  October 30th, 2002.  Do you see that?

11:43:58  4  **A**   I see it.

11:43:59  5  **Q**   Okay.  Do you recall receiving this note from Mr. Beckcom?

11:44:02  6  **A**   Now that I've read it, I remember getting it.

11:44:04  7  **Q**   And he says in that letter, "I also appreciate any further

8  contact you may have with Mark Cullers that might urge him to

9  expediently file his motion on my behalf."  Do you see that?

11:44:15 10  **A**   I do.

11:44:15 11  **Q**   Okay.  So by "further contact," he knows that you've already

12  been in discussions with Mr. Cullers, as we discussed

13  previously, right?

11:44:22 14  **A**   Yes.

11:44:23 15  **Q**   Okay.  And it sounds here like this motion is a foregone

16  conclusion, wouldn't you agree?

11:44:31 17     He's -- he's not asking Mr. Cullers -- or not appreciating

18  any further contact you have -- may have with Mr. Cullers that

19  might convince him to file a motion on my behalf, right?

11:44:43 20  **A**   That's not what the letter says.

11:44:44 21  **Q**   That's not what the letter says, right?  What it says was,

22  "I appreciate any further contact you may have with Mark Cullers

23  that might urge him to expediently file his motion on my

24  behalf," right?

11:44:54 25  **A**   That's what it says.

*Video Deposition of Kelly Siegler*

11:44:55  1  **Q**   So I'm going to show you Exhibit 131.  Exhibit 131 is a

2  November 4th, 2002, letters -- letter from AUSA Cullers to you

3  saying that the U.S. did not have jurisdiction to confer any

4  benefit on Beckcom for his cooperation with the State of Texas.

5  Do you see that?

11:45:23  6  **A**   Let me read it.

11:45:29  7      I see it.

11:45:31  8  **Q**   Okay.  Now, you could have left it at that, right?  You

9  could have left it at that, your dealings with Mr. Cullers

10  concerning Mr. Beckcom's sentence?

11:45:40  11  **A**   Right.

11:45:40  12  **Q**   Because at this point, you've done what you told the jury

13  that you would do, right, you would write a letter to

14  Mr. Cullers, which you did, right?

11:45:50  15  **A**   There was, obviously, some confusion because Mr. Cullers

16  never told me this part that's -- that's addressed in the letter

17  dated November 4th of '02.  He never told me that before, and I

18  don't know that Michael Beckcom knew that either.

11:46:04  19  **Q**   And so you were under the assumption or under the

20  understanding going into that trial that he had jurisdiction to

21  do this Rule 35 agreement, right?

11:46:12  22  **A**   "He" being?

11:46:14  23  **Q**   Mr. Cullers.

11:46:15  24  **A**   I was.

11:46:16  25  **Q**   Okay.  And you had conveyed that to Mr. Beckcom as well,

*Video Deposition of Kelly Siegler*

1   right?

11:46:19  2   **A**   I think Mr. Beckcom thought the same thing.

11:46:21  3   **Q**   Uh-huh.  And he only would have heard that from you, right?

4   He didn't have --

11:46:25  5   **A**   Oh, no.  Mr. Beckcom knew what the law was.  He was well

6   aware of all of this.

11:46:30  7   **Q**   If you could just let me finish my -- my question so we're

8   not talking over each other.

11:46:35  9       But Mr. Beckcom would not have had independent

10   communications with Mr. Cullers now, would he have?

11:46:39 11   **A**   He could have.

11:46:41 12   **Q**   You think that Mr. Beckcom might have been communicating

13   with his federal prosecutor while he was in prison?

11:46:46 14   **A**   He can write letters.

11:46:48 15   **Q**   So it's your testimony that all the information that

16   Mr. Beckcom was getting regarding the sentence -- the possible

17   sentence reduction, he didn't get it all from you?

11:46:59 18   **A**   You should ask Mr. Beckcom that.

11:47:02 19   **Q**   And on November 12th, 2002, you left Mr. Cullers a phone

20   message, Exhibit 133.  Do you see it -- it -- you reference a

21   phone call that you made to him on November 12th?

11:47:28 22   **A**   I see that.

11:47:29 23   **Q**   Okay.  Do you recall what you said to Mr. -- Mr. Cullers in

24   that phone message on November 12th, 2002?

11:47:34 25   **A**   No.

*Video Deposition of Kelly Siegler*

11:47:36  1   Q    Mr. Cullers called you back and left a message for you on

2    November 12th, 2002.  Do you recall that message?

11:47:44  3        Do you recall receiving that message from Mr. Cullers?

11:47:47  4   A    Vaguely.

11:47:48  5   Q    Okay.  It sounded like there was a misunderstanding between

6    the two of you.  Do you agree?

11:47:54  7   A    Yes.

11:47:58  8   Q    And he says in that -- in that message -- and he was

9    responding to your message on November 12th, 2002, right?

11:48:05 10   A    Yes.

11:48:06 11   Q    And he says in the beginning of that message, "If Mike

12    testified in your case with the expectation of some deal from

13    us, that would probably have to be disclosed to the defense in

14    your case, end quote.  You heard that?

11:48:19 15   A    I heard that.

11:48:19 16   Q    Okay.  Did you tell Mr. Cullers in that November 12th, 2002,

17    message that you left for him that Mike had testified in this

18    case with the expectation of some deal?

11:48:31 19   A    No.

11:48:32 20   Q    Okay.  I'm going to show you Exhibit 133.

11:48:35 21        And in that letter, Exhibit 133, you beg Mr. Cullers to

22    reconsider based on the, quote, vital role that Beckcom played

23    in obtaining a conviction of Prible, right?

11:48:47 24   A    I disagree with the word "beg," and the letter speaks for

25    itself.

*Video Deposition of Kelly Siegler*

11:48:52  1   **Q**   Okay.  Do you agree that Mr. Beckcom was the star witness in

2   your case against Mr. Prible?

11:48:57  3   **A**   No.

11:48:58  4   **Q**   But he did play a vital role?

11:49:00  5   **A**   No.  He played a role.

11:49:02  6   **Q**   So you disagree with the statement "a vital role" that you

7   said in this -- in this letter that you wrote to Mr. Cullers?

11:49:10  8   **A**   Michael Beckcom played a role.

11:49:15  9   **Q**   I'm going to show you Exhibit 135.  This is a November 15th,

10   2002, e-mail from you to Mr. Cullers regarding Beckcom's

11   attorney.  Do you see that?

11:49:41 12   **A**   I do.

11:49:41 13   **Q**   And you're giving -- you're providing Mr. Cullers with

14   Beckcom's attorney's name and contact information, right?

11:49:50 15   **A**   Yes.

11:49:50 16   **Q**   Okay.  And eventually, Mr. Cullers did decide to -- to write

17   that Rule 35 motion for Mr. Beckcom, right?

11:49:57 18   **A**   I don't remember.

11:49:58 19   **Q**   You don't recall if Mr. Beckcom got any time off --

11:50:01 20   **A**   I do not.  What is the end of the story?  I don't know.

11:50:04 21   **Q**   Well, I'm ask --

11:50:06 22   **A**   I don't know.

11:50:07 23   **Q**   I mean, I'm asking you because you were at the story.

11:50:10 24   **A**   And I don't remember.

11:50:11 25   **Q**   So you -- you're saying after you -- this last

*Video Deposition of Kelly Siegler*

1    correspondence that I showed you with Mr. Cullers, you didn't

2    have any follow-up with him about what the sentence reduction

3    would be?

11:50:20  4    **A**   I don't remember if I did because I don't know if there was

5    a sentence reduction.

11:50:26  6    **Q**   Other than this correspondence that you had with Mr. Cullers

7    regarding that Rule 35 motion for Mr. Beckcom, did you do any

8    other favors for Mr. Beckcom?

11:50:42  9    **A**   Well, I wouldn't characterize that as a favor either.

11:50:45 10   **Q**   I'm going to show you Exhibit 170, which we've looked at

11   before.  It's Michael Beckcom's phone records, and I'll tell you

12   exactly where to go.  If you go to Bates label number 63 down at

13   the bottom.

11:51:05 14      If you go to date April 17th, 2002 --

11:51:09 15   **A**   Okay.

11:51:10 16   **Q**   -- you'll see that Beckcom called the DA's office Special

17   Crimes phone number on that date?

11:51:15 18   **A**   I see that.

11:51:16 19   **Q**   Okay.  So that was April 17th, 2002, he's trying to reach

20   out to you?

11:51:28 21   **A**   Not necessarily.

11:51:30 22   **Q**   Not necessarily?  Might he have been reaching out to someone

23   else in the DA's office for some reason?

11:51:36 24   **A**   You should ask him that.

11:51:38 25   **Q**   Well, I'll ask you:  Did you -- were you aware of any other

*Video Deposition of Kelly Siegler*

1    prosecutor that he was working on cases with at this time in the

2    DA's office?

11:51:47 3    **A**   I wasn't.

11:51:47 4    **Q**   You weren't.  Okay.  Exhibit 137.  Exhibit 137 is Beckcom's

5    parole application, and it's dated April 19th, 2002.  Do you see

6    that?

11:52:07 7    **A**   Should I have seen this before?

11:52:09 8    **Q**   I'm asking you -- well, I'm asking you if you see this --

9    obviously --

11:52:12 10   **A**   I've never seen this before.

11:52:14 11   **Q**   You've never seen this before?

11:52:15 12   **A**   I don't think so.

11:52:19 13   **Q**   So you didn't fill this out for Mr. Beckcom?

11:52:21 14   **A**   What?

11:52:22 15   **Q**   I'm asking you:  Did you fill it out for Mr. Beckcom?

11:52:24 16   **A**   What is it?

11:52:25 17   **Q**   It's his application for parole in the state case.

11:52:28 18   **A**   You're asking me if I filled this out?

11:52:30 19   **Q**   I am.  I'm just asking if you filled it out for him?

11:52:33 20   **A**   No.

11:52:33 21   **Q**   Okay.  Did you have any role in assisting him in applying

22   for parole in his state case in April of 2002?

11:52:42 23   **A**   No.

11:52:49 24   **Q**   If you go back to page 170 -- or Exhibit 170, same page we

25   were looking at, 63.

*Video Deposition of Kelly Siegler*

11:53:01  1    **A**   Same page?

11:53:02  2    **Q**   Uh-huh.  On April 24th, 2002, Beckcom again reaches -- or

3    calls the Special Crimes unit.  Do you see that?

11:53:11  4    **A**   Not yet.  What day?

11:53:13  5    **Q**   April 24th, 2002.

11:53:17  6    **A**   Okay.

11:53:18  7    **Q**   And then Exhibit 186 --

11:53:25  8    **A**   That was a two-minute call.

11:53:27  9    **Q**   Yes, I see that.  And my question to you --

11:53:28 10    **A**   That doesn't mean he talked to anybody.

11:53:30 11    **Q**   My question to you was:  He called the phone number at the

12    DA's Special Crimes unit on that date, right?

11:53:35 13    **A**   He did.

11:53:36 14    **Q**   Okay.  So on April 17th, 2002, he called that number,

15    correct?

11:53:40 16    **A**   That's the one we did a while ago?

11:53:45 17    **Q**   Yes.

11:53:45 18    **A**   Yes.

11:53:46 19    **Q**   On April 19th, he signed -- or filled out a parole

20    application -- or someone filled out a parole application and

21    dated it April 19th, 2002, right?

11:53:53 22    **A**   I have no idea who did that.

11:53:54 23    **Q**   Well, you'll agree that that Exhibit 137 is dated 2000 --

24    April --

11:53:59 25    **A**   I don't know where --

*Video Deposition of Kelly Siegler*

11:53:59  1  **Q**   -- 19th, 2002?

11:54:00  2  **A**   I don't know where you got that from.  I've never seen that

3  before.  You can ask someone who has information about that to

4  verify it.  I can't.

11:54:08  5  **Q**   Okay.  I'm just asking you if the date on that is

6  April 19th, 2002.  Do you see that at the bottom?

11:54:13  7  **A**   I don't know anything about that.  I'm not going to answer

8  anything about it.

11:54:18  9  **Q**   And in Exhibit 170, we see that Beckcom again called that

10  number at Special Crimes a few days later on April 24th, 2002,

11  right?

11:54:28  12  **A**   And it looks like he again didn't speak to anybody.  It's a

13  two-minute call.

11:54:31  14  **Q**   You have no recollection, sitting here 15 years later, as to

15  whether or not he spoke with anyone on that date, do you?

11:54:37  16  **A**   I have enough sense to know that not much could get done in

17  a two-minute phone call after he went through two receptionists,

18  if not three.

11:54:45  19  **Q**   Right.  So if he had spoken with you, it would have been

20  because you had called him on a unit manager's phone to return

21  his call, right?

11:54:50  22  **A**   No.  No, not at all.

11:54:54  23  **Q**   Aside from writing that letter to Mr. Foreman's prosecutor

24  for the Herrero case --

11:55:01  25  **A**   Mr. Foreman?

*Video Deposition of Kelly Siegler*

11:55:03  1   Q   Mr. Foreman's prosecutor, right.  We discussed that earlier.

11:55:06  2   A   Okay.

11:55:07  3   Q   The letter to Ms. Batson.  Did you do anything else in the

4   way of a benefit for Mr. Foreman as a result of his assistance

5   in either the Prible or the Herrero cases?

11:55:20  6   A   The letter having to do with getting them all separated.

11:55:23  7   Q   Okay.  Did you have any charges against him dropped?

11:55:30  8   A   Not that I remember.

11:55:34  9   Q   That would have been -- needed to have been revealed, right?

11:55:36 10   A   Yes -- no, he didn't testify for anybody ever.

11:55:42 11   Q   So -- so because he didn't testify, in -- in your mind, you

12   didn't need to reveal the fact that you had written a letter for

13   him?

11:55:51 14   A   Not in the Prible case, no.  He nothing to do with the

15   Prible case, Nathan Foreman.

11:55:55 16   Q   I'll show you Exhibit 116.  Exhibit 116 was the Brady motion

17   filed by Prible's counsel pretrial.  Do you see that?

11:56:11 18   A   Yes.

11:56:12 19   Q   Okay.  Now, the defense wasn't required to file this motion,

20   right?  All this information -- Brady information should have

21   been revealed by this time, right?

11:56:19 22   A   Correct.

11:56:20 23   Q   Okay.  It's the state's burden to produce that information,

24   right?

11:56:24 25   A   Correct.

*Video Deposition of Kelly Siegler*

11:56:25 1   Q   Okay.  On Section 2, 1B, and I know it's difficult to read

2   because of your notes, but you'll see it says one of the things

3   they asked you to reveal -- to disclose was the date, place and

4   manner of the state's contacts with this witness, meaning

5   Michael Beckcom, including a statement of how contact was first

6   initiated and with whom it was made.  Do you see that?

11:56:57 7   A   I see that.

11:56:57 8   Q   Uh-huh.  And did you tell defense counsel that contact was

9   actually first made with Nathan Foreman, Beckcom's cellmate?

11:57:05 10  A   I don't believe that was the case.

11:57:10 11  Q   You don't believe that you spoke with Mr. Foreman before you

12  spoke with Mr. Beckcom?

11:57:14 13  A   That's not what you asked me.

11:57:17 14  Q   I believe it is what I asked you, but I'll -- I'll rephrase

15  it.

11:57:20 16      Did you tell the defense that contact was actually first

17  made with Nathan Foreman, Beckcom's cellmate?

11:57:28 18  A   I read this to be contact that Beckcom first made with me.

11:57:35 19  Q   That's right.  So did you -- okay.  Did you reveal to the

20  defense that you had spoken with Mr. Foreman back in August 8th,

21  2001, he was -- he was Mr. Beckcom's cellmate?

11:57:47 22  A   He wasn't his cellmate.  He wasn't his cellmate then.

11:57:51 23  Q   When did he become his cellmate?

11:57:54 24  A   I don't know.

11:57:55 25  Q   Okay.  I thought you said earlier you didn't know that they

*Video Deposition of Kelly Siegler*

1  were ever cellmates?

11:57:58  2  **A**   I didn't.  I just read it a while ago when I looked at

3  Tina's transcript from Beckcom's testimony, and that reminded me

4  of what Beckcom said back then.

11:58:06  5  **Q**   Okay.  But eventually he became Beckcom's cellmate prior to

6  this trial, right?

11:58:10  7  **A**   No, I don't know if it was prior to the trial.  I don't know

8  when it happened.

11:58:14  9  **Q**   Okay.  Number 1C in that exhibit, it asks for a list of all

10  cases in which Beckcom has appeared as a witness, been listed as

11  a witness, or volunteered to appear as a witness.  Did you

12  disclose any other cases in which Mr. Beckcom was a witness for

13  you in response to this motion?

11:58:39  14  **A**   A witness for me?

11:58:40  15  **Q**   Yes.

11:58:42  16  **A**   There was only the one.

11:58:44  17  **Q**   He wasn't a witness for you in any other case that you

18  prosecuted?

11:58:47  19  **A**   No.

11:58:48  20  **Q**   I'm going to show you Exhibit 145.  This is a probable cause

21  affidavit in the case of Danny Bible.  That was a case you

22  prosecuted, right?

11:59:12  23  **A**   It was.

11:59:13  24  **Q**   And if you look at the next -- actually, the third page of

25  this printout, under active parties, it says, "Michael Beckcom,

*Video Deposition of Kelly Siegler*

1    connection, previous bench warrant, witness for the

2    prosecution."  Do you see that?

11:59:29  3    **A**   What's your question?

11:59:32  4    **Q**   So he was a witness for you in Mr. Bible's case --

11:59:35  5    **A**   He was not.

11:59:35  6    **Q**   -- as well?

11:59:36  7    **A**   He was not.

11:59:36  8    **Q**   He wasn't a testifying witness, maybe, but you had spoken

9    with him about Mr. Bible's case?

11:59:42  10   **A**   No, ma'am.  He -- he was bench warranted and connected to

11   that case when he was brought back so Jeffrey Prible wouldn't

12   know that he was brought back for Jeffrey Prible's case.

11:59:50  13   **Q**   So you put a different name on the bench warrant?

11:59:52  14   **A**   That could be the explanation for it.

11:59:55  15   **Q**   Section E, "Agreements made with Beckcom concerning benefits

16   he would receive in exchange for testimony, including oral

17   agreements."  Do you see that?

12:00:05  18   **A**   Yes.

12:00:05  19   **Q**   Now, in response to that motion, did you reveal to

20   defense -- the defense counsel for Mr. Prible that you had

21   arranged a meeting with Mr. Beckcom and Mr. Davi at

22   Mr. Beckcom's request?

12:00:20  23   **A**   No.  That's not what happened.

12:00:22  24   **Q**   That's not what happened?

12:00:24  25   **A**   No.  I don't remember arranging a meeting with Mr. Davi.  I

*Video Deposition of Kelly Siegler*

1  don't remember Mr. Davi.

12:00:30  2  **Q**   Okay.  Ms. Siegler, in the Temple trial, you testified that

3  you deleted all your emails while at the DA's office; is that

4  correct?

12:00:42  5  **A**   I think I testified that when I was done working on a given

6  e-mail and the to-dos were done, I deleted it.

12:00:49  7  **Q**   And you also deleted -- did you also delete all the e-mails

8  a second time from your trash folder?

12:00:55  9  **A**   Yes.

12:00:55  10  **Q**   Okay.  And you also deleted all the e-mails that you sent

11  from your account, right?

12:01:00  12  **A**   Well, I don't know about that.  I just didn't want them in

13  my in box where I had to look at them.

12:01:04  14  **Q**   I'm going to show you Exhibit 154.  Do you have

15  Exhibit 154-1 still?  That's the manual.

12:01:13  16     And it says, "The Attorney General of Texas has held that

17  electronic mail is public information under the Texas Open

18  Records Act."  Do you see that?

12:01:19  19  **A**   I do.

12:01:20  20  **Q**   So you had a duty to preserve your e-mails on your DA

21  account, didn't you?

12:01:25  22  **A**   I assumed the office was doing that.

12:01:28  23  **Q**   So you assumed, even though you, personally, were deleting

24  them, that the office was saving them?

12:01:33  25  **A**   Yeah.  They had everybody's e-mails.

*Video Deposition of Kelly Siegler*

12:01:35  1  Q   And were -- and they would be somewhere at the DA's office?

12:01:38  2  A   On the server.

12:01:40  3  Q   I'll show you Exhibit 110.  This is a privilege log from --

12:01:44  4         **THE COURT:**  I'm sorry.  How much is left?

12:01:46  5  Q   -- the DA's office --

12:01:53  6         **MS. SCARDINO:**  I think maybe 20 minutes, Your Honor.

12:01:55  7         **THE COURT:**  Twenty minutes?

12:01:56  8         **MS. SCARDINO:**  I think maybe, yes, sir.

12:01:57  9         **THE COURT:**  We're going to have to delay your

          10  1:00 o'clock witness or take him out of order.

12:02:01 11         **MS. SCARDINO:**  Okay.

12:02:02 12         **THE COURT:**  I've got a wiretap application I got to go

          13  deal with right now.  We'll --

12:02:05 14         **MS. SCARDINO:**  Should we take lunch?

12:02:06 15         **THE COURT:**  -- break until 1:00 o'clock.

12:02:08 16         **MS. SCARDINO:**  Okay.

12:02:08 17     *(Lunch recess taken from 12:02 p.m. to 1:06 p.m.)*

13:06:01 18         **THE COURT:**  Keep your seats, everybody.  That's all

          19  right.

13:06:04 20         Mr. Rytting, did you have something you want to say?

13:06:06 21         **MR. RYTTING:**  No, Your Honor.

13:06:07 22         **THE COURT:**  You want to go ahead and finish the --

13:06:09 23         **MS. SCARDINO:**  Yes, Your Honor.

13:06:09 24         **THE COURT:**  -- depo?  Okay.  Let's do that, then.

13:06:18 25         **MS. SCARDINO:**  Is Arturo here?  Can you turn up the

*Video Deposition of Kelly Siegler*

1   volume?

13:06:22   2            THE CASE MANAGER:   Should be on.

13:06:45   3            MS. SCARDINO:   One second while we figure out what's

4   going on.

13:06:47   5       *(Video playing.)*

13:07:31   6            MS. SCARDINO:   Can you hear it?   It sounds like it's

7   not hooked up to your system for some reason.

13:07:38   8            THE CASE MANAGER:   Try unplugging it and plugging it

9   back in.

13:07:42  10            MS. SCARDINO:   Okay.   Sorry about that.

13:07:51  11       *(Video deposition of Kelly Siegler continued as follows.)*

13:07:51  12   Q   And that a search for e-mails related to this case, in all

13   of the results that came up, I believe there's only one from

14   your account.

13:08:07  15       So my question to you is if they do have them at the DA's

16   office, how do we find those e-mails?   Because the DA's office

17   could not find them.   So I'm asking you where were they stored,

18   to your knowledge?

13:08:19  19   A   Well, first of all, I don't know that there would be any

20   more.   I don't know why I would have e-mails specifically

21   dealing with Prible.   I'm trying to think of why I would.

22   Because back then, we did not e-mail lawyers like they do today.

23   We didn't.

13:08:34  24   Q   In 2001?

13:08:35  25   A   Yeah.

*Video Deposition of Kelly Siegler*

13:08:36  1  **Q**   Well, in the Temple case, there were e-mails, but you

2  testified that you deleted your e-mails, right?   There are

3  e-mails from others, right?

13:08:46  4  **A**   Right.

13:08:46  5  **Q**   And in this case, there are a lot of e-mails from other

6  people, but none from you, right?   So other lawyers in the

7  office were using e-mail at that time?

13:08:53  8  **A**   I meant defense lawyers, sorry, between prosecutors and

9  defense lawyers.

13:08:56 10  **Q**   I'm talking any e-mails that you sent or received about this

11  case --

13:09:02 12  **A**   Okay.

13:09:02 13  **Q**   -- where would they be located if you deleted them?   Where

14  could we find them?

13:09:07 15  **A**   The DA's was would have them.   If there were any more, they

16  would have them.   They would be here.   There must not be any

17  more.   That doesn't surprise me.

13:09:15 18  **Q**   Your theory at trial was that Mr. Beckcom and Mr. Prible

19  came into contact coincidentally at FCI Beaumont, right?

13:09:26 20  **A**   I don't remember exactly what I said about that.

13:09:30 21  **Q**   I'm going to show you your opening statement.

13:09:33 22  **A**   Okay.

13:09:34 23  **Q**   An excerpt that's Exhibit 195.   Page 78, line 21, and it

24  said -- and -- and you say, "You're also going to hear testimony

25  from a man named Michael Glen Beckcom.   Michael Beckcom is a

*Video Deposition of Kelly Siegler*

1    federal inmate at the Beaumont medium federal penitentiary.

2    He's going to tell you about how he came to meet and know Jeff

3    Prible."  Do you see that?

13:10:00   4    **A**   I do.

13:10:01   5    **Q**   Okay.  So it was important at trial to portray the meeting

6    of Mr. Prible and Mr. Beckcom as coincidental, right?

13:10:10   7    **A**   Not really.

13:10:11   8    **Q**   Okay.

13:10:12   9    **A**   I didn't say that anywhere.

13:10:14   10   **Q**   Okay.  So you'll disagree that that was your theory at

11   trial?

13:10:17   12   **A**   That's not what you just read to me, that I said anything

13   about contact.

13:10:23   14   **Q**   Well, in your opening statement, you tell the jury that

15   Michael Beckcom is going to tell them how he came in contact

16   with Mr. Prible, right?

13:10:33   17   **A**   Yes.

13:10:33   18   **Q**   And so because you put that in your opening statement, that

19   initial contact is pretty important, right?

13:10:40   20   **A**   Not necessarily.

13:10:42   21        **SPEAKER:**  Objection.

13:10:43   22   **BY MS. SCARDINO:**

13:10:44   23   **Q**   Okay.  And Mr. Beckcom testified at trial that the

24   confession that he received -- that he heard from Mr. Prible was

25   heard in the presence of Nathan Foreman as well.  Do you

*Video Deposition of Kelly Siegler*

1    remember that at that time?

13:10:59   2    **A**    I do not remember the specifics of the trial.

13:11:01   3    **Q**    Okay.

13:11:02   4    **A**    It was 15 years ago.

13:11:03   5    **Q**    Okay.  Let me show you Exhibit 109-4.  Actually, I want to

6    get you, actually, to read Exhibits 109-2, 109-3 and 109-4 into

7    the record because they're your work product notes, I believe.

13:11:19   8    **A**    What is this?

13:11:20   9    **Q**    This was produced by order of the Court after the Court's *in*

10    *camera* review of your work product in this case.

13:11:31   11    And I want to bring your attention to the middle of that

12    page, a little -- and it says, "Defendant in Beaumont pen."  Do

13    you see that?

13:11:44   14    **A**    I see a defendant -- yes, "Defendant in Beaumont pen."

13:11:47   15    **Q**    And so this -- these notes look like they were taken before

16    Mr. Prible was charged, do you agree?

13:11:55   17    **A**    Yes.  These look like some initial to-dos or random thoughts

18    I had.

13:12:00   19    **Q**    Okay.  And if you look at the following page, if you look in

20    the middle of the paragraph, it says, "Potential federal prison

21    roommate."  Do you see that?

13:12:12   22    **A**    I do.

13:12:14   23    **Q**    Okay.  So before you were -- you had accepted charges

24    against Mr. Prible, you were already contemplating setting him

25    up with a federal prison roommate; is that correct?

*Video Deposition of Kelly Siegler*

13:12:26 1    A    No.   That's not what that means.

13:12:27 2    Q    The jury wouldn't have believed that coincidental contact

3    theory if they had known that you had thought about putting him

4    with a federal prison roommate before you even charged him,

5    right?

13:12:37 6    A    That's not what that means.   Do you want to know what it

7    means?

13:12:43 8    Q    Another theory that you had at the trial was this theory

9    that DNA disappears immediately once it's in an oral cavity; is

10   that correct?   Do you remember that?

13:12:56 11   A    I don't remember exactly what we said, no.

13:12:58 12   Q    Okay.   Well, the reason this -- this theory was important

13   was because the most damning piece of evidence against

14   Mr. Prible was the DNA -- his DNA found in the victim's mouth.

15   Do you remember that?

13:13:10 16   A    I do.

13:13:10 17   Q    Okay.   And so it was crucial that the prosecution refute

18   Mr. Prible's story of consensual sex, which is what he told --

19   volunteered to the detectives within hours of the murders,

20   right?

13:13:25 21   A    I don't remember what he said initially.

13:13:26 22   Q    Okay.   But you agree that this theory about the semen

23   disappear -- or DNA disappearing immediately was something that

24   was important to the trial?

13:13:37 25   A    I don't know that we ever used the word "disappear

*Video Deposition of Kelly Siegler*

1    immediately."

13:13:41  2    **Q**    Okay.  I'm going to show you your opening statement again,

3    page [sic] 195.  Do you have it in front of you?

13:13:49  4    **A**    Yes.

13:13:51  5    **Q**    Okay.

13:13:53  6    **A**    It's the yellow one.  Do you need it?

13:13:55  7    **Q**    No.  I think those are all -- thank you.

13:13:57  8         Look at page 82, line 18.

13:14:06  9    **A**    Okay.

13:14:06 10    **Q**    Okay.  And I'll read it for you while you're reading along.

11   "The evidence will tell you -- the compelling evidence will tell

12   you that the reason for that is that found -- after the

13   autopsies were done, especially the autopsy on Nilda Tirado,

14   found in her mouth was the semen, the DNA of Ronald Prible.  And

15   the DNA expert will tell you what the odds are, what that means

16   exactly statistically, the fact that his DNA is found in her

17   mouth.  But the most compelling thing he's going to tell you is

18   that you know what, when semen is in somebody's mouth, in a

19   lady's mouth, it goes away in minutes.  It goes away with a

20   small swallow.  That's what the evidence is about in this case,

21   and you're going to know from the testimony all about what kind

22   of a man could ejaculate in a woman's mouth after he executed

23   her husband minutes before he executed her, minutes before he

24   could find gasoline to set her on fire and what kind of a man

25   could have walked out of the house with it smoking and burning

*Video Deposition of Kelly Siegler*

1   knowing three little babies were asleep in their bed.  That's

2   this kind of man, and he's guilty of capital murder."

13:15:04 3     Now, does this refresh your memory about the theory of the

4   prosecution being that DNA disappears immediately once it is in

5   a woman -- is in a victim's mouth?

13:15:15 6   **A**   I did not use the words "disappear immediately."

13:15:17 7   **Q**   Okay.  "It goes away in minutes" is the words that you

8   stated, right?

13:15:23 9   **A**   That's what I said.

13:15:28 10   **Q**   And that was also the testimony that you elicited from the

11   DNA expert in this case, Mr. Watson, correct, that DNA -- the

12   fact that he found any DNA in Ms. -- in the victim's mouth -- or

13   the fact that any DNA was found in her mouth meant that the

14   victim had been executed immediately after the assailant had

15   ejaculated; is that correct?

13:15:52 16   **A**   I don't think that he could testify to that exactly, but

17   you'd have to show me his testimony.

13:15:56 18   **Q**   Okay.  If you can look at Exhibit 109-4 -- do you have 109?

13:16:04 19     At the very top there in your handwriting, it says, "Pam

20   McInnis, semen lives up to 72 hours."  Do you see that?

13:16:12 21   **A**   I do.

13:16:13 22   **Q**   Now, who is Pam McInnis?

13:16:16 23   **A**   She is a DNA analyst and was the head of the crime lab for

24   Pasadena --

13:16:23 25   **Q**   Okay.

*Video Deposition of Kelly Siegler*

13:16:23  1   A    -- and Harris County.  She was connected to both.

13:16:25  2   Q    And so you consulted her about this question as to how long

3   semen could live in the oral cavity, right?

13:16:30  4   A    I at least started with her, yes.

13:16:34  5   Q    Did you reveal to the defense counsel in Mr. Prible's case

6   that you spoke with Ms. McInnis and that she told you semen

7   could live up to 72 hours?

13:16:47  8   A    I think that was part of the trial.  Seventy-two hours is in

9   the trial.

13:16:52  10  Q    My question to you is:  Did you ever reveal to Mr. Prible's

11  counsel that you had spoken to Pam McInnis, and she had told you

12  that semen lives up to 72 hours?

13:17:03  13  A    I don't remember.

13:17:05  14  Q    You mentioned you had Michael Beckcom bench warranted in the

15  Bible -- in the Danny Bible case?

13:17:12  16  A    No.  I mentioned that Michael Beckcom was bench warranted

17  and attached to the Danny Paul Bible case.

13:17:19  18  Q    Okay.  And how do you do that?  What type of documents do

19  you have to file to do that?

13:17:23  20  A    The court -- court coordinators are in charge of bench

21  warrants.

13:17:27  22  Q    But you instruct the court coordinator why they're being

23  bench warranted --

13:17:31  24  A    Yes.

13:17:31  25  Q    -- correct?

*Video Deposition of Kelly Siegler*

13:17:31 1    A    Yes.

13:17:31 2    Q    And then they file some sort of document with the court?

13:17:35 3    A    I don't really know what they do.  That's a court

4    coordinator function.

13:17:39 5    Q    But it comes out as a court order to move somebody from one

6    place to the courtroom or to the -- to the jail, right?

13:17:44 7    A    It does.

13:17:45 8    Q    Okay.  And you knew at the time that he was not going to be

9    a witness in the Danny Bible case?

13:17:51 10   A    That's correct.

13:17:52 11   Q    Okay.  So it was a false misrepresentation to the Court and

12   to the court coordinator?

13:17:56 13   A    No.

13:17:56 14        MR. DOYLE:  Objection.

13:17:56 15   BY MR. RYTTING:

13:17:58 16   Q    What was true about that?

13:18:00 17   A    That we needed Michael Beckcom brought to Harris County, and

18   we needed to make sure that Jeffrey Prible and Michael Beckcom

19   did not run into each other for lots of reasons, to protect the

20   integrity of the case and, also, for the safety purposes for

21   both of them.

13:18:15 22   Q    Okay.  And isn't there other means to do that without having

23   bench warrants somebody as -- and attach them as a witness to

24   the case?

13:18:22 25   A    No.  If I would have attached Michael Beckcom to the Jeffrey

*Video Deposition of Kelly Siegler*

1    Prible case, they would have been brought together on the chain

2    each and every time they were brought up.  That would have been,

3    really, a stupid thing to have happen.

13:18:38  4    **Q**    You can't have them bench warranted at different times?

13:18:40  5    **A**    I did have them bench warranted at different times.  That's

6    why it's connected to Danny Paul Bible.

13:18:45  7    **Q**    No, but in the Prible case.

13:18:47  8    **A**    No.  They get -- it gets all messed up.  The jail can't keep

9    it straight.

13:18:51 10    **Q**    And is this a common practice by Harris County district

11    attorneys?

13:18:55 12    **A**    Yes.

13:18:55 13    **Q**    And so the result is that when, say, someone gets a post

14    conviction case and has to investigate it, they're -- they look

15    at cases and find -- and they cannot be sure if a witness is

16    attached for one reason or another to a case because of the

17    Harris County district attorney's policy?

13:19:13 18    **A**    That would be a complication, yes.

13:19:17 19    **Q**    And did you tell Mr. Wentz and Mr. Gaiser about your -- the

20    results of your interview with Nathan Foreman?

13:19:30 21         Just to end up, just because I'm curious, you mentioned

22    that there were a number of lies in the -- in the application --

23    or in the petition -- Prible's petition, that there are some

24    lies?

13:19:44 25    **A**    I did.

*Video Deposition of Kelly Siegler*

13:19:44  1  **Q**   Okay.  And that means there's -- there must be some faults

2  in that petition that you think are false, correct?

13:19:51  3  **A**   I do.

13:19:52  4  **Q**   Okay.  And can you name one or two of them that you think

5  are false?

13:19:57  6  **A**   There's not much truth in it.

13:19:59  7  **Q**   Okay.  Can you name one that sounds out as being false?

13:20:03  8  **A**   Well, the overarching lie is that I orchestrated a ring of

9  informants from the Beaumont federal prison system.  That is a

10  lie --

13:20:13 11  **Q**   Okay.  All right.  I'm just --

13:20:14 12  **A**   -- that you made up --

13:20:16 13  **Q**   No.  No.

13:20:17 14  **A**   -- and you theorized and you pieced together and you

15  represented to a federal judge and defamed my reputation, and

16  it's completely wrong and unethical and false and --

13:20:28 17  **Q**   What is the basis for you thinking -- for your belief that

18  we've been -- we don't believe that?

13:20:33 19  **A**   You have no evidence to support that.  That is a lie.  You

20  have not one shred of evidence to support it from anybody.

21  **Q**   Okay.

13:20:38 22  **A**   It didn't happen.

13:20:40 23  **Q**   Did you not -- did you not read the transcript of the

24  interview with Carl Walker?

13:20:44 25  **A**   I don't even know who Carl Walker is, and he's a bigger liar

*Video Deposition of Kelly Siegler*

1    than Nathan Foreman.

13:20:48   2    **Q**   Okay.

13:20:49   3    **A**   Your own investigative interview of Carl Walker was a

4    joke --

13:20:52   5    **Q**   Okay.  So --

13:20:52   6    **A**   -- if you analyze the interview itself.

13:20:54   7    **Q**   So --

13:20:54   8    **A**   Read it carefully.

13:20:56   9    **Q**   I'm just saying --

13:20:56   10   **A**   He didn't even know my name.  He wasn't even sure I was a

11   female.

13:20:59   12   **Q**   Okay.

13:20:59   13   **A**   And you want to pretend like Carl Walker is the crux of your

14   conspiracy of informants that I masterminded and orchestrated --

13:21:05   15   **Q**   I'm saying did you --

13:21:06   16   **A**   -- in federal prison?

13:21:07   17   **Q**   Did you read -- did you read his -- the transcript of his

18   interview?

13:21:10   19   **A**   I read -- it was about six pages long.

13:21:13   20   **Q**   No, it was about 30 pages long.

13:21:16   21   **A**   Maybe I read 30.  I don't remember.  It was the one where he

22   was interviewed by --

13:21:20   23   **Q**   I just asked -- Ms. Siegler, I just asked you a question.

13:21:24   24        **MR. DOYLE:**  Let her -- let her finish.

13:21:24   25   **BY MR. RYTTING:**

*Video Deposition of Kelly Siegler*

13:21:24  1    Q    Did you read it?

13:21:24  2    A    I think I did, yes.

13:21:25  3    Q    Okay.  And you've also read the affidavit of Nathan Foreman?

13:21:31  4    A    I don't know if I read an affidavit.  How long is that one?

13:21:37  5    Q    That's about four pages in the Prible case --

13:21:39  6    A    I think I read that.  I think I read that.

13:21:41  7    Q    -- and three pages in the Herrero case, and you commented on

         8    that in your own affidavit.

13:21:45  9    A    Say that again.

13:21:46 10    Q    And you commented on his affidavit in the -- in the Herrero

        11    case.

13:21:50 12    A    Okay.  That's the affidavit you're talking about --

13:21:53 13    Q    Right.

13:21:54 14    A    -- right?

13:21:54 15    Q    So I have -- so there is evidence.  You -- you disagree with

        16    the credibility of that evidence, don't you?

13:22:00 17    A    No, I disagree with your making a false impression to a

        18    federal judge in a case this important and making up lies and

        19    saying that I orchestrated a ring of informants in a federal

        20    prison system and that I told them what to say and caused them

        21    to lie in not just one or two or three, but four different

        22    cases.  That is a lie.

13:22:20 23    Q    No.  There was -- there was -- the claim was that you did --

        24    that you were aware of a ring of informants and that --

13:22:27 25    A    And I told them what to say, and told them to lie --

*Video Deposition of Kelly Siegler*

13:22:30 1   **Q**   That you were aware of a ring of informants.  Wasn't --

13:22:32 2   **A**   -- and I fed them information.

13:22:32 3   **Q**   Wasn't that -- wasn't that the petition?

13:22:34 4   **A**   It was a whole lot more than that, and you know it.

13:22:36 5   **Q**   And that -- that some of the key facts were learned from you

6   by -- according to our witnesses and our affidavits and our

7   taped statements?

13:22:45 8   **A**   Your witnesses' affidavits were lies.

13:22:47 9   **Q**   Okay.  You can take that position, and it contradicts what

10   you -- in both cases, it contradicts precisely what you claim

11   the State's -- the real truth is and what the State's -- what

12   the State has argued; isn't that correct?

13:23:03 13   **A**   You have not one shred or iota or piece of credible evidence

14   from a credible witness that supports any of those allegations.

13:23:13 15   **Q**   And these are the type of witnesses that you used to put

16   people on death row?

13:23:16 17   **A**   I'm calling you a liar, sir.

13:23:18 18   **Q**   And I'm calling you one.

13:23:21 19   **A**   I didn't go to a federal court --

13:23:22 20   **Q**   You used -- you used Michael Beckcom to put Jeffrey Prible

21   on death row.

13:23:27 22   **A**   That's not the only thing that put Jeffrey Prible on death

23   row, and you know it.

13:23:31 24   **Q**   You used Moreno, who we now know lied to you.

13:23:34 25   **A**   For Prible?

*Video Deposition of Kelly Siegler*

13:23:34  1   **Q**   No.   In the -- in the Herrero case, who we now know lied to

2   you.

13:23:38  3   **A**   He did not lie.

13:23:41  4   **Q**   So if you could start with that first page.

13:23:43  5   **A**   At the top it says, "Prible," circled, "Montgomery County."

6   I can't read that word.   "To see if Eddie" --

13:24:10  7   **Q**   Is that "Gomez"?

13:24:12  8   **A**   I think that's "Gomez."

13:24:16  9      I can't read the line under it.   "Made -- called,"

10   underneath the line, "Charged with five bank robberies and" --

11   or "six" -- I can't tell -- "banks."   I don't know what that

12   says after it.   Next line.   I don't know what that says.

13:24:55 13      Next line, "Here comes Prible."   I can't read that.

14   "Defendant dropped.   Murder - no evidence.   People" -- I don't

15   know if that says "cut" or "out him."   I can't read the rest.

13:25:28 16   **Q**   Do you recall when you took these notes?

13:25:30 17   **A**   No.   I don't know where this is from.   I don't know where

18   this is from.

13:25:37 19      It's not the eyesight.

13:25:39 20         **MS. SCARDINO:**   -- and write --

13:25:39 21   **A**   It's the copy.   It's not the eyesight.   I can't read my own

22   writing.

13:25:42 23   **BY MS. SCARDINO:**

13:25:42 24   **Q**   Okay.   So you need a more legible copy than the one that --

13:25:45 25   **A**   No.   It won't matter.   It's my scratchy handwriting that's

*Video Deposition of Kelly Siegler*

1   the problem.

13:25:48  2   **Q**   So your testimony is you can't read your own handwriting?

13:25:50  3   **A**   Happens a lot because I write so fast, trying to take notes,

4   and I can't do a good job, which is why I end up not taking

5   notes, because it doesn't do me any good.

13:25:59  6        *(Conclusion of video deposition.)*

13:26:03  7           **THE COURT:**  Does that conclude the depo?

13:26:05  8           **MS. SCARDINO:**  Yes, Your Honor.

13:26:05  9           **THE COURT:**  Okay.  Do you have another witness?

13:26:07  10          **MS. SCARDINO:**  Yes, Your Honor.

13:26:07  11          **THE COURT:**  He's live?

13:26:08  12          **MS. SCARDINO:**  Yes, Your Honor.  Terry Gaiser.

13:26:11  13          **THE COURT:**  Okay.

13:26:23  14          **MS. SCARDINO:**  Could someone step out?

13:26:24  15          **THE COURT:**  And go get him?

13:26:49  16          **MS. SCARDINO:**  I'm going to sit here, Your Honor, if

17   that's okay.

13:26:52  18          **THE COURT:**  That's fine.

13:26:59  19          Yes, sir, if you want to make your way up here, we're

20   going to have you in the seat nearest me.

13:27:07  21          Before you take your seat, sir, Mr. Rivera will

22   administer the oath, if you will raise your right hand.

13:27:12  23        *(Witness sworn.)*

13:27:12  24          **THE COURT:**  Try to adjust the mic so you can speak

25   right into it, if you can, sir.

*Ms. Scardino Direct of Terry Gaiser*

13:27:24  1          **THE WITNESS:**  I've got kind of a low voice, Judge.

13:27:26  2          **THE COURT:**  I think we can handle it.  I think we can.

13:27:29  3          **THE WITNESS:**  All right.  Does that work?

13:27:30  4          **THE COURT:**  That'll work.

13:27:30  5          **TERRY GAISER, DULY SWORN, TESTIFIED:**

13:27:30  6                      **DIRECT EXAMINATION**

13:27:31  7  **BY MS. SCARDINO:**

13:27:32  8  **Q**   Good afternoon, Mr. Gaiser.

13:27:34  9  **A**   Good afternoon.

13:27:35 10  **Q**   You were Mr. Prible's trial attorney in the capital murder

         11  case; isn't that correct?

13:27:40 12  **A**   I certainly was.

13:27:41 13  **Q**   Okay.  Can you tell us your background?  How long have you

         14  been practicing law?

13:27:46 15  **A**   Oh, I've been practicing law since 1972.

13:27:52 16  **Q**   Okay.  And has that been entirely as a defense attorney, a

         17  criminal defense --

13:27:56 18  **A**   Yes, it has.

13:27:57 19          **THE COURT:**  You must be in state court.  I don't

         20  recall seeing you over here.

13:27:59 21          **THE WITNESS:**  Well, I was in your court once, Judge.

13:28:01 22          **THE COURT:**  Once.  Welcome back.  Welcome back.

13:28:04 23          **THE WITNESS:**  On a pornography case.

13:28:05 24          **THE COURT:**  On a pornography case, okay.

13:28:09 25  **BY MS. SCARDINO:**

**Ms. Scardino Direct of Terry Gaiser**

13:28:09 1  Q   So you've been a criminal defense attorney for about

2   47 years.  And has that always been in the Houston area?

13:28:16 3  A   Well, Houston and environs.

13:28:20 4  Q   So you've had hundreds of cases against the Harris County

5   District Attorney's Office, I would imagine?

13:28:24 6  A   I have hundreds, if not thousands.  I've never counted.

13:28:28 7  Q   Okay.  And you have about 47 years of experience trying to

8   get discovery from the Harris County District Attorney's Office?

13:28:36 9  A   I have.

13:28:38 10  Q   I want to take you back to the years 2001 and 2002.  This

11   was long before the Michael Morton Act, right?

13:28:45 12  A   Correct.

13:28:46 13  Q   Okay.  And --

13:28:47 14  A   Discovery was a lot different back then.

13:28:50 15  Q   And do you recall approximately when you were appointed to

16   represent Mr. Prible in his capital murder case?

13:28:56 17  A   I believe it was September of 2001.

13:28:59 18  Q   Okay.  Does September 28th, 2001 --

13:29:03 19  A   That sounds right.

13:29:04 20  Q   -- sound correct?

13:29:05 21  A   Yes.

13:29:06 22  Q   Okay.  And was this your first capital murder case?

13:29:08 23  A   No, no.  I had had probably 10, 12 capital cases before

24   that.

13:29:13 25  Q   Okay.  Who was the prosecutor in Jeff's case?

*Ms. Scardino Direct of Terry Gaiser*

13:29:16  1  **A**  Kelly Siegler and Vic Wisner.

13:29:20  2  **Q**  Okay.  Was this your first case against Kelly Siegler?

13:29:23  3  **A**  Well, I had dealt with Kelly Siegler in court, but I had

4  never tried a case against her.  I mostly just -- mostly just

5  third degree felonies, I'm sure.

13:29:37  6  **Q**  Okay.  When you received an appointment like this in a

7  capital murder case, what would have been the first thing you

8  would have done?

13:29:47  9  **A**  I can't remember in this case, but, normally, I would go

10  meet with the client.

13:29:52 11  **Q**  Okay.  Would you also request to see the DA's file?

13:29:57 12  **A**  Of course.  I would.

13:29:59 13  **Q**  And how would you go about reviewing the DA's file?  How

14  that would process work?

13:30:04 15  **A**  Back then -- it's totally different now, but back then, you

16  would make an appointment to go to the prosecutor's office, and

17  they would bring out the file and put you in a separate room,

18  you know, whether it was a box of files or boxes of files, and

19  you would go through the files yourself or with cocounsel.

13:30:32 20  **Q**  And would you be able to look at everything that the DA's

21  office had in a given case?  Would everything be included in

22  that file?

13:30:41 23  **A**  Well, what was in that file was what they put in the file.

24  You know, I was never aware that there may be other things that

25  weren't in that file.

*Ms. Scardino Direct of Terry Gaiser*

13:30:50 1   **Q**   Okay.  As far as you knew, was it an open file policy at the

2   DA's office at that time?

13:30:56 3   **A**   Pretty much.  There were some cases where they closed the

4   file.  Where an attorney had done something that angered them

5   for some reason, they would close the file.

13:31:06 6   **Q**   Okay.  Do you remember that being true in Mr. Prible's case?

13:31:10 7   **A**   I saw the file in Mr. Prible's case.  It was not a closed

8   file in that sense.

13:31:16 9   **Q**   Okay.

13:31:17 10         **THE COURT:**  Would you say your relationship with the

11   DA's office was cordial?

13:31:21 12         **THE WITNESS:**  Yes, sir.

13:31:23 13         **THE COURT:**  Remains so?

13:31:24 14         **THE WITNESS:**  I hope so, yes, Your Honor.

13:31:26 15   **BY MS. SCARDINO:**

13:31:27 16   **Q**   Was it customary, when you would look in the DA's file, for

17   the attorney's work product to be included in that file?

13:31:35 18   **A**   No.  No.  They would not put work product in there.

13:31:39 19   **Q**   Okay.

13:31:40 20   **A**   To -- that was not part of their open file policy.

13:31:43 21   **Q**   Okay.  So your understanding, when you went to look at the

22   file, was that it would be everything except the work product;

23   is that accurate?

13:31:50 24   **A**   Supposedly, yes.  That was my understanding.

13:31:52 25   **Q**   And was that your understanding in Mr. Prible's case as

*Ms. Scardino Direct of Terry Gaiser*

1  well?

13:31:56  2  **A**   Yes.

13:31:58  3  **Q**   Do you recall seeing notes of Ms. Siegler and her

4  investigators in Mr. Prible's case file?

13:32:04  5  **A**   No, I did not.

13:32:09  6  **Q**   Back then, in 2001 and 2002, would a prosecutor provide

7  defense attorneys, such as yourself, with a witness list before

8  trial?

13:32:18  9  **A**   At times, but that was not the general practice.  You would

10  usually -- you would have to look for what's -- what subpoenas

11  had been filed in the district clerk's office to find -- to

12  discover the witnesses, usually.

13:32:35  13  **Q**   When you went in to review a copy of the file at the DA's

14  office, were you allowed to make your own copy of anything in

15  the file?

13:32:42  16  **A**   No.  No.  No -- no, I don't -- in most cases, no.  If there

17  was something in the file that was public record that I -- I

18  could go get from the clerk's office, I'd ask, you know, "Can I

19  just get a copy of this now so I don't have to go to the

20  district clerk's office?"

13:32:58  21  **Q**   Okay.

13:32:58  22  **A**   But as a general rule, you would not be allowed to copy

23  anything in the file.

13:33:03  24  **Q**   You just had to sit in the room and make notes?

13:33:05  25  **A**   That's correct.

*Ms. Scardino Direct of Terry Gaiser*

13:33:06  1   Q   And do you recall that -- if that was the case in

2   Mr. Prible's situation when you were -- when you went to review

3   his file?

13:33:13  4   A   Certainly, yes.  That was the case.

13:33:20  5   Q   After you were appointed to represent Mr. Prible and you had

6   had an opportunity to review the file at the DA's office, what

7   was your take on the state's evidence against Mr. Prible?

13:33:31  8   A   Well, the state's case -- in my opinion, the state's case

9   was -- there were two major points in the state's case that had

10   to do with DNA found in -- a sperm specimen found in the female

11   victim's mouth, and -- and that later connected to Jeff, and the

12   testimony of a witness from the federal correctional facility in

13   Beaumont, Michael Beckcom.  Those were the two -- two main --

14   that was the thrust of their case.

13:34:15 15   Q   Those two issues?

13:34:16 16   A   I mean, there were some other things from -- the firearms

17   evidence, for instance, was -- was also -- the fact that

18   firearms had been found in Jeff's parents' house, that the state

19   wanted to make the case that one of those firearms could have

20   been used in the -- in the murders.  But, you know, apparently,

21   there were -- in my expert's view, there were literally 20 or 30

22   different weapons that could have fired the bullets that were

23   fatal in this case.

13:34:55 24   Q   Okay.  So you recall that other than that ballistics

25   evidence, the heart of the state's case was the informant and

*Ms. Scardino Direct of Terry Gaiser*

1  the DNA evidence?

13:35:04  2  **A**   Oh, definitely.  Yes.

13:35:06  3  **Q**   Okay.  And do you recall what the prosecution's theory was

4  regarding the DNA?

13:35:14  5  **A**   Well, based upon what they argued in the -- in the trial was

6  that -- that Jeff had ejaculated in the female decedent's mouth

7  and shot her right away after doing that was their theory of the

8  case.

13:35:36  9  **Q**   Yeah.

13:35:37  10  **A**   The testimony at trial -- well, you're familiar with the

11  testimony at trial.

13:35:42  12  **Q**   Okay.  And do you remember the story about the jailhouse

13  informant and how he came in contact with Mr. Beckcom -- I mean,

14  with Mr. Prible?

13:35:54  15  **A**   Well, my first knowledge of him came from -- from Kelly

16  Siegler.  There was a -- I don't remember exactly when I learned

17  of him, but she had given me, at one point, a -- a handwritten

18  statement that he had given.

13:36:18  19  **Q**   Okay.  And by "he" --

13:36:19  20  **THE COURT:**  Was use -- in major crimes, was the use of

21  prison informants unusual or fairly common or somewhere in

22  between?

13:36:28  23  **THE WITNESS:**  In the Harris County District Attorney's

24  Office, it was pretty common.

13:36:31  25  **THE COURT:**  Pretty common?

*Ms. Scardino Direct of Terry Gaiser*

13:36:32   1         THE WITNESS:  Yes, sir.

13:36:36   2   BY MS. SCARDINO:

13:36:38   3   Q   Do you remember how -- approximately how close to trial you

         4   received this -- this handwritten letter from Mr. Beckcom?

13:36:48   5   A   Oh, I'm sure it was sometime before trial, but I don't know

         6   exactly when.

13:36:52   7   Q   Okay.  Do you think it would have been weeks before trial or

         8   months before trial?  Can you speculate -- or can you not

         9   speculate, but --

13:37:02 10   A   Well, I don't want to speculate, but I -- I was aware of the

        11   handwritten statement that he had given prior to trial.

13:37:11 12   Q   Prior to trial.

13:37:12 13     And the case went to trial in October of 2002.  Do you

        14   remember filing any pretrial motions?

13:37:22 15   A   I -- we filed a load of motions that -- as I remember.  We

        16   filed several motions on the constitutionality of the death

        17   penalty scheme in Texas and discovery motions of -- a variety of

        18   discovery motions.

13:37:37 19   Q   Okay.  And I want to talk about some of those discovery

        20   motions.  Exhibit 109 -- can you see on your monitor there -- is

        21   a Brady motion that you filed.

13:37:51 22   A   Yes.

13:37:52 23   Q   Does that look familiar?

13:37:53 24   A   Yes.

13:37:54 25   Q   Okay.  That's the -- you titled it, "The Motion and Request

*Ms. Scardino Direct of Terry Gaiser*

1  for Production of Evidence Favorable to the Accused"?

13:37:59  2  **A**   Yes.  Yes, ma'am.

13:38:01  3  **Q**   In Section 21B of that motion, you ask for the date, place

4  and manner of the state's contacts with Beckcom, including how

5  contact was first initiated and with whom it was made.  Do you

6  see that?

13:38:15  7  **A**   Yes.

13:38:16  8  **Q**   Okay.  Why did you want this information?

13:38:20  9  **A**   I wanted -- well, as the fact that -- that he was an

10  informant in the case made it important to know, from the

11  standpoint of his credibility, whether he had come forward

12  seeking some sort of remuneration or something in exchange for

13  his testimony as to -- as to -- or whether the -- and how many

14  times the contact had occurred were -- would be important in

15  determining that also.

13:38:56  16      But that would go to his credibility.

13:39:00  17  **Q**   And it was also important for you to know who made contact

18  with Beckcom in -- in the DA's office, which side reached out to

19  the other?

13:39:09  20  **A**   Of course, yes.

13:39:11  21  **Q**   Okay.

13:39:12  22  **A**   The -- I mean, that bore on the same issue of his

23  credibility in terms of what he wanted for his testimony or

24  whether they had gone to him seeking him out to -- to groom him

25  as a witness.

*Ms. Scardino Direct of Terry Gaiser*

13:39:27  1  Q    Okay.  And the Court -- do you remember pretrial hearings --

2  a pretrial hearing on September 10th, 2002, when they took up

3  this Brady motion?

13:39:38  4  A    I -- you'll have to help me because I, you know -- I -- it's

5  been 18 years.

13:39:45  6  Q    Okay.

13:39:46  7  A    But I would have some memory of that, yes.

13:39:48  8  Q    Okay.  Well, I'm going to post Exhibit 70 at pages 4 through

9  5.  This is a transcript from that hearing on the Brady motion.

10  Can you read that?

13:40:05 11       And it says, Number B, which is the provision that I just

12  made -- or read in the Brady motion.  Number B has to do with a

13  date, time, place and manner of the state's contacts with this

14  witness, Beckcom, including a statement of how the contact was

15  first issued and with whom it was made.

13:40:26 16  A    Well, I remember I was interested, for the same reason, as

17  to who had initiated the contact or whether they had initiated

18  it.  How it came about was important to --

13:40:38 19  Q    Right.

13:40:38 20  A    -- bearing on -- on his credibility.

13:40:41 21  Q    And you'll see Ms. Siegler responded, "Judge, and I don't

22  think I'm required to provide that to him.  If they want to ask

23  him on cross-examination how many times I've met with him, how

24  we first came in contact with each other, I think they get to do

25  that.  But I don't think I have to sit down and write a

*Ms. Scardino Direct of Terry Gaiser*

1    statement to the defense as to how I came in contact with

2    Mr. Beckcom."  Do you see that?

3    **A**   Yes, I do.

4    **Q**   Now, why were you -- why did you ask, in open court, for the

5    prosecutor to provide you with this information rather than just

6    Beckcom -- asking Beckcom for it on cross-examination?

7    **A**   At that point, Ms. Siegler is asking me to -- to believe in

8    her witness, that her witness is credible on that point, that --

9    that I couldn't possibly cross-examine him if I didn't have the

10   information of when and where they met and who initiated the

11   contact.

12   **Q**   And did you have -- was his credibility already shot, in

13   your mind, based on the fact that he was a prison informant?

14   **A**   Well, yes, you know.  And later I did research on

15   Mr. Beckcom and -- and dealt with his credibility.

16   **Q**   Uh-huh.

17       I also want to post Exhibit 70 at pages 5 through 6.  On

18   this same issue, Ms. Siegler stated, "Judge, I'll agree to tell

19   Mr. Gaiser how we came into contact and the times that we've

20   met.  I don't remember the dates.  I didn't take any notes.  And

21   the best that I can remember, I'll let him know what they are,

22   but I'm not going to write it all down.  He can come to my

23   office, and I'll sit down and tell him what I can remember."

24       Do you see that?

25   **A**   Yes, I do.

*Ms. Scardino Direct of Terry Gaiser*

13:42:25  1   **Q**   What did Siegler tell you about how she came into contact

2   with Beckcom?

13:42:33  3   **A**   Well, I believe, if my memory's correct, it was the

4   handwritten note from Mr. Beckcom that somehow came into her

5   hands.  It was -- I was never led to believe that she had made

6   contact with him, but it was always, he had made contact with

7   her.

13:42:54  8   **Q**   Did Ms. Siegler tell you that she had been communicating

9   with Beckcom's cellmate, Nathan Foreman, since way back in

10   August 2001 before Prible was indicted?

13:43:04 11   **A**   No.  No, she did not.

13:43:06 12   **Q**   Did she tell you --

13:43:08 13       **MS. MIRANDA:**   Objection, Your Honor, that actually

14   misrepresents the facts in this case.

13:43:11 15       **THE COURT:**   I'll let you bring that out in cross.

13:43:13 16       **MS. MIRANDA:**   Okay.

13:43:13 17   **BY MS. SCARDINO:**

13:43:15 18   **Q**   Did she ever tell you that she had determined that

19   Mr. Foreman was lying about hearing Mr. Prible confess?

13:43:21 20   **A**   No.

13:43:23 21   **Q**   She didn't tell you about him at all?

13:43:24 22   **A**   Well, I knew of his existence because he was mentioned in

23   the -- in Beckcom's handwritten statement.

13:43:32 24   **Q**   And beyond that, did Ms. Siegler tell you anything about

25   Mr. Foreman?

*Ms. Scardino Direct of Terry Gaiser*

13:43:39   1   **A**   Oh, not to -- not that I can remember.

13:43:43   2   **Q**   Did she ever tell you or mention the name Jesse Moreno to

3   you?

13:43:47   4   **A**   No.

13:43:48   5   **Q**   You hadn't heard that name?

13:43:50   6   **A**   No, not -- not till I met with the lawyers recently.

13:43:54   7   **Q**   Okay.  I'm going to show you -- back to Exhibit 109.

13:43:59   8         **MS. SCARDINO:**  Actually, you can pull up 70 at 6

9   through 7.

13:44:05  10   **BY MS. SCARDINO:**

13:44:06  11   **Q**   But another request you made in that Brady motion was a copy

12   of all statements made by Beckcom and communicated to the state,

13   including notes of any conversations had with Beckcom by any

14   agent of the state.

13:44:20  15         And you stated in court, "We've been supplied with a

16   written statement that he made and been told by Ms. Siegler that

17   that's the only written statement they have."  And that's the

18   written -- that's the handwritten statement that you're

19   referring to?

13:44:33  20   **A**   Yes.  Yes.

13:44:35  21   **Q**   And Ms. Siegler says, "That's correct, Judge.  And again,

22   like we've talked about once before, I've given up Mr. Gaiser

23   the statement Beckcom wrote up for me as to his communications

24   with Prible and how they came into contact.  I've already

25   provided that to him, and it's still our position that any notes

*Ms. Scardino Direct of Terry Gaiser*

1    that either myself or Johnny Bonds made when we went to visit

2    Michael Beckcom is work product."

13:44:55  3      Do you see that?

13:44:56  4    A    Yes.

13:44:57  5    Q    And that comports with your recollection of reviewing the

6    file, that the work product was not available to you, correct?

13:45:04  7    A    That's correct.

13:45:05  8    Q    Okay.  And the Court says, "I agree.  So I will grant it as

9    to the witness statement that's been described in the record,

10   not as to notes made by Ms. Siegler or Mr. Bonds."

13:45:18 11      Now, my question to you is:  Did Ms. Siegler ever provide

12   you with Beckcom's statement regarding an inmate named Anton

13   Davi?  That's Exhibit 95.

13:45:32 14   A    I --

13:45:32 15         MS. MIRANDA:  Objection, Your Honor.  Again, she's

16   mischaracterizing the evidence in this case.

13:45:36 17         THE COURT:  Okay.  I'll let you bring that out in

18   cross.

13:45:42 19         All she did was ask, "Did Ms. Siegler ever provide you

20   with Beckcom's statement regarding an inmate named Anton Davi?"

13:45:49 21         MS. MIRANDA:  All right.  But there's absolutely no

22   statement in the record.  And I understand I can bring out

23   certain things at cross, but there is no statement in the

24   record --

13:45:56 25         THE COURT:  Well, then the witness can say he's aware

*Ms. Scardino Direct of Terry Gaiser*

1    of no such statement.  That's fine.

13:46:01  2         MS. SCARDINO:  Okay.  I can rephrase it, Your Honor.

13:46:02  3         THE COURT:  Okay.

13:46:03  4    BY MS. SCARDINO:

13:46:03  5    Q   Did Ms. Siegler ever provide you with this document,

6    Exhibit 95?

13:46:17  7         (Witness reviews document.)

13:46:18  8         THE COURT:  If you remember.

13:46:18  9         THE WITNESS:  No.  No, I don't remember.

13:46:20 10         THE COURT:  Don't remember?

13:46:21 11         THE WITNESS:  No.  I have never seen that till --

13:46:23 12         THE COURT:  You've never seen it?

13:46:24 13         THE WITNESS:  No, not until that was presented to me

14    when they were preparing me for testimony.

13:46:29 15         THE COURT:  Okay.  All right.

13:46:30 16    BY MS. SCARDINO:

13:46:31 17    Q   And you see that at the bottom -- do you see who that letter

18    is signed by?

13:46:37 19    A   Michael Beckcom.

13:46:38 20    Q   Okay.  Do you consider that a statement of Mr. Beckcom?

13:46:42 21    A   I certainly do.

13:46:43 22    Q   Okay.  Another thing you asked for in your Brady motion

23    are -- were agreements made with Beckcom concerning benefits he

24    would receive in exchange for testimony, including oral

25    agreements.  Do you remember making this request?

*Ms. Scardino Direct of Terry Gaiser*

13:46:56  1    **A**    Yes.

13:46:57  2    **Q**    Okay.  And you also filed a motion to require the state to

3    reveal agreements, which is basically the same thing.  You

4    basically asked for this twice, right?

13:47:07  5    **A**    Yes.

13:47:08  6    **Q**    It was pretty important?

13:47:09  7    **A**    Yes, of course.

13:47:10  8    **Q**    Okay.  In that motion is Exhibit 74.

13:47:15  9         Now, why did you -- we'll bring it up.

13:47:19 10         Why did you file this motion?

13:47:22 11    **A**    Well, I -- you know, I'm constitutionally entitled to know

12    for -- for purposes of -- of testing his credibility on -- on --

13    in confronting and cross-examining him what sort of deal he's

14    made with the government in exchange for his testimony.

13:47:42 15    **Q**    And did you specifically limit your requests in this motion

16    to agreements that the state had made with Beckcom?

13:47:50 17    **A**    I think it was for all -- any and all witnesses.

13:47:53 18         **THE COURT:**  I'm going to ask you to pull the

19    microphone a little bit closer to you or --

13:47:56 20         **THE WITNESS:**  I believe it was for all the witnesses

21    in the case.

13:47:58 22    **BY MS. SCARDINO:**

13:47:59 23    **Q**    Did you have any reason to believe, at the time you filed

24    this motion, that there were any other informants in this case

25    other than Beckcom?

*Ms. Scardino Direct of Terry Gaiser*

13:48:07  1   **A**   No.

13:48:11  2   **Q**   And you took this up at a pretrial hearing as well.  That's

3   Exhibit 70 at 28 through 29.

13:48:19  4   **A**   Correct.

13:48:24  5   **Q**   And the Court brought it up.  They said motion to require

6   the state to reveal agreements.  Ms. Siegler says, "We've agreed

7   on that, Judge.

13:48:31  8        The Court:  "That's granted."

13:48:33  9        And you state, "Can we have the state, state for the record

10   what the agreement is?"

13:48:38 11        And Ms. Siegler says, "The agreement right now, Judge, that

12   I have with witness Michael Beckcom is that in exchange for his

13   cooperation and truthful testimony, when this trial is

14   completely over with and resolved, I will notify his assistant

15   U.S. attorney, whose name is Mark Cullers, in Fresno,

16   California, that he cooperated in this case, what the level of

17   his cooperation was, the extent of his cooperation and whether

18   or not I believe that it was truthful.

13:49:03 19        "At that time, it will be Mark Cullers' decision as to

20   whether or not to file a Rule 35 reduction.  Even if he files

21   that Rule 35 reduction, it will be his superior's decision

22   whether or not to proceed with it, and even if they decide to

23   proceed with it, it will be his federal judge in California's

24   decision whether or not to give him any kind of reduction in his

25   sentence.  That's the agreement that we have."

*Ms. Scardino Direct of Terry Gaiser*

13:49:29  1        Do you remember that?

13:49:30  2   A    Yes.

13:49:30  3   Q    Okay.  Did Ms. Siegler ever mention at this hearing that she

4   had written a Rule 35 letter for Nathan Foreman?  That's

5   Exhibit 44.

13:49:45  6            THE COURT:  In the course of your preparation for the

7   trial, had you ever heard of Nathan Foreman?

13:49:49  8            THE WITNESS:  Well, I had heard of Nathan Foreman from

9   the -- the written statement that -- that Beckcom wrote to

10   Siegler.

13:49:58 11            THE COURT:  Okay.

13:50:01 12   BY MS. SCARDINO:

13:50:02 13   Q    Did you ever see this Exhibit 44?  Was this produced to you

14   by the state?

13:50:05 15   A    No.

13:50:06 16   Q    Okay.

13:50:08 17            MS. SCARDINO:  Can you pull up Exhibit 43, please?

13:50:11 18            THE COURT:  You got to say --

13:50:12 19            MS. SCARDINO:  I'm sorry?

13:50:12 20            THE COURT:  Got to show the next page.  It's not

21   obvious who wrote that.

13:50:21 22            Is that from Ms. Siegler?  Okay.  Thank you.

13:50:24 23            MS. SCARDINO:  Yes.

13:50:25 24   BY MR. RYTTING:

13:50:26 25   Q    Exhibit 43.  Exhibit 43 is a Rule 35 letter written by

*Ms. Scardino Direct of Terry Gaiser*

1    Ms. Siegler for Jesse Moreno.  Did the state ever show this to

2    you?

13:50:39  3    **A**   No.  I was not aware of the existence of a Jesse Moreno.

13:50:44  4    **Q**   So I take it, then, that Ms. Siegler did not mention to you

5    that she had testified in a Rule 35 hearing for Moreno two

6    months before Mr. Prible's trial?

13:50:55  7    **A**   I believe the record shows that she stated to the Court that

8    she had testified on a Rule 35 hearing somewhere, but there was

9    not reference to anyone where it was or why it was or who the

10   witness was.

13:51:11  11   **Q**   Okay.  And that -- that actually occurred on Exhibit 70 at

12   page 30, 31.  And the Court says, "Is it the State's intention

13   to be a part of that process in recommending a Rule 35

14   reduction?"

13:51:29  15       And Ms. Siegler says, "Yeah.  They tell me that the mere

16   fact that I write the letter means that I'm recommending it.

17   I've done one before, and I went to Louisiana and testified."

13:51:38  18       Is this the hearing that you were just referring to?

13:51:42  19   **A**   It is.

13:51:43  20   **Q**   Okay.  Did she tell you or say in court who this Rule 35

21   hearing in Louisiana was for?

13:51:49  22   **A**   No.

13:51:49  23   **Q**   Did she mention that it was connected, at all, to

24   Mr. Prible's case?

13:51:54  25   **A**   No.  No.

*Ms. Scardino Direct of Terry Gaiser*

13:51:55  1   **Q**   Okay.

13:51:56  2   **A**   I had no reason to believe it was in any way connected to

3   the case we were trying.

13:52:01  4   **Q**   Okay.

13:52:02  5          **MS. SCARDINO:**  If you could post Exhibit 70 at 30

6   through 31.  I guess, actually, that's already up.  Sorry.

13:52:11  7   **BY MS. SCARDINO:**

13:52:12  8   **Q**   And the Court gave Ms. Siegler a second opportunity to tell

9   you of any agreements when they said:  (Reading) If on any

10   future date the agreement changes or is modified, you'll notify

11   the Defense as soon as possible.  And that also, obviously,

12   extends to any other witnesses involved in the case as far

13   as" --

13:52:34  14          **THE COURT:**  Slow down.  Slow down.

13:52:35  15  **BY MS. SCARDINO:**

13:52:35  16  **Q**   (Reading) -- "at this point in time, are there any other

17   agreements with any other witnesses involved in the case?"

13:52:41  18      And Ms. Siegler responded: (Reading) One of the defendant's

19   ex-wives' names is Melanie Garrison.  She's bench warranted by

20   Karen, and she'll be here this week.  She just got mentioned --

21   moved to Gatesville by Waco, and I -- I haven't even talked to

22   her, but I've told her family that I will try to get her sent

23   back to Gatesville when this is over because she likes it there.

24   She's getting a degree there or something.  If you call that a

25   promise, I've talked to her family about that.  That's all I can

*Ms. Scardino Direct of Terry Gaiser*

1    think of."

13:53:11  2       And the Court asks, "And anybody else or any other

3    agreements that you're aware of?"

13:53:15  4       Ms. Siegler said, "No, sir, that's it."

13:53:19  5       You see that?

13:53:20  6  **A**   Yes, I do.

13:53:21  7  **Q**   Okay.  Still Ms. Siegler -- no mention of Mr. Foreman?

13:53:24  8  **A**   No.

13:53:24  9  **Q**   Correct?

13:53:25 10       Still no mention of Mr. Moreno, correct?

13:53:28 11  **A**   No mention of Mr. Moreno; no mention of Mr. Foreman, no.

13:53:32 12  **Q**   And then the court gave her a third opportunity to inform

13       her of deals that she had made with informants.  Do you recall

14       that?

13:53:39 15  **A**   I -- you'd have to show me.

13:53:41 16  **Q**   Okay.  The Court says, "Anybody else or any other agreements

17       that you're aware of?"  Ms. Siegler says, "No, sir, that's it."

13:53:50 18       The Court, "Same thing, if anything comes about notify the

19       Defense as soon as possible."

13:53:55 20  **A**   Okay.

13:53:55 21  **Q**   So what was your understanding, Mr. Gaiser, after this

22       pretrial hearing, of agreements that the state had made with any

23       informants in this case?

13:54:04 24  **A**   That it was my understanding -- it was obvious from the

25       hearing that the -- the only agreement they had was with Michael

*Ms. Scardino Direct of Terry Gaiser*

1  Beckcom.  That was the only -- that was the only witness that

2  they were giving consideration for in terms of his testimony.

3  He was the only one that I was ever aware of.

13:54:27  4  Q   And were you aware at this time that Ms. Siegler had already

5  been in communication with Mr. Cullers or -- Mr. Beckcom's

6  federal prosecutor for months before Mr. Prible's trial?

13:54:39  7  A   No.

13:54:41  8  Q   Your understanding that -- was that she was going to make

9  the phone call to him after trial?

13:54:45  10  A   After the testimony, correct.

13:54:47  11  Q   If Mr. Beckcom testified truthfully?

13:54:50  12  A   Right.

13:54:51  13  Q   Okay.

13:54:51  14  A   In her opinion.

13:54:54  15  Q   Going back to your Brady motion, you also requested all

16  evidence indicating the deceased, Steve Herrera, was involved in

17  the purchase, sale, delivery or distribution of drugs, firearms,

18  or money laundering, and all evidence intending to incriminate

19  any person other than the defendant in the commission of the

20  defense -- of the offense.

13:55:19  21      Do you recall making that request?

13:55:21  22  A   Yes.

13:55:21  23  Q   Okay.

13:55:22  24      MS. SCARDINO:  And if you could post Exhibit 70 at 9.

13:55:30  25  BY MS. SCARDINO:

*Ms. Scardino Direct of Terry Gaiser*

13:55:31  1   Q   And at the pretrial hearing, you stated, "Ms." -- to the

2   court, "Ms. Siegler has represented that we've seen everything

3   they have in their possession and would be in compliance with

4   that request."

13:55:43  5       Do you see that?

13:55:44  6   A   Yes.

13:55:45  7   Q   Okay.

13:55:46  8           MS. SCARDINO:   Can you pull up Exhibit 130?

13:55:54  9   A   Can you go back to that exhibit?

13:55:56 10   BY MS. SCARDINO:

13:55:56 11   Q   Sure.   Which -- the hearing testimony?

13:55:57 12   A   The one that was just up.

13:55:59 13   Q   Sure.   That's Exhibit 70.

13:56:11 14   A   Okay.   Thank you.

13:56:13 15           MS. SCARDINO:   Now, if you could go back to

16   Exhibit 130.

13:56:19 17   BY MS. SCARDINO:

13:56:19 18   Q   Was this letter produced to you by the state before

19   Mr. Prible's trial?

13:56:25 20   A   You've shown me that, and I've never seen that.

13:56:27 21   Q   Okay.

13:56:28 22   A   Before trial or after trial.

13:56:31 23   Q   Okay.   Now I'm going to show -- or go to your request in

24   your --

13:56:39 25   A   I mean, obviously, that was extremely relevant to whether

*Ms. Scardino Direct of Terry Gaiser*

1  there was another motive for killing -- for killing Steve as to

2  whether or not he was dealing drugs and had money in the house.

13:56:52  3          THE COURT:  Do you -- you said you had other cases

4  with Ms. Siegler?

13:56:55  5          THE WITNESS:  What I said was I had dealt with

6  Ms. Siegler, but never in a trial.

13:57:01  7          THE COURT:  Never got to trial, but --

13:57:02  8          THE WITNESS:  I've had dealings with her since.

13:57:05  9          THE COURT:  And you've had -- well, given the course

10  of your dealings with her before and since, would you say she

11  was forthcoming about evidence she had?

13:57:16  12          THE WITNESS:  Well, obviously, from what I'm seeing

13  now.

13:57:19  14          THE COURT:  But I'm asking --

13:57:21  15          THE WITNESS:  Back then, I had no reason --

13:57:22  16          THE COURT:  You had no reason to think that was a

17  pattern?

13:57:24  18          THE WITNESS:  -- to be skeptical of -- to be skeptical

19  of the things she was telling me.

13:57:28  20          THE COURT:  How about since then?

13:57:29  21          THE WITNESS:  Well, since then I've had other dealings

22  with her and her *Cold Justice* show.  A client of mine spent four

23  years in jail on a charge that was ultimately dismissed by

24  Kim Ogg because it was worked up by *Cold Justice*.

13:57:45  25          THE COURT:  Okay.

*Ms. Scardino Direct of Terry Gaiser*

BY MS. SCARDINO:

Q   Could you have made use of this letter that I just showed you, Exhibit 130, if you had had that prior to Jeff's trial?

A   Well, of course.  I would use it to -- to further investigate all these homes and whether there were drug dealings and -- dealings and all these other addresses and who was involved.  It certainly would have given somebody else a motive to -- to break in and -- and steal drugs or money and execute the people living in the house.

Q   You also asked, in your Brady motion, for all witness statements, whether written or oral.

        MS. SCARDINO:  And if you could go to Exhibit 70 at 16 through 17.

BY MS. SCARDINO:

Q   Why would you have asked for all witness statements?

A   Well, I wanted it for discovery, of course, to see, you know, what -- whether I could use it on cross.

Q   Okay.  And you'll see the court says, "I'm going to say all witness statements, whether oral or written by any witness."  Ms. Siegler states, "Judge, how about just written?  Because oral statements is a lot of people that end up not saying anything worth our time, and I didn't take notes on and I don't plan on using."

    The Court says, "Okay.  I guess with the exception of any oral argu- -- any oral statement by any witness turns out to be

*Ms. Scardino Direct of Terry Gaiser*

1    Brady --"

13:59:14  2        Ms. Siegler, "Okay."

13:59:17  3        The Court, "-- or exculpatory or impacts on punishment,

4    then that needs to be turned over.  So I'm going to say any

5    written statements, and then I'm going to change the language to

6    any oral statements which are Brady or mitigate punishment."

13:59:34  7            **MS. SCARDINO:**  Now, if you could show Exhibit 37,

8    please.

13:59:46  9    **BY MS. SCARDINO:**

13:59:47 10    **Q**   Exhibit 37 is a letter from Ms. -- to Ms. Siegler from a

11   prison inmate named Jesse Gonzalez.  Was this statement turned

12   over to you?

13:59:59 13    **A**   No.  I haven't seen this until you showed it to me in

14   preparing for my testimony.

14:00:04 15    **Q**   Could you have made use of it if you had had it before

16   Mr. Prible's trial?

14:00:09 17    **A**   Well, I mean, all of this together, you know, brings into

18   question the credibility of these people in the Beaumont

19   facility in terms of people wanting to give information to get

20   consideration for doing this.  So I'd want to know, you know,

21   how, generally, this was going on at this facility.

14:00:39 22        I had not seen these names or these letters prior to -- to

23   seeing them recently.

14:00:47 24    **Q**   Okay.  And I'm going to show you Exhibit 36.  This is a

25   letter to Ms. Siegler from another inmate named Carl Walker.

*Ms. Scardino Direct of Terry Gaiser*

1    Did the state produce this to you?

14:01:03   2    **A**    No.

14:01:05   3    **Q**    And, again, you could have made use of this in the same way

4    that you previously stated?

14:01:09   5    **A**    Yes.

14:01:11   6          **MS. SCARDINO:**   And if you could go to Exhibit 35.

14:01:20   7    **BY MS. SCARDINO:**

14:01:20   8    **Q**    This is a letter to Ms. Siegler from Mark Martinez, another

9    inmate at FCI Beaumont.  Was this produced to you by the state?

14:01:28  10    **A**    No.  Same -- same answer.  I hadn't seen this till you

11    showed it to me recently.

14:01:33  12    **Q**    Okay.  And you went through that entire file, case file,

13    correct --

14:01:36  14    **A**    The file --

14:01:37  15    **Q**    -- that they allowed you to go through at the DA's office?

14:01:40  16    **A**    Yes.

14:01:46  17    **Q**    Is one of the reasons you would have wanted to see these

18    letters is to determine how Ms. Siegler chose which informant to

19    use?

14:01:54  20    **A**    Oh, absolutely.  The -- this bears on all of their

21    credibility, but, you know, why Beckcom of -- I would have -- I

22    would have wanted that at the time, but not knowing this, I

23    couldn't wonder anything back then.

14:02:13  24    **Q**    Would it have indicated to you whether or not these inmates

25    were discussing Jeff's case among themselves with Beckcom?

*Ms. Scardino Direct of Terry Gaiser*

14:02:19  1       **MS. MIRANDA:**  Objection, Your Honor.  I'm going to

2  object to leading.  If he's here to testify about the

3  materiality and what he would have made use to, I absolutely

4  object to counsel suggesting what that would be, and I would ask

5  that the witness be the one that would identify the way in which

6  he would use this information, if it had come to his attention.

14:02:36  7       **THE COURT:**  Well, she's asking, "Would it have

8  indicated to you whether or not these inmates were discussing

9  Jeff's case among themselves."

14:02:43 10       **MS. MIRANDA:**  Yes, and in that she is suggesting a

11  manner in which he would have used that.  And if he is going to

12  come to the Court and testify about materiality, I believe that

13  it ought to be his testimony and not counsel's testimony with

14  respect to the ways and the manner and means in which he would

15  have used this information.

14:03:00 16       **THE COURT:**  Okay.  Fair enough.

14:03:04 17       Can you tell us what you would have done with this

18  information?

14:03:07 19       **THE WITNESS:**  That's hard to answer, Judge, since I

20  didn't see it at the time.  Answering it now is -- is...

14:03:18 21       **THE COURT:**  Okay.  If these are leading questions,

22  they're not leading you anywhere, are they?

14:03:22 23       **THE WITNESS:**  During Beckcom's testimony, he -- well,

24  pardon me.  It was my contention during trial that Beckcom got

25  all the information he had about these killings from public

*Ms. Scardino Direct of Terry Gaiser*

1    information, from the complaint that was on file, from -- from

2    the -- the news releases that had to do with -- Beckcom got all

3    of that information.  That's one of the main thrusts of my

4    cross-examination of him was --

14:03:52  5        THE COURT:  Yeah.  Yeah.

14:03:53  6        THE WITNESS:  But this would definitely have shown

7    that there were others that were interested in what Jeff was

8    saying over at the -- the -- the facility.  In fact, a witness

9    came and testified at trial that the complaint and other

10   information was readily available to anybody in the FCI.

14:04:21 11   BY MS. SCARDINO:

14:04:21 12   Q   I'm going to show you Exhibit 96.  That's a -- this is a

13   typed --

14:04:32 14        MS. SCARDINO:  Is that 96?

14:04:41 15   BY MS. SCARDINO:

14:04:41 16   Q   Yes.  That's a typed letter asking -- requesting -- from the

17   DA's office requesting a meeting with Mr. Beckcom and Mr. Davi.

18   Did you ever see that in the DA's file?

14:04:51 19   A   No.

14:04:52 20   Q   Okay.

14:04:52 21   A   No.

14:04:53 22   Q   And Exhibit 23, this is a November 12th, 2001, letter from

23   Alan Percely to Ms. Siegler regarding Nathan Foreman.  Was that

24   ever produced to you by the state?

14:05:12 25   A   No.  No.

*Ms. Scardino Direct of Terry Gaiser*

14:05:17 1  Q   Okay.  I'm going to go to Exhibit 71, which I'll give you a

2  page number.  This -- you had -- yeah.  This is the hearing on

3  your motion for equal access to all information obtained by the

4  prosecution by means of NCIC or JIMS investigations.  Do you

5  remember filing that?

14:05:38 6  A   Yes.

14:05:38 7  Q   Was that a standard discovery motion that you would usually

8  file?

14:05:42 9  A   Yes.

14:05:42 10  Q   And what is an NCIC?

14:05:45 11  A   Well, it's the National Crime Information Center.  They keep

12  records from all the states and -- and -- in terms of arrests

13  and convictions.

14:05:56 14  Q   Okay.  So in layman's terms, it's like a criminal history

15  report --

14:05:59 16  A   Right.

14:05:59 17  Q   -- would you say?

14:06:00 18       Okay.  Did you, as a defense attorney, have the ability to

19  generate it?

14:06:04 20  A   No.  No way.

14:06:06 21  Q   Why did you specifically ask for the state to produce NCICs?

14:06:12 22  A   Just discovery of their -- for the witnesses they were going

23  to use, to specifically ask for their arrest records.

14:06:23 24  Q   If you had seen an NCIC in a file for a witness that you had

25  never heard of, what -- would that have signaled anything to

*Ms. Scardino Direct of Terry Gaiser*

1   you?

2   **A**   I might want -- I'd want to know why it was there, you know.

3   At this late, you know -- looking back, I can't answer what I

4   would have done at the time.  But -- but it certainly would have

5   raised my interest to wonder -- wondering what these records are

6   doing in -- in their file.

7   **Q**   Might you have investigated an individual whose --

8   **A**   Yeah.  I'd want --

9           **MS. MIRANDA:**  Again, Your Honor, objection.

10          **THE COURT:**  Okay.  Yeah.  That's fair enough.

11   Rephrase your question.

12          **MS. SCARDINO:**  Okay.

13   **BY MS. SCARDINO:**

14   **Q**   Did you understand the court to be ordering Ms. Siegler to

15   produce NCICs of only testifying witnesses at this hearing?

16   **A**   I believe that's what the judge ruled, if I'm not mistaken.

17   **Q**   And not non-testifying --

18   **A**   Right.

19   **Q**   -- witnesses?

20       Did you ever see Exhibit 93 -- or, I'm sorry, 169?

21       Did the state produce to you this NCIC of Nathan Foreman?

22   **A**   No.

23          **MS. SCARDINO:**  Can you pull up Exhibit 94?

24   **BY MS. SCARDINO:**

25   **Q**   Did the state produce from you -- from Mr. Prible's file

*Ms. Scardino Direct of Terry Gaiser*

1    this NCIC for Rafael Dominguez?

14:07:56   2    **A**   I don't remember seeing that, no.

14:07:57   3    **Q**   Do you know who Rafael Dominguez is?

14:07:59   4    **A**   No.

14:08:02   5              **MS. SCARDINO:**   If you could pull up Exhibit 72 at 10

6    through 14.

14:08:11   7    **BY MS. SCARDINO:**

14:08:11   8    **Q**   So do you recall another pretrial hearing on October 11th,

9    2002, to take up discovery matters again?

14:08:18  10    **A**   What's the day?

14:08:19  11    **Q**   October 11th, 2002.

14:08:21  12    **A**   So that would be right before trial.

14:08:23  13    **Q**   Yes.

14:08:25  14    **A**   Yes.  I remember there was a hearing.

14:08:30  15              **THE WITNESS:**   Excuse me, Judge.

14:08:31  16    **BY MS. SCARDINO:**

14:08:33  17    **Q**   And, again, the issue of how contact was first initiated

18    with Mr. Beckcom came up.  Do you recall that?

14:08:52  19    **A**   I remember seeing this with -- but in terms of -- of having

20    seen it from when you showed it to me.  I'd -- I --

14:09:01  21    **Q**   Does this transcript refresh your recollection of that

22    hearing?

14:09:05  23    **A**   Well, certainly.

14:09:06  24    **Q**   Okay.  And at that hearing, you stated, "Finally, Judge,

25    just so the record is clear on this, when we initially had a

*Ms. Scardino Direct of Terry Gaiser*

1    hearing concerning discovery with reference to Michael Beckcom,

2    one of the orders the Court issued was that the state furnish us

3    with -- and I believe the Court said that that report could be

4    oral -- an indication of when and how contact was first

5    initiated by -- with regard to Mr. Beckcom and the dates of any

6    contacts with him, and I'm somewhat confused -- and that may be

7    my own fault, in my old age, in having a lot of senior

8    moments -- as to those dates and how contact was initiated.  And

9    I re-urge that we've been told on, I believe, two different

10   dates, but I may be wrong on that -- if Ms. Siegler could

11   reinform me on that, in that regard, I would appreciate it."

14:09:51 12       And Ms. Siegler responded, "Judge, on the record -- I don't

13   have my notes in front of me, so I'm trying to remember this as

14   best I can.  I know that I told Mr. Gaiser inconsistent at one

15   point because I went back and looked up the notes."

14:10:05 16       You see that?

14:10:06 17   A   Yes.

14:10:07 18   Q   Was this -- and she states, "The first time he contacted me,

19   it was by telephone.  He called me.  He got my name from Nathan

20   Foreman," and the Court asks, "Who's Nathan Foreman?"

14:10:21 21       Ms. Siegler responds, "Nathan Foreman is another inmate at

22   FCI medium.  What else did you ask me?"

14:10:26 23       You see that?

14:10:28 24   A   Yes.

14:10:28 25   Q   Now, what did you understand -- or did you have any reason

*Ms. Scardino Direct of Terry Gaiser*

1     to suspect from this exchange between Ms. Siegler and the Court

2     that Foreman had come to Ms. Siegler at any previous time and

3     spoken to her about this case?

14:10:44  4     **A**   No, I did not.

14:10:45  5     **Q**   Okay.  Did she ever mention to you, before trial, that

6     Prible had supposedly confessed to Beckcom and Foreman?

14:10:55  7     **A**   No.

14:10:55  8     **Q**   Okay.  You just remember reading that in that -- that

9     handwritten letter right before trial?

14:11:00 10     **A**   Correct.  Correct.

14:11:01 11     **Q**   Okay.  Did she mention anything about Jesse Moreno?

14:11:05 12     **A**   No.

14:11:06 13     **Q**   Okay.

14:11:06 14     **A**   That's a new name to me.

14:11:08 15     **Q**   Okay.

14:11:08 16          **MS. SCARDINO:**  If you could post Exhibit 72 at 13 to

17     14.

14:11:16 18     **BY MS. SCARDINO:**

14:11:16 19     **Q**   And also at this pretrial hearing, you asked Ms. Siegler how

20     many phone calls she had had with Mr. Beckcom.  Do you remember

21     this?  Does this refresh your recollection?

14:11:27 22     **A**   Yes.

14:11:28 23     **Q**   Okay.  And Ms. Siegler responded, "In altogether, there has

24     been about four or five phone calls where he's called me from

25     Beaumont."  And you state, "He initiated all those phone calls?"

*Ms. Scardino Direct of Terry Gaiser*

1  Ms. Siegler says, "He has to because I can't call an inmate,

2  obviously."

14:11:44  3      Okay.  Did you have any reason to believe that she could

4  call an inmate?

14:11:49  5  **A**   No.  I took her at her word.

14:11:51  6  **Q**   Okay.  Why was it important for you to know whether

7  Ms. Siegler or whether Mr. Beckcom initiated those phone calls?

14:11:59  8  **A**   Same thing we've talked about.  Who -- who was cultivating

9  who?  Was the -- who had -- who precipitated the -- the

10  information?  Who -- who was the instigator of the -- the

11  informant's testimony?

14:12:18  12      **MS. SCARDINO:**  If you could post Exhibit 72 at 5

13  through 6.

14:12:26  14  **BY MS. SCARDINO:**

14:12:26  15  **Q**   At this hearing, the issue of the alibi witness also came

16  up.  Do you remember the alibi witness in this case?

14:12:32  17  **A**   Yes, I do.

14:12:33  18  **Q**   Okay.

14:12:36  19  **A**   The -- she was a young girl that lived near the Pribles

20  that, apparently, had seen or claimed to have seen Jeff being

21  dropped off at his parents' house on the night these murders

22  occurred and seeing -- believing that it was Steve Herrera's car

23  that they arrived in.  So I -- yeah, I remember her.

14:13:00  24  **Q**   And did you learn about the alibi witness from the state?

14:13:03  25  **A**   No, no.  We developed that.  I have -- we developed that,

*Ms. Scardino Direct of Terry Gaiser*

1    and I believe it was Mr. Prible, Jeff's dad, that may have

2    contacted her originally.

14:13:17  3    **Q**    Did you attempt to find out about the alibi witness from the

4    state?

14:13:22  5    **A**    I'm sure we talked about it at some point, but --

14:13:25  6    **Q**    Okay.

14:13:26  7    **A**    -- I mean, I would have to have subpoenaed her, and I'm sure

8    the state was aware of that subpoena.  Now, what else they knew,

9    I do not know.

14:13:34 10    **Q**    Okay.  I'd like for you to look at Exhibit 72 at page 5 up

11    on the screen when you specifically asked, "Your Honor, at this

12    point, we would continue to make our request concerning the

13    information Curtis Brown may have, the alibi witness that we

14    discussed at the last session of court."  Do you see that?

14:13:55 15    **A**    Yes.

14:13:56 16    **Q**    Does this refresh your recollection as to whether you asked

17    the state about that alibi witness at that pretrial hearing?

14:14:03 18    **A**    Well, obviously, I did.

14:14:05 19    **Q**    Okay.  And Ms. Siegler said, in response to that, "Judge, I

20    re-interviewed or interviewed in great detail Detective Brown on

21    Wednesday afternoon and reasked him the question about

22    Mr. Gaiser's concern about this witness.  He told me pretty much

23    the same thing that I stated on the record before, that he

24    vaguely recollects that.  At the time, he didn't note the time

25    that the witness was talking about Prible, saying Prible was

*Ms. Scardino Direct of Terry Gaiser*

1    dropped off.  He looked again for notes.  He can't find any

2    notes."

14:14:33  3      Going down, he says -- she says, "And they think that the

4    witness was a female, and that's the best that I have as far as

5    what they can remember.  And, again, there are no notes or

6    supplements reflecting any of that."

14:14:45  7      You see that?

14:14:47  8    A    Yes.

14:14:48  9    Q    Okay.  And so I want to show you Exhibit 20, page 7.

14:14:58 10      Did you ever see this note in -- or was this note produced

11    to you from Mr. Prible's file?

14:15:05 12    A    No.

14:15:06 13    Q    Okay.  Do you see there where it says, "12-year-old witness

14    saw them together," and it's dated December 10th, '01?

14:15:13 15    A    I -- I had not seen that until it was shown to me by you.

14:15:19 16    Q    Okay.  To your knowledge, was the state aware of -- of the

17    alibi -- or did the state have any notes from this alibi witness

18    or about this alibi witness?

14:15:30 19    A    They never presented any to me.

14:15:36 20    Q    Did Siegler tell you about a meeting that she had had with

21    Foreman on August 8th, 2001?

14:15:44 22    A    No.

14:15:48 23    Q    Did Ms. Siegler or Mr. Wisner tell you about a meeting

24    between Siegler, Foreman and Beckcom at FCI Beaumont on

25    December 10th, 2001?

*Ms. Scardino Direct of Terry Gaiser*

14:15:59  1   A   No.  No.

14:16:04  2   Q   Did Ms. Siegler ever tell you about Hermelio Herrero?

14:16:09  3   A   Who?

14:16:10  4   Q   Hermelio Herrero.

14:16:11  5   A   No.

14:16:16  6   Q   Did she mention to you that some of the same informants in

7   Mr. Prible's case were also helping her on another murder case?

14:16:24  8   A   No.

14:16:25  9        MS. MIRANDA:  Objection to mischaracterization of the

10   record.

14:16:27 11        THE COURT:  Okay.  You can take -- you can bring that

12   up in cross.

14:16:32 13        MS. SCARDINO:  Can you pull up Exhibit 32, please?

14:16:39 14   BY MS. SCARDINO:

14:16:39 15   Q   I'm going to show you a photograph taken at FCI Beaumont on

16   November 11th, 2001.  Was this -- this was almost a year before

17   trial; is that correct?

14:16:50 18   A   Yes.

14:16:50 19   Q   Okay.  Can you identify any of the inmates in this photo?

14:16:55 20   A   I see Jeff and Michael Beckcom.

14:16:59 21   Q   Okay.

14:17:00 22   A   That's -- I don't know the others.

14:17:03 23   Q   Okay.  Now, if you had known the identities of any other of

24   these gentlemen and had seen those informant letters that I

25   showed you earlier, could you have made use of this photo at

*Ms. Scardino Direct of Terry Gaiser*

1  trial?

14:17:16  2  **A**   Well, I certainly could have talked to Jeff about it if

3  I -- if -- if I had seen it.  But prior to trial, no, I had not

4  seen it.

14:17:28  5      And I don't remember -- it wasn't -- obviously, it was not

6  offered in evidence at trial.

14:17:35  7          **MS. SCARDINO:**  Can you pull up Exhibit 170 at 3

8  through 7?

14:17:51  9  **BY MS. SCARDINO:**

14:17:52  10  **Q**   And this is an excerpt from Ms. Siegler's closing argument

11  regarding the DNA evidence.  And as you stated earlier, you

12  recall the theory -- the state's theory about the DNA evidence?

14:18:03  13  **A**   Yes.

14:18:04  14  **Q**   Okay.  And what was that again?

14:18:05  15  **A**   That the -- that their theory was that Jeff had ejaculated

16  and immediately shot Nilda in the back of the head.

14:18:14  17  **Q**   Okay.

14:18:14  18          **MS. SCARDINO:**  Can you post Exhibit 20 at page 4?

14:18:25  19  **BY MS. SCARDINO:**

14:18:26  20  **Q**   Did you ever see this note in Jeff's file in the DA -- in

21  the file produced by the DA's office?

14:18:34  22  **A**   No.

14:18:35  23  **Q**   Okay.

14:18:35  24  **A**   I mean, I know who Pam McInnis is.

14:18:38  25  **Q**   Who's Pam McInnis?

*Ms. Miranda Cross of Terry Gaiser*

14:18:39  1   A   She a serologist that worked in the -- for Fort Bend County,

2   as I remember.

14:18:45  3   Q   Okay.  And you see that note says that semen lives up to

4   72 hours, teeth clenched shut?

14:18:50  5   A   Yeah.  I -- I've never seen that piece of paper till it was

6   shown to me recently.

14:18:55  7   Q   Okay.

14:18:59  8           **MS. SCARDINO:**  I pass the witness, Your Honor.

14:19:01  9           **THE COURT:**  Okay.  Why don't we take our afternoon

10   break.  Ten minutes, please.

14:19:04 11       *(Recess taken from 2:19 p.m. to 2:35 p.m.)*

14:35:00 12           **THE COURT:**  Please be seated.

14:35:00 13           Okay.  Let's proceed with cross.

14:35:02 14                    **CROSS-EXAMINATION**

14:35:04 15   **BY MS. MIRANDA:**

14:35:05 16   Q   Mr. Gaiser, we just met, like, five seconds ago; is that

17   correct?

14:35:09 18   A   Yes.

14:35:09 19   Q   So we have not discussed this case previously, ever?

14:35:11 20   A   No, we have not.

14:35:12 21   Q   All right.  I want to go over a little bit of your

22   testimony, and I'm going to put up there on the screen what has

23   been marked as the -- Petitioner's Exhibit 95.  I believe you

24   were shown that a bit ago.  And while he's putting that up there

25   on the screen, I'd like to ask you a question.

*Ms. Miranda Cross of Terry Gaiser*

14:35:32  1    When you were filing that pretrial motion with respect to

2    witness statements, can you tell -- tell the Court what you

3    meant by witness statements?  What were you looking for?

14:35:43  4    A    Any statement given by a witness relative to the -- to the

5    facts of the case.

14:35:50  6    Q    And when you say "the facts of the case," we're talking

7    about Mr. Prible's case; is that correct?

14:35:54  8    A    Of course.

14:35:55  9    Q    Okay.  And so then, earlier, you were shown Exhibit 95.

10   It's petitioner's exhibit, which was represented to you as a

11   statement from Mr. Beckcom with respect to Anthony Davi.  Do you

12   see that at the bottom paragraph on there?

14:36:11 13   A    No, I don't.

14:36:12 14   Q    Okay.

14:36:14 15        MS. MIRANDA:   Can you move it up a little bit?

14:36:17 16   BY MS. MIRANDA:

14:36:17 17   Q    Okay.

14:36:19 18   A    That's Mr. Beckcom's signature, I take it?

14:36:23 19   Q    That's what it purports to represent, yes.

14:36:25 20   A    Yes.

14:36:26 21   Q    Okay.  So my question is:  Looking at this -- this statement

22   with respect to what Mr. Beckcom said about Anthony Davi,

23   what -- what part of this statement right here is relevant to

24   Mr. Prible's case?

14:36:38 25   A    Well, whatever Mr. Beckcom is doing to gain consideration

*Ms. Miranda Cross of Terry Gaiser*

1    for his testimony, whether it -- it has to do with my case or

2    other cases that he's been involved in trying to get

3    consideration for his involvement in, all are relevant to -- to

4    this trial.

14:37:03  5    **Q**   Okay.  So then this is relevant to the extent that it's --

6    represents what, a potential deal?  Because this is -- there are

7    no facts relevant to Mr. Prible's case on this letter, correct?

14:37:13  8    **A**   No.  Mr. Beckcom is, once again, probing to see if he can

9    either get help for himself or someone else --

14:37:22 10    **Q**   Okay.

14:37:22 11    **A**   -- based upon information that he's discovered.

14:37:25 12    **Q**   And that's -- and that's what I wanted to know.  So this is

13    relevant to Mr. Beckcom and -- and impeachment of Mr. Beckcom;

14    is that correct?

14:37:31 15    **A**   That's the way I see it, yes.

14:37:33 16    **Q**   Okay.  And to potential what, a deal that he has with the

17    state?  Is that your testimony?

14:37:37 18    **A**   No, to the lengths he's willing to go to -- to get

19    consideration for -- for -- from the state for whatever he's

20    doing.

14:37:47 21    **Q**   Okay.  And then how -- how would you have used this -- this

22    exhibit at trial?

14:37:53 23    **A**   This may not have been used at trial, but it certainly would

24    have prompted more investigation into what was going on with

25    Mr. Beckcom and these other inmates.

*Ms. Miranda Cross of Terry Gaiser*

14:38:04  1   **Q**   And to what end?  What were you attempting to show the jury

2   about Mr. Beckcom?

14:38:08  3   **A**   That he was a liar.

14:38:10  4   **Q**   Okay.

14:38:11  5   **A**   That he's willing to say anything to get --

14:38:14  6   **Q**   Okay.

14:38:14  7   **A**   -- a deal.

14:38:15  8   **Q**   All right.  Now, your testimony earlier that you requested

9   and the court ordered the prosecutor in this case to turn over

10   information regarding any deals that they might have with the

11   informants in this case -- is that correct?

14:38:30 12   **A**   Yes.

14:38:30 13   **Q**   And you testified with respect to a Petitioner's

14   Exhibit 43 -- and we'll put that up there -- that Ms. Siegler

15   had not disclosed this -- the Rule 35 letter that she wrote for

16   Mr. Moreno.  Do you recall testifying to that?

14:38:53 17   **A**   That's correct.

14:38:54 18   **Q**   Okay.  And then from this letter -- did Mr. Moreno testify

19   in Mr. Prible's case?

14:39:00 20   **A**   No.

14:39:00 21   **Q**   Okay.  Whose case did he testify in?

14:39:03 22   **A**   I believe it was the Herrero case.

14:39:04 23   **Q**   Okay.  And so this Rule 35 agreement that she wrote, it was

24   a deal that she made with Mr. Moreno in Mr. Herrero's case; is

25   that correct?

*Ms. Miranda Cross of Terry Gaiser*

14:39:13  1    A    As far as I can tell.

14:39:14  2    Q    Okay.  This is not a deal that she made in Mr. Prible's

3    case; is that correct?

14:39:18  4    A    That -- that's correct.

14:39:19  5    Q    So if you asked the court for Ms. Siegler to turn over deals

6    that she made with informants in Mr. Prible's case, this letter

7    would not be one of them, would it?

14:39:27  8    A    In the -- in the technical sense, no.  In the broader sense

9    of what was -- what was being done with Mr. Beckcom and the

10   people at the FCI, yes, it would.

14:39:41 11    Q    Okay.  I want you to look at this letter, and I want you to

12   tell me, from this letter, what has anything to do with

13   Mr. Beckcom.

14:39:46 14    A    That letter has nothing to do with Mr. Beckcom.

14:39:49 15    Q    Okay.  What does Mr. Moreno have to do with Mr. Beckcom?

14:39:52 16    A    Apparently, from what I'm told after the fact --

14:39:55 17    Q    Okay.

14:39:55 18    A    -- they were inmates together at the FCI.

14:39:58 19    Q    Mr. Moreno and Mr. Beckcom were inmates together at FCI

20   Beaumont.  That's your testimony?

14:40:03 21    A    That's -- I -- I -- that's what I understand.

14:40:06 22    Q    You said you were told that.  Who told you that?

14:40:09 23    A    I believe it was the -- the lawyers for Mr. Prible.

14:40:13 24    Q    And they told you that Mr. Beckcom and Mr. Moreno were

25   inmates together at FCI Beaumont?

*Ms. Miranda Cross of Terry Gaiser*

14:40:17  1    A    I believe so.

14:40:18  2    Q    Okay.  And that's why you believe this document has

3    relevant -- is relevant to your case?

14:40:24  4    A    Yes.

14:40:25  5    Q    Okay.  And then -- and how precisely would you have used a

6    deal made by a prosecutor in an unrelated murder case in your

7    case?

14:40:37  8    A    At this point in time, you know, I -- looking back, I can't

9    answer what I would have done at that time.  But it certainly

10    would have alerted me to what she was doing with other witnesses

11    in terms of what she was -- how far she would go to seek a

12    Rule 35.

14:40:57 13    Q    "How far she would go" explain that for me.

14:41:00 14    A    Well, what she would do.  How far she would go.

14:41:03 15    Q    So if she made a deal with an inmate in an unrelated murder

16    case, and she wrote a Rule 35 agreement for that inmate, what --

17    I'm not sure that I understand --

14:41:12 18    A    Well, I certainly could cross Mr. Beckcom as to what his

19    understanding was of what Kelly Siegler would do for him.

14:41:19 20    Q    "For him," for Mr. Beckcom?

14:41:21 21    A    Yes.

14:41:22 22    Q    But not for Mr. Moreno?

14:41:23 23    A    Based on what he [sic] had done for other inmates.

14:41:28 24    Q    You would cross --

14:41:29 25    A    What she had done for other inmates.

*Ms. Miranda Cross of Terry Gaiser*

14:41:30  1   **Q**   You would cross-examine Mr. Beckcom about what --

14:41:35  2   **A**   I consider -- I would ask him if he knew Jesse Moreno, if

3   she [sic] knew Kelly Siegler's relationship with Mr. Moreno,

4   what she had done for Mr. Moreno.

14:41:45  5   **Q**   Okay.

14:41:45  6   **A**   I mean, I wouldn't -- when I cross-examined Mr. Beckcom, I

7   went into some of the things he had done in the past --

14:41:52  8   **Q**   Sure.

14:41:52  9   **A**   -- to seek --

14:41:53  10   **Q**   Sure.

14:41:54  11   **A**   -- to seek benefits from the government.

14:41:57  12   **Q**   And this is all based on the presumption that Mr. Beckcom

13   and Mr. Moreno know each other, correct?

14:42:02  14   **A**   No.  It's based on what Kelly Siegler would do to -- how far

15   she would go --

14:42:10  16   **Q**   So it's your testimony --

14:42:11  17          **MS. SCARDINO:**  Judge --

14:42:11  18          **THE COURT:**  Let him finish.  Let him finish.

14:42:14  19   **BY MS. MIRANDA:**

14:42:14  20   **Q**   It's your testimony --

14:42:15  21          **THE COURT:**  No.  Let him finish.

14:42:16  22          **MS. MIRANDA:**  Oh, I apologize.

14:42:17  23   **A**   How far she would go to seek dispensation for these -- these

24   snitches in the FCI.

14:42:28  25   **BY MS. MIRANDA:**

*Ms. Miranda Cross of Terry Gaiser*

14:42:29  1    Q    And I understand what you're saying about the broader sense,

2    but what I'm trying to understand -- as a trial attorney who has

3    been practicing as long as you have, what I am trying to

4    understand is how you would use information that is irrelevant

5    to this case in the sense that Mr. Beckcom -- this has nothing

6    to do with Mr. Beckcom.

14:42:49  7        And I apologize.  I'm going to stop and start over.

14:42:52  8            MS. SCARDINO:  I'm going to -- okay.  Thank you.

14:42:54  9    BY MS. MIRANDA:

14:42:54 10    Q    I'm going to stop and start over.

14:42:56 11        Is it your testimony that you would be able to

12    cross-examine Mr. Beckcom with respect to deals that Ms. Siegler

13    made in unrelated cases --

14:43:05 14    A    I --

14:43:05 15    Q    -- with any inmate at FCI Beaumont?  Is that what your

16    testimony is?

14:43:08 17            MS. SCARDINO:  Objection, confusing, Your Honor.

14:43:10 18            THE COURT:  I -- I think the witness understands it.

19    It's --

14:43:12 20            THE WITNESS:  Yeah.

14:43:14 21            THE COURT:  He's already said he doesn't know what he

22    would have done, looking back now, 18 years ago, 17 years ago.

14:43:21 23            But go ahead and answer it as best you can.

14:43:24 24    A    Well, it certainly demonstrates how far she would go in aid

25    of someone that was an informant from the FCI.

*Ms. Miranda Cross of Terry Gaiser*

14:43:32 1 | BY MS. MIRANDA:

14:43:32 2 | Q   She would write them a Rule 35 letter?

14:43:34 3 | A   And I can certainly investigate that to see if there are

4 | others that she had done that with --

14:43:38 5 | Q   Okay.

14:43:38 6 | A   -- but I couldn't investigate this because --

14:43:39 7 | Q   Okay.

14:43:39 8 | A   -- I never saw it.

14:43:41 9 | Q   Okay.  And then you --

14:43:42 10 |         MS. SCARDINO:  Objection, Your Honor.

14:43:43 11 |         THE COURT:  Just a second.

14:43:44 12 |         MS. SCARDINO:  Excuse me.  Just -- I would just ask

13 | that Ms. Miranda allow him to finish his statement.

14:43:48 14 |         THE COURT:  Yeah.  Fair enough.

14:43:49 15 |         MS. MIRANDA:  I apologize, Your Honor.

14:43:51 16 |         THE COURT:  Fair enough.

14:43:51 17 |         MS. MIRANDA:  I apologize.

14:43:52 18 | BY MS. MIRANDA:

14:43:52 19 | Q   So you would investigate to see what other inmates that she

20 | made deals with in other cases?

14:43:58 21 | A   Yeah, from the FCI.

14:44:00 22 | Q   Okay.  Not related to Mr. Prible?

14:44:03 23 |         MS. SCARDINO:  Objection, Your Honor, mischaracterizes

24 | evidence.

14:44:06 25 | A   Well --

*Ms. Miranda Cross of Terry Gaiser*

14:44:06  1    THE COURT:  Well, the whole issue of the connection

2    with Mr. Prible's case may depend on whether Mr. Beckcom and

3    Mr. -- and Mr. Moreno knew each in other prison.  I can see

4    that.  But if they knew each other, and Moreno told Beckcom that

5    this is a prosecutor who will not only write a letter, but

6    actually go to an out-of-state court and testify on behalf of a

7    defendant, I can see that it would be relevant.

14:44:40  8    But I don't have any idea whether Moreno and -- and

9    Beckcom knew each other.

14:44:47  10    THE WITNESS:  That -- I couldn't have known that at

11    the time.  I had no reason to believe there was a relationship.

12    I didn't know who Mr. Moreno was.

14:44:56  13    THE COURT:  It might be worth asking a question,

14    though, mightn't it?

14:44:59  15    THE WITNESS:  Of course, if I had seen the letter.

14:45:01  16    THE COURT:  That's all I'm saying.

14:45:02  17    THE WITNESS:  Yeah.  Yes.

14:45:03  18  BY MS. MIRANDA:

14:45:04  19  Q    And just -- because I think this is a critical point.  I

20    need to be clear on the record.

14:45:08  21    So in order for you to know whether Mr. Moreno knows

22    Mr. Beckcom, Ms. Siegler would have to disclose to you every

23    agreement or Rule 35 that she made with federal inmates in the

24    federal pen so that you could ask them whether they knew

25    Mr. Beckcom.  Is that your testimony?

*Ms. Miranda Cross of Terry Gaiser*

14:45:26  1    **A**    No, that's not my testimony.  My --

14:45:29  2    **Q**    Okay.  So if there's no evidence in this record that

3    Mr. Beckcom knew Mr. Moreno, then how would this letter -- how

4    would Ms. Siegler know to disclose this letter to you?

14:45:40  5             **MS. SCARDINO:**  Objection, Your Honor, calls for

6    speculation and confusing.

14:45:44  7             **THE COURT:**  Well --

14:45:45  8             **MS. MIRANDA:**  Your Honor, he's the one that indicated

9    that he would have liked to have --

14:45:47 10             **THE COURT:**  I'm going to allow it.  I'm going to allow

11   it.

14:45:50 12    **A**    What's the question?

14:45:51 13             **THE COURT:**  The question is how this letter would have

14   helped you and whether it -- you're making a claim as broad as

15   Ms. Siegler should have disclosed to you every deal she had ever

16   done with a federal inmate.

14:46:04 17             **THE WITNESS:**  Well, seeing this now, you know, knowing

18   what I know now, this letter would have been very important

19   because it shows that she was making deals with other inmates in

20   the same facility.

14:46:17 21             **THE COURT:**  Well, but in fairness, a lot of

22   prosecutors do that, don't they?  State prosecutors make deals

23   with federal inmates?

14:46:24 24             **THE WITNESS:**  This is -- I haven't seen that many,

25   Judge.  I may be --

*Ms. Miranda Cross of Terry Gaiser*

14:46:27  1       THE COURT:  But Ms. Miranda is asking whether you are

2   claiming as much as Ms. Siegler -- it was incumbent on

3   Ms. Siegler to turn over all deals she had ever made with a

4   federal inmate.  I don't think that's what you're saying.

14:46:44  5       THE WITNESS:  No.  No, that's not what I'm saying.

14:46:46  6       THE COURT:  Well, why don't you explain what you are

7   saying.

14:46:49  8       THE WITNESS:  I'm trying -- she's willing -- how far

9   is she willing to go with inmates in the FCI that would -- you

10  can't -- I can't know until I investigate this letter, and I

11  can't know unless I know all the -- the people that she's making

12  deals with at the FCI.  Obviously, there were others she was

13  making deals with.

14:47:15  14  BY MS. MIRANDA:

14:47:15  15  Q    And I understand that.  From a defense attorney perspective,

16  is there -- you would want to know everything, would you not?

14:47:22  17  A    Of course.

14:47:22  18  Q    Everything in the prosecutor's file; is that correct?

14:47:25  19  A    Yes.

14:47:25  20  Q    All right.  But my question -- you were asked earlier

21  specifically about this exhibit in response to what was ordered

22  by the court in this particular case; is that correct?

14:47:39  23  A    Say that again, please.

14:47:42  24  Q    When you were asked by Mr. Prible's attorney about this

25  exhibit, you were discussing the order that was entered by the

*Ms. Miranda Cross of Terry Gaiser*

1    trial court in this case, in Mr. Prible's case; is that correct?

14:47:54  2    A    Certainly.

14:47:54  3    Q    And you asked the trial court for Ms. Siegler to disclose

4    deals that she made with individuals who were testifying in this

5    case; is that correct?

14:48:04  6    A    Well, individuals who are witnesses or prospective witnesses

7    in the case.

14:48:08  8    Q    Okay.  Witnesses -- fair enough.  Witnesses or prospective

9    witnesses in this case.  Is that -- that's correct?  That was

10   your understanding?

14:48:16 11    A    Yes.

14:48:16 12    Q    Okay.  And then, to your knowledge, was Mr. Moreno a witness

13   or a prospective witness in this case?

14:48:21 14    A    Not to my knowledge, no.

14:48:23 15    Q    Thank you.

14:48:24 16    A    Not at this...

14:48:30 17    Q    All right.  And now I'm going to put up there what has been

18   marked as Petitioner's Exhibit 44, which is the Rule 35

19   agreement that Ms. Siegler wrote for Mr. Foreman.  Do you recall

20   being asked about this?

14:48:52 21    A    Yes.

14:48:52 22    Q    All right.  And if you will look at that, what case was this

23   written in?

14:48:59 24    A    The Herrero case.

14:49:01 25    Q    Okay.  Thank you.

*Ms. Miranda Cross of Terry Gaiser*

14:49:20  1      **MS. MIRANDA:**  If I may have a moment, Your Honor.

14:49:22  2      **THE COURT:**  Sorry?

14:49:22  3      **MS. MIRANDA:**  May I have a moment?

14:49:24  4      **THE COURT:**  Yes.  Yes, you may.

14:49:25  5  **BY MS. MIRANDA:**

14:49:25  6  **Q**   Now, also, just to be clear, earlier during your testimony,

       7  you were asked by Ms. Scardino whether, with respect to the

       8  documents that you were shown, you could make use of those

       9  documents.  Do you recall that?

14:49:51 10  **A**   Yes.

14:49:52 11  **Q**   Okay.  Now, it's not your testimony, is it, that whether or

      12  not you could make use of a document, that's not the standard

      13  for turning over Brady material, is it?

14:50:02 14  **A**   Of course not.

14:50:02 15  **Q**   Okay.

14:50:13 16       Now I'm going to show you what has been marked as

      17  Petitioner's Exhibit 30, and specifically I'm going to look at

      18  what is marked up at the top at page 5, and that bottom

      19  paragraph.

14:50:35 20       Can you read that bottom paragraph?

14:50:38 21  **A**   "At first, when talking about the murder, Prible says --

      22  Prible was taking a position of innocence.  He said that Steve

      23  Herrera was his best friend.  He said that he had been screwing

      24  Nilda, that she and Steve had an open relationship.  He said

      25  that he had admitted to being at Steve's house that day, but

*Ms. Miranda Cross of Terry Gaiser*

1    Steve had driven him home and that he had a witness who saw him

2    being dropped off."

14:51:03 3   Q    And then you can read the next line?

14:51:09 4   A    "I later found out that this witness was then 12 or 13

5    years -- was a then or 12- or 13-year-old neighbor who had

6    gotten up to use the restroom.  But then --"

14:51:23 7   Q    All right.

14:51:24 8   A    Is that enough?

14:51:25 9   Q    No, go ahead.  Finish that paragraph.

14:51:26 10  A    "But then a question came to my mind.  If Steve took Prible

11   home from his house that night, when did he have time to have

12   sex with Nilda?  That's when I began to realize that he was

13   guilty and, from then on, began to press him about the murder."

14:51:40 14  Q    All right.  Now state -- or, I'm sorry, Petitioner's

15   Exhibit 30, you recognize that, don't you, as the handwritten

16   notes that you were provided by Ms. Siegler?

14:51:49 17  A    Correct.

14:51:49 18  Q    Okay.  And so when -- when you testified earlier with

19   respect to Petitioner's Exhibit 109, where you were shown a note

20   about a 13-year-old girl and an alibi witness, and you testified

21   that you did not get those notes -- do you recall that?

14:52:05 22  A    That's correct.

14:52:06 23  Q    Okay.  But you're not testifying that you didn't get that

24   information.  You just didn't get that information in that form;

25   is that correct?

*Ms. Miranda Cross of Terry Gaiser*

14:52:12  1   **A**    That's correct.

14:52:13  2   **Q**    Because it would appear that she gave that information to

3   you in -- in Mr. Beckcom's written statement?

14:52:18  4   **A**    Well, if you call -- if you believe that that identifies the

5   witness.  I don't know when Mr. Prible talked -- talked to this

6   young lady, if he, indeed, did.

14:52:29  7   **Q**    Okay.

14:52:29  8   **A**    "Talked" referring to Jeff's father.

14:52:32  9   **Q**    Sure.  And I understand that part.  I'm just simply

10   referring to -- to the note that you saw earlier when you said

11   you didn't see that note.  But the information in that note you

12   received in the way of this handwritten statement from

13   Mr. Beckcom?

14:52:45  14   **A**    Well, obviously, in that handwritten note, Curtis Brown knew

15   who that witness was and what the name of that witness was.

14:52:52  16   **Q**    All right.

14:52:52  17   **A**    It's an alibi witness.  That's certainly material to this

18   case.

14:52:56  19            **MS. MIRANDA:**  Objection, Your Honor.  Nonresponsive.

14:52:58  20            **THE COURT:**  Ask another question.  You think it was

21   nonresponsive, ask a follow-up.

14:53:05  22            **MS. MIRANDA:**  That's fine.  I think the record speaks

23   for itself on that, Your Honor.

14:53:15  24   **BY MS. MIRANDA:**

14:53:15  25   **Q**    Is it fair to say that you're not a fan of jailhouse

*Ms. Miranda Cross of Terry Gaiser*

1   informant testimony?

14:53:19   2   **A**   Of course I'm not.

14:53:20   3   **Q**   Okay.  Why is that?

14:53:23   4   **A**   I believe that it's fundamentally unreliable.  After Jeff's

5   case, the legislature even took action to the effect of -- of

6   passing a rule of evidence about corroboration of jailhouse

7   informants.

14:53:37   8   **Q**   All right.  And so when -- when you saw that there was going

9   to be a jailhouse informant in this case, what was your

10   reaction?

14:53:49   11   **A**   Oh, another one of these.

14:53:51   12   **Q**   Okay.

14:53:52   13   **A**   Another snitch.

14:53:53   14   **Q**   And did you think that it was important to attempt to

15   impeach this jailhouse informant?

14:53:58   16   **A**   Of course.

14:53:59   17   **Q**   Okay.  And the best way, would you agree with me, to impeach

18   a jailhouse informant is to point out and highlight the sort of

19   inherent unreliability of their testimony; is that correct?

14:54:12   20   **A**   That's one way.

14:54:13   21   **Q**   Okay.  To show that they have a motive to lie?

14:54:17   22   **A**   That's one way.

14:54:18   23   **Q**   All right.  That they want to get their sentence reduced,

24   perhaps?

14:54:21   25   **A**   That's one way.

*Ms. Miranda Cross of Terry Gaiser*

14:54:22 1   Q   Okay.  To -- to show that they have a criminal history?

2   They're, in fact, in jail?

14:54:31 3   A   That's one way.

14:54:32 4   Q   All right.  And perhaps even on a felony?

14:54:35 5   A   That's a way.

14:54:35 6   Q   All right.  What about demonstrating to the jury that the

7   information that the jailhouse informant has actually came from

8   a different source?

14:54:46 9   A   Of course.  That was part of my cross-examination.

14:54:51 10   Q   Okay.  And to show that the defendant could have come by

11   that information some other way, correct?

14:54:55 12   A   That the informant could have come by that information some

13   other way.

14:54:58 14   Q   Yes.

14:54:59 15   A   Not the defendant.

14:55:00 16   Q   Not the defendant.  The informant who's coming to testify in

17   court, could have gotten that information from somewhere other

18   than the defendant --

14:55:07 19   A   Right.

14:55:07 20   Q   -- is that correct?

14:55:08 21   A   Correct.

14:55:09 22   Q   Or even just, generally, the informant's character for

23   truthfulness?

14:55:12 24   A   Right.  When a federal judge in California says that he's a

25   liar, that helps also.

*Ms. Miranda Cross of Terry Gaiser*

14:55:18  1   **Q**   Okay.  Exactly.  And so then in this case, did you do all

2   those things with respect to Mr. Beckcom?

14:55:24  3   **A**   I certainly tried.

14:55:25  4   **Q**   Okay.  Did you show the jury that he had a motive for

5   testifying?

14:55:29  6   **A**   Of course.

14:55:29  7   **Q**   All right.  And that, actually, not only was he testifying

8   in this case, but he had actually done it before, hadn't he?

14:55:35  9   **A**   Yes.

14:55:35 10   **Q**   I believe that in closing arguments, it was referred to as a

11   craft that he was practiced at.  Do you recall that?

14:55:43 12   **A**   Yes.

14:55:44 13   **Q**   All right.  And you also were able to point out to the jury

14   that he was a quadruple felony; is that correct?

14:55:50 15   **A**   Best I remember.

14:55:52 16   **Q**   A capital murderer?

14:55:52 17       What about his character for truthfulness?  Did you do

18   anything to attack Mr. Beckcom's character for truthfulness?

14:56:01 19   **A**   Well, if a federal judge in California had made statements

20   from the bench concerning his credibility and the fact that he

21   was not a credible person, that he was a liar.

14:56:12 22   **Q**   So you were able to show the jury in this case that he had

23   actually, in fact, lied in another case --

14:56:18 24   **A**   Correct.

14:56:18 25   **Q**   -- as found by a federal Judge?

*Ms. Miranda Cross of Terry Gaiser*

14:56:19  1   A   As I remember, I did that.

14:56:21  2   Q   Did you call any witnesses with respect to Mr. Beckcom?

14:56:25  3   A   I think I called Bret Liedtke and --

14:56:28  4   Q   Okay.  And then Mr. Liedtke, what -- why did you call him?

14:56:35  5   A   Because Mr. Liedtke was aware that all this information

6   about Jeff's case was readily available to anyone at the FCI,

7   that everybody that -- that anybody who could read could say

8   that Jeff had confessed to it.

14:56:53  9   Q   Okay.  When you say "anybody who could read," why do you say

10   "anybody who could read"?

14:56:57 11   A   Well, it was public record.  It was --

14:56:58 12   Q   Okay.  And, in fact, you introduced evidence that Mr. Prible

13   was showing his probable cause affidavit around prison; is that

14   correct?

14:57:07 15   A   Yes.

14:57:08 16   Q   All right.  And Mr. Liedtke testified that Prible talked

17   to -- his case to a lot of people?

14:57:12 18   A   Right.  Talked all the time.

14:57:14 19   Q   Talked all the time, to the point that Mr. Liedtke told him

20   to stop talking; is that correct?

14:57:18 21   A   Right.

14:57:19 22   Q   All right.  And so this probable cause affidavit, do you

23   recall what was in -- what kind of information was in the

24   probable cause affidavit?

14:57:26 25   A   I don't remember.

*Ms. Miranda Cross of Terry Gaiser*

14:57:27  1   Q   All right.

14:57:28  2   A   I'm sure it's available.

14:57:29  3   Q   All right.

14:57:35  4          MS. MIRANDA:  Can you give me a second, Your Honor?

14:57:42  5          THE COURT:  Yes.

14:57:42  6   BY MS. MIRANDA:

14:57:42  7   Q   And I don't know.  It might be easier if we hand you a copy

          8   of this, but can you take a second and review this?  Do you

          9   recall seeing this at trial?

14:57:56 10   A   Yes.  I believe it was entered in evidence as an exhibit.

14:58:00 11   Q   All right.  And I'll give you just a second.  And there's,

         12   actually, a second page, so if we need to hand you a physical

         13   copy, we can do that.

14:58:33 14       *(Witness reviews document.)*

14:58:34 15   BY MS. MIRANDA:

14:58:37 16   Q   And I'll wait to proceed when you're ready, Mr. Gaiser.

14:58:40 17   A   I can't see the whole thing.

14:58:42 18          MR. d'HEMECOURT:  Are you ready to move?

14:58:43 19          THE WITNESS:  Pardon?

14:58:44 20          MR. d'HEMECOURT:  Are you ready for me to move it up?

14:58:46 21          THE WITNESS:  Yeah.  Please.

14:58:47 22          Can you just hand it to me?

14:58:58 23          MR. d'HEMECOURT:  I can just hand it to him.

14:59:10 24          THE WITNESS:  Do you know what page it's on?

14:59:13 25          MS. MIRANDA:  Oh, may I approach, Your Honor?

*Ms. Miranda Cross of Terry Gaiser*

14:59:14  1        **THE COURT:**  Yes, you may.

14:59:15  2        Can we put another copy up there?

14:59:20  3        **MS. MIRANDA:**  I believe we probably can.

14:59:23  4        **THE COURT:**  Yeah.  Thank you.

14:59:34  5        **THE WITNESS:**  Thank you.

14:59:34  6        **THE COURT:**  Can we move it down a little bit?

14:59:35  7    *(Witness reviews document.)*

15:00:29  8  **A**   What is your question?

15:00:30  9  **BY MS. MIRANDA:**

15:00:31 10  **Q**   My question is that within this affidavit, does it contain

         11  the names of the victims?

15:00:38 12  **A**   Yes.

15:00:39 13  **Q**   All right.  The location of their bodies in the house?

15:00:43 14  **A**   Yes.

15:00:44 15  **Q**   The manner of their death?

15:00:46 16  **A**   I think it does, yes.

15:00:47 17  **Q**   All right.  Information about even the DNA, is that

         18  contained in the probable cause affidavit?

15:00:53 19  **A**   Well, the --

15:00:55 20  **Q**   And so your point at trial, was it not, was that anyone who

         21  had this type of information that was around Jeffrey Prible

         22  could have gotten this information from the probable cause

         23  affidavit; is that correct?

15:01:07 24  **A**   And news reports, yes.

15:01:08 25  **Q**   Okay.  I'm going to show you -- I'm going to -- actually,

*Ms. Miranda Cross of Terry Gaiser*

1    I'm going to attempt to ask this question without putting them

2    up there.  If you need the letters, then please let me know, and

3    I will put them up there.

15:01:22    4        But earlier during your testimony, you were asked about

5    letters that were written from Mr. Gonzalez, Mr. Walker, and

6    Mr. Mark Martinez.  Do you recall that?  Do you recall those

7    letters?

15:01:34    8    **A**    Yeah.  I had never seen those letters prior to being shown

9    that.

15:01:37    10   **Q**    Okay.  And so if you had seen those letters, what would you

11   have assumed with respect to the information that they had about

12   Mr. Prible?

15:01:49    13            **MS. SCARDINO:**  Objection, Your Honor, calls for

14   speculation.

15:01:51    15   **A**    I --

15:01:52    16            **THE COURT:**  He can answer it.

15:01:53    17            If you can.

15:01:54    18            **THE WITNESS:**  I can't answer that.  I can't assume

19   what they might have known.

15:01:58    20   **BY MS. MIRANDA:**

15:01:59    21   **Q**    Okay.  So you would have received those letters, and you

22   wouldn't have done anything with them?

15:02:02    23   **A**    Oh, I didn't say that.  I said I wouldn't assume anything

24   from the letters other than there seemed to be a large -- a

25   majority of activity going on at the FCI involving these

*Ms. Miranda Cross of Terry Gaiser*

1    informants and Kelly Siegler.

15:02:17   2    **Q**   Okay.  And why do you say Kelly Siegler?

15:02:24   3    **A**   If she had given them to me, I would assume that it would

4    involve her.

15:02:28   5    **Q**   Okay.  So now you can assume?

15:02:31   6    **A**   Yeah.

15:02:31   7    **Q**   So now you're going to assume it has to do with Kelly

8    Siegler.  Is that your testimony?

15:02:35   9          **MS. SCARDINO:**  Objection, Your Honor, harassing the

10   witness.

15:02:37  11          **THE COURT:**  I think you're saying the fact they're

12   writing to Kelly Siegler would have alerted you to inquire

13   further.  Is that what you're saying?

15:02:44  14          **THE WITNESS:**  Yes.

15:02:45  15          **MS. MIRANDA:**  Okay.  And if I may, Your Honor, I would

16   like to probe a little bit.

15:02:50  17   **BY MS. MIRANDA:**

15:02:50  18   **Q**   When you say assume Kelly Siegler, are you assuming that she

19   is somehow complicit in these letters?  Is that your testimony

20   before the Court?

15:02:58  21   **A**   No.

15:02:59  22   **Q**   Okay.  Then what is your testimony?

15:03:01  23   **A**   That the letters would have alerted to -- me to something

24   going on at the FCI involving all these informants, and I would

25   have to investigate further to -- to determine what exactly was

*Ms. Miranda Cross of Terry Gaiser*

1  going on.

15:03:16  2  **Q**   Okay.  And would you agree with me that there's a big

3  difference between assuming that something is going on at FCI

4  Beaumont and assuming Kelly Siegler is involved?

15:03:25  5  **A**   At this point in time, it's different than what I might have

6  done back then.  So I -- you know, I assume -- I assume now

7  because the more I know about the case.  Back then, I don't know

8  what I would have assumed.

15:03:37  9  **Q**   Okay.  And in what you know about the case, was that

10  information provided to you by the defense?

15:03:43  11  **A**   By the defense, by his prior lawyers, by...

15:03:47  12  **Q**   Okay.  Fair enough.  So then -- then let's look at these

13  letters individually.

15:03:54  14   I'm going to put up what has been marked as Petitioner's

15  Exhibit 36.

15:04:14  16   Is there anything in that letter that suggests that Mr. --

17  Ms. Siegler reached out to federal informants in the pen?

15:04:25  18  **A**   No.  I mean, it's -- Carl Walker is writing her a letter.

15:04:30  19  **Q**   So it appears that Mr. Walker reached out to Ms. Siegler; is

20  that correct?

15:04:34  21   **MS. SCARDINO:**  Objection, Your Honor, calls for

22  speculation.

15:04:36  23   **THE COURT:**  Well, I don't think that's too much to

24  deduce.  This letter sounds like he's ready to testify, doesn't

25  it?

*Ms. Miranda Cross of Terry Gaiser*

```
15:04:42   1        THE WITNESS:  The -- yeah.  It -- it doesn't establish
           2   that he is the one that initiated the contact with Ms. Siegler.
           3   All it indicates is that -- that he wants help with his sentence
           4   based upon what Jeff may or may not have said to him.
15:05:03   5   BY MS. MIRANDA:
15:05:03   6   Q    And what would you have done --
15:05:05   7   A    I would wonder --
15:05:05   8   Q    I'm sorry.
15:05:06   9   A    If I had that, I would wonder how he got Kelly Siegler's
          10   name --
15:05:10  11   Q    All right.
15:05:10  12   A    -- in this case.
15:05:11  13   Q    Okay.
15:05:12  14   A    I would begin to investigate that.
15:05:14  15   Q    All right.
15:05:14  16   A    I would start asking questions in those pretrial hearings
          17   about these other inmates and how they initiated contact with
          18   her.
15:05:23  19   Q    Okay.  Fair enough.
15:05:32  20        Would you have attempted to introduce these letters at
          21   trial?
15:05:35  22   A    I don't know.  That would depend on how the facts developed.
15:05:39  23   Q    Would you have attempted to call any of these witnesses at
          24   trial?
15:05:43  25   A    Same answer.  It would depend on how the facts played out
```

*Ms. Miranda Cross of Terry Gaiser*

1    prior to trial in terms of who initiated contact, what the

2    contact was about, how often the contact was.

15:05:54  3    Q    If you had known that there were other inmates in FCI

4    Beaumont that were on the government's witness list, would you

5    have investigated that?

15:06:05  6    A    Certainly.

15:06:08  7    Q    Do you recall whether you were aware of that?

15:06:10  8    A    The government's -- the state's witness list?

15:06:13  9    Q    Whether you were aware that there were other informants at

10    FCI Beaumont on this state's witness list?

15:06:20  11    A    No.  The only name I had heard with respect to Michael

12    Beckcom was Nathan Foreman.

15:06:26  13    Q    All right.  You don't recall the name Mark Martinez?

15:06:30  14    A    No.

15:06:32  15    Q    Or Jesse Gonzalez?

15:06:33  16    A    No.

15:06:34  17    Q    Felix Gonzalez?

15:06:36  18    A    No.

15:06:37  19    Q    Did you ever -- do you recall, in this case, providing

20    Mr. Liedtke with a copy of the government's subpoena list?

15:06:46  21    A    I don't think there would be any reason for me to have given

22    that to Mr. Liedtke.

15:06:50  23    Q    All right.

15:06:52  24    A    I don't know.  I certainly don't remember that --

15:06:55  25    Q    Okay.

*Ms. Miranda Cross of Terry Gaiser*

15:06:55  1   **A**   -- let me put it that way.

15:06:58  2          **MS. MIRANDA:**  May I approach, Your Honor?

15:07:00  3          **THE COURT:**  You may.

15:07:04  4   **BY MS. MIRANDA:**

15:07:04  5   **Q**   I'm going to show you what's been marked as Petitioner's

6   Exhibit 85, and at this point I just want you to read it and see

7   if that refreshes your recollection.

15:07:12  8          **MS. SCARDINO:**  Can we get a copy of that?

15:07:15  9          **MS. MIRANDA:**  Yes.

15:07:17 10          **MR. d'HEMECOURT:**  It's your 85.

15:07:18 11          **MS. SCARDINO:**  My 85?

15:07:23 12          **MS. MIRANDA:**  Yes.

15:07:23 13       *(Witness reviews document.)*

15:07:59 14   **A**   I have not seen this before.

15:08:02 15   **BY MS. MIRANDA:**

15:08:02 16   **Q**   All right.  My question is --

15:08:04 17   **A**   Oh, there's a back.  There's this other --

15:08:06 18          **THE COURT:**  Sorry?

15:08:06 19          **THE WITNESS:**  There's a second page.  I didn't

20   realize.

15:08:09 21          **THE COURT:**  Okay.

15:08:11 22   **BY MS. MIRANDA:**

15:08:12 23   **Q**   And I believe it's the last part of the second page, if

24   you'll look at that.  The back page.

15:08:19 25       *(Witness reviews document.)*

*Ms. Miranda Cross of Terry Gaiser*

15:08:40  1    **A**   I've never seen this.

15:08:41  2    **BY MS. MIRANDA:**

15:08:41  3    **Q**   Okay.  My question is:  Does that refresh your

          4    recollection --

15:08:45  5              **THE COURT:**  What are we looking at?  I'm sorry.

15:08:48  6              **MS. MIRANDA:**  I apologize.  We can put it -- put it up

          7    there.

15:09:04  8              **THE COURT:**  Who has written this?  This is from the

          9    captain at Beaumont to a technician at Beaumont to the associate

          10   warden; is that correct?

15:09:18  11             **MS. MIRANDA:**  Yes.

15:09:22  12   **BY MS. MIRANDA:**

15:09:23  13   **Q**   And does it state in here that you -- Mr. Liedtke reported

          14   that you showed him a copy of the subpoena list?

15:09:28  15             **MS. SCARDINO:**  Objection, Your Honor.  The document

          16   says what it says, but he can't testify to it.  He just said

          17   he -- it doesn't refresh his recollection, and he didn't write

          18   the document.

15:09:38  19             **THE COURT:**  What's the purpose of this document?

15:09:40  20             **MS. MIRANDA:**  Well, to under- -- the purpose of this

          21   document is to see if it refreshes his recollection as to

          22   whether he provided the subpoena list -- the government's

          23   subpoena list to Mr. Liedtke.  Mr. Liedtke, in this --

15:09:53  24             **THE COURT:**  Liedtke.  It says -- but how -- how would

          25   this refresh him if he never saw it before?

*Ms. Miranda Cross of Terry Gaiser*

15:09:58  1      MS. MIRANDA:  Just -- just to remind him of whether or

2   not he did that, whether or not he showed -- because --

15:10:03  3      THE COURT:  He would have no basis for knowing whether

4   this document's authentic or accurate or anything else, would

5   he?

15:10:08  6      MS. MIRANDA:  No.  And, Your Honor, this is not -- I'm

7   not introducing this as an exhibit.  This was simply to refresh

8   his recollection.

15:10:14  9      THE COURT:  Does this help refresh your recollection?

15:10:16 10      THE WITNESS:  No, Judge.  Part of it is erroneous,

11   according to my recollection.

15:10:21 12      MS. MIRANDA:  And for the record, Your Honor, this is

13   the petitioner's exhibit.  This is not our exhibit.  This is

14   their exhibit.

15:10:25 15      THE COURT:  Well, but exhibits can be appropriate for

16   one witness and not the other.  I mean, I don't know how this

17   could refresh him if he's not seen it before and he doubts its

18   accuracy.  But --

15:10:34 19      MS. MIRANDA:  Your Honor, I don't believe he said he

20   doubted its accuracy.

15:10:37 21      THE COURT:  I thought --

15:10:37 22      THE WITNESS:  I just did.

15:10:38 23      THE COURT:  I thought you said it was erroneous.

15:10:40 24      THE WITNESS:  Yes.

15:10:41 25      MS. MIRANDA:  Okay.

*Ms. Miranda Cross of Terry Gaiser*

BY MS. MIRANDA:

Q   So then you do recall that you did not show Mr. Liedtke the government's subpoena list?

A   The first -- the first erroneous statement is that I was given the subpoena list and told that I could -- the -- but a copy could not be provided to the involved inmates.  That was never part of any agreement I had with the state, and as far as I know, I never saw their subpoena list.

Q   Okay.  So your testimony is you did not see their subpoena list?

A   No.

Q   All right.

        MS. MIRANDA:  One more moment, Your Honor.  I think I'm almost done.

BY MS. MIRANDA:

Q   Were you curious about Mr. Foreman at trial?

A   I was just hopeful that no more people were coming at that point because I didn't think there were others.

Q   All right.  So you just testified that if you knew that there were other informants that had information, that you would want to investigate them.  Was that your testimony?

A   I would want to investigate further whether it was them or what their stories were or how they were involved --

Q   All right.

A   -- or what their backgrounds were.  What they were in for,

*Ms. Miranda Cross of Terry Gaiser*

1    what --

15:12:30   2    **Q**   And did you do that with respect to Mr. Foreman?

15:12:33   3    **A**   I don't believe so, but I really don't remember at this

4    point.

15:12:36   5    **Q**   So -- so you knew there was at least one other person that

6    was mentioned by Mr. Beckcom; is that correct?

15:12:41   7    **A**   I knew Mr. Beckcom said that Mr. Foreman was present.

15:12:45   8    **Q**   Okay.  But you did not investigate him at the time of trial?

15:12:48   9    **A**   Not that I remember.

15:12:49  10    **Q**   But you would have investigated Carl Walker?

15:12:52  11    **A**   If -- if I had known he was going to give a statement

12    against my client, of course.

15:12:58  13    **Q**   Okay.  And you would have investigated Mr. Martinez?

15:13:02  14    **A**   If he was going to give a statement against my client, yes.

15:13:05  15    **Q**   Okay.  So is it your testimony, then, that you weren't

16    concerned about Mr. Foreman's credibility?

15:13:11  17    **A**   No.  He was not going to be a witness, as far as I knew.

15:13:15  18    **Q**   Okay.

15:13:16  19    **A**   Anything -- anything about Mr. Foreman would be hearsay.

15:13:21  20    **Q**   And so you wouldn't have used anything about Mr. Foreman at

21    trial.  Is that your testimony?

15:13:26  22         **MS. SCARDINO:**  Objection, Your Honor, vague.

15:13:28  23    **A**   Well, all I had was his name.

15:13:34  24         **THE COURT:**  Well, there's evidence in the case that

25    Mr. Foreman met with Ms. Siegler and with an investigator.

*Ms. Miranda Cross of Terry Gaiser*

15:13:42  1          **THE WITNESS:**  I knew nothing about that.

15:13:44  2          **THE COURT:**  Okay.  The question is:  If you had known

3  that, and if you had known they had considered him too

4  unreliable to use as a witness, would that have been of interest

5  to you?

15:13:55  6          **THE WITNESS:**  Of course it would, Judge.

15:13:57  7          **THE COURT:**  Okay.  That's all she's asking, I think.

15:13:59  8          **MS. MIRANDA:**  Actually, that was not my question,

9  Your Honor.

15:14:02 10          **THE COURT:**  Well, then, rephrase it.  It sounded like

11  that to me.

15:14:06 12          You said, "And so you wouldn't have used anything

13  about Mr. Foreman at trial.  Is that your testimony?"  Without

14  knowing what the evidence is as to Mr. Foreman, how can he

15  answer that?

15:14:17 16          **MS. MIRANDA:**  His -- his testimony was that if he knew

17  there were other inmates at FCI Beaumont that had information on

18  Mr. Prible, he would have wanted to investigate.

15:14:26 19          **THE COURT:**  Right.  Mr. Foreman claimed to have

20  information.

15:14:29 21          **MS. MIRANDA:**  Mr. Beckcom -- I'm talking about what he

22  knew at the time of trial.  At the time of trial, he knew that

23  Mr. Beckcom indicated that Mr. Foreman was present during the

24  confession.

15:14:41 25  **A**   All I had was Beckcom's hearsay statement that somebody else

*Ms. Miranda Cross of Terry Gaiser*

1    overheard a conversation.  I knew nothing about that and -- and

2    had no desire to go find someone that might corroborate

3    Beckcom --

15:14:58  4    **BY MS. MIRANDA:**

15:14:58  5    **Q**   Okay

15:15:00  6    **A**   -- at that point in time.

15:15:01  7    **Q**   Fair enough.

15:15:01  8         **MS. MIRANDA:**  I'll pass the witness.

15:15:03  9         **THE COURT:**  Anything further?

15:15:04 10         **MS. SCARDINO:**  No, Your Honor.  We pass the witness.

15:15:06 11         **THE COURT:**  You may step down.  Thank you very much.

12    You may step down.  Thank you very much.

15:15:10 13         **THE WITNESS:**  Thank you, Judge.

15:15:13 14         **THE COURT:**  Does that bring us to a close for today?

15:15:16 15         **MS. SCARDINO:**  Yes, Your Honor.  I just had a couple

16    of housekeeping measures I wanted to take up with the Court.

15:15:20 17         **THE COURT:**  Okay.

15:15:22 18         **MS. SCARDINO:**  I understand, from your local rules,

19    that all the exhibits on the pretrial order are admitted for

20    purposes --

15:15:27 21         **THE COURT:**  Unless somebody objects to them.

15:15:28 22         **MS. SCARDINO:**  Yes, Your Honor.  And we had that

23    telephonic hearing last week where we addressed some of the

24    objections that the respondent had, and I -- I believe I

25    understood your ruling to be that they're admitted, or do we

*Ms. Miranda Cross of Terry Gaiser*

1    still need to take --

15:15:47   2         **MS. MIRANDA:**  I believe it was that we were going to

3    take them up when they came up.

15:15:49   4         **THE COURT:**  Yeah.  I thought that was what we said.

15:15:51   5         **MS. SCARDINO:**  Okay.  Okay.  I just wanted to make

6    sure that before this is over, we -- I've properly --

15:15:57   7         **THE COURT:**  Have these exhibits come up?  I didn't

8    hear any objection to the exhibits while we've been receiving

9    testimony.

15:16:02  10         **MS. MIRANDA:**  I don't believe they've been offered,

11   Your Honor, but we haven't had any objections.

15:16:05  12         **MS. SCARDINO:**  The ones that you've objected to, you

13   don't think they've come up yet?

15:16:08  14         **MS. MIRANDA:**  No, the ones -- I don't believe so.

15:16:10  15         **THE COURT:**  I've always found it much easier to take

16   up an objection to a document or exhibit when we're in -- in the

17   context of a trial.  That way we can better judge things like

18   relevance or prejudice or --

15:16:22  19         **MS. SCARDINO:**  Okay.  So in my -- just so I'm clear,

20   if -- if it's listed on the pretrial order, and it's not

21   objected to during this hearing, it's going to be admitted?

15:16:32  22         **THE COURT:**  Well, no, she's registered her objection.

15:16:34  23         **MS. SCARDINO:**  Okay.

15:16:35  24         **THE COURT:**  So we have an objection we have to deal

25   it.

15:16:37 1          **MS. SCARDINO:**  Okay.

15:16:37 2          **THE COURT:**  If it doesn't come up at all during the

3    course of the trial, you can either decide you don't need the

4    exhibit, or we're going to have a discussion in the abstract

5    about whether the exhibit ought to be admitted.

15:16:45 6          **MS. SCARDINO:**  Okay.  I understand, Your Honor.  Thank

7    you.

15:16:47 8          **THE COURT:**  Anything else?

15:16:48 9          **MS. SCARDINO:**  One more additional exhibit [sic],

10   Your Honor.

15:16:50 11         **THE COURT:**  Okay.

15:16:51 12         **MS. SCARDINO:**  I wanted to ask if you might allow

13   Mr. Prible to have a hug with his family?  Is that -- would that

14   be something the Court could allow?

15:16:59 15         **THE COURT:**  It's really not my call.  Does security --

15:17:02 16         **THE MARSHAL:**  Your Honor, I think TDC has a -- a

17   policy, because of where he's being housed, that there's not

18   even -- they don't get contact visits.

15:17:14 19         **THE COURT:**  I'm afraid that's the rule of the federal

20   court.  I'm sorry.

15:17:17 21         **MS. SCARDINO:**  That's okay, Your Honor.  Thank you.

22   It was a request.

15:17:20 23         **THE COURT:**  I'm not saying this would happen here, but

24   I used to get involved with how security concerns were dealt

25   with, and we had a horrible incident where a family member

1    slipped a razor blade to an inmate with disastrous consequences.

2    I'm not saying that would happen here, but I do understand the

3    need for the rules.

15:17:41  4          **MS. SCARDINO:**  Yes.  Yes, Your Honor.  Thank you for

5    considering it.

15:17:44  6          *(Evening recess taken at 3:17 p.m.)*

7                              -o0o-

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above matter.

10

11   Date:  June 5, 2019

12                              /s/ *Heather Alcaraz*
                                Signature of Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

**MR. d'HEMECOURT: [4]**
213/17 213/19 213/22
220/9
**MR. DOYLE: [6]** 8/23
11/23 19/24 20/1 146/13
149/23
**MR. RYTTING: [1]**
137/20
**MS. MIRANDA: [52]** 4/14
4/22 5/1 5/9 5/14 19/7 20/20
22/19 29/18 61/14 61/21
109/22 165/12 165/15
167/14 167/20 180/25 181/9
184/8 191/8 194/14 199/21
201/14 201/16 203/7 205/25
206/2 208/18 208/21 213/3
213/24 214/2 216/14 220/1
220/8 220/11 221/5 221/10
221/19 221/25 222/5 222/11
222/18 222/24 223/12 225/7
225/15 225/20 226/7 227/1
227/9 227/13
**MS. SCARDINO: [83]** 4/6
4/21 5/15 5/21 8/12 61/1
61/7 61/12 61/16 61/24 62/1
75/5 75/11 75/14 75/18
87/18 87/20 137/5 137/7
137/10 137/13 137/15
137/22 137/24 138/2 138/5
138/9 152/19 153/7 153/9
153/11 153/13 153/15 166/7
168/1 171/16 171/18 171/22
173/4 175/23 176/7 176/14
178/11 179/6 180/5 182/13
184/11 184/22 185/4 187/15
188/11 191/12 192/6 192/17
193/7 199/16 200/7 200/16
201/9 201/11 201/22 203/4
215/12 216/8 217/20 220/7
220/10 221/14 224/21 226/9
226/14 226/17 226/21 227/4
227/11 227/18 227/22
227/25 228/5 228/8 228/11

**SPEAKER: [2]** 88/7
140/20
**THE CASE MANAGER:**
**[2]** 138/1 138/7
**THE COURT: [130]** 4/1
4/9 4/25 5/8 5/13 5/18 61/6
61/10 61/13 61/23 61/25
62/2 74/25 75/6 75/8 75/13
75/17 75/21 137/3 137/6
137/8 137/11 137/14 137/17
137/21 137/23 153/6 153/8
153/10 153/12 153/14
153/17 153/23 154/1 154/3
154/18 154/21 154/23 157/9
157/12 160/19 160/24
165/14 167/16 167/24 168/2
168/7 168/9 168/11 168/14
169/17 171/5 171/10 171/17
171/19 173/13 177/2 177/6
177/8 177/13 177/15 177/19
177/24 181/6 181/15 181/20
182/4 184/9 191/10 193/8
193/11 199/17 199/20
200/17 200/20 201/10
201/13 201/15 201/25
202/12 202/15 203/6 203/9
203/12 203/20 203/25 204/5
206/1 206/3 208/19 213/4
213/25 214/3 214/5 215/15
216/10 217/22 220/2 220/17
220/20 221/4 221/7 221/18
221/23 222/2 222/8 222/14
222/20 222/22 224/23 225/1
225/6 225/9 225/18 226/8
226/10 226/13 226/16
226/20 227/3 227/6 227/14
227/21 227/23 228/1 228/7
228/10 228/14 228/18
228/22
**THE MARSHAL: [1]**
228/15
**THE WITNESS: [45]**
153/25 154/2 154/20 154/22

160/25 168/8 168/10 168/12
169/19 171/7 177/4 177/7
177/11 177/14 177/17
177/20 181/18 181/22 182/5
185/14 200/19 202/9 202/14
202/16 203/16 203/23 204/4
204/7 213/18 213/20 213/23
214/4 215/17 216/13 217/25
220/18 222/9 222/21 222/23
224/25 225/5 226/12

**'**

**'01 [4]** 27/1 36/5 106/21
190/14
**'02 [3]** 106/10 106/22
124/17
**'99 [2]** 19/19 37/11

**-**

**-o0o [1]** 229/7

**/**

**/s [1]** 229/12

**0**

**01 [1]** 113/10
**02 [1]** 77/5

**1**

**10 [2]** 155/23 185/5
**10-7-1969 [1]** 33/20
**10/7/1969 [1]** 34/7
**106 [3]** 76/22 78/12 78/17
**108-2 [1]** 39/12
**109 [4]** 144/18 161/20 166/7
207/19
**109-3 [1]** 141/6
**109-4 [1]** 141/6
**109-8 [1]** 113/3
**10:26 [1]** 75/8
**10:45 [1]** 75/8
**10th [16]** 26/8 107/16
108/23 109/4 109/6 109/12
109/19 110/18 112/1 112/16
113/6 115/8 115/21 163/2

**1**

**10th... [2]** 190/14 190/25
**110 [1]** 137/3
**111 [1]** 105/5
**112 [4]** 63/20 63/21 66/23 71/22
**113 [2]** 68/3 68/3
**114 [3]** 70/3 70/4 71/23
**116 [2]** 132/16 132/16
**11:00 a.m [1]** 110/18
**11th [3]** 185/8 185/11 191/16
**12 [4]** 31/22 155/23 207/4 207/5
**12-year-old [1]** 190/13
**12/10/01 [1]** 113/10
**123 [1]** 59/19
**125 [1]** 58/10
**12548 [1]** 1/21
**126 [2]** 117/14 117/14
**127 [1]** 119/16
**129 [2]** 120/21 121/2
**12:02 [1]** 137/17
**12th [14]** 101/17 105/6 105/17 106/21 107/2 107/20 107/23 125/19 125/21 125/24 126/2 126/9 126/16 182/22
**13 [3]** 31/22 187/16 207/4
**13-year-old [2]** 207/5 207/20
**130 [5]** 123/1 123/1 176/8 176/16 178/3
**131 [2]** 124/1 124/1
**133 [3]** 125/20 126/20 126/21
**135 [2]** 117/20 127/9
**137 [3]** 129/4 129/4 130/23
**13th [1]** 41/20
**14 [3]** 89/3 185/6 187/17
**1400 [1]** 1/23
**145 [1]** 134/20
**15 [4]** 80/16 100/10 131/14 141/4

**152 [1]** 104/20
**154 [2]** 12/22 136/14
**1540 [1]** 1/14
**15th [4]** 26/14 27/23 101/14 127/9
**16 [5]** 13/9 92/9 96/9 100/10 178/12
**162 [3]** 89/7 89/7 89/15
**169 [1]** 184/20
**16th [1]** 101/20
**17 [3]** 20/5 178/13 200/22
**170 [7]** 97/21 99/23 128/10 129/24 129/24 131/9 192/7
**171 [1]** 103/1
**176 [1]** 72/15
**17th [4]** 42/12 128/14 128/19 130/14
**18 [4]** 31/7 143/8 163/5 200/22
**181 [2]** 116/18 116/18
**186 [1]** 130/7
**1896 [1]** 1/5
**18th [1]** 24/19
**195 [2]** 139/23 143/3
**1969 [2]** 33/20 34/7
**1972 [1]** 154/15
**1987 [1]** 91/1
**1989 [1]** 5/25
**1995 [1]** 55/8
**1996 [1]** 89/9
**1999 [19]** 18/9 18/10 18/11 18/14 19/1 19/14 19/15 19/21 20/7 32/19 37/6 37/7 42/20 42/22 42/23 44/13 44/15 45/1 77/15
**1999-2002 [1]** 8/2
**19th [6]** 97/23 129/5 130/19 130/21 131/1 131/6
**1:00 [1]** 75/17
**1:00 o'clock [2]** 137/10 137/15
**1:06 [1]** 137/17
**1B [1]** 133/1
**1C [1]** 134/9

**1st [5]** 20/11 20/19 26/20 55/4 56/13

**2**

**20 [4]** 137/6 159/21 190/9 192/18
**20 kilos [1]** 84/15
**2000 [3]** 18/7 24/19 130/23
**2001 [91]** 12/25 13/3 13/3 13/5 13/7 13/9 13/9 18/7 19/22 20/8 20/11 20/19 20/23 21/1 21/5 23/18 24/19 26/8 26/14 26/20 27/15 27/23 28/1 28/8 29/15 30/3 33/15 33/24 34/11 34/20 35/17 35/21 35/23 36/16 37/13 37/15 38/14 39/16 39/23 41/20 42/12 43/6 43/14 45/10 51/6 52/21 53/1 53/10 53/15 56/9 57/3 94/21 94/23 95/5 97/23 103/4 103/7 103/24 105/2 105/6 105/18 106/23 107/2 107/14 107/17 107/20 107/23 108/18 108/23 109/12 109/19 110/14 110/18 112/1 112/16 113/6 115/8 115/21 122/2 122/10 133/21 138/24 155/10 155/17 155/18 158/6 165/10 182/22 190/21 190/25 191/16
**2002 [55]** 8/2 12/25 13/7 13/11 53/21 55/4 56/13 58/4 59/21 61/19 63/22 64/12 70/6 98/4 98/23 99/25 100/2 100/15 100/21 101/11 101/14 101/17 101/20 102/1 103/11 103/14 116/19 117/15 120/8 120/23 123/3 124/2 125/19 125/24 126/2 126/9 126/16 127/10 128/14 128/19 129/5 129/22 130/2 130/5 130/14 130/21 131/1 131/6 131/10 155/10 158/6 161/13 163/2 185/9 185/11

## 2

**2004 [1]** 12/3
**2005 [1]** 12/3
**2008 [1]** 5/25
**2016 [2]** 41/8 72/17
**2017 [1]** 16/25
**2019 [3]** 1/10 3/3 229/11
**20th [1]** 107/14
**21 [1]** 139/23
**21B [1]** 162/3
**22nd [4]** 59/21 61/18 63/22 72/17
**23 [1]** 182/22
**23rd [1]** 89/9
**24 [1]** 71/10
**24th [5]** 100/21 101/11 130/2 130/5 131/10
**25 [5]** 13/1 13/2 13/13 15/3 16/7
**250-5584 [1]** 2/4
**26 [3]** 27/25 29/15 108/18
**26th [2]** 28/8 110/14
**28 [1]** 170/3
**28th [2]** 24/19 155/18
**29 [1]** 170/3
**29th [2]** 77/15 120/22
**2:19 [1]** 193/11
**2:35 [1]** 193/11
**2nd [1]** 102/1

## 3

**30 [9]** 1/10 3/3 149/20 149/21 159/21 172/12 173/5 206/17 207/15
**30th [2]** 70/6 123/3
**31 [2]** 172/12 173/6
**32 [1]** 191/13
**35 [26]** 52/13 72/21 117/8 118/2 118/10 118/18 122/19 124/21 127/17 128/7 170/20 170/21 171/4 171/25 172/5 172/8 172/13 172/20 180/6 196/15 196/23 198/12 198/16 201/2 202/23 205/18

**36 [2]** 79/24 217/15
**37 [2]** 179/7 179/10
**3:17 [1]** 229/6
**3rd [7]** 30/3 32/23 35/23 36/5 37/12 37/15 103/4

## 4

**4/4/01 letter [1]** 25/16
**401 [1]** 1/14
**43 [5]** 77/14 171/17 171/25 171/25 196/14
**44 [3]** 171/5 171/13 205/18
**4470 [1]** 1/15
**46 [2]** 20/10 20/10
**47 [2]** 155/2 155/7
**4:09-CV-1896 [1]** 1/5
**4th [12]** 20/23 21/1 21/5 23/18 28/4 28/7 99/25 100/1 100/15 116/19 124/2 124/17

## 5

**500 [1]** 17/2
**512 [2]** 1/15 1/23
**515 [1]** 2/3
**52 [2]** 20/23 21/2
**53 [1]** 26/6
**54 [2]** 31/7 33/4
**55 [1]** 33/6
**5584 [1]** 2/4
**56 [1]** 36/15
**57 [1]** 35/16
**5800 [1]** 28/19
**5845 [1]** 28/19
**5865 [1]** 28/19
**5th [11]** 33/15 33/24 34/11 34/12 34/20 35/17 35/21 36/15 51/6 53/21 117/15

## 6

**60 [2]** 42/10 42/11
**6178 [9]** 98/9 98/11 99/6 99/14 99/19 99/24 100/17 102/7 103/16
**63 [2]** 128/12 129/25
**655-9111 [1]** 1/18

## 7

**70 [10]** 22/4 163/8 164/17 166/8 170/3 172/11 173/5 175/24 176/13 178/12
**71 [2]** 53/21 183/1
**713 [2]** 1/18 2/4
**72 [10]** 55/4 55/4 144/20 145/7 145/12 185/5 187/16 188/12 189/10 193/4
**73 [2]** 56/6 57/11
**74 [1]** 169/8
**755-6178 [1]** 102/7
**77 [1]** 107/14
**77002 [1]** 2/4
**77006 [1]** 1/17
**78 [5]** 108/17 108/17 110/12 110/12 139/23
**78701 [1]** 1/14
**78711 [1]** 1/22
**7th [2]** 38/14 39/2

## 8

**8004 [1]** 2/3
**81 [1]** 120/4
**819 [1]** 1/17
**82 [1]** 143/8
**8339 [1]** 28/19
**85 [3]** 220/6 220/10 220/11
**86 [1]** 76/15
**87 [2]** 74/25 76/1
**88 [1]** 38/11
**8th [22]** 39/2 39/16 39/23 43/6 43/14 45/12 52/21 53/1 53/9 53/15 56/9 94/21 94/23 95/5 103/7 103/24 105/2 106/23 122/2 122/10 133/20 190/21

## 9

**9/10/02 [1]** 77/5
**9111 [1]** 1/18
**93 [1]** 184/20
**936-1400 [1]** 1/23

**94 [1]**  184/23

**95 [4]**  167/13 168/6 193/23
194/9

**96 [2]**  182/12 182/14

**9:02 [1]**  1/6

# A

**A-DES [1]**  24/20

**a.m [4]**  1/6 75/8 75/8
110/18

**ability [1]**  183/18

**able [18]**  4/24 9/2 9/19 9/21
30/12 58/21 59/10 59/14
62/8 62/11 68/20 73/14
75/15 85/4 156/20 200/11
211/13 211/22

**above [2]**  82/13 229/9

**Absent [1]**  16/9

**absolutely [3]**  167/21
180/20 181/3

**abstract [1]**  228/4

**accelerant [1]**  17/23

**accept [6]**  19/2 33/19 33/21
34/6 34/16 35/9

**accepted [13]**  19/6 33/11
33/14 34/10 34/12 34/17
34/22 34/25 35/12 35/13
35/14 35/20 141/23

**access [3]**  13/16 73/4 183/3

**accompany [3]**  6/6 6/10
13/16

**according [5]**  11/13 25/14
84/5 151/6 222/11

**account [3]**  136/11 136/21
138/14

**accuracy [2]**  222/18 222/20

**accurate [2]**  157/23 222/4

**Accused [1]**  162/1

**act [8]**  12/24 70/15 92/12
93/25 95/22 96/23 136/18
155/11

**action [2]**  1/5 209/5

**active [1]**  134/25

**activities [1]**  77/7

**activity [1]**  215/25

**actual [1]**  61/18

**actually [20]**  100/18 105/14
122/1 133/9 133/16 134/24
141/5 141/6 165/13 166/8
172/11 173/6 202/6 210/7
211/7 211/8 211/23 213/12
214/25 225/8

**ADA [1]**  82/18

**added [2]**  97/23 103/3

**addition [2]**  22/8 22/12

**additional [1]**  228/9

**Additionally [1]**  82/20

**addressed [3]**  90/17 124/16
226/23

**addresses [2]**  90/22 178/6

**adjudged [4]**  92/14 93/11
96/2 96/25

**adjust [1]**  153/24

**administer [1]**  153/22

**admissible [1]**  44/16

**admissions [1]**  55/7

**admitted [5]**  206/25 226/19
226/25 227/21 228/5

**advance [1]**  30/10

**advice [1]**  17/1

**affiant [1]**  36/16

**affidavit [21]**  36/15 36/18
36/22 37/3 37/6 37/10 72/15
72/17 72/20 134/21 150/3
150/4 150/8 150/10 150/12
212/13 212/22 212/24
214/10 214/18 214/23

**affidavits [2]**  151/6 151/8

**afraid [1]**  228/19

**after [52]**  5/16 6/18 11/5
11/15 11/18 21/4 22/9 25/23
26/17 32/23 37/12 37/15
40/18 42/9 42/12 45/11
45/14 51/9 51/16 59/6 59/6
75/16 94/25 95/4 95/4 103/7
103/24 105/2 106/25 107/1
107/2 107/10 107/19 108/1

**activities [1]**  77/7

**110/19 112/17 120/23**
127/25 131/17 141/9 143/12
143/22 144/14 152/12 159/5
160/7 174/21 175/9 175/10
176/22 197/16 209/4

**afternoon [5]**  5/18 154/8
154/9 189/21 193/9

**again [43]**  5/8 8/15 16/12
18/18 26/25 36/7 37/14
40/25 52/10 69/11 76/16
81/6 94/25 95/3 100/4
101/13 103/23 104/2 104/3
105/2 106/24 107/6 108/13
108/19 109/16 113/3 118/13
130/2 131/9 131/12 143/2
150/9 166/21 167/15 180/3
184/9 185/9 185/17 190/1
190/5 192/14 195/8 204/23

**against [40]**  21/13 21/18
22/17 23/2 33/11 33/14
34/11 34/17 34/22 34/25
35/9 35/13 35/14 35/17
35/20 37/6 43/4 50/24 51/1
58/7 59/3 65/23 67/7 69/4
70/12 71/5 85/18 87/10 92/1
92/1 127/2 132/7 141/24
142/1 155/4 156/2 156/4
159/7 224/12 224/14

**age [1]**  186/7

**agencies [1]**  119/20

**agency [3]**  92/16 92/17
92/17

**agent [2]**  119/18 166/14

**aggravated [7]**  21/12 21/18
21/18 22/13 22/17 23/2
23/13

**ago [10]**  77/20 100/10 105/1
130/16 134/2 141/4 193/16
193/24 200/22 200/22

**agree [29]**  10/13 15/1 15/2
15/15 15/17 18/2 19/23 25/6
25/7 35/20 35/21 44/18
44/19 50/20 50/22 54/4
57/14 91/24 96/12 123/16

**agree... [9]** 126/6 127/1 130/23 141/16 142/22 164/18 167/8 209/17 217/2
**agreed [3]** 61/3 61/9 170/6
**agreement [21]** 15/6 15/11 15/19 61/8 86/3 89/8 89/25 92/10 92/19 95/11 124/21 170/10 170/11 170/25 173/10 174/25 196/23 198/16 202/23 205/19 223/7
**agreements [14]** 86/1 90/22 135/15 135/17 168/23 168/25 169/3 169/16 170/6 173/9 173/17 174/3 174/16 174/22
**agrees [1]** 92/18
**ah [2]** 31/24 31/24
**ahead [3]** 137/22 200/23 207/9
**ahold [2]** 102/3 102/11
**aid [1]** 200/24
**Alan [5]** 41/9 105/5 106/3 107/23 182/23
**Alcaraz [2]** 2/2 229/12
**alerted [3]** 198/10 216/12 216/23
**alibi [11]** 188/15 188/16 188/24 189/3 189/13 189/17 190/17 190/17 190/18 207/20 208/17
**allegations [1]** 151/14
**alleged [1]** 9/12
**allow [6]** 17/14 201/13 203/10 203/10 228/12 228/14
**allowed [5]** 43/19 107/16 158/14 158/22 180/15
**alone [1]** 95/21
**along [1]** 143/10
**already [22]** 26/15 26/21 27/21 29/16 69/11 87/9 90/7 91/25 93/11 105/9 105/12 114/9 114/14 116/3 119/14

166/24 173/6 175/4 200/21
**alternate [2]** 73/20 76/20
**although [2]** 19/16 19/23
**altogether [1]** 187/23
**always [8]** 12/17 12/19 14/2 14/20 114/3 155/2 165/6 227/15
**among [4]** 40/7 117/4 180/25 181/9
**analyst [1]** 144/23
**analyze [1]** 149/6
**angered [1]** 157/4
**another [35]** 58/12 59/12 67/2 68/4 70/4 82/9 85/17 87/10 89/13 92/15 94/1 95/23 96/3 101/11 101/14 107/11 108/2 110/17 119/18 142/8 147/16 153/9 166/11 168/22 177/1 179/25 180/8 185/8 186/21 191/7 208/20 209/11 209/13 211/23 214/2
**answer [27]** 8/18 8/22 9/14 9/16 14/2 14/5 14/7 14/17 14/19 22/11 22/15 23/1 23/3 23/4 53/12 88/22 92/6 131/7 180/10 181/19 184/3 198/9 200/23 215/16 215/18 218/25 225/15
**answered [1]** 88/8
**Answering [1]** 181/20
**Anthony [4]** 119/18 119/22 194/11 194/22
**anticipate [2]** 4/19 5/18
**Anton [2]** 167/12 167/20
**Antone [2]** 120/7 120/12
**anybody [11]** 25/8 130/10 131/12 132/10 148/20 174/2 174/16 182/10 212/7 212/9 212/10
**anyone [6]** 60/23 98/15 131/15 172/9 212/6 214/20
**anything [38]** 4/12 17/8 17/13 17/17 18/2 37/5 40/19

48/8 48/22 51/11 78/6 82/8 89/17 131/7 131/8 132/3 140/12 158/14 158/23 165/24 174/18 178/22 180/23 183/25 187/11 196/5 197/12 211/18 215/22 215/23 217/16 222/4 224/19 224/19 224/20 225/12 226/9 228/8
**anyway [1]** 85/7
**anywhere [3]** 72/24 140/9 181/22
**apologize [5]** 199/22 200/7 201/15 201/17 221/6
**apparently [3]** 159/20 188/20 197/16
**Appeals [1]** 1/21
**appear [5]** 72/24 89/4 113/18 134/11 208/2
**APPEARANCES [2]** 1/11 2/1
**appeared [3]** 12/8 26/17 134/10
**appearing [1]** 12/7
**appears [5]** 20/17 26/14 98/9 99/7 217/19
**appellate [3]** 12/5 12/6 12/10
**application [6]** 129/5 129/17 130/20 130/20 137/12 147/22
**applied [8]** 82/1 82/3 82/11 83/7 83/19 92/21 96/5 96/8
**applies [2]** 92/23 93/1
**apply [3]** 90/7 92/4 92/6
**applying [1]** 129/21
**appointed [2]** 155/15 159/5
**appointment [2]** 156/6 156/16
**appreciate [3]** 123/7 123/22 186/11
**appreciating [1]** 123/17
**approach [3]** 27/11 213/25 220/2

**appropriate [1]** 222/15
**approval [2]** 80/25 82/12
**approve [2]** 82/18 86/17
**approximately [4]** 5/25
25/22 155/15 161/3
**APRIL [37]** 1/10 3/3 19/1
20/23 21/1 21/5 23/18 24/19
26/8 26/14 26/25 27/23
27/25 28/4 28/7 28/8 29/15
58/4 70/6 77/15 99/25 100/1
100/15 100/21 101/11
128/14 128/19 129/5 129/22
130/2 130/5 130/14 130/19
130/21 130/24 131/6 131/10
**April 10th [1]** 26/8
**April 15th [2]** 26/14 27/23
**April 17th [3]** 128/14
128/19 130/14
**April 18th [1]** 24/19
**April 19th [4]** 129/5 130/19
130/21 131/6
**April 2002 [1]** 58/4
**April 24th [5]** 100/21
101/11 130/2 130/5 131/10
**April 26 [2]** 27/25 29/15
**April 26th [1]** 28/8
**April 29th [1]** 77/15
**April 30th [1]** 70/6
**April 4th [9]** 20/23 21/1
21/5 23/18 28/4 28/7 99/25
100/1 100/15
**area [2]** 59/12 155/2
**areas [1]** 112/12
**aren't [1]** 114/5
**argu [1]** 178/25
**argue [1]** 94/6
**argued [2]** 151/12 160/5
**argument [2]** 87/18 192/10
**arguments [1]** 211/10
**arisen [1]** 90/14
**arising [1]** 23/5
**around [7]** 6/2 6/3 96/16
110/18 112/15 212/13

**arrange [2]** 49/4 107/10
**arranged [1]** 135/21
**arrangement [1]** 80/24
**arrangements [1]** 49/12
**arranging [1]** 135/25
**arrest [2]** 36/16 183/23
**arresting [2]** 92/16 92/17
**arrests [1]** 183/12
**arrived [1]** 188/23
**article [5]** 26/14 26/17
26/19 27/23 65/8
**Arturo [1]** 137/25
**aside [2]** 24/13 131/23
**ask [46]** 8/15 8/25 9/14
17/18 19/2 26/24 30/8 36/7
37/14 47/4 48/6 64/22 65/13
65/18 68/13 93/9 97/3
106/24 109/3 113/20 114/2
115/2 119/6 125/18 127/21
128/24 128/25 131/3 158/18
162/3 163/22 164/4 167/19
169/18 181/4 183/21 183/23
186/22 193/25 199/2 201/12
202/24 208/20 208/21 215/1
228/12
**asked [32]** 9/16 26/12 26/23
32/24 33/8 54/24 88/8 108/7
108/13 112/17 114/3 114/6
114/22 133/3 133/13 133/14
149/23 149/23 168/22 169/4
178/10 178/15 187/19
189/11 189/16 197/5 204/20
204/24 205/3 205/20 206/7
215/4
**asking [55]** 14/10 17/12
17/12 17/13 19/17 23/10
24/13 31/25 43/12 48/8
53/22 56/10 57/8 57/12 59/6
59/15 60/13 60/16 60/18
63/10 64/5 66/1 68/14 72/24
78/23 83/6 85/21 89/17
92/24 94/12 103/13 107/1
112/16 118/15 118/24 119/3

130/5 123/17 123/17 129/8
129/8 129/15 129/18 129/19
131/5 138/17 164/6 164/7
177/14 181/7 182/16 202/13
204/1 218/16 225/7
**asks [5]** 22/7 26/10 134/9
174/2 186/20
**asleep [1]** 144/1
**assailant [1]** 144/14
**assault [2]** 94/8 94/13
**assertion [1]** 50/19
**assist [2]** 13/17 119/17
**assistance [3]** 54/21 56/10
132/4
**assistant [6]** 33/18 34/5
60/6 108/20 115/25 170/14
**assisting [1]** 129/21
**associate [1]** 221/9
**Associates [1]** 1/16
**assume [10]** 4/13 97/20
215/18 215/23 216/3 216/5
216/7 216/18 217/6 217/6
**assumed [4]** 136/22 136/23
215/11 217/8
**assuming [5]** 35/6 115/18
216/18 217/3 217/4
**assumption [1]** 124/19
**attach [1]** 146/23
**attached [8]** 68/8 68/23
68/24 82/13 110/20 145/17
146/25 147/16
**attack [1]** 211/18
**attempt [4]** 99/21 189/3
209/14 215/1
**attempted [2]** 218/20
218/23
**attempting [1]** 196/1
**attention [4]** 7/14 121/3
141/11 181/6
**attorney [54]** 1/20 10/10
12/12 13/15 13/21 13/25
14/13 14/24 15/1 15/4 15/5
15/9 15/24 16/1 16/8 16/9
22/5 28/23 28/24 33/19 34/6

## A

**attorney... [33]** 41/10 43/5
43/7 55/5 56/2 56/10 57/8
57/12 58/11 60/6 62/8 73/9
73/14 78/9 80/19 81/1 105/6
105/10 108/21 115/25 116/3
120/22 127/11 136/16
154/10 154/16 155/1 157/4
170/15 183/18 200/2 204/15
204/24
**attorney's [12]** 17/13 29/17
29/18 61/21 91/3 108/21
127/14 147/17 155/5 155/8
157/17 160/23
**attorneys [4]** 10/6 62/24
147/11 158/7
**audiotape [4]** 32/24 33/1
33/4 33/9
**audition [1]** 71/7
**auditioning [1]** 71/5
**August [36]** 13/3 13/9 38/14
39/2 39/2 39/19 39/23 41/8
41/20 42/12 43/6 43/14
45/10 45/12 52/21 53/1 53/9
53/15 56/9 59/21 61/18
94/21 94/23 95/5 102/1
103/7 103/24 105/2 106/22
106/23 108/11 122/2 122/10
133/20 165/10 190/21
**August 13th [1]** 41/20
**August 16 [1]** 13/9
**August 17th [1]** 42/12
**August 2001 [3]** 13/3 45/10
165/10
**August 2016 [1]** 41/8
**August 22nd [2]** 59/21
61/18
**August 2nd [1]** 102/1
**August 7th [2]** 38/14 39/2
**August 8th [20]** 39/2 39/16
39/23 43/6 43/14 45/12
52/21 53/9 53/15 56/9 94/21
94/23 95/5 103/7 103/24
105/2 122/2 122/10 133/20

**AUSA [1]** 124/2
**Austin [2]** 1/14 1/22
**authentic [1]** 222/4
**autopsies [1]** 143/13
**autopsy [1]** 143/13
**available [7]** 8/8 8/16 62/24
167/6 182/10 212/6 213/2
**Avenue [1]** 1/14
**aware [24]** 32/4 66/3 84/20
92/18 105/9 118/14 121/4
125/6 128/25 150/24 151/1
156/24 161/10 167/25 172/3
174/3 174/17 175/3 175/4
189/8 190/16 212/5 219/7
219/9
**away [5]** 108/14 143/19
143/19 144/7 160/7

## B

**babies [1]** 144/1
**baby [3]** 77/22 78/7 78/11
**babysit [1]** 71/20
**back [49]** 7/24 8/1 9/1 16/7
20/18 42/2 45/1 46/13 46/13
57/3 66/7 108/10 109/9
109/10 111/14 115/20
115/20 126/1 129/24 133/20
134/4 135/11 135/12 138/9
138/22 154/22 154/22
155/10 155/14 156/15
156/15 158/6 165/9 166/7
173/23 175/15 176/9 176/15
177/15 180/23 184/3 186/15
192/16 198/8 200/22 217/6
217/7 220/17 220/24
**background [1]** 154/13
**backgrounds [1]** 223/25
**bad [1]** 82/16
**bag [5]** 77/7 77/22 77/22
78/7 78/11
**ballistics [1]** 159/24
**bandwagon [1]** 70/14
**bank [1]** 152/10
**banks [1]** 152/11

**based [12]** 35/9 54/24 69/18
72/14 126/22 160/5 164/13
195/11 198/23 199/12
199/14 218/4
**basically [2]** 169/3 169/4
**basis [2]** 148/17 222/3
**Bates [1]** 128/12
**Batson [3]** 57/19 57/25
132/3
**bearing [2]** 42/16 163/20
**bears [1]** 180/20
**beaten [1]** 21/14
**Beaumont [54]** 20/24 23/19
23/19 23/21 30/4 30/21
30/23 31/13 32/20 39/6 39/7
51/9 51/10 58/25 59/11
63/7 64/9 66/6 68/4 70/5
71/5 75/24 91/17 95/4 97/3
99/2 104/21 107/11 108/3
108/19 109/13 111/13
115/21 121/14 139/19 140/1
141/12 141/14 148/9 159/13
179/18 180/9 187/25 190/24
191/15 197/20 197/25
200/15 217/4 219/4 219/10
221/9 221/9 225/17
**became [1]** 134/5
**Beckcom [185]** 63/14 63/14
63/16 66/7 66/10 66/11
72/13 87/23 91/18 91/19
93/11 93/11 96/19 97/22
99/3 99/5 102/22 108/23
110/19 110/23 110/24 111/5
111/13 111/19 111/25 112/2
112/3 112/17 112/22 113/6
113/8 113/10 113/15 113/20
114/1 114/6 114/11 114/15
114/19 114/22 115/7 115/13
115/20 116/4 116/14 116/21
117/1 117/6 117/7 117/9
117/20 118/5 118/12 118/14
118/16 118/17 118/24
119/21 120/7 120/10 120/13
120/18 121/3 121/8 121/14

**Beckcom... [120]** 121/16
121/17 123/5 124/4 124/18
124/25 125/2 125/5 125/9
125/12 125/16 125/18
126/22 127/1 127/8 127/17
127/19 128/7 128/8 128/16
129/13 129/15 130/2 131/9
133/5 133/12 133/18 134/4
134/10 134/12 134/25
135/15 135/21 139/18
139/25 139/25 140/6 140/15
140/23 145/14 145/16
146/17 146/18 146/25
151/20 159/13 160/13 161/4
162/4 162/18 163/14 164/2
164/6 164/6 164/15 165/2
165/4 166/12 166/13 166/23
167/2 168/19 168/20 168/23
169/16 169/25 170/12 171/9
175/1 175/11 180/21 180/25
181/24 182/2 182/17 185/18
186/1 186/5 187/6 187/20
188/7 190/24 191/20 194/11
194/22 194/25 195/8 195/13
195/13 195/25 196/2 197/9
197/13 197/14 197/15
197/19 197/24 198/18
198/20 199/1 199/6 199/12
200/5 200/6 200/12 202/2
202/4 202/9 202/22 202/25
203/3 208/13 211/2 212/2
219/12 224/6 224/7 225/21
225/23 226/3

**Beckcom's [36]** 98/23 115/9
115/25 116/15 116/16
116/16 117/17 117/23 118/1
120/22 120/24 121/23 122/2
122/7 123/2 124/10 127/10
127/14 128/11 129/4 133/9
133/17 133/21 134/3 134/5
135/22 165/9 165/23 167/12
167/20 175/5 181/23 194/18
208/3 211/18 225/25

**become [3]** 80/20 82/19
133/23
**bed [1]** 144/1
**been [101]** 12/6 12/9 12/18
12/25 13/4 13/10 20/5 26/17
27/8 27/13 28/17 34/13
34/13 35/8 37/25 41/3 42/23
44/5 44/7 55/9 56/4 56/7
59/14 62/18 62/20 62/24
63/19 67/12 67/16 67/17
69/11 71/23 71/25 72/6 76/8
81/24 84/10 86/22 89/5
90/13 92/14 93/11 93/18
96/2 96/25 97/19 98/15
99/10 99/18 104/12 104/13
105/12 106/1 106/10 110/3
110/4 112/7 117/25 123/12
125/12 128/22 131/19 132/9
132/9 132/21 134/10 144/14
147/1 147/2 148/18 154/14
154/15 154/16 155/1 155/2
156/7 158/11 159/18 159/20
161/7 163/5 165/8 166/15
166/16 167/9 175/5 186/9
187/24 193/23 195/2 195/23
200/3 203/18 205/17 206/16
206/23 217/14 220/5 225/4
227/8 227/10
**before [76]** 1/9 11/16 19/3
25/5 27/5 27/9 28/3 28/21
31/1 31/17 34/25 38/19 44/9
48/19 48/25 50/13 50/13
55/23 55/25 58/15 66/7
66/24 69/1 70/25 71/1 71/11
78/9 80/12 91/18 96/13
104/8 113/25 116/1 116/2
116/11 116/12 122/2 124/17
128/11 129/7 129/10 129/11
131/3 133/11 141/15 141/23
142/4 143/23 143/23 153/21
155/11 155/23 158/7 161/5
161/7 161/8 165/10 166/22
172/6 172/17 175/6 176/18
176/22 177/10 179/15

185/12 187/5 187/9 189/23
191/16 211/8 216/20 220/14
221/25 222/17 227/6
**beg [2]** 126/21 126/24
**began [3]** 115/24 207/12
207/13
**begin [1]** 218/14
**beginning [4]** 18/18 19/1
39/11 126/11
**behalf [5]** 58/2 123/9
123/19 123/24 202/6
**being [22]** 23/18 44/21
50/21 55/1 55/10 56/1 56/8
56/24 108/16 112/14 124/22
144/4 145/22 148/7 157/6
188/20 197/9 205/20 206/25
207/2 215/8 228/17
**belief [2]** 78/25 148/17
**believe [68]** 4/19 5/4 12/3
38/8 40/12 40/13 40/14
40/17 40/19 42/13 49/10
50/21 53/20 54/13 54/13
54/16 54/20 55/25 57/6
66/20 66/22 67/4 69/5 70/19
78/19 79/5 83/2 101/1 105/1
133/10 133/11 133/14
138/13 141/7 148/18 155/17
164/7 165/3 165/5 169/20
169/23 170/18 172/7 173/2
181/12 184/16 186/3 186/9
188/3 189/1 193/23 196/22
197/23 198/1 198/2 202/11
208/4 209/4 211/10 213/10
214/3 220/23 222/19 224/3
226/24 227/2 227/10 227/14
**believed [3]** 44/15 108/14
142/2
**believing [1]** 188/22
**belong [1]** 38/3
**belonging [1]** 99/24
**bench [12]** 135/1 135/10
135/13 145/14 145/16
145/20 145/23 146/23 147/4
147/5 173/19 211/20

**B**

**Bend [1]** 193/1
**benefit [2]** 124/4 132/4
**benefits [4]** 80/7 135/15 168/23 199/11
**best [7]** 164/21 186/14 190/4 200/23 206/23 209/17 211/15
**better [3]** 25/11 48/23 227/17
**between [12]** 5/6 24/19 28/7 77/4 89/8 104/8 126/5 139/8 160/22 187/1 190/24 217/3
**beyond [3]** 32/7 116/7 165/24
**Bible [6]** 134/21 145/15 145/15 145/17 146/9 147/6
**Bible's [2]** 135/4 135/9
**big [2]** 86/23 217/2
**bigger [3]** 83/22 83/23 148/25
**birth [2]** 33/20 34/7
**bit [8]** 38/6 38/15 169/19 193/21 193/24 194/15 214/6 216/16
**blade [1]** 229/1
**blood [1]** 17/23
**blow [1]** 96/15
**blue [1]** 113/24
**BMM [1]** 24/20
**Board [2]** 99/5 103/2
**bodies [1]** 214/13
**bodily [2]** 94/8 94/13
**bonds [26]** 6/1 20/11 20/12 26/22 27/1 27/5 35/4 38/12 38/15 39/3 40/8 91/14 91/17 107/15 108/2 108/22 109/16 110/1 110/14 113/11 113/13 114/2 114/3 120/6 167/1 167/10
**Bonds' [3]** 20/18 113/3 114/20
**book [4]** 82/21 85/10 85/10 85/12

**BOP [5]** 24/17 58/25 59/10 104/15 104/23
**bore [1]** 162/22
**boss [2]** 84/6 86/22
**both [10]** 39/24 51/24 82/17 106/7 108/14 109/9 119/20 145/1 146/21 151/10
**bottom [11]** 13/8 24/18 31/8 76/24 77/2 128/13 131/6 168/17 194/12 206/18 206/20
**Boulevard [1]** 1/17
**bound [3]** 82/21 85/10 85/12
**box [3]** 1/21 136/13 156/18
**boxes [1]** 156/18
**Brady [20]** 7/18 11/14 11/16 16/18 16/18 16/22 78/18 132/16 132/20 161/21 163/3 163/9 163/12 166/11 168/22 175/15 178/10 179/1 179/6 206/13
**break [8]** 8/7 56/16 57/4 75/7 75/16 137/15 178/8 193/10
**break-it-down [1]** 57/4
**Bret [1]** 212/3
**Brian [2]** 12/23 58/20
**bring [10]** 68/1 114/18 141/11 156/17 165/15 167/17 167/22 169/9 191/11 226/14
**brings [1]** 179/17
**broad [1]** 203/14
**broader [2]** 197/8 200/1
**brought [6]** 135/11 135/12 146/17 147/1 147/2 170/5
**Brown [7]** 26/15 27/22 36/17 51/18 189/13 189/20 208/14
**Brueggen [1]** 117/17
**Bs [1]** 65/5
**bull [2]** 106/3 106/4
**bullets [1]** 159/22

**burden [1]** 132/23
**bureau [4]** 80/23 80/24 81/9 82/22
**burning [1]** 143/25
**burns [1]** 17/24
**busy [1]** 100/12
**buying [1]** 84/16

---

**C**

**California [5]** 115/25 120/22 170/16 210/24 211/19
**California's [1]** 170/23
**call [59]** 4/1 5/21 17/18 26/3 28/11 37/23 38/10 42/2 68/1 74/11 74/12 83/13 95/1 97/12 98/10 99/7 99/15 99/18 99/19 99/21 100/7 100/9 100/17 100/22 100/25 101/1 101/4 101/9 101/12 101/14 101/18 102/3 102/4 102/4 102/5 102/7 102/12 102/17 103/15 104/8 104/12 104/15 110/21 120/18 121/8 125/21 130/8 131/13 131/17 131/21 173/24 175/9 188/1 188/4 208/4 212/2 212/4 218/23 228/15
**called [27]** 7/19 37/24 41/20 99/14 99/17 99/23 99/25 100/1 100/4 100/16 100/19 102/21 104/22 104/23 116/5 116/8 116/25 126/1 128/16 130/11 130/14 131/9 131/20 152/9 186/19 187/24 212/3
**calling [6]** 74/10 97/14 102/12 102/15 151/17 151/18
**calls [22]** 97/18 98/4 98/25 99/13 100/13 101/21 101/25 102/2 102/11 102/14 102/18 102/19 102/20 103/10 130/3 187/20 187/24 187/25 188/7 203/5 215/13 217/21
**came [38]** 10/9 11/2 11/15

**came...** [35] 13/24 14/23 14/25 44/9 44/13 50/12 52/20 62/8 67/18 74/18 77/21 105/14 106/24 107/1 121/3 121/15 138/13 139/19 140/2 140/15 160/13 160/15 163/18 163/24 164/1 164/19 165/1 165/4 166/24 182/9 185/18 188/15 207/10 210/7 227/3

**camera** [1] 141/10

**can't** [42] 14/7 14/19 18/2 21/21 21/22 27/14 28/10 30/7 31/18 32/9 32/13 36/13 55/2 62/20 69/24 71/18 86/8 86/12 113/8 131/4 147/4 147/8 152/6 152/9 152/11 152/13 152/15 152/21 153/2 153/4 156/9 184/3 188/1 190/1 198/8 204/10 204/10 204/11 213/17 215/18 215/18 221/16

**cannot** [4] 14/18 23/15 36/14 147/15

**capital** [23] 21/25 22/10 22/14 22/18 22/24 23/6 23/11 35/17 42/19 86/25 87/1 87/10 87/11 92/2 93/18 121/16 144/2 154/10 155/16 155/22 155/23 156/7 211/16

**Capitol** [1] 1/22

**captain** [1] 221/9

**car** [3] 93/22 93/22 188/22

**care** [1] 96/14

**carefully** [1] 149/8

**Carl** [12] 68/3 69/3 69/7 69/8 72/10 148/24 148/25 149/3 149/13 179/25 217/18 224/10

**case** [370]

**cases** [45] 6/1 7/1 7/4 7/8 7/14 17/2 23/5 39/24 46/10 46/15 47/1 47/3 47/4 48/25

51/12 83/18 84/19 85/7 85/7 86/15 86/16 86/23 86/24 87/2 92/22 93/3 93/9 96/10 104/16 106/10 129/1 132/5 134/10 134/12 147/15 150/22 151/10 155/4 155/23 157/3 158/16 177/3 195/2 200/13 201/20

**cash** [1] 77/22

**cause** [15] 19/5 36/15 36/18 36/22 37/2 37/5 37/10 42/13 90/9 134/20 212/13 212/22 212/24 214/18 214/22

**caused** [1] 150/20

**causing** [2] 94/8 94/13

**cavity** [2] 142/9 145/3

**cellmate** [10] 111/23 122/2 133/9 133/17 133/21 133/22 133/22 133/23 134/5 165/9

**cellmates** [5] 111/13 111/19 112/25 113/2 134/1

**Center** [3] 30/4 39/10 183/11

**certain** [3] 10/17 69/24 167/23

**certainly** [17] 154/12 159/4 168/21 178/7 184/4 185/23 192/2 195/23 198/9 198/18 200/24 201/3 205/2 208/17 211/3 219/6 219/24

**certify** [1] 229/8

**chain** [4] 83/22 83/23 86/20 147/1

**change** [1] 179/5

**changes** [1] 173/10

**character** [3] 210/22 211/17 211/18

**characterization** [1] 20/2

**characterize** [1] 128/9

**charge** [13] 21/12 21/17 21/24 22/17 22/18 23/1 23/13 34/25 35/17 42/18 91/22 145/20 177/23

**charged** [7] 22/8 22/13 51/6

**charges** [19] 19/2 19/6 33/11 33/14 33/19 33/21 34/6 34/11 34/12 34/16 34/17 34/22 34/25 35/9 35/12 35/13 35/20 132/7 141/23

**check** [3] 35/1 35/4 77/25

**chief** [2] 82/13 82/17

**children** [1] 44/22

**choice** [1] 93/20

**chose** [5] 58/2 58/3 69/16 76/4 180/18

**Chronicle** [1] 27/23

**circled** [1] 152/5

**circumstance** [1] 80/18

**circumstances** [7] 14/3 14/4 14/5 14/11 16/24 85/23 85/24

**circumstantial** [3] 7/1 7/14 7/14

**CIVIL** [1] 1/5

**claim** [4] 8/11 150/23 151/10 203/14

**claimed** [3] 119/22 188/20 225/19

**claiming** [2] 44/8 204/2

**claims** [1] 55/20

**Clark** [5] 104/21 107/15 108/19 110/14 120/5

**clear** [4] 185/25 202/20 206/6 227/19

**clearly** [1] 64/22

**Clemons** [5] 28/24 29/2 29/13 55/5 58/11

**clenched** [1] 193/4

**clerk's** [3] 158/11 158/18 158/20

**client** [4] 156/10 177/22 224/12 224/14

**close** [4] 61/23 157/5 161/3 226/14

**closed** [2] 157/3 157/7

**closely** [1] 5/25

**closer [1]** 169/19
**closing [2]** 192/10 211/10
**clothes [1]** 17/21
**cocaine [1]** 84/16
**cocounsel [1]** 156/19
**Cogdell [2]** 22/5 22/7
**coincidental [2]** 140/6
142/2
**coincidentally [1]** 139/19
**cold [5]** 7/4 19/21 20/1
177/22 177/24
**come [22]** 7/24 10/10 12/16
15/24 50/12 50/16 62/19
67/25 91/16 114/21 119/19
122/2 162/11 164/22 181/6
181/12 187/2 210/10 210/12
227/7 227/13 228/2
**comes [4]** 96/16 146/5
152/13 174/18
**coming [5]** 26/19 112/10
112/22 210/16 223/17
**commented [2]** 150/7
150/10
**commission [1]** 175/19
**committed [1]** 95/15
**committing [1]** 55/8
**common [6]** 45/24 47/22
147/10 160/21 160/24
160/25
**communicated [2]** 82/23
166/12
**communicating [3]** 118/17
125/12 165/8
**communication [3]** 114/23
119/14 175/5
**communications [3]** 91/15
125/10 166/23
**comparing [1]** 86/25
**compelling [2]** 143/11
143/17
**complainant [1]** 77/6
**complaint [2]** 182/1 182/9
**complete [1]** 57/20

**completed [3]** 8/108/1/2
81/3
**completely [8]** 42/23 56/1
56/24 81/23 117/10 119/10
148/16 170/14
**compliance [1]** 176/3
**complication [1]** 147/18
**complicit [1]** 216/19
**comports [1]** 167/5
**computer [1]** 1/24
**concept [1]** 85/6
**concern [1]** 189/22
**concerned [1]** 224/16
**concerning [7]** 4/4 124/10
135/15 168/23 186/1 189/12
211/20
**concerns [1]** 228/24
**conclude [1]** 153/7
**conclusion [2]** 123/16 153/6
**confer [1]** 124/3
**confess [2]** 66/21 165/19
**confessed [7]** 32/18 35/3
47/9 47/13 50/17 187/6
212/8
**confession [10]** 32/15 36/6
36/10 47/3 55/20 56/18
56/23 57/2 140/24 225/24
**confided [1]** 121/16
**confidential [1]** 60/22
**confronting [1]** 169/13
**confused [1]** 186/6
**confusing [3]** 12/9 200/17
203/6
**confusion [1]** 124/15
**Congress [1]** 1/14
**connected [12]** 74/18 99/16
99/20 100/22 100/24 100/25
135/10 145/1 147/6 159/11
172/23 173/2
**connecting [1]** 17/25
**connection [2]** 135/1 202/1
**cons [1]** 14/10
**consensual [1]** 142/18
**consequences [1]** 229/1

**consider [3]** 57/12 168/20
199/2
**consideration [11]** 81/8
81/10 82/18 82/21 92/10
95/11 175/2 179/20 194/25
195/3 195/19
**considered [3]** 62/22 92/11
225/3
**considering [1]** 229/5
**consistent [1]** 35/6
**consistently [1]** 6/3
**conspiracy [1]** 149/14
**constitutionality [1]** 161/16
**constitutionally [1]** 169/11
**consulted [3]** 12/6 12/12
145/2
**contact [49]** 4/10 25/25
26/3 40/22 40/25 58/25
77/25 97/3 119/18 119/21
119/21 121/16 123/8 123/11
123/18 123/22 127/14 133/5
133/8 133/16 133/18 139/19
140/13 140/15 140/19 142/2
160/13 162/5 162/14 162/17
163/14 163/17 163/24 164/1
164/11 164/19 165/1 165/6
165/6 166/24 185/17 186/4
186/8 218/2 218/17 219/1
219/2 219/2 228/18
**contacted [8]** 4/9 23/17
24/4 24/14 26/2 38/7 186/18
189/2
**contacts [4]** 133/4 162/4
163/13 186/6
**contain [1]** 214/10
**contained [2]** 44/5 214/18
**contemplated [2]** 83/2
86/16
**contemplates [2]** 80/17
81/16
**contemplating [2]** 29/16
141/24
**contemplation [1]** 90/6
**contention [1]** 181/24

**context [5]** 78/20 85/17
90/11 118/1 227/17
**continue [3]** 62/2 62/3
189/12
**continued [4]** 2/1 62/4
75/23 138/11
**contract [26]** 81/1 81/2
81/21 83/14 84/11 84/13
84/18 85/15 85/18 85/22
85/25 86/5 87/5 87/23 88/1
88/5 88/10 88/13 88/16
88/19 88/22 89/12 92/15
92/17 92/18 92/25
**contracts [7]** 83/9 84/20
85/14 86/1 88/24 89/3 90/12
**contradicts [2]** 151/9
151/10
**contrary [3]** 22/23 23/7
41/5
**conversation [18]** 4/9 33/23
34/2 35/10 42/16 42/20
43/10 46/5 52/21 52/25 53/9
77/13 78/12 102/13 113/5
113/14 114/18 226/1
**conversations [5]** 46/2
91/10 114/23 118/8 166/13
**conveyed [1]** 124/25
**convict [1]** 44/16
**convicted [4]** 58/4 87/9
93/18 94/13
**conviction [3]** 94/14 126/23
147/14
**convictions [1]** 183/13
**convince [1]** 123/19
**cooperated [2]** 59/2 170/16
**cooperating [5]** 90/22 92/13
92/13 92/16 92/19
**cooperation [6]** 57/13
120/24 124/4 170/13 170/17
170/17
**cooperative [3]** 55/9 56/4
57/15
**coordinator [3]** 145/22

**coordinators [1]** 145/20
**cop [7]** 81/23 83/21 84/15
85/4 92/24 93/3 93/5
**cop's [1]** 83/12
**copies [1]** 62/11
**cops [7]** 83/10 83/24 84/24
85/1 85/8 91/23 96/9
**copy [21]** 4/8 110/13 115/13
115/14 115/15 115/15
115/17 152/21 152/24
158/13 158/14 158/19
158/22 166/11 213/7 213/13
214/2 219/20 220/8 221/14
223/6
**cordial [1]** 157/11
**correct [122]** 4/21 6/6 9/6
9/7 10/15 10/16 10/19 10/20
11/6 12/13 14/1 14/15 20/19
21/6 23/12 24/21 28/16
28/18 29/8 29/14 30/9 36/20
39/14 47/24 49/6 50/6 52/17
53/16 56/5 56/11 56/19 58/8
59/24 62/13 62/15 65/6 66/3
67/9 67/19 72/18 73/5 74/19
76/18 78/1 79/16 82/2 84/14
91/4 91/5 92/4 92/8 93/17
93/18 94/3 99/9 103/6
103/19 112/1 117/3 117/23
118/19 118/23 130/15
132/22 132/25 136/4 141/25
142/10 144/11 144/15
145/25 146/10 148/2 151/12
154/11 155/12 155/20
158/25 165/3 166/21 167/6
167/7 170/4 174/9 174/10
175/10 180/13 187/10
187/10 191/17 193/17 194/7
195/7 195/14 196/11 196/17
196/25 197/3 197/4 199/13
204/18 204/22 205/1 205/5
205/9 207/17 207/22 207/25
208/1 209/19 210/11 210/20
210/21 211/14 211/24

217/20 221/10 224/6 229/8
**correctional [1]** 159/12
**correspondence [2]** 128/1
128/6
**corresponds [1]** 109/20
**corroborate [1]** 226/2
**corroboration [1]** 209/6
**could [98]** 5/6 5/10 13/4
13/10 14/1 17/18 17/22
26/17 27/13 34/13 34/13
42/23 48/1 60/4 61/9 63/18
67/25 71/23 72/6 76/8 77/2
84/23 90/8 93/6 95/17 95/19
95/22 95/24 95/25 96/1 96/2
96/4 99/17 100/8 100/13
106/10 107/2 107/4 107/5
107/7 107/8 113/21 113/22
113/23 116/6 124/8 124/9
125/7 125/11 131/16 135/14
138/17 139/14 143/22
143/24 143/25 144/16 145/3
145/7 152/4 153/14 158/18
159/19 159/22 173/5 175/24
176/15 178/2 178/12 178/17
179/7 179/15 180/3 180/6
185/5 186/3 186/10 187/16
188/3 188/12 191/25 192/2
198/18 202/24 206/8 206/12
210/10 210/12 210/17 212/7
212/7 212/9 212/10 214/22
222/17 223/5 223/6 228/14
**couldn't [5]** 86/13 164/9
180/23 201/6 202/10
**counsel [16]** 4/4 11/19
13/17 15/20 44/2 44/6 71/16
76/2 76/18 78/20 132/17
133/8 135/20 145/5 145/11
181/4
**counsel's [2]** 13/16 181/13
**counted [1]** 155/6
**County [17]** 18/8 33/7 66/7
80/11 89/8 91/2 99/8 108/21
145/1 146/17 147/10 147/17

**County... [5]** 152/5 155/4
155/8 160/23 193/1
**couple [6]** 4/15 21/5 101/20
107/25 119/19 226/15
**course [21]** 95/18 96/15
105/16 156/12 162/20 169/7
171/6 177/9 178/4 178/16
194/8 202/15 204/17 206/14
209/2 209/16 210/9 211/6
224/12 225/6 228/3
**court [78]** 1/1 2/2 2/3 4/1
5/4 5/8 15/6 15/11 16/11
47/15 47/20 47/23 47/24
48/1 48/4 48/8 48/15 48/18
48/22 49/2 49/4 49/7 61/23
68/1 82/17 105/15 116/23
141/9 145/20 145/20 145/22
146/2 146/3 146/5 146/11
146/12 151/19 154/19
154/21 156/3 163/1 164/4
166/15 167/8 170/5 170/8
172/7 172/12 172/20 173/8
174/2 174/12 174/16 174/18
176/2 178/18 178/24 179/3
181/12 184/14 186/2 186/3
186/20 187/1 189/14 194/2
196/9 197/5 202/6 204/22
205/1 205/3 210/17 216/20
226/16 228/14 228/20
229/12
**Court's [1]** 141/9
**courtroom [2]** 61/12 146/6
**cover [2]** 103/12 110/16
**covers [1]** 103/14
**craft [1]** 211/11
**credibility [14]** 84/23
114/10 150/16 162/11
162/16 162/23 163/20
164/12 164/15 169/12
179/18 180/21 211/20
224/16
**credible [11]** 41/13 41/14
50/21 54/20 56/25 67/8

**C** Case 4:09-cv-01896 Document 235 Filed on 06/03/14 in TXSD Page 242 of 287
211/21
**crime [12]** 22/8 47/9 47/13
82/14 94/7 95/15 95/16
95/22 116/16 117/6 144/23
183/11
**crimes [22]** 27/9 36/25
80/24 80/25 82/14 82/20
82/23 84/7 84/9 84/9 84/17
85/14 86/19 86/21 90/12
96/23 98/12 128/17 130/3
130/12 131/10 160/20
**criminal [31]** 1/21 28/24
38/11 38/18 63/11 73/2 73/9
73/11 73/12 73/14 73/16
73/18 74/6 74/9 74/22 75/4
76/5 76/7 76/12 76/15 76/23
92/13 94/3 94/17 95/7 95/25
105/10 154/17 155/1 183/14
210/1
**criminals [1]** 96/24
**critical [1]** 202/19
**cross [19]** 87/17 163/23
164/6 164/9 165/15 167/18
167/23 169/13 178/17 182/4
191/12 193/13 193/14
198/18 198/24 199/1 199/6
200/12 210/9
**cross-examination [6]**
87/17 163/23 164/6 182/4
193/14 210/9
**cross-examine [3]** 164/9
199/1 200/12
**cross-examined [1]** 199/6
**cross-examining [1]** 169/13
**crucial [1]** 142/17
**crux [2]** 55/10 149/13
**Crystal [1]** 77/20
**CSR [1]** 2/2
**Culler [1]** 122/6
**Cullers [41]** 116/19 117/1
117/13 117/15 118/1 118/5
118/15 118/17 120/21 121/2
121/7 122/1 122/7 122/9

**C** Case 4:09-cv-01896 Document 235 Filed on 06/03/14 in TXSD Page 242 of 287 123/12
123/17 123/18 123/22 124/2
124/9 124/14 124/15 124/23
125/10 125/19 125/23 126/1
126/3 126/16 126/21 127/7
127/10 127/13 127/16 128/1
128/6 170/15 175/5
**Cullers' [1]** 170/19
**cultivating [1]** 188/8
**curious [2]** 147/21 223/16
**Curtis [5]** 26/18 36/16
51/18 189/13 208/14
**customary [1]** 157/16
**cut [4]** 70/16 71/9 80/2
152/15
**cutting [1]** 61/23
**CV [1]** 1/5

**D**

**D'HEMECOURT [1]** 1/20
**DA [5]** 44/15 81/16 90/9
136/20 192/20
**DA's [53]** 11/14 11/21
12/10 17/10 17/18 18/25
41/7 44/22 45/1 45/4 47/22
49/8 59/20 62/6 68/25 73/12
73/15 80/11 86/8 86/11 87/6
89/8 89/11 89/13 90/1 98/1
98/16 99/8 104/20 120/4
128/16 128/23 129/2 130/12
136/3 137/1 137/5 138/15
138/16 139/15 156/11
156/13 156/20 157/2 157/11
157/16 158/13 159/6 162/18
180/15 182/17 182/18
192/21
**dad [1]** 189/1
**damning [1]** 142/13
**Dan [1]** 22/5
**Danny [5]** 134/21 145/15
145/17 146/9 147/6
**date [40]** 13/3 20/17 21/3
21/4 27/16 27/17 28/3 30/6
33/20 33/22 34/7 35/2 35/16
38/13 38/14 39/4 42/11 45/9

**date... [22]** 68/8 68/8 102/2 103/9 109/1 109/3 109/4 109/7 109/10 109/12 109/21 118/21 128/14 128/17 130/12 131/5 131/15 133/3 162/3 163/13 173/10 229/11

**dated [18]** 20/7 26/8 27/25 36/15 39/13 39/16 53/21 70/6 97/22 106/21 107/14 120/22 123/2 124/17 129/5 130/21 130/23 190/14

**dates [5]** 109/5 164/20 186/5 186/8 186/10

**Davi [12]** 119/19 119/23 120/8 120/12 135/21 135/25 136/1 167/13 167/20 182/17 194/11 194/22

**DAVIS [4]** 1/6 32/24 33/8 34/3

**day [34]** 17/22 33/11 33/13 33/15 34/13 34/18 34/19 35/13 36/12 39/2 39/18 46/11 71/9 71/10 71/10 77/7 81/24 89/5 91/18 95/6 97/24 101/3 101/5 103/25 105/14 107/24 110/23 110/24 112/3 112/4 112/23 130/4 185/10 206/25

**days [6]** 21/5 32/23 42/9 107/19 107/25 131/10

**DEA [1]** 119/18

**deadly [4]** 92/11 93/20 95/16 96/23

**deal [20]** 66/18 84/19 86/7 86/9 86/12 87/6 106/14 126/12 126/18 137/13 169/13 195/6 195/16 196/7 196/24 197/2 198/6 198/15 203/15 227/24

**dealing [3]** 83/16 138/21 177/2

**dealings [6]** 124/9 177/8 177/10 177/21 178/5 178/6

**deals [14]** 83/25 87/3 90/12 174/13 196/10 197/5 200/12 201/20 203/19 203/22 204/3 204/12 204/13 205/4

**dealt [5]** 90/13 156/3 164/15 177/5 228/24

**death [5]** 151/16 151/21 151/22 161/16 214/15

**deceased [1]** 175/16

**decedent's [1]** 160/6

**December [15]** 97/23 107/16 108/23 109/4 109/6 109/12 109/19 110/18 112/1 112/16 113/6 115/8 115/21 190/14 190/25

**December 10th [13]** 107/16 108/23 109/6 109/12 109/19 110/18 112/1 112/16 113/6 115/8 115/21 190/14 190/25

**December 19th [1]** 97/23

**decide [7]** 42/15 42/18 85/2 93/3 127/16 170/22 228/3

**decided [3]** 67/6 69/16 80/19

**deciding [2]** 85/1 93/5

**decision [6]** 42/15 43/3 83/12 170/19 170/21 170/24

**deduce [1]** 217/24

**defamed [1]** 148/15

**defendant [18]** 65/22 77/5 80/18 81/1 81/6 81/7 87/5 121/15 141/12 141/14 141/14 152/14 175/19 202/7 210/10 210/15 210/16 210/18

**defendant's [2]** 77/6 173/18

**defendants [2]** 87/11 92/23

**defense [72]** 8/1 8/5 8/8 8/17 9/2 9/10 9/19 10/5 10/18 10/22 10/25 11/19 13/16 13/17 13/21 13/25 14/12 14/24 15/1 15/20 15/24 15/25 43/5 44/2 44/6 44/9 60/10 60/14 60/16

**deals [14]** 83/25 87/3 90/12 60/18 62/7 62/18 62/24 69/22 69/25 71/15 71/15 73/4 73/9 73/13 73/21 73/22 73/24 74/6 74/22 76/1 76/17 78/20 86/14 87/14 126/13 132/19 133/8 133/16 133/20 135/20 135/20 139/8 139/9 145/5 154/16 154/17 155/1 158/7 164/1 173/11 174/17 175/20 183/18 204/15 217/10 217/11

**defensive [1]** 50/6

**define [2]** 6/7 63/2

**defined [1]** 63/8

**definitely [3]** 93/25 160/2 182/6

**definition [3]** 63/3 63/4 63/11

**degree [2]** 156/5 173/24

**delay [1]** 137/9

**delete [1]** 136/7

**deleted [6]** 136/3 136/6 136/7 136/10 139/2 139/13

**deleting [1]** 136/23

**deliberations [2]** 48/20 49/1

**delivery [1]** 175/17

**demonstrates [1]** 200/24

**demonstrating [1]** 210/6

**deny [3]** 66/1 90/1 100/15

**denying [4]** 37/9 58/19 101/3 101/5

**Department [1]** 33/7

**departure [1]** 57/17

**depend [4]** 14/2 202/2 218/22 218/25

**depending [1]** 99/15

**depends [2]** 16/24 86/19

**depo [3]** 75/11 137/24 153/7

**deposition [12]** 4/23 5/21 5/23 8/21 17/6 17/10 17/14 17/19 62/4 75/23 138/11 153/6

**DES [1]** 24/20

**describe [1]** 15/16

**described [2]** 84/4 167/9
**designations [3]** 4/23 5/2 5/5
**desire [1]** 226/2
**destroy [1]** 61/14
**destroyed [1]** 110/9
**detail [3]** 6/24 7/15 189/20
**detailing [1]** 65/14
**details [5]** 7/1 18/5 34/5 36/11 121/16
**Detective [4]** 26/15 27/22 34/3 189/20
**detectives [6]** 17/22 32/24 33/8 33/24 36/18 142/19
**Detention [2]** 30/4 39/10
**determination [3]** 56/20 57/5 81/10
**determine [4]** 57/1 82/15 180/18 216/25
**determined [11]** 50/18 55/19 56/15 56/17 56/22 56/24 67/7 103/8 122/4 122/11 165/18
**determining [1]** 162/15
**DETTMER [1]** 1/19
**developed [3]** 188/25 188/25 218/22
**deviation [3]** 90/10 90/13 90/14
**deviations [1]** 90/8
**Diane [1]** 77/15
**didn't [117]** 6/17 6/18 11/4 12/17 12/19 13/22 15/13 16/16 17/5 18/21 19/4 19/5 19/15 23/24 24/1 25/20 31/15 32/12 37/6 37/7 37/18 37/19 40/12 40/13 40/14 40/17 40/21 40/22 42/24 44/8 45/1 46/4 48/2 51/13 53/20 53/20 54/12 54/13 54/14 54/16 54/22 54/25 57/4 57/6 57/6 57/25 59/4 59/25 60/1 60/16 67/4 69/5

74/21 78/6 79/8 80/10 83/10 84/15 84/15 85/1 85/4 85/6 85/16 86/10 87/2 88/25 91/16 91/17 92/3 95/14 96/18 99/12 102/3 102/14 106/20 107/12 110/8 110/11 113/2 114/8 114/10 125/4 125/17 128/1 129/13 131/12 132/10 132/11 132/12 133/25 134/2 136/12 136/21 138/23 140/9 148/22 149/10 151/19 164/9 164/20 165/21 178/22 181/20 189/24 202/12 207/23 207/24 208/11 215/23 220/19 221/17 223/18 227/7
**difference [1]** 217/3
**different [27]** 11/3 11/8 11/11 13/4 13/10 15/11 57/9 57/18 78/4 82/6 92/5 95/13 98/6 109/5 112/19 119/2 119/3 135/13 147/4 147/5 150/21 155/14 156/15 159/22 186/9 210/8 217/5
**difficult [1]** 133/1
**diligently [1]** 16/10
**direct [5]** 87/16 98/1 98/2 98/13 154/6
**director [1]** 4/3
**director's [1]** 4/4
**disagree [14]** 13/6 18/11 18/12 19/9 19/11 29/22 41/25 50/19 51/15 126/24 127/6 140/10 150/15 150/17
**disagreeing [1]** 57/11
**disappear [3]** 142/23 142/25 144/6
**disappearing [1]** 142/23
**disappears [2]** 142/9 144/4
**disastrous [1]** 229/1
**disclose [13]** 11/4 13/22 16/18 16/21 16/22 43/5 50/5 115/19 133/3 134/12 202/22

**disclosed [9]** 11/17 14/1 14/14 15/1 44/6 78/9 126/13 196/15 203/15
**disclosing [1]** 8/1
**disclosure [4]** 10/22 11/14 11/19 16/20
**discover [1]** 158/12
**discovered [1]** 195/11
**discovery [15]** 15/5 15/11 15/19 16/9 16/9 155/8 155/14 161/17 161/18 161/19 178/16 183/7 183/22 185/9 186/1
**discretion [1]** 91/6
**discuss [10]** 4/12 43/10 104/23 106/20 115/21 117/8 117/11 117/25 119/22 120/11
**discussed [13]** 26/21 35/24 36/1 58/22 79/24 90/7 95/12 102/24 117/22 123/12 132/1 189/14 193/19
**discusses [2]** 39/24 40/2
**discussing [6]** 63/15 89/5 113/15 180/25 181/8 204/25
**discussion [1]** 228/4
**discussions [1]** 123/12
**dismiss [1]** 23/1
**dismissal [1]** 22/12
**dismissed [6]** 21/12 22/9 22/17 23/13 23/15 177/23
**dismissing [1]** 21/17
**dispensation [1]** 199/23
**distribution [1]** 175/17
**district [15]** 1/1 1/1 17/13 33/18 34/6 91/2 108/20 108/21 147/10 147/17 155/5 155/8 158/11 158/20 160/23
**divide [1]** 47/4
**divided [1]** 91/19
**division [4]** 1/2 1/21 49/9 82/15
**divisions [1]** 98/12

**divulge [1]** 16/10
**divulging [1]** 16/15
**DNA [20]** 20/14 142/9
142/14 142/14 142/23
143/14 143/15 143/16 144/4
144/11 144/11 144/12
144/13 144/23 159/10 160/1
160/4 192/11 192/12 214/17
**docket [2]** 68/1 116/22
**document [17]** 59/22 60/7
89/11 146/2 168/5 168/7
198/2 206/12 213/14 214/7
220/13 220/25 221/15
221/18 221/19 221/21
227/16
**document's [1]** 222/4
**documents [6]** 25/6 25/10
62/11 145/18 206/8 206/9
**does [43]** 8/4 8/10 13/18
14/8 15/15 22/16 30/14 32/3
32/5 33/17 34/10 40/1 46/14
46/14 53/11 65/10 72/21
72/24 72/24 73/1 73/3 73/9
103/12 104/22 109/22
120/17 144/3 146/7 153/7
154/3 155/18 161/23 185/21
187/21 189/16 197/15
214/10 214/16 221/3 221/13
222/9 226/14 228/15
**doesn't [21]** 15/7 15/8 25/1
33/21 34/12 53/6 69/20
70/16 99/19 100/8 100/17
101/9 106/11 130/10 139/17
153/5 200/21 217/24 218/1
221/17 228/2
**doing [10]** 48/12 71/11
83/24 136/22 160/7 179/20
184/6 194/25 195/20 198/10
**Dominguez [15]** 31/24
31/24 32/19 35/2 40/3 52/19
52/23 53/8 53/23 55/15 58/7
88/16 96/22 185/1 185/3
**Dominguez's [1]** 53/14

**done [28]** 8/14 21/23 59/8
116/11 124/12 131/16 136/5
136/6 143/13 156/8 157/4
172/17 181/17 184/4 197/9
198/9 198/23 198/25 199/4
199/7 200/22 201/4 203/16
211/8 215/22 217/6 218/6
223/14
**dope [8]** 83/11 83/21 85/7
85/7 90/12 92/24 92/25 93/7
**dos [2]** 136/6 141/17
**doubt [1]** 114/17
**doubted [1]** 222/20
**doubts [1]** 222/17
**down [29]** 5/7 8/7 28/1
28/12 28/21 29/17 29/18
29/18 38/15 48/19 48/23
56/16 57/4 65/18 76/23
85/13 86/2 92/9 118/2
128/12 163/25 164/22
164/23 173/14 173/14 190/3
214/6 226/11 226/12
**downtown [4]** 39/10 95/6
103/25 108/15
**downward [1]** 57/17
**Dr. [2]** 20/14 27/2
**Dr. Watson [2]** 20/14 27/2
**driven [1]** 207/1
**dropped [5]** 132/7 152/14
188/21 190/1 207/2
**drug [11]** 83/17 84/19 86/16
86/23 86/23 87/1 87/2 87/4
95/13 96/7 178/5
**drugs [3]** 175/17 177/2
178/8
**DULY [1]** 154/5
**duo [1]** 64/8
**during [17]** 11/21 36/9
39/23 53/9 56/22 62/6 68/1
98/20 103/18 111/18 181/23
181/24 206/6 215/4 225/23
227/21 228/2
**duty [2]** 50/5 136/20
**DWI [1]** 96/13

**e-mail [4]** 127/10 136/6
138/22 139/7
**e-mails [12]** 136/7 136/10
136/20 136/25 138/12
138/16 138/20 139/1 139/2
139/3 139/5 139/10
**each [15]** 6/6 70/14 71/14
74/3 93/9 98/12 112/22
125/8 146/19 147/2 163/24
199/13 202/3 202/4 202/9
**earlier [26]** 26/20 50/20
50/22 55/6 58/23 62/5 73/3
85/9 90/5 95/13 102/24
108/11 109/20 110/13
122/23 132/1 133/25 191/25
192/11 194/9 196/8 204/20
206/6 207/18 208/10 215/4
**early [2]** 5/18 62/20
**easier [4]** 48/7 112/12 213/7
227/15
**Eddie [4]** 53/23 55/15 88/19
152/6
**edit [1]** 5/7
**effect [2]** 13/7 209/5
**effective [1]** 13/8
**efforts [1]** 16/21
**eight [1]** 107/19
**either [8]** 70/19 112/21
124/18 128/9 132/5 167/1
195/9 228/3
**ejaculate [1]** 143/22
**ejaculated [3]** 144/15 160/6
192/15
**electronic [1]** 136/17
**elicited [1]** 144/10
**ELLISON [1]** 1/9
**else [16]** 20/8 91/9 98/15
113/18 117/5 128/23 132/3
174/2 174/16 178/7 186/22
189/8 195/9 222/4 225/25
228/8
**emails [1]** 136/3
**employees [2]** 104/15

**employees...** [1] 104/23
**Enclosed** [1] 116/20
**enclosing** [1] 117/15
**end** [10] 16/11 34/2 53/18
  97/1 126/14 127/20 147/21
  153/4 178/21 196/1
**ended** [1] 52/10
**enemies** [1] 77/17
**enforcement** [1] 44/13
**enough** [10] 131/16 181/16
  184/10 201/14 201/16 205/8
  207/8 217/12 218/19 226/7
**ensure** [1] 82/23
**enter** [8] 15/19 85/18 85/21
  85/24 88/10 88/13 88/16
  88/19
**entered** [4] 61/20 89/13
  204/25 213/10
**enters** [1] 80/25
**entire** [4] 10/15 44/21 68/20
  180/12
**entirely** [3] 35/9 55/11
  154/16
**entitled** [1] 169/11
**envelope** [5] 68/7 68/22
  69/12 69/14 70/6
**envelopes** [1] 68/23
**environs** [1] 155/3
**equal** [2] 73/4 183/3
**erroneous** [3] 222/10
  222/23 223/4
**Esmeralda** [1] 102/8
**especially** [1] 143/13
**essentially** [1] 87/13
**establish** [1] 218/1
**established** [1] 51/7
**even** [29] 11/18 35/1 44/21
  45/1 50/13 55/2 56/6 66/25
  68/1 69/7 72/13 85/15 99/20
  106/2 108/10 122/3 136/23
  142/4 148/25 149/10 149/10
  170/20 170/22 173/21 209/5
  210/4 210/22 214/17 228/18

**Evening** [1] 229/6
**eventually** [5] 25/19 25/22
  26/5 127/16 134/5
**ever** [52] 8/18 15/19 26/23
  29/4 29/9 39/8 48/4 57/1
  60/13 64/23 65/18 65/21
  66/1 67/10 69/6 71/22 77/4
  85/15 85/24 86/14 94/25
  97/3 99/16 99/20 104/23
  111/16 111/23 132/10 134/1
  142/25 145/10 165/18 166/2
  167/11 167/19 168/5 171/3
  171/7 171/13 172/1 175/3
  182/18 182/24 184/20 187/5
  190/10 191/2 192/20 193/19
  203/15 204/3 219/19
**every** [13] 8/18 9/15 30/2
  66/18 70/16 71/10 74/6
  84/19 96/16 98/9 147/2
  202/22 203/15
**everybody** [2] 137/18 212/7
**everybody's** [1] 136/25
**Everyone** [2] 80/2 80/4
**everything** [8] 68/24 96/14
  156/20 156/21 157/22 176/2
  204/16 204/18
**evidence** [41] 11/15 17/22
  19/4 20/7 42/19 44/12 44/14
  44/14 44/16 44/24 50/23
  100/24 142/13 143/11
  143/11 143/20 148/19
  148/20 150/15 150/16
  151/13 152/14 159/7 159/17
  159/25 160/1 162/1 167/16
  175/16 175/18 177/11 192/6
  192/11 192/12 201/24 203/2
  209/6 212/12 213/10 224/24
  225/14
**EVIDENTIARY** [2] 1/9
  3/2
**ex** [1] 173/19
**ex-wives'** [1] 173/19
**exactly** [15] 30/22 43/9 54/3
  57/9 58/11 116/22 128/12

  144/16 160/16 161/6 211/1
  216/25
**examination** [9] 5/24 87/17
  87/17 154/6 163/23 164/6
  182/4 193/14 210/9
**examine** [3] 164/9 199/1
  200/12
**examined** [1] 199/6
**examining** [5] 9/23 9/24
  11/9 11/12 169/13
**example** [1] 89/12
**except** [1] 157/22
**exception** [2] 9/22 178/24
**excerpt** [3] 22/4 139/23
  192/10
**excerpts** [1] 12/22
**exchange** [9] 21/12 22/22
  106/14 135/16 162/12
  168/24 169/14 170/12 187/1
**exchanged** [1] 80/8
**exculpatory** [4] 79/1 79/3
  79/4 179/3
**Excuse** [2] 185/15 201/12
**execute** [1] 178/8
**executed** [3] 143/22 143/23
  144/14
**exhaust** [1] 93/22
**exhibit** [151] 12/22 13/2
  13/13 15/3 16/7 20/10 20/10
  20/23 21/2 22/4 26/6 31/7
  33/4 33/6 35/16 36/15 38/11
  39/11 42/10 42/11 53/21
  55/4 55/4 56/6 57/11 58/10
  59/19 63/20 63/21 66/23
  68/3 68/3 70/3 70/4 72/15
  74/25 76/1 76/15 76/17
  76/22 77/14 78/12 80/16
  89/7 89/7 90/5 97/17 99/23
  103/1 104/20 105/5 107/14
  108/17 108/17 109/15
  110/12 110/12 116/18
  116/18 117/14 117/14
  119/16 120/4 120/21 121/2

# E

**exhibit... [86]**  123/1 123/1
124/1 124/1 125/20 126/20
126/21 127/9 128/10 129/4
129/4 129/24 130/7 130/23
131/9 132/16 132/16 134/9
134/20 136/14 136/15 137/3
139/23 141/5 144/18 161/20
163/8 164/17 166/7 167/13
168/6 169/8 170/3 171/5
171/13 171/17 171/25
171/25 172/11 173/5 175/24
176/8 176/9 176/13 176/16
178/3 178/12 179/7 179/10
179/24 180/6 182/12 182/22
183/1 184/20 184/23 185/5
187/16 188/12 189/10 190/9
191/13 192/7 192/18 193/23
194/9 194/10 195/22 196/14
204/21 204/25 205/18
206/17 207/15 207/19
213/10 217/15 220/6 222/7
222/13 222/13 222/14
227/16 228/4 228/5 228/9
**Exhibit 106 [2]**  76/22 78/12
**Exhibit 108-2 [1]**  39/11
**Exhibit 109 [3]**  161/20
166/7 207/19
**Exhibit 109-4 [2]**  141/5
144/18
**Exhibit 109-7 [1]**  109/15
**Exhibit 110 [1]**  137/3
**Exhibit 111 [1]**  105/5
**Exhibit 112 [3]**  63/20 63/21
66/23
**Exhibit 113 [2]**  68/3 68/3
**Exhibit 114 [2]**  70/3 70/4
**Exhibit 116 [2]**  132/16
132/16
**Exhibit 123 [1]**  59/19
**Exhibit 125 [1]**  58/10
**Exhibit 126 [2]**  117/14
117/14
**Exhibit 127 [1]**  119/16

**Exhibit 129 [2]**  120/21
121/2
**Exhibit 130 [5]**  123/1 123/1
176/8 176/16 178/3
**Exhibit 131 [2]**  124/1 124/1
**Exhibit 133 [3]**  125/20
126/20 126/21
**Exhibit 135 [1]**  127/9
**Exhibit 137 [2]**  129/4 129/4
**Exhibit 145 [1]**  134/20
**Exhibit 152 [1]**  104/20
**Exhibit 154 [2]**  12/22
136/14
**Exhibit 154-1 [1]**  136/15
**Exhibit 154-25 [4]**  13/2
13/13 15/3 16/7
**Exhibit 154-5 [1]**  90/5
**Exhibit 162 [1]**  89/7
**Exhibit 170 [6]**  97/21 99/23
128/10 129/24 131/9 192/7
**Exhibit 176 [1]**  72/15
**Exhibit 181 [2]**  116/18
116/18
**Exhibit 186 [1]**  130/7
**Exhibit 195 [1]**  139/23
**Exhibit 20 [2]**  190/9 192/18
**Exhibit 23 [1]**  182/22
**Exhibit 30 [2]**  206/17
207/15
**Exhibit 32 [1]**  191/13
**Exhibit 35 [1]**  180/6
**Exhibit 36 [2]**  179/24
217/15
**Exhibit 37 [2]**  179/7 179/10
**Exhibit 43 [5]**  77/14 171/17
171/25 171/25 196/14
**Exhibit 44 [3]**  171/5 171/13
205/18
**Exhibit 46 [2]**  20/10 20/10
**Exhibit 52 [2]**  20/23 21/2
**Exhibit 53 [1]**  26/6
**Exhibit 54 [1]**  33/4
**Exhibit 55 [1]**  33/6
**Exhibit 56 [1]**  36/15

**Exhibit 57 [1]**  35/16
**Exhibit 60 [2]**  42/10 42/11
**Exhibit 70 [9]**  22/4 163/8
164/17 170/3 172/11 173/5
175/24 176/13 178/12
**Exhibit 71 [2]**  53/21 183/1
**Exhibit 72 [6]**  55/4 55/4
185/5 187/16 188/12 189/10
**Exhibit 73 [2]**  56/6 57/11
**Exhibit 74 [1]**  169/8
**Exhibit 77 [1]**  107/14
**Exhibit 78 [4]**  108/17
108/17 110/12 110/12
**Exhibit 81 [1]**  120/4
**Exhibit 85 [1]**  220/6
**Exhibit 86 [1]**  76/15
**Exhibit 87 [2]**  74/25 76/1
**Exhibit 88 [1]**  38/11
**Exhibit 93 [1]**  184/20
**Exhibit 94 [1]**  184/23
**Exhibit 95 [4]**  167/13 168/6
193/23 194/9
**Exhibit 96 [1]**  182/12
**exhibits [6]**  71/22 141/6
222/15 226/19 227/7 227/8
**Exhibits 109-2 [1]**  141/6
**Exhibits 112 [1]**  71/22
**existed [1]**  50/23
**existence [4]**  13/18 14/8
165/22 172/3
**expectation [2]**  126/12
126/18
**expediently [2]**  123/9
123/23
**experience [1]**  155/7
**expert [3]**  20/14 143/15
144/11
**expert's [1]**  159/21
**explain [3]**  83/5 198/13
204/6
**explanation [1]**  135/14
**extends [1]**  173/12
**extent [2]**  170/17 195/5
**extremely [1]**  176/25

**E**

**eyesight [3]** 13/14 152/19 152/21

**F**

**face [4]** 106/19 106/19 107/11 107/11
**face-to-face [2]** 106/19 107/11
**facility [8]** 103/25 108/15 108/22 159/12 179/19 179/21 182/8 203/20
**fact [21]** 22/7 41/24 45/1 58/21 60/8 122/22 132/12 143/16 144/12 144/13 159/17 162/9 164/13 172/16 182/8 197/16 210/2 211/20 211/23 212/12 216/11
**factors [1]** 96/11
**facts [9]** 50/6 119/10 151/5 165/14 194/5 194/6 195/7 218/22 218/25
**fair [9]** 181/16 184/10 201/14 201/16 205/8 208/25 217/12 218/19 226/7
**fairly [1]** 160/21
**fairness [1]** 203/21
**faith [2]** 16/8 16/21
**false [7]** 56/19 146/11 148/2 148/5 148/7 148/16 150/17
**familiar [7]** 29/2 80/13 90/23 122/17 122/22 160/10 161/23
**family [5]** 44/21 173/22 173/25 228/13 228/25
**fan [1]** 208/25
**far [13]** 157/1 173/12 190/4 197/1 198/11 198/13 198/14 199/14 199/23 200/24 204/8 223/7 224/17
**fast [1]** 153/3
**fatal [1]** 159/23
**father [3]** 64/8 64/15 208/8
**father/son [1]** 64/8

**fault [1]** 186/7
**faults [1]** 148/1
**favor [1]** 128/9
**Favorable [1]** 162/1
**favors [2]** 54/21 128/8
**fax [9]** 20/11 20/17 26/21 27/1 27/16 27/17 27/17 110/14 110/16
**FBI [1]** 119/18
**FCI [49]** 20/24 23/19 23/21 39/6 51/9 51/10 53/22 59/11 63/16 64/9 68/4 70/5 71/4 75/24 97/3 99/2 104/21 107/11 108/3 108/19 109/13 111/13 111/19 115/21 120/5 121/14 139/19 180/9 182/10 186/22 190/24 191/15 197/10 197/18 197/19 197/25 199/24 200/15 200/25 201/21 204/9 204/12 212/6 215/25 216/24 217/3 219/3 219/10 225/17
**FCRR [1]** 2/2
**February [1]** 24/19
**February 28th [1]** 24/19
**fed [8]** 103/25 116/16 116/17 117/6 119/11 121/23 122/7 151/2
**federal [46]** 21/8 30/2 30/4 30/7 30/21 39/9 41/21 59/18 59/18 60/23 66/19 70/17 71/7 71/9 87/10 92/1 97/1 97/13 105/10 116/20 116/23 125/13 140/1 140/1 141/20 141/25 142/4 148/9 148/15 149/16 150/18 150/19 151/19 159/12 170/23 175/6 202/23 202/24 203/16 203/23 204/4 210/24 211/19 211/25 217/17 228/19
**feds [1]** 119/5
**feel [1]** 74/4
**Felix [4]** 63/25 64/3 72/10 219/17

**fell [1]** 7/18
**fellow [1]** 36/25
**felonies [1]** 156/5
**felony [3]** 35/17 210/4 211/14
**female [4]** 149/11 159/10 160/6 190/4
**few [4]** 15/23 21/9 108/11 131/10
**fewer [1]** 83/2
**fibers [1]** 17/24
**figure [1]** 138/3
**figured [2]** 55/22 55/23
**file [120]** 8/3 9/4 10/9 10/10 10/11 10/14 10/15 10/17 11/2 15/7 15/12 15/16 15/25 16/12 17/9 17/9 17/14 17/19 18/22 18/23 18/24 19/17 19/18 19/22 19/23 20/3 20/7 20/8 38/1 38/2 38/5 41/7 43/18 43/22 43/22 44/5 44/7 44/10 58/16 58/19 59/19 62/5 62/8 62/12 62/14 67/12 67/16 67/17 67/18 67/20 67/24 67/24 67/25 68/10 68/12 68/14 68/17 68/20 69/23 70/1 71/17 71/21 73/12 73/15 75/25 76/4 76/9 78/15 79/11 79/12 82/19 89/12 89/19 89/25 110/8 123/9 123/19 123/23 132/19 145/19 146/2 156/11 156/13 156/17 156/22 156/23 156/23 156/25 157/1 157/4 157/5 157/7 157/8 157/16 157/17 157/20 157/22 158/4 158/13 158/15 158/17 158/23 159/3 159/6 167/6 169/10 170/20 180/12 180/12 180/14 182/1 182/18 183/8 183/24 184/6 184/25 190/11 192/20 192/21 204/18
**filed [9]** 22/13 72/15 132/17

**filed... [6]** 158/11 161/15 161/16 161/21 169/2 169/23
**files [4]** 156/18 156/18 156/19 170/20
**filing [3]** 161/14 183/5 194/1
**fill [5]** 59/25 60/1 60/3 129/13 129/15
**filled [6]** 59/24 60/5 129/18 129/19 130/19 130/20
**final [1]** 87/18
**finally [3]** 45/4 97/8 185/24
**find [19]** 35/5 49/2 85/10 102/9 116/10 116/13 116/13 116/14 116/20 117/19 138/16 138/17 139/14 143/24 147/15 158/11 189/3 190/1 226/2
**fine [5]** 61/25 75/18 153/18 168/1 208/22
**finish [9]** 5/11 125/7 137/22 149/24 199/18 199/18 199/21 201/13 207/9
**finished [2]** 75/13 75/14
**finishing [2]** 4/19 5/18
**fire [2]** 17/24 143/24
**firearms [4]** 159/16 159/18 159/19 175/17
**fired [1]** 159/22
**first [36]** 26/17 30/19 31/6 31/21 33/25 35/16 42/11 51/6 56/16 66/5 66/6 77/16 82/18 93/11 103/2 113/8 121/3 133/5 133/9 133/16 133/18 138/19 152/4 155/22 156/2 156/7 160/15 162/5 163/15 163/24 185/17 186/4 186/18 206/21 223/4 223/4
**five [9]** 19/6 44/16 83/3 84/4 98/17 98/17 152/10 187/24 193/16
**five-person [1]** 19/6
**flag [2]** 72/2 72/5

**flew [1]** 92/3
**Flores [2]** 89/9 89/21
**folder [2]** 85/13 136/8
**follow [7]** 48/7 77/9 78/16 79/6 81/11 128/2 208/21
**follow-up [2]** 128/2 208/21
**followed [1]** 81/14
**following [4]** 34/13 34/14 39/2 141/19
**follows [4]** 5/23 62/4 75/23 138/11
**foregoing [1]** 229/8
**foregone [1]** 123/15
**Foreman [177]** 14/23 24/5 24/8 24/11 24/15 24/17 24/20 25/14 31/1 31/9 31/10 31/15 31/20 31/25 32/4 32/11 32/19 35/2 35/24 36/1 36/6 36/9 36/10 37/12 37/15 38/7 38/11 39/3 39/6 39/9 39/20 39/24 40/10 40/19 42/9 42/12 42/17 42/21 42/25 43/6 43/9 43/11 43/13 45/12 46/3 46/4 50/9 50/15 50/18 50/19 50/21 51/4 51/24 52/2 52/22 52/23 53/1 53/2 53/9 53/15 53/18 53/23 54/10 54/17 55/15 55/19 56/1 56/4 56/8 56/8 56/19 56/22 56/24 57/1 57/5 57/14 57/20 63/16 73/3 74/11 74/22 88/1 88/3 88/5 88/7 88/13 94/7 94/7 94/9 94/12 95/7 103/1 103/3 103/18 105/2 105/13 105/15 105/20 105/25 106/3 106/15 106/18 106/19 106/22 106/23 107/5 107/11 107/16 108/2 108/15 109/2 109/19 109/21 110/2 110/3 110/19 110/20 111/12 111/19 112/1 112/4 112/17 112/22 113/12 113/13 113/15 113/25 114/8 114/12 114/16 115/20 120/14

120/18 121/8 121/21 122/10 122/13 131/25 132/4 132/15 133/9 133/11 133/17 133/20 140/25 147/20 149/1 150/3 165/9 165/19 165/25 171/4 171/7 171/8 174/7 174/11 182/23 184/21 186/20 186/20 186/21 187/2 187/6 190/21 190/24 205/19 219/12 223/16 224/2 224/7 224/19 224/20 224/25 225/13 225/14 225/19 225/23
**Foreman's [17]** 31/6 36/4 41/9 50/22 56/9 57/12 58/2 103/11 105/6 105/9 113/18 114/10 114/18 121/11 131/23 132/1 224/16
**forever [1]** 85/13
**forgive [1]** 122/17
**form [9]** 19/8 20/21 22/20 29/19 37/22 81/8 86/4 109/23 207/24
**Fort [1]** 193/1
**Fort Bend [1]** 193/1
**forthcoming [2]** 118/18 177/11
**forward [4]** 42/23 43/3 116/21 162/11
**found [21]** 31/20 38/5 54/19 55/12 56/7 58/15 75/25 89/25 106/1 142/14 143/12 143/14 143/16 144/12 144/13 159/10 159/10 159/18 207/4 211/25 227/15
**four [7]** 54/7 70/25 98/12 150/5 150/21 177/22 187/24
**free [1]** 92/24
**Fresno [1]** 170/15
**friend [2]** 24/5 206/23
**friends [1]** 77/18
**front [3]** 110/16 143/3 186/13
**fulfill [1]** 78/18

**F**

**full [6]** 18/3 77/22 77/22
78/7 78/11 106/7
**function [1]** 146/4
**fundamentally [1]** 209/4
**furnish [1]** 186/2
**furnished [1]** 82/17
**further [11]** 35/11 40/23
123/7 123/11 123/18 123/22
178/4 216/13 216/25 223/22
226/9
**future [2]** 105/23 173/10

**G**

**gain [1]** 194/25
**Gaiser [23]** 5/17 43/7 43/12
67/10 67/24 71/19 76/4
78/16 78/17 79/6 79/13
79/14 115/19 147/19 153/12
154/5 154/8 164/19 166/22
174/21 186/14 193/16
213/16
**Gaiser's [2]** 75/16 189/22
**garden [1]** 93/21
**Garrison [1]** 173/19
**gasoline [1]** 143/24
**Gatesville [2]** 173/21
173/23
**gave [22]** 14/4 17/21 54/21
67/17 67/21 71/14 71/18
73/22 73/23 73/24 74/6 76/5
76/7 78/4 78/4 79/5 115/7
119/7 120/18 173/8 174/12
208/2
**general [5]** 1/20 28/14
136/16 158/9 158/22
**generally [2]** 179/21 210/22
**generate [1]** 183/19
**generically [1]** 97/5
**gentlemen [1]** 191/24
**GEORGE [1]** 1/20
**gets [3]** 7/19 147/8 147/13
**getting [7]** 17/8 64/7 114/11
123/6 125/16 132/6 173/24

**girl [2]** 188/19 207/20
**give [21]** 30/1 30/10 62/1
74/8 74/21 74/25 76/1 78/19
79/2 96/16 115/13 115/14
118/25 119/4 170/24 179/19
183/1 213/4 213/11 224/11
224/14
**given [23]** 9/6 10/5 14/3
17/1 68/24 76/17 77/10
77/15 81/11 95/12 121/8
136/5 156/21 160/17 160/18
161/11 166/22 177/9 178/7
194/4 216/3 219/21 223/5
**giving [6]** 73/18 73/20
76/12 78/20 127/13 175/2
**Glen [1]** 139/25
**glom [1]** 66/17
**goal [1]** 83/22
**goes [4]** 116/21 143/19
143/19 144/7
**going [109]** 4/17 7/25 8/18
8/25 9/1 9/14 9/14 9/16 14/2
14/20 16/7 20/10 22/4 26/6
29/9 39/11 48/14 53/12
61/11 63/20 67/2 76/22
77/14 83/13 83/25 84/16
84/19 85/2 89/7 91/16 93/3
93/8 96/13 97/21 99/7
101/11 108/17 109/1 112/23
116/18 117/14 119/5 123/1
124/1 124/20 126/20 127/9
128/10 131/7 134/20 136/14
137/9 138/4 139/21 139/24
140/2 140/15 143/2 143/17
143/21 146/8 153/16 153/20
163/8 164/22 166/7 169/18
175/8 175/15 176/23 178/18
179/4 179/5 179/21 179/24
181/1 181/11 182/12 183/1
183/22 190/3 191/15 193/22
195/24 200/7 200/8 200/10
203/10 203/10 205/17
206/16 206/17 209/8 214/25
214/25 215/1 215/25 216/7

216/24 217/10 217/13 217/14
220/5 224/11 224/14 224/17
227/2 227/21 228/4
**Gomez [5]** 53/23 55/16
88/19 152/7 152/8
**gone [2]** 17/2 162/24
**Gonzalez [17]** 63/24 63/25
64/2 64/3 64/14 65/7 66/12
66/17 66/24 67/6 67/11
72/10 72/10 179/11 215/5
219/15 219/17
**Gonzalezes [1]** 64/23
**good [15]** 5/19 5/19 5/19
16/8 16/21 82/16 84/17 90/9
93/6 108/11 114/10 153/4
153/5 154/8 154/9
**got [35]** 10/25 18/15 25/23
26/4 27/3 27/5 31/20 35/7
42/24 58/19 59/6 60/5 66/7
66/25 70/24 80/12 100/8
102/14 104/6 107/2 108/11
114/6 127/19 131/2 137/12
137/12 154/1 171/18 171/20
173/20 177/7 181/24 182/2
186/19 218/9
**gotten [5]** 27/5 120/14
207/6 210/17 214/22
**government [2]** 169/14
199/11
**government's [5]** 219/4
219/8 219/20 221/22 223/3
**grade [1]** 82/13
**grand [36]** 19/13 19/18
42/14 45/2 45/5 45/15 45/20
45/22 45/24 46/2 46/5 46/14
46/19 47/1 47/2 47/8 47/11
47/15 48/9 48/13 48/17
48/19 48/24 49/3 49/8 49/9
49/23 49/23 50/2 50/2 50/6
50/8 50/11 50/15 51/2 51/2
**grant [1]** 167/8
**granted [1]** 170/8
**great [1]** 189/20
**GREGORY [1]** 1/16

**G**

**GRETCHEN [1]** 1/13
**groom [1]** 162/24
**group [2]** 12/7 12/10
**guess [2]** 173/6 178/24
**guideline [1]** 80/10
**guidelines [8]** 79/15 79/23
80/6 80/12 80/13 82/4 83/7
92/6
**guilty [7]** 55/12 92/14 93/12
96/3 96/25 144/2 207/13
**guy [5]** 31/9 77/19 83/22
83/23 84/16
**guys [1]** 72/8

**H**

**habeas [6]** 11/21 12/7 12/8
12/11 72/16 72/16
**habitual [5]** 92/13 94/3 95/7
95/25 96/24
**hadn't [3]** 166/5 180/10
211/8
**hair [1]** 17/24
**half [3]** 13/9 75/13 75/14
**half-way [2]** 75/13 75/14
**hammer [1]** 21/14
**hand [5]** 153/22 213/7
213/12 213/22 213/23
**handle [3]** 7/5 22/23 154/2
**handled [1]** 8/19
**hands [1]** 165/5
**handwriting [9]** 76/25 77/2
77/3 77/3 109/16 113/3
144/19 152/25 153/2
**handwritten [12]** 26/7
123/2 160/17 161/4 161/11
165/4 165/23 166/18 187/9
207/15 208/12 208/14
**happen [4]** 147/3 148/22
228/23 229/2
**happened [12]** 21/15 21/21
23/5 77/4 100/11 100/14
105/14 112/6 116/7 134/8
135/23 135/24

**happening [1]** 87/14
**Happens [1]** 153/3
**happy [2]** 4/10 4/10
**harassing [1]** 216/9
**hard [1]** 181/19
**Harris [15]** 18/8 33/7 66/7
80/11 89/8 91/2 99/8 108/21
145/1 146/17 147/10 147/17
155/4 155/8 160/23
**have [347]**
**haven't [5]** 91/1 173/21
179/13 203/24 227/11
**having [13]** 8/11 21/16
41/21 46/7 48/2 48/22 53/1
60/15 84/16 132/6 146/22
185/19 186/7
**he [379]**
**he -- well [1]** 181/23
**he's [48]** 20/16 24/25 25/7
25/8 25/14 26/3 28/13 29/25
53/24 55/2 57/20 69/18
69/19 70/13 70/15 74/20
106/8 108/11 109/18 114/16
116/10 116/13 119/3 120/5
123/17 123/17 128/19 140/2
143/17 144/2 148/25 153/11
167/25 169/13 181/2 187/24
193/24 195/2 195/11 195/18
195/19 196/5 200/21 203/8
210/24 217/24 222/17
228/17
**head [3]** 6/22 144/23 192/16
**hear [5]** 4/3 71/8 138/6
139/24 227/8
**heard [19]** 11/16 25/5 31/6
32/15 36/6 36/10 45/15
55/20 66/21 125/3 126/14
126/15 140/24 140/25 166/5
171/7 171/8 183/25 219/11
**hearing [40]** 1/9 3/2 12/7
12/8 12/11 12/13 56/18
59/21 60/20 60/22 61/4
61/19 72/16 72/21 122/24
163/2 163/9 165/19 170/2

170/3 172/5 172/8 172/18
172/21 174/22 174/25 176/1
176/11 183/2 184/15 185/8
185/14 185/22 185/24 186/1
187/19 188/15 189/17
226/23 227/21
**hearings [2]** 163/1 218/16
**hearsay [2]** 224/19 225/25
**heart [1]** 159/25
**Heather [2]** 2/2 229/12
**held [1]** 136/16
**help [7]** 26/10 26/12 26/12
163/4 195/9 218/3 222/9
**helped [1]** 203/14
**helpful [2]** 117/19 121/4
**helping [1]** 191/7
**helps [1]** 210/25
**her [49]** 4/9 4/16 4/19 26/10
26/12 26/12 57/12 61/9 78/4
78/15 143/14 143/16 143/23
143/23 143/24 144/13 145/2
145/4 149/24 149/24 156/4
158/3 160/7 164/8 164/8
165/4 165/7 173/22 173/22
173/22 173/25 174/12
174/13 175/14 177/8 177/10
177/22 177/22 187/3 188/5
188/5 188/23 189/2 189/7
191/7 216/4 217/18 218/10
227/22
**here [27]** 8/10 33/16 36/21
40/20 68/2 69/18 69/19 83/9
83/14 93/1 96/15 121/21
122/18 123/15 131/14
137/25 139/16 152/13
153/16 153/19 154/20
173/20 181/2 194/23 221/13
228/23 229/2
**Hermelio [12]** 32/15 33/15
33/20 34/7 35/1 35/14 51/18
54/18 58/4 72/16 191/2
191/4
**Hermilio [1]** 22/5
**Herrera [4]** 27/15 33/20

**Herrera... [2]** 175/16
206/23
**Herrera's [1]** 188/22
**Herrero [57]** 32/15 32/18
33/11 33/15 34/7 34/11
34/25 35/1 35/9 35/14 38/2
39/24 46/10 46/21 46/22
47/11 47/13 49/20 50/2
51/18 51/21 52/8 53/24 54/8
54/18 54/22 55/7 55/12
55/21 56/11 56/18 57/13
58/4 59/3 74/14 85/23 88/11
88/14 88/17 88/20 89/16
89/20 92/22 93/9 104/22
104/23 106/9 106/13 131/24
132/5 150/7 150/10 152/1
191/2 191/4 196/22 205/24
**Herrero's [15]** 22/5 50/2
52/17 52/19 53/18 55/23
55/25 56/6 56/13 57/2 72/16
96/21 96/22 104/4 196/24
**highlight [1]** 209/18
**highlighted [1]** 100/1
**Hilder [1]** 1/16
**him [187]** 17/25 21/13
21/18 21/24 22/18 25/19
25/22 25/25 26/2 26/3 28/3
28/4 28/7 28/23 29/5 29/10
30/17 31/5 31/17 31/18
31/24 32/6 37/19 40/11
40/12 40/13 40/14 40/21
40/22 40/25 41/5 42/2 42/4
42/19 43/10 43/16 45/14
50/17 50/20 52/7 52/13 53/6
53/9 53/11 53/20 53/20
54/13 54/16 54/19 54/20
54/21 54/23 54/24 55/2 57/6
57/6 58/7 58/7 58/12 58/22
59/3 64/18 68/1 68/13 69/5
69/6 70/19 70/25 74/12
76/12 77/11 79/6 80/20
83/21 83/22 88/4 88/21
89/23 90/2 90/3 93/6 94/16

95/3 95/17 95/19 95/20
95/22 95/25 96/2 98/20
99/12 99/21 100/15 101/1
101/3 101/5 102/8 103/7
103/21 103/23 104/2 104/7
104/8 105/3 105/21 106/18
108/13 111/1 115/2 116/8
116/17 117/1 117/5 118/9
118/25 119/7 119/8 119/13
119/13 119/22 120/2 120/10
120/11 120/24 123/8 123/19
123/23 125/21 126/17 128/2
128/24 129/19 129/21
131/20 132/7 132/13 135/9
137/10 141/24 142/3 142/4
152/15 153/15 160/15
160/17 162/24 162/24
162/24 163/22 163/23
163/23 164/9 164/21 164/23
165/6 165/21 166/25 169/13
170/24 175/9 182/4 186/6
189/21 198/19 198/20 199/2
199/18 199/18 199/21
201/13 207/1 207/1 207/13
212/4 212/19 213/23 218/4
221/14 221/25 222/1 222/17
224/8 225/3
**himself [9]** 32/18 40/3
66/17 66/18 78/16 115/14
115/16 115/17 195/9
**Hire [1]** 73/16
**his [145]** 17/21 21/21 22/22
24/5 24/25 25/14 26/2 28/4
28/21 28/23 29/3 29/17
29/24 31/3 31/19 31/20 36/2
41/12 51/10 52/14 52/20
52/20 53/24 54/21 54/25
55/6 55/8 55/11 56/10 56/15
57/7 57/12 58/12 64/14
66/20 66/22 71/16 71/20
77/18 78/9 80/19 81/1 81/23
82/12 84/18 91/20 92/2
93/12 93/14 93/14 93/20

95/22 97/23 98/3 98/3 98/24
99/1 99/7 99/24 102/12
102/12 102/17 103/3 103/3
105/20 111/3 113/16 114/20
114/20 114/21 114/22
114/23 115/15 116/16
116/22 116/22 117/3 118/4
118/18 121/16 123/9 123/23
124/4 125/13 129/17 129/22
131/21 132/4 133/22 133/22
133/23 142/14 143/16
144/17 149/17 149/17
150/10 155/16 159/3 162/11
162/13 162/16 162/22
162/23 163/20 164/12
164/15 165/22 166/23
169/12 169/14 170/12
170/14 170/17 170/17
170/21 170/23 170/24 175/2
181/6 181/13 188/21 195/1
195/3 198/18 201/13 206/23
207/11 211/17 211/20
212/13 212/17 217/11 218/3
221/17 221/21 222/8 224/23
225/16 225/16 228/13
**histories [1]** 74/6
**history [19]** 38/11 38/18
73/2 73/11 73/12 73/14
73/17 73/19 74/9 74/22 75/4
76/6 76/7 76/12 76/15 76/23
82/16 183/14 210/1
**hit [1]** 53/24
**hold [2]** 99/16 100/9
**Holtke [2]** 32/24 33/8
**home [3]** 21/13 207/1
207/11
**homes [1]** 178/5
**honest [1]** 84/24
**Honor [54]** 4/7 4/16 4/22
5/22 61/2 61/25 75/12 137/6
137/21 137/23 153/8 153/10
153/12 153/16 157/14
165/13 167/15 168/2 181/1

# H

**Honor... [35]** 184/9 189/11
193/8 200/17 201/10 201/15
201/23 203/5 203/8 206/1
208/19 208/23 213/4 213/25
215/13 216/9 216/15 217/21
220/2 221/15 222/6 222/12
222/19 223/13 224/22 225/9
226/10 226/15 226/22
227/11 228/6 228/10 228/16
228/21 229/4

**HONORABLE [1]** 1/9
**hook [1]** 97/8
**hooked [1]** 138/7
**hooking [1]** 83/21
**hoops [1]** 91/21
**hope [5]** 6/25 12/14 59/13
107/24 157/14
**hopeful [1]** 223/17
**hoping [1]** 29/25
**horrible [1]** 228/25
**hose [1]** 93/22
**hours [7]** 71/10 142/19
144/20 145/7 145/8 145/12
193/4
**house [9]** 77/21 143/25
159/18 177/2 178/9 188/21
206/25 207/11 214/13
**housed [4]** 23/18 24/20 25/1
228/17
**housekeeping [1]** 226/16
**housing [2]** 23/23 24/17
**HOUSTON [11]** 1/2 1/17
2/4 27/23 31/11 31/12 39/10
95/6 108/15 155/2 155/3
**however [2]** 55/9 61/6
**hug [1]** 228/13
**huh [19]** 16/5 27/18 32/2
39/8 41/15 43/8 53/3 81/22
84/21 94/3 101/17 101/25
104/1 116/3 117/5 125/3
130/2 133/8 164/16
**hundreds [2]** 155/4 155/6
**hung [1]** 111/22

# I

**I -- I [2]** 115/10 190/15
**I -- if [1]** 192/3
**I'd [10]** 8/15 68/8 68/9
158/18 179/20 184/2 184/8
185/20 189/10 193/25
**I'll [33]** 12/22 17/21 19/22
20/2 24/2 26/24 50/25 56/16
68/24 72/15 100/18 103/14
104/19 104/19 111/3 111/3
119/11 128/11 128/25
132/16 133/14 133/14 137/3
143/10 164/18 164/21
164/23 165/15 167/17 183/1
213/11 213/16 226/8
**I'm [166]** 4/10 4/10 8/18
8/25 9/14 9/14 12/1 12/9
14/9 17/12 17/12 19/17
20/10 22/4 23/9 23/9 23/10
24/8 24/13 26/6 31/22 33/14
35/6 38/12 39/11 43/12
54/10 58/17 58/19 59/6
59/15 59/15 60/13 60/18
61/14 62/19 63/10 63/18
63/20 64/5 66/1 68/14 69/23
71/13 72/24 75/22 76/22
77/14 78/23 83/6 85/21
86/25 86/25 89/7 89/17
89/24 93/8 93/14 94/12
94/22 96/13 97/21 99/14
100/22 103/13 107/1 108/5
108/17 108/19 112/16
115/10 115/17 115/17
116/18 117/14 118/15 119/8
123/1 124/1 126/20 127/9
127/21 127/23 128/10 129/8
129/8 129/15 129/19 131/5
131/7 134/20 136/14 137/4
138/17 138/21 139/10
139/21 143/2 147/21 148/11
149/9 149/15 151/17 151/18
153/16 156/5 161/5 163/8
163/22 164/22 166/7 169/11
176/23 177/12 177/14
178/18 179/4 179/5 179/24
181/1 182/12 183/1 184/16
184/20 186/6 186/13 189/5
189/7 191/15 193/22 197/16
198/17 200/2 200/7 200/8
200/10 202/16 203/10
203/10 204/5 204/8 205/17
206/16 206/17 207/14 208/9
209/2 213/2 214/25 214/25
215/1 217/14 218/8 220/5
221/5 222/6 223/14 225/21
227/19 228/19 228/20
228/23 229/2

**I've [28]** 4/7 18/3 25/4
67/24 68/24 77/19 111/16
111/16 123/6 129/10 131/2
137/12 154/1 154/15 155/6
163/23 166/22 166/24
172/17 173/22 173/25
176/20 177/8 177/21 193/5
221/1 227/6 227/15

**idea [7]** 15/13 67/4 76/21
90/20 112/24 130/22 202/8
**identifies [1]** 208/4
**identify [2]** 181/5 191/19
**identities [1]** 191/23
**identity [2]** 13/22 14/14
**ignored [1]** 107/8
**ignoring [1]** 106/17
**imagine [1]** 155/5
**immediately [8]** 112/17
142/9 142/23 143/1 144/4
144/6 144/14 192/16
**immunity [1]** 86/1
**impacts [1]** 179/3
**impeach [2]** 209/15 209/17
**impeachment [1]** 195/13
**impede [1]** 13/15
**impediment [3]** 13/19 14/9
14/21
**important [19]** 84/21 85/3
93/4 96/12 96/12 96/15

**important... [13]** 140/5 140/19 142/12 142/24 150/18 162/10 162/14 162/17 163/18 169/6 188/6 203/18 209/14

**impression [1]** 150/17

**imprisoned [1]** 92/1

**improper [2]** 35/8 41/3

**incarcerated [4]** 32/20 35/2 64/9 121/14

**incident [1]** 228/25

**included [3]** 42/25 156/21 157/17

**including [7]** 56/3 133/5 135/16 162/4 163/14 166/13 168/24

**inconsistent [3]** 7/18 35/8 186/14

**incorrect [2]** 96/8 122/5

**incriminate [1]** 175/18

**incumbent [1]** 204/2

**indeed [1]** 208/6

**independent [2]** 76/11 125/9

**indicated [4]** 180/24 181/8 203/8 225/23

**indicates [1]** 218/3

**indicating [3]** 79/18 90/21 175/16

**indication [1]** 186/4

**indict [1]** 42/19

**indicted [2]** 69/11 165/10

**indictment [3]** 19/14 19/19 42/14

**indictments [1]** 42/10

**individual [6]** 92/13 92/14 92/16 92/19 102/19 184/7

**individually [1]** 217/13

**individuals [4]** 90/22 112/19 205/4 205/6

**inform [3]** 36/9 58/25 174/12

**informant [66]** 13/24 14/11

14/22 47/9 47/12 50/11 65/18 66/3 66/5 71/5 71/15 71/23 80/20 81/7 81/23 82/5 82/8 82/15 83/4 83/8 83/10 83/15 83/16 83/20 84/11 84/22 85/17 85/19 85/22 85/25 86/4 86/9 86/12 87/6 88/24 89/8 89/14 90/6 90/7 91/7 91/10 91/11 91/22 91/25 93/9 95/11 95/12 95/15 95/19 95/20 117/2 121/22 159/25 160/13 162/10 164/13 180/18 191/24 200/25 209/1 209/9 209/15 209/18 210/7 210/12 210/16

**informant's [3]** 84/23 188/11 210/22

**informants [39]** 40/2 47/3 51/21 63/12 65/11 65/21 79/16 79/24 80/7 80/8 80/17 81/5 81/17 83/2 83/12 86/18 90/17 91/4 91/15 92/21 96/6 148/9 149/14 150/19 150/24 151/1 160/21 169/24 174/13 174/23 191/6 196/11 197/6 209/7 216/1 216/24 217/17 219/9 223/20

**information [77]** 11/17 12/24 14/23 14/25 15/4 15/10 16/15 16/19 16/23 30/1 34/4 34/4 35/6 40/23 41/1 65/12 71/8 79/1 79/3 79/4 82/16 82/21 82/23 96/17 105/21 106/15 106/20 108/12 113/20 114/7 119/22 121/4 122/18 125/15 127/14 131/3 132/20 132/20 132/23 136/17 151/2 162/8 164/5 164/10 179/19 181/6 181/15 181/18 181/25 182/1 182/3 182/10 183/3 183/11 188/10 189/13 195/11 196/10 200/4 207/24 207/24 208/2 208/11

210/7 210/11 210/12 210/17 212/5 212/23 214/17 214/21 214/22 215/11 217/10 223/20 225/17 225/20

**informed [1]** 34/3

**informing [1]** 120/24

**inherent [1]** 209/19

**initial [4]** 56/17 117/16 140/19 141/17

**initially [4]** 55/6 106/23 142/21 185/25

**initiated [13]** 133/6 162/5 163/17 163/17 164/10 185/17 186/5 186/8 187/25 188/7 218/2 218/17 219/1

**injury [2]** 94/8 94/13

**inmate [43]** 20/23 21/8 30/7 30/12 50/15 66/19 67/2 67/2 68/4 70/4 70/17 75/24 87/15 96/14 96/16 97/4 97/9 97/19 97/22 98/4 98/22 98/25 99/2 99/4 108/23 110/19 110/19 119/18 140/1 167/12 167/20 179/11 179/25 180/9 186/21 188/1 188/4 198/15 198/16 200/15 203/16 204/4 229/1

**inmate's [1]** 30/2

**inmates [29]** 40/3 63/16 69/8 71/4 71/7 71/9 79/25 97/18 104/16 109/9 120/7 180/24 181/8 191/19 195/25 197/18 197/19 197/25 198/23 198/25 201/19 202/23 203/19 203/23 204/9 218/17 219/3 223/6 225/17

**innocence [1]** 206/22

**inquire [1]** 216/12

**instance [1]** 159/17

**instead [4]** 65/5 106/17 106/19 107/10

**instigator [1]** 188/10

**instruct [1]** 145/22

**instructed [1]** 60/22

**integrity [1]** 146/20

**intending [1]** 175/18
**intention [1]** 172/12
**interest [3]** 119/20 184/5
225/4
**interested [4]** 38/12 117/3
163/16 182/7
**interim [1]** 5/6
**interview [16]** 6/11 6/18
13/17 18/19 31/1 39/21
39/23 50/23 108/22 109/2
120/7 147/20 148/24 149/3
149/6 149/18
**interviewed [5]** 18/8 113/25
149/22 189/20 189/20
**interviewing [1]** 110/3
**interviews [3]** 6/6 6/12 6/16
**introduce [3]** 116/5 116/8
218/20
**introduced [1]** 212/12
**introducing [1]** 222/7
**invasion [1]** 21/13
**investigate [13]** 20/6 147/14
178/5 201/3 201/6 201/19
204/10 216/25 218/14
223/21 223/22 224/8 225/18
**investigated [5]** 16/25 184/7
219/5 224/10 224/13
**investigating [1]** 18/16
**investigation [2]** 18/10
195/24
**investigations [1]** 183/4
**investigative [2]** 20/6 149/3
**investigator [4]** 9/8 73/16
108/22 224/25
**investigators [4]** 10/4 98/18
98/19 158/4
**involve [1]** 216/4
**involved [37]** 12/4 18/6
18/11 32/11 32/13 51/18
51/21 51/22 51/24 52/2 52/5
52/7 52/7 52/23 53/6 53/11
63/13 85/12 88/3 88/7 92/11
92/12 93/1 93/25 95/15

173/17 175/16 178/7 195/2
217/4 223/6 223/23 228/24
**involvement [1]** 195/3
**involves [1]** 92/14
**involving [3]** 96/23 215/25
216/24
**iota [1]** 151/13
**irrelevant [1]** 200/4
**Irrespective [1]** 43/3
**isn't [8]** 14/14 22/7 23/19
39/3 63/13 146/22 151/12
154/11
**isolation [3]** 24/25 25/2
25/7
**issue [8]** 8/10 83/9 83/14
162/22 164/18 185/17
188/15 202/1
**issued [2]** 163/15 186/2
**issues [1]** 159/15
**items [1]** 4/15
**its [2]** 222/17 222/20
**itself [3]** 126/25 149/6
208/23

## J

**jail [6]** 80/2 117/6 146/6
147/8 177/23 210/2
**jailhouse [14]** 13/24 14/11
14/22 47/2 47/8 47/12 50/11
160/12 208/25 209/6 209/9
209/15 209/18 210/7
**Jaime [4]** 77/15 78/1 78/11
78/15
**JAMES [10]** 1/16 76/16
76/19 77/9 77/9 77/18 78/13
78/15 79/5 79/11
**James' [1]** 77/21
**January [1]** 103/14
**Jason [7]** 21/9 21/16 21/17
22/22 23/6 32/10 32/11
**Javier [1]** 49/10
**Jeff [14]** 66/24 66/25 77/20
77/21 140/2 159/11 160/6
182/7 188/20 191/20 192/2

**Jeff's [11]** 66/24 155/25
159/18 178/3 180/25 181/9
189/1 192/20 208/8 209/4
212/6
**Jefferson [6]** 75/24 75/25
76/3 76/13 109/13 115/20
**JEFFREY [14]** 1/4 9/11
9/25 43/4 50/24 60/16 88/3
135/11 135/12 146/18
146/25 151/20 151/22
214/21
**Jesse [47]** 20/24 21/2 21/15
24/5 24/25 25/1 25/7 25/12
25/15 26/7 26/12 29/24 30/3
30/18 30/23 31/2 31/4 31/10
31/19 31/23 32/7 32/14 35/7
35/9 36/11 37/16 39/20
39/21 40/6 52/16 53/22
57/10 57/16 57/18 58/10
59/21 60/15 63/24 64/2
72/10 166/2 172/1 172/3
179/11 187/11 199/2 219/15
**JIMS [1]** 183/4
**job [1]** 153/4
**Johnny [23]** 20/11 27/5
35/4 38/12 38/15 91/17
107/15 108/2 108/4 108/14
108/22 109/16 110/3 110/14
112/4 112/5 113/21 113/22
114/2 114/3 114/9 114/20
167/1
**joke [1]** 149/4
**Jonathan [4]** 75/24 76/3
76/13 109/13
**Jr [2]** 33/20 34/7
**judge [27]** 60/24 148/15
150/18 154/1 154/21 163/21
164/18 166/21 170/7 170/11
170/23 178/20 181/19
184/16 185/15 185/24
186/12 189/19 199/17
203/25 210/24 211/19
211/25 222/10 225/6 226/13

# J

**judge... [1]** 227/17
**July [19]** 30/3 32/23 33/15
33/24 34/11 34/12 34/20
35/17 35/21 35/23 36/5
36/15 37/12 37/15 51/6 57/3
89/9 101/17 101/20
**July 12th [1]** 101/17
**July 16th [1]** 101/20
**July 23rd [1]** 89/9
**July 3rd [6]** 30/3 32/23
35/23 36/5 37/12 37/15
**July 5th [6]** 33/15 33/24
34/11 35/21 36/15 51/6
**July the [1]** 34/12
**jump [1]** 70/13
**June [1]** 229/11
**jurisdiction [2]** 124/3
124/20
**jury [49]** 19/13 19/18 42/14
45/2 45/5 45/15 45/20 45/22
45/25 46/2 46/5 46/14 46/19
47/2 47/2 47/8 47/11 47/15
48/9 48/13 48/17 48/19
48/24 49/3 49/8 49/9 49/23
49/24 50/2 50/2 50/6 50/8
50/11 50/15 51/2 51/2 55/10
55/12 86/6 86/10 87/16
124/12 140/14 142/2 196/1
210/6 211/4 211/13 211/22
**just [108]** 4/8 5/7 6/21
11/12 14/4 21/22 23/10
23/25 24/20 29/12 30/8 33/4
35/25 36/13 39/8 41/17
41/18 48/2 54/12 54/15
54/17 56/21 57/6 60/13 63/5
63/23 64/5 64/21 66/1 68/22
70/8 70/13 72/24 74/5 76/5
79/24 83/6 83/17 84/4 85/21
85/21 86/16 92/20 92/23
96/15 99/17 99/18 100/16
100/25 101/6 103/13 112/5
113/21 113/22 113/23
113/24 113/25 115/17

134/2 136/12 140/12 147/21
147/21 148/11 149/9 149/23
149/23 150/21 156/4 156/4
158/19 158/24 163/11 164/5
172/18 173/20 176/12 178/2
178/20 183/22 185/25 187/8
193/16 201/11 201/12
201/12 202/19 206/6 207/24
208/9 210/22 213/11 213/22
213/23 220/6 221/16 222/1
222/1 222/22 223/17 223/19
226/15 227/5 227/19
**Justice [2]** 177/22 177/24

# K

**Karen [1]** 173/20
**keep [16]** 38/2 51/13 53/22
54/6 54/24 55/1 58/22 59/3
63/5 91/13 114/9 115/13
115/17 137/18 147/8 183/11
**KEITH [1]** 1/9
**Kelly [24]** 5/23 14/12 31/11
62/4 75/23 100/12 104/22
108/21 113/11 138/11 156/1
156/2 156/3 160/15 198/19
199/3 199/14 216/1 216/2
216/7 216/12 216/18 217/4
218/9
**kept [7]** 6/21 37/25 59/12
62/15 68/15 82/21 102/15
**key [1]** 151/5
**killed [3]** 55/2 55/3 87/2
**killing [2]** 177/1 177/1
**killings [1]** 181/25
**kilos [1]** 84/15
**Kim [1]** 177/24
**kind [9]** 17/25 29/25 61/23
143/21 143/24 144/2 154/1
170/24 212/23
**kinds [1]** 89/4
**knew [44]** 32/6 34/5 41/1
41/3 42/5 65/14 65/18 66/24
71/11 77/6 91/16 95/2
111/12 111/14 111/18

111/24 118/5 118/8 124/18
125/5 146/8 157/1 165/22
189/8 199/2 199/3 202/3
202/4 202/9 202/24 203/3
208/14 223/19 224/5 224/7
224/17 225/1 225/16 225/22
225/22 226/1
**knock [2]** 68/2 68/2
**know [176]** 8/24 10/18
13/13 13/21 13/23 15/17
16/16 19/3 19/3 21/21 23/24
24/1 24/7 24/9 24/16 25/4
27/3 27/21 31/1 31/3 31/15
31/20 32/12 32/13 36/23
37/2 37/4 37/7 37/11 42/22
43/9 46/4 51/11 51/12 51/17
58/14 58/24 59/4 59/8 60/5
63/7 63/10 63/11 66/6 67/2
67/15 68/14 68/22 70/1
70/16 71/20 71/25 72/7 76/3
76/3 76/7 76/9 76/19 77/17
78/14 78/17 79/13 79/13
80/10 84/19 85/15 88/4
89/21 90/12 91/9 94/20 95/1
97/13 97/13 97/17 97/18
98/19 99/3 104/6 104/7
105/25 106/4 106/8 111/14
111/16 111/23 112/22 113/2
118/4 120/3 124/18 127/20
127/22 128/4 130/25 131/2
131/7 131/16 133/1 133/24
133/25 134/7 134/7 135/12
136/12 138/19 138/20 140/2
142/6 142/25 143/18 143/21
146/3 148/25 149/10 150/4
151/4 151/23 151/24 152/1
152/11 152/12 152/15
152/17 152/17 156/18
156/24 158/18 159/20 161/5
162/10 162/17 163/4 164/14
164/21 169/11 169/11
178/17 179/17 179/20
179/20 180/21 184/2 184/2

# K

**know... [32]** 184/3 185/3 186/14 188/6 189/9 191/22 192/24 195/12 198/8 199/13 200/21 202/12 202/21 203/4 203/17 203/18 204/10 204/11 204/11 204/16 208/5 213/7 213/24 215/2 217/6 217/7 217/7 217/9 218/22 219/24 222/16 223/8

**knowing [8]** 14/13 14/24 83/25 144/1 180/22 203/17 222/3 225/14

**knowledge [6]** 74/16 138/18 160/15 190/16 205/12 205/14

**known [13]** 14/1 15/4 31/17 31/18 67/24 142/3 191/23 202/10 215/19 219/3 224/11 225/2 225/3

**knows [4]** 10/14 70/16 123/11 202/21

**KS [1]** 31/8

**Kutzit [1]** 17/23

# L

**L.L.P [1]** 1/13
**lab [1]** 144/23
**label [1]** 128/12
**lack [1]** 48/23
**lady [1]** 208/6
**lady's [1]** 143/19
**Lafayette [1]** 60/21
**language [1]** 179/5
**large [1]** 215/24
**larger [1]** 121/22
**last [9]** 4/9 33/18 55/17 63/21 101/9 127/25 189/14 220/23 226/23
**lasted [2]** 100/17 101/2
**late [1]** 184/3
**later [6]** 22/9 131/10 131/14 159/11 164/14 207/4
**laundering [1]** 175/18

**law [5]** 44/12 63/8 105/5 154/14 154/15
**lawyer [2]** 86/14 87/14
**lawyers [8]** 6/25 138/22 139/6 139/8 139/9 166/6 197/23 217/11
**layman's [1]** 183/14
**lead [2]** 4/11 105/21
**leading [7]** 91/10 104/4 118/6 118/15 181/2 181/21 181/22
**Leal [1]** 49/10
**learn [2]** 111/15 188/24
**learned [5]** 77/19 111/16 115/4 151/5 160/16
**least [6]** 20/19 30/23 86/15 99/21 145/4 224/5
**leave [2]** 102/5 102/6
**leaving [2]** 40/19 112/11
**led [1]** 165/5
**left [8]** 6/18 40/18 124/8 124/9 125/19 126/1 126/17 137/4
**legal [1]** 63/4
**legally [1]** 44/16
**legible [1]** 152/24
**legislature [1]** 209/5
**Lemonwood [2]** 77/19 77/21
**lengths [1]** 195/18
**lenient [1]** 81/9
**less [1]** 84/4
**let [24]** 12/9 20/5 20/5 48/6 48/6 55/2 61/24 64/21 84/17 90/24 93/3 124/6 125/7 141/5 149/24 149/24 164/21 165/15 167/17 199/18 199/18 199/21 215/2 220/1
**let's [16]** 8/7 16/17 16/17 31/7 33/18 55/4 62/3 70/3 74/3 74/3 82/10 93/8 110/12 137/24 193/13 217/12
**letter [142]** 20/23 21/1 21/3 21/4 21/6 23/17 24/12 24/13

24/25 25/1 25/15 25/14 25/16 25/23 26/2 26/7 26/7 26/10 28/4 52/13 53/21 54/4 54/6 54/23 55/5 55/18 56/2 56/9 57/7 57/9 57/11 57/14 57/18 57/19 57/24 57/25 58/3 58/10 63/21 63/24 64/7 64/10 64/11 64/14 65/2 65/7 65/13 66/12 66/15 66/20 67/4 67/10 68/3 68/5 68/6 69/1 69/10 69/13 69/21 69/24 70/4 70/25 72/14 104/6 104/6 105/5 105/18 105/20 106/9 106/18 106/21 106/24 107/1 107/2 107/10 107/14 107/19 107/20 107/23 108/1 108/18 109/3 109/20 110/17 110/20 116/19 116/24 117/15 118/21 119/2 119/16 120/4 120/21 121/2 121/7 121/11 121/13 121/22 122/16 123/7 123/20 123/21 124/2 124/13 124/16 126/21 126/24 127/7 131/23 132/3 132/6 132/12 161/4 168/17 171/4 171/25 172/16 176/18 178/2 179/10 179/25 180/8 182/16 182/22 187/9 195/7 196/15 196/18 197/6 197/11 197/12 197/14 201/2 202/5 202/15 203/3 203/4 203/13 203/18 204/10 217/16 217/18 217/24
**letters [22]** 38/3 71/15 71/17 71/23 72/3 109/5 124/2 125/14 179/22 180/18 191/24 215/2 215/5 215/7 215/8 215/10 215/21 215/24 216/19 216/23 217/13 218/20
**level [2]** 19/5 170/16
**liar [15]** 41/1 41/18 54/19 55/2 57/20 95/2 107/6 114/14 114/16 122/4 148/25

# L

**liar... [4]** 151/17 196/3 210/25 211/21

**lie [11]** 65/25 80/1 80/2 148/8 148/10 148/19 150/21 150/22 150/25 152/3 209/21

**lied [8]** 52/5 54/12 54/15 56/8 108/10 151/24 152/1 211/23

**Liedtke [12]** 212/3 212/4 212/5 212/16 212/19 219/20 219/22 221/13 221/23 221/23 221/24 223/2

**lies [5]** 18/3 147/22 147/24 150/18 151/8

**lieutenant [7]** 82/13 104/21 107/15 108/18 110/14 111/10 120/5

**lieutenant's [3]** 111/1 111/4 111/8

**life [1]** 58/5

**light [1]** 11/15

**like [66]** 5/9 8/15 15/7 24/20 29/15 31/14 38/3 46/13 49/10 57/16 57/17 58/22 61/4 61/5 61/6 66/18 68/8 68/9 69/14 70/15 70/16 71/4 74/4 74/4 77/8 78/4 78/6 82/8 83/17 84/4 85/6 85/13 85/16 85/20 85/23 87/3 89/18 90/20 91/12 91/21 91/25 95/14 97/5 102/24 103/13 109/18 112/2 114/1 123/15 126/5 131/12 138/6 138/22 141/15 141/17 149/13 156/6 166/22 183/14 189/10 193/16 193/25 216/16 217/24 225/10 227/17

**liked [1]** 203/9

**likely [1]** 118/3

**likes [1]** 173/23

**likewise [1]** 92/9

**limit [1]** 169/15

**line [57]** 31/23 33/8 33/25 98/1 98/2 98/14 100/13 100/19 113/8 121/19 139/23 143/8 152/9 152/10 152/12 152/13 207/3

**lines [1]** 24/18

**list [23]** 28/5 28/21 45/19 97/22 97/24 99/7 99/24 103/4 103/11 103/15 134/9 158/7 219/4 219/8 219/10 219/20 221/14 221/22 221/23 223/3 223/5 223/8 223/10

**listed [7]** 28/13 52/20 92/3 96/11 96/14 134/10 227/20

**lists [1]** 81/11

**literally [1]** 159/21

**little [9]** 38/6 38/15 141/12 144/1 169/19 193/21 194/15 214/6 216/16

**live [4]** 5/15 145/3 145/7 153/11

**lived [1]** 188/19

**lives [4]** 77/18 144/20 145/12 193/3

**living [2]** 25/8 178/9

**load [1]** 161/15

**local [1]** 226/18

**located [1]** 139/13

**location [1]** 214/13

**log [2]** 82/20 137/3

**long [12]** 25/22 30/14 71/10 95/2 99/15 145/2 149/19 149/20 150/4 154/13 155/11 200/3

**look [40]** 10/9 10/10 11/2 15/7 15/24 24/18 31/7 31/22 35/11 40/19 55/4 70/3 70/5 75/1 80/16 82/10 101/11 103/10 110/12 110/16 134/24 136/13 141/15 141/17 141/19 141/19 143/8 144/18 147/14 156/20 157/16 157/21 158/10

**look [57]** 40/23 189/10 197/11 205/22 206/17 217/12 220/24

**looked [11]** 10/11 16/25 67/15 72/3 76/9 78/3 115/11 128/10 134/2 186/15 190/1

**looking [9]** 73/15 78/3 129/25 184/3 194/3 194/21 198/8 200/22 221/5

**looks [12]** 29/15 31/14 71/4 73/12 77/8 78/6 91/21 103/13 109/18 112/2 113/5 131/12

**LORIE [1]** 1/6

**lost [4]** 40/20 106/18 106/19 107/3

**lot [20]** 5/3 6/1 7/1 17/4 57/9 84/6 84/7 91/21 102/14 106/10 110/11 112/15 139/5 151/4 153/3 155/14 178/21 186/7 203/21 212/17

**lots [2]** 66/22 146/19

**Louisiana [6]** 28/24 29/9 60/21 72/21 172/17 172/21

**Lovett [1]** 1/17

**low [6]** 23/20 51/9 51/12 51/15 66/25 154/1

**lunch [3]** 75/16 137/14 137/17

**lying [11]** 41/4 42/5 50/18 53/4 56/7 57/6 74/17 74/20 103/8 122/11 165/19

**Lyons [4]** 77/15 78/4 78/11 78/15

**Lyons' [1]** 78/1

# M

**ma'am [5]** 32/2 44/20 96/20 135/10 162/2

**made [60]** 4/10 32/3 38/10 43/3 50/20 55/7 67/23 89/8 89/18 90/9 91/12 98/10 98/25 99/19 113/21 113/22 113/23 115/15 121/3 125/21 133/6 133/9 133/17 133/18

**made... [36]** 135/15 148/12 152/9 162/5 162/10 162/17 163/12 163/15 165/5 165/6 166/11 166/12 166/16 167/1 167/10 168/23 169/14 169/16 174/13 174/22 178/2 179/15 180/3 181/3 191/25 196/24 197/2 197/6 198/6 198/15 200/13 201/20 202/23 204/3 205/4 211/19

**mail [5]** 127/10 136/6 136/17 138/22 139/7

**mails [12]** 136/7 136/10 136/20 136/25 138/12 138/16 138/20 139/1 139/2 139/3 139/5 139/10

**main [3]** 102/7 159/13 182/3

**major [6]** 98/2 98/11 98/13 99/14 159/9 160/20

**majority [1]** 215/25

**make [34]** 11/18 12/15 16/21 18/21 24/23 49/12 52/7 53/6 53/11 57/17 59/16 62/11 66/12 69/20 78/2 81/10 89/4 101/9 114/11 115/11 115/13 116/5 146/18 153/19 156/16 158/14 158/24 159/19 175/8 189/12 203/22 206/8 206/12 227/5

**makes [1]** 69/12

**making [16]** 7/22 17/18 48/24 56/20 60/8 83/13 83/25 119/17 150/17 150/21 168/25 175/21 203/14 203/19 204/11 204/13

**man [6]** 55/1 76/15 139/25 143/22 143/24 144/2

**manager [2]** 102/13 102/21

**manager's [4]** 97/9 97/15 104/13 131/20

**managers' [1]** 98/7

**manipulated [1]** 8/12

**manner [7]** 90/18 93/4 162/4 163/13 181/11 181/14 214/15

**manual [15]** 12/22 12/23 12/25 13/7 15/13 79/15 81/16 90/15 90/15 90/17 90/20 90/23 91/1 92/3 136/15

**many [7]** 84/22 100/5 102/10 162/13 163/23 187/20 203/24

**March [9]** 20/11 20/19 26/20 26/25 27/1 27/15 72/17 116/19 117/15

**March 1st [3]** 20/11 20/19 26/20

**March 2001 [1]** 27/15

**March 22nd [1]** 72/17

**March 4th [1]** 116/19

**March 5th [1]** 117/15

**Marcy [2]** 36/23 36/24

**marijuana [1]** 84/17

**Mark [12]** 22/24 70/4 72/10 116/19 120/21 123/8 123/22 170/15 170/19 180/8 215/6 219/13

**marked [6]** 193/23 205/18 206/16 206/18 217/14 220/5

**Martin [11]** 76/16 76/19 76/23 77/5 77/9 77/18 77/25 78/13 78/15 79/6 79/11

**Martinez [7]** 70/4 70/11 72/11 180/8 215/6 219/13 224/13

**masterminded [1]** 149/14

**matched [1]** 34/5

**material [5]** 7/18 7/19 50/5 206/13 208/17

**materiality [2]** 181/3 181/12

**materials [1]** 17/5

**matter [10]** 7/1 10/3 25/1 49/23 50/8 90/18 93/5 95/14 152/25 229/9

**mattered [1]** 95/18

**matters [3]** 16/10 105/10 185/9

**may [33]** 13/16 16/10 53/21 55/4 56/13 63/22 64/12 101/14 119/16 120/8 123/8 123/18 123/22 156/24 186/6 186/10 189/1 189/13 195/23 202/2 203/25 206/1 206/3 206/4 213/25 214/1 216/15 218/4 218/4 220/2 220/3 226/11 226/12

**May 15th [1]** 101/14

**May 1st [2]** 55/4 56/13

**May 2002 [1]** 64/12

**May 22nd [1]** 63/22

**May 5th [1]** 53/21

**May 6 [1]** 120/8

**maybe [10]** 6/20 17/2 18/7 42/8 46/25 108/11 135/8 137/6 137/8 149/21

**McInnis [6]** 144/20 144/22 145/6 145/11 192/24 192/25

**mean [33]** 4/17 8/4 8/15 9/3 9/20 12/15 27/10 34/12 41/16 46/13 54/10 61/14 61/23 73/25 97/5 99/19 100/8 100/17 102/1 106/11 114/1 127/23 130/10 159/16 160/13 162/22 176/25 179/17 189/7 192/24 199/6 217/18 222/16

**meaning [2]** 116/15 133/4

**means [12]** 9/5 25/7 102/2 142/1 142/6 142/7 143/15 146/22 148/1 172/16 181/14 183/4

**meant [5]** 15/14 15/17 139/8 144/13 194/3

**measures [1]** 226/16

**mechanical [1]** 1/24

**medium [14]** 23/18 23/20 31/13 51/10 51/12 51/16 53/22 66/25 108/19 111/20

**medium... [4]** 120/5 121/14
140/1 186/22
**meet [8]** 29/4 109/9 109/12
111/1 112/17 112/19 140/2
156/10
**meeting [55]** 30/5 30/7
30/19 30/23 30/24 32/14
32/23 32/25 35/23 36/5 36/8
36/9 39/5 39/5 39/9 39/13
40/8 40/18 43/13 43/17
47/16 51/3 51/3 91/17 105/3
106/21 106/23 106/25 107/1
107/11 108/2 108/8 108/15
109/7 109/18 109/21 110/1
110/5 110/9 110/10 110/24
111/25 112/2 112/7 112/23
113/6 113/14 114/4 115/8
135/21 135/25 140/5 182/17
190/20 190/23
**Melanie [1]** 173/19
**member [1]** 228/25
**members [1]** 82/14
**memorialization [1]** 113/5
**memorializing [2]** 87/12
109/18
**memory [7]** 22/16 32/3
33/6 34/10 104/22 144/3
163/7
**memory's [1]** 165/3
**mention [13]** 16/12 121/21
166/2 171/3 172/4 172/23
174/7 174/10 174/11 174/11
187/5 187/11 191/6
**mentioned [18]** 31/4 36/2
36/4 41/11 52/25 53/8 53/14
55/6 114/20 118/25 121/11
122/13 145/14 145/16
147/21 165/22 173/20 224/6
**mentions [2]** 33/8 65/7
**mere [1]** 172/15
**message [13]** 41/8 41/24
102/6 102/9 125/20 125/24
126/1 126/2 126/3 126/8

**messed [1]** 147/8
**met [31]** 30/3 30/16 30/22
38/19 39/3 40/10 45/11
45/14 50/13 53/15 57/20
64/4 64/7 77/18 95/3 110/23
111/2 111/4 111/8 112/3
112/4 112/20 115/19 122/3
122/9 163/23 164/10 164/20
166/6 193/16 224/25
**metal [1]** 93/20
**meticulous [2]** 7/3 7/10
**mic [1]** 153/24
**Michael [42]** 63/14 63/14
91/18 97/22 99/3 99/4
108/23 113/8 113/10 113/20
114/11 114/15 114/19
115/25 116/14 120/7 121/3
122/7 123/2 124/18 127/8
128/11 133/5 134/25 139/25
139/25 140/15 145/14
145/16 146/17 146/18
146/25 151/20 155/11
159/13 167/2 168/19 170/12
174/25 186/1 191/20 219/11
**microphone [1]** 169/19
**middle [3]** 66/18 141/11
141/20
**might [53]** 12/9 15/23 18/4
21/22 23/13 27/8 28/10 29/7
31/17 31/18 31/19 36/13
37/24 38/10 38/10 41/12
41/23 59/14 62/19 67/2 71/8
71/25 75/15 76/9 77/17
80/17 81/6 81/17 83/2 90/13
99/10 99/16 99/17 99/18
104/12 114/21 116/5 117/19
118/10 123/8 123/19 123/23
125/12 128/22 184/2 184/7
196/10 202/13 213/7 215/19
217/5 226/2 228/12
**mightn't [1]** 202/14
**Mike [5]** 113/11 116/20
117/19 126/11 126/17

**mind [9]** 6/15 29/24 29/25
30/2 68/19 114/9 132/11
164/13 207/10
**mine [3]** 22/24 91/20
177/22
**minimum [1]** 30/15
**minute [13]** 75/7 101/18
101/19 101/24 102/3 102/4
102/4 102/10 102/10 102/10
130/8 131/13 131/17
**minutes [18]** 100/5 100/6
100/8 100/17 100/19 100/23
101/2 101/10 101/13 101/16
101/24 137/6 137/7 143/19
143/23 143/23 144/7 193/10
**MIRANDA [4]** 1/19 4/8
201/13 204/1
**mischaracterization [1]**
191/9
**mischaracterizes [1]**
201/23
**mischaracterizing [1]**
167/16
**misrepresentation [1]**
146/11
**misrepresents [1]** 165/14
**misspelled [1]** 65/3
**mistaken [1]** 184/16
**misunderstanding [1]**
126/5
**mitigate [1]** 179/6
**modified [1]** 173/10
**mom [1]** 26/7
**moment [6]** 7/24 105/1
105/7 206/1 206/3 223/13
**moments [1]** 186/8
**money [7]** 77/7 77/22 78/7
78/11 175/18 177/2 178/8
**monitor [1]** 161/20
**Montgomery [1]** 152/5
**months [13]** 70/25 71/1
71/1 77/20 103/7 108/11
116/1 116/2 117/20 122/23
161/8 172/6 175/6

**Morales [7]** 21/9 21/16 21/17 22/22 23/6 32/10 32/11

**more [24]** 5/16 6/8 13/9 17/11 38/15 41/1 42/22 53/14 64/22 83/21 88/3 92/25 93/4 93/6 138/20 139/15 139/17 151/4 152/24 195/24 217/7 223/13 223/17 228/9

**Moreno [89]** 20/24 21/2 21/2 21/6 21/8 22/6 22/8 22/17 23/2 23/17 24/21 24/25 28/20 29/16 30/3 30/23 31/2 31/10 31/12 32/3 32/7 32/14 32/19 32/23 35/2 35/7 35/23 36/5 36/8 36/9 36/11 37/13 37/16 39/21 40/6 46/3 46/6 46/19 52/16 53/22 55/6 55/8 55/10 55/19 55/19 56/3 56/7 57/3 57/3 57/10 57/16 57/18 58/7 58/10 58/22 59/1 59/11 59/22 60/15 60/20 88/10 96/21 104/4 151/24 166/2 172/1 172/3 172/5 174/10 174/11 187/11 196/16 196/18 196/24 197/15 197/19 197/24 198/22 199/2 199/3 199/4 199/13 202/3 202/4 202/8 202/12 202/21 203/3 205/12

**Moreno's [9]** 21/15 25/15 26/7 29/10 29/24 35/10 56/17 72/21 122/24

**morning [2]** 5/17 46/15

**Morton [1]** 155/11

**most [19]** 6/12 6/21 6/21 6/25 8/5 8/7 8/16 9/1 9/3 9/5 9/18 9/18 9/20 9/22 63/5 118/3 142/13 147/17 158/16

**mostly [2]** 156/4 156/4

**motion [32]** 118/2 118/10 123/23 127/17 128/7 132/16 132/19 134/13 135/19 161/21 161/25 162/3 163/3 163/9 163/12 166/11 168/22 169/2 169/8 169/10 169/15 169/24 170/5 175/15 178/10 183/3 183/7 194/1

**motions [6]** 161/14 161/15 161/16 161/17 161/18 161/20

**motive [4]** 177/1 178/7 209/21 211/4

**mouth [11]** 142/14 143/14 143/17 143/18 143/19 143/22 144/5 144/12 144/13 159/11 160/6

**move [9]** 42/23 43/3 59/11 112/13 146/5 194/15 213/18 213/20 214/6

**moved [7]** 51/9 51/12 51/14 51/14 51/15 112/15 173/21

**moving [4]** 15/3 73/2 92/9 112/18

**MR [17]** 1/16 1/20 22/6 22/8 27/1 50/13 55/20 64/2 115/19 116/16 124/10 125/23 165/19 202/3 213/16 217/16 225/13

**Mr. [464]**

**Mr. Beckcom [94]** 63/16 72/13 87/23 93/11 93/11 96/19 102/22 110/23 110/24 111/13 113/6 114/6 114/22 115/7 115/13 115/20 117/1 117/9 118/5 118/12 118/14 118/16 118/17 118/24 119/21 120/10 120/18 121/8 123/5 124/25 125/2 125/5 125/9 125/12 125/16 125/18 127/1 127/17 127/19 128/7 128/8 129/13 129/15 133/12 134/12 135/21 139/18 140/6 140/23 160/13 161/4 164/2 164/15 165/4 168/20 175/11 182/17 185/18 186/5 187/20 188/7 194/11 194/22 194/25 195/8 195/13 195/13 195/25 196/2 197/9 197/13 197/14 197/15 197/19 197/24 198/18 198/20 199/1 199/6 199/12 200/5 200/6 200/12 202/2 202/22 202/25 203/3 208/13 211/2 212/2 224/6 224/7 225/21 225/23

**Mr. Beckcom's [14]** 98/23 115/9 116/15 116/16 117/17 117/23 118/1 120/24 133/21 135/22 175/5 194/18 208/3 211/18

**Mr. Bible's [2]** 135/4 135/9

**Mr. Bonds [10]** 6/1 26/22 27/1 39/3 40/8 91/14 110/1 113/15 120/6 167/10

**Mr. Bonds' [2]** 20/18 113/3

**Mr. Clemons [2]** 29/2 29/13

**Mr. Cogdell [1]** 22/7

**Mr. Culler [1]** 122/6

**Mr. Cullers [34]** 117/1 117/13 117/15 118/1 118/15 118/17 121/2 121/7 122/1 122/7 122/9 122/14 122/16 123/12 123/17 123/18 124/9 124/14 124/15 124/23 125/10 125/19 125/23 126/1 126/3 126/16 126/21 127/7 127/10 127/13 127/16 128/1 128/6 175/5

**Mr. Davi [4]** 135/21 135/25 136/1 182/17

**Mr. Defense [1]** 71/15

**Mr. Dominguez [2]** 88/16 96/22

**Mr. Dominguez's [1]** 53/14

**Mr. Eddie [1]** 88/19

**Mr. Flores [1]** 89/21

**Mr. Foreman [64]** 31/15

# M

**Mr. Foreman... [63]** 36/9 37/12 37/15 39/6 39/20 39/24 40/10 42/9 42/21 43/6 43/13 45/12 50/18 52/22 53/1 53/18 56/8 56/22 56/24 57/1 57/20 63/16 88/1 88/3 88/5 88/7 88/13 103/3 103/18 105/2 105/13 105/25 106/15 106/19 107/11 108/2 109/2 109/21 110/2 111/12 115/20 120/14 121/8 121/21 122/13 131/25 132/4 133/11 133/20 165/19 165/25 174/7 174/11 205/19 223/16 224/2 224/7 224/19 224/20 224/25 225/14 225/19 225/23

**Mr. Foreman's [8]** 58/2 103/11 105/6 105/9 121/11 131/23 132/1 224/16

**Mr. Gaiser [12]** 5/17 43/12 67/10 71/19 115/19 147/19 154/8 164/19 166/22 174/21 186/14 193/16

**Mr. Gaiser's [2]** 75/16 189/22

**Mr. Gonzalez [8]** 64/14 65/7 66/12 66/17 66/24 67/6 67/11 215/5

**Mr. Herrero [5]** 34/11 35/9 47/11 47/13 55/21

**Mr. Herrero's [8]** 52/17 52/19 55/23 55/25 56/6 96/21 104/4 196/24

**Mr. Jefferson [2]** 75/25 115/20

**Mr. Jesse [1]** 64/2

**Mr. Liedtke [10]** 212/4 212/5 212/16 212/19 219/20 219/22 221/13 221/23 221/23 223/2

**Mr. Mark [1]** 215/6

**Mr. Martin [2]** 76/23 77/25

**Mr. Martinez [2]** 70/11

**Mr. Moreno [34]** 21/2 21/6 21/8 22/17 23/2 24/21 28/20 29/16 35/23 36/8 36/9 37/13 56/3 60/20 88/10 96/21 104/4 174/10 174/11 196/16 196/18 196/24 197/15 197/19 197/24 198/22 199/3 199/4 199/13 202/3 202/12 202/21 203/3 205/12

**Mr. Moreno's [2]** 29/10 72/21

**Mr. Percely [3]** 41/10 105/12 106/14

**Mr. Percely's [1]** 107/19

**Mr. Prible [45]** 12/1 17/21 34/17 34/23 35/18 35/21 36/10 36/16 37/6 42/18 50/12 50/13 50/16 50/17 51/2 62/7 66/21 69/4 70/12 71/6 92/2 114/23 122/3 122/3 127/2 135/20 139/18 140/6 140/16 140/24 141/16 141/24 142/14 155/16 159/5 159/7 160/14 189/1 197/23 201/22 208/5 212/12 215/12 225/18 228/13

**Mr. Prible's [69]** 10/4 10/5 13/11 43/12 43/7 50/9 52/16 60/10 60/13 63/15 64/24 68/5 69/22 69/25 71/1 71/2 71/12 71/15 74/1 76/1 76/16 76/17 78/9 87/24 88/2 88/6 88/7 91/7 92/7 96/19 103/8 106/1 111/19 115/4 115/5 115/21 116/12 118/6 118/10 118/15 120/13 120/23 122/10 142/18 145/5 145/10 154/10 157/6 157/7 157/25 158/4 159/2 172/6 172/24 175/6 176/19 179/16 184/25 190/11 191/7 194/7 194/24 195/7 196/19 197/2 197/6 202/2 204/24 205/1

**Mr. Rivera [1]** 153/21

**Mr. Rose's [1]** 13/6

**Mr. Rytting [1]** 137/20

**Mr. Temple [1]** 11/22

**Mr. Walker [3]** 69/16 215/5 217/19

**Mr. Watson [1]** 144/11

**Mr. Wentz [4]** 43/12 67/10 71/19 147/19

**Mr. Wilson [1]** 108/7

**Mr. Wiser [1]** 91/14

**Mr. Wisner [1]** 190/23

**Mrs [1]** 64/2

**MS [5]** 1/13 1/19 144/12 176/1 179/10

**Ms. [84]** 4/4 4/8 5/5 5/13 5/17 5/21 25/15 57/19 57/25 60/25 78/4 97/21 120/13 132/3 136/2 145/6 149/23 158/3 163/21 164/7 164/18 165/8 165/24 166/16 166/21 167/10 167/11 167/19 168/5 170/6 170/11 171/3 171/22 172/1 172/4 172/15 173/8 173/18 174/4 174/7 174/17 175/4 176/2 177/4 177/6 178/20 179/2 179/10 179/25 180/8 180/18 182/23 184/14 186/10 186/12 186/21 187/1 187/2 187/19 187/23 188/1 188/7 189/19 190/23 191/2 192/10 196/14 197/5 200/12 201/13 202/22 203/4 203/15 204/1 204/2 204/3 205/3 205/19 206/7 207/16 217/17 217/19 218/2 224/25

**Ms. Batson [3]** 57/19 57/25 132/3

**Ms. Lyons [1]** 78/4

**Ms. McInnis [1]** 145/6

**Ms. Miranda [3]** 4/8 201/13 204/1

**Ms. Scardino [1]** 206/7

**Ms. Siegler [71]** 4/4 5/21

**Ms. Siegler... [69]** 25/15
60/25 97/21 120/13 136/2
149/23 158/3 163/21 164/7
164/18 165/8 165/24 166/16
166/21 167/10 167/11
167/19 168/5 170/6 170/11
171/3 171/22 172/1 172/4
172/15 173/8 173/18 174/4
174/7 174/17 175/4 176/2
177/4 177/6 178/20 179/2
179/10 179/25 180/8 180/18
182/23 184/14 186/10
186/12 186/21 187/1 187/2
187/19 187/23 188/1 188/7
189/19 190/23 191/2 196/14
197/5 200/12 202/22 203/4
203/15 204/2 204/3 205/3
205/19 207/16 217/17
217/19 218/2 224/25
**Ms. Siegler's [4]** 5/5 5/13
5/17 192/10
**much [12]** 69/14 116/6
131/16 137/4 148/6 157/3
189/22 204/2 217/23 226/11
226/12 227/15
**murder [41]** 17/2 17/25
19/7 21/9 21/25 22/10 22/14
22/18 22/24 23/6 23/11
32/15 33/19 34/7 35/17
42/19 50/13 55/8 55/12 58/4
86/25 87/1 87/11 92/2 93/18
96/13 105/22 105/25 117/16
121/17 144/2 152/14 154/10
155/16 155/22 156/7 191/7
198/6 198/15 206/21 207/13
**murdered [1]** 44/22
**murderer [2]** 87/10 211/16
**murders [4]** 44/17 142/19
159/20 188/21
**must [12]** 25/11 42/4 44/15
60/3 81/11 81/14 82/11
82/15 82/18 139/16 148/1
154/19

**my [89]** 6/12 8/22 14/9
14/17 17/17 23/3 23/7 28/11
28/16 37/7 37/11 38/24
42/15 43/21 44/7 50/25 53/8
54/15 61/17 62/22 71/17
77/12 81/25 84/3 84/8 86/22
91/19 93/5 94/10 95/10 98/2
98/13 99/6 102/8 114/5
115/11 117/10 121/3 121/4
121/14 123/9 123/19 123/23
125/7 125/7 130/9 130/11
136/13 138/15 145/10
148/15 149/10 152/21
152/25 157/24 159/8 159/21
160/15 164/22 165/3 167/11
174/24 179/14 181/24 182/3
184/5 186/7 186/7 186/13
186/19 194/21 195/1 203/1
203/1 204/20 205/14 207/10
210/9 214/10 220/11 220/16
221/3 222/11 224/12 224/14
225/8 227/19 228/15
**myself [5]** 6/12 18/5 105/16
116/5 167/1

# N

**name [56]** 28/1 28/5 29/3
29/17 31/3 31/6 31/18 31/19
31/21 36/2 36/4 40/4 41/12
52/20 52/20 53/14 55/6 69/7
69/9 78/15 78/19 79/5 79/11
97/5 97/6 97/23 99/4 108/23
109/14 111/10 113/8 113/18
114/18 114/20 114/21
117/18 120/7 120/14 120/18
121/8 121/11 127/14 135/13
148/4 148/7 149/10 166/2
166/5 170/15 186/19 187/14
208/15 218/10 219/11
219/13 224/23
**named [9]** 20/24 24/5 75/24
76/15 139/25 167/12 167/20
179/11 179/25
**names [5]** 69/8 74/5 173/19
179/22 214/11

**narc [3]** 83/12 83/17 84/4
**Nathan [98]** 14/22 24/8
24/11 24/14 24/17 25/14
31/1 31/6 31/9 31/10 31/20
31/25 32/4 32/19 35/24 36/1
36/4 36/6 36/10 38/11 39/9
41/9 41/13 41/14 41/21
42/17 42/25 43/9 43/10 50/9
50/15 50/19 50/19 50/21
50/22 51/3 51/24 52/2 52/23
53/2 53/8 53/15 53/23 54/17
56/1 56/18 57/5 57/12 57/14
73/3 74/11 74/22 94/7 94/9
94/12 95/7 103/1 105/15
105/20 106/3 107/16 108/15
109/19 110/3 113/10 113/11
113/12 113/13 113/15
113/18 113/22 113/23
113/24 113/25 114/8 114/10
114/12 114/15 114/18
120/17 122/9 132/15 133/9
133/17 140/25 147/20 149/1
150/3 165/9 171/4 171/7
171/8 182/23 184/21 186/19
186/20 186/21 219/12
**National [1]** 183/11
**NCIC [5]** 183/4 183/10
183/24 184/21 185/1
**NCICs [2]** 183/21 184/15
**near [2]** 105/23 188/19
**nearest [1]** 153/20
**nearly [1]** 57/15
**necessarily [14]** 13/20
14/20 28/6 31/16 44/25
62/16 83/15 99/12 99/19
110/6 113/17 128/21 128/22
140/20
**need [20]** 4/12 18/4 20/24
35/15 49/12 53/20 74/4
86/10 110/19 114/9 122/18
132/12 143/6 152/24 202/20
213/12 215/2 227/1 228/3
229/3
**needed [11]** 11/18 35/11

Case 4:09-cv-01896   Document 255   Filed on 06/05/19 in TXSD   Page 264 of 287

**N**

**needed... [9]** 44/24 59/3 80/6 87/12 91/3 91/9 132/9 146/17 146/18
**needs [1]** 179/4
**neighbor [1]** 207/5
**neighborhood [1]** 24/5
**Neither [2]** 40/16 81/25
**network [1]** 121/22
**never [56]** 12/8 22/13 22/24 25/4 41/5 48/18 48/21 58/15 58/18 60/10 60/23 64/4 64/7 67/23 78/8 90/13 94/9 94/16 94/18 95/3 100/9 100/13 102/11 102/16 103/23 104/2 106/1 107/5 111/18 113/10 119/25 122/1 122/13 124/16 124/17 129/10 129/11 131/2 155/6 156/4 156/24 165/5 168/11 168/12 176/20 177/6 177/7 183/25 190/19 193/5 201/8 215/8 221/1 221/25 223/7 223/8
**nevertheless [4]** 52/13 54/21 56/9 57/7
**new [7]** 19/22 20/8 37/5 37/9 42/19 106/20 187/14
**news [2]** 182/2 214/24
**newspaper [1]** 65/8
**next [13]** 26/4 38/24 46/17 81/25 84/8 98/3 100/23 107/24 134/24 152/12 152/13 171/20 207/3
**nice [1]** 42/8
**Nick [1]** 117/16
**night [3]** 4/9 188/21 207/11
**Nilda [4]** 143/13 192/16 206/24 207/12
**nilly [2]** 83/24 93/3
**nine [3]** 24/18 42/9 102/4
**nine-minute [1]** 102/4
**no [275]**
**No. [1]** 78/17
**No. 106 [1]** 78/17

**non [1]** 184/17
**non-testifying [1]** 184/17
**none [1]** 139/6
**nonresponsive [3]** 8/13 208/19 208/21
**nontestifying [1]** 63/12
**normal [1]** 11/12
**normally [1]** 156/9
**not [310]**
**note [17]** 71/20 113/21 113/22 113/23 123/2 123/5 165/4 189/24 190/10 190/10 192/20 193/3 207/19 208/10 208/11 208/11 208/14
**notes [60]** 6/15 6/18 15/25 18/21 39/14 39/18 43/16 43/19 43/21 43/22 43/22 43/23 44/5 44/7 44/8 62/9 62/22 62/23 62/23 67/23 76/4 76/10 76/23 77/8 77/12 78/3 78/8 78/12 78/17 79/12 109/16 110/5 110/7 110/9 110/11 113/19 114/5 114/20 114/22 133/2 141/7 141/15 152/16 153/3 153/5 158/3 158/24 164/20 166/13 166/25 167/10 178/22 186/13 186/15 190/1 190/2 190/5 190/17 207/16 207/21
**nothing [24]** 15/22 19/22 20/8 22/25 23/6 23/11 37/9 42/16 50/23 57/24 72/14 77/4 77/6 84/2 86/3 89/16 90/16 116/7 121/7 132/14 197/14 200/5 225/1 226/1
**notice [5]** 30/10 65/2 66/23 69/10 103/5
**noticed [1]** 68/6
**notified [1]** 82/15
**notifies [1]** 81/1
**notify [3]** 170/14 173/10 174/18
**notoriously [1]** 79/25
**November [21]** 105/6

105/17 106/21 107/2 107/14 107/20 107/23 108/10 108/18 110/14 124/2 124/17 125/19 125/21 125/24 126/2 126/9 126/16 127/9 182/22 191/16
**November 11th [1]** 191/16
**November 12th [13]** 105/6 105/17 106/21 107/2 107/20 107/23 125/19 125/21 125/24 126/2 126/9 126/16 182/22
**November 15th [1]** 127/9
**November 20th [1]** 107/14
**November 26 [1]** 108/18
**November 26th [1]** 110/14
**November 4th [2]** 124/2 124/17
**now [79]** 4/12 4/16 4/18 5/6 8/25 13/18 15/7 16/12 20/24 22/16 23/10 26/24 32/14 34/25 38/18 40/8 41/11 44/12 48/1 50/5 51/18 53/18 55/14 58/4 60/10 60/20 65/11 66/12 68/3 69/3 70/11 73/2 74/16 81/16 85/9 90/5 103/5 105/1 107/14 108/11 115/24 118/21 119/21 123/6 124/8 125/10 132/19 135/19 137/13 144/3 144/22 151/24 152/1 156/15 158/19 164/4 167/11 169/9 170/11 176/15 176/23 177/13 179/7 181/20 186/25 189/8 191/23 196/8 200/22 203/17 203/18 205/17 206/6 206/11 206/16 207/14 216/5 216/7 217/6
**nowhere [4]** 57/19 72/20 103/14 103/15
**number [29]** 28/11 28/12 28/13 28/14 28/16 28/18 28/21 29/18 29/18 98/9 98/13 99/6 99/7 99/15 99/24 101/15 103/5 103/6 103/16

**N**

**number... [10]** 128/12 128/17 130/11 130/14 131/10 134/9 147/22 163/11 163/12 183/2

**numbers [1]** 101/20

**O**

**o'clock [2]** 137/10 137/15
**o0o [1]** 229/7
**oath [1]** 153/22
**object [4]** 20/2 87/21 181/2 181/4
**objected [2]** 227/12 227/21
**objection [28]** 8/13 19/8 20/21 22/20 29/19 87/19 109/23 140/21 146/14 165/13 167/15 181/1 184/9 191/9 200/17 201/10 201/23 203/5 208/19 215/13 216/9 217/21 221/15 224/22 227/8 227/16 227/22 227/24
**objections [3]** 80/23 226/24 227/11
**objects [1]** 226/21
**obligated [1]** 9/9
**obligation [1]** 55/1
**obligations [1]** 78/18
**obtained [1]** 183/3
**obtaining [1]** 126/23
**obvious [7]** 9/22 70/13 72/8 72/12 96/17 171/21 174/24
**obviously [12]** 102/3 108/7 124/15 129/9 173/11 176/25 177/12 188/2 189/18 192/5 204/12 208/14
**occur [1]** 71/22
**occurred [3]** 162/14 172/11 188/22
**October [8]** 102/1 103/4 103/14 120/22 123/3 161/13 185/8 185/11
**October 11th [2]** 185/8 185/11
**October 29th [1]** 120/22
**October 30th [1]** 123/3
**October 3rd [1]** 103/4
**odd [1]** 68/11
**odds [1]** 143/15
**off [38]** 6/2 20/25 61/3 80/20 81/20 82/4 83/3 83/3 83/8 83/9 83/11 83/13 83/17 83/20 84/5 84/10 84/11 84/15 84/22 85/2 85/6 85/7 86/21 87/5 90/12 91/3 91/22 92/15 92/24 93/3 93/5 93/7 96/6 96/15 127/19 188/21 190/1 207/2
**offenders [4]** 98/2 98/11 98/13 99/15
**offense [17]** 7/25 8/1 8/5 8/8 8/16 8/25 9/2 9/6 9/9 9/19 9/21 9/22 10/3 10/5 73/10 121/17 175/20
**offer [2]** 11/4 120/11
**offered [2]** 192/6 227/10
**office [76]** 1/20 8/3 11/13 11/21 12/4 12/10 15/13 17/10 17/14 17/18 18/8 18/25 41/7 44/22 45/1 45/4 47/22 49/8 59/20 61/21 62/6 67/18 68/25 73/15 79/15 80/6 80/11 86/8 86/11 87/6 89/8 89/11 89/13 90/1 97/9 97/15 98/1 98/16 99/8 99/11 101/12 102/6 104/20 111/1 111/4 111/8 112/7 120/4 128/16 128/23 129/2 136/3 136/22 136/24 137/1 137/5 138/16 138/16 139/7 155/5 155/8 156/16 156/21 157/2 157/11 158/11 158/14 158/18 158/20 159/6 160/24 162/18 164/23 180/15 182/17 192/21
**officer [2]** 81/7 82/11
**Official [1]** 2/3
**often [5]** 6/7 6/8 6/10 36/18
**oftentimes [1]** 6/6
**Ogg [1]** 177/24
**Oh [15]** 75/15 84/17 100/12 109/4 125/5 154/15 160/2 161/5 166/1 180/20 199/22 209/11 213/25 215/23 220/17
**old [5]** 24/5 186/7 190/13 207/5 207/20
**omitted [1]** 122/18
**once [6]** 142/9 144/4 154/21 154/22 166/22 195/8
**one [89]** 4/17 5/16 14/23 17/2 17/16 28/17 30/22 30/23 31/25 40/16 42/6 42/22 45/7 45/15 45/17 46/17 49/10 49/13 53/14 54/7 54/10 55/17 57/9 65/5 70/8 80/18 82/14 84/10 86/8 86/11 87/11 88/3 91/3 91/9 92/15 98/13 100/1 100/23 101/18 101/19 101/24 102/3 102/10 104/19 105/14 106/10 112/10 112/10 112/21 130/16 133/2 134/16 138/3 138/13 143/6 146/5 147/16 148/4 148/7 148/20 149/21 150/4 150/21 151/3 151/18 152/24 159/19 160/17 172/17 173/18 175/3 176/12 180/17 181/5 182/3 186/2 186/14 197/7 203/8 209/11 209/20 209/22 209/25 210/3 218/2 222/16 223/13 224/5 228/9
**one-minute [2]** 102/3 102/10
**ones [5]** 73/23 76/9 106/11 227/12 227/14
**only [29]** 10/14 45/15 45/17 47/24 48/15 56/15 64/10 68/6 76/5 77/17 90/9 96/5 100/5 100/22 101/2 115/15

**only... [13]** 125/3 134/16 138/13 151/22 166/17 174/25 175/1 175/1 175/3 184/15 202/5 211/7 219/11

**open [19]** 8/3 8/5 9/4 10/13 15/7 15/12 15/16 16/12 44/7 61/11 61/23 62/5 67/24 70/1 136/17 157/1 157/20 164/4 206/24

**opening [5]** 87/16 139/21 140/14 140/18 143/2

**opens [1]** 73/12

**opinion [2]** 159/8 175/14

**opportunity [3]** 159/6 173/8 174/12

**oral [11]** 135/16 142/9 145/3 168/24 178/11 178/19 178/21 178/25 178/25 179/6 186/4

**Orally [1]** 15/21

**orchestrated [4]** 9/13 148/8 149/14 150/19

**order [16]** 4/1 15/6 15/11 17/6 61/16 61/18 61/20 77/25 78/18 137/10 141/9 146/5 202/21 204/25 226/19 227/20

**ordered [3]** 16/10 196/9 204/21

**ordering [1]** 184/14

**orders [1]** 186/2

**organized [3]** 7/3 7/10 82/14

**oriented [1]** 6/24

**originally [1]** 189/2

**other [83]** 6/6 17/9 31/9 40/3 42/20 55/7 55/8 55/14 59/1 59/1 59/11 63/12 63/16 63/16 66/18 69/8 70/15 70/17 76/8 85/24 92/12 98/17 98/19 99/10 106/11 110/10 112/22 115/14 117/4 119/3 120/11 125/8 128/6 139/5 139/6 146/19 146/22 156/24 159/16 159/24 162/19 163/24 169/24 169/25 173/12 173/16 173/17 174/2 174/16 175/19 177/3 177/21 178/6 182/9 191/23 195/2 195/25 198/10 198/23 198/25 199/13 201/19 201/20 202/3 202/4 202/9 203/19 210/11 210/13 210/17 215/24 218/17 219/3 219/9 220/17 222/16 223/20 224/5 225/17

**others [9]** 40/7 46/25 69/11 139/3 182/7 191/22 201/4 204/12 223/18

**otherwise [2]** 19/6 28/4

**ought [4]** 81/10 96/17 181/13 228/5

**our [11]** 5/2 61/22 83/23 151/6 151/6 151/6 166/25 178/22 189/12 193/9 222/13

**ours [1]** 5/7

**out [77]** 4/11 14/11 23/5 35/5 37/12 37/15 37/19 37/20 37/22 38/7 38/12 38/16 40/16 40/20 43/1 44/8 53/24 55/22 55/24 56/7 59/24 59/25 60/1 60/4 60/5 65/12 68/2 70/15 71/21 77/8 77/11 77/25 80/4 83/24 87/18 92/3 105/17 111/22 111/22 113/24 116/10 116/13 116/13 116/14 116/25 120/10 120/22 128/20 128/22 129/13 129/15 129/18 129/19 130/19 130/20 137/10 138/3 143/25 146/5 148/7 152/15 153/14 156/17 162/18 162/24 165/15 167/17 167/22 178/25 189/3 202/6 207/4 209/18 211/13 217/17

**out-of-state [1]** 202/6

**outside [2]** 46/16 111/22

**over [31]** 5/8 9/10 11/15 11/18 17/2 18/18 44/9 56/13 73/20 73/22 77/21 91/23 96/9 102/15 102/15 115/11 125/8 154/20 170/14 173/23 179/4 179/12 182/8 193/21 196/9 197/5 200/7 200/10 204/3 206/13 227/6

**overarching [1]** 148/8

**overheard [1]** 226/1

**overlap [2]** 5/2 5/7

**own [10]** 81/23 98/12 98/24 99/1 149/3 150/8 152/21 153/2 158/14 186/7

**P**

**P.C [1]** 1/16

**p.m [5]** 137/17 137/17 193/11 193/11 229/6

**P.O [1]** 1/21

**page [47]** 3/3 13/1 13/1 13/8 13/13 24/18 27/25 31/7 31/8 31/22 31/22 31/23 35/16 42/11 63/21 70/5 77/16 80/16 89/3 90/11 92/9 96/9 98/3 103/2 109/15 129/24 129/24 130/1 134/24 139/23 141/12 141/19 143/3 143/8 152/4 171/20 172/12 183/2 189/10 190/9 192/18 206/18 213/12 213/24 220/19 220/23 220/24

**page 1 [2]** 13/1 27/25

**page 109-7 [1]** 109/15

**page 12 [1]** 31/22

**page 13 [1]** 31/22

**page 14 [1]** 89/3

**page 15 [1]** 80/16

**page 154-16 [2]** 92/9 96/9

**page 154-5 [1]** 90/11

**page 170 [1]** 129/24

**page 18 [1]** 31/7

# P

**page 25 [1]** 13/1
**page 30 [1]** 172/12
**page 4 [1]** 192/18
**page 5 [2]** 189/10 206/18
**page 7 [1]** 190/9
**Page 78 [1]** 139/23
**page 82 [1]** 143/8
**pages [7]** 31/7 149/19
149/20 150/5 150/7 163/8
164/17
**Pam [5]** 144/19 144/22
145/11 192/24 192/25
**paper [2]** 60/15 193/5
**paperwork [2]** 112/3 114/1
**paragraph [12]** 16/13 16/14
16/16 77/16 90/23 121/18
121/19 141/20 194/12
206/19 206/20 207/9
**pardon [2]** 181/24 213/19
**parents' [2]** 159/18 188/21
**parole [5]** 129/5 129/17
129/22 130/19 130/20
**part [27]** 8/5 8/7 8/16 9/1
9/3 9/5 9/18 9/18 9/20 13/4
30/24 31/8 76/22 82/19
89/19 112/19 120/16 124/16
145/8 157/20 172/13 194/23
208/9 210/9 220/23 222/10
223/7
**participate [1]** 16/8
**particular [2]** 78/21 204/22
**parties [1]** 134/25
**parts [2]** 57/15 66/12
**Pasadena [1]** 144/24
**pass [3]** 193/8 226/8 226/10
**passage [4]** 85/9 92/20
92/23 93/1
**passed [2]** 85/13 112/22
**passing [1]** 209/6
**past [3]** 81/8 82/16 199/7
**pattern [1]** 177/17
**Paul [2]** 145/17 147/6
**pause [3]** 61/3 75/2 75/6

**paused [2]** 61/1 75/5
**paying [1]** 7/14
**pen [4]** 141/12 141/14
202/24 217/17
**penalty [1]** 161/17
**pending [9]** 80/19 81/6
92/10 92/11 92/14 93/1 93/4
93/12 93/13
**penitentiary [1]** 140/1
**people [22]** 12/10 82/4 83/3
83/3 83/8 84/4 84/10 84/22
87/2 97/1 99/11 139/6
151/16 152/14 178/9 178/21
179/18 179/19 197/10
204/11 212/17 223/17
**per [2]** 62/16 77/5
**Percely [13]** 41/9 41/9
41/10 42/2 42/7 105/5
105/12 106/3 106/14 106/17
107/3 107/23 182/23
**Percely's [1]** 107/19
**perhaps [2]** 209/24 210/4
**period [1]** 62/6
**permission [1]** 120/6
**permit [1]** 108/20
**person [15]** 10/14 12/18
19/6 39/3 71/24 72/6 77/12
86/17 92/15 94/1 95/3 95/23
175/19 211/21 224/5
**personally [1]** 136/23
**persons [1]** 92/12
**perspective [1]** 204/15
**persuade [2]** 58/21 59/10
**petition [12]** 18/3 22/23
23/8 23/9 41/6 65/24 68/7
111/17 147/23 147/23 148/2
151/3
**Petitioner [2]** 1/4 1/12
**petitioner's [11]** 3/4 193/23
194/10 196/13 205/18
206/17 207/14 207/19
217/14 220/5 222/13
**phone [64]** 17/18 28/5
28/11 28/13 28/21 28/21

38/10 41/8 41/24 64/15
64/18 65/13 69/6 77/12 97/8
97/10 97/12 97/18 97/22
97/24 98/4 98/10 98/22
98/23 98/24 98/25 99/1 99/7
99/7 99/13 99/24 101/1
101/12 101/14 101/17
101/20 101/21 101/25
102/12 102/13 102/17
102/18 102/19 102/20 103/3
103/3 103/10 103/15 104/4
104/8 104/12 125/19 125/21
125/24 128/11 128/17
130/11 131/17 131/20 175/9
187/20 187/24 187/25 188/7
**phones [5]** 97/19 98/4 98/7
98/25 99/2
**photo [4]** 66/5 66/23 191/19
191/25
**photograph [2]** 65/22
191/15
**photos [2]** 66/3 66/8
**physical [1]** 213/12
**picked [1]** 100/9
**picture [1]** 66/4
**piece [4]** 60/15 142/13
151/13 193/5
**pieced [1]** 148/14
**pink [1]** 104/19
**pipe [1]** 93/22
**place [7]** 12/25 24/22 75/1
133/3 146/6 162/3 163/13
**placed [1]** 99/16
**plan [2]** 5/9 178/23
**planning [1]** 5/4
**play [4]** 5/4 5/8 5/12 127/4
**played [5]** 5/23 126/22
127/5 127/8 218/25
**playing [1]** 138/5
**pleadings [1]** 4/6
**please [15]** 4/2 68/8 75/1
75/9 110/21 116/20 122/17
171/17 179/8 191/13 193/10
193/12 204/23 213/21 215/2

# P

**pleased [1]** 4/3
**pled [1]** 23/15
**plugging [1]** 138/8
**point [34]** 13/4 16/22 26/1
29/15 29/25 36/8 42/4 55/23
55/25 56/21 61/2 84/9 104/7
106/5 119/1 124/12 160/17
164/7 164/8 173/16 186/15
189/5 189/12 198/8 202/19
209/18 211/13 212/19
214/20 217/5 220/6 223/18
224/4 226/6
**points [2]** 51/10 159/9
**police [1]** 81/7
**policies [1]** 91/3
**policy [23]** 7/25 8/3 9/4
10/21 11/13 11/14 12/22
12/23 13/7 15/7 15/12 15/16
16/12 62/5 73/18 73/20 90/8
90/16 92/3 147/17 157/1
157/20 228/17
**pornography [2]** 154/23
154/24
**portions [1]** 5/7
**portray [1]** 140/5
**position [3]** 151/9 166/25
206/22
**possession [1]** 176/3
**possibility [2]** 55/7 117/8
**possible [4]** 116/4 125/16
173/11 174/19
**possibly [1]** 164/9
**post [9]** 18/14 147/13 163/8
164/17 173/5 175/24 187/16
188/12 192/18
**potential [10]** 38/19 38/20
38/21 38/22 65/21 117/1
118/2 141/20 195/6 195/16
**potentially [1]** 4/20
**practice [6]** 45/24 47/22
65/11 65/16 147/10 158/9
**practiced [1]** 211/11
**practicing [3]** 154/14

**precipitated [1]** 188/9
**precisely [2]** 151/10 198/5
**preclude [1]** 95/20
**preference [1]** 61/22
**prejudice [1]** 227/18
**premise [1]** 14/9
**preparation [1]** 171/6
**prepare [2]** 17/6 45/19
**prepared [3]** 35/17 42/10
42/12
**preparing [3]** 105/22
168/14 179/14
**prepping [1]** 12/11
**presence [2]** 56/18 140/25
**present [26]** 11/4 42/13
45/1 45/4 45/22 46/10 46/16
47/15 47/20 47/23 47/24
48/1 48/4 48/9 48/15 48/18
49/5 49/13 56/8 56/22 57/2
110/1 113/7 115/2 224/7
225/23
**presented [12]** 19/13 19/18
45/7 46/22 46/22 47/1 49/13
49/23 55/10 78/9 168/13
190/19
**presenting [5]** 47/25 48/2
48/5 48/10 51/1
**preserve [1]** 136/20
**press [1]** 207/13
**presumably [4]** 19/4 28/3
112/8 112/25
**presumption [1]** 199/12
**pretend [1]** 149/13
**pretrial [15]** 16/8 132/17
161/14 163/1 163/2 170/2
174/22 176/1 185/8 187/19
189/17 194/1 218/16 226/19
227/20
**pretty [12]** 70/13 86/6
88/25 96/17 100/22 108/1
140/19 157/3 160/24 160/25
169/6 189/22
**preventing [6]** 17/8 17/13

**previous [2]** 135/1 187/2
**previously [7]** 31/5 31/15
31/19 32/6 123/13 180/4
193/19
**PRIBLE [132]** 1/4 9/12
9/25 10/23 10/24 11/24 12/1
16/4 17/21 20/18 27/20
34/17 34/23 35/13 35/18
35/21 36/6 36/10 36/16 37/6
38/3 38/5 39/24 42/9 42/15
42/18 43/4 44/16 46/7 46/10
46/22 47/6 47/9 49/18 49/23
50/8 50/12 50/13 50/16
50/17 50/24 51/2 51/22 52/2
52/4 52/24 62/7 62/20 63/13
64/15 64/19 65/2 66/21 67/7
69/4 69/10 70/12 71/6 72/14
74/7 74/13 77/20 85/23
89/16 89/19 89/25 90/19
91/4 92/2 92/22 93/9 95/14
98/21 106/2 106/9 106/11
113/21 114/23 117/2 121/15
121/15 122/3 122/3 126/23
127/2 132/5 132/14 132/15
135/11 135/20 138/21
139/18 140/3 140/6 140/16
140/24 141/16 141/24
142/14 143/14 146/18 147/1
147/7 150/5 151/20 151/22
151/25 152/5 152/13 155/16
159/5 159/7 160/14 165/10
165/19 166/24 187/6 189/1
189/25 189/25 197/23
201/22 206/21 206/22
207/10 208/5 212/12 212/16
214/21 215/12 225/18
228/13
**Prible's [83]** 10/4 10/5
13/11 14/24 43/5 43/7 50/9
52/16 60/10 60/13 60/16
63/15 64/24 68/5 69/22
69/25 71/1 71/2 71/12 71/15
74/1 74/16 74/18 74/23 76/1

**Prible's... [58]** 76/16 76/17 78/9 87/24 88/2 88/4 88/6 88/7 89/22 91/7 92/7 96/19 102/16 103/8 106/1 111/19 115/4 115/5 115/21 116/1 116/2 116/12 118/6 118/10 118/15 120/13 120/19 120/23 122/10 132/17 135/12 142/18 145/5 145/10 147/23 154/10 157/6 157/7 157/25 158/4 159/2 172/6 172/24 175/6 176/19 179/16 184/25 190/11 191/7 194/7 194/24 195/7 196/19 197/2 197/6 202/2 204/24 205/1
**Pribles [1]** 188/19
**printed [3]** 38/12 38/16 73/19
**printout [3]** 98/3 116/22 134/25
**printouts [1]** 73/19
**prior [21]** 12/7 12/12 17/10 17/14 17/19 21/10 56/15 56/21 66/8 71/16 92/18 134/5 134/7 161/11 161/12 178/3 179/22 192/3 215/8 217/11 219/1
**prison [37]** 21/8 25/11 30/7 30/10 30/21 53/22 54/24 58/5 58/12 58/22 59/12 65/9 65/21 66/19 67/3 70/17 79/24 87/10 92/1 93/12 93/15 97/1 97/13 112/19 112/20 125/13 141/20 141/25 142/4 148/9 149/16 150/20 160/21 164/13 179/11 202/3 212/13
**prisons [4]** 59/18 59/18 99/5 103/2
**private [2]** 48/25 73/16
**privilege [1]** 137/3
**probable [14]** 19/5 36/15 36/18 36/22 37/2 37/5 37/10

212/24 214/18 214/22
**probably [7]** 21/5 95/1 102/9 110/8 126/13 155/23 214/3
**probe [1]** 216/16
**probing [1]** 195/8
**problem [3]** 84/18 110/20 153/1
**problems [1]** 119/17
**procedure [1]** 81/11
**proceed [5]** 4/13 170/22 170/23 193/13 213/16
**proceeding [5]** 11/22 12/2 48/9 50/3 72/16
**proceedings [6]** 1/24 47/23 48/13 48/17 49/8 229/9
**process [9]** 30/13 30/14 116/17 122/17 122/18 122/19 122/22 156/14 172/13
**produce [9]** 60/16 60/18 82/11 132/23 180/1 183/21 184/15 184/21 184/25
**produced [21]** 1/24 12/23 41/7 59/19 60/10 60/13 68/9 68/25 89/11 89/18 89/25 99/5 103/1 104/20 141/9 171/13 176/18 180/9 182/24 190/10 192/21
**product [20]** 17/9 18/23 43/19 43/21 44/9 62/14 62/17 62/19 62/22 63/2 63/4 63/5 63/8 141/7 141/10 157/17 157/18 157/22 167/2 167/6
**production [2]** 10/21 162/1
**prognosis [1]** 4/14
**promise [1]** 173/25
**promising [1]** 5/20
**prompted [1]** 195/24
**properly [1]** 227/6
**propose [1]** 5/4
**proposes [1]** 106/14

62/7 134/18 134/22
**prosecuting [6]** 13/15 15/4 15/5 15/9 16/8 16/9
**prosecution [5]** 111/18 135/2 142/17 144/4 183/4
**prosecution's [1]** 160/3
**prosecutor [37]** 7/5 10/14 13/18 13/22 14/8 36/25 50/5 52/14 78/18 80/14 80/23 80/25 81/2 81/9 82/17 90/10 116/6 116/9 116/10 116/13 116/17 117/7 119/11 119/14 121/23 122/7 125/13 129/1 131/23 132/1 155/25 158/6 164/5 175/6 196/9 198/6 202/5
**prosecutor's [3]** 82/22 156/16 204/18
**prosecutors [5]** 98/17 98/20 139/8 203/22 203/22
**prospective [3]** 205/6 205/8 205/13
**protect [1]** 146/19
**protection [1]** 44/9
**protective [3]** 61/16 61/18 61/20
**proves [1]** 106/5
**provide [8]** 15/4 15/10 158/6 163/22 164/5 167/11 167/19 168/5
**provided [7]** 4/8 34/4 166/25 207/16 217/10 221/22 223/6
**providing [2]** 127/13 219/19
**provision [1]** 163/11
**public [5]** 12/24 136/17 158/17 181/25 212/11
**pull [8]** 166/8 169/18 171/17 176/8 184/23 185/5 191/13 192/7
**pulled [1]** 71/21
**punishment [2]** 179/3 179/6

**P**

**purchase [1]** 175/17
**purports [1]** 194/19
**purpose [3]** 80/8 221/19
221/20
**purposes [4]** 82/22 146/20
169/12 226/20
**pursuant [1]** 61/20
**put [33]** 28/5 28/11 28/21
28/23 29/17 53/24 65/18
66/17 83/20 86/9 86/12
93/21 99/24 100/9 102/8
102/21 135/13 140/18
151/15 151/20 151/22
156/17 156/23 157/18
193/22 196/14 205/17 214/2
215/3 217/14 220/1 221/6
221/6
**putting [4]** 86/3 142/3
193/24 215/1

**Q**

**quadruple [1]** 211/14
**question [66]** 8/22 8/25
9/16 9/17 14/10 14/16 14/17
14/17 17/17 22/7 22/12
23/10 26/11 26/23 38/24
47/4 48/6 50/14 50/25 53/8
53/12 54/1 54/15 56/12 61/9
64/22 74/2 81/25 84/3 84/8
89/18 93/10 94/10 95/10
99/6 106/24 114/2 114/3
118/13 125/7 130/9 130/11
135/3 138/15 145/2 145/10
149/23 167/11 179/18
184/11 189/21 193/25
194/21 202/13 203/12
203/13 204/20 207/10
208/20 214/8 214/10 215/1
220/16 221/3 225/2 225/8
**questioning [1]** 22/5
**questions [8]** 8/18 9/14 17/1
46/17 61/4 61/19 181/21
218/16

**quote [7]** 9/1 13/15 16/19
87/5 121/13 126/14 126/22

**R**

**radar [3]** 20/18 26/25 27/15
**Rafael [8]** 40/3 52/19 52/23
53/8 53/23 55/15 185/1
185/3
**raise [2]** 72/2 153/22
**raised [1]** 184/5
**Ralph [1]** 31/24
**random [1]** 141/17
**Rangers [1]** 117/16
**rare [5]** 85/15 86/1 86/24
88/25 89/5
**rather [1]** 164/5
**razor [1]** 229/1
**re [3]** 104/22 186/9 189/20
**re-interviewed [1]** 189/20
**re-urge [1]** 186/9
**reach [7]** 37/12 37/15 37/19
37/20 37/22 120/10 128/19
**reached [9]** 14/11 38/7
65/12 77/8 77/11 116/25
162/18 217/17 217/19
**reaches [2]** 105/17 130/2
**reaching [1]** 128/22
**reaction [1]** 209/10
**read [64]** 8/6 8/8 8/9 8/17
13/14 18/3 20/25 59/4 61/6
61/11 61/24 67/25 68/1 70/1
70/2 71/20 71/21 77/3 79/13
79/14 83/6 85/9 86/17 90/24
91/1 92/20 92/23 105/7
113/9 113/9 115/11 123/6
124/6 133/1 133/18 134/2
140/12 141/6 143/10 148/23
149/8 149/17 149/17 149/19
149/21 150/1 150/3 150/4
150/6 150/6 152/6 152/9
152/13 152/15 152/21 153/2
163/10 163/12 206/20 207/3
212/7 212/9 212/10 220/6
**readily [2]** 182/10 212/6
**reading [7]** 62/9 90/5

143/10 173/9 173/16 173/18
187/8
**ready [7]** 5/21 75/21 75/22
213/16 213/18 213/20
217/24
**real [1]** 151/11
**realize [2]** 207/12 220/20
**really [9]** 18/4 84/24 85/12
119/2 140/7 146/3 147/3
224/3 228/15
**reasked [1]** 189/21
**reason [25]** 19/1 32/6 79/23
83/23 84/21 85/3 88/22
117/25 118/3 118/16 128/23
138/7 142/12 143/12 147/16
157/5 163/16 169/23 173/2
177/15 177/16 186/25 188/3
202/11 219/21
**reasonable [1]** 16/21
**reasons [4]** 57/5 66/22
146/19 180/17
**reassurance [5]** 118/24
118/25 119/2 119/4 119/7
**reassure [1]** 118/9
**reassured [2]** 118/18
119/13
**recall [75]** 7/20 7/22 17/25
19/17 19/20 20/8 20/9 20/15
21/14 21/17 21/22 21/24
22/2 23/14 24/10 26/20 28/7
28/10 28/20 29/7 29/9 29/12
30/4 30/16 34/22 36/13 39/5
39/5 41/10 44/13 45/9 45/11
60/7 60/7 64/5 64/18 65/1
77/7 94/5 94/12 100/10
100/12 110/24 111/10
115/15 123/5 125/23 126/2
126/3 127/19 152/16 154/20
155/15 158/3 159/1 159/24
160/3 174/13 175/21 185/8
185/18 192/12 196/16
205/19 206/9 207/21 211/11
212/23 213/9 215/6 215/6
219/7 219/13 219/19 223/2

**receive [2]** 135/16 168/24
**received [17]** 4/5 21/1 21/5
59/6 59/8 63/22 66/16 70/25
72/2 107/10 107/22 139/10
140/24 156/6 161/4 208/12
215/21
**receiving [5]** 64/11 108/1
123/5 126/3 227/8
**recently [5]** 65/8 166/6
179/23 180/11 193/6
**receptionist [1]** 102/7
**receptionists [1]** 131/17
**recess [4]** 75/8 137/17
193/11 229/6
**recognize [7]** 58/17 59/9
59/22 68/5 69/1 69/8 207/15
**recollection [16]** 76/12
112/14 112/18 120/17
131/14 167/5 185/21 187/21
189/16 220/7 221/4 221/17
221/21 222/8 222/9 222/11
**recollects [1]** 189/24
**recommending [2]** 172/13
172/16
**reconsider [1]** 126/22
**reconvene [1]** 5/12
**record [26]** 20/25 48/14
49/22 50/1 61/3 61/6 67/20
77/3 103/3 141/7 158/17
167/9 167/22 167/24 170/9
172/7 185/25 186/12 189/23
191/10 202/20 203/2 208/22
212/11 222/12 229/9
**recorded [4]** 1/24 30/24
97/12 97/19
**recording [2]** 35/25 97/14
**records [8]** 24/17 98/23
103/1 128/11 136/18 183/12
183/23 184/5
**recovering [1]** 13/14
**red [2]** 72/2 72/5
**reduced [2]** 58/13 209/23
**reduction [15]** 29/16 30/1

117/9 122/19 125/17 128/2
128/5 170/20 170/21 170/24
172/14
**refer [2]** 24/2 54/7
**reference [3]** 125/20 172/9
186/1
**referenced [1]** 33/4
**references [1]** 60/20
**referencing [1]** 39/20
**referred [3]** 80/24 115/10
211/10
**referring [8]** 55/15 106/8
113/11 122/19 166/19
172/18 208/8 208/10
**refers [2]** 85/9 85/9
**reflecting [1]** 190/6
**reflects [1]** 54/2
**refresh [16]** 22/16 32/3 33/6
34/10 104/22 120/17 144/3
185/21 187/21 189/16 221/3
221/17 221/25 222/7 222/9
222/17
**refreshes [2]** 220/7 221/21
**refuse [1]** 53/12
**refusing [1]** 8/22
**refute [1]** 142/17
**regard [2]** 186/5 186/11
**regarding [17]** 10/21 11/14
50/1 73/18 77/6 79/15 80/6
117/16 125/16 127/10 128/7
160/4 167/12 167/20 182/23
192/11 196/10
**regardless [1]** 56/2
**regards [1]** 82/16
**registered [1]** 227/22
**reimbursed [1]** 60/4
**reinform [1]** 186/11
**related [2]** 138/12 201/22
**relationship [4]** 157/10
199/3 202/11 206/24
**relative [1]** 194/4
**releases [1]** 182/2
**relevance [2]** 89/15 227/18

194/23 195/3 195/5 195/7
195/13 198/3 198/3 202/7
**Remains [1]** 157/13
**remember [163]** 6/19 12/21
18/5 18/7 18/10 21/10 21/15
21/16 21/21 21/23 22/1 23/5
23/15 23/16 23/20 25/24
26/4 26/18 27/3 27/19 27/24
29/3 29/4 29/6 29/11 30/21
30/22 30/22 30/25 31/6
31/18 32/13 32/16 32/20
32/25 34/21 35/24 36/11
37/24 39/4 39/9 40/24 41/23
42/3 44/11 46/25 48/21
51/13 55/17 55/22 56/20
57/4 58/17 58/20 59/13 60/9
63/14 63/15 63/18 64/2 64/6
64/6 64/7 64/8 64/11 64/21
64/25 69/7 69/8 78/2 78/6
79/17 88/21 89/23 90/2 90/3
94/4 94/6 94/8 94/14 94/17
95/8 95/9 100/16 101/4
101/6 101/7 101/7 101/8
102/19 103/22 104/9 104/11
105/4 107/13 108/13 109/14
111/2 111/21 111/25 112/2
112/5 112/20 115/23 117/18
117/18 120/1 120/3 120/12
120/14 120/16 123/6 127/18
127/24 128/4 132/8 135/25
136/1 139/20 141/1 141/2
142/10 142/11 142/15
142/21 145/13 149/21 156/9
157/6 160/12 160/16 161/3
161/14 161/15 163/1 163/16
164/20 164/21 164/23 166/1
168/8 168/9 168/10 168/25
171/1 183/5 185/2 185/14
185/19 186/13 187/8 187/20
188/16 188/23 190/5 192/5
193/2 211/15 212/1 212/25
219/24 224/3 224/9
**remembers [1]** 112/5

**remind [1]** 222/1
**reminded [1]** 134/3
**removed [1]** 10/17
**remuneration [1]** 162/12
**repeats [1]** 5/3
**rephrase [5]** 74/2 133/14
168/2 184/11 225/10
**report [16]** 9/23 33/7 33/16
38/11 38/18 73/2 73/11
73/14 74/22 75/4 76/12
76/15 76/8 117/16 183/15
186/3
**reported [1]** 221/13
**reporter [15]** 2/2 2/3 47/15
47/20 47/23 47/24 48/1 48/4
48/9 48/15 48/18 48/23 49/2
49/4 229/12
**reporters [1]** 49/7
**reports [18]** 7/25 8/1 8/5
8/16 9/1 9/2 9/6 9/9 9/19
9/21 10/3 10/5 18/9 20/6
73/4 76/6 76/8 214/24
**represent [13]** 12/23 17/21
18/2 19/22 35/12 68/25
69/15 103/15 104/19 111/3
155/16 159/5 194/19
**representation [1]** 13/6
**represented [5]** 87/15
105/15 148/15 176/2 194/10
**representing [2]** 18/4 89/24
**represents [1]** 195/6
**reputation [1]** 148/15
**request [20]** 12/24 30/12
47/18 54/6 57/17 59/16
82/12 108/2 108/7 110/17
135/22 156/11 161/25
166/11 168/25 175/21 176/4
176/23 189/12 228/22
**requested [6]** 9/23 9/24
109/7 109/9 175/15 196/8
**requesting [8]** 82/11 107/15
108/4 108/20 109/21 120/6
182/16 182/17

**requests [2]** 81/8 169/15
**require [4]** 7/8 7/10 169/2
170/5
**required [9]** 16/22 79/2
82/4 83/7 86/14 87/6 87/6
132/19 163/22
**requirement [2]** 16/18
16/20
**requirements [3]** 92/2
95/10 96/5
**requires [1]** 7/5
**requiring [1]** 57/24
**research [1]** 164/14
**resolved [4]** 93/13 93/14
93/14 170/14
**respect [18]** 4/16 4/18 46/21
47/6 47/11 181/14 194/1
194/11 194/22 196/13
200/12 206/7 207/19 211/2
212/2 215/11 219/11 224/2
**respectfully [2]** 108/20
120/6
**respond [2]** 25/15 25/20
**responded [4]** 163/21
173/18 186/12 187/23
**respondent [3]** 1/7 1/19
226/24
**responding [1]** 126/9
**responds [1]** 186/21
**response [6]** 12/24 114/7
134/13 135/19 189/19
204/21
**responsibility [1]** 82/22
**rest [5]** 5/5 17/9 68/23
113/9 152/15
**restate [2]** 20/5 50/25
**restroom [1]** 207/6
**result [2]** 132/4 147/13
**results [2]** 138/13 147/20
**resume [1]** 75/11
**return [4]** 102/12 102/14
102/18 131/20
**returned [2]** 102/16 102/20
**returning [1]** 102/19

**reveal [1]** 132/18
122/9 132/12 133/3 133/19
135/19 145/5 145/10 169/3
170/6
**revealed [4]** 122/1 122/6
132/9 132/21
**review [15]** 17/5 19/17
32/24 33/1 33/9 44/10 67/17
67/18 67/21 68/20 141/10
158/13 159/2 159/6 213/8
**reviewable [1]** 62/18
**reviewing [3]** 4/8 156/13
167/5
**reviews [5]** 168/7 213/14
214/7 220/13 220/25
**right [288]**
**rile [1]** 78/10
**ring [6]** 8/11 9/12 148/8
150/19 150/24 151/1
**rise [1]** 19/5
**Rivera [1]** 153/21
**RMR [1]** 2/2
**road [1]** 118/2
**robberies [1]** 152/10
**robbery [6]** 21/13 21/18
22/13 22/17 23/2 23/14
**Robert [2]** 104/21 108/18
**role [9]** 71/5 71/7 113/16
126/22 127/4 127/5 127/6
127/8 129/21
**RONALD [4]** 1/4 36/6 43/4
143/14
**room [4]** 10/11 49/3 156/17
158/24
**roommate [3]** 141/21
141/25 142/4
**Rose [2]** 12/24 58/20
**Rose's [1]** 13/6
**row [3]** 151/16 151/21
151/23
**rule [31]** 52/13 72/21 83/23
86/13 97/13 117/8 118/2
118/10 118/18 122/19
124/21 127/17 128/7 158/22

**R**

**rule... [17]** 170/20 170/21 171/4 171/25 172/5 172/8 172/13 172/20 196/15 196/23 198/12 198/16 201/2 202/23 205/18 209/6 228/19
**ruled [1]** 184/16
**rules [5]** 11/11 96/8 97/17 226/18 229/3
**ruling [1]** 226/25
**run [3]** 38/19 73/23 146/19
**running [1]** 73/9
**Rusk [1]** 2/3
**RYTTING [2]** 1/16 137/20

**S**

**S-H-U [1]** 24/3
**safe [6]** 53/23 54/6 54/24 58/22 59/3 59/12
**safety [1]** 146/20
**said [73]** 7/8 9/1 9/5 9/18 14/23 32/18 41/17 50/22 54/12 54/15 54/17 62/6 64/14 65/24 70/21 70/24 76/5 76/7 78/22 79/5 79/10 79/10 82/10 86/8 86/11 86/13 86/23 89/1 89/3 89/6 89/18 90/20 98/11 98/22 102/18 105/1 105/15 105/20 111/5 114/7 118/14 125/23 127/7 133/25 134/4 139/20 139/24 140/12 142/11 142/21 144/9 170/5 173/9 174/4 177/3 177/5 186/3 189/19 194/22 197/22 200/21 206/22 206/23 206/24 208/10 215/23 218/4 221/16 222/19 222/23 224/7 225/12 227/4
**sale [1]** 175/17
**same [42]** 4/24 7/6 7/8 11/16 14/6 24/22 24/23 35/13 36/25 46/11 46/13 51/21 71/24 72/3 72/6 89/4

109/3 109/7 112/3 112/4 112/7 119/8 125/2 129/24 130/1 162/22 163/16 164/18 169/3 174/18 180/3 180/10 180/10 188/8 189/23 191/6 203/20 218/25
**saving [1]** 136/24
**saw [17]** 24/20 35/24 40/3 65/24 66/4 66/5 66/6 66/8 85/15 157/7 190/14 201/8 207/1 208/10 209/8 221/25 223/8
**say [56]** 10/13 21/7 25/6 25/6 27/14 29/17 31/13 33/17 33/21 40/17 48/21 52/2 57/15 57/19 57/21 57/22 58/11 67/5 69/24 70/15 70/20 71/18 72/20 77/11 77/11 79/8 79/21 88/24 100/18 116/21 118/13 137/20 139/24 140/9 147/13 150/9 150/20 150/25 157/10 167/25 171/18 172/20 177/10 178/18 179/4 183/17 194/6 196/5 204/23 208/25 212/7 212/9 212/9 215/23 216/2 216/18
**saying [40]** 15/9 23/10 40/16 40/20 40/24 41/12 44/4 44/8 50/16 56/3 56/21 57/14 69/18 69/19 69/21 69/23 70/14 84/17 99/10 99/14 100/12 102/15 114/1 124/3 127/25 149/9 149/15 150/19 178/21 182/8 189/25 200/1 202/16 204/4 204/5 204/7 216/11 216/13 228/23 229/2
**says [84]** 13/8 13/15 15/3 16/7 24/19 24/25 25/7 25/10 25/12 26/2 31/8 31/8 31/12 31/23 33/16 33/21 35/16 38/15 41/6 42/11 54/4 54/5

54/5 59/16 60/5 63/21 64/17 66/24 77/16 90/15 90/15 92/10 99/4 100/16 103/9 105/9 105/11 108/19 110/17 113/10 116/19 116/24 117/19 117/21 119/4 119/16 123/7 123/20 123/21 123/21 123/25 126/8 126/11 133/2 134/25 136/16 141/12 141/20 144/19 152/5 152/12 152/12 152/15 163/11 166/21 167/8 170/6 170/11 172/12 172/15 174/16 174/17 178/18 178/24 188/1 190/3 190/3 190/13 193/3 206/21 210/24 221/16 221/16 221/24
**SCARDINO [3]** 1/13 1/13 206/7
**scenarios [1]** 92/5
**scene [1]** 17/25
**scheduled [1]** 46/15
**scheme [1]** 161/17
**scratchy [1]** 152/25
**screen [3]** 189/11 193/22 193/25
**screwing [1]** 206/23
**script [3]** 115/8 115/10 115/12
**se [1]** 62/16
**seal [1]** 61/14
**sealed [4]** 61/4 61/7 61/8 61/9
**search [1]** 138/12
**searched [1]** 39/1
**seat [2]** 153/20 153/21
**seated [3]** 4/2 75/9 193/12
**seats [1]** 137/18
**second [20]** 24/18 31/23 63/23 70/8 77/16 81/5 82/3 83/6 121/19 121/19 136/8 138/3 173/8 201/11 213/4 213/8 213/11 213/12 220/19 220/23

**seconds [1]** 193/16
**secret [6]** 48/13 48/18 48/20
87/20 91/12 91/13
**secretary [1]** 102/8
**section [7]** 82/10 82/10
82/11 86/16 133/1 135/15
162/3
**security [2]** 228/15 228/24
**see [154]** 9/2 9/19 9/21
10/25 11/1 17/14 17/19 18/4
20/12 26/8 27/25 28/2 28/25
29/1 30/8 30/12 31/25 33/9
33/18 33/24 34/8 35/1 35/18
35/19 37/5 38/14 38/16
39/13 42/11 43/19 46/16
61/5 62/24 63/20 63/22
63/25 65/3 66/25 67/1 68/8
68/9 69/14 70/6 73/14 74/3
74/3 74/4 77/23 80/20 81/3
81/12 82/24 89/9 97/23
97/25 99/23 100/3 100/19
101/19 101/22 101/23 102/1
103/2 103/5 103/11 104/7
104/8 105/23 105/24 107/17
107/18 108/13 108/24
109/18 109/25 110/18
110/19 110/20 110/21 113/8
116/22 120/8 120/9 120/25
121/5 121/17 123/3 123/4
123/9 124/5 124/7 125/20
125/22 127/11 128/16
128/18 129/5 129/8 130/3
130/9 131/6 131/9 132/17
133/2 133/6 133/7 135/2
135/17 136/18 140/3 141/13
141/14 141/21 144/20 152/6
156/11 161/20 162/6 163/21
164/2 164/24 167/3 168/17
168/17 171/13 174/5 176/5
178/16 178/18 180/17
181/20 182/18 184/20
186/16 186/23 189/14 190/7
190/10 190/13 191/20

195/15 201/3 201/19 202/3
202/7 208/11 213/17 220/6
221/21 223/9
**seeing [15]** 9/22 58/17
58/20 60/7 60/9 117/3
154/20 158/3 177/12 179/23
185/2 185/19 188/22 203/17
213/9
**seek [4]** 198/11 199/9
199/11 199/23
**seeking [3]** 92/17 162/12
162/24
**seemed [1]** 215/24
**seen [35]** 19/23 19/25 20/3
58/15 58/18 65/8 69/1
111/16 129/7 129/10 129/11
131/2 168/11 168/12 176/2
176/20 179/13 179/22
180/10 183/24 185/20
188/20 188/20 190/15
191/24 192/3 192/4 193/5
202/15 203/24 215/8 215/10
220/14 221/1 222/17
**segregation [2]** 23/25 24/2
**sell [1]** 83/21
**selling [1]** 92/25
**semen [8]** 142/22 143/14
143/18 144/20 145/3 145/6
145/12 193/3
**send [1]** 65/19
**senior [1]** 186/7
**sense [11]** 12/15 66/13
69/20 78/2 101/9 131/16
157/8 197/8 197/8 200/1
200/5
**sent [4]** 27/1 136/10 139/10
173/22
**sentence [24]** 29/16 29/25
56/10 57/8 58/12 59/21 81/9
116/4 116/15 116/16 116/22
117/3 117/23 118/1 118/4
122/19 124/10 125/16
125/17 128/2 128/5 170/25

**sentenced [2]** 58/5 117/20
**separate [3]** 81/24 112/12
156/17
**separated [1]** 132/6
**separately [2]** 27/12 27/13
**September [3]** 155/17
155/18 163/2
**September 10th [1]** 163/2
**September 28th [1]** 155/18
**serious [1]** 93/2
**serologist [1]** 193/1
**server [1]** 137/2
**session [1]** 189/14
**set [6]** 50/12 50/16 50/20
106/19 122/3 143/24
**setting [1]** 141/24
**seven [1]** 77/20
**Seventy [1]** 145/8
**Seventy-two [1]** 145/8
**several [4]** 71/4 82/4 83/7
161/16
**sex [2]** 142/18 207/12
**shall [6]** 15/4 15/10 16/8
16/10 82/19 82/20
**share [1]** 91/14
**she [81]** 4/9 8/24 19/25 20/2
26/10 26/12 33/19 34/6
102/9 144/23 145/1 145/6
145/11 160/17 165/1 165/5
165/8 165/11 165/12 165/18
165/18 165/21 166/2 167/19
171/3 172/5 172/7 172/8
172/20 172/23 173/20
173/23 174/13 175/8 177/10
177/11 177/19 181/10
186/18 187/5 187/11 187/20
188/3 188/19 190/3 190/20
191/6 193/1 196/15 196/23
196/24 197/2 197/6 198/10
198/11 198/11 198/13
198/14 198/14 198/15
198/16 198/25 199/3 199/4
199/15 199/23 200/24 201/2

**she... [13]**  201/4 201/19 202/23 203/15 203/19 204/3 204/9 204/12 205/4 206/24 208/2 216/3 216/18
**she'll [1]**  173/20
**she's [8]**  167/15 173/19 173/24 181/7 204/8 204/11 225/7 227/22
**sheet [2]**  110/16 116/22
**Sheriff's [2]**  18/8 33/7
**shot [3]**  160/7 164/12 192/16
**should [16]**  4/12 13/15 43/23 62/2 68/12 68/13 68/19 110/13 114/2 125/18 128/24 129/7 132/20 137/14 138/2 203/15
**show [53]**  20/10 22/4 26/6 30/8 35/15 39/11 43/16 63/20 67/10 67/13 72/15 74/3 76/22 77/14 89/7 97/21 108/17 116/18 117/14 123/1 124/1 126/20 127/9 128/10 132/16 134/20 136/14 137/3 139/21 141/5 143/2 144/17 166/7 171/20 172/1 174/15 176/23 177/22 179/7 179/24 182/12 190/9 191/15 196/1 206/16 209/21 210/1 210/10 211/4 211/22 214/25 220/5 223/2
**showed [14]**  26/20 35/25 69/21 69/24 109/20 110/12 128/1 178/2 179/13 180/11 185/20 191/25 221/14 222/2
**shower [1]**  77/22
**showing [2]**  41/9 212/13
**shown [12]**  15/25 66/10 90/9 176/20 182/6 190/15 193/6 193/24 194/9 206/8 207/19 215/8
**shows [6]**  41/24 104/21 114/1 117/22 172/7 203/19

**shred [2]**  148/20 150/13
**SHU [10]**  23/18 23/21 23/22 23/23 24/2 24/4 24/14 25/3 25/4 26/3
**shut [1]**  193/4
**sic [5]**  10/4 143/3 198/23 199/3 228/9
**side [1]**  162/18
**Siegler [98]**  4/4 5/21 5/23 14/12 25/15 31/11 33/19 34/3 34/6 60/25 62/4 75/23 97/21 100/13 108/21 120/13 136/2 138/11 149/23 156/1 156/2 156/3 158/3 160/16 163/21 164/7 164/18 165/1 165/8 165/24 166/16 166/21 167/10 167/11 167/19 168/5 170/6 170/11 171/3 171/10 171/22 172/1 172/4 172/15 173/8 173/18 174/4 174/7 174/17 175/4 176/2 177/4 177/6 178/20 179/2 179/10 179/25 180/8 180/18 182/23 184/14 186/10 186/12 186/21 187/1 187/2 187/19 187/23 188/1 188/7 189/19 190/20 190/23 190/24 191/2 196/14 197/5 198/19 199/14 200/12 202/22 203/4 203/15 204/2 204/3 205/3 205/19 207/16 216/1 216/2 216/8 216/12 216/18 217/4 217/17 217/19 218/2 224/25
**Siegler's [6]**  5/5 5/13 5/17 192/10 199/3 218/9
**sign [9]**  36/19 60/4 82/4 83/3 83/3 83/8 84/5 84/22 91/3
**signaled [1]**  183/25
**signature [2]**  194/18 229/12
**signed [6]**  36/23 60/5 72/17 84/10 130/19 168/18
**signer [1]**  86/21
**similarity [1]**  71/25

**simpler [1]**  73/6
**simply [4]**  78/19 84/2 208/9 222/7
**since [14]**  12/16 17/2 20/5 42/19 77/19 91/1 114/14 154/15 165/9 177/8 177/10 177/20 177/21 181/19
**sir [9]**  137/8 151/17 153/19 153/21 153/25 157/12 161/1 174/4 174/17
**sit [4]**  153/16 158/24 163/25 164/23
**sitting [1]**  131/14
**situation [12]**  11/3 81/5 82/3 82/6 83/7 90/17 92/4 92/7 95/14 116/14 116/15 159/2
**situations [7]**  80/17 81/16 81/20 82/1 83/1 90/8 119/19
**six [10]**  71/1 71/1 83/3 95/10 98/17 100/6 100/8 100/17 149/19 152/11
**skeptical [2]**  177/18 177/18
**slash [1]**  87/15
**slipped [1]**  229/1
**slips [1]**  104/20
**Slow [2]**  173/14 173/14
**small [1]**  143/20
**smaller [3]**  86/15 86/15 86/23
**smoking [1]**  143/25
**snitch [4]**  84/2 93/6 96/13 209/13
**snitches [3]**  8/11 9/12 199/24
**solution [1]**  119/17
**solve [1]**  7/3
**some [44]**  13/4 13/9 20/24 26/1 29/25 32/6 36/8 38/5 42/4 55/23 55/25 56/21 76/23 84/16 84/16 102/18 102/20 104/7 108/11 118/25 119/7 122/18 124/15 126/12 126/18 128/23 138/7 141/17

**some... [16]** 146/2 147/23 148/1 151/5 157/3 157/5 159/16 161/19 162/12 163/7 189/5 191/6 199/7 210/11 210/12 226/23
**somebody [5]** 146/5 146/23 178/7 225/25 226/21
**somebody's [1]** 143/18
**somehow [2]** 165/4 216/19
**someone [12]** 18/25 60/3 65/11 77/9 128/22 130/20 131/3 147/13 153/14 195/9 200/25 226/2
**something [16]** 13/4 35/15 38/18 59/14 70/16 85/4 89/19 137/20 142/23 157/4 158/17 162/12 173/24 216/23 217/3 228/14
**sometime [2]** 21/4 161/5
**sometimes [5]** 6/20 10/12 10/12 16/2 104/15
**somewhat [1]** 186/6
**somewhere [6]** 23/21 68/12 137/1 160/21 172/8 210/17
**son [3]** 26/10 26/12 64/8
**soon [4]** 44/23 108/1 173/11 174/19
**soot [1]** 17/24
**sorry [24]** 12/1 12/9 24/8 31/22 33/14 47/17 48/6 54/10 86/25 93/14 94/22 108/5 137/4 138/10 139/8 171/19 173/6 184/20 206/2 207/14 218/8 220/18 221/5 228/20
**sort [5]** 45/19 146/2 162/12 169/13 209/18
**sought [1]** 80/19
**sound [3]** 89/18 91/12 155/20
**sounded [2]** 126/5 225/10
**sounds [7]** 5/9 91/25 123/15 138/6 148/7 155/19 217/24

**sources [1]** 210/8
**SOUTHERN [1]** 1/1
**speak [12]** 42/2 42/9 64/23 69/6 74/19 94/25 97/3 99/12 104/3 105/2 131/12 153/24
**speaking [13]** 26/15 29/9 42/12 64/18 72/12 97/9 98/15 98/19 100/15 103/18 103/21 104/3 118/14
**speaks [2]** 126/24 208/22
**special [24]** 23/23 27/9 36/25 80/24 80/25 81/8 82/14 82/18 82/20 82/20 82/23 84/6 84/8 84/9 84/17 85/14 86/19 86/21 90/12 98/12 128/16 130/3 130/12 131/10
**specific [4]** 26/23 81/20 96/10 112/18
**specifically [12]** 30/6 47/5 57/17 79/12 112/16 138/20 169/15 183/21 183/23 189/11 204/21 206/17
**specifics [2]** 67/23 141/2
**specimen [1]** 159/10
**speculate [3]** 161/8 161/9 161/10
**speculating [1]** 100/25
**speculation [3]** 203/6 215/14 217/22
**spent [1]** 177/22
**sperm [1]** 159/10
**spoke [25]** 25/22 28/4 28/7 28/20 29/13 32/14 46/5 46/18 52/4 52/6 52/8 52/19 65/12 94/19 94/23 100/18 101/3 101/5 103/7 103/23 120/2 131/15 133/11 133/12 145/6
**spoken [11]** 6/19 42/4 43/6 50/9 64/15 78/21 131/19 133/20 135/8 145/11 187/3
**standard [2]** 183/7 206/12
**standpoint [1]** 162/11

**star [1]** 27/1
**start [6]** 17/24 75/17 152/4 200/7 200/10 218/16
**started [6]** 4/7 18/16 18/18 26/18 27/19 145/4
**state [47]** 11/21 12/7 12/8 12/11 72/16 87/11 105/10 121/13 124/4 129/17 129/22 151/12 154/19 159/18 166/12 166/14 169/2 169/16 170/6 170/9 170/9 170/9 171/14 172/1 174/22 176/18 180/1 180/9 182/24 183/21 184/21 184/25 186/2 187/25 188/24 189/4 189/8 189/17 190/16 190/17 195/17 195/19 202/6 203/22 207/14 221/13 223/7
**state's [16]** 20/14 132/23 133/4 151/11 151/11 159/7 159/8 159/8 159/9 159/25 162/4 163/13 172/12 192/12 219/8 219/10
**stated [12]** 23/7 33/19 34/6 144/8 164/18 166/15 172/7 176/1 180/4 185/24 189/23 192/11
**statement [59]** 7/15 7/22 15/2 15/9 15/15 19/24 24/24 44/18 44/19 50/20 50/22 77/9 77/15 78/5 78/14 78/16 79/10 79/11 87/16 115/2 115/7 115/14 115/16 127/6 133/5 139/21 140/14 140/18 143/2 160/18 161/11 163/14 164/1 165/23 166/16 166/17 166/18 166/23 167/9 167/12 167/20 167/22 167/23 168/1 168/20 171/9 178/25 179/11 194/4 194/11 194/21 194/23 201/13 208/3 208/12 223/4 224/11 224/14 225/25
**statements [15]** 7/18 10/22 11/5 48/24 151/7 166/12

## S

**statements... [9]** 178/11
178/15 178/19 178/21 179/5
179/6 194/2 194/3 211/19
**states [6]** 1/1 22/23 34/3
178/20 183/12 186/18
**Station [1]** 1/22
**statistically [1]** 143/16
**stay [1]** 49/3
**steal [1]** 178/8
**stenography [1]** 1/24
**step [3]** 153/14 226/11
226/12
**Steve [9]** 77/17 77/20
175/16 177/1 188/22 206/22
206/24 207/1 207/10
**Steve's [1]** 206/25
**still [15]** 12/4 32/6 55/1 61/7
74/20 95/17 95/19 109/14
118/3 121/21 136/15 166/25
174/7 174/10 227/1
**stop [4]** 83/24 200/7 200/10
212/20
**stopping [1]** 86/3
**stored [1]** 138/17
**stories [1]** 223/23
**story [9]** 56/17 66/20 66/22
78/1 78/4 127/20 127/23
142/18 160/12
**straight [1]** 147/9
**street [5]** 83/12 84/16 87/3
95/13 96/7
**streets [3]** 83/20 92/25 93/7
**stupid [2]** 71/13 147/3
**Subdivision [1]** 77/19
**subject [3]** 15/5 15/10 61/16
**submitted [1]** 18/9
**submitting [1]** 60/8
**subpoena [9]** 189/8 219/20
221/14 221/22 221/23 223/3
223/5 223/8 223/9
**subpoenaed [1]** 189/7
**subpoenas [1]** 158/10
**substance [3]** 43/13 51/3

**substantially [1]** 5/3
**such [10]** 62/15 66/3 80/18
81/10 82/18 82/21 82/23
90/10 158/7 168/1
**suddenly [1]** 42/18
**sufficient [3]** 42/23 44/15
78/19
**suggesting [2]** 181/4 181/10
**suggests [2]** 4/14 217/16
**Suite [2]** 1/14 2/3
**superior's [1]** 170/21
**supervisor [2]** 82/12 86/22
**supplemental [1]** 33/7
**supplements [1]** 190/6
**supplied [1]** 166/15
**support [2]** 148/19 148/20
**supports [1]** 151/14
**suppose [1]** 102/6
**supposed [2]** 57/2 110/17
**supposedly [3]** 35/3 157/24
187/6
**sure [33]** 27/3 27/19 27/21
37/4 47/6 61/13 63/18 71/18
74/3 76/7 100/22 104/11
114/11 115/10 115/11
115/17 116/5 119/8 146/18
147/15 149/10 156/5 161/5
176/11 176/13 189/5 189/7
198/17 199/8 199/10 208/9
213/2 227/6
**surprise [1]** 139/17
**suspect [8]** 21/25 22/10
22/19 38/21 38/22 73/20
76/20 187/1
**swallow [1]** 143/20
**sworn [2]** 153/23 154/5
**system [3]** 138/7 148/9
150/20

## T

**take [43]** 4/11 4/16 5/12
6/15 6/18 15/25 30/14 40/10
44/8 48/19 48/23 62/8 65/21
66/15 75/7 76/4 93/9 102/9

119/12 120/10 137/10
137/14 151/9 153/3 153/21
155/10 159/7 164/20 172/4
178/22 185/9 191/11 193/9
194/18 213/8 226/16 227/1
227/3 227/15
**taken [9]** 75/8 99/18 110/5
110/7 137/17 141/15 191/15
193/11 229/6
**taking [5]** 71/20 83/10
83/10 153/4 206/22
**talk [14]** 8/15 13/25 14/12
16/17 48/14 60/23 91/18
99/17 107/5 110/20 114/15
116/6 117/5 161/19
**talked [28]** 17/1 25/19 26/1
28/3 29/11 43/9 52/16 68/6
73/3 77/11 89/3 95/2 101/1
104/2 104/6 130/10 166/22
173/21 173/25 188/8 189/5
192/2 208/5 208/5 208/8
212/16 212/18 212/19
**talking [37]** 6/17 23/9 26/18
31/23 33/23 34/2 38/2 38/3
42/25 58/24 62/5 70/20
70/23 72/8 73/25 77/13
81/24 90/11 94/11 99/10
99/11 105/12 106/2 106/3
106/4 106/4 112/25 115/24
115/24 125/8 139/10 150/12
189/25 194/6 206/21 212/20
225/21
**talks [3]** 69/10 116/3 118/5
**taped [1]** 151/7
**TDC [1]** 228/16
**team [9]** 58/21 59/10 59/11
60/11 60/14 60/17 60/18
69/22 69/25
**technical [1]** 197/8
**technician [1]** 221/9
**technology [2]** 4/11 4/18
**Ted [3]** 108/4 108/18 120/4
**teeth [1]** 193/4

**T**

**telephone [5]** 64/23 102/22
103/1 104/13 186/19
**telephonic [1]** 226/23
**tell [54]** 4/9 18/4 32/9 36/5
40/19 40/21 40/22 47/2 47/8
47/11 50/8 50/11 50/15 51/2
63/9 65/21 74/5 114/15
119/11 121/2 126/16 128/11
133/8 133/16 140/2 140/14
140/15 143/11 143/11
143/15 143/17 147/19
152/11 154/13 164/18
164/23 165/1 165/8 165/12
165/18 165/21 165/24 166/2
172/15 172/20 173/8 181/17
190/20 190/23 191/2 194/2
194/2 197/1 197/12
**telling [7]** 48/19 58/11
106/17 106/18 106/18
119/13 177/19
**Temple [8]** 7/13 7/17 11/3
11/8 11/22 36/17 136/2
139/1
**ten [2]** 75/7 193/10
**ten-minute [1]** 75/7
**term [1]** 63/7
**terms [9]** 92/18 162/23
175/2 179/19 183/12 183/14
185/19 198/11 219/1
**Terry [12]** 43/7 67/24 68/2
76/4 76/9 78/16 78/17 79/6
79/12 79/13 153/12 154/5
**test [1]** 17/22
**testified [42]** 4/24 7/13 7/17
11/6 20/16 21/9 22/9 36/17
58/7 59/2 62/14 63/14 72/21
74/7 91/18 94/9 96/19 96/21
96/22 117/9 117/10 118/9
118/19 120/13 122/23
126/12 126/17 136/2 136/5
139/2 140/23 154/5 172/5
172/8 172/17 175/11 182/9
196/13 207/18 207/20

**testify [34]** 7/19 9/8 10/4
32/12 41/21 46/2 47/3 47/9
47/12 54/14 54/17 54/25
65/22 67/6 69/3 74/8 75/25
76/16 85/17 87/10 88/21
92/1 119/10 132/10 132/11
144/16 181/2 181/12 196/18
196/21 202/6 210/16 217/24
221/16
**testifying [14]** 41/21 52/10
53/24 76/6 76/8 84/2 135/8
184/15 184/17 196/16 205/4
207/23 211/5 211/7
**testimony [77]** 4/16 5/15
22/22 35/25 46/18 48/23
49/14 49/14 54/25 55/11
55/20 59/20 67/13 71/14
71/17 75/16 79/9 89/4 90/16
92/20 102/17 103/23 111/3
115/9 116/20 120/15 125/15
134/3 135/16 139/24 143/21
144/10 144/17 153/2 159/12
160/10 160/11 162/13
162/23 168/14 168/24
169/14 170/13 175/2 175/10
176/11 179/14 181/13
181/13 181/23 188/11
193/22 195/1 195/17 196/8
197/20 199/16 199/20
200/11 200/16 202/25 203/1
206/6 206/11 209/1 209/19
215/4 216/8 216/19 216/22
223/9 223/21 224/15 224/21
225/13 225/16 227/9
**testing [1]** 169/12
**TEXAS [10]** 1/1 1/14 1/17
1/22 2/4 117/16 124/4
136/16 136/17 161/17
**than [24]** 6/8 11/3 13/9
25/11 42/20 57/9 63/16 78/4
81/24 83/2 84/4 93/5 112/13
128/6 149/1 151/4 152/24
159/24 164/5 169/25 175/19

**thank [19]** 4/2 75/9 75/12
75/20 123/2 143/7 171/22
176/14 200/8 205/15 205/25
214/4 214/5 226/11 226/12
226/13 228/6 228/21 229/4
**Thanks [1]** 110/21
**that [1428]**
**that -- well [1]** 56/16
**That'll [1]** 154/4
**that's [158]** 5/1 5/1 5/17
7/15 8/21 14/9 14/20 17/4
17/23 18/15 21/3 23/3 23/25
25/4 25/10 25/12 28/14 30/2
31/8 33/15 42/10 43/21
52/12 53/21 54/2 54/15 56/5
57/9 59/14 61/23 61/25 64/8
64/17 68/11 70/6 70/21 71/9
75/9 75/18 78/8 78/22 78/25
79/9 79/10 83/9 83/14 85/15
86/24 87/2 89/1 89/5 90/14
90/15 91/5 94/10 96/8 96/14
97/13 100/1 100/18 103/9
105/11 109/1 111/5 112/6
116/24 117/21 121/19
121/24 122/5 123/20 123/21
123/25 124/16 124/16
130/16 133/13 133/19
135/23 135/24 136/15
137/18 139/23 140/12 142/1
142/6 143/20 144/1 144/9
146/3 146/10 147/5 150/5
150/12 151/22 152/8 152/25
153/17 153/18 158/25
161/25 166/17 166/17
166/18 166/21 167/7 167/9
167/13 168/1 170/2 170/8
170/25 171/4 173/6 173/25
174/4 174/17 176/13 181/21
182/3 182/12 182/16 184/10
184/16 187/14 190/4 191/22
194/18 194/19 195/12
195/12 195/15 196/17 197/4
197/20 197/21 197/21 198/2

**that's... [20]**  202/16 203/1
204/4 204/5 205/9 206/12
207/12 207/22 208/1 208/17
208/22 209/20 209/22
209/25 210/3 210/5 217/23
225/7 228/19 228/21

**their [30]**  4/20 5/5 5/11 18/9
48/20 48/25 60/18 67/3
80/10 83/11 98/12 144/1
157/20 159/14 160/7 176/3
180/20 183/22 183/23 184/6
192/15 209/19 209/23
214/13 214/15 222/14 223/8
223/9 223/23 223/25

**them [86]**  4/8 4/16 4/17
4/25 9/6 10/11 10/19 12/7
14/14 17/7 17/11 30/8 34/3
34/5 35/3 38/5 44/9 46/16
49/13 53/24 54/6 59/1 64/4
64/6 64/6 64/7 65/13 65/13
67/14 67/17 67/21 70/1
73/17 73/22 73/24 74/4 74/8
76/7 85/16 86/25 88/23
90/18 96/18 96/22 107/8
112/13 112/13 112/18
112/21 119/8 132/6 136/12
136/13 136/24 136/24
138/15 138/17 139/13
139/14 139/15 139/16
140/15 146/21 146/23 147/4
147/5 148/4 150/20 150/20
150/25 150/25 151/2 157/4
179/23 190/14 197/7 201/2
202/24 215/1 215/3 215/22
216/3 223/21 223/22 226/21
227/3

**themselves [4]**  83/11 85/1
180/25 181/9

**then [75]**  4/23 5/5 5/6 5/10
5/11 5/11 5/12 7/24 20/7
23/4 25/20 33/19 34/6 37/8
37/11 39/2 42/24 46/17
61/12 81/11 83/19 93/21

94/7 101/25 102/8 102/8
102/12 105/17 111/14 112/4
112/5 130/7 133/22 134/4
137/24 138/22 146/2 155/14
156/15 156/15 158/6 167/25
172/4 174/12 177/15 177/20
177/21 179/4 179/5 180/23
194/9 195/5 195/21 196/18
198/5 201/9 203/3 205/12
207/3 207/4 207/5 207/6
207/10 207/13 211/1 212/4
215/2 216/22 217/6 217/7
217/12 217/12 223/2 224/15
225/10

**theorized [1]**  148/14

**theory [13]**  139/18 140/10
142/3 142/8 142/8 142/12
142/22 144/3 160/3 160/7
192/12 192/12 192/15

**there's [29]**  5/3 13/25 16/12
19/21 37/9 41/8 48/15 70/6
99/19 101/20 101/25 102/4
102/10 110/20 118/21 121/7
121/21 138/13 148/1 148/6
167/21 203/2 213/11 217/2
220/17 220/17 220/19
224/24 228/17

**thereto [1]**  82/13

**these [82]**  7/4 8/16 13/9
24/17 25/10 33/24 38/3
39/13 46/10 48/25 59/1 59/1
59/11 71/14 71/17 71/18
71/22 72/3 72/8 74/4 77/8
77/12 78/8 79/12 80/13
81/20 82/1 83/1 83/1 83/25
86/15 86/15 86/23 88/24
89/3 91/15 92/2 92/6 93/8
95/10 96/5 96/8 99/5 102/19
104/16 104/19 109/15
112/19 113/18 114/5 118/8
119/17 119/20 141/15
141/17 151/15 152/16 178/5
178/6 179/18 179/22 179/22
180/17 180/24 181/8 181/21

180/25 184/5 188/21 191/24
195/25 199/23 199/23
209/11 215/25 216/19
216/24 217/12 218/17
218/20 218/23 227/7

**they [170]**  4/19 5/5 8/8 9/20
10/9 10/11 11/1 11/2 12/11
12/15 12/17 12/19 12/20
15/13 15/14 15/17 15/18
17/22 18/23 18/24 19/1 19/6
24/23 25/6 32/19 35/14 37/7
37/11 38/3 38/4 39/15 42/22
43/18 43/23 44/14 44/23
44/23 45/2 45/3 46/16 46/17
48/14 48/14 48/19 48/25
49/2 49/3 49/9 59/12 62/8
62/9 62/11 64/5 65/14 65/18
65/22 66/10 66/14 67/15
67/18 70/1 70/2 70/23 71/7
71/8 71/8 71/11 71/25 72/3
72/5 72/12 73/4 73/6 73/7
73/16 78/10 78/14 80/1 80/2
84/23 85/1 85/15 86/24
88/25 91/16 92/3 96/5 96/12
96/24 96/24 100/12 102/11
104/16 110/7 110/8 111/21
111/22 112/12 112/15 113/2
119/6 119/12 133/3 133/25
136/25 137/1 138/15 138/15
138/22 139/13 139/15
139/16 141/15 142/3 146/2
146/3 147/1 147/2 147/8
147/14 147/15 156/17
156/23 157/3 157/5 157/18
160/5 162/24 163/2 163/17
163/22 163/24 164/10
164/21 166/17 166/24
168/14 170/5 170/22 172/15
173/9 174/25 175/2 176/3
180/15 181/22 183/11
183/22 188/23 189/8 190/3
190/5 190/19 196/10 197/18
197/24 202/4 202/24 203/22
209/21 209/23 210/1 215/11

**they...** [7] 215/19 218/17 223/23 223/25 225/3 227/3 228/18

**they're** [22] 5/4 18/22 24/22 25/1 43/22 64/8 70/14 97/14 97/14 99/3 106/2 106/4 106/7 112/25 112/25 141/7 145/22 147/14 181/22 210/2 216/11 226/25

**they've** [2] 227/10 227/13

**thick** [2] 79/18 90/21

**thing** [14] 59/4 119/5 119/8 125/2 143/17 147/3 151/22 156/7 168/22 169/3 174/18 188/8 189/23 213/17

**things** [19] 4/13 7/6 7/9 10/17 13/10 48/15 63/5 70/20 117/4 119/3 119/3 133/2 156/24 159/16 167/23 177/19 199/7 211/2 227/17

**think** [81] 7/5 7/8 10/2 14/2 14/20 19/25 25/21 26/23 29/24 30/2 32/6 32/11 43/15 44/22 45/3 47/19 47/21 48/4 55/1 55/2 55/17 57/20 62/19 62/20 66/11 68/12 71/8 71/25 91/24 96/11 104/11 105/14 106/2 106/2 107/22 112/9 112/10 116/5 116/6 125/2 125/12 129/12 136/5 137/6 137/8 138/21 143/7 144/16 145/8 148/2 148/4 150/2 150/6 150/6 152/8 154/2 154/2 161/7 163/22 163/24 163/25 169/17 174/1 177/16 190/3 200/18 202/19 204/4 208/20 208/22 209/14 212/3 214/16 216/11 217/23 219/21 223/13 223/18 225/7 227/13 228/16

**thinking** [1] 148/17

**thinks** [1] 80/11

**third** [4] 70/5 134/24 156/5

**this** [486]

**thorough** [4] 7/3 7/10 42/25 79/19

**those** [53] 4/5 5/8 5/12 6/15 9/9 10/3 10/5 14/5 18/21 43/21 47/1 47/3 47/23 49/7 49/8 71/23 73/4 73/20 86/18 87/2 90/6 90/8 92/23 93/2 96/10 97/1 97/19 98/6 98/13 99/12 99/13 101/22 102/20 109/9 138/16 143/7 151/14 159/13 159/15 159/19 161/19 186/8 187/25 188/7 191/24 206/8 207/21 211/2 215/6 215/8 215/10 215/21 218/16

**though** [6] 44/21 56/6 72/13 108/10 136/23 202/14

**thought** [18] 40/21 43/1 56/21 57/5 69/17 72/7 93/6 105/16 114/14 116/17 117/7 117/19 125/2 133/25 142/3 222/21 222/23 227/4

**thoughts** [1] 141/17

**thousands** [1] 155/6

**threaded** [1] 93/21

**three** [17] 44/22 55/9 55/14 56/3 59/1 59/11 98/18 101/16 101/25 101/25 102/2 102/4 102/10 131/18 144/1 150/7 150/21

**three-minute** [2] 102/4 102/10

**through** [26] 20/7 71/22 78/16 79/6 83/13 90/12 91/21 92/25 93/4 93/8 93/8 96/5 102/8 131/17 156/19 163/8 164/17 166/9 170/3 173/6 178/13 180/12 180/15 185/6 188/13 192/8

**throughout** [1] 15/6

**thrust** [1] 159/14

**thrusts** [1] 182/3

**till** [4] 166/6 168/11 180/10 193/5

**time** [77] 5/11 6/4 6/17 6/21 15/21 19/2 19/5 20/25 24/14 26/4 26/15 26/22 27/22 30/23 37/1 42/22 43/1 43/2 44/17 53/14 55/18 55/19 56/6 62/6 66/5 67/25 70/16 71/9 80/2 85/14 86/20 86/20 86/22 88/3 98/9 98/20 99/11 100/7 100/14 103/18 111/12 111/18 121/14 122/23 127/19 129/1 132/21 136/8 139/7 141/1 146/8 147/2 157/2 163/13 169/23 170/19 173/16 175/4 178/22 180/22 181/20 184/4 186/18 187/2 189/24 189/24 198/8 198/9 202/11 207/11 212/18 212/19 217/5 224/8 225/22 225/22 226/6

**timely** [4] 16/10 16/15 16/18 16/19

**times** [7] 101/25 147/4 147/5 158/9 162/14 163/23 164/19

**timing** [1] 4/25

**TINA** [1] 1/19

**Tina's** [1] 134/3

**Tirado** [2] 27/15 143/13

**Tirado/Herrera** [1] 27/15

**titled** [1] 161/25

**to-dos** [2] 136/6 141/17

**today** [8] 4/20 5/5 8/11 17/6 17/15 17/19 138/22 226/14

**Todd** [2] 28/24 55/5

**together** [16] 4/25 6/5 27/10 27/11 32/20 64/9 72/9 111/22 113/1 147/1 148/14 179/17 190/14 197/18 197/19 197/25

**told** [53] 10/19 17/16 24/10 31/4 31/19 36/12 36/13

**told... [46]** 43/10 43/12 49/22 50/1 55/6 57/3 60/3 78/6 86/6 86/10 87/15 87/16 87/16 87/17 87/17 105/20 107/3 107/5 112/4 112/15 113/11 117/1 118/16 119/8 119/8 124/12 124/16 124/17 142/18 145/6 145/11 150/20 150/25 150/25 166/16 173/22 186/9 186/14 189/22 197/16 197/22 197/22 197/24 202/4 212/19 223/5

**too [7]** 31/13 96/9 102/4 112/3 122/16 217/23 225/3

**took [11]** 33/1 39/18 62/23 76/10 78/17 152/16 163/2 170/2 188/5 207/10 209/5

**toolbox [1]** 93/21

**top [10]** 31/22 35/16 38/14 39/16 63/25 99/4 101/17 144/19 152/5 206/18

**totally [1]** 156/15

**touch [3]** 26/4 26/5 100/8

**trace [1]** 17/22

**transcribe [2]** 47/23 49/7

**transcribed [1]** 49/14

**transcript [10]** 1/24 31/14 61/18 111/7 134/3 148/23 149/17 163/9 185/21 229/8

**transfer [1]** 58/22

**transferred [4]** 6/2 6/3 58/12 67/3

**transparency [2]** 80/8 85/3

**transparent [1]** 86/6

**trash [1]** 136/8

**traveled [1]** 72/20

**trial [117]** 7/19 9/9 9/23 9/24 10/4 11/9 11/12 11/12 11/15 11/18 12/12 21/9 22/22 32/10 32/11 41/21 53/19 54/18 55/23 55/25 56/6 56/13 56/15 56/22 58/8 66/7 66/8 71/1 71/2 71/12

71/12 80/23 81/2 81/8 81/19 82/22 92/2 104/4 105/23 111/4 111/5 115/9 116/1 116/2 116/11 116/12 116/20 118/6 120/13 120/23 120/24 121/15 124/20 134/6 134/7 136/2 139/18 140/5 140/11 140/23 141/2 142/8 142/24 145/8 145/9 154/10 158/8 160/5 160/10 160/11 161/3 161/5 161/7 161/8 161/11 161/12 161/13 170/13 171/7 172/6 175/6 175/9 176/19 176/22 176/22 177/6 177/7 178/3 179/16 181/24 182/9 185/12 187/5 187/9 191/17 192/1 192/3 192/6 195/4 195/22 195/23 200/2 205/1 205/3 213/9 214/20 218/21 218/24 219/1 223/16 224/8 224/21 225/13 225/22 225/22 227/17 228/3

**tried [15]** 6/23 12/18 13/11 17/1 50/11 50/16 50/20 63/5 74/15 89/4 95/1 106/10 106/11 156/4 211/3

**tries [1]** 106/16

**true [4]** 7/15 89/20 146/16 157/6

**truth [2]** 148/6 151/11

**truthful [6]** 56/1 56/25 57/16 108/16 170/13 170/18

**truthfully [5]** 117/10 118/9 118/19 119/10 175/11

**truthfulness [3]** 210/23 211/17 211/18

**try [10]** 50/12 54/6 66/18 71/8 99/17 102/9 122/3 138/8 153/24 173/22

**trying [22]** 58/17 62/19 66/17 70/13 70/15 83/17 83/21 87/5 91/13 91/22 96/6 96/9 128/19 138/21 153/3 155/7 173/3 186/13 195/2

**turn [6]** 9/9 109/15 137/25 196/9 197/5 204/3

**turned [4]** 43/1 93/22 179/4 179/11

**turning [1]** 206/13

**turns [1]** 178/25

**Twenty [1]** 137/7

**twice [2]** 64/15 169/4

**two [39]** 27/11 32/23 46/10 47/1 65/5 80/17 81/16 81/20 83/1 83/1 90/6 90/8 92/5 98/17 100/19 100/23 101/2 101/9 101/13 101/24 102/10 103/6 112/19 120/7 122/23 126/6 130/8 131/13 131/17 131/17 145/8 148/4 150/21 159/9 159/13 159/13 159/15 172/5 186/9

**two-minute [4]** 102/10 130/8 131/13 131/17

**type [7]** 36/18 36/21 84/11 95/12 145/18 151/15 214/21

**typed [6]** 37/2 39/1 71/23 72/6 182/13 182/16

**types [1]** 96/10

**typewriter [1]** 72/1

**typically [2]** 38/19 97/1

**U**

**U.S [16]** 28/23 28/24 29/17 55/5 56/2 56/10 57/7 57/12 58/11 60/6 61/21 115/25 116/3 120/22 124/3 170/15

**Uh [19]** 16/5 27/18 32/2 39/8 41/15 43/8 53/3 81/22 84/21 94/3 101/17 101/25 104/1 116/3 117/5 125/3 130/2 133/8 164/16

**Uh-huh [19]** 16/5 27/18 32/2 39/8 41/15 43/8 53/3 81/22 84/21 94/3 101/17 101/25 104/1 116/3 117/5 125/3 130/2 133/8 164/16

**ultimate [2]** 86/21 91/6

Case 4:09-cv-01896   Document 235   Filed on 06/03/19 in TXSD   Page 282 of 287

**ultimately [2]**  10/14 177/23
**unaware [1]**  85/5
**undated [2]**  58/10 118/21
**under [9]**  7/18 63/8 85/23
124/19 124/19 134/25
136/17 152/9 221/20
**underneath [1]**  152/10
**understand [26]**  9/11 17/12
19/16 23/4 25/11 48/17
50/14 53/7 63/7 73/13 89/15
98/6 122/8 167/22 184/14
186/25 197/21 198/17 200/1
200/2 200/4 204/15 208/9
226/18 228/6 229/2
**understanding [14]**  16/17
16/19 61/17 63/3 91/2
124/20 157/21 157/24
157/25 174/21 174/24 175/8
198/19 205/10
**understands [1]**  200/18
**understood [3]**  61/15 87/14
226/25
**unethical [1]**  148/16
**unfortunately [1]**  4/25
**unilateral [1]**  83/12
**unilaterally [1]**  93/5
**unique [1]**  81/20
**unit [14]**  23/23 24/2 58/21
59/10 67/3 97/9 98/6 102/12
102/21 104/13 110/18 130/3
130/12 131/20
**UNITED [1]**  1/1
**unless [8]**  10/18 14/1 14/13
14/25 92/17 112/12 204/11
226/21
**unlike [2]**  69/7 69/11
**unplugging [1]**  138/8
**unrelated [3]**  198/6 198/15
200/13
**unreliability [1]**  209/19
**unreliable [3]**  79/25 209/4
225/4
**until [8]**  11/5 19/22 20/8

137/15 168/13 179/13
190/15 204/10
**unusual [1]**  160/21
**up [103]**  4/16 4/19 5/18
6/21 17/1 26/19 30/8 36/18
36/21 37/2 39/16 47/4 50/12
50/16 50/20 51/10 51/13
52/10 52/20 53/18 62/19
71/23 72/6 77/9 79/6 83/22
83/22 83/23 91/10 91/19
97/1 97/8 100/9 101/11
104/4 105/14 106/19 114/18
114/21 118/6 118/15 120/10
122/3 128/2 137/25 138/7
138/13 141/25 144/20 145/7
145/12 147/2 147/8 147/21
148/12 150/18 153/4 153/19
163/2 166/8 166/22 166/23
169/9 170/2 170/5 171/17
173/6 176/8 176/12 177/24
178/21 184/23 185/5 185/9
185/18 186/15 188/16
189/10 191/12 191/13 192/7
193/3 193/22 193/24 194/15
196/14 205/17 206/18 207/6
208/21 213/20 214/2 215/2
215/3 217/14 221/6 226/16
227/3 227/3 227/7 227/13
227/16 228/2
**upon [4]**  83/11 160/5
195/11 218/4
**urge [3]**  123/8 123/23 186/9
**urging [1]**  90/10
**us [15]**  4/8 40/16 68/9 68/25
83/13 83/24 89/25 93/4 99/5
112/13 126/13 154/13
181/17 186/2 226/14
**usage [1]**  80/7
**use [52]**  41/3 57/6 69/3
69/16 70/11 79/15 79/23
82/4 83/1 83/4 83/8 83/10
83/14 84/11 84/22 86/18
90/6 91/4 91/6 91/9 91/10
91/21 92/11 95/16 95/17

95/19 95/23 95/25 96/2
96/13 96/16 96/18 96/23
115/7 144/6 160/20 160/20
178/2 178/4 178/17 179/15
180/3 180/19 181/3 181/6
183/23 191/25 200/4 206/8
206/12 207/6 225/4
**used [29]**  17/23 41/5 80/17
81/6 81/7 81/17 85/17 90/17
90/18 91/25 92/21 94/16
94/18 105/22 115/10 142/25
151/15 151/20 151/20
151/24 159/20 181/11
181/15 195/21 195/23 198/5
224/20 225/12 228/24
**using [6]**  53/18 82/8 87/9
95/20 139/7 178/23
**usual [1]**  97/19
**usually [4]**  30/14 158/10
158/12 183/7

**vague [1]**  224/22
**vaguely [2]**  126/4 189/24
**variety [1]**  161/17
**various [3]**  40/2 40/2 91/15
**verify [1]**  131/4
**versus [2]**  11/12 87/1
**very [17]**  5/19 5/25 6/24
19/1 31/22 33/18 33/25
69/14 79/19 89/5 95/2
114/10 122/22 144/19
203/18 226/11 226/12
**vet [1]**  84/23
**vetting [1]**  80/7
**Vic [3]**  91/16 91/17 156/1
**vicarious [1]**  92/15
**victim [3]**  93/21 117/17
144/14
**victim's [4]**  142/14 144/5
144/12 159/11
**victims [3]**  21/13 93/2
214/11
**video [10]**  5/17 5/23 61/1
61/5 62/4 75/5 75/23 138/5

# V

**video... [2]** 138/11 153/6
**view [3]** 62/8 114/10 159/21
**viewable [1]** 43/25
**Vincent [1]** 89/9
**Vincent's [1]** 22/24
**violence [5]** 92/12 93/2
93/25 95/23 96/24
**violent [1]** 94/17
**visit [5]** 37/13 37/16 106/19
107/16 167/1
**visitation [1]** 110/17
**visits [1]** 228/18
**vital [3]** 126/22 127/4 127/6
**voice [1]** 154/1
**VOL [1]** 3/2
**volume [2]** 1/10 138/1
**voluntarily [1]** 15/21
**voluntary [4]** 15/5 15/10
15/19 16/9
**volunteered [2]** 134/11
142/19
**vote [2]** 46/16 48/14
**voucher [2]** 59/20 60/8

# W

**Waco [1]** 173/21
**wait [4]** 100/5 100/5 100/5
213/16
**walked [3]** 40/16 108/14
143/25
**Walker [14]** 68/4 69/3 69/7
69/16 72/10 148/24 148/25
149/3 149/13 179/25 215/5
217/18 217/19 224/10
**Walker's [1]** 69/9
**walking [1]** 96/16
**want [44]** 48/13 48/21 52/7
61/2 68/22 83/5 83/10 84/15
84/15 85/1 85/4 88/4 94/6
105/7 107/5 113/9 118/4
136/12 137/20 137/22 141/5
141/11 142/6 149/13 153/19
155/10 161/10 161/19 162/8

184/2 184/8 190/9 193/21
197/11 197/11 204/16
209/23 220/6 223/21 223/22
**wanted [22]** 5/3 40/25
42/24 49/14 67/25 70/2
84/19 84/20 85/2 114/11
118/9 159/19 162/9 162/23
178/16 180/17 180/22
195/12 225/18 226/16 227/5
228/12
**wanted -- well [1]** 162/9
**wanting [2]** 96/16 179/19
**wants [5]** 8/24 80/2 80/4
81/23 218/3
**warden [1]** 221/10
**warrant [2]** 135/1 135/13
**warranted [7]** 135/10
145/14 145/16 145/23 147/4
147/5 173/19
**warrants [2]** 145/21 146/23
**wasn't [37]** 6/3 10/12 18/11
24/6 37/7 37/11 43/19 52/5
52/7 65/16 68/9 72/12 73/15
74/24 85/12 86/21 91/12
93/13 98/2 98/13 100/22
100/24 113/21 113/23
113/24 114/11 129/3 132/19
133/22 133/22 134/17 135/8
149/10 151/1 151/3 151/3
192/5
**waste [2]** 43/1 43/2
**watch [4]** 84/24 85/8 91/23
96/9
**Watson [5]** 20/11 20/14
27/2 27/17 144/11
**way [29]** 10/18 13/25 14/13
14/24 25/18 73/13 75/13
75/14 80/12 85/7 132/4
153/19 165/9 173/2 180/3
181/5 183/20 195/15 208/12
209/17 209/20 209/22
209/25 210/3 210/5 210/11
210/13 220/1 227/17

**we [161]** 4/10 4/12 4/15
4/18 4/18 4/19 4/23 4/24 5/3
5/6 5/8 5/10 5/11 5/11 5/16
5/17 7/8 7/24 20/25 24/20
26/1 26/4 26/4 26/21 30/21
30/22 33/4 34/5 35/6 35/11
40/16 40/16 43/9 43/10 47/4
48/4 48/4 51/6 55/5 55/5
58/22 58/24 59/8 61/3 61/9
61/9 62/2 62/5 63/5 68/19
73/3 73/22 74/10 75/1 75/6
75/11 75/15 75/15 83/10
84/15 84/15 84/18 84/20
85/1 85/2 85/6 85/6 85/16
86/10 86/10 87/2 90/7 91/19
93/3 94/11 95/1 95/12 96/8
96/15 98/6 100/17 102/24
104/6 108/13 108/14 109/3
110/17 110/19 110/19 111/2
112/2 112/3 112/4 112/4
112/15 112/15 112/20
113/20 113/25 114/11
114/14 116/6 123/12 129/24
130/16 131/9 132/1 137/14
138/3 138/16 138/22 138/23
139/14 142/11 142/25
146/17 146/18 148/18
151/24 152/1 154/2 154/2
161/15 161/15 163/24
164/19 167/1 170/9 170/25
173/3 185/25 188/25 188/25
189/5 189/12 189/13 193/9
193/16 193/19 193/20 213/7
213/12 213/13 214/2 214/3
214/6 220/8 221/5 221/6
226/10 226/22 226/23
226/25 227/2 227/4 227/6
227/11 227/17 227/24
227/24 228/25
**we'll [5]** 38/6 75/7 137/13
169/9 196/14
**we're [15]** 4/17 8/10 31/12
38/2 73/25 75/12 75/14

**we're... [8]** 84/17 90/11 125/7 137/9 153/19 194/6 227/16 228/4
**we've [13]** 79/24 81/24 89/4 128/10 148/18 164/19 166/15 166/22 170/6 176/2 186/9 188/8 227/8
**weapon [6]** 92/12 93/20 95/16 96/23 105/21 105/25
**weapons [2]** 93/2 159/22
**Wednesday [1]** 189/21
**week [4]** 21/7 34/14 173/20 226/23
**weeks [2]** 30/15 161/7
**Welcome [2]** 154/22 154/22
**well [115]** 6/8 6/24 9/22 13/8 13/21 17/8 21/3 23/9 25/20 33/23 38/5 49/2 51/19 51/24 52/1 54/4 54/24 56/16 58/25 60/3 61/17 68/9 68/14 82/21 85/6 85/10 85/12 86/19 91/12 91/14 93/13 94/11 94/19 95/10 95/19 96/19 99/3 103/13 107/24 109/3 113/18 114/8 114/20 118/3 119/6 124/25 125/5 127/21 128/9 128/25 129/8 130/23 135/6 136/12 138/19 139/1 140/14 140/25 142/12 148/8 154/21 155/3 156/3 156/23 158/1 159/8 160/5 160/10 160/15 161/10 162/9 163/8 163/16 164/14 165/3 165/22 167/25 169/11 170/2 171/8 177/9 177/12 177/21 178/4 178/16 179/17 181/7 181/23 183/11 185/23 189/18 192/2 194/25 198/14 198/18 200/24 201/25 202/1 203/7 203/17 203/21 204/6 205/6 208/4 208/14 211/19 212/11 214/19 217/23 221/20 222/15 224/23

**well-bound [3]** 82/21 85/10 85/12
**went [24]** 11/11 19/21 20/1 30/21 48/19 48/25 51/10 61/3 69/12 98/11 99/15 104/7 104/8 112/15 131/17 157/21 158/13 159/2 161/13 167/1 172/17 180/12 186/15 199/7
**Wentz [5]** 43/12 67/10 71/19 115/19 147/19
**were [204]** 8/5 8/8 8/16 9/6 9/9 9/20 10/3 10/5 10/10 11/21 12/2 12/11 21/14 22/8 22/9 22/13 26/21 26/24 27/10 27/21 30/16 32/20 34/22 35/13 35/14 35/20 36/11 38/5 40/18 42/10 43/18 43/21 44/5 45/7 47/2 47/25 48/10 48/19 48/24 51/1 51/21 51/22 53/1 55/14 55/15 56/21 58/21 59/10 61/19 62/5 62/9 63/12 63/12 64/5 65/22 66/3 66/10 70/23 71/11 71/17 72/8 72/12 77/18 77/21 78/8 78/10 78/14 79/12 80/8 80/12 80/13 83/16 84/6 84/6 84/8 84/9 85/1 85/4 85/16 86/1 86/16 86/17 86/23 86/24 88/24 93/2 93/3 96/6 96/6 96/9 96/22 96/24 98/20 99/5 103/18 104/3 104/16 109/1 110/1 111/13 111/19 112/12 113/2 113/7 113/15 114/3 115/24 116/3 117/2 118/5 118/14 118/16 119/13 120/23 122/22 124/19 127/23 128/25 129/25 134/1 136/6 136/23 137/1 138/17 139/1 139/7 139/15 141/15 141/23 141/24 143/13 144/1 147/2 147/22 150/24 151/1

157/3 158/14 159/2 159/5 159/9 159/13 159/16 159/21 159/21 159/22 162/14 164/4 168/14 168/23 169/24 172/18 173/3 175/2 175/4 178/5 180/25 181/8 182/7 182/7 183/22 191/7 193/24 194/1 194/3 194/9 196/1 197/18 197/19 197/22 197/24 204/12 204/20 204/24 204/25 205/4 206/7 206/8 207/16 207/19 211/13 211/22 215/4 215/5 219/3 219/4 219/7 219/9 219/9 223/16 223/17 223/18 223/20 223/23 223/23 223/25 223/25 225/17 227/2 228/24
**weren't [9]** 4/24 43/21 48/2 48/5 49/3 103/21 129/4 156/25 224/15
**what's [15]** 14/4 14/16 26/11 48/14 54/1 63/2 68/14 90/20 135/3 138/3 158/10 185/10 203/12 220/5 221/19
**whatever [9]** 18/3 19/1 70/2 70/15 89/15 100/13 106/14 194/25 195/19
**whatsoever [2]** 49/22 50/1
**whenever [3]** 10/9 11/2 102/5
**wherever [2]** 25/1 86/22
**whether [53]** 19/18 22/16 27/14 32/3 34/10 71/18 77/12 78/1 79/12 81/10 91/6 96/12 104/7 104/23 106/9 131/15 156/18 162/11 162/13 162/24 163/17 170/17 170/20 170/22 170/24 176/25 177/2 178/5 178/11 178/17 178/19 180/24 181/8 188/6 188/7 189/16 195/1 202/2 202/8

**whether... [14]** 202/21 202/24 203/14 204/1 206/7 206/11 219/7 219/9 221/22 222/1 222/2 222/3 223/22 228/5

**which [51]** 15/5 15/10 21/13 21/15 22/9 22/18 25/7 25/11 30/22 33/6 38/5 42/6 42/25 42/25 44/13 48/9 49/17 69/11 73/25 81/5 82/19 83/1 86/1 87/4 94/11 102/2 102/9 106/4 109/19 109/20 113/7 119/9 121/18 124/14 128/10 134/10 134/12 142/18 153/4 162/18 163/11 169/3 176/11 179/6 180/18 181/5 181/11 181/14 183/1 194/10 205/18

**while [11]** 26/19 46/16 65/8 125/13 130/16 134/2 136/3 138/3 143/10 193/24 227/8

**white [1]** 77/19

**who [75]** 13/23 19/3 20/16 24/7 24/9 24/16 29/11 31/9 36/24 41/9 47/12 53/4 55/10 63/19 74/10 76/3 76/19 76/21 77/19 81/7 83/16 85/1 86/14 87/14 92/24 96/6 96/19 96/21 96/22 102/7 102/21 111/23 117/17 118/11 120/18 130/22 131/3 144/22 148/25 151/24 152/1 155/25 162/17 163/17 164/10 168/17 171/21 172/9 172/20 178/6 185/3 188/8 188/8 188/9 188/9 188/9 188/10 188/10 191/3 192/24 197/22 200/2 202/5 202/12 205/4 205/6 207/1 207/5 208/15 212/7 212/9 212/10 214/20 219/1 221/8

**who's [4]** 106/3 186/20 192/25 210/16

**whole [12]** 6/4 59/4 77/22

**which [ ]** 103/12 116/17 151/4 202/1 213/17

**whom [5]** 54/7 54/10 133/6 162/5 163/15

**whose [5]** 69/8 111/23 170/15 184/7 196/21

**why [46]** 24/23 24/23 32/9 40/13 42/18 51/14 53/18 57/5 60/12 60/16 61/24 67/6 69/3 70/11 72/23 75/11 86/24 87/2 102/10 108/13 113/18 116/8 116/11 138/20 138/21 145/22 147/6 153/4 162/8 164/4 164/4 169/9 169/10 172/9 178/15 180/21 183/21 184/2 188/6 193/9 198/2 204/6 209/3 212/4 212/9 216/2

**will [23]** 4/13 4/13 35/12 35/12 54/4 61/14 92/10 105/21 116/21 143/11 143/11 143/15 153/21 153/22 167/8 170/14 170/19 170/21 170/23 173/22 202/5 205/22 215/3

**William [2]** 20/11 27/17

**willing [5]** 4/11 195/18 196/5 204/8 204/9

**willy [2]** 83/24 93/3

**willy-nilly [2]** 83/24 93/3

**Wilson [3]** 108/7 108/18 120/4

**window [1]** 92/3

**wiretap [1]** 137/12

**Wiser [1]** 91/14

**Wisner [2]** 156/1 190/23

**within [5]** 21/5 21/7 107/25 142/19 214/10

**without [7]** 45/25 78/20 83/13 83/24 146/22 215/1 225/13

**witness [126]** 5/16 6/6 6/10 6/12 6/15 6/19 7/19 9/8

**witness [ ]** 13/22 13/23 14/8 14/13 14/14 14/25 20/16 34/4 38/20 38/20 41/3 41/5 45/19 47/25 48/2 48/5 48/16 59/20 60/8 74/6 74/8 74/10 74/11 74/12 74/14 74/24 77/4 78/13 78/20 78/21 82/8 87/15 89/21 91/19 96/14 102/16 127/1 133/4 134/10 134/11 134/11 134/12 134/14 134/17 135/1 135/4 135/8 137/10 146/9 146/23 147/15 151/14 153/9 153/23 158/7 159/12 162/25 163/14 164/8 164/8 167/9 167/25 168/7 170/12 172/10 175/1 178/10 178/15 178/19 178/19 178/25 181/5 182/8 183/24 188/15 188/16 188/24 189/3 189/13 189/17 189/22 189/25 190/4 190/13 190/17 190/18 193/8 194/2 194/3 194/4 200/18 205/12 205/13 207/1 207/4 207/20 208/5 208/15 208/15 208/17 213/14 214/7 216/10 219/4 219/8 219/10 220/13 220/25 222/16 224/17 225/4 226/8 226/10

**witnesses [43]** 3/4 4/24 7/18 13/16 13/17 18/9 18/19 18/21 45/22 45/25 48/10 54/7 55/7 55/9 55/14 56/3 59/1 59/2 59/11 73/19 73/23 76/6 76/8 91/19 97/2 151/6 151/15 158/12 169/17 169/20 173/12 173/17 183/22 184/15 184/19 198/10 205/6 205/6 205/8 205/8 205/9 212/2 218/23

**witnesses' [1]** 151/8

**wives' [1]** 173/19

**woman [1]** 144/5

**W**

**woman's [1]** 143/22
**won [1]** 7/13
**won't [1]** 152/25
**wonder [5]** 69/12 180/23
184/5 218/7 218/9
**wondered [1]** 75/15
**wondering [1]** 184/5
**Woodgate [1]** 77/18
**word [8]** 25/4 40/17 48/23
65/2 126/24 142/25 152/6
188/5
**words [3]** 115/14 144/6
144/7
**work [41]** 4/17 6/5 7/8 17/9
17/11 18/23 43/19 43/21
44/9 46/14 62/14 62/17
62/19 62/22 63/2 63/4 63/5
63/7 80/20 81/23 83/11
83/11 83/17 83/20 85/2 87/5
91/22 92/24 93/3 93/5 96/6
141/7 141/10 154/3 154/4
156/14 157/17 157/18
157/22 167/2 167/6
**worked [9]** 5/25 16/25 17/1
26/19 36/25 49/8 49/9
177/24 193/1
**working [28]** 4/11 18/25
19/3 26/22 26/24 27/10
27/11 27/12 27/13 27/19
27/22 62/23 65/22 81/20
83/9 83/13 84/11 84/15 85/6
85/7 90/11 92/15 96/6 98/20
104/16 111/22 129/1 136/5
**works [2]** 5/14 122/17
**world [1]** 92/24
**worth [2]** 178/22 202/13
**would [299]**
**wouldn't [19]** 15/1 28/5
28/16 29/17 41/25 62/22
77/11 85/18 95/19 110/9
123/16 128/9 135/11 142/2
199/6 215/22 215/23 224/20
225/12

**write [19]** 15/13 16/16
57/24 57/25 58/3 65/13
80/10 122/16 124/13 125/14
127/16 152/20 153/3 163/25
164/22 172/16 201/2 202/5
221/17
**writes [1]** 28/1
**writing [19]** 15/22 25/17
25/20 65/19 82/12 82/18
86/9 86/12 86/18 87/7 87/12
87/13 90/9 92/18 96/8
131/23 152/22 216/12
217/18
**written [36]** 10/22 11/5
37/24 37/25 38/10 67/20
80/12 85/21 86/2 86/4 87/23
88/1 88/5 88/10 88/13 88/16
88/19 88/22 107/19 107/20
115/2 132/12 166/16 166/17
166/18 171/4 171/9 171/25
178/11 178/19 178/20 179/5
205/23 208/3 215/5 221/8
**wrong [4]** 28/11 41/12
148/16 186/10
**wrote [20]** 15/14 15/18 21/3
21/4 52/13 54/23 55/18 56/2
56/9 57/7 57/10 57/14 127/7
166/23 171/9 171/21 196/15
196/23 198/16 205/19

**Y**

**y'all [2]** 27/10 113/15
**yard [2]** 72/9 111/22
**yeah [29]** 6/14 31/12 33/14
71/11 103/13 103/13 109/5
119/16 136/25 138/25 160/9
172/15 182/5 182/5 183/2
184/8 184/10 188/23 193/5
200/20 201/14 201/21
202/17 213/21 214/4 215/8
216/6 218/1 227/4
**year [6]** 71/10 103/12
190/13 191/16 207/5 207/20
**years [17]** 11/23 12/2 20/5
21/10 67/25 100/10 100/10

155/10 163/5 177/23 200/22
200/22 207/5
**yellow [1]** 143/6
**Yep [1]** 41/19
**yes [246]**
**Yes, [1]** 114/5
**Yes, but [1]** 114/5
**yet [3]** 116/7 130/4 227/13
**you [1592]**
**you -- well [1]** 129/8
**you'd [3]** 74/4 144/17
174/15
**you'll [14]** 10/13 15/15
38/14 91/24 99/23 128/16
130/23 133/2 140/10 163/4
163/21 173/10 178/18
220/24
**you're [44]** 4/11 6/24 18/4
23/10 26/15 30/7 37/9 40/20
44/4 53/22 60/15 69/21 79/2
87/9 91/22 99/10 101/3
101/5 102/15 107/6 112/8
114/1 122/19 127/13 127/13
127/25 129/18 139/24
143/10 143/21 150/12
160/10 166/14 174/3 174/17
200/1 203/14 204/4 207/23
208/25 213/16 216/7 216/11
216/13
**you've [16]** 19/23 23/7
58/18 69/1 89/3 96/11
123/11 124/12 129/11 150/3
155/1 155/4 168/12 176/20
177/9 227/12
**you-all [7]** 9/12 37/6 38/19
52/2 68/6 85/4 117/22
**young [3]** 44/22 188/19
208/6
**your [279]**
**Your Honor [53]** 4/7 4/16
4/22 5/22 61/2 61/25 75/12
137/6 137/21 137/23 153/8
153/10 153/12 153/16

**Y**

**Your Honor... [39]**  157/14
165/13 167/15 168/2 181/1
184/9 189/11 193/8 200/17
201/10 201/15 201/23 203/5
203/8 206/1 208/23 213/4
213/25 215/13 216/9 216/15
217/21 220/2 221/15 222/6
222/12 222/19 223/13
224/22 225/9 226/10 226/15
226/22 227/11 228/6 228/10
228/16 228/21 229/4
**yours [2]**  45/24 78/8
**yourself [5]**  17/6 68/2 116/8
156/19 158/7