IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RONALD JEFFREY PRIBLE, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | NO. 4:09-CV-01896 |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
|           Respondent's. | § | |

## RESPONDENT DAVIS'S POST-HEARING SUPPLEMENTAL BRIEF

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*counsel of record*

TINA J. MIRANDA
Assistant Attorney General

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (FAX)
tina.miranda@oag.texas.gov

ATTORNEYS FOR RESPONDENT

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................ii

TABLE OF AUTHORITIES ..............................................................iv

RESPONDENT DAVIS'S POST-HEARING SUPPLEMENTAL BRIEF.........1

STATEMENT OF THE CASE ...........................................................1

STATEMENT OF FACTS .................................................................4

SUPPLEMENTAL BRIEF ................................................................9

I.   Prible's Accusation that the State Orchestrated His Confession is Wholly Unsubstantiated by Facts in the Record. ....................................................12

A. There is no evidence that Siegler knew, before charging Prible with capital murder, that there were informants at FCI Beaumont–Medium willing to inform on Prible. ..................................................14

   1. The facts do not support Prible's assertion that Moreno told Siegler during their July 3, 2001 interview that Foreman was prepared to testify against Prible. .......................................................15

   2. The facts show that, instead, informant testimony played no role in the prosecutor's decision to charge Prible with capital murder.......19

B. There is also no evidence that Siegler manipulated Prible's housing assignments at FCI Beaumont to facilitate a confession. ...................20

   1. The facts do not support Prible's assertion that the prosecutor charged him with capital murder to put him within reach of known informants at FCI Beaumont–Medium. ...........................................21

   2. Indeed, the evidence demonstrates that Siegler was already planning to remove Prible from federal custody—months prior to Beckcom obtaining a confession from him. .......................................................24

C. There is also no evidence that Siegler encouraged or instructed any FCI Beaumont inmates to obtain incriminating information on Prible. ....25

1. The record bears out that Prible was targeted by opportunistic federal inmates. ............................................................................. 26

2. Nothing supports Prible assertion that the State was complicit in the inmates' scheme to obtain incriminating information that could be used against him. ............................................................... 28

  a. Not a single FCI–Beaumont inmate has testified or otherwise stated that the prosecutor encouraged, instructed, or otherwise directed them to obtain incriminating information from Prible... 29

  b. Prible has not proven his assertion that the prosecutor provided FCI–Beaumont inmates with information on him or his case prior to his arrival. .................................................................. 32

D. Finally, Prible Not Proven That His Confession was "Manufactured" or False. ............................................................................. 38

II. Incremental Impeachment Evidence is the Most Prible Has Produced Here. ........................................................................................ 41

CONCLUSION ............................................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Adams v. United States,* 317 U.S. 269 (1942) ................................. 12

*Brady v. Maryland,* 373 U.S. 83 (1963) ..................................... 2, 42

*Coleman v. Quarterman*, 456 F.3d 537 (5th Cir. 2006) ................................ 13

*Creel v. Johnson*, 162 F.3d 385 (5th Cir. 1998) ........................... 29

*Dale v. Quarterman*, 553 F.3d 876 (5th Cir. 2008) ........................ 13

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ....................... 12, 14

*Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005) ........................... 13

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ........................... 12

*Kansas v. Ventris*, 556 U.S. 586 (2009) ........................... 10

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ........................... 39

*Massiah v. United States*, 377 U.S. 201 (1964) ........................... passim

*Miller v. Dretke*, 431 F.3d 241 (5th Cir. 2005) ........................... 42

*Ross v. Estelle*, 694 F.2d 1008 (5th Cir. 1983) ........................... 14

*Spencer v. Texas*, 385 U.S. 554 (1967) ........................... 10

*United States v. Birbal*, 113 F.3d 342 (2nd Cir. 1997) ................... 29

*United States v. Watson*, 894 F.2d 1345 (D.C. Cir. 1990) .................... 31-32

*Webster v. Estelle*, 505 F.2d 926 (1975) ........................... 12

## Statutes

28 U.S.C. § 2254 ................................................. 1, 10, 13

## RESPONDENT DAVIS'S POST-HEARING
## SUPPLEMENTAL BRIEF

Ronald Jeffrey Prible ("Prible") was convicted in a Texas state court of capital murder and sentenced to death for the murders of Estaban "Steve" Herrera and Nilda Tirado. Prible unsuccessfully sought relief from both his conviction and sentence in state court, and now seeks federal habeas corpus relief. *See* 28 U.S.C. § 2254. Following the evidentiary hearing recently held in this cause to develop the facts surrounding the circumstances of Prible's confession, the Respondent Lorie Davis ("the Director") submits the following brief supplementing her previously filed Answer and Motion for Summary Judgment, *see* ECF No. 191.

## STATEMENT OF THE CASE[1]

Prible began challenging Beckcom's testimony and the circumstances surrounding his confession during his initial state habeas proceedings. Prible's initial state habeas application was filed on November 13, 2004. 1 SHCR 2. A year later, while this application was still pending in the trial court, Prible filed a pro se document entitled "subsequent writ" asserting that the prosecutor, Kelly Siegler, conspired with Beckcom, Foreman, and Raphael Dominguez to secure a false confession against himself and Hermelio Herrero.

---

[1] This is the procedural history relevant to Prible's claim that the prosecutor was utilizing a ring of informants at FCI Beaumont—Medium to manufacture a confession against him.

1

Prible indicated in this filing that there was a witness to the conspiracy "who wants to make the truth known." 1 SHCR 275–78. On June 20, 2007, Prible filed an actual pro se application for writ of habeas corpus asserting violations under *Brady* and *Massiah*[2] based on his contention that the State was utilizing a ring of informants to manufacture a confession against him. 1 SCHR 382. He identified Carl Walker as the witness willing to testify regarding the conspiracy. 1 SHCR 386. He then filed a second pro se application (his third subsequent application) a few months later alleging that trial counsel was ineffective for failing to bring the alleged ring–of–informants to the trial court's attention. 1 SCHR 412–413. Both pro se applications were ultimately dismissed by the Texas Court of Criminal Appeals (CCA) as abuses of the writ. *Ex parte Prible*, 2008 WL 2487786 (Tex. Crim. App. June 18, 2008).

Prible then brought his allegations to federal court. Relying upon newly obtained hearsay statements from Carl Walker, Prible's first amended federal habeas petition included several previously unraised claims related to his ring–of–informants conspiracy theory. *See* ECF No. 7. These unexhausted claims included allegations that the State utilized Beckcom as a state agent, suppressed evidence, and sponsored false testimony. *Id.* at 27, 32, 39. Prible also maintained that counsel was ineffective for failing to raise as *Massiah*

---

[2]     *Brady v. Maryland,* 373 U.S. 83 (1963); *Massiah v. United States*, 377 U.S. 201, 206 (1964)

violation during trial. *Id.* at 36. This Court stayed the federal habeas proceedings and held them in abeyance while Prible sought relief on these claims in state court. ECF No. 23.

Prible's fourth state writ application, asserting various prosecutorial misconduct allegations premised almost entirely on the hearsay statements of Carl Walker, was filed on September 8, 2010. 4 SCHR 32–49. The CCA remanded the application to the trial court to determine whether Prible exercised reasonable diligence to obtain the evidence supporting these claims. *Ex parte Prible*, 2001 WL 5221864 (Tex. Crim. App. 2011). Following a live evidentiary hearing, and based on the trial court's recommendation, the CCA dismissed Prible's fourth state writ application as an abuse of the writ because "the allegation fail[ed] to satisfy the requirements of Article 11.071 § 5(a)." *Id.* Specifically, the CCA found that "the factual basis of Prible [ring–of– informants] claims were available when [Prible]'s initial habeas petition was filed in November, 2004." 4 SHCR 801.

