# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **RONALD JEFFREY PRIBLE,** | § | |
| | § | **PETITIONER'S EXHIBIT LIST** |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **4:09-cv-01896** |
| | § | |
| **LORI DAVIS, DIRECTOR,** | § | |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE, INSTITUTIONAL DIVISION,** | § | |
| | § | |
| **Respondent.** | § | |

## PETITIONER'S POST-EVIDENTIARY HEARING BRIEF

TO THE HONORABLE KEITH ELLISON, UNITED STATES DISTRICT JUDGE:

Petitioner Ronald Jeffrey Prible ("Prible" or "Petitioner") files this Post-Evidentiary Hearing Brief and would respectfully show the Court as follows:

## I.
## Introduction

On April 29, April 30, and May 2, 2019, the Court held an evidentiary hearing in this case, which afforded it the opportunity to make credibility determinations with respect to various critical witnesses involved in Petitioner's habeas claims. Petitioner presented seven witnesses: Nathan Foreman, Carl Walker, Jr., Johnny Bonds, Vic Wisner, Michael Beckcom, Kelly Siegler, and Terry Gaiser.[1] This brief points out the important testimony of each witness, argues why the witness should or should not be believed, and explains how the testimony supports Petitioner's habeas claims.

---

[1] Some of these witnesses – Bonds, Wisner, Beckcom, and Siegler – were presented by deposition. The exhibit numbers at their depositions differed from the exhibit numbers listed on Petitioner's Exhibit List submitted with the Joint Pretrial Order (Dkt. 222-A). For the Court's reference, Petitioner has attached an appendix comparing the deposition exhibit numbers (*i.e.,* those that appear on the evidentiary hearing transcript) to the exhibit numbers listed in Petitioner's Exhibit List submitted with the Joint Pretrial Order. All exhibit references herein are to the Joint Pretrial Order.

## II.
## Factual Development at the Evidentiary Hearing

### A.    Nathan Foreman

At the hearing, Foreman credibly testified that he learned about Prible's case from Jesse Moreno, who had spoken with Siegler about it.  He also recalled his communications with Siegler and Bonds leading up to Prible's trial, including Siegler's disclosure to him that Prible's DNA had been found in the victim's mouth.  He credibly sketched out a conspiracy among several inmates, which was known to if not choreographed by Siegler, to provide incriminating testimony against Prible in exchange for sentence reductions.   Foreman's testimony was consistent with the two affidavits that he signed in January 2016 (**Exhibits 87** and **123**), and was corroborated by the testimony of Carl Walker, the affidavits of Oscar Gonzalez (**Exhibit 88**) and Gordon Harpe (**Exhibit 73**), Siegler's and Bonds' work product notes (**Exhibits 19** and **20**), and the letters from the various non-testifying informants to Siegler (**Exhibits 35-37**).

### 1.    Foreman credibly testified that he was recruited to act as an informant in Prible's case by Jesse Moreno, who had discussed the case with Siegler.

At the hearing, Foreman testified that he lived in FCI Beaumont's Special Housing Unit (the "SHU") for a little over a year beginning in mid-2000.[2]  *See* Ev. Hrg. Tr. Vol. 1 at 35-36. He explained that inmates in the SHU are separated from the general population, but it is not the same as solitary confinement.  *Id.* at 37.  Inmates in the SHU have cellmates.  *Id.*[3]  And Foreman was an orderly in the SHU, so he was able to move around from cell to cell and talk with other inmates beyond just his SHU cellmates.  *Id.*[4]

---

[2] This is corroborated by Foreman's BOP housing and transfer records (**Exhibit 18**).
[3] This is corroborated by the BOP SHU regulations guidelines (**Exhibit 134**).
[4] This is corroborated by Siegler's notes from her August 8, 2001 interview of Nathan Foreman:  "I: trusty – 6 ½ months."  *See* **Exhibit 19**.

Foreman said that he was in the SHU at the same time as Jesse Moreno. *Id.* at 38. Foreman and Moreno had known in each other in the free world; they grew up in the same neighborhood. *Id.* Foreman testified that while they were in the SHU together, Moreno "brought something to my attention about a time cut" if they testified against another inmate, Jeff Prible. *Id.* at 39. Foreman said that Moreno already knew facts about Prible and his case. *Id.* at 39.[5] Moreno told Foreman to get in contact with Kelly Siegler. *Id.* at 39. At the time, Foreman did not know who Siegler was; later, he learned that she was a prosecutor out of Houston. *Id.* at 39-40.

Foreman got out of the SHU sometime in the summer of 2001 and went to FCI Beaumont Medium. There, he ran into Prible on the compound. *Id.* at 41. Foreman explained that he and Prible were housed in different units within the Medium, so they could not meet with each other in their cells. *Id.* at 42. But they could and did see each other on the yard. *Id.* at 41-43. Foreman could not recall his first encounter with Prible on the yard, but he did remember that before he met Prible, he already knew something about his case, from Moreno. *Id.* at 42-43. And he was already interested in getting a time cut in exchange for providing the government with information on Prible. *Id.* at 43. Foreman testified that he acted on Moreno's suggestion and contacted Siegler. *Id.*

### 2. Foreman explained to the Court how the informants were able to covertly communicate with the prosecutor.

Foreman recalled meeting with Siegler at the Federal Detention Center in Houston to discuss the Prible case. *Id.* at 44. He testified that he and "[a]ll the inmates that were [] supposably (sic) involved in this case" were able to also contact Siegler by telephone. *Id.* The other inmates were Moreno, Michael Beckcom, and Rafael "Cat" Dominguez. *Id.* at 45.

---

[5] Again, this is corroborated by Siegler's notes from the August 8, 2001 interview: "Jessie & me at B Medium together." *See* **Exhibit 19.**

Foreman testified that he had a clear recollection of these other inmates contacting Siegler by telephone. *Id.* at 45. When asked how this could be done, Foreman explained that "the unit manager would allow us to use his phone." *Id.*[6] Foreman remembered that the unit manager was named "Harpe." *Id.* at 46. Foreman said that Siegler was also able to contact the inmates by calling Mr. Harpe's phone.[7] *Id.*

> **3.   Foreman credibly testified that he, Beckcom, and the other informants aimed to get time cuts by "lying on" Prible, and that Siegler helped the scheme along by providing the informants with sensitive case information – *i.e.,* that Prible's DNA had been found in the victim's mouth.**

Foreman eventually became Michael Beckcom's cellmate. *Id.* Foreman said that he and Beckcom would meet with Prible quite regularly, "every day sometimes," on the rec yard. *Id.* at 47. Sometimes it would just be him and Beckcom meeting with Prible, other times there would be other inmates present. *Id.* at 47. Foreman was shown one of the prison photographs contained in **Exhibit 32** and was able to identify himself, Carl Walker, Eddie Gomez, Beckcom, Dominguez, Oscar Gonzalez, and Mark Martinez as the inmates surrounding Mr. Prible. *Id.* at 49. Foreman recalled that all of these inmates were interested in getting time cuts "[b]y rolling over on Jeff" – in other words, by "lying on him." *Id.* at 49. The purpose of the photograph was "[t]o show that we all were affiliated with each other." *Id.*

Foreman testified that he relayed the information that he already had about Prible's case to Beckcom. *Id.* at 54. He had gotten that information "from Jesse Moreno and Kelly Siegler." *Id.* Foreman specifically remembered Siegler telling him about the DNA evidence in the case:

> Q (by Mr. Rytting):  Did you know anything about the DNA or semen in this case?

---

[6] This is corroborated by Harpe's declaration (**Exhibit 73**).
[7] This is corroborated by Harpe's affidavit (**Exhibit 73**), Siegler's testimony (Ev. Hrg. Tr. Vol. 2 at 97), and Beckcom's testimony (Ev. Hrg. Tr. Vol. 1 at 214).

A.  Other than what Kelly Siegler told me.

Q.  And what did she tell you?

A.  . . . [S]he asked me about him, and I said, 'Well, you know' – 'you know, him and the girl were dating or had a relationship.  That's all he had ever said, you know. . . . [A]nd she said, 'Well, did he tell you that his semen was found in her mouth?'"

*Id.* at 55-56.

### 4.      Foreman unequivocally denied the truth of the confession story contained in Beckcom's elaborate handwritten statement.

At the hearing, Foreman was taken through Beckcom's lengthy handwritten statement describing Prible's supposed "confession" to Beckcom *and Foreman,* and unequivocally denied the truth of Beckcom's elaborate tale.  Foreman denied hearing Prible say that "he knows things that nobody knows," that "[y]our deepest, darkest reaches of your worst nightmare doesn't come close to me," that "he loved [Beckcom and Foreman] as brothers" and had "told [them] things that only he and God know."  *Id.* at 59-61.  Foreman never heard Prible say that he was in Special Ops and had carried out secret missions in which he had killed other people for the government.  *Id.* at 67.  Nor did Foreman hear Prible say that he was a "ghost" and was able to get in and out of the crime scene without being heard using "a high-intensity, low-drag maneuver."  *Id.* at 64, 76.  Foreman testified that Beckcom "most definitely" made up the part in the letter about Prible telling them that "I've gone to other countries and maimed, killed and mutilated people to look like some other cartel had done it.  I did this for my country.  Things we're not supposed to know about."  *Id.* at 68.  Most importantly, Foreman said he never heard Prible confess to the murders, as Beckcom claimed he had:

Q.  [D]o you recall Mr. Prible ever saying that he shot the victims in this case?

A.  No, I don't.

Q.  Was that something that you would remember?

5

A.  Yes.

Q.  Why?

A.  Because that – I would have said it then.

Q.  You would have informed on him then?

A.  I would have informed on that.

*Id.* at 63.  Foreman testified that he would have remembered if Prible had told him and Beckcom that "[a]nybody that can go in a house, take out a whole family and get out clean, is a bad motherfucker.  I'm that kind of motherfucker," *id.* at 66, because he was interested at the time in testifying against Prible.  "If this gentleman would have said anything as to what I'm being told he said," Foreman stated, "I would remember that."  *Id.* at 67.

Foreman testified that during the time period that he and Beckcom were speaking to Prible, he was interested in getting a time cut, and was on high alert to any sort of confession Prible might make.  *Id.* at 60-61.  But he insisted, without equivocating, that he didn't hear Prible confess.  According to Foreman, Beckcom's dramatic tale simply was not true.  *Id.* at 64.  ". . . [A]ll I could say is that [Beckcom] should have been a book writer or something," Foreman testified.  *Id.*  "It[] really sounds like he got it off television."  *Id.* at 76.

Foreman explained that inmates would not normally discuss the crimes that they were accused of unless it was a crime that didn't amount to anything.  *Id.* at 65.  This is because prisoners are always looking for a way to get their sentences reduced.  *Id.* at 64.  And an inmate who confessed to killing three children might end up facing a violent end.  *Id.* at 66.

Foreman told the Court that the purpose of taking the photograph with Beckcom, Prible, and their mothers was to "[s]how we was all affiliated with each other."  *Id.* at 69.  Foreman testified that Beckcom's story about what happened right after that photo was taken – the dramatic confession by Prible on the prison yard – was "made up."  *Id.* at 70 ("Q.  . . . [D]id your

. . . cellmate, Mr. Beckcom, make this up, to the best of your knowledge?  A.  It – it's – I know it's made up.").  Foreman confirmed that he and the other inmates gave Prible wine on the yard to loosen him up and "try[] to get him to confess."  *Id.* at 71.[8]  Oscar Gonzalez was the winemaker.  *Id.* at 72.  Foreman remembered having to escort Prible back to his unit because he was so drunk.  *Id.*  But despite his high level of intoxication, Prible still never confessed.  *Id.* at 72.

Foreman stated that Prible spoke of Steve Herrera as if they were friends.  *Id.*  Prible never said that Steve was his enemy in any sense, notwithstanding Beckcom's statement that Prible and Steve were fighting over money and Prible feared that Steve would kill him.  *Id.* at 73.  As far as talking about his case, Foreman just remembered Prible saying that "they were trying to accuse him for something that he didn't do."  *Id.* at 51.  "[T]hat's as far as it went."  *Id.*  Foreman did not end up testifying against Prible, but admitted that he had been willing to do so.  *Id.* at 49-50.

5.     **Foreman held up under cross-examination, insisting that he never heard Prible confess.**

Under cross, Foreman stuck to his story.  He testified that Moreno knew about Prible and the crime that he was accused of, and that he and Moreno started talking about Prible's case while they were in the SHU together.  *Id.* at 79.  He could not remember how many times he met with Siegler in person, but remembered one meeting specifically:  the one at FDC Houston.  *Id.* at 79-80.  He testified that whenever Prible talked about his case, it was only to say that "he was being accused of something that he didn't do.  That's it."  *Id.* at 84.  He admitted that he was interested in informing on Prible, and that he asked his attorney to contact Siegler to see if he could get a time cut.  *Id.* at 86-87.  The only information he had at that time to offer Siegler was

---

[8] This is also corroborated by Walker's evidentiary hearing testimony and by the affidavit of Oscar Gonzalez **(Exhibit 88).**

"[T]hat [Prible] dated – that he used to mess around with the girl, and he and the guy were good friends. . . . That's the best I could do." *Id.* at 87.

### B.   Carl Walker, Jr.

Carl Walker was previously an inmate at FCI Beaumont.  He was released from the federal prison system in December 2015.  Ev. Hrg. Tr. Vol. 1 at 92.  He testified that he now owns a cell phone, tablet, and computer repair company with four employees.  *Id.* at 90-91.  He goes to businesses and customers' homes to do on-site repairs and consulting and also teaches people how to be technicians.  *Id.* at 92.  Walker credibly painted a picture of a well-planned conspiracy by numerous FCI Beaumont inmates, orchestrated by Kelly Siegler, to frame both Prible and Hermilo Herrero in exchange for time cuts.  He admitted that he actively participated in the conspiracy.  His testimony was consistent with his 2010 transcribed interview with Petitioner's counsel (**Exhibit 55**), the testimony of Nathan Foreman, Foreman's two affidavits (**Exhibits 87** and **123**), the affidavits of Oscar Gonzalez (**Ex. 88**) and Gordon Harpe (**Ex. 73**), and the inmate photographs (**Exhibit 32**) and letters to Siegler (**Exhibits 35-37**).

### 1.   Walker's testimony supports the theory that the conspiracy to frame Prible was set in motion *before* Prible even arrived at FCI Medium.

Walker testified that he arrived at FCI Beaumont around the summer of 2000.  *Id.* at 92. He had been convicted of conspiracy to possess with intent to distribute crack cocaine and possession with intent to distribute crack cocaine.  *Id.*  When he got to prison, he was only 26 or 27 years old.  *Id.* at 93.  He was sentenced to 360 months, which meant that when he got out, he would have been incarcerated for about half of his life.  *Id.*  He said that when he first got to prison, he was "frightened, nervous, terrified, depressed . . . it was just a lot at that age." *Id.* at

93. Walker was housed in the same pod in Beaumont Medium as Beckcom, Foreman, and Oscar and Felix Gonzalez.  *Id.* at 104.[9]

Walker first heard of Prible in 2001 when he was in Beaumont Medium.  *Id.*  He "learned that [Prible] was coming over from the low facility, and he was under investigation for several murders."  *Id.* at 94.  He was "approached or recruited" by some acquaintances in the prison chapel, who asked him if he wanted a "blessing" – *i.e.,* an opportunity to get out of jail early:

> Q (by Mr. Rytting):  And you referred to a "blessing."  And so who approached you about this blessing?  To the best you recall.
>
> A.  I want to say it was Mr. Foreman, but it could have been one of three people.  But I want to say either Mr. Foreman or Mr. Beckcom, but it could have also been Oscar.
>
> Q.  Now, and – Oscar Gonzalez?
>
> A.  Yes.
>
> Q.  Okay.  And . . . whoever approached you, did they already have some information about Mr. Prible's case?
>
> A.  Oh, they had a plethora of information about Mr. Prible's case.  They had details, locations, what was found, where the body was, what happened.  I mean, they had everything about Mr. Prible.
>
> Q.  And that was – was this before you even saw Mr. Prible?
>
> A.  This is before I even met him.

