United States District Court
Southern District of Texas
**ENTERED**
May 20, 2020
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RONALD JEFFERY PRIBLE, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | H-09-CV-1896 |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

In 2002, a Texas jury convicted Ronald Jeffery Prible of capital murder.  He was sentenced to death.  After unsuccessfully seeking state appellate and post-conviction remedies, Prible filed a federal petition for a writ of habeas corpus in 2009.  Now before the Court is Prible's Fourth Amended Petition for Writ of Habeas Corpus.  The matters raised by Prible's petition have required significant factual development, extensive briefing, and serious judicial consideration.  For the reasons described below, the Court finds that Prible is entitled to federal habeas corpus relief.

**I.     BACKGROUND**

**A.     The Murders, The Investigation, and Prible's Arrest**

At around 6:00 a.m. on April 24, 1999, a neighbor saw smoke pouring from Esteban "Steve" Herrera's house.  Authorities found Herrera lying in the middle of the garage in a pool of blood.  Four bodies were found inside the smoky house.  Herrera's girlfriend Nilda Tirado lay face-down on a couch inside, naked from the waist down.  Three children were found dead in the bedrooms.

A forensic investigation revealed that the assailant had used an accelerant to create a flashfire that self-extinguished, but not before suffocating the sleeping children.  Both Tirado and

1

Herrera had died from a single gunshot to the back of the head.  Both adults had died before the fire started.

Prible, a friend of Herrera and Tirado, was quickly identified as a suspect.  The police investigation established that Prible had spent the evening with Herrera.  Herrera's brother-in-law had accompanied Prible and Herrera to a club until around 2:00 a.m. on the morning of the murders.  They returned to the Herrera home.  Herrera and Prible were in the garage playing pool when the brother-in-law left.

Scientific evidence confirmed that Prible had been present in the Herrera home.  A forensic examination uncovered sperm cells from oral, vaginal, and anal swabs taken from Tirado's corpse.  Herrera's DNA matched the anal and vaginal swabs.  DNA testing identified Prible as the source of the semen found on the oral swab.

The police questioned Prible, but he disclaimed any involvement in the murder.  Prible admitted that he had been in the Herrera home after returning from the club, but said that Herrera drove him home at around 4:00 a.m.  When the police asked what he would do if they found his DNA at the scene, he added that he had been having an affair with Tirado and had engaged in consensual oral sex with her.

Police searched the home of Prible's parents, where Prible also resided. The search uncovered guns and ammunition.  A firearms examiner later testified at trial that a magazine found at Prible's residence could hold bullets similar to those found at the crime scene.  But the murder weapon was never recovered.  Investigators could not find blood stains, accelerant, or any forensic evidence on Prible or his clothing.

In addition, Prible had an alibi.  A teenage neighbor saw Herrera drop Prible off at his parents' home in the early morning hours.

Prible's DNA alone was not enough to pursue prosecution. Prible was not arrested, let alone indicted, in connection with the murders for two years. The case went cold.

In early 2001, Harris County Assistant District Attorney Kelly Siegler was asked to review the cold case. By that point, no new information had been developed that would come out at trial. The State, nonetheless, charged Prible with capital murder on July 5, 2001.

At that time, Prible was housed in the federal prison FCI Beaumont Low for a federal bank robbery conviction.[1]  Rather than be transferred to Harris County custody for the state capital murder charges, however, on the day Prible was charged he was transferred to FCI Beaumont Medium. That same day, Nathan Foreman was also transferred to FCI Beaumont Medium and eventually became cellmates with Michael Beckcom. Beckcom would later testify at trial that Prible had confessed the murders in detail to him and Foreman.

Siegler presented Prible's case to the grand jury on August 29, 2001, without calling any witnesses. The grand jury returned an indictment. The State of Texas tried Prible for capital murder in 2002. The State's case against Prible was not strong. As summarized on direct appeal, the State's case rested on six main facts:

> The State presented evidence that: 1) [Prible] was the last person seen with Steve at the house prior to the murders; 2) he had a motive to kill Steve; 3) the bullets that killed Nilda and Steve were fired from the same weapon; 4) [Prible's] sperm was deposited in Nilda's mouth at some point prior to her death; 5) a fire was set to destroy physical evidence, including evidence of [Prible's] DNA; and 6) [Prible] admitted to Beckcom that he committed the murders.

*Prible v. State*, 175 S.W.3d 724, 730 (Tex. Crim. App. 2005).

---

[1] In June 1999, Prible pled guilty to bank robbery in violation of Title 18 U.S.C. § 2113(a). *United States v. Prible*, No. 4:99-cr-348-1 (S.D. Tex. June 17, 1999) (Doc. No. 6). Prible was sentenced in federal court in September 1999. *Id.* (Doc. No. 13).

Most of this evidence, however, does not explicitly inculpate Prible in the murders.  At issue in the instant proceedings are the two factors that the State argued directly incriminated Prible: the State's use of inmate testimony and the DNA evidence.

### B.    The State's Use of Inmate Testimony Against Prible

The star witness for the State was Michael Beckcom, a "jailhouse snitch" who was housed with Prible at FCI Beaumont Medium.  Beckcom's key inculpatory testimony was that Prible confessed to him and his cellmate, Nathan Foreman, on November 24, 2001.  Before trial, the trial court held a conference devoted largely to discussing the State's interaction with its anticipated witness Beckcom.  Trial counsel requested that the State provide (1) information about Beckcom's criminal record and any sentence reductions he had received; (2) information about "the date, time, place, and manner of the State's contacts with [Beckcom], including a statement of how the contact was first issued and with whom it was made"; (3) information about any other cases in which he had provided testimony; (4) a copy of Beckcom's statement to prosecutors and any notes related to conversations between Beckcom and prosecutors; and (5) a copy of any agreement about what Beckcom would receive for his testimony.  2 RR 4, 6, 8.[2]  The trial court ordered the release of the first category of information, Beckcom's prior history of testifying, and information about any deals with the prosecution.

The prosecution balked at providing information about its contacts with Beckcom.  Siegler stated:

> I'll agree to tell Mr. Gaiser how we came into contact and the times that we've met. I don't remember the dates.  I didn't take any notes.  And the best that I can remember, I'll let him know what they are, but I'm not going to write it all down. He can come to my office and I'll sit down and tell him what I can remember.

---

[2] The Court will refer to the Reporter's Record from Defendant's Appeal from the 351st District Court of Harris County, Texas, No. 75587, as _ RR _.

*Id.* at 5–6.  The trial court granted the second request "as to Siegler's oral transmission of the information to Mr. Gaiser as described on the record."  *Id.* at 6.  The prosecution provided the defense a summary of Beckcom's statement, but the trial court agreed that any notes constituted attorney work product.  *Id.* at 7.  The prosecution also agreed to tell the defense about any disciplinary violations Beckcom may have committed.  *Id.* at 24.

The prosecution also provided some information about any deals it made with Beckcom in exchange for testifying.  At the hearing, Siegler stated:

> [I]n exchange for his cooperation and truthful testimony, when this trial is completely over with and resolved I will notify his Assistant United States Attorney [whose] name is Mark Cullers, in Fresno, California, that [Beckcom] cooperated in this case, what the level of his cooperation was, the extent of his cooperation, and whether or not I believe that it was truthful.  At that time it will be Mark Cullers' decision as to whether or not to file a [Federal Rules of Criminal Procedure] Rule 35 reduction.  Even if he files that Rule 35 reduction, it will be his superior's decision whether or not to proceed with it.  And even if they decide to proceed with it, it will be his Federal Judge in California's decision whether or not to give him any kind of reduction in his sentence.

*Id.* at 29.  In that same pre-trial conference, the parties discussed the admission of any written and oral statements the prosecution intended to use.  The prosecution had already given the defense all written statements.  *Id.* at 27.  Siegler told the defense that Prible "made comments and statements to other people in the Beaumont prison" but she already "gave [the defense] their names."  *Id.*  She told the defense that Beckcom was the only federal inmate the prosecution would use at trial.  *Id.* at 28.

The State's opening statement at trial discussed extensively Beckcom's proposed testimony.  The State bluntly told jurors that Beckcom is a "vial [sic], disgusting man himself.  Who is himself an ex-con several times over.  Who is himself convicted of murder on a case that was at one time a capital murder. . . .  You're not going to like him.  He's going to make you sick to your stomach."  21 RR 79.  The State then informed the jury that Beckcom hoped for, but was

5

not guaranteed, a benefit from his testimony.  *Id.* at 79–81.  The State's emphasis on Beckcom foretold his importance to their case because only Beckcom would "tell you all of the details of everything that Jeff Prible told him about how he did it that night, including the fact that he was proud of the fact that he killed the whole family." *Id.* at 82.

Beckcom was the State's penultimate witness in its case-in-chief.  After preliminary questions regarding his background, the State asked Beckcom about his extensive criminal history. At the time of trial, Beckcom had been incarcerated in federal prison for five years.  26 RR 9. Beckcom explained that he had previously testified against others in exchange for deals with the government. *Id.* at 12–13.  Beckcom explained the deal he made with the State that resulted in his testimony against Prible: "[I]f I testify truthfully to this Court that you will reciprocate by calling my Federal prosecutor.  At that point it's out of your hands, but just to let him know what I've done." *Id.* at 14.  Otherwise, testified Beckcom, the State made him no other promises. *Id.* at 17. Beckcom testified that he could not return to FCI Beaumont because other inmates knew about his testimony against Prible. *Id.* at 19–20.  He had, in fact, already been put into protective custody. *Id.* at 21.

When asked when he had heard about Siegler, Beckcom responded: "I didn't learn about your name until . . . probably the end of September, early October of 2001." *Id.* at 22.  Beckcom testified that "[p]rior to that I had heard of the case just briefly, something about a guy coming from the [FCI Beaumont] Low charged with murder.  I didn't really get too much information on it." *Id.*  Beckcom testified that he got Siegler's name from Nathan Foreman who "lived in [his] unit at the prison and then ultimately became [his] cellmate." *Id.* at 23.  When he learned about Siegler, Beckcom stated, he did "[n]othing immediately," but eventually called her in "the first half of October 2001." *Id.* at 23, 24.  He told her that he "had information regarding this case

6

involving a murder." *Id.* at 24.  Siegler visited him in "either late November or early December."

*Id.*  Siegler brought investigator Johnny Bonds with her.  *Id.* at 24–25.  Beckcom thought Siegler

was "probably a little skeptical of another inmate maybe spinning a yarn to [her]."  *Id.* at 25.

Beckcom gave her a letter dated December 10, 2001, detailing his knowledge of the crime.  *Id.*

Beckcom testified that he had "spoken" with Siegler on the phone "two or three times" and that

the phone calls were mostly about her recommending a sentence reduction.  *Id.* at 26–27.

In his direct testimony, Beckcom testified as follows regarding his interactions and

conversations with Prible:

Beckcom and Prible met in the recreation yard through a shared acquaintance.  *Id.* at 28–

29.  Prible began exercising with the two men, but did not engage Beckcom in conversation for

"weeks or maybe a month."  *Id.* at 31.  Initially, they engaged in "general conversation" mostly

about people they both knew.  *Id.* at 32.  Beckcom had previously "heard bits and pieces of

information when [Prible] got there," but he "still really didn't know who he was."  *Id.*  Eventually,

Beckcom asked Prible about the capital charges.  *Id.*  The two men initially had general

conversations about the capital prosecution, but Prible disclaimed any involvement in the crime.

*Id.* at 33–34.  Beckcom claimed that he "wasn't paying a lot of attention" to Prible's statements

about his case, "because it's not something [he] care[d] to relive, [his] capital murder case."  *Id.* at

34.

In "bits and pieces of conversations," Prible began to provide Beckcom with details about

the crime.  *Id.* at 33.  Details came out in "[s]everal conversations" over "weeks if not a month."

*Id.* at 37.  In the beginning, when Prible "was still struggling with actually confiding a lot," he told

Beckcom: "'I'm not a sane man'. . . .  'Your deepest, darkest reaches of your worst nightmares

don't come close to me, don't come close to what I am capable of.'" *Id.* at 42. Prible also implied that he would murder for hire. *Id.* at 42–43.

At first, Beckcom "was getting information . . . with no intention of even using it. I was actually curious, trying to find out what the situation looked like." *Id.* at 37. Prible told Beckcom that "they got DNA on [Tirado]," but "everybody knew [he] was having an affair with her," because she and Herrera "had some kind of open relationship." *Id.* at 33–34. Prible also said that the police "were looking for a .38 caliber pistol that they knew he had had, but he had sold it." *Id.* at 34. At any rate, "[i]t was clean. That wasn't the [murder] weapon." *Id.* Still, Prible described Herrera as "his best friend." *Id.* at 39.

Beckcom "at one point . . . actually became interested in" contacting Siegler so he "began prodding [Prible] into conversations at times." *Id.* at 36. When Beckcom asked Prible if he was "sure [the murder weapon] can't be found," Prible answered, "asphalt's good some times for hiding things." *Id.*

Eventually, Beckcom contacted Siegler. From her, Beckcom learned that he would have to know "[s]pecifics about the case, facts," so he "sought to find out as much as [he] could." *Id.* at 37.

After speaking with Siegler for the first time, Beckcom told Prible that he did not care whether Prible had committed the murders, and Prible "softened up a bit" and gave Beckcom more details. *Id.* at 47–48. Prible described how "Steve was shot in the pool room. Nilda was face down on the couch, shot in the back of the head, she was partially clothed." *Id.* at 48. Prible said the children died from smoke inhalation. *Id.* at 49. Prible "gave [Beckcom] the impression" that he had sex with the victim "in the bathroom" on the night of the murder. *Id.* at 44. At the time, Herrera was "[i]n the pool room, in the garage." *Id.* at 45. Prible told Beckcom that he had "a

8

witness that saw [Herrera] take me home that night." *Id.* at 40.   "[A] child of maybe 12 or 13 years

. . . had gotten up in the middle of the night to use the restroom and saw him through the window

with [Herrera] out in front of his parents' home." *Id.* at 41.

Prible increasingly gained confidence in Beckcom and Foreman.   Beckcom said: "He

became close to Foreman and I.   He called us his brothers and said he loved us . . . .   [A]t one point

he told us he's told us things that only he and God knows." *Id.* at 49.   The two men expressed

interest in forming a business with Prible after their incarceration.   Beckcom specifically testified

that "Foreman was interested.   Foreman was interested in investing in the business so we were

actually making plans on something to do when we got out." *Id.* at 35.

The last, and most important, conversation was on November 24, 2001. *Id.* at 53.   That

day, Beckcom, Foreman, and Prible took a photograph together with their parents. *Id.* at 56.   Later

that night, Prible "really poured it all out." *Id.* at 53.   Prible had "finally gotten used to us and

relaxed.   He felt like, you know, we were going to help him out. We told him we would give him

any help we could. We planned on doing business." *Id.*   Beckcom described the circumstances

under which Prible finally described the murders:

> We were sitting out in the rec yard that particular evening.   It was getting dark, we
> were sitting under—we had these little pavilions out on the rec yard with tables
> underneath where you can play cards and dominoes.
>
> And [Prible] was just sitting there and he got pretty quite [sic] for a while and I
> could tell he was thinking about some things.   So, he pulled Foreman and I aside
> and that's when he gave me the information . . . .
>
> He said, "You know, Steve screwed me.   He screwed me out of $250,000.00.   That
> was my money."   And then he gave me the story about, you know, they were
> planning to buy some drugs. . . .
>
> Well, [Prible] was very agitated especially when he got to the part, "Well, he was
> going to steal my money and he's going to kill me, fuck him."   And he was literally
> spitting on us.   He was pretty agitated.   I could tell he was thinking back to the
> scene like he was thinking back to the actual event.

9

*Id.* at 53–54.  Prible said that Herrera "was going to kill [him], so [he] handled [his] business." *Id.* at 51.  Prible described how, while they were arguing, he shot Herrera, then when Tirado ran into the house to call the police, Prible shot her.  *Id.* Prible looked for the stolen money, but could not find it.  *Id.* at 52.  Prible lit a fire to cover evidence, but "it didn't take." *Id.* at 51–52.

Beckcom asked Prible: "How the hell did you get in and out of this house without being seen?"  Prible responded: "Anybody that can go in a house and take out a whole family and get out without being seen is a bad mother fucker and I'm that mother fucker." *Id.* at 52–53.  Referring to his military service, Prible "said that his parents lived a couple of miles from there so it wasn't far.  And he said it was a high intensive, low drag maneuver.  That's what I was trained for, in and out.  I'm a ghost." *Id.* at 55.

Beckcom's direct testimony ended with a confirmation of Prible's confidence in his prison friends.  Prible said: "You know, I trust you guys.  You're my brothers.  You're the only ones that could convict me, but basically he had made his peace.  He said, If you do that you'll have to live with it.  I'm prepared to die." *Id.* at 54–55.

In cross-examination, trial counsel reviewed Beckcom's extensive criminal history, including prior times he had assisted the Government to get a lesser sentence.  *Id.* at 64–69, 77–80.  Beckcom admitted: "Oh, I've told lies in the past," but assured that he was now "just telling. . . what [Prible] told me." *Id.* at 62.  Beckcom admitted that he had lied under oath before.  *Id.* at 91.

When trial counsel questioned why Prible would trust Beckcom and confess after only a few months, Beckcom said: "[O]ne of the first things I told him is you shouldn't be talking about a case that's pending." *Id.* at 70–71.  Beckcom admitted that there were similarities between Prible's crime and a capital murder charge which Beckcom had faced, leaving Beckcom with the

10

impression that Prible "seemed to want to try to understand how they were going to approach him, how long this thing might play out how, how long he might be in jail. And I told him mine took, you know, a year." *Id.* at 72. Beckcom admitted that he made notes about Prible's story. *Id.* at 75.

