UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **RONALD JEFFREY PRIBLE,** | ' | |
| Petitioner, | ' | |
| | ' | |
| VS. | ' | 4:09-cv-01896 |
| | ' | |
| **LORIE DAVIS, DIRECTOR,** | ' | |
| **TEXAS DEPARTMENT OF CRIMINAL** | ' | |
| **JUSTICE, CORRECTIONAL INSTITUTIONS** | ' | |
| **DIVISION,** | ' | |
| Respondent. | ' | |

**EMERGENCY MOTION FOR RELEASE ON BOND**

TO THE HONORABLE KEITH P. ELLISON, U.S. DISTRICT JUDGE:

Petitioner Ronald Jeffery Prible ("Mr. Prible") files this Emergency Motion for Release on Bond pursuant to Rule 23 of the Federal Rules of Appellate Procedure, and in support thereof, would respectfully show the Court as follows:

**I.
BACKGROUND**

On May 20, 2020, this Court conditionally granted habeas relief to Mr. Prible on five *Brady* claims and on a *Massiah* claim. The Court ordered

> that a writ shall issue unless, within 180 days, the State of Texas either begins new proceedings against Prible or releases him from custody. The 180-day time period shall not start until the conclusion of any appeal from this Memorandum and Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

*Memorandum and Order*, Dkt [245], at 88. The Court also reserved authority "to extend the 180-day period upon further order of the Court." *Id.* On June 12, 2020, Respondent noticed an appeal. *See Notice of Appeal,* Dkt [247].

1

Since the entry of the Court's Order, COVID-19 has exploded within the Polunsky Unit, where Mr. Prible is housed on death row. On July 24, 2020, the statistics were as follows:

**Offender Active Cases – 740**
**Offender Recovered – 7**
**Employee Active Cases – 73**
**Employee Recovered – 17**

See Texas Department of Criminal Justice COVID-19 Case Counts, at https://txdps.maps.arcgis.com/apps/opsdashboard/index.html#/dce4d7da662945178ad5fbf3981fa35c. As of July 30, 2020, TDCJ claimed that 689 prisoners have recovered, and only 57 cases were active:

**Offender Active Cases – 57**
**Offender Recovered - 689**
**Employee Active Cases - 57**
**Employee Recovered - 38**
**Medical Restriction - 1,067**
**Medical Isolation – 57**

https://txdps.maps.arcgis.com/apps/opsdashboard/index.html#/dce4d7da662945178ad5fbf3981fa35c. There are reasons to be skeptical about the rate of recovery: the figures indicate that within one week, approximately 93% of prisoners with active cases recovered. On the other hand, only 52% of guards with active cases recovered within this time span. No matter the recovery rate, Polunsky was unable to prevent an explosion of cases in the first place. Prisoners in TDCJ facilities remain susceptible to COVID-19 infection and possibly re-infection.

## II.
## JURISDICTION

In most cases, an appeal divests the district court of jurisdiction. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). However, in *Jago v.*

*U.S. Dist. Ct., N. Dist. of Ohio*, 570 F.2d 618, 622-23 (1978), the Sixth Circuit, addressing Federal Rule of Appellate Procedure 23, explained that "the question concerning physical custody of the defendant pending review [of a decision in a habeas corpus proceeding] does not affect the matters involved in the appeal itself. The habeas petitioner is not physically transferred to the appellate court, though the issues concerning his petition are presented there." *Id.; see also Tillman v. Rickard*, No. CV 1:18-01244, 2020 WL 2114571, at *1 (S.D.W. Va. May 4, 2020). The *Jago* court found that "a proper understanding of the history of Rule 23 supports a conclusion that it, also, preserves in the district judge authority to issue one or more orders regarding the custody or enlargement of a prisoner pending the review of the decision in the habeas corpus action. The district court does not lose his jurisdiction when an appeal is noted from the decision." 570 F.2d at 623.

      **A.**    **This Court may have jurisdiction under Fed. R. App. P. 23(b)(3).**

Rule 23(b) states that "[w]hile a decision **not** to release a prisoner is under review, the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court, may order that the prisoner be:

      (1) detained in the custody from which release is sought;

      (2) detained in other appropriate custody; or

      (3) released on personal recognizance, with or without surety.

