# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Ronald Jeffrey Prible, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:09-cv-01896 |
| Lorie Davis, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
|     Respondent. | § | |

## DECLARATION OF LORIE DAVIS

Pursuant to 28 U.S.C. § 1746, I, Lorie Davis, declare as follows:

1. "My name is Lorie Davis.  I am over the age of 18 years, competent to make this declaration and have personal knowledge of the facts herein stated.

2. I am employed by the Texas Department of Criminal Justice (TDCJ) as the Director of the Correctional Institutions Division (CID).  I started as a correctional officer at the Ellis Unit in 1988 and worked my way up to the highest-ranking CID official. During this time, I have served as: (1) senior warden at eleven CID units, (2) the CID Region III Director, (3) Director of Correctional Training and Staff Development, (4) Deputy Director of CID Management Operations, and (5) Deputy Director of CID Support Operations.

3. Since the onset of the detection and spread of the COVID-19 virus in Texas in March 2020, I have been involved with others in TDCJ agency

leadership in helping to formulate and direct TDCJ's preparation and response to the impact of the virus on, among others, the offender population within the facilities operated within the CID. That involvement has included input into TDCJ's operational responses to the COVID-19 outbreak in Texas, both in terms of the formulation and implementation of TDCJ policies and protocols generally and specific involvement in working with CID staff including unit wardens with respect to that response. My involvement in that response process has continued to today.

4. In response to the detection and spread of the COVID-19 virus in Texas, TDCJ implemented operational changes that were set out in a new coronavirus policy, B-14.52, Coronavirus Disease 2019 (COVID-19) developed by the Correctional Managed Health Care Committee (CMHCC) as part of the CMHCC's Infection Control Manual. The CMHCC and its medical professionals develop the Infection Control Manual for use by TDCJ in its operations. The new policy was effective March 20, 2020. Upon the issuance of policy B-14.52 by CMHCC, TDCJ directed its unit personnel to put in place the operational requirements (including requirements for enhanced cleaning and sanitation protocols, signage, education, screening, use of personal protective equipment (PPE), and medical isolation or restriction for confirmed or potential exposures) set out in the policy for the units under their direct supervision, including the Polunsky Unit.

2

5. Following the issuance of policy B-14.52 by the CMHCC, the Center for Disease Control (CDC) issued guidance specifically directed to correctional institutions. The CDC guidance is dated March 23, 2020. A true and correct copy of that publicly available guidance reviewed by TDCJ management, including myself, is attached to this declaration as **Attachment 1**.

6. Following CDC's issuance of this guidance to correctional institutions regarding response to the COVID-19 outbreak, the CMHCC updated policy B-14.52, effective March 27, 2020. Upon the issuance of the updated policy B-14.52 by CMHCC, TDCJ directed its unit personnel to put in place the operational requirements set out in the policy (including requirements for enhanced cleaning and sanitation protocols, signage, education, screening, use of PPE, and medical isolation or restriction for confirmed or potential exposures) for the units under their direct supervision, including the Polunsky Unit.

7. CMHCC subsequently updated policy B-14.52 numerous times. These revisions went into effect April 2, 2020, April 15, 2020, May 6, 2020, May 13, 2020, June 11, 2020, and July 13, 2020. With each revision, TDCJ directed its unit personnel to put in place the operational requirements set out in the most recent version of the policy (including requirements for enhanced cleaning and sanitation protocols, signage, education, screening, use of PPE, and medical

3

isolation and restriction for confirmed or potential exposures) for the units under their direct supervision, including the Polunsky Unit.

8. In addition to directing CID unit personnel to implement the operational changes set out in policy B-14.52, TDCJ also took the following precautionary steps with respect to the operation of TDCJ units, even prior to the time CMHCC issued the initial version of policy B-14.52 and prior to the time that there was any indication of COVID-19 directly affecting TDCJ facilities or its employees:

- On or about, March 13, 2020, TDCJ management began maintaining regular communication with the CDC, the Texas Division of Emergency Management, the Texas Department of State Health Services, TDCJ's Health Services Division (which maintains contact with the Office of Professional Services), and its university healthcare providers to monitor developments associated with the spread of COVID-19. The university health care providers (UTMB and Texas Tech), administrative medical staff (regional and at unit level), and TDCJ Health Services Director also held daily conference calls.