Prible returned to federal court and reasserted these claims along with several others in his second, and then later third, amended petition. *See* ECF No. 47, 99. This Court granted Prible's extensive discovery requests authorizing him to further develop the facts surrounding the circumstances of his confession. Following that discovery, Prible lodged a forth amended petition asserting the allegations set out in the previous section. *See* ECF No. 181. The

Director filed her answer and motion for summary judgment, asserting that these claims were procedurally barred and lacked merit. ECF No. 191. Prible's subsequent request for a live evidentiary hearing on these claims was granted by Court. ECF No. 202. The hearing three–day hearing began on April 29, 2019 and concluded on May 2, 2019. The present briefing follows.

## STATEMENT OF FACTS[3]

Michael Beckcom testified at trial that Prible confessed to committing the present murders. 26 RR 3–99.[4] The Court of Criminal Appeal accurately summarized the facts regarding Michael Beckcom's testimony in its opinion affirming Prible's conviction and death sentence on direct appeal. *Prible v. State*, 175 S.W.3d 724, 728–29 (Tex. Crim. App. 2005).

On April 4, 2001, Jesse Moreno, an inmate at FCI Beaumont–Medium wrote a letter to Kelly Siegler, a prosecutor with the Harris County District Attorney's (HCDA) Office, stating that he had information that could be helpful in one of her unsolved cases. Pet.'s Hrg. Ex. 6. Moreno served as an informant for Siegler several years prior in a case against Jason Morales. *Id*. Siegler met with Moreno on July 3, 2001, at FCI Beaumont–Medium. 2 EHRR 23–25.

---

[3]    These are the facts relevant to the circumstances surrounding Prible's confession to Michael Beckcom while incarcerated at Federal Correctional Institution ("FCI") Beaumont—Medium.

[4]    The Court of Criminal Appeals' summary of Beckcom's testimony is set out in the Director's answer and motion for summary judgment. ECF No. 191 at 26–27 (citing *Prible v. State*, 175 S.W.3d 724, 728–29 (Tex. Crim. App. 2005)).

Moreno was housed in the Special Housing Unit (the "SHU") at the time. *Id;* *see also* Pet.'s Hrg. Ex. 7. During the interview, which Siegler recorded, Moreno provided her with information implicating fellow–inmate Hermelio Herrero in the murder of Albert Guajardo. Pet.'s Hrg. Ex. 11. Moreno told Siegler that when Herrero confessed his involvement in this murder to him, fellow inmates Raphael Dominguez and Nathan Foreman were also present. Pet.'s Hrg. Ex. 11 at 17. It appears from the transcript that this is the first time Siegler learned of Nathan Foreman. *See* Pet.'s Hrg. Ex. 11 at 18–19.[5] Two days later, on July 5, 2001, Siegler charged Herrero with the murder, specifically referencing the inculpatory information provided by Moreno.[6] Resp.'s Hrg. Ex. 6.

Siegler also filed capital murder charges against Prible on July 5, 2001, for killing Nilda Tirado and Esteban Herrera. Resp.'s Hrg. Ex. 5. Prible was incarcerated at FCI Beaumont–Low at the time, having been convicted of bank robbery in federal court. Siegler testified that she was not originally assigned to the Tirado/Herrera murder case but was approached by Houston Police Department (HPD) detective Curtis Brown and asked to review the file

---

[5]    Siegler testified during her deposition that she thought she might have heard Nathan Foreman's name prior to this interview, but ultimately could not independently recollect when she heard his name for the first time. [deposition testimony at 84–95]

[6]    For safety reasons, the probable cause affidavit did not identify Moreno by name. Respondent's Hearing Exhibit 6.

sometime in 2000 or 2001. Pet.'s Hrg. Ex. 4 at 55–56, 62. Siegler stated that, after reviewing the evidence, she believed the HCDA "needed to proceed with working the case." *Id*. at 56. Following his capital murder charge, Prible was transferred from FCI Beaumont–Low to FCI Beaumont–Medium on July 25, 2001. Pet.'s Hrg. Ex. 17.

Sometime later that summer, Siegler was contacted by Foreman. 2 EHRR 37–38. Forman had been housed in the SHU at FCI Beaumont–Medium and was released back to his unit on July 25, 2001. Pet.'s Hrg. Ex. 18. Siegler and her investigator Johnny Bonds met with Foreman at the Federal Detention Center in Houston on August 8, 2001. *See* Pet.'s Hrg. Ex. 19 & 20. During that meeting, Foreman told Siegler and Bonds that he had information incriminating Prible. *Id*. But neither Siegler nor Bonds found Foreman credible. 1 EHRR 140–142; 2 EHRR 40. Both testified that they did not believe Foreman was telling the truth about his interaction with Prible. *Id*. Bonds stated that he did not believe the two inmates had even met because, when asked to describe Prible, Foreman could not do so. 1 EHRR 142.

Around this same time, Siegler was preparing to indict Prible on the capital murder charge. Prior to meeting with Foreman, she signed detainer paperwork to remove Prible from federal custody. Res. Hrg. Ex. 9. She also prepared the indictments on August 17, 2001. 2 EHRR 42. Siegler then presented Prible's case to the grand jury. She presented Herrero's case on the

6

same day. 2 EHRR 46. Siegler testified that her meeting with Foreman had no impact on her decision to indict Prible and that there was no mention of an informant made to the grand jury in his case. 2 EHRR 42–43, 47. By contrast, Siegler did inform the grand jury about Moreno who would testify against Herrero at his trial. 2 EHRR 47. The jury returned indictments against Prible and Herrero on August 29, 2001. Pet.'s Hrg. Ex. 24 & 25.

Shortly thereafter, pursuant to the HCDA Office's policy, the detainer paperwork for both Prible and Herrero was forwarded to FCI Beaumont. Resp.'s Hrg. Ex. 9 & 10. In accordance with the interstate agreement and federal procedures, Prible and Herrero were eventually transferred from FCI Beaumont–Medium to the Harris County Jail on November 29, 2001. Resp.'s Hrg. Ex. 4; Pet.'s Hrg. Ex. 17.

Prior to being transferred out of federal custody, Michael Beckcom, an FCI Beaumont Medium inmate, called Siegler with information against Prible. Beckcom testified that he got Siegler's name and phone number from Foreman. 26 RR 23–24. Beckcom's initial phone conversation with Siegler occurred in October 2001. 26 RR 23–24; 37. Beckcom was seeking a sentence reduction in exchange for the information he had on Prible, but Siegler was not interested in the information Beckcom had at that time. *Id.* Beckcom decided to seek out additional information on Prible. 26 RR 37. Beckcom eventually got a confession from Prible on November 24, 2001, then contacted Siegler to let her

know. Beckcom met with Siegler on December 10, 2001, to provide her the details of the confession. 2 EHRR 110.

Around that same time, Foreman also reached out to Siegler through his attorney, Alan Percely, claiming that Foreman told him "he has information that will lead you to the weapon that was used in the murder case that you are preparing to go to trial on in the near future," and that "[h]e has other information relating to this case that will be of assistance to you." Resp.'s Hrg. Ex. 13. Bonds contacted FCI Beaumont to set up a second meeting with Foreman. Pet.'s Hrg. Ex. 27. Neither Bonds, Siegler, nor Foreman recalled that meeting, but handwritten notes from Bonds suggest the meeting likely occurred. 1 EHRR 88, 160–162, 2 EHRR 109.

Several months later, additional inmates wrote letters to Siegler indicating that they, too, had information on Prible and were willing to testify against him. These letters were written by Mark Martinez, Carl Walker, and Jesse Gonzalez. Resp.'s Hrg. Ex. 16, 17, & 18. Gonzalez's letter referred to a prior phone conversation with Siegler during which he told her that he knew Prible "from the Woodgate subdivision where we lived." Resp.'s Hrg. Ex. 17. Gonzalez avers in his affidavit that he spoke with Siegler once over the phone. Resp.'s Hrg. Ex. 19. Siegler asked him his name and whether he knew Prible, but he never heard from her after that. *Id*. Siegler testified that her "take" on Gonzalez was that "[he] was trying to glom on and put himself in the middle of

a case to try to get himself a deal, like every other inmate in federal prison." 2 EHRR 66. Siegler provided a similar response when questioned about the letter from Martinez. She testified, "…[I]t's pretty obvious that he's just trying to jump on the bandwagon of all—what all they're all saying to each other out there. He's trying to say whatever he can to act like he knows something he doesn't know for a time cut, like every other inmate in federal prison." 2 EHRR 70. Siegler also testified that she did not believe Walker. 2 EHRR 69. In fact, unlike the other inmates, she did not recognize his name." *Id.*

Beckcom testified against Prible at his trial in October 2002. 26 RR 3. He was the only FCI Beaumont inmate to do so. Siegler did not use Forman, Gonzalez, Martinez, or Walker as witnesses, because she did not find them credible. 2 EHRR 40, 67, 69, 73, 88.