*Id.* at 95.

### 2.   Walker testified that before Prible even arrived at FCI Medium, the inmates had detailed, non-public information about his case, supporting Petitioner's theory that the prosecutor must have fed them the information.

When asked whether the source of all of this information was newspapers or other inmates, Walker testified that "my opinion at the time, the only people that could have known

---

[9] Beckcom testified that he remembered Walker and that Walker visited him and Foreman sometimes.  Ev. Hrg. Tr. Vol. 1 at 232.

that is the individual that either done it or the people that was on the scene when they recovered the bodies." *Id.* at 96. The inmates "basically presented [me] with a proposition that if I didn't want to do all my time, I could be given this information to use to reduce my time, if I testified." *Id.* at 97. He explained that he was not recruited to get information from Prible, because "[t]here was no information they needed to get. All the information was already presented to me." *Id.* at 97. He explained the scheme this way:

> And in regards to what we were expected to do was collaborate as if we became prison buddies or pals or et cetera, and then he, all of a sudden, feel compelled to confess all these horrific things. And then at that point, we supposed to have written letters to the prosecutor asking to be a witness or – or volunteering to be a witness because we was just so overwhelmed about the information he supposedly give us. . . . It was discussed, strategized, platted out. I mean, there was things in play before they even came to frutation [sic]. It was already mapped out. . . . It was discussed on the yard what the intentions were. Like, prior to getting him intoxicated. Prior to having him in photo shoots. Prior to getting him drugs. . . . [M]ost of the things that was done to Mr. Prible or to stage the appearance of being close to Mr. Prible was already preordained.

*Id.* at 98-99.

Walker testified that the main individuals involved in the planning were Beckcom and Foreman, but Dominguez, Gonzalez, and others were also involved. *Id.* at 99. He remembers Beckcom being really adamant about going through with the scheme because he had blown a few hundred thousand dollars of his mom's money playing the stock market, and he needed to get home to help her out. *Id.* at 105. But Walker got the sense that the scheme did not originate with Beckcom or Foreman, "[b]ecause the details they knew and how they knew what they knew was so vivid or so in depth that, like I say, I knew before he got there, and they knew even more than I knew." *Id.* at 99-100. The inmates instructed Walker to call Siegler, and he wrote her

number down in his prison phone book.  *Id.* at 100.[10]  Walker knows for a fact that Beckcom, Foreman, and Oscar were calling Siegler, because they were in the unit together and he witnessed them making calls.  *Id.* at 109.  He said those inmates could call from their counselors' phones.  *Id.* at 110.[11]

### 3. Walker testified that the prison photos with Prible were meant to serve as corroborating evidence for a "confession."

Walker was shown a prison photograph contained in **Exhibit 32** and was able to identify everyone in the photograph.  *Id.* at 101.  He said that "95 or 100% of everybody in that photograph was in the plot against Mr. Prible," including himself at the time.  *Id.* at 102.  The photo was not spontaneous.  *Id.* at 103.  Photo tickets had to be pre-purchased, and "everybody was instructed to be there to be part of that group [photo]."  *Id.* at 103.  He thinks that everyone in the photo had Siegler's phone number except for Prible.  *Id.* at 103.

Walker had not previously seen the photograph featuring Prible, Beckcom, Foreman, and their families, but he knew about the photograph.  *Id.* at 110.  He said that "[b]efore that photograph was even taken, there was discussed that . . . that particular photograph was going to be taken to establish how close netted [sic] the group was":

> [T]he whole plot or the plan was to create a picture of close intimacy with Mr. Prible, a close connection.  So the – the way you create – the way it was being created was to show that, like, his family was with their family, or we all was in group pictures or individuals with him. . . You're trying to show that he would be comfortable enough or confident enough in your friendship to give you this information.  Otherwise, it was – there was no basis [for him to confess]."

*Id.* at 110-11.

### 4. Walker described how he and Oscar Gonzalez made a batch of grape wine specifically for the night of the "confession" – proving that the spontaneous "confession" was planned at least 30 days in advance.

---

[10] *See* Walker's personal phone book listing "Kelly Singer" **(Exhibit 107).**
[11] This is corroborated by Harpe's declaration **(Exhibit 73),** Foreman's testimony, and Beckcom's testimony.

Walker also described a plan that the inmates carried out to get Prible intoxicated.  *See id.* at 112.  Walker said he and his cellmate, Oscar Gonzalez, were the winemakers at the prison.  *Id.* He explained that prison wine could be made out of sugar and various fruits, potatoes, or tomatoes found at the prison, given enough time.  The hard part was hiding the wine and concealing it while it was brewing.  *Id.*  Walker told the Court how the inmates prepared a special batch of grape wine for Prible:

> Q (by Mr. Rytting):  And was a particular batch of alcohol made for the purpose of giving it to Mr. Prible?
>
> A. As a matter of fact, there was.  There was some grape wine made for Mr. Prible.
>
> Q. And what's significant about grape wine?
>
> A. I don't know it's significant.  One of the things about the grape wine is – from being a person that made wine, it takes longer to form it than any other one. Any – the average wine takes maybe ten days or so given – give or take.  But grape wine takes about 30 days. . . . So you can't make it in bulk.  You can't make a whole lot of it.  Where we would make two, three, maybe 4 gallons of some of the other kind of wine, this one you would have to make maybe a gallon or real small amount because it took so long to ferment, trying to hide it for a month is a very difficult task versus trying to hide it for 10 days or 12 days or something.

*Id.* at 112-13.  Walker testified that it was understood, from the beginning, that this batch of grape wine would be "specifically for Mr. Prible."  *Id.* at 114.  Walker described a scene where all of the inmates involved in Prible's set-up held a party "under the gazebo" where they drank the grape wine.  *Id.*  He recalled Prible getting so drunk that he needed assistance.  *Id.*  Walker said that part of the motive behind getting Prible intoxicated was to get him to say something he shouldn't,

but it really didn't matter if he got drunk and decided to confide or not because even before he was – before all that even took place, the knowledge was already there, you know.  That was more of a formality, like, you would go through the motions.  You would set it up.  So it's just to establish a closeness that, Hey, we go out.  We drink.  We hang out, you know, do this, do that.  So it's – if he would have confessed, I mean, what – it was done to establish the intimacy of our group.  [But] [t]o my knowledge, Mr. Prible never confessed.

*Id.* at 114-15.

> **5.     Walker's testimony provides support for Petitioner's theory that Beckcom actually wrote the inmate letters to Siegler.**

As for the instruction to write Siegler a letter, Walker said he signed a typed letter to her, but did not actually write it.  *Id.* at 116.  He said the inmates discussed what the letter would say.  *Id.* at 117.  The letter was structured so other inmates' names were mentioned (*i.e.,* Foreman, Martinez, etc.), thereby corroborating each other's stories.  *Id.*[12]  Walker believes that Beckcom actually wrote the letter that Walker signed.  *Id.* at 132.  He said an inmate would have to have privacy and access to a typewriter to type a letter like that, either in the law library or if you taught a class.  *Id.* at 132.[13]

> **6.     Walker's testimony supports Petitioner's allegation that the factual basis of his habeas claims was not available to him when he filed his initial habeas petition in 2004.**

Walker testified that after a hurricane hit Beaumont in 2005, he was shipped, along with several hundred other FCI Beaumont inmates, to another federal prison in Yazoo, Mississippi.  *Id.* at 119.  One of the other transferred inmates was named "Smiley" Wilson, and he had been an acquaintance of Walker's at FCI Beaumont.  *Id.* at 119-20.  Walker had previously revealed to Smiley "some information about what had happened to Mr. Prible."  *Id.* at 120.  Smiley informed Walker that there was an inmate named Larry Walker who had been receiving letters from an

---

[12] In this way, the informant letters are similar to Beckcom's handwritten statement and trial testimony, in which Foreman is a silent corroborating witness.

[13] Beckcom taught a stock market class at the prison.  *See* Beckcom's deposition transcript, **Exhibit 29** at 142.

attorney with information that Smiley had remembered hearing from Carl Walker.  *Id.* at 120-21. Prible's attorneys had been writing to the wrong "Walker."  *Id.* at 121.  Smiley grabbed one of the letters from Larry and gave it to Carl.  *Id.*  Carl "automatically knew what it was, who it was. I knew the whole thing."  *Id.*  Carl reached out to Prible's attorney and let him know that he was the right Walker, and that they had been communicating with the wrong one.  *Id.* at 121-22.  This was the first time Carl Walker ever reached out to Prible's counsel.  *Id.* at 122.[14]

Walker testified that Prible was a mark "in every sense of the word."  *Id.* at 106.  Hermilo Herrero was also a mark, but Walker wasn't directly linked to the set-up of Herrero.  *Id.* at 106. Walker remembered that "a person named Jesse" was involved in Herrero's case, as was Dominguez, and that Foreman and Beckcom were "more than aware" of Herrero's case.  *Id.* at 106-07.

On cross, Walker described a conversation that he had had with Hermilo Herrero after Herrero's trial on a transit bus from Harris County going back to FCI Beaumont.  *Id.* at 124. Walker had returned to state court to get his probation dismissed.  On the way back to Beaumont in the van, he and Herrero "realized who we were, and we realized we knew the same people, and he told me his name, then I knew who he was, and, you know, I was like, Wow."  *Id.* at 124. Herrero tried to get Walker to write him an affidavit for his case, but Walker would not do it, because he did not want to expose himself as a snitch at the very violent FCI Beaumont Medium. *Id.* at 124-25.

### 7.    Walker was unshakeable under cross-examination.

On cross, Walker testified that he "kn[ew] for a fact that I made more than at least one attempt to reach out to Ms. Siegler because that's what I was instructed to do."  *Id.* at 125.  He does not recall if he ever spoke with Siegler directly.  *Id.*  He said Siegler did not personally give

---

[14] This story was confirmed by Prible's state habeas counsel, Roland Moore, at the 2011 state writ hearing.

him any details about Prible's case, nor offer him a deal.  *Id.*  Under cross-examination, he stuck

to his story about when he learned the information about Prible's case:

> Q (by Mr. d'Hemecourt):  And you testified that you had some specific details
> about Mr. Prible's crime, correct?
>
> A. I did.  I do.
>
> Q. When did you get those details?
>
> A. I think the details came into play once I agreed to take part of the – the deal.
> Whatever you call it.
>
> Q. And do you recall around when that was?
>
> A. It was before I met Mr. Prible.  That's for sure.

*Id.* at 127.   Walker ended up not testifying against Prible at trial.  He explained that he "just fell

to the wayside" because he "wasn't fully enthusiastic about the process" of informing on Prible.

*Id.* at 115-16.

### C.    Johnny Bonds

Johnny Bonds was the HCDA investigator on the Prible prosecution.  He testified as to

the general *Brady* practices at the HCDA, Siegler's *Brady* practices in particular, and the

interviews that he and Siegler undertook with respect to Beckcom and Foreman during their

workup of Prible's case.

> ### 1.    Bonds' testimony provides support for Petitioner's claim that *Brady* evidence was concealed from his trial counsel, notwithstanding Siegler's claim that *all* information in her file – including her work product notes – was available to defense counsel to review at any time.

Bonds testified that he did not know whether there was an open file policy at the HCDA

back in 2001 and 2002.  "I know we turned files over," he said.  "I'm sure that there were some

things in the file that weren't turned over."  *See* Ev. Hr. Tr. Vol. 1 at 135.  He did not "personally

think it should have been a problem" if supplemental reports had been left out of the offense

15

report given to defense counsel to review.  *Id.* at 136-37.  He remembered that "[T]here were some [] things [defense counsel] were not allowed to see or take copies of."  *Id.* at 137.  As for Siegler's personal *Brady* practices, Bonds testified:

> I know that Kelly didn't give up anything she didn't have to give up.  I know she followed the law.  I never saw her do anything that was – was in violation of the rules . . . But I know she never gave anything away. . . .[S]he made the defense earn what they got.

*Id.* at 151.  Regarding whether it was common practice to withhold witness statements from the defense unless the witness was testifying, Bonds testified:

> Q (by Ms. Scardino):  . . . So back in 2001, 2002, do you recall if it was . . . common practice to withhold statements unless the witness was testifying?
>
> A.  You know, I don't know the exact rule.  I know that everything we did was in compliance with state law.
>
> Q.  Okay.
>
> A.  We didn't – we didn't do anything that was in violation of state law.
>
> Q.  Okay.  And I'm asking what you – what the practice was.
>
> A.  I don't know what the practice was.
>
> Q.  What Ms. Siegler's practice was.
>
> A.  I think – I think – you know, actually, I think probably some – some prosecutors had different – different [] practices than others.  So I don't – I don't know.  But to my knowledge, nobody did anything they weren't supposed to do.

*Id.* at 152-53.

### 2.    Bonds confirmed that the evidence the HCDA had in 1999 was insufficient to charge Prible with the murders.

Bonds was asked why the DNA match to Prible in 1999 would not have been enough to charge him in the murders, and he testified that it was because Prible had said, from the very beginning, that his DNA would be found because he and Tirado had had voluntary sexual

relations.  *Id.* at 143.  Bonds said that in his experience, whenever there was probable cause, a case would be presented to the grand jury.  *Id.* at 143-44.  It would not just sit around going cold. *Id.* at 144.

As for why the HCDA suddenly accepted charges against Prible in 2001, the following exchange took place:

> Q (by Ms. Scardino):  . . . Do you know why charges were all of a sudden accepted against Prible?  What new evidence came to light?
>
> A.  Well, the new evidence, I'm assuming, was Beckcom.  That – that, combined with the DNA evidence and, you know, the other circumstances.  I mean, I think Beckcom was the icing on the cake.
>
> Q.  Okay.  Is it possible that at that July 3rd, '01, meeting with Moreno, that Ms. Siegler discussed Prible's case with Moreno, who was old friends with Nathan Foreman?
>
> A.  I – you know, I have no idea.  I can't say.

*See id.* at 148-49.

### 3.   Bonds confirmed that the August 8, 2001 meeting with Foreman at the FDC in Houston was the first time either one of them had ever met Foreman.

Bonds testified that when he and Siegler went to meet Foreman at the FDC in Houston, "that was the first time either one of us had ever met him."  Id. at 147-48.   Bonds said he assumed that Foreman knew that Siegler was working on the Prible case, but "I don't know how he knew."  *Id.* at 148.  Bonds insisted at his deposition that at the time he and Siegler first spoke to Foreman on August 8, 2001, Siegler had already spoken with another inmate about Prible's case.  *See id.* at 140-41, 145.  According to Bonds,

> [A]pparently, Foreman had some information from somebody that Prible was the suspect and that, you know, that he possibly could get some leverage by saying he confessed to me. . . . [S]o he knew about Prible.  I don't know how he knew about Prible.  I don't know if he got it from . . . Beckcom or somebody else.  I don't know where he got the information.  But he did know about Prible.

*Id.* at 158-59.

>     **4.      Bonds' testimony supports Petitioner's claim that Siegler continued to
>             cultivate Foreman as an informant even after their initial interview
>             revealed him to be a liar.**

Bonds interviewed Foreman twice, with Siegler, and concluded that Foreman was

fabricating evidence.  According to Bonds,

> [Foreman] starts telling us basically [Prible] did it, you know, and he couldn't
> give us any details. . . . And two minutes into his conversation, I'm like, This guy
> is lying.  He doesn't know anything about this case.  Then I asked him to describe
> Prible.  He's like, What?  I said, What does he look like?  And he couldn't give
> me a physical description.  And at that point, I don't think he – at that time we
> talked to Nathan Foreman, I don't think he had ever met Prible. . . .
>
> [I]t was real obvious, after talking to Foreman for a few minutes, he was just
> lying.  And, basically, we confronted him with it. . . . You're wasting our time,
> you know.  The bottom line is, we told him we don't need people lying to us, you
> know.  *If you have good information, that's fine.*  But don't come to us with a
> bunch of lies because we're not going to be able use lies and . . . then blew him
> off.  And I'll tell you something.  He kind of – I remember he kind of like, Well,
> is it worth a try.  I mean, he was – he was trying to get in on the bandwagon, you
> know, get some of this good time.  And it was obvious he knew that it wasn't
> working."