Trial counsel also asked Beckcom about the written statement that he provided to Siegler after Prible's alleged confession in order to impeach his credibility:

| | |
|---|---|
| Trial counsel: | And you knew at that point in time, from the time you wrote this statement from a previous conversation you had with Ms. Siegler that what she wanted was details, right? |
| Beckcom: | I pretty much had them all by that time. |
| Trial Counsel: | But you knew—well, he had left by that time, but you knew what you needed to make this story come to life, right? |
| Beckcom: | I didn't necessarily know what I needed. I just gave her what he gave me. |
| Trial Counsel: | So, you had to put the details, specific details of the murder itself so that— |
| Beckcom: | So that she would believe me, sure. |

*Id.* at 84. Beckcom stated that he had not seen or heard anything from any person or media about Prible's case, except for Prible's own statements. *Id.* at 85 ("Q: [N]obody talked to you about the case, you didn't know anything about it . . . all the knowledge you acquired, you acquired from Jeff Prible? A: Yes."). Beckcom said that he received Siegler's name from Foreman, and that he understood that Foreman had provided other informants to Siegler. *Id.* at 82. He also confirmed that he and Foreman knew that they were planning to provide Siegler with information about Prible when they took the photo together the day of Prible's confession to corroborate that they knew him. *Id.* at 83. Beckcom clarified that, while Prible told them about his case "[i]n bits and pieces" over two months, he "pretty much had [all the details] by" the time he talked to Siegler. *Id.* at 84.

11

On redirect, Siegler had Beckcom review numerous details from the crime and affirm that he learned them from Prible.  *Id.* at 92–95.

### C.      Testimony About Prible's DNA

The jury also heard evidence about the DNA found in Tirado's mouth.  The State presented two witnesses. The Chief Harris County Medical Examiner, Dr. Joye Carter, testified that sperm cells can be found in a person's mouth at least several hours after ejaculation, and maybe longer. She testified that "semen is a very sticky substance and some of it could actually adhere or stick to like placque that's on the teeth or in the recesses of the mouth [and] not fully be cleaned out." 23 RR 68.  She also stated that there was "no indication" that Tirado had been sexually assaulted. *Id.* at 128.

William Watson also testified for the State.  At the time of trial, Watson held a master's degree in biology.  He performed DNA testing on the sperm cells found on Tirado. Watson testified that a "microscopic" amount of DNA was collected on the swabs taken from Tirado's mouth.  This DNA was Prible's.  24 RR 118.  In the report that he prepared after the murders, Watson did not try to estimate exactly how long before death the sperm had been deposited in her mouth.  Watson testified that he had never developed a DNA profile from an oral swab and had not seen it in the literature.  *Id.* at 100, 112.  However, Watson stated that the fact that he could develop a profile from the oral swab was "consistent with there being a great deal of sperm present."  *Id.* at 94. Watson testified that the fact that he was able to generate a full and complete male profile from the oral swab was inconsistent with the semen being deposited into Tirado's mouth a long time before she was killed.  He also said that the fact that he was able to obtain the male profile "certainly would be consistent with" Prible depositing the semen in Tirado's mouth "moments, if not seconds, before she was killed."  *Id.* at 101–03.

12

Dr. Robert Benjamin, a molecular biologist, testified for Prible.  Dr. Benjamin said that he did not agree with Watson's testimony because there were too many variables and Watson made too many assumptions.  Dr. Benjamin stated that, if the semen had been deposited in a consensual act, the recipient may not take steps to remove it from the mouth.  27 RR 118–21.  Dr. Benjamin also stated that using quantities of DNA to estimate time since ejaculation is "just not scientifically valid."  *Id.* at 123–24.  He said that "there were no controlled scientific studies" to support Watson's conclusions.  *Id.* at 136.

### D.      Arguments and Conviction

The arguments made by the prosecutors in closing foreshadowed the issues raised in the instant proceedings.  Prosecutor Vic Wisner's closing focused on two factors: Beckcom's testimony and the DNA evidence.  On one hand, Wisner bolstered Beckcom's testimony, urging jurors that "Mike Beckcom is telling the truth."  28 RR 7.  On the other hand, Wisner guaranteed that "[w]e've got enough without him.  Beckcom just kind of fleshes out what happened, fills in some of the details.  We have enough evidence without him, but I suggest to you everything he's telling you about what happened is the truth."  *Id.*  Wisner told jurors that, in order to believe the defense's case, jurors would have to find that "this Defendant is the unluckiest, unluckiest [sic] criminal defendant who's ever set foot in a courtroom.  And there has been a conspiracy to frame this Defendant both in the free world and prison, so audacious it makes any frame up that has ever been conducted in the annals of crime look like child's play."  *Id.* at 9.  In particular, Prible was unlucky "from a practical hands-on perspective," because the semen found in Ms. Tirado's mouth "had to come right before she was killed or after she was killed."  *Id.* at 10.  In fact, "[t]here is no way in the world that that semen wasn't deposited either moments before or seconds after Nilda died."  *Id.* at 11.

13

In their closing argument, the defense tried to bolster their DNA testimony and detract from Beckcom's credibility.

But jurors heard last from Siegler. In an emotionally charged argument, Siegler attempted to dismantle the defense's case. Siegler dismissed the claim that Prible and Tirado had an affair, because "appearance is what leads to affairs" and Prible "is creepy and gives you the creeps." *Id.* at 55. Siegler challenged the defense DNA expert's testimony by being "crude for a minute" and suggesting that it depended on Prible having "some kind of magic semen, magic sperm that somehow lives longer than any of y'alls or any other man's in this whole universe." *Id.* Siegler continued that, to believe the defense, jurors would have to assume that "his semen is so tasty that she walked around savoring the flavor of it in her mouth for a couple hours*." Id.* at 55–56. In crass language, Siegler described Prible as someone so depraved that he could kill Tirado while sexually excited. *Id.* at 59. Siegler summed up her argument: "[I]f Jeff Prible had managed to control his ejaculation and his mouth, he might not have ever been caught." *Id.* at 72.

Siegler's argument eventually turned to Beckcom's testimony, arguing: "Is there any evidence in this trial that Michael Beckcom got any facts about what happened anywhere except out of the mouth of this Defendant?" *Id.* at 75. She also told jurors: "[Y]ou can believe everything Mike Beckcom said and find him guilty of capital murder. You can hate his guts and think he's a creep and believe he's telling the truth and find this Defendant guilty of capital murder or you cannot believe one word he had to say and still find Jeff Prible guilty of capital murder." *Id.* at 77. After addressing problems with Beckcom's credibility, Siegler said:

> But the most important thing, how would Mike Beckcon [sic] know all the things that he does know unless the killer told him? Whose fault is it that Mike Beckcom came to court? It's Jeff Prible's for telling him. And whose fault is it that Mike Beckcom knew all the details? Jeff Prible's for telling him. And how did Mike Beckcom know all the details? Because Jeff Prible did it. That's how he knows all these details.

14

*Id.* at 81.

The jury convicted Prible of capital murder.

**E.     Punishment**

Under Texas law, a jury decides a capital convict's sentence by answering special issue questions.  In this case, the jury had to answer two questions: (1) would Prible be a future threat to society and (2) did mitigating circumstances warrant a life sentence?  The State presented testimony from Prible's former wife, a Harris County Sheriff's deputy, and a former business partner whom Prible threatened.  The State also relied on evidence of Prible's prior bank robberies. The defense presented testimony from a correctional counselor and family members, and evidence about Prible's good character.  The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

**II.     PROCEDURAL BACKGROUND**

**A.     State Litigation**

On direct appeal, Prible claimed that the evidence supporting his capital-murder conviction was insufficient.  Prible emphasized that "Beckcom's testimony was questionable because he testified in the hope of having his own sentence reduced and he could have learned the details of the alleged offense through the probable cause affidavit in [Prible's] possession." *Prible v. State*, 175 S.W.3d 724, 730 (Tex. Crim. App. 2005) (internal quotation marks omitted).  The Texas Court of Criminal Appeals found that,

> Beckcom, however, testified about some details that were not contained in the probable cause affidavit.  For example, he knew that there was a pool table in the garage and [Prible] had drops of catsup on his shoe.  Beckcom's testimony also contradicted or excluded some details that were contained in the probable cause affidavit.  He testified that [Prible] told him that Steve "took $250,000 of [his] hard-earned money," but the amount recited in the probable cause affidavit was $45,000. He knew that the police had DNA evidence and that [Prible] claimed to have had

15

> an affair with Nilda, but he apparently did not know about [Prible's] and Nilda's alleged sexual encounter in the bathroom while Steve was in the garage. The jury was free to take these discrepancies into account and to believe or disbelieve Beckcom's testimony based on their evaluation of his credibility.

*Id*. (alterations in original). The Court of Criminal Appeals concluded that, "[b]ased on the evidence at trial, a rational jury could have concluded beyond a reasonable doubt that [Prible] committed the murders of Nilda Tirado and Steve Herrera during the same criminal transaction." *Id.*

Prible's initial state habeas application, which was filed by state habeas counsel on November 19, 2004, did not raise any issues relating to Beckcom's testimony or mention anything about an alleged ring of informants. Then, while on death row, Prible started to hear about other defendants—including a man named Hermilo Herrero—who had been prosecuted by Siegler using what seemed to be an overlapping set of prison informants. (Doc. No. 17, at 19). Suspecting that something similar had happened in his case, Prible filed two *pro se* applications in 2007, raising *Brady*,[3] *Giglio*,[4] *Massiah*,[5] and *Strickland*[6] issues relating to the use of inmate testimony in his case. In one application, Prible alleged that "the prosecution (Kelly Siegler) hid her true ties to Mike Beckom [sic] and her jailhouse informants in Beaumont Federal Prison" and was "using Beckom [sic] and his group of friends from Federal Prison to aid her in making cases." (Doc. No. 99, at 44 (citing Ex. 24, at 00384)). Prible argued that, had he "been made aware of the ties [Siegler] had to Beckcom and his group of friends who aided Siegler in other cases," he could have used that as impeachment evidence in his case. (*Id.* (citing Ex. 24, at 00386)). In the other

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

[4] *Giglio v. United States*, 405 U.S. 150 (1972).

[5] *Massiah v. United States*, 377 U.S. 201 (1964).

[6] *Strickland v. Washington*, 466 U.S. 668 (1984).

16

application, Prible alleged that his trial counsel was ineffective for not investigating Hermilo Herrero as a potential witness.  (*Id.* at 45 (citing Ex. 25, at 00411–15)).

The Court of Criminal Appeals denied Prible's initial state habeas application and construed the second and third *pro se* pleadings as subsequent applications, found that they did not meet the requirement for merits review because neither application contained "sufficient specific facts establishing that the application meets one of the exceptions set out in in Art. 11.071, § 5," *see* TEX. CODE CRIM. PRO. art. 11.071, § 5, and dismissed them as abusive.  *Ex parte Prible*, Nos. WR-69,328-01, WR-69,328-02, WR-69,328-03, 2008 WL 2487786, at *1 (Tex. Crim. App. June 18, 2008).

### B.    Initial Stages of Federal Litigation

Prible timely filed his original federal habeas petition on June 18, 2009.  (Doc. No. 1).  The petition raised numerous claims, four of which related to the State's development and use of inmate testimony for trial:

- The State intentionally sponsored false and misleading testimony in violation of Prible's due process rights, as established in *Giglio v. United States*, 405 U.S. 150 (1972).

- The State violated Prible's due process rights by suppressing evidence of the nature of the arrangement between Beckcom, Foreman, and the lead prosecutor, contrary to *Brady v. Maryland*, 373 U.S. 83 (1963).

- The State violated Prible's rights under the Sixth Amendment and *Massiah v. United States*, 377 U.S. 201 (1964), by employing Beckcom as a state agent.

- Trial and habeas counsel provided ineffective representation under *Strickland v. Washington*, 466 U.S. 668 (1984), for not raising a *Massiah* objection.

17

(Doc. No. 1).  Unlike some of Prible's other claims,[7] the above four claims had not been properly exhausted in state court.

Prible filed an amended petition on August 17, 2009.  (Doc. No. 7).  Respondent then moved for summary judgment.  (Doc. No. 12).  On April 30, 2010, the Court denied the summary judgment motion without prejudice and stayed this action to allow Prible to seek state court review of his unexhausted claims.  (Doc. No. 23, at 3).  This Court's stay order noted that "Prible secured the affidavits supporting his unexhausted claims after state habeas review had concluded," raising the possibility that the state court might allow Prible to file a successive state habeas action.  (*Id.*).

### C.    Successive State Proceedings

On September 8, 2010, Prible filed a successive application for habeas relief in the 351st District Court of Harris County, raising the following claims:

- Whether "[t]he State violated Prible's rights guaranteed by the Sixth Amendment" and *Massiah*;

- Whether "[t]he State intentionally sponsored false and misleading testimony in violation of Prible's due process rights," as established in *Giglio*;

- Whether "[t]he State violated due process by concealing the nature of the arrangement between Beckcom, Foreman and the lead prosecutor," contrary to *Brady*;

- Whether "[i]n violation of due process, the State permitted its key witness to mislead the jury about the existence and extent of the benefits he expected to receive for testifying against Prible," contrary to *Giglio*; and

- Whether "Prible is actually innocent of capital murder." U.S. Const. amends.  VIII, XIV.

---

[7] Prible's original petition also included claims of improper admission of testimony about the children's deaths, ineffective representation in the handling of DNA evidence, violation of his right to a jury composed of a fair cross-section of society, withholding of information by the prosecution from the defense, and actual innocence.

### 1.      Factual Basis of Prible's Successive State Litigation

The above five claims were based on allegations that Beckcom and Foreman were part of a ring of informants at FCI Beaumont whom Prosecutor Kelly Siegler had recruited and fed information to assist her in securing a conviction against Prible.  The allegations relied heavily on an August 26, 2010, interview that Prible's federal habeas counsel had with a federal inmate, Carl Walker, Jr.  Federal counsel did not secure an affidavit memorializing Walker's story, but prepared a transcription of the interview.  (Doc. No. 99, Ex. 2).

In the interview, Walker described how informants were "recruited" at FCI Beaumont Medium to testify in particular cases, including Prible's.  (*Id*. at 4).  Walker recounted that, not long after he arrived at FCI Beaumont in the summer of 2000, Beckcom and Foreman approached him in an attempt to bring him into the informant circle.  Walker assumed that "the prosecutor was working directly with Foreman," but he was not sure whether Foreman or Beckcom "had more direct control or direct communication with the prosecutor."  (*Id*. at 9, 29).

According to Walker, Beckcom and Foreman knew from Siegler that Prible was coming to FCI Beaumont even before Prible arrived.  (*Id*. at 9).  Walker described how Beckcom and Foreman "s[at] me down, they t[old] me these various events and supposedly details of [Prible's] case and whose [sic] who, and what's what."  (*Id*. at 11).  Beckcom and Foreman then gave Siegler's number to Walker and directed Walker to call Siegler so that she could assess whether Walker was "a candidate" to testify against Prible.  (*Id*. at 13).  Walker said he called Siegler "[o]nce or twice."  (*Id*.).  The other men were "always on the phone" with Siegler.  (*Id.* at 23).  Foreman was "on the phone almost on a daily basis" regarding the case.  (*Id.* at 28).  Walker also said that the recruiters directed him to "write a letter" to be sent to Siegler describing "details about [Prible's] case" that Beckcom and Foreman had told him.  (*Id*. at 13).  Walker claimed that

"common sense" told him that "someone high on the food chain was feeding these guys the information because [Prible] wasn't telling" Walker facts about the crime. (*Id*. at 14, 15). "[T]he whole plot was made out before it was actually executed." (*Id*. at 14).

The understanding was always that informants would be rewarded with "time off, or benefits." (*Id*. at 16). Overall, Walker described a ring of "five or six" informants who were trying to incriminate inmates like Prible. (*Id*. at 22). That same ring, Walker explained, was simultaneously involved in setting up another inmate, Hermilo Herrera, for another cold case murder. (*Id*. at 21–22). According to Walker, "this is how you have [the] miraculous coincidence that the same group of guys . . . have been confessed to by two different people on two different murders, totally different murders." (*Id*. at 21). Walker further described how the informants associated with Prible, including Beckcom and Foreman, got Prible drunk and high, and took group pictures with him to create at least the appearance of a bond with Prible. The men's role was to "get . . . information, then bank it, bank it." (*Id*. at 20).

To Walker's knowledge, however, Prible never actually confessed. (*Id*. at 16). Walker did not think that Prible had committed the murders. (*Id*. at 18). Ultimately, Walker did not testify against Prible. He said he came to a "moral . . . crossroad" when he asked himself: "[Am I] going to openly lie about information I had no idea about and send this man to his death?" (*Id*. at 30). He added: "I just know these guys is guilty of conspiring against him and working to recruit me and others or whomever that would listen to, actually, ah, get him on death row. I know that for a fact. I do know for a fact that Kelly Siegler was involved." (*Id.* at 49).

## 2. Litigation of Prible's Successive State Application

After Prible filed his successive habeas application in the trial court on September 8, 2010, the trial court forwarded his application to the Texas Court of Criminal Appeals. Under article

11.071 § 5(a) of the Texas Code of Criminal Procedure, a Texas inmate may file a successive state application only in limited circumstances, including when "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application . . . ." The Court of Criminal Appeals remanded Prible's application for the convicting court to determine "whether the factual basis for these claims was unavailable on the dates that applicant filed his previous applications." *Ex parte Prible*, No. WR-69,328-04, 2010 WL 5185846, at *1 (Tex. Crim. App. Dec. 15, 2010). The Court of Criminal Appeals ordered that Prible "shall have the opportunity to show when and how he obtained the evidence at issue and whether he exercised reasonable diligence to obtain this evidence at the earliest opportunity." *Id.*

In January 2011, Prible moved for *in camera* review of the prosecutor's file.[8] The State did not oppose the motion and voluntarily provided some material for review. The State disclosed three letters that prosecutors had sealed in a letter-sized envelope that was designated "attorney work product."[9] The letters from federal inmates Jesse Gonzalez, Mark A. Martinez, and Walker each described how Prible provided details of the crime while in prison. (Doc. No. 99, Ex. 3). Each explained that Prible told them varying details about the killing. The men referred to prior conversations with Siegler and her interaction with all three. Walker's letter named Beckcom and Foreman, hinted at Siegler's "previous conversations" with them, described how Walker was

---

[8] During the pendency of the state habeas proceedings, this Court also authorized discovery of Bureau of Prisons telephone records which showed repeated phone calls between Beckcom and Siegler before trial. *Prible v. Quarterman*, No. 4:08-mc-316, Doc. 18 (S.D. Tex. 2018).