Mr. Prible has not been released pending appeal. Instead, the Court's Order continued Mr. Prible's confinement at least until the parties exhaust appellate procedures, and the Court reserved authority to extend Mr. Prible's confinement after exhaustion of appellate procedures. *See Memorandum and Order*, Dkt [245], at 88. With the filing of Respondent's notice of appeal, this Court's Order

is now under the Fifth Circuit's review. Because this Court's Order denied release, Rule 23(b)(3) gives this Court jurisdiction to act on Mr. Prible's present motion.

> **B.  Alternatively, this Court can exercise jurisdiction under Rule 23(c) if the Court's Order is deemed to have commanded Mr. Prible's release.**

As the federal district court in *United States v. Lee*, No. CR 12-00133 JMS (02), 2016 WL 1039046, at *3 (D. Haw. Mar. 15, 2016), explained:

> Both Rule 23(b) (regarding "Detention or Release Pending Review of Decision Not to Release") and 23(c) (regarding "Release Pending Review of Decision Ordering Release") refer to "the court or judge rendering the decision [i.e., the district court], *or* the court of appeals, *or* the Supreme Court" (emphasis added) as having the power to release a prisoner "on personal recognizance, with or without surety" while a habeas decision is under appellate review.

Indeed, the very reason Rule 23 was enacted was "at least in part, to preserve a retained district court power regarding bail, even while a decision is on review." *Id.* (citing *Jago,* 570 F.2d at 622-23, 625-26 (analyzing the history and origin of Rule 23, and explaining how Rule 23 preserves district court's bail power)).

> **C.  Rule 23(d) does not apply here.**

Rule 23(d) of the Federal Rules of Appellate Procedure states that:

> An initial order governing the prisoner's custody or release, including any recognizance or surety, continues in effect pending review unless for special reasons shown to the court of appeals or the Supreme Court, or to a judge or justice of either court, the order is modified or an independent order regarding custody, release, or surety is issued.

Fed. R . App. P. 23(d).

The phrase "initial order governing the prisoner's custody or release" refers to an initial order under Rule 23(b) or 23(c), not to an order denying or granting the writ. Thus, the Fifth Circuit's comment in *Woodfox v. Cain*, 789 F.3d 565, 568 (5th Cir. 2015) (*"Woodfox II"*), that

4

only the Supreme Court and Court of Appeals can modify initial orders governing custody, does not apply, even if it were binding rather than *dicta*. Indeed, the history of the *Woodfox* case shows that the Fifth Circuit realized that the district court had authority to enter an initial order enlarging Mr. Woodfox under Rule 23, even though the district court had entered judgment granting conditional relief in the habeas case (like the one entered in Mr. Prible's) and the respondent had already filed a notice of appeal.

On September 25, 2008, in *Woodfox v. Cain*, 3:06-cv-00789-JJB-RLB (M.D. La 2008) (*"Woodfox I"*), the district court entered a judgment "that the state either retry Albert Woodfox within 120 days of this order or dismiss the charges." M.D. La., 3:06-cv-00789-JJB-RLB, DE 50. On September 26, 2008, the respondent filed a notice of appeal. On September 29, 2008, pursuant to Rule 23, Woodfox filed a motion for release pending appeal. M.D. La., 3:06-cv-00789-JJB-RLB, DE 53. On November 25, 2008, the district court granted Woodfox's motion for release pending appeal upon finding that Woodfox satisfied the standards set forth in *Hilton v. Braunskill,* 481 U.S. 770, 775 (1987). M.D. La, 3:06-cv-00789-JJB-RLB, DE 75.

The respondent sought a stay from the Fifth Circuit. *See Woodfox II,* 789 F.3d at 567-68 (setting out the procedural history of the case). The Fifth Circuit stayed the district court's November 25, 2008, order, reversed the decision to grant conditional relief, but remanded for further consideration of a *Batson* claim. *Id.* On remand, the district court granted relief on the *Batson* claim, the Fifth Circuit upheld the decision, and the respondent sought certiorari. *Id.* On February 6, 2015, Woodfox filed a second motion for release pursuant to Rule 23(c) in district court,[1] which was granted on June 8, 2015.[2] *Id.; see* M.D. La., 3:06-cv-00789-JJB-RLB, DE 279 (Motion), 317 (Order).