- Effective March 16, 2020, TDCJ activated the Command Center located at the TDCJ Administrative Headquarters Building, 861-A IH 45-N, Huntsville. Currently, the location is staffed by various agency leaders Monday through Friday, 8:00 a.m.—5:00 p.m. TDCJ conducts briefing

4

conference calls with agency leadership Monday, Wednesday, and Friday. After the conference call, the TDCJ website is updated.

- TDCJ began providing COVID-19 specific updates on its website on March 11, 2020. The website can be accessed at https://www.tdcj.texas.gov/. TDCJ also implemented an Ombudsman Family Hotline for offender families and the public.

- Effective March 20, 2020, pursuant to the Governor's Executive Order, all offender medical copays have been waived and continue to be waived as of this date.

- With respect to travel, TDCJ management asked staff to limit any unnecessary domestic traveling, limited agency travel to travel that was a necessity, limited international travel, and instituted telework on a case-by-case basis.

- With respect to employees and illness, TDCJ management advised employees who felt ill or who were running a fever to stay at home, began implementing COVID-19 screenings for employees who felt ill at work and who worked in parts of the state in which the presence of the coronavirus had been confirmed, and required a physician's note stating that an employee who appeared to be ill was clear of any symptoms of COVID-19 as a condition of returning to work.

5

- Effective March 24, 2020, TDCJ minimized transfers between units based on agency needs and on a case by case basis. Currently, for all units on precautionary lockdown, there are no transfers in and out of the units, except where medically necessary or in an emergency. If a unit is not on precautionary lockdown, agency needed transfers have been authorized for offenders that were releasing (to be near home), for medical appointments, or necessary transfers due to classification. For transfers based upon agency needs, TDCJ implemented screening processes on every facility before the offender departed and upon arrival to the new unit which included temperature screening and interviews by staff regarding fever and other symptoms such as shortness of breath. The screening is conducted before the offender enters a vehicle and when they exit the vehicle upon arrival at the unit to which they transferred. Buses and vans are disinfected before and after each use.

- TDCJ has manufactured COVID-19 related signs, an offender pamphlet, and an offender pocket card. The informational pamphlet and pocket cards are distributed to offenders at the unit. In general, units post the signs in high traffic areas and other locations as determined by unit warden.

- With respect to visitation, TDCJ management first instituted screening procedures for offender visitation (as early as March 11, 2020) and later

6

(effective March 13, 2020) suspended all offender visitation in accordance with a declaration from the Governor of Texas and eliminated all other visitors to units to include volunteer assemblies, routine audits, vendors, outside contractors, tours, and training sessions.

- TDCJ inventoried its existing stock of PPE and began to acquire additional PPE for TDCJ units.

- TDCJ increased distribution of hand sanitizer for use by TDCJ employees at all TDCJ units and departments.

- TDCJ began manufacturing cloth masks, face shields, and plastic gowns as supplemental PPE (at TDCJ factories equipped to manufacture) such for use by TDCJ offenders and staff.  As of August 12, TDCJ has distributed 2,553 two-liter bottles, 6,996 one gallon jugs, and 433 pint bottles of hand sanitizer, 23,231,754 bars of soap, 781,489 cloth face masks, 59,572 face shields, and 399,269 plastic gowns in its facilities in response to the COVID-19 outbreak.

- TDCJ produces hand soap which is issued to offenders in all facilities. Staff and offenders are encouraged to follow CDC guidelines on frequent handwashing.  Each unit has been provided adequate supplies of hand soap for use by offenders and staff.

- As a general practice, TDCJ already had in place cleaning guidelines for its facilities and maintains a high standard of cleanliness. As part of its

7

implementation measures for COVID-19, TDCJ ordered enhanced cleaning and disinfection of its facilities. TDCJ facilities are following the COVID-19 policy to disinfect surfaces with bleach solution sprayed on and allowed to air dry for 10 minutes. The bleach solution is a mixture of powdered bleach manufactured by TDCJ that is mixed with water. TDCJ also manufactures and distributes "DD" cleaner which is equivalent to Pine Sol and "Bippy" which is equivalent to Comet. In addition, facilities have an adequate supply of laundry bleach which also is used in mixtures for disinfecting and as a multipurpose type product. Heightened disinfection of areas with a positive COVID-19 test also is required in each facility.  TDCJ has also acquired and distributed to certain units electrostatic sprayers to disperse vital oxide.