## SUPPLEMENTAL BRIEF

Initially, the Director notes this Court's unease over the State's use of a jailhouse informant to convict Prible of capital murder. The prosecutor in this case acknowledged that the use of this type of evidence is not ideal, but testified that she ultimately decided to present this evidence just in case it made the difference:

> This is what I'll say, Judge: I—I thought long and hard about that, and I remember thinking to myself, [t]here are five victims here. I believe that the case against Jeffrey Prible was strong enough for a jury to convict, but I did not want to live the rest of my life not using Michael Beckcom and maybe one juror or two jurors having

a little bit of doubt and tell me that, and then regretting for the rest of my life and career that I didn't use an inmate.

I thought I had enough, but I—I wanted to be sure. I wanted to make sure that I did all that I needed to in this case.

3 EHRR 48. This decision, though disfavored by some—perhaps even this Court, does not violate constitutional constraints.

The Supreme Court has resisted efforts to "craft a broader exclusionary rule for uncorroborated statements obtained by [jailhouse snitches]." *Kansas v. Ventris*, 556 U.S. 586, 594 n.* (2009). As explained, "Our legal system … is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses, and we have long purported to avoid 'establish[ing] this Court as a rule–making organ for the promulgation of state rules of criminal procedure." *Id*. (quoting *Spencer v. Texas*, 385 U.S. 554, 564 (1967)). Thus, unless Prible can demonstrate that the State's use of Beckcom's testimony otherwise offends the Constitution, federal habeas relief is not available here. *See* 28 U.S.C. § 2254 (a) (providing that federal habeas relief is afforded to a state court prisoner "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States).

Prible raises eight separate claims alleging prosecutorial misconduct and ineffective assistance of counsel related to the use of Beckcom's testimony

at trial. *See* ECF No. 181 at 184–244.[7] These claims include allegations that 1) the State sponsored false testimony by Beckcom (CLAIM ONE); 2) the State suppressed impeachment evidence that would have materially undermined Beckcom's testimony (CLAIMS TWO, THREE, FOUR, FIVE, and EIGHT); 3) the State used Beckcom as an agent to obtain a confession against Prible; and 4) trial counsel was ineffective for failing to challenge Beckcom's testimony on the grounds that he was acting as an agent for the State.[8] At the center of these claims is Prible's allegation that "the State was utilizing a ring of informants who were engaging in a collective, coordinated effort to secure sentence reductions in return for providing the State with incriminating information in the form of manufactured confessions." *See* ECF No. 181 at 202. There are two essential factual questions arising from this allegation: 1) whether the State used Beckcom as an agent to orchestrate Prible's confession; and 2) whether Beckcom's testimony that Prible confessed to him is false.

---

[7]    The Director responded fully to these eight claims in her Answer and Motion for Summary Judgment. *See* ECF No. 191. As set out there, these claims are procedurally barred on federal habeas review. The following briefing primarily addresses, in the alternative, the merits of the factual allegations Prible lodges to support these claims as developed at the recent evidentiary hearing and is intended to supplement the Director's previously filed response.

[8]    To the extent that Prible might now, in his post–hearing briefing to assert new, previously unraised claims for relief, the Director objects and notes that these claims are unexhausted, procedurally defaulted, and time–barred.

Prible "carries the heavy burden of demonstrating entitlement to [federal habeas] relief." *Floyd v. Vannoy*, 894 F.3d 143, 160 (5th Cir. 2018). "A judgment of conviction must be presumed to have been reached in accordance with due process until otherwise shown." *Webster v. Estelle*, 505 F.2d 926, 928 ((citing *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938)). As explained by the Supreme Court in *Adams v. United States*,

> If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.

*Adams v. United States*, 317 U.S. 269, 281 (1942). Yet, Prible's petition is riddled with speculative assertions regarding the circumstances giving rise to his confession that have not been proven, even after being granted extensive discovery and live evidentiary hearing by this Court. Because he has not established the truth of these allegations, he cannot succeed on any of the federal habeas claims grounded therein.

## I.   Prible's Accusation that the State Orchestrated His Confession is Wholly Unsubstantiated by Facts in the Record.

Prible's conspiracy theory alleging a state–run ring of informants rests almost entirely on speculative statements made by Carl Walker. Specifically, Prible asserts in his petition that Walker "describes a conspiracy by various FCI Beaumont informants working with Siegler to frame Prible and Hermelio

Herrero for murder in exchange for time cuts." ECF No. 181 at 78. According to Walker, "…the plan to frame Prible for the Herrera/Tirado murders was already in place even before Prible arrived at the Medium." *Id.* at 79. Prible further contends that "Walker was aware of Kelly Siegler's involvement in relaying information that was needed to solidify the supposed confession that Prible had given them." *Id.* at 87 (internal citations and quotation omitted).

Notably, the state court found that Walker's statements "consist almost entirely of hearsay and speculation and contain no direct evidence of [Prible's] conspiracy theory." 1 SHCR 799-800. The court further found that Walker's statements "are unpersuasive and have little evidentiary value with respect to the validity of [Prible's] habeas claims regarding any alleged conspiracy involving the lead prosecutor and federal inmates." *Id.* at 800. The state court's credibility finding regarding Walker's statements is afforded deference here. *Coleman v. Quarterman*, 456 F.3d 537, 541 (5th Cir. 2006). A federal habeas court "may not substitute its own credibility determinations for those of the state court simply because it disagrees with the state court's findings." *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005). Rather, Prible bears the burden of rebutting this presumptively correct finding with clear and convincing evidence. *Dale v. Quarterman*, 553 F.3d 876, 879 (5th Cir. 2008); 28 U.S.C. § 2254(e)(1).

Prible has sought through discovery to substantiate Walker's speculative assertions but has yet to establish as fact what he claims in his petition to be true. This includes several critical tenets of his conspiracy theory: 1) that Siegler knew before charging him with capital murder that Foreman would testify as an informant for the State; 2) that she manipulated Prible's housing within FCI Beaumont to facilitate informant testimony; 3) that she encouraged FCI Beaumont inmates to obtain or manufacture a confession against Prible; and 4) that the confession testified to by Beckcom is false. The burden of proving these allegations rests squarely on Prible. *Floyd,* 894 F.3d at 160, *supra*. A presumptively valid state court conviction cannot be set aside based on unsupported, speculative, and conclusory assertions. *Ross v. Estelle*, 694 F.2d 1008, 1011–12 & n.2 (5th Cir. 1983). And as shown below, too many of Prible's assertions here are precisely that.

### A.   There is no evidence that Siegler knew, before charging Prible with capital murder, that there were informants at FCI Beaumont–Medium willing to inform on Prible.

To prove his conspiracy theory and substantiate Walker's assertions, Prible must demonstrate that Siegler knew, prior to Prible's arrival at the Medium, that there were inmates at FCI Beaumont willing to inform against him. Prible repeatedly asserts in his petition that Jesse Moreno provided Siegler with this information during their July 3, 2001 meeting. ECF No. 181 at 21, 65, 189. Specifically, he contends that Moreno told Siegler that Foreman

14

had information on Prible and would be willing to testify against him. *Id.*

According to Prible,

> [i]f the jury had known that Moreno had given Siegler Foreman's name while Prible was still on the Low, and that she had charged Prible in the belief that she would have an informant—namely Foreman—to testify against him, the testimony of Michael Beckcom would have been a lot less believable to the jury."