*Id.* at 139-41 (emphasis added).

Bonds testified that the information Foreman provided contrasted sharply with

Beckcom's.  *Id.* at 159-60.  Bonds explained that Beckcom's information "was very detailed.  It

fit the crime.  He had information that only the – the defendant would have known."  *Id.* at 160.

Foreman, on the other hand, "was just guessing."  *Id.* at 160.  Nonetheless, Bonds indicated that

the door was left open for Foreman to return to them if he got more information:

> Q (by Ms. Scardino):  Now, when you and Kelly interviewed Foreman back in
>     August 8th, '01, and you immediately found the guy to be just a liar, did Kelly
>     agree with you?
>
> A.  Uh-huh.  Absolutely.
>
> Q.  Okay.  What did she say at that time?

A. Basically, you know, Look, you're wasting our time.  Don't be calling us if you don't know what you're talking about.  You know, we know what you're trying to do, and it's not working.

Q. Uh-huh.  Uh-huh.  If he had called you back later with information that was – that he had gotten from Prible, would that have been a different story, or would you have automatically sort of –

A. I – I – you know, my feeling about him was his credibility was not – he had no credibility.

Q. Was shot?

A. Yeah.  So, it's possible that he did get new information.  I'm not saying that didn't happen.

Q. Uh-huh.

A. Apparently, he did befriend him because they got a picture together in November of '01.

Q. Uh-huh.

A. So he may have gone and got more information.  ***I mean, we basically told him at that time, Don't come [to] us when you don't know anything.***

*See id.* at 172-73 (emphasis added).

When presented with his notes from a December 10, 2001 meeting between him, Siegler, and Foreman, Bonds said he did not remember attending that meeting.  *Id.* at 161-62.  He said he may have gone over to Beaumont with Siegler that day, but to meet with somebody at the state prison while Siegler spoke with Foreman and Beckcom at FCI Beaumont.  *Id.* at 162.  He was "kind of at a loss of why we would want to talk to [Foreman] again."  *Id.* at 162, 164.

> **5.  Bonds' testimony provides support for Petitioner's claim that Siegler suppressed *Brady* evidence concerning the other Prible/Herrero informants, as Bonds himself never knew that there were other inmates vying to testify against Prible.**

Bonds testified that he was not aware of any inmates other than Beckcom and Foreman "trying to get on this bandwagon" to testify against Prible in exchange for a time cut.  *Id.* at 141-42.  He testified that he had never seen the following:

- the April 4, 2001 letter from Jesse Moreno to Siegler **(Exhibit 6),** Ev. Hr. Tr. Vol. 1 at 145-46;

- the letter from Moreno's mom to Siegler **(Exhibit 10),** Ev. Hr. Tr. Vol. 1 at 145-46;

- the letter from Jesse "Oscar" Gonzalez to Siegler **(Exhibit 37),** Ev. Hr. Tr. Vol. 1 at 154;

- the letter from Carl Walker to Siegler **(Exhibit 36),** Ev. Hr. Tr. Vol. 1 at 154;

- the letter from Mark Martinez to Siegler **(Exhibit 35),** Ev. Hr. Tr. Vol. 1 at 155; and

- the photos of Prible and the informants who had written to Siegler **(Exhibit 32),** Ev. Hr. Tr. Vol. 1 at 156.

Bonds testified that he had never heard of the Hermilo Herrero case either.  *Id.* at 146.

### D.    Victor Wisner

Wisner was Siegler's co-counsel at Prible's trial.   His testimony supports Petitioner's claim that Siegler concealed *Brady* evidence.

> **1.    Wisner's testimony contradicted Siegler's assertion that Prible's trial counsel had access to her entire file, including her attorney work product; Wisner himself did not even know about any informants other than Beckcom.**

Wisner testified that at the HCDA, "[w]e would always have an open file policy unless there was some extraordinary need not to, but it would not include our personal notes in preparation for trial" – *i.e.,* work product.  Ev. Hrg. Tr. Vol. 1 at 186.  Wisner testified that he had no idea that there were inmates other than Michael Beckcom in FCI Beaumont who were vying to testify against Prible.  *Id.* at 192.  Wisner said that he had never heard of Nathan

Foreman. *Id.* at 189.  He said he did not know that Siegler and Bonds met with Foreman back on August 8, 2001, before Prible was indicted. *Id.* at 189-90.  "[I]f they would have told me that George Foreman's nephew had met with them," he testified, "it would have stuck out in my mind." *Id.* at 190.  Wisner knew nothing of Foreman coming forward to try to testify against Prible originally; nor that Foreman was the cellmate of the informant who ended up testifying. *Id.* at 190.  He was unaware that Siegler met with Beckcom and Foreman back-to-back on December 10, 2001, at FCI Beaumont. *Id.* at 194.

Wisner said that he never spoke with Beckcom on the telephone. *Id.* at 187-88.  He said he never spoke with informants on the telephone from prison, and was "not even sure I could have accepted the call." *Id.* at 188.  He would assume that phone calls made on inmate phones would be recorded, but that the office phones of BOP employees would not be. *Id.* at 188.

Wisner also knew nothing about Carl Walker.  He had never seen the letters to Siegler from Walker **(Exhibit 36),** Mark Martinez **(Exhibit 35),** or Oscar Gonzalez **(Exhibit 37).**  Ev. Hrg. Tr. Vol. 1 at 192.  He agreed that the informant letters would not constitute attorney work product. *Id.* at 197.  He acknowledged that if he were a defense attorney representing Prible, he would probably have been able to use those documents to impeach Beckcom's testimony at trial that everything he heard about the case, he heard from Prible. *See id.* at 193-94.  "At least I'd try to, yes." *Id.* at 194.

Wisner knew nothing of Jesse Moreno. *See id.* at 194.  He had never seen the letters to Siegler from Moreno and his mother **(Exhibits 6** and **10).**  Ev. Hrg. Tr. Vol. 1 at 194.  He was not aware of the July 3, 2001 meeting between Moreno and Siegler, nor that Moreno had talked with Siegler about his friend, Nathan Foreman. *Id.* at 194-95 ("I don't know anything about Nathan Foreman because I don't know names.  But if I had heard that George Foreman's nephew

was involved, that would have stood out in my mind.").  He admitted that as a defense attorney, he would have wanted to know about all of the dealings between Siegler, Moreno, and Foreman in the setup of Prible.  *Id.* at 196.

Wisner was not familiar with the name of Hermilo Herrero.  *Id.* at 195.  He did not know that the same snitches in Prible's case were also snitching on Herrero at the same time.  *Id.* at 196. Yet Wisner testified, improbably, that the jury still could have "fully evaluated" Beckcom's testimony without knowing all of the back-room machinations going on between Siegler and these unknown prison informants:

> Q (by Ms. Scardino):  Now that you know about all of these [informant letters] that were concealed in Ms. Siegler's work product file, now that you know about her ongoing communications with a web of informants that she was working with on two cases simultaneously, do you feel that a jury could have fully evaluated Beckcom's testimony without knowing all that?
>
> A.  I would assume they were skeptical.  They knew he was a federal inmate who was in custody on very serious charges, and he wanted consideration for what he did.  So I would say I think they could have fully evaluated him.

*Id.* at 199.

When pressed about his *Brady* obligations with respect to these other informants angling to testify against Prible, Wisner said:  "I couldn't be responsible for Brady on something I didn't know. . . Are you saying I should ask a prosecutor I'm sitting with, Do you have any Brady information that you're not telling me, and I need you to tell me so I can tell – tell the defense? . . . I cannot read people's minds, and I don't [] have access to information that I don't know."  *Id.* at 191-92.

### 2. Wisner testified, improbably, that the testimony of Beckcom was really just extraneous.

Wisner admitted that the information about the other informants would have been "much more important" without the DNA evidence in the victim's mouth.  *Id.* at 202.  "[I]f all we had

was a confession of Beckcom, . . . all of this would be extremely important to me both as a prosecutor and a defense attorney." *Id.* at 202. "Without the semen, your whole job is attacking the informant." *Id.* at 204. But in Wisner's view, Beckcom's testimony was not even necessary; it was "just something to give color to the case." *Id.* at 198. According to Wisner, the defense had no plausible theory for why Prible's DNA was found in the victim's mouth. *Id.* at 201-202. The reason given by Wisner for his opinion that the defensive theory of consensual oral sex was implausible was because Prible "did not give off the appearance of somebody who would be seen as attractive to a female." *Id.* at 209. "If he was a handsome, tall, muscular, charismatic person, it may lead me to a different conclusion, or it may seem possibly plausible." *Id.* at 209-210.

### E.   Michael Beckcom

Throughout his testimony, Beckcom lied when it would suit his own needs. His first lie came within the first minute of his testimony, when he coldly implied that he was simply present at the scene when his murder victim was killed, rather than being the one who actually forced the victim into the metal toolbox, shut the door, and snaked a garden hose from the muffler of his running Ford Explorer into it so the man would suffocate to death. *Id.* at 211-212. He lied again a minute later, when he said that "Siegler didn't really help me on anything." *Id.* at 213. In fact, Siegler was able to get his sentenced reduced by one year because he testified for her in Prible's case. *See* **Exhibit 131.** But the most important feature of Beckcom's testimony was that it was diametrically opposed to Foreman's testimony, when the two men, according to Beckcom's testimony at trial, were supposed to have heard the exact same "confession" from Prible.

F.     **Kelly Siegler**

1.     **Videotaped Deposition Testimony**

Siegler was intentionally unprepared, evasive, and combative at her deposition.   She became particularly hostile while being questioned about her appearance at Jesse Moreno's Rule 35 hearing two months before Prible's trial, and refused to answer questions about it even after Petitioner's counsel offered to seal that portion of the deposition.   *See* **Exhibit 4-B.**   She claimed that she could not decipher her own handwriting when asked to read her work product notes into the record.   *See* Ev. Hrg. Tr. Vol. 2 at 152-53.   But most disturbingly, Siegler flat-out lied about many things that are easily verifiable.

a.     **Siegler's testimony supports the theory that she indicted Prible only after discovering she had informants in FCI Beaumont that she could use against him.**

Siegler testified that when she got the Prible case, she "[s]tarted from the beginning all over again," interviewing witnesses and conducting an investigation.   *Id.* at 218.   Yet there are no notes in the file of any such interviews.   Her inability to point to any new evidence stemming from her renewed "investigation" supports Petitioner's allegation that she decided to charge him only after learning that she had willing informants in FCI Beaumont who would testify against him.   Furthermore, she was careful to conceal from the grand jury the fact that she was using the same group of informants to prosecute Prible as she was using in her case against Hermilo Herrero.

Siegler testified that she presented Prible's case to the grand jury in August 2001, *after* she had met with Nathan Foreman.   *Id.* at 45.   She did not present any witnesses.   *Id.*   She presented the Prible and Herrero cases to the same grand jury on the very same day.   *Id.* at 46.   She testified that she told the grand jury there was an informant who would testify against

Hermilo Herrero, but did not tell the grand jury that there was an informant who would testify against Prible. *Id.* at 46. She did not inform the grand jury that the same group of informants was assisting simultaneously on the two cases. *See id.* at 47.

> **b.** **Siegler tried to deny that Moreno introduced her to Nathan Foreman.**

Siegler claimed that she could not remember what she had done for Jesse Moreno when he had testified for her a few years before Prible's trial in the murder trial of another defendant named Jason Morales. *Id.* at 21. She said she could not remember dismissing a charge of aggravated robbery against Moreno, nor could she remember deciding not to charge him in a capital murder case in which he was a suspect. *Id.* at 21. The capital murder case in which Jesse Moreno was never charged was *Texas v. Gene Auther Taylor,* Cause No. 0738114, in the 263rd District Court of Harris County. According to the Fourteenth Court of Appeals' opinion affirming Taylor's conviction for capital murder, Moreno was the mastermind of a home invasion involving Taylor and two others that ended with the murder of a drug dealer. *See Gene Auther Taylor v. State,* Cause No. 14-97-01325-CR (14th Ct. App.—Nov. 18, 1999). Siegler testified at her deposition that she did not handle that capital murder case and had "nothing to do" with the decision not to charge Moreno. *Id.* at 22. Notably, however, the HCDA was prosecuting the capital murder case at the same time that Siegler was prosecuting the Jason Morales murder case with Moreno as a key witness.

When asked whether Moreno was in the SHU at the time he wrote her the April 2001 letter, Siegler claimed she didn't know what the SHU was, even though she had questioned Beckcom about the SHU during the Prible trial. *See* 26 RR 96; Ev. Hrg. Tr. Vol. 2 at 25 ("I don't know what the SHU is. That's your word. I've never heard that before."). She also

professed not to know that Moreno was in the SHU with Foreman.  *Id.* at 24.  She insisted that Moreno did not introduce her to Foreman.

### c.  Siegler could not deny that she and Moreno discussed Prible's case at their July 3, 2001 meeting.

Siegler told the federal judge at Jesse Moreno's Rule 35 hearing that she met with Moreno on July 3, 2001 "for about an hour and a half."  *See* **Exhibit 49.**  Yet she only recorded approximately 30 minutes of this meeting, leaving plenty of time to discuss Prible's case unrecorded.  At her deposition, Siegler could not foreclose the possibility that she and Moreno had discussed Prible's case at that July 3, 2001 meeting:

> Q (by Ms. Scardino):  At that meeting that you had with Mr. Moreno, at some point during that meeting, did Mr. Moreno inform you that Mr. Foreman, Nathan Foreman had heard a confession by Mr. Prible?
>
> A.  I don't remember what the details were, what Jesse Moreno told me that day.
>
> Q.  So he might have told you that, but you just can't recall?
>
> A.  I cannot.

*Id.* at 36.

### d.  Siegler tried to distance Moreno and Foreman from the Prible prosecution, insisting that they were not "witnesses" in that case.

Siegler repeatedly insisted that with respect to Prible's case, Moreno and Foreman were not "witnesses."  *Id.* at 41, 74.   She insisted that Foreman wasn't involved in Prible's case at all. *See id.* at 52 ("You-all say Nathan Foreman was involved in the Prible case.  He was not. . . You want to make him involved.  He wasn't involved."); *id.* at 88 ("One more time, Mr. Foreman was not involved in Jeffrey Prible's case.  I know you want him to be, but he was not.").   She disagreed with the assertion that Foreman tried to "set [Prible] up," *id.* at 50, even while conceding that Foreman came to her with a "confession" story before he had ever met Prible.

26

She denied, inexplicably, that the same informants involved in the Prible case were also involved in the Herrero case. *Id.* at 51.

Siegler initially denied ever speaking with Foreman again after their first August 8, 2001 meeting. She testified as follows:

Q (by Ms. Scardino):  You spoke with [Foreman] on August 8th, 2001, right?

A.  I did.

Q.  And did you ever speak with him again after that?

A.  He probably tried to call me, but I don't know what we talked about for very long because I knew he was a liar.

Q.  Okay.  But you never met with him in person again?

A.  After the Beaumont – after the –

Q.  August 8th, 2001?

A.  – downtown Houston day, no.

. . .