[9] The letters are not dated. Two envelopes with the letters were dated in April and May 2002, a few months before trial and a few months after Prible left federal custody.

"present on many occasions when [Prible] was telling his side of the story," and ended: "I'm more than willing to testify to these things in court. I'm currently serving a thirty year sentence for Possession w/Intent to Distribute. I will help you in any way I can and would appreciate any help you could give me." (*Id.* at 10).

The state trial level habeas court held an evidentiary hearing on June 8 and 9, 2011, to determine whether the factual basis for Prible's conspiracy and prosecutorial misconduct claims was unavailable when Prible filed his previous state habeas applications. At this hearing, the court heard testimony from an investigator who worked with Prible's trial counsel; an investigator who worked with defense attorneys who represented inmate Hermilio Herrero, a defendant in an unrelated case involving the same alleged ring of informants; Roland B. Moore, III, Prible's initial state habeas counsel; and Kurt Wentz, one of Prible's trial attorneys.

State habeas counsel Moore provided an affidavit in state habeas court explaining what efforts he made to develop evidence outside the trial record to contest the legality of Prible's capital conviction and sentence, including information regarding the ring of informants. Successive State Habeas Record at 411–16.[10] In his affidavit, Moore stated that, during the period of time that he represented Prible, he "suspected that Beckcom had perjured himself" and "that [Beckcom's] cellmate Nathan Foreman was involved with Mr. Beckcom in a scheme to give false testimony." *Id.* 412. Moore accordingly took "extraordinary measures to contact [Foreman, who was] the one person who had been identified as a possible member of such a ring or organization." *Id.* Trial counsel "had no leads to any other members of a ring or organization of informants" at the time of

---

[10] The Court will refer to the Record from Defendant's application for writ of habeas corpus in the 351st District Court of Harris County, Texas, No. 921126-B, as "Successive State Habeas Record at _."

trial. *Id*. Among those measures, state habeas counsel "subpoenaed Foreman and attached him to another case." *Id*. at 413. But Foreman "refused to say anything. Foreman refused to talk after he realized what [trial counsel] wanted to speak to him about." *Id*.

On June 24, 2011, the state habeas court issued its "Findings of Fact Pursuant to Tex. Code Crim. App. Art. 11.071, Sec. 5(a)(1)." *Id*. at 797–804. As the title suggests, the court did not rule on the substance of Prible's claims, but found, as a procedural matter, that Texas's abuse-of-the-writ doctrine foreclosed review. The court specifically found that "the factual basis for the instant claims were available when [Prible's] initial habeas petition was filed in November, 2004" and that "a factual basis for [Prible's] conspiracy theory may have been available at the time of [his] trial." *Id*. at 801, 803.

The state court's procedural determination was, nonetheless, intertwined with its assessment of the evidence Prible had provided for his claims. The court summarized that Prible "raise[d] five claims alleging a conspiracy among the lead prosecutor in his case and several federal prison inmates who were housed with [Prible] at FCI Beaumont." *Id*. at 798. The court's findings acknowledged Prible's allegations that Siegler had fed "otherwise-unknown details about [Prible's] case" to Foreman, who in turn "provided information with a ring of snitches he recruited to assist the lead prosecutor in obtaining a false confession from [Prible]," rendering Beckcom a "state agent" and his trial testimony "perjured." *Id*. at 799. The state court concluded that Prible's allegations were largely based on Walker's interview statement. *Id*. The state court, however, found Walker's statement not persuasive because it "consist[ed] almost entirely of hearsay and speculation and contain[ed] no direct evidence of [Prible's] conspiracy theory." *Id*. The state court further concluded that Prible "present[ed] no evidence establishing that State's witness Michael Beckcom has recanted his testimony regarding [Prible's] confession that he committed

23

the capital murder," and, in fact, Beckcom "denies [Prible's] claim that he was provided with information about [Prible's] case from Nathan Foreman or the lead prosecutor." *Id.* at 800.  In the end, the court concluded that Prible was not entitled to successive habeas proceedings because he failed to show that "the factual basis for his claims was unavailable on the dates that [Prible] filed his three previous applications, as required by TEX. CODE CRIM. PRO. art. 11.071 § 5(a)(1)." *Id.* at 803.

In reaching its conclusion, however, the state habeas court did not consider the new supporting and corroborating evidence developed during state habeas review.  For instance, the state court did not discuss the impact of the letters suppressed in Siegler's work product file. Instead, the decision focused on the facts presented in the state habeas application filed before factual development occurred, centering its analysis on Walker's statement.  Based on this circumscribed analysis, the habeas court found that "the factual basis for the instant claims were available when [Prible's] initial habeas petition was filed in November, 2004." *Id.* at 801.

Without explicitly adopting the lower court's findings, the Court of Criminal Appeals held that "the allegations fail[ed] to satisfy the requirements of Article 11.071, § 5(a)" and dismissed Prible's successive application as an abuse of the writ.  *Ex parte Prible*, No. WR-69,328-04, 2011 WL 5221864, at *1 (Tex. Crim. App. Nov. 2, 2011).

### D.    Prible's Fourth Amended Federal Petition

Prible returned to this Court and requested additional discovery to develop his claims.  This Court granted additional discovery, including allowing Prible to access additional portions of Siegler's work product file.  (Doc. No. 134).  Federal habeas counsel also conducted various authorized interviews and depositions of the prosecution team, FCI Beaumont informants, and Bureau of Prisons personnel throughout 2017.

24

On March 26, 2018, Prible filed his Fourth Amended Petition for Writ of Habeas Corpus, which is now before the Court.  (Doc. No. 181).  In his Fourth Petition, Prible raised sixteen claims for relief:

Claim 1: The State violated due process by sponsoring false and misleading testimony that minimized the State's contact with key witnesses and communications with, and use of, other informants as state agents, to develop evidence incriminating Prible.  (Doc. No. 181, at 162).

Claim 2: In violation of due process guaranteed under *Brady*, the State suppressed material evidence that Beckcom and Foreman were part of an organized attempt to secure favors in return for fabricating a false confession.  (Doc. No. 181, at 177).

Claim 3: In violation of *Brady* and due process guaranteed by the Fourteenth Amendment, the prosecution suppressed evidence that Foreman, who Beckcom represented could corroborate his story, gave a different account, and was, in fact, fabricating evidence against Prible.  (Doc. No. 181, at 196).

Claim 4: In violation of *Brady*, the State suppressed evidence impeaching Beckcom's testimony regarding the circumstances of the alleged "confession" and his motives for questioning Prible.  (Doc. No. 181, at 199).

Claim 5: The State withheld evidence that the trial court ordered produced pursuant to *Brady*.  (Doc. No. 181, at 203).

Claim 6: The State violated Prible's rights guaranteed by the Sixth Amendment and *Massiah*.  (Doc. No. 181, at 233).

Claim 7: Prible was denied his Sixth Amendment right to effective assistance of counsel.  (Doc. No. 181, at 237).

Claim 8: In violation of *Massiah*, the State suppressed evidence that independently established that it had deployed Beckcom and Foreman as agents to pry incriminating information from Prible, even though the State was aware Prible was represented by counsel.  (Doc. No. 181, at 242).

Claim 9: Prible was deprived of his Fourteenth Amendment right to due process by the admission of evidence documenting the deaths of the complainants' children. (Doc. No. 181, at 244).

Claim 10: In violation of due process under *Brady*, the State suppressed material evidence that Siegler had consulted the head of the Harris County Crime Lab to ask how long semen could remain in the oral cavity and was told it lives up to 72 hours. (Doc. No. 181, at 233).

Claim 11: The State violated due process by sponsoring false and misleading testimony, and engaging in false and misleading argument, concerning the amount of time that semen could persist in the oral cavity, after being advised by the head of the Harris County Crime Lab that it could live up to 72 hours. (Doc. No. 181, at 256).

Claim 12: Prible received ineffective assistance of counsel, as a matter of federal constitutional law, where trial counsel failed to effectively address and rebut the testimony of William Watson that the semen found in Tirado must have been deposited in her mouth near or at the time of her death, where there was no scientific basis for this expert conclusion. (Doc. No. 181, at 258).

Claim 13: Prible was denied his constitutional right to an impartial jury because the venire did not reflect a fair cross-section of the community. (Doc. No. 181, at 269).

Claim 14: Prible is actually innocent of capital murder and may receive relief through the actual innocence gateway under *Schlup v. Delo*, 513 U.S. 298 (1995). (Doc. No. 181, at 276).

Claim 15: In violation of due process, the State sponsored false testimony to bolster its rape/murder theory and to prevent corroboration of Prible's alibi witness. (Doc. No. 181, at 282).

Claim 16: Trial counsel's failure to utilize Prible's phone records and failure to exclude or refute the foundation of the state's rape theory violated Prible's Sixth Amendment right to effective assistance of counsel. (Doc. No. 181, at 266).

Respondent filed a Motion for Summary Judgment and Answer to Petitioner's Fourth Amended Petition. (Doc. No. 191). Prible filed an opposed motion for an evidentiary hearing to further explore his habeas claims on August 8, 2018. (Doc. No. 199). The stated purpose of the hearing was to explore relevant procedural issues, including whether Prible could establish cause and prejudice to overcome the procedural default of his prosecutorial misconduct claims. (*Id.* at 2–3). The Court granted the motion for evidentiary hearing on February 25, 2019. (Minute Entry 2/25/2019).

The Court held an evidentiary hearing in which the parties presented testimony and evidence relating to the claims involving the prosecution's use of inmate testimony at trial.

26

III.    **EVIDENTIARY HEARING**

The Court held a three-day evidentiary hearing from April 29, 2019 to May 2, 2019.  At this hearing, the Court heard live testimony from Nathan Foreman, Carl Walker, Kelly Siegler, and Terrence Gaiser (Prible's trial attorney).  The Court also viewed portions of the depositions of Michael Beckcom, Johnny Bonds (Siegler's investigator on Prible's case), Victor Wisner (the other prosecutor on Prible's case), and Siegler.  The Court summarizes the testimony as it applies to Prible's federal habeas claims, as follows.

A.    **Testimony of Nathan Foreman**

At the evidentiary hearing, Foreman's testimony served two purposes: (1) provide background into the ring of informants and their interaction with Siegler, and (2) "testify that Beckcom's story of him and Foreman hearing a confession from Prible was not true."  HT1-21.[11]

While incarcerated in FCI Beaumont in 2001, Foreman was held in the Special Housing Unit ("SHU"), which is "like, somewhat solitary, but only difference is there you have, like, two other cellmates."  HT1-37.  There, he met inmate Jesse Moreno, from whom he had learned some facts about Prible's case.  HT1-39.[12]  Moreno suggested that Foreman contact Siegler.  HT1-40.

---

[11] The transcript for the three-day evidentiary hearing is located at docket entries 234, 235, and 236.  The Court will cite to the transcript as HT_-__.

[12] Respondent succinctly summarized Moreno's initial interaction with Siegler as follows:

On April 4, 2001, Jesse Moreno, an inmate at FCI Beaumont-Medium wrote a letter to Kelly Siegler, a prosecutor with the Harris County District Attorney's (HCDA) Office, stating that he had information that could be helpful in one of her unsolved cases.  Pet.'s Hrg. Ex. 6.  Moreno served as an informant for Siegler several years prior in a case against Jason Morales.  *Id.*  Siegler met with Moreno on July 3, 2001, at FCI Beaumont-Medium.  2 EHRR 23–25.  Moreno was housed in the Special Housing Unit (the "SHU") at the time.  *Id.*; *see also* Pet.'s Hrg. Ex. 7.  During the interview, which Siegler recorded, Moreno provided her with information implicating fellow-inmate Hermelio Herrero in the murder of Albert Guajardo.  Pet.'s Hrg. Ex. 11.  Moreno told Siegler that when Herrero confessed his

Foreman, Moreno, Beckcom, and another inmate named Rafael Dominguez all contacted Siegler from the unit manager's phone.  HT1-45.

Foreman did not remember when he contacted Siegler but recalled meeting her at the Federal Detention Center in Houston.  HT1-44.  Siegler and her investigator, Johnny Bonds, met with Foreman at the Federal Detention Center in Houston on August 8, 2001.  HT1-14.  Foreman did not remember the content of that conversation.  HT1-44, 80–81.

Foreman testified that, after he became cellmates with Beckcom in October 2001, they met Prible in the recreational yard.  HT1-47.  By that point, however, Foreman already knew some facts about Prible's case and had relayed them to Beckcom.  HT1-51, 54.  Foreman had gotten his information from Moreno and Siegler.  HT1-54.

Foreman and other inmates were trying to "roll[] over on" Prible in exchange for "time cuts."  HT1-49.  But Prible would not talk about the crime—"he didn't really talk about what he was accused of," other than to say that "they were trying to accuse him for something that he didn't do." HT1-51.

Prible's federal habeas attorneys took Foreman line-by-line through the December 10, 2001, letter that Beckcom wrote to Siegler relating to Prible's alleged confession.  Foreman directly contradicted Beckcom's account and denied that Prible had ever made inculpatory statements.  Importantly, Foreman testified that he did not recall the November 24, 2001,

---

involvement in this murder to him, fellow inmates Raphael Dominguez and Nathan Foreman were also present.  Pet.'s Hrg. Ex. 11 at 17.  It appears from the transcript that this is the first time Siegler learned of Nathan Foreman.  *See* Pet.'s Hrg. Ex. 11 at 18–19.  Two days later, on July 5, 2001, Siegler charged Herrero with the murder, specifically referencing the inculpatory information provided by Moreno.  6 Resp.'s Hrg. Ex. 6.

(Doc. No. 240, at 4–5) (footnote omitted).

conversation in which Prible had allegedly confessed to the murders in his presence.  HT1-59–60.
On the day that Beckcom said that Prible confessed, Foreman testified that the group of inmates
used homemade wine to try to get Prible to talk.  HT1-71.  Prible eventually got so drunk that
Foreman had to help him back to his unit, but Prible did not confess.  HT1-71–72.  Foreman said
that he would have remembered if Prible had said anything inculpatory, because he would have
used that to inform on Prible.  HT1-63.

Foreman convincingly and unwaveringly challenged the basis for Beckcom's trial
testimony.  Foreman unequivocally and credibly testified that Beckcom did not provide truthful
testimony at trial.  HT1-64, 70. Foreman testified that Beckcom "should have been a book writer
or something," because his testimony was "not true" and completely fictional.  HT1-64.  The Court
finds that Foreman was a credible witness.

### B.    Testimony of Carl Walker, Jr.

The constitutional claims in Prible's federal petition find their origin in the interview Carl
Walker Jr. gave to Prible's attorney in 2010.[13]   Walker was incarcerated in FCI Beaumont
contemporaneously with Prible.  Walker testified credibly about his involvement in the ring of
informants vying to inform on Prible.  Walker testified that he was "approached or recruited" by
some inmates who asked "if [he] wanted a blessing, opportunity to get out of jail without having
to do all [his] sentence."  HT1-95.  The men offered him an opportunity to get a time cut by
testifying against Prible.  HT1-97.  Walker said that he thought that Foreman approached him, but
it could also have been Beckcom or his cellmate Oscar Gonzalez.  HT1-95, 126.  Prible was to be

---

[13] Counsel had difficulty finding Walker because of confusion over an inmate with a similar name.
HT1-119–20.

"a mark . . . [i]n every sense of the word. . . .  [H]e was going to be a scapegoat for several individuals to have an opportunity to get out of prison sooner than later."  HT1-106.

The men already had a "plethora of information about Mr. Prible's case" when they approached Walker—"details, locations, what was found, where the body was, what happened." HT1-95.  The men concocted a plan to "collaborate as if we became prison buddies or pals or et cetera [with Prible], and then he, all of a sudden, feel compelled to confess all these horrific things."  HT1-98.  The men would then "writ[e] letters to the prosecutor asking to be a witness or—or volunteering to be a witness because we was just so overwhelmed about the information he supposedly give us."  *Id.*  The two main people involved in this plan were Beckcom and Foreman. HT1-99.  Walker was given instructions to call Siegler and tell her what he had supposedly found out from Prible.  HT1-100.

In the meantime, a grand jury returned an indictment against Prible on August 29, 2001. Prible would be transferred from FCI Beaumont Medium to the Harris County Jail on November 29, 2001.  Before he left, however, on November 24, 2001, the group staged a photo "to create a picture of close intimacy with Mr. Prible, a close connection. . . . to show that . . . he would be comfortable enough or confident enough in your friendship to give you this information."  HT1-111.  Walker said that everyone in the photo was involved in the plot against Prible, as well as against other inmates.  HT1-102, 103.

Walker testified that the group made a batch of wine specifically for Prible and drank it with him.  The men intended for him to get so drunk that he would provide details about the murders.  HT1-114.  However, Walker said that it "really didn't matter" if Prible actually confessed, because "the knowledge was already there, you know.  That was more of a formality,

30

like, you would go through the motions.  You would set it up." HT1-114–15, 127.  To Walker's

knowledge, Prible never actually confessed.  HT1-115.

Walker, nonetheless, sent Siegler a letter offering to testify that Prible had confessed.

Walker testified that he did not write it himself, he only signed it.  HT1-116.  Walker's letter was

among those kept in the work product folder.  Walker explained that the inmates' letters were

designed to corroborate each other.  HT1-117.  He believed that Beckcom wrote the letters,

primarily because "[t]he only place to type letters is either in the law library, or maybe if you, like,

a teacher or instructor or something teaching a class, you could have privacy or you'll have the

exclusivity to have access to a typewriter."  HT1-132.  Beckcom was the only inmate in the

conspiracy with that access.