---

[1] M.D. La, 3:06-cv-00789-JJB-RLB, DE 279.
[2] M.D. La, 3:06-cv-00789-JJB-RLB, DE 316.

5

The respondent appealed the June 8, 2015, Rule 23(c) order, and the Fifth Circuit, in *Woodfox II,* reversed. The Fifth Circuit clearly treated the stayed Rule 23(c) order, which issued November 25, 2008, as a valid exercise of the district court's authority. It was the fact that the district court issued a subsequent Rule 23 order on June 8, 2015, that caused the Fifth Circuit to comment that the district court "may have impermissibly modified its initial order from 2008 or entered an independent one," as well as to state in *dicta* that, under Rule 23(d), only the Court of Appeals and the Supreme Court have the authority to modify an initial Rule 23 order or enter an independent one.

### III.
### RULE 23(c) STANDARDS

Prible maintains that Rule 23(c) applies, because this Court granted conditional relief on his writ, just as the Louisiana district court did when it ruled on Woodfox's initial 2008 Rule 23(c) motion. Rule 23(c) creates a rebuttable presumption that a petitioner who is granted habeas relief is entitled to release on bail. In *Braunskill*, 481 U.S. at 777, the United States Supreme Court directed that when deciding whether to grant a motion for release under Rule 23(c), federal courts should apply "the general standards for staying a civil judgment." *Id.* at 775. Those standards require balancing a series of factors, including the following: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 776. To rebut the presumption in favor of bail, the State must show that those "traditional stay factors tip the balance against" Mr. Prible's release. *Id*. at 777. In that balancing, the Court may also consider whether Mr. Prible poses a flight risk and a danger to the public if released. *Id.*

6

After setting forth the foregoing balancing factors, the Supreme Court nevertheless cautioned that "[s]ince the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules." *Id.* The Fifth Circuit utilizes a flexible two-pronged analysis in habeas cases, as follows: whether a petitioner is highly likely to succeed on the merits of his habeas claims, and has also shown exceptional circumstances warranting release pending resolution of the appeal. *Nelson v. Davis*, 739 F. App'x 254, 255 (5th Cir. 2018) (*citing Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974)).

## IV.
## ARGUMENT FOR RELEASE ON BOND

**A. Mr. Prible raises substantial claims upon which he has a high probability of success.**

This Court granted habeas relief on five claims that Mr. Prible raised pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). In doing so, the Court found that "[w]ithout question, the prosecution in this case engaged in a pattern of deceptive behavior and active concealment," and found, further, that "the evidence suppressed sufficiently serves to controvert the primary basis for Prible's conviction." *Memorandum and Order*, Dkt [245], at 70.

This Court also granted relief under *Massiah v. United States*, 377 U.S. 201 (1964). *Memorandum and Order*, Dkt [245], at 82. That Mr. Prible's Sixth Amendment right attached before Michael Beckcom acted as an agent of the State in deliberately eliciting incriminating evidence from him is indisputable. Beckcom's role as a State agent is supported by trial transcripts and deposition testimony in post-conviction proceedings. *Id.* As for the last prong of *Massiah*'s three-prong test, this Court found that "prejudice is not a close question":

> Beckcom's testimony was plainly the most compelling evidence that the jury heard at trial. Although the defense could and did impeach Beckcom's credibility as a jailhouse snitch, they did not have strong impeachment evidence about the actual substance of what he

7

> relayed to the jury about Prible's confession. Prible has made a strong case that there is more than a "reasonable probability" that exclusion of Beckcom's testimony would have altered the outcome of the trial.

*Id.*

### B. Exceptional circumstances exist.

In the form of a non-exclusive list of considerations, the Fifth Circuit has provided guidance on what constitutes exceptional or extraordinary circumstances. Extraordinary circumstances exist, for example, where there is a "serious deterioration of the petitioner's health while incarcerated"; where a short sentence for a relatively minor crime is "so near completion that extraordinary action is essential to make collateral review truly effective"; and possibly where there has been an "extraordinary delay in processing a habeas corpus petition." *Nelson,* 739 Fed. App'x at 254-55 (citing *Calley,* 496 F.2d at 702).