- In accordance with CDC guidelines, based on unit configuration, TDCJ has initiated social distancing measures as much as operationally possible in a correctional environment.  As stated in CDC guidelines, not all strategies will be feasible in all facilities.

9. In addition to taking the above steps and directing CID unit personnel to implement the operational changes set out in B-14.52 to respond to the COVID-19 outbreak in Texas, TDCJ has taken additional steps to address the onset of coronavirus cases affecting TDCJ offenders and staff, including the following:

- TDCJ distributed PPE and hand sanitizer to various units, including the Polunsky Unit.

- Effective April 8, 2020, TDCJ management directed that any TDCJ unit in which an offender resides or TDCJ employee works that experiences a positive COVID-19 test will be placed on precautionary medical lockdown. This precautionary lockdown limits the movement of offenders within the unit and facilitates observation measures to appropriately monitor suspected spreading of the virus and allows facility management to respond accordingly. Units remain on lockdown for the later of 14 days as of the time of lockdown or a period of 14 days after any additional positive cases are detected. During this time, only unit assigned correctional staff and employees are permitted access on the unit.

- Effective April 13, 2020, TDCJ halted all offender intake from county jails.

10.     As of August 13, 2020, the Polunsky Unit has eight active offender cases, all of whom are currently in medical isolation.  There are five active employee cases and an additional five employees who are symptomatic with pending test results.  There are 749 recovered offenders and 79 recovered employees.

11.     As soap and water are available on TDCJ units, hand sanitizer is not distributed to the offender population due to security concerns.  In

9

accordance with B-14.52, units are encouraging handwashing with soap and water for at least 20 seconds (suggested by CDC guidelines as well).  There is no mandate or requirement by CDC or TDCJ policy to provide the offender population access to hand sanitizer. CDC guidelines clearly outline that hand sanitizer should be distributed "if soap and water are not available," but this is not an issue for TDCJ. Unlimited soap and adequate water are available for proper handwashing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 13, 2020."

Lorie Davis

10

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of **March 23, 2020**.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the following CDC website periodically for updated interim guidance: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

## In this guidance

- Who is the intended audience for this guidance?
- Why is this guidance being issued?
- What topics does this guidance include?
- Definitions of Commonly Used Terms
- Facilities with Limited Onsite Healthcare Services
- COVID-19 Guidance for Correctional Facilities
- Operational Preparedness
- Prevention
- Management
- Infection Control
- Clinical Care of COVID-19 Cases
- Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons
- Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

## Who is the intended audience for this guidance?



This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.



CS 316182-A   03/27/2020

## Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. **At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**

## What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

√   Operational and communications preparations for COVID-19

√   Enhanced cleaning/disinfecting and hygiene practices

√   Social distancing strategies to increase space between individuals in the facility

√   How to limit transmission from visitors

√   Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

√   Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

√   Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited

√   Healthcare evaluation for suspected cases, including testing for COVID-19

√   Clinical care for confirmed and suspected cases

√   Considerations for persons at higher risk of severe disease from COVID-19

## Definitions of Commonly Used Terms

**Close contact of a COVID-19 case—**In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

**Cohorting—**Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19—**Community transmission of COVID-19 occurs when individuals acquire the disease through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing cases inside their walls. Facilities should consult with local public health departments if assistance is needed in determining how to define "local community" in the context of COVID-19 spread. However, because all states have reported cases, all facilities should be vigilant for introduction into their populations.

**Confirmed vs. Suspected COVID-19 case—**A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms. A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results. If test results are positive, a suspected case becomes a confirmed case.

**Incarcerated/detained persons—**For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting where these guidelines are generally applicable. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e, detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical Isolation—**Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials (detailed in guidance below). In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion.

**Quarantine—**Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility.

**Social Distancing—**Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication.

**Staff—**In this document, "staff" refers to all public sector employees as well as those working for a private contractor within a correctional facility (e.g., private healthcare or food service). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators.