DE 181 at 65.[9] Unfortunately for Prible, the record he was permitted to develop at length does not bear this out.

>    1.   **The facts do not support Prible's assertion that Moreno told Siegler during their July 3, 2001 interview that Foreman was prepared to testify against Prible.**

The July 3, 2001 interview between Moreno and Siegler was recorded. Prible submitted the recording and a transcript of that interview as a hearing exhibit. *See* Pet.'s Hrg. Ex. 11. The recording is clearly the best evidence of what was discussed between Siegler and Moreno during this interview. At no point during this interview, however, does Moreno mention Prible or the Tirado/Herrero murders. *Id.* Foreman's name is mentioned, but only in reference to Herrero's case—not Prible's. Pet.'s Hrg. Ex. 11 at 17–20.

---

[9]    *See also* 1 EHRR 14 (Prible's opening statement asserting "The same day [July 5, 2001], assured she had willing informants at FCI Beaumont, she also prepared charged against Mr. Prible."

Absolutely nothing in this interview suggests that Foreman had information on Prible or would be a willing to testify against him.

Prible maintains, however, that only "[s]ome of this meeting was recorded" and points to Siegler's deposition testimony as proof. ECF No. 181 at 42; 43 (citing Pet.'s Ex. 4–A at 130–131). The whole of what Prible cites to includes the following exchange:

> Q:    Okay. Jesse Moreno talked with you about Mr. Prible's case and Mr. Herrero's case, correct?
>
> A:    He did.

Pet.'s Ex. 4–A at 130–131. Siegler's testimony here is entirely inadequate to prove what Prible contends. Without context, she was asked by Prible's attorney whether Moreno spoke to her about both Prible and Herrero's case. *Id*. Nothing in the question asked by counsel, or in Siegler's affirmative response, indicates when Moreno might have talked to Siegler about Prible's case or more critically, what they discussed. Notably, Prible made no attempt to provide clarification on either point. These are not facts that can be assumed, they must be proven. And they have not been.

Indeed, Siegler was asked directly during her deposition whether Moreno had informed her during the July 3, 2001 meeting that Foreman heard a confession by Prible, and she testified that she had no independent recollection of what was discussed during that interview. 2 EHRR 36.

Critically, however, she testified during the evidentiary hearing that any substantive conversation between she and Moreno on July 3, 2001, was recorded. 3 EHRR 44. Thus, any assertion by Prible that Moreno told Siegler during that interview that Foreman was a willing informant against Prible is baseless.

Indeed, beyond this brief and vague reference, nothing else in the record speaks to a conversation between Siegler and Moreno about Prible's case. Prible attempted to establish this fact through other witnesses but failed. Prible questioned Bonds, Beckcom, and Dominguez regarding their knowledge of what Moreno might have told Siegler about Foreman and Prible's case. Bonds testified that 1) he was unaware that Siegler had even met with Moreno; 2) had no knowledge of what they discussed during that interview; 3) and his first contact with Foreman pertained to the August 8, 2001 interview. 1 EHRR 146–147, 149. Beckcom testified that he had no knowledge of whether Moreno had given Foreman's name to Siegler. 3 EHRR 9. And Dominguez testified that he was not aware of any involvement Moreno might have had in Prible's case and that he had never heard Moreno talking about Prible's case. Resp.'s Hrg. Ex. 21 at 78. He further stated that Moreno would not even have known Prible because he left FCI Beaumont–Medium before Prible was transferred over from the Low. *Id.*

17

Even Foreman, the subject of the alleged conversation between Moreno and Siegler, failed to corroborate the notion Prible puts forth here. Foreman testified at the hearing that he met Moreno in the SHU, that Moreno already "had some facts" about Prible's case, and that Moreno suggested that he try to get a time cut for testifying against Prible. 1 EHRR 39. But testimony from Foreman that Moreno urged him to try to inform on Prible is proof of nothing more than that. Foreman offered nothing at the hearing to support Prible's claim that Moreno told Siegler that he would be a willing informant against Prible. He did not testify that he told Moreno he was willing to testify against Prible, that he told Moreno to tell Siegler this, or that Moreno told him he told Siegler this. There is simply no evidence that Siegler knew before charging Prible with capital murder that Foreman—or any other FCI Beaumont inmate—would testify against him.[10]

---

[10] To the extent that Prible might argue that Siegler's knowledge that there were informants at FCI Beaumont–Medium willing to testify against another inmate, Herrero, is sufficient to prove his assertion here, he is wrong. The fact that a witness, or witnesses, came forward with information in one case does not demonstrate that Siegler knew these same inmates could, or would, provide information against Prible. Indeed Prible was not even at FCI Beaumont Medium at the time, *see* Pet.'s Hrg. Ex. 17. Any such claim by Prible would be more baseless speculation on his part.

**2.    The facts show that, instead, informant testimony played no role in the prosecutor's decision to charge Prible with capital murder.**

The most obvious place to look for support of Prible's claim that the prosecutor charged him with capital murder knowing there was an informant who would testify against him is the probable cause affidavit. But this affidavit makes no mention of an informant. Resp.'s Hrg. Ex. 5. By contrast, the probable cause affidavit filed in Herrero's case on the same day, the case for which Moreno *did* provided Siegler information, reflects this fact. Resp.'s Hrg. Ex. 6. The absence of any reference to an informant in the probable cause affidavit supports Siegler's testimony that she believed there was enough evidence against Prible to proceed with the case without informant testimony—evidence that would not become available to her for several months after charges were filed.

Furthermore, Siegler did not reach out to Foreman following her July 3, 2001 meeting with Moreno. 2 EHRR 37–38. It is telling that she did not. Had Siegler known about, and relied upon, Foreman as a potential informant in her decision to charge Prible with capital murder, it is reasonable to assume that she would have reached out to him as soon as possible to ascertain any inculpatory information he might have. But she did not meet with Foreman until he reached out to her on August 8, 2001, nearly a month *after* Prible had been charged with capital murder. *Id.*; *see also* 1 EHRR 43–44.

19

Indeed, this August 8, 2001 meeting with Foreman was Siegler's first contact with any inmate at FCI Beaumont–Medium regarding Prible's case. And both Siegler and her investigator, Bonds, immediately and completely discounted Foreman's claim to have incriminating information on Prible. 1 EHRR 140–142; 2 EHRR 40. Siegler then proceeded to indict Prible—without informant testimony. 2 EHRR 46. In response to questioning on this, Siegler responded:

> One more time, I don't know what they had in 1999. It could have been completely sufficient in 1999 to move forward, but I didn't have the case then. I wanted to be thorough, which included talking to Nathan Foreman, which I thought would be a waste of time and it turned out to be a waste of time. Irrespective of that, I made the decision to move forward on the case against Ronald Jeffrey Prible.

2 EHRR 42. Siegler made it clear here and elsewhere during her testimony that Foreman was simply not involved—in any way—in the case against Prible. 2 EHRR 52, 88. As such, Prible's continued assertion that Siegler charged him with capital murder based on potential informant testimony from Foreman is wholly unproven.

### B. There is also no evidence that Siegler manipulated Prible's housing assignments at FCI Beaumont to facilitate a confession.

Another key tenet in Prible's prosecutorial misconduct allegations is his claim that Siegler charged Prible with capital murder to put him within reach

of potential informants at FCI Beaumont—Medium. *See* ECF No. 181 at 43-44; 216. Prible argues in his petition:

> Evidence … showing the State knew on July 3, 2001, that Beckcom's confederate, Foreman, was at FCI Beaumont and was already working to supply the State with incriminating information against another inmate, if it had been disclosed, would have allowed trial counsel to document for the jury that the State charged Prible two days later, on July 5, 2001, not because it had different non-informant evidence, but in order to ensure that Prible was in reach of veteran jailhouse agents whom the State had used as informants in the past.