Q.  Is it your testimony that you never spoke with [Foreman] again after August 8th, 2001?

A.  That was the day of the downtown fed facility?

Q.  Uh-huh.

A.  I never talked to him again.

*Id.* at 94-95; 103-04.  When confronted with evidence showing that she requested another meeting with Foreman for December 10, 2001, the same day that she also met with Beckcom, she had no explanation for it.  "I don't remember why we would have asked to go see him again because Johnny and I both believed, when we walked away from the meeting with Nathan Foreman at the downtown Houston facility, that he was not being truthful." *Id.* at 108.  She

admitted she remembered the meeting with Beckcom that day, *id.* at 110-11, so she surely must have remembered meeting with Foreman as well.

In another attempt to distance Foreman from Prible's case, she professed not to even know that Foreman and Beckcom were cellmates:

> Q (by Ms. Scardino): . . . [A]nd you knew at this time that Mr. Foreman and Mr. Beckcom were cellmates at FCI Beaumont, right?
>
> A. I don't know if I knew that back then.
>
> Q. When did you learn that?
>
> A. I don't know that I've ever learned that.  I've seen that in your petition.
>
> Q. You never knew at any time during your prosecution of Mr. Prible's case that Foreman and Beckcom were cellmates at FCI medium?
>
> A.  I don't remember if I knew that.  I knew that they all – they all hung out together on the yard working out outside.  I knew that.  But who was whose cellmate, I don't know if I ever knew that.
>
> . . .
>
> Q. Presumably, they're cellmates, so they're talking about this case together, right?
>
> A. I didn't know they were cellmates.

*Id.* at 111-113.

Siegler testified that because Foreman never testified in Prible's case, she did not need to reveal to Prible's counsel the fact that she had written a Rule 35 letter to Foreman's prosecutor. *Id.* at 132.

> ### e.     Siegler's testimony supports Petitioner's claim that she and Beckcom misled the jury on the benefits she had promised him for his testimony.

Siegler admitted that she had already been speaking with Beckcom's federal prosecutor, AUSA Mark Cullers, for months leading up to Prible's trial about a potential Rule 35 sentence

reduction.  *Id.* at 116-118.  And she admitted that Beckcom knew she was in talks with Cullers leading up to Prible's trial.  *Id.* at 118.  She said she told Beckcom about her communications with Cullers in order to reassure Beckcom that a Rule 35 motion would be forthcoming if he testified truthfully.  *Id.* at 118-119.  She claimed, incredibly, that she could not remember whether Cullers ended up writing a Rule 35 motion for Beckcom nor whether Beckcom got any credit at all for his testimony in Prible's case.  *Id.* at 127 ("What is the end of the story?  I don't know.").  She said she would not characterize the correspondence she had with Cullers, in which she successfully persuaded him to file a Rule 35 motion for Beckcom, as a "favor" to Beckcom.  *Id.* at 128.

> **f.    Presumably to shield herself from the same *Brady* scrutiny that she had experienced in the Temple case, Siegler improbably claimed that *her entire file*, including all of her work product notes, had been made available to Prible's trial counsel.**

At David Temple's state writ hearing, Siegler testified that she was not required to turn over favorable evidence if she did not believe it to be relevant, inconsistent, or credible, or if it was, in her assessment, "ridiculous."  *See Ex Parte David Mark Temple,* No. WR-78,545-02 (Tex. Ct. Crim. App.—Nov. 23, 2016).  She also stated that if information does not amount to anything, the defense is not entitled to it.  *Id.*  The Texas Court of Criminal Appeals agreed with the state habeas judge in finding that Siegler's "misconception regarding her duty under *Brady* was 'of enormous significance'" and granted habeas relief.  *Id.*  Having been called out for <u>36 separate *Brady* violations</u> in the Temple case, Siegler was evidently determined not to take any chances with her testimony in Prible's case.  She claimed, unbelievably, that *everything* in her file was disclosed to Prible's defense counsel – even her personal notes and other work product.  *See* Ev. Hrg. Tr. Vol. 2 at 43, 62-63, 67-70.  Her testimony in this regard conflicts with her statements at a pre-trial discovery hearing in Prible's case, in which she argued that she did not

have to disclose her notes of interviews with Michael Beckcom because they constituted work product.  *See* **Exhibit 70** at 7.[15]

### 2. Live Testimony

Siegler's live testimony at the hearing was similarly unreliable.  Once again, she showed up intentionally unprepared to testify, never having reviewed the Prible file or even asking the HCDA if she could look at it.  Ev. Hrg. Tr. Vol. 3 at 23.  Once again, she was cagey about many matters, and downright untruthful about others.

> #### a. Siegler's testimony at the evidentiary hearing supports Petitioner's theory that she orchestrated the informant conspiracy by first discussing Prible's case with Jesse Moreno, who then put in her in touch with Nathan Foreman.

Siegler admitted at the hearing that she discussed Prible's case with Jesse Moreno.  *Id.* at 24.  She would have had no reason to do so except in the context of the informant conspiracy, as Moreno had no firsthand knowledge of the Herrera/Tirado murders and did not personally know the Herrera/Tirado family or Jeff Prible.  Siegler initially admitted that she knew Moreno was in the SHU with Foreman and Rafael Dominguez, but disagreed that they hatched their plan to inform on Herrero and Prible while in the SHU together.  *Id.* at 25.  Then she reversed her earlier statement and denied knowing that Foreman and Moreno were in the SHU together.  *Id.* at 26-27.

Siegler was questioned about her testimony at the Rule 35 hearing for Jesse Moreno in Lafayette, Louisiana on August 22, 2002, and about her assertion, at her deposition, that she was instructed not to tell anyone about it:

> Q (by Ms. Scardino):  What exactly did the federal judge tell you that day about not telling anyone about your testimony?
>
> A.  That it was confidential and that I should not talk about it to anyone.

---

[15] Her testimony is also at odds with that that of her co-counsel, Wisner, who testified that the HCDA's open file policy excluded attorney work product.

Q.  And he gave you this instruction at the hearing?

A.  He did.

Q.  And so it would be in the transcript?

A.  I would assume so.

Q.  And so for that reason, you never told anyone, before your deposition in this case, that you had testified in Moreno's Rule 35 hearing?

A.  Not that I remember.

Q.  You never disclosed it to Mr. Herrero's attorneys, right?

A.  It happened after the trial.

Q.  But don't you have a continuing obligation to disclose Brady [] evidence even after a trial has been completed?

A.  It was told to the jury and the judge and the defense lawyers during the trial. They knew all that was going to happen.

Q.  They didn't know that you were going to personally testify at his hearing, did they?

A.  Yes, they did.

Q.  You think that's in the transcript somewhere – in the Herrero transcript?

A.  Yes, ma'am.

*Id.* at 32-33.  Siegler's testimony is impeached by the transcript of the Moreno Rule 35 hearing.

*See* **Exhibit 49.**  No such instruction was given to her on the record by Moreno's federal judge.

Her testimony is further impeached by the *State v. Herrero* trial transcript **(Exhibits 63** and **161),**

her March 2016 affidavit given in Herrero's state habeas case **(Exhibit 125),** and her October

2017 deposition testimony in this case **(Exhibit 4-A).**  At Herrero's trial, Siegler told the jury

this in her opening statement:

> You're also going to hear Jesse tell you about this deal that he cut with me.  Because understand, y'all get to hear all of it.  Jesse will tell you that in exchange for his testimony from that chair to you later today or tomorrow, this is his understanding of what will happen for him:

31

I am to write a letter to his – his old former Assistant United States Attorney who handled Jesse Moreno's case that put him in prison in the first place, and that after I write that letter, his Assistant United States Attorney will take that letter and forward it to a panel of three judges.  Now that letter is to say, depending on my opinion of how he testifies, truthfully and completely and completely forthcoming to you.  My letter goes to his A.U.S.A., to a panel of three judges, and within sixty days Jesse Moreno will be notified by mail whether or not he gets any kind of time cut.  It's called a Rule 35 under the federal system.

So Jesse Moreno will tell you that in exchange for confronting this defendant, running all the risks that he already has, he doesn't know what may or may not happen.  It's completely up to three federal judges that he'll never see face-to-face.  That is the great, wonderful deal that he's cut to tell you what he knows about this defendant.

See **Exhibit 161** at 11-12.  Later in Herrero's trial, Siegler had this exchange with Moreno:

```
    Q.   What's the best you can hope for in regards
to this case for testifying to this jury?
    A.   I get another letter and give to it my
prosecutor.
    Q.   A letter from whom?
    A.   From you.
    Q.   And that letter goes to who?
    A.   To my prosecutor.

                          . . .

    Q.   What's that called in federal lingo, these
letters, time reductions?
    A.   It's just, they give you a reduction in
time.
    Q.   Have you ever heard the phrase, Rule 35?
    A.   Yes.
    Q.   Under this Rule 35, if you testify
```

truthfully and completely, your understanding, sitting
here today, is that I would write you a letter saying
that to your federal prosecutor?

    A.   Yes, ma'am.

    Q.   What happens, Mr. Moreno, if after you get
all done here, I feel like you lied?

    A.   I don't get nothing.

    Q.   Why not?

    A.   If you feel like I lie, I getting nothing.

    Q.   Because I ain't writing the letter, right?

    A.   Even if you write the letter, I'm not
guaranteed anything.

    Q.   What happens if after you're all done here
testifying, if I feel like you're holding back on
something?  Not quite lying, but just holding back a
little bit?

    A.   I don't get anything.

    Q.   Okay.  Let's pretend that I write the letter
for you, because you testified truthfully and
completely, in my opinion.  The letter goes to your
federal prosecutor.  Is there any guarantee from your
federal prosecutor about what is going to happen, if
you get a reduction or not?

    A.   No, ma'am, there is no guarantee.

    Q.   And let's just say that I write the letter

> and it's a good letter for you; and your federal
> prosecutor says it's a good letter, too.  Is there any
> guarantee even then that those Judges, those Federal
> Judges, will give you a reduction?
>
>      A.   No ma'am.
>
>      Q.   Is this a very locked-in deal that you've
> cut with me here, Mr. Moreno?
>
>      A.   No, no deal.  The only promise you gave me
> was protective custody.
>
>      Q.   So why do it with such a lousy deal?
>
>      A.   I ain't got no choice.  Either that or I'm
> dead.

See excerpt from trial transcript of *State v. Herrero,* **Exhibit 63,** Vol. 3 at 168-70.  Siegler and
Moreno also told the Herrero jury this, which proved to be false:

>      Q.   (BY MS. SIEGLER)  When a decision is made on
> your case, on your potential reduction in this case
> from your testifying, do you get to be present?
>
>      A.   No, ma'am.

These exchanges with Moreno took place on April 24, 2002.  On August 22, 2002, Siegler
traveled to Lafayette and persuaded Moreno's federal judge to reduce his remaining 78-month
sentence to 1 month.  *See* **Exhibit 49.**  Moreno got to be present at the hearing.  *Id.*  In her March
2016 affidavit in Herrero's state writ case, Siegler again left out the part about her testifying in
person at Moreno's Rule 35 hearing.  All she said was:

> Throughout trial I was forthright that, in return for their truthful testimony, the
> federal prosecutors handling Moreno's and Dominguez's cases would receive a letter
> from me detailing the assistance they provided to the State, and that Moreno and

34

Dominguez might receive a sentence reduction in consideration.

**Exhibit 125.**

Siegler testified at the evidentiary hearing that the reason she did not tell Prible's

attorneys that she testified in Moreno's sentence reduction hearing two months before Prible's

trial is because "Moreno did not testify in Prible's trial."  Ev. Hrg. Tr. Vol. 3 at 34.  Siegler

denied that Moreno put her in contact with Foreman.  *Id.*  As she had done in her deposition, she

sought to distance Moreno as much as possible from Prible's case:

> Q (by Ms. Scardino):  Now, you didn't tell the [Prible] court at [the pre-trial
> hearing] that the Louisiana hearing was for Jesse Moreno, who you had
> spoken with about Prible's case and had recruited you your original informant
> in that case, did you?
>
> A.  There was no need to at that point.  And, again, Jesse Moreno was not a
> witness in the Prible case.
>
> Q.  Even though he spoke with you about the Prible case and got you in touch
> with Nathan Foreman?
>
> A. I disagree with the way you phrased that question.  That's not how I remember
> it happening.  Jesse Moreno was not a witness in the Prible case.

*Id.* at 37.  Likewise, she continued to try to distance Foreman from Prible's case:

> Q (by Ms. Scardino):  Now, Nathan Foreman wasn't just another inmate at FCI
> Medium, was he?  He was your original snitch in this case.
>
> A. I disagree with that completely.
>
> Q. You think he wasn't involved in this case as a snitch?
>
> A.  As I stated over and over and over again at the deposition, I did not use
> Nathan Foreman as a witness because I never believed that he was credible.
> We went over this a lot of times the day of the deposition, and you keep
> wanting to infer that I used Nathan Foreman in the Prible case.  I did not.
>
> Q. Now, you remember Beckcom's testimony at trial, that Nathan Foreman was a
> corroborating witness to every single piece of the confession that he
> supposedly got from Mr. Prible?

A.  That's not exactly the way I would describe it, but the transcript will speak for itself.

. . .

Q  (by Ms. Scardino):   . . . Nathan Foreman was the nontestifying but corroborating witness to Beckcom's confession story, wasn't he?

A.  I disagree with that.  Nathan Foreman was not a witness in Jeffrey Prible's trial.

*Id.* at 38-39, 43.

> **b.**  **Siegler admitted at the hearing that without Beckcom's testimony, she was not confident that she could secure a conviction.**

At the evidentiary hearing, this Court asked Siegler why, if Prible's was the only capital case in which she used an informant, she thought the dimensions of the case made it particularly appropriate to use Mr. Beckcom as a witness.  *Id.* at 47.  She responded:

> I believe that the case against Jeffrey Prible was strong enough for a jury to convict, but I did not want to live the rest of my life not using Michael Beckcom and maybe one juror or two jurors having a little bit of doubt and telling me that, and then regretting for the rest of my life and career that I didn't use an inmate.  I thought I had enough, but I – I wanted to be sure.  I wanted to make sure that I did all that I needed to in this case. . . . It was a cold case, but I believe there was enough there for an indictment and a conviction even without Michael Beckcom.  I believed that, but I can't – I can't make that automatically that 12 jurors are going to agree with me.  I believed there was enough without Michael Beckcom, but I didn't want to run the risk that 1 of 12 jurors might wish that there was a little bit more . . .

Her testimony supports Petitioner's claim that Beckcom's testimony was material to the conviction.

> **c.**  **Siegler told this Court that Beckcom did not get anything for his testimony in the Prible case, when he actually got a year off of his remaining sentence.**

At the hearing, the Court inquired as to any benefits bestowed on Beckcom for testifying in the Prible case:

> THE COURT:   And Mr. Beckcom has testified that in the end, he didn't get anything out of having talked to you and talked with Mr. Bonds.   That he didn't get a time cut; he didn't get anything.   Is that true?
>
> SIEGLER:   I believe it is, sir.
>
> THE COURT:   Did you try to get him a time cut or anything like that?
>
> SIEGLER:   I wrote a letter, and I think that y'all have a copy of that letter, the same – the same letter.

Ev. Hrg. Tr. Vol. 3 at 53.   For testifying against Prible, Beckcom actually got his already-lenient 135-month sentence for murdering a federal witness reduced to 123 months.   *See U.S. v. Beckcom,* Case No. 1:98-cr-05157-OWW (E.D. Cal.) at Dkt. Nos. 28-29.   And Siegler did much more than write him a letter to ensure that he got this time cut.   Her extensive efforts on Beckcom's behalf are outlined in Sections IV(B)(9) and IV(D) of Petitioner's Fourth Amended Petition.

> ### d.   Siegler testified that her understanding of *Brady* was consistent during the time period that she was trying the David Temple and Prible cases.