Walker was a credible witness who was unwavering in his testimony.  Walker provided

trustworthy testimony that corroborated Foreman's rejection of Beckcom's trial testimony.[14]

### C.    Deposition Testimony of Johnny Bonds

Bonds was Siegler's investigator on the Prible case.   Bonds provided some general

background information about the investigation into Prible.  He also noted that, initially, there was

---

[14] Respondent argues that "Prible's conspiracy theory alleging a state-run ring of informants rests almost entirely on speculative statements made by Carl Walker."  (Doc. No. 240, at 12). Respondent supports that argument with a factual finding by the state habeas court that "Walker's statements . . . consist almost entirely of hearsay and speculation and contain no direct evidence of [Prible's] conspiracy theory," and that Walker's statements "are unpersuasive and have little evidentiary value with respect to the validity of [Prible's] habeas claims regarding any alleged conspiracy involving the lead prosecutor and federal inmates."  (Doc. No. 191, at 13) (quoting Successive State Habeas Record at 799–800).  Respondent fails to consider important differences between the allegations in the state habeas proceedings and those as they have developed in the instant case.  The state court only considered Walker's statement, which included hearsay and speculation.  His federal evidentiary hearing testimony, however, provided substance to his speculation and first-hand knowledge about the events.  Walker's evidentiary hearing did not provide much testimony placing Siegler at the head of a ring of informants, but more than confirmed that a conspiracy existed at least among the inmates themselves.  The state factual findings, therefore, addressed a much different issue than that considered by this Court.

not enough information to charge Prible.  HT1-143.  Bonds's experience with the case, however, was somewhat limited.  Bonds said that he had never spoken to Beckcom.  HT1-140.  Bonds also explained that he never saw Walker's letter to Siegler.  HT1-154–55.  However, after reviewing the informant letters, he acknowledged that it looks like the same person typed them, because they look identical.  HT1-180–81.

Bonds testified that, during the August 2001 meeting with Foreman at the Federal Detention Center, "two minutes into his conversation, I'm like, This [sic] guy is lying.  He doesn't know anything about this case."  HT1-140.  Bonds said that Siegler felt the same way.  HT1-172.

When confronted with his own notes documenting a visit that he and Siegler had with Foreman at FCI Beaumont in December 2001, Bonds was surprised.  HT1-160–62.  He only recalled meeting Foreman once.  Bonds did not know why they would meet with Foreman when they knew he was a liar.  HT1-162–63.  Bonds assumed that his notes reflect Siegler's report to him about a meeting that she had with Foreman, rather than a meeting both Bonds and Siegler were in.  HT1-164.[15]

Bonds acknowledged that Foreman and Beckcom "might have colluded to get more information."  HT1-169.  He also acknowledged that it was unlikely that Prible would talk about his crime to other inmates after he was indicted.  HT1-171–72.

---

[15] Respondent concedes that "[n]either Bonds, Siegler, nor Foreman recalled that meeting, but handwritten notes from Bonds suggest the meeting likely occurred."  (Doc. No. 240, at 8).

### D.      Deposition Testimony of Vic Wisner

Wisner was Siegler's co-counsel on the Prible case.  Wisner, however, did not have much information directly relevant to this case.  For example, Wisner did not know about Foreman. HT1-190.  From Wisner's testimony, it was obvious that Siegler guided the prosecution and trial.

Although Wisner said that, as a defense attorney, he would have wanted to know about Foreman and the other inmates who wrote letters in the case, he placed the greatest weight on the presence of Prible's semen in Tirado's mouth.  HT1-200–10.  He acknowledged that, without the semen, the evidence about the informants would be much more important.  HT1-204.

### E.      Deposition Testimony of Michael Beckcom

Beckcom's testimony was presented from a video deposition.  In many ways, Beckcom's hearing testimony mirrored that which he gave at trial.  Beckcom found out about Siegler's connection to Prible's case from Foreman after they became cellmates.  HT1-215.  Beckcom said that he called Siegler from the unit manager's phone.  HT1-214.  The purpose of Beckcom's first phone call was to discuss the possibility of arranging for a reduction in his sentence.  HT1-238. Siegler made clear in that conversation that he needed to get specifics about the case.  HT1-238. From then on, Beckcom took notes after conversations with Prible "[t]o have the information that Kelly Siegler asked [him] to get."  HT1-239.  Beckcom, however, said that a prosecutor has never given him details about a crime in connection with his work as an informant, HT3-7, and that Siegler specifically did not give him details about the facts of Prible's case, HT3-12–13.

At trial, Beckcom testified that he found out that Prible was coming to FCI Beaumont Medium before he arrived.  HT1-221.  Beckcom and Foreman talked about trying to get a confession from Prible "plenty."  HT1-220.  But Beckcom did not recall Foreman telling him facts about Prible's case.  HT3-17.

33

Beckcom explained that he was one of "a group of guys from Houston, which after this whole thing got set in motion, it kind of became evident to me that this whole group of, like, fricking ten guys were trying to get information, and somehow I ended up with the information." HT1-218.  Beckcom, however, did not know at the start of a conspiracy against Prible; he "kind of surmised that later on."  HT1-220.

Beckcom confirmed that Foreman was with him every time Prible talked about his case. HT1-239.   Beckcom explained, "[t]he details Jeff Prible gave me, he gave completely and explicitly to me and Nathan Foreman one night.  He just rolled it out."  HT1-218.  Beckcom opined that Foreman's affidavit stating that Prible never confessed is false.  HT1-249.

From the beginning, Beckcom testified that Siegler led him to believe that he would "get walked out . . . for [his] testimony" against Prible.  HT1-214.  Siegler told Beckcom, "[t]his probably will get you out of prison."  HT1-213.  Beckcom thought that Siegler told him that she had talked to the federal prosecutors about his own case and they would "play ball."  HT1-230–31.  He said that he had no other reason to develop evidence against Prible other than to receive a Rule 35 letter for a sentence reduction.  HT1-236.  Beckcom "knew [Siegler] had lied" because he only received one year off of his sentence for his testimony.  HT1-214.

In many ways, Beckcom was not a credible witness.  From the Court's review of the record and its observation of his live testimony, it is obvious that Beckcom was dishonest when it suited his needs.  In other areas, however, Beckcom's testimony corroborated other testimony and the timeline of events.  While the Court finds that Beckcom was generally not a credible individual, certain areas of his testimony can be confirmed when compared to the record.

34

### F.      Testimony of Kelly Siegler

Siegler testified both by deposition and in live examination before the Court.   Siegler testified about her meeting with Foreman at FDC in August 2001.   While she brought the Prible case to the grand jury after she met with Foreman, Siegler testified that her decision had nothing to do with him.   HT2-45.   She did not tell the grand jury that there was a prison informant in Prible's case.   HT2-47.

Siegler testified that she never met with Foreman after the FDC meeting.   Siegler said that Foreman probably tried to call her, but she did not remember "what we talked about for very long because I knew he was a liar."   HT2-95.   Siegler claimed that she simply did not believe Foreman and would not have wanted more information from him.   HT2-40–41.   Siegler conceded, however, that even though she similarly did not believe Foreman in Herrero's case and accordingly did not use his testimony at trial, she nonetheless wrote a Rule 35 letter for him.   HT2-52–53, 56–57. When confronted with the evidence that she requested a second meeting with Foreman in December 2001, after she received a letter from Foreman's attorney stating that Foreman knew where the murder weapon was, she said she did not remember why she wanted the second meeting. HT2-105–09.

Siegler recalled receiving the letters from Gonzalez, Walker, and Martinez, but she claimed that she did not believe their accounts.   HT2-67–70.   As Respondent observes, "Siegler did not use Forman [sic], Gonzalez, Martinez, or Walker as witnesses, because she did not find them credible." (Doc. No. 240, at 9).   Curiously, Siegler said that the letters were in the file open for Prible's defense attorneys to read.   HT2-71.   This, of course, turned out to be untrue.

Siegler acknowledged that she reached out to Beckcom's federal prosecutor months before Prible's trial to introduce herself.   HT2-115–16.   She discussed a possible Rule 35 for Beckcom in

those pretrial conversations.  HT2-117.  Siegler said she told Beckcom about the conversations she had with his prosecutor to reassure him about the Rule 35 letter.  HT2-118–19.

Consistent with her deposition testimony, Siegler maintained in her live examination that she did not find Foreman credible and did not need to disclose information about her meetings with him to Prible's defense counsel.  HT3-38, 42–43.  She opined Foreman was a liar "in a category all by himself."  HT3-49.  She also reiterated that she did not need to disclose information about Moreno to Prible's defense counsel.  HT3-35–43.

Siegler testified that she did not give any inmate at FCI Beaumont information about Prible's case or encourage any inmate to obtain information against Prible.  HT3-46–47.  Siegler said that, to the best of her knowledge, this was the only capital case in which she used prison inmates who were in the same facility as the accused as witnesses.  HT3-47.

Siegler acknowledged that she first spoke to Pam McInnis, head of the Harris County crime lab, about the semen and DNA evidence.  HT2-144–45.  McInnis said that semen could live up to 72 hours in the oral cavity.  HT2-145.  Siegler thought this evidence was in the trial, but she could not remember if she told Prible's counsel about McInnis's conclusion.  *Id.*

Siegler's testimony was not credible on both minor and major points.  Siegler made several statements that the record directly refutes.  For example, when asked about the SHU (which is where Foreman met Jesse Moreno), she claimed she did not know what the SHU was and that she had never heard the term before.  HT2-25.  In addition to the fact that SHU is a well-known term, Siegler herself referred to the SHU at Prible's trial.  HT3-26 (quoting 26 RR 96).  She also testified that the letters from the other inmates trying to inform on Prible were in the open file; it is now undisputed that they were in her work product file and were not disclosed to defense counsel.  She testified that she never saw Foreman after the August 2001 FDC meeting; yet, there is unrefuted

36

evidence that she had a meeting with him in December 2001 at FCI Beaumont.  She testified that this was the only capital case in which she used prison inmates as witnesses; in fact, she has done so in numerous other cases.  (Doc. No. 241, at 39–40).  Siegler was also combative in demeanor and did not appear forthcoming with many of her answers.

### G.      Testimony of Terry Gaiser

Gaiser, Prible's trial attorney, was appointed on September 28, 2001.  HT2-155.  Gaiser confirmed that he had not seen the note about McInnis's conclusions on the semen evidence before the federal habeas proceedings.  HT2-193.  Gaiser said that he asked Siegler for information about how she came into contact with Beckcom.  HT2-164.  However, Siegler never told him that she had communicated with Foreman or that she had determined that Foreman was lying.  HT2-165.  In fact, Siegler did not tell Gaiser anything about Foreman; Gaiser was aware of Foreman only because of Beckcom's statements.  HT2-165–66.  Siegler also did not tell Gaiser that she wrote a Rule 35 letter for Foreman in connection with other cases.  HT2-172.  Siegler never mentioned Jesse Moreno to Gaiser either.  HT2-166.

Gaiser said he would have wanted the letters and evidence about the other inmates because that evidence "brings into question the credibility of these people in the Beaumont facility in terms of people wanting to give information to get consideration for doing this."  HT2-179.  However, he never saw any of these pieces of evidence before trial. HT2-179–80.

Gaiser confirmed that Siegler had previously told him that she could not contact inmates at FCI Beaumont by phone.  HT2-187–88.  Gaiser said that the knowledge that she could, in fact, call them was important so he could ascertain "who was cultivating who? . . . [W]ho precipitated the—the information? Who—who was the instigator of the—the informant's testimony?"  HT2-188.

With that background, the Court will consider the constitutional claims raised in Prible's fourth amended petition.

## IV.   LEGAL STANDARDS

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011).  Federal habeas corpus review provides an important, but limited, examination of state criminal judgments.  Because "state courts are the principal forum for asserting constitutional challenges to state convictions," *id.* at 103, concerns for comity, federalism, and finality define the contours of federal habeas review.  *See Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Accordingly, federal jurisprudence sets procedural hurdles to federal habeas review of state criminal proceedings.  "[T]wo fundamental tenets" govern federal review of state convictions:

> First, a state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court. . . .  Second, a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule.

*Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017).  "These requirements ensure that the state courts have the first opportunity to correct any error with a state conviction and that their rulings receive due respect in subsequent federal challenges."  *Skinner v. Switzer*, 562 U.S. 521, 541–42 (2011) (Thomas, J., dissenting).  In the case of procedural default, however, the bar to federal review may be lifted "if the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law."  *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (internal quotation marks omitted) (alterations in original).

If an inmate has presented his claims in a manner allowing the state courts to resolve their merits, AEDPA provides for a highly deferential federal review.  AEDPA "bars relitigation of any

claim adjudicated on the merits in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, 562 U.S. at 98 (internal quotation marks omitted). Under those provisions, "a federal court may not grant a habeas corpus application . . . unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (first quoting 28 U.S.C. § 2254(d)(1), then quoting *id.* § 2254(d)(2)).[16] "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 409–10 (2000)); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002). Simply put, "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Federal courts also generally presume that the state courts have made correct factual findings, unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

---

[16] The Supreme Court has clarified that relief lies under § 2254(d)(1) if (1) "the state court arrives at a conclusion opposite to that reached by this Court on a question of law," (2) "the state court decides a case differently than this Court has on a set of materially indistinguishable facts"; or (3) "the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

39

## V.        ANALYSIS

### A.        *Brady* Claims (Claims 2, 3, 4, 5, and 10)

Claims 2 through 5 and 10 rely on *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.   "There are three components of a true *Brady* violation: (1) the evidence at issue, whether exculpatory or impeaching, must be favorable to the accused; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Canales v. Stephen*s, 765 F.3d 551, 574 (5th Cir. 2014) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).   In evaluating whether the evidence was material, the evidence is "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).   Impeachment evidence must also be disclosed under *Brady*.   *See United States v. Bagley*, 473 U.S. 667, 676 (1985).   Evidence that enables the defense to "attack[] the reliability of the investigation" is also *Brady* material. *Kyles*, 514 U.S. at 446.

The extensive factual development in this case has created a rich and complicated portrait of what happened at trial and what was not known to the defense.   Years of litigation have resulted in a dense record full of complex arguments and detailed allegations, often branching out into different cases and implicating various incarcerated individuals.

But the ultimate facts of this case are simple.   The State's case rested on two facts: (1) a single witness who testified that Prible confessed to the murders and (2) testimony suggesting that Prible's DNA had entered Tirado's mouth only a short while before her death.   As the Court will discuss further below, the State did not disclose the full extent of its interaction with its star

40

witness, Michael Beckcom.  The State also failed to disclose evidence which would enable the defense to argue that Beckcom had fabricated his story, conspired with others to inculpate Prible, and tried to corroborate his contrived story by typing letters for other inmates to sign.  Given the weakness of the State's case against Prible, stopping the defense from developing impeachment evidence against its star witness is unconstitutional.

The State also hid evidence about its DNA evidence.  Prible admitted that he had sexual relations with Tirado.  He claimed, however, that they had done so hours before the murder happened.  The State's case depended on showing that the sexual acts occurred moments before Tirado died.  The State did not disclose that it had developed evidence supporting the defense's expert testimony on the DNA, but still presented testimony with directly opposite scientific conclusions.  The suppression of information from the defense hampered, if not prevented, the development of a defense to counter the two facts that supported Prible's conviction.

As previously discussed, no matter how egregious the underlying constitutional violation, certain procedural requirements curb federal habeas review.  Before turning to the merits of Prible's *Brady* claims, the Court must decide whether he has presented those arguments in a timely and procedurally proper manner.

### 1.      Procedural Reviewability

Respondent argues that procedural defects preclude federal review of Prible's *Brady* claims.  First, Respondent contends that Prible did not file some of those claims in federal court in a timely manner, rendering them time-barred by the AEDPA one-year limitations period.  Second, Respondent argues that Prible failed to litigate his claims in compliance with state law, rendering

them procedurally unreviewable.  As discussed below, the Court finds that all of Prible's *Brady*

claims are available for federal review.

> a.      Limitations Period

Respondent argues that Prible filed Claims 3, 4, 5, and 10 outside the time period allowed

under AEDPA's limitations period.  AEDPA established a one-year deadline, subject to statutory

and equitable tolling, in which an inmate must raise his federal habeas claims after the conclusion

of state review.[17]  Prible filed a timely federal habeas petition on June 18, 2009.  On March 26,

2018, Prible filed his Fourth Amended Habeas Petition raising Claims 3, 4, 5, and 10 for the first

time.  Because Prible raised those claims almost nine years after his original petition, Respondent

contends that they are barred from federal consideration.  As discussed below, the Court finds that

---

[17] AEDPA provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus
> by a person in custody pursuant to the judgment of a State court. The limitation period shall
> run from the latest of—
>
> > (A) the date on which the judgment became final by the conclusion of direct review
> > or the expiration of the time for seeking such review;
> > (B) the date on which the impediment to filing an application created by State action
> > in violation of the Constitution or laws of the United States is removed, if the
> > applicant was prevented from filing by such State action;
> > (C) the date on which the constitutional right asserted was initially recognized by
> > the Supreme Court, if the right has been newly recognized by the Supreme Court
> > and made retroactively applicable to cases on collateral review; or
> > (D) the date on which the factual predicate of the claim or claims presented could
> > have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other
> collateral review with respect to the pertinent judgment or claim is pending shall not be
> counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

the claims are available for federal consideration because (1) Claims 3, 4, and 5 relate back to the original petition and (2) the facts leading to Claim 10 could not have been discovered previously.

Prible argues that Claims 3, 4, and 5 relate back to the seventh claim in his original petition. A federal habeas court may consider the merits of an otherwise untimely claim if it relates back to a timely filed federal habeas petition. *See Mayle v. Felix*, 545 U.S. 644, 656 (2005). A claim in an amended federal habeas petition relates back under Federal Rule of Civil Procedure 15(c) if the timely claim and the proposed claim to be added by amendment "are tied to a common core of operative facts." *Id*. at 664. "An amended habeas petition . . . does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650.

Prible's seventh claim, the only *Brady* claim in the original petition, focused on the State suppressing evidence of its relationship with Foreman, Beckcom, and other informants, and the impact this suppression had on the defense's ability to impeach Beckcom's credibility at trial. Specifically, the seventh claim's "core of operative facts" asserted that the State suppressed:

- evidence that Siegler had contacted Foreman, Beckcom's cellmate, on numerous occasions;

- evidence that Siegler was using a circle of informants (including Beckcom and Foreman) at the prison to investigate and provide testimony against Prible;

- evidence that Foreman and his crew were told specifics about the offense that the State was trying to prove against Prible; and

- evidence that Siegler used the ring of informants to prosecute defendants in other cases.