### 1. COVID-19 is an imminent threat to Mr. Prible's physical health and well-being.

In *Valentine v. Collier*, 4:20-CV-1115 (S.D. Tex, July 6, 2020) (Memorandum and Order), this Court found that "because prisons are environments that are dangerously susceptible to the rapid spread of communicable diseases, inmates at all TDCJ prisons are particularly vulnerable to contracting COVID-19, which can lead to serious illness or death for many."[3] Since July 6, 2020, COVID-19 cases have exploded at the Polunsky Unit. By July 27, 2020, Polunky's active cases accounted for nearly a quarter of all active cases in the entire Texas prison system.

The raw numbers are frightening, and so was the rate of infection. Polunsky's maximum inmate capacity is 2,984. Assuming that Polunsky's census is at the maximum, approximately

---

[3] *See also* the declarations of various medical and public health professionals recently filed in COVID-19 litigation in other federal district courts around the country, combined in the attached **Exhibit 1.**

8

25% of Polunsky's prison population became infected by COVID-19. Polunsky does not publish data for death row. COVID-19 cases in the population housing prisoners in the general population may count for the majority of infections. However, Mr. Prible knows of five death row inmates who have recently been diagnosed with COVID-19. Polunsky placed the inmates in the Unit's 'A' pod, which is normally used for defendants on "death watch."

COVID-19 was not endemic to the Polunsky prison population; rather, it was introduced by outside sources and then rapidly spread within the unit. TDCJ data indicates that Polunsky employees were the vectors. On July 24, 2020, TDCJ counted 73 employees with active COVID-19 infections, which at the time was by far the highest number of any unit within the state's prison system. Given the explosion of cases, and strong evidence that COVID-19 spreads via aerosol transmission, the poor circulation and ventilation at Polunsky cannot be excluded as the cause. Although administratively segregated, the death row population is, therefore, at extreme risk of contracting COVID-19 from the guards or the ventilation.

Mr. Prible has been very ill recently. On July 27, 2020, Mr. Prible reported experiencing diarrhea and severe abdominal cramping in the preceeding two weeks. A high fever, by his account, passed into a period of chills. Mr. Prible also had pressure and pain in his chest and a persistent cough. However, he tested negative for the coronavirus, and believes he instead may have had a serious bout of food poisoning that may have been caused by significant staffing shortages and possibly deteriorating sanitary conditions at Polunsky due to the pandemic.

Mr. Prible is 48 years old. He has underlying health conditions that put him at risk for COVID-19 complications and mortality. Some of the factors that place individuals at risk for serious complications and death are obesity and hypertension. Body mass index tables classify persons with a BMI over 30 as obese. At 5'10 and approximately 210-215 pounds, Mr. Prible's

BMI is between 30.1 and 30.8. Prible also reports having high blood pressure and is therefore likely hypertensive.

Mr. Prible also has other conditions that COVID-19 could adversely affect. He suffers from an umbilical hernia which, he reports, is enlarging. However, TDCJ has, for two years, refused to authorize medical treatment of Prible's hearnia. According to the American College of Surgeons, "there is a risk" in this situation "of the intestines being squeezed in the hernia pouch and blood supply being cut off."[4] Chronic, violent coughing caused by COVID-19 will result in painful abdominal pressure, exacerbating this existing condition, at a time when TDCJ has curtailed all but emergency surgeries. Mr. Prible has already felt the effects of the limitations on care. Three years ago, Mr. Prible had colon surgery, resulting in the removal of several large polyps, but COVID-19 forced the cancellation of his anticipated September 2020 checkup.

Although Mr. Prible cannot receive treatment or checkups with TDCJ, he may be able to have his significant health problems successfully monitored and remediated if released. Mr. Prible received an honorable discharge from the Marines and may be eligible, as a result, for Veterans Administration health care.