**Symptoms—**Symptoms of COVID-19 include fever, cough, and shortness of breath. Like other respiratory infections, COVID-19 can vary in severity from mild to severe. When severe, pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood. Monitor the CDC website for updates on these topics.

## Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails usually employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of confirmed and suspected COVID-19 cases and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with confirmed and suspected COVID-19 cases. Facilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic.

## COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections can be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness**. This guidance is intended to help facilities prepare for potential COVID-19 transmission in the facility. Strategies focus on operational and communications planning and personnel practices.

- **Prevention.** This guidance is intended to help facilities prevent spread of COVID-19 from outside the facility to inside. Strategies focus on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals).

- **Management.** This guidance is intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission. Strategies include medical isolation and care of incarcerated/detained persons with symptoms (including considerations for cohorting), quarantine of cases' close contacts, restricting movement in and out of the facility, infection control practices for individuals interacting with cases and quarantined contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas visited by cases.

## Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

### Communication & Coordination

√ **Develop information-sharing systems with partners.**

- o Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before cases develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.

- o Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.

o Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.

o Where possible, put plans in place with other jurisdictions to prevent confirmed and suspected COVID-19 cases and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.

o Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.

√ **Review existing pandemic flu, all-hazards, and disaster plans, and revise for COVID-19.**

o Ensure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases. (Medical isolation and quarantine locations should be separate). The plan should include contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for details regarding individual medical isolation and quarantine locations (preferred) vs. cohorting.

o Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care.

o Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.

o Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the epidemiologic context changes.

√ **Coordinate with local law enforcement and court officials.**

o Identify lawful alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission.

o Explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak.

√ **Post signage throughout the facility communicating the following:**

o **For all:** symptoms of COVID-19 and hand hygiene instructions

o **For incarcerated/detained persons:** report symptoms to staff

o **For staff:** stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.

o Ensure that signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

## Personnel Practices

√ **Review the sick leave policies of each employer that operates in the facility.**

o Review policies to ensure that they actively encourage staff to stay home when sick.

o If these policies do not encourage staff to stay home when sick, discuss with the contract company.

o Determine which officials will have the authority to send symptomatic staff home.

√ **Identify staff whose duties would allow them to work from home. Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of COVID-19 transmission.**

   o Discuss work from home options with these staff and determine whether they have the supplies and technological equipment required to do so.

   o Put systems in place to implement work from home programs (e.g., time tracking, etc.).

√ **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.

   o Allow staff to work from home when possible, within the scope of their duties.

   o Identify critical job functions and plan for alternative coverage by cross-training staff where possible.

   o Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.

   o Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

√ **Consider offering revised duties to staff who are at** higher risk of severe illness with COVID-19**.** Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

   o Facility administrators should consult with their occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to COVID-19.

√ **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza cases in a facility can speed the detection of COVID-19 cases and reduce pressure on healthcare resources.

√ **Reference the Occupational Safety and Health Administration website for recommendations regarding worker health.**

√ **Review** CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer.

## Operations & Supplies

√ **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility.**

   o Standard medical supplies for daily clinic needs

   o Tissues

   o Liquid soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

   o Hand drying supplies

   o Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)

   o Cleaning supplies, including EPA-registered disinfectants effective against the virus that causes COVID-19

- o Recommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when face masks are acceptable alternatives to N95s.
- o Sterile viral transport media and sterile swabs to collect nasopharyngeal specimens if COVID-19 testing is indicated

√ **Make contingency plans for the probable event of PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**

- o See CDC guidance optimizing PPE supplies.

√ **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty.

√ **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)

- o Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

√ I**f not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit tested for any respiratory protection they will need within the scope of their responsibilities.**

√ **Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.** See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with COVID-19 cases or their close contacts.

## Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission.

## Operations

√ **Stay in communication with partners about your facility's current situation.**

- o State, local, territorial, and/or tribal health departments
- o Other correctional facilities

√ **Communicate with the public about any changes to facility operations, including visitation programs.**

√ **Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.**

    o Strongly consider postponing non-urgent outside medical visits.

    o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **Implement lawful alternatives to in-person court appearances where permissible.**

√ **Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for respiratory symptoms.**

√ **Limit the number of operational entrances and exits to the facility.**

## Cleaning and Disinfecting Practices

√ **Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced.**

√ **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.

    o Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

    o Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

    o Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

    o Labels contain instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use.