ECF No. 181 at 216. This is a pejorative accusation, to be sure. But it is also an entirely speculative and unproven one because the evidence does not establish Siegler had knowledge of, or the authority to influence, Prible's housing assignments with FCI Beaumont.

> **1.    The facts do not support Prible's assertion that the prosecutor charged him with capital murder to put him within reach of known informants at FCI Beaumont–Medium.**

Initially, the truth of the present allegation depends, in part, on Prible's ability to prove the previous one. That is, Prible's claim that the prosecutor charged him with capital murder to effectuate his transfer from FCI Beaumont–Low to the Medium so that "veteran jailhouse agents" would have access to him presupposes that Siegler knew there were informants willing to testify against him. But, as demonstrated above, she did not. For this reason alone, Prible cannot meet his burden of proof here.

Even so, Prible's allegation also falsely assumes that Siegler knew that charging him with capital murder would result in his transfer from FCI Beaumont–Low to the Medium. Prible points to Siegler's July 3, 2001 interview with Moreno as proof. He refers to the following exchange:

| | |
|---|---|
| Siegler: | Um, Beaumont Medium is that what you called it? |
| Moreno: | Beaumont Medium, yeah. |
| | |
| Siegler: | Beaumont. And you were in there for the same case? |
| Moreno: | For the same case, yeah? |
| | |
| Siegler: | You had just gotten sent there? |
| Moreno: | Yeah, I was at, ah, at the High, right across the street. I'm at the Medium [UI] you get a High, Medium, and Low. |
| | |
| Siegler: | Yeah, I just found that out. What's the difference? |
| Moreno: | Its higher security. |
| | |
| Siegler: | And how did you get from high to medium? What changed? |
| Moreno: | My good time, and I got that detainer on that other murder charge. |
| | |
| Siegler: | Mine? |
| Moreno: | [UI] |
| | |
| Siegler: | Where you were a witness? |
| Moreno: | Yeah, I got it dropped off, I got it dropped? |
| | |
| Siegler: | From High to Medium? |
| Moreno: | Yeah, so they dropped me. |

Pet.'s Hrg. Ex. 11 at 4-5. Prible maintains that this brief, preliminary exchange with Moreno during an interview on an entirely different case was sufficient for Siegler to ascertain the federal prison's undoubtedly complex security

"point system" and deduce that charging Prible with capital murder would result in his transfer from FCI Beaumont–Low to the Medium. Aside from the sheer absurdity of this suggestion, there are facts in the record that prove the opposite.

Siegler testified that she was entirely unaware of Prible's internal movements within the FCI Beaumont facilities:

> Q:   And after that, he was moved from the FCI Beaumont Low to the FCI Beaumont Medium because his points went up, right?
>
> A:   I don't know anything about that.
>
> Q:   You didn't know that he was moved from the low to the medium?
>
> A:   I didn't keep up with that. I don't remember when he was moved or why he was moved.

2 EHRR 51. Her testimony here is substantiated by other evidence in the record. Siegler and Bonds met with Prible at the FCI Beaumont–Low facility in May 2001. Pet. Hrg. Ex. 4 at 84–85. The detainer paperwork sent by the HCDA's office on September 4, 2001, requesting Prible's transfer from federal custody to the Harris County Jail was addressed to "Federal Correctional Institution (LOW)." Resp.'s Hrg. Ex. 9. This indicates that at the time this paperwork was sent, more than a month after Prible's transfer to the Medium, Siegler still believed Prible was housed at FCI Beaumont–Low. This also

thoroughly refutes Prible's claim that Siegler knew that charging Prible with capital murder would result in his transfer to the Medium.

> ### 2. Indeed, the evidence demonstrates that Siegler was already planning to remove Prible from federal custody—months prior to Beckcom obtaining a confession from him.

The State's detainer paperwork undermines Prible's allegation that Siegler manipulated his housing assignment to secure a confession even further because it demonstrates that Siegler was planning to have him removed from federal custody immediately following his indictment on August 29, 2001. Siegler testified at her deposition regarding the interstate agreement that allowed state prosecutors to seek custody of a defendant serving time in a federal institution to proceed to trial. Pet. Hrg. Ex. 126–127. Office policy permitted an individual who had been indicted in Texas to have a detainer placed on him and transferred from federal to state custody. *Id*. at 127. The detainer paperwork for Prible was signed by Siegler on, or before, August 3, 2001. Resp.'s Hrg. Ex. 9. This is *before* Siegler had even met with Foreman to determine whether he had credible information. The paperwork was then sent to FCI Beaumont–Low on September 4, 2001, immediately following Prible's August 29, 2001 indictment. *Id*. This was *after* Siegler met with Foreman and determined that he was not credible and that their meeting was a "waste of time." *See* 2 EHRR 43. The fact that Siegler was actively pursuing Prible's

removal from federal custody without having secured informant testimony is a clear refutation of Prible's assertion that Siegler was manipulating Prible's housing at FCI Beaumont to facilitate a false confession.[11] This fact further supports Siegler's testimony that she was proceeding with the case against Prible irrespective of whether there was an informant to testify against him.

### C. There is also no evidence that Siegler encouraged or instructed any FCI Beaumont inmates to obtain incriminating information on Prible.

At the heart of Prible's prosecutorial-misconduct claims is his allegation that the prosecutor knowingly took advantage of a ring of informants operating

---

[11]    To further demonstrate that Siegler manipulated Prible's housing to secure informant testimony, Prible maintained in his petition that she intentionally held onto to Prible's detainer paperwork following the indictment to allow the informant-ring time to obtain information against Prible, even though the paperwork for Herrero—who was indicted on the same day as Prible—was sent immediately. ECF No. 181 at 43-44; 49. According to Prible, Siegler did not file the interstate detainer paperwork to transfer him out of federal custody until November 29, 2001, after she was "confident the informants had extracted a 'confession' from [him]." ECF No. 181 at 49. To support this proposition, Prible attached Herrero's detainer paperwork to his petition as an exhibit, but not Prible's. He relied, instead, on Prible's BOP housing records which reflected the date he was actually removed from federal custody—not the date the request was sent by the prosecutor. *See* ECF No. 181 at 44 (citing Pet.'s Ex. 16); 47 (citing Pet.'s Ex. 17). The Director in preparing for the evidentiary hearing, discovered Prible's detainer paperwork among the documents produced to Prible by the HCDA's office in this case. This paperwork proves Prible's assertion false because it established that the it was sent by Harris County to FCI Beaumont on the same day that Herrero's paperwork was sent on September 4, 2001—immediately following their indictments. Resp.'s Hrg. Exs. 9 & 10. November 29, 2001 is the date they were both transferred to the Harris County Jail. Resp.'s Hrg. Ex. 4; Pet.'s Hrg. Ex. 17. This oversight by Prible with respect to his detainer paperwork, though undoubtedly inadvertent, nevertheless demonstrates the danger inherent in speculatively ascribing nefarious purpose to the prosecutor—something Prible does throughout his petition.

at FCI Beaumont–Medium to obtain incriminating information against Prible. Based largely on statements made by Carl Walker, Prible insinuates in his petition that the prosecutor was actively working with these inmates to manufacture a false confession. ECF No. 181 at 79–88; 187–88. To that end, Prible asserts that the prosecutor was in constant contact with the inmates and let them know that Prible was coming over to the Medium from the Low, encouraged the inmates to inform against him, and even supplied them with information about his case so they could manufacture a confession. This is another serious accusation lodged against the prosecutor without proof. To the extent that there were informants at the Medium working together to obtain incriminating information against fellow inmates in secure sentence reductions from the prosecutor, they were doing so of their own initiative—not the prosecutor's.