As she had in her deposition, Siegler testified at the evidentiary hearing that *everything* in her file was disclosed to Prible's defense counsel – even her personal notes and other work product.   *See* Ev. Hrg. Tr. Vol. 3 at 36-37.   She insisted this was the case even when confronted with the transcript of a pre-trial hearing in the Prible case in which she asserted, on the record, work product protection over certain materials requested by the defense.   *Id.*   Siegler testified at the hearing that her understanding of the *Brady* rule was consistent during the time period that she tried the Temple and Prible cases.   *Id.* at 39-40.   This is significant, because the Texas Court of Criminal Appeals ruled, in the Temple case, that she fundamentally misconceived her duty under *Brady.   See Ex Parte David Mark Temple,* No. WR-78,545-02 (Tex. Ct. Crim. App.— Nov. 23, 2016); Ev. Hrg. Tr. Vol. 3 at 40.

In the Temple writ hearing, Siegler testified to the following understanding of *Brady:*

Q.  And so, you've told us that you believe inconsistent statements to fall under the rules of Brady, yes?

A.  Correct.

Q.  Inconsistent statements of whom?

A.  Material witnesses.

Q.  What about – well, tell us your understanding of material witness.

A.  Well, I think if you get called to testify at trial, you are pretty material.

. . .

Q.  If [a] lead doesn't amount to anything in your opinion, then in your opinion the defense doesn't get it, right?

A.  In so many words, yes.

. . .

Q.  Is it your opinion that Brady relies on your assessment of the evidence?

A.  Unfortunately, yes.

Q.  And if in your assessment of the evidence it is kooky or a rabbit trail, then it's not Brady?

A.  In most cases, that is correct.

. . .

Q.  . . . Earlier what I heard you say was that if law enforcement vetted it, that it turned up a dead-end, then you did not believe that to be Brady and that you didn't need to turn that over to the defense.

A.  In some cases, that's correct.

*See* **Exhibit 132** at 186, 249-50, 263, 265.  This testimony from the Temple hearing is relevant to

Siegler's conduct in Prible's case.  She understood that evidence had to be disclosed under *Brady*

only if it was credible, and that she, the prosecutor, made the gateway credibility determination.

38

*See* **Exhibit 65** (Findings of Fact and Conclusions of Law entered in *Ex Parte Temple,* Cause No. 921126-B, in the 351st District Court of Harris County, Texas, on June 24, 2011); *Ex Parte David Mark Temple,* No. WR-78,545-02 (Tex. Ct. Crim. App.—Nov. 23, 2016); Ev. Hrg. Tr. Vol. 3 at 40.   Siegler testified that she did not believe Foreman, Walker, Gonzalez, or Martinez. If she concealed her communications with these inmates from the defense because she did not find them to be credible, she misconceived her duty under *Brady.*

At the Temple writ hearing, Siegler testified to her incorrect understanding that only inconsistent statements of "material witnesses" fall under *Brady,* and that a witness is "material" only if he or she gets called to testify at trial.   *See* **Exhibit 132** at 186.   Because Foreman and Moreno were not called to testify at trial, they would not be "material witnesses" under Siegler's definition.   If she believed she did not have to disclose her communications with them because they were not "material witnesses," she violated the *Brady* rule in the same way she violated it in the Temple case.

> **e.   Siegler regularly used jailhouse informants to obtain convictions in capital cases, notwithstanding her testimony at the hearing that she could not remember any others.**

The following exchange occurred at the evidentiary hearing:

THE COURT:  "To the best of your recollection, in how many capital cases did you use as witnesses prison inmates who were in the same facility as the accused?"

MS. SIEGLER:  Judge, right now I'm just thinking of this one.  I think it's just this one.

Later, Siegler told the Court that "there could have been other death penalty cases where I used another inmate, I just can't think of them right now."  *Id.* at 53.  In fact, Siegler is known to have used prison informants in at least four other capital murder cases.  Those cases are:

- *State v. Howard Paul Guidry,* Cause No. 1073163, in the 230th District Court of Harris County. Mr. Guidry was convicted of capital murder and sentenced to death in 1997. On the eve of his trial, the State announced that a jailhouse snitch had surfaced who claimed that Mr. Guidry had spontaneously confessed his involvement in the murder. The snitch had been deliberately placed in the cell adjacent to Mr. Guidry at the Harris County Jail shortly after Mr. Guidry's own arrival. The State's last-minute disclosure of the jailhouse snitch proved to be an intentionally deceptive diversionary tactic to distract and tax Mr. Guidry's trial counsel in the critical weeks immediately preceding his trial; he ended up not being called to testify. *See Guidry v. Thaler,* Cause No. 4:12-mc-00441 (S.D. Tex.—Houston) (federal habeas corpus proceeding).

- *State v. Charles Victor Thompson,* Case No. 0782657, in the 262nd District Court of Harris County. Thompson was convicted of capital murder and sentenced to death in 1999. A longtime paid informant for the HCDA testified in Thompson's punishment phase retrial that Thompson had given him a list of witnesses that he wanted killed so they would not testify against him. Siegler and Wisner were the prosecutors at the retrial. Earlier this year, the Fifth Circuit granted a COA on the issue of whether Thompson had established a *Brady* violation in the State's non-disclosure of a past relationship with the informant, sufficient to overcome procedural default, and if so, whether Thompson is entitled to habeas relief on the grounds of the *Brady* violation or a *Massiah* violation in the introduction of the informant's testimony during the punishment re-trial. *See Thompson v. Davis,* Cause No. 17-70008, in the United States Court of Appeals for the Fifth Circuit, Doc. No. 00514838385.

- *State v. William Darin Irvan,* Cause No. 864928, in the 180th District Court of Harris County. Mr. Irvan was convicted of capital murder and sentenced to death in 2003 for a murder that had occurred in 1987. The only direct evidence of Mr. Irvan's guilt was the testimony of a female federal prison inmate who claimed that Mr. Irvan confessed to her before she went to prison. *See Irvan v. Thaler,* Cause No. 4:12-cv-01683 (S.D. Tex.—Houston) (federal habeas proceeding).

- *State v. Tarus Vandell Sales,* Case No. 089316, in the 179th District Court of Harris County. Sales was convicted of capital murder and sentenced to death in 2003. Sales and the informant were cellmates at the Harris County Jail. The snitch, who was ostensibly no more than a fellow inmate, was actually a paid informant for the DEA and HPD at the time he elicited incriminating statements from Sales, who had already been indicted and was represented by counsel. *See Sales v. Stephens,* Cause No. 4:15-cv-00256 (S.D. Tex.—Houston) (federal habeas proceeding).

G.      Terrence Gaiser

Terrence Gaiser was the trial attorney appointed to represent Prible in the capital murder case on September 28, 2001.  *See* Ev. Hrg. Tr. Vol. 2 at 155.  His testimony supports Petitioner's *Brady* claims that a significant amount of favorable evidence, including evidence of the broader informant conspiracy and the "72 hours" note, was concealed from Prible's defense counsel.

Gaiser testified that back in 2001-2002, if a defense attorney wanted to review a file, he would have to make an appointment to go to the prosecutor's office.  The prosecutor would bring out the file and put the defense attorney in a separate room, and he would go through the files himself or with co-counsel.  *Id.* at 156.  As far as he knew, it was pretty much an open-file policy at the HCDA at that time:

> Q (by Ms. Scardino):  And would you be able to look at everything that the DA's office had in a given case?  Would everything be included in that file?
>
> A. Well, what was in that file was what they put in the file.  You know, I was never aware that there may be other things that weren't in that file.

*Id.* at 156-57.  The exception to this was attorney work product.  *Id.* at 157.  So his understanding, when he went to review a file, was that it would contain everything the HCDA had except for the prosecutor's work product.[16]  *Id.* at 157.  This was his understanding in Prible's case as well.  *Id.* at 157-58.  He did not see any notes taken by Siegler or her investigators in Prible's case file.  *Id.* at 158.

Gaiser testified that back in 2001 and 2002, it was not the HCDA's general practice to provide a defense attorney with a witness list before trial.  *Id.* at 158.  The defense attorney would have to look at what subpoenas had been filed in the district clerk's office to discover who the witnesses were.  *Id.*  Gaiser did not remember ever seeing the State's subpoena list in Prible's case.  *See id.* at 223.  As a general rule, a defense attorney would not be allowed to copy

---

[16] This testimony comports with Wisner's.

anything from the HCDA's file, other than the occasional public record. *Id.* at 158.[17]  Instead, the defense attorney just had to sit in the room and make notes. *Id.*  That was what Gaiser had to do in Prible's case when he went to review the file. *Id.* at 158-59.

Gaiser filed several pre-trial motions in Prible's case. *Id.* at 161-162.  One of these was a *Brady* motion **(Exhibit 109)**. *See* Ev. Hrg. Tr. Vol. 2 at 161.  In that motion, he asked for the date, place, and manner of the State's contacts with Beckcom, including how contact was first initiated and with whom it was made. *Id.* at 162.  Gaiser testified that he sought this information because it bore on Beckcom's credibility. *Id.* at 162.  He wanted to know whether Beckcom had come forward seeking some sort of remuneration for his testimony. *Id.*  It was also important, from a credibility standpoint, to learn whether it was Beckcom who reached out to the HCDA or whether the HCDA sought out Beckcom to groom him as a witness. *Id.*

The trial court took up Gaiser's *Brady* motion at a pre-trial hearing. *Id.* at 163.  At that hearing, Siegler told him that she was not required to provide the requested information to him, that he should just cross-examine Beckcom about it. *Id.* at 163-64.  But Gaiser testified that he asked for Siegler to provide him this information in open court because he couldn't possibly cross-examine Beckcom without it. *Id.* at 164.  Furthermore, Siegler was asking Gaiser to believe that Beckcom would testify truthfully, something he could not do. *Id.*

At the same pre-trial hearing, Siegler eventually relented and said Gaiser could come to her office and she would tell him how she and Beckcom came into contact and the times that they'd met, even though she "[didn't] remember dates" and "didn't take any notes." *See id.* at 164 and **Exhibit 70** at 4-5.[18]  As for what Siegler ended up telling him, Gaiser testified that "I

---

[17] Wisner testified that generally, defense counsel was not allowed to copy anything from the file "unless it was their client's statement or something extraordinary." *Id.* at 187. *See also* testimony of Johnny Bonds, Transcript Vol. 1, at 135-36.
[18] In fact, she had taken notes of her meetings with Beckcom, and those notes were dated. *See* **Exhibit 20.**

was never led to believe that she had made contact with [Beckcom], but it was always, [Beckcom] had made contact with her." Ev. Hrg. Tr. Vol. 2 at 165.  Siegler never disclosed to Gaiser that she had been communicating with Beckcom's cellmate, Nathan Foreman, since way back in August 2001, before Prible was even indicted.  *Id.* at 165.  Nor did she reveal to Gaiser that she had determined that Foreman was lying about having heard Prible confess.  *Id.*

In his *Brady* motion, Gaiser also asked for a copy of all statements made by Beckcom.  In response, Siegler stated, at the hearing, that they had only one:  the lengthy handwritten statement dated "12/10/01" (**Exhibit 30**).  *See* Ev. Hr. Tr. Vol. 2 at 166.  She also told the court that "it's still our position that any notes that either myself or Johnny Bonds made when we went to visit Michael Beckcom is work product."  *Id.* at 167.  Gaiser testified that this statement by Siegler comported with his recollection of reviewing the Prible file – *i.e.,* that no work product was in the file.  *Id.*  Gaiser testified that Siegler never showed him the letter she had received from Beckcom asking her to meet with him and Anton Davi (**Exhibit 95**).  *See* Ev. Hrg. Tr. Vol. 2 at 168.

In his *Brady* motion, Gaiser also asked for all agreements made between the State and *any witnesses* concerning benefits those witnesses would receive in exchange for their testimony. He did not specifically limit his request to agreements between the State and *Beckcom,* but also did not have any reason to believe, at the time he filed the motion, that there were any informants in the case besides Beckcom.  *Id.* at 169.  At the hearing on the *Brady* motion, Siegler stated that the parties had agreed to this request, and the trial judge asked her to state on the record what the agreement was.  *Id.*  In response, Siegler explained the agreement that she had *with Beckcom, i.e.,* that if he testified truthfully, she would write a letter to his federal prosecutor, who would then decide whether to ask for a reduction; and that it would ultimately be up to his federal judge

whether to grant him a reduction.  *Id.* at 170.  Siegler never mentioned that she had written a Rule 35 letter for Foreman **(Exhibit 44).**  Gaiser testified that the only thing he had heard about Foreman was what was contained in Beckcom's handwritten letter.  *See* Ev. Hrg. Tr. Vol. 2 at 171.  Nor did Siegler indicate that she had written a Rule 35 letter for Jesse Moreno **(Exhibit 43),** nor that she had just recently traveled to Louisiana to testify in a federal court proceeding on Moreno's behalf.  *See* Ev. Hrg. Tr. Vol. 2 at 171-72.  Gaiser testified that he "was not aware of the existence of a Jesse Moreno. . . . That's a new name to me."  *Id.* at 166, 172, 187.  Siegler mentioned, at the pre-trial hearing, that she had made a Rule 35 recommendation before and "went to Louisiana and testified," but neglected to tell the court that the Louisiana hearing had been for an informant who was involved in Prible's case.  *Id.* at 172.  Gaiser testified that "I had no reason to believe [the Rule 35 hearing that Siegler mentioned] was in any way connected to the case we were trying."  *Id.* at 172-73.  Gaiser testified that the pre-trial hearing left him with the impression that the only agreement the State had made was with Michael Beckcom.  *Id.* at 174-75.  But he did not know that Siegler had been communicating with Beckcom's federal prosecutor for months before Prible's trial.  *Id.* at 175.  Gaiser understood that Siegler was going to call the federal prosecutor *after* Beckcom testified, *if* he testified truthfully.  *Id.*

In his *Brady* motion, Gaiser also requested all evidence indicating that victim Steve Herrera was involved in drugs and firearms, and all evidence tending to incriminate anyone other than Prible in the murders.  *See* **Exhibit 109;** Ev. Hrg. Tr. Vol. 2 at 175-76.  Siegler represented to the trial court that Gaiser had seen all responsive information in the State's possession.  *Id.*  But Gaiser testified that Siegler never disclosed to him the threatening letter sent to the Herrera family a few days after the murders **(Exhibit 130),** in which someone threatened to burn the family's houses down.  Gaiser said this letter would have been "extremely relevant to whether

there was another motive for killing – for killing Steve as to whether or not he was dealing drugs and had money in the house." Ev. Hrg. Tr. Vol. 2 at 176-77.

In his *Brady* motion, Gaiser also asked for all witness statements.   At the pre-trial hearing, Siegler balked at disclosing oral statements, "[b]ecause oral statements is a lot of people that end up not saying anything worth our time, and I didn't take notes on and I don't plan on using." *See* **Exhibit 70** at 16-17; Ev. Hrg. Tr. Vol. 2 at 178.   So the court ordered her to turn over all written witness statements and any oral witness statement that turned out to be *Brady* evidence. *See* **Exhibit 70** at 17; Ev. Hrg. Tr. Vol. 2 at 178-79.   But Gaiser testified that he was never shown the letters to Siegler from inmates Oscar Gonzalez **(Exhibit 37),** Carl Walker **(Exhibit 36),** and Mark Martinez **(Exhibit 35).** *See* Ev. Hrg. Tr. Vol. 2 at 179-80.   Nor was he ever shown the letter to FCI Beaumont from the HCDA requesting a meeting with Beckcom and Anton Davi **(Exhibit 96),** or the November 12, 2001 letter from Alan Percely to Siegler regarding his client Nathan Foreman **(Exhibit 23).** *See* Ev. Hrg. Tr. Vol. 2 at 182.