The original petition alleges that the suppressed evidence was material, because "defense counsel would have completely undermined the integrity of the State s [sic] case if he had information that would have allowed him to demonstrate that the State was involved in a conspiracy to violate Mr.

Prible's right to counsel and was trying to incriminate Mr. Prible with the testimony from members

of this conspiracy." (Doc. No. 1, at 44).

Claims 3, 4, and 5 in the Fourth Amended Petition cover substantially the same allegations.

Specifically, the Fourth Amended Petition describes the challenged claims as follows:

- **Claim 3**: In violation of *Brady* and due process guaranteed by the Fourteenth
  Amendment, the prosecution suppressed evidence that Foreman, whom Beckcom
  represented could corroborate his story, gave a different account, and was, in fact,
  fabricating evidence against Prible.  (Doc. No. 181, at 196).

- **Claim 4**: In violation of *Brady*, the State suppressed evidence impeaching its
  [Beckcom's] testimony regarding the circumstances of the alleged "confession"
  and his motives for questioning Prible.  (Doc. No. 181, at 199).

- **Claim 5**: The State withheld evidence that the trial court ordered produced pursuant
  to *Brady*.  (Doc. No. 181, at 203).

The only difference between the *Brady* claim in the original petition and those in the Fourth

Amended Petition is that, as a result of additional discovery in the case, the new claims specify

with greater particularity the evidence that Siegler suppressed.  In other words, the original and

amended claims share a common core of operative facts: they concern suppression of exculpatory

evidence that (1) originates from the same time (a five-month period between July and December,

2001), (2) was suppressed by the same actor (Siegler), (3) concern the same subject matter (the

State's relationship to Foreman and Beckcom and their motives and roles in the ring of informants),

and (4) is material for the same reason (impeachment of Beckcom's testimony regarding the

alleged confession).

*Mandacina v. United States,* 328 F.3d 995 (8th Cir. 2003), which the Supreme Court in

*Mayle* cited with approval in laying out the relation back standard, is instructive.  In *Mandacina*,

the inmate's original federal habeas petition raised a *Brady* violation involving the suppression of

"evidence of other suspects obtained by the Gladstone Police Department."  *Id.* at 1001.  The

inmate then sought to amend his habeas petition to include suppression of a particular report—to which the original petition made no reference—that documented a witness interview implicating other persons in the victim's murder.  The Eighth Circuit held that the amended pleading related back to the original pleading.  *See id.  Mayle* suggests that relation back was appropriate in *Mandacina* because "[b]oth pleadings related to evidence obtained at the same time by the same police department."  *Mayle*, 545 U.S. at 664 n.7.  The relationship between Claims 3, 4, and 5 and the original seventh claim closely resembles the relationship between the original and amended pleadings in *Mandacina*.  The only difference between the allegations in the original petition and the challenged ones is that, as a result of additional discovery in the case, the later claims specify with greater particularity the evidence that was suppressed by Siegler.  As in *Mandacina*, the suppressed evidence that is mentioned for the first time in the new claims falls directly under the category of suppressed evidence already identified in the original petition and, thus, those claims relate back to the original petition.  The Court thus finds that Claims 3, 4, and 5 relate to a common core of facts that do not differ in substantial thrust from the allegations made in Prible's earlier filings.[18]

---

[18] In the alternative, Prible argues that the Court can reach any procedurally defaulted claims through the *Schlup v. Delo*, 513 U.S. 298 (1995), actual innocence gateway. In *Schlup*, the Supreme Court held that prisoners seeking review of defaulted claims on the ground of actual innocence must establish that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id.* at 324, 327.  A *Schlup* claim of innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). However, because the Court determines that Prible's amended pleadings relate back to his original pleadings and are thus are not barred by AEDPA's limitations period, the Court need not reach Prible's actual innocence claim.

Respondent also argues that Prible failed to raise Claim 10 in a timely manner.  Claim 10 argues that, "[i]n violation of due process under *Brady*, the State suppressed material evidence that Siegler had consulted the head of the Harris County Crime Lab to ask how long semen could remain in the oral cavity, and was told it lives up to 72 hours."  (Doc. No. 181, at 233).  Habeas counsel learned of the suppressed evidence only through Siegler's own notes, which were disclosed on May 11, 2017, pursuant to this Court's order.  The suppressed evidence is material, Prible argues, because "it supports his defense that he had consensual sexual contact with Nilda earlier in the night before she was murdered, rather than immediately prior to her execution." (*Id.*) Prible highlights the fact that "Petitioner could not have discovered these notes earlier; it took a court order for the HCDA [Harris County District Attorney's] Office to finally let Petitioner see them."  (Doc. No. 198, at 56).

Section 2244(d)(1)(D) provides that the AEDPA limitations period begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  Because the State kept information about Siegler's interaction with the crime lab hidden in the attorney work product file, Prible could not have known of the facts that would have supported a *Brady* claim until at least May 11, 2017, when the State finally disclosed Siegler's work product file.  Prible could not have discovered the factual basis of that claim earlier because the State only disclosed Siegler's work product material pursuant to court order.  Prible filed his amended habeas petition on March 26, 2018, within one year of the disclosure.  Thus, Prible filed Claim 10 in a timely manner under 28 U.S.C. § 2244(d)(1)(D).

The Court therefore concludes that Claims 3, 4, 5, and 10 are not barred by AEDPA's limitations period.

b.      Procedural Default

Respondent next argues that Prible's *Brady* claims are procedurally unreviewable because Prible failed to litigate his claims in compliance with state law.   A federal constitutional claim raised on federal habeas is procedurally defaulted and may not be reviewed if the last state court to consider that claim expressly relied on an adequate and independent state procedural bar for denial of relief.   *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).   A procedural default may be excused, however, if a petitioner can show cause and prejudice to overcome the default.   *Id.* at 750–51.   The Court finds that Prible's *Brady* claims are procedurally defaulted, but that Prible has shown cause and prejudice to overcome the default.

i.      *Prible's* Brady *Claims Are Procedurally Defaulted*

The Court agrees that Prible's second *Brady* claim is procedurally defaulted.   As discussed above, the state court dismissed Prible's successive state habeas application, which included Claim 2, under Texas's "abuse of the writ doctrine," codified at Texas Code of Criminal Procedure Article 11.071 § 5(a).   A dismissal pursuant to Article 11.071 "is an independent and adequate state ground for the purpose of imposing a procedural bar" in a subsequent federal habeas proceeding.   *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).

The Court further agrees with Respondent that Prible's other *Brady* claims are procedurally defaulted.   "A procedural default also occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'"   *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)); *see also Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001).   Without distinguishing between individual claims, the state trial level habeas court dismissed Prible's successive state

habeas petition because it concluded that the "factual basis" for Prible's ring-of-informants "conspiracy theory" was "available" when Prible filed his original state habeas petition in 2004. (Doc. No. 90-1 ¶¶ 26, 32, 34).  Given the breadth of this conclusion, as well as the similarities between Claims 3–5 and Claim 2, which was included in the successive petition, it is clear that the state court would apply the same procedural bar to Claims 3–5 if presented with those claims. Respondent reaches the same conclusion.  For Claims 3–5, Respondent avers that "the Texas abuse-of-the-writ doctrine, set out in Tex. Code Crim. Proc. Art. 11071 § 5, would procedurally bar Prible's attempt to raise this unexhausted claim in a subsequent writ application."  (*Id.* at 32). Respondent similarly asserts that Claim 10 "would be dismissed as an abuse of the writ if he were to raise [it] in a subsequent state habeas application."  (Doc. No. 191, at 150).  Prible's *Brady* claims are procedurally defaulted.[19]

---

[19] Respondent also briefly argues that Claims 3–5 are unreviewable because they are unexhausted, (Doc. No. 191, at 32), though Respondent does not raise the same argument against Claim 10, (*Id.* at 150; Doc. No. 240).  However, by acknowledging the procedural default of Claims 3–5 and 10, Respondent has effectively waived any nonexhaustion argument.  *See Thompson v. Wainwright*, 714 F.2d 1495, 1501 (11th Cir. 1983) ("[W]hen the state affirmatively acknowledges futility [of exhaustion] . . . its statement is often considered under the rubric of waiver."); *see also McGee v. Estelle*, 722 F.2d 1206, 1212–13 (5th Cir. 1984) (citing *Thompson* for the proposition that "the state may waive exhaustion").  Treating an acknowledgement of procedural default as a waiver of exhaustion makes sense because exhaustion is a matter of comity, not jurisdiction, and comity does not require that a federal court force a case back into the state system when the state itself has determined that review would be procedurally barred.  *See Felder v. Estelle*, 693 F.2d 549, 551– 54 (5th Cir. 1982) (discussing waivers of exhaustion and comity).  Moreover, waiver aside, nonexhaustion does not bar review of Claims 3–5 and 10 because "exhaustion is not required if it would plainly be futile."  *Graham v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1996).  Exhaustion is futile if "there is no opportunity to obtain redress in state court . . . ."  *Id.* (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).  The procedural default of Claims 3–5 and 10 renders redress in state court unavailable.  *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.").  Thus, ultimately, it is the procedural default, and not the nonexhaustion, of Claims 3–5 and 10 that presents a procedural hurdle to their federal review.

ii.     *Cause and Prejudice Overcomes Default*

A procedural default may be excused upon a showing of cause and prejudice.  *Fisher v. State*, 169 F.3d 295, 301 (5th Cir. 1999).  "The resolution of 'when and how defaults in compliance with state procedural rules can preclude federal court consideration of a federal question is itself a federal question.'"  *Barrientes v. Johnson*, 221 F.3d 741, 763 (5th Cir. 2000) (alterations omitted) (quoting *Fairman v. Anderson*, 188 F.3d 635, 641 (5th Cir.1999)).  "To the extent, therefore, that the Texas Court of Criminal Appeals decided issues of cause and prejudice in dismissing [defendant's] [successive] State Petition, we are not bound by its decision."[20]  *Id.*

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that

---

[20] The situation in *Barrientes* closely parallels that here.  Barrientes's federal habeas petition contained prosecutorial misconduct claims, including a *Brady* claim, related to exculpatory evidence from a sheriff's file that Barrientes alleged was unavailable to him when filing his state court habeas application.  *See Barrientes*, 221 F.3d at 752, 764.  Barrientes was sent back to state court to exhaust his prosecutorial misconduct claims.  *Id.* at 750.  The Texas Court of Criminal Appeals denied his successive petition as an abuse of the writ, rendering his claims procedurally defaulted.  *Id.*  In considering whether Barrientes had shown cause and prejudice to overcome the default, the Fifth Circuit held that it was "not bound" by the Texas Court of Criminal Appeals' abuse-of-the-writ decision and that the district court should have held an evidentiary hearing to reach its own findings as to cause and prejudice.  *Id.* at 763, 768.

Still, Respondent argues that 28 U.S.C. § 2254(e)(1)—which provides that "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by "clear and convincing evidence"—nonetheless requires that this Court, in conducting its cause analysis, apply a presumption of correctness to the state court's underlying factual determinations articulated in its "Findings of Fact Pursuant to Tex. Code Crim. App. Art. 11.071, Sec. 5(a)(1)."  Respondent cites no binding precedent for this claim.  Even so, the Court finds, as discussed *infra*, that Prible has rebutted with clear and convincing evidence the state court's key findings of fact in support of its decision to apply the abuse of the writ doctrine to his successive state court habeas petition.

some interference by officials made compliance impracticable, would constitute cause under this standard." *Id.* (citations omitted).  "A *Brady* violation can provide cause and prejudice to overcome a procedural bar on a habeas claim." *Thompson v. Davis*, 916 F.3d 444, 455 (5th Cir. 2019); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004).

The Supreme Court has recognized overlap between a substantive *Brady* claim and the showing required to overcome the procedural bar of a *Brady* claim.  For a defaulted *Brady* claim, "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself." *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *see also Banks*, 540 U.S. at 691.  There are three elements of a substantive *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82.  "Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Banks*, 540 U.S. at 691.  "[C]oincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes." *Id.*

The Court will discuss the favorable evidence that Siegler suppressed, and its materiality under *Brady*'s prejudice prong, at length in addressing the merits of Prible's *Brady* claims, *see infra* V.2.a & V.2.b.  Here, the Court focuses on how Siegler's suppression of that evidence prevented Prible from developing his *Brady* claims in state court, thus providing cause to overcome their default.

"Under *Banks*, a petitioner shows 'cause' if 'the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence.'" *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (quoting *Banks*, 540 U.S. at 691).  It is beyond serious dispute that the prosecution withheld critical information from the defense in this case.  Siegler knew that Beckcom was associated with several other inmates intent on gaining favor by securing evidence against Prible, and that some of these same inmates were involved in the case against Hermilo Herrero.  Yet the State did not divulge that other inmates sought out the prosecution to inform against Prible.  Nor did Siegler disclose the extent of her interactions with Beckcom or the precise nature of the deals made for his testimony.  Nor did she reveal the extent of her interactions with Foreman or divulge that Foreman—who, without testifying, still loomed over the trial testimony— had twice given patently false accounts of Prible's supposed confession to her.

In the end, the Court need not look further than the State's own file to demonstrate that Siegler prevented the defense from learning about exculpatory material evidence.   In her deposition, Siegler claimed that she had an "open file" policy and did not maintain a separate work product file.  (Doc. No. 181, Ex. 4-A, at 112, 147).  In reality, however, the State maintained a dense work product file containing a significant amount of exculpatory information that was not disclosed to the defense, including notes memorializing meetings with Foreman and Beckcom concerning Prible's case, letters from several inmates—including Walker—trying to inform on Prible, and a note revealing that Siegler had consulted Pam McGinnis, the head of the Harris County Crime Lab, who told her semen could live up to seventy-two hours in the mouth.[21]  These

---

[21] As discussed in this Court's order compelling production of certain materials contained in Siegler's work product file,  the work product doctrine does not excuse Siegler's suppression. (Doc. No. 154, at 2).  As an attorney representing a client, a prosecutor is entitled to rely on the work product, within constitutional limitations.  The work-product doctrine protects "documents

materials came to light only because of court proceedings and court orders occurring after Prible filed his initial federal petition.

The State's suppression of evidence prevented Prible from developing his *Brady* claims in state court proceedings. Prible's trial attorney, Terrence Gaiser, brought several pre-trial *Brady* motions requesting that the State furnish, among other things, the date, place, and manner of all contacts with Beckcom, a statement of how contact with Beckcom was first initiated, a copy of all statements made by Beckcom, notes of any conversations had with Beckcom, and any agreements made with Beckcom concerning benefits in exchange for testimony. 2 RR 4, 6, 8. In response, Siegler provided a handwritten note from Beckcom and indicated that he had been the one to initiate contact. HT2-165. At a pre-trial hearing, Siegler disclosed that she had had four or five telephone conversations with Beckcom. Siegler did not, however, disclose that she had initiated some of those contacts, that she had long been communicating with Beckcom's cellmate Foreman, or that she found Foreman's testimony regarding Prible's confession to not be credible. *Id*. Gaiser testified at the evidentiary hearing that he had reviewed everything in the State's file on Prible, but that the file did not include the letters from Walker and other inmates concerning Prible's case, or any other information that would have alerted him to Siegler's contacts with the other informants.

---

and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative []including the other party's attorney . . . ." Fed. R. Civ. P. 26(b)(3). "[T]he work product doctrine insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries." *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991). But "[t]he privilege derived from the work-product doctrine is not absolute." *United States v. Nobles*, 422 U.S. 225, 239 (1975). "Because *Brady* is based on the Constitution, it overrides court-made rules of procedure. Thus, the work-product immunity for discovery . . . prohibits discovery . . . but it does not alter the prosecutor's duty to disclose material that is within *Brady*." *See* 2 Charles Alan Wright, Federal Practice and Procedure § 254.2 (3d ed. 2000); *see also Dickson v. Quarterman*, 462 F.3d 470, 479 n.7 (5th Cir. 2006) (quoting Wright § 254.2). The work-product doctrine cannot excuse Siegler's efforts to hide relevant and exculpatory information from the defense, including information about her contacts with inmates and letters inmates sent to her claiming that Prible confessed.

Indeed, Siegler's co-counsel, prosecutor Victor Wisner, attested that even he was not made aware of Siegler's communications with the other informants, or the letters they sent her.  HT1-189–97. Because of the evidence Siegler suppressed, Prible's defense team had no knowledge of her contacts and communications with other FCI Beaumont informants, or even the full extent and nature of her contacts with Beckcom.

Similarly, evidence of a larger ring of informants was not available to Prible's state habeas counsel, Roland Moore, despite his diligent attempts to discover it.  Siegler's suppression of evidence left precious little for Moore to work with in investigating suspicions of prosecutorial misconduct.  The only information Moore had was the identities of Beckcom and Foreman, and Prible's suggestion that a man with the last name of Walker might have relevant information. (Doc. No. 198-1, at 57–59).  Beckcom and Foreman refused to speak with Moore.  (*Id.* at 57).  And though Moore tried to find a person named Walker, with no other identifying information, that effort quickly became "a fool's errand."  (*Id.* at 59).  With no concrete evidence to support such claims, Moore did not include any prosecutorial misconduct claims in Prible's original federal habeas application.

Prible later sought to discover Walker's identity and whereabouts on his own, but mistakenly assumed that a different person, Larry Wayne Walker, was the Walker with information about the ring of informants.  Prible sent Larry Walker several letters through Ward Larkin, a layperson and anti-death penalty advocate.  (Doc. No. 181-51, at 14).  Only through sheer coincidence did Prible learn Carl Walker's identity: after Larry Walker was transferred from FCI Beaumont to a BOP facility in Yazoo, Mississippi, where Carl Walker had also since been transferred, he realized Carl Walker might be the intended recipient of the letters and shared them with him.  (*Id.* at 48); HT1-121.  Although Carl Walker did alert Larkin that he was the Walker

being sought, Carl Walker did not respond to further inquiries at the time, (Doc. No. 181-51, at 48), and Prible had no way to contact him further (Doc. No. 198, at 15–16).  Thus, even though Prible identified Carl Walker before he filed his 2007 *pro se* petition, he had no way to obtain supporting evidence from him.[22]  Only after federal proceedings commenced did Walker change his mind and provide a statement.