### 2. COVID-19 elevates the risk of serious mental health problems.

For nearly 20 years, the State of Texas has confined Mr. Prible in what it calls "administrative segregation," a bureaucratic euphemism for solitary confinement. Under this system, Mr. Prible is held in isolation for 23 hours per day in an 8x12 foot cell. During the single hour outside his cell, he is taken in shackles to either shower or exercise in a cage within the prison compound, where he is allowed brief exposure to atmosphere and sunlight via an opening above. A report from the University of Texas School of Law concluded that the "harsh and inhumane"

---

[4] *See* https://www.facs.org/~/media/files/education/patient%20ed/adultumbilical.ashx.

conditions on Texas' death row amount to a form of torture. *See* Human Rights Clinic, University of Texas School of Law, *Designed to Break You: Human Rights Violations on Texas' Death Row*, April 2017, at 21 ("Inmates held in solitary confinement are effectively subject to a severe form of psychological torture every day of their lives.").[5]

In Mr. Prible's case, the psychological impacts of solitary confinement are evident and remarkable. Mr. Prible's penmanship was once more organized, coherent, and legible. But letters filed recently with this Court demonstrate that his writing has descended into illegible, frequently incoherent expressions of anguished frustration. Religious references and idiolectic symbolism punctuate and interrupt these writings throughout.

The appearance of Mr. Prible's handwriting is diagnostic of a severe psychological disturbance attributable to death row confinement. The thought patterns, perseverative phrasing, religious motifs, looseness of hand, and frequent use of peculiar symbols is strikingly similar to handwritten expressions produced by persons diagnosed with schizophrenia. Mr. Prible has, in the past, also reported anxiety, depression, racing thoughts, and auditory hallucinations. He expresses concerns, often emotionally, that he is losing his mind.

The fact that Mr. Prible's conviction was secured by jailhouse snitch testimony, which federal habeas proceedings proved to be perjurious, has sharpened his deep feelings of injustice and frustration at justice delayed. Mr. Prible has expressed these frustrations in *pro se* pleadings and letters to the Court. His continued confinement, despite proof of his innocence, exacerbates the psychological impact of the extremely punitive conditions that death-sentenced prisoners are subjected to.

---

[5] Available at https://assets.documentcloud.org/documents/3899098/Designed-To-Break-You-Report.pdf (last visited July 17, 2020).

The deleterious effects of long-term isolation that Mr. Prible has endured for 18 years are well-established. Prisoners confined in this manner suffer from mental health problems including anxiety, panic, insomnia, paranoia, aggression, and depression. *See* Haney, *Crime and Delinquency* (2003). In *Ruiz v. Johnson,* after describing the conditions of confinement in administrative segregation units across the Texas Department of Corrections, Judge Justice declared:

> Before the court are levels of psychological deprivation that violate the United States Constitution's prohibition against cruel and unusual punishment. It has been shown that defendants are deliberately indifferent to a systemic pattern of extreme social isolation and reduced environmental stimulation. These deprivations are the cause of cruel and unusual pain and suffering by inmates in administrative segregation, particularly in Levels II and III.

37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd and remanded sub nom., Ruiz v. U.S.,* 243 F.3d 941 (5th Cir. 2001). In *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 1001 (S.D. Tex. 2001) (*"Ruiz II"*), Judge Justice found that "[i]n three major areas—conditions of confinement in administrative segregation, the failure to provide reasonable safety to inmates against assault and abuse, and the excessive use of force by correctional officers in Texas prisons—today's prisoners remain victims of an unconstitutional system."

Against this background, the rampant spread of COVID-19 in Polunsky, and TDCJ's response to it, are aggravating factors. Case studies indicate that infection can induce psychosis. *See,* S. Ferrando, et al., *COVID-19 Psychosis: A Potential New Neuropsychiatric Condition Triggered by Novel Coronavirus Infection and the Inflammatory Response?,* Academy of Consultation-Liaison Psychiatry (2020).[6] A cohort study of 153 patients conducted in the United

---

[6] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7236749/pdf/main.pdf

Kingdom and published in the Lancet found that "altered mental status" "comprising encephalopathy or encephalitis and primary psychiatric diagnoses" was the "second most common presentation" in COVID-19 cohorts. *See* A. Varatharaj, et al., *Neurological and neuropsychiatric complications of COVID-19 in 153 patients: a UK-wide surveillance study,* Lancet Psychiatry (July 25, 2020).[7] These psychological symptoms "often occur[ed] in younger patients" and not just in the elderly.