√ **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**

√ **Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.**

## Hygiene

√ **Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**

√ **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signage throughout the facility, and communicate this information verbally on a regular basis.** Sample signage and other communications materials **are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

  o **Practice good cough etiquette:** Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.

  o **Practice good hand hygiene:** Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

  o **Avoid touching your eyes, nose, or mouth without cleaning your hands first.**

  o **Avoid sharing eating utensils, dishes, and cups.**

  o **Avoid non-essential physical contact.**

√ **Provide incarcerated/detained persons and staff no-cost access to:**

  o **Soap—**Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing.

  o **Running water, and hand drying machines or disposable paper towels for hand washing**

  o **Tissues** and no-touch trash receptacles for disposal

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

√ **Communicate that sharing drugs and drug preparation equipment can spread COVID-19 due to potential contamination of shared items and close contact between individuals.**

## Prevention Practices for Incarcerated/Detained Persons

√ **Perform pre-intake screening and temperature checks for all new entrants. Screening should take place in the sallyport, before beginning the intake process,** in order to identify and immediately place individuals with symptoms under medical isolation. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

  o **If an individual has symptoms of COVID-19** (fever, cough, shortness of breath):

    ▪ Require the individual to wear a face mask.

    ▪ Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.

    ▪ Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)

    ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.

- o **If an individual is a close contact of a known COVID-19 case (but has no COVID-19 symptoms):**
  - Quarantine the individual and monitor for symptoms two times per day for 14 days. (See Quarantine section below.)
  - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.

√ **Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

- o **Common areas:**
  - Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)

- o **Recreation:**
  - Choose recreation spaces where individuals can spread out
  - Stagger time in recreation spaces
  - Restrict recreation space usage to a single housing unit per space (where feasible)

- o **Meals:**
  - Stagger meals
  - Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
  - Provide meals inside housing units or cells

- o **Group activities:**
  - Limit the size of group activities
  - Increase space between individuals during group activities
  - Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
  - Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out

- o **Housing:**
  - If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
  - Arrange bunks so that individuals sleep head to foot to increase the distance between them
  - Rearrange scheduled movements to minimize mixing of individuals from different housing areas

- o **Medical:**
  - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.
  - Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

√ **Communicate clearly and frequently with incarcerated/detained persons about changes to their daily routine and how they can contribute to risk reduction.**

√ **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**

√ **Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility.**

√ **Provide** up-to-date information about COVID-19 **to incarcerated/detained persons on a regular basis, including:**

   o Symptoms of COVID-19 and its health risks

   o Reminders to report COVID-19 symptoms to staff at the first sign of illness

√ **Consider having healthcare staff perform rounds on a regular basis to answer questions about COVID-19.**

## Prevention Practices for Staff

√ **Remind staff to stay at home if they are sick.** Ensure that staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

   o In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).

   o Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis, including:**

   o Symptoms of COVID-19 and its health risks

   o Employers' sick leave policy

   o **If staff develop a fever, cough, or shortness of breath while at work:** immediately put on a face mask, inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

   o **If staff test positive for COVID-19:** inform workplace and personal contacts immediately, and do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly.

   o **If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-quarantine at home for 14 days and return to work if symptoms do not develop. If symptoms do develop, follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **If a staff member has a confirmed COVID-19 infection, the relevant employers should inform other staff about their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act.**

   o Employees who are close contacts of the case should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

√ **When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.**

√ **Ask staff to keep interactions with individuals with respiratory symptoms as brief as possible.**

## Prevention Practices for Visitors

√ **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

 o Staff performing temperature checks should wear recommended PPE.

 o Exclude visitors and volunteers who do not clear the screening process or who decline screening.

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.**

√ **Provide visitors and volunteers with information to prepare them for screening.**

 o Instruct visitors to postpone their visit if they have symptoms of respiratory illness.

 o If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

 o Display signage outside visiting areas explaining the COVID-19 screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

√ **Promote non-contact visits:**

 o Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors.

 o Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.

 o Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

√ **Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.**

 o If moving to virtual visitation, clean electronic surfaces regularly. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)

 o Inform potential visitors of changes to, or suspension of, visitation programs.

 o Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).

 o If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation would be done in the interest of incarcerated/detained persons' physical health and the health of the general public. However, visitation is important to maintain mental health.