### 1.    The record bears out that Prible was targeted by opportunistic federal inmates.

This is the one assertion by Walker that is actually corroborated by other FCI Beaumont inmates. Foreman, Beccom, and Gonzalez all acknowledge, at least to some degree, that there were inmates at the Medium who openly discussed Prible's case and actively sought to obtain incriminating information that could be used to secure a sentence reduction from the prosecutor. Foreman testified that there were several inmates interesting in getting time cuts for

26

"rolling over on Jeff." 1 EHRR 49. Gonzalez stated in his affidavit that "there was talk on the Medium about checking Jeff in as soon as he got on the yard because he killed the three little girls." Resp. Hrg. Ex. 19.  And Beckcom acknowledged in his deposition that other inmates may have been "working" Prible's case. 3 EHRR 9.

That inmates targeted Prible is hardly surprising. Initially, as acknowledged by the state court in the habeas hearing "everyone knows" that it is not uncommon for federal inmates to come forward to testify against other inmates to reduce their sentences. 3 SHRR[12] 30. Siegler made a similar observation in her deposition: "Federal inmates audition for any role they have on any case they can think of with any information they might hear to try to get a time cut. That's what federal inmates do all day long 24 hours a day every day of the year." 2 EHRR 71.

Beyond that, Prible was particularly vulnerable because he was accused of raping Nilda and murdering her three young children. Beckcom testified at his deposition that prisoners found crimes involving rape and children "particularly reprehensible" and that both of these were "in play" with Prible's case. Pet.'s Hrg. Ex. 29 at 58–59. As mentioned, Gonzalez indicated in his affidavit that they went after Prible "because people believed he killed the

---

[12]     "SHRR" refers to the State Habeas Reporter's Record for the evidentiary hearing held on Prible's fourth state writ application.

three little girls." Resp. Hrg. Ex. 19. Walker testified that the nature of the murders Prible committed were mentioned when he was "recruited" by his fellow inmates to inform against him. 1 EHRR97; Pet. Hrg. Ex. 55 at 10.

Furthermore, Prible was not a random target. Several inmates in the alleged ring of informant knew either Prible or the family he murdered personally. Mark Martinez stated in the letter he wrote to the prosecutor that he and Steve Herrera were friends. Resp.'s Hrg. Ex. 16. Gonzalez wrote in his letter that he and his Father, Felix, knew Prible from their neighborhood in Houston. Resp.'s Hrg. Ex. 18. Given all this, the plot against Prible, though unfortunate, was not improbable or entirely unforeseeable. Indeed, testimony at trial from another FCI Beaumont inmate, Brian Liedtke, established that he warned Prible not to talk about his case to other inmates, "I told him to shut up. He talked about his case so much. I told him people would come in and testify against him if he kept that stuff up. And 'lo and behold —" 27 RR 26. The fact that inmates at FCI Beaumont were looking to use Prible for their own advantage, however, is not enough prove what he alleges here.

> **2.    Nothing supports Prible assertion that the State was complicit in the inmates' scheme to obtain incriminating information that could be used against him.**

Perhaps the most glaring deficiency in the evidence is the absence of testimony from a single member of the alleged conspiracy, including Walker,

asserting that they were approached by the State about obtaining information that could be used against Prible—or any other inmate. The Constitution is implicated only if the informant is acting as a state agent. *Massiah*, 377 U.S. at 207. "The Sixth Amendment rights of a talkative inmate are not violated when a jail inmate, without having been deputized by the government to question the defendant, acts as an entrepreneur to seek information of potential value." *United States v. Birbal*, 113 F.3d 342, 346 (2nd Cir. 1997). The key inquiry is whether the informant acted pursuant to instructions from the State or otherwise submitted to the State's control. *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998). For Prible's prosecutorial misconduct claims to have merit, he must prove that the inmates were acting at the behest of the State. But he cannot.

> **a.   Not a single FCI–Beaumont inmate has testified or otherwise stated that the prosecutor encouraged, instructed, or otherwise directed them to obtain incriminating information from Prible.**

Moreno, the first FCI Beaumont inmate to meet with Siegler, contacted her about the Hermelio Herrero case. Moreno wrote her a letter claiming to have information on an unsolved case. Pet.'s Hrg. Ex. 6. In response to that letter, Siegler arranged to meet with Moreno on July 3, 2001. 2 EHRR 23–25. Nothing in the record, which includes a transcript of that interview, suggests

that Siegler asked Moreno to obtain information on Herrero or encourage him to seek out additional information on Prible. *See* Pet.'s Hrg. Ex. 11.

Foreman, was the next FCI Beaumont inmate to initiate contact with Siegler, hoping for a deal. Foreman testified that it was Moreno who brought Prible's case to his attention and encouraged him to try to get a sentence reduction. 1 EHRR 39. He contacted Siegler at Moreno's urging. 1 EHRR 43–44. Contrary to what Prible asserts, it was not the prosecutor that sought out Foreman to use as an informant. Foreman testified for Prible in these proceedings yet offered nothing to suggest Siegler asked or encouraged him— either before or after their August 8, 2001 meeting—to obtain information that could be used against Prible. Indeed, Siegler made it clear in her testimony that she had no interest in using Foreman. 2 EHRR 42, 52, 88.

Beckcom, the informant who testified at Prible's trial, also indicated that he was the one to reach out to the prosecutor with information, not the other way around. 3 EHRR 8. Beckcom testified at trial and in these proceedings that he received Siegler's number from Foreman and reached out to her in early October 2001 to try to get a sentence reduction in exchange for information on Prible. 26 RR 37; 1 EHRR 215; 3 EHRR 8. Siegler, however, was not interested in the information Beckcom had at that time. 26 RR 37. Beckcom then decided, on his own initiative, to seek out as much information

as he could on Prible to try to get a deal. *Id.*[13] There is no indication here, or elsewhere in the record, that the prosecutor asked or encouraged Beckcom to work as an informant.

Gonzalez, who wrote a letter to Siegler in May 2002, seeking a deal in exchange for information on Prible, stated in his affidavit:

> One of the guys told me that I should contact Siegler. I remember going into the counselor's office with my dad once and talking with Siegler on the phone. I can't remember the counselor's name but I remember she was a woman. Siegler asked me my name and if I knew Jeff. I told her that I did and she said she would be in touch. But I never heard from her after that.

Resp.'s Hrg. Ex. 19. Nothing in Gonzalez's statement regarding his contact with Siegler hints at agency. This is simply another inmate reaching out to the prosecutor with information, hoping for consideration.

---

[13] Prible contends Beckcom's trial testimony regarding his initial phone call with Siegler is sufficient to demonstrate a *Massiah* violation. Specifically, he asserts that, "[a]fter the initial phone conversation in October 2001, Beckcom went to the work for the State on Prible." ECF No. 181 at 235. But there is no evidence establishing that Beckcom "went to work" on Prible at the State's direction. Indeed, Beckcom testified "when this whole thing got started, *I set myself in motion* to testify in the state court …" Pet. Hrg. Ex. 29 at 19 (emphasis added). Without proof that that Siegler asked, encouraged, or otherwise instructed Beckcom to obtain incriminating information on Prible, Beckcom is simply an entrepreneur, and there is no constitutional violation. *See e.g. United States v. Watson*, 894 F.2d 1345, 1348 (D.C. Cir. 1990) (holding "without doubt that the Government did not elicit [defendant]'s statements through the agency of [the informant] because there was no evidence that the government encouraged the informant in any way, and the fact that the informant "may have hoped to make a sale to the Government when he spoke with [defendant] … does not make the Government responsible for his actions."). For these same reasons, counsel was not ineffective for failing to object to Beckcom's testimony on Sixth Amendment grounds, and his seventh claim is necessarily without merit.

And finally, even Walker—the only inmate to suggest that the prosecutor was complicit in the inmate's efforts to obtain incriminating information from Prible—failed to provide proof. Not only could he not testify to having been approached by the prosecutor and asked to obtain information on Prible, he could not even recall ever having spoken "directly" with Siegler. He merely recalled being instructed by fellow inmates to "reach out" and call her. 1 EHRR 125.

The fact that opportunistic federal inmates were actively seeking to inform against Prible and passing Siegler's number amongst themselves does not make the State responsible for their actions. In *Watson*, the D.C. Circuit held that an informant hoping to "make a sale" to the government when he solicited information from an unsuspecting defendant was not an "agent" for purpose of *Massiah*. *Watson*, 894 F.2d at 1348. "On the contrary, [the informant] was acting as an entrepreneur." *Id*.