At the evidentiary hearing, Gaiser was also questioned about his pre-trial motion for equal access to all NCIC and JIMS criminal history information **(Exhibit 71).**   Gaiser explained that he filed this motion because he did not have the ability, as a defense attorney, to generate NCIC or JIMS reports. *See* Ev. Hrg. Tr. Vol. 2 at 183.   If he had seen an NCIC in a file for a witness that he had never heard of, he would have wanted to know why it was there. *Id.* at 183-84.   Gaiser testified that he never saw the NCICs for Nathan Foreman **(Exhibit 169)** or Rafael Dominguez **(Exhibit 94).** *See* Ev. Hrg. Tr. Vol. 2 at 184-85.   Gaiser said he does not even know who Dominguez is. *Id.* at 185.

The trial court convened another discovery hearing on October 11, 2002, right before Prible's trial.   At this hearing, Gaiser expressed confusion as to the dates that the State met with

Beckcom and how contact with Beckcom was initiated. *Id.* at 186. Siegler stated that Beckcom contacted her by telephone after getting her name from Nathan Foreman. When the trial judge asked who Nathan Foreman was, Siegler said only that "Nathan Foreman is another inmate at FCI Medium," without providing any other context. *See* **Exhibit 72** at 12. Gaiser said he had no reason to suspect, from this exchange between Siegler and the trial court, that Foreman had come to Siegler at any previous time and spoken to her about Prible's case. *Id.* at 186-87. Gaiser said Siegler never told him, before trial, that Prible had supposedly confessed to Beckcom and Foreman; he just remembered reading that in Beckcom's handwritten letter right before trial. *Id.* at 187.

At the pre-trial hearing, Siegler also stated, in open court, that Beckcom had initiated all of the phone calls they had had together, "because I can't call an inmate, obviously." *Id.* at 187-88. Gaiser testified that he took her at her word and had no reason to believe that she could have called an inmate. *Id.* at 188. It was important for Gaiser to know who initiated the phone calls between Siegler and Beckcom so he could figure out "who was cultivating who." *Id.*

Gaiser testified that he did not learn about the alibi witness from the State; the defense team developed that information on their own. *Id.* at 188. Gaiser asked, at a pre-trial hearing, for all information that the State had about the alibi witness, and Siegler stated, in open court, that law enforcement did not have any notes regarding the alibi witness. *Id.* at 189-90. Gaiser testified that Siegler never showed him the work product notes from Prible's file, dated December 10, 2001, about the alibi witness. *Id.* at 190; **Exhibit 20** at 7.

Gaiser testified that Siegler never told him about her meeting with Foreman on August 8, 2001, or about her meetings with Foreman and Beckcom on December 10, 2001. *Id.* at 190. Gaiser testified that if he had known that Foreman had met with Siegler and her investigator, and

that they had considered him too unreliable to use as a witness, it would have "of course" been of interest to him. *Id.* at 225. All Gaiser had at the time of trial was Beckcom's hearsay statement that Foreman had overheard a conversation in which Prible confessed. *Id.*

Gaiser testified that Siegler never told him about Hermilo Herrero or that some of the same informants in Prible's case were also helping her on another murder case. *Id.* at 190-91. He said Siegler never showed him the November 11, 2001 photograph of Prible and the group of snitches. *Id.* at 191-92. And she never disclosed to Gaiser the note in her file indicating that Pam McInnis, the Fort Bend County serologist, had told her that semen lives up to 72 hours in the mouth. *Id.* at 192-93.

### III.
### The Evidentiary Hearing Proved That Respondent's Procedural Default Defenses Are Not Viable

**A.     Petitioner has overcome procedural default by proving cause and prejudice.**

The facts that prove up a *Brady* violation can also excuse procedural default of a substantive prosecutorial misconduct claim, whether brought under *Brady v. Maryland,* 373 U.S. 83 (1963), or *United States v. Giglio*, 405 U.S. 150 (1972). Suppression and materiality under *Brady* or *Giglio* "parallel" the showing of cause and prejudice under *Murray v. Carrier,* 477 U.S. 478 (1986), which allows federal courts to reach the merits of otherwise procedurally defaulted claims. *See Strickler v. Green*, 527 U.S. 263 (1999); *Banks v. Dretke*, 540 U.S. 668 (2004).

**1.     Cause under *Carrier* (suppression under *Brady*)**

Through the evidentiary hearing, Prible has established that he diligently attempted to develop the evidence underlying his *Brady, Giglio,* and *Massiah* claims in state habeas proceedings, but was stymied by the prosecution's suppression of evidence that would have revealed the existence and extent of the informant conspiracy. He has established, through his

47

trial attorney Terrence Gaiser, that a substantial amount of *Brady* evidence was suppressed even after the defense specifically requested it in various pre-trial motions and hearings. Harris County investigator Johnny Bonds and prosecutor Victor Wisner testified that members of the prosecution team were not even aware of the various other informants and Siegler's communications with them. Through the testimony of Carl Walker, Prible demonstrated that evidence of the larger informant conspiracy, which Walker, as a co-conspirator, had first-hand knowledge of, was not available to his state habeas counsel despite his diligent attempts to discover it. At the evidentiary hearing, Walker provided uncontestable confirmation of testimony that Prible presented to the state courts, which showed Prible diligently sought to discover Walker's identity and whereabouts but mistakenly assumed that a different person, named Larry Wayne Walker, was the witness with information about the ring of informants that had set up Prible.

### 2.   Prejudice under *Carrier* (materiality under *Brady*)

Prible's conviction was the result of Michael Beckcom's testimony and the DNA evidence found in the victim's mouth. Prosecutors' attempts to now downplay the importance of Beckcom, going as far as to call Beckcom's testimony immaterial, serves only to cast doubt on their credibility. Beckcom's testimony provided the motive for the murder, a detailed description of how the murders were allegedly carried out, and a storyline designed to defeat the testimony of the otherwise solid alibi witness that Prible's defense attorneys presented at trial. The DNA evidence was used to convince the jury that Prible engaged in oral sex immediately before the murder, within minutes or seconds, according to the prosecutor's closing arguments. That left Prible as the only conceivable killer.

###### a.   The State withheld material evidence that Beckcom perjured Prible's "confession."

At the evidentiary hearing, Prible's witnesses established that the prosecution had information that Beckcom was part of a conspiracy involving multiple informants who were intent on providing testimony that the prosecutor realized was incriminating but false.  However, the prosecution suppressed photographs and letters confirming Beckcom's participation in this conspiracy, as well as the contacts the State had had with multiple members of this conspiracy. Further, the State suppressed evidence that a witness – Nathan Foreman, who, according to the State's own case, was in a position to corroborate Beckcom's every statement – had given patently false accounts of Prible's supposed "confession" to the prosecutor and HCDA investigator at two separate interviews. Three important points follow from the State's realization about Foreman's veracity:

**First**, prosecutors did not conclude Foreman was fabricating (while Beckcom was being truthful) from Foreman's demeanor or poor command of information, or from internally inconsistent statements that might raise questions about his trustworthiness or ability as a witness.  During her deposition, the prosecutor expressly denied that such misgivings were why she concluded Foreman was lying about Prible.   At the evidentiary hearing, the prosecutor characterized Foreman as an accomplished and convincing liar.   The conclusion that Foreman was fabricating evidence, therefore, had to have been based on the information that Foreman provided, not his presentation.   According to Bonds, the information Foreman offered in an August 8, 2001 interview left the impression that Foreman had never met Prible, let alone obtained incriminating evidence from him.   During his deposition, Bonds expressed genuine surprise that the State would even consider interviewing Foreman again, as happened on December 10, 2001.   Bonds, and so too Siegler, affirmed that Foreman did not become a more

truthful witness.   The prosecutor contended Foreman fabricated his story every time she encountered him, including in the Herrero case.

**Second**, the State could not withhold the accounts of Prible's confession, which the prosecution team concluded Foreman fabricated, on the ground that they were inadmissible hearsay, unusable at trial.   Foreman's statements would not have been used to prove the truth of the matter asserted, and the State could not object that they were.   Foreman's statements therefore could be used just as readily, and effectively, as if Beckcom himself had provided prior inconsistent statements that the State had concluded were abject fabrications.

**Third**, Prible's defense counsel could have called Foreman, and Foreman would not have been able to corroborate Beckcom's testimony unless he was coached, because, as he testified at the evidentiary hearing, he did not know Beckcom had composed a lengthy script of Prible's confession.   Foreman credibly likened Beckcom's December 10, 2001 handwritten statement to a television show that Beckcom had produced from his own imagination.   Hence, Foreman would have had no idea how to testify in-step with Beckcom.   Furthermore, defense counsel could have called the prosecutor or her investigator as a defense witness, as the trial judge has discretion to allow an attorney for a party to testify at trial.   S*ee United States v. Bates*, 600 F.2d 505, 511 (5th Cir. 1979) (The decision to allow a party's attorney to testify "is entrusted to the sound discretion of the trial judge"); *United States v. Crockett*, 506 F.2d 759 (5th Cir. 1975), petition for cert. filed, 43 U.S.L.W. 3540 (U.S. Mar. 31, 1975) (No. 74-1252); *Moore v. State*, 811 S.W.2d 197, (1991) (citing *Bates*, *supra*).   Were the trial court to deny defense counsel the opportunity to cross-examine the prosecution team about what Foreman told them during the interview, that would have been an abuse of discretion and a constitutional violation.   *See Chambers v. Mississippi,* 410 U.S. 284, 294-95 (1973).

It is clearly more likely than not that any reasonable jury, faced with evidence severely undermining the two pillars of the State's case, would have reached an outcome other than conviction. The evidence was suppressed during trial and during state habeas proceedings, and was discovered only through court-ordered discovery and through *in camera* review of evidence that the State was prepared to withhold, as privileged, through federal hearings and beyond. Hence, as well as cause, prejudice under *Carrier*, and materiality under *Brady*, were unquestionably shown at the evidentiary hearing.

> **b.    The State withheld material evidence that semen can persist in the oral cavity for 72 hours.**

Prible further proved at the evidentiary hearing that the State suppressed evidence which rendered false and misleading the prosecution's inflammatory closing argument that forensic scientific evidence compelled the conclusion that Prible had shot the victim right after oral copulation.  As shown at the evidentiary hearing, a Harris County serologist had informed the lead prosecutor that spermatozoa can persist in the oral cavity 72 hours after it is deposited, yet the prosecutor suppressed the evidence and proceeded falsely and misleadingly to represent to the jury that forensic science proved Prible orally raped the victim moments before she died.

**B.    The Court may reach each of Petitioner's constitutional claims through *Schlup's* gateway innocence exception to default.**

The April-May evidentiary hearing in this case also provides a clear path through "gateway innocence" for this Court to reach all claims asserted in Petitioner's Fourth Amended Petition, including those filed outside of the AEDPA's statute of limitations, as follows.

1.  **Petitioner's *Schlup* and *McQuiggin* claims**

a.  **Standards**

Actual innocence is not equivalent to legal innocence or insufficiency of the evidence. *See Schlup v. Delo,* 513 U.S. 298, 330 (1995).  Actual innocence is a different standard and rests on a different evidentiary basis.  Under the *Jackson v. Virginia* sufficiency standard, the only evidence that a court may consider is evidence admitted at trial.  443 U.S. 307, 324 (1979).  The *Jackson* standard requires taking the admitted evidence in a light most favorable to the government, and assessing whether any rational juror given that evidence, seen in that light, could have found the defendant guilty beyond a reasonable doubt.  *Id.*  Under *Schlup,* the Court considers the effect and implications of new evidence, *i.e.,* evidence that was not introduced at trial.  513 U.S. at 324.  The court does not review the evidence in a light most favorable to the prosecution.  *See Rivas v Fischer*, 687 F.3d 514, 543 (2nd Cir. 2012).  Further, the court has full authority to make credibility determinations about the new evidence, and the discretion to make redeterminations about the credibility of evidence introduced at trial. *House v. Bell*, 547 U.S. 518, 538-39 (2006).  The court must then determine whether it is more likely than not that some rational jury, which considered the new evidence of innocence in conjunction with the evidence at trial, would have found the defendant guilty beyond a reasonable doubt.  *See Schlup,* 513 U.S. at 327.  Equivalently, the inquiry is whether **"more likely than not any reasonable juror would have reasonable doubt**."  *See House*, 547 U.S. at 538 (emphasis added).

Several points follow.  First, actual innocence is determined relative to the evidence at trial.  Second, actual innocence does not require conclusive exoneration.  *See House*, 547 U.S. at 553.  New evidence that "thoroughly undermines" the verdict can meet *Schlup* standards.  *See Rivas,* 687 F.3d at 543 (citing *House,* 547 U.S. at 553-54).  Third, the actual innocence standard,

itself, does not strictly limit the type of evidence that a court can consider.  Instead, the Supreme Court clarified in *Schlup* that the ultimate criterion is reliability, 513 U.S. at 324.  And rather than defining rigid categories of acceptable evidence, the Supreme Court provided guidance as to the type of evidence that would usually be required to achieve the rare result in which *Schlup's* actual innocence standard is met.

A credible *Schlup* claim requires the habeas petitioner asserting actual innocence "to support his allegations of constitutional error with new reliable evidence, whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial." 513 U.S. at 324.  However, the reference in *Schlup* to eyewitness testimony does not rigidly limit acceptable testimony to persons who witnessed the actual crime. Otherwise, convictions resting on false jailhouse snitch testimony could not be challenged as manifestly unjust – even though nothing could be more unjust than a capital conviction imposed by virtue of testimony perjured in pursuit of favors dangled by the State, whether the perjury is about a defendant's alleged admission to a crime or about the commission of the crime itself. For purposes of *Schlup,* the issue is whether new evidence reliably undermines the very foundation of the State's case.

### b.    Argument

The State did not have an eyewitness to the murders of Steve Herrera and Nilda Tirado, nor an eyewitness to incriminating conduct before or after the murders.  Instead, the primary evidence against Prible came from forensic expert William Watson, whose testimony was not the subject of the evidentiary hearing, and from jailhouse informant Michael Beckcom, who claimed to have witnessed, and documented in writing, an extensive and thoroughly incriminating jailhouse confession by Prible.

###### i. No reasonable juror would have believed the State's perimortem interval was valid had they heard the testimony of Dr. Elizabeth Johnson.

Argument and evidence as to why Dr. Johnson's expert testimony supports Prible's *Schlup* and *McQuiggin* arguments is set forth in Prible's prior pleadings, including the Fourth Amended Petition and his Reply to Respondent's Motion for Summary Judgment (Dkts. 181 and 198). While the implications of Dr. Johnson's forensic report were not the subject of the evidentiary hearing, deposition testimony admitted at the evidentiary hearing demonstrated the baseless falsity of a central component of the State's case, which was that Prible had to have raped the victim rather than engaged in consensual oral sex. A consensual encounter militated against a subsequent murder, while rape provided a motive for killing the victim and burning the body.

###### ii. Every juror would have had a reasonable doubt as to Prible's guilt had he or she heard the testimony of Foreman and Walker.

According to the State's own case, as presented through Beckcom, Foreman was a witness to the same confessional events that incriminated Prible deeply and inextricably in the murder of Steve and Nilda Tirado. That Foreman was in a privileged position to see and hear everything Beckcom claims to have seen and heard is beyond dispute. Foreman was Beckcom's cellmate during the critical period when both were contriving together to solicit incriminating information from Prible. By Beckcom's own account, Foreman formed the same bonds with Prible as Beckcom; Foreman was present on every relevant occasion during which Beckcom and Prible interacted; and Foreman, on those occasions, actively engaged in conversations that Beckcom was having with Prible. Foreman therefore unquestionably had the vantage point of a co-conspirator, including personal knowledge of Beckcom's plans, Beckcom's interactions with

Prible, Beckcom's purpose in having those interactions, and the circumstances under which those interactions took place.

Respondent failed to impeach the substance of Foreman's testimony or his motives. Foreman had nothing to gain by testifying as he did at the evidentiary hearing, unlike Beckcom. Finally, Foreman's testimony that Beckcom's account of Prible's confession was entirely fictitious, far from being impeached, was corroborated by Walker's testimony.