Respondent argues that Prible cannot establish cause to overcome the default of his *Brady* claims because he, like the defendant in *Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998), "confuses knowledge of the factual predicate of the claim with access to the best evidence supporting that claim."  (Doc. No. 191, at 37).  But the facts adduced at the evidentiary hearing as just described clearly undermine this argument.  Although Prible may have suspected prosecutorial misconduct, including *Brady* violations, during the course of state court proceedings, Siegler's efforts to suppress evidence of her contacts with Beckcom and the other informants left Prible with no concrete evidence to support such a claim during those proceedings, despite Prible and his counsel's diligent efforts to discover such evidence.  Prible may not be penalized for failing to raise claims for which he lacked any evidence.  *Strickler*, 527 U.S. at 286 ("Proper respect for state procedures counsels against a requirement that all possible claims be raised in state collateral proceedings, even when no known facts support them.").  Relatedly, because Prible has shown by clear and convincing evidence that the factual predicates for his *Brady* claims were not available until after he had filed his state court habeas applications, Prible has refuted any presumption of correctness owed to the State court's findings to the contrary.

---

[22] Prible also had no means to compel Walker's testimony through court-ordered process.  Texas law does not authorize discovery on subsequent applications unless a court finds that the application meets the requirements of Article 11.071 § 5, and the Texas Court of Criminal Appeals found that Prible did not meet those requirements.

In sum, Siegler's suppression of evidence created an external obstacle that impeded Prible's ability to bring his *Brady* claims during state habeas proceedings. Siegler's actions in this case therefore provide cause to forgive the procedural default of Prible's *Brady* claims.

In addition to cause for the default, Prible must show actual prejudice. As discussed above, the prejudice inquiry in this context overlaps with *Brady*'s materiality standard. *See Banks*, 540 U.S. at 698 ("Unless suppressed evidence is material for *Brady* purposes, its suppression does not give rise to sufficient prejudice to overcome a procedural default." (quotation and alterations omitted)). The test for materiality and prejudice is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280; *see Banks*, 540 U.S. at 698. As the Court will discuss *infra* in connection with the underlying *Brady* claim, Prible has shown actual prejudice from the State's withholding of information.

Accordingly, the Court finds that Prible's *Brady* claims are procedurally reviewable. The Court first reviews Prible's *Brady* claims stemming from the prosecution's use of informants (Claims 2–5) and then Prible's *Brady* claim relating to the State's investigation into DNA evidence (Claim 10). Because the state courts did not adjudicate the merits of Prible's *Brady* claims, this Court's review of those claims is *de novo*.

### 2.    The Suppressed Evidence Was Favorable to Prible's Defense

a.    Prible's Ring of Informants *Brady* Claims (Claims 2–5)

Prible's four interrelated *Brady* claims concern the suppression of evidence about the group of FCI Beaumont informants. Prible claims that:

- Claim 2: In violation of due process guaranteed under *Brady*, the State suppressed material evidence that Beckcom and Foreman were part of an organized attempt to secure favors in return for fabricating a false confession. (Doc. No. 181, at 177).

- Claim 3: In violation of *Brady* and due process guaranteed by the Fourteenth Amendment, the prosecution suppressed evidence that Foreman, whom Beckcom represented could corroborate his story, gave a different account, and was, in fact, fabricating evidence against Prible.  (Doc. No. 181, at 196).

- Claim 4: In violation of *Brady*, the State suppressed evidence impeaching [Beckcom's] testimony regarding the circumstances of the alleged "confession" and his motives for questioning Prible.  (Doc. No. 181, at 199).

- Claim 5: The State withheld evidence that the trial court ordered produced pursuant to *Brady*.  (Doc. No. 181, at 203).

At their core, each of the four claims relate to Prible's purported confession and Siegler's interaction with FCI Beaumont inmates.

i.    *Information about Nathan Foreman*

The State suppressed substantial evidence about Nathan Foreman, who, although he did not testify at trial, was used by the state to corroborate Beckcom's testimony.  At trial, the State based its case in large part on inmate witness Beckcom, without calling any other witnesses to corroborate his testimony that Prible confessed to other inmates.  Even so, the State sought to implicitly bolster Beckcom's testimony by emphasizing that Prible told Foreman, and others, about the murders.

Beckcom testified at trial that he received Siegler's name from his cellmate, Foreman, and that Foreman was present for each of his relevant conversations with Prible.  Beckcom was able to create a more convincing story by adding Foreman to his narrative because it gave the impression that someone else had heard the same confession, thereby making it less likely that Beckcom fabricated the story.  Foreman was, in essence, a non-testifying corroborating witness to Beckcom's story about Prible's confession—and the prosecution implied as much.  For instance, when countering the defense's argument that Beckcom derived information about Prible's

56

probable cause statement, Siegler argued in closing that other inmates "never saw Jeff Prible show it to Mike Beckcom or Nathan Foreman."  28 RR 83.

The facts developed through the federal habeas process show, however, that the jury lacked significant information about Foreman, and consequently, about Beckcom's credibility.  Well before Prible was indicted, Siegler anticipated using inmate testimony.  (Doc. No. 181, at 19–20).  Jesse Moreno, an inmate who had acted as an informant in the past, suggested that Siegler and investigator Johnny Bonds seek out the assistance of Foreman.  In a pre-trial hearing, Siegler stated that Foreman first contacted her in October of 2001 and that she did not meet with him until December of 2001.  20 RR 12.  Not until this Court ordered the disclosure of Siegler's work product notes, however, was it verified that Siegler and Bonds met with Foreman at the Federal Detention Center in Houston on August 8, 2001.

After charges were filed on Prible, he was moved from FCI Beaumont Low to FCI Beaumont Medium on July 25, 2001.  Around this time, Foreman was moved from FCI Beaumont Medium's SHU back into general population.  (Doc. No. 181, Ex. 17, 18).  Foreman and Beckcom became cellmates.

On August 8, 2001, Siegler and Bonds met with Foreman at the Federal Detention Center in Houston to find out what Foreman knew about Prible (the "August 8 Meeting").  They learned that Foreman was looking for a deal to testify against Prible.  However, both Siegler and Bonds testified that they believed that Foreman not only lacked credibility, but also was fabricating evidence against Prible before he had even met him.

Board of Prisons (BOP) records indicate that Foreman continued to speak with Siegler after the August 8 Meeting.  (Doc. No. 181, Ex. 21).  Foreman's attorney also contacted Siegler.  (Doc.

No. 181, Ex. 23).  Siegler's notes show that even Foreman's wife contacted her.  (Doc. No. 181, Ex. 19).

Bonds' notes show that Siegler met with Foreman again on December 10, 2001, immediately before an interview she had with Beckcom, in which Beckcom drafted a ten-page document describing his alleged conversation with Prible.  (Doc. No. 181, at 26).  The notes memorializing that meeting were placed in the work product file.  (Doc. No. 181, Ex. 20).  Siegler maintains that they did not find Foreman credible throughout the interaction.  HT3-38–39.

Siegler did not tell the defense about her interactions with Foreman, other than to mention that he called her "around October of 2001" and that they did not "go see him until December." 20 RR 12.  Respondent argues that, "[d]espite what Prible contends . . . the prosecutor was under no duty to disclose this information" primarily because "Forman [sic] did not testify against Prible. Th[e] nature and extent of his meetings with the State is [sic] not, therefore, likely to impact the jury's verdict on guilt-innocence."  (Doc. No. 191, at 113–14).

Respondent's argument relies on a constricted view of Foreman's explicit and implicit influence in this case.  Before even meeting Prible, Foreman claimed to have knowledge about him.  The prosecution continued communicating with Foreman, even though Siegler professed to find him lacking credibility.

Importantly, Foreman's credibility was not independent from Beckcom's testimony. Foreman was the only other man present when Prible allegedly confessed; he was the only person who could vouch for Beckcom's testimony.  Because Beckcom's testimony turned on conversations witnessed by Foreman, information about Foreman and his credibility would be central to the jury's assessment of the only testimony describing the crime.  Yet for reasons not completely apparent on federal habeas review, the prosecution found Beckcom credible while

determining that Foreman was not.  Evidence that Foreman had previously claimed, falsely, that Prible confessed; that Foreman was working with Beckcom and other inmates to provide evidence against Prible in exchange for a sentence reduction; that Siegler provided Foreman with information about Prible's case (namely, the existence of the DNA evidence); that Siegler had written Foreman a Rule 35 letter in another case even though she determined that he was not credible; and that Foreman worked with Beckcom to orchestrate a confession, all had substantial impeachment value.  The information about Foreman also casts doubt on the State's method of investigation: it demonstrated that Siegler was willing to meet with, take evidence from, and do favors for inmates she deemed not credible.  Siegler kept that information from the defense.  HT2-165, 186–87.  Simply put, the State suppressed exculpatory and material evidence about Foreman.

### ii.     *Letters from Other Inmates*

During his successive state proceedings, Prible sought *in camera* review of the State's file. The State did not oppose that motion, but still did not turn over the whole file.  For the first time in February 2011, the State provided Prible with three letters that prosecutors had sealed in a letter-sized envelope designated "attorney work product."  The letters to Siegler were from inmates Carl Walker, Mark Martinez, and Oscar Gonzalez.  These letters all indicated that several inmates had heard Prible confess to the murders.  As described in Walker's letter, "[a]s you may, or may not, know from previous conversations with Nathan Foreman, myself, Mark Martinez, Jesse Gonzalez, his father Felix Gonzalez and Beckcom were all close friends of Pribble [sic]."  (Doc. No. 99-3, at 10).  Each letter offered to testify against Prible in exchange for a time cut.  (Doc. No. 99-3).  The letters each told a similar story and provided corroboration for the others.

At a minimum, the letters reveal that a ring of informants was engaged in a collective, coordinated effort to secure sentence reductions in return for providing the State with incriminating

evidence in the form of manufactured confessions.  Testimony developed on federal habeas review has shown that the corroboration was likely due to Beckcom's calculated efforts.  The inmates testified in the evidentiary hearing that they did not write the letters.  Walker testified that although he signed a letter, he did not write it.  HT1-116.  Martinez denied altogether signing the letter bearing his name.  (Doc. No. 181, at 121).  According to Walker, the inmates' letters were designed to corroborate each other, HT1-117, and he believed that they were all written by Beckcom. Walker explained that Beckcom was the only inmate in the conspiracy with access to a typewriter, and all of the letters were typewritten.  HT1-132.  Each letter misspells Prible's name as "Pribble," (Doc. No. 99-3), and Beckcom's deposition suggests that he believed that this latter spelling, "Pribble," was the correct one, HT1-233.  It goes without saying that evidence showing that the State's star witness was fabricating statements by other witnesses, especially those the prosecutor apparently did not deem credible, is favorable to the defense.

Disclosure of these letters would have prompted a reasonable attorney to interview each of the inmates.  Both Gaiser and Wisner testified at the evidentiary hearing that the letters would have been relevant and useful to argue that a group of men engaged in a coordinated attempt to obtain and/or manufacture incriminating evidence against Prible.

Respondent argues that "[t]he State had no duty to produce these letters to the defense because they are not 'favorable' as contemplated under *Brady*."  (Doc. No. 191, at 45). Respondent, however, bases this argument on a confined view of the benefit the documents would have had to the defense.  Respondent argues:

> Each of the letters contain the assertion that Prible confessed to the murders.  Nor are they impeachment evidence.  They do not, as Prible claims, prove his ring-of-informants claim or undermine the credibility of Beckcom's testimony.  The fact that multiple federal inmates wrote to the prosecutor regarding another fellow inmate seeking to trade incriminating information for a reduction in their sentence does not prove the State solicited their help, or that Beckcom's testimony is false.

60

> Nor does the fact that Beckcom was not the only inmate looking to inform on Prible prove a state-run conspiracy.  And, as acknowledged by the state court in the habeas hearing "everyone knows" that it is not uncommon for federal inmates to come forward to testify against other inmates in order to reduce their sentences.

(*Id.*).  True, the letters themselves do not establish that Siegler guided a ring of informants that would fabricate testimony against Prible.  As shown in the evidentiary hearing, however, and as discussed *supra*, the letters could certainly have been the first steps toward showing a conspiracy formed by the inmates themselves.

Had the letters not been hidden away in the work product file, the defense could have pointed out similarities in the letters, both in form and in content.  Testimony from the evidentiary hearing suggested that only Beckcom would have had the opportunity to type the letters for other inmates.  And disclosing the letters would have allowed the defense to develop testimony, such as that from Walker in the evidentiary hearing: that Prible never confessed but was in fact set up by other inmates and that someone, likely the State's star witness Beckcom, wrote letters for the other inmates saying that Prible had in fact confessed.

The evidentiary hearing testimony uncovered that the letters were likely fabricated.  From that information, as evinced by the federal evidentiary hearing, the defense could have developed rich, credible evidence that would have challenged the content and reliability of testimony from the State's star witness.  On federal review, disclosure of the false letters, along with suppressed information about the State's dealings with Foreman, shows that Beckcom was committed to creating a false narrative about Prible's confession.  Indeed, the State did not believe Foreman, who was said to corroborate Beckcom's testimony against Prible.  Armed with full knowledge of Beckcom's efforts, a reasonable jury may well have reached a different outcome.  The Court thus concludes that this evidence would have been favorable to the defense.

### iii.   *Other Information from the Work Product File*

Prible has identified significant amounts of information that was not previously available to the defense.  Such information consists of, among others, BOP records and records from other trials.  Most problematic, however, is the information contained in the prosecutor's work product file.  In October 2015, the State also provided for the first time other documents from the work product file.  As described by Prible, these documents included:

- The November 12, 2001, letter from Nathan Foreman's attorney, Alan Percely, to Siegler, in which Percely conveys Foreman's desire to provide evidence against Prible in exchange for Siegler's assistance in getting Foreman's sentence reduced.

- Texas Crime Information Center (TCIC)/National Crime Information Center (NCIC) criminal background reports for Foreman and Rafael Dominguez, dated December 6, 2001.  These reports were produced from a folder of privileged material containing TCIC/NCIC reports for potential witnesses and testifying witnesses at Prible's trial.

- A sticky note attached to would-be informant Mark Martinez's April 30, 2002, letter to Siegler, which appears to memorialize a March 7th voicemail from Martinez regarding the Prible case.  It directs Siegler to call Martinez's counselor at FCI Beaumont.

- An undated letter from Beckcom to Siegler referencing his upcoming testimony in Prible's trial and expressing concern that he could not count on his California AUSA to assist him, and proposing that Siegler help him secure a Rule 35 sentence reduction by arranging for him and another FCI Beaumont inmate named Anton Davi to inform on even more FCI Beaumont inmates.

- A letter from the HCDA to Lt. Robert Clark at FCI Beaumont, asking for permission for Siegler and Bonds to interview Beckcom and Anton Davi, as Beckcom requested, in May 2002, five months before Prible's trial.

- Documents showing that, after Prible's trial, Siegler strenuously lobbied Beckcom's AUSA for a time cut and evidently even recruited an AUSA working out of the Houston office to weigh in on Beckcom's behalf.

(Doc. No. 181, at 73–74).  These suppressed documents reveal the extent of Siegler's involvement with the ring of informants and, in particular, Beckcom.  Indeed, the documents indicate that, in exchange for information on Prible and other inmates, Siegler lobbied to reduce the informants'

sentences.  They also reveal that Beckcom in fact proposed to Siegler that he inform on other FCI Beaumont inmates in exchange for a Rule 35 sentence reduction.  This information tends to impeach Beckcom's credibility and the manner in which the State assembled its case against Prible.  The withholding of these documents further solidifies the Court's finding that the State in this case withheld important, favorable information from the defense.

Prible has accordingly demonstrated that the suppressed evidence would have been favorable to his defense for the purposes of his third, fourth, and fifth *Brady* claims.

> b.      Prible's DNA Evidence *Brady* Claim (Claim 10)

Long before Prible was charged with capital murder, the prosecution knew that Prible's semen had been found in Tirado's mouth.  That fact alone was not necessarily inculpatory.  The evidence did not suggest that Tirado had been sexually assaulted, and while Prible admitted that he had sexual relations with Tirado, he claimed that it was consensual and had occurred long before the murders.  The prosecution thus needed to prove that "[t]here is no way in the world that that semen wasn't deposited either moments before or seconds after [Tirado] died."  28 RR 11. Accordingly, at trial the prosecution's case in chief relied heavily on evidence about the longevity of semen to prove that Prible had been in the house around the time of the killings.  Indeed, Prible's DNA evidence was one of two pillars upon which the prosecution's case relied almost exclusively, the other being Beckcom's testimony.

At trial, the State called two expert witnesses to testify as to the DINA evidence.  Testimony from the first witness, Chief Harris County Medical Examiner Dr. Joye Carter, did not help the State's theory that Prible's sexual contact with Tirado had to have occurred seconds before she was killed.  Dr. Carter testified that sperm cells can be found in a person's mouth for hours after ejaculation, possibly because "it could actually adhere or stick to like plaque that's on the teeth or

in the recesses of the mouth." 23 RR 68.  The State instead bolstered its theory with testimony

from William Watson, an expert in molecular biology.  Watson did not try to estimate an exact

perimortem interval (PMI) between oral sex and death, but still testified that the quantity of the

DNA sample was inconsistent with the semen being deposited into Tirado's mouth as long as an

hour before she was killed.  He also said that the fact that he was able to obtain the male profile

"certainly would be consistent with" Prible depositing the semen in Tirado mouth "moments, if

not seconds, before she was killed." 24 RR 101–03.