COVID-19, therefore, poses a significant threat to Mr. Prible's psychological as well as physical well-being that can only be magnified by the unhealthy mental and physical conditions of administrative segregation that Mr. Prible endures. Fear of contracting a deadly disease at the very moment when habeas relief is granted is a significant psychological stressor.

Texas' criminal justice system remains ill-equipped to deal with the COVID crisis in any fashion other than by depriving inmates of some of the provisions that kept the prison system, post- *Ruiz I* and *II*, from falling below constitutional standards. Prisoners no longer have in-person visits with family, friends, or counsel. While counsel can arrange for phone conferences, phone conferences with relatives and friends are extremely limited. Mr. Prible is now completely deprived of human contact amidst a pandemic and worsening prison conditions. According to Mr. Prible and reports from undersigned counsel's other death row clients, the COVID-19 outbreak amongst employees has caused understaffing, with predictable declines in essential prison services, such as vermin and pest control, sanitation, and food services.

### 3. Respondent will not be substantially injured.

Where relief is granted, Respondent's interest in incarceration over bailment is diminished. While on bail, Mr. Prible would be in custody for purposes of habeas corpus, and living under

---

[7] Available at https://www.thelancet.com/action/showPdf?pii=S2215-0366%2820%2930287-X.

terms and conditions that limit his movement and activities. Respondent can also move to have Mr. Prible re-incarcerated if circumstances so warrant. If continued confinement is considered a meaningful interest, despite this Court's finding that Mr. Prible's conviction is constitutionally infirm, any injury to that interest that bailment may cause will be temporary, no matter the outcome of appeal. If Respondent prevails on appeal, bailment will terminate. If Mr. Prible prevails, the habeas case ends, and Respondent will no longer have an interest in maintaining custody, thereby mooting any question as to whether release on bail harms Respondent.

The balance greatly favors release. For 18 years, Respondent has confined Mr. Prible on death row, although his conviction rests on false testimony and constitutional violations. As one federal district court has put it, the loss of liberty is an especially "severe form of irreparable injury." *Ferrara v. U.S.*, 370 F. Supp. 2d 351, 360 (D. Mass. 2005). *See also Harrison v. Ryan*, CIV. A. No. 87-7439, 1990 WL 45740, at *2 (E.D. Pa. Apr. 12, 1990) ("[T]he liberty interest of an improperly convicted prisoner is stronger than any injury that may be caused to the [State] in releasing petitioner"). Mr. Prible, in demonstrating his conviction is unconstitutional, also made a showing of actual innocence, yet the Texas prison system's inability to protect prisoners from COVID-19 puts him at risk of debilitation or death on a Polunsky sick bed rather than a gurney. This magnifies Prible's interest in bail.

### 4. Public interest will not be harmed.

"The public has a strong interest in the **release** of a prisoner that a court has found to be incarcerated in violation of the Constitution." *Floyd v. Vannoy*, No. CV 11-2819, 2017 WL 2688082, at *3 (E.D. La. June 22, 2017) (emphasis added) (citing *U.S. ex rel. Newman v. Rednour*, 917 F. Supp. 2d 765, 789 (N.D. Ill. 2012), *aff'd sub nom. Newman v. Harrington*, 726 F.3d 921 (7th Cir. 2013), and *Burbank v. Cain*, No. 06-2121, 2007 WL 2809996, at *4 (E.D. La. Sept. 24,

14

2007)). That interest in release grows if a prisoner simultaneously makes a substantial showing of innocence.