If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them. See above suggestions for promoting non-contact visits.

√   **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

## Management

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

### Operations

√   **Implement alternate work arrangements deemed feasible in the** Operational Preparedness **section.**

√   **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.**

   o   If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to appropriately isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√   **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case).** Subsequently in this document, this practice is referred to as **routine intake quarantine**.

√   **When possible, arrange lawful alternatives to in-person court appearances.**

√   **Incorporate screening for COVID-19 symptoms and a temperature check into release planning.**

   o   Screen all releasing individuals for COVID-19 symptoms and perform a temperature check. (See Screening section below.)

      ▪   If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

      ▪   If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

      ▪   Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

√ **Coordinate with state, local, tribal, and/or territorial health departments.**

- o When a COVID-19 case is suspected, work with public health to determine action. See Medical Isolation section below.

- o When a COVID-19 case is suspected or confirmed, work with public health to identify close contacts who should be placed under quarantine. See Quarantine section below.

- o Facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See Facilities with Limited Onsite Healthcare Services section.

## Hygiene

√ **Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility.** (See above.)

√ **Continue to emphasize practicing good hand hygiene and cough etiquette.** (See above.)

## Cleaning and Disinfecting Practices

√ **Continue adhering to recommended cleaning and disinfection procedures for the facility at large.** (See above.)

√ **Reference specific cleaning and disinfection procedures for areas where a COVID-19 case has spent time (below).**

## Medical Isolation of Confirmed or Suspected COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities with Limited Onsite Healthcare Services, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that COVID-19 cases will be appropriately isolated, evaluated, tested (if indicated), and given care.**

√ **As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.**

√ **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

- o Provide medical care to cases inside the medical isolation space. See Infection Control and Clinical Care sections for additional details.

- o Serve meals to cases inside the medical isolation space.

- o Exclude the individual from all group activities.

- o Assign the isolated individual a dedicated bathroom when possible.

√ **Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters.** Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

√ **Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.** Cohorting should only be practiced if there are no other available options.

- o  If cohorting is necessary:
  - ▪ **Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.**
  - ▪ Unless no other options exist, do not house COVID-19 cases with individuals who have an undiagnosed respiratory infection.
  - ▪ Ensure that cohorted cases wear face masks at all times.

√  **In order of preference, individuals under medical isolation should be housed:**

- o  Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
- o  Separately, in single cells with solid walls but without solid doors
- o  As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.
- o  As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.
- o  As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
- o  As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.
- o  Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above arrangements
  (NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative.

√  **If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)

- o  Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.
- o  Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.

√  **Custody staff should be designated to monitor these individuals exclusively where possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility to the extent possible.

√  **Minimize transfer of COVID-19 cases between spaces within the healthcare unit.**

√ **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- o **Cover** their mouth and nose with a tissue when they cough or sneeze

- o **Dispose** of used tissues immediately in the lined trash receptacle

- o **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

√ **Maintain medical isolation until all the following criteria have been met. Monitor the CDC website for updates to these criteria.**

**For individuals who will be tested to determine if they are still contagious:**

- ■ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ■ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ■ The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart

**For individuals who will NOT be tested to determine if they are still contagious:**

- ■ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ■ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ■ At least 7 days have passed since the first symptoms appeared

**For individuals who had a confirmed positive COVID-19 test but never showed symptoms:**

- o At least 7 days have passed since the date of the individual's first positive COVID-19 test **AND**

- o The individual has had no subsequent illness

√ **Restrict cases from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.**

- o If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning.

## Cleaning Spaces where COVID-19 Cases Spent Time

**Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note—these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.**

- o Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.

- o Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).

√ **Hard (non-porous) surface cleaning and disinfection**

 o If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

 o For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.

  ▪ Consult a list of products that are EPA-approved for use against the virus that causes COVID-19. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

  ▪ Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:

   - 5 tablespoons (1/3rd cup) bleach per gallon of water or

   - 4 teaspoons bleach per quart of water

√ **Soft (porous) surface cleaning and disinfection**

 o For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

  ▪ If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

  ▪ Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and are suitable for porous surfaces.