> **b.    Prible has not proven his assertion that the prosecutor provided FCI–Beaumont inmates with information on him or his case prior to his arrival.**

According to Prible, the State's complicity in the scheme against him is evidenced in part by the fact that the inmates at FCI Beaumont–Medium knew Prible was coming over from the Low before he arrived and were already talking about the facts of his case. ECF No. 181 at 78–79. Here again he relies

upon statements made by Walker during his 2010 interview with defense counsel. *Id.* When asked during that interview how the inmates could possibly have known that Prible was coming, Walker responded, "Well, from what I understand they were all in cahoots with the, ah, prosecutor." Pet.'s Hrg. Ex. 55 at 9. But, it becomes clear later during the interview that Walker's "understanding" is entirely speculative, Id. at 10, 17–18. Prible's subsequent attempts to corroborate that speculation have failed.

Initially, not a single witness from the alleged informant ring has testified or otherwise stated that Siegler told them that Prible was being transferred from the Low to the Medium. It has been known since Prible's trial that Beckcom, at least, had advanced notice of Prible's transfer. Beckcom told the jury that "Prior to [early October] I had heard of the case just briefly, something about a guy coming from the Low charged with murder." 26 RR 22. Gonzalez avers in his affidavit that "[b]efore [Prible] got to the Medium people in the Medium knew he was coming over there and they knew what had happened in his case." Resp.'s Hrg. Ex. 19. But neither Gonzalez, Beckcom, nor any other members of the alleged ring of informants substantiates Walker's "understanding" that this information was received from the prosecutor. Beckcom attributed the knowledge about Prible's impending transfer to the Medium as "yard talk" and "inmate rumor mill." 3 EHRR 15. Gonzalez also referred to the inmate's knowledge about Prible and his case as "yard talk" and

also referenced a newspaper article that "came out before [Prible] got to the Medium describing the murders."  Resp.'s Hrg. Ex. 19.

Furthermore, accepting Walker's assertion that the prosecutor told inmates that Prible was coming over from the Low to the Medium presupposes that Siegler knew that Prible would be transferred after he was charged with capital murder. As set out previously, this is not the case. *See* Section I.A. *supra*. Direct testimony, corroborated by other evidence in the record, establishes that Siegler had no knowledge of Prible's internal movements with the FCI Beaumont facilities. Thus, she could not have provided this information to the inmates.

Walker's account also presumes that the prosecutor had contact with at least one member of the alleged ring of informants during the twenty days spanning July 5, 2001, when charges were filed, and July 25, 2001, the day Prible arrived at the Medium. But there is no evidence of this either. The record demonstrates that the prosecutor's initial contact with Foreman did not occur until August 8, 2001, after his release from the SHU.[14] Thus, even assuming Siegler told him about Prible, he could not have shared this

---

[14]     BOP prison records show that Foreman was in the solitary confinement in the SHU for several months, until July 25, 2001, the same day Prible arrived in the Medium. Pet.'s Hrg. Ex. 18 Thus, contrary to what Walker asserts, he could not have been having conversations with Foreman about Prible in the weeks leading up to his transfer to the Medium. Although Foreman testified that he had contact with other inmates housed within the SHU, he did not have contact with general population.

information with Walker or other members of the alleged Ring until his return to general population on July 25, 2001—the same day Prible arrived at the Medium. And Beckcom's first contact with Siegler did not transpire until October, two months later.  Thus, to the extent that the inmates were talking about Prible prior to his arrival, they were doing that on their own.

Prible's allegation that the prosecutor was providing FCI Beaumont inmates with information on Prible's case also remains unproven.  According to Prible "Walker 'was aware of Kelly Siegler's involvement in relaying information that was needed to solidify [] the supposed [] confession that [Prible] had given them.'" ECF No. 181 at 87. He urged in his petition that Walker could attest to the fact that Foreman was "schooled" by the prosecutor about the specifics of the facts of the offense that the State was trying to prove against him. *Id*. at 186. Both Walker and Foreman testified for Prible at the evidentiary hearing, but neither offered testimony proving this.

Walker, when questioned about how the inmates at FCI Beaumont–Medium came into possession of information on Prible's case, could not provide a definitive answer. Instead, he merely offered conjecture: "It—it—the only—I mean, my opinion at the time, the only people what could have know that is the individual that either done it or the people that was on the scene when they recovered the bodies." 1 EHRR 100. Later, when asked by the Court where the

plan against Prible originated with Siegler, Beckcom, or elsewhere, Walker testified:

> To be honest, Your Honor, I don't—I'm not sure, but I never thought Mr. Beckcom or Mr. Foreman knew—I mean, was the orchestration of it. …Because the details they knew and how they knew what they knew was so vivid or so in depth that, like I saw, I knew before he got there, and they knew ever more than I knew. … So I don't know. I just assumed it was definitely more— …"

1 EHRR 99–100. It is clear from this testimony that Walker does not know where the inmates who approached him got their information. He simply assumed it came from the prosecutor because it was so the inmates knew certain details about the crime. Specifically, Walker testified that the inmates knew "how people died, what evidence linked Prible to the crime, who died in the fire, stuff like that." 1 EHRR 128. This is wholly insufficient to establish a fact supporting federal habeas relief.

Gonzalez in his affidavit referenced the fact that "[a] news article came out before Jeff got to the medium describing the murders." Resp.'s Hrg. Ex. 19. Prible included an April 15, 2001, Houston Chronicle news article as one of his hearing exhibits. Pet. Hrg. Ex. 154.  That article contains detailed information about the murders including 1) the location, position, and description of the bodies; 2) the cause of death for each victim; 3) a description of the rooms where the victims were found; and 3) evidence suggesting that Nilda was raped prior to being killed. As such it is Prible himself that provided proof the inmates at

FCI Beaumont had access to detailed information about Prible's crime prior to his arrival from a source other than the prosecutor.

Beyond that, Foreman did not substantiate Walker's claim that Siegler "schooled" him on the facts of Prible's case. Foreman testified that it was Moreno who initially shared information with him about Prible's case while they were in the SHU together. 1 EHRR 39.[15] And although he testified that he learned details about Prible's case from both Moreno and Siegler, the only information Foreman recalled learning from Siegler was the fact that Prible's DNA was found in Nilda's mouth. 1 EHRR 54–56. Recollecting a single instance of shared information is a far cry from establishing that he was "schooled" by Siegler on the facts of the case.  In fact, Foreman offered nothing to support Prible claim that Siegler was feeding him facts to manufacture a confession. Although he made vague reference to having learned information from Siegler about Prible's case, Foreman offered little context, and did not assert that it was done to facilitate the informant testimony. 1 EHRR 54–56.

Regardless, Foreman did not testify against Prible at trial, Beckcom did. And when asked by Prible during the hearing, Foreman stated that he did not share the information he learned from Siegler with Beckcom. 1 EHRR 56. Nor

---

[15]     Prible asserted during his opening statements that, "Foreman will testify that he was told about Prible's case by Jesse Moreno, who heard about it from Siegler." No such testimony was ever offered. Nor is there evidence anywhere else in the record even suggesting that Siegler fed Moreno facts about Prible's case.

did Beckcom testify at trial that Prible confessed this fact to him. *See* 26 RR 92. Beckcom reiterated during his post–conviction testimony that the information he testified to came directly from Prible. 3 EH 5, 12–13; *see also* Pet. Hrg. Ex. 29 at 152–153. Beckcom expressly denied receiving information from the prosecutor about Prible's case, indicating that Siegler was more interested in what information he could give her and asked him, "what can you tell me?" 3 EHRR 7, 11. Prible wholly fails to prove his claim that the prosecutor was supplying FCI Beaumont inmates with information about his case.