According to Beckcom, on November 24, 2001, Prible met him and Foreman on the yard, took them aside, and gave a lengthy, impassioned confession in which he admitted shooting the victims, retailed his motive for the murder, and expressed a bitter animosity toward Steve Herrera.   Foreman denied this dramatic confession took place.   Instead of describing an impassioned, adamant confessor along the lines of Beckcom's testimony, Foreman described a drunken episode in which Prible became too inebriated to walk, but never said a self-incriminating word.

Walker confirmed at the evidentiary hearing that November 24, 2001, was the culmination of a plan, long in the making and in which Beckcom was involved, to ply Prible with a batch of homemade alcohol in the hopes of obtaining a confession that never came. Walker was in a position to know this because he was the cellmate of Oscar Gonzalez, the winemaker, who provided the alcohol given to Prible.   Walker also confirms that Prible became intoxicated, as planned, but never confessed.   Although Oscar Gonzalez did not testify at the hearing, he, too, provided a sworn statement that aligns with Walker's account, and corroborates Foreman's evidentiary hearing testimony. *See* **Exhibit 88.**   Beckcom, meanwhile, as shown below, has discredited himself by threats against Petitioner's habeas counsel and by his demeanor and testimony during his deposition.

Any reasonable juror who credited Foreman's testimony at the evidentiary hearing that Beckcom's account of Prible's ultimate confession was a concoction worthy of a fictional television show would have found that the State had not proved Prible guilty beyond a reasonable doubt. This Court can therefore reach the merits of Prible's otherwise-defaulted claims under *Schlup*.

### iii.    AEDPA statutes of limitation should be tolled.

This Court, under *McQuiggin*, 569 U.S. at 386-87, can reach otherwise defaulted claims even if they were raised after the statute of limitations. As the Supreme Court has explained, the *Schlup* inquiry, if satisfied, tolls limitations, unless Respondent proves "unjustifiable delay" in the presentation of new evidence of innocence. *Id.* Even so, such delay is not an absolute obstacle, but only "a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence." *Id.*

There has been no showing either that Prible delayed developing the forensic testimony of Dr. Elizabeth Johnson, which undermines the perimortem interval that the State insisted was supported by Watson's testimony. Nor has there been a showing that Prible delayed developing the testimonies of Walker, Foreman, or Gonzalez, which refute Beckcom's rendition of Prible's alleged confession. Consequently, through *Schlup's* "gateway innocence" exception to procedural default, this Court can reach every prosecutorial misconduct *(Giglio, Brady, Massiah)* and ineffectiveness of trial counsel claim raised in Prible's Fourth Amended Petition. No state court has reached the merits of any of these claims. Hence, federal review of the merits is *de novo. See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Shea v. Kirkegard*, 2013 WL 989813 (D. Mont. 2013) (not reported) (de novo review afforded because of showing of gateway innocence). Hence, relief must be granted upon a finding, unencumbered by AEDPA deference,

that Prible has proved the elements of a *Giglio, Brady, Massiah* or *Strickland* claim by a preponderance of the evidence.

## IV.
## The Results of the Evidentiary Hearing Justify Relief on the Merits

### A.    Habeas relief should be granted on Prible's claim that the State suppressed evidence that Beckcom worked with a ring of informants to fabricate evidence against Prible.

Respondent has urged this Court to grant summary judgment for three reasons:  (1) because Prible pled a *Brady* claim in his *pro se* 11.071 applications, alleging he was set up by a ring of informants; (2) because Prible could have, but failed, to develop facts in state proceedings supporting his ring of informants claim; and (3) because the evidence that the informants might have presented was incriminating, not exculpatory.   But Prible did not have the means to articulate a cognizable claim because the lead prosecutor had successfully concealed material evidence from his defense team, as the evidentiary hearing showed.

### 1.    Proof of suppression mounted throughout the evidentiary hearing.

The lead prosecutor not only kept evidence of the ring of informants from Prible's trial counsel – her co-counsel, Wisner, and her investigator, Johnny Bonds, were unaware of the ring of informants also.  The first time Wisner saw any of the evidence documenting the existence of the ring of informants and Beckcom's participation in it – *i.e.,* the inmate photos, letters, and other records – was at his deposition in 2017.  *See* Ev. Hrg. Tr. Vol. 1 at 189-196.  Likewise, the first time Bonds had ever seen this evidence was at his 2017 deposition.  *See* Ev. Hrg. Tr. Vol. 1 at 141-42, 145-46, 154-56.  Neither Wisner nor Bonds were aware, until they were deposed, that Foreman was ever Beckcom's cellmate, nor was either one privy to information about the Herrero case.  Neither of the two knew of Siegler's contacts and communications with other FCI Beaumont inmates who Siegler realized were angling to testify against Prible in return for her

efforts to obtain a sentence reduction. Wisner did not know that Siegler and Bonds had interviewed Foreman, nor what the results of those interviews were. In fact, Wisner did not know who Foreman was until informed during his deposition in this case.

Prible's lead trial counsel, Terrence Gaiser, credibly testified that he learned of the existence of the informant ring, and the identity of its members, when presented with the evidence by federal habeas counsel. According to Gaiser, the State had an open-file policy at the time of trial, and he reviewed the file. But none of the evidence that Prible has since marshalled to support his prosecutorial misconduct claims – photos, correspondence, phone records, etc. – were contained therein. Gaiser credibly denied that he ever saw Siegler's or Bonds' interview notes. The defense team had no knowledge whatsoever of Siegler's contacts and communications with other FCI Beaumont informants.

By contrast, the lead prosecutor's testimony that the information underlying Prible's *Brady* claims – including her handwritten notes – was available to trial counsel is so incredible that it calls into serious question anything else the lead prosecutor said. At trial she announced she was withholding the exact type of information she now says was disclosed. Her co-counsel and lead investigator testified that they were not privy to the information upon which Prible's *Brady* claims rest. Bonds testified that Siegler "didn't give up anything she didn't have to give up." Ev. Hrg. Tr. Vol. 1 at 151. Wisner testified that prosecutor notes and other work product were routinely withheld from the "open file." Ev. Hrg. Tr. Vol. 1 at 186. And the HCDA continued to withhold notes of Foreman's and Beckcom's interviews, other handwritten notes, and other work product until this Court ordered *in camera* review late in these proceedings.

### 2. The materiality of the suppressed evidence became abundantly clear at the evidentiary hearing.

Respondent's primary argument – that the evidence of an informant's ring is immaterial because it is merely cumulative impeachment evidence – is untenable. Trial counsel impeached Beckcom with his criminal past, his service as a snitch in other cases, and his reputation in the federal system for untruthfulness. However, trial counsel did not have information to impeach and falsify Beckcom's testimony at Prible's trial because the State suppressed it.

### a. Supression of Foreman's August 8, 2001, and December 10, 2001, statements was material.

Throughout his testimony, Beckcom presented Foreman as a witness who could corroborate every statement that Beckcom made about Prible's confession. Beckcom testified at trial, and repeated during his deposition, that Foreman was present at all relevant times when Beckcom interacted and communicated with Prible. According to Beckcom, Foreman helped carry out Beckcom's plan to provide the prosecutor with evidence, including taking photographs with their and Prible's respective families, which Beckcom gave to Siegler to use as evidence of his and Foreman's camaraderie with Prible.

Undisclosed prosecutor notes show, however, that the lead prosecutor and her investigator interviewed Foreman twice, and determined on both occasions that Foreman's story of the circumstances and substance of Prible's "confession" was a fabrication. According to Bonds, Beckcom gave a detailed account, whereas Foreman, who was privy to the same information according to Beckcom, gave nebulous accounts. The information the prosecution team received from Foreman was so bad, in fact, that the investigator wrote "B.S." in his interview notes. *See* **Exhibit 20.** However, the State did not immediately disclose Foreman's inconsistent, incredible statements.

As argued in the section on prejudice for purposes of *Schlup,* trial counsel could have nullified Beckcom's testimony if the prosecutors had timely disclosed what they heard from Foreman.  No jury would believe a witness if the person the witness portrayed as a corroborating source of information not only got the story wrong, but was fabricating evidence.  The obvious conclusion that any rational juror would reach, in a situation where two witnesses vouch that the other heard and saw the same events, would be that their accounts diverge badly because both witnesses were making up different stories rather than telling a single truth.

> **b.**    **Beckcom's involvement with the ring of informants is material.**

Respondent has long maintained that Beckcom and the other informants who were in contact with Siegler were simply opportunists, who, like many others in federal prison, were independently looking for ways to reduce their sentences.  Respondent maintains that there was no conspiracy to fabricate evidence of which the prosecutor was aware or had to disclose.  After the evidentiary hearing, this defense of the prosecutor's conduct can no longer be sustained.

Beckcom's statement was all about how he and Foreman engaged and befriended Prible and ultimately induced Prible to confess to the murders on November 24, 2001.  The fact that Foreman fabricated a confession story means one thing only, and that is that Foreman did not see, hear, or say what Beckcom testified he did.  The inescapable conclusion is that Beckcom also fabricated Prible's confession.  Beckcom therefore does not stand apart from the other informants.

The State was aware, because of photographic evidence and letters to the prosecutor referring to Beckcom, that Beckcom was associated with other informants who were all angling to testify against Prible.  Because Foreman's fabrications compel the conclusion that Beckcom too was fabricating evidence, the State could not withhold information of the ring on the ground that their false accounts of Prible's confession were merely attempts to exploit Beckcom's true

information. Instead, the implication is that Beckcom was participating in the informants' efforts to secure State favors in exchange for perjured testimony. Were a jury presented with evidence that Beckcom's story was fabricated and that Beckcom was in league with a ring of informants who were fabricating evidence against Prible, they would have disregarded his testimony entirely.

**B.    In light of the evidentiary hearing, relief is necessary on Prible's claim that the prosecutor failed to disclose the nature and extent of the deals made for Beckcom's testimony and sponsored false and misleading testimony about them.**

Due process is violated when a prosecutor fails to disclose evidence that a key witness has received a deal for his testimony. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). "Brady requires disclosure of tacit agreements between the prosecutor and a witness. A deal is a deal—explicit or tacit." *Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009). "Brady evidence is not limited to actual 'deals' or 'agreements' between witnesses and the government." *Harshman v. Superintendent, State Corr. Inst. at Rockview*, —— F. Supp. 3d ——, No. 17-116, 2019 WL 1354048, at *10 (M.D. Pa. Mar. 26, 2019).

At trial, Siegler solicited the following testimony from Beckcom about the deal she had arranged with him:

> We have an understanding that if I testify truthfully to this Court that you will reciprocate by calling my Federal prosecutor. At that point it's out of your hands, but just to let him know what I've done.

26 RR 14.

This was false, but Siegler failed to correct it. In the first place, the deal was not initially struck for Beckcom's *testimony*. In early October 2001, the prosecutor struck a deal for Beckcom *to solicit information* from Prible in return for her efforts to see that he received a

sentence reduction.  26 RR 22.  Furthermore, Siegler's efforts to ensure that Beckcom received a sentence reduction began early on.  As Siegler admitted at her deposition, she began lobbying Beckcom's federal prosecutor months before Prible's trial regarding a Rule 35 reduction.  Ev. Hrg. Tr. Vol. 2 at 116-118.  Because of these efforts and Siegler's express representations to him, Beckcom believed that Siegler's influence would result in a reduction of his entire remaining sentence so that he "was going to get walked out" of prison:

> A (by Beckcom):  Well, when this whole thing got started and I – I set myself in motion to testify in state court, she said she was going to call my prosecutor in California.  She said, "This probably will get you out of prison."
>
> Q (by Ms. Scardino):  She said – she said that to you, This will get you out of prison?
>
> A.  Yeah.  So I think she bullshitted me at that point because once it was said and done, as I'm getting off the stand, they go in the back, and she's got this grim look on her face, and I'm like what now?  'Well, they're only going to give you 12 months.'  So at that point I felt like – I knew she had lied to me in the beginning that I was going to get walked out, you know, for my testimony.
>
> Q.  Did she lead you to believe that you would be getting out of prison?
>
> A.  Yeah.
>
> . . .
>
> Q.  Did you ever ask [Siegler] for any sort of assurance, before you went up and testified and put yourself at risk, that it would be worthwhile?
>
> A.  I'm sure I probably did, but I don't remember how that conversation would have ended because I never got anything.
>
> Q.  Well, you ended – you got a year off.
>
> A.  Yeah.
>
> Q.  Is that right?
>
> A.  Yeah.
>
> Q.  But you thought you would be walking out the door after?
>
> A.  For a house full of bodies?  Yeah.  Children?  Sure.

Ev. Hrg. Tr. Vol. 1 at 214, 229.  Beckcom said Siegler assured him that the feds "were going to play ball.  I've talked to them, and they're in, something to that effect."  *Id.* at 230-31.

In her closing argument, Siegler told the jury that Beckcom's fate was in the hands of his federal judge.  This left the impression that her role had come to an end.  However, Siegler continued to lobby Beckcom's federal prosecutor after Prible's trial.  Siegler also knew that she could ask to testify on Beckcom's behalf or be summoned for that purpose, and that her testimony could have substantial effect, including walking Beckcom out of prison.  Only months before Prible's trial began, she had travelled to Louisiana to testify at Jesse Moreno's Rule 35 hearing.  Siegler knew, because the district court announced it at the hearing, that her intervention had resulted in a 77-month reduction of the remaining 78 months that Moreno had to serve.  *See* **Exhibit 49.**  Siegler therefore misled the jury about the Rule 35 reduction process, and her continued involvement and her potential influence, just as she had the Hermilo Herrero jury.

Finally, Siegler's minimization of her role concealed the fact that she had taken steps to arrange for Beckcom to provide jailhouse snitch testimony in another case. While waiting to testify in Prible's trial, Beckcom proposed a way to ensure he received a Rule 35 reduction. Beckcom wrote Siegler that he and another inmate, Anton Davi, had information about a crime, and proposed that she help him convince federal prosecutors to make a deal for his testimony against the alleged perpetrator.  *See* **Exhibit 95.**  Siegler set up a meeting and made the trip to Beaumont Medium to meet with Beckcom, *see* **Exhibit 96,** but she did not disclose her efforts to assist Beckcom to Prible's trial attorneys.

For reasons stated in the Fourth Amended Petition, it is reasonably probable that the prosecution's failure to disclose the nature and extent of the deals with Beckcom would have had a substantial effect on the outcome of Prible's trial. Relief is therefore warranted.

### C.   Relief on Prible's *Massiah* claim should be granted.

A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel being present; and (3) that agent "deliberately elicit[s]" incriminating statements from the defendant. *Massiah v. U.S.,* 377 U.S. 201, 206 (1964); *Creel v. Johnson,* 162 F.3d 385, 393 (5th Cir. 1998), cert. denied, 526 U.S. 1148 (1999). The first element is undisputed, as Prible was indicted in August 2001 and appointed counsel on September 28, 2001. And Beckcom's trial and deposition testimony convincingly prove up the other two elements.

### 1.   Beckcom operated as a State agent, and solely for the sake of State favors.

At his deposition, Beckcom confirmed that he heard about Siegler's connection to Prible's case from Foreman.[19] Ev. Hrg. Tr. Vol. 1 at 215-16. Beckcom testified that he got Siegler's phone number from Foreman and called her. He acknowledged that the first telephone call to her was not to provide her with information about the case, because he did not have much information to give her; rather, the purpose of that first phone call was to arrange a deal with her for his testimony. *Id.* at 235-36, 238. He admitted that he had no other reason to develop evidence against Prible other than the fact that he might be given a Rule 35. *Id.* at 236. He stated that that was his sole motivation for providing testimony for Siegler. *Id.* at 237.

---

[19] At various times during his testimony, Beckcom referred to Foreman by his nickname, "Bo."