The defense responded with testimony from a molecular biologist, Dr. Robert Benjamin,

who disagreed with Watson's testimony because there were too many variables and Watson made

too many assumptions.  Dr. Benjamin testified that using quantities of DNA to estimate time since

ejaculation is "just not scientifically valid" and "no controlled scientific studies" supported

Watson's conclusions.  27 RR 123–24, 136.  The prosecution, nonetheless, heavily emphasized

Watson's testimony in its closing argument.

In Claim 10, Prible argues that the State suppressed *Brady* evidence relating to Watson's

testimony.  Factual development on federal habeas review has added important new dimensions

to the DNA evidence at trial.  Recent evidence refutes Watson's methodology and conclusions.[23]

---

[23] Prible attaches to his petition a report from Dr. Elizabeth A. Johnson, an expert in molecular biology and DNA analysis.  Dr. Johnson's report rejects both Watson's methodology and conclusions. Dr. Johnson states that Watson "could not reliably" state that the oral swab was "consistent with there being a great deal of sperm present" because he did not perform either a microscopic evaluation of the sample to assess the number of spermatozoa present or a test for the P30 protein. (Doc. 181, Ex. 114 ¶¶ 14–16).  She states that, using Watson's stated yield of DNA in the oral swab, the volume of seminal fluid "is far less than the volume of seminal fluid that would be found in someone's mouth if ejaculation had occurred moments if not seconds before the victim was killed as Mr. Watson testified upon direct examination."  (*Id.* ¶ 16).  Dr. Johnson also points out that there was literature at the time of trial "on the duration of spermatozoa in the mouth after ejaculation into the oral cavity of live individuals," which confirms that "[t]he removal and dilution of spermatozoa from any body cavity occurs faster in a live individual than a deceased

Even more importantly, however, factual development has revealed that the State suppressed evidence that the prosecution had information that contradicted Watson's testimony, but did not turn it over to the defense.

This Court performed an *in camera* review of the State's work product file. Siegler's notes revealed that she had investigated the survival period for semen to determine a PMI. Siegler's notes revealed that she had contacted Pam McInnis, the head of the Harris County Crime Lab. McInnis told Siegler that semen can survive in the mouth for up to seventy-two hours. Siegler made a note about this but buried it in her work product file rather than reveal it to the defense. (Doc. No. 181, Ex. 20).

Prible contends that the State violated *Brady* by hiding the State's knowledge about the PMI in the work product folder. There is no question that the prosecution kept that information from the defense. This evidence is favorable to Prible because it supports his assertion that the oral sex was consensual and took place many hours before the murder. It also impeaches Watson's testimony that semen survives for only minutes, if not seconds, which the State relied heavily on at trial.

Respondent advances two arguments, however, as to why the suppression of this evidence did not amount to a *Brady* violation that warrants habeas relief. First, Respondent argues that "[a]lthough the evidence appears to be impeachment evidence, it lacks foundational support."

---

individual due to activity." (*Id.* ¶¶ 18–19). She concludes from this that "Mr. Watson could not have reliably testified as he did at trial regarding the amount of spermatozoa on the oral swab taken from [Tirado] or the timing of the deposit of semen into her mouth relative to the time of her death." (*Id.* ¶ 20). Accordingly, Prible argues Dr. Johnson's expert testimony meets the *Schlup* standard for innocence and that an evidentiary hearing is necessary to determine how the report and its impeachment of Watson's testimony would affect a jury. (Doc. No. 199, at 21). However, because the Court grants Prible habeas relief on his *Brady* claims, as discussed *infra*, the Court need not address Prible's actual innocence claim.

65

(Doc. No. 191, at 152).  True, neither party has produced any evidence that would support the position that the semen may exist inside the victim's mouth for seventy-two hours.  However, the veracity of McInnis's opinion is not the issue.  The value in divulging that material to the defense would be proving that the prosecution knew that DNA samples could last longer, possibly much longer, than the seconds or minutes testified to by Watson.  Also, disclosure would allow Prible to argue that the State had information that would support his defense, but hid it and instead, shopped for an expert who would support its theory.

Second, Respondent contends that the suppressed evidence is "immaterial."  (*Id.* at 153).  Respondent argues that, because Dr. Carter testified that semen could exist in the victim's mouth for some time and Dr. Benjamin testified that scientific research did not support Watson's testimony, "the testimony offered at trial was sufficient to refute [Watson's] testimony for Prible's purposes."  (*Id.*).  The Court disagrees.  Further evidence undercutting one of the State's principal arguments, especially when that evidence is from the head of the Harris County Crime Lab, could have been of paramount importance to the defense.

The DNA testimony was critical to the State's case, as the State was able to argue that Prible killed Tirado immediately after ejaculating in her mouth.  Evidence that Siegler received McInnis's contradicting opinion undercuts both the veracity of the State's DNA theory and Siegler's method of investigation.  The defense could have used the suppressed note about McInnis's opinion to show that Siegler shopped around for someone willing to say that Prible was lying about the timing of the oral sex, even though she knew that Prible's version was scientifically plausible.  Accordingly, this evidence is favorable under *Brady* because it both refutes the validity of Watson's testimony and undermines the integrity of the State's investigation of Prible's case.

66

### 3.      Prejudice

To establish prejudice, Prible must show that the nondisclosed information was material. The test for materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280; *see Banks*, 540 U.S. at 698.  "[T]he materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks*, 540 U.S. at 698 (quoting *Kyles*, 514 U.S. at 435).  "[M]ateriality must be assessed collectively, not point by point." *Banks v. Thaler*, 583 F.3d 295, 328 (5th Cir. 2009) (citing *Kyle*, 514 U.S. at 436).

The cumulative effect of the suppressed evidence in this case is such that it can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*.  Had this evidence been disclosed to the defense, it would reasonably have undercut the two pillars upon which the prosecution's case against Prible solely rested: Beckcom's testimony and Prible's DNA evidence.

The Court turns first to the suppressed evidence relating to Beckcom's testimony.  As discussed *supra*, the prosecution at trial relied heavily on Beckcom's testimony that Prible had confessed to him and Foreman about the murders.  Beckcom's testimony was bolstered by his claim that Foreman was present at each interaction with Beckcom.  Yet, as the Court has discussed at length *supra*, the suppressed evidence—the letters to Siegler, the new information about Foreman, and the numerous other documents uncovered in Siegler's work product folder—reveals an orchestrated effort by a ring of informants to fabricate a confession from Prible in return for sentence reductions.  Had this evidence been disclosed, the defense could have argued not only that Beckcom was part of a ring of informants that sought to obtain incriminating evidence against

67

Prible for their own gain, but also that Beckcom, the State's star witness, had in fact fabricated and falsified evidence against Prible.

Indeed, the suppressed evidence could have been used to impeach Beckcom's credibility. Armed with the letters to Siegler from several would-be informants that echoed Beckcom's testimony regarding Prible's confession, the defense could have emphasized Siegler's curious decision to present only Beckcom at trial. Such evidence, as Gaiser testified at the hearing, would have raised questions as to what made Beckcom unique amongst the corroborating informants and, accordingly, cast doubt on his motivations and credibility. HT2-180–81. Moreover, as Gaiser testified, the defense could have used documents showing that Beckcom proposed informing on even more FCI Beaumont inmates in exchange for Siegler's help securing a Rule 35 sentence reduction, to highlight the extent to which Beckcom was willing to go to receive personal benefit. HT2-194–95; *supra* at 61–62. This evidence would have certainly impugned Beckcom's motivations and credibility.

Not only could the defense have used this evidence to impeach the State's star witness individually, but indeed, it could have been used to uncover a broad, orchestrated effort to manufacture confessions against Prible and others, like Herrera. For instance, the defense could have invoked the curious similarity in the form and content of the letters—including consistently misspelling Prible's name as "Pribble," (Doc. No. 99, Ex. 3)—to show that the letters were written by the same person or, at a minimum, in a deliberately coordinated effort. Indeed, as Gaiser testified, the letters could have been used to demonstrate just how many inmates were willing to act for personal benefit. HT2-179. To bolster this presentation of a ring of informants, the defense could have pointed to the suppressed evidence that Siegler wrote and lobbied for Rule 35 sentence reductions for Beckcom, Foreman, and numerous other informants. Moreover, the defense could

68

have used suppressed evidence that Foreman was apparently present during all critical interactions between Prible and Beckcom to cast doubt on the veracity of Beckcom's testimony and the trustworthiness of the State's assembly of its case against Prible, especially in light of Siegler's professed distrust of Foreman.  Using this evidence, in conjunction with the other documents suppressed in Siegler's work product file, the defense could have developed a compelling argument around the ring of informants and cast doubt both on Beckcom's testimony and the manner in which the State investigated and constructed its case against Prible.  Without the suppressed evidence, the defense at trial was left to attempt to impeach Beckcom with only his past conduct.

Taken as a whole, these efforts would have, at the very least, cast serious doubt on the veracity of the State's star witness and, in turn, one of the State's two pillars against Prible.  The materiality standard for *Brady* prejudice requires that there be a reasonable probability that the outcome would have been different.  *Banks*, 540 U.S. at 699.  That standard is certainly met here. This is especially true when considering the additional impact of the suppressed evidence related to the State's second pillar—DNA evidence—to which the Court turns next.

At trial, the prosecution's case in chief relied heavily on using Prible's semen to prove that he had been in the house at the time of the killings.  Critical to the State's theory of the case was Watson's testimony that Prible likely deposited the semen in Tirado's mouth "moments, if not seconds, before she was killed." 24 RR 101–03.  Suppressed evidence from Siegler's work product file, however, revealed a contradicting opinion from McInnis, the head of the Harris County Crime Lab, that semen can survive in the mouth for up to seventy-two hours.  (Doc. No. 181, Ex. 20). Had this evidence been disclosed to the defense, it would have bolstered the defense's theory that Prible's sexual encounter with Tirado occurred hours, not seconds, before she was killed, and that

Prible had returned home by the time of the killing.  Indeed, that this evidence came from the head of the Harris County Crime Lab, which is connected with law enforcement, may have lent more credibility to McInnis and accordingly may well have held more sway in the eyes of a reasonable jury.

Where, as here, the suppressed evidence taken as a whole would have allowed the defense to seriously undercut the two main arguments the prosecution relied upon, the Court has no trouble finding that a reasonable jury may well have reached a different outcome.  The Court thus concludes that the suppressed evidence is material and, accordingly, that Prible has shown prejudice to overcome any procedural default and to satisfy the third prong of his *Brady* claims.

### 4.   Conclusion of *Brady* Claims

Unlike a civil attorney representing a client, there is a "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S. at 281.  A prosecutor may litigate with zeal, but the Constitution ensures that, "though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that justice shall be done.  He is the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *United States v. Agurs*, 427 U.S. 97, 110–11 (1976) (quotation omitted).

"Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.'" *Banks*, 540 U.S. at 696 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).  Here, it plainly was not.  Without question, the prosecution in this case engaged in a pattern of deceptive behavior and active concealment.  And the evidence suppressed sufficiently serves to controvert the primary basis for Prible's conviction.  Simply put, the prosecution withheld

material evidence.  The Constitution requires far more, especially in the case of a man sentenced to death.  The Court will grant habeas relief on Claims 2, 3, 4, 5, and 10.

    **B.**    *Giglio* **Claims (Claims 1 and 11)**

Prible also contends that the State sponsored false and misleading testimony through Beckcom and Watson in violation of *Giglio v. United States*, 405 U.S. 150 (1972).  In Claim 1, Prible focuses on Beckcom's testimony that Beckcom and Foreman had learned of the crime only from Prible himself.  Prible relies on an array of sources—testimony from the other inmates, records showing extensive contacts between the inmates and Siegler, and documents from other cases—to demonstrate that Siegler gave Beckcom the information that served as the basis of his trial testimony.  In Claim 11, Prible argues that the prosecution adduced false and misleading testimony because Watson's DNA testimony was scientifically baseless and likely wrong.

In *Giglio*, the Supreme Court held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."  *Id.* at 153 (quotation omitted).  "To establish a due process violation based on the State's knowing use of false or misleading evidence, [petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false." *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (citing *Giglio*, 405 U.S. at 153–54).  The Court "will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with material witnesses."  *Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir. 1977).

Prible has made a strong showing that he can meet the first two prongs of the *Giglio* test with regards to Beckcom's testimony.  As discussed *supra*, testimony and evidence developed after trial have shown that the defense could have developed a strong and possibly successful

71

argument that Beckcom testified falsely.  Additionally, Beckcom's testimony, as one of two main pieces of evidence that the prosecution relied on, was certainly material.

However, the Court finds that Prible has not satisfied the third *Giglio* criterion.  Prible has presented evidence supporting the assertion that Siegler knew that she was presenting false evidence.  The record undeniably shows that Siegler contacted Beckcom's prosecutor several times in an effort to secure him a sentence reduction.  Siegler minimized and hid the extent and content of those contacts.  Siegler and Beckcom even disclosed to the jury that Beckcom's goal in testifying was to obtain a sentence reduction.  As already discussed, Siegler certainly suppressed material that would have significantly undercut Beckcom's story. Beckcom acted as her agent in securing information from Prible.  However, while this evidence may not reflect well on Siegler, the Court finds that, taken as a whole, the evidence is not conclusive as to whether Siegler knew she was presenting false or seriously misleading testimony.

Likewise, Prible has not shown that Siegler knew that Watson's DNA testimony was false or seriously misleading.  Siegler was aware that experts had different views on the amount of time that semen could survive in the oral cavity.  As discussed *supra*, she was obligated under *Brady* to disclose to Prible the information that she found.  However, Siegler's failure to disclose does not necessarily mean that she knew Watson's testimony was false or seriously misleading.

This Court does not endorse the cavalier attitude Siegler has displayed regarding her constitutional duty to preserve the fundamental fairness of the trial proceedings.   Siegler intentionally and knowingly withheld information with the defense, was deceptive about her efforts to do so, and was far from credible in her federal court testimony.  But the evidence has not shown that she knew that Beckcom was lying or that the scientific evidence was indisputably false. Although the issue is not free from doubt, the Court must deny Prible's *Giglio* claims.

72

C.     *Massiah* Claims (Claims 6, 7, and 8)

Prible raises three claims relating to the State's influence over inmates as they sought information from Prible.   In Claims 6 and 8, Prible argues that Beckcom and Foreman unconstitutionally acted as agents of the State in securing information against him.   In Claim 7, Prible argues that he was denied his Sixth Amendment right to effective assistance of counsel at trial and on state habeas because his trial counsel failed to object to Beckcom's testimony under *Massiah* and his state habeas counsel failed to make an ineffective-assistance claim on that basis. (Doc. No. 181, at 215–19).

As previously discussed, the prosecution's ability to convict Prible hinged on the testimony of a single informant.   The use of informant testimony is constitutionally permissible.   The Constitution, however, requires that the informant acquire information independently, not as an agent for the State.   Under *Massiah v. United States*, 377 U.S. 201 (1964), a government agent may not seek information from a criminal defendant outside the presence of the defendant's counsel once the Sixth Amendment's right to counsel has attached.   *See Thompson v. Davis*, 916 F.3d 444, 454 (5th Cir. 2019).

"A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel's being present; and (3) that agent 'deliberately elicit[s]' incriminating statements from the defendant."   *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) (quoting *Massiah*, 377 U.S. at 206).   "Under the Fifth Circuit's two-prong test for determining whether an agency relationship exists between the government and a jailhouse informant, the defendant bears the burden of showing that 'the informant: (1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from

73

the defendant; and (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control." *United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017) (quoting *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998)).

When Prible first filed his federal habeas petition, he alleged that Siegler had recruited inmate informers who, at her direction, set into motion circumstances in which they could extract a confession from Prible. Although extensive factual development in the years since has lent support to this ring-of-informants theory, not all of Prible's allegations have been completely verified. Yet, even on Beckcom's and Siegler's accountings of the facts, Beckcom still acted as an agent of the State by taking Prible's uncounseled statements with the promise of a reward from Siegler. Before turning to the merits of Prible's *Massiah* claims, however, the Court will discuss procedural concerns raised by Respondent.

### 1. Procedural Bar

Respondent argues that Prible defaulted his *Massiah* claims by litigating them in a manner that did not comply with state law. Prible first raised a *Massiah* claim in his *pro se* application that the Court of Criminal Appeals found to be an abuse of the writ. Prible raised the *Massiah* issue again in his federal petition in 2009. By that point, Prible had developed additional evidence supporting his allegation that Siegler had used inmates as agents to gather information against him. As discussed above, this Court stayed proceedings in 2010 to allow Prible to exhaust state court review of several claims, including his *Massiah* claim, by filing a successive state habeas application. The subsequent actions of the state habeas court in reviewing Prible's *Massiah* claim mirror those already discussed above in relation to Prible's *Brady* claims: the state court allowed some factual development of the *Massiah* claim, but ultimately did not reach the claim's merits after finding the claim procedurally barred by Texas's abuse-of-the-writ doctrine. Respondent

argues that this state-imposed procedural bar renders Prible's *Massiah* claim procedurally defaulted. The Court agrees. Prible has shown, however, that he can establish cause and prejudice to overcome the procedural default.

As discussed *supra* in connection with Prible's *Brady* claims, an inmate can meet the cause requirement by showing that "some objective factor external to the defense impeded [the defense's] efforts to comply with the State's procedural rule," *Murray v. Carrier*, 477 U.S. 478, 488 (1986), or that "the factual or legal basis for a claim was not reasonably available to counsel," *Coleman v. Thompson,* 501 U.S. 722, 753 (1991). As with his *Brady* claims, Prible's ability to develop his *Massiah* claims in state court proceedings was hobbled by Siegler's suppression of information regarding the extent of her relationship with Beckcom and other inmates, and the nature of the arrangement between her and Beckcom. During trial, direct appeal, and state habeas proceedings, Prible and his attorneys had no reason to know that Siegler was suppressing evidence of her relationship with informers. As with Prible's *Brady* claim, it was only after federal habeas counsel was finally able to conduct interviews with Walker and other inmates that Prible's *Massiah* claim became anything more than speculative. Indeed, the full nature of Beckcom's interaction with the prosecution only came into focus with Beckcom's interview, clarified and contextualized by later testimony from other inmates. Only in his deposition did Beckcom finally acknowledge that the only reason he acted was to get himself a sentence reduction. In sum, only once federal review began was Prible able to remove the obstacle that Siegler's suppression of evidence had created for the development of his *Massiah* claims. Because Siegler's suppression of evidence was an "objective factor" that impeded the development of Prible's *Massiah* claims, Prible has shown cause to overcome the default of those claims. Moreover, as discussed further below, prejudice is clear given the critical import of Beckcom's testimony at trial. The Court finds cause

and prejudice to allow federal review of Prible's *Massiah* claims.  Because the state courts never

adjudicated the merits of his claims, federal review of those issues is *de novo*.