As this Court recognized, the two pillars of the State's case against Mr. Prible were trial testimony from an informant, Michael Beckcom, along with DNA evidence. *Memorandum and Order*, Dkt [245], at 63. Mr. Prible successfully attacked both. In habeas proceedings, two members of the FCI Beaumont informants' ring, to which Beckcom belonged, gave credible testimony that Beckcom manufactured Mr. Prible's alleged confession. At trial, Beckcom portrayed one member, Nathan Foreman, as a witness to Mr. Prible's confession who could corroborate every statement that Mr. Prible supposedly made to Beckcom. However, at the 2019 evidentiary hearing before this Court,

> Foreman convincingly and unwaveringly challenged the basis for Beckcom's trial testimony. Foreman unequivocally and credibly testified that Beckcom did not provide truthful testimony at trial. HT1-64, 70. Foreman testified that Beckcom "should have been a book writer or something," because his testimony was "not true" and completely fictional. HT1-64.

*Memorandum and Order*, Dkt [245], at 28. A second member of the ring, Carl Walker, Jr., also gave "unwavering," "credible" testimony at the evidentiary hearing that supported Foreman's disproof of Beckcom's trial testimony. Walker detailed how the informants' ring worked to falsely incriminate Mr. Prible. *Id.*

Mr. Prible also refuted DNA evidence that the State sponsored through a post-graduate named William Watson. The State used Watson's testimony to contrive a lurid closing argument, aimed at convincing the jury that Mr. Prible shot Nilda Tirado in the head while forcing her to perform fellatio. Alternatively, the State argued the DNA evidence showed that Mr. Prible engaged in necrophiliac oral sex right after shooting Tirado in the back of the head. This Court found that "[f]actual development on federal habeas review has added important new dimensions

15

to the DNA evidence at trial. Recent evidence refutes Watson's methodology and conclusions, … [and] revealed that the State suppressed evidence that the prosecution had information that contradicted Watson's testimony, but did not turn it over to the defense." *Id.* at 64-65.

### 5. Mr. Prible is not a flight risk.

Mr. Prible's immediate and extended family have always supported him and continue to do so. His family support was evident during the 2019 evidentiary hearing. Mr. Prible's son (now deceased), daughters, mother, sister, aunt, and cousins all attended the hearing. Mr. Prible's mother has an extra room in her home where he can stay upon release. Mr. Prible's aunt has offered her guest house to him as well. Individually and together, Mr. Prible's extended family have the resources to provide for his room and board during the pendency of the appeal.

Mr. Prible's principal goal is to reunite with his family. His oldest child, a son, died suddenly in a train-pedestrian accident last November, just six months after attending his father's evidentiary hearing. A couple of years before that, Mr. Prible's father, who had been a fixture at court hearings, died after an illness. These losses have strengthened Mr. Prible's feelings for, and his resolve to reunite with, his remaining relatives, including his daughters, mother, sister, aunt, and cousins. Mr. Prible maintains extensive and close ties to the community. To flee would mean abandoning his family; flight, therefore, contradicts a core reason underlying Mr. Prible's desire for liberty.

Mr. Prible's desire to see justice done provides additional assurance against flight. Throughout trial, appellate, and post-conviction proceedings, Mr. Prible has maintained his innocence and sought to clear his name. Having prevailed in the district court, Mr. Prible's interest lies in ultimate vindication by higher appellate courts rather than in absconding.

### 6. Mr. Prible is not a threat to the community.

Mr. Prible's criminal record consists of a series of non-violent bank robberies. He committed these crimes more than two decades ago, when he was 26 years old. While on death row, Mr. Prible has had few disciplinary violations.

Wherefore, Mr. Prible requests that his Motion for Release on Bond be granted.

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

By: /s/ *James Rytting*
Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
819 Lovett Boulevard
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112
james@hilderlaw.com

Gretchen N. Scardino
SCARDINO LLP
State Bar No. 24037170
501 Congress Ave., Suite 150
Austin, Texas 78701
Telephone: (512) 443-1667
Facsimile: (512) 487-7606
Gretchen@scardinollp.com

ATTORNEYS FOR PETITIONER

**CERTIFICATE OF CONFERENCE**

On the 31st day of July, 2020, I conferred with Respondent regarding this motion and Respondent is OPPOSED to it.

/s/ *James Rytting*
James Rytting

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of August, 2020, a true and correct copy of the above and foregoing instrument was served on all counsel of record via ECF, certified mail, return receipt requested, facsimile, electronically, or hand delivery.

/s/ *James Rytting*
James Rytting