√ **Electronics cleaning and disinfection**

 o For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.

  ▪ Follow the manufacturer's instructions for all cleaning and disinfection products.

  ▪ Consider use of wipeable covers for electronics.

  ▪ If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

√ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

√ **Food service items.** Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ Laundry from a COVID-19 cases **can be washed with other individuals' laundry.**

 o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.

 o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

 o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

   o  Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

√  **Consult** cleaning recommendations above **to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.**

## Quarantining Close Contacts of COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective quarantine, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored.**

√  **Incarcerated/detained persons who are close contacts of a** confirmed or suspected COVID-19 case **(whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (see CDC guidelines).**

   o  If an individual is quarantined due to contact with a suspected case who is subsequently tested for COVID-19 and receives a negative result, the quarantined individual should be released from quarantine restrictions.

√  **In the context of COVID-19, an individual (incarcerated/detained person or staff) is considered a close contact if they:**

   o  Have been within approximately 6 feet of a COVID-19 case for a prolonged period of time OR

   o  Have had direct contact with infectious secretions of a COVID-19 case (e.g., have been coughed on)

Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

√  **Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.**

   o  Provide medical evaluation and care inside or near the quarantine space when possible.

   o  Serve meals inside the quarantine space.

   o  Exclude the quarantined individual from all group activities.

   o  Assign the quarantined individual a dedicated bathroom when possible.

√  **Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually.** Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

   o  If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 should be placed under medical isolation immediately.

   o  If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.

   o  Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to a COVID-19 case). Under this scenario, avoid mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine.

o If at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.

√ **If the number of quarantined individuals exceeds the number of individual quarantine spaces available in the facility, be especially mindful of those who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)

√ **In order of preference, multiple quarantined individuals should be housed:**

o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

o Separately, in single cells with solid walls but without solid doors

o As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions

o As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door

o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.

o As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.

o Safely transfer to another facility with capacity to quarantine in one of the above arrangements

(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

√ **Quarantined individuals should wear face masks if feasible based on local supply, as source control, under the following circumstances** (see PPE section and Table 1):

o If cohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals).

o If quarantined separately, individuals should wear face masks whenever a non-quarantined individual enters the quarantine space.

o All quarantined individuals should wear a face mask if they must leave the quarantine space for any reason.

o Asymptomatic individuals under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear face masks.

√ **Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties** (see PPE section and Table 1).

o Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear PPE.

√ **Quarantined individuals should be monitored for COVID-19 symptoms twice per day, including temperature checks.**

  o If an individual develops symptoms, they should be moved to medical isolation immediately and further evaluated. (See Medical Isolation section above.)

  o See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of COVID-19 cases.

√ **If an individual who is part of a quarantined cohort becomes symptomatic:**

  o **If the individual is tested for COVID-19 and tests positive:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

  o **If the individual is tested for COVID-19 and tests negative:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period.

  o **If the individual is not tested for COVID-19:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

√ **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

√ **Quarantined individuals can be released from quarantine restrictions if they have not developed symptoms during the 14-day quarantine period.**

√ **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ **Laundry from quarantined individuals can be washed with other individuals' laundry.**

  o Individuals handling laundry from quarantined persons should wear disposable gloves, discard after each use, and clean their hands after.

  o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

  o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

  o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

## Management of Incarcerated/Detained Persons with COVID-19 Symptoms

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that suspected COVID-19 cases will be effectively isolated, evaluated, tested (if indicated), and given care.**

√ **If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.**

√ **Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask and should be placed under medical isolation immediately. Discontinue the use of a face mask if it inhibits breathing. See Medical Isolation section above.**

√ **Medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated.** Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well.

√ **If testing is indicated (or if medical staff need clarification on when testing is indicated), contact the state, local, tribal, and/or territorial health department. Work with public health or private labs as available to access testing supplies or services.**

   o If the COVID-19 test is positive, continue medical isolation. (See Medical Isolation section above.)

   o If the COVID-19 test is negative, return the individual to their prior housing assignment unless they require further medical assessment or care.

## Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

√ **Provide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.**

   o Consider having healthcare staff perform regular rounds to answer questions about COVID-19.

   o Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

√ **Implement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms.** See Screening section for a procedure to safely perform a temperature check.

√ **Consider additional options to intensify social distancing within the facility.**

## Management Strategies for Staff

√ **Provide clear information to staff about the presence of COVID-19 cases within the facility, and the need to enforce social distancing and encourage hygiene precautions.**

   o Consider having healthcare staff perform regular rounds to answer questions about COVID-19 from staff.

√ **Staff identified as close contacts of a COVID-19 case should self-quarantine at home for 14 days and may return to work if symptoms do not develop.**

   o See above for definition of a close contact.

   o Refer to CDC guidelines for further recommendations regarding home quarantine for staff.

## Infection Control

Infection control guidance below is applicable to all types of correctional facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with confirmed or suspected COVID-19 cases.

√ **All individuals who have the potential for direct or indirect exposure to COVID-19 cases or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.**

- o Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.

- o Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

√ **Staff should exercise caution when in contact with individuals showing symptoms of a respiratory infection.** Contact should be minimized to the extent possible until the infected individual is wearing a face mask. If COVID-19 is suspected, staff should wear recommended PPE (see PPE section).

√ **Refer to PPE section to determine recommended PPE for individuals persons in contact with confirmed COVID-19 cases, contacts, and potentially contaminated items.**

## Clinical Care of COVID-19 Cases

√ **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**

- o If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

- o The initial medical evaluation should determine whether a symptomatic individual is at higher risk for severe illness from COVID-19. Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

√ **Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.**

√ **Healthcare staff should evaluate persons with respiratory symptoms or contact with a COVID-19 case in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the suspected case is wearing a face mask.**

- o If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.

√ **Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).**

√ **The facility should have a plan in place to safely transfer persons with severe illness from COVID-19 to a local hospital if they require care beyond what the facility is able to provide.**

√ **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible.**

## Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

√ **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases.**

- o Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95s) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program.
- o For PPE training materials and posters, please visit the CDC website on Protecting Healthcare Personnel.

√ **Ensure that all staff are trained to perform hand hygiene after removing PPE.**

√ **If administrators anticipate that incarcerated/detained persons will request unnecessary PPE, consider providing training on the different types of PPE that are needed for differing degrees of contact with COVID-19 cases and contacts, and the reasons for those differences (**see Table 1). **Monitor linked CDC guidelines in Table 1 for updates to recommended PPE.**

√ **Keep recommended PPE near the spaces in the facility where it could be needed, to facilitate quick access in an emergency.**

√ **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they have with COVID-19 cases and their contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**

- o **N95 respirator**

See below for guidance on when face masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols from a COVID-19 case.

- o **Face mask**
- o **Eye protection—**goggles or disposable face shield that fully covers the front and sides of the face
- o **A single pair of disposable patient examination gloves**

Gloves should be changed if they become torn or heavily contaminated.

- o **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - ▪ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with the individual. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - ▪ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, care activities where splashes and sprays are anticipated, and high-contact patient care activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

√ **Note that shortages of all PPE categories are anticipated during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category can be found on CDC's website:**

- o **Guidance in the event of a shortage of N95 respirators**
  - ▪ Based on local and regional situational analysis of PPE supplies, **face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
- o **Guidance in the event of a shortage of face masks**
- o **Guidance in the event of a shortage of eye protection**
- o **Guidance in the event of a shortage of gowns/coveralls**

**Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response**

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19 | – | ✓ | – | – | – |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | – | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | – |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | – | ✓ | ✓ | ✓ | ✓ |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | ✓** | | ✓ | ✓ | ✓ |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | ✓ | – | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |

\*   If a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating into the facility's general population, face masks are not necessary.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

√ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

- o *Today or in the past 24 hours, have you had any of the following symptoms?*
    - ▪ *Fever, felt feverish, or had chills?*
    - ▪ *Cough?*
    - ▪ *Difficulty breathing?*
- o *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*

√ **The following is a protocol to safely check an individual's temperature:**

- o Perform hand hygiene
- o Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
- o Check individual's temperature
- o **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned routinely as recommended by CDC for infection control.
- o Remove and discard PPE
- o Perform hand hygiene