In the end, nothing supports Prible assertion that the State orchestrated Prible's confession. He does not show that Siegler "deployed Beckcom and Foreman as agents to pry incriminating information from Prible." *See* ECF No. 181 at 301. The aspersion Prible casts on the prosecutor in this case is unfounded and does not support federal habeas relief.

### D.   Finally, Prible Not Proven That His Confession was "Manufactured" or False.

Contrary to what Prible asserts, the facts developed in these proceedings do not establish, by a preponderance of the evidence, that Beckcom manufactured Prible's confession and testified falsely about it at trial. Prible attacks the veracity of Beckcom's testimony by pointing to 1) Walker's assertion that the prosecutor was providing inmates with information about

Prible's crimes; 2) Foreman's testimony that he did not, as Beckcom testified at trial, hear Prible confess; and 3) the letters written by Martinez, Walker, and Gonzalez to the prosecutor claiming to have information on Prible. For the reasons set out below, this is not enough.

Walker's assertion that the prosecutor was providing inmates with information about Prible's crime has not been proven. *See* Section I.C., *supra*. Not a single FCI Beaumont inmate, including Walker, testified that they received information from the prosecutor for purposes of manufacturing a confession against Prible. Only one inmate testified that he learned information about Prible's case from the prosecutor. And even then, Foreman testified to having learned a single fact, but made no assertions that the prosecutor mentioned this for purposes of facilitating a manufactured confession. But again, Foreman did not testify at trial and did not share this information with the witness who did.

Foreman's testimony claiming not to have heard Prible's confession falls short of proving Beckcom's testimony false for several reasons. First, conflicting testimony or evidence is insufficient to demonstrate perjury. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (Perjury is not established by mere contradictory testimony from witnesses, inconsistencies within a witness' testimony and conflicts between reports, written statements and the trial testimony of prosecution witnesses). "Such contradictory trial testimony,

39

however, merely establishes a credibility question for the jury." *Id*.[16]  Beyond

that, for the reasons previously set out in the Director's Answer and Motion for

Summary Judgment, Foreman is not a credible witness.  *See* ECF No. 191 at

105–106. Moreover, Foreman's testimony at the evidentiary hearing that

Prible never talked to him about his case, other than to proclaim his innocence,

is hardly believable in light of evidence that Prible himself presented at trial.

At trial, Prible offered testimony from Brian Liedtke that Prible spoke about

his case to "everyone" and that he talked about his case "every day." 27 RR 26.

Prible talked so much about his case to so many people that Liedtke warned

him to stop. *Id*. Foreman knew Prible and hung out with him frequently on the

yard. *see* 1 EHRR 47. Prible was comfortable enough with Foreman to take a

picture with him. 1 EHRR 49. Yet when asked whether Prible would ever talk

about his case, Foreman responded, "Not really. …[H]e didn't really talk about

what he was accused of." 1 EHRR 51. Given the testimony proffered by Prible

at trial, Foreman's testimony here is dubious, at best.

---

[16]     Notably, Prible did not establish through Foreman's testimony that he would have testified at Prible's trial to the information provided in these proceedings. And, it cannot be assumed that he would have. Prior to Prible's trial, Foreman was attempting to testify *against* him in exchange for a deal with the State. As late as October 2001, Foreman's attorney contacted Siegler claiming that Foreman had information on the murder weapon in one of her cases about to go to trial. Resp. Hrg. Ex. 13.  In the years immediately following Prible's conviction, during Prible's state habeas proceedings, Foreman refused to speak with Prible's attorneys.  It is only in the last few years—more than a decade removed from trial—that Foreman has shown any willingness to cooperate with Prible's defense.  Thus,

Furthermore, Beckcom was unwavering in his post–conviction testimony. When shown Foreman's affidavit wherein he denied having heard Prible's confession, Beckcom's surprise was recorded on the record. Pet. Hrg. Ex. 29 at 138. Counsel then admonished Beckcom to make no further comment until he was asked a question. *Id*. Counsel then read Beckcom a portion of the affidavit and asked whether Foreman's assertions were correct, Beckcom responded, "No." *Id*. When asked what part was false, Beckcom indicated the whole affidavit was false. *Id*. Beckcom also repeatedly and vehemently reaffirmed that the information he testified to regarding the confession came directly from Prible, despite the fact that he clearly did not believe the prosecutor upheld her end of the deal. 1 EHRR 242, 254, 3 EHRR 4–5. In one particular exchange Beckcom stated, "All I know is my testimony is based on what came out of Jeff Prible's mouth and I wrote down. I mean if you're asking me to recant what I said, I didn't lie." 1 EHRR 254. And then at the conclusion of his direct examination, he further stated, "I'm basing it on what I was told by [Prible]. Well, I mean what do you want me to say? You want me to unhear what I heard?" 3 EHRR 16.

## II.   Incremental Impeachment Evidence is the Most Prible Has Produced Here.

Because Prible has not proven that the state orchestrated his confession or that Beckcom manufactured it, he cannot establish the merits of his

*Massiah, Strickland*, or *Giglio* claims.  His *Brady* claims also fail. Even if the evidence alleged suppressed could somehow be construed as favorable, *see* ECF 191 at 120–140, it is not material. It is at most incremental impeachment evidence. And this is not enough. *See Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005) (explaining that evidence that provides only incremental impeachment value does not rise to the level of *Brady* materiality).

    Prible argues in his petition Beckcom could have been "devastatingly examined" with this evidence, but the record does not bear this out. Beckcom was deposed in these proceedings and questioned about Foreman's claim that he lied, the letters, the alleged conspiracy, whether the prosecutor fed him information, and more yet remained steadfast in his instance that Prible confessed to him. Prible also claims that he could have called the other FCI Beaumont inmates to testify about their letters to the prosecutor to establish the alleged conspiracy but, as set out above, he has not produced testimony in these proceedings to show this. Nor has he demonstrated that any of these witnesses would have been available to testify favorably for him at trial.

    Regardless, as set out previously in the Director's Answer and Motion for Summary Judgment, Beckcom was thoroughly impeached by the defense at trial. The jury heard extensive testimony regarding Beckcom's prior criminal history dating back 1986, which included a capital murder charge. 26 RR 5-11; 78. The jury also learned that Beckcom had a history of snitching against

42

his fellow inmates in exchange for favorable treatment from the prosecution, and of the sentence reduction he hoped to receive for his testimony in this case. 26 RR 11-17. Prible's attorney pointed out during cross-examination that Beckcom had previously lied under oath. 26 RR 91. The defense offered testimony from another inmate who testified that Beckcom was opportunistic and not truthful. 27 RR 18-27. Prible's attorneys also attempted to show that Beckcom fabricated the confession by calling several witnesses who testified that Beckcom had access to materials containing details about Prible's case. 26 RR 238, 243-45; 27 RR 18-27; 27 RR 36. Incremental impeachment of Beckcom's testimony is simply not enough to prove materiality here.

## CONCLUSION

For the reasons set out above, the Director respectfully requests that this Court find the eight claims Prible raises regarding his confession and Michael Beckcom's testimony meritless.

Respectfully submitted,

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

_s/ Tina J. Miranda_
TINA J. MIRANDA
Assistant Attorney General
Texas Bar No. 24026139
Southern District Bar No. 27728

Office of the Attorney General
Criminal Appeals Division
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
tina.miranda@oag.texas.gov

Telephone: (512) 936-1600
Facsimile: (512) 320-8132

ATTORNEYS FOR RESPONDENT

_s/ Tina J. Miranda_
TINA J. MIRANDA

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2019, I electronically filed the foregoing document with the clerk of the court for the United States District Court, Southern District of Texas, using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

Gretchen N. Scardino
SCARDINO LLP
gretchen@scardinollp.com
401 Congress Avenue, Suite 1540
Austin, Texas 78701
(512) 443-1667

James G. Rytting
HILDER & ASSOCIATES, P.C.
james@hilderlaw.com
819 Lovett Boulevard
Houston, TX 77006
(713) 655-9111

        *s/ Tina J. Miranda*
        TINA J. MIRANDA