Beckcom admitted that Siegler made clear, during their initial phone conversation, that he was supposed to get specifics about the case.  *Id.* at 238.

Beckcom, admitted that the deal he arranged involved securing the prosecutor's assistance in obtaining a Rule 35 sentence reduction.  Although Beckcom was not entirely committal when directly asked, his testimony about his understanding of the benefit he stood to gain when the prosecutor used her influence shows that a sentence reduction was the inducement that moved Beckcom to solicit information from Prible about his case.  Beckcom testified that "when this whole thing got started and I – I set myself in motion to testify in state court, she said she was going to call my prosecutor in California.  She said, 'This probably will get you out of prison.'"  Ev. Hrg. Tr. Vol. 1 at 214.

### 2.    Beckcom deliberately elicited information from Prible.

Beckcom was not a passive or fortuitous recipient of information from Prible.  Evidence at the evidentiary hearing demonstrated that Beckcom's every interaction with Prible was designed to elicit information about Prible's case.  Beckcom conceded that he befriended Prible in order to elicit information from him, as follows:

> Q.  It wasn't as if you befriended [Prible], and then it came out later that he was charged with this?  This was [] intentional on your part, introducing yourself to him and trying to elicit information from him, right?
>
> A.  I'm sure it probably played out that way.

*Id.* at 222-23.  Beckcom further admitted that other conversations, such as discussions about Prible's asphalt business, were a "pretense" to induce Prible to pass on self-incriminating information.  *Id.* at 249-50.  Testimony from Walker and Foreman at the evidentiary hearing show that Beckcom went beyond active questioning and pretenses in order to induce Prible to

talk about his case; he was also part of a plot to ply Prible with alcohol in order to procure self-incriminating information.

### 3.    The *Massiah* violation was extraordinarily harmful.

With the elements of *Massiah* thoroughly satisfied, Prible had a due process and Sixth Amendment right to exclude Beckcom's testimony entirely.  The prejudicial effect of Beckcom's testimony cannot be gainsaid.  The prosecutor admitted that without Beckcom, the State risked acquittal.  *See* Section F(2)(b), *supra*.  Beckcom provided far more than the prosecutor's depreciated assessment of his testimony's impact.  Beckcom's testimony incriminated Prible to the point of being inflammatory.  Beckcom supplied motive and animus, and impressed on the jury a callous disregard by Prible for the lives of the five murder victims that Beckcom claimed he extinguished – among them three young girls.  Beckcom's testimony unquestionably had a substantially injurious effect, enough to cause any reasonable jurist to have "grave doubts about whether the error was harmless."  *See O'Neil v. McAninch*, 513 U.S. 432 (1995).  Relief should therefore be granted on Prible's *Massiah* claims.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner Ronald Jeffrey Prible, Jr. requests that this Court:

(1)    issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death, and

(2)    grant such other relief as law and justice require.

Respectfully submitted,

**SCARDINO LLP**

By: */s/  Gretchen N. Scardino*
Gretchen N. Scardino
State Bar No. 24037170
401 Congress Ave., Suite 1540
Austin, Texas 78701
Telephone:  (512) 443-1667
Facsimile:  (512) 487-7606
Gretchen@scardinollp.com

Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
HILDER & ASSOCIATES, P.C.
819 Lovett Boulevard
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112

**ATTORNEYS FOR PETITIONER**

**<u>CERTIFICATE OF SERVICE</u>**

On June 24, 2019, a copy of the foregoing was served upon Respondent by email.

*/s/ Gretchen N. Scardino*
Gretchen N. Scardino

# APPENDIX

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RONALD JEFFREY PRIBLE, | § | |
| | § | **PETITIONER'S EXHIBIT LIST** |
| Petitioner, | § | |
| | § | |
| V. | § | 4:09-cv-01896 |
| | § | |
| LORI DAVIS, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, INSTITUTIONAL DIVISION, | § | |
| | § | |
| Respondent. | § | |

## EXHIBIT CROSS-REFERENCE CHART

At the evidentiary hearing held on April 29, 30, and May 2, 2019, several witnesses were presented via videotaped deposition testimony. The exhibits that the witnesses were questioned about at their depositions appear on Petitioner's Exhibit List attached as Exhibit A to the Joint Pre-Trial Order (Dkt. 222), but they were numbered differently at the depositions. The following chart provides a key to the numbering of the exhibits as they appear in the evidentiary hearing transcript.

| Ev. Hrg. Transcript Ex. No. | Petitioner's Exhibit List No. | Description |
|---|---|---|
| **Video Deposition of Johnny Bonds – Transcript of April 29, 2019** | | |
| 52 | 6 | April 4, 2001 handwritten letter from Jesse Moreno to Kelly Siegler |
| 53 | 10 | April 10, 2001 handwritten letter from Celia Moreno to Kelly Siegler |
| 55 | 26 | August 29, 2001 Indictment against Hermilo Herrero |
| 88 | 169 | NCIC for Nathan Foreman, printed by Johnny Bonds on August 7, 2001 **(Redacted - Filed Under Seal)** |
| 112 | 37 | May 22, 2002 letter from Jesse ("Oscar") and Felix Gonzalez to Kelly Siegler |
| 113 | 36 | Undated letter from Carl Walker to Kelly Siegler |

| Ev. Hrg. Transcript Ex. No. | Petitioner's Exhibit List No. | Description |
|---|---|---|
| 114 | 35 | April 30, 2002 letter from Mark Martinez to Kelly Siegler plus telephone memo from Mark Martinez to Kelly Siegler dated 3/7/[02]? |
| 163 | 32 | Informant photos with Jeff Prible |
| 77 | 27 | November 20, 2001 Fax from Johnny Bonds to Lt. Robert Clark at FCI Medium requesting Foreman visit |
| 109-7 | 30 | December 10, 2001 handwritten statement by Michael Beckcom |
| 78 | 28 | November 26, 2001 Fax from Bonds to Lt. Clark requesting Michael Beckcom visit right after Nathan Foreman |
| 174 | 30 | December 10, 2001 handwritten statement by Michael Beckcom |
| 109-6 | 20 (page 6) | Tab 65 Work Product, produced by HCDA on May 12, 2017 |
| 112 | 37 | May 22, 2002 letter from Jesse ("Oscar") and Felix Gonzalez to Kelly Siegler |
| 113 | 36 | Undated letter from Carl Walker to Kelly Siegler |
| 114 | 35 | April 30, 2002 letter from Mark Martinez to Kelly Siegler plus telephone memo from Mark Martinez to Kelly Siegler dated 3/7/[02]? |
| 180 | 38 | Typed letter from Michael Beckcom found in his *Texas v. Beckcom* case file |
| **Video Deposition of Vic Wisner – Transcript of April 29, 2019** | | |
| 112 | 37 | May 22, 2002 letter from Jesse ("Oscar") and Felix Gonzalez to Kelly Siegler |
| 113 | 36 | Undated letter from Carl Walker to Kelly Siegler |
| 114 | 35 | April 30, 2002 letter from Mark Martinez to Kelly Siegler plus telephone memo from Mark Martinez to Kelly Siegler dated 3/7/[02]? |
| 52 | 6 | April 4, 2001 handwritten letter from Jesse Moreno to Kelly Siegler |
| 53 | 10 | April 10, 2001 handwritten letter from Celia Moreno to Kelly Siegler |
| **Video Deposition of Michael Beckcom – Transcript of April 29, 2019** | | |
| 4 | 56 | Trufone records and phone list – Michael Beckcom (**Filed Under Seal**) |
| 8B | 32 | Informant photos with Jeff Prible |
| 22 | 96 | May 1, 2002 letter from HCDA to Lt. Clark requesting visit between Kelly Siegler/Johnny Bonds and Michael Beckcom/Anton Davi |
| 34 | 95 | Undated letter from Michael Beckcom to Kelly Siegler regarding Anton Davi |

| Ev. Hrg. Transcript Ex. No. | Petitioner's Exhibit List No. | Description |
|---|---|---|
| 18 | 37 | May 22, 2002 letter from Jesse ("Oscar") and Felix Gonzalez to Kelly Siegler |
| 30 | 126 | October 30, 2002 handwritten thankyou note from Michael Beckcom to Kelly Siegler |
| 10 | 30 | December 10, 2001 handwritten statement by Michael Beckcom |
| 28F | 154 | April 15, 2001 Houston Chronicle article, "Survivors Await Break in Family's 1999 Killing" |
| **Video Deposition of Kelly Siegler – Transcript of April 30, 2019** | | |
| 154 | 129 | Excerpts from 2001 HCDA Operations Manual |
| 46 | 3 | March 1, 2001 Fax from William Watson to Johnny Bonds enclosing lab report dated June 4, 1999 |
| 52 | 6 | April 4, 2001 handwritten letter from Jesse Moreno to Kelly Siegler |
| 70 | 64 | Trial Transcript, Vol. 4, *Herrero v. State,* Cause No. 903122, in the 179th District Court of Harris County, Texas (excerpts) |
| 53 | 10 | April 10, 2001 handwritten letter from Celia Moreno to Kelly Siegler |
| 54 | 11 | Transcript and audio of July 3, 2001 Kelly Siegler/Jesse Moreno interview |
| 55 | 12 | July 5, 2001 HCSO supplemental report discussing Kelly Siegler's July 3, 2001 meeting with Jesse Moreno |
| 57 | 14 | July 5, 2001 Prible Information and Indictment paperwork |
| 56 | 15 | July 5, 2001 Probable Cause Affidavits by Curtis Brown |
| 88 | 169 | NCIC for Nathan Foreman, printed by Johnny Bonds on August 7, 2001 **(Redacted - Filed Under Seal)** |
| 108 | 19 | Tab 9 Work Product, produced by HCDA on May 12, 2017 |
| 60 | 25 | August 29, 2001 Indictment against Jeff Prible |
| 71 | 42 | May 1, 2002 letter from Kelly Siegler to Michael Greene at FCI Bmt, asking that Jesse Moreno, Rafael Dominguez, Nathan Foreman, and Eddie Gomez be separated from Hermilo Herrero |
| 72 | 43 | May 1, 2002 letter from Kelly Siegler to AUSA Todd Clemons regarding Jesse Moreno's cooperation in Hermilo Herrero case |
| 73 | 44 | May 1, 2002 letter from Kelly Siegler to AUSA Tracy Batson regarding Foreman's cooperation in Hermilo Herrero case |
| 125 | 41 | Undated handwritten letter from Jesse Moreno to Kelly Siegler telling her what to say to AUSA Todd Clemons |

| Ev. Hrg. Transcript Ex. No. | Petitioner's Exhibit List No. | Description |
|---|---|---|
| 123 | 48 | Fact Witness Voucher for Kelly Siegler in *U.S. v. Jesse Moreno*, Case No. 96-20037-005, in the U.S. District Court for the Western District of Louisiana, Lafayette Division, dated August 22, 2002 |
| 112 | 37 | May 22, 2002 letter from Jesse ("Oscar") and Felix Gonzalez to Kelly Siegler |
| 113 | 36 | Undated letter from Carl Walker to Kelly Siegler |
| 114 | 35 | April 30, 2002 letter from Mark Martinez to Kelly Siegler plus telephone memo from Mark Martinez to Kelly Siegler dated 3/7/[02]? |
| 176 | 125 | March 22, 2016 Affidavit of Kelly Siegler in Hermilo Herrero writ case, *Ex Parte Herrero*, Cause No. 903122-C, in the 179th District Court of Harris County, Texas |
| 87 | 142 | NCIC for Jonathan Jefferson, printed by Johnny Bonds on December 6, 2001 (**Redacted**) |
| 86 | 103 | JIMS and NCIC for James Martin, printed by P. Klim on April 30, 1999 (**Redacted - Filed Under Seal**) |
| 106 | 166 | Kelly Siegler's notes on criminal history report of James Martin (**Redacted**) |
| 43 | 165 | Statement of Jamie Lyons (**Redacted**) |
| 162 | 168 | Informant agreement between HCDA and Vincent Flores dated July 23, 1996 |
| 170 | 56 | Trufone records and phone list – Michael Beckcom (**Filed Under Seal**) |
| 171 | 21 | Trufone Records and phone lists – Nathan Foreman (**Filed Under Seal**) |
| 152 | 22 | Telephone memos to Kelly Siegler from informants, Jesse Moreno, and Alan Percely |
| 111 | 23 | November 12, 2001 Letter from Alan Percely to Kelly Siegler regarding Nathan Foreman |
| 77 | 27 | November 20, 2001 Fax from Johnny Bonds to Lt. Robert Clark at FCI Medium requesting Foreman visit |
| 78 | 28 | November 26, 2001 Fax from Bonds to Lt. Clark requesting Michael Beckcom visit right after Nathan Foreman |
| 109-7 | 30 | December 10, 2001 handwritten statement by Michael Beckcom |
| 181 | 33 | March 4, 2002 letter from AUSA Mark Cullers to Kelly Siegler |
| 126 | 34 | March 5, 2002 letter from AUSA Mark Cullers to Kelly Siegler |

| Ev. Hrg. Transcript Ex. No. | Petitioner's Exhibit List No. | Description |
|---|---|---|
| | | enclosing Texas Rangers report on Nick Brueggen murder |
| 127 | 95 | Undated letter from Michael Beckcom to Kelly Siegler regarding Anton Davi |
| 81 | 96 | May 1, 2002 letter from HCDA to Lt. Clark requesting visit between Kelly Siegler/Johnny Bonds and Michael Beckcom/Anton Davi |
| 129 | 97 | October 29, 2002 Letter from Kelly Siegler to AUSA Mark Cullers regarding Michael Beckcom's cooperation |
| 130 | 30 | October 30, 2002 handwritten thankyou note from Michael Beckcom to Kelly Siegler |
| 131 | 98 | November 4, 2002 letter from AUSA Mark Cullers to Kelly Siegler saying they could not confer a benefit on Michael Beckcom |
| 133 | 127 | Transcript of voicemail left by AUSA Mark Cullers to Kelly Siegler on November 12, 2002 |
| 135 | 102 | November 15, 2002 fax from Kelly Siegler to Mark Cullers enclosing email with Michael Beckcom's attorney contact information |
| 170 | 56 | Trufone records and phone list – Michael Beckcom **(Filed Under Seal)** |
| 137 | 157 | Michael Beckcom's Application for Parole **(Redacted)** |
| 186 | 156 | Michael Beckcom's Pre-Sentence Investigative Report |
| 116 | 109 | *Motion and Request for Production of Evidence Favorable to the Accused,* filed in *State v. Prible,* Cause No. 921126, in the 351st District Court of Harris County, Texas, with Kelly Siegler's handwritten notes |
| 145 | 112 | *Texas v. Bible* documents (Indictment dated 3/29/01; Harris County District Clerk's summary of case; Harris County District Clerk's Parties List, identifying "Michael Beckmon" as a "Previous Bench Warrant for the Prosecution") |
| 154 | 129 | Excerpts from 2001 HCDA Operations Manual |
| 110 | 167 | HCDA Privilege log in *Prible v. Davis,* dated September 21, 2016 |
| 195 | 16 | Siegler's Opening Statement in *Texas v. Prible* |

Dated:  June 24, 2019

Respectfully Submitted,

**SCARDINO LLP**

By: */s/  Gretchen N. Scardino*
Gretchen N. Scardino
State Bar No. 24037170
401 Congress Ave., Suite 1540
Austin, Texas 78701
Telephone:  (512) 443-1667
Facsimile:  (512) 487-7606
Gretchen@scardinollp.com

Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
HILDER & ASSOCIATES, P.C.
819 Lovett Boulevard
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112

**ATTORNEYS FOR PETITIONER**

<u>**CERTIFICATE OF SERVICE**</u>

On June 24, 2019, a copy of the foregoing was served upon Respondent by email.

*/s/ Gretchen N. Scardino*
Gretchen N. Scardino