### 2.    Prible's *Massiah* Claim: Beckcom (Claim 6)

In Claim 6, Prible argues that the State violated *Massiah* because:

> Beckcom's testimony leaves little doubt that (1) his initial phone call to Siegler in
> early October 2001 was for the purpose of reaching an agreement for him to serve
> as an agent to investigate Prible, and (2) Beckcom had learned very little about the
> case from Prible until after he and Siegler had worked out a deal that would reward
> him for informing on Prible.

(Doc. No. 181, at 213).  From this, Prible concludes that "[t]he State and Beckcom thereafter

conspired to violate Prible's constitutional rights by eliciting statements about the crime in the

absence of defense counsel."  (*Id.* at 214).  The issue before the Court is thus whether Beckcom

acted as an agent of the state in deliberately eliciting incriminating evidence from Prible after his

right to counsel had attached.  For the purposes of analyzing this issue, the Court assumes that

Beckcom testified credibly at trial and that Prible did indeed confess to the murder, because even

under these assumptions, the Court finds that Beckcom was in an agency relationship with Siegler

in violation of Prible's constitutional rights.

Prible's Sixth Amendment right to counsel had attached by the time Prible's trial counsel

was appointed on September 28, 2001.  *See United States v. Gouveia*, 467 U.S. 180, 189 (1984)

("[T]he right to counsel attaches at the initiation of adversary judicial criminal proceedings.").

Beckcom acknowledged that he first contacted Siegler in October 2001 to discuss the possibility

of receiving a sentencing reduction in exchange for information.  HT1-238.

The second question under *Messiah* is whether Beckcom sought out information from

Prible as an agent of the State.  Under Fifth Circuit law, Beckcom must have solicited information

because he was "promised, reasonably led to believe, or actually received a benefit," and "acted

pursuant to instructions from the State, or otherwise submitted to the State's control." *United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017) (quotation omitted); *see Thompson v. Davis*, 941 F.3d 813, 816 (5th Cir. 2019).

As Beckcom's testimony shows, he entered into an agency relationship with the State during that first conversation with Siegler. At the time of the initial meeting, Beckcom did not have any real information about Prible. HT1-236. Beckcom said that the purpose of his initial call with Siegler was to see whether he could arrange for a reduction in his sentence *even though he did not have any evidence at that time*.[24] At trial, Beckcom testified that Siegler told him that she would be interested only if he knew "[s]pecifics about the case." 26 RR 37; HT1-238. Beckcom left that meeting on a mission to secure information from Prible, knowing that he would receive a benefit if he obtained a confession and testified against Prible. Thus, at a minimum, Beckcom was "reasonably led to believe" that he would receive a Rule 35 letter in exchange for getting information from Prible, and then acted pursuant to instructions from Siegler to get details about the crime from Prible.

Beckcom's conversations and meetings with Siegler after the first phone call in October 2001 provide further evidence that Beckcom was acting based on promises of relief from Siegler. As described above, in her deposition, Siegler testified that she reached out to the Assistant U.S. Attorney working on Beckcom's federal criminal case to talk about a Rule 35 reduction before Beckcom even testified. Beckcom testified that he asked for assurances and wanted to make sure

---

[24] Respondent emphasizes that "Beckcom, the informant who testified at Prible's trial, also indicated that he was the one to reach out to the prosecutor with information, not the other way around." (Doc. No. 240, at 30). Whether Beckcom or Siegler initiated contact, however, is not the inquiry. Even if Beckcom initiated contact, he was subsequently led to believe that he would benefit in exchange for informing on Prible and acted pursuant to Siegler's instructions that he obtain specific incriminating information about Prible. The Court thus concludes that Beckcom was a state agent.

that Siegler was in contact with the AUSA.  Beckcom said Siegler told him he would probably get out.  And indeed, although Beckcom wanted a greater reduction, he did eventually receive a year off his sentence as a result of his testimony.  All this evidence indicates that Beckcom was in an agency relationship with Siegler, which predated Beckcom's substantive conversations with Prible.

Finally, Prible has shown that Beckcom "deliberately elicited" incriminating statements while acting as the State's agent.  Beckcom acknowledged that he talked about trying to get a confession from Prible with Foreman; accordingly, he was not merely a passive recipient of information.  Even in his testimony at trial, he admitted to asking questions about the evidence in the case to gather the "specifics" Siegler requested.  Beckcom acted deliberately in seeking out a confession from Prible, in hopes of obtaining a reduction to his own sentence.  Thus, Prible has shown that the State violated *Massiah* when it used Beckcom to elicit incriminating statements from Prible.

Prejudice is not a close question.  Beckcom's testimony was plainly the most compelling evidence that the jury heard at trial.  Although the defense could and did impeach Beckcom's credibility as a jailhouse snitch, they did not have strong impeachment evidence about the actual substance of what he relayed to the jury about Prible's confession.  Prible has made a strong case that there is more than a "reasonable probability" that exclusion of Beckcom's testimony would have altered the outcome of the trial.

### 3.    Prible's *Massiah* Claim: Foreman (Claim 8)

Prible has also raised a *Massiah* claim based on Foreman's alleged work as a state agent.  Prible argues that the State suppressed evidence that Foreman was a state agent before and during the time that he and Beckcom were trying to obtain a confession from Prible.  Prible primarily

bases this claim on the meeting that Foreman had with Siegler and Bonds at FDC in August 2001. Although it is undisputed that the State did not disclose this meeting and that Foreman tried to inform on Prible, Foreman did not testify that Siegler gave him any instructions at that meeting or made any promises to him.  Prible has not shown that there was any agency relationship or *quid pro quo* between Foreman and the State.  Accordingly, Prible has not shown that the State violated *Massiah* in Siegler's dealings with Foreman.

### 4.     Prible's *Massiah* Claim: Ineffective Assistance of Trial Counsel (Claim 7)

Prible also argues that trial counsel provided ineffective assistance for not raising a *Massiah* claim at trial.  "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  "To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness."  *Id.* (quotation omitted).  The Court must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), provide a limited exception to the procedural default rules when state habeas counsel was ineffective for failing to assert a substantial ineffective assistance of trial counsel claim in the petitioner's first state habeas petition.  In order to successfully assert a *Strickland* claim for appellate counsel, Prible must also have a reasonable probability that he would have prevailed on appeal but for his counsel's deficient performance. *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

79

The root of this claim is that trial counsel knew that Beckcom tried to obtain a confession and information from Prible while both were in detention, starting in late October or early November 2001.[25]   At this time, Prible's Sixth Amendment right to an attorney had already attached, and Beckcom had already spoken with the lead prosecutor.   Despite having information about this timeline, Prible's trial counsel failed to object to Beckcom's testimony or to request a *Massiah* hearing.   Prible argues that, had his counsel objected, the trial court would have excluded Beckcom's testimony.   Since Beckcom's testimony was critical to the prosecution's case, Prible argues that it is "reasonably probable" that the outcome of the trial would have been different if Beckcom's testimony had been excluded.   *Strickland*, 466 U.S. at 693–94.   Similarly, state habeas counsel had the same information but failed to make an ineffective-assistance claim in the first state habeas application based on trial counsel's failure to make a *Massiah* objection. Respondent argues that Prible's trial counsel was not ineffective for failing to object to Beckcom's testimony at trial because there was no evidence that Beckcom was an agent of the state: "Counsel is not deficient for, nor can prejudice result from, the failure to raise a baseless objection."   (Doc. No. 191, at 98).

While the record developed through Prible's state and federal habeas proceedings has enabled Prible to show successfully that Beckcom was an agent of the State, the information at trial was not so clear.   At trial, Beckcom seemed to suggest that Prible confessed to him before he contacted Siegler.   26 RR 23–24; 36–37, 47.   According to Beckcom, after Prible had made inculpatory statements, Beckcom then found out that Siegler would need specifics.   *Id.* at 37.

---

[25] Respondent claims that Prible failed to raise this claim in a manner consistent with AEDPA's limitations period.  As with Prible's *Brady* claims, the Court finds that this claim relates back to the earlier petitions and, at any rate, the circumstances discussed *supra* also prevented Prible from advancing this claim in a timely manner.  *See supra* V.A.1.a.

Beckcom testified about the November 24, 2001, conversation in which Prible allegedly confessed as if Prible had voluntarily and without solicitation told Beckcom about the crime. *Id.* at 53–54. In fact, Beckcom also testified that he counseled Prible not to talk about his case. *Id.* at 70–71.

Much more information about the agency relationship emerged only during habeas proceedings. While trial counsel knew that Beckcom reached out to Siegler well before he had any substantive conversations with Prible, the full extent of Beckcom's efforts to secure a confession was not apparent to them at that time. While an attorney could have raised a *Massiah* objection, it does not appear that Beckcom would have been so forthcoming at trial to describe his efforts to communicate with Siegler and secure information from Prible. Further, even if Prible's state habeas counsel should have been aware of the potential *Massiah* issues, Prible has not shown that the state habeas court would have granted relief absent the full record developed in federal habeas proceedings. The Court finds that Prible is not entitled to relief on his ineffective assistance of counsel claim.

### 5. Conclusion of *Massiah* Claims

"[T]he prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 171 (1985). Prible's initial complaint was that Siegler orchestrated a trap wherein Prible would become entangled in a web of informers who, having gained his confidence, would extract from him a confession. Prible alleged that Siegler not only seeded this conspiracy with facts about the murder, but somehow caused the federal prison to place within his orbit the men

who would take advantage of him.  Prible argued that Siegler then maintained regular contact with, and control of, the informers.

The evidence has not completely verified all of Prible's allegations.  Still, the evidence sufficiently proves a *Massiah* claim in relation to Beckcom.  Siegler promised Beckcom time off his sentence if he got information from Prible.  Nothing suggests that Siegler instructed Beckcom to be a passive listener.  *Cf. Kuhlmann v. Wilson*, 477 U.S. 436, 460 (1986) (finding no *Massiah* violation when the police instructed the inmate informant "only to listen to" the defendant).  Siegler must have known that, by telling Beckcom she needed specifics, Beckcom "would take affirmative steps to secure incriminating information" and that "such propinquity [between the inmates] likely would lead to that result."  *United States v. Henry*, 447 U.S. 264, 271 (1980).  Siegler regularly communicated with Beckcom after their initial meeting and, when he claimed to have created a situation in which Prible confessed, again made promises to him.  Beckcom acted as an agent of the State in taking Prible's uncounseled statements.  The Court therefore grants relief on Claim 6.

### D.    Due Process (Claim 9)

In Claim 9, Prible argues that the trial court improperly admitted evidence at trial.  The State only charged Prible with killing Herrera and Tirado.  The trial court, however, allowed the State to introduce guilt/innocence phase evidence that their three children also died in the fire.  On direct appeal, Prible argued that the evidence of the children's deaths was inadmissible under Texas Evidence Code § 404(b) and the due process clause.  Under Texas law, evidence of other crimes is generally inadmissible, but exceptions exist to prove motive, provide context, or corroborate statements.  The Court of Criminal Appeals provided two justifications for the admission of those deaths: (1) "the State used the evidence of the children's deaths to support the testimony of a jailhouse informant, Michael Beckcom . . .  detailing the manner in which the crimes

were committed with information that Beckham [sic] could not have obtained except from [Prible] himself" and (2) "the evidence was admissible as same-transaction contextual evidence . . . [which was] so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Prible*, 175 S.W.3d at 731, 732.

Federal habeas courts do not "sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998); *see also Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("[E]rrors of state law, including evidentiary errors, are not cognizable in habeas corpus . . . ."). The Court of Criminal Appeals found on direct appeal that evidence of the children's deaths was admissible under state law. The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). The Court's sole inquiry, then, is whether the admission of this evidence violated the Constitution, *see Estelle v. McGuire*, 502 U.S. 62, 68 (1991), which only provides relief from an evidentiary ruling that is "so unduly prejudicial that it render[ed] the trial fundamentally unfair," *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *see also Hafdahl v. Johnson*, 251 F.3d 528, 536 (5th Cir. 2001) ("If evidence of an extraneous offense is wrongly admitted, however, habeas corpus relief is proper only if the error is of such magnitude that it resulted in 'fundamental unfairness.'").

Here, Texas law allowed the prosecution to introduce the extraneous evidence as an exception to general evidentiary principles. Evidence of the deaths filled in gaps that would otherwise exist in the evidentiary picture for jurors:

> First, evidence of the children's deaths was part of the crime scene. That evidence was necessary to fully understand the situation as neighbors and firefighters found it. . . . Second, the children's deaths were a direct consequence of [Prible's] conduct of setting fire to Nilda. Thus, Steve and Nilda's murders are so intertwined with

the deaths of their children that the State's case might well be incomplete without some mention of the children's presence in the home. Under these circumstances, testimony about the children's deaths fills in gaps of the interwoven events and consequences of a defendant's criminal conduct and thus helps the jury to understand the case in context.

*Prible*, 175 S.W.3d at 732.  The state court reasonably found that any error was not a denial of "fundamental fairness" under the Due Process Clause.  Prible has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

### E.      Ineffective Assistance of Counsel: DNA Claim (Claim 12)

In addition to his claims that the State violated *Brady* by suppressing DNA evidence regarding how long semen could remain in the victim's mouth and sponsoring false and misleading testimony about the DNA evidence, Prible contends that trial counsel provided ineffective representation by not effectively rebutting the testimony of the State's expert.  Trial counsel secured expert assistance to refute Watson's testimony and strongly disputed Watson's conclusions in closing argument.  It is true that counsel could have crafted Siegler's withheld note into a theory that the State had shopped experts until finding one who would agree with their timeline of the evidence.  However, such information was not available to Prible's trial counsel at the time of trial.  Prible has not shown that, given the information available to them, trial counsel was unreasonable in how they approached the evidence or deficient in their efforts.

### F.      Fair Cross-Section (Claim 13)

Prible claims that he was denied his right to a jury drawn from a fair cross-section of the community because Harris County systematically excludes Hispanics from jury service.  In order to demonstrate a prima facie violation of the fair cross-section requirement for juries, a petitioner must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Prible argues that Harris County's process of selecting jurors underrepresents Hispanics for various reasons, such as low jury pay and the use of stale address lists.

Prible raised this claim on state habeas review. The state habeas court found that Prible defaulted judicial consideration of this claim by failing to lodge a trial objection to the jury panel. Successive State Habeas Record at 465. The state habeas court relied on Texas's contemporaneous rule which requires "a party to preserve an issue for appellate review" by making "a timely objection with specific grounds for the desired ruling." *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). Texas's contemporaneous objection rule is an adequate and independent state law bar to federal review. *See Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999) (citing *Amos v. Scott*, 61 F.3d 333, 345 (5th Cir. 1995)). Because Prible has not shown cause or prejudice for the default of this claim, federal review is barred. *See Roberts v. Thaler*, 681 F.3d 597, 604–05 (5th Cir. 2012).

### G.     Actual Innocence (Claim 14)

Prible raises a stand-alone claim of actual innocence. "Actual innocence" is not an independent ground for habeas corpus relief. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993); *In re Raby*, 925 F.3d 749, 755 (5th Cir. 2019); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir.

2006).  Insofar as Prible argues that his actual innocence entitles him to relief separate from any other constitutional issue, he does not raise a cognizable habeas claim.

### H.      Final Claims (Claims 15 and 16)

Prible's fifteenth claim argues that the State sponsored false testimony in order to mislead the jury, bolster the argument that he had raped Tirado, and detract from Prible's alibi witnesses. Prible argues that the State knowingly presented false testimony about the period between oral sex and Tirado's death, crime scene evidence regarding burn patterns and sexual assault, his relationship with Tirado, Tirado's personal opinion of Prible, and phone calls made from the Herrera home.  In his sixteenth claim, Prible faults trial counsel for not developing defensive efforts to counteract the false testimony he outlines in Claim 15.

Respondent observes that Prible raised these claims for the first time in his Fourth Amended Petition.   On that basis, Respondent argues that the claims are procedurally unreviewable.  The Court agrees and finds that Prible has not shown that he can overcome the procedural default.  Claims 15 and 16 are thus procedurally unreviewable.

## VI.   CERTIFICATE OF APPEALABILITY

Respondent does not need permission to appeal from the grant of habeas relief.  Under AEDPA, however, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Prible has not yet requested that this Court grant him a COA on the denied claims; however, this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *See Soliz v. Davis*, 750 F. App'x 282, 287–89 (5th Cir. 2018).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack*

*v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit, however, anticipates that a court will resolve any questions about a COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *see also Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003).  On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484; *see also Miller-El*, 537 U.S. at 336–38. Unless the prisoner meets the COA standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Having considered the merits of the denied claims, and in light of AEDPA's standards and controlling precedent, this Court declines to grant a COA.

## VII.   CONCLUSION

Prible is entitled to federal habeas relief on claims two, three, four, five, six, and ten.  The Court **DENIES** the State's Motion for Summary Judgment and **CONDITIONALLY GRANTS**

federal habeas relief as discussed above.  It is therefore **ORDERED** that a writ of habeas corpus shall issue unless, within 180 days, the State of Texas either begins new proceedings against Prible or releases him from custody.  The 180-day time period shall not start until the conclusion of any appeal from this Memorandum and Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings. The 180-day period may also be extended on further order of the Court.  The Court **DENIES** a certificate of appealability for all claims.

The Clerk will deliver a copy of this Memorandum and Order to the parties.

**SIGNED** at Houston, Texas, on this 20th day of May, 2020.

HON. KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE